Exhibit C

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE No. 22-14102-CV-MIDDLEBROOKS

DONALD J. TRUMP,

      Plaintiff,

v.

HILLARY R. CLINTON, et al.,

      Defendants.

_____/

## <u>ORDER ON SANCTIONS</u>

This case should never have been brought. Its inadequacy as a legal claim was evident from the start. No reasonable lawyer would have filed it. Intended for a political purpose, none of the counts of the amended complaint stated a cognizable legal claim.

Thirty-one individuals and entities were needlessly harmed in order to dishonestly advance a political narrative. A continuing pattern of misuse of the courts by Mr. Trump and his lawyers undermines the rule of law, portrays judges as partisans, and diverts resources from those who have suffered actual legal harm.

I previously granted Defendant Charles Dolan's motion for sanctions, brought pursuant to Federal Rule of Civil Procedure 11. (DE 284). Now before me is a motion seeking sanctions brought by eighteen other Defendants. Upon consideration of the Motion (DE 280), Response (DE 285) and Reply (DE 287), for the reasons that follow and also for those stated in my previous Order, sanctions are awarded.

## I.    BACKGROUND

Plaintiff initiated this lawsuit on March 24, 2022, alleging that "the Defendants, blinded by political ambition, orchestrated a malicious conspiracy to disseminate patently false and injurious

information about Donald J. Trump and his campaign, all in the hope of destroying his life, his political career, and rigging the 2016 Presidential Election in favor of Hillary Clinton." (DE 1 ¶ 9).

The next day, Alina Habba, Mr. Trump's lead counsel told Fox News' Sean Hannity:

> You can't make this up.  You literally cannot make a story like this up . . . and President Trump is just not going to take it anymore.  If you are going to make up lies, if you are going to try to take him down, he is going to fight you back.  And that is what this is, this is the beginning of all that.[1]

She then explained on Newsmax:

> What the real goal [of the suit] is, is democracy, is continuing to make sure that our elections, continuing to make sure our justice system is not obstructed by political enemies.  That cannot happen.  And that's exactly what happened.  They obstructed justice.  They continued the false narrative . . . This grand scheme, that you could not make up, to take down an opponent.  That is un-American.[2]

On April 20, 2022, less than a month after the Complaint was filed, Hillary Clinton moved for dismissal with prejudice.  Her motion identified substantial and fundamental factual and legal flaws.  Each of the other Defendants followed suit, pointing to specific problems with the claims against them.  The problems in the Complaint were obvious from the start.  They were identified by the Defendants not once but twice, and Mr. Trump persisted anyway.

Despite this briefing and the promise "to cure any deficiencies," Plaintiff's counsel filed the Amended Complaint on June 21, 2022.  (DE 177).  The Amended Complaint failed to cure any of the defects.  *See* DE 267, Order of Dismissal (September 8, 2022).  Instead, Plaintiff added eighty new pages of largely irrelevant allegations that did nothing to salvage the legal sufficiency

---

[1] Fox News, *Trump Sues Clinton, Steele for 'False Narrative' About Russian Collusion* (March 25, 2022), https://www.foxnews.com/video/6301845469001.

[2] Newsmax, *Trump Suing Hillary Clinton Over Russia Hoax*, Habba Madaio & Associates LLP – News (March 31, 2022), https://habbalaw.com/news/trump-suing-hillary-clinton-over-russia-hoax.

of his claims.  (DE 267 at 64).  The Amended Complaint is 193 pages in length, with 819 numbered

paragraphs, and contains 14 counts, names 31 defendants, 10 John Does described as fictitious and

unknown persons, and 10 ABC Corporations identified as fictitious and unknown entities.

On July 14, 2022, the United States moved pursuant to the Westfall Act, 28 U.S.C. § 2679

(d)(i), to substitute itself as Defendant for James Comey, Andrew McCabe, Peter Strzok, Lisa

Page, and Kevin Clinesmith.  (DE 224).  On July 21, 2022, I granted the motion to substitute.  (DE

234).

On September 8, 2022, I dismissed the case with prejudice as to all Defendants except for

the United States.[3]  I issued a detailed and lengthy Order, which I incorporate by reference here.

(DE 267).  I found that fatal substantive defects which had been clearly laid out in the first round

of briefing, precluded the Plaintiff from proceeding under any of the theories presented.  I found

that the Amended Complaint was a quintessential shotgun pleading, that its claims were foreclosed

by existing precedent, and its factual allegations were undermined and contradicted by the public

reports and filings upon which it purported to rely.  I reserved jurisdiction to adjudicate issues

pertaining to sanctions.

Undeterred by my Order and two rounds of briefing by multiple defendants, Ms. Habba

continued to advance Plaintiff's claims.  In a September 10, 2022, interview with Sean Hannity,

the host asked her "Why isn't [Hillary Clinton] being held accountable for what she did?"  Ms.

Habba's response reiterated misrepresentations on which this lawsuit was based:

> Because when you have a Clinton judge as we did here, Judge
> Middlebrooks who I had asked to recuse himself but insisted that he
> didn't need to, he was going to be impartial, and then proceeds to
> write a 65-page scathing order where he basically ignored every
> factual basis which was backed up by indictments, by investigations,

---

[3] The United States' Motion to Dismiss under Federal Rule 12(b)(i) was granted and the Amended
Complaint as to it was dismissed without prejudice.

the Mueller report, et cetera, et cetera, et cetera, not to mention Durham, and all the testimony we heard there, we get dismissed. Not only do we get dismissed, he says that this is not the proper place for recourse for Donald Trump. He has no legal ramifications. Where what [sic] is the proper place for him? Because the FBI won't help when you can do anything, obstruct justice, blatantly lie to the FBI, Sussmann's out, he gets acquitted, where do you go? That's the concern for me, where do you get that -- that recourse?[4]

She also indicated that, while Mr. Trump doubted the suit would succeed, she nevertheless "fought" to pursue it:

You know, I have to share with you a story, Sean, that I have not shared with anybody. The recourse that I have at this point is obviously to appeal this to the 11th Circuit as Gregg said. But when I brought this case and we were assigned you know, this judge and we went through the recusal process, we lost five magistrates, including Reinhart [sic] who's dealing with the boxes as we know. The former president looked at me and he told me, you know what Alina. You're not going to win. You can't win, just get rid of it, don't do the case. And I said, no, we have to fight. It's not right what happened. And you know, he was right, and it's a sad day for me personally because I fought him on [it] and I should have listened, but I don't want to lose hope in our system. I don't. So, you know I'm deciding whether we're going to appeal it.[5]

Defendants now move to recover attorneys' fees and costs under Fed. R. Civ. P. 11, 28 U.S.C. § 1927, the Defend Trade Secrets Act, and/or this Court's inherent power. (DE 280 at 1). In Part II, I find that a sanction under this Court's inherent power is appropriate. I do so by examining Plaintiff's (and his lawyers') conduct throughout this litigation. In Part III, I look to Plaintiff's conduct in other cases. And in Part IV, I determine the reasonableness of Defendants' attorneys' fees and costs.

---

[4] Transcript from FOX: Hannity WLNR 28709447, Sept. 10, 2022.

[5] *Id*.

## II.     ANALYSIS OF LITIGATION CONDUCT IN THIS CASE

"'[T]ampering with the administration of justice . . . involves far more than an injury to a single litigant.  It is a wrong against the institutions set up to protect and safeguard the public.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (citation omitted).  A court's inherent power includes the ability to assess attorneys' fees and costs against the client, the attorney or both when either has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  *Id.* at 45-46.

The "inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct."  *Chambers*, 501 U.S. at 46.  "[I]f in the informed discretion of the Court, neither the statute nor the Rules are up to the task," the Court may safely rely on its inherent power "to sanction bad faith conduct in the course of litigation."  *Id.* at 50; *see also Peer v. Lewis*, 606 F.3d 1306, 1314 (11th Cir 2010).

"The key to unlocking a court's inherent power is a finding of bad faith."  *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) (citations omitted).

"The inherent-powers standard is a subjective bad faith standard."  *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017).  However, absent direct evidence of subjective bad faith, this standard can also be met if an attorney's conduct is "tantamount to bad faith," meaning the "attorney's conduct is so egregious that it could only be committed in bad faith."  *Id.* at 1224–25 (citing *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767 (1980)).  An attorney's conduct is "tantamount to bad faith" if he "recklessly raises a frivolous argument."  *Id.* at 1225 (quoting *Barnes*, 158 F.3d at 1214).  "Recklessness alone does not satisfy the inherent powers standard," but "recklessness plus a frivolous argument suffice."  *Id.*

The inherent power "is both broader and narrower than other means of imposing sanctions."  *Peer*, 606 F.3d at 1314 (quoting *Chambers*, 501 U.S. at 46).  It is broader in the sense

that while other sanction mechanisms only reach certain individuals or conduct, the inherent power extends to the full range of litigation abuses. *Id.*

In my informed discretion, I find that Rule 11, 28 U.S.C. § 1927, and the Defend Trade Secrets Act are not "up to the task" of confronting the litigation abuse involved here. Rule 11 is backward looking, limited to pleading and motion abuse, and experience has shown it to be ineffective at deterrence. *See* Fed. R. Civ. P. 11, Advisory Committee Notes. Section 1927 "only applies to unnecessary filings after the lawsuit has begun." *Macort v. Prem Inc.*, 208 F. App'x 781, 786 (11th Cir. 2006). And the Defend Trade Secrets Act may only provide limited relief. The purpose of the inherent power to sanction a party is to vindicate judicial authority without resorting to contempt of court and to make the non-violating party whole. *See Chambers*, 501 U.S. at 45-46; *see also Purchasing Power, LLC*, 851 F.3d at 1223.

Here, we are confronted with a lawsuit that should never have been filed, which was completely frivolous, both factually and legally, and which was brought in bad faith for an improper purpose. Mr. Trump is a prolific and sophisticated litigant who is repeatedly using the courts to seek revenge on political adversaries. He is the mastermind of strategic abuse of the judicial process, and he cannot be seen as a litigant blindly following the advice of a lawyer. He knew full well the impact of his actions. *See Byrne*, 261 F.3d at 1121. As such, I find that sanctions should be imposed upon Mr. Trump and his lead counsel, Ms. Habba.

