# Nos. 22-13410-H, 22-14099-H, 23-10387-H, 23-13177-H

## In the United States Court of Appeals
## for the Eleventh Circuit

DONALD J. TRUMP,
*Plaintiff-Appellant*,

ALINA HABBA, MICHAEL T. MADAIO, HABBA MADAIO & ASSOC.;
PETER TICKTIN, JAMIE SASSON, and THE TICKTIN LAW GROUP,
*Appellants,*

versus

HILLARY R. CLINTON, DEMOCRATIC NATIONAL COMMITTEE,
HFACC, INC., DNC SERVICES CORP., PERKINS COIE, LLC, JOHN
PODESTA, ROBERT MOOK, DEBBIE WASSERMAN SCHULTZ,
FUSION GPS, GLENN SIMPSON, PETER FRITSCH, NELLIE OHR,
BRUCE OHR, IGOR DANCHENKO, RODNEY JOFFE, NEUSTAR
SECURITY SERVICES, NEUSTAR INC., ORBIS BUSINESS
INTELLIGENCE LTD., and CHARLES DOLAN,
*Defendants-Appellees*.

On appeal from the United States District Court
for the Southern District of Florida

## APPELLANTS' APPENDIX (Volume 1 of 2)

JESSE R. BINNALL
JARED J. ROBERTS
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
(703) 888-1943

RICHARD C. KLUGH
RICHARD C. KLUGH, P.A.
40 N.W. 3rd Street, PH1
Miami, Florida 33128
(305) 536-1191

*Counsel for Appellants*

# APPENDIX

## Volume 1

District Court Docket Sheet ..................................................................... DS

Amended Complaint ................................................................................ 177

Certificate of Service

## Volume 2

Order Granting Motions to Dismiss .......................................................... 267

Order Granting Dolan Motion for Sanctions ............................................ 284

Order Granding Joint Motion for Sanctions ............................................. 302

Motion for Indicative Ruling on Fed. R. Civ. P. 60(b) Motion .............. 331

Motion for Disqualification ...................................................................... 335

Order Denying Motion for Disqualification .............................................. 342

Order Denying Motion for Indicative Ruling ........................................... 343

Certificate of Service

DS

USCA11 Case: 23-13177   Document: 90-1   Date Filed: 03/05/2024   Page: 4 of 233

APPEAL,CLOSED,PMH,STAYED

# U.S. District Court
## Southern District of Florida (Ft Pierce)
## CIVIL DOCKET FOR CASE #: 2:22-cv-14102-DMM

Trump v  Clinton et al

Assigned to: Judge Donald M. Middlebrooks

Referred to  Magistrate Judge Patrick M  Hunt

Case in other court:  USCA, 22-11955-J

USCA, 22-13410-J

USCA, 22-13791-J

USCA, 22-14099-J

USCA, 23-10387-J

USCA, 23-10536-J

USCA, 23-13177-J

Cause: 18:1962 Racketeering (RICO) Act

Date Filed  03/24/2022

Date Terminated: 03/13/2023

Jury Demand  Plaintiff

Nature of Suit: 470 Racketeer/Corrupt Organization

Jurisdiction  Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 03/24/2022 | 1 | COMPLAINT against All Defendants. Filing fees $ 402.00. IFP Filed, filed by DONALD J TRUMP. No Motion for IFP filed. (Attachments: # 1 Summon(s), # 2 Summon(s), # 3 Summon(s), # 4 Summon(s), # 5 Summon(s), # 6 Summon(s), # 7 Summon(s), # 8 Summon(s), # 9 Summon(s), # 10 Summon(s), # 11 Summon(s), # 12 Summon(s), # 13 Summon(s), # 14 Summon(s), # 15 Summon(s), # 16 Summon(s), # 17 Summon(s), # 18 Summon(s), # 19 Summon(s), # 20 Summon(s), # 21 Summon(s), # 22 Summon(s), # 23 Summon(s), # 24 Summon(s), # 25 Summon(s), # 26 Summon(s), # 27 Summon(s), # 28 Summon(s), # 29 Civil Cover Sheet)(Ticktin, Peter) (Attachment 24 replaced on 3/28/2022) (kpe). Images for docket entries 1 -24, 1 -25, 1 -26, 1 -27 and 1 -28 are removed pursuant to 12 Order. (Entered: 03/24/2022) |
| 03/24/2022 | 2 | Clerks Notice of Judge Assignment to Judge Donald M  Middlebrooks<br><br>Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Shaniek M. Maynard is available to handle any or all proceedings in this case  If agreed, parties should complete and file the Consent form found on our website  It is not necessary to file a document indicating lack of consent.<br><br>Pro se (NON PRISONER) litigants may receive Notices of Electronic Filings (NEFS) via email after filing a Consent by Pro Se Litigant (NON-PRISONER) to Receive Notices of Electronic Filing. The consent form is available under the forms section of our website  (ebz) (Entered  03/24/2022) |

USCA11 Case: 23-13177    Document: 90-1    Date Filed: 03/05/2024    Page: 5 of 233

| 03/24/2022 | 3 | Clerks Notice to Filer re: Summons(es) cannot be issued. The filing fee has not been paid. (ebz) (Entered: 03/24/2022) |
|---|---|---|
| 03/24/2022 | 4 | Clerks Notice to Filer re  Electronic Case  Filing fees not paid  Filer is instructed to file a Notice of Compliance of Filing Fee, and electronically pay the correct fees of $402.00 within 24 hours of this notice. (jua) (Entered: 03/24/2022) |
| 03/24/2022 | 5 | Notice of Compliance of Filing Fee $402.00, receipt number AFLSDC-15504826, Electronic Civil Case Filing re 4 Clerks Notice to Filer re: Electronic Case (Ticktin, Peter) (Entered: 03/24/2022) |
| 03/24/2022 | 6 | Bar Letter re: Admissions sent to attorney Alina Habba and Michael T. Madaio, mailing date March 24, 2022, (pt) (Entered: 03/24/2022) |
| 03/24/2022 | 7 | STRICKEN Summons Issued as to All Defendants. (ail) Modified per DE 12 ORDER on 3/28/2022 (ebz). (kpe). Image for docket entry 7 removed pursuant to 12 Order. (Entered: 03/24/2022) |
| 03/25/2022 | 8 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Michael T. Madaio. Filing Fee $ 200.00 Receipt # AFLSDC-15508333 by Donald J. Trump. Responses due by 4/8/2022 (Attachments  # 1 Certification, # 2 Text of Proposed Order)(Ticktin, Peter) (Entered  03/25/2022) |
| 03/25/2022 | 9 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Alina Habba. Filing Fee $ 200.00 Receipt # AFLSDC-15508371 by Donald J. Trump. Responses due by 4/8/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Ticktin, Peter) (Entered: 03/25/2022) |
| 03/25/2022 | 10 | MOTION to redact addresses from DE 1-24, 1-25, 1-26, 1-27, 1-28, and 7 p.24-28 re 1 Complaint,, 7 Summons Issued by United States Of America  Attorney Anthony Erickson Pogorzelski added to party United States Of America(pty dft) (Attachments: # 1 Text of Proposed Order)(Erickson-Pogorzelski, Anthony) (Entered: 03/25/2022) |
| 03/25/2022 | 11 | ORDER OF RECUSAL. Magistrate Judge Shaniek M. Maynard recused. Case reassigned to Magistrate Judge Ryon M. McCabe for all further proceedings. Signed by Magistrate Judge Shaniek M. Maynard on 3/25/2022. *See attached document for full details.* (vjk) (Entered: 03/28/2022) |
| 03/25/2022 | 14 | CASE REFERRED to Magistrate Judge Ryon M  McCabe, pursuant to DE 11 (mr1) (Entered  03/29/2022) |
| 03/28/2022 | 12 | ORDER GRANTING MOTION TO REDACT re 10 Motion. The Clerk of Court is directed to STRIKE and REMOVE docket entries 1-24, 1-25, 1-26, 1-27, 1-28 and 7 from the record. Plaintiff SHALL FILE redacted copies of docket entries 1-24, 1-25, 1-26, 1-27, 1-28 and 7 on or before March 29, 2022. Signed by Judge Donald M. Middlebrooks on 3/28/2022. *See attached document for full details.* (ebz) (Entered: 03/28/2022) |
| 03/28/2022 | 13 | CLERK'S NOTICE of Compliance by removing images from docket entries 1  24, 1  25, 1  26, 1  27, 1  28 & 7 pursuant to 12 Order. (kpe) (Entered: 03/28/2022) |
| 03/29/2022 | 15 | PAPERLESS ORDER granting 8 and 9 Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorneys Michael T. Madaio and Alina Habba. Signed by Judge Donald M. Middlebrooks on 3/29/2022. (kal) (Entered: 03/29/2022) |

USCA11 Case: 23-13177   Document: 90-1   Date Filed: 03/05/2024   Page: 6 of 233

| | | |
|---|---|---|
| 03/30/2022 | 16 | NOTICE by United States Of America re 12 Order on Motion for Miscellaneous Relief, *Joint Filing of Redacted Copies* (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Redacted copy of docket entries 1-24 - 1-28, # 3 Exhibit Redacted copy of docket entry 7) (Erickson-Pogorzelski, Anthony) (Entered: 03/30/2022) |
| 03/30/2022 | 17 | Joint MOTION to redact addresses from companion case by United States Of America  (Attachments  # 1 Text of Proposed Order, # 2 Exhibit, # 3 Exhibit)(Erickson-Pogorzelski, Anthony) (Entered: 03/30/2022) |
| 03/30/2022 | 18 | PAPERLESS ORDER denying as moot 17 the Parties' Joint Notice of Filing Redacted Copies of Summonses and Motion to Otherwise Redact Addresses from the Court's Public Record. The United States has moved to redact the addresses of five named former FBI employees from the docket in Case No. 22-cv-14101. Docketing staff from the clerk's office has advised my chambers that Case No. 22-cv-14101 was opened in error, and accordingly the addresses for all Defendants have now been removed from that docket. Signed by Judge Donald M. Middlebrooks on 3/30/2022. (kal) (Entered: 03/30/2022) |
| 03/30/2022 | 19 | NOTICE of filing letter by Phillp Roy Mohler  (ebz) (Entered  04/01/2022) |
| 04/04/2022 | 20 | Letter from Philip Mohler (lbc) (Entered: 04/04/2022) |
| 04/04/2022 | 21 | Plaintiff's MOTION to Disqualify Judge *Donald M. Middlebrooks* by Donald J. Trump. (Ticktin, Peter) (Entered: 04/04/2022) |
| 04/04/2022 | 22 | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Marc Elias served on 4/4/2022, response/answer due 4/25/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process on Marc Elias)(Ticktin, Peter) (Entered: 04/04/2022) |
| 04/06/2022 | 23 | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed R. Civ. P. 12 by Donald J. Trump. Debbie Wasserman Schultz served on 4/4/2022, response/answer due 4/25/2022. (Attachments  # 1 Affidavit Affidavit of Service of Process on Debbie Wasserman)(Ticktin, Peter) (Entered  04/06/2022) |
| 04/06/2022 | 24 | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Robert E. Mook served on 4/5/2022, response/answer due 4/26/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process on Robert E Mook)(Ticktin, Peter) (Entered: 04/06/2022) |
| 04/06/2022 | 25 | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R  Civ  P  12 by Donald J  Trump  Igor Danchenko served on 3/30/2022, response/answer due 4/20/2022  (Attachments  # 1 Affidavit Affidavit of Service of Process on Igor Danchenko)(Ticktin, Peter) (Entered: 04/06/2022) |
| 04/06/2022 | 26 | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Democratic National Committee served on 4/5/2022, response/answer due 4/26/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process on Democratic National Commitee)(Ticktin, Peter) (Entered: 04/06/2022) |
| 04/06/2022 | 27 | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R  Civ  P  12 by Donald J  Trump  Charles Halliday Dolan Jr  served on 3/30/2022, response/answer due 4/20/2022 (Attachments: # 1 Affidavit Affidavit of Service of Process Charles Halliday Dolan Jr.)(Ticktin, Peter) (Entered: 04/06/2022) |

| | | |
|---|---|---|
| 04/06/2022 | 28 | STRICKEN SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Andrew McCabe served on 4/5/2022, response/answer due 4/26/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process on Andrew McCabe)(Ticktin, Peter) Modified on 4/26/2022 (ebz). (Main Document 28 replaced on 4/26/2022) (ebz). (Attachment 1 replaced on 4/26/2022) (ebz). (Entered: 04/06/2022) |
| 04/06/2022 | 29 | ORDER OF RECUSAL. Magistrate Judge Ryon M. McCabe recused. Case reassigned to Magistrate Judge Bruce E. Reinhart as Paired Magistrate Judge for all further proceedings Signed by Magistrate Judge Ryon M McCabe on 4/6/2022 *See attached document for full details.* (jmd) (Entered: 04/06/2022) |
| 04/06/2022 | 30 | ORDER denying 21 Motion to Disqualify Judge. Signed by Judge Donald M. Middlebrooks on 4/6/2022. *See attached document for full details.* (gm1) (Entered: 04/06/2022) |
| 04/11/2022 | 31 | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Peter Fritsch served on 4/6/2022, response/answer due 4/27/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process)(Ticktin, Peter) (Entered: 04/11/2022) |
| 04/11/2022 | 32 | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. DNC Services Corporation served on 4/5/2022, response/answer due 4/26/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process)(Ticktin, Peter) (Entered: 04/11/2022) |
| 04/13/2022 | 33 | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Perkins Coie, LLC served on 4/6/2022, response/answer due 4/27/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process)(Ticktin, Peter) (Entered: 04/13/2022) |
| 04/13/2022 | 34 | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Nellie Ohr served on 3/31/2022, response/answer due 4/21/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process on Nellie Ohr)(Ticktin, Peter) (Entered: 04/13/2022) |
| 04/13/2022 | 35 | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Bruce Ohr served on 3/31/2022, response/answer due 4/21/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process on Bruce Ohr)(Ticktin, Peter) (Entered: 04/13/2022) |
| 04/14/2022 | 37 | Letter from Phillp Mohler. (ebz) (Entered: 04/15/2022) |
| 04/14/2022 | 38 | Letter from Phillp Mohler (ebz) (Entered: 04/15/2022) |
| 04/15/2022 | 36 | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. John Podesta served on 4/13/2022, response/answer due 5/4/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process on John Podesta)(Ticktin, Peter) (Entered: 04/15/2022) |
| 04/15/2022 | 39 | ORDER REFERRING CASE AND SETTING TRIAL DATE: (Jury Trial set for 5/8/2023 09:00 AM in Fort Pierce Division before Judge Donald M Middlebrooks , Calendar Call set for 5/3/2023 01 15 PM in West Palm Beach Division before Judge Donald M. Middlebrooks), ORDER REFERRING CASE to Magistrate Judge Bruce E. Reinhart to conduct a Scheduling Conference Signed by Judge Donald M Middlebrooks on 4/15/2022 *See attached document for full details* (ebz) |

| 04/15/2022 | | Pattern Jury Construction Builder Document - To access the latest date to reflect changes to the 11th Circuit Pattern Jury Instructions go to https://pji.ca11.uscourts.gov or click here. (Entered: 04/15/2022) |
|---|---|---|
| 04/18/2022 | [40](#) | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to [1](#) Complaint,,, by Neustar, Inc   Attorney Alexandria N Epps added to party Neustar, Inc.(pty:dft). (Attachments: # [1](#) Text of Proposed Order)(Epps, Alexandria) (Entered  04/18/2022) |
| 04/18/2022 | [41](#) | Certificate of Other Affiliates/Corporate Disclosure Statement by Neustar, Inc. identifying Corporate Parent TransUnion, Other Affiliate T. Rowe Price Group, Inc. for Neustar, Inc. (Epps, Alexandria) (Entered: 04/18/2022) |
| 04/19/2022 | 42 | PAPERLESS ORDER granting [40](#) Defendant Neustar, Inc 's Unopposed Motion for Extension of Time  Defendant Neustar, Inc. seeks a 30-day extension of its deadline to respond to the Complaint, citing the extensive nature of the Complaint and the need for additional time to review relevant documents  I find good cause to grant the Motion  Accordingly, the deadline for Defendant Neustar, Inc. to respond to the Complaint is extended to **May 20, 2022**. Signed by Judge Donald M. Middlebrooks on 4/19/22  (kal) (Entered  04/19/2022) |
| 04/19/2022 | [43](#) | SUMMONS (Affidavit) Returned Executed on [1](#) Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Glenn Simpson served on 4/5/2022, response/answer due 4/26/2022. (Attachments: # [1](#) Affidavit Affidavit of Service of Process on Glenn Simpson)(Ticktin, Peter) (Entered: 04/19/2022) |
| 04/19/2022 | [44](#) | SUMMONS (Affidavit) Returned Executed on [1](#) Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R Civ P 12 by Donald J  Trump  Michael Sussman served on 4/5/2022, response/answer due 4/26/2022  (Attachments  # [1](#) Affidavit Affidavit of Service of Process on Michael Sussmann)(Ticktin, Peter) (Entered: 04/19/2022) |
| 04/19/2022 | [45](#) | STRICKEN SUMMONS (Affidavit) Returned Executed on [1](#) Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Kevin Clinesmith served on 4/5/2022, response/answer due 4/26/2022. (Attachments: # [1](#) Affidavit Affidavit of Service of Process on Kevin Clinesmith)(Ticktin, Peter) Modified on 4/26/2022 (ebz). (Main Document 45 replaced on 4/26/2022) (ebz). (Attachment 1 replaced on 4/26/2022) (ebz). (Entered: 04/19/2022) |
| 04/20/2022 | [46](#) | SUMMONS (Affidavit) Returned Executed on [1](#) Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R Civ P 12 by Donald J  Trump  Fusion GPS served on 4/5/2022, response/answer due 4/26/2022  (Attachments  # [1](#) Affidavit Affidavit of Service of Process on Fusion GPS)(Ticktin, Peter) (Entered: 04/20/2022) |
| 04/20/2022 | [47](#) | MOTION for Extension of Time extension to 05/23/2022 to file responsive pleading by Charles Halliday Dolan Jr.. Attorney Jonathan Edward Levine added to party Charles Halliday Dolan Jr.(pty dft). Responses due by 5/4/2022 (Attachments: # [1](#) Proposed Order)(Levine, Jonathan) (Entered: 04/20/2022) |
| 04/20/2022 | [48](#) | NOTICE of Attorney Appearance by David Oscar Markus on behalf of Hillary R  Clinton  Attorney David Oscar Markus added to party Hillary R. Clinton(pty:dft). (Markus, David) (Entered: 04/20/2022) |
| 04/20/2022 | [49](#) | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for David E. Kendall. Filing Fee $ 200.00 Receipt # AFLSDC-15575147 by Hillary R. Clinton. Responses due by 5/4/2022 (Attachments: # [1](#) Certification, # [2](#) Text of Proposed Order)(Markus, David) (Entered: 04/20/2022) |

| 04/20/2022 | 50 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Michael J. Mestitz. Filing Fee $ 200.00 Receipt # BFLSDC-15575169 by Hillary R. Clinton. Responses due by 5/4/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Markus, David) (Entered: 04/20/2022) |
|---|---|---|
| 04/20/2022 | 51 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Katherine M. Turner. Filing Fee $ 200.00 Receipt # BFLSDC-15575178 by Hillary R. Clinton. Responses due by 5/4/2022 (Attachments # 1 Certification, # 2 Text of Proposed Order)(Markus, David) (Entered 04/20/2022) |
| 04/20/2022 | 52 | Defendant's MOTION to Dismiss with Prejudice 1 Complaint,,, by Hillary R. Clinton. Responses due by 5/4/2022 (Markus, David) (Entered: 04/20/2022) |
| 04/20/2022 | 53 | NOTICE of Attorney Appearance by Diana Marie Fassbender on behalf of Igor Danchenko  Attorney Diana Marie Fassbender added to party Igor Danchenko(pty:dft). (Fassbender, Diana) (Entered: 04/20/2022) |
| 04/20/2022 | 54 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Franklin Monsour Jr.. Filing Fee $ 200.00 Receipt # AFLSDC-15575603 by Igor Danchenko. Responses due by 5/4/2022 (Attachments: # 1 Text of Proposed Order)(Fassbender, Diana) (Entered: 04/20/2022) |
| 04/20/2022 | 55 | MOTION for Extension of Time to File Response/Reply/Answer as to 1 Complaint,,, by Igor Danchenko  (Attachments  # 1 Text of Proposed Order)(Fassbender, Diana) (Entered: 04/20/2022) |
| 04/21/2022 | 56 | ACKNOWLEDGEMENT of Service on 1 Complaint by Donald J. Trump. NO proof of service attached. (Ticktin, Peter). Modified on 4/21/2022 (lbc). (Entered: 04/21/2022) |
| 04/21/2022 | 57 | PAPERLESS ORDER granting 47 Defendant Charles Halliday Dolan's Unopposed Motion for Extension of Time. Defendant Dolan's deadline to respond to Plaintiff's Complaint was April 20, 2022  (DE 27 )  Defendant seeks a 30 day extension of this deadline, citing the extensive nature of the Complaint and that Defendant Dolan "is sorting through issues of legal representation " (DE 47 )  I find good cause to grant the Motion  Accordingly, Defendant Dolan's deadline to respond to the Complaint is extended to **May 23, 2022**. Signed by Judge Donald M. Middlebrooks on 4/21/2022. (kal) Modified signature date on 4/21/2022 (pcs)  (Entered  04/21/2022) |
| 04/21/2022 | 58 | PAPERLESS ORDER granting 49 , 50 , 51 , and 54 Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorneys David E. Kendall, Michael J. Mestitz, Katherine M. Turner, and Franklin Monsour Jr. Signed by Judge Donald M. Middlebrooks on 4/21/2022. (kal) (Entered: 04/21/2022) |
| 04/21/2022 | 59 | PAPERLESS ORDER granting 55 Defendant Igor Danchenko's Motion for Extension of Time. Defendant Danchenko's deadline to respond to Plaintiff's Complaint was April 20, 2022  (DE 25 )  Defendant Danchenko seeks an extension until May 20, 2022, citing that he "requires additional time" to evaluate the extensive Complaint. (DE 55 ). I find good cause to grant the Motion  Accordingly, Defendant Danchenko's deadline to respond to the Complaint is extended to **May 20, 2022**  Signed by Judge Donald M. Middlebrooks on 4/21/2022. (kal) (Entered: 04/21/2022) |
| 04/21/2022 | 60 | NOTICE of Attorney Appearance by Adam Seth Fels on behalf of Bruce Ohr, Nellie Ohr. Attorney Adam Seth Fels added to party Bruce Ohr(pty:dft), Attorney Adam Seth Fels added to party Nellie Ohr(pty:dft). (Fels, Adam) (Entered: 04/21/2022) |

| 04/21/2022 | 61 | NOTICE of Attorney Appearance by Eugene K. Pettis on behalf of Marc Elias. Attorney Eugene K. Pettis added to party Marc Elias(pty:dft). (Pettis, Eugene) (Entered: 04/21/2022) |
|---|---|---|
| 04/21/2022 | 62 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Benjamin Peacock  Filing Fee $ 200 00 Receipt # AFLSDC 15579823 by Bruce Ohr, Nellie Ohr  Responses due by 5/5/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Fels, Adam) (Entered: 04/21/2022) |
| 04/21/2022 | 63 | NOTICE of Attorney Appearance by Eugene K. Pettis on behalf of Marc Elias (Pettis, Eugene) (Entered: 04/21/2022) |
| 04/21/2022 | 64 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Joshua Berman. Filing Fee $ 200.00 Receipt # AFLSDC-15579833 by Bruce Ohr, Nellie Ohr. Responses due by 5/5/2022 (Attachments  # 1 Certification, # 2 Text of Proposed Order)(Fels, Adam) (Entered  04/21/2022) |
| 04/21/2022 | 65 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer by Nellie Ohr. (Attachments: # 1 Text of Proposed Order)(Fels, Adam) (Entered: 04/21/2022) |
| 04/21/2022 | 66 | MOTION to Expedite by Donald J Trump  (Attachments  # 1 Text of Proposed Order Order on Plaintiff's Motion for Enlargement of Time to File Amended Complaint)(Ticktin, Peter) (Entered: 04/21/2022) |
| 04/22/2022 | 67 | NOTICE of Attorney Appearance by Roberto Martinez on behalf of Michael Sussman. Attorney Roberto Martinez added to party Michael Sussman(pty:dft). (Martinez, Roberto) (Entered: 04/22/2022) |
| 04/22/2022 | 68 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for April A  Otterberg  Filing Fee $ 200 00 Receipt # AFLSDC 15581774 by Marc Elias  Responses due by 5/6/2022 (Attachments: # 1 Certification April Otterberg Certification Pursuant to Rule 4(b), # 2 Text of Proposed Order Order Granting Motion to Appear Pro Hac Vice)(Pettis, Eugene) (Entered 04/22/2022) |
| 04/22/2022 | 69 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Reid J. Schar. Filing Fee $ 200.00 Receipt # AFLSDC-15581858 by Marc Elias. Responses due by 5/6/2022 (Attachments: # 1 Certification Reid J. Schar Certification Pursuant to Rule 4(b), # 2 Text of Proposed Order Order Granting Motion to Appear Pro Hac Vice)(Pettis, Eugene) (Entered: 04/22/2022) |
| 04/22/2022 | 70 | PAPERLESS ORDER granting 65 Defendant Nellie Ohr's Unopposed Motion for Extension of Time  Defendant Nellie Ohr's deadline to respond to Plaintiff's Complaint is April 21, 2022. (DE 34 ). Defendant Nellie Ohr requests a 20-day extension of this deadline, citing the extensive nature of the Complaint  I find good cause to grant the Motion  Accordingly, Defendant Nellie Ohr's deadline to respond to the Complaint is extended to **May 11, 2022**. Signed by Judge Donald M. Middlebrooks on 4/22/2022  (kal) (Entered  04/22/2022) |
| 04/22/2022 | 71 | NOTICE of Attorney Appearance by Adam Seth Fels on behalf of Peter Fritsch, Fusion GPS, Glenn Simpson. Attorney Adam Seth Fels added to party Peter Fritsch(pty:dft), Attorney Adam Seth Fels added to party Fusion GPS(pty:dft), Attorney Adam Seth Fels added to party Glenn Simpson(pty:dft). (Fels, Adam) (Entered: 04/22/2022) |
| 04/22/2022 | 72 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Joshua A  Levy  Filing Fee $ 200 00 Receipt # AFLSDC 15582082 by Peter Fritsch, Fusion GPS, Glenn Simpson |

| 04/22/2022 | 73 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Rachel Clattenburg Filing Fee $ 200.00 Receipt # AFLSDC-15582090 by Peter Fritsch, Fusion GPS, Glenn Simpson. Responses due by 5/6/2022 (Fels, Adam) (Entered: 04/22/2022) |
|---|---|---|
| 04/22/2022 | 74 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Kevin P. Crenny. Filing Fee $ 200.00 Receipt # AFLSDC-15582106 by Peter Fritsch, Fusion GPS, Glenn Simpson. Responses due by 5/6/2022 (Fels, Adam) (Entered: 04/22/2022) |
| 04/22/2022 | 75 | NOTICE of Attorney Appearance by Eleni S Kastrenakes Howard on behalf of Perkins Coie, LLC Attorney Eleni S Kastrenakes Howard added to party Perkins Coie, LLC(pty:dft). (Kastrenakes Howard, Eleni) (Entered: 04/22/2022) |
| 04/22/2022 | 76 | NOTICE of Attorney Appearance by William R. Barzee on behalf of Robert E. Mook. Attorney William R. Barzee added to party Robert E. Mook(pty:dft). (Barzee, William) (Entered: 04/22/2022) |
| 04/22/2022 | 77 | NOTICE of Attorney Appearance by Gerald Edward Greenberg on behalf of Democratic National Committee. Attorney Gerald Edward Greenberg added to party Democratic National Committee(pty dft) (Greenberg, Gerald) (Entered 04/22/2022) |
| 04/22/2022 | 78 | NOTICE of Attorney Appearance by Gerald Edward Greenberg on behalf of DNC Services Corporation. Attorney Gerald Edward Greenberg added to party DNC Services Corporation(pty:dft). (Greenberg, Gerald) (Entered: 04/22/2022) |
| 04/22/2022 | 79 | Corporate Disclosure Statement by Perkins Coie, LLC (Kastrenakes Howard, Eleni) (Entered 04/22/2022) |
| 04/22/2022 | 80 | MOTION for Extension of Time to File Response/Reply/Answer as to 1 Complaint,,, by DNC Services Corporation, Democratic National Committee, Marc Elias, Peter Fritsch, Fusion GPS, Robert E. Mook, Perkins Coie, LLC, Glenn Simpson, Michael Sussman. (Attachments: # 1 Text of Proposed Order on Defendants' Motion for Extension of Time)(Kastrenakes Howard, Eleni) (Entered: 04/22/2022) |
| 04/23/2022 | 81 | NOTICE of Attorney Appearance by Gerald Edward Greenberg on behalf of Debbie Wasserman Schultz Attorney Gerald Edward Greenberg added to party Debbie Wasserman Schultz(pty:dft). (Greenberg, Gerald) (Entered: 04/23/2022) |
| 04/23/2022 | 82 | Agreed MOTION for Extension of Time to File Response/Reply/Answer as to 1 Complaint,,, by Debbie Wasserman Schultz. (Attachments: # 1 Text of Proposed Order Granting DWS Motion for Extension to Respond to Complaint)(Greenberg, Gerald) (Entered: 04/23/2022) |
| 04/25/2022 | 83 | PAPERLESS ORDER REQUIRING EXPEDITED RESPONSE to 66 "Plaintiff's Expedited Motion for an Extension of Time to File an Amended Complaint as a Matter of Course or to Response [sic] to Hillary Clinton's Motion to Dismiss." Plaintiff's Certificate of Conferral indicates that "[a]n email was sent to all counsel on record" and that Plaintiff's counsel "called David Kendall and left a message," but that no response was received at the time Plaintiff filed the Motion. This does not satisfy the conferral requirements of this court's Local Rules As such, I cannot discern whether the requested relief is opposed In the interest of ruling on Plaintiff's Motion without unnecessary delay I will expedite briefing. Therefore, if any Defendant opposes the Motion, they must file a response **on or before April 27, 2022** explaining their position Signed by Judge Donald M Middlebrooks on 4/25/2022. (kal) (Entered: 04/25/2022) |

| 04/25/2022 | 84 | MOTION To redact addresses from public record and preclude further filing of the addresses on the public record by United States Of America. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Redacted copy of docket entry 28, # 3 Exhibit Redacted copy of docket entry 28-1, # 4 Exhibit Redacted copy of docket entry 45, # 5 Exhibit Redacted copy of docket entry 45-1)(Erickson-Pogorzelski, Anthony) (Entered: 04/25/2022) |
| --- | --- | --- |
| 04/25/2022 | 85 | PAPERLESS ORDER granting 62 , 64 , 68 , 69 , 72 , 73 , and 74 Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorneys Benjamin Peacock, Joshua Berman, April A Otterberg, Reid J. Schar, Joshua A. Levy, Rachel Clattenburg, and Kevin P. Crenny. Signed by Judge Donald M. Middlebrooks on 4/25/2022  (kal) (Entered  04/25/2022) |
| 04/25/2022 | 86 | PAPERLESS ORDER granting 80 Defendants Perkins Coie LLP, Michael Sussman, Marc Elias, the Democratic National Committee and DNC Services Corp. (DNC), Robert E. Mook, Fusion GPS, Glenn Simpson, and Peter Fritsch's (collectively, "Defendants") Unopposed Motion for Extension of Time. Defendants seek an extension of time until May 11, 2022 for each to serve their respective responsive pleading or motion directed to the Complaint, citing the voluminous nature of Plaintiff's Complaint. I find good cause to grant the Motion. (DE 80 ). Accordingly, Defendants' deadline to respond to Plaintiff's Complaint is extended to **May 11, 2022**. Signed by Judge Donald M. Middlebrooks on 4/25/2022. (kal) (Entered: 04/25/2022) |
| 04/25/2022 | 87 | PAPERLESS ORDER granting 82 Defendant Debbie Wasserman Schultz's Agreed Motion to Extend Time to Respond to Complaint. Defendant's deadline to respond to Plaintiff's Complaint is April 25, 2022. (DE 23 ). She seeks to extend this deadline until May 11, 2022, citing the voluminous nature of Plaintiff's Complaint  I find good cause to grant the Motion  (DE 82 ). Accordingly, Defendant's deadline to respond to Plaintiff's Complaint is extended to **May 11, 2022** . Signed by Judge Donald M  Middlebrooks on 4/25/2022  (kal) (Entered  04/25/2022) |
| 04/25/2022 | 88 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for George R.A. Doumar. Filing Fee $ 200.00 Receipt # AFLSDC-15586857 by Charles Halliday Dolan Jr.. Responses due by 5/9/2022 (Attachments: # 1 Text of Proposed Order)(Levine, Jonathan) (Entered: 04/25/2022) |
| 04/25/2022 | 89 | STRICKEN RESPONSE to Motion re 66 MOTION to Expedite filed by Hillary R. Clinton. Replies due by 5/2/2022. (Markus, David) Modified per DE 101 NOTICE TO STRIKE on 4/28/2022 (ebz)  (Entered  04/25/2022) |
| 04/25/2022 | 99 | Clerks Notice to Filer re 89 Response to Motion. **Login/Signature Block Violation**; CORRECTIVE ACTION REQUIRED - The name of attorney e-filing this document via their CM/ECF login does not match the name of attorney on the signature block of the document. The name used for login must match the typed name on signature block of the document. This filing is a violation of Section 3J(1) of CM/ECF Admin Procedures and Local Rule 5.1(b). Filer must File a Notice of Striking, then refile document pursuant to CM/ECF Admin Procedures and Local Rules. (ebz) (Entered: 04/27/2022) |
| 04/26/2022 | 90 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Shawn G  Crowley  Pay gov Agency Tracking ID FLSDC AFLSDC 15589054  Filing Fee $ 200 00 by DNC Services Corporation, Democratic National Committee, Debbie Wasserman Schultz. Responses due by 5/10/2022 (Attachments: # 1 Text of Proposed Order Granting PHV of Shawn G  Crowley)(Greenberg, Gerald) (Entered  04/26/2022) |
| 04/26/2022 | 91 | NOTICE of Attorney Appearance by Edward Soto on behalf of Rodney Joffe. Attorney Edward Soto added to party Rodney Joffe(pty:dft). (Soto, Edward) (Entered: 04/26/2022) |

USCA11 Case: 23-13177 Document: 90-1 Date Filed: 03/05/2024 Page: 13 of 233

| 04/26/2022 | 92 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 1 Complaint,,, by Rodney Joffe. (Attachments: # 1 Text of Proposed Order)(Soto, Edward) (Entered: 04/26/2022) |
|---|---|---|
| 04/26/2022 | 93 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Steven Tyrrell Filing Fee $ 200 00 Receipt # AFLSDC 15589786 by Rodney Joffe Responses due by 5/10/2022 (Attachments: # 1 Text of Proposed Order)(Soto, Edward) (Entered: 04/26/2022) |
| 04/26/2022 | 94 | PAPERLESS ORDER granting 88 and 90 Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorneys George R.A. Doumar and Shawn G. Crowley. Signed by Judge Donald M. Middlebrooks on 4/26/2022. (kal) (Entered: 04/26/2022) |
| 04/26/2022 | 95 | ORDER GRANTING SECOND MOTION TO REDACT The United States' Second Motion to Redact DE 84 Motion is GRANTED IN PART AND RULING IS RESERVED IN PART. The Motion is GRANTED to the extent that it seeks redaction of the documents nowin the court file Accordingly, the Clerk of Court is directed to STRIKE and REMOVE Docket Entries 28, 28-1, 45, and 45-1 from the record. These items shall be substituted with the redacted versions filed by the government. On or before April 28, 2022, Plaintiff SHALL RESPOND to that portion of the United States' Motion which sets forth a suggested procedure for handling future improper disclosures of addresses in court documents. Signed by Judge Donald M. Middlebrooks on 4/26/2022 *See attached document for full details* (ebz) (Entered 04/26/2022) |
| 04/26/2022 | 96 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Christopher Muha. Filing Fee $ 200.00 Receipt # AFLSDC-15591802 by Kevin Clinesmith. Attorney Noah Hy Brozinsky added to party Kevin Clinesmith(pty:dft). Responses due by 5/10/2022 (Attachments: # 1 Text of Proposed Order Proposed Order)(Brozinsky, Noah) (Entered: 04/26/2022) |
| 04/26/2022 | 97 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for William Pittard. Filing Fee $ 200.00 Receipt # AFLSDC-15591820 by Kevin Clinesmith. Responses due by 5/10/2022 (Attachments # 1 Text of Proposed Order Proposed Order William Pittard)(Brozinsky, Noah) (Entered 04/26/2022) |
| 04/26/2022 | 98 | Defendant's MOTION for Extension of Time to File Response/Reply/Answer as to 45 Summons Returned Executed, by Kevin Clinesmith. (Attachments: # 1 Text of Proposed Order Proposed Order)(Brozinsky, Noah) (Entered: 04/26/2022) |
| 04/27/2022 | 100 | NOTICE of Change of Address, Email or Law Firm Name by Noah Hy Brozinsky (Brozinsky, Noah) (Entered 04/27/2022) |
| 04/27/2022 | 101 | NOTICE of Striking 89 Response to Motion filed by Hillary R. Clinton by Hillary R. Clinton (Markus, David) (Entered: 04/27/2022) |
| 04/27/2022 | 102 | RESPONSE to Motion re 66 MOTION to Expedite filed by Hillary R Clinton Replies due by 5/4/2022 (Markus, David) (Entered: 04/27/2022) |
| 04/27/2022 | 103 | NOTICE of Attorney Appearance by Howard Jay Harrington on behalf of Perkins Coie, LLC. Attorney Howard Jay Harrington added to party Perkins Coie, LLC(pty:dft). (Harrington, Howard) (Entered: 04/27/2022) |
| 04/27/2022 | 104 | PAPERLESS ORDER granting 92 Defendant Rodney Joffe's Unopposed Motion for Extension of Time. Defendant Joffe's deadline to respond to the Complaint is May 11, 2022 Defendant Joffe seeks a nine day extension until May 20, 2022, citing the extensive nature of the Complaint and that more time will allow an opportunity to coordinate with counsel for other |

| | | |
|---|---|---|
| | | Defendants to minimize duplication. I find good cause to grant the Motion. Accordingly, Defendant Joffe's deadline to respond to the Complaint is extended to **May 20, 2022**. Signed by Judge Donald M. Middlebrooks on 4/27/2022. (kal) (Entered: 04/27/2022) |
| 04/27/2022 | 105 | PAPERLESS ORDER granting 93 , 96 , and 97 Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorneys Steven Tyrrell, Christopher Muha, and William Pittard Signed by Judge Donald M. Middlebrooks on 4/27/2022. (kal) (Entered: 04/27/2022) |
| 04/27/2022 | 106 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for F. Joseph Warin. Filing Fee $ 200.00 Receipt # AFLSDC-15595561 by Perkins Coie, LLC. Responses due by 5/11/2022 (Attachments: # 1 Certification of Attorney F. Joseph Warin, # 2 Text of Proposed Order on Motion to Appear Pro Hac Vice) (Kastrenakes Howard, Eleni) (Entered: 04/27/2022) |
| 04/27/2022 | 107 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Geoffrey M  Sigler  Filing Fee $ 200 00 Receipt # AFLSDC 15595563 by Perkins Coie, LLC  Responses due by 5/11/2022 (Attachments: # 1 Certification of Attorney Geoffrey M. Sigler, # 2 Text of Proposed Order on Motion to Appear Pro Hac Vice)(Kastrenakes Howard, Eleni) (Entered  04/27/2022) |
| 04/27/2022 | 108 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Katherine Moran Meeks. Filing Fee $ 200.00 Receipt # AFLSDC-15595567 by Perkins Coie, LLC. Responses due by 5/11/2022 (Attachments: # 1 Certification of Attorney Katherine Moran Meeks, # 2 Text of Proposed Order on Motion to Appear Pro Hac Vice)(Kastrenakes Howard, Eleni) (Entered: 04/27/2022) |
| 04/27/2022 | 109 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Nancy E. Hart. Filing Fee $ 200.00 Receipt # AFLSDC-15595571 by Perkins Coie, LLC. Responses due by 5/11/2022 (Attachments  # 1 Certification of Attorney Nancy E  Hart, # 2 Text of Proposed Order on Motion to Appear Pro Hac Vice) (Kastrenakes Howard, Eleni) (Entered: 04/27/2022) |
| 04/27/2022 | 110 | ORDER GRANTING DEFENDANT KEVIN E. CLINESMITH'S MOTION TO EXTEND RESPONSE DEADLINE re 98 Motion for Extension of Time to File Response/Answer to a Complaint or Other Case Initiating Document Kevin Clinesmith. Response/Answer due 6/27/2022. Signed by Judge Donald M. Middlebrooks on 4/27/2022. *See attached document for full details.* (ebz) (Entered: 04/28/2022) |
| 04/28/2022 | 111 | ORDER GRANTING PLAINTIFF'S EXPEDITED MOTION FOR AN EXTENSION OF TIME re 66 Motion to Expedite. Amended Complaint due by 6/20/2022  Responses due by 6/20/2022 Signed by Judge Donald M  Middlebrooks on 4/28/2022 *See attached document for full details.* (ebz) (Entered: 04/28/2022) |
| 04/28/2022 | 112 | RESPONSE in Opposition re 84 MOTION To redact addresses from public record and preclude further filing of the addresses on the public record filed by Donald J. Trump. Replies due by 5/5/2022. (Ticktin, Peter) (Entered: 04/28/2022) |
| 04/29/2022 | 113 | PAPERLESS ORDER granting 106 , 107 , 108 , and 109 Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorneys F  Joseph Warin, Geoffrey M  Sigler, Katherine Moran Meeks, and Nancy E. Hart. Signed by Judge Donald M. Middlebrooks on 4/29/2022. (kal) (Entered: 04/29/2022) |

| Date | Doc # | Description |
|---|---|---|
| 04/29/2022 | 114 | REPLY IN SUPPORT OF UNITED STATES OF AMERICA'S UNOPPOSED SECOND re 84 MOTION To redact addresses from public record and preclude further filing of the addresses on the public record filed by United States Of America. (Erickson-Pogorzelski, Anthony) Modified text on 4/29/2022 (ebz). (Entered: 04/29/2022) |
| 04/29/2022 | 115 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Maximillian Feldman. Filing Fee $ 200.00 Receipt # AFLSDC-15602245 by DNC Services Corporation, Democratic National Committee, Debbie Wasserman Schultz Responses due by 5/13/2022 (Attachments # 1 Text of Proposed Order Granting PHV of Maximillian Feldman.)(Greenberg, Gerald) (Entered: 04/29/2022) |
| 05/02/2022 | 116 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Wendy B. Reilly. Filing Fee $ 200.00 Receipt # AFLSDC-15604719 by Robert E. Mook. Responses due by 5/16/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Barzee, William) (Entered: 05/02/2022) |
| 05/02/2022 | 117 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Isabela M. Garcez. Filing Fee $ 200.00 Receipt # AFLSDC-15604840 by Robert E. Mook. Responses due by 5/16/2022 (Attachments # 1 Certification, # 2 Text of Proposed Order)(Barzee, William) (Entered 05/02/2022) |
| 05/02/2022 | 118 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Andrew J. Ceresney. Filing Fee $ 200.00 Receipt # AFLSDC-15604897 by Robert E. Mook. Responses due by 5/16/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Barzee, William) (Entered: 05/02/2022) |
| 05/03/2022 | 119 | STRICKEN MOTION to Intervene by Jimmy Smith. (ebz) Modified per DE 126 Order on 5/5/2022 (ebz)   Entered: 05/03/2022) |
| 05/03/2022 | 120 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Robert P. Trout. Filing Fee $ 200.00 Receipt # AFLSDC-15609103 by HFACC, Inc., John Podesta. Attorney Paola Pinto added to party HFACC, Inc.(pty:dft), Attorney Paola Pinto added to party John Podesta(pty:dft). Responses due by 5/17/2022 (Attachments: # 1 Text of Proposed Order)(Pinto, Paola) (Entered: 05/03/2022) |
| 05/03/2022 | 121 | PAPERLESS ORDER granting 115 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Maximillian Feldman. Signed by Judge Donald M. Middlebrooks on 5/3/2022  (kal) (Entered  05/03/2022) |
| 05/03/2022 | 122 | PAPERLESS ORDER granting 116 , 117 , and 118 Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Wendy B. Reilly, Isabela M. Garcez, and Andrew J. Ceresney. Signed by Judge Donald M. Middlebrooks on 5/3/2022. (kal) (Entered: 05/03/2022) |
| 05/04/2022 | 123 | PAPERLESS ORDER Setting Status Conference: a Status Conference Re: Scheduling/Deadlines/Procedural Matters is hereby set for **6/2/2022 at 2:00 PM** in the West Palm Beach Division before Magistrate Judge Bruce E  Reinhart  Counsel shall be prepared to discuss the scheduling of the Rule 16 conference.<br><br>The June 2nd Status Conference will be held in Courtroom 2 of the U S  Courthouse located at 701 Clematis Street in West Palm Beach, Florida. Anyone may attend the status conference in person. In the alternative, counsel may appear remotely via Zoom  The Court will email the Zoom link to counsel in advance of the conference  Only counsel will be permitted to attend |

the status conference via Zoom. Members of the public or press may listen to the audio of the conference using the following telephone link:

Dial by your location: +1 669 254 5252 US (San Jose) +1 646 828 7666 US (New York) +1 551 285 1373 US +1 669 216 1590 US (San Jose) Meeting ID: 160 751 8992; Passcode: 717319. Find your local number: https://www.zoomgov.com/u/aeEkZDMCbU. Signed by Magistrate Judge Bruce E. Reinhart on 5/4/2022. (hk02) (Entered: 05/04/2022)

| | | |
|---|---|---|
| 05/04/2022 | 124 | MOTION TO DISMISS 1 Complaint,,, FOR FAILURE TO STATE A CLAIM by John Podesta Responses due by 5/18/2022 (Pinto, Paola) (Entered: 05/04/2022) |
| 05/04/2022 | 125 | PAPERLESS ORDER granting 120 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Robert P. Trout. Signed by Judge Donald M. Middlebrooks on 5/4/2022. (kal) (Entered: 05/04/2022) |
| 05/05/2022 | 126 | ORDER STRIKING MOTION TO INTERVENE re 119 Motion to Intervene filed by Jimmy Smith Signed by Judge Donald M. Middlebrooks on 5/5/2022. *See attached document for full details.* (ebz) (Entered: 05/05/2022) |
| 05/05/2022 | 127 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Roberta A. Kaplan. Filing Fee $ 200.00 Receipt # AFLSDC-15616626 by DNC Services Corporation, Democratic National Committee, Debbie Wasserman Schultz. Responses due by 5/19/2022 (Attachments: # 1 Text of Proposed Order Granting PHV of Roberta A. Kaplan)(Greenberg, Gerald) (Entered: 05/05/2022) |
| 05/06/2022 | 128 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Stephen Barry Filing Fee $ 200 00 Receipt # AFLSDC 15618815 by Michael Sussman Responses due by 5/20/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Martinez, Roberto) (Entered: 05/06/2022) |
| 05/06/2022 | 129 | PAPERLESS ORDER granting 127 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Roberta A. Kaplan. Signed by Judge Donald M. Middlebrooks on 5/6/2022. (kal) (Entered: 05/06/2022) |
| 05/06/2022 | 130 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Sean Berkowitz. Filing Fee $ 200.00 Receipt # AFLSDC-15618873 by Michael Sussman. Responses due by 5/20/2022 (Attachments  # 1 Certification, # 2 Text of Proposed Order)(Martinez, Roberto) (Entered  05/06/2022) |
| 05/06/2022 | 131 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Michael Bosworth. Filing Fee $ 200.00 Receipt # AFLSDC-15618882 by Michael Sussman. Responses due by 5/20/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Martinez, Roberto) (Entered: 05/06/2022) |
| 05/06/2022 | 132 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Michael Houlihan  Filing Fee $ 200 00 Receipt # AFLSDC 15618905 by Michael Sussman  Responses due by 5/20/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Martinez, Roberto) (Entered: 05/06/2022) |
| 05/09/2022 | 133 | NOTICE of Attorney Appearance by William R. Barzee on behalf of Jake Sullivan. Attorney William R. Barzee added to party |

1/1/24, 7:38 PM                                    CM/ECF - Live Database - flsd

Jake Sullivan (pty:dft) (Barzee, William) (Entered: 05/09/2022)
USCA11 Case: 23-13217    Document: 90    Date Filed: 03/05/2024    Page: 17 of 233

| 05/09/2022 | [134] | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Brian L Stekloff Filing Fee $ 200 00 Receipt # AFLSDC 15622123 by Jake Sullivan Responses due by 5/23/2022 (Attachments: # [1] Certification, # [2] Text of Proposed Order)(Barzee, William) (Entered: 05/09/2022) |
| 05/09/2022 | [135] | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Sarah E. Neuman. Filing Fee $ 200.00 Receipt # AFLSDC-15622146 by Jake Sullivan. Responses due by 5/23/2022 (Attachments: # [1] Certification, # [2] Text of Proposed Order)(Barzee, William) (Entered: 05/09/2022) |
| 05/09/2022 | 136 | PAPERLESS ORDER granting [128] , [130] , [131] , and [132] Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorneys Stephen Barry, Sean Berkowitz, Michael Bosworth, and Michael Houlihan Signed by Judge Donald M Middlebrooks on 5/9/2022 (kal) (Entered 05/09/2022) |
| 05/10/2022 | [137] | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to [124] MOTION TO DISMISS [1] Complaint,,, FOR FAILURE TO STATE A CLAIM by Donald J. Trump. (Attachments: # [1] Text of Proposed Order)(Ticktin, Peter) (Entered: 05/10/2022) |
| 05/10/2022 | 138 | PAPERLESS ORDER granting [134] and [135] Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorneys Brian L Stekloff and Sarah E Neuman Signed by Judge Donald M. Middlebrooks on 5/10/2022. (kal) (Entered: 05/10/2022) |
| 05/11/2022 | [139] | MOTION to Dismiss with Prejudice [1] Complaint,,, by Peter Fritsch, Fusion GPS, Glenn Simpson. Responses due by 5/25/2022 (Fels, Adam) (Entered: 05/11/2022) |
| 05/11/2022 | [140] | Defendant's Certificate of Other Affiliates/Corporate Disclosure Statement - NONE disclosed by Fusion GPS (Fels, Adam) (Entered 05/11/2022) |
| 05/11/2022 | [141] | MOTION TO DISMISS [1] Complaint,,, FOR FAILURE TO STATE A CLAIM *and Memorandum of Law in Support* by DNC Services Corporation, Democratic National Committee, Debbie Wasserman Schultz. Responses due by 5/25/2022 (Greenberg, Gerald) (Entered: 05/11/2022) |
| 05/11/2022 | [142] | Corporate Disclosure Statement by DNC Services Corporation, Democratic National Committee (Greenberg, Gerald) (Entered 05/11/2022) |
| 05/11/2022 | [143] | Defendant's MOTION TO DISMISS [1] Complaint,,, FOR FAILURE TO STATE A CLAIM *Perkins Coie LLP's Motion to Dismiss Under Federal Rule 12(B)(6) and Incorporated Memorandum of Law* by Perkins Coie, LLC. Responses due by 5/25/2022 (Attachments: # [1] Exhibit 1 (Excerpts from IG Report))(Kastrenakes Howard, Eleni) (Entered: 05/11/2022) |
| 05/11/2022 | [144] | MOTION to Dismiss with Prejudice [1] Complaint,,, by Nellie Ohr. Responses due by 5/25/2022 (Fels, Adam) (Entered: 05/11/2022) |
| 05/11/2022 | [145] | MOTION to Dismiss with Prejudice [1] Complaint,,, by Robert E. Mook. Responses due by 5/25/2022 (Barzee, William) (Entered: 05/11/2022) |

| | | |
|---|---|---|
| 05/11/2022 | [146](#) | MOTION to Dismiss with Prejudice [1](#) Complaint,,, by Michael Sussman. Responses due by 5/25/2022 (Martinez, Roberto) (Entered: 05/11/2022) |
| 05/11/2022 | [147](#) | MOTION to Dismiss with Prejudice [1](#) Complaint,,, *UNDER FEDERAL RULE 12(B)(6)* by Marc Elias. Responses due by 5/25/2022 (Attachments # [1](#) Exhibit Mueller Report)(Pettis, Eugene) (Entered 05/11/2022) |
| 05/12/2022 | 148 | PAPERLESS ORDER granting [137](#) Plaintiff's Unopposed Motion for an Extension of Time to Respond to Defendant John Podesta's Motion to Dismiss (DE [124](#) ). For the same reasons articulated in my Order granting Plaintiff's Motion for an Extension of Time to Respond to Defendant Hillary Clinton's Motion to Dismiss (DE [111](#) ), Plaintiff's Motion (DE [137](#) ) is granted. Signed by Judge Donald M. Middlebrooks on 5/12/2022. (kal) (Entered: 05/12/2022) |
| 05/16/2022 | [149](#) | MOTION TO DISMISS [1](#) Complaint,,, FOR FAILURE TO STATE A CLAIM by HFACC, Inc   Responses due by 5/31/2022 (Pinto, Paola) (Entered: 05/16/2022) |
| 05/16/2022 | [150](#) | STRICKEN Corporate Disclosure Statement by HFACC, Inc. (Pinto, Paola) Modified per DE [154](#) NOTICE TO STRIKE on 5/18/2022 (ebz). (Entered: 05/16/2022) |
| 05/16/2022 | [151](#) | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to [143](#) Defendant's MOTION TO DISMISS [1](#) Complaint,,, FOR FAILURE TO STATE A CLAIM *Perkins Coie LLP's Motion to Dismiss Under Federal Rule 12(B)(6) and Incorporated Memorandum of Law*, [141](#) MOTION TO DISMISS [1](#) Complaint,,, FOR FAILURE TO STATE A CLAIM *and Memorandum of Law in Support*, [146](#) MOTION to Dismiss with Prejudice [1](#) Complaint,,, , [144](#) MOTION to Dismiss with Prejudice [1](#) Complaint,,, , [145](#) MOTION to Dismiss with Prejudice [1](#) Complaint,,, , [147](#) MOTION to Dismiss with Prejudice [1](#) Complaint,,, *UNDER FEDERAL RULE 12(B)(6)*, [139](#) MOTION to Dismiss with Prejudice [1](#) Complaint,,, by Donald J Trump (Attachments: # [1](#) Text of Proposed Order)(Ticktin, Peter) (Entered: 05/16/2022) |
| 05/16/2022 | 152 | Clerks Notice to Filer re [150](#) Certificate of Other Affiliates/Corporate Disclosure Statement. **Login/Signature Block Violation**; CORRECTIVE ACTION REQUIRED - The name of attorney e-filing this document via their CM/ECF login does not match the name of attorney on the signature block of the document. The name used for login must match the typed name on signature block of the document. This filing is a violation of Section 3J(1) of CM/ECF Admin Procedures and Local Rule 5.1(b). Filer must File a Notice of Striking, then refile document pursuant to CM/ECF Admin Procedures and Local Rules. (ebz) (Entered: 05/17/2022) |
| 05/17/2022 | 153 | PAPERLESS ORDER granting [151](#) Plaintiff's Unopposed Motion for Extension of Time. Plaintiff seeks an extension of time to respond to the recently filed Motions to Dismiss in this matter (DE [139](#) , DE [141](#) , DE [143](#) , DE [144](#) , DE [145](#) , DE [146](#) , DE [147](#) ). For the same reasons articulated in my Order granting Plaintiff's Motion for Extension of Time to Respond to Defendant Hillary Clinton's Motion to Dismiss (DE [111](#) ), Plaintiff's Motion (DE [151](#) ) is granted  In the interest of efficiency, I will also *sua sponte* extend Plaintiff's deadline to respond to Defendant HFACC's Motion to Dismiss (DE [149](#) ), and any future motions to dismiss filed by the Defendants, until **June 20, 2022**  Signed by Judge Donald M  Middlebrooks on 5/17/2022  (kal) (Entered: 05/17/2022) |
| 05/17/2022 | [154](#) | NOTICE of Striking [150](#) Certificate of Other Affiliates/Corporate Disclosure Statement filed by HFACC, Inc. by HFACC, Inc. (Pinto, Paola) (Entered: 05/17/2022) |
| 05/17/2022 | [155](#) | Corporate Disclosure Statement by HFACC, Inc. (Pinto, Paola) (Entered: 05/17/2022) |

USCA11 Case: 23-13177    Document: 90-1    Date Filed: 03/05/2024    Page: 19 of 233

| | | |
|---|---|---|
| 05/20/2022 | 156 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Samantha L. Southall, Esquire. Filing Fee $ 200.00 Receipt # AFLSDC-15656205 by Neustar, Inc.. Attorney Jennifer Olmedo-Rodriguez added to party Neustar, Inc.(pty:dft). Responses due by 6/3/2022 (Attachments: # 1 Exhibit A - Certification of Samantha L. Southall, # 2 Exhibit B - Proposed Order)(Olmedo-Rodriguez, Jennifer) (Entered: 05/20/2022) |
| 05/20/2022 | 157 | MOTION TO DISMISS 1 Complaint,,, FOR FAILURE TO STATE A CLAIM *and Memorandum of Law* by Rodney Joffe. Responses due by 6/3/2022 (Attachments # 1 Exhibit A Trump Declaration)(Soto, Edward) (Entered 05/20/2022) |
| 05/20/2022 | 158 | STIPULATED MOTION for Substitution of Counsel. Substituting Jennifer Olmedo-Rodriguez, Esquire for Alexandria N. Epps by Neustar, Inc.. Responses due by 6/3/2022 (Olmedo-Rodriguez, Jennifer) (Entered: 05/20/2022) |
| 05/20/2022 | 159 | MOTION TO DISMISS 1 Complaint,,, FOR FAILURE TO STATE A CLAIM *and Incorporated Memorandum of Law in Support* by Igor Danchenko. Responses due by 6/3/2022 (Attachments: # 1 Exhibit 1 - Inspector General Report)(Fassbender, Diana) (Entered: 05/20/2022) |
| 05/20/2022 | 160 | MOTION TO DISMISS 1 Complaint,,, FOR FAILURE TO STATE A CLAIM by Neustar, Inc.. Responses due by 6/3/2022 (Olmedo-Rodriguez, Jennifer) (Entered: 05/20/2022) |
| 05/23/2022 | 161 | PAPERLESS ORDER granting 156 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Samantha L. Southall. Signed by Judge Donald M. Middlebrooks on 5/23/2022 (kal) (Entered 05/23/2022) |
| 05/23/2022 | 162 | MOTION TO DISMISS 1 Complaint,,, FOR FAILURE TO STATE A CLAIM by Charles Halliday Dolan Jr.. Responses due by 6/6/2022 (Levine, Jonathan) (Entered: 05/23/2022) |
| 05/23/2022 | 163 | MOTION TO DISMISS 1 Complaint,,, 162 MOTION TO DISMISS 1 Complaint,,, FOR FAILURE TO STATE A CLAIM FOR FAILURE TO STATE A CLAIM *Memorandum In Support of Motion to Dismiss* by Charles Halliday Dolan Jr.. Responses due by 6/6/2022 (Attachments # 1 Exhibit Dolan Declaration, # 2 Exhibit Danchenko Indictment)(Levine, Jonathan) (Entered: 05/23/2022) |
| 05/23/2022 | 164 | ORDER GRANTING MOTION FOR SUBSTITUTION OF COUNSEL. ORDER granting 158 Motion for Substitution of Counsel. Attorney Jennifer Olmedo-Rodriguez added. Attorney Alexandria N Epps representing Neustar, Inc. (Defendant) terminated. Signed by Judge Donald M. Middlebrooks on 5/23/2022. *See attached document for full details.* (amb) (Entered: 05/24/2022) |
| 05/25/2022 | 165 | MOTION to Dismiss with Prejudice 1 Complaint,,, by Jake Sullivan. Responses due by 6/8/2022 (Barzee, William) (Entered: 05/25/2022) |
| 05/31/2022 | 166 | Joint MOTION Adjourn Status Conference re 123 Order Setting Status Conference,,,, by Hillary R. Clinton. (Markus, David) (Entered: 05/31/2022) |
| 05/31/2022 | 167 | PAPERLESS ORDER denying 166 the parties' Joint Motion to Adjourn the Status Conference to be held on 6/2/22 Signed by Magistrate Judge Bruce E. Reinhart on 5/31/2022. (hk02) (Entered: 05/31/2022) |

USCA11 Case: 23-13177     Document: 90-1     Date Filed: 03/05/2024     Page: 20 of 233

| | | |
|---|---|---|
| 06/01/2022 | 168 | NOTICE of Attorney Appearance by Zachary Andrew Lipshultz on behalf of Michael Sussman. Attorney Zachary Andrew Lipshultz added to party Michael Sussman(pty:dft). (Lipshultz, Zachary) (Entered: 06/01/2022) |
| 06/02/2022 | 169 | NOTICE OF UNAVAILABILITY by Donald J. Trump for dates of June 2nd to June 6th; August 3rd to August 8th and August 18th to August 31st of 2022 (Sasson, Jamie) (Entered: 06/02/2022) |
| 06/02/2022 | 170 | PAPERLESS Minute Entry for proceedings held before Magistrate Judge Bruce E. Reinhart: Status Conference held on 6/2/2022. Total time in court: 30 minutes. Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. (hk02) (Entered: 06/02/2022) |
| 06/03/2022 | 171 | MOTION to Reconsider Judge Middlebrooks' Order re 126 Order Striking by Jimmy Smith. (Address Updated) (ebz) Modified text on 6/3/2022 (ebz) (Entered: 06/03/2022) |
| 06/06/2022 | 172 | ORDER DENYING MOTION FOR RECONSIDERATION re 171 Motion for Reconsideration by Jimmy Smith. Signed by Judge Donald M. Middlebrooks on 6/6/2022. *See attached document for full details.* (ebz) (Entered: 06/06/2022) |
| 06/07/2022 | 173 | Notice of Appeal re 126 Order Striking by Jimmy Smith  FILING FEE  (NOT PAID)  Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]  For information go to our FLSD website under Transcript Information  (apz) (Entered: 06/10/2022) |
| 06/07/2022 | | Transmission of Notice of Appeal, Order under appeal and Docket Sheet to US Court of Appeals re 173 Notice of Appeal, Notice has been electronically mailed. (apz) (Entered: 06/10/2022) |
| 06/10/2022 | 174 | CLERK'S NOTICE of Mailing Transcript Information Form to Jimmy Smith re 173 Notice of Appeal. (apz) (Entered: 06/10/2022) |
| 06/14/2022 | 175 | PAPERLESS ORDER Setting a Status Conference for 7/6/2022 at 2:00 PM in West Palm Beach Division before Magistrate Judge Bruce E. Reinhart.<br><br>The July 6th Status Conference will be held in Courtroom 2 of the U.S. Courthouse located at 701 Clematis Street in West Palm Beach, Florida. Anyone may attend the status conference in person. In the alternative, counsel may appear remotely via Zoom using the same link previously provided. Only counsel will be permitted to attend the status conference via Zoom. Members of the public or press may listen to the audio of the conference using the following telephone link:<br><br>Dial by your location: +1 669 254 5252 US (San Jose) +1 646 828 7666 US (New York) +1 551 285 1373 US +1 669 216 1590 US (San Jose) Meeting ID: 160 751 8992; Passcode: 717319. Find your local number: https://www.zoomgov.com/u/aeEkZDMCbU. Signed by Magistrate Judge Bruce E. Reinhart on 5/4/2022. (hk02) (Entered: 05/04/2022) Signed by Magistrate Judge Bruce E. Reinhart on 6/14/2022. (hk02) (Entered: 06/14/2022) |
| 06/17/2022 | 176 | Acknowledgment of Receipt of NOA from USCA re 173 Notice of Appeal, filed by Jimmy Smith  Date received by USCA 6/10/22. USCA Case Number: 22-11955-J. (vjk) (Entered: 06/21/2022) |

USCA11 Case: 23-13177      Document: 90-1      Date Filed: 03/05/2024      Page: 21 of 233

| 06/21/2022 | [177](#) | AMENDED COMPLAINT against ABC Corporations 1 through 10, Kevin Clinesmith, Hillary R. Clinton, James Comey, DNC Services Corporation, Igor Danchenko, Democratic National Committee, Charles Halliday Dolan Jr., Marc Elias, Peter Fritsch, Fusion GPS, HFACC, Inc., Rodney Joffe, John Does 1 through 10, Andrew McCabe, Robert E. Mook, Neustar, Inc., Bruce Ohr, Nellie Ohr, Orbis Business Intelligence, Ltd., Lisa Page, Perkins Coie, LLC, John Podesta, Phillipe Reines, Debbie Wasserman Schultz, Glenn Simpson, Christopher Steele, Peter Strzok, Jake Sullivan, Michael Sussman, United States Of America, Adam Schiff, Rod Rosenstein, filed by Donald J. Trump.(Ticktin, Peter) (Entered: 06/21/2022) |
|---|---|---|
| 06/21/2022 | [178](#) | NOTICE of Filing Proposed Summons(es) by Donald J. Trump re [177](#) Amended Complaint/Amended Notice of Removal,, filed by Donald J Trump (Ticktin, Peter) (Entered 06/21/2022) |
| 06/21/2022 | [179](#) | STRICKEN NOTICE of Filing Proposed Summons(es) by Donald J. Trump re [177](#) Amended Complaint/Amended Notice of Removal,, filed by Donald J. Trump (Ticktin, Peter) Modified per DE 214 Order on 7/11/2022 (ebz). Modified text on 7/11/2022 (ebz). (Entered: 06/21/2022) |
| 06/21/2022 | 180 | Clerks Notice to Filer re [177](#) Amended Complaint. **Parties Not Added**; ERROR - The Filer failed to add all parties from the amended complaint  Filer is instructed to file a Notice of Entry of Parties Listed into CM/ECF and add the additional parties (ebz) (Entered: 06/22/2022) |
| 06/22/2022 | [181](#) | Summons Issued as to Rod Rosenstein, Adam Schiff. (Attachments: # [1](#) Stricken and Removed)(ebz) Modified on 6/28/2022 (ls). (per DE # [191](#) ) (Entered: 06/22/2022) |
| 06/22/2022 | [182](#) | Notice of Entry of Parties Listed on [177](#) Amended Complaint/Amended Notice of Removal,, into CM/ECF. NOTE: New Filer(s) will appear twice, since they are also a new party in the case  New Filer(s)/Party(s)  Neustar Security Services (Ticktin, Peter) (Entered: 06/22/2022) |
| 06/22/2022 | [183](#) | NOTICE of Filing Proposed Summons(es) by Donald J. Trump re [177](#) Amended Complaint/Amended Notice of Removal,, filed by Donald J. Trump (Ticktin, Peter) (Entered: 06/22/2022) |
| 06/22/2022 | [184](#) | Summons Issued as to Neustar Security Services. (ebz) (Entered: 06/22/2022) |
| 06/22/2022 | 185 | PAPERLESS Order Cancelling the Status Conference previously scheduled for July 6, 2022. Signed by Magistrate Judge Bruce E. Reinhart on 6/22/2022. (hk02) (Entered: 06/22/2022) |
| 06/22/2022 | [186](#) | ORDER OF RECUSAL. Magistrate Judge Bruce E. Reinhart recused. Case reassigned to Magistrate Judge William Matthewman for all further proceedings  Signed by Magistrate Judge Bruce E  Reinhart on 6/22/2022  *See attached document for full details.* (jmd) (Entered: 06/22/2022) |
| 06/22/2022 | [187](#) | ORDER. In light of the Amended Complaint, Defendants' currently pending Motions to Dismiss, listed below, are DENIED AS MOOT: [52](#) Motion to Dismiss; [124](#) Motion to Dismiss for Failure to State a Claim; [139](#) Motion to Dismiss; [141](#) Motion to Dismiss for Failure to State a Claim; [143](#) Motion to Dismiss for Failure to State a Claim; [144](#) Motion to Dismiss; [145](#) Motion to Dismiss; [146](#) Motion to Dismiss; [147](#) Motion to Dismiss; [149](#) Motion to Dismiss for Failure to State a Claim; [157](#) Motion to Dismiss for Failure to State a Claim; [159](#) Motion to Dismiss for Failure to State a Claim; [160](#) Motion to Dismiss for Failure to State a Claim; [162](#) Motion to Dismiss for Failure to State a Claim; [163](#) Motion to Dismiss for Failure to State a Claim; [165](#) |

| | | |
|---|---|---|
| | | Motion to Dismiss. Signed by Judge Donald M. Middlebrooks on 6/23/2022. *See attached document for full details.* (ebz) (Entered: 06/23/2022) |
| 06/23/2022 | 188 | ORDER  The Court has reviewed Plaintiff's Amended Complaint  To the extent that the allegations against certain Defendants, and therefore the arguments relied on by those Defendants in support of dismissal, remain unchanged, and in the interest of reducing costs in this action, Defendants are advised that they may readopt their prior Motions to Dismiss if they so choose  Moreover, to the extent that the various Defendants seek to raise the same arguments, they are encouraged to consolidate their responses where appropriate  Signed by Judge Donald M  Middlebrooks on 6/23/2022  *See attached document for full details.* (ebz) (Entered: 06/23/2022) |
| 06/24/2022 | 193 | MOTION for Leave to Appeal in forma pauperis by Jimmy Smith. (apz) (Entered: 06/28/2022) |
| 06/24/2022 | 194 | TRANSCRIPT INFORMATION FORM by Jimmy Smith re 173 Notice of Appeal  No Transcript Requested  (apz) (Entered 06/28/2022) |
| 06/27/2022 | 189 | Unopposed MOTION to Redact the Address of Rod Rosenstein, a Former Employee of the Department of Justice, from the Public Record re 181 Summons Issued by Donald J. Trump. (Attachments: # 1 Text of Proposed Order)(Ticktin, Peter) Modified Text on 6/27/2022 (ls). (Entered: 06/27/2022 |
| 06/27/2022 | 190 | ORDER OF RECUSAL  Magistrate Judge William Matthewman recused  Case reassigned to Magistrate Judge Alicia O  Valle for all further proceedings. Signed by Magistrate Judge William Matthewman on 6/27/2022. *See attached document for full details*  (jmd) (Entered  06/27/2022) |
| 06/28/2022 | 191 | ORDER granting 189 Unopposed Motion to Redact the Address of Rod Rosenstein, a Former Employee of the Department of Justice, from the Public Record re 181 Summons Issued. Directing Clerk of Court to Strike and Remove Docket Entry 181-1 from the record. Plaintiff's Redacted Version due 7/1/2022. Signed by Judge Donald M. Middlebrooks on 6/28/2022. *See attached document for full details.* (ls) (Entered: 06/28/2022) |
| 06/28/2022 | 192 | ORDER Requiring Status Report  Status Report due by 7/1/2022  Signed by Judge Donald M  Middlebrooks on 6/28/2022 *See attached document for full details.* (ls) (Entered: 06/28/2022) |
| 06/29/2022 | 195 | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. James Comey served on 4/1/2022, response/answer due 4/22/2022. (Attachments: # 1 Exhibit Proof of Service on James Comey, # 2 Exhibit Email from Samuel Hendrix accepting service on behalf of James Comey)(Ticktin, Peter) (Entered: 06/29/2022) |
| 06/30/2022 | 196 | SUMMONS (Affidavit) Returned Executed on 1 Complaint,,, with a 21 day response/answer filing deadline pursuant to Fed. R  Civ  P  12 by Donald J  Trump  (Attachments  # 1 Affidavit Affidavit of Service of Process)(Ticktin, Peter) (Entered 06/30/2022) |
| 06/30/2022 | 197 | SUMMONS (Affidavit) Returned Executed on 177 Amended Complaint/Amended Notice of Removal,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Rod Rosenstein served on 6/28/2022, response/answer due 7/19/2022. (Attachments: # 1 Affidavit Proof of service and Email confirming service of Amended Complaint)(Ticktin, Peter) (Entered: 06/30/2022) |

| 06/30/2022 | 198 | SUMMONS (Affidavit) Returned Executed on 177 Amended Complaint/Amended Notice of Removal,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Adam Schiff served on 6/28/2022, response/answer due 7/19/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process and Email from Douglas Letter accepting service)(Ticktin, Peter) (Entered: 06/30/2022) |
|---|---|---|
| 06/30/2022 | 199 | STIPULATION re 177 Amended Complaint/Amended Notice of Removal,, *Joint Stipulation Regarding Response Time to Amended Complaint* by Hillary R Clinton (Attachments # 1 Text of Proposed Order)(Markus, David) (Entered  06/30/2022) |
| 06/30/2022 | 200 | ORDER ON THE PARTIES' PROPOSED JOINT STIPULATION REGARDING RESPONSE TIME TO AMENDED COMPLAINT re 199 Stipulation, is DENIED Signed by Judge Donald M. Middlebrooks on 6/30/2022. *See attached document for full details.* (ebz) (Entered: 07/01/2022) |
| 07/01/2022 | 201 | SUMMONS (Affidavit) Returned Executed on 177 Amended Complaint/Amended Notice of Removal,, with a 21 day response/answer filing deadline pursuant to Fed  R  Civ  P  12 by Donald J  Trump  Neustar Security Services served on 6/29/2022, response/answer due 7/20/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process on Neustar Security Services)(Ticktin, Peter) (Entered  07/01/2022) |
| 07/01/2022 | 202 | Unopposed MOTION to Withdraw as Attorney by Michael S. Bosworth for / by Michael Sussman. Responses due by 7/15/2022 (Attachments: # 1 Text of Proposed Order)(Martinez, Roberto) (Entered: 07/01/2022) |
| 07/01/2022 | 203 | MOTION for Extension of Time to File Response/Reply/Answer as to 177 Amended Complaint/Amended Notice of Removal,, by Hillary R. Clinton. (Attachments: # 1 Text of Proposed Order)(Markus, David) (Entered: 07/01/2022) |
| 07/01/2022 | 204 | PAPERLESS ORDER granting in part 203 Defendant Hillary Rodham Clinton's Motion for Extension of Time to Respond to Plaintiff's Amended Complaint, filed on behalf of Defendants. Defendant Clinton requests a two-week extension of Defendants' deadline to respond to Plaintiff's Amended Complaint (DE 177 ), citing that the intervening Fourth of July holiday has complicated communications among the various defense counsel in this matter. Plaintiff does not oppose the relief requested. Based on the holiday, and in the interest of allowing Defendants to file a streamlined Motion, I find good cause to grant Defendant Clinton's Motion in part. Accordingly, Defendants' deadline to respond to the Amended Complaint is extended to **July 14, 2022**. Signed by Judge Donald M. Middlebrooks on 7/1/2022. (jnk) (Entered: 07/01/2022) |
| 07/01/2022 | 205 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 177 Amended Notice of Removal,, by United States Of America. (Attachments: # 1 Text of Proposed Order)(Erickson-Pogorzelski, Anthony) (Entered  07/01/2022) |
| 07/01/2022 | | Set/Reset Response/Answer Due Deadline: ABC Corporations 1 through 10 response/answer due 7/14/2022; Kevin Clinesmith response/answer due 7/14/2022; Hillary R. Clinton response/answer due 7/14/2022; James Comey response/answer due 7/14/2022; DNC Services Corporation response/answer due 7/14/2022; Igor Danchenko response/answer due 7/14/2022; Democratic National Committee response/answer due 7/14/2022; Charles Halliday Dolan Jr. response/answer due 7/14/2022; Marc Elias response/answer due 7/14/2022; Peter Fritsch response/answer due 7 14/2022; Fusion GPS response/answer due 7/14/2022; HFACC, Inc. response/answer due 7/14/2022; Rodney Joffe response/answer due 7/14/2022; John Does 1 through 10 response/answer due 7/14/2022; Andrew McCabe response/answer due 7/14/2022; Robert E. Mook response/answer due 7/14/2022; Neustar Security Services response/answer due 7/14/2022; Neustar, Inc. response/answer due 7/14/2022; Bruce |

| | | |
|---|---|---|
| | | Ohr response/answer due 7/14/2022; Nellie Ohr response/answer due 7/14/2022; Orbis Business Intelligence, Ltd. response/answer due 7/14/2022; Lisa Page response/answer due 7/14/2022; Perkins Coie, LLC response/answer due 7/14/2022; John Podesta response/answer due 7/14/2022; Phillipe Reines response/answer due 7/14/2022; Rod Rosenstein response/answer due 7/14/2022; Adam Schiff response/answer due 7/14/2022; Debbie Wasserman Schultz response/answer due 7/14/2022; Glenn Simpson response/answer due 7/14/2022; Christopher Steele response/answer due 7/14/2022; Peter Strzok response/answer due 7/14/2022; Jake Sullivan response/answer due 7/14/2022; Michael Sussman response/answer due 7/14/2022; United States Of America response/answer due 7/14/2022. Per DE 204 Order. (ebz) (Entered: 07/01/2022) |
| 07/01/2022 | 206 | ORDER DENYING NON-PARTY JIMMY SMITH'S MOTION FOR LEAVE TO APPEAL IN FORMA PAUPERIS re 193 Motion for Leave to Appeal in forma pauperis Signed by Judge Donald M Middlebrooks on 7/1/2022 *See attached document for full details.* (ebz) (Entered: 07/01/2022) |
| 07/01/2022 | 207 | ORDER GRANTING MOTION TO WITHDRAW AS COUNSEL. Michael Bosworth's Unopposed Motion for Leave to Withdraw as Counsel for Defendant Michael Sussman (DE 202) is GRANTED. Notice of Termination delivered by US Mail to Michael Bosworth. Signed by Judge Donald M. Middlebrooks on 7/1/2022. *See attached document for full details.* (ebz) (Entered: 07/01/2022) |
| 07/01/2022 | 208 | STATUS REPORT *Pursuant to Court's Order on June 28, 2022* by Donald J. Trump (Ticktin, Peter) (Entered: 07/01/2022) |
| 07/01/2022 | 209 | ORDER OF RECUSAL. Magistrate Judge Alicia O. Valle recused. Case reassigned to Magistrate Judge Jared M. Strauss for all further proceedings. Signed by Magistrate Judge Alicia O. Valle on 7/1/2022. *See attached document for full details.* (bms) (Entered: 07/01/2022) |
| 07/01/2022 | 210 | ORDER OF RECUSAL Magistrate Judge Jared M Strauss recused Case reassigned to Magistrate Judge Patrick M Hunt for all further proceedings. Signed by Magistrate Judge Jared M. Strauss on 7/1/2022. *See attached document for full details.* (bms) (Entered 07/05/2022) |
| 07/05/2022 | 211 | ORDER GRANTING IN PART NON-PARTY UNITED STATES' MOTION FOR ENLARGEMENT OF TIME. The United States' Motion for Enlargement of Time DE 205 is GRANTED IN PART. It is granted insofar as the deadline for the Original Federal Defendants to respond to the Amended Complaint (DE 177) is extended to July 14, 2022. It is denied in all other respects. Signed by Judge Donald M Middlebrooks on 7/5/2022. *See attached document for full details.* (ebz) (Entered: 07/05/2022) |
| 07/08/2022 | 212 | REDACTION to 179 Notice of Filing Proposed Summons(es) *Unopposed Motion to Redact Notice of Filing Proposed Summons* by Donald J Trump (Attachments # 1 Text of Proposed Order Proposed Order)(Ticktin, Peter) (Entered 07/08/2022) |
| 07/09/2022 | 213 | NOTICE of Attorney Appearance by James Evans Gillenwater on behalf of Neustar Security Services. Attorney James Evans Gillenwater added to party Neustar Security Services(pty:dft). (Gillenwater, James) (Entered: 07/09/2022) |
| 07/11/2022 | 214 | PAPERLESS ORDER granting 212 Plaintiff's Unopposed Motion to Redact the Notice of Filing Proposed Summons. The Clerk of Court is directed to **STRIKE AND REMOVE** Docket Entry 179 from the record Signed by Judge Donald M Middlebrooks on 7/11/2022. (kal) (Entered: 07/11/2022) |

| 07/11/2022 | 215 | Unopposed MOTION for Leave to File Excess Pages *in Motion to Dismiss First Amended Complaint* by Perkins Coie, LLC. (Kastrenakes Howard, Eleni) (Entered: 07/11/2022) |
|---|---|---|
| 07/11/2022 | 216 | PAPERLESS ORDER granting 215 Defendants Perkins Coie, LLP, Rodney Joffe, Neustar, Inc., and Charles Halliday Dolan, Jr's Unopposed Motion for Leave to Exceed Page Limit  The Moving Defendants represent that the twenty one served non federal defendants intend to file a Joint Motion to Dismiss the First Amended Complaint and request thirty-five additional pages to do so  Based on the voluminous nature of the Complaint and the Court's interest in a unified response, I find good cause to grant the Motion. Accordingly, the served non-federal defendants may file a Joint Motion to Dismiss **not to exceed 55 pages**  Signed by Judge Donald M  Middlebrooks on 7/11/2022  (jnk) (Entered  07/11/2022) |
| 07/12/2022 | 217 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for John M. McNichols. Filing Fee $ 200.00 Receipt # AFLSDC-15781263 by Neustar Security Services. Responses due by 7/26/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Gillenwater, James) (Entered: 07/12/2022) |
| 07/12/2022 | 218 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Kathryn E  Garza  Filing Fee $ 200 00 Receipt # AFLSDC 15781307 by Neustar Security Services  Responses due by 7/26/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Gillenwater, James) (Entered: 07/12/2022) |
| 07/12/2022 | 219 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Allison S. Eisen. Filing Fee $ 200.00 Receipt # AFLSDC-15781318 by Neustar Security Services. Responses due by 7/26/2022 (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Gillenwater, James) (Entered: 07/12/2022) |
| 07/12/2022 | 220 | PAPERLESS ORDER granting 217 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney John M. McNichols. Signed by Judge Donald M. Middlebrooks on 7/12/2022  (jnk) (Entered  07/12/2022) |
| 07/12/2022 | 221 | PAPERLESS ORDER granting 218 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Kathryn E. Garza. Signed by Judge Donald M. Middlebrooks on 7/12/2022. (jnk) (Entered: 07/12/2022) |
| 07/12/2022 | 222 | PAPERLESS ORDER granting 219 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Allison S  Eisen  Signed by Judge Donald M  Middlebrooks on 7/12/2022  (jnk) (Entered: 07/12/2022) |
| 07/12/2022 | 223 | SUMMONS (Affidavit) Returned Executed on 177 Amended Complaint/Amended Notice of Removal,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Lisa Page served on 7/7/2022, response/answer due 7/28/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process on Lisa Page)(Ticktin, Peter) (Entered: 07/12/2022) |
| 07/14/2022 | 224 | MOTION to Substitute Party *(Comey, McCabe, Clinesmith, Page, and Strzok)* ( Responses due by 7/28/2022), MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, by United States Of America Attorney Stephen R. Terrell added to party United States Of America(pty:dft), Attorney Stephen R. Terrell added to party United States Of America(pty dft)  (Attachments  # 1 Exhibit A  Westfall Act Certification, # 2 Exhibit B   Crum Declaration, # 3 Text of Proposed Order, # 4 Certification of Service)(Terrell, Stephen) (Entered: 07/14/2022) |

| 07/14/2022 | 225 | MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, by Charles Halliday Dolan Jr.. Responses due by 7/28/2022 (Attachments: # 1 Exhibit Second Declaration)(Levine, Jonathan) (Entered: 07/14/2022) |
|---|---|---|
| 07/14/2022 | 226 | MOTION TO DISMISS 177 Amended Complaint/Amended Notice of Removal,, FOR FAILURE TO STATE A CLAIM by Hillary R. Clinton. Responses due by 7/28/2022 (Attachments: # 1 Exhibit)(Markus, David) (Entered: 07/14/2022) |
| 07/14/2022 | 227 | MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, by Rodney Joffe. Responses due by 7/28/2022 (Soto, Edward) (Entered: 07/14/2022) |
| 07/14/2022 | 228 | Defendant's MOTION to Dismiss with Prejudice 177 Amended Complaint/Amended Notice of Removal,, by Neustar, Inc.. Responses due by 7/28/2022 (Olmedo Rodriguez, Jennifer) (Entered  07/14/2022) |
| 07/15/2022 | 229 | SUMMONS (Affidavit) Returned Executed on 177 Amended Complaint/Amended Notice of Removal,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Donald J. Trump. Peter Strzok served on 7/2/2022, response/answer due 7/25/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process on Peter Strzok)(Ticktin, Peter) (Entered: 07/15/2022) |
| 07/20/2022 | 230 | NOTICE by United States Of America re 181 Summons Issued, 197 Summons Returned Executed, 198 Summons Returned Executed, *of Receipt of Service of Summonses and Amended Complaint* (Terrell, Stephen) (Entered: 07/20/2022) |
| 07/21/2022 | 231 | MOTION for Extension of Time to File Response/Reply/Answer as to 226 MOTION TO DISMISS 177 Amended Complaint/Amended Notice of Removal,, FOR FAILURE TO STATE A CLAIM , 227 MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, , 228 Defendant's MOTION to Dismiss with Prejudice 177 Amended Complaint/Amended Notice of Removal,, , 225 MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, by Donald J. Trump. (Attachments: # 1 Text of Proposed Order Proposed Order on Plaintiff's Motion for Extension of Time)(Ticktin, Peter) (Entered: 07/21/2022) |
| 07/21/2022 | 232 | PAPERLESS ORDER granting in part 231 Plaintiff's Motion for Extension of Time. Plaintiff's deadline to respond to Defendants' Motions to Dismiss (DEs 224 , 225 , 226 , 227 , 228 ) is July 28, 2022  He seeks a two week extension of this deadline, citing the "complex nature of the case" and counsels' other trials the week of July 25, 2022. Defendants also seek leave to file a 55 page response to Defendant Clinton's Motion to Dismiss (DE 226 )  I find good cause to allow Plaintiff the same number of pages I allowed Defendants. Accordingly, Plaintiff's Motion is granted with respect to his request to file a 55-page response  As to an extension of time, Plaintiff's Motion is granted only in part  Based on counsels' upcoming trials, I find good cause to extend Plaintiff's deadline to respond to **August 4, 2022**. But because the arguments in the recently-filed Motions to Dismiss are largely the same as those raised in Defendants' previous motions, a longer extension is not warranted  Signed by Judge Donald M. Middlebrooks on 7/21/2022. (jnk) (Entered: 07/21/2022) |
| 07/21/2022 | 233 | MOTION to Continue re 39 Scheduling Order,,, Order Referring Case to Magistrate Judge,, by Donald J. Trump. Responses due by 8/4/2022 (Attachments: # 1 Exhibit Affidavit of Peter Ticktin in Support of Motion to Extend Trial Date as Exhibit "A", # 2 Exhibit Plaintiff's Proposed Scheduling Report as Exhibit "B", # 3 Exhibit Plaintiff's Proposed Scheduling Order, as Exhibit "C")(Ticktin, Peter) (Entered: 07/21/2022) |

| | | |
|---|---|---|
| 07/21/2022 | | Set/Reset Deadlines/Hearings as to 225 MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, , 226 MOTION TO DISMISS 177 Amended Complaint/Amended Notice of Removal,, FOR FAILURE TO STATE A CLAIM , 227 MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, , 224 MOTION to Substitute Party *(Comey, McCabe, Clinesmith, Page, and Strzok)* MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, , 228 Defendant's MOTION to Dismiss with Prejudice 177 Amended Complaint/Amended Notice of Removal,, . Per DE 232 Order. Responses due by 8/4/2022 (ebz) (Entered: 07/21/2022) |
| 07/21/2022 | 234 | ORDER SUBSTITUTING PARTIES  The United States' Motion to Substitute and Dismiss DE 224 is GRANTED IN PART and I will DEFER RULING IN PART. It is granted with respect to the United States' substitution argument, and I will defer ruling on the United States' dismissal argument  The United States is SUBSTITUTED as defendant for James Corney, Andrew McCabe, Peter Strzok, Lisa Page, and Kevin Clinesmith. Defendants James Corney, Andrew McCabe, Peter Strzok, Lisa Page, and Kevin Clinesmith are DISMISSED from this action  Signed by Judge Donald M  Middlebrooks on 7/21/2022  *See attached document for full details.* (ebz) (Entered: 07/22/2022) |
| 07/22/2022 | 235 | RESPONSE in Opposition re 233 MOTION to Continue re 39 Scheduling Order,,, Order Referring Case to Magistrate Judge,, filed by Hillary R. Clinton. Replies due by 7/29/2022. (Markus, David) (Entered: 07/22/2022) |
| 07/22/2022 | 236 | ORDER DENYING MOTION TO EXTEND TRIAL DATE re 233 Motion to Continue. Signed by Judge Donald M. Middlebrooks on 7/22/2022  *See attached document for full details*  (ebz) (Entered  07/22/2022) |
| 08/04/2022 | 237 | MEMORANDUM in Opposition re 226 MOTION TO DISMISS 177 Amended Complaint/Amended Notice of Removal,, FOR FAILURE TO STATE A CLAIM by Donald J. Trump. (Attachments: # 1 Exhibit 1, Declaration of Alina Habba, Esquire, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D)(Ticktin, Peter) (Entered: 08/04/2022) |
| 08/04/2022 | 238 | MEMORANDUM in Opposition re 224 MOTION to Substitute Party *(Comey, McCabe, Clinesmith, Page, and Strzok)* MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, by Donald J  Trump (Attachments: # 1 Text of Proposed Order)(Ticktin, Peter) (Entered: 08/04/2022) |
| 08/04/2022 | 239 | RESPONSE to Motion re 227 MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, filed by Donald J. Trump. Replies due by 8/11/2022. (Ticktin, Peter) (Entered: 08/04/2022) |
| 08/04/2022 | 240 | RESPONSE to Motion re 228 Defendant's MOTION to Dismiss with Prejudice 177 Amended Complaint/Amended Notice of Removal,, filed by Donald J  Trump  Replies due by 8/11/2022  (Ticktin, Peter) (Entered  08/04/2022) |
| 08/04/2022 | 241 | RESPONSE to Motion re 225 MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, filed by Donald J. Trump. Replies due by 8/11/2022. (Ticktin, Peter) (Entered: 08/04/2022) |
| 08/05/2022 | 242 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 238 Memorandum, *(Expedited)* by United States Of America. (Attachments: # 1 Text of Proposed Order, # 2 Certification of Service)(Terrell, Stephen) (Entered: 08/05/2022) |
| 08/06/2022 | 243 | PAPERLESS ORDER granting in part 242 the United States' Unopposed Expedited Motion for Enlargement of Time. The United States' deadline to reply in support of its Motion to Dismiss is August 11, 2022, and its deadline to respond to Plaintiff's |

| | | |
|---|---|---|
| | | Motion to Set aside the Government's Westfall Act Certification. The United States seeks to extend these deadlines to August 25, 2022, citing that counsel has a pre-planned and pre-scheduled vacation from August 8 to August 12, 2022. Based on counsel's vacation plans, I find good cause to grant the United States' Motion in part and extend its deadline to reply in support of its Motion to Dismiss to **August 18, 2022**. However, because counsel's vacation plans still allow sufficient time for the United States to respond to Plaintiff's Motion to Set Aside the Government's Westfall Act Certification, the United States' Motion is denied with respect to that request. Accordingly, the United States' deadline to both reply in support of its Motion to Dismiss and respond to Plaintiff's Motion to Set Aside the Government's Westfall Act Certification is **August 18, 2022**. Signed by Judge Donald M. Middlebrooks on 8/6/2022. (jnk) (Entered: 08/06/2022) |
| 08/08/2022 | 244 | Unopposed MOTION for Leave to File Excess Pages *in Defendant's Reply in Support of Motion to Dismiss* by Hillary R Clinton. (Markus, David) (Entered: 08/08/2022) |
| 08/08/2022 | 245 | PAPERLESS ORDER granting 244 Motion for Leave to File Excess Pages. The Moving Defendants request ten extra pages for their joint reply brief, for a total of twenty pages. Based on the complex nature of this case, I find good cause to grant the relief requested. Accordingly, the Moving Defendants may file a reply brief in support of their Motion to Dismiss **not to exceed twenty pages**. Signed by Judge Donald M. Middlebrooks on 8/8/2022. (jnk) (Entered: 08/08/2022) |
| 08/09/2022 | 246 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 177 Amended Complaint/Amended Notice of Removal,, by Orbis Business Intelligence, Ltd   Attorney Enjolique Aytch Lett added to party Orbis Business Intelligence, Ltd. (pty:dft). (Attachments: # 1 Exhibit A - Purported Service Documents, # 2 Text of Proposed Order)(Lett, Enjolique) (Entered  08/09/2022) |
| 08/09/2022 | 247 | PAPERLESS ORDER granting in part 246 Defendant Orbis Business Intelligence Ltd.'s Motion to Set Response Deadline to Plaintiff's Amended Complaint. Defendant Orbis requests that I set a deadline for it to respond to Plaintiff's Amended Complaint (DE 177 ), and that I make the deadline September 2, 2022. While I find good cause to grant the Motion in part and set a deadline for Defendant Orbis to respond, I also find that September 2, 2022 is not an appropriate deadline in light of how long this case has been pending, the Motion's vague language about when Orbis learned of this action, and the fact that the arguments Orbis will raise will likely be duplicative of those raised by the other Defendants in their Joint Motion to Dismiss (DE 226 ). As such, I will set Defendant Orbis's deadline to respond to Plaintiff's Amended Complaint (DE 177 ) as **on or before August 18, 2022**. Signed by Judge Donald M. Middlebrooks on 8/9/2022. (jnk) (Entered: 08/09/2022) |
| 08/09/2022 | | Set/Reset Response/Answer Due Deadline  Orbis Business Intelligence, Ltd  response/answer due 8/18/2022  Per DE 247 Order. (ebz) (Entered: 08/10/2022) |
| 08/11/2022 | 248 | NOTICE of Attorney Appearance by Akiesha Renee Gilcrist Sainvil on behalf of Orbis Business Intelligence, Ltd.. Attorney Akiesha Renee Gilcrist Sainvil added to party Orbis Business Intelligence, Ltd. (pty:dft). (Gilcrist Sainvil, Akiesha) (Entered: 08/11/2022) |
| 08/11/2022 | 249 | REPLY to Response to Motion re 227 MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, filed by Rodney Joffe. (Soto, Edward) (Entered: 08/11/2022) |
| 08/11/2022 | 250 | REPLY to Response to Motion re 226 MOTION TO DISMISS 177 Amended Complaint/Amended Notice of Removal,, FOR FAILURE TO STATE A CLAIM filed by Hillary R. Clinton. (Markus, David) (Entered: 08/11/2022) |

USCA11 Case: 23-13177    Document: 90-1    Date Filed: 03/05/2024    Page: 29 of 233

| | | |
|---|---|---|
| 08/11/2022 | 251 | REPLY to Response to Motion re 223 MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, filed by Charles Halliday Dolan Jr.. (Levine, Jonathan) (Entered: 08/11/2022) |
| 08/11/2022 | 252 | Defendant's REPLY to Response to Motion re 226 MOTION TO DISMISS 177 Amended Complaint/Amended Notice of Removal,, FOR FAILURE TO STATE A CLAIM , 228 Defendant's MOTION to Dismiss with Prejudice 177 Amended Complaint/Amended Notice of Removal,, filed by Neustar, Inc.. (Olmedo-Rodriguez, Jennifer) (Entered: 08/11/2022) |
| 08/15/2022 | 253 | NOTICE of Change of Address, Email or Law Firm Name by Akiesha Renee Gilcrist Sainvil (Gilcrist Sainvil, Akiesha) (Entered: 08/15/2022) |
| 08/15/2022 | 254 | CLERK'S NOTICE - Attorney Admissions has not updated address and/or email information for attorney Akiesha Renee Gilcrist Sainvil re 253 Notice of Change of Address, Email or Law Firm Name  Attorney Akiesha Renee Gilcrist Sainvil has not completed the required procedures for updating their information with the Court. After filing something in all pending cases, Attorney is instructed to go to their PACER account, Manage My Account, to complete the process of updating their information. The Court is NOT responsible for updating secondary email addresses. See the Courts website for detailed instructions  www.flsd.uscourts.gov/updating_your_information (pt) (Entered: 08/15/2022) |
| 08/16/2022 | 255 | Corrected REPLY to Response to Motion re 226 MOTION TO DISMISS 177 Amended Complaint/Amended Notice of Removal,, FOR FAILURE TO STATE A CLAIM , 228 Defendant's MOTION to Dismiss with Prejudice 177 Amended Complaint/Amended Notice of Removal,, filed by Neustar, Inc.. (Olmedo-Rodriguez, Jennifer) (Entered: 08/16/2022) |
| 08/18/2022 | 256 | MOTION to Substitute Party *(United States for Adam Schiff and Rod Rosenstein)* ( Responses due by 9/1/2022), MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, by United States Of America (Attachments: # 1 Exhibit A - Westfall Act Certification, # 2 Exhibit B - Clouse Declaration, # 3 Exhibit C - Jenkins Declaration, # 4 Text of Proposed Order)(Terrell, Stephen) (Entered: 08/18/2022) |
| 08/18/2022 | 257 | Defendant's Corporate Disclosure Statement by Orbis Business Intelligence, Ltd. identifying Corporate Parent Orbis Business International Ltd. for Orbis Business Intelligence, Ltd. (Lett, Enjolique) (Entered: 08/18/2022) |
| 08/18/2022 | 258 | REPLY to Response to Motion re 224 MOTION to Substitute Party *(Comey, McCabe, Clinesmith, Page, and Strzok)* MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, filed by United States Of America. (Terrell, Stephen) (Entered: 08/18/2022) |
| 08/18/2022 | 259 | ORDER SUBSTITUTING PARTIES. The United States' Motion to Substitute and Dismiss DE 256 is GRANTED IN PART and I will DEFER RULING IN PART. It is granted with respect to the United States' substitution argument, and I will defer ruling on the United States' dismissal argument. Defendants Adam Schiff and Rod Rosenstein are DISMISSED from this action. Signed by Judge Donald M. Middlebrooks on 8/18/2022. *See attached document for full details.* (ebz) (Entered: 08/18/2022) |
| 08/18/2022 | 260 | Defendant's MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, by Orbis Business Intelligence, Ltd   Responses due by 9/1/2022 (Attachments  # 1 Exhibit A, # 2 Exhibit B)(Lett, Enjolique) (Entered 08/18/2022) |

USCA11 Case: 23-13177    Document: 99-1    Date Filed: 03/05/2024    Page: 30 of 233

| | | |
|---|---|---|
| 09/01/2022 | 261 | SUMMONS (Affidavit) Returned Executed on 177 Amended Complaint/Amended Notice of Removal,, with a response/answer filing deadline pursuant to Fed. R. Civ. P. 15 as determined by the attorney/filer of 08/09/2022 by Donald J. Trump. Orbis Business Intelligence, Ltd. served on 7/19/2022. (Attachments: # 1 Affidavit Affidavit of Service of Process) (Ticktin, Peter) (Entered: 09/01/2022) |
| 09/01/2022 | 262 | MEMORANDUM in Opposition re 260 Defendant's MOTION to Dismiss for Lack of Jurisdiction 177 Amended Complaint/Amended Notice of Removal,, by Donald J Trump  (Attachments # 1 Exhibit A)(Ticktin, Peter) (Entered 09/01/2022) |
| 09/01/2022 | 263 | DECLARATION OF TAKING *of Alina Habba* by Donald J. Trump. (Attachments: # 1 Exhibit A)(Ticktin, Peter) (Entered: 09/01/2022) |
| 09/02/2022 | 264 | ORDER extending deadline for Plaintiff to respond to 256 United States' Motion to Substitute and Dismiss. Plaintiff may file a response on or by September 6, 2022  Signed by Judge Donald M  Middlebrooks on 9/2/2022  *See attached document for full details.* (kal) (Entered: 09/02/2022) |
| 09/06/2022 | 265 | MEMORANDUM in Opposition re 258 Reply to Response to Motion, *to Dismiss* by Donald J. Trump. (Attachments: # 1 Exhibit)(Ticktin, Peter) (Entered: 09/06/2022) |
| 09/08/2022 | 266 | Defendant's REPLY *IN SUPPORT OF THE MOTION TO DISMISS THE AMENDED COMPLAINT* by Orbis Business Intelligence, Ltd   (Lett, Enjolique) (Entered  09/08/2022) |
| 09/08/2022 | 267 | ORDER granting 224 the United States' Motion to Dismiss Under Federal Rule 12(b)(1); granting 225 and 227 Defendants Charles Halliday Dolan, Jr. and Rodney Joffe's Motions to Dismiss for Lack of Personal Jurisdiction; granting 226 Defendants Hillary Clinton, HFACC, Inc., John Podesta, Robert Mook, Jake Sullivan, DNC, DNC Services Corporation, Debbie Wasserman Schultz, Perkins Coie LLP, Marc Elias, Michael Sussman, Charles Halliday Dolan, Jr., Fusion GPS, Glenn Simpson, Peter Fritsch, Nellie Ohr, Bruce Ohr, Igor Danchenko, Rodney Joffe, Neustar Security Services and Neustar Inc.'s Joint Motion to Dismiss Under Federal Rule 12(b)(6); granting 256 United States' Motion to Dismiss Under Federal Rule 12(b)(1); granting 260 Defendant Orbis Business Intelligence Ltd.'s Motion to Dismiss; denying Plaintiff's 238 and 265 Motions to Set Aside Government's Certification. Plaintiff's Amended Complaint 177 is dismissed with prejudice as to the Non-Federal Defendants Under Rule 12(b)(6) and without prejudice as to the United States Under Rule 12(b)(1). I reserve jurisdiction to adjudicate issues pertaining to sanctions. Signed by Judge Donald M. Middlebrooks on 9/8/2022. *See attached document for full details.* (gm1) (Entered: 09/08/2022) |
| 09/21/2022 | 268 | MOTION for Sanctions by Charles Halliday Dolan Jr.. (Attachments: # 1 Exhibit May 31, 2022 Letter, # 2 Exhibit Dolan Declaration, # 3 Text of Proposed Order)(Levine, Jonathan) (Entered  09/21/2022) |
| 09/21/2022 | 269 | NOTICE by Charles Halliday Dolan Jr. re 268 MOTION for Sanctions *Rule 11 Sanctions Motion Praecipe* (Attachments: # 1 Exhibit Invoices) (Levine, Jonathan) (Entered: 09/21/2022) |
| 10/05/2022 | 270 | Plaintiff's RESPONSE to 268 MOTION for Sanctions by Donald J Trump  (Attachments  # 1 Exhibit Declaration of Alina Habba, # 2 Exhibit Danchenko Indictment, # 3 Exhibit Government Opposition to MTD)(Ticktin, Peter) (Entered: 10/05/2022) |

USCA11 Case: 23-13177    Document: 90-1    Date Filed: 03/05/2024    Page: 31 of 233

| 10/06/2022 | 271 | STRICKEN. Omnibus MOTION Many Things Motion Herein, Motion Nunc Pro Tunc by John J. McCarthy. (pcs) Modified per DE 278 Order on 10/21/2022 (ebz). (Entered: 10/07/2022) |
|---|---|---|
| 10/11/2022 | 272 | Notice of Appeal re 267 Order on Motion to Dismiss/Lack of Jurisdiction, Order on Motion to Dismiss for Failure to State a Claim, by Donald J Trump  Filing fee $ 505 00 Receipt# 3042  Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]  For information go to our FLSD website under Transcript Information  (apz) (Entered  10/11/2022) |
| 10/11/2022 |  | Transmission of Notice of Appeal, Order under appeal and Docket Sheet to US Court of Appeals re 272 Notice of Appeal, Notice has been electronically mailed. (apz) (Entered: 10/11/2022) |
| 10/11/2022 | 273 | Clerk's Notice of Filing Deficiency Re  272 Notice of Appeal, filed by Donald J Trump  Document was filed conventionally that should have been filed electronically (CM/ECF Administrative Procedures). Document missing required signature(s) (Fed R Civ P  11(a))  (apz) (Entered  10/11/2022) |
| 10/12/2022 | 274 | NOTICE of Attorney Appearance by Jared Joseph Roberts on behalf of Donald J. Trump. Attorney Jared Joseph Roberts added to party Donald J. Trump(pty:pla). (Roberts, Jared) (Entered: 10/12/2022) |
| 10/12/2022 | 275 | Corrected Notice of Appeal as to 267 Order on Motion to Dismiss/Lack of Jurisdiction,,,,,,,,,,,,, Order on Motion to Dismiss for Failure to State a Claim,,,,,,,,,,,,,,,,,,,,, by Donald J. Trump. Filing fee $ 505.00. No Filing Fee Required. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under Transcript Information  (Roberts, Jared) (Entered  10/12/2022) |
| 10/12/2022 |  | Transmission of Corrected Notice of Appeal, Order under appeal and Docket Sheet to US Court of Appeals re 275 Notice of Appeal, Notice has been electronically mailed. (apz) (Entered: 10/12/2022) |
| 10/12/2022 | 276 | REPLY to Response to Motion re 268 MOTION for Sanctions filed by Charles Halliday Dolan Jr  (Levine, Jonathan) (Entered: 10/12/2022) |
| 10/18/2022 | 277 | Acknowledgment of Receipt of NOA from USCA re 275 Notice of Appeal, filed by Donald J. Trump. Date received by USCA 10/11/2022. USCA Case Number: 22-13410-J. (apz) (Entered: 10/19/2022) |
| 10/20/2022 | 278 | ORDER STRIKING MOTION FOR MISCELLANEOUS RELIEF re 271 Motion for Miscellaneous Relief filed by John J. McCarthy Signed by Judge Donald M  Middlebrooks on 10/20/2022 *See attached document for full details*  (ebz) (Entered 10/21/2022) |
| 10/25/2022 | 279 | TRANSCRIPT INFORMATION FORM by Donald J. Trump re 275 Notice of Appeal,, 272 Notice of Appeal,. No Transcript Requested. (Roberts, Jared) (Entered: 10/25/2022) |
| 10/31/2022 | 280 | Joint MOTION for Sanctions by Hillary R. Clinton. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibits 2-12 Declarations in Support of Motion for Sanctions)(Markus, David) (Entered  10/31/2022) |
| 11/08/2022 | 281 | MOTION for Rule 59(e); 60(b) by John J. McCarthy re DE 278 Order . Responses due by 11/22/2022 (apz) Modified text on 11/9/2022 (apz). (Entered: 11/09/2022) |

USCA11 Case: 23-13177  Document: 90-1  Date Filed: 03/05/2024  Page: 32 of 233

| | | |
|---|---|---|
| 11/08/2022 | 282 | Notice of Appeal re 278 Order Striking by John J. McCarthy. FILING FEE. (NOT PAID). Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under All Forms and look for Transcript Order Form www.flsd.uscourts.gov/forms/all-forms. (apz) (Entered: 11/09/2022) |
| 11/09/2022 | | Transmission of Notice of Appeal, Order under appeal, and Docket Sheet to US Court of Appeals re 282 Notice of Appeal, Notice has been electronically mailed  (apz) (Entered  11/09/2022) |
| 11/09/2022 | 283 | CLERK'S NOTICE of Mailing Pro Se Instructions to John J. McCarthy re 282 Notice of Appeal. (apz) (Entered: 11/09/2022) |
| 11/10/2022 | 284 | ORDER granting 268 Defendant Charles Dolan's Motion for Rule 11 Sanctions. Signed by Judge Donald M. Middlebrooks on 11/10/2022  *See attached document for full details*  (gm1) (Entered  11/10/2022) |
| 11/14/2022 | 285 | RESPONSE in Opposition re 280 Joint MOTION for Sanctions filed by Donald J. Trump. Attorney Garrett Edward Kesl added to party Donald J. Trump(pty:pla). Replies due by 11/21/2022. (Attachments: # 1 Exhibit Exhibit A)(Kesl, Garrett) (Entered: 11/14/2022) |
| 11/15/2022 | 286 | Acknowledgment of Receipt of NOA from USCA re 282 Notice of Appeal, filed by John J. McCarthy. Date received by USCA  11/9/2022  USCA Case Number  22 13791 J  (apz) (Entered  11/15/2022) |
| 11/21/2022 | 287 | REPLY to 280 Joint MOTION for Sanctions by Hillary R. Clinton. (Markus, David) (Entered: 11/21/2022) |
| 11/28/2022 | 288 | Plaintiff's MOTION to Stay re 284 Order on Motion for Sanctions by Donald J. Trump. Responses due by 12/12/2022 (Attachments  # 1 Exhibit Proposed Order on Plaintiff's Attorney's Unopposed Motion for Stay of Final Order and to Approve Bond to be Paid to Registry of Court)(Ticktin, Peter) (Entered: 11/28/2022) |
| 11/29/2022 | 289 | ORDER GRANTING UNOPPOSED MOTION FOR STAY OF FINAL ORDER AND TO APPROVE BOND TO BE PAID TO REGISTRY OF COURT: ORDER Granting 288 Motion to Stay. Signed by Judge Donald M. Middlebrooks on 11/29/2022. *See attached document for full details.* (nan) (Entered: 11/30/2022) |
| 12/05/2022 | 290 | Letter from Barabara L  Wardwell  (ebz) (Entered  12/05/2022) |
| 12/09/2022 | 291 | Notice of Appeal as to 284 Order on Motion for Sanctions by Alina Habba, Michael T Madaio, Habba Madaio & Associates, Peter Ticktin, Jamie A Sasson, The Ticktin Law Group. Filing fee $ 505.00 receipt number AFLSDC-16161429. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under All Forms and look for Transcript Order Form www.flsd.uscourts.gov/forms/all-forms. (Roberts, Jared) (Entered: 12/09/2022) |
| 12/12/2022 | | Transmission of Notice of Appeal, Order under appeal, and Docket Sheet to US Court of Appeals re 291 Notice of Appeal, Notice has been electronically mailed  (apz) (Entered  12/12/2022) |
| 12/12/2022 | 292 | SUA SPONTE ORDER REQUIRING CORRECTED OBJECTIONS TO FEES Signed by Judge Donald M. Middlebrooks on 12/12/2022. *See attached document for full details.* (nan) (Entered: 12/12/2022) |

USCA11 Case: 23-13177    Document: 90-1    Date Filed: 03/05/2024    Page: 33 of 233

| | | |
|---|---|---|
| 12/13/2022 | 293 | Acknowledgment of Receipt of NOA from USCA re 291 Notice of Appeal, filed by Michael T Madaio, Peter Ticktin, Habba Madaio & Associates, Jamie A Sasson, The Ticktin Law Group, Alina Habba. Date received by USCA: 12/9/2022. USCA Case Number: 22-14099-J. (apz) (Entered: 12/14/2022) |
| 12/15/2022 | 294 | STRICKEN RESPONSE to Motion re 280 Joint MOTION for Sanctions *(Corrected)* filed by The Ticktin Law Group Attorney Garrett Edward Kesl added to party The Ticktin Law Group(pty:a). Replies due by 12/22/2022. (Kesl, Garrett) Modified per DE 296 Notice of Striking on 12/16/2022 (ebz) (Entered  12/15/2022) |
| 12/15/2022 | 295 | Clerk's Notice to Filer re 294 Response to Motion. **Login/Signature Block Violation**; CORRECTIVE ACTION REQUIRED - The name of attorney e-filing this document via their CM/ECF login does not match the name of attorney on the signature block of the document. The name used for login must match the typed name on signature block of the document. This filing is a violation of Section 3J(1) of CM/ECF Admin Procedures and Local Rule 5.1(b). Filer must File a Notice of Striking, then refile document pursuant to CM/ECF Admin Procedures and Local Rules. (ebz) (Entered: 12/15/2022) |
| 12/15/2022 | 296 | NOTICE of Striking 294 Response to Motion filed by The Ticktin Law Group by Habba Madaio & Associates, The Ticktin Law Group, Donald J Trump (Kesl, Garrett) (Entered  12/15/2022) |
| 12/15/2022 | 297 | RESPONSE to Motion re 280 Joint MOTION for Sanctions *Corrected* filed by The Ticktin Law Group. Replies due by 12/22/2022. (Ticktin, Peter) (Entered: 12/15/2022) |
| 12/27/2022 | 298 | TRANSCRIPT INFORMATION FORM by Alina Habba, Habba Madaio & Associates, Michael T Madaio, Jamie A Sasson, The Ticktin Law Group, Peter Ticktin re 291 Notice of Appeal,,. No Transcript Requested. (Roberts, Jared) (Entered: 12/27/2022) |
| 01/13/2023 | 299 | ORDER OF USCA. : Motion to consolidate appeals filed by Appellant Donald J. Trump is GRANTED by clerk in 22-13410, ORDER: Motion to consolidate appeals filed by Appellants Alina Habba, Michael T. Madaio, Habba Madaio & Associates, Peter Ticktin, Jamie A. Sasson and The Ticktin Law Group is GRANTED by clerk in 22-14099 re 275 Notice of Appeal, filed by Donald J. Trump, 291 Notice of Appeal, filed by Michael T Madaio, Peter Ticktin, Habba Madaio & Associates, Jamie A Sasson, The Ticktin Law Group, Alina Habba. USCA #21-13410-HH, #22-14099-J. (apz) (Entered: 01/13/2023) |
| 01/19/2023 | 300 | STRICKEN. NOTICE of Change of Address, Email or Law Firm Name by William R. Barzee (Barzee, William) Modified per DE 303 Notice to Stike on 1/23/2023 (ebz)  Modified text on 1/23/2023 (ebz)  (Entered  01/19/2023) |
| 01/19/2023 | 301 | Clerk's Notice to Filer re 300 Notice of Change of Address, Email or Law Firm Name. **Login/Signature Block Violation**; CORRECTIVE ACTION REQUIRED - The name of attorney e-filing this document via their CM/ECF login does not match the name of attorney on the signature block of the document. The name used for login must match the typed name on signature block of the document. This filing is a violation of Section 3J(1) of CM/ECF Admin Procedures and Local Rule 5.1(b). Filer must File a Notice of Striking, then refile document pursuant to CM/ECF Admin Procedures and Local Rules. (ebz) (Entered: 01/19/2023) |
| 01/19/2023 | 302 | ORDER granting 280 Defendants' Joint Motion for Sanctions  Signed by Judge Donald M  Middlebrooks on 1/19/2023  *See attached document for full details.* (Attachments: # 1 Appendix A) (gm1) (Entered: 01/19/2023) |

| | | |
|---|---|---|
| 01/21/2023 | 303 | NOTICE of Striking 300 Notice of Change of Address, Email or Law Firm Name filed by Robert E. Mook by Robert E. Mook (Barzee, William) (Entered: 01/21/2023) |
| 01/21/2023 | 304 | NOTICE of Change of Address, Email or Law Firm Name by William R. Barzee (Barzee, William) (Entered: 01/21/2023) |
| 01/23/2023 | 305 | CLERK'S NOTICE - Attorney Admissions has updated the contact information for PHV attorneys Andrew J. Ceresney, Wendy B. Reilly, and Isabela M. Garcez re 304 Notice of Change of Address, Email or Law Firm Name (pt) (Entered: 01/23/2023) |
| 01/27/2023 | 306 | ORDER of DISMISSAL from USCA for want of prosecution because the appellant Jimmy Smith has failed to pay the filing and docketing fees to the district court within the time fixed by the rules re 1 3 Notice of Appeal, filed by Jimmy Smith USCA #22-11955-J. (apz) (Entered: 01/27/2023) |
| 02/03/2023 | 307 | MOTION to Stay re 302 Order on Motion for Sanctions *And Approve Bond* by Alina Habba, Habba Madaio & Associates, Donald J. Trump. Attorney Jared Joseph Roberts added to party Alina Habba(pty:a), Attorney Jared Joseph Roberts added to party Habba Madaio & Associates(pty:a). Responses due by 2/17/2023 (Attachments: # 1 Text of Proposed Order)(Roberts, Jared) (Entered: 02/03/2023) |
| 02/06/2023 | 308 | Notice of Appeal as to 302 Order on Motion for Sanctions by Alina Habba, Habba Madaio & Associates, Donald J. Trump. Filing fee $ 505 00 receipt number AFLSDC 16298473 Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)] For information go to our FLSD website under All Forms and look for Transcript Order Form www.flsd.uscourts.gov/forms/all-forms. (Roberts, Jared) (Entered: 02/06/2023) |
| 02/06/2023 | | Transmission of Notice of Appeal, Order under appeal, and Docket Sheet to US Court of Appeals re 308 Notice of Appeal, Notice has been electronically mailed. (apz) (Entered: 02/06/2023) |
| 02/06/2023 | 309 | ORDER GRANTNG UNOPPOSED MOTION FOR STAY OF FINAL ORDER AND TO APPROVE BOND TO BE PAID TO REGISTRY OF COURT ORDER granting 307 Motion to Stay Upon Plaintiff's deposit of $1,031,788 33 into the Court's Registry, enforcement of this Court's Order Granting Sanctions DE 302 is STAYED pending a mandate or the equivalent from the Eleventh Circuit Court of Appeals Signed by Judge Donald M Middlebrooks on 2/6/2023 *See attached document for full details.* (nan) (Entered: 02/07/2023) |
| 02/09/2023 | 310 | Acknowledgment of Receipt of NOA from USCA re 308 Notice of Appeal, filed by Habba Madaio & Associates, Alina Habba, Donald J. Trump. Date received by USCA: 2/6/2023. USCA Case Number: 23-10387-J. (apz) (Entered: 02/10/2023) |
| 02/12/2023 | 311 | TRANSCRIPT INFORMATION FORM by Alina Habba, Habba Madaio & Associates, Donald J. Trump re 308 Notice of Appeal,, No Transcript Requested (Roberts, Jared) (Entered 02/12/2023) |
| 02/13/2023 | 312 | Notice of Appeal re 302 Order on Motion for Sanctions by John J. McCarthy. FILING FEE: (NOT PAID). Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under All Forms and look for Transcript Order Form www.flsd.uscourts.gov/forms/all-forms. (apz) Modified text on 4/6/2023 (apz). (Entered: 02/15/2023) |

USCA11 Case: 23-13177    Document: 90-1    Date Filed: 03/05/2024    Page: 35 of 233

| 02/15/2023 | | Transmission of Notice of Appeal, Order under appeal, and Docket Sheet to US Court of Appeals re 312 Notice of Appeal, Notice has been electronically mailed. (apz) (Entered: 02/15/2023) |
| --- | --- | --- |
| 02/15/2023 | 313 | CLERK'S NOTICE of Mailing Pro Se Instructions to John J. McCarthy re 312 Notice of Appeal. (apz) (Entered: 02/15/2023) |
| 02/16/2023 | 314 | Acknowledgment of Receipt of NOA from USCA re 312 Notice of Appeal, filed by John J. McCarthy. Date received by USCA: 2/15/2023. USCA Case Number: 23-10387-J. (apz) (Entered: 02/16/2023) |
| 02/17/2023 | 315 | Clerks Receipt for deposit into the registry per order of the court (DE#309) received on 2/17/2023 in the amount of $ 1,031,788 33, receipt number FLS265147 (vt) (Entered: 02/17/2023) |
| 02/17/2023 | 317 | ORDER DENYING 281 Non-Party John J. McCarthy's Motion for Rule 59(e);60(b). Signed by Judge Donald M. Middlebrooks on 2/17/2023. *See attached document for full details.* (nan) (Entered: 02/21/2023) |
| 02/21/2023 | 316 | PAPERLESS ORDER terminating 228 Defendant Neustar, Inc 's Motion to Dismiss The claims against this defendant were dismissed by way of my Order dated September 8, 2022 (DE 267 ). Signed by Judge Donald M. Middlebrooks on 2/21/2023. (kal) (Entered: 02/21/2023) |
| 02/22/2023 | 318 | ORDER of DISMISSAL by USCA. This appeal was erroneously docketed as to John J. McCarthy by the Eleventh Circuit Court of Appeals and is hereby dismissed AS TO JOHN J. MCCARTHY ONLY re 312 Notice of Appeal, filed by John J. McCarthy. USCA #23-10387-J. (apz) (Entered: 02/23/2023) |
| 02/23/2023 | 319 | Acknowledgment of Receipt of NOA from USCA re 312 Notice of Appeal, filed by John J. McCarthy. Date received by USCA 2/15/2023 USCA Case Number 23 10536 J (apz) (Entered 02/24/2023) |
| 03/07/2023 | 320 | MOTION to Withdraw from This Case with Prejudice as Nunc Pro Tunc by John J. McCarthy. (Address Updated) Responses due by 3/21/2023 (ebz) (Entered: 03/07/2023) |
| 03/13/2023 | 322 | ORDER Closing Case Signed by Judge Donald M Middlebrooks on 3/13/2023 *See attached document for full details* (nan) (Entered: 03/14/2023) |
| 03/14/2023 | 321 | Unopposed MOTION to Withdraw as Attorney by Michael F. Houlihan for / by Michael Sussman. Responses due by 3/28/2023 (Attachments: # 1 Text of Proposed Order)(Martinez, Roberto) (Entered: 03/14/2023) |
| 03/28/2023 | 323 | PAPERLESS ORDER granting 320 John J. McCarthy's Motion to Withdraw / be Removed as an Interested Party from this Case Mr McCarthy shall be removed from this case and will no longer receive any filings per his request Signed by Judge Donald M. Middlebrooks on 3/28/2023. (gm1) (Entered: 03/28/2023) |
| 03/28/2023 | 324 | PAPERLESS ORDER granting 321 Motion to Withdraw as Attorney. Michael F. Houlihan representing Sussman, Michael (Defendant) withdrawn from case. Notice of Termination delivered by US Mail to Michael Houlihan. Signed by Judge Donald M. Middlebrooks on 3/28/2023. (gm1) (Entered: 03/28/2023) |
| 04/06/2023 | 325 | ORDER of DISMISSAL from USCA for want of prosecution because the appellant John J McCarthy failed to pay the filing and docketing fees to the district court, or alternatively, file a motion to proceed in forma pauperis in district court and file a Transcript Order Form and failed to comply with the rules on Certificates of Interested Persons and Corporate Disclosure |

| | | |
|---|---|---|
| | | Statements w claims time fixed by the entities re 90-2 Notice of Appeal, filed by John J. McCarthy USCA #23-10536-J. (apz) (Entered: 04/06/2023) |
| 06/22/2023 | 326 | Pursuant to 11th Cir R. 11.2 and 11th Cir R. 11.3, the Clerk of the District Court for the Southern District of Florida certifies that the record is complete for purposes of this appeal re: 275 Notice of Appeal, 272 Notice of Appeal, Appeal No. 22-13410-HH. The entire record on appeal is available electronically. (apz) (Entered: 06/22/2023) |
| 07/17/2023 | 327 | STIPULATED MOTION for Substitution of Counsel. Substituting John Wylie for William Barzee by Robert E. Mook. Attorney John William Wylie, IV added to party Robert E. Mook(pty:dft). Responses due by 7/31/2023 (Attachments: # 1 Text of Proposed Order)(Wylie, John) (Entered: 07/17/2023) |
| 07/17/2023 | 328 | STIPULATED MOTION for Substitution of Counsel. Substituting John Wylie for William Barzee by Jake Sullivan. Attorney John William Wylie, IV added to party Jake Sullivan(pty dft). Responses due by 7/31/2023 (Attachments # 1 Text of Proposed Order)(Wylie, John) (Entered: 07/17/2023) |
| 07/20/2023 | 329 | PAPERLESS ORDER granting 327 Motion for Substitution of Counsel. Attorney John William Wylie, IV added. Attorney William R. Barzee representing Mook, Robert E. (Defendant) terminated. Signed by Judge Donald M. Middlebrooks on 7/20/2023. (gm1) (Entered: 07/20/2023) |
| 07/20/2023 | 330 | PAPERLESS ORDER granting 328 Motion for Substitution of Counsel. Attorney John William Wylie, IV added. Attorney William R. Barzee representing Sullivan, Jake (Defendant) terminated. Signed by Judge Donald M. Middlebrooks on 7/20/2023. (gm1) (Entered: 07/20/2023) |
| 07/27/2023 | 331 | MOTION for Rule 60 *Indicative Ruling Pursuant to Rule 62.1* by Alina Habba, Habba Madaio & Associates, Michael T Madaio, Jamie A Sasson, The Ticktin Law Group, Peter Ticktin, Donald J. Trump. Attorney Jared Joseph Roberts added to party Michael T Madaio(pty:a), Attorney Jared Joseph Roberts added to party Jamie A Sasson(pty:a), Attorney Jared Joseph Roberts added to party The Ticktin Law Group(pty:a), Attorney Jared Joseph Roberts added to party Peter Ticktin(pty:a). Responses due by 8/10/2023 (Roberts, Jared) (Entered: 07/27/2023) |
| 08/10/2023 | 332 | RESPONSE to Motion re 331 MOTION for Rule 60 *Indicative Ruling Pursuant to Rule 62.1* filed by Charles Halliday Dolan Jr. Replies due by 8/17/2023. (Levine, Jonathan) (Entered: 08/10/2023) |
| 08/10/2023 | 333 | RESPONSE in Opposition re 331 MOTION for Rule 60 *Indicative Ruling Pursuant to Rule 62.1* filed by Hillary R. Clinton, DNC Services Corporation, Igor Danchenko, Democratic National Committee, Charles Halliday Dolan Jr., Marc Elias, Peter Fritsch, Fusion GPS, HFACC, Inc., Rodney Joffe, Robert E. Mook, Neustar Security Services, Neustar, Inc., Bruce Ohr, Nellie Ohr, Orbis Business Intelligence, Ltd., Perkins Coie, LLC, John Podesta, Debbie Wasserman Schultz, Glenn Simpson, Jake Sullivan, Michael Sussman. Replies due by 8/17/2023. (Kastrenakes Howard, Eleni) (Entered: 08/10/2023) |
| 08/10/2023 | 334 | RESPONSE in Opposition re 331 MOTION for Rule 60 *Indicative Ruling Pursuant to Rule 62.1* filed by Orbis Business Intelligence, Ltd. Replies due by 8/17/2023. (Lett, Enjolique) (Entered: 08/10/2023) |
| 08/14/2023 | 335 | MOTION to Disqualify Judge by Alina Habba, Habba Madaio & Associates, Michael T Madaio, Jamie A Sasson, The Ticktin Law Group, Peter Ticktin, Donald J. Trump. (Roberts, Jared) (Entered: 08/14/2023) |

| 08/17/2023 | 336 | REPLY N SUPPORT OF MOTION re 331 MOTION for Rule 60 *Indicative Ruling Pursuant to Rule 62.1* filed by Alina Habba, Habba Madaio & Associates, Michael T Madaio, Jamie A Sasson, The Ticktin Law Group, Peter Ticktin, Donald J. Trump. (Roberts, Jared) Modified text on 8/18/2023 (ebz). (Entered: 08/17/2023) |
| 08/28/2023 | 337 | RESPONSE in Opposition re 335 MOTION to Disqualify Judge filed by Charles Halliday Dolan Jr   Replies due by 9/5/2023 (Levine, Jonathan) (Entered: 08/28/2023) |
| 08/28/2023 | 338 | RESPONSE in Opposition re 335 MOTION to Disqualify Judge filed by Hillary R. Clinton. Replies due by 9/5/2023. (Markus, David) (Entered: 08/28/2023) |
| 09/05/2023 | 339 | REPLY IN SUPPORT OF THEIR MOTION re 335 MOTION to Disqualify Judge filed by Alina Habba, Habba Madaio & Associates, Michael T Madaio, Jamie A Sasson, The Ticktin Law Group, Peter Ticktin, Donald J  Trump  (Roberts, Jared) Modified text on 9/6/2023 (ebz). (Entered: 09/05/2023) |
| 09/06/2023 | 340 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Jason C. Greaves. Filing Fee $ 200.00 Receipt # AFLSDC-16898168 by Alina Habba, Habba Madaio & Associates, Michael T Madaio, Jamie A Sasson, The Ticktin Law Group, Peter Ticktin, Donald J. Trump. Responses due by 9/20/2023 (Roberts, Jared) (Entered: 09/06/2023) |
| 09/11/2023 | 341 | PAPERLESS ORDER granting 340 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Jason C  Greaves  Signed by Judge Donald M  Middlebrooks on 9/11/2023 (kal) (Entered: 09/11/2023) |
| 09/15/2023 | 342 | ORDER dismissing 335 Motion to Disqualify. Signed by Judge Donald M. Middlebrooks on 9/15/2023. *See attached document for full details.* (kpe) (Entered: 09/15/2023) |
| 09/15/2023 | 343 | ORDER on Motion for Indicative Ruling. Order denying 331 Motion for Indicative Ruling Based Upon New Evidence. Signed by Judge Donald M  Middlebrooks on 9/15/2023  *See attached document for full details*  (kpe) (Entered  09/15/2023) |
| 09/27/2023 | 344 | Notice of Appeal as to 342 Order on Motion to Disqualify Judge, 343 Order on Motion for Rule 60 by Alina Habba, Habba Madaio & Associates, Michael T Madaio, Jamie A Sasson, The Ticktin Law Group, Peter Ticktin, Donald J. Trump. Filing fee $ 505.00 receipt number AFLSDC-16951578. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under All Forms and look for Transcript Order Form www.flsd.uscourts.gov/forms/all-forms. (Roberts, Jared) (Entered: 09/27/2023) |
| 09/28/2023 |  | Transmission of Notice of Appeal, Orders under Appeal, and Docket Sheet to US Court of Appeals re 344 Notice of Appeal, Notice has been electronically mailed. (jgo) (Entered: 09/28/2023) |
| 09/28/2023 | 345 | Acknowledgment of Receipt of NOA from USCA re 344 Notice of Appeal, filed by Michael T Madaio, Peter Ticktin, Habba Madaio & Associates, Jamie A Sasson, The Ticktin Law Group, Alina Habba, Donald J. Trump. Date received by USCA: 09/28/2023. USCA Case Number: 23-13177-J. (jgo) (Entered: 09/29/2023) |
| 10/11/2023 | 346 | TRANSCRIPT INFORMATION FORM by Alina Habba, Habba Madaio & Associates, Michael T Madaio, Jamie A Sasson, The Ticktin Law Group, Peter Ticktin, Donald J. Trump re 344 Notice of Appeal,,. No Transcript Requested. (Roberts, Jared) |

| 11/16/2023 | 347 | MOTION to Withdraw as Attorney by Isabela M. Garcez for / by Robert E. Mook. Responses due by 11/30/2023 (Attachments  # 1 Text of Proposed Order)(Wylie, John) (Entered  11/16/2023) |
| --- | --- | --- |
| 12/07/2023 | 348 | ORDER GRANTING 347 Motion to Withdraw as Attorney. Isabela M. Garcez representing Mook, Robert E. (Defendant) withdrawn from case. Notice of Termination delivered by US Mail to Isabela Garcez. Signed by Judge Donald M. Middlebrooks on 12/7/2023. *See attached document for full details.* (nan) (Entered: 12/07/2023) |
| 12/21/2023 | 349 | MOTION to Withdraw as Attorney by Edward Soto for / by Rodney Joffe. Responses due by 1/4/2024 (Attachments: # 1 Text of Proposed Order)(Soto, Edward) (Entered  12/21/2023) |

| PACER Service Center | | |
| --- | --- | --- |
| Transaction Receipt | | |
| 01/01/2024 19:38:32 | | |
| **PACER Login** | rklugh1736 | **Client Code** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:22-cv-14102-DMM |
| **Billable Pages** | 30 | **Cost** | 3 00 |
| **Exempt flag:** | Not Exempt | **Exempt reason:** | Not Exempt |

177

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 2:22-cv-14102-DMM

DONALD J. TRUMP,

               Plaintiff,

v.

HILLARY R. CLINTON, HFACC, INC.,
DEMOCRATIC NATIONAL COMMITTEE,
DNC SERVICES CORPORATION, PERKINS
COIE, LLC, MICHAEL SUSSMANN, MARC
ELIAS, DEBBIE WASSERMAN SCHULTZ,
CHARLES HALLIDAY DOLAN, JR., JAKE
SULLIVAN, ADAM SCHIFF, JOHN PODESTA,
ROBERT E. MOOK, PHILLIPE REINES,
FUSION GPS, GLENN SIMPSON, PETER
FRITSCH, NELLIE OHR, BRUCE OHR,
ORBIS BUSINESS INTELLIGENCE, LTD.,
CHRISTOPHER STEELE, IGOR DANCHENKO,
NEUSTAR, INC., NEUSTAR SECURITY
SERVICES, RODNEY JOFFE, JAMES COMEY,
PETER STRZOK, LISA PAGE, KEVIN
CLINESMITH, ANDREW MCCABE, ROD
ROSENSTEIN, JOHN DOES 1 THROUGH 10
(said names being fictitious and unknown persons),
and ABC CORPORATIONS 1 THROUGH 10 (said
names being fictitious and unknown entities),

               Defendants.

_____/

## <u>AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR TRIAL BY JURY</u>

      The Plaintiff, Donald J. Trump, by and through his undersigned counsel, hereby serves his

Amended Complaint for Damages and Demand For Trial by Jury on the Defendants, Hillary R.

Clinton, HFACC, Inc., the Democratic National Committee, DNC Services Corporation, Perkins

Coie, LLC, Michael Sussmann, Marc Elias, Debbie Wasserman Schultz, Charles Halliday Dolan,

Jr., Jake Sullivan, Adam Schiff, John Podesta, Robert E. Mook, Phillipe Reines, Fusion GPS, Glenn Simpson, Peter Fritsch, Nellie Ohr, Bruce Ohr, Orbis Business Intelligence, Ltd., Christopher Steele, Igor Danchenko, Neustar, Inc., Neustar Security Services, Rodney Joffe, James Comey, Peter Strzok, Lisa Page, Kevin Clinesmith, Andrew McCabe, Rod Rosenstein, John Does 1 through 10 (said names being fictious and unknown persons), and ABC Corporations 1 through 10 (said names being fictitious and unknown entities) and alleges as follows:

### Introduction

1.      In the run-up to the 2016 Presidential Election, Hillary Clinton and her cohorts orchestrated an unthinkable plot – one that shocks the conscience and is an affront to this nation's democracy.  Acting in concert, the Defendants maliciously conspired to weave a false narrative that their Republican opponent, Donald J. Trump, was colluding with a hostile foreign sovereignty. The actions taken in furtherance of their scheme—falsifying evidence, deceiving law enforcement, spreading disinformation through the media, and exploiting access to highly-sensitive data sources—are so outrageous, subversive and incendiary that even the events of Watergate pale in comparison.

2.      Under the guise of 'opposition research,' 'data analytics,' and other political stratagems, the Defendants nefariously sought to sway the public's trust.  They worked together with a common, self-serving purpose: to vilify Donald J. Trump.  Indeed, their far-reaching conspiracy was designed to cripple Trump's initial bid for presidency and tarnish his electability for future elections by fabricating a scandal that would be used to trigger an unfounded federal investigation and ignite a media frenzy.

3.      The scheme was conceived, coordinated and carried out by top-level officials at the Clinton Campaign and the DNC—including 'the candidate' herself—who attempted to shield her

involvement behind a wall of third parties.[1]  To start, the Clinton Campaign and the DNC enlisted the assistance of their shared counsel, Perkins Coie, a law firm with deep Democrat ties, in the hopes of obscuring their actions under the veil of attorney-client privilege.  Perkins Coie was tasked with spearheading the scheme to find—or fabricate—proof of a sinister link between Donald J. Trump and Russia.  To do so, Perkins Coie launched parallel operations: on one front, Perkins Coie partner Marc Elias led an effort to produce spurious 'opposition research' claiming to reveal illicit ties between the Trump Campaign and Russian operatives; on a separate front, Perkins Coie partner Michael Sussmann headed a campaign to develop misleading evidence of a bogus 'back channel' connection between e-mail servers at Trump Tower and a Russian-owned bank.

4.      Marc Elias, in his mission to obtain derogatory anti-Trump 'opposition research,' commissioned Fusion GPS, an investigative firm, and its co-founders, Peter Fritsch and Glenn Simpson, and directed them to dredge up evidence—actual or otherwise—of collusion between Trump and Russia.  Fritsch and Simpson, in turn, enlisted the assistance of Orbis Ltd. and its owner, Christopher Steele, to produce a series of reports purporting to contain proof of the collusion.  Of course, the now fully debunked collection of reports, known as the "Steele Dossier," was riddled with misstatements, misrepresentations and, most of all, flat out lies.  In truth, the Steele Dossier was largely based upon information provided to Steele by his primary sub-source, Igor Danchenko, who was subsequently indicted for falsifying his claims.  Even more damning, Danchenko had close ties to senior Clinton Campaign official, Charles Halliday Dolan, Jr., who

---

[1] U.S. Dep't of Justice, Office of the Inspector General, Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation at 96 (2019) (hereinafter "IG Report").

knowingly provided false information to Danchenko, who relayed it to Steele, who reported it in the Steele Dossier and eagerly fed the deceptions to both the media and the FBI. This duplicitous arrangement existed for a singular self-serving purpose – to discredit Donald J. Trump and his campaign.

5.      At the same time, Michael Sussmann, in his hunt for damaging intel against the Trump Campaign, turned to Rodney Joffe—a fervent anti-Trumper who had recently been promised a high-ranking position with the Clinton Administration—to exploit his access to sensitive, proprietary and non-public data in search of a secret "back channel" connection between Trump Tower and Alfa Bank. When it was discovered that no such channel existed, the Defendants resorted to truly subversive measures – hacking servers at Trump Tower, Trump's private apartment, and, most alarmingly, the *White House*. This ill-gotten data was then manipulated to create a misleading "inference" and submitted to law enforcement in an effort to falsely implicate Donald J. Trump and his campaign.[2] All of these acts were carried out in coordination with the Clinton Campaign, the DNC, and Perkins Coie, at the behest of certain Democratic "VIPs."[3]

6.      While their multi-pronged attack was underway, the Defendants seized on the opportunity to publicly malign Donald J. Trump by instigating a full-blown media frenzy. Indeed, the Clinton Campaign and DNC—admittedly on a "mission" to "raise the alarm" about their contrived Trump-Russia link[4]—repeatedly fed disinformation to the media and shamelessly

---

[2] Indictment at ¶ 23 (ECF Doc. No. 1), *U.S. v. Sussmannn*, case no. 1:21-cr-00582-CRC, District of Columbia (Sept. 16, 2021) (hereinafter the "Sussmannn Indictment").
[3] *Id.* ¶ 10.
[4] Jennifer Palmieri (former Clinton Campaign Communications Director), *The Clinton campaign warned you about Russia. But nobody listened to us.*, The Washington Post, March 24, 2017.

promoted their false narratives.  All the while, Fusion GPS, Perkins Coie, Hillary Clinton, Jake Sullivan, Rodney Joffe, Adam Schiff, Debbie Wasserman Schultz, and others did their best to proliferate the spread of those dubious and false claims through press releases, televised interviews, social media, and other public statements.

7.     The fallout from the Defendants' actions was not limited to the public denigration of Trump and his campaign.  The Federal Bureau of Investigation (FBI)—relying on the Defendants' fraudulent evidence—commenced several large-scale investigations and expended precious time, resources and taxpayer dollars looking into the spurious allegation that the Trump Campaign had colluded with the Russian Government to interfere in the 2016 presidential election. The effects of this unfounded investigation were prolonged and exacerbated by the presence of a small faction of Clinton loyalists who were well-positioned within the Department of Justice and the FBI – James Comey, Andrew McCabe, Peter Strzok, Lisa Page, Kevin Clinesmith, and Bruce Ohr. These government officials were willing to abuse their positions of public trust to advance the baseless probe to new levels, including obtaining an extrajudicial FISA warrant and instigating the commencement of an oversight investigation headed by Special Counsel Robert Mueller. As a result, Donald J. Trump and his campaign were forced to expend tens of millions of dollars in legal fees to defend against these contrived and unwarranted proceedings. Justice would ultimately prevail – following a two-year investigation, Special Counsel Mueller went on to exonerate Donald J. Trump and his campaign with his finding that there was no evidence of collusion with Russia.

8.     The Defendants' actions were carried out in secrecy and were intentionally concealed from Donald J. Trump, the Federal Election Commission, the American people, among many others. It is only recently, in 2022, that the full extent of the Defendants' conspiracy has been unmasked and continues to be exposed by Special Counsel John Durham, who has been

heading a DOJ investigation into the origins of the Trump-Russia conspiracy. To date, Durham has already issued indictments to Sussmann, Danchenko, and former FBI employee Kevin Clinesmith, among others, for proffering false statements to law enforcement officials. As outlined below, these 'speaking' indictments not only implicate many of the Defendants named herein but also provide a great deal of insight into the inner workings of the Defendants' conspiratorial enterprise. Based on the facts that have already been uncovered throughout the course of Durham's investigation, it seems all but certain that additional indictments are forthcoming.

9.      In short, the Defendants, blinded by political ambition, orchestrated a malicious conspiracy to disseminate patently false and injurious information about Donald J. Trump and his campaign, all in the hopes of destroying his political career and rigging the 2016 Presidential Election in favor of Hillary Clinton. When their gambit failed, and Donald J. Trump was elected, the Defendants' efforts continued unabated, merely shifting their focus to undermining his presidential administration and tarnishing his electability for future presidential elections. Worse still, the Defendants continue to spread their vicious lies to this day as they unabashedly publicize their thoroughly debunked falsehoods in an effort to ensure that he will never be elected again.

10.      The deception, malice, and treachery perpetrated by the Defendants has caused significant harm to the American people, and to the Plaintiff, Donald J. Trump, and they must be held accountable for their heinous acts.

## Jurisdiction and Venue

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that claims which arise under the laws of the United States, and this court has supplemental jurisdiction of the additional claims pursuant to 28 U.S.C. § 1367(a) as they all are so related to the federal questions that they form part of the same case or controversy.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because at least one Defendant and the Plaintiff reside in this District and a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this District. In this regard, the publications of injurious falsehoods were intended to occur in the Southern District of Florida, and they did occur in the Southern District of Florida.

### The Parties

13.     The Plaintiff, Donald J. Trump, the 45th President of the United States of America, is a private citizen who is *sui juris* and a resident of the State of Florida in the County of Palm Beach.

14.     The Defendant, Hillary R. Clinton (hereinafter "Clinton"), is a resident of the State of New York and is *sui juris.*  She was the Democratic nominee for the 2016 Presidential Election. Clinton's acts and omissions as identified in this lawsuit arise out of or relate to her conduct in and/or affecting, among other jurisdictions, Florida.

15.     The Defendant, HFACC, Inc. (hereinafter the "Clinton Campaign"), is a corporation with its principal place of business in New York and doing business all over the United States, including in Palm Beach County, Florida.  The Clinton Campaign's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

16.     The Defendant, the Democratic National Committee is a national committee, as defined by 52 U.S.C. § 30101, with its principal place of business in Washington, D.C.  The Democratic National Committee is registered with the FEC as the DNC Services Corp./Dem. Services Corp, and it operates through the Defendant, the DNC Services Corporation.  In turn, the DNC Services Corporation is a District of Columbia not-for-profit corporation, with its principal

place of business in Washington, D.C.  The Democratic National Committee undertakes most of its business and financial activities through the DNC Services Corporation (hereinafter, the Democratic National Committee and the DNC Services Corporation are collectively referred to as the "DNC").  The DNC operates and conducts substantial and continuous business in the State of Florida.  The DNC's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

17.     The Defendant, Perkins Coie, LLP (hereinafter "Perkins Coie"), is an international law firm with its headquarters in Seattle, Washington.  Perkins Coie has a registered agent in Tallahassee, Florida, and does substantial, continuous business in Florida generally and in Palm Beach County specifically.  Perkins Coie's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

18.     The Defendant, Michael Sussmann (hereinafter "Sussmann"), is a resident of the District of Columbia, and is *sui juris.*  He is an attorney and a former agent and/or employee of Perkins Coie and, at all relevant times herein, was acting within the scope of his employment with Perkins Coie.  Sussmann's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

19.     The Defendant, Debbie Wasserman Schultz (hereinafter "Schultz") is a resident of the State of Florida and is *sui juris.*  She served as Chairperson of the DNC from May 2011 until the date of her resignation on July 28, 2016.  Schultz's acts and omissions as identified in this lawsuit arise out of or relate to her conduct in and/or affecting, among other jurisdictions, Florida.

20.     The Defendant, Charles Halliday Dolan, Jr.  (hereinafter "Dolan"), is a resident of the State of New York, and is *sui juris.*  With respect to the 2016 Clinton Campaign, Dolan actively campaigned and participated in calls and events as a volunteer on behalf of Hillary Clinton.

8

Dolan's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

21.     The Defendant, Jake Sullivan (hereinafter "Sullivan"), is a resident of the District of Columbia, and is *sui juris*.  He was Chief Foreign Policy Advisory for the 2016 Clinton Campaign and, at all relevant times herein, was acting within the scope of his employment with the Clinton Campaign. Currently, Sullivan is serving as National Security Advisor for the Biden Administration.  Sullivan's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

22.     The Defendant, Adam Schiff (hereinafter "Schiff"), is a resident of the State of California, and is *sui juris*.   He has been a U.S Representative for the State of California since 2001.  Schiff's acts and omissions as identified in this lawsuit arise out of or relate to her conduct in and/or affecting, among other jurisdictions, Florida.

23.     The Defendant, John Podesta (hereinafter "Podesta"), is a resident of the District of Columbia, and is *sui juris*.  He was Chairman for the 2016 Clinton Campaign and, at all relevant times herein, was acting within the scope of his employment with the Clinton Campaign.  Podesta's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

24.     The Defendant, Robert E. Mook (hereinafter "Mook"), is a resident of the Commonwealth of Virginia and served as the campaign manager for the 2016 Clinton Campaign. At all relevant times herein, was acting within the scope of his employment with the Clinton Campaign.  Mook's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting among other jurisdictions, Florida.

25.     The Defendant, Phillipe Reines (hereinafter "Reines"), is a resident of the District

of Columbia, and is *sui juris*. He served as a long-time former communications advisor to Hillary Clinton and, at all relevant times herein, was acting within the scope of his employment with the Clinton Campaign. Reines' acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting among other jurisdictions, Florida.

26.     The Defendant, Marc Elias (hereinafter "Elias"), is a resident of Washington D.C. and is *sui juris*. He is an attorney and a former employee and/or agent of Perkins Coie, the DNC and the Clinton Campaign and, at all relevant times herein, was acting within the scope of his employment and/or agency of Perkins Coie. Elias's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

27.     The Defendant, Fusion GPS, is a Delaware limited liability company which represents that it provides research, strategic intelligence, and due diligence services to corporations, law firms, and investors worldwide, and is headquartered in Washington D.C. Fusion GPS's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

28.     The Defendant, Glenn Simpson (hereinafter "Simpson"), is a principal and co-founder of Fusion GPS, is a resident of the District of Columbia, and is *sui juris*. Simpson's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

29.     The Defendant, Peter Fritsch (hereinafter "Fritsch"), is a principal and co-founder of Fusion GPS, is a resident of the State of Florida, and is *sui juris*. Fritsch's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

30.     The Defendant, Nellie Ohr (hereinafter "Mrs. Ohr"), is a resident of the

Commonwealth of Virginia, and is *sui juris*.  At all relevant times, she was an employee of Fusion GPS and was acting within the scope of her employment with Fusion GPS.  Mrs. Ohr's acts and omissions as identified in this lawsuit arise out of or relate to her conduct in and/or affecting, among other jurisdictions, Florida.

31.     The Defendant, Bruce Ohr (hereinafter "Mr. Ohr"), is a resident of the Commonwealth of Virginia, and is *sui juris*.  At all relevant times, Bruce Ohr was a United States Department of Justice official.  Mr. Ohr's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

32.     The Defendant, Orbis Business Intelligence Ltd. (hereinafter "Orbis Ltd."), is a London, England-based intelligence consultancy firm.  Orbis Ltd.'s acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

33.     The Defendant, Christopher Steele (hereinafter "Steele"), is a principal and founder of Orbis Ltd., a resident of the United Kingdom, and he is *sui juris*.  Steele's acts and omissions as identified in this lawsuit were all done in the scope of his employment with Orbis, Ltd., and arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

34.     The Defendant, Igor Danchenko (hereinafter "Danchenko"), at all times relevant to this Complaint, was a citizen of the Russian Federation and was lawfully in the United States. Danchenko resides in the District of Columbia and the Commonwealth of Virginia and is *sui juris*. At all relevant times, Danchenko was a contractor for Orbis Ltd. and was acting within the scope of his agency with Orbis Ltd. Danchenko's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

35.     The Defendant, Neustar, Inc., is an information technology company with its

11

headquarters in Sterling, Virginia. Neustar's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

36.    The Defendant, Neustar Security Services ("NSS") (collectively, with Neustar, Inc., referred to as "Neustar") is an information technology company with its headquarters in Sterling, Virginia. Neustar's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

37.    The Defendant, Rodney Joffe (hereinafter "Joffe"), is a resident of the Commonwealth of Virginia, and is *sui juris*. Joffe is a former executive of Neustar and, at all relevant times herein, was acting within the scope of his employment with Neustar. Joffe's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

38.    The Defendant, James Comey (hereinafter "Comey"), is a resident of the Commonwealth of Virginia, and is *sui juris.* Comey was the 7th Director of the Federal Bureau of Investigation from 2013 to May 2017. Comey's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

39.    The Defendant, Peter Strzok (hereinafter "Strzok"), is a resident of the Commonwealth of Virginia, and is *sui juris.* At all relevant times, Strzok was an agent of the Federal Bureau of Investigation. Strzok's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

40.    The Defendant, Lisa Page (hereinafter "Mrs. Page"), is a resident of the District of Columbia, and is *sui juris.* At all relevant times Mrs. Page was an attorney for the Federal Bureau of Investigation. Mrs. Page's acts and omissions as identified in this lawsuit arise out of or relate to her conduct in and/or affecting, among other jurisdictions, Florida.

41.     The Defendant, Kevin Clinesmith (hereinafter "Clinesmith"), is a resident of the District of Columbia, and is *sui juris.* At all relevant times, Clinesmith was an attorney for the Federal Bureau of Investigation. Clinesmith's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

42.     The Defendant, Andrew McCabe (hereinafter, "McCabe"), is a resident of the Commonwealth of Virginia, and is *sui juris.* McCabe was the Deputy Director of the Federal Bureau of Investigation from 2016 to March of 2018.  McCabe's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

43.     The Defendant, Rod Rosenstein (hereinafter, "Rosenstein"), is a resident of the State of Maryland and is sui juris.  Rosenstein was the United States Deputy Attorney General from April 2017, until May 2019.    Rosenstein's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

44.     The Defendants, John Does 1 through 10, are individuals whose identities are presently unknown to the Plaintiff, including, but not limited to, journalists, publishers, editors, investigators, state or federal officials, co-conspirators, officers, employees, agents, managers, owners, principals and/or other duly authorized individuals who caused or contributed to the incident or incidents for which the Plaintiff seeks damages, and/or are vicariously and/or otherwise liable for the acts, commissions, or other culpable conduct of those who did cause or contribute to the incidents alleged.

45.     The Defendants, ABC Corporations 1 through 10, are corporate entities presently unidentifiable to the Plaintiff, including, but not limited to, media companies, publication companies, editorial companies, municipalities, state or federal agencies, law enforcement

authorities, investigative agencies, political organizations, political affiliates, private firms and/or

other duly authorized corporate or governmental entities who caused or contributed to the incident

or incidents for which the Plaintiff seeks damages, and/or are vicariously and/or otherwise liable

for the acts, commissions, or other culpable conduct of those who did cause or contribute to the

incidents alleged.

### Statement of Facts

#### *The DNC and the Clinton Campaign Become One*

46.     On April 6, 2015, the Clinton Campaign retained Perkins Coie, a law firm with

longstanding ties to the Democratic Party, as its general counsel.[5]

47.     Shortly thereafter, on April 12, 2015, Clinton formally declared her candidacy for

President of the United States.  Clinton sought the nomination of the Democratic Party.

48.     It was clear from the early days of the Democratic primaries that the DNC—which

according to its own rules, is required to "maintain impartiality and evenhandedness" during the

Democratic Primary nominating process—was backing Clinton and favored her as the preferred

Democratic nominee.[6]

49.     For example, in a confidential, inter-office DNC memorandum dated May 26, 2015

(the "DNC Memo"), which only came to light after the DNC servers were hacked by an individual

using the name "Guccifer 2.0," it was noted that the DNC sought to "provide a contrast between

the GOP field and HRC" and that it would "[u]se specific hits to muddy the waters around ethics,

transparency and campaign finance attacks on HRC."[7]

---

[5] Gov't Ex. 0301, *U.S. v. Sussmann*.
[6] DNC Charter and Bylaws, Art.  5 § 4.
[7] Complaint, Ex.  A (ECF Doc.  No.  8), *Wilding v.  DNC Services Corp., et al.*, case no.  0:16-cv-61511-WJZ, Southern District of Florida (July 13, 2016).

50.     Notably, the DNC Memo also stated that, in order to "muddy the waters" around Clinton's perceived vulnerabilities as a candidate, the DNC had outlined a plan to "damage Republican presidential candidates' credibility with voters by looking for targeted opportunities to undermine their specific messaging."  The DNC Memo also discussed "opposition research" and a strategy to "utilize the research to place highly targeted hits" against Republican candidates.[8]

51.     Around that same time, as later disclosed through a WikiLeaks release of confidential DNC documents, Schultz, the head of the DNC, stated in an e-mail that Clinton's Democratic competitor, Bernie Sanders, "isn't going to be president."

52.     Furthermore, Donna Brazile, then vice-chair of the DNC, said in criticism of Schultz: "She hadn't been very interested in controlling the party – she let Clinton's headquarters in Brooklyn do as it desired so she didn't have to inform the party officers how bad the situation was."

53.     In or around mid-2015, in an effort to foster greater coordination and cohesion with Clinton and the Clinton Campaign, the DNC retained the same law firm, Perkins Coie, to serve as its general counsel.

54.     Two of Perkins Coie's senior partners, Elias and Sussmann, were largely responsible for handling the firm's representation of the DNC and the Clinton Campaign in their legal, political, and other affairs.  Elias, in particular, was designated as "General Counsel" for both the DNC and the Clinton Campaign.

55.     In or around August 2015, Elias and Sussmann negotiated a Joint Fund-Raising Agreement between their two clients, the DNC and the Clinton Campaign.

---

[8] *Id.*

56.     The Joint Fund-Raising Agreement was nothing more than a thinly veiled effort to align the interests and operations of the DNC and the Clinton Campaign by giving the Clinton Campaign control over the DNC, an organization that was supposed to remain impartial.

57.     Specifically, the Joint Fund-Raising Agreement—which was entered into months before Clinton won the Democratic nomination—specified that, in exchange for raising money and investing in the DNC, the Clinton Campaign would control the DNC's finances, strategy, and all the money raised.  Her campaign had the right of refusal on who would be the party communications director, and it would make final decisions on all the other staff.  The DNC also was required to consult with the campaign about all other staffing, budgeting, data, analytics, and mailings.[9]

58.     In reference to the effect of the Joint Fund-Raising Agreement, then-DNC chairman Donna Brazile stated that she "couldn't write a press release without passing it by" the Clinton Campaign.[10]

59.     Gary Gensler, the Chief Financial Officer of the Clinton Campaign, stated that the DNC was "fully under the control" of the Clinton Campaign.[11]

60.     The Federal Election Commission noted that the arrangement between the Clinton Campaign and the DNC was "troubling" and found that that there was an "unusual degree of closeness between [the Clinton Campaign] and the DNC."[12]

---

[9] Donna Brazile, *Hacks: The Inside Story of the Break-ins and Breakdowns that Put Donald Trump in the White House*, November 7, 2017.
[10] Donna Brazile, *Inside Hillary Clinton's Secret Takeover of the DNC*, Politico Magazine, November 2, 2017.
[11] *Id.*
[12] Statement of Reasons at 7, August, 30, 2019, MURs 7304 & 7331, *In Re Hillary Victory Fund, et al.*

61.     Given the intimate ties between the DNC and the Clinton Campaign, and the amount of control that Clinton exerted over both, it was clear that the organizations' interests were aligned and they shared a common purpose: get Clinton elected President by any means necessary.

### The Clinton Campaign and DNC Conspire With Their Attorneys, Perkins Coie, to Frame Republican Candidate Donald J. Trump

62.     On June 16, 2015, Donald J. Trump announced his candidacy for President and sought the Republican nomination.[13]

63.     Seeking to thwart Trump's campaign, harm his political career, and diminish the likelihood of him winning the election, the Clinton Campaign and the DNC devised a nefarious scheme to discredit, delegitimize and defame him by proliferating a false narrative that Donald J. Trump and his campaign were actively colluding with Russia to interfere in the 2016 Presidential Election.

64.     This plot was conceived and funded by Clinton, the Clinton Campaign, and DNC and would require the participation, cooperation and assistance of many individuals and entities acting in concert with one another to willfully carry out numerous tortious and criminal acts.  The Defendants had a meeting of minds and a common objective: to irreparably harm Trump's electability and to destroy his political career.

65.     To start, the Clinton Campaign and the DNC enlisted the assistance of their joint attorneys, Perkins Coie.

66.     The Clinton Campaign and the DNC chose Perkins Coie to oversee and coordinate their plan for a specific purpose – they formulated that conspiring with their legal counsel would

---

[13] Reem Nasr, *Donald Trump announces candidacy for president*, June 16, 2015, https://www.cnbc.com/2015/06/16/donald-trump-announces-candidacy-for-president.html.

fraudulently conceal their dealings under the shroud of attorney-client privilege.  However, despite the Defendant' ill-intentions, attorney-client privilege is wholly inapplicable to the pertinent discussions between these parties – not only were the communications between the DNC/Clinton Campaign and Perkins Coie non-legal in nature, but they were also in furtherance of criminal and tortious wrongdoing.

67.     Specifically, the Clinton Campaign and the DNC directed Perkins Coie to coordinate a two-pronged plan to publicly and falsely denigrate Donald J. Trump, with Elias and Sussmann each leading parallel operations to wrongly implicate him as colluding with Russia.

68.     On one front, Elias would work with Fusion GPS and a host of others to develop a dossier, based on lies and misinformation purporting to show an incriminating link between Trump and Russia, which would be used to mislead law enforcement officials and ignite a media frenzy.

69.     On a separate front, Sussmann would commission the information technology company, Neustar, to brazenly hack servers from highly-sensitive locations—including Donald J. Trump's private residence, Trump Tower, and, most shockingly, the White House—to uncover proprietary data that could then be manipulated to give the impression that Trump was engaged in illegitimate business with a Russian bank, Alfa Bank.

### *Perkins Coie Recruits Fusion GPS to Effectuate a Multi-Faceted Smear Campaign*

70.     To effectuate the first phase of the Defendants' conspiracy—involving the creation of a fraudulent and incriminating dossier—the DNC and the Clinton Campaign would require the services of an investigative firm to dredge up derogatory 'opposition research' on Donald J. Trump and, to the extent there was none, to manufacture it.

71.     At all relevant times, Fusion GPS was a private investigative firm specializing in media and politics.  It was founded in 2011 by former *Wall Street Journal* employees Glenn

Simpson and Peter Fritsch.[14]

72.    On March 1, 2016, Fritsch sent an e-mail to a "senior figure in the Democratic Party" and conveyed his belief that Trump "had to be stopped." The Democratic contact responded by stating "Yes.  Let's talk."[15]

73.    The "senior figure in the Democratic Party" arranged for Fritsch and Simpson to meet with Elias. The meeting took place on April 20, 2016, in Washington D.C.[16]

74.    Effective as of April 1, 2016, on behalf of and at the direction of the Clinton Campaign and the DNC, Elias and Perkins Coie retained Fusion GPS.[17]

75.    In particular, Fusion GPS was hired, through Perkins Coie, to perform 'opposition research' for the Clinton Campaign and the DNC.[18]

76.    At that time, Simpson and Fritsch were aware that Perkins Coie represented the DNC and the Clinton Campaign.[19]

77.    The Clinton Campaign and the DNC were well aware that Fusion GPS had a well-

---

[14] See generally Glenn Simpson and Peter Fritsch, *Crime in Progress: Inside the Steele Dossier and the Fusion GPS Investigation of Donald Trump* (hereinafter "*Crime in Progress*").

[15] Glenn Simpson and Peter Fritsch, *Crime in Progress: Inside the Steele Dossier and the Fusion GPS Investigation of Donald Trump* ("*Crime in Progress*"), p.  55.

[16] *Id.*  at 56.

[17] Gov't Ex. 0302, *U.S. v. Sussmann*; *see also* Interview of Marc Elias at tr. 15, Permanent Select Committee on Intelligence, U.S. House of Representatives, December 13, 2017 (hereinafter, the "Elias Testimony") ("Q: You, Marc Elias and Perkins Coie, on behalf of the DNC and the Hillary Clinton Campaign, retained Fusion GPS? A: True.")

[18] Elias Testimony at 633:13-17 ("Q: Other than the Clinton Campaign at this time, was there any other client who Fusion GPS did work for? A: The Democratic National Committee. Q: Okay. So those were the two clients? A: Yes.").

[19] Letter from Matthew J. Gehringer, General Counsel, Perkins Coie, to William W. Taylor, III, Zuckerman Spaedar LLP, dated October 24, 2017, MUR 7291 HFA Resp. at 2, Ex. 1; *see also* Interview of Glenn Simpson at tr. 19, Permanent Select Committee on Intelligence, U.S. House of Representatives, November 14, 2017 (hereinafter, the "Simpson Testimony") ("Q: With respect to this fact pattern, with respect to your firm being retained, were you aware that Perkins Coie was working on behalf of the DNC? A: Yes.").

documented history of employing a 'scorched earth' strategy wherein the company would produce false and/or misleading dossiers to be spread through the media to damage his opportunity to win an election.

78.     The Clinton Campaign, the DNC, Perkins Coie and Fusion GPS each understood that Fusion GPS's true task was to launch a public smear campaign based on fraudulent evidence that could be used to falsely implicate Donald J. Trump to derail his campaign, ruining his opportunity to be elected and if elected to then interfere with his ability to properly serve as President of the United States.

79.     The Defendants agreed that Fusion GPS would report the results of its "investigation" to Elias.[20]

80.     In fact, Simpson and Fritsch reported *only* to Elias and did "not have any contact with the campaign brass." [21]

81.     In this way, Elias acted as a liaison between Fusion GPS and the Clinton Campaign/the DNC – he was the "gatekeeper" of communications between these parties and would report the progress of Fusion GPS's work to the Clinton Campaign and the DNC.[22]

82.     As Fritsch and Simpson recounted in their book, the relationship was set up that way for a specific reason; per Elias, Fusion GPS was walled-off from the Clinton Campaign and the DNC for "legal reasons: If Fusion's communications were with a lawyer, they could be

---

[20] *Id.* at 57.

[21] *Id.*

[22] Elias Testimony at 48 ("I was the sole. I was the – I was the gatekeeper. But there were – but there were instances in which there were some interactions otherwise. But that – but I was the gatekeeper."); *see also* Sullivan Testimony at 56 ("Q: Were you in meeting in which Mr. Elias briefed you on information that was of an opposition research nature? A: I was.").

considered privileged and kept confidential."[23]

83.    To further conceal their involvement with Fusion GPS, the Clinton Campaign and the DNC funneled the funds to finance Fusion GPS's work through Perkins Coie:

a.    Elias has testified that "[t]he money with which to retain [Fusion GPS] came from the Clinton campaign, Hillary for America, called the Clinton campaign, and the Democratic National Committee."[24]

b.    For example, on August 16, 2016, the DNC made a $66,500 payment to Perkins Coie; the DNC has acknowledged that this was the first of many such payments that were paid by the DNC and the Clinton Campaign, through Perkins Coie, to Fusion GPS.[25]

c.    Despite being earmarked as payments for Fusion GPS, the Clinton Campaign and the DNC reported the payments as being for "legal and compliance consulting."[26]

d.    In total, a sum in the amount of $777,907.97 was paid by the DNC to Perkins Coie and subsequently disbursed by Perkins Coie to Fusion GPS, as payment for Fusion GPS's services.[27]

e.    Likewise, a sum in the amount of $180,000 was paid by the Clinton Campaign to Perkins Coie and subsequently disbursed by Perkins Coie to Fusion GPS, as payment for Fusion GPS's services.[28]

---

[23] *Id.*
[24] Elias Testimony at 15.
[25] MUR 7291 DNC Resp. at 2 n.2; 8.
[26] Second General Counsel's Report at 2-3, MUR 7291 & 7449, *In the Matter of DNC Services Corp./DNC, et al.* (hereinafter, "FEC Second Gen. Counsel's Rpt.").
[27] *Id.*
[28] *See* MUR 7291 & 7449, Response to Discovery Requests at 6 (Apr. 13, 2021).

f.  As described in greater detail below, the Federal Election Commission pursued charges against the Clinton Campaign and the DNC for misreporting these payments in violation of campaign finance laws, finding that "[the Clinton Campaign] and the DNC did not properly disclose the purpose of [their] disbursements to Perkins Coie, for what appears to have been opposition research done by Fusion [GPS]."[29]

84.  The Clinton Campaign, the DNC and Perkins Coie intentionally sought to conceal their hiring of Fusion GPS from the public.[30]

85.  The coordination and interactions between the Clinton Campaign, the DNC, Perkins Coie and Fusion GPS were frequent and significant – *daily* conference calls were scheduled to be held every single weekday (Monday through Friday) at 8:30am from June 6, 2016 through the beginning of November 2016; required attendees included Elias, Simpson, Fritsch, and Clinton Campaign lawyer, Deborah Fine.[31]

86.  In addition, Elias would have weekly in-person meetings with Simpson and Fritsch.[32]

87.  In or around the time Fusion GPS was retained by the Defendants, Nellie Ohr was an employee of Fusion GPS, where her role was to conduct extensive opposition research on Donald J. Trump's family members and campaign aides.

---

[29] First General Counsel's Report at 27, MUR 7291, 7331 & 7449, *In the Matter of DNC Services Corp./DNC, et al.* (hereinafter, "FEC First Gen. Counsel's Rpt.").
[30] Elias Testimony at 643:21-24 ("Q: [Y]ou didn't want the public to know that Fusion GPS was working with the campaign. Is that fair? A: Sure.").
[31] Gov't Ex. 304, *U.S. v. Sussmann*.
[32] Elias Testimony at 635:10-12 ("Q: And the weekly check-ins – was that an in-person meeting? A: Yes. Q: And would you do that at Perkins Coie or at Fusion GPS. A: Always at my office.").

88.     Mrs. Ohr's husband, Bruce Ohr, was an Associate Deputy Attorney General with the DOJ. Mrs. Ohr had also been previously employed with the DOJ.

89.     The Clinton Campaign, the DNC, Perkins Coie, and Fusion GPS knew that this close relationship with a high-ranking DOJ official would be of great value in effectuating their plot – they understood that Mr. Ohr would be instrumental in lending credibility to the Steele Dossier by having Mr. Ohr serve as a seemingly trustworthy intermediary to disseminate it through government channels such as the FBI and the DOJ.

### As the Presidential Race Takes Form, the Defendants Put Their Plan Into Action

90.     On May 26, 2016, Donald J. Trump secured enough GOP votes to become the presumptive Republican Nominee for President of the United States in the 2016 election.[33]

91.     Shortly thereafter, on June 6, 2016, Hillary Clinton clinched enough GOP votes to become the presumptive Democratic Nominee for President of the United States in the 2016 election.[34]

92.     With the stage set and the election cycle underway, the Clinton Campaign, the DNC, Perkins Coie and Fusion GPS put their collective plan into action.

93.     Specifically, the Defendants undertook to develop two separate false narratives that would be fed to law enforcement and simultaneously spread through the media, all in an effort to cause malicious aspersions on Donald J. Trump, the Trump Campaign, and the Trump Organization, including: (i) a fraudulent 'dossier' purportedly substantiated findings of a nefarious

---

[33] Amita Kelly, *Donald Trump Clinches GOP Nomination*, NPR, May 26, 2016, https://www.npr.org/2016/05/26/479588197/donald-trump-clinches-gop-nomination.
[34] Domenico Montanaro, *Clinton Has Enough Delegates to Claim Democratic Nomination*, NPR, June 6, 2016, https://www.npr.org/2016/06/06/481020591/why-hillary-clinton-will-be-called-the-presumptive-nominee.

link between Trump and Russia; and (ii) falsified and/or misleading data which allegedly showed a 'back channel' connection between the Trump Organization and a Russian bank, Alfa Bank, which has deep connections to the Russian Government.

### *Fusion GPS Enlists the Assistance of Steele and Orbis Ltd.*

94.     To develop the dossier, the Clinton Campaign, the DNC, Perkins Coie and Fusion GPS turned to Orbis Ltd., a private intelligence firm, and its owner, Christopher Steele, a former British intelligence officer.

95.     Orbis Ltd. was chosen to partake in the scheme because Steele's interests were aligned with the Defendants' overarching conspiracy – he "was desperate that Donald Trump not get elected" and he "was passionate about [Donald J. Trump] not being president."[35]

96.     Orbis Ltd. was also chosen because of the ties between one of its analysts/sub-sources, Danchenko, and an individual with intimate ties to the Clinton Campaign and one its close associates, Dolan.

   a.  Danchenko, a Russian citizen, had been working as a contractor/analyst with Orbis Ltd. Since 2011, focusing primarily on Russian and Eurasian geo-political matters.[36]

   b.  Dolan, then an employee of public relations firm, Kglobal, was a longtime participant in Democratic politics, having previously served as chairman of national Democratic political organization, state chairman of former President Bill Clinton's 1992 and 1996 presidential campaigns, adviser to Clinton's 2008 presidential campaign, and having been appointed by Clinton to two four-year

---

[35] Bruce Ohr Transcribed Interview 124, Aug.  28, 2918.
[36] Danchenko Indictment ¶ 16.

terms on an advisory commission at the U.S. State Department.  With respect to the 2016 Clinton campaign, Dolan actively campaigned and participated in calls and events as a volunteer on behalf of the Clinton Campaign.[37]

c.  In late April 2016, Danchenko began having discussions with Dolan about a potential business collaboration between Orbis Ltd. and Kglobal to create a "dossier" to smear Donald J. Trump and to disseminate the false accusations to the media.  Those discussions reflected that Danchenko and Dolan had exchanged information regarding each other's backgrounds and professional activities, including Danchenko's work for Orbis Ltd, and Steele:[38]

d.  On or about April 29, 2016, Danchenko sent an e-mail to Dolan indicating that Danchenko had passed a letter to Steele and his business partner at Orbis Ltd. on behalf of Dolan and intended to set up a meeting between the two.[39]

e.  That same day, Danchenko sent an e-mail to Dolan outlining certain work that Danchenko was conducting with Orbis Ltd. The e-mail attached an Orbis Ltd. Report titled "Intelligence Briefing Note, 'Kompromat' and 'Nadzor' in the Russian Banking Sector."[40]

f.  On or about June 10, 2016, Dolan sent an e-mail to a U.S.-based acquaintance which reflected that Dolan and Danchenko had become colleagues and were exchanging information.  In describing Danchenko, Dolan stated: "He is too young

---

[37] *Id.* ¶ 19.
[38] *Id.* ¶ 23.
[39] *Id.* ¶ 24.
[40] *Id.* ¶ 25.

for KGB.  But I think he worked for FSB.[41]  Since he told me he spent two years

in Iran.  And when I first met him he knew more about me than I did.  [winking

emoticon].”

97.    In or about May 2016, Fusion GPS officially retained Orbis Ltd.[42]

98.    Elias expressly authorized Fusion GPS's decision to retain Orbis Ltd.[43]

99.    Steele has testified that his task was to "collect intelligence from our sources on

Trump-Russia issues and interference in the US presidential campaign which would be fed to a

client of Fusion, which was a law firm, Washington-based."[44]

100.    In taking on this assignment, Steele was aware that "Democratic Party associates"

were paying for his and Fusion GPS's "research," and that "the ultimate client" was "the leadership

of the Clinton presidential campaign."[45]

101.    Steele also viewed Perkins Coie as a client, as well as the "legal arm of the

Democratic Party."[46]

102.    Critically, Steele has testified that "the candidate"—Hillary Clinton—was "aware

of [his] reporting."[47]

---

[41] The Federal Security Service of the Russian Federation, commonly referred to as the "FSB," is
the principal security agency of Russia and the principal successor agency to the KGB.

[42] Tr.  of Christopher Steele Deposition at 155-156 (Mar.  17-18, 2020), *Aven v.  Orbis* (2020)
EWHC 1812 (QB) (hereinafter, "Steele Dep.").

[43] Elias Testimony at 33 ("Q: […] Would you have to sign off on that decision [to retain Fusion
GPS]? Do you have to sign off on decisions to hire subcontractors and vendors? A: I had the
authority under the contract. I didn't in all instances. I did in this instance.").

[44] Steele Dep. at tr. 156:15-19.

[45] IG Report at 96; *see also* Steele Dep. at 162-163 ("Q: . . . in early July . . . who did you think
the ultimate client was? A: I thought it was the campaign . . . Q: You knew it was the leadership
of the Clinton presidential campaign, didn't you? A: I believed it was the campaign, yes.  Q: The
leadership of the Clinton campaign? A: Fine, the leadership of the campaign.")

[46] Steele Dep. at tr. 158:2-4; 67:21-22.

[47] FBI Notes at 96; *see also* Steele Dep. at tr. 163 (emphasis added).

103.     Shortly after being retained—at the direction of Clinton, the Clinton Campaign, the DNC, Perkins Coie, and Fusion GPS—Orbis Ltd. and Steele, with the assistance of Nellie Ohr, Danchenko Dolan, and others, began preparing approximately seventeen anti-Trump memoranda known collectively as the "Steele Dossier" or simply the "Dossier."

104.     All of these parties had a collective understanding regarding the true nature of the Dossier – it would contain unverified, falsified, and fraudulent information which would be fed to law enforcement to perpetuate a false narrative that Donald J. Trump was colluding with Russia.

105.     Indeed, Steele has explicitly acknowledged that "the purpose of [his] work was to prevent Donald Trump from becoming president[.]"[48]; he has acknowledged that the "FBI" was an "intended audience" of his reporting.[49]

106.     Thus, the Dossier was intended to not only harm Trump's political career and candidacy, but more importantly, it was fabricated to induce the FBI to commence an investigation into alleged ties between Russia and Donald J. Trump, the Trump Campaign, and the Trump Organization.

107.     In drafting the Dossier, Steele purported to rely upon numerous sources who contributed information and prevarications to him.

108.     Several of the alleged sources named in the Dossier have refuted, under oath, that they provided any of the purported information contained in the Dossier to Steele:

      a.   Olga Galkina, a Russian citizen who was referenced as "sub-source 3" in the Dossier, stated that she was never a source or sub-source to Steele, and, in fact,

---

[48] Steel Dep. at tr. 97:5-8 ("Q: That was the purpose of your work, to prevent Donald Trump from becoming president? A: By definition, an opposing candidate in their campaign was seeking to win an election.")

[49] *Id.* at tr. 67:21-22.

never even met him.[50]

    b. Alexey Dundich, a Russian citizen who was referenced as "sub-source 4" in the Dossier, stated that he never was a source of information, and never even met Steele.[51]

109. The primary source for the information provided in the Dossier was Steele's analyst, Danchenko.

110. From May 2016 through December 2016, Danchenko assembled and provided to Steele purported information that Steele would, in turn, rely upon to draft the Dossier.

111. During that same time, Danchenko had numerous meetings, communications and interactions with Dolan.[52]

112. Danchenko also brokered numerous meetings between himself, Dolan and Galinka.[53]

    a. In addition, Dolan and Galinka communicated regularly during that time and regularly discussed, among other things, their political views and their support for Clinton.[54]

    b. Galinka viewed Dolan as an "advisor" to Clinton and believed that he would "take [her] to the State Department if Hillary wins."[55]

---

[50] Declaration of Olga Aleksandrovna Galkina dated June 8, 2021 (ECF Doc.  No.  153-8), *Fridman, et al.  v.  Bean LLC a/k/a Fusion GPS*, *et al.*, case no.  17-2041-RJL, District of Columbia (June 21, 2021).
[51] Declaration of Alexey Sergeyevich Dundich dated May 13, 2021 (ECF Doc.  No.  153-4), *Fridman, et al.  v.  Bean LLC a/k/a Fusion GPS*, *et al.*, case no.  17-2041-RJL, District of Columbia (June 21, 2021).
[52] *See generally* Danchenko Indictment.
[53] *Id.* ¶¶ 39-41.
[54] *Id.* ¶ 41.
[55] *Id.* ¶¶ 41.

113.    Certain information contained in the Dossier, which Danchenko provided to Steele, mirrors and/or reflects information that Dolan had conveyed to Danchenko.

114.    For example, an allegation contained in Report 80 of the Dossier, claiming that Donald J. Trump had previously engaged in "salacious sexual activity" in the Presidential Suite at a Moscow hotel, was derived from Dolan:

a.    Dolan had stayed at the Moscow hotel in June 2016, and, during that trip, he participated in, among other things: 1) a meeting with the general manager of the Moscow hotel and a female hotel staff member, (2) a lunch with a Staff Member and other members of the Moscow hotel staff and (3) a tour of the Moscow hotel, including the Presidential Suite.

b.    Thereafter, Dolan told Danchenko that he learned from a hotel staffer that Trump had stayed in the Presidential Suite and engaged in "salacious sexual activity."

c.    References to the Moscow hotel, the Presidential Suite, and a hotel manager and other staff would all later appear in the Dossier, which included absurd allegations that Trump participated in "sexual or salacious activity."

d.    Dolan ultimately admitted that no one at the hotel mentioned anything to him about Trump's supposed "sexual or salacious" activity.

115.    Another allegation, contained in Report 111 of the Dossier, claiming that the Russian government withdrew a Russian from his job at the Russian Embassy in Washington, D.C. due to fears relating to the diplomat's purported role in meddling in the U.S. Presidential Election, had clearly originated from Dolan:

> [S]peaking separately to [a] compatriot, a senior Russian [Ministry of Foreign Affairs] official reported that as a prophylactic measure, a leading Russia diplomat, [Russian Diplomat-1], had been

> withdrawn from Washington on short notice because Moscow
> feared his heavy involvement in the US presidential election
> operation, including the so-called veterans' pensions ruse (reported
> previously), would be exposed in the media there. His replacement,
> [Russian Diplomat-2] however was clean in this regard.

116.    This allegation bore substantial similarities to information that Dolan received

during the 2016 time period.

117.    Moreover, Dolan was undoubtedly a source for an allegation in the Dossier

regarding Paul Manafort's departure from the Trump Campaign:

> S/he said it was true that the Ukraine corruption revelations had
> played a part in this, but also, several senior players close to
> [Trump] had wanted [Paul Manafort] out, primarily to loosen his
> control on strategy and policy formulation. Of particular
> importance in this regard was Paul Manafort's] predecessor as
> campaign manager, [Campaign Staff Member-1-], who hated [Paul
> Manafort] personally and remained close to [Trump] with whom
> he discussed the presidential campaign on a regular basis.

118.    The above allegation contained information that Dolan provided to Danchenko is

in response to a specific request. In particular, on August 19, 2016, Danchenko e-mailed Dolan to

inquire as to any "thought, rumor, or allegation" about Paul Manafort.

119.    Thereinafter, on August 20, 2016, Dolan e-mailed Danchenko the following:

> I had a drink with a GOP friend of mine who knows some of the
> players and got some of what is in this article, which provides even
> more detail. She also told me that [Campaign Staff Member-1],
> who hates [Paul Manafort] and still speaks to Trump regularly
> played a role. He is said to be doing a happy dance over it.

120.    Later that same day, Danchenko replied to Dolan, expressing his appreciation for

the information, adding that their "goals clearly coincide[d]" with respect to gathering derogatory

information about Trump.[56] Dolan responded, stating "Thanks! I'll let you know if I hear anything

---

[56] *Id.* ¶ 49.

else."[57]

121.    Moreover, an allegation contained in an undated Dossier report described a "well-developed conspiracy of cooperation" between Donald J. Trump, the Trump Campaign, and senior Russian officials, claiming:

> Speaking in confidence to a compatriot in late July 2016, [Source E], an ethnic Russian close associate of Republican US presidential candidate Donald Trump, admitted that there was a well-developed conspiracy of co-operation between them and the Russian leadership.  This was managed on the Trump side by the Republican candidate's Campaign manager, [Paul Manafort], who was using foreign policy advisor, [Carter Page], and others as intermediaries. The two sides had a mutual interest in defeating Democratic presidential candidate Hillary Clinton, whom President Putin apparently both hated and feared.

122.    This allegation would ultimately be offered in support of four FISA applications targeting former Trump Campaign associate Carter Page.

123.    An additional allegation contained in the Dossier indicated that Russian diplomatic staff in Washington, D.C., New York, and Miami were paying U.S.-based cyber actors to conduct operations against the Democratic Party and Clinton.

### *Sussmann Recruits Joffe and Neustar to Lead a Cyberattack Against Trump*

124.    While Elias was overseeing Fusion GPS, Orbis, Steele and others in the creation of the Dossier, Sussmann—at the direction of the Clinton Campaign and the DNC—was heading another aspect of the Defendants' conspiracy: a plot to exploit sensitive data sources and falsify evidence to manufacture ties between Donald J. Trump and a Russian bank.

125.    To put this plan in motion, the Clinton Campaign, DNC, Perkins Coie and Fusion GPS would require the assistance of a cybersecurity expert with the expertise and access to

---

[57] *Id.* ¶ 50.

sensitive, non-public data that could be exploited for their nefarious purposes.

126.    At all relevant times, Neustar was an information technology company founded in 1998 which offers various internet-related information, data and analytics services, including Domain Name System ("DNS") resolution services, to its customers.[58]

127.    At all relevant times, Neustar processed approximately 150 billion DNS responses per day with regard to its customers' data; this data is stored, for a period of time, by Neustar.[59]

128.    Far from apolitical, Neustar and its employees have long been aligned with the Democratic Party.  In 2016 alone, 100% of congressional campaign donations from Neustar employees went to Democrats.

129.    At all relevant times, Joffe was an executive of Neustar and had an ownership interest in at least six additional technology and/or data-related companies, Dissect Cyber Inc. ("Dissect Cyber"), Zetalytics LLC ("Zetalytics"), BitVoyant, LLC ("BitVoyant"), BlueVoyant, LLC ("Bluevoyant"), Packet Forensics, LLC (Packet Forensics"), and Littoral Ventures, LLC ("Littoral") (collectively, the "Data Companies").

130.    At all relevant times, Joffe had access to numerous data sources through his various positions with Neustar and the Data Companies, including access to non-public, proprietary data.

131.    In or around 2016, Joffe was in communication with high-ranking officials of the Clinton Campaign and/or the DNC in the lead-up to the 2016 Presidential Election.

132.    During that time, Joffe was "tentatively offered the top [cybersecurity] job by the Democrats" in the event Clinton won the presidency.  He stated that he "definitely would not take

---

[58] Sussmann Indictment at ¶ 12.
[59] Testimony of Steve DeJong at tr. 504:18-25, *U.S. v. Sussmann*, May 17, 2022 (trial transcript; afternoon session) (hereinafter, "DeJong Testimony").

the job under Trump."[60]

133.    Since at least August 2009, Perkins Coie, and Sussmann in particular, frequently served as outside counsel for Joffe and Neustar; as such, Neustar was a significant source of revenue for Perkins Coie.[61]

      a.    For instance, from 2014 through 2017, Perkins Coie billed the following amounts to Neustar: $693,323.49 in legal fees in 2014; $1,197,254.04 in legal fees in 2015; $1,476,851.84 in legal fees in 2016; and $2,155,216.65 in legal fees in 2017.[62]

134.    In or around July 2016, Perkins Coie, Elias and Sussmann, acting on behalf of and at the direction of the Clinton Campaign and the DNC, tasked Joffe to exploit his access to the information gathering services and non-public data of Neustar and the Tech Companies to dredge up confidential, proprietary, non-public information, data and/or records relating to Donald J. Trump, the Trump Campaign, and the Trump Organization, in the hopes that the data would reveal wrongdoing that could be used to create an injurious falsehood to harm the political reputation of Donald J. Trump.

135.    The Clinton Campaign, the DNC, Fusion GPS, and Joffe further agreed that, if no such damaging information could be found, that the ill-obtained data would be falsified and/or presented in a fraudulent manner to create an "inference" of wrongdoing.[63]

136.    The above-named Defendants referred to this project as "Crimson Rhino."[64]

---

[60] Sussmann Indictment ¶ 15.
[61] Gov't Ex. 2202, *U.S. v. Sussmann*.
[62] *Id.*
[63] Sussman Indictment at ¶23(h); *see also* Paul Sperry, *Clinton Tech" Rodney Joffe Had a Shady Past Before He Targeted Trump,* New York Post, February 21, 2022.
[64] Testimony of Jay Novick, *U.S. v. Sussmann*, May 17, 2022 (trial transcript, morning session) (hereinafter, the "Novick Testimony").

137.    The name was used to avoid having the name "Trump" bandied about, and its purpose was to link certain individuals listed in a tasking document—all "of whom were associated with the Trump Campaign—with Russia.[65]

138.    The purpose of obtaining this information was to modify it to appear incriminating and then to disseminate it to law enforcement and the media, thereby damaging the candidacy and overall electability of Donald J. Trump.[66]

139.    As described in greater detail below, with regard to their interactions with law enforcement, the Defendants' agreed to utilize a method known as 'circular reporting' whereby two individuals—Sussmann and Joffe—would simultaneously and surreptitiously present evidence to law enforcement in an attempt to self-corroborate their respective efforts.

140.    In furtherance of these efforts, beginning in or around July 2016, Joffe began exploiting his access to non-public data sources, including through Neustar and the Data Companies, in search of proof of a secret "back channel" between Donald J. Trump or the Trump Organization and Alfa Bank.[67]

141.    In doing so, Joffe unlawfully searched, gathered and mined internet data, including non-public and proprietary data, to obtain derogatory information on Donald J. Trump.[68]

    a.  The purpose of obtaining such data was to create an "inference" and "narrative" regarding Trump's purported ties to Russia.[69]

---

[65] Novick Testimony at tr. 1999:19-2015:25.
[66] Sussman Indictment at ¶21.
[67] Sussmann Indictment ¶¶ 21-23; *see also* Motion to Inquire into Potential Conflicts of Interest ¶ 4 (ECF Doc. No. 35), *United States v. Sussmann*, case no. 1:21-cr-00582-CRC, District of Columbia (Feb. 11, 2022) (hereinafter "Sussmann Conflict Motion").
[68] *Id.*
[69] Sussmann Indictment ¶ 23.

    b.  Those actions were directed by and/or done at the behest of certain "VIPs" of the Clinton Campaign and Perkins Coie.[70]

    c.  Those "VIPs" include Clinton, Sullivan, Elias and/or Sussmann.

142.  Among other things, Joffe—at the direction of Clinton, the Clinton Campaign, the DNC, Perkins Coie, and Sussmann—exploited his access to non-public and proprietary internet data through Neustar and the Data Companies, including without limitation, domain name system (DNS) internet traffic, of: (i) a healthcare provider; (ii) Trump Tower; (iii) Donald Trump's private apartment in Central Park West, and (iv) the Executive Office of the President of the United States (EOP).[71]

    a.  In doing so, Joffe, by and through his position with Neustar, intentionally accessed, without authorization or in excess of any authorization, the computers, servers, and/or other sensitive data sources at the above-stated facilities.

    b.  Joffe, by and through his position with Neustar, stole trade secrets, in the form of proprietary, sensitive and confidential data, information, and knowledge, from the above-stated facilities.

    c.  After obtaining the data, Joffe, by and through his position with Neustar, "spoofed" the information, by disguising the origin of the computer communications, and making them appear falsely to originate from a particular IP address.

143.  With regard to the EOP, Joffe and Neustar had come to access and maintain dedicated servers for the EOP as part of a highly sensitive arrangement whereby Neustar provided

---

[70] *Id.* ¶ 22-23; *see also* Sussmann Conflict Motion ¶¶ 4-5.
[71] *Id.*

DNS resolution services to the EOP.[72]

144.    Joffe and Neustar exploited this arrangement by, among other things, mining the EOP's DNS traffic and other data for the purpose of gathering derogatory information about Donald J. Trump.[73]

145.    In addition, Joffe, Neustar, and their associates queried their holdings of non-public internet data against a lengthy list of more than 9,000 IP addresses, 3,000 internet domains, and 60 e-mail addresses and domains that related to Donald J. Trump, the Trump Organization, and numerous Trump associates, in their search for derogatory information.[74]

146.    Donald J. Trump only recently learned of this information no earlier than September 16, 2021, as these revelations were exposed for the first time in the Sussmann indictment and/or subsequent motions filed by Special Counsel John Durham.

### The Defendants Commence Their Disinformation Campaign

147.    Steele finished his first report of the Dossier on June 20, 2016.

148.    Almost immediately thereafter, Fusion GPS, with the approval of the Clinton Campaign, the DNC and Perkins Coie, began shopping their fictitious stories to various news outlets, hoping that it would become national and international news, and ultimately cause harm to Donald J. Trump.

149.    Importantly, all of the communications between Fusion GPS and the media, as described *infra*, were expressly authorized by Perkins Coie, the DNC and the Clinton Campaign, as Simpson has testified that Fusion GPS does not share information with the media without

---

[72] *Id.*
[73] *Id*.
[74] Sussman Indictment at ¶22(h).

express consent from its clients.[75]

150.    Beginning as early as May 2016, Fusion GPS began contacting reporters to persuade them to publish negative stories about Trump, the Trump Campaign, and the Trump Organization – stories that Fusion GPS was well aware were false and misleading.

151.    Around that same time, Fusion GPS also directed Steele to spread information to the media, including briefing journalists on his 'findings' and disseminating information to the media.[76]

152.    On May 14, 2016, Fritsch and Fusion GPS employee, Jake Berkowitz, engaged in various communications with Franklin Foer, a journalist for *Slate*, concerning the purported Russian connections of several of Trump's campaign associates, including Carter Page and Rick Burt.[77]

153.    On June 27, 2016, Fritsch sent an e-mail to Foer attempting to insinuate that the Trump Campaign was colluding with Russia.[78]

154.    The next day, June 28, 2016, Foer responded and provided a draft article to Fritsch and Berkowitz to review, stating: "I'm out of town this week.  I handed in a draft of the piece - - here's a copy.  It's not at all edited, so forgive all the rawness.  I have no idea what my editor will

---

[75] Simpson Testimony at 32-33 ("Q:[I]f you're doing work on behalf of a client, it could be I guess one of two situations: The client could either authorize you to talk to reporters on their behalf; or if a reporter called you and asked you for information, you could check with your client as to whether you have their permission to share the information? A: That is correct. […] Q: You wouldn't be sharing information without your client's approval one way or the other? A: That's right.").
[76] *Id.* at 59 ("Q: Did you direct Steele to brief the media outlets, and why? A: Yeah. We did it together.")
[77] *U.S. v. Sussmann*, ECF Doc. No. 98-1 (hereinafter the "Fusion GPS e-mails"), e-mails from Franklin Foer to Jake Berkowitz dated May 14, 2016 through May 15, 2016.
[78] Fusion GPS e-mails, e-mail from Peter Fritsch to Franklin Foer dated June 27, 2016 9:23am .

say. But can you guys scan it for omissions and errors? And obviously, keep it to yourself. (Also promise me that you won't use it as a prod to the competition, whoever they are now.)."[79]

155.    Fritsch replied on the same day, stating that he and Berkowitz would "read it closely and make some suggestions."[80]

156.    In addition to spreading their lies through the media, the Clinton Campaign, the DNC, Perkins Coie and Fusion GPS also planned to simultaneously report their false stories to federal law enforcement and counterintelligence authorities.

157.    The purpose of feeding their false narratives to federal authorities was twofold: first, the Defendants sought to trigger various federal investigations into Donald J. Trump and his associates, hoping that it would injure his candidacy and political reputation; second, the Defendants sought to bolster the credibility of the stories they were peddling to the media by the fact that they were being actively investigated by federal authorities.

158.    The opening salvo occurred on July 5, 2016, when Steele—a paid FBI informant—began sending his dossier memoranda to the FBI, knowing that they contained false information on Donald J. Trump purporting to show compromising ties to Russia.[81]

159.    Simpson has admitted that Fusion GPS was aware that Steele was going to brief the FBI about his 'findings' relating to Trump and Russia and that Simpson "assented to" him doing so.[82]

### *The Intelligence Community Uncovers the Defendants' Plot*

160.    The Republican National Committee ("RNC") held its presidential nominating

---

[79] Fusion GPS e-mails, e-mails between Fristch, Berkowitz and Foer dated June 28, 2016.
[80] *Id.*
[81] *Id*. at ¶ 2; *see also* IG Report.
[82] Simpson Testimony at 61.

convention from July 18 through July 21, 2016, wherein Donald J. Trump was nominated as the Republican Nominee for President of the United States in the 2016 election.

161.    On July 26, 2016, Clinton formally won the nomination of the Democratic Party at the Democratic National Convention.

162.    In late July of 2016, U.S. intelligence agencies obtained insight into Russian intelligence analysis alleging that Clinton had "approved a campaign plan to stir up a scandal against U.S. Presidential candidate Donald Trump by tying him to Putin and the Russians' hacking of the Democratic National Committee."[83]

163.    Sometime thereafter, CIA Director John Brennan briefed then-President Barack Obama and other senior national security officials on the intelligence, including the "alleged approval by Hillary Clinton . . .  of a proposal from one of her foreign policy advisors to vilify Donald Trump by stirring up a scandal claiming interference by Russian security services."[84]

164.    Meanwhile, throughout the course of the Democratic National Convention, which was held between July 25, 2016 through July 28, 2016, Sullivan—Clinton's foreign policy advisor—"really started sounding the alarm" about Russian interference in the 2016 Presidential Election.[85]

165.    Sullivan and Jennifer Palmieri, then-Communications Director for the Clinton Campaign, were "on a mission to get the press to focus on . . . the prospect that Russia had not

---

[83] Letter from John Ratcliffe, Dir.  of Nat'l Intelligence, to Sen.  Lindsey Graham, Chairman, S. Comm.  on the Judiciary (Sept.  29, 2020), https://www.judiciary.senate.gov/imo/media/doc/09-29-20_Letter%20to%20Sen.%20 Graham_Declassification%20of%20FBI's%20Crossfire%20Hurricane%20Investigations_20-00912_U_SIGNEDFINAL.pdf.  .

[84] *Id.*

[85] Sullivan Testimony at 14.

only hacked and stolen e-mails from the Democratic National Committee, but that it had done so to help Donald Trump and hurt Hillary Clinton."[86]

166.    Sullivan began meeting with the "reporting and producer teams of each of the major networks" including "CNN, ABC, FOX, CBS [and] NBC."[87]

167.    Among other things, Sullivan briefed the major networks on "the nature of the connections between several members of Trump's foreign policy and political team and elements of the Russian Government or Russian-backed proxies" and how these connections allegedly created a "pretty disturbing picture."[88]

168.    In or around that time, Frisch e-mailed journalist Jay Solomon with the *Wall Street Journal*, discussing a senior Trump advisors' supposed meeting with former KGB official with close ties to Putin, among other false allegations of Russia collusion.  In one e-mail, Peter Frisch, on July 26, 2016, wrote to the Wall Street Journal reporter, when he told him that Carter Page "is neither confirming or denying". that he should "call adam Schiff. Or difi for that matter.  I bet they are concerned about what page was doing other than giving a speech over 3 days in Moscow."

169.    On the morning of July 31, 2016, Steele met with Nellie Ohr and Bruce Ohr, at which time Steele discussed his work on the Steele Dossier. Bruce Ohr was already aware at that time that Steele was "sharing his information with the Clinton campaign."[89]

    a.    Thereafter, in August 2016, Bruce Ohr met with Andrew McCabe and Lisa Page and briefed them on the false accusation contained in the Steele Dossier,

---

[86] Jennifer Palmieri, *The Clinton campaign warned you about Russia. But nobody listened to us*., The Washington Post, March 24, 2017.

[87] Interview of Jake Sullivan at tr. 15, Permanent Select Committee on Intelligence, U.S House of Representatives, December 21, 2017 (hereafter, the "Sullivan Testimony").

[88] *Id.* at 16.

[89] S. REP. NO. 116-290, vol. 5, at 909–10.

particularly those concerning Carter Page.

170.    On that same day, as described in greater detail below, the FBI opened a Foreign

Agents Registration Act ("FARA") investigation, known as Operation Crossfire Hurricane

("Crossfire Hurricane"), into whether individuals associated with the Trump Campaign were

witting of and/or coordinating activities with the Russian government.

### *Defendants Escalate Their Efforts as the FBI Launches Crossfire Hurricane*

171.    As the unfounded Crossfire Hurricane investigation was unfolding, Clinton, the

Clinton Campaign, the DNC, Perkins Coie undertook further efforts to prop up the unfounded

investigation, spark additional investigations within the FBI, and spread disinformation through

the media.

172.    In particular, Clinton, the Clinton Campaign, the DNC, Perkins Coie and Fusion

GPS devised a plot whereby Sussmann and Joffe would each independently and surreptitiously

present their 'white papers' and modified data to the FBI in the hopes that the dual presentation

would corroborate their respective findings. This tactic is known as 'circular reporting.'

173.    At the same time, Steele would continue—and accelerate—his interactions with the

FBI, as part of a collective effort to make their allegations of Trump-Russia collusion appear

legitimate.

174.    Meanwhile, Fusion GPS, Steele, Sussmann would simultaneously engage with

journalists and attempt to leverage the ongoing investigations—which they knew to be falsely

prompted—as a means of adding credibility to their claims and perpetuating their lies through the

media.

175.    On July 29, 2016, Elias, Sussmann, Joffe, Fritsch, and Fusion GPS employee Laura

Seago had an in-person meeting at the Washington D.C. office of Perkins Coie.[90]

    a. The purpose of the meeting was "to discuss allegations of communications between the Trump organization and Alfa Bank."[91]

    b. An inter-office calendar entry for Perkins Coie designated the meeting as pertaining to the "Clinton" matter.[92]

176.    On the same day, Steele was also present at Perkins Coie's Washington D.C. office for a meeting with Sussmann.[93]

    a. At that meeting, Sussmann told Steele about a purported connection between a server at Alfa Bank and a server at the Trump Organization.[94]

    b. Shortly after the meeting concluded, Simpson directed Steele to draft Memorandum 112 of the Steele Dossier, which concerns the purported corrupt ties between Alfa Bank and the Russian Government.[95]

    c. According to Steele, the "instruction to produce [Memorandum 112] was absolutely definitely linked to the server issue." [96]

177.    All of Sussmann's time for the July 29 meetings was billed to the Clinton Campaign under the category "General Political Advice"[97] with the billing description "meeting with Elias,

---

[90] *See* Gov't Ex. 1705, *U.S. v. Sussmann*; *see also* Steele Dep. at tr. 159:10 (March 17, 2020).
[91] Saego Testimony at tr. 575:20-22.
[92] *See* Gov't Ex. 1705, *U.S. v. Sussmann*.
[93] Steele Dep. at tr. 159:10 ("I visited Perkins Coie on 29 July.").
[94] Steele Dep. at tr. 1:19-25 through 2:1-3 (March 18, 2020).
[95] *Id.* at tr. 2:4-6 (March 18, 2020)
[96] *Id.* at tr. 5:1-2.
[97] For all of Sussmann's other billing entries cited herein that he billed to the Clinton Campaign, he similarly billed his time to the Clinton Campaign under the category "General Political Advice."

others regarding [] confidential project."[98]

178.    On July 31, 2016, Sussmann billed the Clinton Campaign for "communications with M. Elias regarding server issue".[99]

179.    Shortly thereafter, in early August 2016, Sussmann met with Steele again to discuss the Trump-Alfa Bank allegations; his time for the meeting was billed to the Clinton Campaign.[100]

180.    On about August 12, 2016, Sussmann met with Elias and Joffe in Elias' office; the meeting was billed to the Clinton Campaign with the billing description "confidential meetings with Elias, others."[101]

   a.   Fritsch also met with Sussmann at the Perkins Coie office on the same date.[102]

181.    On or about August 17, 2016, Sussmann had a conference call with Elias and Joffe; his time was billed to the Clinton Campaign with the billing description "telephone conference with Joffe."[103]

182.    On the same day, there was also a conference call between Elias, Simpson, Fritsch, and Clinton Campaign attorney Deborah Fine.[104]

183.    On or about August 19, 2016, Sussmann had another meeting with Elias and Joffe; Sussmann billed his time to the Clinton Campaign with the billing description stating, in part, "confidential meeting with Elias, others[.]"

---

[98] Gov't Ex. 1704, *U.S. v. Sussmann*.

[99] Gov't Ex. 553.2, *U.S. v. Sussmann*.

[100] Tr. of Interview at 74–75, H. Permanent Select Comm. on Intelligence Interview of Michael Sussmann (Dec. 18, 2017), https://www.dni.gov/files/HPSCI_Transcripts/2020-05-04-Michael_Sussmann-MTR_Redacted.pdf; Tr. of Steele Dep. at 1–2.

[101] Sussmann Indictment at ¶20; *see also* Gov't Ex. 1704, *U.S. v. Sussmann*.

[102] Gov't Ex. 0318, *U.S. v. Sussmann*.

[103] Gov't Ex. 1704, *U.S. v. Sussmann*.

[104] Gov't Ex. 0326, *U.S. v. Sussmann*.

184.    On or about August 20, 2016, Sussmann met with a representative of Fusion GPS and communicated with the media; he billed his time to the Clinton Campaign with the billing description, "Meeting with consultant and Elias; revisions to White Paper; meeting with expert; meeting with expert and reporter; follow up meeting with reporter; conversations with Elias."

185.    On the same day, Georgia Tech researcher Manos Antonakakis e-mailed Steve DeJong, a Neustar employee, stating, in pertinent part: "You know that if you are getting an encrypted e-mail with Rodney [Joffe] CCed, in the middle of the night, something is up. I will need you to pull all data you have (UltraDNS, TLDs, ccTLDs, and especially the data from the 'Secondary' dataset we talked about in May), for the following zones and IP addresses:" and then listed numerous domains relating to Trump and/or Alfa Bank.[105]

186.    Although the e-mail was sent from Mr. Antonakakis, it was understood that the 'research request' that required the data was, in fact, from Joffe.[106]

187.    On the same day, August 20, 2016, Joffe and his researchers manipulated a sales form on two different websites, faking the other's e-mail address to make them "appear to communicate with each other.  .  ."[107]

    a.  Joffe believed that this fake "inference" was believable enough that "Hillary's opposition research and whatever professional gov[ernments] and investigative

---

[105] Gov't Ex. 0111; *see also* DeJong Testimony at tr. 513:5-14.
[106] *Id.* at 514:7-13 ("It's not uncommon for us to get research requests and data requests. Rodney was well-known for working at all hours, 24/7, depending on what time zone he happened to be in. It was not uncommon for us to get these requests. It was a little uncommon that it would come from Manos, but it wasn't unexpected that it would come from Rodney in the middle of the night.").
[107] Sussmann Indictment at ¶23.

journalists are also digging [would] come up with the same things[.]"[108]

188.   On or about the same date, Joffe clarified in an e-mail that the "task" he had been "given" by Perkins Coie, the Clinton Campaign, and the DNC was "indeed broad" and further stated, in part:

> Being able to provide evidence of *anything* that shows an attempt to behave badly in relation to this, the VIPs would be happy.  They're looking for a true story that could be used as the basis for closer examination.[109]

189.   On or about August 21, 2016, Joffe e-mailed his team of researchers, urging them to push forward with their anti-Trump research, which he claimed would "give the base of a very useful narrative."[110]

190.   In that same e-mail, Joffe admitted that the 'narrative' that they were trying to prove—a connection between Trump and Alfa Bank—was merely a "red herring" with no factual basis that should be "ignored."[111]

191.   On September 1, 2016, Sussmann met with Eric Lichtblau of the *New York Times* to discuss the false Trump-Alfa Bank connection; Lichtblau would later write an article about the topic.[112]

192.   On September 8, 2016, Fritsch providing a summary of findings on the Trump Russia connection to Steven Mulfson of the *Washington Post*.

193.   Beginning on or about September 5, 2016, despite knowing that the data relating to the Trump and Alfa Bank servers was merely a 'red herring', Sussmann, Joffe and Fusion GPS

---

[108] *Id.*
[109] *Id.*
[110] *Id.*
[111] *Id.*
[112] Gov't Ex. 0349, *U.S. v. Sussmann*.

began to draft, review, and revise multiple "White Papers" summarizing the allegations—which

they knew to be false—of a supposed tie between Donald J. Trump and Alfa Bank.[113]

194.    All the time Sussmann spent drafting his 'white papers,' as with all his time spent

working with Neustar, Fusion GPS, and all of his acts in furtherance of the Defendants' conspiracy,

were billed to the Clinton Campaign.[114]

195.    The next day, on September 6, 2016, Sussmann and Elias met with representatives

of Fusion GPS; he billed his time to the Clinton Campaign and the meeting was categorized as

relating to the "Clinton" matter.115

196.    On September 7, 2016, U.S. intelligence officials forwarded an investigative

referral to Comey and Strzok regarding "U.S. Presidential candidate Hillary Clinton's approval of

a plan concerning U.S. Presidential candidate Donald Trump and Russian hackers hampering U.S.

elections as a means of distracting the public from her use of a private mail server."[116]

197.    On September 12, 2016, Sussmann spoke with Elias via phone regarding

Sussmann's efforts to communicate with one newspaper on the allegations about Alfa Bank;

Sussmann and Elias both billed the call to the Clinton Campaign.

198.    On September 13, 2016, Sussmann purchased two thumb drives (the "Thumb

Drives") from a Staples located nearby Perkins Coie's Washington D.C. Office.[117]

---

[113] *Id.* at ¶24; *see also* American News, *Fusion GPS Revealed To Have Pushed Russia Collusion Story to Numerous Outlets*, April 27, 2020.
[114] *See generally* Sussmann Indictment.
[115] Gov't Ex. 1705, *U.S. v. Sussmann*.
[116] Letter from John Ratcliffe, Dir.  of Nat'l Intelligence, to Sen.  Lindsey Graham, Chairman, S. Comm.  on the Judiciary (Sept.  29, 2020), https://www.judiciary.senate.gov/imo/media/doc/09-29-20_Letter%20to%20Sen.%20 Graham_Declassification%20of%20FBI's%20Crossfire%20Hurricane%20Investigations_20-00912_U_SIGNEDFINAL.
[117] Gov't Ex. 0380, *U.S. v. Sussmann*.

199.    The expense for the Thumb Drives was charged to, and ultimately reimbursed by, the Clinton Campaign.[118]

200.    On or about September 14, 2016, Joffe sent the white paper, on which Sussmann had been working, to his team with the following comment:

> Please read as if you had no prior knowledge or involvement, and you were handed this document as a security expert (NOT a DNS expert) and were asked: Is this plausible as an explanation?' NOT to be able to say that this is, without doubt, fact, but to merely be plausible.  Do NOT spend more than a short while on this (If you spend more than an hour you have failed the assignment).  Hopefully less.  :)[119]

201.    On or about the same date, one of Joffe's researchers replied, stating that the white paper achieved Joffe's objective, but noting that the paper "smartly" avoided discussing weaknesses or "holes" in the paper's hypothesis.[120]

a.   In a September 15, 2016 e-mail correspondence, one of the recipients of the question responded to Joffe, stating, in part, that the "paper's conclusion was plausible" in the "narrow scope" defined by Joffe.

b.   In a September 16, 2016 e-mail correspondence, one of Joffe's team confirmed that Sussmann would convey the false information to the FBI regarding the supposed connection between Donald J. Trump and Alfa Bank, with the plan to deceive.[121]

202.    In or around that time, in early-to-mid September 2016, a meeting occurred at the offices of Perkins Coie in Washington D.C. Attendees included Elias, Sussman, Joffe, Fritsch and

---

[118] *Id.*
[119] *Id.* at ¶24.
[120] Sussman Indictment at ¶24(f).
[121] Sussman Indictment at ¶24(i).

Fusion GPS employee Lauren Seago; the purpose of the meeting was to review and discuss the status of the "allegations of communications between the Trump Organization and Alfa Bank." [122]

203.    On or about September 15, 2016, just four days before Sussmann's meeting with the FBI, Elias exchanged e-mails with Sullivan, Mook, Podesta, and Palmieri with the subject line "Alfa Bank article" – i.e., the plot to falsely connect Donald J. Trump to the Russian bank, Alfa Bank, by disseminating the lies to the media.[123]

### *Sussmann Meets with FBI General Counsel to Submit Falsified Data and Evidence*

204.    On September 18, 2016, Sussmann texted the FBI General Counsel, Jim Baker, stating the following: "Jim — it's Michael Sussmann. I have something time-sensitive (and sensitive) I need to discuss. Do you have availability for a short meeting tomorrow? I'm coming on my own — not on behalf of a client or company — want to help the Bureau. Thanks," he wrote in the message displayed in court."

205.    On September 19, 2016, Sussmann met with Baker at FBI Headquarters in Washington D.C. to convey his allegations of the connection between Donald J. Trump and the Russian bank.[124]

206.    During this meeting, the following, in substance and in part, took place:

a.    Sussmann stated falsely that he was not acting on behalf of any client, which led Baker to understand that Sussmann was conveying the allegations as a good citizen and not as an advocate for any client.[125]

---

[122] Testimony of Laura Seago at tr. 575:20-22, *U.S. v. Sussmann,* May 18 (trial transcript; morning session) (hereinafter, the "Seago Testimony").
[123] Gov't Ex. 0390, *U.S. v. Sussmann*.
[124] Sussman Indictment at ¶27.
[125] Sussman Indictment at ¶27(a).

b.  Sussmann stated that he had been approached by multiple cyber experts concerning the Russian bank connections allegations; Sussmann provided the names of three cyber experts but did not name or mention Neustar, Joffe, the Clinton Campaign, or any other person or company referenced above.[126]

c.  Sussmann described the allegations of a secret Trump Organization server that was in communication with the Russian bank, including that the Russian bank had used a TOR exit node located at a healthcare company to communicate with the Trump Organization.[127]

d.  Sussmann stated that media outlets were in possession of information about the Trump Organization's secret server, and that a story would be published on Friday of that week.[128]

e.  Sussmann provided to Baker two Thumb Drives and hard copy papers, which contained and comprised the following: (i) the aforementioned white paper that Sussmann had assisted in drafting, entitled *White Paper #1 AuditableV3*, which contained no date or author's name; (ii) a white paper drafted by a researcher, which was entitled, *White Paper Comments: Time Series Analysis of Recursive Queries*, dated September 19, 2016, and contained no author's name; (iii) white paper drafted by Fusion GPS regarding the Russian Bank and its parent company, which contained no date or author's name; and (iv) eight files containing the Russian Bank data and other purported data and information relating to the

---

[126] Sussman Indictment at ¶27(b).
[127] Sussman Indictment at ¶27(d).
[128] Sussman Indictment at ¶27(e).

mail.trump-e-mail.com domain.[129]

    f.   Sussmann told Baker that the issue was "time sensitive" and said that a "major media outlet" would soon be reporting it; in fact, Sussmann was personally pushing the story to the *New York Times* through his communications with *Times* reporter, Eric Lichtblau.

207.    Sussmann reported the Trump-Alfa Bank connection, as though it was real, and lied to Baker, by falsely stating that he was not acting on behalf of any client, when he was specifically there at the behest of Clinton, the Clinton Campaign, and the DNC.  In fact, he billed the Clinton Campaign for his efforts, as he had with all of his actions taken in furtherance of the Defendants' conspiracy.[130]

208.    Sussmann's statement to Baker that he was not acting on behalf of any client was knowingly and intentionally false.  In truth, and as Sussmann well knew, he and his firm, Perkins Coie, had been acting on behalf of and in coordination with five specific clients, *i.e.,* Clinton, the Clinton Campaign, the DNC, Fusion GPS, Joffe, and Neustar in assembling and conveying his allegations.[131]

209.    Sussmann billed his meeting with Baker to the Clinton Campaign with the billing description, "work and communications regarding confidential project."[132]

210.    Sussmann concealed and failed to disclose, among other things, that, (i) he had spent time drafting one of the white papers he provided to Baker and billed that time to the Clinton Campaign, (ii) Fusion GPS, which at the time was also acting as a paid agent of the Clinton

---

[129] Sussman Indictment at ¶27(f).
[130] Sussman Indictment at ¶30.
[131] Id.
[132] Sussman Indictment at ¶29.

Campaign and the DNC, drafted another of those white papers; and (iii) the "major media outlet" was the *New York Times* and Sussmann himself had provided the Alfa Bank allegations to *Times* reporter Eric Lichtblau.[133]

211.    Sussmann's lies and omissions were material because, among other reasons, they misled Baker and other FBI personnel concerning the political nature of his work and deprived the FBI of information that might have permitted it more fully to assess and uncover the origins of the relevant data and technical analysis, including the identities and motivations of Sussmann's clients.[134]

212.    Had the FBI uncovered the origins of the relevant data and analysis, it would have learned, among other things, that (i) in compiling and analyzing the Alfa Bank allegations, Joffe had exploited his access to non-public data at multiple internet companies to conduct opposition research concerning Donald J. Trump; (ii) in furtherance of these efforts, Joffe had enlisted, and was continuing to enlist, the assistance of researchers at a U.S.-based university who were receiving and analyzing internet data in connection with a pending federal government cybersecurity research contract; and (iii) Sussmann, Elias, Perkins Coie, Joffe, and Neustar had coordinated, and were continuing to coordinate, with representatives and agents of the Clinton Campaign and the DNC with regard to the data and written materials that Sussmann gave to the FBI and the media.

213.    Immediately after the aforementioned September 19, 2016, meeting, Baker spoke with the Assistant Director of the FBI's Counterintelligence Division, Bill Priestap.    During their conversation, Baker conveyed the substance of his meeting with Sussmann.    Priestap took

---

[133] Sussman Indictment at ¶30.
[134] Sussman Indictment at ¶32.

contemporaneous handwritten notes which reflect, in substance, the above-referenced statements by Sussmann and stated, among other things: "Michael Sussmann – Atty: Perkins Coie, LLP not doing this for any client."[135]

214.    On September 23, 2016, as a direct result of Sussmann's meeting with Baker, the FBI opened a full field investigation into the "network communications between a US-based server [the Trump Organization] and the Russian ALFA BANK organization."[136]

      a.    A full field investigation is the highest level of investigation that can be authorized by the FBI – it is an investigation in which the FBI "employs all of [its] resources."[137]

215.    The FBI's investigation of these allegations nevertheless concluded that there was insufficient evidence to support the allegations of a secret communications channel with the Russian bank.  In particular, and among other things, the FBI's investigation revealed that the e-mail server at issue was not owned or operated by the Trump Organization but rather, had been administered by a mass marketing e-mail company that sent advertisements for Trump hotels and hundreds of other clients.

216.    In the weeks following his meeting with the FBI, Sussmann continued to coordinate with Joffe, Elias, Fusion GPS, and Steele to disseminate the Russian bank allegations to the media and to law enforcement. [138]

217.    For example, on or about October 10, 2016, Sussmann e-mailed a reporter a link to

---

[135] Sussman Indictment at ¶28.
[136] *See* Def. Ex. DX-525, *U.S. v. Sussmann*.
[137] Testimony of Curtis Heide at tr. 1817:25-1818:2, *U.S. v. Sussmann*, May 24, 2022 (trial transcript; afternoon session) (hereinafter, the "Heide Testimony").
[138] Sussman Indictment at ¶33.

an opinion article which asserted, in substance and in part, that investigative reporters had not

published as many stories regarding Donald J. Trump as other media outlets.[139]

### *Joffe Also Contacts the FBI To Report False Information*

218.    On or about October 2, 2016, Joffe reached out to FBI Special Agent (SA) Tom

Grasso via telephone and provided "information relating to communications between the Trump

Campaign and some entity in Russia."[140]

219.    In particular, Joffe provided at least one IP address, pertaining to an individual

connected to Alfa Bank, to SA Grasso.[141]

220.    At the time he contacted SA Grasso, Joffe was a confidential human source (CHS)

for the FBI.[142]

221.    Joffe contacted SA Grasso despite the fact that SA Grasso was not Joffe's handling

agent.[143]

      a.    Standard practice within the FBI is for a CHS to deal exclusively with his handling

         agent.[144]

222.    During the course of the call, Joffe specifically asked SA Grasso "not to disclose

his identity to other people in the Bureau."[145]

223.    Further, Joffe did not disclose to SA Grasso the source of the data he was passing

along, nor did he disclose his connections to Fusion GPS, Perkins Coie, the DNC or the Clinton

---

[139] Sussman Indictment at ¶34.
[140] Testimony of Tom Grasso at tr. 2159:3-9, *U.S. v. Sussmann*, May 25, 2022 (trial transcript; morning session) (hereinafter the "Grasso Testimony").
[141] *Id.* at tr. 2158:13-14.
[142] *Id.* at tr. 2166:24-2167:1.
[143] *Id.* at tr. 2167:2-3.
[144] *Id.* at tr. 2174:16-20.
[145] *Id.* at tr. 2167:19-23.

Campaign.[146]

224.    The same day Joffe e-mail Grasso, he sent an e-mail to Sussmann to arrange an in-person meeting the following day.[147]

225.    The Clinton Campaign, the DNC, Perkins Coie, and Fusion GPS were well aware JJoffe's intention to feed false information to the FBI.

**Steele Continues Meeting with Law Enforcement While the Media Blitz Goes On**

226.    Meanwhile, on the same date Sussmann met with the FBI—September 19, 2016—Steele provided reports from the Steele Dossier to the FBI which contained false information regarding Carter Page and his purported ties to Russia.

a.    Thereafter, the FBI applied for four (4) separate FISA warrants as to Carter Page.

b.    In doing so, the FBI relied substantially on the Dossier as a means of establishing probable cause that Carter Page was a witting agent of the Russian Federation.

c.    Indeed, McCabe would later testify before Congress behind closed doors in December 2017 that, if not for the Steele Dossier, no FISA warrant would have been issued.[148]

d.    Inspector General Michael Horowitz found that the Steele Dossier played a "central and essential role in the decision by the FBI [Office of General Counsel] to support the request for FISA surveillance targeting Carter Page, as well as the [Department of Justice]'s ultimate decision to seek the FISA order."[149]

e.    Each of the FISA applications set forth the FBI's assessment that Carter Page was

---

[146] *Id.* at tr. 2171:9-15.
[147] Gov't Ex. 0432, *U.S. v. Sussmann*.
[148] 120919-examination.pdf (justice.gov) at fn. 264.
[149] IG Report at 359.

a knowing agent of Russia and further alleged—in reliance on the Dossier—that Carter Page was part of a "well-coordinated conspiracy of co-operation between the Trump Campaign and the Russian government."

227.    Two days later, on September 21, 2016, Steele, Fritsch, and Simpson met with numerous members of the media in Washington D.C., including reporters from *The New York Times*, *The Washington Post*, *New Yorker*, *Yahoo News*, and *CNN*, to discuss their investigative findings of an alleged "sinister relationship" between Donald J. Trump and Russia, including the "possible coordination of members of Donald J. Trump's campaign team and Russian government officials."[150]

    a.  Fusion GPS specifically directed Steele to appear for the briefings to the press.[151]

    b.  The purpose of Steele being present for these meetings was to add credibility to the Defendant's false claims – he was "presented as a serious and experienced former intelligence officer whose research could be trusted."[152]

228.    Around that time, Steele and Simpson met with Michael Isikoff of *Yahoo! News* and discussed his 'findings' in the Dossier regarding the purported Trump-Russia collusion.[153]

229.    On September 23, 2016, *Yahoo! News* published an article titled "*U.S. Intel Officials Probe Ties Between Trump Advisor and Kremlin*."[154]

230.    The article was littered with false and defamatory information about Trump and his campaign, including "numerous references to information contained in the Dossier, including U.S.

---

[150] *Crime in Progress* at 110; *see also* IG report at 105.
[151] *See* IG Report at 105.
[152] Steele Dep. at tr. 166:19-24.
[153] *See* IG Report at 104-108.
[154] *See* https://www.yahoo.com/news/u-s-intel-officials-probe-ties-between-trump-adviser-and-kremlin-175046002.html.

officials had received intelligence reporting that Carter Page had met with Igor Sechin, Chairman of Rosneft, and Igor Divyekin, Deputy Chief in the Russian Presidential Administration."[155]

231.    The article cited a "well placed Western intelligence source" for the information obtained; Isikoff has since confirmed that the information was contributed by Steele.[156]

232.    On September 27, 2016, Sussmann sent an e-mail to Lichtblau disclosing an IP address and DNS data, purportedly connected to the Trump-Alfa Bank 'back channel.'[157]

233.    On October 3, 2016, Steele met with FBI's Crossfire Hurricane team in Rome, Italy.[158]

234.    At that meeting, Steele failed to disclose the identities of his client, Fusion GPS, or his ultimate clients, Perkins Coie, the Clinton Campaign, and the DNC.[159]

235.    Steele also refused to agree to cease his communications with the media and other third parties.[160]

236.    Thereafter, on October 11, 2016, Steele met with an official of the United States Department of State (the "State Dept."), Kathleen Kavalec—who "had been closely coordinating with the FBI" —in an attempt to reinforce Sussman's false claims concerning the purported Alfa Bank-Trump connection.[161]

237.    At that meeting, Steele told Kavalec, among other things, that: "Peter Aven of Alfa Bank has been the conduit for secret communications between the Kremlin and [Paul] Manafort;

---

[155] *Id.*; *see also* IG Report at 106.
[156] *Id.*; *see also* IG Report at 106.
[157] Gov't Ex. 0427, *U.S. v. Sussmann*.
[158] *See* IG Report at 108-114.
[159] *Id.* at 111.
[160] *Id.* at 113.
[161] Steele Dep. at tr. 45:4-6 (March 18, 2020).

messages are encrypted via Tor software and run between a hidden server manages by Alfa Bank."[162]

238.    Steele later acknowledged that he received this information did not come from one of his sources but rather from Simpson and Fusion GPS.[163]

239.    In her notes of the meeting, Kavalec recounted the following: "Orbis undertook this investigation into Russia/Trump connection at the behest of an institution he declined to identify that had been hacked. The institution approached them based on the recommendation of Glenn Simpson and Peter Fritsch (specialists in economic crime, formerly of the WSJ) and is *keen to see this information come to light prior to November 8*. Orbis undertook the investigation in June of 2016."[164]

    a.    Steele later testified that the "institution" referred to in Kavalec's notes is the DNC.[165]

    b.    Steele also confirmed that he, along with Fusion GPS, shared the DNC and Clinton Campaign's goal of having the information "come to light" prior to Election Day.[166]

240.    The DNC's deadline for having the Trump-Russia information "come to light" is of utmost significance – November 8, 2016, was Election Day; indeed, Steele expressed to Kavalec

---

[162] *Id.* at 45:7-20; 90:5.
[163] *Id.* at 45:19-20 and 46:8-10.
[164] U.S. Dept. of State, Case No. F-2018-04736, Doc No. C06679743, unclassified April 30, 2019 (emphasis added).
[165] Steele Dep. at tr. 92:7.
[166] Steele Dep. at tr. 5:20-25 ("Q: Now that was, indeed, was it not, the position of Fusion, that they did want your information to come to light prior to November 8? A: I think that's right, yes. Q: And that was a view I suggest you shared? A: Yes. […]").

that the goal of his "ultimate clients" was to "prevent Donald Trump from becoming president."[167]

### Defendants Fabricate an 'October Surprise' in a Last-Ditch Attempt to Sway the Election

241.    With the election fast approaching, the Defendants hastened their efforts to publicly malign Donald J. Trump and his campaign.

242.    On October 12, 2016, one day after his meeting with the State Dept., Steele met with Elias and Sussmann in Perkins Coie's Washington D.C. office.

243.    On that same day, Steele and Simpson met with reporters from *The New York Times*, *The Washington Post*, and *Yahoo News* and provided additional briefings of his supposed findings concerning a Trump-Russia connection.[168]

244.    In or around that time, Fusion GPS sent out a flurry of e-mails to media contacts for the purpose of spreading false and defamatory information regarding Donald J. Trump through the media:

    a.  For example, on September 19, 2016, Jake Berkowitz of Fusion GPS wrote to Matthew Mosk at CBS News sending him the same, spreading the Russian Collusion story.[169]

    b.  Furthermore, on October 5, 2016 Peter Frisch e-mailed Eric Lichtblau—a reporter with *The New York Times* who had also been in frequent communication with Sussmann, with the subject regarding Alfa and Trump—discussing Donald J. Trump and the Alfa Bank. [170]

---

[167] *Id.* at 94:15-18 ("Q: When you met the FBI in October, you told them that the ultimate clients were people seeking to prevent Donald Trump from becoming president? A: Yes.").
[168] *Id.* at 117.
[169] Fusion GPS e-mails, e-mails from Berkowitz to Mosk dated September 19, 2016.
[170] Fusion GPS e-mails, e-mails from Fritsh to Lichtenblau dated October 5, 2016.

c.  On October 18, 2016, Frisch exchanged several e-mails with Mark Hosenball of *Reuters*, an international news agency. In one of the e-mails, dated October 18, 2016 at 11:01am, Frisch pressured the reporter, writing, "meantime, do the f-cking alfa bank secret comms story.  It is hugely important.  Forget the WikiLeaks sideshow".  In response to the e-mail, Hosenball wrote back, "the problem with the Alfa bank story at this point is that my cyber expert colleagues cannot satisfy themselves about the authenticity of some of the key date, which they say from what they can tell is NOT public data."[171]

245.    In or around September or October of 2016, Elias briefed Mook about the information and data in his possession pertaining to the Trump-Alfa Bank connection.[172]

246.    At that time, Elias was aware that the information and data in his possession had been unlawfully obtained by Sussmann, Joffe, and others and had been fraudulently modified to create a false inference that there existed a secret back-channel for communications between the Trump Organization and Alfa Bank; Elias conveyed this information to Mook.

247.    After his discussion with Elias, Mook had several conversations with Podesta, Sullivan and Palmieri as to "whether the campaign should affirmatively push [the Alfa Bank allegations] to the media[.]"[173]

248.    By Mook's own admission, he "didn't totally understand" the Trump-Alfa Bank allegations and he wasn't "totally confident in" the veracity of the information; indeed, he thought

---

[171] Gov't Ex. 0652, *U.S. v. Sussmann*.
[172] Testimony of Robert Mook at tr. 1263:9-12, Transcript of Jury Trial (May 20, morning session), *U.S. v. Sussmann* (hereinafter, the "Mook Testimony
[173] *Id.* at 1265:1-16.

it was "highly suspect."[174]

249.    In fact, Mook and other senior members of the Clinton Campaign lacked "any subject matter expertise with which to judge what [they] were briefed on."[175]

250.    Mook, Podesta, Sullivan and Palmieri "decided to give it to a reporter."[176]

251.    The Clinton Campaign "want[ed] that information out to the public," and the most effective way to do so was "through the media."[177]

252.    Thereafter, Mook spoke to Clinton about the decision to push the false Alfa Bank allegations to the media – Clinton "agreed to that."[178]

253.    Ultimately, the "leadership team [of the Clinton Campaign] decided to direct members of [its] press team to share [the Alfa Bank] information with the media[.]"[179]

254.    In particular, the Clinton Campaign disseminated the Trump-Alfa Bank information to "someone at *Slate*."

255.    In or around that time, in October 2016, Fritsch and two of his Fusion GPS employees, Berkowitz and Seago, attended a meeting with Franklin Foer, a *Slate* journalist, at Foer's home.[180]

256.    In that meeting, the Fusion GPS team briefed Foer on the "allegations between the Trump Organization and Alfa Bank" and talked about the "highly credible computer scientists who seemed to thin that these allegations were credible."[181]

---

[174] Mook Testimony at tr. 1253:22-1254:2, 1282:10.
[175] *Id.* at tr. 1264:20-24.
[176] *Id.* at tr. 1266:3-4.
[177] *Id.* at tr. 1256:9-15.
[178] *Id.* at tr. 1267:12-16; *see also id.* at tr. 1274:10-11.
[179] *Id.* at tr. 12923-5.
[180] Seago Testimony at tr. 581.
[181] *Id.* at 581:17-21.

257.    Fusion GPS's purpose for holding this meeting was to convince Foer to publish an article concerning the Trump-Alfa Bank allegations.[182]

258.    On October 30, 2016, Fritsch forwarded to Foer a tweet from an MSNBC contributor which stated, "Reid says he's talked w/ top NatSec officials who say that Comey 'possesses explosive information' about Trump's ties to Russia'"; accompanying the tweet, Fritsch told Foer it was "time to hurry."[183]

259.    The next day, on October 31, 2016, Foer provided a draft of his *Slate* article to Fritsch for his review.

260.    Shortly thereafter,  Fritsch e-mailed Michael Isikoff, a journalist with *Yahoo News*, stating: "Big story on the trump Alfa server moving early pm. OTR. [United States Government] absolutely investigating. Campaign will light it up I imagine."[184]

261.    On the same day, October 31, 2016, eight days before the 2016 Presidential Election, *Slate* published an article—written by Franklin Foer—reporting on the supposed Trump-Alfa Bank connection.[185]

262.    In the article, Foer claims that he "communicated extensively with [a person going by the pseudonym] Tea Leaves and two of [her] closest collaborators, who also spoke with me on the condition of anonymity."[186]

  a.  Tea Leaves has since been identified as April Lorenzen, a data analyst with

---

[182] *Id.* at 582:10-12 ("Q: And to what extent was the purpose of this meeting to try and encourage Mr. Foer to publish an article? A: We certainly hopes that he would publish an article.").

[183] Fusion GPS e-mails, e-mails from Fritsch to Foer dated October 30, 2016.

[184] Gov't Ex. 0668, *U.S. v. Sussmann*.

[185] Franklin Foer, *Was a Trump Server Communicating with Russia?*, Slate, October 31, 2016.

[186] *Id.*

ZETAlytics, one of the data analytics companies owned by Joffe.[187]

263.    Foer also wrote that Tea Leaves and her collaborators "persuasively demonstrated some of their analytical methods to me–and showed me two white papers[.]"[188]

264.    Foer's article discussed the purported 'findings' of the cyber researchers at length and attempt to frame their findings as damning evidence of Trump's collusion with Russia, including quotes from sources stating things such as: the data is "not simulated; "[n]o reasonable person would come to the conclusion other than the one I've come to" (that the data shows communications between Trump servers and Alfa Bank); and that "[i]t would be really, really hard to fake these."[189]

265.    On about the same day, October 31, 2016, shortly after the release of Foer's *Slate* article, Sullivan put out a written campaign statement that claimed that Trump and the Russians had set up a "secret hotline" through Alfa Bank and that "federal authorities" were investigating "this direct connection between Trump and Russia." He portrayed the shocking discovery as the work of independent experts—"computer scientists"—without disclosing their connection to Hillary Clinton and/or the Clinton Campaign.  The full statement was as follows:

> [T]his could be the most direct link yet between Donald Trump and Moscow.  Computer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank. This secret hotline may be the key to unlocking the mystery of Trump's ties to Russia.  It certainly seems the Trump Organization felt it had something to hide, given that it apparently took steps to conceal the link when it was discovered by journalists.  This line of communication may help explain Trump's bizarre adoration of Vladimir Putin and endorsement of so many pro-Kremlin positions throughout this campaign.  It raises even more troubling questions

---

[187] Testimony of Ryan Gaynor at tr. 1632:4-7, U.S. v. Sussmann, May 23, 2022 (trial transcript; afternoon session) (hereinafter, the "Gaynor Testimony").
[188] *Id.*
[189] *Id.*

in light of Russia's masterminding of hacking efforts that are clearly intended to hurt Hillary Clinton's campaign.  We can only assume that federal authorities will now explore this direct connection between Trump and Russia as part of their existing probe into Russia's meddling in our elections.

266.    Sullivan was acting in the scope and authority of his employment with the Clinton Campaign when he made this false statement, which was made with the intention of harming Trump and his campaign.

267.    Elias, acting in the scope and authority of the Clinton Campaign, assisted Sullivan with the statement, as evidenced by his billing entries submitted to the Clinton Campaign.

268.    On the same day, Clinton published the same false and damaging statements to the public through her Twitter account, wherein she included a photograph of Sullivan's statement along with her own commentary: "Computer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank."[190]

269.    A second tweet from Clinton on that same day said that it was "time for Trump to answer serious questions about his ties to Russia."  It also included a graphic stating the following:

> 1.  Donald Trump has a secret server.  (Yes, Donald Trump.) 2.  It was set up to communicate privately with a Putin-tied Russian bank called Alfa Bank.  3.  When a reporter asked about it, they shut it down.  4.  One week later, they created a new server with a different name for the same purpose.[191]

270.    Sullivan and Clinton made the above statements despite her awareness that they

---

[190] Hillary Clinton (@HillaryClinton), Twitter (Oct.  31, 2016, 8:36 PM), https://twitter.com/hillaryclinton/status/79325031211926323?lang=en.
[191] Hillary Clinton (@HillaryClinton), Twitter (Oct.  31, 2016, 7:32 PM), https://twitter.com/HillaryClinton/status/79323416957694712?ref_src=twsrc%5Etfw%7Ctwca mp%5Etweetembed%7Ctwterm%5E79323416957694712%7Ctwgr%5E%7Ctwcon%5Es1_&re f_url=https%3A%2F%2Fthenationaldesk.com%2Fnews%2Famericas-news-now%2Ftweets-by-hillary-clinton-allegedly-support-accusations-her-campaign-paid-to-spy-on-trump-donald-president-e-mails-russia-john-durham-michael-susmann

were patently false, that the supposed 'findings' concerning the DNS data had been fabricated, and that neither Donald J. Trump nor the Trump Organization had any ties to Alfa Bank.  She was driven by a pathological need to stop Trump from ever entering the White House irrespective of the damage and national discord it would cause.

271.    According to Podesta, the Clinton Campaign had also prepared a video promoting the Trump-Alfa Bank false narrative that it had planned to release in conjunction with Sullivan's statements and Clinton's tweets as part of an "all-out push through social media."[192]

272.    Meanwhile, on that same day, October 31, 2016, Steele and Simpson had a Skype call with David Corn, a journalist with *Mother Jones*.[193]

273.    According to Steele's testimony, the purpose of having this meeting was that he "wanted [Corn] to publish that the US Government was investigating Trump";[194] he was also "aware that Mr. Corn was likely to be publishing an article after [the] interview."[195]

274.    Later that day, *Mother Jones* released an article titled "*A Veteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump*" published by David Corn which contained numerous disparaging statements about Trump and his campaign, and, in particular, referenced many of the false allegations contained in the Dossier.

275.    For example, the *Mother Jones* article stated: "The first memo, based on the former intelligence officer's conversations with Russian sources, noted, 'Russian regime has been cultivating, supporting and assisting Trump for at least 5 years. Aim, endorsed by Putin, has been

---

[192] Michael Isikoff, David Corn, *Russian Roulette: The Inside Story of Putin's War on America and the Election of Donald Trump*, 2018, at page 224.
[193] Steele Dep. at 85:16-17 (March 18, 2020).
[194] Steele Dep. at tr. 24:4-5 (July 23, 2020).
[195] *Id.* at tr. 22:11-15.

to encourage splits and divisions in western alliance.' It maintained that Trump 'and his inner circle have accepted a regular flow of intelligence from the Kremlin, including on his Democratic and other political rivals.' It claimed Russian intelligence had 'compromised' Trump during his visits to Moscow and could 'blackmail him.' It also reported that Russian intelligence had compiled a dossier on Hillary Clinton based on 'bugged conversations she had on various visits to Russia and intercepted phone calls.'"[196]

276.    John D. Podesta, Hillary Clinton's campaign chairman, also pushed the false Trump-Russia allegations.  After Wikileaks released internal Clinton campaign e-mails, Podesta told reporters on October 11, 2016, that "I've been involved in politics for nearly five decades. This definitely is the first campaign that I've been involved in which I've had to tangle with Russian intelligence agencies who seem to be doing everything they can on behalf of our opponent."

277.    He then stated, without even a shred of evidence that "I think it is a reasonable assumption to, or at least a reasonable conclusion, that Mr. Stone had advance warning, and the Trump campaign had advance warning about what Assange was going to do."[197]

### The Defendants' Scheme Continues Forward Even After Trump's Victory

278.    On November 9, 2016, in spite the Defendants' collective efforts, Trump won the 2016 Presidential Election.

279.    Nonetheless, the Defendants forged ahead with their efforts to tarnish his presidency, impede his ability to effectively govern, and otherwise destroy his political career.

---

[196] David Corn, *A Veteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump*," *Mother* Jones, October 31, 2016.
[197] https://time.com/4528049/hillary-clinton-john-podesta-e-mails-hackers-russia/

280.     In mid-November 2016, Glenn Simpson met personally with Bruce Ohr, at his request, to discuss Fusion GPS's findings regarding Russia and the election.

281.     On December 10, 2016, Glenn Simpson provided a thumb drive to Bruce Ohr containing most of the reports comprising the Steele Dossier.

282.     Bruce Ohr was  as a long-time friend of Steele with a relationship going back to at least 2006.  Bruce Ohr texted and e-mailed extensively with Steele beginning in January 2016 [198]

283.     Bruce Ohr held the fourth highest position at the Department of Justice, and was married to Nellie Orh, who was working for Fusion GPS.   Nellie Ohr, was hired as an independent contractor by Glenn Simpson, the founder of political opposition research firm Fusion GPS

284.     Bruce Ohr testified before Congress in August, 2018, that his wife, Nellie Ohr provided him memory stick, which included research she had done for Fusion GPS on various Russian figures.  Bruce Ohr stated before Congress, "and the reason she provided that information to me is, my understanding was, it related to some of the same —it related to the FBI's Russia investigation. And she gave me that stick to give to the FBI."[199]

285.     On December 12, 2016, Ohr provided the same thumb drive to the FBI.

286.     Mr. Ohr concealed this meeting from the Department of Justice; he was later reprimanded and demoted for doing so.  Moreover, Orh received two demotions because "DOJ ethics regulations forbid department officials from working on cases where a spouse has a financial interest." Ohr admitted he had been aware of this rule at the time.    The only person whom Ohr admitted at the Department of Justice that he told that he passed along his wife's dossier

---

[198] The Markets Work Article by Jeff Carlson dated August 12, 2018 "The Bruce Ohr & Christopher Steele Conversation
[199] John Solomon, *The family secret Bruce Ohr told Rod Rosenstein about Russia Case*, The Hill, February 20, 2019.

to the FBI was the Deputy Attorney General, Rod Rosenstein.  Bruce Ohr testified before Congress and stated the following: "what I had said, I think, to Mr. Rosenstein in October of 2017 was that my wife was working for Fusion GPS…The dossier, as I understand it, is the collection of reports that Chris Steele has prepared for Fusion GPS."[200]

287.   On December 15, 2016, Simpson and Fritsch met with Eric Litchtblau of *The New York Times* and provided him a copy of the Dossier.

288.   On December 20, 2016, Bruce Ohr provided a second thumb drive to the FBI, which contains anti-Trump "opposition research" reports prepared by his wife, Nellie Ohr, in her capacity as a Fusion GPS employee.

289.   Around the same time, in mid-November 2016, Steele arranged a meeting with David Kramer, a director of a private foundation affiliated with Senator John McCain.

290.   David Kramer previously worked in state department and was a longtime aide to McCain.   Kramer became aware of the dossier through his relationship with Steele, whom he had previously met.   Steele, McCain and Kramer met at the Halifax Forum, which is an international forum, to discuss the dossier.

291.   Later, on November 29, 2016, Kramer flew to London, and met with Steele, who showed him the actual Dossier.  The next day, Glenn Simpson of Fusion GPS handed the dossier over to Kramer, who then handed it over to McCain, sometime in early December 2016.  McCain then went to James Comey, director of the FBI, with a copy of the Dossier on December 9, 2016.  In response to being handed a copy of the Dossier, Comey informed the senator that the FBI already had an investigation underway,

---

[200] *Id.*

a. Steele's purpose in doing so was that he hoped McCain would share his findings with his "colleagues on the various committees in the Senate," including "his committees in Congress, the Homeland Security Committee and the Intelligence Committee," as well as "other agencies."[201]

b. David Kramer, in a Court deposition held on December 17, 2017, suggested that Steele and Fusion GPS founder Glenn Simpson sought to use him and McCain as conduits to pass the dossier to the FBI.   Kramer said he "believed McCain was sought out in order provide more "oomph" in terms of attaching the FBI's attention."  "I think they felt a senior Republican was better to be a recipient of this rather than a Democrat  because if it were a Democrat, I think the view was this it would have been dismissed as a political attack", said Kramer.[202]

292.    Furthermore, on December 29, 2016, Kramer leaked copies of the dossier to *Buzzfeed News* and multiple other media outlets, such as The Washington Post, *The Wall Street Journal* and *CNN*.[203]

293.    On January 5, 2017, Steele instructed the external IT provider to delete "all e-mail traffic relating to Orbis' assignment by Fusion GPS to gather intelligence regarding Russia's eddorts to influence the US Presidential election process and the links between Russia and

---

[201] Steele Dep. at tr. 56:12-16; 59:22-25; 60:21 (July 23, 2020).

[202] The Daily Caller by Chuck Ross dated March 14, 2019 "John McCain associate had Contact with a Dozen Reporters regarding Steele Dossier".

[203] The Daily Caller by Shelby Talcott, dated April 27, 2022 "Resurfaced Interview Reveals McCain Associate's Leak to BuzzFeed was Alleged "Hail Mary" to Prevent Trump Inauguration."   The Daily Caller by Chuck Ross dated March 14, 2019 "John McCain associate had Contact with a Dozen Reporters regarding Steele Dossier".

Trump."[204]

294.    With the Dossier in hand, on January 10, 2017, Buzzfeed published the Dossier in its entirety, posting it on its website and describing it as "explosive."[205]

295.    The article also stated that Buzzfeed was "publishing the full document so that Americans can make up their minds about allegations about the president-elect that have circulated at the highest levels of the U.S. government."

296.    On January 20, 2017, Donald J. Trump was inaugurated as the 45th President of the United States.

### Sussmann Attempts to Deceive the CIA into Launching an Unfounded Investigation

297.    Meanwhile, Sussmann and Joffe continued to play their part in the Defendants' grand conspiracy.

298.    Through late 2016 and early 2017, Joffe and a researcher continued to compile additional information and data regarding the Alfa Bank allegations and gathered other purported data allegedly involving Donald J. Trump's related computer networks which they claimed tied him to Russia.

299.    Around that time, Sussmann began arranging a meeting with the Central Intelligence Agency (CIA) to continue spreading his lies.

300.    In late December 2016, Sussmann contacted the General Counsel of the CIA to set up a meeting regarding the Trump-Alfa Bank allegations.[206]

301.    In late January 2017, Sussmann contacted a former employee of the CIA in a further

---

[204] Ken Bensinger, Miriam Elder, Mark Schoofs, *These Reports Allege Trump Has Deep Ties To Russia*, *Buzzfeed News*, January 10, 2017.
[205] *Id.*
[206] Sussmann Indictment at ¶40.

attempt to obtain a meeting with the CIA.

302.   On January 31, 2017, Sussmann and the former employee of the CIA had several communications seeking to arrange a meeting with the CIA.[207]

303.   Pursuant to these communications, Sussmann summarized the Trump-Alfa Bank allegations, requested that the former employee assist him in obtaining a meeting with the CIA, and stated that if the CIA was not interested then Sussmann's client would likely go to the media with the allegations. A meeting was eventually arranged.[208]

304.   On or about February 9, 2017, Sussmann met with two CIA employees at a location outside the District of Columbia.[209]

305.   At the meeting, the following, in substance and in part, occurred:

   a.   Sussmann stated falsely – as he previously had stated to the FBI General Counsel – that he was "not representing a particular client." In truth and in fact, and as Sussmann had acknowledged to the Former Employee just days earlier, Sussmann was representing a client.[210]

   b.   Sussmann disclosed that Perkins Coie, was active in representing several Democratic Party causes and officer-holders, including both the DNC and Clinton. Sussmann stated, however, that such work was unrelated to his reasons for contacting the CIA.[211]

   c.   Sussmann discussed and described the updated allegations, including new details

---

[207] *Id.* at ¶41.
[208] *Id.*
[209] *Id.*
[210] Sussman Indictment at ¶42(a).
[211] Sussman Indictment at ¶42(b).

concerning the Russian Bank allegations that he had not provided to the FBI General Counsel.[212]

d. Sussmann provided to the CIA employees (i) several white papers, and (ii) multiple data files containing purported DNS data, ranging from 2016 through early 2017.[213]

306.    As he had done in his prior meeting with the FBI, Sussmann—acting on behalf of the Clinton Campaign and the DNC—again lied to and intentionally mislead federal law enforcement officials in furtherance of the Defendants' scheme.

307.    That Sussmann was acting on behalf of, and in coordination with, the Clinton Campaign and the DNC when he made his false statements to the FBI and the CIA was confirmed in December 2017, when Sussmann testified under the penalty of perjury before the House Permanent Select Committee on Intelligence:

> Q: [] When you decided to engage the two principals, one, [the FBI General Counsel] in September, and the general counsel of [Agency-2] in December, you were doing that **on your own volition,** based on information another client provided you. Is that correct?
>
> [Sussman]: No.
>
> Q: So what was – so did your client direct you to have those conversations?
>
> [Sussman]: Yes.
>
> Q: Okay. And your client also was witting of you going to [the CIA] in February to disclose the information that individual had provided you?
>
> [Sussman]: **Yes**

---

[212] Sussman Indictment at ¶42(c).
[213] Sussman Indictment at ¶42(d).

[ ... ]

Q: Okay. I want to ask you, so you mentioned that **your client directed you** to have these engagements with the FBI and [redacted] and to disseminate the information that client provided you. Is that correct?

[Sussmann]: [] [W]e had a conversation, as lawyers do with their clients, about client needs and objectives and the best course to take for a client. And so it may have been a decision that we came to together. I mean, I don't want to imply that I was sort of directed to do something against my better judgment, or that we were in any sort of conflict, but this was -- I think it's most accurate to say it was done on behalf of my client.[214]

308.    In addition, the materials Sussmann provided to the CIA—including several white papers and multiple data files containing purported DNS data, ranging from 2016 through early 2017—were falsified or "spoofed" to appear incriminating in nature.

309.    Indeed, after the meeting with Sussmann, CIA ultimately concluded that the data provided by Sussman had been altered, spoofed and/or falsified to create a misleading connection between Trump and Alfa Bank. Specifically, the CIA found that the data was not "technically plausible," that it did not "withstand technical scrutiny," that it "contained gaps" and was "user created and not machine/tool generated."[215]

310.    This conclusion aligns with the conclusion reached by Ankura, an industry-leading private technological consulting firm hired by Alfa Bank to investigate the server claims. In particular, Ankura concluded that it was "likely that threat actors may have conducted some inauthentic DNS activity to force a 'connection' between Alfa-Bank and the Trump Organization,

---

[214] Sussman Indictment at ¶44.
[215] Mem. in Opp. at 20 (ECF Doc. No, 70), *U.S. v. Sussman*, 1:21-cr-00582 (D.C., April 15, 2022)

only to then later 'discover' the connection."[216]

311.    In other words, like the CIA, Ankura believed the data was assembled and manipulated by "malicious actors."[217]

### *Fusion GPS and Joffe Continue Their Conspiratorial Efforts*

312.    In February 2017, Fusion GPS and Steele were hired by the Penn Quarter Group (PQG) to continue their Trump research.

313.    In March 2017, Daniel Jones, through The Democracy Integrity Project ("TDIP") and/or the Penn Quarter Group ("PQG"), had "secured the services of Steele [and] Fusion GPS to continue exposing Russian interference in the 2016 Presidential Election."[218]

    a. John Podesta testified before the House Intelligence Committee in December 2017, that he met on February 10, 2017, with Daniel Jones, along with Glenn Simpson and Peter Fritch of Fusion GPS.   In separate testimony, Jake Sullivan, also revealed he participated in the meeting.

    b. Podesta told the House Intelligence Committee in December 2017, that "they were interested in trying to raise money to continue their efforts to investigate the Russian interference in the campaign."   Podesta stated that he agreed to help the trio open doors to big Democratic fund-raisers and sit down for press interviews and documentaries regarding any "new developments" uncovered by dossier author and former British intelligence officer Christopher Steele. Jake Sullivan

---

[216] *See Covert Channel Allegation: New Data Analysis Results* at 4, Ankura, April 2020, available at https://justthenews.com/sites/default/files/2020-04/Ankura_AlfaBank_ResearchAnalysis_Apr2020dh.pdf
[217] *Id.* at 18.
[218] H. Permanent Select Comm. On Intelligence Report, Report on Russian Active Measures at 113 (March 22, 2018).

accompanied Podesta to the meeting, which he said lasted about an hour and was held in an office building in Washington. [219]

314.    In connection with this engagement, Jones planned to "push the information he obtained from Fusion [GPS] and Steele to policymakers on Capitol Hill, the press, and the FBI."[220]

315.    Since 2017, The Democracy Integrity Project ("TDIP") has paid Fusion GPS, Steele and their associates more than $3.8 million to continue their 'opposition research' against Donald J. Trump and to continue pushing the false Trump-Russia narrative.

316.    In particular, TDIP has paid $3.3 million to Fusion GPS; $250,000 to "Walsingham Partners Ltd.," a London-based firm owned by Steele and his partner, Christopher Burrows; nearly $130,000 to "Edward Austin Ltd." a London-based intelligence consultancy operated by Edward Baumgartner, a Fusion GPS contractor; and $148,000 to the law firm Zuckerman Spaeder, which has represented Fusion GPS in a variety of Dossier-related legal matters.

317.    Daniel Jones operated what he called a "shadow media organization helping the government" to investigate Russian meddling in the 2016 election. He told the FBI in March 2017 that "he received funding from a group of between seven and 10 wealthy donors and that he planned to provide information to federal investigators, the press, and lawmakers". [221]

318.    In 2018 Alfa Bank, which was falsely implicated in the collusion conspiracy against Donald J. Trump, filed a Jon Doe lawsuit, seeking to determine "who spread the false allegations

---

[219] Clinton Foundation Timeline E-mail/Dossier Investigations by Katie Weddington dated February 10, 2017 " John Podesta and Jake Sullivan re-engage with Fusion GPS and Dan Jones after 2016 election to push Clinton/Steele dossier."

[220] Letter from Chairman Grassley to Senator Coons dated May 29, 2018; *see also id.*
[221] The Daily Caller Article by Chuck Ross, Dated April 1, 2019 Firms Tied To Fusion GPS, Christopher Steele Were Paid $3.8 Million By Soros-Backed Group | The Daily Caller

about the Russian bank to the news media and U.S. authorities". [222]

319.    Daniel Jones' provided videotaped testimony in the Jon Doe civil case, in which he recounted "how he formed TDIP, in early 2017, raised money for it and continued a private investigation into alleged Russian and other interference in the 2016 election."   In his testimony Jones acknowledged that "he worked post-election with some of the key figures tied to Hillary Clinton's campaign on the  Russia collusion allegations, including Michael Sussmann and Glenn Simpson."   Daniel Jones also testified that "Simpson helped him raise money for his non-profit TDIP and Daniel Jones hired Simpson's Fusion GPS firm to investigate election issues starting in early 2017. Records introduced during the testimony confirmed the donor-funded TDIP paid Simpson's firm about $3.3 million for its work".[223]

320.    Daniel Jones also described in his testimony how he "worked with Sussmann and the DNC to obtain evidence from Rodney Joffe, about alleged computer communications between a Trump server and the Alfa Bank in Russia".[224]

321.    Moreover, Daniel Jones testified he was "asked by a Democratic investigator on the Senate Armed Services Committee to investigate the Alfa Bank allegations in early 2017 and to meet with Sussmann."   After the meeting with Sussman, Daniel Jones testified he "received computer data from Sussmann containing 37 million DNS lookups to review for any connections of Trump-Russia collusion, and later learned the data came from a computer executive that Sussmann identified only by the pseudonym "Max." Jones said he quickly determined that

---

[222] American Faith.com by Just The News, dated October 17, 2021, Soros-tied group met with FBI during Russia collusion probe, hired Christopher Steele - American Faith; Daniel Jones Transcript from Deposition taken on August 18, 2021 in Palm Beach County Circuit Court Case, AO Alfa-Bank v. Jon Doe, Case Number 50-2020-CA-006304-XXX-MB
[223] *Id.*
[224] *Id.*

executive to be Joffe.[225]

322.   Daniel Jones was also tasked by a Democrat on the Armed Services Committee in 2017 to prepare a 600-plus-page report on the Alfa Bank-Trump allegations.   In his testimony, Jones revealed the "Democratic staffer who tasked him with the work indicated Democrats in Congress did not believe the FBI and others in U.S. intelligence had aggressively enough investigated the Alfa Bank allegations before dismissing them."   "That was my perception, that the Senate Armed Services committee, other senators on the Senate Intelligence Committee and the House Intelligence Committee believed that the government wasn't doing enough to look into these allegations and refute them or confirm them or make any assessment of them," Jones testified. [226]

323.   Daniel Jones testified that "he built a firewall between Simpson's and Steele's research work for TDIP and the Senate Armed Services project because of their past ties to the Clinton campaign." [227]

324.   On October 8, 2018, a publication called the New Yorker wrote an article titled, "*was there a connection between a Russian Bank and the Trump Campaign"* which pushed the false narrative Trump Russia Collusion.   In furtherance of the conspiracy, Rodney Joffe sat down for the New Yorker article, anonymously calling himself "Max" and "admitting in the piece that he'd continued to help that effort long after the election, providing Daniel Jones's team with 37 million Internet records to examine."  Joffe, explained to the New Yorker "how vitally important it was in 2016 to make sure the threat his team discovered was "known before the election." "Which was why he and his lawyer

---

[225] *Id.*
[226] *Id.*
[227] *Id.*

first went with their information to the press."[228]

325.   The New Yorker article, with the false information brought to them by Fusion GPS, TDIP and Joffe (aka Max), concluded that the Alfa Bank Trump collusion allegations were legit.[229] As a result, the general public was led to the believe, falsely, that there was a connection between Trump and the Alfa Bank, despite the fact that none existed.

326.   For example, the article stated, "examining records for the Trump domain, Max's group discovered D.N.S. lookups from a pair of servers owned by Alfa Bank, one of the largest banks in Russia. Alfa Bank's computers were looking up the address of the Trump server nearly every day. There were dozens of lookups on some days and far fewer on others, but the total number was notable: between May and September, Alfa Bank looked up the Trump Organization's domain more than two thousand times. "We were watching this happen in real time—it was like watching an airplane fly by," Max said. "And we thought, Why the hell is a Russian bank communicating with a server that belongs to the Trump Organization, and at such a rate? [230]

327.   Meanwhile, Joffe and Neustar's exploitation of access to non-public data sources continued throughout 2017.

328.   For example, on July 18, 2017, Joffe e-mailed Steve De Jong, an employee of Neustar, Inc., stating: "I have 4 jobs that look specifically for [T]rump data" and included a list four Trump and Alfa Bank related queries.[231]

***Danchenko Impedes the FBI's Ongoing Investigations with Numerous False Statements***

---

[228] New York Post by Kimbery Strassel, Dated February 18, 2022  Truth about techies who targeted Trump (nypost.com); The New Yorker by Dexter Fixins, Dated October 8, 2018 Was There a Connection Between a Russian Bank and the Trump Campaign? | The New Yorker
[229] *Id.*
[230] *Id.*
[231] Gov't Ex. 0719, *U.S. v. Sussmann*.

329.     Over time, the FBI attempted to investigate, vet, and analyze the Dossier but ultimately was not able to confirm or corroborate most of their substantive allegations.

330.     In the context of those efforts, the FBI learned that Danchenko, a Russian analyst, had served as a central source of information contained in the Dossier.

331.     From January 2017 through November 2017, the FBI conducted numerous interviews with Danchenko (collectively the "Interviews") concerning, among other things, the information that Danchenko had provided to Steele for the Dossier.

332.     During the course of these Interviews, Danchenko plainly admitted that he had "zero" corroboration for the key allegations that he had contributed to the Dossier.

333.     In addition, as alleged in further detail below, Danchenko repeatedly lied to FBI agents during his Interviews.

334.     First, Danchenko falsely stated that he never communicated with Charles Halliday Dolan, Jr, a claim which was patently false.

335.     In fact, Danchenko and Dolan had been in frequent communication since at least April 2016, had gone on a trip together, and had attended numerous meetings and conferences together.

336.     The disclosure of Danchenko's relationship with Dolan would have been incredibly relevant to the FBI's understanding of the contents of the Dossier:

  a.   At all relevant times, Dolan has long held deep ties to the Democratic Party operative and has been a close associate of and adviser to Hillary Clinton.

  b.   As a result, Dolan frequently interacted with senior Russian Federation leadership whose names would later appear in the Dossier, such as Putin spokesman Dmitry Peskov and then-Russian ambassador to the US Sergey Kislyak.

c. Also, in 2006, the Kremlin signed a deal with Ketchum, the PR firm where Dolan served as vice president for public affairs. As part of that agreement, Ketchum was to handle global public relations for the Russian government as well as the state-owned energy company Gazprom.

337.   In fact, as detailed above, many of the allegations contained in the Dossier came *directly from* Dolan, who had conveyed them to Danchenko who, in turn, reported them to Steele.

338.   Dolan's role as a contributor of information to the Dossier was highly relevant and material to the FBI's evaluation of those reports because:

a. Dolan maintained pre-existing and ongoing relationships with numerous persons named or described in the Dossier, including one of Danchenko's Russian sub-sources,

b. Dolan maintained historical and ongoing involvement in Democratic politics, which bore upon Dolan's reliability, motivations, and potential bias as a source of information for the Dossier, and

c. Danchenko gathered some of the information contained in the Dossier at events in Moscow organized by Dolan and others that Danchenko attended at Dolan's invitation. Certain allegations that Danchenko provided to Steele, and which appeared in the Dossier, mirrored and/or reflected information that Dolan himself also had received through his own interactions with Russian nationals.

339.   On or about January 13, 2017, Dolan replied to an e-mail sent by a U.S.-based person discussing a recent news article regarding the Dossier, wherein Dolan stated:

> [] I've been interviewed by the Washington Post and the London
> Times -three times over the last two days over the Steele Dossier on
> Trump and I know the Russian agent who made the report (He used

> to work for me).  My client in [Foreign Country] [Business] has been accused of being the party that organized the hacking.  Presently speaking with the barrister in London who is filing a brief against Steele has been unmasked as the man behind an explosive dossier about US president-elect Donald Trump.  Also in conversation with former British Ambassador who knows Steele.  Quite right -Oh what a boring life.

340.    At that time, Danchenko was not publicly known to be a source for Steele.

341.    On March 16, 2017, Danchenko informed the FBI that he believed the source in the above-referenced allegations referred, at least in part, to the Chamber President.  He repeated these claims in subsequent interviews on or about March 16, 2017, May 18, 2017, October 24, 2017, and November 2, 2017.

### *The FBI's Role in Perpetuating the Defendants' False Claims.*

342.    Meanwhile, all along, several high-level officers within the FBI seized upon the false reporting that had been presented as an opportunity to hatch their own wrongful scheme against Donald J. Trump.

343.    On September 23, 2016, a mere four (4) days after Sussman's meeting with Baker, the FBI opened a full field investigation into the "network communications between a US-based server [the Trump Organization] and the Russian ALFA BANK organization."

344.    By October 5, 2016, and internal FBI memo confirmed that the Alfa Bank allegations had "already been debunked" and that there was no "covert channel" between the Trump Organization and Alfa Bank.

345.    By August 16, 2016, as part of the larger Crossfire Hurricane umbrella investigation into the presidential campaign of Donald J. Trump, the FBI had opened individual cases of four United States individuals, Carter Page, George Papadopoulos, Paul Manafort, and General Michael Flynn.  All four of these individuals, Page, Papadopoulos, Manafort, and Flynn were associated

with the Trump Campaign.

346.    Flynn is a retired United States Army lieutenant general, who was formerly director of the Defense Intelligence Agency.  In the run-up to the 2016 Presidential Election, Flynn was a vocal critic of the policies of then President Barak Obama.  Moreover, Flynn openly criticized presidential candidate, Clinton, opposing her nomination for Presidency, calling for her to withdraw from the race and stating that "if I did a tenth-a tenth-of what she did, I would be in jail today." During the 2016 Presidential race, Flynn worked for Donald. J. Trump's campaign as its foreign policy advisor.   On November 18, 2016, Flynn accepted Trump's offer for the position of National Security Advisor.

347.    In the position as National Security Advisor, Flynn would preside over seventeen (17) intelligence agencies and would be in the key position to stop the plot of the Defendants to hijack Trump's presidency, and to create the false Russian narrative.

348.    For the Defendants' plot to succeed, it was imperative that Flynn not be allowed to serve as the National Security advisor. Due to his position, he would have naturally learned of the inner machinations of the Russia Collusion conspiracy and could potentially inform Donald J. Trump of same.

349.    Therefore, senior FBI officials, Comey, McCabe, Page, Strzok, the DNC and Clinton orchestrated a plan to falsely accuse Flynn of colluding with Russia to protect the potential dissemination of the intimate details of their plot

350.    In fact, the plan to remove Flynn from his position overseeing national intelligence, started under former President Barack Obama.   President Obama advised President-Elect Trump against hiring Flynn and expressed "profound concerns" about placing Flynn in a sensitive, high-level national security post.

351.     Realizing the danger of making Flynn privy to their investigations into Donald J. Trump and his campaign, the senior FBI officials openly discussed their concern about briefing the veteran intelligence official, General Flynn, on the ongoing investigation of the Trump campaign.

352.     As such, in August of 2016, the senior FBI officials commenced an FBI investigation of Flynn.   The investigation was code named "Crossfire Razor", and the investigation's stated "goal" was to determine whether Flynn "was directed and controlled by and/or coordinated activities with the Russian Federation in a manner which is a threat to the national security and/or possibly a violation of the Foreign Agents Registration Act, 18 U.S.C. § 951 et seq.

353.     The FBI predicated the counterintelligence investigation on Flynn on three alleged facts: Flynn's service as foreign policy advisor to Donald J. Trump campaign, his publicly documented connection to state-affiliated Russian entities, and the fact that he had traveled to Russia in December 2015.

354.     After four months of investigations, the FBI "determined that Flynn was no longer a viable candidate as part of the larger Crossfire Hurricane umbrella case" and prepared to close the investigation.

355.     The FBI drafted a "Closing Communication to put into motion the termination of the case.  This document stated that after numerous searches of holdings and investigative steps, each step yielded "no derogatory information" on Flynn.  The document noted "the absence of any derogatory information or lead information" and that the investigation had failed to produce any information on which to predicate further investigated efforts".

356.     However, following the closure of the investigation, the senior leadership of the FBI, including, Comey, McCabe, Strzok and Page scrambled to reopen a case against Flynn in an effort

to prevent him from serving as National Security Adviser.

357.    The FBI's top counterintelligence official would later memorialize discussions about the FBI's attempts to "get [Flynn] fired."

358.    For example, on January 4, 2017, FBI Deputy Director Strzok learned that "Razor's" closure had not been timely executed, and the counterintelligence investigation into Flynn was unexpectedly, still formally open.  Mr. Strzok relayed the "serendipitously good news to Lisa Page, an attorney for the FBI, and special counsel to FBI Deputy Director Andrew McCabe, remarking that "our utter incompetence actually helps us."  Mr. Strzok instructed agents to "keep it open for now" at the behest of the '7th floor', a reference to James Comey and his Deputy Director, McCabe.  They determined that no reopening was needed when they discovered they had failed to officially close the previous investigation.

359.    At the behest of Comey and McCabe, the senior FBI agents met to decide how to handle Flynn.  Their ultimate goal" was to get Flynn to lie, so he could be prosecuted or fired.  FBI notes released in April 2020, confirm this plan.  Specifically, a handwritten note by FBI agent, Bill Preistap, head of FBI counterintelligence, was later unearthed that said: "I believe we should rethink this. What is our goal? Truth/admission or to get him to lie, so we can prosecute him or get him fired?" This was, in essence, a sting operation, as Flynn had not committed a crime.  Moreover, handwritten notes from the FBI's lawyers warned that the FBI could be "seen as playing games" as a result of their conduct[232]

360.    Around this time, FBI Director, Comey took the position that the FBI would not notify the incoming Trump administration of the ongoing investigation of Flynn, despite other

---

[232] LifeZette, by Polizette Staff, Dated April 30, 2020 Obama tried to sink Flynn, then the FBI tried to get him (lifezette.com)

senior officials believing that the incoming administration should be notified.

361.    Comey was able to justify his withholding of this information from the Trump administration, by claiming to the FBI that the information was not a "counterintelligence investigation, but instead, protected as a purported "criminal investigation."

362.    The Deputy Attorney General, Director of National Intelligence, and Director of the Central Intelligence Agency all agreed that the FBI should notify the Trump administration, but Comey, as Director of the FBI, refused to brief the White House.

363.    Instead of notifying the White House and Donald J. Trump, Comey, as well as McCabe, proceeded with the plan, and authorized FBI agents to interview Flynn.  This was done, despite the fact that the interview should have been coordinated with the Department of Justice and been approved by the proper channels, considering that Flynn was the impending national security advisor, and he was not represented by counsel.

364.    Prior to the interview, Strzok coordinated with FBI' officials regarding strategy for interviewing Flynn, stating that it should be given a "defensive briefing" about an investigation under the Crossfire Hurricane umbrella or alternatively an interview under light defensive briefing pretext. The interview was masked under the guise of a briefing, and not a criminal interview, as the FBI, was once again concerned about the information being discovered by the Trump administration.  In fact, Mr. Strzok stated in internal memos his justification for the secrecy, stating that the Department of Justice might "direct us" to inform the Vice President of the United States or "anyone else", speculating that this could lead to the White House directing  Flynn not to speak to the FBI.

365.    On January 22, 2017, an FBI attorney e-mailed Strzok and Page and stated that "if we usually tell the White House, then I think I should do what we what we normally do."  The

senior FBI officials disregarded the advice of counsel directed that the investigation be concealed from Donald J. Trump and the White House.

366.    Ultimately, Deputy Director, McCabe called Flynn and set up the interview.  In later media statements McCabe stated that he explained to Flynn that it was a "sit down" and expressed to Flynn the FBI's desire to accomplish the interview "quickly, quietly and discretely as possible."   McCabe was the primary interviewer.  It was later reported that Flynn was unguarded and viewed the agents as allies, despite the fact that Flynn was the subject of an FBI investigation.

367.    Both of the agents at the interview stated that Flynn exhibited a "very sure demeanor and did not give any indicators of deception."  Moreover, they did not perceive that he was lying during the interview.

368.    Further evidence of the plot was discovered on October 7, 2020, when Director of National Intelligence, John Ratcliffe wrote a letter to Senate Intelligence Committee Chairman, Lindsay Graham.

369.    Ratcliffe's letter stated that Clinton and her campaign conceived the false Trump Russia collision story to protect Clinton's presidential bid, which, was at the time, in trouble because of revelations about her illegally using a private e-mail server to handle classified information. Ratcliffe confirmed in the letter that Obama, Comey, and Strzok knew about it.

370.    Included with the letter were handwritten notes by then-CIA Director John Brennan, describing briefing Obama on "alleged approval by Hillary Clinton, on July 26, 2016, of a proposal from one of her foreign policy advisors to vilify Donald Trump by stirring up a scandal claiming interference by Russian security services."

371.    On October 6, 2020, this same letter prompted Donald J. Trump to order the

declassification of the Russia Collusion documents, which led to the discovery of more information regarding the plot to takedown Donald J. Trump.

372.    On January 5, 2017, an Oval Office meeting occurred between President Obama, Vice President Joe Biden, James Comey, and Sally Yates (then-national security adviser to Suisan Rice).

373.    At this meeting, it was confirmed by testimony later given by Comey and Yates in 2020, that President Obama gave guidance to key officials who would be tasked with protecting his administration's utilization of secretly funded Clinton campaign research.

374.    Newly released notes confirm President Barack Obama's key role in the surveillance and leak operation against Michael Flynn. The handwritten notes demonstrate that President Obama personally directed former FBI Director James Comey and former Deputy Attorney General Sally Yates to investigate Flynn for having routine phone calls with a Russian counterpart. The notes also suggest they withhold information from President Trump and his key national security figures.

375.    Sally Yates confirmed to the Special Counsel investigating the matter that on January 5, 2017, President Obama revealed the existence of the Flynn investigation to her.   In an e-mail, Susan Rice further detailed the President Obama's involvement stating that "President Obama said he wants to be sure that, as we engage with the incoming team, we are mindful to ascertain if there is any reason that we cannot share information fully as it relates to Russia."

376.    The focus of the January 5, 2017 was to both develop a strategy of how to target Flynn and the matter of withholding vital national security information from Flynn.

377.    This was accomplished, as both Donald J. Trump and Flynn were entirely unaware that the investigation of Flynn was given the go-ahead.

378.    On January 24, 2017, Flynn was interviewed by the FBI, which was conducted by McCabe.

379.    Following said interview, acting Attorney General Sally Yates,  made an "urgent" request to meet with White House counsel Don McGahn, and subsequently met with him on January 26 and January 27.  At the meeting Yates told McGahn that Flynn had misled Vice President Pence and other administration officials about the nature of his conversations with a Russian ambassador and told him that Flynn was possibly susceptible to blackmail by the Russians.

380.    Moreover, the false story was also leaked to the national press, in an effort to put pressure on Donald J. Trump to fire Flynn.   On February 9, 2017, The Washington Post broke the story regarding Flynn and his possible collusion with Russia.   The New York Times also confirmed the story by The Washington Post,

381.    Public pressure on Flynn increased as a result of said news reports.    On February 13, 2018, Flynn resigned as National Security Advisor.

382.    On February 14, 2018 White House Press Secretary Sean Spicer said Trump had asked for Flynn to resign, "not based on a legal issue, but based on a trust issue", due to "misleading the Vice President and others.

383.    Later, in December 2017, President Trump said he had to fire General Flynn "because he lied" to the Vice President and the FBI.

384.    Ultimately, the Defendants, including Comey, McCabe Strzok, and Page, were successful in causing Flynn to be ousted as National Security Advisor.

385.    Among others at the FBI, Crossfire Hurricane was led by FBI Deputy Assistant Director Peter Strzok, FBI Director James Comey, and FBI Deputy Director, Andrew McCabe,

with involvement and assistance from, among others, FBI Special Counsel Lisa Page and FBI attorney Kevin Clinesmith.

    a.   Text messages between Strzok and FBI Special Counsel Lisa Page, who were engaged in an illicit affair during that time, reveal that both of them had an utter disdain for the subject of their investigation, Donald J. Trump, and were determined to ensure that Hillary Clinton won the 2016 presidential election.

    b.   For example, on August 8, 2016, Page texted Strzok, "[Trump's] not ever going to become president right? Right?!." Strzok replied, "No. No he's not. We'll stop it."

    c.   The text messages also contained reference to an "insurance policy" that was being cultivated by Strzok, Page, McCabe, Comey and others at the FBI, in the event that Trump were to win the election:

    d.   On August 15, 2016, Strzok texted Page: I want to believe the path you threw out for consideration in Andy's (Andrew McCabe, Deputy Director of the FBI) office that there's no way Trump gets elected—but I'm afraid we can't take that risk. It's like an insurance policy in the unlikely event you die before you're 40 …"

    e.   This reference to an "insurance policy" reveals that Strzok and Page intended to ensure that, if Donald. J. Trump did indeed win the presidential election, that he would be quickly removed from office or, at a minimum, unable to effectively govern.

386.    As discussed above, the FBI had opened individual cases under the Crossfire Hurricane Umbrella as to four United States individuals, Carter Page, George Papadopoulos, Paul Manafort, and Michael Flynn.

387.    Three of these individuals, Page, Papadopoulous, and Manafort, were associated with the Trump Campaign.

388.    The focus of Crossfire Hurricane quickly became to obtain a FISA warrant authorizing spying and electronic surveillance of Carter Page, a foreign policy advisor with the Trump Campaign.

389.    To surveil an American citizen, FISA requires that there be probable cause that the target is an "agent of a foreign power" who is "knowingly engag[ing]…in clandestine intelligence activities." In short, to legitimately obtain a FISA warrant against Carter Page, the FBI had to demonstrate that he was a Russian agent who was knowingly engaging in intelligence activities on behalf of Russia.

390.    The FBI ultimately obtained a total of four court approved FISA applications targeting Carter Page, which authorized intrusive electronic surveillance of him from in or about October 2016 through in or about September 2017; the first application was approved on October 21, 2016 ("FISA #1"), and three renewal applications were approved on January 12, 2017 ("FISA # 2), April 7, 2017 ("FISA # 3"), and June 29, 2017 ("FISA # 4").

391.    The FISA applications were reviewed by numerous FBI agents, FBI attorneys, and National Security Division (NSD) attorneys and, as required by law, was ultimately certified by then FBI Director James Comey and approved by then Deputy Attorney General Sally Yates.[233]

392.    In fact, no probable cause existed and there was no truth to any of the allegations against Carter Page, Donald J. Trump, or the Trump Campaign.

393.    Strzok was directly involved in the decision to open Crossfire Hurricane and the

---

[233] *Id*. at 6.

four FISA applications.  Additionally, "the documentation opening each of the four individual investigations was approved by Strzok."[234]

394.    Further, Comey and Sally Yates approved the first renewal application Comey and then Acting Attorney General Dana Boente approved the second renewal, and then Acting FBI Director Andrew McCabe and then Deputy Attorney General (DAG), signed the third renewal, and the Defendant, Rod Rosenstein approved the fourth renewal.[235]

395.    McCabe received regular briefings on the progress of Crossfire Hurricane and discussed the investigation with Comey at regular briefings.[236]

396.    Clinesmith was assigned to provide legal support to FBI personnel working on Crossfire Hurricane. Clinesmith worked with the National Security Division of the United States Department of Justice to prepare the FISA applications to obtain authority from the United States Foreign Intelligence Surveillance Court.[237]

397.    While 'assisting' the FBI, Clinesmith doctored an e-mail with the Central Intelligence Agency. Clinesmith communicated with the CIA regarding whether Carter Page was a source. [238]

398.    Clinesmith took the e-mail he received and added the words "not a source" and provided the doctored e-mail to the FBI.[239]

399.    Ohr had regular contact with the Crossfire Hurricane team and provided them with

---

[234] *Id* at 349
[235]  *Id.* at 7
[236] 120919-examination.pdf (justice.gov) (Page 69)
[237] *See generally* Indictment, *United States v.  Clinesmith*, case no.  1:20-cr-00165-JEB, District of Columbia (Aug.  14, 2020) (hereinafter, "Clinesmith Indictment").
[238] *Id.*
[239] *Id.*

information that appeared in the FBI interview Report Form (FD-302).

400.     James Comey was the Director of the FBI and his actions in this capacity allowed the false Trump-Russia collusion narrative to continue to thrive.

401.     Comey personally signed three FISA applications to spy on Carter Page, with the Dossier serving as part of the basis for the warrant requests.

402.     Comey was aware, or should have been aware, that there was no evidentiary basis for the FISA applications and that the Steele Dossier was not a credible source:

   a.   *The Washington Times* reported that it had obtained a three page highly classified memo from September 2016, in which the CIA informed then FBI Director James Comey, that the Clinton Campaign was planning to blame "collusion" between Trump and the Russian government.  The memo shows that Comey was advised by the CIA of what the Clinton campaign had been doing.  Comey was advised of the fact that the Clinton campaign was setting up Donald J. Trump, weeks after the FBI had opened the Crossfire Hurricane investigation into alleged collusion. That information was a red flag to the FBI and it was ignored, as Comey was aligned with the Clinton Campaign.

   b.   Comey admitted in December, 2018, during his testimony before the House Judiciary Committee, that prior to signing the FISA application to obtain the warrant to conduct surveillance on Carter Page, that he was aware that the fake Dossier, authored by Steele, was financed by the Clinton Campaign and the DNC, or as he referred to them, "political actors, who opposed Donald J. Trump."  Yet, none of that information was disclosed in the FISA applications in October, 2016, or any of the renewals.

c.  Moreover, Comey during his testimony before the House Judiciary Committee that when he met with Donald J, Trump in January 2017, in Trump Tower, to brief him on the Dossier, that he failed to inform the incoming President, about who financed the document, despite, the fact that Comey was well aware that it was financed by Hillary Clinton via the DNC and the Clinton Campaign through Perkins Coie.

d.  Comey intentionally withheld that information from Donald J. Trump, as well as in the FISA applications, themselves.  Comey not only withheld that information from Donald J. Trump and the FISA Court, so that the scheme could be hidden, but he also pushed back, on behalf of the FBI, requests from Donald J, Trump to investigate the origins of the "salacious material" i.e.: the Dossier.  As such, Comey confirmed that he did not tell Donald J. Trump, during his briefing that the Dossier had been paid for by his political opponents, mainly Hillary Clinton, the Clinton Campaign, and the DNC, via the Perkins Coie law firm.

e.  On the same day that he approved the approved a FISA surveillance warrant application verifying reporting by Christopher Steele, former FBI Director James Comey admitted in an e-mail to former Director of National Intelligence James Clapper that he was "not able to sufficiently corroborate the reporting" provided in Christopher Steele's now-disproved dossier. "We are not able to sufficiently corroborate the reporting," Comey wrote.

f.  Comey leaked information, which was classified, regarding his private conversations with President Donald J. Trump, to a college professor friend, knowing that it would be shared to a reporter, causing an investigation.

403.  Despite knowing that the information could not be sufficiently corroborated,

92

Comey utilized the Steele Dossier as purported evidence to sign FISA documents to conduct surveillance on Carter Page, when he knew that the Dossier was discredited, and failed to advise the FISA court.

404.     Comey failed to tell the FISA court that the Dossier was reportedly funded by the Clinton Campaign and the DNC and compiled by Fusion GPS.

405.     Comey failed to tell the FISA court that the Dossier he relied upon to request a warrant to monitor Carter Page was a product of the Fusion GPS

406.     Comey relied on the Dossier to monitor Carter Page, even though months later he called the information in the Dossier salacious and unverified.

407.     Comey relied on the Dossier, even though the FBI determined the document was only minimally corroborated, and in fact, he was not able to "sufficiently corroborate the reporting."

408.     Andrew McCabe was Deputy Director of the Federal Bureau of Investigation (FBI) from February 2016 to March 2018.

409.     On May 9, 2017, McCabe became acting director of the FBI, and served in this role until August 1, 2017, when he reverted back to his role as Deputy Director.

410.     McCabe's actions in this capacity spearheaded the investigation, and allowed the false Trump-Russia collusion narrative to continue to thrive.

411.     In June, 2017, McCabe, acting as Deputy Director of the FBI, personally signed the Fourth FISA application to spy on Carter Page, with the Dossier serving as part of the basis for the warrant requests.

412.     As Deputy Director of the FBI, McCabe played a critical role in the FBI's investigation into Donald J. Trump, titled "Hurricane Cross-Fire".  McCabe was instrumental in

pushing the FISA warrants, despite his knowledge that they were uncorroborated and false.

413.    McCabe was also part of the discussion about the insurance policy, in the event of a Trump win in 2016 between Strzok and Page.  Specifically, in February, 2018, Senator Nunes released a memorandum into abuses by the FBI, and asserted that a text message from Strzok discusses "a meeting with Deputy Director McCabe to discuss an 'insurance' policy against President Trump's election".

414.    During the time he headed the investigation into Donald. J. Trump, McCabe was aware that Clinton's campaign lawyer, Sussmann, was working on her behalf, when he was provided the Dossier to the FBI.    Yet, he failed to disclose this in his investigation, or when executing the FISA Warrant.

415.    Recently, on May 13, 2022, in the criminal case brought by John Durham against Sussman, several Department of Justice notes were produced in the case, showing that Sussman did in fact inform the FBI, which would have included McCabe, that he was working on "behalf of his client", although he did not specify who his client was.    Sussman's own lawyers have admitted in the Durham case that more than 300 FBI e-mail chains they have reviewed show the FBI knew that Sussman worked for Democratic campaigns. per the Washington Post.

416.    McCabe knowing that the dossier was funded by the Clinton campaign, and that Sussman was working on behalf of Clinton, intentionally kept the FBI in the dark, and downplayed any notion that the Dossier was not legitimate, warranting the spying on Donald J. Trump.  As a result, the FBI employees, not including its senior FBI officials, which were calling the shots, were left in the dark regarding the Clinton connection to the dossier.

417.    In his actions, McCabe was responsible for refusing to close the Mike Flynn investigation, despite there being no evidence of a criminal act, continuing to push forward the

investigation to find evidence of wrongdoing on the part of Donald J. Trump.

418.    Moreover, McCabe had a conflict of interest in heading the investigation into Donald J. Trump, as prior to his appointment as Director of the FBI, months earlier, his wife a Democratic politician had been the recipient of $675,000 in campaign cash donated by Clinton and Democratic Party-affiliated political action committees

419.    Despite all of this, McCabe signed the final FISA. Application, and continued to head the investigation of Clinton's political opponent.

420.    In 2017, while heading the investigation, McCabe also attempted to have Donald J. Trump removed from office. In a 60 minutes interview in February 2019, McCabe confirmed that he and a handful of other Justice Department officials, including Rosenstein, openly discussed recruiting Cabinet members to invoke the 25th Amendment to remove Donald J. Trump.

421.    In 2017 and 2018, the House Intelligence Committee probed the Russia collusion claim.   In May 2020, transcripts were released of those hearings.   During those hearings McCabe admitted that the FBI was unable to "prove the accuracy" of the dossier, which was used to obtain surveillance warrants for former Trump campaign aide Carter Page.  Moreover, McCabe testified that he did not know if Steele's reporting on Page, was true or not.

422.    In 2018, the Inspector General, Michael Horowitz conducted an into investigation into FBI Deputy Director Andrew McCabe, regarding media leaks to the press by McCabe  These unauthorized leaks were done in October 2016, by McCabe to the *Wall Street Journal*, in which he  leaked information regarding an investigation of the Clinton Foundation.

423.    In the  report from Inspector General Michael Horowitz, it was disclosed that McCabe made unauthorized disclosures to the media that were designed to combat the perception

that he had a conflict of interest in overseeing dual FBI investigations related to former Secretary of State Hillary Clinton.  The press disclosures in question were made to Wall Street Journal reporter Devlin Barrett, shortly after he wrote a story detailing political donations from Clinton ally and former Virginia Gov. Terry McAuliffe to the failed state Senate campaign of McCabe's wife, Jill McCabe.

424.   The Office of Inspector General found that then-Deputy Director Andrew McCabe lacked candor, including under oath, on multiple occasions in connection with describing his role in connection with a disclosure to the Wall Street Journal. The Office of Inspector General also concluded that McCabe's disclosure of the existence of an ongoing investigation to the press, violated the FBI's and the Department's media policy and constituted misconduct."  The report concluded that McCabe was "responsible for approving an improper media disclosure",

425.   On March 16, 2018, Attorney General Jeff Sessions fired McCabe.  The decision was based on the report from the DOJ Inspector General and the FBI's disciplinary office.

426.   On December 19, 2019, the Department of Justice Inspector General Michael Horowitz submitted his report of his review of Four FISA applications and other Aspects of the FBI's Crossfire Hurricane Investigation.

427.   In his report, Horowitz reported that he found 17 "significant inaccuracies and omissions" in the FBI investigation of Page and that the FBI failed "to include exculpatory evidence in its four successful applications for surveillance warrants."

428.   In a 2020, McCabe was probed by the Senate Judiciary Committee.  At the hearing, McCabe admitted that the warrant would not have been obtained without the dossier.  Moreover, he admitted unacceptable" errors were made throughout the investigation.

429.   At all material times, McCabe knew that the FBI was unable to prove the

information put into the dossier, despite this knowledge, McCabe moved forward with the dossier to obtain the FISA warrant, even though it did not meet the necessary legal threshold and should never have been issued.

430.   Since his firing from the FBI, McCabe continues to spread the falsity regarding the Trump Russia-collusion story. In February, 2019, while promoting his book on television, McCabe was interviewed by Anderson Cooper. On the show, McCabe made clear he still questions where Trump's loyalties lie. When Cooper asked if he believes Trump could be a Russian asset, McCabe replied, "I think it's possible. I think that's why we started the investigation." The headline, posted across the media, based on the interview was McCabe - " I think it's' possible Trump is a Russian asset.

431.   The Deputy Attorney General, Rod Rosenstein also conspired to cause damage to Donald J. Trump.  Rosenstein was a key figure in overseeing that probe, which was charged with investigating whether anyone on President Trump's team was conspiring with Russian operatives.

432.   In his role as Deputy Attorney General, Rosenstein overzealously targeted Donald J. Trump by concealing and allowing the FBI to act unlawfully, and personally accelerating the investigation, despite his knowledge that it was baseless.

433.   Moreover, Rosenstein, in his role, failed to disclose the political funding behind the salacious Steele dossier on the FBI's FISC warrant application.

434.   In April 2017, Rosenstein was placed in charge of the Trump- Russia collision investigation by the Department of Justice.

435.   Three months later, on July 18, 2017, Rosenstein was the official responsible for renewing the FISA warrant, signing his name on the fourth FISA (Foreign Intelligence Surveillance Act) warrant application. Rosenstein was the official responsible for making a finding

of probable cause. Rosenstein later admitted to not reading the entire FISA warrant, prior to signing the document.

436.    As the head of the investigation for the Department of Justice, Rosenstein had a major conflict of interest, as he wanted to see harm caused upon Donald J. Trump but remained in charge of the investigation.

437.    During his tenure as head of the investigation for the Department of Justice, Rosenstein was at the center of the Russia hoax. Rosenstein exploited his authority and intentionally concealed and manipulated the false collusion conspiracy.

438.    In fact, it was well-known to Rosenstein, prior to signing the FISA warrant, that the FBI document that initially launched the Trump-Russia probe, dated July 31, 2016, failed to identify a single piece of plausible evidence justifying the Bureau's investigation of the Trump campaign.

439.    Despite this, Rosenstein, in his position as head of the investigation, intentionally failed to expose the truth, specifically that the FBI investigation was devoid of any evidence, and therefore illegitimate.

440.    In his investigation, Rosenstein failed to question Comey, Strzok and others at the FBI about the lack of evidence, or demand that they produce some tangible evidence that would justify his continued investigation.

441.    Furthermore, Rosenstein, as head of the investigation, could have terminated the obviously illicit probe of Donald J. Trump, having every opportunity to do so, but did not. Instead, Rosenstein accelerated and elevated the investigation.

442.    The acceleration of the investigation occurred, when on May 17, 2017, Rosenstein appointed Robert Mueller as Special Counsel to investigate the Trump-Russia collusion hoax.

443.     At the time of the Special Counsel's appointment, Rosenstein was aware that there was still no evidence of a collusion conspiracy involving the Trump campaign and Russia.

444.     Months before the appointment of the Special Counsel, in January of 2017, the FBI had debunked the Steele "dossier" upon which the FBI had so heavily relied.   Other FBI efforts to locate collusion evidence produced nothing.

445.     To appoint a Special Counsel, the regulations required Rosenstein to demonstrate that there was some evidence of a potential crime, and to articulate a criminal act. Despite the fact, that there was no evidence of any crime committed, Rosenstein abused his authority by appointing a Special Counsel.

446.     Moreover, to appoint a Special Counsel, the Department of Justice must show that an investigation or prosecution "would present a conflict of interest for the Department of Justice." Despite the fact that no such conflict existed, Rosenstein proceeded with appointing a Special Counsel to oversee the matter.

447.     As the head of the investigation into Donald J. Trump, the Russia Collusion probe, and the signer of the renewed FISA warrant, Rosenstein bore utter disdain for Donald J. Trump. The magnitude of this hatred and unlawful conduct was exposed by *The New York Times,* on September 21, 2018, when it reported that Rosenstein suggested, in May 2017, that he could secretly tape and record conversations between himself and Trump. Specifically, that he discussed wearing a wire during his meeting with President Donald J. Trump and suggested invoking the 25th amendment to attempt to remove Trump from office.[240]

448.     Rosenstein admitted in May 2019 to Fox 5 News, according to the Washington

---

[240] New York Times, by Nicholas Fandos and Adam Goldman, dated October 10, 2018, *Former Top F.B.I. Lawyer Says Rosenstein Was Serious About Taping Trump - The New York Times*

Examiner, to discussing with McCabe, his plans to secretly record the president, but denied he ever intended to wear a "wire." "I had a conversation with Andrew McCabe about an investigation that he was conducting involving the president. And there was a discussion about whether or not the president would be recorded in the course of that investigation. I never intended to wear a wire, and I think that if Mr. McCabe asked me to wear a wire, we would've had to reconsider the whole thing. Because you can't run an investigation and serve as a witness," Rosenstein said in an episode of the Siege on Democracy podcast.

### *A String of Federal Investigations Clear Donald J. Trump and Uncover the Defendants' Illicit Conspiracy*

449.    On May 9, 2017, Comey was fired from his position of Director of the FBI.

450.    Shortly thereafter, in the wake of his firing, Comey took retaliatory action against Donald J. Trump.

451.    During his time with the FBI, Comey had documented several of his interactions with Donald J. Trump in a series of memos. After he was no longer an employee of the FBI, Comey intentionally shared these memos with one of his lawyer friends, who he directed to leak to a *New York Times* reporter who had been reporting on the Russia conspiracy theory.

452.    The leak was investigated by the Office of the Inspector General (IG) which, in an August 2019 report, faulted Comey for the "unauthorized disclosure of sensitive investigative information, obtained during the course of FBI employment, in order to achieve a personally desired outcome."[241]

---

[241] Report of Investigation of Former Federal Bureau of Investigation Director James Comey's Disclosure of Sensitive information and Handling of Certain Memoranda, Office of the Inspector General, Oversight and Review Division 19-02, August 2019, https://oig.justice.gov/reports/2019/o1902.pdf (hereinafter, the "IG Report (Aug. 2019).

453.    The outcome that Comey desired—per his own admission to Congress—was to "prompt" the appointment of a special counsel to investigate Donald J, Trump' alleged conspiracy with the Russian movement.

454.    The IG's report noted that Comey had "set a dangerous example" by "release[ing] sensitive information" to "create public pressure for official action."

455.    Comey was successful in getting the special master appointed, due to his unlawful leaking of information, even though Comey didn't have enough evidence to pursue it in his own official capacity.

456.    In May 2017, Robert Mueller was appointed as Special Counsel to "oversee the previously-confirmed FBI investigation of Russian government efforts to influence to 2016 Presidential Election and related matters."[242]

457.    Strzok, the leader of the Russia probe, texted Lisa Page in May 2017 that he was reluctant to join Mueller's probe and leave his senior FBI post because he feared "there's no big there, there."[243]

458.    In addition, in May 2017, Page told Representative John Ratcliffe "it still existed in the scope of possibility that there would be literally nothing" to connect Trump and Russia, no matter what Mueller or the FBI did."

459.    On March 22, 2019, Special Counsel Robert Mueller concluded his 22-month investigation and submitted his confidential report entitled "Report on the Investigation into Russian Interference in the 2016 Presidential Election" (the "Mueller Report") to Attorney General

---

[242] Appoint of Special Counsel (press release), US Department of Justice, May 17, 2017, https://www.justice.gov/opa/pr/appointment-special-counsel.

[243] Lisa Page bombshell: FBI couldn't prove Trump-Russia collusion before Mueller appointment | The Hill

William Barr.

460.    The Mueller Report demonstrated that, after a two-year long investigation coming

on the heels of a year-long FBI investigation, the Special Counsel found no evidence that Donald

J. Trump or his campaign ever colluded with the Russian government to undermine the 2016

election.

461.    Specifically, Special Counsel Mueller "did not find that the Trump campaign, or

anyone associated with it, conspired or coordinated with the Russian government in these efforts,

despite multiple efforts from Russian-affiliated individuals to assist the Trump campaign."[244]

462.    In March of 2019, shortly after the Muller Report determined there was no

collusion, Reines went on Fox News and continued to accuse Donald J. Trump.

463.    Reines debated with Mollie Hemingway who told Reines that the conspiracy was

over and Reines responded: "You saying it on FOX doesn't make it so.  He's under investigation

by 17 other entities including the Southern District of New York."[245]

464.    In or around 2019, several probes were commenced or carried out concerning the

origins of the FBI's Crossfire Hurricane and relevant wrongdoing of the Defendants.

*Office of the Inspector General*

465.    First, the Office of the Inspector General performed a review to determine whether

the Crossfire Hurricane investigation was adequately predicated and whether the FBI had acted on

false and misleading information.

466.    Through this investigation, the IG uncovered numerous deficiencies with the FBI's

---

[244] Letter from AG William Barr, March 24, 2019.
[245]https://www.realclearpolitics.com/video/2019/03/24/mollie_hemingway_vs_philippe_reines_o
n_mueller_its_important_to_understand_philippe_its_over.html#!

conduct.

467.     In a report dated December 9, 2019, the IG identified "at least 17 significant errors or omissions in the Carter Page FISA applications, and many additional errors in the Woods Procedure."[246]

468.     Thereafter, on January 23, 2020, the DOJ formally admitted to the FISC that, with respect to at least the last two warrant applications, "if not earlier, there was insufficient predication to establish probable cause to believe that [Dr.] Page was acting as an agent of a foreign power."

469.     The FISC has also issued several rulings finding that FISA warrants contained material omissions and misstatements, lacked candor, and/or that the warrants were not lawfully obtained:

   a.   In an Order dated December 17, 2019, the FISC stated: "The frequency with which representations made by FBI personnel turned out to be unsupported or contradicted by information in their possession, and with which they withheld information detrimental to their case, calls into question whether information contained in other FBI applications is reliable."

   b.   In an Order dated January 7, 2020, the FISC stated: "The Court understands the government to have concluded, in view of the material misstatements and omissions, that the Court's authorizations were not valid.

   c.   In an Order dated March 5, 2020, the FISC stated: "There is thus little doubt that the government breached its duty of candor to the Court with respect to those applications [involving Carter Page]."

-----

[246] IG Report (12/19).

d.   In an Order dated June 25, 2020, the FISC stated: "The government acknowledges
     that there were material omissions, and the Court has found violations of the
     government's duty of candor, in all four applications [regarding Carter Page]."

### Federal Election Commission

470.   The FEC has issued numerous reports and findings concerning the various
violations of campaign finance laws by the Clinton Campaign and/or the DNC in connection with
their financial dealings with the other Defendants and otherwise relating to facts surrounding this
action.

471.   On July 23, 2019, the FEC found reason to believe that the DNC and HFA violated
52 U.S.C. § 30104(b)(5)(A) and (b)(6)(B)(v) and 11 C.F.R § 104.3(b)(3)(i) and (b)(4)(i) by
misreporting the purpose of funds paid to Fusion GPS through Perkins Coie.[247]

472.   The FEC's investigation revealed that the total amount of money that the DNC
spent on Fusion GPS' opposition research—which it passed through Perkins Coie and illegally
reported as "legal and compliance consulting"—was in the amount of $777,907.97.[248]

473.   Similarly, the FEC found that a sum in the amount of $180,000 was paid by the
Clinton Campaign to Perkins Coie and subsequently disbursed by Perkins Coie to Fusion GPS, as
payment for Fusion GPS's services.[249]

474.   The FEC Office of General Counsel concluded that "[the Clinton Campaign] and
the DNC did not properly disclose the purpose of [their] disbursements to Perkins Coie, for what

---

[247] Certification ¶ 2.a, MURs 7291 &7449 (DNC & HFA) (July 26, 2019).
[248] Second General Counsel's Report at 2-3, MUR 7291 & 7449, *In the Matter of DNC Services Corp./DNC, et al.* (hereinafter, "FEC Second Gen. Counsel's Rpt.").
[249] *Id.*

appears to have been opposition research done by Fusion [GPS]."[250]

475.    After conclusion of its investigation, the FEC found "probable cause to believe that the Clinton Campaign "violated 52 U.S.C. § 30104(b)(5)(A) and 11 C.F.R. § 104.3(b)(4)(i) by misreporting the purpose" of the disbursements to Fusion GPS.[251]

476.    Likewise, the FEC found probable cause to believe that the DNC "violated 52 U.S.C. § 30104(b)(5)(A) and 11 C.F.R. § 104.3(b)(4)(i) by misreporting the purpose" of the disbursements to Fusion GPS.[252]

477.    On February 22, 2022, the Clinton Campaign and the DNC respectively entered into Conciliation Agreements with the FEC to resolve these violations.[253]

478.    As set forth in its Conciliation Agreement, the Clinton Campaign agreed to pay a civil penalty to the FEC in the amount of $8,000 pursuant to 52 U.S.C. 30109(a)(5)(A) and to not violate U.S.C. § 30104(b)(5)(A) or 11 C.F.R. § 104.3(b)(4)(i) in the future.[254]

479.    As set forth in its Conciliation Agreement, the DNC agreed to pay a civil penalty to the FEC in the amount of $105,000 pursuant to 52 U.S.C. 30109(a)(5)(A) and to not violate U.S.C. § 30104(b)(5)(A) or 11 C.F.R. § 104.3(b)(4)(i) in the future.[255]

***Department of Justice/Special Counsel John Durham***

480.    In light of these admissions, as well as the obvious questions about the legitimacy

---

[250] FEC First Gen. Counsel's Rpt. at 27.

[251] Conciliation Agreement between HFACC and FEC at 1, February 22, 2022, MUR 7291 & 7449, *In the Matter of DNC Services Corp./DNC, et al.* (hereinafter, "Clinton Campaign Conciliation Agreement").

[252] Conciliation Agreement between DNC and FEC at 1, February 22, 2022, MUR 7291 & 7449, *In the Matter of DNC Services Corp./DNC, et al.* (hereinafter, "DNC Conciliation Agreement").

[253] *See generally* Clinton Campaign Conciliation Agreement and DNC Conciliation Agreement.

[254] Clinton Campaign Conciliation Agreement at 3.

[255] DNC Conciliation Agreement at 3.

of Crossfire Hurricane, Attorney General William Barr assigned John Durham, the United States Attorney for the District of Connecticut, to lead an investigation on behalf of the Department of Justice into Crossfire Hurricane.

481.   Thereafter, on October 19, 2020, Barr officially appointed Durham to serve as Special Counsel and to continue his investigation into the origins of Crossfire Hurricane.

482.   On August 8, 2020, in his first actions as Special Counsel, Durham criminally indicted former FBI attorney Kevin Clinesmith, for making a false statement, stemming from his altering of an e-mail in connection with the submission of a Foreign Intelligence Surveillance Act ("FISA") application related to spying on Donald J. Trump.   Clinesmith was referred for potential prosecution by the Justice Department's inspector general's office, which conducted its own review of the Russia investigation.

483.   Between July 2015 and September 2019, Clinesmith was employed with the FBI as an Assistant General Counsel in the National Security Department.   Clinesmith was assigned to provide legal support to FBI personnel working on Crossfire Hurricane, and he assisted FBI personnel with applications prepared by the FBI and the Justice Department's National Security Division to conduct surveillance under the FISA. [256]

484.   Clinesmith intentionally altered an e-mail he received from a "government agency", by adding the words "not a source," and then forwarded the e-mail to the FBI Supervisory Special Agent.   On June 29, 2017, the FBI Supervisory Special Agent, relying on the altered e-mail, signed and submitted the fourth FISA application to the U.S. Foreign Intelligence

---

[256] Press Release Department of Justice U.S Attorneys Office District of Connecticut, dated August 19, 2020 FBI Attorney Admits Altering E-mail Used for FISA Application During "Crossfire Hurricane" Investigation | USAO-CT | Department of Justice

Surveillance Court, which allowed them to eavesdrop on Carter Page, who was a former Trump campaign advisor.  The application did not include the individual's history or status as a source, with the other government agency.[257]

485.    Ultimately, on August 19, 2021, Clinesmith pleaded guilty to one count of making a false statement within both the jurisdiction of the executive branch and judicial branch of the U.S. government.[258]

486.    On September 16, 2021, less than a year into his investigation, Durham indicted Sussmann for one count of making a false statement to a federal law enforcement in violation of 18 U.S.C. § 1001(a)(2) for, on September 19, 2016, "stat[ing] to the General Counsel of the FBI that he was not acting on behalf of any client in conveying the particular allegations concerning [Donald J. Trump], when in truth, and in fact, and as [Sussmann] well knew, he was acting on behalf of specific clients, namely, [Joffe] and the Clinton Campaign."[259]

487.    On November 3, 2021, Durham indicted Danchenko for five separate counts of violating 18 U.S.C. § 1001(a)(2) for making false statements to a law enforcement officials:[260]

e.    Count One alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on June 15, 2017 when he "denied to agents of the FBI that he had spoken with [Dolan] about any material contained in the [Steele Dossier], when in truth and in fact, and as the defendant well knew, [Dolan] was the source for an allegation contained in the [Steele Dossier] dated August 22, 2016 and was otherwise involved in the events

---

[257] *Id*.

[258] *Id.*

[259] Indictment at 27, *United States v.  Sussmann*, case no.  1:21-cr-00582-CRC, District of Columbia (Sept.  16, 2021) (hereinafter, "Sussmann Indictment").

[260] *See generally* Indictment, *United States v. Danchenko*, case no. 1:21-cr-00245-AJT, Eastern District of Virginia (Nov.  3, 2021) (hereinafter, Danchenko Indictment")

and information described in the reports."[261]

   f.  Count Two alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on March 16, 2017 when he "stated to agents of the FBI that he received a late July 2016 telephone call from an individual who Danchenko believed was 'probably' Chamber President-1, when in truth and in fact, and as [Danchenko] well knew, Chamber President-1 never called Danchenko."[262]

   g.  Count Three alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on May 18, 2017 when he "stated to agents of the FBI that he 'was under the impression' that a late July 2016 telephone call that he received was from Chamber President-I, when in truth and in fact, and as the defendant well knew, Chamber President-I never called Danchenko."[263]

   h.  Count Four alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on October 24, 2017 when he "stated to agents of the FBI that he believed that he spoke to Chamber President-I on the telephone on more than one occasion, when in truth and in fact, and as the defendant well knew, Danchenko never spoke to Chamber President-I."[264]

   i.  Count Five alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on November 16, 2017 when he "stated to agents of the FBI that he believed that he had spoken to Chamber President-I on the telephone, when in truth and in fact, and as the

---

[261] *Id.* at 37.
[262] *Id.*
[263] *Id.* at 38.
[264] *Id.*

defendant well knew, Danchenko never spoke to Chamber President-I."[265]

488.    On December 17, 2021, Durham filed a motion to inquire into potential conflicts of interests in Danchenko's criminal case, notifying the court to a potential conflict of interest since Danchenko's defense counsel also represents the Clinton Campaign, noting that "the interests of the Clinton Campaign and [Danchenko] could potentially diverge in connection with any plea discussions, pre-trial proceedings, hearings, trial, and sentencing proceedings."

489.    In the motion, Durham also confirms that his office is actively investigating the Clinton Campaign for its role in the subject matter of this action, stating that "[a]reas of inquiry that may become relevant . . . include topics such as (1) the Clinton Campaign's knowledge or lack of knowledge concerning the veracity of information in the Company Reports sourced by the defendant, (2) the Clinton Campaign's awareness or lack of awareness of the defendant's collection methods and sub-sources, (3) meetings or communications between and among the Clinton Campaign, U.S. Investigative Firm-1, and/or U.K. Person-1 regarding or involving the defendant, (4) the defendant's knowledge or lack of knowledge regarding the Clinton Campaign's role in and activities surrounding the Company Reports, and (5) the extent to which the Clinton Campaign and/or its representatives directed, solicited, or controlled the defendant's activities." He further noted that "the Clinton Campaign and [Danchenko] each might have an incentive to shift blame and/or responsibility to the other party for any allegedly false information that was contained within the Company Reports and/or provided to the FBI."[266]

490.    On January 25, 2022, in a discovery-related motion in the Sussmann criminal case,

---

[265] *Id.*
[266] *See generally* Motion to Inquire into Potential Conflicts of Interest (ECF Doc.  No.35), *United States v.  Danchenko*, case no.  1:21-cr-00245-AJT, Eastern District of Virginia (Dec.  17, 2021).

it was revealed that Durham has already questioned a "former employee of the Clinton Campaign" and has served document requests and/or subpoenas on the Clinton Campaign and a "political organization" – likely the DNC.[267]

491.    On February 11, 2022, Durham filed a motion to inquire into potential conflicts of interest in the Sussmann case.  Notably, in reference to Neustar and Joffe's exploitation of non-public data in connection with the Defendants' conspiracy, Durham states that "among the Internet data [Joffe] and his associates exploited was domain name system ("DNS")  Internet traffic pertaining to (i) a particular healthcare provider, (ii) Trump Tower, (iii) Donald Trump's Central Park West apartment building, and (iv) the Executive Office of the President of the United States ("EOP")," and specifically notes that "[Joffe] and his associates exploited [a sensitive] arrangement [with the EOP] by mining the EOP's DNS traffic and other data for the purpose of gathering derogatory information about Donald Trump."[268]

### The Defendants' Malicious Conspiracy Remains Active to This Day

492.    The Defendants' collective effort to falsely implicate and publicly denigrate Donald J. Trump has not ceased and, in fact, the Defendants continue to proliferate the injurious falsehood that Donald J. Trump colluded with Russia to this very day.

493.    Fusion GPS, Simpson, Fritsch, and Steele continued their collective mission to fabricate evidence and disparage Donald J. Trump with it, well after Trump won the 2016 election.

494.    Perkins Coie still serves as general counsel to the DNC.[269]

---

[267] *See* Government's Discovery Update and Request for Additional Time to Produce Residual Discovery Materials, *United States v. Sussmann*, case no.  1:21-cr-00582-CRC, District of Columbia (Jan.  25, 2022).

[268] *See generally* Motion to Inquire into Potential Conflicts of Interest (ECF Doc.  No.35), *United States v. Sussmann*, case no.  1:21-cr-00582-CRC, District of Columbia (Feb.  11, 2022).

[269] *See* https://www.perkinscoie.com/en/experience/democratic-national-committee-2.html.

495.     John Podesta and Philippe Reines have continued to insist that Donald J. Trump
colluded with Russia.

496.     In October of 2017, Podesta went on Twitter and accused Donald J. Trump of
"running a "big lie campaign" centered on the investigation into Russian meddling in the U.S.
election."[270]

497.     On, April 16, 2018, Reines tweeted "yes collusion, yes collusion, yes collusion"
in response to an article titled: 'Breaking: Trump puts the brake on new Russian sanctions,
reversing Haley's announcement.'

498.     John Podesta is the founder and Chair for the Board of Directors for the Center for
American Progress.  Podesta previously served as counselor to President Barak Obama, serving as
co-chair of Obama's transition tram.  Podesta also previously served as White House chief of Staff
for Bill Clinton, and chaired Hillary Clinton's 2016 Presidential Campaign.     The Center for
American Progress is intended to be a is a public policy research and advocacy organization which
presents a liberal viewpoint on economic and social issues. It has its headquarters in Washington,
D.C., but is really an anti-Trump organization.

499.     The organization has been involved, by and through its founder and chair, Podesta,
of pushing the false Trump Russia collusion narrative.  In furtherance of the plan to push the false
Russia narrative to the general public, Podesta and the American Progress Action Fund set up the
"Moscow Project".

500.     The Moscow Project was set up as a basis to continue to spread the false Russian
narrative.  Its stated purpose is to analyze the facts behind Trump's collusion with Russia and

---

[270] https://www.yahoo.com/news/trump-behind-apos-big-lie-164719959.html

communicate it to the public.  The Moscow Project still exists, to this day, pushing the false Trump

Russia collusion narrative.  For example, as of the date of the filing of this amended Complaint,

on its website, the "Moscow Project" editors, under the direction of Podesta, write in red bold

letters, "The Trump Russia Collusion."  Moreover, on its homepage, it showcases several articles,

which falsely claim that there was collusion, such as "Yes Collusion. Yes Obstruction", dated June

22, 2020.  "Creating a New Scandal is the Latest Episode of Trump's Endless Coverup", dated

May 20, 2020. [271]

501.     Reflecting its goal of spreading lies regarding Donald J. Trump, the Center for

America Progress Web-Site, under the direction of Podesta wrote on March 23, 2017 on its web-

site,  the following, "on Wednesday the *Associated Press* reported that Paul Manafort, Trump's

former campaign manager, secretly worked with a Russian billionaire on a plan to "greatly

benefit the Putin Government." Sound familiar? This isn't the first time we've heard about shady

ties between Manafort and Russian officials. And it's not just Manafort. It seems like every day

brings new reports of ties between the Trump team and Russia. And today is no exception, it is

now being reported that FBI has information that Trump associates communicated with Russian

operatives—possibly to coordinate the release of information during the campaign. Confused by

all the news? The Moscow Project is here to help. Consider it your one-stop-shop for the who,

what when, and where of all things Trump and Russia. See all the key players, a timeline of

events, and a fact-checked version of the Steele Dossier (of Buzzfeed fame). You can also

contribute to the investigation using the Genius tool or by sending confidential tips

---

[271] The Moscow Project themoscowproject.org, dated June 17, 2022.

to tips@themoscowproject.org.[272]

502.    Debbie Wasserman Schultz has also continued to maintain that Donald J. Trump colluded with Russia.

503.    For instance, on May 10, 2019, Schultz appeared on MSNBC and boldly announced that there were "clear indications" that Donald J. Trump colluded with Russia.  She went on to state:

> You know, what's so disturbing is that Donald Trump is so lacking in confidence about his ability to actually get elected without the help of a foreign power, and particularly a foreign adversary, that they will go to any lengths and that he will instruct and allow his colleagues and allies to go to any lengths to be able to secure his success in an election.[273]

504.    Adam Schiff, a member of the Democratic Party, who represents California's 28th Congressional District since 2013, has been a vocal advocate of the Trump Russia-collusion conspiracy story.

505.    Schiff has routinely falsely claimed that he has seen "ample evidence "that Trump colluded with the Russian government.  Schiff has stated on multiple occasions that there is an abundance of evidence that the Trump campaign colluded with the Russians to win the 2016 presidential election.  Moreover, Schiff has routinely claimed to the press, and the American public, for years, that he has "smoking gun" evidence proving Trump colluded with Russia in order to win the 2016 election.

506.    In January 2017, a committee probe of the Trump Russia Collusion was started by

---

[272] The Moscow Project - Center for American Progress Action,
www.americaprogressaction.org, dated March 23, 2017
[273]https://www.realclearpolitics.com/video/2019/05/11/wasserman_schultz_trump_clearly_colluded_with_russia_and_engaged_in_obstructed_justice_to_cover_it_up.html

the House Intelligence committee, in which Schiff is a member, and now chairs.   In 2017, Schiff as a member of the House Intelligence committee, was involved in the congressional probe, acting as one of the staunchest advocates in the committee that the collusion had actually occurred.   The committee probe concluded in March 2018, with a report finding no evidence that the Trump campaign conspired with the Kremlin and finding that The House Intelligence Committee found the "Trump campaign did not collude with Russia".

507.    Transcripts released from those proceedings, which Schiff vehemently objected to their release, but were released after a vote of the members, prove that Schiff knew there was no proof of collusion. Yet, he still repeatedly touted the claim of collusion on national media outlets for several more years, and continues to this day to maintain that Trump colluded with Russia.

508.    In February 2019, Senate intelligence committee Chairman Richard Burr told CBS News his panel had discovered nothing to indicate collusion had occurred, which Schiff denied. Schiff stated to the press, "All of this is evidence of collusion, and you either have to look the other way to say it isn't or you have to have a different word for it, because it is a corrupt dealing with a foreign adversary during a campaign.

509.    On March 2, 2019, Schiff stated to the press, "I think there is direct evidence in the e-mails from the Russians through their intermediary offering dirt on Hillary Clinton as part of what is described in writing as the Russian government effort to help elect Donald Trump".

510.    On March 28, 2019, the nine Republican members of the House Intelligence Committee officially called for Schiff to resign due to his allegations that Trump's campaign colluded with Russians in the 2016 election. Schiff responded by accusing the Republican members of tolerating "immoral" and "corrupt" conduct by Trump campaign members and administration appointees.

511.    Recently, an e-mail was uncovered by John Durham indicating Schiff's affiliation with Fusion GPS.   Peter Frisch, on behalf of Fusion GPS e-mailed Jay Solomon at the Wall Street Journal in July 2016.   In the e-mail, dated July 26, 2016, which was recently unearthed by John Durham, Peter Frisch wrote to the Wall Street Journal reporter, when the reporter told him that Carter Page "is neither confirming or denying". that he should "call Adam Schiff. Or difi for that matter.  I bet they are concerned about what page was doing other than giving a speech over 3 days in Moscow."

512.    Schiff continues to spread the false Trump Russia-collusion narrative.  From 2017 to 2021, Schiff has been a regular guest on national news outlets, such as MSNC, CBS's "Face the Nation, NBC' Meet the Press and CNN, in which he has routinely claimed that Trump colluded with Russia, that there is plenty of evidence, and it is damming. For Example, on March 24, 2019, on ABC's This Week" with George Stephanopoulos, Schiff called it congresses duty to expose e Trump's relationship with Russia. Moreover, continuing to state there was significant evidence of Trump collusion.   When asked by the host if he would apologize for his claims that Trump colluded with Russia, after new information had been revealed disproving the collision, he double-downed on his prior statements, that there was significant and incriminating evidence of the collusion.

513.    On May 9th, 2020, Schiff claimed on CNN's State of the Union, there was "more than circumstantial evidence" that Donald Trump's 2016 presidential campaign colluded with Russia.   "You can see evidence in plain sight on the issue of collusion, pretty compelling evidence,"

514.    On April 16, 2021, Schiff on MSNBC "the last word" with Lawrence O'Donnell, continued to maintain the false narrative that Donald J. Trump and his administration colluded

with Russian, and went even further stating that it continued to do so in the 2020 election.  Stating that the "Trump campaign was passing strategic polling and strategic information to a Russian intelligence agent."    "Not just Russian intelligence, but the same ones that tried to help Trump win the 2016 election, what most people would call collusion, I don't know how the no collusion crowd explains that."

515.    At all relevant times, Adam Schiff knew that the Steele Dossier was an opposition research document paid for by the Clinton campaign and the DNC.  Schiff suppressed that information from the congressional probe, as well as from the American public, such information which would have undercut the collusion accusations.

516.    After years of delay, when Schiff was forced to release transcripts of interviews conducted by him, and his fellow House Intelligence Committee members into Russia meddling, it was learned that the director of National Intelligence, former Obama Attorney General, former Deputy Attorney General, and the FBI Deputy Director, among others, all told his committee that there was no direct evidence of criminal conspiracy.

517.    Despite this knowledge, Schiff knew, continued to profess that the central assertion of the dossier, that the Trump campaign had colluded with the Russian government during the 2016 campaign, was not only possible but indeed a fact. He did so on numerous occasions and with great certitude. Every time he did, it was a lie. To this day, Schiff has never produced any evidence to back up his claims.

518.    Likewise, Clinton has continued to drum up the false Trump-Russia narrative in the hopes of damaging Trump's political career.

519.    In an October 2019 interview for the "Campaign HQ" podcast, Clinton stated about Trump: "I don't know what Putin has on him, whether it's both personal and financial. I assume it

is."[274]

520.   For example, on June 16, 2021, Clinton appeared on MSNBC's *Morning Joe* show and again attempted to reinforce the debunked Trump-Russia story—of which she led the effort to manufacture and is no doubt aware is false—when she stated to MSNBC's audience, which included the general public of the State of Florida and the rest of the United States: "We don't have Trump as spokesperson for Putin, anymore."  "After disastrous Trump presidency, in which he gave Putin a green light to do whatever he wanted to do, once Trump was elected, of course..."

521.   On February 16, 2022, in response to media reports concerning the filing of Durham's February 11, 2022 motion, Clinton tweeted that "Trump & Fox are desperately spinning up a fake scandal to distract from his real ones.  So it's a day that ends in Y.  The more his misdeeds are exposed, the more they lie.  For those interested in reality, here's a good debunking of their latest nonsense."[275]

522.   Recently, in a June 18, 2022 article published by the *Financial Times*, Clinton referred to her loss Trump in the 2016 Presidential Election as "unfinished business" and further stated: "Look, the most important thing is to win the next election. The alternative is so frightening that whatever does not help you win should not be a priority."[276]

523.   These are but a few of the recent examples of the Defendants' ongoing efforts to maintain their conspiracy to spread injurious falsehoods against Donald J. Trump.

---

[274] Blake, Aaron. "Hillary Clinton suggests Putin has kompromat on Trump, Russia will back Tulsi Gabbard third-party bid." Washington Post. October 18, 2019. Accessed August 11, 2020. https://www.washingtonpost.com/politics/2019/10/18/hillary-clinton-suggests-putin-has-kompromat-trump-russians-will-back-tulsi-gabbard-third-party-bid/
[275] https://twitter.com/HillaryClinton/status/1494036101572575232.
[276] Edward Luce, *Hillary Clinton: 'We are standing on the precipice of losing our democracy"*, June 17, 2022, https://www.ft.com/content/2e667c3f-954d-49fa-8024-2c869789e32f.

524.    As a direct and proximate cause of the Defendants' actions, Trump has sustained significant injuries and damages including, but not limited to, expenses in the form of defense costs, legal fees and related expenses incurred in connection with his efforts to defend against the Defendants' tortious actions, false accusation, and overall scheme to discredit and delegitimize him, the Trump Campaign and Administration, and the Trump Organization and the various federal investigations and official proceedings that arose therefrom, which to date is in an amount no less than twenty-four million dollars ($24,000,000) and continuing to accrue, as well as the loss of existing and future business opportunities.[277]

525.    It was a goal of the Defendants' conspiracy, and indeed a direct and proximate consequence of the same, that this substantial economic harm would befall Trump.  The Plaintiff does not claim nor seek any compensation for damage to his reputation, but rather, he seeks damages for the cost of dealing with the legal issues and political issues, which he was required to spend to redress the injurious falsities which were propounded by the Defendants, and all other losses incurred due to the tortious conduct of the Defendants.

526.    All precedent acts and requirements have been done or have been waived by the Defendants.

527.    The Plaintiff was required to retain the attorneys named below to bring this action and to pay them reasonable attorneys' fees.

---

[277] The different opportunities which evaporated are too many to list, but as an example, Donald J. Trump has been banned from different social media platforms, including Twitter.  Most of this was due to the misinformation campaign waged by Hillary Clinton, whereby truth was deemed false and lies were deemed to be truth.

**Count I**
**RICO**
**(18 U.S.C. § 1962(C))**
*(Against Clinton, Clinton Campaign, DNC, Perkins Coie, Elias, Sussmannn, Fusion GPS, Joffe)*

528.     The Plaintiff avers the allegations contained in the preceding paragraphs and
incorporates them in this count, as if set forth at length herein.

529.     The Defendants, Clinton, the Clinton Campaign, the DNC, Perkins Coie, Elias,
Sussmann, Fusion GPS, and Joffe (collectively, the "RICO Defendants") are all "persons" within
the meaning of 18 U.S.C. § 1961(3).

**The RICO Enterprise**

530.     At all relevant times, the RICO Defendants, Clinton, the Clinton Campaign, the
DNC, Perkins Coie, Elias, Sussmann, Fusion GPS, and Joffe, conducted the affairs of an
association in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4).

531.     The members of the Enterprise are a group of persons associated together for the
common purpose of carrying on an ongoing enterprise; specifically—as confirmed by U.S.
intelligence officials—the Enterprise had a common, unlawful goal of corruptly and wrongfully
harming the Plaintiff's political reputation, damaging his electability for the 2016 Presidential
Election and subsequent elections, impeding his ability to effectively govern, and otherwise
sabotaging his political career through deceptive, criminal and fraudulent means, including, but
not limited to, falsely implicating the Plaintiff, the Trump Campaign, and the Trump
Administration as colluding with Russia. The actions undertaken by the RICO Defendants in
furtherance of this goal were intended to inflict the type of injury and harm suffered by Plaintiff.

532.     The Enterprise was formed as early as April 2015, when Clinton announced her
candidacy, formed her campaign and began conspiring with the DNC and Perkins Coie to target

Plaintiff, and remains ongoing and continuing to the present day. In the alternative, the Enterprise

continued through at least January 20, 2021 when Plaintiff formally departed the office of the

presidency.

533.    At all relevant times, the Enterprise has had a longevity sufficient to permit the

RICO Defendants to pursue the Enterprise's purpose. Indeed, the Enterprise's conduct remains

ongoing to this day as the RICO Defendants continue to perpetuate their fraudulent scheme by

spreading disinformation, harmful lies, and false narratives to the media concerning Plaintiff's

purported illicit ties to Russia. In addition, given the potential that Plaintiff will run for President

again in 2024, coupled with the RICO Defendants' longstanding political and professional

relationships, there is a significant likelihood that conduct of the Enterprise's racketeering conduct

will repeat in the future, including but not limited to, theft of trade secrets, obstruction of justice,

and other unlawful tactics, in furtherance of their attempts to further damage Plaintiff's electability

and to ensure that he is unable to secure a victory in the 2024 Presidential Election.

534.    The Enterprise is, and at all relevant times was, a continuing unit that functioned

with a common purpose and had an ascertainable structure for carrying out its objectives. While

the precise organizational framework of the Enterprise may have varied over time, and some of

the RICO Defendants may have held different roles at different times, the Enterprise has been

structured to operate as a continuing unit to accomplish the common goals and purposes of its

scheme. In general, the leadership of the Enterprise was the Clinton Campaign and the DNC, as

well as Clinton, who exerted significant control over both the Clinton Campaign and the DNC.

Clinton, the Clinton Campaign and the DNC worked in tandem with their joint counsel, Perkins

Coie, whose partners, Sussmann, and Elias, simultaneously served as general counsel for the

Clinton Campaign and the DNC, in devising, coordinating, and overseeing the Enterprise's

activities. Perkins Coie was the central hub that coordinated and oversaw the day-to-day operations

of the Enterprise. Perkins Coie, at the behest of and on behalf of the Clinton Campaign and the

DNC, contracted with Fusion GPS to spearhead the media-based smear campaign against Plaintiff;

this arrangement was misreported to the FEC for the purposes of concealing the Clinton Campaign

and the DNC's connection to Fusion GPS. Perkins Coie also represented Joffe and his company,

Neustar. Joffe's role was to lead a cyber-based, data-driven attack against Plaintiff. All of the

RICO Defendants played a part in misleading law enforcement and counterintelligence officials,

including, without limitation the preparation and presentation of various falsified materials and

various false statements made in connection with same.

535.   At all relevant times, each of the RICO Defendants were aware of each other's

conduct in furtherance of the scheme and were knowing and willing participants in that conduct.

The RICO Defendants had frequent meetings, calls and communications amongst themselves for

the purpose of orchestrating, coordinating, and carrying out their unlawful actions.  To the extent

any of the RICO Defendants did not communicate or interact directly with any other RICO

Defendants, such as the Clinton Campaign, they communicated and/or interacted indirectly

through Perkins Coie as a liaison and were continually apprised of the activities of the other RICO

Defendants; this was done purposefully with the intention that attorney-client privilege

communications could be used to conceal their communications.

536.   Since the Enterprise's activities had a significant impact on the 2016 presidential

election, provoked numerous unwarranted federal investigations and congressional inquiries,

severely impacted the reputation of a presidential candidate, affected fundraising and electoral

spending in the 2016 presidential election and 2020 presidential election, and, ultimately, impeded

the ability of a sitting President of the United States to effectively govern, the Enterprise affected

interstate and foreign commerce.

537.     Many of the members of the Enterprise have longstanding interpersonal and/or professional relationships rooted in their political and professional connections, ongoing business dealings, and mutual interest and participation in common activities and dealings.

### Predicate Acts

538.     Section 1961(1) of RICO also provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1832 (relating to theft of trade secrets); 18 U.S.C. § 1512 (obstruction of justice); and 18 U.S.C. § 1343 (fraud by wire, radio or television).  As set forth herein, in furtherance of their scheme to harm the Plaintiff, his reputation and his business, the RICO Defendants engaged in numerous acts in violation of 18 U.S.C. § 1832, 18 U.S.C. § 1512, and 18 U.S.C. § 1343.

539.     Each RICO Defendant has conducted and participated in, directly or indirectly, the management, conduct and/or operation of the Enterprise and its affairs through a pattern of racketeering activity including acts indictable under 18 U.S.C. § 1832 (theft of trade secrets), 18 U.S.C. § 1512 (obstruction of justice), and 18 U.S.C. § 1343 (wire fraud).

540.     The RICO Defendants have consistently and regularly committed acts of racketeering activity spanning from, at least, April 2015 through, at a minimum, November 17, 2017.  These multiple acts shared a common or related purpose, goal, result, participants, victims, and methods of commission.

541.     Beginning in or around April 2015, the RICO Defendants engaged in wide-ranging scheme to concoct a false narrative that the Plaintiff, his businesses, his campaign, and eventually, his administration, were colluding with Russia to undermine the 2016 Presidential Election and engage in other corrupt dealings.

542.     The RICO Defendants, through their deceptive and illegal conduct intended to mislead law enforcement, the media, and the public at large through the spread of disinformation and fraudulent claims; to unlawfully obtain confidential, sensitive and proprietary data that could be falsified and weaponized against Plaintiff; and to obstruct and falsely provoke federal investigations against the Plaintiff, the Trump Campaign, and the Trump Administration.

543.     In furtherance of this scheme, the Defendants committed multiple related acts, each of which constitutes an act of racketeering activity, and which, collectively, constitute a pattern of racketeering activity.

### *Theft of Trade Secrets (18 U.S.C. § 1832)*

544.     In violation of 18 U.S.C. § 1832(a)(5), Joffe, in coordination with and at the direction of the other RICO Defendants, abused and exploited access to non-public and highly-sensitive data sources and/or servers and acquired, obtained in excess of authorization and/or stole proprietary, sensitive and confidential internet data, records and/or information, including without limitation, DNS internet traffic data pertaining to Plaintiff, including data originating from his servers located at his private New York residence and those located at Trump Tower and used in connection with his business, The Trump Organization LLC, a company involved in interstate commerce, and stole trade secrets in violation of 18 U.S.C. § 1832 (theft of trade secrets).

545.     DNS internet traffic data houses highly proprietary, sensitive and confidential data. For example, among other things, an analysis of raw DNS data reveals a comprehensive view into an individual or a company's website traffic, e-mail traffic, webmail traffic, chat messaging, in addition to the types of technology, hardware, software, programs, securities and processes being utilized by the servers.

546.     Joffe, with assistance from the other RICO Defendants, exploited his access to non-

public data sources and/or servers, through Neustar and the Data Companies, to unlawfully acquire, steal and exploit sensitive, proprietary and confidential internet data, including without limitation, DNS information, traffic, and/or data originating from computers and/or servers: (i) located at Plaintiff's private apartment in Central Park West in New York and belonging to the Plaintiff; and (ii) located at Trump Tower and belonging to The Trump Organization, in which Plaintiff has an ownership interest (collectively, with the computers and/or servers house in Plaintiff's private apartment, "Plaintiff's Servers").

547. By illegally accessing the above-mentioned information and data, the RICO Defendants were able to obtain proprietary, sensitive, and/or confidential information and data including, among other things, the number and frequency of e-mail communications between the Plaintiff's Servers and other third party servers, the number and frequency of website visits to third party websites by the Plaintiff's Servers, the number and frequency of webmail interactions between the Plaintiff's Servers and other third party servers, and the number and frequency of chat messaging interactions between the Plaintiff's Servers and other third party servers, as well as information pertaining to the types of technology, hardware, software, programs, securities and processes being utilized by Plaintiff's Servers.

548. This information and data revealed highly proprietary, sensitive, and confidential knowledge, including insight into Plaintiff's and The Trump Organization's contacts, client lists, business dealings, financial dealings, communications, future and current plans, techniques, patterns, methods, processes, and procedures, as well as identification of their corporate partners, political associates, clients, and vendors.

549. This proprietary, sensitive and confidential information, data and/or knowledge constitutes trade secrets within the meaning of 18 U.S.C. § 1839(3) where they constitute business

and/or political methods, techniques, processes, procedures and programs that are both protected from disclosure by the Plaintiff and derive significant economic value from not generally being known to or ascertainable by others, including the RICO Defendants, who were able to obtain insight and economic value from the unauthorized use, disclosure and misappropriation of such information.

550.    The Plaintiff and The Trump Organization restricts access to their proprietary, sensitive and confidential information and data, including DNS data, even within their own personnel and prevents unauthorized access to such records by digital or electronic means.

551.    The Plaintiff and The Trump Organization further protects against theft and disclosure of such information by third parties by the requirement of executed non-disclosure agreements prior to providing any such access.

552.    The Plaintiff's confidential records were misappropriated by Defendants within the meaning of 18 U.S.C. § 1839(5), when the Plaintiff's confidential and proprietary records were acquired by the RICO Defendants, without the Plaintiff's authorization and through Defendants' acts of espionage or other improper means conducted by electronic or other means.

553.    Joffe, with assistance from, in coordination with, and at the direction of the other RICO Defendants, violated the Defend Trade Secrets Act, 18 U.S.C. § 1832(a)(1), by obtaining Plaintiff's proprietary, sensitive and confidential information and data by fraud, artifice, and deception and, thereafter, stealing, appropriating, taking, carrying away, and concealing the theft of Plaintiff's confidential records with intent to convert Plaintiff's confidential records, which are related to products sold in interstate and foreign commerce, to Defendants' own benefit, while knowing and intending that such misappropriation would injure the Plaintiff.

554.    Clinton, the Clinton Campaign, the DNC, Perkins Coie, Sussman, Elias, and Fusion

GPS violated the Defend Trade Secrets Act, 18 U.S.C. § 1832(a)(5) by conspiring, assisting, aiding, and abetting Joffe in obtaining Plaintiff's proprietary, sensitive and confidential information and data by fraud, artifice, and deception and, thereafter, stealing, appropriating, taking, carrying away, and concealing the theft of Plaintiff's confidential records with intent to convert Plaintiff's confidential records, which are related to products sold in interstate and foreign commerce, to Defendants' own benefit, while knowing and intending that such misappropriation would injure the Plaintiff

555.    Each of the RICO Defendants were aware of, and active participants and/or conspirators in, Joffe's violation the Defend Trade Secrets Act, 18 U.S.C. § 1832, and each of the RICO Defendants committed at least one act in furtherance of this goal.

556.    The RICO Defendants' actions constitute theft of trade secrets and/or a conspiracy to steal trade secrets in violation of 18 U.S.C. § 1832(a)(5).

557.    All of Defendants' actions in violation of 18 U.S.C. § 1832 occurred after May 11, 2016 and, therefore, qualify as predicate acts pursuant to the 2016 amendment federal RICO statute.

### *Obstruction of Justice (18 U.S.C. § 1512)*

558.    The RICO Defendants, through and using the Enterprise, engaged in, and continues to engage in, a coordinated effort to destroy the Plaintiff's political career and impede his ability to effectively govern as President of the United States.  This coordinated effort amounts to a set of related predicate acts with similar purposes, results, and methods, which included acts in violation of 18 U.S.C. § 1512 (obstruction of justice).

559.    On one or more occasions, the RICO Defendants, knowingly and deliberately provided falsified, altered and misleading records, including the White Papers and the Dossier, to

law enforcement officials and made false statements to law enforcement officials, including the FBI and CIA, with the intention of obstructing, impeding, influencing and/or impairing their investigations into alleged Russian collusion, and/or conspired with others to carry out these acts.

560.    On September 19, 2016, Sussmann met with FBI officials in Washington D.C., at which time he, among other things: (i) made false statements to FBI officers, including that he was acting on behalf of any client; (ii) provided falsified, altered and/or misleading records, including the White Papers, to FBI officials; (iii) withheld and/or concealed pertinent information, including without limitation the true nature of the White Papers, his work with Neustar and Joffe, the falsity of the purported link between Trump Tower and Alfa Bank, and the existence of the Enterprise and its overarching conspiracy to create a false narrative of Trump-Russia collusion.

561.    On September 19, 2016, Sussmann met with FBI officials in Washington D.C., at which time he, among other things: (i) made false statements to FBI officials, including that he was not acting on behalf of any client; (ii) knowingly provided falsified, altered and/or misleading records, materials and evidence, including (1) *White Paper #1 AuditableV3,* (2) *White Paper Comments: Time Series Analysis of Recursive Queries,* (3) a white paper drafted by Fusion GPS regarding a purported Trump-Alfa Bank connection, and (4) eight files containing falsified, altered, and/or curated data and information relating to Alfa Bank, Trump Tower, and the mail.trump-e-mail.com domain, to FBI officials; (iii) withheld and/or concealed pertinent information, including, without limitation, that he was acting on behalf of his clients, Clinton, the Clinton Campaign, the DNC; that he was perpetrating a fraudulent scheme, along with his cohorts, in furtherance of the Enterprise; the falsified, spoofed and/or misleading nature of the White Papers and the other documents that he was handing over; the true nature of his work with the RICO Defendants; the falsity of the purported link between Trump Tower and Alfa Bank,; and the

existence of the Enterprise and its overarching conspiracy to mislead law enforcement for the purpose of creating a false narrative concerning the purported Trump-Russia collusion.

562.    Sussmann's conduct in connection with his September 19, 2016 meeting with the FBI corruptly obstructed, influenced, and impeded and/or constituted an attempt to corruptly obstruct, influence or impede one or more official proceeding(s), namely the FBI's Crossfire Hurricane investigation, the FBI's full field investigation into the Trump-Alfa Bank connection, and/or other investigations by the FBI, the DOJ, the CIA, Congress, and/or the IG and therefore constituted a violation of 18 U.S.C. § 1512.

563.    On October 2, 2016, Joffe contacted FBI Special Agent Tom Grasso via telephone, at which time he, among other things: (i) made false and misleading statements to SA Grasso, including statements regarding "information relating to communications between the Trump Campaign and some entity in Russia"; (ii) provided unlawfully obtained records, including an IP address of an individual affiliated with Alfa Bank; (iii) despite being a confidential human source, Joffe intentionally circumvented his handler and spoke with Grasso on the condition of anonymity, all for the purpose of adding credibility to the 'circular reporting' Joffe was carrying out with Sussman; (iv) withheld and/or concealed pertinent information, including, without limitation, that he was working with Clinton, the Clinton Campaign, the DNC, Perkins Coie, Sussmann, and Fusion GPS; that he was perpetrating a fraudulent scheme, along with his cohorts, in furtherance of the Enterprise; the true nature of his work with the RICO Defendants; the falsity of the purported link between Trump Tower and Alfa Bank,; and the existence of the Enterprise and its overarching conspiracy to mislead law enforcement for the purpose of creating a false narrative concerning the purported Trump-Russia collusion.

564.    Joffe's conduct in connection with his October 2, 2016 call with SA Grasso

corruptly obstructed, influenced, and impeded and/or constituted an attempt to obstruct, influence

or impede the due administration of justice, and/or one or more official proceedings, namely

investigations by the CIA, the FBI, Congress, the IG, and/or the DOJ and therefore constituted a

violation of 18 U.S.C. § 1512.

565.   On February 9, 2017, Sussmann met with CIA officials at a location outside of

Washington D.C., at which time he, among other things: (i) made false statements to CIA officials,

including that he was not representing a particular client; (ii) provided falsified, altered and/or

misleading records, including updated White Papers and multiple data files containing purported

DNS data, ranging from 2016 through early 2017, to CIA officials; (iii) withheld and/or concealed

pertinent information, including, without limitation, that he was acting on behalf of his clients,

Clinton, the Clinton Campaign, the DNC; that he was perpetrating fraudulent scheme, along with

his cohorts, in furtherance of the Enterprise; the falsified, spoofed and/or misleading nature of the

White Papers and the other documents that he was handing over; the true nature of his work with

the RICO Defendants; the falsity of the purported link between Trump Tower and Alfa Bank,; and

the existence of the Enterprise and its overarching conspiracy to mislead law enforcement for the

purpose of creating a false narrative concerning the purported Trump-Russia collusion.

566.   Sussmann's conduct in connection with his February 9, 2017 meeting corruptly

obstructed, influenced, and impeded and/or constituted an attempt to obstruct, influence or impede

the due administration of justice, and/or one or more official proceedings, namely, investigations

by the CIA, the FBI, Congress, the IG, and/or the DOJ and therefore constituted a violation of 18

U.S.C. § 1512.

567.   Sussmann's actions on February 9, 2017 corruptly obstructed, influenced, and

impeded and/or endeavored to obstruct, influence or impede the due administration of justice,

and/or one or more official proceedings, namely, ongoing investigations by the CIA, the FBI, the IG, and/or the DOJ and therefore constituted a violation of 18 U.S.C. § 1512.

568.    The other RICO Defendants, Clinton, Clinton Campaign, DNC, Perkins Coie, and Elias, had a meeting of the minds, common intent, were aware of, and conspired with Sussmann in the commission of the above-mentioned violations of 18 U.S.C. § 1512, including, without limitation, his conduct in connection with his meeting with the FBI on September 19, 2016 and his meeting with the CIA on February 9, 2017, and each of the other RICO Defendants committed an overt act in furtherance of said violation(s), and the RICO Defendants conspired to commit the above-named acts in furtherance of the overarching conspiracy to denigrate the Plaintiff and to derail his political career.

569.    Therefore, the actions of the RICO Defendants, Clinton, Clinton Campaign, DNC, Perkins Coie, and Elias, constituted a conspiracy to obstruct justice in violation of 18 U.S.C. § 1512(k).

570.    By virtue of the foregoing, Sussmann, and the other RICO Defendants, willfully, knowingly, deliberately and corruptly obstructed, influenced, and impeded and/or endeavored to obstruct, influence or impede the due administration of justice, and/or one or more official proceedings, including, but not limited to, Crossfire Hurricane and/or other investigations by the FBI, the CIA, the IG, and the DOJ.

571.    In addition, the RICO Defendants, led by Fusion GPS, produced the fraudulent Steele Dossier, which contained falsified, misleading and inaccurate reporting about the alleged Trump-Russia connection, and which the RICO Defendants orchestrated to be fed to law enforcement, including without limitation the FBI and the DOJ, for the purpose of corruptly obstructing, influenced, and impeding and/or attempting to obstruct, influence or impede one or

more official proceedings, including, but not limited to, Crossfire Hurricane, the full field investigation of the Trump-Alfa Bank allegations and/or other investigations by the FBI, the CIA, Congress, the IG, and the DOJ, in violation of 18 U.S.C. § 1512.

572.    In addition, the RICO Defendants conspired with Danchenko in connection with his conduct in making various false statements and misrepresentations to the FBI in violation of 18 U.S.C. § 1512, including, but not limited to:

     a.   On June 15, 2017, Danchenko stated, at the direction of and in coordination with the RICO Defendants, that he had not spoken with Dolan about any material contained in the Dossier. This statement was patently false, as Danchenko used the information provided by Dolan as a source for allegations made in the Dossier.

     b.   On March 16, 2017, May 18, 2017, October 24, 2017, and November 16, 2017, Danchenko, at the direction of and in coordination with the RICO Defendants, directly lied about the sources relied upon in compiling the Dossier.

573.    The RICO Defendants had a meeting of the minds, common intent, were aware of, and conspired with Orbis Ltd., Steele, and Danchenko in connection with the commission of the above-mentioned violations of 18 U.S.C. § 1512, including, without limitation, the scheme to manufacture and disseminate the Steele Dossier and Danchenko's various false statements to law enforcement, and each of the other RICO Defendants committed an overt act in furtherance of said violations, and the RICO Defendants conspired to commit the above-named acts in furtherance of the overarching conspiracy to denigrate the Plaintiff and to derail his political career.

574.    Therefore, the actions of the RICO Defendants constituted a conspiracy to obstruct justice in violation of 18 U.S.C. § 1512(k).

575.    Based on the foregoing, the RICO Defendants' actions constituted at least two

separate violations of 18 U.S.C. § 1512.

### Wire Fraud (18 U.S.C. § 1343)

576.    A scheme to defraud includes any plan to deprive a person of something of value by trick, deceit, chicanery or overreaching, including through affirmative misrepresentations, material omissions of fact, or any deceptive or dishonest behavior.

577.    As described herein, the Enterprise engaged in a calculated scheme to defraud the news media, law enforcement and counterintelligence officials for the purpose of proliferating a false narrative of collusion between Trump and Russia.

578.    Plaintiff was the intended target of the fraudulent scheme; in committing the acts of wire fraud described *infra*, the RICO Defendants sought to mislead others (journalists, reporters, law enforcement officials, etc.) as a means of depriving Plaintiff of tangible and/or intangible property, including, without limitation, causing loss of political and/or business reputation, loss of business opportunities, loss of competitive position, and/or loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations.

579.    As a direct and proximate result of the RICO Defendants' actions, Plaintiff did in fact suffer said injuries and/or deprivation of said property.

580.    As part of and in furtherance of the scheme, the RICO Defendants made repeated use of, or caused their agents, representatives, and/or subordinates to repeatedly make use of, the interstate wires to transmit various documents, communications, or payments, including with knowledge that the use of wires would follow in the ordinary course of business or where such use could be reasonably foreseen.

581.    Each separate use of the interstate wire facilities employed by the RICO Defendants was related, had similar intended purposes, involved similar participants and/or targets, utilized

similar techniques and methods of execution, and negatively affected the same victim – the Plaintiff.

582.    Many of the precise dates of the RICO Defendants' uses of the interstate wire facilities have been, and continue to be, concealed by the RICO Defendants and therefore are not knowable at the present time. Indeed, the Enterprise was intentionally devised in such a manner that would fraudulently conceal relevant communications made in furtherance of these types of predicate acts, including, but not limited to, the RICO Defendants' abuse of attorney-client privilege, the entering into of numerous confidentiality agreements amongst all parties, and the misreporting of the true nature of the parties' arrangement to federal authorities and agencies including the FEC. As such, knowledge of the Enterprise fraudulent acts is peculiarly within RICO Defendants' control.[278]

583.    In spite of his diligent efforts, Plaintiff does not, and cannot, know the full extent of the Enterprise's fraudulent scheme. At a minimum, however, the RICO Defendants' use of interstate wire facilities to perpetuate their unlawful scheme included the following:

    a.   May 14, 2016 e-mails between Fusion GPS (Fritsch and Berkowitz) and Franklin Foer, journalist for *Slate*, concerning the purported Russian connections of several of Trump's campaign associates, including Carter Page and Rick Burt.

    b.   June 27-28, 2016 e-mails from Fritsch to Foer attempting to insinuate that the Trump Campaign was colluding with Russia.

    c.   July 26, 2016 e-mails from Fritsch to Jay Solomon, journalist with the *Wall Street Journal*, discussing a senior Trump advisors' supposed meeting with former KGB official with close ties to Putin, among other false allegations of Russia collusion;

---

[278] *Cf. Hill v. Morehouse Med. Assocs., Inc.*, 2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003) ("Rule 9(b)'s heightened pleading standard may be applied less stringently. . . when specific factual information about . . . fraud is peculiarly within [a] defendant's knowledge or control" as long the pleading party accompanies its legal theory with factual allegations that make the "theoretically viable claim plausible."); *Omnipol, A.S. v. Worrell*, 421 F. Supp. 3d 1321, 1344 (M.D. Fla. 2019) ("Rule 9(b)'s pleading standard may be relaxed when evidence of the fraud is exclusively within the defendant's possession.").

including one e-mail when Fritsch wrote to Solomon that Carter Page "is neither confirming or denying". that he should "call adam Schiff. Or difi for that matter. I bet they are concerned about what page was doing other than giving a speech over 3 days in Moscow."

d.  August 16, 2016 wire payment from the DNC to Perkins Coie in the amount of $66,500, which was funneled through Perkins Coie to Fusion GPS in order to conceal the relationship between the DNC and Perkins Coie.

e.  From August 2016 through November 2016, wire payments totaling $777,907.97 paid by the DNC to Perkins Coie and subsequently disbursed by Perkins Coie to Fusion GPS.

f.  From August 2016 through November 2016, wire payments totaling $180,000 paid by the Clinton Campaign to Perkins Coie and subsequently disbursed by Perkins Coie to Fusion GPS.

g.  August 20, 2016 e-mails from Joffe to his researchers asking that the researchers spoof communications between e-mail address to make them "appear to communicate with each other"; to ensure that the fake "inference" was believable enough that "Hillary's opposition research and whatever professional gov[ernments] and investigative journalists are also digging [would] come up with the same things[.]"; and stating that "[b]eing able to provide evidence of *anything* that shows an attempt to behave badly in relation to this, the VIPs would be happy.  They're looking for a true story that could be used as the basis for closer examination."

h.  August 21, 2016 e-mail from Joffe to researchers urging them to push forward with their anti-Trump research, which he claimed would "give the base of a very useful narrative"; and admitting that the 'narrative' that they were trying to prove—a connection between Trump and Alfa Bank—was merely a "red herring" with no factual basis that should be "ignored."

i.  September 13, 2016 e-mail from Joffe to researchers, attaching falsified 'white papers' that he, Sussmann and Fusion GPS had been working, and stating: "Please read as if you had no prior knowledge or involvement, and you were handed this document as a security expert (NOT a DNS expert) and were asked: Is this plausible as an explanation?' NOT to be able to say that this is, without doubt, fact, but to merely be plausible.  Do NOT spend more than a short while on this (If you spend more than an hour you have failed the assignment).  Hopefully less.  :)."

j.  September 15, 2016 e-mail from Elias to Sullivan, Mook, Podesta and Palmieri with the subject line "Alfa Bank article."

k.  September 18, 2016 text message from Sussmann to Jim Baker to schedule meeting with FBI and falsely stating that Sussmann is "coming on my own – no on behalf of a client or company – want to help the Bureau."

l.  October 2, 2016 phone call from Joffe to FBI Special Agent Grasso wherein Joffe circumvented his FBI handler to provide "information relating to communications

between the Trump Campaign and some entity in Russia," including an IP address, as an anonymous source.

m. September 27, 2016 e-mail from Sussmann to Eric Litchtblau, reporter with *The New York Times*, disclosing an IP address and DNS data, purportedly connected to the Trump-Alfa Bank 'back channel.'

n. September 19, 2016, e-mail from Fusion GPS (Jake Berkowitz) to Matthew Mosk, *CBS News*, sending him details and information concerning the Russian Collusion story.

o. October 18, 2016 e-mail from Fritsch to Eric Lichtblau, *The New York Times*— who had also been in frequent communication with Sussmann, with the subject regarding Alfa and Trump—discussing Donald J. Trump and the Alfa Bank.

p. October 18, 2016 e-mails from Fritsch to Mark Hosenball of *Reuters*, stating, among other things, "meantime, do the f-cking alfa bank secret comms story. It is hugely important. Forget the WikiLeaks sideshow".

q. October 2016 phone call between Mook and Clinton, when Clinton authorizes Mook to release the Trump-Alfa Bank allegations—which she knew to be false and defamatory—to push it to the media, including to *Slate*.

r. October 2016 e-mail communication from Clinton Campaign staffer to Franklin Foer with Alfa Bank information and directing the release of a *Slate* article, as expressly authorized by top ranking officials of the Clinton Campaign, including Clinton, Mook, Sullivan and Podesta, as well as Perkins Coie, and Elias, Sussmann.

s. October 30, 2016 forwarded tweet from Fritsch to Franklin Foer, *Slate*, about Comey possessing explosive information about Trump's ties to Russia and stating "time to hurry."

t. October 30, 2016 e-mail from Fritsch to Michael Isikoff, *Yahoo News* stating *"*Big story on the trump Alfa server moving early pm. OTR. [United States Government] absolutely investigating. Campaign will light it up I imagine."

u. October 31, 2016 electronic campaign statement from Jake Sullivan stating: "[T]his could be the most direct link yet between Donald Trump and Moscow. Computer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank. This secret hotline may be the key to unlocking the mystery of Trump's ties to Russia. It certainly seems the Trump Organization felt it had something to hide, given that it apparently took steps to conceal the link when it was discovered by journalists. This line of communication may help explain Trump's bizarre adoration of Vladimir Putin and endorsement of so many pro-Kremlin positions throughout this campaign. It raises even more troubling questions in light of Russia's masterminding of hacking efforts that are clearly intended to hurt Hillary Clinton's campaign. We can only assume that federal authorities will now explore this direct connection between Trump and Russia as part of their existing probe into Russia's meddling in our elections."

v.   October 31, 2016 tweet from Hillary Clinton re-publishing Sullivan's above statement and adding: "Computer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank."

w.   October 31, 2016 tweet from Hillary Clinton stating "time for Trump to answer serious questions about his ties to Russia" and including a graphic stating; "1. Donald Trump has a secret server.  (Yes, Donald Trump.) 2.  It was set up to communicate privately with a Putin-tied Russian bank called Alfa Bank.  3.  When a reporter asked about it, they shut it down.  4.  One week later, they created a new server with a different name for the same purpose."

x.   October 31, 2016 Skype call between Steele, Simpson and David Corn, *Mother Jones*, providing Trump-Alfa Bank info to Corn; per Steele, the purpose of the meeting was that "he "wanted [Corn] to publish that the US Government was investigating Trump."

y.   October 11, 2016 television statements from Podesta stating: "I've been involved in politics for nearly five decades.  This definitely is the first campaign that I've been involved in which I've had to tangle with Russian intelligence agencies who seem to be doing everything they can on behalf of our opponent."; and "I think it is a reasonable assumption to, or at least a reasonable conclusion, that Mr. Stone had advance warning, and the Trump campaign had advance warning about what Assange was going to do."

z.   July 18, 2017 e-mail from Joffe to Neustar employee, Steve DeJong, stating "I have 4 jobs that look specifically for [T]rump data" and included a list four Trump and Alfa Bank related queries."

aa.   October 2017 tweet from Podesta accusing Donald J. Trump of "running a "big lie campaign" centered on the investigation into Russian meddling in the U.S. election."

bb.   April 16, 2018 tweet from Reines stating "yes collusion, yes collusion, yes collusion" in response to an article titled: 'Breaking: Trump puts the brake on new Russian sanctions, reversing Haley's announcement."

cc.   October 2018 e-mails and/or other form of electronic submissions from Joffe to Daniel Jones with data for 37 million DNS lookups.

dd.   May 10, 2019 television appearance on MSNBC by (former DNC chairperson) Wasserman-Schultz stating there are "clear indications" that Donald J. Trump colluded with Russia and further stating: "You know, what's so disturbing is that Donald Trump is so lacking in confidence about his ability to actually get elected without the help of a foreign power, and particularly a foreign adversary, that they will go to any lengths and that he will instruct and allow his colleagues and allies to go to any lengths to be able to secure his success in an election."

ee.   October 2019 podcast interview on "CampaignHQ" by Clinton, stating: ""I don't know what Putin has on him, whether it's both personal and financial. I assume it is."

ff.  June 16, 2021 television appearance on MSNBC's *Morning Joe* show stating: "We don't have Trump as spokesperson for Putin, anymore."; and "[a]fter disastrous Trump presidency, in which he gave Putin a green light to do whatever he wanted to do, once Trump was elected, of course..."

gg.  February 16, 2022 tweet from Clinton stating: "Trump & Fox are desperately spinning up a fake scandal to distract from his real ones.  So it's a day that ends in Y.  The more his misdeeds are exposed, the more they lie.  For those interested in reality, here's a good debunking of their latest nonsense."

584.    Each of the foregoing transmissions listed above constituted the transmittal by means of wire communication in interstate commerce of signals, sounds or writings for the purpose of executing or attempting to execute the predicate acts or the scheme to defraud described herein.

585.    In sending the foregoing transmissions, the RICO Defendants sought to deceive and defraud the respective recipients, including journalists, reporters, media contacts, law enforcement officials, and counterintelligence officials, as applicable, and intended for the respective recipients to rely on their false, misleading and/or fraudulent misrepresentations.

586.    With regard to the false and fraudulent transmissions sent to journalists, reporters and/or media contacts, the RICO Defendants intended to deceive the journalists, reporters and/or media contacts so that they would publish false, defamatory, and inaccurate articles, stories, and/or news pieces about Plaintiff and his alleged collusion with Russia; the above-mentioned journalists, reporters, and media contacts did in fact rely upon the RICO Defendants' fraudulent misrepresentations in publishing false, defamatory, and inaccurate articles, stories, and/or news pieces about Plaintiff and his alleged collusion with Russia.

587.    With regard to the false and fraudulent transmissions sent to law enforcement officials and/or counterintelligence officials, the RICO Defendants intended to deceive the law enforcement officials and/or counterintelligence officials to provoke them into launching one or more public investigation(s) into Plaintiff and his alleged collusion with Russia; the above-

mentioned law enforcement officials and/or counterintelligence officials did in fact rely upon the RICO Defendants' fraudulent misrepresentations in launching one or more public investigation(s) into Plaintiff and his alleged collusion with Russia, including the FBI's Crossfire Hurricane investigation, the FBI's full field investigation into the allegations contained in the Steele Dossier, the FBI's full field investigation into the allegations regarding the Trump-Alfa Bank connection, the CIA's investigation relating to Trump-Russia allegations, congressional investigations, and the Special Counsel investigations.

588.     Plaintiff was injured as a direct and proximate result of the Enterprise's scheme to defraud and by the reliance of the journalists, reporters, media contacts, law enforcement officials and/or counterintelligence officials on the RICO Defendants' fraudulent misrepresentation.

### Timeliness of Claims

589.     Despite his exercise of reasonable diligence, Plaintiff was unable to discover his injury and/or the fact that it was caused by a RICO violation(s) until December 9, 2019, at the earliest, upon the release of the Office of the Inspector General's report entitled *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigations* on December 9, 2019, which exposed, in part, the RICO Defendants' role in defrauding the media and intentionally misleading the FBI into commencing the Crossfire Hurricane investigation.

590.     In addition, to the extent necessary, suspension, tolling and/or extension of the applicable statute of limitations is warranted for the reasons set forth below, without limitation.

### *Fraudulent Concealment*

591.     The RICO Defendants actively and fraudulently concealed the existence of the Enterprise and the nature of their illicit actions by organizing the Enterprise in a such a manner that would conceal its existence and the nature of the RICO Defendants' illicit conduct.

592.    The RICO Defendants intentionally exploited attorney-client privilege as a means of obscuring their activities and rendering all of their communications confidential and privileged.

593.    According to Elias, Fusion GPS was intentionally walled-off from the Clinton Campaign and the DNC for "legal reasons: If Fusion's communications were with a lawyer, they could be considered privileged and kept confidential."[279]

594.    Given Perkins Coie's role as the "gatekeeper" amongst the Clinton Campaign, the DNC, Fusion GPS, and Joffe, the RICO Defendants have attempted to construct an organizational framework for the Enterprise that protects all of their communications under the pretense of attorney-client privilege.[280]

595.    Indeed, the RICO Defendants have consistently argued that any and all of their communications are privileged, even those between parties that are seemingly unrelated and not in privity.[281]

596.    To further conceal the existence of the Enterprise, the Clinton Campaign and the DNC funneled payments to Fusion GPS, through Perkins Coie, for the purpose of intentionally disguising the relationship between the RICO Defendants.

   a.    For example, on August 16, 2016, the DNC made a $66,500 payment to Perkins Coie; the DNC has acknowledged that this was the first of many such payments that were paid by the DNC and the Clinton Campaign, through Perkins Coie, to

---

[279] *Id.*
[280] Elias Testimony at 48 ("I was the sole. I was the – I was the gatekeeper. But there were – but there were instances in which there were some interactions otherwise. But that – but I was the gatekeeper."); Sullivan Testimony at 56 ("Q: Were you in meeting in which Mr. Elias briefed you on information that was of an opposition research nature? A: I was.").
[281] *See generally*, *U.S. v. Sussmann*.

139

Fusion GPS.[282]

   b.  Despite being earmarked as payments for Fusion GPS, the Clinton Campaign and the DNC reported the payments as being for "legal and compliance consulting."[283]

      i.  The FEC found "probable cause to believe that the Clinton Campaign and the DNC "violated 52 U.S.C. § 30104(b)(5)(A) and 11 C.F.R. § 104.3(b)(4)(i) by misreporting the purpose" of the disbursements to Fusion GPS.[284]

      ii.  On February 22, 2022, the Clinton Campaign and the DNC respectively entered into Conciliation Agreements with the FEC to resolve these violations.[285]

      iii.  As set forth in its Conciliation Agreement, the Clinton Campaign agreed to pay a civil penalty to the FEC in the amount of $8,000 pursuant to 52 U.S.C. 30109(a)(5)(A) and to not violate U.S.C. § 30104(b)(5)(A) or 11 C.F.R. § 104.3(b)(4)(i) in the future; similarly, the DNC agreed to pay a civil penalty to the FEC in the amount of $105,000 pursuant to 52 U.S.C. 30109(a)(5)(A) and to not violate U.S.C. § 30104(b)(5)(A) or 11 C.F.R. § 104.3(b)(4)(i) in the future.[286]

597.   Elias has even admitted that the Clinton Campaign, the DNC and Perkins Coie

---

[282] MUR 7291 DNC Resp. at 2 n.2; 8.

[283] Second General Counsel's Report at 2-3, MUR 7291 & 7449, *In the Matter of DNC Services Corp./DNC, et al.* (hereinafter, "FEC Second Gen. Counsel's Rpt.").

[284] *See generally* Clinton Campaign Conciliation Agreement and DNC Conciliation Agreement.

[285] *See generally* Clinton Campaign Conciliation Agreement and DNC Conciliation Agreement.

[286] *Id.*

intentionally sought to conceal their relationship with Fusion GPS hidden from the public.[287]

598.    In addition, the RICO Defendants, on numerous occasions, made false statements to law enforcement officials for the purpose of covering-up their illicit actions.

599.    For example, on September 18, 2016 (via text) and September 19, 2016 (in-person), Sussmann told FBI General Counsel, Jim Baker, that his meeting with Baker was not on behalf of any client. As a result of that lie, there was a "close hold" placed on Sussmann as a source, and his identity was kept confidential from all except a chosen few within the FBI. Had Sussmann been honest about appearing on behalf of any client, his identity would not have been protected and his actions would have been discoverable at a much earlier time.[288]

600.    Due to his fraudulent misrepresentation, it was not publicly known that Sussmann went to the FBI until the filing of the Sussmann Indictment on September 16, 2021. Even several of the FBI agents who testified at his trial stated that they did not know Sussmann's identity until after the indictment was filed.

601.    Similarly, when Joffe fed false information to Special Agent Grasso ("SA Grasso") with the FBI, he directed SA Grasso "not to disclose his identity to other people in the Bureau."[289]

602.    Joffe also intentionally neglected to disclose to SA Grasso that he was working in coordination with the Clinton Campaign, the DNC, and Perkins Coie. [290]

603.    Due to Joffe's misrepresentation and omission, SA Grasso agreed to keep Joffe's identity secret.

---

[287] Elias Testimony at 643:21-24 ("Q: [Y]ou didn't want the public to know that Fusion GPS was working with the campaign. Is that fair? A: Sure.").
[288] *See generally*, Gaynor Testimony.
[289] *Id.* at tr. 2167:19-23.
[290] *Id.* at tr. 2171:9-15.

604.    In addition, many of the RICO Defendants have made false or misleading statements, often times under oath, in the course of congressional investigations, law enforcement and/or counter-intelligence investigations, and civil or criminal proceedings, all for the purpose of concealing their wrongdoing.

605.    Finally, given the subversive and fraudulent nature of the RICO Defendants' actions—including widespread fraud, obstruction of justice, and cyber-hacking—the Enterprise's conduct is self-concealing by nature and not susceptible to discovery by Plaintiff or other third parties.

606.    In spite of the same, Plaintiff made significant efforts to investigate the Enterprise's conduct and exercised due diligence to the extent permissible by law.

607.    For instance, among other things, Plaintiff has frequently raised public awareness of the Defendants' illicit scheme and has publicly called for their misconduct to be investigated by the proper authorities.

***Statutory Tolling***

608.    In *Agency Holding Corp. v. Malley-Duff & Assoc.*, 483 U.S. 143 (1987), the Supreme Court noted that "even a cursory comparison of the two statutes reveals that the civil action provision of RICO was patterned after the Clayton Act" and affirmed that the "4-year statute of limitations for Clayton Act actions … [is] the most appropriate limitations period for RICO actions."[291]

609.    When a statute of limitations is adopted in such a manner, the tolling and suspension provisions which are part of that statute must likewise be applied. Indeed, the Supreme Court has

---

[291] *Agency Holding Corp. v. Malley-Duff & Assoc.*, 483 U.S. 143, 156 (1987); *see also* 15 U.S.C. § 15.

expressly held that "[a]ny period of limitation . . . is understood fully only in the context of the various circumstances that suspend it from running against a particular cause of action."[292]

610.   Accordingly, given the Supreme Court's adoption of the Clayton Act's four-year statute of limitations for civil RICO claims, the tolling and suspension provision of the Clayton Act, set forth in 15 U.S.C. § 16(i), likewise applies to civil RICO claims.[293]

611.   The following proceedings, without limitation, qualify as "civil or criminal proceedings [] instituted by the United States," as defined in 15 U.S.C. § 16(i), applicable to the instant action:

    a.   *In the Matter of DNC Services Corp./Democratic National Committee and William Q. Derrough in his official capacity as treasurer; Hillary for America and Elizabeth Jones in her official capacity as treasurer; Perkins Coie LLP; Marc Elias; Fusion GPS; Christopher Steele*, Federal Election Commission, MURs 7291 and 7449 (July 23, 2019);

    b.   Investigation of Special Counsel John Durham, pursuant to 28 U.S.C. §§ 509,5 10, and 515, Office of the Attorney General Order No. 4878-2020 (December 19, 2020);

    c.   *United States v. Kevin Clinesmith*, case no. 1:20-cr-00165-JEB, United States District Court, District of Columbia (August 14, 2020);

    d.   *United States v. Michael Sussmann*, case no. 1:21-cr-00582-CRC, United States District Court, District of Columbia (September 16, 2021);

    e.   *United States v. Igor Danchenko*, case no. 1:21-cr-00245-AJT, United States District Court, Eastern District of Virginia (Nov. 3, 2021);

612.   As to each of the above "civil or criminal proceedings," the running of the

---

[292] *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 463 (1975)*; see also West v. Conrail,* 481 U.S. 35 (1987); *Bd. of Regents v. Tomanio,* 446 U.S. 478 (1980).

[293] *See, e.g., Pension Fund Mid Jersey Trucking Industry v. Omni Funding*, 687 F.Supp. 962, 965 (D.N.J., June 28, 1988) ("I conclude that the tolling provisions of the Clayton Act are applicable under RICO."); *Gianelli v. Schoenfeld*, 2021 WL 4690724, at *6 (E.D. Cal. Oct. 7, 2021) ("The court is willing to assume . . . that the Clayton Act's tolling provision applies to RICO claims."); *Pres. Petrified Forrest v. Renzi*, 2014 WL 530574, at *3-4 (D. Ariz. Feb. 12, 2013) ("

applicable statute of limitations was suspended as of the commencement of said proceeding and remained suspended "during the pendency thereof and for one year after." *Id.*

### Damages

613. The Plaintiff has been injured in his business and property as a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c).

614. As a direct and proximate result of the RICO Defendants' racketeering activity described herein, numerous unfounded investigations, including the FBI's Crossfire Hurricane investigation and its full field Alfa Bank investigation, numerous congressional investigations, and Special Counsel investigations were commenced; countless false, damaging, and defamatory articles and media stories of all types (televisions, radio, internet, etc.) were published, resulting in the widespread dissemination of false, damaging and defamatory accusations of Plaintiff's purported collusion with Russia which became years-long headline story that irreparable, unjustly and permanently tarnished Plaintiff's political reputation.

615. As a result of the foregoing, Plaintiff has been injured in his business and property and has incurred and will continue to incur, significant damages, losses, and deprivation of tangible and intangible property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations, and has suffered actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.

616. Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in

connection with his effort to defend against the RICO Defendants' actions and the various federal investigations and/or official proceedings which arose therefrom, in addition to the loss of existing and future business opportunities for himself, the Trump Campaign, and the Trump Organization LLC.

617.    All of these injuries were sustained within, and were the result of conduct occurring within, the United States.

618.    The Plaintiff is entitled to recover, pursuant to Title 18 United States Code §1964(c), treble damages in the amount to be determined by offer of proof at time of trial.  The Plaintiff is also entitled to recover attorneys' fees and costs of this litigation, as well as damages arising from lost profits and/or lost business opportunities attributable to the activities engaged in by defendants committed in furtherance of the Enterprise.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Hillary Clinton, HFACC, Inc., the Democratic National Committee, Perkins Coie, LLP, Michael Sussmann, Marc Elias, Fusion GPS, and Rodney Joffe for damages, including compensatory and treble damages, costs, attorneys' fees, and such further and other relief as this honorable Court may deem just and proper.

### Count II
### RICO Conspiracy
### (18 U.S.C. § 1962(D))
*(Against Clinton, Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta, Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele, Danchenko, Neustar, Inc., Neustar Security Services, and Joffe)*

619.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

620.     Defendants, Clinton, the Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta, Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele, Danchenko, Neustar, Inc., Neustar Security Services, and Joffe (the "RICO Conspiracy Defendants"), are all "persons" within the meaning of 18 U.S.C. § 1961(3).

621.     Each of the RICO Conspiracy Defendants agreed to accomplish the unlawful plan of the Enterprise through a course of racketeering activity, including, but not limited to, theft of trade secrets (18 U.S.C. § 1832), obstruction of justice (18 U.S.C. § 1512), and wire fraud (18 U.S.C. § 1343).

622.     Each of the RICO Conspiracy Defendants agreed to overall objective of the Enterprise, namely to corruptly and wrongfully harm the Plaintiff's political reputation, damage his electability for the 2016 Presidential Election and subsequent elections, impede his ability to effectively govern, and otherwise sabotaging his political career through deceptive, criminal and fraudulent means, including, but not limited to, falsely implicating the Plaintiff, the Trump Campaign, and the Trump Administration as colluding with Russia. In the alternative, each of the RICO Conspiracy Defendants agreed with at least one of the other RICO Conspiracy Defendants to commit two predicate acts in furtherance of the Enterprise's conspiracy.

623.     Each of the RICO Conspiracy Defendants engaged in all, or significant portions of, the racketeering acts alleged in this Complaint, possessed knowledge of at least the general contours of the conspiracy, and acted with the intent to further and/or facilitate the conduct of the Enterprise.

624.     Each Defendant knew about and agreed to facilitate the Enterprise by way of the acts in which he or she engaged as alleged herein and/or through explicit agreement amongst some or all of the RICO Conspiracy Defendants.

146

625.     Further evidence of an agreement among the Defendants is particularly within the knowledge and control of each of the RICO Conspiracy Defendants.

626.     Each of the RICO Conspiracy Defendants was aware of the existence of the Enterprise; agreed to the overall objective of the conspiracy; and knowingly furthered the conduct of the Enterprise, including the predicate acts of theft of trade secrets (18 U.S.C. § 1832), obstruction of justice (18 U.S.C. § 1512), and wire fraud (18 U.S.C. § 1343), and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern racketeering activity.

627.     Each of the RICO Conspiracy Defendants knew about and agreed to facilitate the Enterprise's scheme to harm the Plaintiff's political career, tarnish his electability, and undermine his ability to effectively govern as the President of the United States through the wrongful acts identified herein.  It was part of the conspiracy that the RICO Conspiracy Defendants would commit a pattern of racketeering activity in the conduct of the affairs of the enterprise, including the acts of racketeering as set forth herein.

628.     The RICO Conspiracy Defendants' conduct constitutes conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

629.     No RICO Conspiracy Defendant has withdrawn, or otherwise dissociated itself, from the conspiracy at issue or the other conspirators.

630.     As a direct and proximate result of the RICO Conspiracy Defendants' racketeering activity described herein, numerous unfounded investigations, including the FBI's Crossfire Hurricane investigation and its full field Alfa Bank investigation, numerous congressional investigations, and Special Counsel investigations were commenced; countless false, damaging, and defamatory articles and media stories of all types (televisions, radio, internet, etc.) were

published, resulting in the widespread dissemination of false, damaging and defamatory accusations of Plaintiff's purported collusion with Russia which became years-long headline story that irreparable, unjustly and permanently tarnished Plaintiff's political reputation.

631.    As a result of the foregoing, Plaintiff has been injured in his business and property and has incurred and will continue to incur, significant damages, losses, and deprivation of tangible and intangible property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations, and has suffered actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.

632.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the RICO Conspiracy Defendants' actions and the various federal investigations and/or official proceedings which arose therefrom, in addition to the loss of existing and future business opportunities for himself, the Trump Campaign, and the Trump Organization LLC.

633.    All of these injuries were sustained within, and were the result of conduct occurring within, the United States.  The Plaintiff is entitled to recover, pursuant to Title 18 United States Code §1964(c), treble damages in the amount to be determined by offer of proof at time of trial. The Plaintiff is also entitled to recover attorneys' fees and costs of this litigation, as well as damages arising from lost profits and/or lost business opportunities attributable to the activities engaged in by defendants committed in furtherance of the Enterprise.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Michael Sussmann, Perkins Coie, LLP, Hillary R. Clinton, HFACC, Inc., the Democratic National Committee, the DNC Services Corporation, Charles Halliday Dolan, Jr., Jake Sullivan, John Podesta, Perkins Coie, LLP, Marc Elias, Fusion GPS, Glenn Simpson, Peter Fritsch, Nellie Ohr, Bruce Ohr, Orbis Business Intelligence, Ltd., Christopher Steele, Igor Danchenko, Neustar, Inc., Rodney Joffe, Robert Mook, Philippe Reines, James Comey, Peter Strzok, Lisa Page, Kevin Clinesmith, Andrew McCabe, John Does 1 through 10, said names being fictious and unknown persons, and ABC Corporations 1 through 10, said names being fictitious and unknown entities, for damages, including compensatory and treble damages, costs, attorneys' fees, and such further and other relief as this Court may deem just and proper.

### Count III
### Injurious Falsehood
*(Against Clinton, Sullivan, Schultz, Schiff, Danchenko, Sussmann, and Steele)*

634. The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

635. As detailed at length herein, on multiple occasions the Defendants, Clinton, Joffe, Sussmann, Steele, Sullivan, Schultz, and Schiff made, disseminated and/or published false and damaging statements concerning the Plaintiff, specifically that he was colluding with Russia and its President Vladimir Putin.

636. At all relevant times, the Defendants acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia; despite said knowledge, the Defendants conspired to disseminate false information and spread a false narrative in an attempt to ruin the

Plaintiff.

637.     These  individual  Defendants,  Clinton,  Sullivan,  Schultz,  Schiff,  Danchenko,

Sussmann, and Steele, made, disseminated, and/or published the false and damaging statements to

third parties, including, but not limited to, government authorities, media outlets, and the general

public.

638.     Clinton, Sullivan, Schultz, and Schiff among other things, falsely and deliberately

published false and damaging statements about the Plaintiff and his purported ties with Russia and

promoted their false allegations through the media.

639.     In turn, the media heavily reported their allegations story as true, making it appear

as if the Plaintiff had colluded with the Russian government, despite the falsity of their claims.

640.     Sullivan, among other things, issued a press release on October 31, 2016, on behalf

of Clinton and the Clinton Campaign, in made false and damaging claims about the Plaintiff:

> [T]his could be the most direct link yet between Donald Trump and
> Moscow.  Computer scientists have apparently uncovered a covert
> server linking the Trump Organization to a Russian-based bank.
> This secret hotline may be the key to unlocking the mystery of
> Trump's ties to Russia.  It certainly seems the Trump Organization
> felt it had something to hide, given that it apparently took steps to
> conceal the link when it was discovered by journalists.  This line of
> communication may help explain Trump's bizarre adoration of
> Vladimir Putin and endorsement of so many pro-Kremlin positions
> throughout this campaign.  It raises even more troubling questions
> in light of Russia's masterminding of hacking efforts that are clearly
> intended to hurt Hillary Clinton's campaign.  We can only assume
> that federal authorities will now explore this direct connection
> between Trump and Russia as part of their existing probe into
> Russia's meddling in our elections.

641.     Clinton, personally, also published the same false and damaging statements to the

public, through her Twitter account on October 31, 2016, and to media outlets.

642.     Clinton continues to publish the false and damaging allegations to media outlets.

643.    For example, on June 16, 2021, Hillary Clinton appeared on the Morning Joe show on MSNBC and stated to the general public of the State of Florida, and the rest of the United States: "We don't have Trump as spokesperson for Putin, anymore."  "After disastrous Trump presidency, in which he gave Putin a green light to do whatever he wanted to do, once Trump was elected, of course."

644.    Schiff, as a senior congressman, has been the main presenter of the false information to the American public, through his numerous guest interviews with national television news stations.   As such, Schiff has published the same false and damaging statements to the public, through various interviews on national television, and other news outlets, from 2016 till 2021.  For Example, on March 24, 2019, on ABC's This Week" with George Stephanopoulos, Schiff called it congresses duty to expose Trumps "duty to expose Trump's relationship with Russia.  Stating, "there was significant evidence of Trump collusion."

645.    On May 9, 2020, Schiff claimed on CNN's State of the Union, there was "more than circumstantial evidence" that Donald Trump's 2016 presidential campaign colluded with Russia.  "You can see evidence in plain sight on the issue of collusion, pretty compelling evidence,"

646.    On April 16, 2021, Schiff on MSNBC "the last word" with Lawrence O'Donnell, continued to publish the false statements, and maintaining the false narrative that Donald J. Trump and his administration had colluded with Russian, and went even further stating that it continued to do so in the 2020 election.  Stating that the "Trump campaign was passing strategic polling and strategic information to a Russian intelligence agent."     "Not just Russian intelligence, but the same ones that tried to help Trump win the 2016 election, what most people would call collusion, I don't know how the no collusion crowd explains that."

647.    Schultz has also published numerous false and damaging statements about the Plaintiff and his alleged collusion with Russia.

648.    For example, she told CNN's Erin Burnett on "OutFront", that reported contacts between President Donald J. Trump's campaign aides and Russia amounted to collusion.   Schultz told the reporter, "[W]ith every passing day, it gets more and more disturbing, and more and more evidence that there was collusion."  "Donald Trump should be the first person asking for one, but since I think he likely was part of it, it's not surprising that hasn't happened."

649.    Danchenko, among other things, submitted falsified evidence to the FBI and published false and damaging statements orally to the FBI.

650.    Sussmann, among other things, submitted falsified evidence to the FBI, DOJ and CIA and published false and damaging statements orally to the FBI.

651.    Steele, among other things knowingly maintained and published to third parties, including, but not limited to the FBI, the false series of reports referred to as the "Steele Dossier."

652.    The individual Defendants knew that the statements were false at the time they made then and also knew or should have known that said statements would damage the Plaintiff's lawful property interests.

653.    As a direct and proximate result of the individual Defendants' unlawful conduct, the Plaintiff has suffered and will continue to suffer economic losses and irreparable injuries.

654.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.  In addition, Plaintiff has been injured in his business and property and has incurred and will continue to incur, significant damages, losses, and deprivation of tangible and intangible

property, including but not limited to loss of political and/or business reputation, loss of business

opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade

secrets, and/or loss of contractual relations.

655.     Among other things, the Plaintiff was forced to incur expenses in an amount to be

determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and

continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in

connection with his effort to defend against the Defendants' false accusations and the various

federal investigations and/or official proceedings arose therefrom.

656.     The Plaintiff does not claim nor seek any compensation for damage to his

reputation, but rather, he seeks damages for the cost of dealing with the legal issues and political

issues, which he was required to spend to redress the injurious falsities which were propounded by

the Defendants, and all other losses incurred due to the tortious conduct of the Defendants.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter

a Judgment for Donald J. Trump and against the Defendants, Hillary Clinton, Jake Sullivan,

Debbie Wasserman Schultz, Adam Schiff, Michael Sussmann, Christopher Steele, and Igor

Danchenko, for damages, including Punitive damages, costs, and such further and other relief as

this Court may deem just and proper.

## <u>Count IV</u>
### Conspiracy to Commit Injurious Falsehood
*(Against Clinton, Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta,
Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele,
Danchenko, Neustar, Inc., Neustar Security Services, and Joffe)*

657.     The Plaintiff avers the allegations contained in the preceding paragraphs and

incorporates them in this count, as if set forth at length herein.

658.     The Defendants had a meeting of minds to harm the Plaintiff by making false and

damaging statements regarding the Plaintiff's alleged collusion with the Russian government, and its President Vladimir Putin, and then disseminating the false and damaging statements by publishing them to third parties, including, but not limited to, government authorities, media outlets, and the general public, in an attempt to cause harm to the Plaintiff.

659.    As such, the Defendants conspired to commit unlawful acts by unlawful means. They had different roles, where some actors, such as Danchenko, Dolan, Steele, and Joffe, were involved in the fabrication of supposed facts to put into the Dossier, and later helped to foist it upon the FBI, while others were more involved with the publishing of the allegations to the media and general public, and still others were more involved in feeding false information federal authorities.

660.    Each of the Defendants executed one or more acts in furtherance of the conspiracy, as detailed in this Complaint, and committed overt acts to harm the Plaintiff in furtherance of the conspiracy.

661.    In this regard, the Defendants conspired to create a false narrative that that the Plaintiff was colluding with Russia through their dissemination of false and damaging statements.

662.    At all relevant times, the Defendants acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia; despite said knowledge, the Defendants conspired to disseminate false information and spread a false narrative in an attempt to ruin the Plaintiff.

663.    Despite this knowledge, that no evidence existed of the collusion, the Defendants further conspired to publish the false information to third parties, such as the FBI, other governmental agencies, the news-media outlets, and the U.S. population, in an attempt to smear

the Plaintiff's to harm his chance of being elected and properly administrating his office of President of the United States.

664.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.  In addition, Plaintiff has been injured in his business and property and has incurred and will continue to incur, significant damages, losses, and deprivation of tangible and intangible property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations.

665.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

666.    The Plaintiff does not claim nor seek any compensation for damage to his reputation, but rather, he seeks damages for the cost of dealing with the legal issues and political issues, which he was required to spend to redress the injurious falsities which were propounded by the Defendants, and all other losses incurred due to the tortious conduct of the Defendants.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Michael Sussmann, Perkins Coie, LLP, Hillary R.  Clinton, HFACC, Inc., the Democratic National Committee, the DNC Services

Corporation, Debbie Wasserman Schultz, Charles Halliday Dolan, Jr., Jake Sullivan, John Podesta, Perkins Coie, LLP, Marc Elias, Fusion GPS, Glenn Simpson, Peter Fritsch, Bruce Ohr, Nellie Ohr, Orbis Business Intelligence, Ltd., Christopher Steele, Igor Danchenko, Neustar, Inc., and/or Neustar Security Services, Rodney Joffe, Robert Mook, Philippe Reines, John Does 1 through 10, said names being fictious and unknown persons, and ABC Corporations 1 through 10, said names being fictitious and unknown entities, for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### Count V
### Malicious Prosecution
*(Against Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele, Joffe, Comey, Rosenstein, McCabe, Strzok, Page, and Clinesmith)*

667.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

668.    The Defendants, Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele and Joffe, willfully and knowingly misled FBI and DOJ officials with the intention of inducing the FBI to commence an investigation of the Plaintiff and his alleged collusion with Russia.

669.    The Defendants, Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele and Joffe, concocted a scheme to denigrate the Plaintiff and by so doing, to cause harm to his campaign, and, in the course of carrying out this scheme, conspired to feed false and/or misleading information to the FBI and the DOJ, which prompted the FBI to commence an investigation.

670.    The Defendants, Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele and Joffe, were the legal cause of the commencement of the FBI's investigation into the Plaintiff in that they, among other things, engaged in efforts to falsify information, documents, and/or evidence, such as the Dossier and the white papers, provided said false information, documents

and/or evidence to the FBI and the DOJ, made false and/or misleading statements to the FBI and
the DOJ concerning, among other things, the facts and circumstances of the development of the
Dossier and the white papers, the credibility of their evidence and sources, the individuals and
entities behind the Dossier and white papers, and other facts relevant to the Defendants' plot to
falsely implicate the Plaintiff.

671.     As a direct and proximate results of the Defendants' efforts, on July 31, 2016, the
FBI launched a Foreign Agents Registration Act ("FARA") investigation, known as Crossfire
Hurricane, to determine whether individual(s) associated with the Plaintiff and his campaign were
witting of and/or coordinating activities with the Russian government.

672.     In acting to bring forth the false information to commence the investigation by the
FBI for the express purpose of harming the Plaintiff, the Defendants acted with malicious intent.

673.     The Defendants, Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele
and Joffe, acted with actual malice, as they knew that the Plaintiff was not colluding with Russia
or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded
with Russia; despite said knowledge, the Defendants conspired to disseminate false information
and spread a false narrative in an attempt to ruin the Plaintiff.

674.     Subsequent to the commencement of Crossfire Hurricane, additional Defendants
who were well-position within the FBI, Comey, McCabe, Strzok, Page, and Clinesmith, were the
legal cause of the continuation of the FBI's investigation and the commencement of extrajudicial
FISA surveillance of the Plaintiff and his administration in that they, among other things, engaged
in efforts to falsify evidence, information and/or documents, such as an e-mail correspondence
regarding Carter Page that was submitted in furtherance of FISA application(s); relied upon
knowingly false information including, without limitation, the White Papers and the Steele

Dossier, which the Defendants were aware was not credible and was funded by the Clinton

Campaign and the DNC; withheld pertinent and material information from FISA applications and

in submissions, communications, and correspondences with judges, law enforcement officials,

supervisors, superiors, and other government officials; made false and/or misleading statements to

the FISC, Congress, and/or the Plaintiff, who at the time was sitting President of the United States;

and otherwise misled as to the credibility of the evidence supporting their investigation, the

individuals and entities behind the Dossier and white papers, and other facts relevant to the

evidentiary basis for Crossfire Hurricane, the FISA applications, the Mueller investigation, and

other related investigations regarding the alleged Trump-Russia connection.

675.   In acting to falsely maintain and continue the investigation(s) by the FBI and the

DOJ for the express purpose of harming the Plaintiff, the Defendants, Comey, McCabe, Strzok,

Page, and Clinesmith, acted with malicious intent.

676.   The Defendants, Comey, McCabe, Rosenstein, Strzok, Page, and Clinesmith, acted

with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum,

acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia, and

they knew that Crossfire Hurricane lacked a legitimate evidentiary basis and was based on a false

and contrived premise; despite said knowledge, the Defendants conspired to continue the baseless

investigations, to obtain FISA warrants in excess of their lawful authority, and to proliferate the

spread of the Defendants' false narrative.

677.   As a direct and proximate result of the Defendants' actions, the Plaintiff has

suffered, and continues to suffer, significant damages, including but not limited to, actual,

compensatory, special, incidental, and consequential damages in addition to costs of defense and

attorneys' fees.  In addition, Plaintiff has been injured in his business and property and has incurred

and will continue to incur, significant damages, losses, and deprivation of tangible and intangible property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations.

678.     Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities for himself, the Trump Campaign, and the Trump Organization LLC.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Michael Sussmann, Peter Fritsch, Glenn Simpson, Christopher Steele, Nellie Ohr, Igor Danchenko, Rodney Joffe, James Comey, Andrew McCabe, Rod Rosenstein, Peter Strzok, Lisa Page, and Kevin Clinesmith for compensatory damages, Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### <u>Count VI</u>
### Conspiracy to Commit Malicious Prosecution
*(Against Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, Joffe, Podesta, Mook, Reines, Comey, McCabe, Rosenstein, Strzok, Page, and Clinesmith)*

679.     The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

680.     The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson,

Fritsch, Steele, Ohr, Danchenko, and Joffe, had a meeting of minds and a common plan to induce

the FBI and/or the Department of Justice through deceptive means into commencing an unfounded

investigation into the Plaintiff's alleged collusion with the Russian government, Vladimir Putin,

and other government officials.

681.    The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson,

Fritsch, Steele, Ohr, Danchenko, and Joffe, conspired to cause the FBI's investigation to be

commenced, and continue forward, by, among other things, falsifying information, documents,

and evidence, such as the Dossier and the white papers, providing said falsified information,

documents, and evidence to the FBI and the DOJ, and making false and/or misleading statements

to the FBI and the DOJ concerning, among other things, the facts and circumstances of the

development of the Dossier and the white papers, the credibility of their evidence and sources, the

individuals and entities behind the Dossier and White Papers, and other facts relevant to the

Defendants' plot to falsely implicate the Plaintiff.

682.    The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson,

Fritsch, Steele, Ohr, Danchenko, and Joffe, concocted a scheme to denigrate the Plaintiff and

tarnish his harm his chance of becoming elected and then to properly and effectively administrate

his office of President of the United States.  In the course of carrying out this scheme, they

conspired to feed false and/or misleading information to the FBI and the DOJ which prompted the

FBI to commence an investigation.

683.    The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson,

Fritsch, Steele, Ohr, Danchenko, and Joffe, conspired to do an unlawful act by unlawful means.

684.    The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson,

Fritsch, Steele, Ohr, Danchenko, and Joffe, acted with actual malice, as they knew that the Plaintiff

was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of

whether the Plaintiff had colluded with Russia; despite said knowledge, the Defendants conspired

to disseminate false information and spread a false narrative in an attempt to ruin the Plaintiff.

685.    Moreover, in conspiring to bring forth the false information to commence the

investigation by the FBI for the express purpose of harming the Plaintiff, the Defendants, Clinton,

Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, and Joffe,

acted with malicious intent.

686.    Subsequent to the commencement of Crossfire Hurricane, additional Defendants

who were well-position within the FBI, Comey, McCabe,  Rosenstein, Strzok, Page, and

Clinesmith, conspired to continue the FBI's investigation and to commence an extrajudicial FISA

surveillance of the Plaintiff and his administration in that they, among other things, conspired to

falsify evidence, information and/or documents, such as an e-mail correspondence regarding

Carter Page that was submitted in furtherance of FISA application(s); conspired to rely upon

knowingly false information including, without limitation, the White Papers and the Steele

Dossier, which the Defendants were aware was not credible and was funded by the Clinton

Campaign and the DNC; conspired to withhold pertinent and material information from FISA

applications and in submissions, communications, and correspondences with judges, law

enforcement officials, supervisors, superiors, and other government officials; conspired to make

false and/or misleading statements to the FISC, Congress, and/or the Plaintiff, who at the time was

sitting President of the United States; and otherwise conspired to mislead as to the credibility of

the evidence supporting their investigation, the individuals and entities behind the Dossier and

white papers, and other facts relevant to the evidentiary basis for Crossfire Hurricane, the FISA

applications, the Mueller investigation, and other related investigations regarding the alleged

Trump-Russia connection.

687.     In conspiring to falsely maintain and continue the investigation(s) by the FBI and the DOJ for the express purpose of harming the Plaintiff, the Defendants, Comey, McCabe, Rosenstein, Strzok, Page, and Clinesmith, acted with malicious intent.

688.     The Defendants, Comey, McCabe, Strzok, Page, and Clinesmith, acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia, and they knew that Crossfire Hurricane lacked a legitimate evidentiary basis and was based on a false and contrived premise; despite said knowledge, the Defendants conspired to continue the baseless investigations, to obtain FISA warrants in excess of their lawful authority, and to proliferate the spread of the Defendants' false narrative.

689.     Each of the above-named Defendants executed several acts in furtherance of the conspiracy, as detailed at length in this Complaint, and committed overt acts to harm the Plaintiff in the furtherance of the conspiracy.

690.     As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.

691.     As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.  In addition, Plaintiff has been injured in his business and property and has incurred and will continue to incur, significant damages, losses, and deprivation of tangible and intangible

property, including but not limited to loss of political and/or business reputation, loss of business

opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade

secrets, and/or loss of contractual relations.

692.    Among other things, the Plaintiff was forced to incur expenses in an amount to be

determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and

continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in

connection with his effort to defend against the Defendants' false accusations and the various

federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing

and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter

a Judgment for Donald J. Trump and against the Defendants, Hillary Clinton, Michael Sussmann,

Debbie Wasserman Schultz, Charles Halliday Dolan, Jr., Jake Sullivan, Marc Elias, Glenn

Simpson, Peter Fritsch, Christopher Steele, Nellie Ohr, Igor Danchenko, and Rodney Joffe, John

Podesta, Robert Mook, Philippe Reines, James Comey, Andrew McCabe, Rod Rosenstein, Peter

Strzok, Lisa Page, and Kevin Clinesmith for compensatory damages, Punitive damages, costs, and

such further and other relief as this Court may deem just and proper.

### Count VII
### Computer Fraud and Abuse Act
### (18 U.S.C. § 1030)
*(Against Neustar, Inc., Neustar Security Services, Joffe, DNC, Clinton Campaign, Clinton, Perkins Coie, Sussmann)*

693.    The Plaintiff avers the allegations contained in the preceding paragraphs and

incorporates them in this count, as if set forth at length herein.

694.    The computers belonging to the Executive Office of the President of the United

States are non-public, belonging to a department or agency of the United States, are exclusively

for the use of the United States Government and are involved in interstate and foreign commerce and communications.

695.    The computers belonging to the Trump Organization LLC, located at Trump Tower, are involved in interstate and foreign commerce and communication and, therefore, are protected computers under 18 U.S.C. § 1030(e)(2).

696.    The Defendants' conduct as alleged herein violated 18 U.S.C. §§ 1030(a)(2), 1030(a)(3), 1030(a)(4), and/or 1030(a)(6).

697.    The Defendants, Neustar, Inc. and/or Neustar Security Services, and Joffe, knowingly, intentionally and unlawfully accessed and/or exceeded their authority to access the computers at the Executive Office of the President of the United States and thereby obtained and used valuable, sensitive and/or proprietary information and data from those computers in violation of 18 U.S.C. § 1030(a)(2)(B), 1030(a)(2)(C), and 1030(a)(3).

698.    Such information and data include, but are not limited to, non-public, sensitive, confidential, classified and/or proprietary internet data, DNS records, techniques, processes, procedures and programs.

699.    Neustar and/or Neustar Security Services, and Joffe also knowingly, intentionally and unlawfully accessed and/or exceeded their authority to access computers belonging to the Trump Organization LLC, located at the Trump Tower, and thereby obtained and used valuable, sensitive and/or proprietary information and data from those computers in violation of 18 U.S.C. § 1030(a)(2)(C).

700.    Such information and data include, but are not limited to, non-public, sensitive, confidential and/or proprietary internet data, DNS records, business methods, techniques, processes, procedures and programs.

701.    As detailed at length herein, the Defendants, the DNC, the Clinton Campaign, Clinton, Perkins Coie, and Sussmann conspired with Neustar, Inc., and/or Neustar Security Services, and Joffe in their commission of the above-stated acts, in violation of 18 § U.S.C. 1030(b).

702.    As a direct and proximate result of the DNC, the Clinton Campaign, Clinton, Perkins Coie, Sussmann, Neustar, Inc. and/or Neustar Security Services, and Joffe's violations of 18 U.S.C. § 1030, the Plaintiff has been injured and has sustained a loss in excess of $5,000.

703.    Among other things, the Defendants obtained valuable, sensitive, proprietary and confidential data and information pertaining to the Plaintiff, which they manipulated, falsified and altered for nefarious purposes, and, in addition, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' actions and the various federal investigations and/or official proceedings arose therefrom

704.    The acts of the above-mentioned Defendants which violated 18 U.S.C. § 1030 were not discoverable until September 16, 2021, upon the disclosure of said acts described in the indictment of Michael Sussmann in *United States v.  Sussmann*, case no.  1:21-cr-00582-CRC, United States District Court, District for Columbia.

705.    As a direct and proximate result of the Defendant's actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage, including, among other things, the cost of investigating and responding to the unauthorized access, defending himself against federal investigations, harm to his business, and loss of trade secrets and/or other proprietary, sensitive or

valuable information and data, entitling the Plaintiff to compensatory relief under 18 U.S.C. § 1030(g).

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Neustar, Inc. and/or Neustar Security Services, Rodney Joffe, Perkins Coie, LLP, Michael Sussmann, HFACC, Inc., the Democratic National Committee, the DNC Services Corporation, and Hillary Clinton for compensatory damages, punitive damages, costs, attorneys' fees, and such further and other relief as this honorable Court may deem just and proper.

### Count VIII
### Theft of Trade Secrets
### (18 U.S.C. § 1830-32)
*(Against Neustar, Inc., Neustar Security Services, Joffe, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton)*

706.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

707.    The Plaintiff owns and possesses certain non-public, proprietary, sensitive and confidential information and data, including without limitation, DNS data.

708.    DNS internet traffic data houses highly proprietary, sensitive and confidential data. For example, among other things, an analysis of raw DNS data reveals a comprehensive view into an individual or a company's website traffic, e-mail traffic, webmail traffic, chat messaging, in addition to the types of technology, hardware, software, programs, securities and processes being utilized by the servers.

709.    Neustar, Inc. and/or Neustar Security Services, and Joffe, at the direction of Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, exploited access to non-public data sources and/or servers and unlawfully acquired, stole and exploited sensitive, proprietary and

confidential internet data, including without limitation, DNS information, traffic, and/or data originating from computers and/or servers: (i) located at Plaintiff's private apartment in Central Park West in New York and belonging to the Plaintiff; and (ii) located at Trump Tower and belonging to The Trump Organization, in which Plaintiff has an ownership interest (collectively, with the computers and/or servers house in Plaintiff's private apartment, "Plaintiff's Servers").

710.    Joffe and Neustar, Inc. and/or Neustar Security Services, exploited their access to non-public data to, among other things, mine DNS traffic and other data from Plaintiff's Servers for the purpose of gathering derogatory information about the Plaintiff.

711.    In doing so, Joffe and Neustar, Inc. and/or Neustar Security Services intentionally accessed, without authorization, Plaintiff's Servers.

712.    By illegally accessing the above-mentioned information and data, Neustar, Inc. and/or Neustar Security Services, and Joffe, were able to obtain proprietary, sensitive, and/or confidential information and data including, among other things, the number and frequency of e-mail communications between the Plaintiff's Servers and other third party servers, the number and frequency of website visits to third party websites by the Plaintiff's Servers, the number and frequency of webmail interactions between the Plaintiff's Servers and other third party servers, and the number and frequency of chat messaging interactions between the Plaintiff's Servers and other third party servers, as well as information pertaining to the types of software, programs, securities and processes being utilized by Plaintiff's Servers.

713.    This information and data revealed highly proprietary, sensitive, and confidential knowledge, including insight into Plaintiff's and The Trump Organization's business dealings, financial dealings, communications, future and current plans, techniques, patterns, methods, processes, and procedures, as well as identification of their corporate partners, political associates,

clients, and vendors.

714.    This proprietary, sensitive and confidential information, data and/or knowledge constitutes trade secrets within the meaning of 18 U.S.C. § 1839(3) where they constitute business and/or political methods, techniques, processes, procedures and programs that are both protected from disclosure by the Plaintiff and derive significant economic value from not generally being known to or ascertainable by others, including the Defendants, who can obtain economic value from disclosure or use of such information.

715.    The Plaintiff and The Trump Organization restricts access to their proprietary, sensitive and confidential information and data, including DNS data, even within their own personnel and prevents unauthorized access to such records by digital or electronic means.

716.    The Plaintiff and The Trump Organization further protects against theft and disclosure of such information by third parties by the requirement of executed non-disclosure agreements prior to providing any such access.

717.    Defendants, Neustar. Inc. and/or Neustar Security Services, and Joffe, violated the Defend Trade Secrets Act, 18 U.S.C. § 1832(a)(1), by knowingly obtaining the Plaintiff's confidential records by fraud, artifice, and deception and, thereafter, stealing, appropriating, taking, carrying away, and concealing the theft of the Plaintiff's confidential records with intent to convert the Plaintiff's confidential records, which are related to products sold in interstate and foreign commerce, to the Defendants' own benefit, while knowing and intending that such misappropriation would injure the Plaintiff.

718.    Defendants, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, conspired with Neustar, Inc. and/or Neustar Security Services and Joffe to commit the above-named acts in furtherance of the overarching conspiracy to denigrate and spread injurious

falsehoods to harm the Plaintiff's political career and to impede his ability to effectively govern.

719.     Defendants, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, conspired with Neustar, Inc. and/or Neustar Security Services, and Joffe to violate the Defend Trade Secrets Act, 18 U.S.C. § 1832(a)(1), by assisting, aiding, and abetting Neustar and Joffe in obtaining Plaintiff's proprietary, sensitive and confidential information and data by fraud, artifice, and deception and, thereafter, stealing, appropriating, taking, carrying away, and concealing the theft of Plaintiff's confidential records with intent to convert Plaintiff's confidential records, which are related to products sold in interstate and foreign commerce, to Defendants' own benefit, while knowing and intending that such misappropriation would injure the Plaintiff

720.     Each of the Defendants, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, were aware of, and active participants in, the conspiracy for Neustar, Inc. and/or Neustar Security Services, and Joffe to violate the Defend Trade Secrets Act, 18 U.S.C. § 1832, and each of the RICO Defendants committed at least one act in furtherance of this goal.

721.     The Plaintiff's confidential records were misappropriated by Defendants within the meaning of 18 U.S.C. § 1839(5), where the Plaintiff's records were acquired by the Defendants, through unlawful and deceptive acts, without the Plaintiff's authorization and through Defendants' acts of espionage or other improper means conducted by electronic or other means.

722.     The theft of the protected trade secrets has damaged the Plaintiff.

723.     The actions of Defendants, Neustar, Inc., and/or Neustar Security Services, and Joffe, constitute theft of trade secrets in violation of 18 U.S.C. § 1832(a)(1).

724.     The actions of Defendants, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, constitute a conspiracy to steal trade secrets in violation of 18 U.S.C. § 1832(a)(5).

725.     As a direct and proximate result of the Defendants' actions, the Plaintiff has

suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.  In addition, Plaintiff has been injured in his business and property and has incurred and will continue to incur, significant damages, losses, and deprivation of tangible and intangible property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations.

726.    Among other things, the Plaintiff was forced to incur Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' actions and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Neustar, Inc. and/or Neustar Security Services, Rodney Joffe, Perkins Coie, LLP, Michael Sussmann, HFACC, Inc., the Democratic National Committee, the DNC Services Corporation, and Hillary Clinton, for compensatory damages, punitive damages, costs, attorneys' fees, and such further and other relief as this Court may deem just and proper.

### Count IX
### Stored Communications Act
### (18 U.S.C. 2701-12)
*(Against Neustar, Inc. and/or Neustar Security Services, and Joffe)*

727.    The Plaintiff avers the allegations contained in the preceding paragraphs and

incorporates them in this count, as if set forth at length herein.

728.    The Defendants, Neustar, Inc. and/or Neustar Security Services, and Joffe, on one or more occasions willfully and intentionally accessed, without authorization or in excess of any authorization, facilities through which an electronic communication service is provided.

729.    Neustar, Inc. and/or Neustar Security Services, and Joffe obtained unauthorized access to or, at a minimum, exceeded their authorization to access, numerous facilities through which an electronic communication service is provided, including, but not limited to: (i) the computers, networks and/or servers of the Plaintiff's private New York residence; (ii) the computers, networks and/or servers of the Executive Office of the President of the United States; and (iii) the computers, networks and/or servers of the Trump Organization LLC, specifically those located at Trump Tower (collectively, the "Computers").

730.    Neustar, Inc. and/or Neustar Security Services, and Joffe obtained wire or electronic communications from the Computers that were in electronic storage in such systems.

731.    The Plaintiff was aggrieved as a direct and proximate result of Neustar, Inc. and/or Neustar Security Services, and Joffe's actions, and was caused to suffer significant damage, entitling him to an award for monetary relief under 18 U.S.C. § 2707(c).

732.    The violations of Neustar and Joffe were willful and intentional, thereby warranting an award of punitive damages under 18 U.S.C. § 2707(c).

733.    Moreover, in conspiring to bring forth the false information to commence the investigation by the FBI for the express purpose of harming the Plaintiff, the Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, and Joffe, acted with malicious intent.

734.    The Plaintiff also seeks an award for attorneys' fees and costs as permitted pursuant

to 18 U.S.C. § 2707(c).

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Neustar, Inc. and/or Neustar Security Services,  and Rodney Joffe, for compensatory damages, punitive damages, costs, attorneys' fees, and such further and other relief as this Court may deem just and proper.

**Count X**
**Agency**
*(Against Clinton)*

735.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

736.    Clinton, acting as a principal, used the law firm, Perkins Coie, and the Clinton Campaign as her agents to act on her behalf to carry out the plot against Trump to assure that he would be falsely implicated as colluding with a hostile foreign sovereignty.

737.    Specifically, the Clinton Campaign and the DNC under Clinton's direction put into place a scheme to hire dishonest operatives to put together a collection of lies and innuendo about the Plaintiff and shop it to the FBI.  The statements that were disseminated were knowingly false and damaging.

738.    Clinton directed the DNC and the Clinton Campaign to also retain Perkins Coie, LLP to find proof of a sinister link between Trump and Russia in the lead-up to the 2016 Presidential Election.

739.    The Clinton Campaign and the DNC, under the direction of Hillary Clinton, directed its law firm, Perkins Coie, to hire an outside intelligence firm, Fusion GPS to dig up dirt on the Plaintiff's alleged connections with Russia in 2016.  They paid Fusion GPS approximately $10 million to produce and propagate a false narrative that the Plaintiff had colluded with the Russians.

740.    Clinton attempted to shield her involvement through a barricade of agents working on her behalf.

741.    Once retained Perkins Coie, was tasked with spearheading the mission to find or fabricate proof of a sinister link between Trump and Russia in the lead-up to the 2016 Presidential Election.

742.    The Clinton Campaign also secured Joffe and his company Neustar, Inc.  to help Clinton achieve her goal.

743.    During the lead-up to the 2016 Presidential Election, the Clinton Campaign retained Perkins Coie to perform "opposition research" on the Trump Campaign.

744.    Perkins Coie did not provide legal services to the Defendants, but instead, was commissioned to dig up whatever dirt they could on the Plaintiff, and to the extent there was none, to manufacture it.

745.    Perkins Coie, acting with the knowledge and direction of the Clinton Campaign, then proceeded to proliferate a false narrative that the Trump Campaign was actively colluding with Russian operatives to subvert the 2016 Presidential Election.

746.    Sussmann and Elias, while working for Perkins Coie, and working on behalf of the Clinton Campaign, worked with Joffe and attempted to find any such wrongdoing by the Plaintiff.

747.    Sussmann advised the media and others, falsely and knowingly claiming to demonstrate the existence of a secret communications channel between the Trump Organization and Alfa Bank.  In this regard, Sussmann invoiced the Clinton Campaign for his communications with Joffe and Elias.

748.    Sussmann was also advising the Clinton Campaign in connection with cybersecurity issues, and Perkins Coie, acted as the Clinton Campaign's General Counsel.

749.    Joffe used his access at multiple organizations to gather and mine public and non-public Internet data regarding Trump and his associates, with the goal of creating a "narrative" regarding the candidate's ties to Russia."

750.    Joffe later shared certain results of those data searches and analysis with Sussmann so that Sussmann, in turn, could provide them to the media and the FBI.

751.    Clinton was fully aware of the plan and hired and instructed the necessary parties to make it happen.

752.    Moreover, employees of Perkins Coie, Elias and Sussmann had multiple conferences regarding their work and billed the Clinton Campaign for these meetings.

753.    All of the abovementioned acts were committed by Perkins Coie under the instruction and for the benefit of Hillary Clinton and the Clinton Campaign.

754.    The agents, the Clinton Campaign and Perkins, Coie, LLP, were not acting outside of the instructions of the principal when committing the above-mentioned acts because they were hired for the sole purpose of digging up or manufacturing information on the Plaintiff.

755.    Sussmann, and his firm, Perkins Coie were always acting on behalf of and in coordination with the Clinton Campaign, in assembling and conveying Sussmann's allegations.

756.    Additionally, all of Sussmann's recorded time and work relating to the Russian Bank were billed to the Clinton Campaign.

757.    Clinton is liable as a principal for all of the acts her agents committed against the Plaintiff at her request and for her benefit.

758.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and

attorneys' fees.  In addition, Plaintiff has been injured in his business and property and has incurred and will continue to incur, significant damages, losses, and deprivation of tangible and intangible property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations.

759.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

760.    The Plaintiff does not claim nor seek any compensation for damage to his reputation, but rather, he seeks damages for the cost of dealing with the legal issues and political issues, which he was required to spend to redress the injurious falsities which were propounded by the Defendants, and all other losses incurred due to the tortious conduct of the Defendants.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Hillary Clinton, for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### Count XI
### Respondeat Superior/Vicarious Liability
*(Against Perkins Coie)*

761.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

762.     Under the doctrine of respondeat superior, the Defendant, Perkins Coie, is vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

763.     Specifically, under the doctrine of respondeat superior, Perkins Coie is responsible for the tortious actions that its employees, Sussmann and Elias, committed.

764.     Elias and Sussmann were two of Perkins Coie's senior partners responsible for representing the DNC.  The senior partners negotiated the Joint Fund-Raising Agreement between the DNC and the Clinton Campaign in which Hillary Clinton would be permitted to control the party's finances, strategy, and utilize the money that the DNC raised.

765.     Sussmann and Joffe engaged in efforts with Elias and individuals acting on behalf of the Clinton Campaign to manufacture evidence of wrongdoing by the Plaintiff and the existence of a secret communications channel between the Trump Organization and Alfa Bank.

766.     Sussmann reported the Alfa Bank connection as though it was real and lied to the FBI General Counsel in that he falsely stated that he was not acting on behalf of any client, when he was specifically there at the behest of Clinton, the Clinton Campaign, and the DNC.  In fact, he invoiced the Clinton Campaign for his efforts.

767.     From in or about late July through in or about mid-August 2016, Sussmann, Joffe, and Elias coordinated and communicated about the Plaintiff's involvement with Alfa Bank. Sussmann and Perkins Coie invoiced the Clinton Campaign for that conspiratorial meeting.

768.     Elias and Sussmann perpetrated lies about the Plaintiff and falsified evidence.  Elias and Sussmann committing these egregious acts while working for a client of their firm.  The DNC and the Clinton Campaign hired Perkins Coie and Sussmann and Elias to complete the work as a part of their job.

769.   At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

770.   As a direct and proximate result of the torturous actions by agents, servants, representatives, employees and/or contractors, as alleged above, Perkins Coie is vicariously liable to the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

771.   As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.  In addition, Plaintiff has been injured in his business and property and has incurred and will continue to incur, significant damages, losses, and deprivation of tangible and intangible property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations.

772.   Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities for himself, the Trump Campaign, and the Trump Organization LLC.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter

a Judgment for Donald J. Trump and against the Defendant, Perkins Coie, LLP, for damages,
including Punitive damages, costs, and such further and other relief as this Court may deem just
and proper.

**Count XII**
**Respondeat Superior/Vicarious Liability**
*(Against the DNC)*

773.    The Plaintiff avers the allegations contained in the preceding paragraphs and
incorporates them in this count, as if set forth at length herein.

774.    Under the doctrine of respondeat superior, the Defendant, the DNC, is vicariously
responsible for the torturous conduct of its agents, servants, representatives, employees and/or
contractors.

775.    Specifically, under the doctrine of respondeat superior, the DNC is responsible for
the tortious actions committed by its chairperson, Schultz, and other members and employees.

776.    At all material times, the above-named employees were all acting within the scope
of their employment, performing work for their employer at the time of the tortious conduct, and
therefore are responsible for the actions of their employees.

777.    As a direct and proximate result of the torturous actions by agents, servants,
representatives, employees and/or contractors, as alleged above, the DNC is vicariously liable to
the Plaintiff, as he suffered losses due to the actions of the employees who were working within the
scope of their employment.

778.    Among other things, the Plaintiff was forced to incur expenses in an amount to be
determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and
continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in
connection with his effort to defend against the Defendants' false accusations and the various

federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, the Democratic National Committee, the DNC Services Corporation, for Compensatory damages, Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### Count XIII
### Respondeat Superior/Vicarious Liability
*(Against the Clinton Campaign)*

779.   The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

780.   Under the doctrine of respondeat superior, the Defendant, the Clinton Campaign, vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

781.   Specifically, under the doctrine of respondeat superior, the Clinton Campaign is responsible for the tortious actions committed by its campaign manager, communications director, and foreign policy advisor.

782.   On or about September 15, 2016, Elias exchanged e-mails with the Clinton Campaign's campaign manager, communications director, and foreign policy advisor concerning the plot to falsely connect Donald J. Trump to a Russian bank.

783.   At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

784.   As a direct and proximate result of the torturous actions by agents, servants,

representatives, employees and/or contractors, as alleged above, the Clinton Campaign is vicariously liable to the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

785.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, HFACC Inc., for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### Count XIV
### Respondeat Superior/Vicarious Liability
*(Against Fusion GPS)*

786.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

787.    Under the doctrine of respondeat superior, the Defendant, Fusion GPS is vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

788.    Specifically, under the doctrine of respondeat superior, Fusion GPS is responsible for the tortious actions committed by its employees, Fritsch and Simpson.

789.    Elias, in his mission to obtain derogatory anti-Trump 'opposition research,' commissioned Fusion GPS, and its co-founders, Fritsch and Simpson, and directed them to dredge

up evidence—legitimate or otherwise, true or otherwise, of collusion between the Plaintiff and
Russia.

790.   Fritsch and Simpson, in turn, enlisted the assistance of Orbis Ltd and its owner,
Steele, to produce a series of reports setting forth damning evidence of the supposed collusion
between the Plaintiff and Russia.

791.   Moreover, the efforts of Ohr to pass the knowingly false Dossier through her
husband to the Department of Justice, while she was in the full-time employment of Fusion GPS
also leads to the liability of Fusion GPS.

792.   The now-debunked collection of reports, known as the "Steele Dossier" or simply
the "Dossier," was riddled with misstatements, misrepresentations and flat out lies.  As it turns
out, the Dossier was largely based upon information provided to Steele by his primary sub-source,
Danchenko, who admittedly fabricated his claims.

793.   Danchenko had close ties to senior Clinton Campaign official Dolan, who
knowingly provided false information to Danchenko, who relayed it to Steele, who reported it in
his Dossier and fed it to the FBI and the media.

794.   Fritsch and Simpson were hired and working for their company Fusion GPS when
they fabricated research and evidence.

795.   At all material times, the above-named employees were all acting within the scope
of their employment, performing work for their employer at the time of the tortious conduct, and
therefore are responsible for the actions of their employees.

796.   As a direct and proximate result of the torturous actions by agents, servants,
representatives, employees and/or contractors, as alleged above, Fusion GPS is vicariously liable
to the Plaintiff, as he suffered losses due to the actions of the employees who were working within

the scope of their employment.

797.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings which arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Fusion GPS, for damages, including punitive damages, costs, and such further and other relief as this Court may deem just and proper.

## Count XV
### Respondeat Superior/Vicarious Liability
(*Against Orbis Business Intelligence Ltd*)

798.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

799.    Under the doctrine of respondeat superior, the Defendant, Orbis, vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

800.    Specifically, under the doctrine of respondeat superior, Orbis is responsible for the tortious actions committed by its employee, Steele.

801.    Fritsch and Simpson enlisted the assistance of Orbis Ltd and its owner, Steele, to produce a series of reports setting forth damning evidence of the supposed collusion between the Plaintiff and Russia.

802.    The now-debunked collection of reports, known as the "Steele Dossier" or simply

the "Dossier," was riddled with misstatements, misrepresentations and flat out lies.  As it turns out, the Dossier was largely based upon the fabricated information provided to Steele by his primary sub-source, Danchenko.

803.    Danchenko had close ties to senior Clinton Campaign official, Dolan, who knowingly provided false information to Danchenko, who relayed it to Steele, who reported it in his Dossier and fed it all the way back up the chain.

804.    Fusion GPS was hired to create the fabricated Dossier and Steele was working for the company when he created it.

805.    At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

806.    As a direct and proximate result of the tortious actions by agents, servants, representatives, employees and/or contractors, as alleged above, Orbis is vicariously liable to the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

807.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.  In addition, Plaintiff has been injured in his business and property and has incurred and will continue to incur, significant damages, losses, and deprivation of tangible and intangible property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Orbis Business Intelligence Ltd., for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

## Count XVI
### Respondeat Superior/Vicarious Liability
*(Against Neustar, Inc and/or Neustar Security Services)*

808.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

809.    Under the doctrine of respondeat superior, the Defendants, Neustar, Inc. and/or Neustar Security Services, vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

810.    Specifically, under the doctrine of respondeat superior, Neustar, Inc. and/or Neustar Security Services is responsible for the tortious actions committed by its employee, Joffe.

811.    The Clinton Campaign secured Neustar, Inc. and/or Neustar Security Services, which is run by Joffe, to help Hillary Clinton achieve her goal.

812.     Sussmann and Elias, while working for Perkins Coie, LLP, and working on behalf of the Clinton Campaign, worked with Joffe and attempted to find wrongdoing by the Plaintiff or the Trump Organization.

813.    Sussmann advised the media and others, falsely and knowingly claiming to demonstrate the existence of a secret communications channel between the Trump Organization and Alfa Bank.  In this regard, Sussmann invoiced the Clinton Campaign for his Communications with Joffe and Elias.

814.    Sussmann was also advising the Clinton Campaign in connection with cybersecurity

issues, and Perkins Coie, acted as the Clinton Campaign's General Counsel.

815.   Joffe used his access at multiple organizations to gather and mine public and non-public Internet data regarding Trump and his associates, with the goal of creating a "narrative" regarding the candidate's ties to Russia."

816.   Joffe later shared certain results of those data searches and analysis with Sussmann so that Sussmann, in turn, could provide them to the media and the FBI.

817.   Joffe was working and acting on behalf of Neustar, Inc. and/or Neustar, Inc. and/or Neustar Security Services when he attempted to find wrongdoing and fabricated facts and evidence.

818.   At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

819.   As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage in addition to costs of defense and attorneys' fees.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Neustar, Inc. and/or Neustar Security Services, for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

## **Jury Demand**

The Plaintiff hereby demands a trial by jury of all issues so triable.

**THE TICKTIN LAW GROUP**
270 SW Natura Avenue
Deerfield Beach, Florida 33441
Telephone: (561) 232-2222


 _/s/ Pete*r Ticktin*          __
PETER TICKTIN, ESQUIRE
Florida Bar No. 887935
JAMIE ALAN SASSON, ESQUIRE
Florida Bar No. 10802
Our Matter No.: 22-0062


and

**HABBA MADAIO & ASSOCIATES LLP**
1430 US Highway 206
Suite 240
Bedminster, New Jersey 07921
ALINA HABBA, ESQUIRE (*Pro Hac Vice*)
New Jersey Bar No. 018592010
MICHAEL T. MADAIO, ESQUIRE (*Pro Hac Vice*)
New Jersey Bar No. 070752013
Our Matter No.: 4500-7

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically

filed this 21st day of June, 2022, with the Clerk of Court using CM/ECF, which will send a notice

of electronic filing to all Parties listed on the Service List.


___ /s/ Peter Ticktin

| | |
|---|---|
| **THE TICKTIN LAW GROUP** | **HABBA MADAIO & ASSOCIATES** |
| Peter Ticktin, Esquire | Alina Habba, Esquire |
| Florida Bar No.: 887935 | ahabba@habbalaw.com |
| Serv512@LegalBrains.com | Michael T. Madaio, Esquire |
| Jamie Alan Sasson, Esquire | mmadaio@habbalaw.com |
| Florida Bar No.: 10802 | 1430 US Highway 206 Suite 240 |
| Serv513@LegalBrains.com | Bedminster, New Jersey 07921 |
| 270 SW Natura Avenue | Telephone: (908) 869-1188 |
| Deerfield Beach, Florida 33441-1610 | *Attorneys for the Plaintiff* |
| Telephone: (954) 570-6757 | |
| *Attorneys for the Plaintiff* | |

## SERVICE LIST

Anthony Erickson-Pogorzelski, Esquire
Fla. Bar No. 619884
Anthony.Pogorzelski@usdoj.gov
**Assistant U.S. Attorney**
99 N.E. 4th Street, Suite 300
Miami, Florida 33132
Telephone: 305- 961-9296
*Attorneys for Defendant*
*United States of America*

David E. Kendall, Esquire
dkendall@wc.com
**Williams & Connolly, LLP**
725 12th Street NW
Washington, DC 20005-3901
Telephone: 202-434-5000
*PRO HAC VICE*
*Attorney for the Defendant*
*Hillary R. Clinton*

David Oscar Markus, Esquire
dmarkus@markuslaw.com
**Markus/Moss, LLP**
40 N.W. Third Street
Penthouse 1
Miami, Florida 33128
Telephone: 305-379-6667
*Attorneys for the Defendant*
*Hillary R. Clinton*

Katherine M. Turner, Esquire
kturner@wc.com
**Williams & Connolly, LLP**
725 12th Street NW
Washington, DC 20005-3901
Telephone: 202-434-5000
*PRO HAC VICE*
*Attorney for the Defendant*
*Hillary R. Clinton*

Michael J. Mestitz, Esquire
mmestitz@wc.com
**Williams & Connolly, LLP**
725 12th Street NW
Washington, DC 20005-3901
Telephone: 202-434-5000
*PRO HAC VICE*
*Attorney for the Defendant*
*Hillary R. Clinton*

Jonathan Edward Levine, Esquire
Jonathan.levine@levinepllc.com
**Levine & Associates, PLLC**
5311 Lee Highway
Arlington, Virginia 22207
Telephone: 703-525-2668
*Attorney for Defendant*
*Charles Halliday Dolan, Jr.*

George R.A. Doumar, Esquire
gdoumar@doumarmartin.com
**Mahdavi, Bacon, Halfhill & Young,
PLLC**
11350 Random Hills Road, Suite 700
Fairfax, Virginia 22030
Telephone: 703-352-1300
*PRO HAC VICE*
*Attorney for Defendant*
*Charles Halliday Dolan, Jr*

Franklin G. Monsour, Jr., Esquire
fmonsour@orrick.com
**Orrick, Herrington & Sutcliffe, LLP**
51 West 52nd Street
New York, New York 10019
Telephone: 202-339-8533
*PRO HAC VICE*
*Attorney for Defendant*
*Igor Danchenko*

Diana Marie Fassbender, Esquire
dszego@orrick.com
**Orrick, Herrington & Sutcliffe, LLP**
1152 15th Street NW

Washington, D.C. 20005
*PRO HAC VICE*
*Attorney for Defendant*
*Igor Danchenko*

Alexandra N. Epps, Esquire
aepps@qslwm.com
**Quiling Selander Lownds Winslett and Moser, PC**
6900 North Dallas Parkway, Suite 800
Plano, Texas 75024
Telephone: 214-560-5463
*Attorney for the Defendant*
*Neustar, Inc.*

Adam Seth Fels, Esquire
afels@ffslawfirm.com
Florida Bar No.: 0114917
**Fridman Fels & Soto, PLLC**
2525 Ponce de Leon Blvd., Ste 750
Coral Gables, FL 33134
Telephone: 305-569-7701
*Attorney for the Defendant*
*Bruce Ohr and Nellie Ohr*
*Fusion GPS*
*Glenn Simpson*
*Peter Fritsch*

Kevin P. Crenny, Esquire
kcrenny@levyfirestone.com
**Levy Firestone Muse, LLP**
900 17th Street NW, Suite 1200
Washington, D.C., 20006
Telephone: 202-845-3215
*PRO HAC VICE*
*Attorney for the Defendant*
*Fusion GPS*
*Glenn Simpson*
*Peter Fritsch*

Joshua Levy, Esquire
jal@levyfirestone.com
**Levy Firestone Muse, LLP**
900 17th Street NW, Suite 1200
Washington, D.C., 20006
Telephone: 202-845-3215

*PRO HAC VICE*
*Attorney for the Defendant*
*Fusion GPS*
*Glenn Simpson*
*Peter Fritsch*

Rachel Clattenburg, Esquire
rmc@levyfirestone.com
**Levy Firestone Muse, LLP**
900 17th Street NW, Suite 1200
Washington, D.C., 20006
Telephone: 202-845-3215
*PRO HAC VICE*
*Attorney for the Defendant*
*Fusion GPS*
*Glenn Simpson*
*Peter Fritsch*

Joshua Berman, Esquire
Joshua.Berman@cliffordChance.com
**Clifford Chance US, LLP**
2011 K. Street, NW
Washington, D.C., 20006-1001
Telephone: 202-912-5000
*PRO HAC VICE*
*Attorney for Defendants*
*Nellie Ohr and Bruce Ohr*

Benjamin Peacock, Esquire
Benjamin.Peacock@cliffordChance.com
**Clifford Chance US, LLP**
2011 K. Street, NW
Washington, D.C., 20006-1001
Telephone: 202-912-5000
*PRO HAC VICE*
*Attorney for Defendants*
*Nellie Ohr and Bruce Ohr*

Eugene K. Pettis, Esquire
cmarr@hpslegal.com
Service@hpslegal.com
**Haliczer Pettis & Schwamm P.A.**
100 SE 3rd Avenue, 7th Floor
Fort Lauderdale, FL 33394
Telephone: 954-523-9922

*Attorneys for Defendant*
*Marc Elias*


Debra P. Klauber, Esquire
dklauber@hpslegal.com
Service@hpslegal.com
**Haliczer Pettis & Schwamm P.A.**
100 SE 3rd Avenue, 7th Floor
Fort Lauderdale, FL 33394
Telephone: 954-523-9922
*Attorneys for Defendant*
*Marc Elias*


April A. Otterberg, Esquire
aotterberg@jenner.com
**Jenner & Block, LLP**
353 N. Clark Street
Chicago, Il 60654-3454
Telephone: 312-222-9350
*PRO HAC VICE*
*Attorney for the Defendant*
*Marc Elias*


Reid J. Schar, Esquire
rschar@jenner.com
**Jenner & Block, LLP**
353 N. Clark Street
Chicago, Il 60654-3454
Telephone: 312-222-9350
*PRO HAC VICE*
*Attorney for the Defendant*
*Marc Elias*


Roberto Martinez, Esquire
Bob@colson.com
becky@colson.com
Florida Bar No.: 305596
**Colson Hicks Eidson, P.A.,**
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Telephone: 305-476-7400
*Attorney for the Defendant*
*Michael Sussmann*


Michael S. Bosworth, Esquire

Michael.Bosworth@lw.com
**Latham & Watkins, LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212-916-1221
*PRO HAC VICE*
*Attorney for the Defendant*
*Michael Sussmann*


Michael F. Houlihan, Esquire
Michael.Houlihan@lw.com
**Latham & Watkins, LLP**
200 Clarendon Street
Boston, MA 02116
Telephone: 617-880-4642
*PRO HAC VICE*
*Attorney for the Defendant*
*Michael Sussmann*


Sean M. Berkowitz, Esquire
Sean.Berkowitz@lw.com
**Latham & Watkins, LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: 312-876-7700
*PRO HAC VICE*
*Attorney for the Defendant*
*Michael Sussmann*


Stephen P. Barry, Esquire
Stephen.Barry@lw.com
**Latham & Watkins, LLP**
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Telephone: 202-637-2200
*PRO HAC VICE*
*Attorney for the Defendant*
*Michael Sussmann*


Eleni Kastrenakes Howard, Esquire
Eleni.kastrenakeshoward@akerman.com
Florida Bar No.: 73073
**Akerman, LLP**
777 S. Flagler Drive, Suite 1100, West
Tower
West Palm Beach, Florida 33401

Telephone: 561-653-5000
*Attorney for the Defendant*
*Perkins Coie, LLP*

Howard Jay Harrington, Esquire
Jay.harrington@akerman.com
Florida Bar No.: 0118719
**Akerman, LLP**
777 S. Flagler Drive, Suite 1100, West
Tower
West Palm Beach, Florida 33401
Telephone: 561-653-5000
*Attorney for the Defendant*
*Perkins Coie, LLP*

F. Joseph Warin, Esquire
fwarin@gibsondunn.com
**Gibson Dunn & Crutcher, LLP**
1050 Connecticut Avenue NW
Washington, D.C., 20036-5306
Telephone: 202-887-3609
*PRO HAC VICE*
*Attorney for the Defendant*
*Perkins Coie, LLP*

Geoffrey M. Sigler, Esquire
gsigler@gibsondunn.com
**Gibson Dunn & Crutcher, LLP**
1050 Connecticut Avenue NW
Washington, D.C., 20036-5306
Telephone: 202-887-3609
*PRO HAC VICE*
*Attorney for the Defendant*
*Perkins Coie, LLP*

Katherine M. Meeks, Esquire
kmeeks@gibsondunn.com
**Gibson Dunn & Crutcher, LLP**
1050 Connecticut Avenue NW
Washington, D.C., 20036-5306
Telephone: 202-887-3609
*PRO HAC VICE*
*Attorney for the Defendant*
*Perkins Coie, LLP*

Nancy E. Hart, Esquire

nhart@gibsondunn.com
**Gibson Dunn & Crutcher, LLP**
1050 Connecticut Avenue NW
Washington, D.C., 20036-5306
Telephone: 202-887-3609
*PRO HAC VICE*
*Attorney for the Defendant*
*Perkins Coie, LLP*

Gerald E. Greenberg, Esquire
ggreenberg@gsgpa.com
Florida Bar No.: 440094
**Gelber Schachter & Greenberg, P.A.**
One South East Third Avenue, Suite 2600
SunTrust International Center
Miami, Florida 33131
Telephone: 305-728-0950
*Attorney for the Defendant*
*Democratic National Committee*
*DNC Services Corporation*
*Debbie Wasserman Schultz*

Shawn G. Crowley, Esquire
scrowley@kaplanhecker.com
**Kaplan Hecker & Fink, LLP**
350 5th Avenue, 63rd Floor
New York, New York 10118
Telephone: 212-763-0883
*PRO HAC VICE*
*Attorney for the Defendants*
*Democratic National Committee*
*DNC Services Corporation*

Maximillian Feldman, Esquire
mfeldman@kaplanhecker.com
**Kaplan Hecker & Fink, LLP**
350 5th Avenue, 63rd Floor
New York, New York 10118
Telephone: 212-763-0883
*PRO HAC VICE*
*Attorney for the Defendants*
*Democratic National Committee*
*DNC Services Corporation*

Roberta A. Kaplan, Esquire

191

rkaplan@kaplanhecker.com
**Kaplan Hecker & Fink, LLP**
350 5th Avenue, 63rd Floor
New York, New York 10118
Telephone: 212-763-0883
*PRO HAC VICE*
*Attorney for the Defendants*
*Democratic National Committee*
*DNC Services Corporation*

Edward Soto, Esquire
Edward.soto@weil.com
Florida Bar No.: 0265144
**Weil Gotshal & Manges, LLP**
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone: 305-577-3100
*PRO HAC VICE*
*Attorney for the Defendant*
*Rodney Joffe*

Steven Tyrrell, Esquire
Steven.tyrrell@weil.com
**Weil, Gotshal & Manges, LLP**
2001 M St. NW, Suite 600
Washington, D.C. 20063
Telephone:
*PRO HAC VICE*
*Attorney for the Defendant*
*Rodney Joffe*

Noah Brozinsky, Esquire
nbrozinsky@kaiserDillon.com
Florida Bar No.: 010470
**KaiserDillon, PLLC**
1099 14th Street NW, 8th Floor West
Washington, D.C. 20005
*Attorney for the Defendant*
*Kevin E. Clinesmith*

Christopher Muha, Esquire
CMuha@kaiserdillon.com
**KaiserDillon, PLLC**
1099 14th Street NW, 8th Floor West
Washington, D.C. 20005
Telephone: 202-640-2850

*PRO HAC VICE*
*Attorney for the Defendant*
*Kevin E. Clinesmith*

William Pittard, Esquire
Wpittard@kaiserdillon.com
**KaiserDillon, PLLC**
1099 14th Street NW, 8th Floor West
Washington, D.C. 20005
Telephone: 202-640-2850
*PRO HAC VICE*
*Attorney for the Defendant*
*Kevin E. Clinesmith*

Paola Pinto, Esquire
ppinto@schertlerlaw.com
Florida Bar No.: 1013933
**Schertler Onorato Mead & Sears**
555 13th Street, N.W.
Suite 500 West
Washington, D.C. 20004
Telephone: 202-628-4155
*Attorney for the Defendants*
*John Podesta*
*HFACC, Inc.*

Robert P. Trout, Esquire
Rtrout@schertlerlaw.com
**Schertler Onorato Mead & Sears**
555 13th Street, N.W.
Suite 500 West
Washington, D.C. 20004
Telephone: 202-628-4155
*PRO HAC VICE*
*Attorney for the Defendants*
*John Podesta*
*HFACC, Inc.*

William R. Barzee, Esquire
williambarzee@barzeeflores.com
**Barzee Flores**
Courthouse Center, Penthouse One
40 NW Third Street
Miami, Florida 33128
Telephone: 3025-374-3998
*Counsel for the Defendants*

*Robert E. Mook*
*Jack Sullivan*

Andrew J. Ceresney, Esquire
aceresney@debevoise.com
**Debevoise & Plimpton, LLP**
919 Third Avenue
New York, NY 10022
Telephone: 212-909-6000
*PRO HAC VICE*
*Attorney for the Defendant*
*Robert E. Mook*

Isabela M. Garcez, Esquire
imgarcez@debevoise.com
**Debevoise & Plimpton, LLP**
919 Third Avenue
New York, NY 10022
Telephone: 212-909-6000
*PRO HAC VICE*
*Attorney for the Defendant*
*Robert E. Mook*

Wendy B. Reilly, Esquire
wbreilly@debevoise.com
**Debevoise & Plimpton, LLP**
919 Third Avenue
New York, NY 10022
Telephone: 212-909-6000
*PRO HAC VICE*
*Attorney for the Defendant*
*Robert E. Mook*

Brian L. Stekloff, Esquire
bstekloff@wilkinsonstekloff.com
**Wilkinson Stekloff, LLP**
2001 M. Street NW, 10th Floor
Washington, D.C. 20036
Telephone: 202-847-4030
*PRO HAC VICE*
*Attorney for the Defendant*
*Jake Sullivan*

Sarah E. Neuman, Esquire
sneuman@wilkinsonstekloff.com
**Wilkinson Stekloff, LLP**

2001 M. Street NW, 10th Floor
Washington, D.C. 20036
Telephone: 202-847-4030
*PRO HAC VICE*
*Attorney for the Defendant*
*Jake Sulliv*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing appendix was served via electronic filing on the Court's ECF electronic filing platform on this 5th day of March, 2024, upon counsel of record for the Appellees.

/s/ Richard C. Klugh
Richard C. Klugh