## A. **The Case Was Initiated By A Shotgun Pleading Designed To Serve A Political Purpose.**

The deliberate use of a shotgun pleading is an abusive litigation tactic which amounts to obstruction of justice. *See Davis v. Coca Cola Bottling Co. Consol.*, 516 F.3d 955, 982 n.66 (11th Cir. 2008), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). This case involved three categories of shotgun pleadings condemned by the Eleventh Circuit: (1) a

6

complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint; (2) a complaint that is replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action; and (3) a complaint that asserts multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against. *See Barmapov v. Amulal*, 986 F.3d 1321, 1324 (11th Cir. 2021); *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015).

I find that the pleadings here were abusive litigation tactics. The Complaint and Amended Complaint were drafted to advance a political narrative; not to address legal harm caused by any Defendant.

The 819 paragraphs of the 186-page Amended Complaint are filled with immaterial, conclusory facts not connected to any particular cause of action. Consider the incendiary charge that Mr. Comey, the Director of the FBI, conspired with Ms. Clinton to maliciously prosecute him. Leaving aside the fact that Mr. Trump was never prosecuted, examine the allegations in the Amended Complaint pertaining to Mr. Comey. The first mention of Mr. Comey, other than identifying him as a party, was in paragraph 349: "Therefore, senior FBI officials Comey, McCabe, Page, Strzok, the DNC and Clinton orchestrated a plan to falsely accuse Flynn of colluding with Russia to protect the potential dissemination of the intimate details of their plot." The next few paragraphs pertain to the FBI's investigation of Michael Flynn, Mr. Trump's former security advisor, who was subsequently fired for lying to the Vice President and the FBI. (¶ 383). The Amended Complaint alleges that Mr. Comey "scrambled to reopen" the investigation into Mr. Flynn (¶ 356), met with Mr. McCabe to discuss the investigation (¶ 359), and decided not to notify

the incoming Trump administration of the investigation of Flynn (¶¶ 360-63).  Next, the Amended

Complaint cites a letter from the Director of National Intelligence, John Ratcliff, to Senator

Lindsey Graham:

> Ratcliff's letter stated that Clinton and her campaign conceived the
> false Russia collision [sic] story to protect Clinton's presidential bid,
> which was at the time, in trouble because of revelations about her
> illegally using a private email server to handle classified
> information.  Ratcliff confirmed in the letter that Obama, Comey
> and Strzok knew about it.

(Amended Complaint at ¶ 369).[6]

The Amended Complaint continues with allegations about a meeting between Mr. Comey,

President Obama, Vice President Biden, and Sally Yates (then a national security advisor) where

President Obama directed Mr. Comey to investigate Mr. Flynn and not inform Mr. Trump.  (*Id.* ¶¶

372-377).  The Amended Complaint alleges that Mr. Flynn was interviewed by the FBI, and that

subsequently Acting Attorney General Yates informed Mr. Trump's White House Counsel Don

McGahn that Mr. Flynn misled Vice President Pence and other administration officials about the

nature of his conversations with the Russian Ambassador.  (*Id.* ¶ 379).  The Amended Complaint

then concludes: "Ultimately, the Defendants, including Comey, McCabe, Strzok, and Page, were

successful in causing Flynn to be ousted as National Security Advisor."  (*Id.* ¶ 384).

The Amended Complaint then turns to the FBI's Crossfire Hurricane investigation and four

---

[6] This provocative allegation stirred my curiosity, so I looked up the Ratcliff letter.  The allegation
in the Amended Complaint fails to mention that the information came from a Russian intelligence
analysis and that Mr. Ratcliffe commented: "The IC (intelligence community) does not know the
accuracy of this allegation or the extent to which the Russian intelligence analysis may reflect
exaggeration or fabrication."  Letter from John Ratcliff, Dir. of Nat'l Intel., to Sen. Lindsey
Graham,         U.S.         Senate         (Sept.         29,         2020)
https://www.judiciary.senate.gov/press/rep/releases/chairman-graham-releases-information-
from-dni-ratcliffe-on-fbis-handling-of-crossfire-hurricane.   Mr. Trump's lawyers saw no
professional impediment or irony in relying upon Russian intelligence as the good faith basis for
their allegation.

court-approved FISA applications targeting Carter Page.   (*Id.* ¶¶ 385-90).   The Amended Complaint alleges:

> The FISA applications were reviewed by numerous FBI agents, FBI attorneys, and National Security Division (NSD) attorneys and, as required by law, was ultimately certified by the FBI Director James Comey and approved by then Deputy Attorney General Sally Yates.

(*Id.* ¶ 391).

From there, the Amended Complaint states: "In fact, no probable cause existed and there was no truth to any of the allegations against Carter Page, Donald J. Trump, or the Trump campaign." (*Id.* ¶ 392).

The Amended Complaint then discusses the FISA warrant application and Mr. Comey's approval of those warrants and alleges: "Mr. Comey was aware, or should have been aware, that there was no evidentiary basis for the FISA application, and that the Steele Dossier was not a credible source." (*Id.* ¶¶ 292-407).

The next mention of Mr. Comey states that on May 8, 2017, he was fired from his position as Director of the FBI.  The Amended Complaint then alleges that Mr. Comey "had documented several of his interactions with Mr. Trump in a series of memos," and that after leaving the FBI, Mr. Comey shared those memos with a friend who he directed to leak to a New York Times reporter.  (*Id.* ¶¶ 449-52).

The Amended Complaint continues:

> 453.    The outcome that Comey desired – per his own admission to Congress – was to "prompt" the appointment of a special counsel to investigate Donald J. Trump's alleged conspiracy with the Russian government.
>
> 454.    The IG's report noted that Comey had "set a dangerous example" by "releas[ing] sensitive information" to "create public pressure for official action."

455.    Comey was successful in getting the special master [sic] appointed, due to his unlawful leaking of information, even though Comey didn't have enough evidence to pursue it in his own official capacity.

456.    In May 2017, Robert Mueller was appointed as Special Counsel to "oversee the previously-confirmed FBI investigation of Russian government efforts to influence the 2016 Presidential Election and related matters."[7]

This is what the Plaintiff's lawyers considered to be the short and plain statement of the claim that Mr. Comey maliciously prosecuted Mr. Trump and conspired with Ms. Clinton to do so.  These allegations, about investigating Mr. Flynn, signing FISA warrant applications pertaining to Mr. Page, or leaking information about his interactions with Mr. Trump, do not allege that Mr. Comey initiated an investigation of Mr. Trump, much less a prosecution.  And the implausible claim that Mr. Comey conspired with Ms. Clinton, given the impact of his announcements on her 2016 campaign, not only lacks substance but is categorically absurd.

The Amended Complaint is a hodgepodge of disconnected, often immaterial events, followed by an implausible conclusion.  This is a deliberate attempt to harass; to tell a story without regard to facts.

In order to understand the scope of this abuse, multiply the above discussion by thirty-one defendants and their lawyers, forced to try to analyze and defend against the sprawling Complaints.

_____

[7] In a footnote to paragraph 456, the Amended Complaint cites to the Justice Department announcement of the appointment of the Special Counsel. That statement by Deputy Attorney Rosenstein, also sued by Mr. Trump, reads in part as follows: "'My decision is not a finding that crimes have been committed or that any prosecution is warranted. I have made no such determination. What I have determined is that based upon the unique circumstances, the public interest requires me to place this investigation under the authority of a person who exercises a degree of independence from the normal chain of command.'" *See* Press Release, Office of Public Affairs, Appointment of Special Counsel, U.S. Dep't of Just., (May 17, 2017) https://www.justice.gov/opa/pr/appointment-special-counsel.

I sifted through the thread of allegations against each defendant only to find they added up to no cognizable claim. And the pleadings were drafted in a way to disguise that fact.

In three instances the Eleventh Circuit has found shotgun pleadings, less problematic than the pleadings here, as a basis for sanctions. *See Jackson v. bank of Am., N.A.,* 898 F.3d 1348 (11th Cir. 2018); *Byrne v. Nezhat,* 261 F.3d 1075 (11th Cir. 2001); *Pelleteir v. Zweifel,* 921 F.2d 1465 (11th Cir. 1991).

In *Jackson,* the court described the case as an "abuse of process" effectuated "by filing a multi-count, incomprehensible complaint that flouted the Federal Rules of Civil Procedure and this Circuit's well-established precedent." *Jackson*, 898 F.3d at 1348. "By attempting to prosecute an incomprehensible pleading to judgment, the Plaintiffs obstructed the due administration of justice in the District Court." *Id.*

The facts in *Jackson* are similar, although less egregious than here. The complaint in *Jackson* alleged fourteen causes of action and contained 109 paragraphs of allegations and each of the claims incorporated all previous allegations. The Defendants filed a motion for more definite statement identifying the complaint as a shotgun pleading. The Plaintiff did not oppose the motion but sought leave to file an amended complaint. The amended complaint "swelled to twenty-three pages and 123 paragraphs, made minor changes to a number of factual allegations, added two new counts, and listed one or more Defendants in parentheses under the heading of each count . . . . " *Id.* at 1348. The Court of Appeals stated: "[h]ere, after being put on notice by Defendants of the specific defects in their complaint, the Jacksons filed an amended complaint afflicted with the same defects . . . . " *Id.* Stating that "[t]olerating such behavior constitutes toleration of obstruction of justice," the Court affirmed the trial judge's order dismissing the amended complaint and instructed plaintiff's counsel to show cause why he should not be ordered to pay double costs and

expenses, including attorney's fees and costs incurred in defending the appeal pursuant to Rule 38 of the Federal Rules of Appellate Procedure. *Id.* at 1357-59. The Court pointed out that the defendants had identified the deficiency and the Eleventh Circuit's precedent in their motion. "If [plaintiffs' counsel] was not aware of the precedent when he filed the [plaintiffs'] initial complaint, Defendants' motion told him all he needed to know." *Id.* at 1359. Nevertheless "he stood fast, brazenly filing a facsimile of his initial pleading." *Id.*

Similarly here, Defendant Neustar identified the shotgun pleading deficiency and the Eleventh Circuit's precedent as one of its grounds for dismissal of Mr. Trump's initial Complaint. (DE 160 at 7-8, n.8). The Defendants' joint Motion to Dismiss the Amended Complaint did likewise. (DE 226 at 46-47). The Plaintiff refused to acknowledge this clear precedent. Instead, he added 80 new pages, and new defendants (including his former Deputy Attorney General and a California Congressman) in order to rehash old grievances from the 2016 election.

The other two Eleventh Circuit opinions analyze the use of shotgun pleadings to support a frivolous RICO claim. In both, the Court found the tactic deserving of sanctions. In *Pelletier*, the Court of Appeals reversed the denial of a Rule 11 sanctions motion in a civil RICO case. *Pelletier*, 921 F.2d at 1465.[8] Analyzing in detail the amended complaint in that case, the Court of Appeals concluded that the plaintiff failed to establish any of the required predicate acts, to show any continuing relationship or pattern of acts, or any injury flowing from those acts. *Id.* at 1496-1500.

---

[8] *Pelletier* and *Byrne* were abrogated on other grounds by *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008) (holding "plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations."). I do not rely on *Pelletier* and *Byrne* as they relate to mail fraud. *See Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1358, 1360 (11th Cir. 2018) (citing *Pelletier* and *Byrne* as good law for purposes of sanctions resulting from improper pleading). A more detailed analysis of why Mr. Trump lacked standing to bring his RICO claim is set forth in my Order granting Defendants' Motion to Dismiss. (DE 267 at 42-43).

Concluding that each of the counts in the amended complaint were objectively frivolous when filed, the Court of Appeals found it apparent that the case was brought to harass the defendants:

> Our conclusion is buttressed by the manner in which [plaintiff] pled his case in the district court and briefed it on appeal . . . . [These] are quintessential "shotgun" pleadings, replete with factual allegations that could not possibly be material to any of the causes of action they assert. Each count incorporates all of these factual allegations and states, further, that it is based on the conduct in the complaint attributable to [defendant] and "those acting in concert with him." Anyone schooled in the law who read these complaints, however, would know that many of the facts alleged could not possibly be material to all of the counts.

*Pelletier,* 921 F.2d at 1518.  The appellate court found the amended complaint was conclusory, baseless and without any merit.  In deciding that the claim was prosecuted in bad faith, the court rejected the thought that it might have been the "product of incompetent lawyering, and thus excusable, rather than" a tool of harassment, because the plaintiff was skilled in the law and had been warned he was likely to run afoul of Rule 11.  *Id.* at 1519.  The Court concluded:

> We think that imposing sanctions in this case would serve the dual purpose of deterring the filing of frivolous claims and defenses while not chilling attorneys' legitimate enthusiasm and creativity in advancing legal and factual theories.  At a time when the federal courts -- which are a scarce dispute resolution resource, indeed -- are straining under the pressure of an ever-increasing caseload, we simply cannot tolerate this type of litigation.  Particularly with regard to civil RICO claims, plaintiffs must *stop and think* before filing them.

*Id*. at 1522 (emphasis in original)*.* [9]

In *Byrne*, the court affirmed a $400,000 sanction against counsel, under Rule 11, Section 1927, and the court's inherent powers, finding that the expansion of a simple "garden variety

---

[9] In *Pelletier*, the Court not only reversed the district court's denial of Rule 11 sanctions and remanded for a determination of an appropriate amount, but also determined that the appeal was frivolous on the merits and awarded double costs and reasonable attorney's fees pursuant to Rule 38 of the Federal Rules of Appellate Procedure.

medical malpractice" case to include RICO and other baseless claims was frivolous from the outset and doomed to fail. *Byrne*, 261 F.3d at 1115.

Identifying the complaint and amended complaint in *Byrne* as shotgun pleadings, *id.* at 1106, 1129, the Court of Appeals emphasized the harm presented by the tactic and the authority of Article III courts to control the practice through inherent powers:

> Shotgun pleadings, if tolerated, harm the court by impeding its ability to administer justice. The time a court spends managing litigation framed by shotgun pleadings should be devoted to other cases waiting to be heard . . . . Although obstruction of justice is typically discussed in the context of criminal contempt, the concept informs the rules of law—both substantive and procedural—that have been devised to protect the courts and litigants (and therefore the public) from abusive litigation tactics, like shotgun pleadings. If use of an abusive tactic is deliberate and actually impedes the orderly litigation of the case, to-wit: obstructs justice, the perpetrator could be cited for criminal contempt.

*Byrne*, 261 F.3d at 1131-32, 1130 n.110 (citations omitted).

In *Byrne*, the Court pointed out that plaintiffs file shotgun pleadings and frivolous claims to extort settlement of unmeritorious claims. Here, although his complaint asked for damages in excess of twenty-four million dollars, treble damages under RICO, and attorneys' fees and costs, I do not think Mr. Trump or his lawyers actually thought the Defendants would ever agree to settle. This suit was filed for equally improper purposes—to harass and punish, for fundraising, and to advance a political agenda.

**B.  The Pleadings Contained Factual Allegations That Were Knowingly False Or Made With Reckless Disregard For The Truth.**

The Plaintiff consistently misrepresented and cherry-picked portions of public reports and filings to support a false factual narrative. Often the report or filing actually contradicted his allegations. It happened too often to be accidental; its purpose was political, not legal. Factual allegations were made without any evidentiary support in circumstances where falsity is evident.

14

Examples include:

**The Mueller Report.** A section of the Amended Complaint is titled "A String of Federal Investigations Clear Donald J. Trump and Uncover the Defendant's Illicit Conspiracy." (Amended Complaint ¶100). After a two-year investigation, the Special Counsel "found no evidence that Donald Trump or his campaign ever colluded with the Russian Government." (*Id.* ¶460). The Amended Complaint further alleges that Special Counsel Mueller "went on to exonerate Donald J. Trump and his campaign with his finding that there was no evidence of collusion with Russia." (*Id.* at ¶7). While perhaps acceptable as a cable news talking point, that allegation is neither an accurate nor fair reading of the Mueller Report.[10]

First, the Mueller Report stated that "[i]n evaluating whether evidence about collective action constituted a crime, we applied the framework of conspiracy, not the concept of 'collusion.'" *Mueller* Report Volume I at 8. Second, in determining whether the conduct "amounted to a violation of federal criminal law" the question was "whether admissible evidence would probably be sufficient to obtain and sustain a conviction." *Mueller Report* Volume I at 8. Third, the Report found:

> [W]hile the investigation identified numerous links between individuals with ties to the Russian government and individuals associated with the Trump Campaign, the evidence was not sufficient to support criminal charges . . . . [T]he investigation established that several individuals affiliated with the Trump Campaign lied to the [Special Counsel's Office], and to Congress about their interactions with Russian-affiliated individuals and related matters.

*Mueller Report* at 9. Fourth, with respect to obstruction of justice, the Report states: "While this

---

[10] 1 Robert S. Mueller, III, U.S. Dep't of Just., Report on the Investigation into Russian Interference in the 2016 Presidential Election (2019); 2 Robert S. Mueller, III, U.S. Dep't of Just., Report on the Investigation into Russian Interference in the 2016 Presidential Election (2019).

report does not conclude that the President committed a crime, it also does not exonerate him." Mueller Report Volume II at 2; (DE 147-1).

*Crossfire Hurricane Investigation.*  A core aspect of the Plaintiff's claim is his contention that Ms. Clinton, Mr. Comey, and others were responsible for the Crossfire Hurricane Investigation.  The Complaint and Amended Complaint copiously cite to the IG Report to support these allegations.  But the IG Report found that the FBI opened the investigation "for an authorized purpose" and "with adequate factual predication" that had nothing to do with the Defendants or the Steele Dossier.  (DE 143-1 at 347).

*Charles Dolan Allegations.*  As set forth in my Order granting Rule 11 sanctions (DE 284), the Plaintiff alleged that Mr. Dolan was a former Chairman of the DNC (Amended Complaint ¶ 96), a senior Clinton Campaign Official (*id.* ¶ 4), and "an individual with intimate ties to the Clinton Campaign and one of its close associates" (DE 177 ¶ 96).  In fact, as Mr. Dolan's lawyer told Plaintiff's counsel, he was none of those things.  It made no difference.  Despite an affidavit from Mr. Dolan saying he lived in Virginia, and the fact that service upon him occurred there, the Amended Complaint claimed he lived in New York.  The Plaintiff's lawyers' excuse: There are a lot of Dolans—some of them live in New York.  (DE 270 at 10).

The Complaint and Amended Complaint allege that Mr. Dolan was responsible for allegations in the Steele Dossier concerning salacious activity by Mr. Trump in Moscow.  Mr. Dolan's lawyers' warnings that this was untrue went unheeded.  In defending against sanctions, the Plaintiff's lawyers pointed to the Danchenko Indictment.[11]  However, the Danchenko Indictment does not support Plaintiff's claims, rather it contradicts and undermines them.

---

[11] *United States v. Danchenko*, No. 1:21-cr-00245-AJT, (E.D. Va. Nov. 3, 2021) (hereinafter "Danchenko Indictment").

***Criminal Indictments.***  The Complaint and Amended Complaint rely substantially on the Sussmann,[12] Danchenko, and Clinesmith[13] Indictments.  The Plaintiff alleges that "these 'speaking' indictments not only implicate many of the Defendants named herein but also provide a great deal of insight into the inner workings of the Defendants' conspiratorial enterprise.  Based on the facts that have already been uncovered throughout the course of Durham's investigation, it seems all but certain that additional indictments are forthcoming."  (Amended Complaint ¶ 8).

The Indictments themselves are not relevant.  An untried indictment is not evidence of the conduct alleged.  *See United States v. Machado,* 886 F.3d 1070 (11th Cir. 2018).  A criminal indictment should be no more than the starting point for a lawyer's good faith pre-filing investigation.  The danger of overreliance has been demonstrated here, in light of the acquittals of Mr. Sussmann and Mr. Danchenko.  That is not to say an indictment has no significance -- a grand jury has issued it with the assistance of a lawyer for the government.  But a plaintiff's good faith pre-filing inquiry cannot simply ignore the facts in an indictment that contradict and undermine his allegations while touting those he likes.

The Sussmann Indictment charged Mr. Sussmann with falsely telling the FBI's General Counsel that he was not acting on behalf of a client when he conveyed allegations about email communications between the Trump Organization and a bank affiliated with the Russian government.  But the Plaintiff relied on the Indictment to support his allegations of theft of trade secrets, violations of the Computer Fraud and Abuse Act, and violations of the Stored Communications Act in Counts I, VII, VIII, and IX.  (DE 177 at 119, 163, 166, 170).

---

[12] *United States v. Sussmann*, No. 1:21-cr-00582-CRC, (D.D.C. Sept. 16, 2021) (Hereinafter "Sussmann Indictment").

[13] *United States v. Clinesmith*, No. 1:20-cr-00165-JEB, (D.D.C. Aug. 14, 2020) (Hereinafter "Clinesmith Indictment").

As the Order of Dismissal points out, there are legal deficiencies in these claims. But the Sussmann Indictment also warned the Trump lawyers of factual problems. It specified that the communications involved "purported DNS data reflecting apparent DNS lookups between Russian Bank-1 and an email domain, 'mail l.trump-email.com.'" (Sussmann Indictment ¶ 16). DNS data is meant to be public and as part of the infrastructure for the internet, accessible to any entity. The Indictment further advises that the FBI determined "that the email server at issue was not owned or operated by the Trump Organization, but rather had been administered by a mass marketing email company that sent advertisements for Trump hotels and hundreds of other clients." (Sussmann Indictment ¶ 7). The Sussmann Indictment does not support and instead contradicts the conclusory trade secret and unauthorized access allegations set forth in Plaintiff's Amended Complaint.

And as noted above, the Danchenko Indictment contains allegations that, if true, were fatal to the Plaintiff's conspiracy claims. The Danchenko Indictment states that, according to Mr. Dolan, "individuals affiliated with the Clinton Campaign did not direct and were not aware of" Mr. Dolan's meetings and activities with Mr. Danchenko and other Russian nationals. (Danchenko Indictment ¶ 36). Further, it alleges that according to Mr. Dolan, he was unaware of the specifics of Mr. Danchenko's project against Trump or that Mr. Danchenko's reporting would be provided to the FBI. (*Id.* ¶ 52). In responding to Mr. Dolan's sanctions motion, the lawyers claimed their allegations were "directly sourced" from the Danchenko Indictment. (DE 270 at 10). That is plainly untrue.

***Twitter Suspension.*** To support his damages claim, Plaintiff alleged that he was "banned from different social media platforms, including Twitter" as a result of "the misinformation campaign waged by Hillary Clinton." (Amended Complaint ¶ 524 n.277). However, Twitter

suspended Mr. Trump on January 8, 2021—two days after the January 6th attack on the Capitol—because it determined Mr. Trump's tweets posed "the risk of further incitement of violence."[14]

Moreover, in a lawsuit Mr. Trump filed against Twitter, attempting to show state action, he alleges that "Democrat legislators" pressured Twitter to censor him and that he was banned for exercising his right of free speech. *Trump et al. v. Twitter et al.,* No. 3:21-CV-08378 (N.D. Cal. July 7, 2021) (DE 1 ¶¶ 6, 48).

The assertion that the Twitter ban was caused by misinformation by Ms. Clinton five years earlier is plainly false.

**C.   The Plaintiff's Legal Theories Were Frivolous, Foreclosed By Existing Precedent.**

The Plaintiff recklessly advanced claims foreclosed by existing precedent that the most basic legal research would have revealed.  It was not that the Complaint and Amended Complaint were inadequate in any respect, they were inadequate in nearly every respect, even after the deficiencies had been identified in the multiple motions to dismiss.  The Eleventh Circuit has squarely held that to knowingly advance frivolous claims constitutes bad faith meriting sanctions under a court's inherent powers. *Peer*, 606 F.3d at 1316 (reversing district court's failure to award sanctions under inherent powers based upon Circuit Court's finding that lawyer "knowingly pursued a frivolous claim, and thus acted in bad faith.").

I will not detail all of the failings of the Amended Complaint here.  Most are identified in the Order of Dismissal.  I concluded that fundamental substantive defects precluded the Plaintiff from proceeding under any of the theories he advanced.

In arguing against the imposition of sanctions, the Plaintiff attempts to defend his legal

---

[14] Twitter Inc., *Permanent Suspension of @realDonaldTrump*, Twitter Blog (Jan 8, 2021), https://blog.twitter.com/en_us/topics/company/2020/suspension.

positions.  For instance, he contends that while novel, his assertion that the RICO statute of limitations should be tolled because of the former President's duties is a compelling argument for an extension of existing law.  (DE 284 at 4).  But *Clinton v. Jones,* 520 U.S. 681 (1997), does not leave room for that argument. *See Trump v. Vance,* 140 S. Ct. 2412 (2020) (holding that President is "neither absolutely immune from state criminal subpoenas seeking his private papers nor entitled to a heightened standard of need"); *Trump v. United States*, No. 22-13005, 2022 WL 17352069 (11th Cir. 2022) (holding district court lacks equitable jurisdiction to block government investigation of former President).  That is especially true here where Mr. Trump, in his personal capacity, found time during his presidency to file other civil actions.  *See, e.g., Trump v Mazars USA, LLP,* 140 S. Ct. (2019); *Trump v Deutsche Bank AG*, 943 F.3d 627 (2d Cir. 2019); *Trump v Comm. on Ways & Means,* 391 F. Supp. 3d 93, 95 (D.D.C. 2019).

The argument that the statute of limitations should be extended because of the tolling provision of the Clayton Act is likewise frivolous.  Even were it to be applicable to RICO, none of the government proceedings identified by the Plaintiff—the Sussmann and Danchenko Indictments, or the FEC proceeding—bear any relation to RICO.  And in addition to the statute of limitations, Plaintiff's RICO claim failed at every step of the substantive RICO analysis.

The Plaintiff does not even *attempt* to respond with respect to most of the legal failings of his claims.  To reiterate a few:

- The malicious prosecution claim without a prosecution;

- The theory of personal jurisdiction based on an allegation that defendants "knew that Florida is a state in the United States which was an important one;"

- The trade secret claim without a trade secret or ownership;

- The Computer Fraud and Abuse claim foreclosed by *Van Buren v United States,* 141 S. Ct. 1648 (2021); and

- Obstruction of justice untethered to any official proceeding.

Despite its 193 pages, the Amended Complaint did not come close to stating a legal claim. That was never its intended purpose.

## III.   A PATTERN OF ABUSE OF THE COURTS.

I have explained why the totality of the problems with the Complaint, Amended Complaint, and the arguments and statements of Plaintiff's counsel show that this lawsuit was filed and prosecuted in bad faith. But this case is part of Mr. Trump's pattern of misusing the courts to serve political purposes. Federal courts have both the inherent power and the constitutional obligation to protect their jurisdiction from conduct that impairs their ability to carry out Article III functions. *Procop v. Strickland*, 792 F.2d 1069, 1073 (11th Cir. 1986); *see also Martin-Trigona v. Shaw*, 986 F. 2d 1384, 1388 (11th Cir. 1993) (affirming dismissal because lawsuit filed on behalf of vexatious litigant); *O'Neal v. Allstate Indem. Ins. Co. Inc.*, No. 20-14712, 2021 WL 4852222, at *6 (11th Cir. Oct. 19, 2021).

Thus, while a litigant's conduct in other cases would normally not be relevant, when the court is faced with a sanctions motion against a repeat offender, undeterred by admonitions, it has the authority to consider that litigant's outside conduct. *See Johnson v. 27th Ave. Caraf, Inc.*, 9 F.4th 1300, 1313-14 (11th Cir. 2021) (finding district court had "inherent power to investigate the scope and extent" of litigant's misconduct that "threaten[ed] the integrity of the court."); *O'Neal*, 2021 WL 4852222, at *5 (rejecting a plaintiff's sanctions appeal, in part, because "the district court [] conducted a comprehensive examination of Plaintiff's litigation history, cited dozens of Plaintiff's past cases, concluded that only two had merit, and provided examples of past cases where Plaintiff followed an abusive strategy similar to that employed in this case . . . . ").

## A.  **Trump v. Pulitzer Board**

On November 15, 2021, on behalf of Mr. Trump, Ms. Habba demanded the Pulitzer Prize Board "take immediate steps to strip the New York Times and the Washington Post of the 2018 Pulitzer Prize for National Reporting."[15] By correspondence styled "Demand Letter, Notice of Potential Litigation and Non-Spoliation of Evidence," she threatened "prompt legal action" should the prize not be withdrawn.

Then, on May 27, 2022, Mr. Trump wrote stating: "I again call on you to rescind the Prize you awarded on blatantly fake, derogatory and defamatory news. If you choose not to do so, we will see you in court."[16]

On October 13, 2022, Weber, Crabb, & Wein, P.A., another law firm representing Mr. Trump, wrote again threatening suit, claiming that in refusing to rescind the award "the Board and its members acted not only with reckless disregard for the truth, but with authentic animosity and malice toward President Trump and the desire to cause him true harm [sic]."  As such, according to these lawyers, "the members of the Board are individually liable" for damages, including punitive damages for defamation.[17]

---

[15] Demand Letter from Alina Habba, Lawyer for Former President Donald J. Trump, to Bud Kliment, Interim Administrator, The Pulitzer Prizes (Nov. 15, 2021), https://www.documentcloud.org/documents/21112616-habba-and-trump-demand-letters-to-pulitzer-prizes-board.

[16] Letter from Donald J. Trump, to Ms. Marjorie Miller, Administrator, The Pulitzer Prize (May 27, 2022).  For copy of letter see Katie Robertson, *Pulitzer Board Rejects Trump Request to Toss Out Wins for Russia Coverage*, N.Y. Times (July 18, 2022), https://www.nytimes.com/2022/07/18/business/media/pulitzer-prizes-trump.html.

[17] Letter from R. Quincy Bird and Jeremy D. Bailie, Lawyers for Donald J. Trump, to Marjorie Miller, Administrator, The Pulitzer Prize Board (Oct. 13, 2022) https://cdn.nucleusfiles.com/bf/bf8ec68a-f0b8-400d-a74b-e6c480f89c07/pulitzer-prize-board-letter-final.pdf.

A little over a week later, Mr. Trump, at a rally in Robstown, Texas, held on October 22, 2022, announced: "Within the next two weeks we're suing the Pulitzer organization to have those prizes taken back."[18]

On December 13, 2022, Mr. Trump followed up on his threat by filing a lawsuit in a state court in Okeechobee, Florida, a location with no apparent connection to Mr. Trump or any of the defendants. *Trump v. Members of the Pulitzer Prize Board et al.,* No. 22-CA-000246, (Fla. 19th Cir. Ct. Dec. 13, 2022) (hereinafter "*Trump v. Pulitzer*") (DE 1). He sued, individually, nineteen members of the Pulitzer Prize Board alleging defamation by implication."[19] The complaint, 29 pages, 145 paragraphs, similar to the Amended Complaint at issue here, misrepresents the findings of the Mueller Report and the origins of the Operation Crossfire investigation. The alleged defamatory statement reads:

> A. <u>Statement from the Pulitzer Prize Board</u>. The Pulitzer Prize Board has an established formal process by which complaints against winning entries are carefully reviewed. In the last three years, the Pulitzer Board has received inquiries, including from former President Donald Trump about submissions from the New York Times and the Washington Post on Russian interference in the U.S. elections and its connections to the Trump campaign – submissions that jointly won the 2018 National Reporting Prize.
>
> These inquires prompted the Pulitzer Board to commission two independent reviews of the work submitted by those organizations to our National Reporting competition. Both reviews were

---

[18] *See* Julia Shapero, *Trump doubles down on threats to sue Pulitzer board at Texas rally*, The Hill (Oct. 22, 2022, 11:06 PM), https://thehill.com/blogs/blog-briefingroom/3699833-trump-doubles-down-on-threats-to-sue-pulitzer-board-at-texas-rally/.

[19] Defamation by implication is "the concept that literally true statements can be defamatory where they create a false impression." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). (citations omitted). The Florida Supreme Court explained that "if the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts, he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct." *Id.* at 1108.

> conducted by individuals with no connection to each other. The separate reviews converged in their conclusions: that no passages or headlines, contentions or assertions in any of the winning submissions were discredited by facts that emerged subsequent to the [2018 Pulitzer Prizes in National Reporting Stand] conferral of the prizes.

(*Trump v. Pulitzer*, DE 1 ¶ 117).

It has been said that journalism is the first draft of history.[20] The 2018 Pulitzer Award for National Reporting honored the staffs of the New York Times and the Washington Post "[f]or deeply sourced, relentlessly reported coverage in the public interest that dramatically furthered the nation's understanding of Russian interference in the 2016 presidential election and its connection to the Trump campaign, the President-elect's transition team and his eventual administration."[21] The effort by Mr. Trump and his lawyers to use the courts to bully journalists as part of a dishonest and futile attempt to rewrite history is a shameless attack on a freedom essential to democracy. *See Mills v Alabama*, 384 U.S. 214, 218-19 (1966) ("[T]he press serves . . . as a powerful antidote to any abuses of power by government officials and a constitutionally chosen means for keeping officials elected by the people responsible to all of the people who they were selected to serve.").

### B.  Trump v. New York Attorney General

In March 2019, the New York Office of the Attorney General ("OAG") headed by Attorney General Letitia James ("AG James"), began investigating Mr. Trump and his New York business.[22]

---

[20] While first use of the phrase is debated, it is often attributed to Philip Graham, the former president and publisher of the Washington Post from a speech he gave to Newsweek reporters in 1963: "So let us today drudge on about our inescapably impossible task of providing every week a first rough draft of history that will never be completed . . . . " Katherine Graham, *Personal History* (1998).

[21] *Staffs of The New York Times and The Washington Post*, The Pulitzer Prizes, https://www.pulitzer.org/winners/staffs-new-york-times-and-washington-post.

[22] The following procedural history and underlying facts are taken from filings in the case which

(James AC ¶ 64).   The OAG initiated its investigation following Congressional testimony by Michael Cohen, "a former senior executive of the Trump Organization and Special Counsel to Mr. Trump," wherein he produced copies of Plaintiff's financial statements that allegedly *inflated* the value of his assets to obtain favorable loans and insurance coverage, while the Trump Organization simultaneously *deflated* the value of those same assets to reduce its tax burden.  (*Trump v. James*, DE 9 at 8-9).  According to Mr. Trump, the Cohen testimony was a pretext to justify the OAG Investigation, and he points to various public statements by AG James as support for his theory that the OAG is "nothing more than a weapon in [AG James's] arsenal to wage war on [Mr. Trump]."  (James AC ¶¶ 67, 76).

On August 24, 2020, the OAG commenced a special proceeding in the New York Supreme Court, New York County, to enforce subpoenas served during the Investigation.[23]   (James AC ¶ 75).  On February 17, 2022, Justice Engoron, the state-court Justice presiding over the special proceeding, denied a motion to quash filed by Mr. Trump and granted the OAG's motion to compel ("February 2022 Order").  *See People of the State of New York v. The Trump Organization, Inc.*, No. 451G85/2020, 2022 WL 489625 (Sup. Ct. N.Y. Cnty. Feb. 17, 2022).  Justice Engoron rejected the Trump Respondents'[24] argument that the OAG Investigation was based on "personal animus" and that it amounted to selective prosecution.  *See id.* at *5-6.

Justice Engoron's Order has been affirmed by the state-appellate courts in New York.  On May 26, 2022, the February 2022 Order was unanimously affirmed by the New York Appellate

---

subsequently ended up before me: *Donald J. Trump v. Letitia James*, No. 22-81780-CV-DMM (S.D. Fla.) (hereinafter "*Trump v. James*").  The amended complaint in that case is at Docket Entry 19 and is hereafter referred to as "James AC."

[23] The special proceeding is styled, *People v. The Trump Organization*, Index No. 451685/2020.

[24] Donald J. Trump, Ivanka Trump, and Donald Trump, Jr.

Division's First Department. *People by James v. Trump Org., Inc.*, 205 A.D.3d 625 (1st Dep't 2022) (affirming finding that the OAG Investigation was "lawfully initiated" and not selective prosecution). On June 14, 2022, in a two-sentence order, the New York Court of Appeals—New York's highest court—dismissed Mr. Trump's appeal. *People by James v. Trump Org., Inc.*, 38 N.Y.3d 1053 (2022) (holding that "no substantial constitutional question is directly involved.").

Simultaneously, in December 2021, Mr. Trump and the Trump Organization LLC sued AG James under 42 U.S.C. § 1983 in the United States District Court for the Northern District of New York. *Trump v. James*, No. 21-cv-1352, 2022 WL 1718951 at *1 (N.D.N.Y. May 27, 2022). Mr. Trump alleged that the OAG's investigation infringed on various of his constitutional rights. As summarized by Judge Sannes, Mr. Trump (and the Organization) asserted that AG James:

> (1) violated their Fourteenth Amendment due process rights by commencing "investigations against Plaintiffs in bad faith and without a legally sufficient basis," (2) violated their First Amendment rights by seeking to stifle Plaintiffs' free speech and retaliate against Plaintiffs based upon Mr. Trump's political views, (3) violated their Fourth Amendment rights by issuing subpoenas without any "justifiable legal or factual basis," and (4) abused process to advance her own political career and injure Mr. Trump personally and politically.

*Id*. at *4. Judge Sannes granted AG James's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) on the grounds of *Younger* Abstention, *id*. at *14, and stated that, in the alternative, the case would be dismissed under Rule 12(b)(6) because of *res judicata*, *id*. at *19. The Court also noted: "Plaintiffs' assertions that [AG James] conducted a 'baseless fishing expedition' and 'knowingly advanced claims that were unwarranted under existing law,' are wholly unsupported." *Id*. at *12 n.13 (citation omitted). Mr. Trump has appealed to the Second Circuit. (*Trump v. James* DE 9 at 11).

On September 21, 2022, following its Investigation, the OAG commenced an enforcement

action pursuant to New York Law §63(12) ("Enforcement Action").  (*Id*. at 12).  On November

14, 2022, following a granting of the OAG's motion for preliminary injunction, Justice Engoron

appointed the Honorable Barbara Jones, a retired federal judge, to serve as monitor of the Trump

Organization.  (*Trump v. James*, DE 9-1 at 2).  Mr. Trump appealed to the New York Appellate

Division's First Department, where it remains pending.  (*Trump v. James*, DE 9 at 13).

Then, on November 2, 2022, Mr. Trump filed a lawsuit against AG James in a Florida state

court, the Circuit Court of the Fifteenth Judicial Circuit for Palm Beach County, Florida.  (*Trump

v. James*, DE 1-1 at 11).  The following day, he posted the following on Truth Social:

> Statement by Donald J. Trump, 45th President of the United States
> of America
>
> A puppet judge of the New York Attorney General and other sworn
> enemies of President Trump and the Republican Party has just
> issued a ruling never before seen anywhere in America. It is
> Communism come to our shores.
>
> Businesses will be fleeing New York, which they already are, for
> other states and other countries. Today's ridiculous ruling by a
> politically-motivated, hand-picked judge makes it even more vital
> for courts in both New York and Florida to do the right thing and
> stop this inquisition.
>
> We have to fight back against radical tyranny and save our
> Country![25]

On November 14, 2022, Plaintiff filed an Amended Complaint and an Emergency Motion

for Temporary Injunction.  (*Trump v. James*, DE 19; DE 1-1 at 113).  Plaintiff brought three counts

against Defendant, "individually."   Count I is brought under 42 U.S.C. § 1983 for various

constitutional violations.  (James AC at 26).  Count II alleges violations of Plaintiff's rights to

---

[25]   @realDonaldTrump, Truth Social (Nov. 2, 2022, 5:51 PM),
https://truthsocial.com/@realDonaldTrump/posts/109282083674316908.

privacy and property under Florida law. (*Id*. at 31). Count III alleges violations of Plaintiff's rights as grantor and beneficiary of the Trust. (*Id*. at 35). In his Emergency Motion, Plaintiff requested a temporary injunction against Defendant, "either personally, through an agent or through any other persons acting in active concert or participation with her, from requesting, demanding, possessing or disclosing the 2020 or 2022 amendments" of Plaintiff's Trust. (*Trump v. James*, DE 1-1 at 113).

On November 16, 2022, Defendant removed the case to this Court, where it is now pending before me. (*Trump v. James*, DE 1). The James AC copies verbatim substantial portions of the dismissed New York federal action. It begins with provocative rhetoric, all too familiar:

> Extraordinary wrongdoing requires extraordinary relief. As set forth below, James has repeatedly abused her position as Attorney General for the State of New York to pursue a vendetta against President Trump, a resident of Palm Beach County, Florida, with the stated goal of destroying him personally, financially, and politically. Suffice it to say that these actions are contrary to both the Constitutions and the laws of New York and Florida and the United States Constitution.

(James AC ¶ 1).

On December 21, 2022, I denied the Emergency Motion for Temporary Injunction finding that none of the prerequisites for an injunction were met. (*Trump v. James*, DE 14). I found that Plaintiff's attempt to sidestep rulings by the New York courts by suing AG James individually rather than in her official capacity was plainly frivolous. (*Id*. at 6). I found there was no likelihood of success on the merits, no irreparable harm, and to "impede a civil Enforcement Action by the New York Attorney General would be unprecedented and contrary to the interests of the people of New York." (*Id*. at 8). I urged Mr. Trump and his lawyers to reconsider their opposition to AG James's Motion to Dismiss because "[t]his litigation has all the telltale signs of being both vexatious and frivolous." (*Id*. at n.6).

### C. **Trump v. Twitter**

On July 7, 2021, Mr. Trump, Linda Cuadros, and the American Conservative Union, individually and on behalf of the class, sued Twitter, Inc. and Jack Dorsey. The complaint was filed in U.S. District Court in the Southern District of Florida. *Donald J. Trump et al. v. Twitter, Inc. et al.*, No. 21-CV-22441 (S.D. Fla.) (hereinafter "*Trump v. Twitter*").[26] The case was subsequently transferred to the Northern District of California pursuant to Twitter's forum selection clause. (*Trump v. Twitter*, DE 87).

Shortly after announcing the lawsuits, Mr. Trump started sending "breaking news alert" text messages directly to his followers including a link[27] that asked them to donate to his Save America PAC:

> President Trump is filing a LAWSUIT against Facebook and Twitter for UNFAIR CENSORSHIP! *For the NEXT HOUR we've activated a 5X-IMPACT on ALL GIFTS!* **Please contribute IMMEDIATELY to INCREASE your impact by 500% and to get your name on the Donor List President Trump sees!**[28]

---

[26] That same day, Mr. Trump also sued YouTube, LLC; Sundar Pichai, the chief executive officer of Google LLC and Alphabet Inc.; Facebook, Inc.; and its chief executive officer, Mark Zuckerberg. *See Trump et al. v. YouTube, LLC,. et al.*, No. 21-CV-22445 (S.D. Fla.) (hereinafter "*Trump v. YouTube*"); *Trump et al. v. Facebook, Inc. et al.*, No. 21-CV-22440 (S.D. Fla.) (hereinafter "*Trump v. Facebook*"). Both of these cases were transferred to the Northern District of California.

[27] The text message read, "Pres Trump: I am SUING Facebook & Twitter for UNCONSTITUTIONAL CENSORSHIP. For a short time, 5X-IMPACT on all gifts! Donate NOW: bit.ly/3hiWKi5." The link in the text message brought recipients to a dynamic website prompting them with the above request for donations. While the website has since changed, it has been documented in other places. *See, e.g.,* Jake Lahut, *Trump announces lawsuits against Facebook and Twitter, immediately starts fundraising off it*, Business Insider (July 7, 2021, 12:54 PM), https://www.businessinsider.com/trump-facebook-twitter-lawsuit-fundraising-immediately-2021-7.

[28] Lahut, *supra* note 26 (showing a Tweet from Twitter User @NYTnickc including screenshots of the text message and donation website) (emphasis in original).

Mr. Trump's primary claim in all three of the cases is that the defendants censored his speech in violation of the First Amendment to the United States Constitution. *See Trump v. Twitter*, DE 1; *Trump v. YouTube*, DE 1; *Trump v. Facebook*, DE 1. A problem with his argument is that Twitter, Facebook, and YouTube are private companies, and the First Amendment applies only to governmental abridgements of speech. *See Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) ("[T]he Free Speech Clause prohibits only *governmental* abridgment of speech. The free-speech clause does not prohibit *private* abridgment of speech.") (emphasis in original). Mr. Trump's only viable course of action was to allege that the companies were so dominated by governmental authorities as to be considered "state actors."

With respect to Twitter, aspects of Mr. Trump's argument bear directly on the claims made against Ms. Clinton and the Defendants here. Recall that in this case, Mr. Trump's lawyers point to the suspension of his Twitter account as the only example of economic injury that he suffered and blame the suspension on disinformation by Ms. Clinton; never mind that Twitter closed Mr. Trump's account after the Jan 6th attack on the Capitol because of "the risk of further incitement of violence." (*Trump v. Twitter*, DE 21 ¶114).

But in the Twitter litigation, the Trump lawyers claim that it was Democratic members of Congress, Vice President Harris, and First Lady Michelle Obama, that "coerced" Twitter to censor Mr. Trump. (*Id.* ¶¶ 48-61).

The District Court for the Northern District of California dismissed the case in its entirety finding that "the amended complaint does not plausibly allege that Twitter acted as a government entity when it closed plaintiffs' accounts." *Trump v. Twitter Inc.*, No. 21-cv-08378-JD 2022 WL 1443233, at *7 (N.D. Cal. May 6, 2022). Appeal of the dismissal is currently pending in the Ninth Circuit. *See Trump v. Twitter, Inc.*, *et al.*, 22-cv-15961 (9th Cir.).

### D. **Trump v. CNN**

On October 16, 2019, Charles Harder, as "litigation counsel for President Donald J. Trump and Donald J. Trump for President, Inc." advised CNN that "my clients intend to file legal action against you to seek compensatory damages, treble damages, punitive damages, injunctive relief, reimbursement of legal costs, and all other available legal and equitable remedies to the maximum extent permitted by law."[29]  Claiming violation of the Lanham Act because of "misrepresentations to the public, to your advertisers, and others," the letter claimed "[n]ever in the history of this country has a President been the subject of such a sustained barrage of unfair, unfounded, unethical and unlawful attacks . . . . " *Id.*

On March 6, 2020, represented by Mr. Harder, Donald J. Trump for President, Inc. sued CNN for libel based upon an article by a contributor entitled "Soliciting dirt on your opponents from a foreign government is a crime.  Mueller should have charged Trump campaign officials with it."[30]  *Donald J. Trump for President, Inc. v. CNN Broad., Inc.*, 20-CV-01045-MLB (N.D. Ga. Mar. 6, 2020) (hereinafter "*Trump v. CNN*") (DE 1).  The district court found the complaint did not adequately plead actual malice and dismissed it with leave to amend no later than November 30, 2020.  *Trump v. CNN*, 500 F. Supp. 3d 1349, 1358 (N.D. Ga. Nov. 11, 2020).

---

[29] Demand Letter from Charles J. Harder, Lawyer for Donald J. Trump, to Jeff Zucker, President and CEO of CNN, and David Vigilante, Executive Vice President and General Counsel of CNN (Oct. 16, 2019).  For copy of letter see @michaelglassner, Twitter (Oct. 18, 2019 12:04 PM), https://twitter.com/michaelglassner/status/1185225081141772290?ref_src=twsrc%5Etfw%7Ctw camp%5Etweetembed%7Ctwterm%5E1185225081141772290%7Ctwgr%5E3343fa879f8ca95c6 fc5c5a9f5c9ac5e765d8097%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.foxnews.com% 2Fmedia%2Ftrump-legal-team-threatens-cnn-with-lawsuit-over-unfair-unfounded-unethical-and-unlawful-coverage (posting copy of letter).

[30] Larry Noble, *Soliciting dirt on your opponents from a foreign government is a crime. Mueller should have charged Trump campaign officials with it*, CNN (June 13, 2019 at 3:37 PM), https://www.cnn.com/2019/06/13/opinions/mueller-report-trump-russia-opinion-noble/index.html.

31

Plaintiff's counsel subsequently advised that an amended complaint would not be filed, so on December 31, 2020, the case was dismissed without prejudice for failure to comply with the Court's order. (*Trump v CNN*, DE 38).

Mr. Trump then began fundraising for another lawsuit against CNN, issuing the following appeal:

> I'm calling on my best and most dedicated supporters to add their names to stand with me in my impending lawsuit against fake news CNN . . . Add your name immediately to show your support for my upcoming lawsuit against fake news CNN.[31]

On October 3, 2022, Mr. Trump sued CNN for Defamation Per Se (Count I) and Defamation (Count II). *Trump v. Cable News Network, Inc.*, No. 22-CV-61842-AHS (S.D. Fla. Oct. 3, 2022) (hereinafter "*Trump v CNN* II"), DE 1 at 19, 24. While claiming to meet the "actual malice" standard of *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), Mr. Trump's lawyers argue it "does not—and should not—apply where the defendant is not publishing statements to foster debate, critical thinking, or [the] 'unfettered interchange of ideas' but rather seeks to participate in the political arena by offering propaganda." (*Trump v CNN* II, DE 1 ¶ 65 n.42).

Less than 24 hours later, a fundraising email from Mr. Trump proclaimed: "I am suing the Corrupt News Network (CNN) for DEFAMING and SLANDERING my name." Supporters were encouraged to contribute $5 or more.[32]

To be clear, the sanction in this case is not imposed against Mr. Trump for the Pulitzer, Twitter, or CNN litigation. Those cases are before other judges who will make their own

---

[31] Marco Margaritoff, *Trump Begs Supporters For Donations Toward 'Upcoming' CNN Lawsuit*, Yahoo News (August 6, 2022), https://news.yahoo.com/trump-begs-supporters-donations-toward-164711363.html.

[32] *See* Erik Larsen, *Trump Uses CNN Lawsuit to Raise Money*, Bloomberg (Oct. 4, 2022), https://money.yahoo.com/trump-uses-cnn-lawsuit-raise-143932468.html.

determinations.  And a decision in Mr. Trump's Florida lawsuit against the New York Attorney General, a case now pending before me, is premature.

However, this widespread and persistent conduct points to the need for deterrence in this case and helps explain why Rule 11, Section 1927, and the Defend Trade Secrets Act are not up to the task.  This is purposeful conduct, some of which occurs beyond the pleadings and even outside of the courtroom.  "[I]t is a wrong against the institutions set up to protect and safeguard the public."  *Chambers*, 501 U.S. at 44.  Mr. Trump's deliberate use of a frivolous lawsuit for an improper purpose constitutes bad faith.  And the behavior is not unique, but part of a plan, or at least a playbook.  The telltale signs:

- Provocative and boastful rhetoric;

- A political narrative carried over from rallies;

- Attacks on political opponents and the news media;

- Disregard for legal principles and precedent; and

- Fundraising and payments to lawyers from political action committees.[33]

And when a ruling is adverse, accusations of bias on the part of judges—often while the litigation is ongoing.

---

[33] Mr. Trump's Save America PAC has spent $9.7 million in legal bills since 2021 according to a Washington Post review of FEC Filings.  Devin Barrett, Josh Dawsey, and Isaac Stanley-Becker, *Trump's committee paying for lawyers of key Mar-a-Lago witnesses*, The Washington Post (Dec. 5, 2022, 5:52 PM), https://www.washingtonpost.com/national-security/2022/12/05/trump-witnesses-legal-bills-pac/.  Over $2 million has reportedly been paid to Ms. Habba.  Steven Lubet, *Cassidy Hutchinson transcript reveals new low for Trump World*, The Hill (Dec 28, 2022, 8:00 AM), https://thehill.com/opinion/judiciary/3789257-cassidy-hutchinson-transcript-reveals-new-low-for-trump-world/.  Ms. Habba, in addition to her role as a lawyer, has become a senior advisor for Mr. Trump's new MAGA, political action committee.  According to a MAGA Inc. spokesperson, "whether it's on legal matters or political issues, she is more than capable to represent President Trump in a variety of venues."  Ryan King, *Trump Attorney Alina Habba joins MAGA Inc.*, Washington Examiner (Oct. 26, 2022, 9:55 AM), https://www.washingtonexaminer.com/politics/trump-attorney-alina-habba-joins-maga-inc.

But "[l]egal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Bridges v. California*, 314 U.S. 252, 270 (1940). Frivolous lawsuits should not be used as a vehicle for fundraising or fodder for rallies or social media. Mr. Trump is using the courts as a stage set for political theater and grievance. This behavior interferes with the ability of the judiciary to perform its constitutional duty.

## IV.    CONSEQUENCES

Having determined that sanctions are appropriate under inherent authority, I must now determine what those sanctions should be. I find that an award of Defendants' attorneys' fees and costs is a fair and just sanction given Plaintiff's and his counsel's actions in this case. *See Chambers*, 501 U.S. at 56-58. What follows, then, is an analysis of what amount of fees and costs is reasonable. *See Bynum v. Am. Airlines, Inc.*, 166 Fed. Appx. 730, 736 (5th Cir. 2006) (remanding imposition of sanctions for proof of incurred fees and expenses to determine reasonableness).

### A. <u>Defendants' Fee Application And Plaintiff's Objections</u>

Before analyzing the reasonableness of Defendants' fee request, I will briefly explain what materials I considered in reaching my conclusions. A fee applicant bears the burden of providing an adequate application, but the opposing party must raise clear objections for a court to rule on them. *See Am. Civ. Liberties Union of Georgia v. Barnes*, 168 F.3d 423, 428 (11th Cir. 1999) ("'objections and proof from fee opponents' concerning hours that should be excluded must be specific and 'reasonably precise.'") (citation omitted).

Defendants request **$1,058,283.50** in fees and costs. *See generally* Defendants' Joint Motion for Sanctions (DE 280-2) (hereinafter "Application"). The Application is a 304-page document filed in support of Defendants' fee request. *See id*. The Application contains eleven

34

exhibits in support of the requested fees for each set of lawyers/law firms representing (some jointly) the Defendants in this case. Each exhibit contains (1) a declaration attesting to the authenticity of the hours and rates billed, with a corresponding summary of fees based on stages of the case; (2) background information on each timekeeper that describes professional experience and credentials; and (3) time entries.

In response, Plaintiff filed largely indecipherable objections. (DE 285-1) (hereinafter "Objections"); (DE 297) (hereinafter "Corrected Objections"). I will highlight just a few of these issues. First, Plaintiff's Objections relied on an unsigned draft of the Application. *Compare* Objections at 241 (stating on Mr. Tyrrell's signature line, "draft for circulation") *with* Application at 255 (containing Mr. Tyrrell's signature). This was significant not just because it was unsigned, but because some of the calculations changed from the draft to the final Application. *Compare* Objections at 273 (Ms. Lett's declaration stating total fees under Chart C as $5,650) *with* Application at 285 (Ms. Lett's declaration stating total fees under Chart C as $9,375). In an effort to clarify the record, I *sua sponte* ordered Plaintiff to file corrected objections. (DE 292).

Plaintiff's Corrected Objections were equally unhelpful. First, Plaintiff still relies on certain draft portions of the Application. *Compare* Corrected Objections at 307 (Ms. Lett's declaration stating in all caps and yellow highlighted text "DATE" and "FILL IN RESULT OF CONFERRAL") *with* Application at 285 (Ms. Lett's declaration stating the date and result of conferral). As a result, many of the same numerical discrepancies remained. *See, e.g., id*. Second, there are multiple miscalculations. For instance, in raising line-by-line objections to Defendant Joffe's attorneys' fees, Plaintiff failed to multiply the hourly rate by the number of hours billed, making the total amount objected to uncertain. (*See* Corrected Objections at 302). I doubt that this was intentional because nowhere else in the Corrected Objections does this appear to happen.

(*See, e.g., id.* at 268).  In another example, in calculating the total fees incurred by Defendant DNC, Plaintiff failed to include the $15,632.50 incurred in the third stage of the case.  (*See id.* at 93) (concluding total fees incurred $170,192, rather than $185,824.50).

These errors, taken as a whole, render the entire document unreliable.  I considered whether to offer Plaintiff yet another opportunity to cure his objections.  Without a motion, however, I did not find it to be a fair exercise of this Court's discretion.  In almost every area of law, a party waives an objection for failing to properly raise it.  So too here.  Thus, to the extent that Plaintiff's objections were not clearly identifiable, I did not consider them.

**B.  Reasonableness Of Fees**

Of the total request for fees and costs ($1,058,283.50), $14,292.39 are costs incurred for electronic legal research and $600 in *pro hac vice* filing fees.  Plaintiff does not object to either.[34] (*See generally* Corrected Objections at 33-35).  Filing fees are taxable costs under 28 U.S.C. § 1920.  However, consistent with the finding of other courts in this Circuit and other circuit courts, costs incurred for electronic legal research are considered a component of attorneys' fees rather than costs under 28 U.S.C. § 1920.  *Springer v. Convergy's Corp.*, 2006 WL 8439203 at *2 (M.D. Fla. July 7, 2006).  I find the award of $14,292.39 for electronic legal research reasonable given Plaintiff's lack of objection and the sprawling nature of his claims, which while frivolous, were numerous enough to necessitate substantial legal research.

"[T]he starting point in any determination for an objective estimate of the value of a

---

[34] Plaintiff appears to object, without explanation, to Defendant Danchenko's costs incurred for electronic legal research ($6,389) as "vague."  (Corrected Objections at 244).  This is nonsensical and likely a mistake.  "Vague," as used by Plaintiff everywhere else in his Corrected Objections refers to vague *time entries* (more on this below).  Nowhere else does Plaintiff raise a "vague" objection for costs incurred for electronic legal research, which are typically barebones receipts. (*See, e.g., id.* at 301).  I will overrule this objection as I can discern no basis for it.

lawyer's services is to multiply hours reasonably expended by a reasonable hourly rate." *Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).  "The product of these two figures is the lodestar and there is a 'strong presumption' that the lodestar is the reasonable sum the attorneys deserve." *Bivins v. Wrap It Up, Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008) (citation omitted).  In determining the lodestar, "the court is to consider the 12 factors enumerated in *Johnson v. Georgia Hwy. Exp., Inc.*, 488 F.2d 714 (5th Cir. 1974)."[35] *Id*. at 1350.  "After the lodestar is determined . . . the court must next consider the necessity of an adjustment for results obtained." *Norman*, 836 F.2d at 1302. And finally, "'[t]he court . . . is itself an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value.'" *Id*. at 1303 (citation omitted).

### 1. *Reasonable Hourly Rate*

"A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman*, 836 F.2d at 1302.  The "relevant legal community" is generally "'the place where the case is

---

[35] As summarized in *Bivins*, the 12 factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Bivins*, 548 F.3d at 1350 n.2.

filed.'" *Barnes*, 168 F.3d 437. "More typically, the fee applicant asks for rates approximating the highest charged in the community, whereas the fee opponent generally submits evidence of the lowest rate charged in any part of the community." *Norman*, 836 F.2d at 1300. That is not the case here.

Almost all of Defendants' attorneys seek substantially discounted rates, ranging from 28% to 66% less than the rates actually billed. (*See, e.g.,* Application at 102). On a sliding scale based on experience, Defendants' attorneys seek rates ranging from $255-800 for lawyers and $120-150 for paralegals. Plaintiff objects to the total amount as "unreasonable or excessive," but he limits those objections to purported deficiencies in "billing judgment" (more on this below). Nowhere in his response in opposition or dozens of pages of line-by-line objections does Plaintiff challenge the *rate* charged by Defendants' attorneys.

Defendant Joffe's attorneys (and paralegal) are the only ones not to have discounted their rates. Defendant Joffe's lead attorney, Mr. Tyrrell, seeks his "ordinary non-local rates," on the grounds that he qualifies for an exception applicable to attorneys with "extensive prior experience with a particular factual situation." (*Id.* at 252 n.1); *see also Barnes*, 168 F.3d at 438 (stating that non-local rates *may* be acceptable if attorney had "extensive prior experience with a particular factual situation," but refusing to apply that exception where no obvious savings or efficiencies resulted). While Plaintiff does not object, I refuse to apply the *Barnes* exception where it is not obvious that Defendant Joffe's attorneys provided any significant gains in efficiencies. *Compare* (Application at 283) (Defendant Orbis Business Intelligence Ltd.'s attorneys, who raised a successful personal jurisdiction challenge, seeking fees for about 90 hours) *with* (*id.* at 251) (Defendant Joffe's attorneys, who also raised a successful personal jurisdiction challenge, seeking fees for about 208 hours). Moreover, Mr. Tyrell's declaration (Application at 251) speaks to *his*

purported prior knowledge, not that of Defendant Joffe's other attorneys and paralegal who also seek their non-local rates. Accordingly, in considering the *Johnson* factors, the discounted rate of the other attorneys in this case, and my own experience, I will discount Defendant Joffe's attorneys' and paralegal's fees. *See* Appendix A at 5.

I find the rest of the rates charged by Defendants' attorneys reasonable. *See generally* Appendix A. In reaching this conclusion, I considered my own experience, the *Johnson* factors, and what reasonably comparable attorneys in a similar case in this legal community might be expected to charge. Plaintiff's lack of objection further supports the reasonableness of the rates. Given that there are dozens of attorneys, I will refrain from explaining my reasoning for each and every one of them—although I have considered them all. In reference to the *Johnson* factors, I considered the complexity of the allegations leveled by Plaintiff and the skill it required to succinctly respond to each allegation with well-reasoned arguments. In my view, this case required excellent lawyering to defend against the overwhelming number of convoluted allegations and frivolous claims raised by Plaintiff. Indeed, these lawyers are some of the best in the country, and accordingly charge top dollar (as evidenced by the rates actually paid by Defendants). In their ranks are litigators that have argued, and won, several cases before the U.S. Supreme Court; served in positions of great significance in government; graduated from and taught at prestigious law schools; clerked for federal district courts, circuit courts, and the U.S. Supreme Court; and obtained victories for their clients to the tune of billions of dollars. (*See, e.g.,* Application at 9, 53, 56, 105, 209).

Having set reasonable rates for the lawyers involved (*See generally* Appendix A), I now move on to evaluating the time they spent on their work in this case.

### 2. *Hours Reasonably Expended*

In determining the number of hours "reasonably expended," the Supreme Court requires fee applicants to exercise "billing judgment." *Hensley*, 461 U.S. at 434 (citations and quotations omitted). Therefore, attorneys "should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." *Id*. "This must necessarily mean that the hours excluded are those that would be unreasonable to bill to a client and therefore to one's adversary *irrespective of the skill, reputation or experience of counsel*." *Norman*, 836 F.2d at 1301 (emphasis in original). "Redundant hours generally occur where more than one attorney represents a client," but in such cases attorneys may still be compensated "if they are not unreasonably doing the same work." *Id*. at 1302.

Where—as is the case here—"fee documentation is voluminous . . . an hour-by-hour review is simply impractical and a waste of judicial resources." *Loranger v. Stierheim*, 10 F.3d 776, 783 (11th Cir. 1994); *see also Fox v. Vice*, 563 U.S. 826, 838 (2011) (explaining that "trial courts . . . should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time. And appellate courts must give substantial deference to these determinations, in light of 'the district court's superior understanding of the litigation.'"). Notwithstanding, I am mindful of this Court's obligation to "produce an order on attorneys' fees that allows for 'meaningful review.'" *Barnes*, 168 F.3d at 428.

Here, the fee documentation is certainly voluminous. *See, e.g., Padurjan v. Aventura Limousine & Transp. Serv., Inc.*, 441 Fed. Appx. 684, 687 (11th Cir. 2011) ("The more than $200,000 [the movant] seeks in attorneys' fees is indication enough that this case is voluminous.").

Defendants' Application seeks over a million dollars in fees, is 304-pages long, and includes hundreds of time entries by dozens of lawyers.

In response, Plaintiff raised line-by-line objections by way of tables at the end of each exhibit. (*See generally* Corrected Objections). The tables, while not descriptive in any meaningful way, do identify objected to entries under the following categories: block billing, duplicative, excessive, vague, and clerical. Accordingly, I will balance the aforementioned competing directives—not to attempt "auditing perfection" yet still allow for "meaningful review"—by analyzing a mostly random selection[36] of Plaintiff's "billing judgment" objections under each of his categories. The entries excerpted below serve as a representative sample of the entries that I examined and the reasoning applied therein.

## C. **Objections**

### 1. *Block Billing*

Plaintiff's objections to block billing are largely overblown. It is true that lawyers should avoid block billing (*i.e.*, billing for several tasks in the same time entry) to, at least in this context, allow a court to ascertain the number of hours reasonably expended per task. The degree of block billing identified by Plaintiff simply does not rise to a level that merits an across-the-board cut of hours. However, I am inclined to cut back in individual cases if the block billing spanned several hours and included numerous tasks. *See, e.g., Barnes*, 168 F.3d at 429 ("The records often lump together all the tasks performed by an attorney on a given day without breaking out the time spent on each task.").

By way of example, Plaintiff objects to the following entries for block billing:

---

[36] For "block billing" and "excessive," I focused primarily on entries with unusually high amounts charged. The logic being that such entries were more likely to yield examples of improper block billing or excessive billing.

1) Review & revise defendants' draft reply brief; review Trump's opposition brief; emails re: draft reply brief.

(Application at 122) (8/10/2022, 3.9 hours, $2,145).

2) Review Trump amended complaint; review previous motions practice; review draft portion of motion to dismiss Trump amended complaint; discussion with A. Eisen re: draft motion to dismiss.

(*Id*. at 241) (6/28/2022, 5 hours, $3,500).

3) April 2022: Confer and strategize via email and telephone with counsel regarding case, initial appearances, local rules, and complaint; review complaint; review draft motion to dismiss; draft and file pro hac motions; review and file response to motion to expedite.

(*Id*. at 21) (4/1/2022, 15 hours, $9,375).

The first two examples do not merit a reduction in hours. The second tows the line, but I find that even if the timekeeper had entered those times separately, five hours would nonetheless be reasonable. This same reasoning applies to the first example *and* to all of the other objections for block billing that I looked at. The third, however, is the sort of block billing that requires a reduction in hours because it is impossible for the Court to accurately divvy up the time per task in a reasonable manner. The timekeeper for this entry is Attorney Markus. A closer look at his time entries revealed a similar pattern. I note however that as local counsel, his role was not as susceptible to itemized billing and his total hours were not substantial. But I will cut his hours by 15%. *See* Appendix A at 2.

### 2. Duplicative

Plaintiff's objections for "duplicative" time entries are not presented in a way that allows this Court to properly review and analyze them. Plaintiff's table simply points out entries that he believes are "duplicative" but does not say *what it duplicates*. Instead, Plaintiff leaves it up to the Court to piece together a cogent series of objections. I refuse to do so. But even when I reviewed

the relevant time entries with an eye for duplicative billing, I did not find any unreasonable billing that merits a cut in hours.

### 3. *Excessive*

Plaintiff objects to, among others, the following time entries as "excessive":

> 1)  Review draft DNC motion to dismiss brief and share with RAK for final review

(Application at 76) (5/6/2022, 2.3 hours, $1,610).

> 2)  Reviewing amended complaint; reviewing, editing draft brief.

(*Id*. at 24) (7/7/2022, 5.5 hours, $3,850).

> 3)  Review & revise motion to dismiss brief re: Trump lawsuit; emails to & from I. Garcez, A. Lopez re: same

(*Id*. at 118) (5/4/2022, 2.9 hours, $1,595).

Plaintiff's objections are unconvincing.  It is no surprise that these lawyers, when responding to such an egregious example of shotgun pleadings and subsequent opposition, had to spend numerous hours thoroughly analyzing the allegations and crafting exhaustive responses.  I find these time entries, and others like it, reasonable.

### 4. *Vague*

"[T]he general subject matter of the time expenditures ought to be set out with sufficient particularity so that the district court can assess the time claimed for each activity." *Norman*, 836 F.2d at 1303.  Notwithstanding, the court can rely on "its own knowledge and experience . . . and may form an independent judgment" when determining the reasonableness of fees.  *Id*.  Plaintiff objects to the following time entries as "vague":

> 1)  Review complaint and continue revisions to [redacted].

(Application at 65) (4/6/2022, 4.5 hours, $3,150).

> 2)  Research [redacted].

(*Id.* at 79) (5/18/2022, 1.7 hours, $637.50).

> 3) Miscellaneous communications, including with client and other counsel, regarding status of matter, ongoing coordination, and related matters; review and analyze materials re: same.

(*Id.* at 275) (7/19/2022, 1.4 hours, $1,435.50).[37]

The first and third time entries provide sufficient detail to overcome an objection for being vague. The same is true for almost all other time entries viewed under this category. Only the second time entry rises to the level of being vague. The timekeeper for the second entry is Attorney Turner. A closer look at her time entries revealed a similar pattern. While I find Attorney Turner's total hours to be relatively low, I will cut her hours by 15% to account for the handful of vague entries. *See* Appendix A at 2.

### 5. *Clerical*

Consistent with the idea that, "the hours excluded are those that would be unreasonable to bill to a client and therefore to one's adversary *irrespective of the skill, reputation or experience of counsel,*" *Norman*, 836 F.2d at 1301 (emphasis in original), lawyers should not (in the interest of reducing fees) bill their clients for clerical work that a non-lawyer could just as well do.

It appears that Plaintiff's only objections under the category of "clerical" (totaling $390) is for work done by Ms. Dietrich, a "Senior Case Manager," a role akin to a paralegal. (Corrected Objections at 33-35; 56; 92). Ms. Dietrich's hourly rate is $150, a reasonable rate for paralegals. (Application at 58). Billing a client for clerical work done by a non-lawyer related to its case is completely reasonable and expected.

---

[37] This is Mr. Tyrell's non-local rate. For the reasons explained above, I am reducing it to $700. *See* Appendix A at 5.

### D. **Adjustment Of The Lodestar**

The lodestar in this case is **$937,989.39**.  *See* Appendix A at 1.  Having determined the lodestar, the Court must next "consider the necessity of an adjustment for results obtained." *Norman*, 836 F.2d at 1302.  The Parties have not argued for an adjustment, and I do not find one to be necessary.

Relatedly, however, I find that *apportionment* of the lodestar is necessary.  The amount of fees awarded in this case, while reasonable, is substantial.  As such, joint and several liability (a presumption under Rule 11, but not here) would be inappropriate.  *Cf. Fowler v. Ritz-Carlton Hotel Co., LLC*, No. 3:10-CV-884-J-34JRK, 2016 WL 11468583, at \*7 (M.D. Fla. Aug. 2, 2016) (apportioning fee based on ability to pay).  The parties that bear the brunt of the responsibility for the sanctionable conduct—Plaintiff and his lead attorney—should be jointly and severally liable for the sanction.  The Rule 11 sanctions that I imposed on the other lawyers in this case (*See* DE 284) is sufficient.  *See Gallop v. Cheney*, 667 F.3d 226, 231 (2d Cir. 2012)*, as amended* (Feb. 3, 2012) (vacating sanctions against local counsel due to level of involvement).

Accordingly, Plaintiff Donald J. Trump and Plaintiff's lead attorney—Alina Habba, and Habba Madaio & Associates—are jointly and severally liable for the total amount.

## IV.   **CONCLUSION**

For the forgoing reasons, and having carefully considered the record, the written submissions of the Parties, and applicable law, it is hereby **ORDERED AND ADJUDGED** that:

1. Defendants' Joint Motion for Sanctions (DE 280) is **GRANTED.**

2. Plaintiff Donald J. Trump and Plaintiff's lead attorney—Alina Habba and Habba Madaio & Associates—are jointly and severally liable for **$937,989.39**.[38]

**SIGNED** in chambers at West Palm Beach, Florida this 19th day of January, 2023.

Donald M. Middlebrooks
United States District Judge

cc:     counsel of record

---

[38] "[S]anctions must never be hollow gestures: their bite must be real." *Martin v. Automobile Lamborghini Exclusive, Inc.*, 307 F. 3d 1332, 1336 (11th Cir. 2002). But for the bite to be real it must be an amount a person can pay. *Id.* I believe the monetary sanctions imposed here are well within Plaintiff and Plaintiff's lawyer ability to pay, and therefore I have not thought it necessary to conduct an intrusive inquiry into their finances. However, should Plaintiff or Plaintiff's lawyer (and law firm) believe that the amount would seriously jeopardize their financial status, *see, e.g., Baker v Alderman*, 158 F. 3d 516 (11th Cir. 1998), that individual or firm should file within ten (10) days of this Order, under seal, a verified statement of net worth which includes assets and liabilities. In the event of such a filing, the obligation of that individual or law firm will be tolled until further order of the Court.