Nos. 22-13410, 22-14099, 23-10387, & 23-13177

# In the United States Court of Appeals for the Eleventh Circuit

---

DONALD J. TRUMP, ET AL.,
*APPELLANTS*

*v.*

HILLARY R. CLINTON, ET AL.,
*APPELLEES*

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
(CASE NO. 22-CV-14102)
(THE HONORABLE DONALD M. MIDDLEBROOKS, J.)*

---

**SUPPLEMENTAL APPENDIX TO BRIEF OF APPELLEES
VOLUME I OF III**

---

DAVID OSCAR MARKUS
MARKUS/MOSS PLLC
*40 NW 3rd Street, PH 1
Miami, FL 33128
(305) 379-6667*

DAVID E. KENDALL
KATHERINE M. TURNER
MICHAEL J. MESTITZ
JAMES N. SASSO
WILLIAMS & CONNOLLY LLP
*680 Maine Avenue, S.W.
Washington, DC 20024
(202) 434-5000*

*Counsel for Appellee
Hillary Clinton*

*Additional Appellees' Counsel
listed in the signature block*

# TABLE OF CONTENTS

**Docket/Tab No.**

## Volume I

Complaint for Damages and Demand for Trial by Jury
(Mar. 24, 2022) ..................................................................... 1

Plaintiff's Motion to Disqualify Judge Middlebrooks (Apr. 4, 2022) ...... 21

Order Denying Motion for Disqualification (Apr. 6, 2022) ..................... 30

Defendant Hillary Rodham Clinton's Motion to Dismiss the Complaint
and Memorandum of Law in Support (Apr. 20, 2022) ....................... 52

Plaintiff's Expedited Motion for an Extension of Time to File an
Amended Complaint as a Matter of Course or to Response to Hillary
Clinton's Motion to Dismiss and Memorandum of Law
(Apr. 21, 2022) .................................................................... 66

Defendant John Podesta's Motion to Dismiss the Complaint and
Memorandum of Law in Support (May 4, 2022) ............................. 124

Defendants Fusion GPS, Glenn Simpson, and Peter Fritsch's Motion to
Dismiss the Complaint and Memorandum of Law in Support
(May 11, 2022) .................................................................... 139

Democratic Nation Committee, DNC Services Corporation, and Debbie
Wasserman Schultz's Motion to Dismiss the Complaint and
Memorandum of Law in Support (May 11, 2022) ........................... 141

Perkins Coie LLP's Motion to Dismiss Under Federal Rule 12(b)(6) and
Incorporated Memorandum of Law (May 11, 2022) ........................ 143

Defendant Nellie Ohr's Motion to Dismiss the Complaint and
Memorandum of Law in Support (May 11, 2022) ........................... 144

Defendant Robert E. Mook's Motion to Dismiss the Complaint and
Memorandum of Law in Support (May 11, 2022) ........................... 145

Defendant Michael Sussmann's Motion to Dismiss Pursuant to
Federal Rule of Civil Procedure 12(b)(6) and Memorandum of Law
in Support (May 11, 2022) ...................................................... 146

Marc Elias's Motion to Dismiss Under Federal Rule 12(b)(6) and
Incorporated Memorandum of Law (May 11, 2022) ........................ 147

Defendant HFACC, Inc.'s Motion to Dismiss the Complaint and
Memorandum of Law in Support (May 16, 2022) ........................... 149

Defendant Rodney Joffe's Motion to Dismiss the Complaint and
Memorandum of Law (May 20, 2022) .............................................. 157

Defendant Igor Danchenko's Motion to Dismiss the Complaint and
Incorporated Memorandum of Law (May 20, 2022) ....................... 159

Defendant Neustar, Inc.'s Motion to Dismiss Plaintiff's Complaint
Pursuant to Fed. R. Civ. P. 12(b)(6) and Incorporated Memorandum
of Law (May 20, 2022) ...................................................................... 160

Charles Dolan's Motion to Dismiss (May 23, 2022) ............................ 162

Charles Dolan's Memorandum in Support of Motion to Dismiss
(May 23, 2022) .................................................................................. 163

[Jake Sullivan] Motion to Dismiss under Rule 12(b)(6) and
Memorandum of Law in Support (May 25, 2022) ........................... 165

Amended Complaint for Damages and Demand for Trial by Jury
(June 21, 2022) .................................................................................. 177

Order (June 23, 2022) .......................................................................... 188

Charles Dolan's Motion to Dismiss Plaintiff's Amended Complaint
and Memorandum in Support (July 14, 2022) ................................ 225

Second Declaration of Charles Dolan (July 14, 2022) ..................... 225-1

Hillary Clinton's, HFACC, Inc.'s, John Podesta's, Robert Mook's, Jake
Sullivan's, DNC's, DNC Services Corporation's, Debbie Wasserman
Schultz's, Perkins Coie LLP's, Marc Elias's, Michael Sussmann's,
Charles Halliday Dolan, Jr.'s, Fusion GPS's, Glenn Simpson's, Peter
Fritsch's, Nellie Ohr's, Bruce Ohr's, Igor Danchenko's, Rodney
Joffe's, Neustar Security Services's, and Neustar, Inc.'s Joint Motion
to Dismiss Under Federal Rule 12(b)(6) and Incorporated
Memorandum of Law (July 14, 2022) .............................................. 226

Defendant Rodney Joffe's Motion to Dismiss for Lack of Personal
Jurisdiction (July 14, 2022) ............................................................. 227

1

Complaint for Damages and Demand for Trial by Jury (Mar. 24, 2022)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.


DONALD J. TRUMP,

                        Plaintiff,

v.

HILLARY R. CLINTON, HFACC, INC.,
DEMOCRATIC NATIONAL COMMITTEE,
DNC SERVICES CORPORATION, PERKINS
COIE, LLC, MICHAEL SUSSMANN, MARC
ELIAS, DEBBIE WASSERMAN SCHULTZ,
CHARLES HALLIDAY DOLAN, JR., JAKE
SULLIVAN, JOHN PODESTA, ROBERT E.
MOOK, PHILLIPE REINES, FUSION GPS,
GLENN SIMPSON, PETER FRITSCH,
NELLIE OHR, BRUCE OHR, ORBIS
BUSINESS INTELLIGENCE, LTD.,
CHRISTOPHER STEELE, IGOR DANCHENKO,
NEUSTAR, INC., RODNEY JOFFE, JAMES
COMEY, PETER STRZOK, LISA PAGE,
KEVIN CLINESMITH, ANDREW MCCABE,
JOHN DOES 1 THROUGH 10 (said names
being fictios and unknown persons), and
ABC CORPORATIONS 1 THROUGH 10 (said
names being fictitious and unknown entities),

                        Defendants.
_____/


**COMPLAINT FOR DAMAGES AND DEMAND FOR TRIAL BY JURY**

        The Plaintiff, Donald J. Trump, by and through his undersigned counsel, hereby serves his

suit against the Defendants, Hillary R. Clinton, HFACC, Inc., the Democratic National Committee,

DNC Services Corporation, Perkins Coie, LLC, Michael Sussmann, Marc Elias, Debbie

Wasserman Schultz, Charles Halliday Dolan, Jr., Jake Sullivan, John Podesta, Robert E. Mook,

Phillipe Reines, Fusion GPS, Glenn Simpson, Peter Fritsch, Nellie Ohr, Bruce Ohr, Orbis Business Intelligence, Ltd., Christopher Steele, Igor Danchenko, Neustar, Inc., Rodney Joffe, James Comey, Peter Strzok, Lisa Page, Kevin Clinesmith, Andrew McCabe, John Does 1 through 10 (said names being fictious and unknown persons), and ABC Corporations 1 through 10 (said names being fictitious and unknown entities) and alleges as follows:

### Introduction

1.      In the run-up to the 2016 Presidential Election, Hillary Clinton and her cohorts orchestrated an unthinkable plot – one that shocks the conscience and is an affront to this nation's democracy.  Acting in concert, the Defendants maliciously conspired to weave a false narrative that their Republican opponent, Donald J. Trump, was colluding with a hostile foreign sovereignty. The actions taken in furtherance of their scheme—falsifying evidence, deceiving law enforcement, and exploiting access to highly-sensitive data sources - are so outrageous, subversive and incendiary that even the events of Watergate pale in comparison.

2.      Under the guise of 'opposition research,' 'data analytics,' and other political stratagems, the Defendants nefariously sought to sway the public's trust.  They worked together with a single, self-serving purpose: to vilify Donald J. Trump.  Indeed, their far-reaching conspiracy was designed to cripple Trump's bid for presidency by fabricating a scandal that would be used to trigger an unfounded federal investigation and ignite a media frenzy.

3.      The scheme was conceived, coordinated and carried out by top-level officials at the Clinton Campaign and the DNC—including 'the candidate' herself—who attempted to shield her involvement behind a wall of third parties.[1]  To start, the Clinton Campaign and the DNC enlisted the assistance of their shared counsel, Perkins Coie, a law firm with deep Democrat ties, in the

---

[1] U.S. Dep't of Justice, Office of the Inspector General, Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation at 96 (2019) (hereinafter "IG Report").

hopes of obscuring their actions under the veil of attorney-client privilege.  Perkins Coie was tasked with spearheading the scheme to find—or fabricate—proof of a sinister link between Donald J. Trump and Russia.  To do so, Perkins Coie launched parallel operations: on one front, Perkins Coie partner Marc Elias led an effort to produce spurious 'opposition research' claiming to reveal illicit ties between the Trump Campaign and Russian operatives; on a separate front, Perkins Coie partner Michael Sussmann headed a campaign to develop misleading evidence of a bogus 'back channel' connection between e-mail servers at Trump Tower and a Russian-owned bank.

4.      Marc Elias, in his mission to obtain derogatory anti-Trump 'opposition research,' commissioned Fusion GPS, an investigative firm, and its co-founders, Peter Fritsch and Glenn Simpson, and directed them to dredge up evidence—actual or otherwise—of collusion between Trump and Russia.  Fritsch and Simpson, in turn, enlisted the assistance of Orbis Ltd. and its owner, Christopher Steele, to produce a series of reports purporting to contain proof of the supposed collusion.  Of course, the now fully debunked collection of reports, known as the "Steele Dossier," was riddled with misstatements, misrepresentations and, most of all, flat out lies.  In truth, the Steele Dossier was largely based upon information provided to Steele by his primary sub-source, Igor Danchenko, who was subsequently indicted for falsifying his claims.  Even more damning, Danchenko had close ties to senior Clinton Campaign official, Charles Halliday Dolan, Jr., who knowingly provided false information to Danchenko, who relayed it to Steele, who reported it in the Steele Dossier and eagerly fed the deceptions to both the media and the FBI.  This duplicitous arrangement existed for a singular self-serving purpose – to discredit Donald J. Trump and his campaign.

5.      At the same time, Michael Sussmann, in his hunt for damaging intel against the

Trump Campaign, turned to Neustar, Inc., an information technology company, and one of its top executives, Rodney Joffe, a fervent anti-Trumper who had recently been promised a high-ranking position with the Clinton Administration, to exploit their access to non-public data in search of a secret "back channel" connection between Trump Tower and Alfa Bank. When it was discovered that no such channel existed, the Defendants resorted to truly subversive measures – hacking servers at Trump Tower, Trump's private apartment, and, most alarmingly, the *White House*. This ill-gotten data was then manipulated to create a misleading "inference" and submitted to law enforcement in an effort to falsely implicate Donald J. Trump and his campaign.[2] All of these acts were carried out in coordination with the Clinton Campaign and the DNC, at the behest of certain Democratic "VIPs."[3]

6.     While their multi-pronged attack was underway, the Defendants seized on the opportunity to publicly malign Donald J. Trump by instigating a full-blown media frenzy. Indeed, the Clinton Campaign and DNC—admittedly on a "mission" to "raise the alarm" about their contrived Trump-Russia link[4]—repeatedly fed disinformation to the media and shamelessly promoted their false narratives. All the while, Hillary Clinton, Jake Sullivan, Debbie Wasserman Schultz, and others did their best to proliferate the spread of those dubious and false claims through press releases, social media, and other public statements.

7.     The fallout from the Defendants' actions was not limited to the public denigration of Trump and his campaign. The Federal Bureau of Investigation (FBI)—relying on the Defendants' fraudulent evidence—commenced a large-scale investigation and expended precious

---

[2] Indictment at ¶ 23 (ECF Doc. No. 1), *United States v. Sussmann*, case no. 1:21-cr-00582-CRC, District of Columbia (Sept. 16, 2021) (hereinafter the "Sussmann Indictment").
[3] *Id.* ¶ 10.
[4] Jennifer Palmieri (former Clinton Campaign Communications Director), *The Clinton campaign warned you about Russia. But nobody listened to us*., The Washington Post, March 24, 2017.

time, resources and taxpayer dollars looking into the spurious allegation that the Trump Campaign had colluded with the Russian Government to interfere in the 2016 presidential election. The effects of this unfounded investigation were prolonged and exacerbated by the presence of a small faction of Clinton loyalists who were well-positioned within the Department of Justice and the FBI – James Comey, Andrew McCabe, Peter Strzok, Lisa Page, Kevin Clinesmith, and Bruce Ohr. These government officials were willing to abuse their positions of public trust to advance the baseless probe to new levels, including obtaining an extrajudicial FISA warrant and instigating the commencement of an oversight investigation headed by Special Counsel Robert Mueller. As a result, Donald J. Trump and his campaign were forced to expend tens of millions of dollars in legal fees to defend against these contrived and unwarranted proceedings. Justice would ultimately prevail – following a two-year investigation, Special Counsel Mueller went on to exonerate Donald J. Trump and his campaign with his finding that there was no evidence of collusion with Russia.

8.      The full extent of the Defendants' wrongdoing has been steadily and gradually exposed by Special Counsel John Durham, who has been heading a DOJ investigation into the origins of the Trump-Russia conspiracy. To date, he has already issued indictments to Sussmann and Danchenko, among others, for proffering false statements to law enforcement officials. As outlined below, these 'speaking' indictments not only implicate many of the Defendants named herein but also provide a great deal of insight into the inner-workings of the Defendants' conspiratorial enterprise. Based on recent developments and the overall direction of Durham's investigation, it seems all but certain that additional indictments are forthcoming.

9.      In short, the Defendants, blinded by political ambition, orchestrated a malicious conspiracy to disseminate patently false and injurious information about Donald J. Trump and his campaign, all in the hopes of destroying his life, his political career and rigging the 2016

Presidential Election in favor of Hillary Clinton.  When their gambit failed, and Donald J. Trump was elected, the Defendants' efforts continued unabated, merely shifting their focus to undermining his presidential administration. Worse still, the Defendants continue to spread their vicious lies to this day as they unabashedly publicize their thoroughly debunked falsehoods in an effort to ensure that he will never be elected again.  The deception, malice, and treachery perpetrated by the Defendants has caused significant harm to the American people, and to the Plaintiff, Donald J. Trump, and they must be held accountable for their heinous acts.

## Jurisdiction and Venue

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that claims which arise under the laws of the United States, and this court has supplemental jurisdiction of the additional claims pursuant to 28 U.S.C. § 1367(a) as they all are so related to the federal questions that they form part of the same case or controversy.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because at least one Defendant and the Plaintiff reside in this District and a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this District.  In this regard, the publications of injurious falsehoods were intended to occur in the Southern District of Florida, and they did occur in the Southern District of Florida.

## The Parties

12.     The Plaintiff, Donald J. Trump, the 45th President of the United States of America, is a private citizen who is *sui juris* and he resides in the State of Florida in the Southern District of Florida.

13.     The Defendant, Hillary R. Clinton (hereinafter "Clinton"), is a resident of the State of New York and is *sui juris*.  She was the Democratic nominee for the 2016 Presidential Election. Clinton's acts and omissions as identified in this lawsuit arise out of or relate to her conduct in

and/or affecting, among other jurisdictions, Florida.

14.     The Defendant, HFACC, Inc. (hereinafter the "Clinton Campaign"), is a corporation with its principal place of business in New York and doing business all over the United States, including in the Southern District of Florida.  The Clinton Campaign's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

15.     The Defendant, the Democratic National Committee is a national committee, as defined by 52 U.S.C. § 30101, with its principal place of business in Washington, D.C.  The Democratic National Committee is registered with the FEC as the DNC Services Corp./Dem. Services Corp, and it operates through the Defendant, the DNC Services Corporation.  In turn, the DNC Services Corporation is a District of Columbia not-for-profit corporation, with its principal place of business in Washington, D.C.  The Democratic National Committee undertakes most of its business and financial activities through the DNC Services Corporation (hereinafter, the Democratic National Committee and the DNC Services Corporation are collectively referred to as the "DNC").  The DNC operates and conducts substantial and continuous business in the State of Florida.  The DNC's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

16.     The Defendant, Perkins Coie, LLP (hereinafter "Perkins Coie"), is an international law firm with its headquarters in Seattle, Washington.  Perkins Coie has a registered agent in Tallahassee, Florida, and does substantial, continuous business in Florida generally and in the Southern District of Florida specifically.  Perkins Coie's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

17.     The Defendant, Michael Sussmann (hereinafter "Sussmann"), is a resident of

United States, and is *sui juris*.  He is an attorney and a former agent and/or employee of Perkins Coie and, at all relevant times herein, was acting within the scope of his employment with Perkins Coie.  Sussmann's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

18.     The Defendant, Debbie Wasserman Schultz (hereinafter "Schultz") is a resident of the State of Florida and is *sui juris*.  She served as Chairperson of the DNC from May 2011 until the date of her resignation on July 28, 2016.  Schultz's acts and omissions as identified in this lawsuit arise out of or relate to her conduct in and/or affecting, among other jurisdictions, Florida.

19.     The Defendant, Charles Halliday Dolan, Jr.  (hereinafter "Dolan"), is a resident of the United States, and is *sui juris*.  With respect to the 2016 Clinton Campaign, Dolan actively campaigned and participated in calls and events as a volunteer on behalf of Hillary Clinton. Dolan's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

20.     The Defendant, Jake Sullivan (hereinafter "Sullivan"), is a resident of the United States, and is *sui juris*.  He was Chief Foreign Policy Advisory for the 2016 Clinton Campaign and, at all relevant times herein, was acting within the scope of his employment with the Clinton Campaign. Currently, Sullivan is serving as National Security Advisor for the Biden Administration.  Sullivan's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

21.     The Defendant, John Podesta (hereinafter "Podesta"), is a resident of the United States, and is *sui juris*.  He was Chairman for the 2016 Clinton Campaign and, at all relevant times herein, was acting within the scope of his employment with the Clinton Campaign.  Podesta's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting,

among other jurisdictions, Florida.

22.     The Defendant, Robert E. Mook (hereinafter "Mook"), is a resident of the United States and served as the campaign manager for the 2016 Clinton Campaign. At all relevant times herein, was acting within the scope of his employment with the Clinton Campaign. Mook's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting among other jurisdictions, Florida.

23.     The Defendant, Phillipe Reines (hereinafter "Reines"), is a resident of the United States, and is *sui juris*. He served as a long-time former communications advisor to Hillary Clinton and, at all relevant times herein, was acting within the scope of his employment with the Clinton Campaign. Reines' acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting among other jurisdictions, Florida.

24.     The Defendant, Marc Elias (hereinafter "Elias"), is a resident of Washington D.C. and is *sui juris*. He is an attorney and a former employee and/or agent of Perkins Coie, the DNC and the Clinton Campaign and, at all relevant times herein, was acting within the scope of his employment and/or agency of Perkins Coie. Elias's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

25.     The Defendant, Fusion GPS, is a Delaware limited liability company which represents that it provides research, strategic intelligence, and due diligence services to corporations, law firms, and investors worldwide, and is headquartered in Washington D.C. Fusion GPS's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

26.     The Defendant, Glenn Simpson (hereinafter "Simpson"), is a principal and co-founder of Fusion GPS, is a resident of the United States, and is *sui juris*. Simpson's acts and

omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

27.     The Defendant, Peter Fritsch (hereinafter "Fritsch"), is a principal and co-founder of Fusion GPS, is a resident of Florida, and is *sui juris*.  Fritsch's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

28.     The Defendant, Nellie Ohr (hereinafter "Mrs. Ohr"), is a resident of the United States, and is *sui juris*.  At all relevant times, she was an employee of Fusion GPS and was acting within the scope of her employment with Fusion GPS.  Mrs. Ohr's acts and omissions as identified in this lawsuit arise out of or relate to her conduct in and/or affecting, among other jurisdictions, Florida.

29.     The Defendant, Bruce Ohr (hereinafter "Mr. Ohr"), is a resident of the United States, and is *sui juris*.  At all relevant times, Bruce Ohr was a United States Department of Justice official.  Mr. Ohr's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

30.     The Defendant, Orbis Business Intelligence Ltd. (hereinafter "Orbis Ltd."), is a London, England-based intelligence consultancy firm.  Orbis Ltd.'s acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

31.     The Defendant, Christopher Steele (hereinafter "Steele"), is a principal and founder of Orbis Ltd., a resident of the United Kingdom, and is *sui juris*.  Steele's acts and omissions as identified in this lawsuit were all done in the scope of his employment with Orbis, Ltd., and arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

32.     The Defendant, Igor Danchenko (hereinafter "Danchenko"), at all times relevant to this Complaint, was a citizen of the Russian Federation and was lawfully in the United States. Danchenko resided in Washington, D.C.  and Virginia and is *sui juris.*  At all relevant times, Danchenko was a contractor for Orbis Ltd. and was acting within the scope of his agency with Orbis Ltd. Danchenko's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

33.     The Defendant, Neustar, Inc.  (hereinafter "Neustar"), is an information technology company with its headquarters in Sterling, Virginia.  Neustar's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

34.     The Defendant, Rodney Joffe (hereinafter "Joffe"), is a resident of the United States, and is *sui juris.*  Joffe is a former executive of Neustar and, at all relevant times herein, was acting within the scope of his employment with Neustar.  Joffe's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

35.     The Defendant, James Comey (hereinafter "Comey"), is a resident of the United States, and is *sui juris.* Comey was the 7th Director of the Federal Bureau of Investigation from 2013 to May 2017. Comey's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

36.     The Defendant, Peter Strzok (hereinafter "Strzok"), is a resident of the United States, and is *sui juris.*  At all relevant times, Strzok was an agent of the Federal Bureau of Investigation.  Strzok's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida .

11

37.     The Defendant, Lisa Page (hereinafter "Mrs. Page"), is a resident of the United States, and is *sui juris.* At all relevant times Mrs. Page was an attorney for the Federal Bureau of Investigation.  Mrs. Page's acts and omissions as identified in this lawsuit arise out of or relate to her conduct in and/or affecting, among other jurisdictions, Florida .

38.     The Defendant, Kevin Clinesmith (hereinafter "Clinesmith"), is a resident of the United States, and is *sui juris.* At all relevant times, Clinesmith was an attorney for the Federal Bureau of Investigation. Clinesmith's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida .

39.     The Defendant, Andrew McCabe (hereinafter, "McCabe"), is a resident of the United States, and is *sui juris.* McCabe was the Deputy Director of the Federal Bureau of Investigation from 2016 to March of 2018.  McCabe's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida

40.     The Defendants, John Does 1 through 10, are individuals whose identities are presently unknown to the Plaintiff, including, but not limited to, journalists, publishers, editors, investigators, state or federal officials, co-conspirators, officers, employees, agents, managers, owners, principals and/or other duly authorized individuals who caused or contributed to the incident or incidents for which the Plaintiff seeks damages, and/or are vicariously and/or otherwise liable for the acts, commissions, or other culpable conduct of those who did cause or contribute to the incidents alleged.

41.     The Defendants, ABC Corporations 1 through 10, are corporate entities presently unidentifiable to the Plaintiff, including, but not limited to, media companies, publication companies, editorial companies, municipalities, state or federal agencies, law enforcement authorities, investigative agencies, political organizations, political affiliates, private firms and/or

other duly authorized corporate or governmental entities who caused or contributed to the incident

or incidents for which the Plaintiff seeks damages, and/or are vicariously and/or otherwise liable

for the acts, commissions, or other culpable conduct of those who did cause or contribute to the

incidents alleged.

## **Statement of Facts**

**The DNC and the Clinton Campaign**
**Become One**

42.     On April 12, 2015, Clinton declared her candidacy for President of the United

States.  Clinton sought the nomination of the Democratic Party.

43.     Shortly thereafter, in April 2015, the Clinton Campaign retained Perkins Coie, a

law firm with longstanding ties to the Democratic Party, as its general counsel.[5]

44.     It was clear from the early days of the Democratic primaries that the DNC—which

according to its own rules, is required to "maintain impartiality and evenhandedness" during the

Democratic Primary nominating process—was backing Clinton and favored her as the preferred

Democratic nominee.[6]

45.     For example, in a confidential, inter-office DNC memorandum dated May 26, 2015

(the "DNC Memo"), which only came to light after the DNC servers were hacked by an individual

using the name "Guccifer 2.0," it was noted that the DNC sought to "provide a contrast between

the GOP field and HRC" and that it would "[u]se specific hits to muddy the waters around ethics,

transparency and campaign finance attacks on HRC."[7]

46.     Notably, the DNC Memo also stated that, in order to "muddy the waters" around

---

[5] Indictment at ¶ 10.
[6] DNC Charter and Bylaws, Art.  5 § 4.
[7] Complaint, Ex.  A (ECF Doc.  No.  8), *Wilding v.  DNC Services Corp., et al.*, case no.  0:16-cv-61511-WJZ, Southern District of Florida (July 13, 2016).

Clinton's perceived vulnerabilities as a candidate, the DNC had outlined a plan to "damage Republican presidential candidates' credibility with voters by looking for targeted opportunities to undermine their specific messaging." The DNC Memo also discussed "opposition research" and a strategy to "utilize the research to place highly targeted hits" against Republican candidates.[8]

47.     Around that same time, as later disclosed through a WikiLeaks release of confidential DNC documents, Schultz, the head of the DNC, stated in an e-mail that Clinton's Democratic competitor, Bernie Sanders, "isn't going to be president."

48.     Furthermore, Donna Brazile, then vice-chair of the DNC, said in criticism of Schultz: "She hadn't been very interested in controlling the party – she let Clinton's headquarters in Brooklyn do as it desired so she didn't have to inform the party officers how bad the situation was."

49.     In or around mid-2015, in an effort to foster greater coordination and cohesion with Clinton and the Clinton Campaign, the DNC retained the same law firm, Perkins Coie, to serve as its general counsel.

50.     Two of Perkins Coie's senior partners, Elias and Sussmann, were largely responsible for handling the firm's representation of the DNC and the Clinton Campaign in their legal, political, and other affairs. Elias, in particular, was designated as "General Counsel" for both the DNC and the Clinton Campaign.

51.     In or around August 2015, Elias and Sussmann negotiated a Joint Fund-Raising Agreement between their two clients, the DNC and the Clinton Campaign.

52.     The Joint Fund-Raising Agreement was nothing more than a thinly veiled effort to align the interests and operations of the DNC and the Clinton Campaign by giving the Clinton

---

[8] *Id.*

Campaign control over the DNC, an organization that was supposed to remain impartial.

53.     Specifically, the Joint Fund-Raising Agreement—which was entered into months before Clinton won the Democratic nomination—specified that, in exchange for raising money and investing in the DNC, the Clinton Campaign would control the DNC's finances, strategy, and all the money raised.  Her campaign had the right of refusal on who would be the party communications director, and it would make final decisions on all the other staff.  The DNC also was required to consult with the campaign about all other staffing, budgeting, data, analytics, and mailings.[9]

54.     Given the intimate ties between the DNC and the Clinton Campaign, and the amount of control that Clinton exerted over both, it was clear that the organizations' interests were aligned and they shared a common purpose: get Clinton elected President by any means necessary.

**The Clinton Campaign and DNC Conspire**
**With Their Attorneys, Perkins Coie, to Frame**
**Republican Candidate Donald J. Trump**

55.     On June 16, 2015, Donald J. Trump announced his candidacy for President and sought the Republican nomination.

56.     Seeking to thwart Trump's campaign and to diminish the likelihood of him winning the election, the Clinton Campaign and the DNC devised a nefarious scheme to discredit, delegitimize and defame him by proliferating a false narrative that Donald J. Trump and his campaign were actively colluding with Russia to interfere in the 2016 Presidential Election.

57.     This plot was conceived and funded by Clinton, the Clinton Campaign, and DNC and would require the participation, cooperation and assistance of many individuals and entities acting in concert with one another to willfully carry out numerous tortious and criminal acts.  The

---

[9] Donna Brazile, *Hacks: The Inside Story of the Break-ins and Breakdowns that Put Donald Trump in the White House*, November 7, 2017.

Defendants had a meeting of minds and a common objective: to irreparably harm Trump's ability to get elected and to end his political career.

58.     To start, the Clinton Campaign and the DNC enlisted the assistance of their joint attorneys, Perkins Coie.

59.     The Clinton Campaign and the DNC chose Perkins Coie to oversee and coordinate their plan for a specific purpose – they anticipated that conspiring with their legal counsel would help conceal their dealings under the shroud of attorney-client privilege.  However, attorney-client privilege is wholly inapplicable to the pertinent discussions between these parties – not only were the communications between the DNC/Clinton Campaign and Perkins Coie non-legal in nature, they were also in furtherance of criminal and fraudulent wrongdoing.

60.     Specifically, the Clinton Campaign and the DNC directed Perkins Coie to coordinate a two-pronged plan to publicly and falsely denigrate Donald J. Trump, with Elias and Sussmann each leading parallel operations to wrongly implicate him as colluding with Russia.

61.     On one front, Elias would work with Fusion GPS and a host of others to develop a dossier, based on lies and misinformation purporting to show an incriminating link between Trump and Russia, which would be used to mislead law enforcement officials and ignite a media frenzy.

62.     On a separate front, Sussmann would commission the information technology company, Neustar, to brazenly hack servers from highly-sensitive locations—including Donald J. Trump's private residence, Trump Tower, and, most shockingly, the White House—to uncover proprietary data that could then be manipulated to give the impression that Trump was engaged in illegitimate business with a Russian bank, Alfa Bank.

**Elias Recruits Fusion GPS and Others
to Manufacture a Falsified Set of
Reports Known as the Steele Dossier**

63.     To effectuate the first phase of the Defendants' conspiracy—involving the creation

of an incriminating dossier—the DNC and the Clinton Campaign would require the services of an

investigative firm to dredge up derogatory 'opposition research' on Donald J. Trump and, to the

extent there was none, to manufacture it.

64.     At all relevant times, Fusion GPS was a private investigative firm specializing in

politics.  It was founded in 2011 by former *Wall Street Journal* employees Glenn Simpson and

Peter Fritsch.[10]

65.     On March 1, 2016, Fritsch sent an e-mail to a "senior figure in the Democratic

Party" and conveyed his belief that Trump "had to be stopped."  The Democratic contact responded

by stating "Yes.  Let's talk."[11]

66.     The "senior figure in the Democratic Party" arranged for Fritsch and Simpson to

meet with Elias.  The meeting took place on April 20, 2016, in Washington D.C.[12]

67.     In or around April 2016, on behalf of and at the direction of the Clinton Campaign

and the DNC, Elias and Perkins Coie retained Fusion GPS.

68.     In particular, Fusion GPS was hired to perform 'opposition research' for the Clinton

Campaign and the DNC.

69.     The Clinton Campaign and the DNC were well aware that Fusion GPS had a well-

documented history of employing a 'scorched earth' strategy wherein the company would produce

---

[10] See generally Glenn Simpson and Peter Fritsch, *Crime in Progress: Inside the Steele Dossier and the Fusion GPS Investigation of Donald Trump* (hereinafter "*Crime in Progress*").
[11] Glenn Simpson and Peter Fritsch, *Crime in Progress: Inside the Steele Dossier and the Fusion GPS Investigation of Donald Trump* ("*Crime in Progress*"), p.  55.
[12] *Id.*  at 56.

false and/or misleading dossiers to be spread through the media to damage his opportunity to win an election.

70.    The Clinton Campaign, the DNC, Perkins Coie and Fusion GPS each understood that Fusion GPS's true task was to prepare a fraudulent "dossier" that could be used to falsely implicate Donald J. Trump to derail his campaign, ruining his opportunity to be elected and if elected to then interfere with his ability to properly serve as President of the United States by inducing criminal investigations of Donald J. Trump.

71.    The Clinton Campaign and the DNC funneled funds through Perkins Coie to finance Fusion GPS's research.  Fusion GPS would then report to the Perkins Coie attorney, Elias, the results of its "investigation."[13]

72.    In fact, Simpson and Fritsch reported *only* to Elias and did "not have any contact with the campaign brass." [14]

73.    As Fritsch and Simpson recounted in their book, the relationship was set up that way for a specific reason; per Elias, Fusion GPS was walled-off from the Clinton Campaign and the DNC for "legal reasons: If Fusion's communications were with a lawyer, they could be considered privileged and kept confidential."[15]

74.    At or around that time, Nellie Ohr was an employee of Fusion GPS, where her role was to conduct extensive opposition research on Donald J. Trump's family members and campaign aides.

75.    Mrs. Ohr's husband, Bruce Ohr, was an Associate Deputy Attorney General with the DOJ. Mrs. Ohr had also been previously employed with the DOJ.

---

[13] *Id.* at 57.
[14] *Id.*
[15] *Id.*

76.     The Clinton Campaign, the DNC, Perkins Coie, and Fusion GPS knew that this close relationship with a high-ranking DOJ official would be of great value in effectuating their plot – they understood that Mr. Ohr would be instrumental in lending credibility to the Steele Dossier by having Mr. Ohr serve as a seemingly trustworthy intermediary to disseminate it through government channels such as the FBI and the DOJ.

77.     To develop the dossier, the Clinton Campaign, the DNC, Perkins Coie and Fusion GPS turned to Orbis Ltd., a private intelligence firm, and its owner, Christopher Steele, a former British intelligence officer.

78.     Orbis Ltd. was chosen to partake in the scheme based on the ties between one of its analysts, Danchenko, and an individual with intimate ties to the Clinton Campaign and one its close associates, Dolan.

a.  Danchenko, a Russian citizen, had been working as a contractor/analyst with Orbis Ltd. Since 2011, focusing primarily on Russian and Eurasian geo-political matters.[16]

b.  Dolan, then an employee of public relations firm, Kglobal, was a longtime participant in Democratic politics, having previously served as chairman of the DNC, state chairman of former President Bill Clinton's 1992 and 1996 presidential campaigns, adviser to Clinton's 2008 presidential campaign, and having been appointed by Clinton to two four-year terms on an advisory commission at the U.S. State Department.  With respect to the 2016 Clinton campaign, Dolan actively campaigned and participated in calls and events as a volunteer on behalf of the Clinton Campaign.[17]

---

[16] Danchenko Indictment ¶ 16.
[17] *Id.* ¶ 19.

79.     In late April 2016, Danchenko began having discussions with Dolan about a potential business collaboration between Orbis Ltd. and Kglobal to create a "dossier" to smear Donald J. Trump and to disseminate the false accusations to the media.  Those discussions reflected that Danchenko and Dolan had exchanged information regarding each other's backgrounds and professional activities, including Danchenko's work for Orbis Ltd, and Steele:[18]

c.   On or about April 29, 2016, Danchenko sent an email to Dolan indicating that Danchenko had passed a letter to Steele on behalf of Dolan and intended to set up a meeting between the two.[19]

d.   That same day, Danchenko sent an email to Dolan outlining certain work that Danchenko was conducting with Orbis Ltd. The email attached an Orbis Ltd. Report titled "Intelligence Briefing Note, 'Kompromat' and 'Nadzor' in the Russian Banking Sector."[20]

e.   On or about June 10, 2016, Dolan sent an email to a U.S.-based acquaintance which reflected that Dolan and Danchenko had become colleagues and were exchanging information.  In describing Danchenko, Dolan stated: "He is too young for KGB.  But I think he worked for FSB.[21]  Since he told me he spent two years in Iran.  And when I first met him he knew more about me than I did.  [winking emoticon]."

80.     In or about June 2016, Fusion GPS officially retained Orbis Ltd. and Steele to find "links between Russia and the then Republican candidate. . .  Donald J. Trump."  When no such

---

[18] *Id.* ¶ 23.
[19] Danchenko Indictment ¶ 24.
[20] *Id.* ¶ 25.
[21] The Federal Security Service of the Russian Federation, commonly referred to as the "FSB," is the principal security agency of Russia and the principal successor agency to the KGB.

evidence was found, the directive shifted to manipulating the truth and developing a false narrative that Donald J. Trump was colluding with Russia.[22]

      a.  In taking on this assignment, Steele was aware that "Democratic Party associates" were paying for his and Fusion GPS's "research," and that "the ultimate client" was "the leadership of the Clinton presidential campaign."[23]

      b.  Critically, Steele has testified that "the candidate"—Hillary Clinton—was "aware of [his] reporting."[24]

      c.  Furthermore, Steele shared the common goal of the Defendants' overarching conspiracy: he "was desperate that Donald Trump not get elected" and he "was passionate about [Donald J. Trump] not being president."[25]

81.    Soon thereafter—at the direction of Clinton, the Clinton Campaign, the DNC, Perkins Coie, and Fusion GPS—Orbis Ltd. and Steele, with the assistance of Mook, Nellie Ohr, Danchenko Dolan, and others, began preparing approximately seventeen anti-Trump memoranda known collectively as the "Steele Dossier" or simply the "Dossier."

82.    Just after the Dossier was published, Podesta met Simpson to compare notes on Russia meddling in the election.[26]

83.    Robby Mook, manager of the Clinton Campaign, has denied having knowledge of who funded the Dossier.  However, Elias testified he sent the bills from Fusion GPS to Mook.[27]

---

[22] *Id.*
[23] IG Report at 96; *see also* Tr.  of Christopher Steele Deposition at 162-163 (Mar.  18, 2020), *Aven v.  Orbis* (2020) EWHC 1812 (QB) ("Q: . . .  in early July . . .  who did you think the ultimate client was? A: I thought it was the campaign . . .  Q: You knew it was the leadership of the Clinton presidential campaign, didn't you? A: I believed it was the campaign, yes.  Q: The leadership of the Clinton campaign? A: Fine, the leadership of the campaign.")
[24] FBI Notes at 96; *see also* Tr.  of Steele Dep. at 163 (emphasis added).
[25] Bruce Ohr Transcribed Interview 124, Aug.  28, 2918.
[26] https://www.shiftfrequency.com/podesta-illegal-spying-on-trump/
[27] https://townhall.com/tipsheet/mattvespa/2020/05/12/did-hillary-clintons-campaign-manager-know-about-trump-dossier-dem-lawyer-says-he-sent-receipts-n2568625

84.     The Dossier was intended to not only harm Trump's candidacy, but more importantly, it was fabricated to induce the FBI to commence an investigation into alleged ties between Russia and Donald J. Trump, the Trump Campaign, and the Trump Organization.

85.     In drafting the Dossier, Steele purported to rely upon numerous sources who contributed information and prevarications to him.

86.     Several of the alleged sources named in the Dossier have refuted, under oath, that they provided any of the purported information contained in the Dossier to Steele:

      d.  Olga Galkina, a Russian citizen who was referenced as "sub-source 3" in the Dossier, stated that she was never a source or sub-source to Steele, and, in fact, never even met him.[28]

      e.  Alexey Dundich, a Russian citizen who was referenced as "sub-source 4" in the Dossier, stated that he never was a source of information, and never even met Steele.[29]

      f.  Petr Avan, a Russian citizen who was referenced in the Dossier, denies the allegations contained in the Dossier and states that its contents are false.[30]

87.     The primary source for the information provided in the Dossier was Steele's analyst, Danchenko.

88.     From May 2016 through December 2016, Danchenko assembled and provided to Steele purported information that Steele would, in turn, rely upon to draft the Dossier.

89.     During that same time, Danchenko had numerous meetings, communications and

---

[28] Declaration of Olga Aleksandrovna Galkina dated June 8, 2021 (ECF Doc. No. 153-8), *Fridman, et al. v. Bean LLC a/k/a Fusion GPS, et al.*, case no. 17-2041-RJL, District of Columbia (June 21, 2021).
[29] Declaration of Alexey Sergeyevich Dundich dated May 13, 2021 (ECF Doc. No. 153-4), *Fridman, et al. v. Bean LLC a/k/a Fusion GPS, et al.*, case no. 17-2041-RJL, District of Columbia (June 21, 2021).
[30] Witness Statement of Petr Aven dated October 2, 2020, *Aven v. Orbis* (2020) EWHC 1812 (QB).

interactions with Dolan.

90.    Certain information contained in the Dossier, which Danchenko provided to Steele, mirrors and/or reflects information that Dolan had conveyed to Danchenko.

91.    For example, an allegation contained in Report 80 of the Dossier, claiming that Donald J. Trump had previously engaged in "salacious sexual activity" in the Presidential Suite at a Moscow hotel, was derived from Dolan:

> g.    Dolan had stayed at the Moscow hotel in June 2016, and, during that trip, he participated in, among other things: 1) a meeting with the general manager of the Moscow hotel and a female hotel staff member, (2) a lunch with a Staff Member and other members of the Moscow hotel staff and (3) a tour of the Moscow hotel, including the Presidential Suite.
>
> h.    Thereafter, Dolan told Danchenko that he learned from a hotel staffer that Trump had stayed in the Presidential Suite and engaged in "salacious sexual activity."
>
> i.    References to the Moscow hotel, the Presidential Suite, and a hotel manager and other staff would all later appear in the Dossier, which included absurd allegations that Trump participated in "sexual or salacious activity."
>
> j.    Dolan ultimately admitted that no one at the hotel mentioned anything to him about Trump's supposed "sexual or salacious" activity.

92.    Another allegation, contained in Report 111 of the Dossier, claiming that the Russian government withdrew a Russian from his job at the Russian Embassy in Washington, D.C. due to fears relating to the diplomat's purported role in meddling in the U.S. Presidential Election, had clearly originated from Dolan:

> [S]peaking separately to [a] compatriot, a senior Russian [Ministry of Foreign Affairs] official reported that as a prophylactic measure,

a leading Russia diplomat, [Russian Diplomat-1], had been
withdrawn from Washington on short notice because Moscow
feared his heavy involvement in the US presidential election
operation, including the so-called veterans' pensions ruse (reported
previously), would be exposed in the media there.  His replacement,
[Russian Diplomat-2] however was clean in this regard.

93.     This allegation bore substantial similarities to information that Dolan received

during the 2016 time period.

94.     Moreover, Dolan was undoubtedly a source for an allegation in the Dossier

regarding Paul Manafort's departure from the Trump Campaign:

S/he said it was true that the Ukraine corruption revelations had
played a part in this, but also, several senior players close to
TRUMP had wanted [Paul Manafort] out, primarily to loosen his
control on strategy and policy formulation.   Of particular
importance in this regard was Paul Manafort's] predecessor as
campaign manager, [Campaign Staff Member-1-], who hated [Paul
Manafort] personally and remained close to TRUMP with whom
he discussed the presidential campaign on a regular basis.

95.     The above allegation contained information that Dolan provided to Danchenko is

in response to a specific request.  In particular, on August 19.  2016, Danchenko emailed Dolan to

inquire as to any "thought, rumor, or allegation" about Paul Manafort.

96.     Thereinafter, on August 20, 2016.  Dolan emailed Danchenko the following:

I had a drink with a GOP friend of mine who knows some of the
players and got some of what is in this article, which provides even
more detail.  She also told me that [Campaign Staff Member-1],
who hates [Paul Manafort] and still speaks to Trump regularly
played a role.  He is said to be doing a happy dance over it.

97.     Later that same day, Danchenko replied to Dolan, expressing his appreciation for

the information, adding that their "goals clearly coincided" with respect to gathering derogatory

information about Trump.

98.     Moreover, an allegation contained in an undated Dossier report described a "well-

developed conspiracy of cooperation" between Donald J. Trump, the Trump Campaign, and senior

Russian officials, claiming:

> Speaking in confidence to a compatriot in late July 2016, [Source E], an ethnic Russian close associate of Republican US presidential candidate Donald Trump, admitted that there was a well-developed conspiracy of co-operation between them and the Russian leadership.  This was managed on the Trump side by the Republican candidate's Campaign manager, [Paul Manafort], who was using foreign policy advisor, [Carter Page], and others as intermediaries. The two sides had a mutual interest in defeating Democratic presidential candidate Hillary Clinton, whom President PUTIN apparently both hated and feared.

99.     This allegation would ultimately be offered in support of four FISA applications

targeting former Trump Campaign associate Carter Page.

100.    An additional allegation contained in the Dossier indicated that Russian diplomatic

staff in Washington, D.C., New York, and Miami were paying U.S.-based cyber actors to conduct

operations against the Democratic Party and Clinton.

**Sussmann Recruits Neustar to Lead a
Cyberattack Against the Trump Campaign**

101.    While Elias was conspiring with Fusion GPS, Orbis, Steele and others to create the

Dossier, Sussmann—at the direction of the Clinton Campaign and the DNC—was heading another

aspect of the Defendants' conspiracy: a plot to exploit sensitive data sources and falsify evidence

to manufacture ties between Donald J. Trump and a Russian bank.

102.    To put this plan in motion, the Clinton Campaign, DNC, and Perkins Coie required

the assistance of a technology company with the expertise and access to sensitive non-public data

which could be exploited for their nefarious purposes.

103.    At all relevant times, Neustar was an information technology company founded in

1998, which offers various internet-related information, data and analytics services, including

Domain Name System ("DNS") resolution services, to its customers.[31]

104.    Far from apolitical, Neustar and its employees have long been aligned with the Democratic Party.  In 2016 alone, 100% of congressional campaign donations from Neustar employees went to Democrats.

105.    At all relevant times, Joffe was an executive of Neustar and had an ownership interest in at least two additional technology companies, Dissect Cyber Inc. ("Dissect Cyber") and Zetalytics LLC ("Zetalytics").[32]

106.    Joffe was in communication with high-ranking officials of the Clinton Campaign and/or the DNC in the lead-up to the 2016 Presidential Election.

107.    During that time, Joffe was "tentatively offered the top [cybersecurity] job by the Democrats" in the event Clinton won the presidency.  He stated that he "definitely would not take the job under Trump."[33]

108.    Perkins Coie and Sussmann, in particular, frequently served as outside counsel for Neustar; in this regard, Neustar was a significant source of revenue for Perkins Coie.[34]

109.    In or around July 2016, Perkins Coie and Sussmann, acting on behalf of the Clinton Campaign and the DNC, tasked Neustar, under the direction of its executive, Joffe, to exploit its information gathering services and their access to non-public data to dredge up any information, data or records that could show any wrongdoing by Donald J. Trump, the Trump Campaign or the Trump Organization.

110.    Thereafter, Neustar, led by Joffe, initiated a search for proof of a secret "back

---

[31] Sussmann Indictment ¶ 12.
[32] *Id.; see also* Charlie Savage and Adam Goldman, *Trump Server Myster Produces Fresh Conflict*, The New York Times, September 30, 2021, https://www.nytimes.com/2021/10/01/us/politics/trump-alfa-bank-indictment.html.
[33] *Id.*  ¶ 15.
[34] Sussmann Indictment ¶ 14.

channel" between Donald J. Trump or the Trump Organization and Alfa Bank; when it became clear that no such back channel existed, Neustar and Joffe shifted their focus to fabricating evidence to invent proof of the supposed "back channel."

111.    On or about August 20, 2016, Joffe and his researchers manipulated a sales form on two different websites, faking the other's email address to make them "appear to communicate with each other. . ."

112.    Joffe believed that this fake "inference" was believable enough that "Hillary's opposition research and whatever professional gov[ernments] and investigative journalists are also digging [would] come up with the same things[.]"

113.    On or about the same date, Joffe clarified in an email that the "task" he had been "given" by Perkins Coie, the Clinton Campaign, and the DNC was "indeed broad" and further stated, in part:

> Being able to provide evidence of *anything* that shows an attempt to behave badly in relation to this, the VIPs would be happy.  They're looking for a true story that could be used as the basis for closer examination.

114.    On or about August 21, 2016, Joffe emailed his team of researchers, urging them to push forward with their anti-Trump research, which he claimed would "give the base of a very useful narrative."

115.    In that same e-mail, Joffe admitted that the connection between Trump and Alfa Bank was merely a "red herring" with no factual basis that should be "ignored."

116.    Despite this knowledge, Sussmann and Joffe began to draft, review, and revise a "White Paper" summarizing the allegations—which they knew to be false—of a tie between Donald J. Trump and Alfa Bank.

117.    All the time Sussmann spent drafting his 'white papers,' as with all his time spent

working with Neustar, Fusion GPS, and all of his acts in furtherance of the Defendants' conspiracy, were billed to the Clinton Campaign.

118.   On or about August 27, 2016, Joffe sent the white paper, on which Sussmann had been working, to his team with the following comment:

> Please read as if you had no prior knowledge or involvement, and you were handed this document as a security expert (NOT a DNS expert) and were asked: Is this plausible as an explanation?' NOT to be able to say that this is, without doubt, fact, but to merely be plausible. Do NOT spend more than a short while on this (If you spend more than an hour you have failed the assignment). Hopefully less. :)

119.   On or about the same date, one of Joffe's researchers replied, stating that the white paper achieved Joffe's objective, but noting that the paper "smartly" avoided discussing weaknesses or "holes" in the paper's hypothesis.

120.   On or about September 15, 2016, one of the recipients of the question responded to Joffe, stating, in part, that the "paper's conclusion was plausible" in the "narrow scope" defined by Joffe.

121.   On or about September 16, 2016, one of Joffe's team confirmed that Sussmann would convey the false information to the FBI regarding the supposed connection between Donald J. Trump and Alfa Bank, with the plan to deceive.

122.   In addition, in furtherance of his efforts with Sussmann and Elias to disseminate false allegations regarding Trump, Joffe also exploited his access—which he had through multiple companies, including Neustar, Dissect Cyber, and Zetalytics—to unlawfully search, gather and mine internet data, including non-public and proprietary data, to obtain derogatory information on

Donald J. Trump.[35]

    a.   The purpose of obtaining such data was to create an "inference" and "narrative" regarding Trump's purported ties to Russia.[36]

    b.   Those actions were directed by and/or done at the behest of certain "VIPs" of the Clinton Campaign and Perkins Coie.[37]

    c.   Those "VIPs" include Clinton, Sullivan, Elias and/or Sussmann.

123.    Among other things, Neustar, Joffe and their associates—at the direction of Clinton, the Clinton Campaign and the DNC — exploited access to non-public and proprietary internet data, including without limitation, domain name system (DNS) internet traffic, of: (i) a healthcare provider; (ii) Trump Tower; (iii) Donald Trump's private apartment in Central Park West, and (iv) the Executive Office of the President of the United States (EOP).[38]

    k.   In doing so, Joffe and Neustar intentionally accessed, without authorization or in excess of any authorization, the computers, servers, and/or other sensitive data sources at the above-stated facilities.

    l.   Furthermore, Joffe and Neustar stole trade secrets, in the form of proprietary, sensitive and confidential data, information, and knowledge, from the above-stated facilities.

124.    With regard to the EOP, Joffe and Neustar had come to access and maintain dedicated servers for the EOP as part of a highly sensitive arrangement whereby Neustar provided DNS resolution services to the EOP.[39]

---

[35] Sussmann Indictment ¶¶ 21-23; *see also* Motion to Inquire into Potential Conflicts of Interest ¶ 4 (ECF Doc.  No. 35), *United States v.  Sussmann*, case no.  1:21-cr-00582-CRC, District of Columbia (Feb.  11, 2022) (hereinafter "Sussmann Conflict Motion").
[36] Sussmann Indictment ¶ 23.
[37] *Id.*  ¶ 22-23; *see also* Sussmann Conflict Motion ¶¶ 4-5.
[38] *Id.*
[39] *Id.*

125.     Joffe and Neustar exploited this arrangement by, among other things, mining the EOP's DNS traffic and other data for the purpose of gathering derogatory information about Donald J. Trump.

126.     In addition, Joffe, Neustar, and their associates queried their holdings of non-public internet data against a lengthy list of more than 9,000 IP addresses, 3,000 internet domains, and 60 e-mail addresses and domains that related to Donald J. Trump, the Trump Organization, and numerous Trump associates, in their search for derogatory information.

**As the Presidential Race Takes Form,**
**The Steele Dossier Is Used To**
**Mislead Federal Law Enforcement**

127.     The Republican National Committee ("RNC") held its presidential nominating convention from July 18 through July 21, 2016, wherein Donald J. Trump was nominated as the Republican Nominee for President of the United States in the 2016 election.

128.     On July 26, 2016, Clinton won the nomination of the Democratic Party to be its presidential candidate for the 2016 Presidential Election.

129.     That very same day, a briefing from the U.S. intelligence community warned that it had intercepted communications concerning the "alleged approval by Hillary Clinton. . . of a proposal from one of her foreign policy advisors to vilify Donald Trump by stirring up a scandal claiming interference by Russian security services."[40]

130.     With the stage set and the election cycle underway, the Defendants put their plan into action.

131.     Specifically, the Defendants began feeding false information to federal law

---

[40] Letter from John Ratcliffe, Dir. of Nat'l Intelligence, to Sen. Lindsey Graham, Chairman, S. Comm. on the Judiciary (Sept. 29, 2020), https://www.judiciary.senate.gov/imo/media/doc/09-29-20_Letter%20to%20Sen.%20 Graham_Declassification%20of%20FBI's%20Crossfire%20Hurricane%20Investigations_20-00912_U_SIGNEDFINAL.pdf.

enforcement authorities, while simultaneously spreading those same lies through the media.  All

in an effort to cast malicious aspersions on Donald J. Trump, the Trump Campaign, and the Trump

Organization

132.    The opening salvo occurred in early-to-mid July 2016, when Steele—a paid FBI

informant—began sending his dossier memoranda to the FBI, knowing that they contained false

information on Donald J. Trump purporting to show compromising ties to Russia.[41]

133.    On the morning of July 31, 2016, Steele met with Nellie Ohr and Bruce Ohr, at

which time Steele discussed his work on the Steele Dossier. Bruce Ohr was already aware at that

time that Steele was "sharing his information with the Clinton campaign."[42]

134.    On that same day, the FBI opened a Foreign Agents Registration Act ("FARA")

investigation, known as Operation Crossfire Hurricane ("Crossfire Hurricane"), into whether

individuals associated with the Trump Campaign were witting of and/or coordinating activities

with the Russian government.

135.    Among others at the FBI, Crossfire Hurricane was led by FBI Deputy Assistant

Director Peter Strzok, FBI Director James Comey, and FBI Deputy Director, Andrew McCabe,

with involvement and assistance from, among others, FBI Special Counsel Lisa Page and FBI

attorney Kevin Clinesmith.

      a.    Text messages between Strzok and FBI Special Counsel Lisa Page, who were

           engaged in an illicit affair during that time, reveal that both of them had an utter

           disdain for the subject of their investigation, Donald J. Trump, and were

           determined to ensure that Hillary Clinton won the 2016 presidential election.

      b.    For example, on August 8, 2016, Page texted Strzok, "[Trump's] not ever going

---

[41] *Id*.  at ¶ 2; *see also* IG Report.
[42] S. REP. NO. 116-290, vol. 5, at 909–10.

to become president right? Right?!." Strzoke replied, "No. No he's not. We'll stop it."

   c.  The text messages also contained reference to an "insurance policy" that was being cultivated by Strzok, Page, McCabe, Comey and others at the FBI, in the event that Trump were to win the election:

   d.  For instance, on August 15, 2016, Strzok texted Page: I want to believe the path you threw out for consideration in Andy's (Andrew McCabe, Deputy Director of the FBI) office that there's no way Trump gets elected—but I'm afraid we can't take that risk. It's like an insurance policy in the unlikely event you die before you're 40 … "

   e.  This reference to an "insurance policy" reveals that Strzok and Page intended to ensure that, if Donald. J. Trump did indeed win the presidential election, that he would be quickly removed from office or, at a minimum, unable to effectively govern.

136.   By August 16, 2016, the FBI had opened individual cases under the Crossfire Hurricane umbrella as to four United States individuals, Carter Page, George Papadopoulos, Paul Manafort, and Michael Flynn.

137.   Three of these individuals, Page, Papadopoulous, and Manafort, were associated with the Trump Campaign.

138.   The focus of Crossfire Hurricane quickly became to obtain a FISA warrant, authorizing the spying and electronic surveillance of Carter Page, a foreign policy advisor with the Trump Campaign.

139.   To surveil an American citizen, the FISA requires that there be probable cause that

the target is an "agent of a foreign power" who is "knowingly engag[ing]…in clandestine intelligence activities." In short, to legitimately obtain a FISA warrant against Carter Page, the FBI had to demonstrate that he was a Russian agent who was knowingly engaging in intelligence activities on behalf of Russia.

140.    In August 2016, Bruce Ohr met with Andrew McCabe and Lisa Page and briefed them on the false accusation contained in the Steele Dossier, particularly those concerning Carter Page.

141.    On September 19, 2016, Steele provided reports from the Steele Dossier to the FBI, which contained false information regarding Carter Page and his purported ties to Russia.

142.    Thereafter, the FBI applied for four (4) separate FISA warrants as to Carter Page.

143.    In doing so, the FBI relied substantially on the Dossier as a means of establishing probable cause that Carter Page was a witting agent of the Russian Federation.

144.    Indeed, McCabe would later testify before Congress, behind closed doors, in December 2017, that, if not for the Steele Dossier, no FISA warrant would have been issued.[43]

145.    Each of the FISA applications set forth the FBI's assessment that Carter Page was a knowing agent of Russia and further alleged—in reliance on the Dossier—that Carter Page was part of a "well-coordinated conspiracy of co-operation between the Trump Campaign and the Russian government."

146.    The FBI ultimately obtained a total of four court approved FISA applications targeting Carter Page, which authorized intrusive electronic surveillance of him from in or about October 2016 through in or about September 2017.

147.    The first application was approved on October 21, 2016 ("FISA #1"), and three

---

[43] 120919-examination.pdf (justice.gov) at fn. 264.

renewal applications were approved on January 12, 2017 ("FISA # 2"), April 7, 2017 ("FISA # 3"), and June 29, 2017 ("FISA # 4").

148.    The FISA applications were reviewed by numerous FBI agents, FBI attorneys, and National Security Division (NSD) attorneys and, as required by law, was ultimately certified by then FBI Director James Comey and approved by then Deputy Attorney General Sally Yates.[44]

149.    In fact, no probable cause existed and there was no truth to any of the allegations against Carter Page, Donald J. Trump, or the Trump Campaign.

150.    Strzok was directly involved in the decision to open Crossfire Hurricane and the four FISA applications.  Additionally, "the documentation opening each of the four individual investigations was approved by Strzok."[45]

151.    Furthermore, Comey and Sally Yates approved the first renewal application. Comey and then Acting Attorney General Dana Boente approved the second renewal.  Acting FBI Director Andrew McCabe and then Deputy Attorney General (DAG) Rod Rosenstein approved the third renewal.[46]

152.    McCabe received regular briefings on the progress of Crossfire Hurricane and discussed the investigation with Comey at regular briefings.[47]

153.    Clinesmith was assigned to provide legal support to FBI personnel working on Crossfire Hurricane. Clinesmith worked with the National Security Division of the United States Department of Justice to prepare the FISA applications to obtain authority from the United States Foreign Intelligence Surveillance Court.[48]

---

[44] *Id*. (Page 6)
[45] *Id* at 349
[46] *Id.* at *7*
[47] [120919-examination.pdf (justice.gov)](https://justice.gov) (Page 69)
[48] *See generally* Indictment, *United States v.  Clinesmith*, case no.  1:20-cr-00165-JEB, District of Columbia (Aug. 14, 2020) (hereinafter, "Clinesmith Indictment").

154.    While 'assisting' the FBI, Clinesmith doctored an email with the Central Intelligence Agency. Clinesmith communicated with the CIA regarding whether Carter Page was a source. [49]

155.    Clinesmith took the email he received and added the words "not a source" and provided the doctored email to the FBI.[50]

156.    Ohr had regular contact with the Crossfire Hurricane team and provided them with information that appeared in the FBI interview Report Form (FD-302).

157.    James Comey was the Director of the FBI and his actions in this capacity allowed the false Trump-Russia collusion narrative to continue to thrive.

158.    Comey personally signed three FISA applications to spy on Carter Page, with the Dossier serving as part of the basis for the warrant requests.

159.    Comey was aware, or should have been aware, that there was no evidentiary basis for the FISA applications and that the Steele Dossier was not a credible source:

   a.   *The Washington Times* reported that it had obtained a three page highly classified memo from September 2016, in which the CIA informed then FBI Director James Comey, that the Clinton Campaign was planning to blame "collusion" between Trump and the Russian government.  The memo shows that Comey was advised by the CIA of what the Clinton campaign had been doing.  Comey was advised of the fact that the Clinton campaign was setting up Donald J. Trump, weeks after the FBI had opened the Crossfire Hurricane investigation into alleged collusion. That information was a red flag to the FBI and it was ignored, as Comey was aligned with the Clinton Campaign.

---

[49] *Id.*
[50] *Id.*

b. Comey admitted in December, 2018, during his testimony before the House Judiciary Committee, that prior to signing the FISA application to obtain the warrant to conduct surveillance on Carter Page, that he was aware that the fake Dossier, authored by Steele, was financed by the Clinton Campaign and the DNC, or as he referred to them, "political actors, who opposed Donald J. Trump." Yet, none of that information was disclosed in the FISA applications in October, 2016, or on any of the renewals.

c. Moreover, Comey during his testimony before the House Judiciary Committee disclosed that when he met with Donald J, Trump in January 2017, in Trump Tower, to brief him on the Dossier, that he failed to inform the incoming President, about who financed the document, despite, the fact that Comey was well aware that it was financed by Hillary Clinton via the DNC and the Clinton Campaign through Perkins Coie.

d. Comey intentionally withheld that information from Donald J. Trump, as well as in the FISA applications, themselves. Comey not only withheld that information from Donald J. Trump and the FISA Court, so that the scheme could be hidden, but he also pushed back, on behalf of the FBI, requests from Donald J, Trump to investigate the origins of the "salacious material" i.e.: the Dossier. As such, Comey confirmed that he did not tell Donald J. Trump, during his briefing that the Dossier had been paid for by his political opponents, mainly Hillary Clinton, the Clinton Campaign, and the DNC, via the Perkins Coie law firm.

160. Comey utilized the Steele Dossier as purported evidence to sign FISA documents to conduct surveillance on Carter Page, when he knew that the Dossier was discredited, and failed

to advise the FISA court.

161.   Comey failed to tell the FISA court that the Dossier was reportedly funded by the Clinton Campaign and the DNC and compiled by Fusion GPS.

162.   Comey failed to tell the FISA court that the Dossier he relied upon to request a warrant to monitor Carter Page was a product of the Fusion GPS

163.   Comey relied on the Dossier to monitor Carter Page, even though months later he called the information in the Dossier salacious and unverified.

164.   Comey relied on the Dossier, even though the FBI determined the document was only minimally corroborated.

**The Defendants Spread Their False
Narrative Through the Media While
Sussmann Makes False Statements to
Law Enforcement**

165.   At the same time that the FBI's unfounded investigation was underway, the Defendants were also spreading disinformation through the media in their effort of igniting a media frenzy.

166.   Their coordinated efforts at or around that time included, without limitation, the following acts:

   a.   On September 1, 2016, Sussmann met with a reporter to discuss the false Trump-Alfa Bank connection; the reporter would later write an article about the topic.

   b.   On September 12, 2016, Sussmann spoke with Elias, via phone, regarding Sussmann's efforts to communicate with one newspaper on the allegations about Alfa Bank; Sussmann and Elias.  Each billed the call to the Clinton Campaign.

   c.   On September 21, 2016, Steele, Fritsch, and Simpson met with numerous members of the media in Washington D.C., including reporters from *The New York Times*,

37

*The Washington Post*, *New Yorker*, *Yahoo News*, and *CNN*, to discuss their investigative findings of an alleged "sinister relationship" between Donald J. Trump and Russia, including the "possible coordination of members of Donald J. Trump's campaign team and Russian government officials."[51]

d.  In mid-October 2016, Steele again met with reporters of *The New York Times*, *The Washington Post*, and *Yahoo News* and provided additional briefings of his supposed findings concerning a Trump-Russia connection.[52]

167.    The next phase of the plan involved Sussmann meeting with the FBI to provide false evidence and information and to continue their efforts to intentionally mislead federal law enforcement authorities.

168.    In the lead-up to Sussmann's meeting with the FBI, there were numerous meetings between Sussmann and Elias, Neustar, and/or Fusion GPS, all of which were billed to the Clinton Campaign and/or the DNC, including, but not limited to the following:

a.  On or about July 29, 2016, Sussmann and Elias met with personnel from Fusion GPS in Elias' office; Sussmann billed his time for this meeting to the Clinton Campaign under the category "General Political Advice"[53] with the billing description "meeting with Elias, others regarding [] confidential project."

b.  In early August 2016, Sussmann met with Steele to advise him of a potential connection between Trump Tower and the Russian Alfa Bank; his time was billed to the Clinton Campaign.[54]

---

[51] *Crime in Progress* at 110; *see also* IG report at 105.
[52] *Id.* at 117.
[53] For all of Sussmann's other billing entries cited herein that he billed to the Clinton Campaign, he similarly billed his time to the Clinton Campaign under the category "General Political Advice."
[54] Tr. of Interview at 74–75, H. Permanent Select Comm. on Intelligence Interview of Michael Sussmann (Dec. 18, 2017), https://www.dni.gov/files/HPSCI_Transcripts/2020-05-04-Michael_Sussmann-MTR_Redacted.pdf; Tr. of Steele Dep. at 1–2.

   c.   On about August 12, 2016, Sussmann met with Elias and Joffe in Elias' office; the meeting was billed to the Clinton Campaign with the billing description "confidential meetings with Elias, others."

   d.   On or about August 17, 2016, Sussmann had a conference call with Elias and Joffe; his time was billed to the Clinton Campaign with the billing description "telephone conference with Joffe."

   e.   On or about August 19, 2016, Sussmann had another meeting with Elias and Joffe; Sussmann billed his time to the Clinton Campaign with the billing description stating, in part, "confidential meeting with Elias, others[.]"

   f.   On or about August 20, 2016, Sussmann met with a representative of Fusion GPS and communicated with the media; he billed his time to the Clinton Campaign with the billing description, "Meeting with consultant and Elias; revisions to White Paper; meeting with expert; meeting with expert and reporter; follow up meeting with reporter; conversations with Elias."

169.    On or about September 15, 2016, just four days before Sussmann's meeting with the FBI, Elias exchanged emails with Sullivan, as well as the Clinton Campaign's manager and communications director, concerning the plot to falsely connect Donald J. Trump to the Russian bank, Alfa Bank, by disseminating the lies to the media.[55]

170.    On or about September 19, 2016, Sussmann met with the FBI General Counsel at FBI Headquarters in Washington D.C. to convey his allegations of the connection between Donald J. Trump and the Russian bank.

171.    During this meeting, the following, in substance and in part, took place:

---

[55] Sussmann Indictment ¶ 25.

a.  Sussmann stated falsely that he was not acting on behalf of any client, which led the FBI General Counsel to understand that Sussmann was conveying the allegations as a good citizen and not as an advocate for any client.

b.  Sussmann stated that he had been approached by multiple cyber experts concerning the Russian bank connections allegations; Sussmann provided the names of three cyber experts, but did not name or mention Neustar, Joffe, the Clinton Campaign, or any other person or company referenced above.

c.  Sussmann described the allegations of a secret Trump Organization server that was in communication with the Russian bank, including that the Russian bank had used a TOR exit node located at a healthcare company to communicate with the Trump Organization.

d.  Sussmann stated that media outlets were in possession of information about the Trump Organization's secret server, and that a story would be published on Friday of that week.

e.  Sussmann provided to the FBI General Counsel two thumb drives and hard copy papers, which contained and comprised the following: (i) the aforementioned white paper that Sussmann had assisted in drafting, entitled *White Paper #1 AuditableV3*, which contained no date or author's name; (ii) a white paper drafted by a researcher, which was entitled, *White Paper Comments: Time Series Analysis of Recursive Queries*, dated September 19, 2016, and contained no author's name; (iii) white paper drafted by Fusion GPS regarding the Russian Bank and its parent company, which contained no date or author's name; and (iv) eight files containing the Russian Bank data and other purported data and information relating to the

mail.trump-email.com domain.

172.    Sussmann reported the Trump-Alfa Bank connection, as though it was real, and lied to the FBI General Counsel, by falsely stating that he was not acting on behalf of any client, when he was specifically there at the behest of Clinton, the Clinton Campaign, and the DNC.  In fact, he billed the Clinton Campaign for his efforts, as he had with all of his actions taken in furtherance of the Defendants' conspiracy.

173.    Sussmann's statement to the FBI General Counsel that he was not acting on behalf of any client was knowingly and intentionally false.  In truth, and as Sussmann well knew, he and his firm, Perkins Coie, had been acting on behalf of and in coordination with four specific clients, *i.e.,* Neustar, Clinton, the Clinton Campaign, and the DNC in assembling and conveying his allegations.

174.    Sussmann billed his meeting with the FBI General Counsel to the Clinton Campaign with the billing description, "work and communications regarding confidential project."

175.    Sussmann concealed and failed to disclose, among other things, that, (i) he had spent time drafting one of the white papers he provided to the FBI General Counsel and billed that time to the Clinton Campaign, and (ii) Fusion GPS, which at the time was also acting as a paid agent of the Clinton Campaign and the DNC, drafted another of those white papers.

176.    Sussmann's lies and omissions were material because, among other reasons, they misled the FBI General Counsel and other FBI personnel concerning the political nature of his work and deprived the FBI of information that might have permitted it more fully to assess and uncover the origins of the relevant data and technical analysis, including the identities and motivations of Sussmann's clients.

177.    Had the FBI uncovered the origins of the relevant data and analysis, it would have

learned, among other things, that (i) in compiling and analyzing the Alfa Bank allegations, Joffe had exploited his access to non-public data at multiple internet companies to conduct opposition research concerning Donald J. Trump; (ii) in furtherance of these efforts, Joffe had enlisted, and was continuing to enlist, the assistance of researchers at a U.S.-based university who were receiving and analyzing internet data in connection with a pending federal government cybersecurity research contract; and (iii) Sussmann, Elias, Perkins Coie, Joffe, and Neustar had coordinated, and were continuing to coordinate with representatives and agents of the Clinton Campaign and the DNC, with regard to the data and written materials that Sussmann gave to the FBI and the media.

178.    Immediately, after the aforementioned September 19, 2016, meeting, the FBI General Counsel spoke with the Assistant Director of the FBI's Counterintelligence Division. During their conversation, the FBI General Counsel conveyed the substance of his meeting with Sussmann.  The Assistant Director took contemporaneous handwritten notes which reflect, in substance, the above-referenced statements by Sussmann and stated, among other things: "Michael Sussmann – Atty: Perkins Coie, LLP not doing this for any client."

179.    In the days following Sussmann's meeting with the FBI General Counsel, and as a result of that meeting, the FBI opened an investigation of the Trump-Alfa Bank allegations.

180.    The FBI's investigation of these allegations nevertheless concluded that there was insufficient evidence to support the allegations of a secret communications channel with the Russian bank.  In particular, and among other things, the FBI's investigation revealed that the email server at issue was not owned or operated by the Trump Organization but rather, had been administered by a mass marketing email company that sent advertisements for Trump hotels and hundreds of other clients.

181.     Moreover, demonstrating that Sussmann carried out the aforementioned work on behalf of his clients, Sussmann continued in the weeks following this meeting to coordinate with Joffe, Elias, and Fusion GPS, to disseminate the Russian bank allegations to the media.

182.     For example, on or about October 10, 2016, Sussmann emailed a reporter a link to an opinion article which asserted, in substance and in part, that investigative reporters had not published as many stories regarding Donald J. Trump as other media outlets.

183.     In or about late October 2016, approximately one week before the 2016 U.S. Presidential Election, multiple media outlets reported that U.S. government authorities had received and were investigating allegations concerning a purported secret channel of communications between the Trump Organization and a particular Russian bank, Alfa Bank.

184.     One of these articles, published by the *New Yorker* on October 8, 2016, stated:

> Examining records for the Trump domain, Max's group discovered D.N.S. lookups from a pair of servers owned by Alfa Bank, one of the largest banks in Russia.  Alfa Bank's computers were looking up the address of the Trump server nearly every day.  There were dozens of lookups on some days and far fewer on others, but the total number was notable: between May and September, Alfa Bank looked up the Trump Organization's domain more than two thousand times.  "We were watching this happen in real time—it was like watching an airplane fly by," Max said.  "And we thought, Why the hell is a Russian bank communicating with a server that belongs to the Trump Organization, and at such a rate?"

185.     On or about October 31, 2016, eight days before the 2016 Presidential Election, Sullivan put out a written campaign statement that claimed that Trump and the Russians had set up a "secret hotline" through Alfa Bank and that "federal authorities" were investigating "this direct connection between Trump and Russia." He portrayed the shocking discovery as the work of independent experts—"computer scientists"—without disclosing their attachment to Hillary Clinton or the Clinton Campaign.  The full statement was as follows:

> [T]his could be the most direct link yet between Donald Trump and Moscow. Computer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank. This secret hotline may be the key to unlocking the mystery of Trump's ties to Russia. It certainly seems the Trump Organization felt it had something to hide, given that it apparently took steps to conceal the link when it was discovered by journalists. This line of communication may help explain Trump's bizarre adoration of Vladimir Putin and endorsement of so many pro-Kremlin positions throughout this campaign. It raises even more troubling questions in light of Russia's masterminding of hacking efforts that are clearly intended to hurt Hillary Clinton's campaign. We can only assume that federal authorities will now explore this direct connection between Trump and Russia as part of their existing probe into Russia's meddling in our elections.

186.   Sullivan was acting in the scope and authority of his employment with the Clinton Campaign when he made this false statement, which was made with the intention of harming Trump and his campaign.

187.   Elias, acting in the scope and authority of the Clinton Campaign, assisted Sullivan with the statement, as evidenced by his billing entries submitted to the Clinton Campaign.

188.   On the same day, Clinton published the same false and damaging statements to the public through her Twitter account, wherein she included a photograph of Sullivan's statement along with her own commentary: "Computer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank."[56]

189.   A second tweet from Clinton on that same day said that it was "time for Trump to answer serious questions about his ties to Russia." It also included a graphic stating the following:

> 1. Donald Trump has a secret server. (Yes, Donald Trump.) 2. It was set up to communicate privately with a Putin-tied Russian bank called Alfa Bank. 3. When a reporter asked about it, they shut it down. 4. One week later, they created a new server with a different

---

[56] Hillary Clinton (@HillaryClinton), Twitter (Oct. 31, 2016, 8:36 PM), https://twitter.com/hillaryclinton/status/793250312119263233?lang=en.

name for the same purpose.[57]

190.    Clinton made these statements despite her awareness that they were patently false and that neither Donald J. Trump nor the Trump Organization had any ties to Alfa-bank.  She was driven by a pathological need to stop Trump from ever entering the White House irrespective of the damage and national discord it would cause.

191.    The Defendant, John D.  Podesta, Hillary Clinton's campaign chairman, also pushed the false Trump-Russia allegations.  After Wikileaks released internal Clinton campaign emails, Podesta told reporters on October 11, 2016, that "I've been involved in politics for nearly five decades.  This definitely is the first campaign that I've been involved in which I've had to tangle with Russian intelligence agencies who seem to be doing everything they can on behalf of our opponent."

192.    He then stated, without even a shred of evidence that "I think it is a reasonable assumption to, or at least a reasonable conclusion, that Mr.  Stone had advance warning, and the Trump campaign had advance warning about what Assange was going to do."[58]

193.    On November 9, 2016, in spite the Defendants' collective efforts, Trump won the 2016 Presidential Election.

194.    Despite his victory, the Defendants' efforts continued unabated.

195.    In mid-November 2016, Glenn Simpson met personally with Bruce Ohr, at his request, to discuss Fusion GPS's findings regarding Russia and the election.

196.    Mr. Ohr concealed this meeting from the Department of Justice; he was later

---

[57] Hillary Clinton (@HillaryClinton), Twitter (Oct.  31, 2016, 7:32 PM),
https://twitter.com/HillaryClinton/status/793234169576947712?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed
%7Ctwterm%5E793234169576947712%7Ctwgr%5E%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fthenationalde
sk.com%2Fnews%2Famericas-news-now%2Ftweets-by-hillary-clinton-allegedly-support-accusations-her-
campaign-paid-to-spy-on-trump-donald-president-emails-russia-john-durham-michael-susmann
[58] https://time.com/4528049/hillary-clinton-john-podesta-emails-hackers-russia/

reprimanded and demoted for doing so.

197.    On December 10, 2016, Glenn Simpson provided a thumb drive to Bruce Ohr containing most of the reports comprising the Steele Dossier. Ohr, in turn, provided the thumb drive to the FBI.

198.    Ten days later, on December 20, 2016, Bruce Ohr provided a second thumb drive to the FBI, containing anti-Trump "opposition research" reports prepared by his wife, Nellie Ohr, in her capacity as a Fusion GPS employee.

199.    Over time, the FBI attempted to investigate, vet, and analyze the Dossier, but ultimately was not able to confirm or corroborate most of their substantive allegations.

200.    In the context of those efforts, the FBI learned that Danchenko, a Russian analyst, had served as a central source of information contained in the Dossier.

201.    From January 2017 through November 2017, the FBI conducted numerous interviews with Danchenko (collectively the "Interviews") concerning, among other things, the information that Danchenko had provided to Steele for the Dossier.

202.    During the course of these Interviews, Danchenko plainly admitted that he had "zero" corroboration for the key allegations that he had contributed to the Dossier.

203.    In addition, as alleged in further detail below, Danchenko repeatedly lied to FBI agents during his Interviews.

204.    First, Danchenko falsely stated that he never communicated with Charles Halliday Dolan, Jr, a claim which was patently false.

205.    In fact, Danchenko and Dolan had been in frequent communication since at least April 2016, had gone on a trip together, and had attended numerous meetings and conferences together.

206.    The disclosure of Danchenko's relationship with Dolan would have been incredibly relevant to the FBI's understanding of the contents of the Dossier:

    a.  At all relevant times, Dolan has long held deep ties to the Democratic Party operative and has been a close associate of and adviser to Hillary Clinton.

    b.  As a result, Dolan frequently interacted with senior Russian Federation leadership whose names would later appear in the Dossier, such as Putin spokesman Dmitry Peskov and then-Russian ambassador to the US Sergey Kislyak.

    c.  Also, in 2006, the Kremlin signed a deal with Ketchum, the PR firm where Dolan served as vice president for public affairs.  As part of that agreement, Ketchum was to handle global public relations for the Russian government as well as the state-owned energy company Gazprom.

207.    In fact, as detailed above, many of the allegations contained in the Dossier came *directly from* Dolan, who had conveyed them to Danchenko who, in turn, reported them to Steele.

208.    Dolan 's role as a contributor of information to the Dossier was highly relevant and material to the FBI's evaluation of those reports because:

    a.  Dolan maintained pre-existing and ongoing relationships with numerous persons named or described in the Dossier, including one of Danchenko's Russian sub-sources,

    b.  Dolan maintained historical and ongoing involvement in Democratic politics, which bore upon Dolan's reliability, motivations, and potential bias as a source of information for the Dossier, and

    c.  Danchenko gathered some of the information contained in the Dossier at events in Moscow organized by Dolan and others that Danchenko attended at Dolan's

invitation.  Certain allegations that Danchenko provided to Steele, and which appeared in the Dossier, mirrored and/or reflected information that Dolan himself also had received through his own interactions with Russian nationals.

209.    On or about January 13, 2017, Dolan replied to an email sent by a U.S.-based person discussing a recent news article regarding the Dossier, wherein Dolan stated:

> [] I've been interviewed by the Washington Post and the London Times -three times over the last two days over the Steele Dossier on Trump and I know the Russian agent who made the report (He used to work for me).  My client in [Foreign Country] [Business] has been accused of being the party that organized the hacking.  Presently speaking with the barrister in London who is filing a brief against Steele has been unmasked as the man behind an explosive dossier about US president-elect Donald Trump.  Also in conversation with former British Ambassador who knows Steele.  Quite right -Oh what a boring life.

210.    At that time, Danchenko was not publicly known to be a source for Steele.

211.    On March 16, 2017, Danchenko informed the FBI that he believed the source in the above-referenced allegations referred, at least in part, to the Chamber President.  He repeated these claims in subsequent interviews on or about March 16, 2017, May 18, 2017, October 24, 2017, and November 2, 2017.

212.    Meanwhile, Sussmann and Joffe continued to play their part in the Defendants' grand conspiracy.

213.    Through late 2016 and early 2017, Joffe and a researcher continued to compile additional information and data regarding the Alfa Bank allegations and gathered other purported data allegedly involving Donald J. Trump's related computer networks which they claimed tied him to Russia.

214.    Around that time, Sussmann began arranging a meeting with the Central Intelligence Agency (CIA) to continue spreading his lies.

215.     On or about February 9, 2017, Sussmann met with two CIA employees at a location outside the District of Columbia.

216.     At the meeting, the following, in substance and in part, occurred:

    a.   Sussmann stated falsely – as he previously had stated to the FBI General Counsel that he was "not representing a particular client." In truth and in fact, and as Sussmann had acknowledged to the Former Employee just days earlier, Sussmann was indeed representing a client.

    b.   Sussmann disclosed that Perkins Coie, was active in representing several Democratic Party causes and officer-holders, including both the DNC and Clinton. Sussmann stated, however, that such work was unrelated to his reasons for contacting the CIA.

    c.   Sussmann discussed and described the updated allegations, including new details concerning the Russian Bank allegations that he had not provided to the FBI General Counsel.

    d.   Sussmann provided to the CIA employees (i) several white papers, and (ii) multiple data files containing purported DNS data, ranging from 2016 through early 2017.

217.     As he had done in his prior meeting with the FBI, Sussmann—acting on behalf of the Clinton Campaign and the DNC—again lied to and intentionally mislead federal law enforcement officials in furtherance of the Defendants' scheme.

218.     That Sussmann was acting on behalf of, and in coordination with, the Clinton Campaign and the DNC when he made his false statements to the FBI and the CIA was confirmed in December 2017, when Sussmann testified under the penalty of perjury before the House

Permanent Select Committee on Intelligence:

> Q: [] When you decided to engage the two principals, one, [the FBI General Counsel] in September, and the general counsel of [Agency-2] in December, you were doing that **on your own volition,** based on information another client provided you. Is that correct?
>
> [Sussman]: No.
>
> Q: So what was – so did your client direct you to have those conversations?
>
> [Sussman]: Yes.
>
> Q: Okay. And your client also was witting of you going to [the CIA] in February to disclose the information that individual had provided you?
>
> [Sussman]: **Yes**
>
> [ . .. ]
>
> Q: Okay. I want to ask you, so you mentioned that **your client directed you** to have these engagements with the FBI and [redacted] and to disseminate the information that client provided you. Is that correct?
>
> [Sussmann]: [] [W]e had a conversation, as lawyers do with their clients, about client needs and objectives and the best course to take for a client. And so it may have been a decision that we came to together. I mean, I don't want to imply that I was sort of directed to do something against my better judgment, or that we were in any sort of conflict, but this was -- I think it's most accurate to say it was done on behalf of my client.

219.     Meanwhile, the Defendants' continued their campaign of spreading disinformation through the media.

220.     On March 7, 2017, Mook acknowledged during a Fox & Friends appearance, that there was a wiretap of Russian officials in contact with associates of President Trump, and that surveillance may have been conducted on Trump computers as well.

221.     In October of 2017, Podesta went on Twitter and accused Donald J. Trump of

"running a "big lie campaign" centered on the investigation into Russian meddling in the U.S. election."[59]

**A String of Federal Investigations**
**Clear Donald J. Trump and**
**Uncover the Defendants' Illicit Conspiracy**

222.    On May 9, 2017, Comey was fired from his position of Director of the FBI.

223.    Shortly thereafter, in the wake of his firing, Comey took retaliatory action against Donald J. Trump.

224.    During his time with the FBI, Comey had documented several of his interactions with Donald J. Trump in a series of memos. After he was no longer an employee of the FBI, Comey intentionally shared these memos with one of his lawyer friends, who he directed to leak to a *New York Times* reporter who had been reporting on the Russia conspiracy theory.

225.    The leak was investigated by the Office of the Inspector General (IG) which, in an August 2019 report, faulted Comey for the "unauthorized disclosure of sensitive investigative information, obtained during the course of FBI employment, in order to achieve a personally desired outcome."[60]

226.    The outcome that Comey desired—per his own admission to Congress—was to "prompt" the appointment of a special counsel to investigate Donald J, Trump' alleged conspiracy with the Russian movement.

227.    The IG's report noted that Comey had "set a dangerous example" by "release[ing] sensitive information" to "create public pressure for official action."

228.    Comey was successful in getting the special master appointed, due to his unlawful

---

[59] https://www.yahoo.com/news/trump-behind-apos-big-lie-164719959.html
[60] Report of Investigation of Former Federal Bureau of Investigation Director James Comey's Disclosure of Sensitive information and Handling of Certain Memoranda, Office of the Inspector General, Oversight and Review Division 19-02, August 2019, https://oig.justice.gov/reports/2019/o1902.pdf (hereinafter, the "IG Report (Aug. 2019).

leaking of information, even though Comey didn't have enough evidence to pursue it in his own official capacity.

229.    In May 2017, Robert Mueller was appointed as Special Counsel to "oversee the previously-confirmed FBI investigation of Russian government efforts to influence to 2016 Presidential Election and related matters."[61]

230.    Strzok, the leader of the Russia probe, texted Lisa Page in May 2017 that he was reluctant to join Mueller's probe and leave his senior FBI post because he feared "there's no big there, there."[62]

231.    In addition, in May 2017, Page told Representative John Ratcliffe "it still existed in the scope of possibility that there would be literally nothing" to connect Trump and Russia, no matter what Mueller or the FBI did."

232.    On March 22, 2019, Special Counsel Robert Mueller concluded his 22-month investigation and submitted his confidential report entitled "Report on the Investigation into Russian Interference in the 2016 Presidential Election" (the "Mueller Report") to Attorney General William Barr.

233.    The Mueller Report demonstrated that, after a two-year long investigation coming on the heels of a year-long FBI investigation, the Special Counsel found no evidence that Donald J. Trump or his campaign ever colluded with the Russian government to undermine the 2016 election.

234.    Specifically, Special Counsel Mueller "did not find that the Trump campaign, or anyone associated with it, conspired or coordinated with the Russian government in these efforts,

---

[61] Appoint of Special Counsel (press release), US Department of Justice, May 17, 2017, https://www.justice.gov/opa/pr/appointment-special-counsel.
[62] Lisa Page bombshell: FBI couldn't prove Trump-Russia collusion before Mueller appointment | The Hill

despite multiple efforts from Russian-affiliated individuals to assist the Trump campaign."[63]

235.     In March of 2019, shortly after the Muller Report determined there was no evidence of collusion, Reines went on Fox News and continued to accuse Donald J. Trump falsely.

236.     Reines debated with Mollie Hemingway who told Reines that the conspiracy was over and Reines responded: "You saying it on FOX doesn't make it so.  He's under investigation by 17 other entities including the Southern District of New York."[64]

237.     Starting in or around 2019, two additional probes were launched to investigate the origins of the FBI's Crossfire Hurricane.

238.     First, the Office of the Inspector General performed a review to determine whether the Crossfire Hurricane investigation was adequately predicated and whether the FBI had acted on false and misleading information.

239.     Through this investigation, the IG uncovered numerous deficiencies with the FBI's conduct.

240.     In a report dated December 9, 2019, the IG identified "at least 17 significant errors or omissions in the Carter Page FISA applications, and many additional errors in the Woods Procedure."[65]

241.     Thereafter, on January 23, 2020, the DOJ formally admitted to the FISC that, with respect to at least the last two warrant applications, "if not earlier, there was insufficient predication to establish probable cause to believe that [Dr.] Page was acting as an agent of a foreign power."

242.     The FISC has also issued several rulings finding that FISA warrants contained material omissions and misstatements, lacked candor, and/or that the warrants were not lawfully

---

[63] Letter from AG William Barr, March 24, 2019.
[64] https://www.realclearpolitics.com/video/2019/03/24/mollie_hemingway_vs_philippe_reines_on_mueller_its_important_to_understand_philippe_its_over.html#!
[65] IG Report (12/19).

obtained:

    a.   In an Order dated December 17, 2019, the FISC stated: "The frequency with which representations made by FBI personnel turned out to be unsupported or contradicted by information in their possession, and with which they withheld information detrimental to their case, calls into question whether information contained in other FBI applications is reliable."

    b.   In an Order dated January 7, 2020, the FISC stated: "The Court understands the government to have concluded, in view of the material misstatements and omissions, that the Court's authorizations were not valid.

    c.   In an Order dated March 5, 2020, the FISC stated: "There is thus little doubt that the government breached its duty of candor to the Court with respect to those applications [involving Carter Page]."

    d.   In an Order dated June 25, 2020, the FISC stated: "The government acknowledges that there were material omissions, and the Court has found violations of the government's duty of candor, in all four applications [regarding Carter Page]."

243.    In light of these admissions, as well as the obvious questions about the legitimacy of Crossfire Hurricane, Attorney General William Barr assigned John Durham, the United States Attorney for the District of Connecticut, to lead an investigation on behalf of the Department of Justice into Crossfire Hurricane.

244.    Thereafter, on October 19, 2020, Barr officially appointed Durham to serve as Special Counsel and to continue his investigation into the origins of Crossfire Hurricane.

245.    On September 16, 2021, less than a year into his investigation, Durham indicted Sussmann for one count of making a false statement to a federal law enforcement in violation of

18 U.S.C. § 1001(a)(2) for, on September 19, 2016, "stat[ing] to the General Counsel of the FBI that Sussmann was not acting on behalf of any client in conveying the particular allegations concerning [Donald J. Trump], when in truth, and in fact, and as [Sussmann] well knew, he was acting on behalf of specific clients, namely, [Joffe] and the Clinton Campaign."[66]

246.    On November 3, 2021, Durham indicted Danchenko for five separate counts of violating 18 U.S.C. § 1001(a)(2) for making false statements to a law enforcement officials:[67]

e.    Count One alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on June 15, 2017 when he "denied to agents of the FBI that he had spoken with [Dolan] about any material contained in the [Steele Dossier], when in truth and in fact, and as the defendant well knew, [Dolan] was the source for an allegation contained in the [Steele Dossier] dated August 22, 2016 and was otherwise involved in the events and information described in the reports."[68]

f.    Count Two alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on March 16, 2017 when he "stated to agents of the FBI that he received a late July 2016 telephone call from an individual who Danchenko believed was 'probably' Chamber President-1, when in truth and in fact, and as [Danchenko] well knew, Chamber President-1 never called Danchenko."[69]

g.    Count Three alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on May 18, 2017 when he "stated to agents of the FBI that he 'was under the impression' that a late July 2016 telephone call that he received was from Chamber President-I,

[66] Indictment at 27, *United States v. Sussmann*, case no. 1:21-cr-00582-CRC, District of Columbia (Sept. 16, 2021) (hereinafter, "Sussmann Indictment").
[67] *See generally* Indictment, *United States v. Danchenko*, case no. 1:21-cr-00245-AJT, Eastern District of Virginia (Nov. 3, 2021) (hereinafter, Danchenko Indictment")
[68] *Id.* at 37.
[69] *Id.*

when in truth and in fact, and as the defendant well knew, Chamber President-I never called Danchenko."[70]

h.  Count Four alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on October 24, 2017 when he "stated to agents of the FBI that he believed that he spoke to Chamber President-I on the telephone on more than one occasion, when in truth and in fact, and as the defendant well knew, Danchenko never spoke to Chamber President-I."[71]

i.  Count Five alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on November 16, 2017 when he "stated to agents of the FBI that he believed that he had spoken to Chamber President-I on the telephone, when in truth and in fact, and as the defendant well knew, Danchenko never spoke to Chamber President-I."[72]

247.  On December 17, 2021, Durham filed a motion to inquire into potential conflicts of interests in Danchenko's criminal case, notifying the court to a potential conflict of interest since Danchenko's defense counsel also represents the Clinton Campaign, noting that "the interests of the Clinton Campaign and [Danchenko] could potentially diverge in connection with any plea discussions, pre-trial proceedings, hearings, trial, and sentencing proceedings."

248.  In the motion, Durham also confirms that his office is actively investigating the Clinton Campaign for its role in the subject matter of this action, stating that "[a]reas of inquiry that may become relevant . . . include topics such as (1) the Clinton Campaign's knowledge or lack of knowledge concerning the veracity of information in the Company Reports sourced by the defendant, (2) the Clinton Campaign's awareness or lack of awareness of the defendant's

---

[70] *Id.* at 38.
[71] *Id.*
[72] *Id.*

collection methods and sub-sources, (3) meetings or communications between and among the Clinton Campaign, U.S. Investigative Firm-1, and/or U.K. Person-1 regarding or involving the defendant, (4) the defendant's knowledge or lack of knowledge regarding the Clinton Campaign's role in and activities surrounding the Company Reports, and (5) the extent to which the Clinton Campaign and/or its representatives directed, solicited, or controlled the defendant's activities." He further noted that "the Clinton Campaign and [Danchenko] each might have an incentive to shift blame and/or responsibility to the other party for any allegedly false information that was contained within the Company Reports and/or provided to the FBI."[73]

249.    On January 25, 2022, in a discovery-related motion in the Sussmann criminal case, it was revealed that Durham has already questioned a "former employee of the Clinton Campaign" and has served document requests and/or subpoenas on the Clinton Campaign and a "political organization" – likely the DNC.[74]

250.    On February 11, 2022, Durham filed a motion to inquire into potential conflicts of interest in the Sussmann case.  Notably, in reference to Neustar and Joffe's exploitation of non-public data in connection with the Defendants' conspiracy, Durham states that "among the Internet data [Joffe] and his associates exploited was domain name system ("DNS")  Internet traffic pertaining to (i) a particular healthcare provider, (ii) Trump Tower, (iii) Donald Trump's Central Park West apartment building, and (iv) the Executive Office of the President of the United States ("EOP")," and specifically notes that "[Joffe] and his associates exploited [a sensitive] arrangement [with the EOP] by mining the EOP's DNS traffic and other data for the purpose of

---

[73] *See generally* Motion to Inquire into Potential Conflicts of Interest (ECF Doc.  No.35), *United States v.  Danchenko*, case no.  1:21-cr-00245-AJT, Eastern District of Virginia (Dec.  17, 2021).

[74] *See* Government's Discovery Update and Request for Additional Time to Produce Residual Discovery Materials, *United States v.  Sussmann*, case no.  1:21-cr-00582-CRC, District of Columbia (Jan.  25, 2022).

gathering derogatory information about Donald Trump."[75]

**The Defendants' Malicious Conspiracy
Remains Active to This Day**

251.    The Defendants' collective effort to falsely implicate and publicly denigrate Donald J. Trump has not ceased and, in fact, the Defendants continue to proliferate the injurious falsehood that Donald J. Trump colluded with Russia to this very day.

252.    Fusion GPS, Simpson, Fritsch, and Steele continued their collective mission to fabricate evidence and disparage Donald J. Trump with it, well after Trump won the 2016 election.

253.    Since 2017, The Democracy Integrity Project ("TDIP") has paid Fusion GPS, Steele and their associates more than $3.8 million to continue their 'opposition research' against Donald J. Trump and to continue pushing the false Trump-Russia narrative.

254.    In particular, TDIP has paid $3.3 million to Fusion GPS; $250,000 to "Walsingham Partners Ltd.," a London-based firm owned by Steele and his partner, Christopher Burrows; nearly $130,000 to "Edward Austin Ltd." a London-based intelligence consultancy operated by Edward Baumgartner, a Fusion GPS contractor; and $148,000 to the law firm Zuckerman Spaeder, which has represented Fusion GPS in a variety of Dossier-related legal matters.

255.    Philippe Reines has continued to insist that Donald J. Trump colluded with Russia.

256.    On, April 16, 2018, Reines tweeted "yes collusion, yes collusion, yes collusion" in response to an article titled: 'Breaking: Trump puts the brake on new Russian sanctions, reversing Haley's announcement.'

257.    Debbie Wasserman Schultz has also continued to maintain that Donald J. Trump

---

[75] *See generally* Motion to Inquire into Potential Conflicts of Interest (ECF Doc. No.35), *United States v. Sussmann*, case no. 1:21-cr-00582-CRC, District of Columbia (Feb. 11, 2022).

colluded with Russia.

258.    For instance, on May 10, 2019, Schultz appeared on MSNBC and boldly announced that there were "clear indications" that Donald J. Trump colluded with Russia.  She went on to state:

> You know, what's so disturbing is that Donald Trump is so lacking in confidence about his ability to actually get elected without the help of a foreign power, and particularly a foreign adversary, that they will go to any lengths and that he will instruct and allow his colleagues and allies to go to any lengths to be able to secure his success in an election.[76]

259.    Likewise, Clinton has continued to drum up the false Trump-Russia narrative in the hopes of damaging Trump's political career.

260.    For example, on June 16, 2021, Clinton appeared on MSNBC's *Morning Joe* show and again attempted to reinforce the debunked Trump-Russia story—of which she led the effort to manufacture and is no doubt aware is false—when she stated to MSNBC's audience, which included the general public of the State of Florida and the rest of the United States: "We don't have Trump as spokesperson for Putin, anymore."  "After disastrous Trump presidency, in which he gave Putin a green light to do whatever he wanted to do, once Trump was elected, of course..."

261.    On February 16, 2022, in response to media reports concerning the filing of Durham's February 11, 2022 motion, Clinton tweeted that "Trump & Fox are desperately spinning up a fake scandal to distract from his real ones.  So it's a day that ends in Y.  The more his misdeeds are exposed, the more they lie.  For those interested in reality, here's a good debunking of their latest nonsense."[77]

262.    These are but a few of the recent examples of the Defendants' ongoing efforts to

---

[76]https://www.realclearpolitics.com/video/2019/05/11/wasserman_schultz_trump_clearly_colluded_with_russia_and _engaged_in_obstructed_justice_to_cover_it_up.html
[77] https://twitter.com/HillaryClinton/status/1494036101572575232.

maintain their conspiracy to spread injurious falsehoods against Donald J. Trump.

263.   As a direct and proximate cause of the Defendants' actions, Trump has sustained significant injuries and damages including, but not limited to, expenses in the form of defense costs, legal fees and related expenses incurred in connection with his efforts to defend against the Defendants' tortious actions, false accusation, and overall fraudulent scheme to discredit and delegitimize him, the Trump Campaign and Administration, and the Trump Organization and the various federal investigations and official proceedings that arose therefrom, which to date is in an amount no less than twenty-four million dollars ($24,000,000) and continuing to accrue, as well as the loss of existing and future business opportunities.[78]

264.   It was a goal of the Defendants' conspiracy, and indeed a foreseeable and natural consequence of the same, that this substantial economic harm would befall Trump.  The Plaintiff does not claim nor seek any compensation for damage to his reputation, but rather, he seeks damages for the cost of dealing with the legal issues and political issues, which he was required to spend to redress the injurious falsities which were propounded by the Defendants, and all other losses incurred due to the tortious conduct of the Defendants.

265.   All precedent acts and requirements have been done or have been waived by the Defendants.

266.   The Plaintiff was required to retain the attorneys named below to bring this action and to pay them reasonable attorneys' fees.

**Count I**
**RICO**
**(18 U.S.C. § 1962(C))**
*(Against Clinton, Clinton Campaign, DNC, Perkins Coie, Elias, and Sussmann)*

---

[78] The different opportunities which evaporated are too many to list, but as an example, Donald J. Trump has been banned from different social media platforms, including Twitter.  Most of this was due to the misinformation campaign waged by Hillary Clinton, whereby truth was deemed false and lies were deemed to be truth.

267.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

268.    The Defendants, Clinton, the Clinton Campaign, the DNC, Perkins Coie, Elias, and Sussmann (collectively, the "RICO Defendants") are all "persons" within the meaning of 18 U.S.C. § 1961(3).

### The RICO Enterprise

269.    At all relevant times, the RICO Defendants, Clinton, the Clinton Campaign, the DNC, Perkins Coie, Elias, and Sussmann, constituted an association in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4).

270.    The members of the Enterprise are a group of persons associated together for the common purpose of carrying on an ongoing enterprise; specifically, the Enterprise had a common, unlawful goal of dismantling the Plaintiff's political career and/or impeding his ability to effectively govern through fraudulent, deceptive, and criminal means, including, but not limited to, falsely implicating the Plaintiff, the Trump Campaign, and the Trump Administration as colluding with Russia.

271.    By virtue of the RICO Defendants' professional relationships and frequent business collaborations, the Enterprise had an existence and legitimate business and political purpose separate and apart from the racketeering activity itself.

272.    Since the Enterprise's activities had a significant effect on the 2016 presidential race, and affected fundraising and electoral spending, the Enterprise affected interstate and foreign commerce.

273.    The Enterprise was formed as early as April 2015 and remains ongoing and continuing to the present day.

274.    Considering the nature of the RICO Defendants' longstanding political and

professional relationship, the continuing nature of Clinton's political career, her ever-present political rivalry with Plaintiff, and the nature of the Enterprise's goals, the longevity of the Enterprise is sufficient to permit the RICO Defendants to pursue the Enterprise's ongoing goal of damaging the Plaintiffs' political career with the continuing proliferation, and/or threat of proliferation, of disinformation, obstruction of justice, and other unlawful tactics intended to damage the Plaintiff's political career and to impede his ability to effectively govern.

275.    The members of the Enterprise have longstanding inter-relationships rooted in their political and professional connections, in addition to common control, ongoing business dealings, and mutual interest and participation in common activities and dealings.

276.    The Enterprise has, or at all relevant times had, an organized, clearly delineated, ongoing organizational framework and command structure for carrying out its objectives: the Clinton Campaign and the DNC were at all relevant times mutually controlled by Clinton, who worked in tandem with their joint counsel, Perkins Coie, whose partners, Sussmann, and Elias, simultaneously served as general counsel for the Clinton Campaign and the DNC.

277.    No RICO Defendant has withdrawn, or otherwise dissociated itself, from the Enterprise.

**Predicate Acts**

278.    Section 1961(1) of RICO also provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1832 (relating to theft of trade secrets) and 18 U.S.C. §§ 1503 and/or 1512 (obstruction of justice).  As set forth herein, in furtherance of the scheme to defraud the Plaintiff, the RICO Defendants engaged in numerous acts in violation of 18 U.S.C. § 1832 and 18 U.S.C. § 1503 and/or 1512, including, without limitation, as set forth herein.

279.    Each RICO Defendant has conducted and participated in, directly or indirectly, the

management, conduct and/or operation of the Enterprise and its affairs through a pattern of racketeering activity including acts indictable under 18 U.S.C. § 1832 (theft of trade secrets) and 18 U.S.C. § 1503, and/or 1512 (obstruction of justice).

280.     The RICO Defendants have consistently and regularly committed acts of racketeering activity spanning from at least April 2015.  These multiple acts shared a common or related purpose, goal, result, participants, victims, and methods of commission.

281.     Beginning in or around April 2015, the RICO Defendants engaged in wide-ranging and fraudulent scheme to concoct a false narrative that the Plaintiff and his campaign were colluding with Russia to undermine the 2016 Presidential Election.

282.     The RICO Defendants, through their deceptive and fraudulent conduct intended to mislead law enforcement, the media, and the public at large and to impede, obstruct and falsely provoke federal investigations against the Plaintiff, the Trump Campaign, and the Trump Administration.

283.     In furtherance of this scheme, the Defendants committed multiple related acts, each of which constitutes an act of racketeering activity, and which, collectively, constitute a pattern of racketeering activity.

### *Theft of Trade Secrets (18 U.S.C. § 1832)*

284.     In violation of 18 U.S.C. § 1832(a)(5), the RICO Defendants conspired with Neustar and Joffe, on at least two occasions, abused and exploited access to non-public and highly sensitive data sources and/or servers, and acquired obtained in excess of authorization and/or stole proprietary, sensitive and confidential internet data, records and/or information, including without limitation, DNS internet traffic data pertaining to Plaintiff, including data originating from his servers located at his private New York residence and those located at Trump Tower and used in

connection with his business, The Trump Organization LLC, a company involved in interstate commerce, and stole trade secrets in violation of 18 U.S.C. § 1832 (theft of trade secrets).

285.    DNS internet traffic data houses highly proprietary, sensitive and confidential data. For example, among other things, an analysis of raw DNS data could reveal a comprehensive view into an individual or a company's website traffic, e-mail traffic, webmail traffic, chat messaging, in addition to the types of technology, hardware, software, programs, securities and processes being utilized by the servers.

286.    The RICO Defendants conspired with Neustar and Joffe to exploit access to non-public data sources and/or servers and unlawfully acquire, steal and exploit sensitive, proprietary and confidential internet data, including without limitation, DNS information, traffic, and/or data originating from computers and/or servers (i)  located at Plaintiff's private apartment in Central Park West in New York and belonging to the Plaintiff; and (ii) located at Trump Tower and belonging to The Trump Organization, in which Plaintiff has an ownership interest (collectively, with the computers and/or servers house in Plaintiff's private apartment, "Plaintiff's Servers).

287.    By conspiring to illegally access the above-mentioned information and data, the RICO Defendants, through Neustar and Joffe, were able to obtain proprietary, sensitive, and/or confidential information and data including, among other things, the number and frequency of e-mail communications between the Plaintiff's Servers and other third party servers, the number and frequency of website visits to third party websites by the Plaintiff's Servers, the number and frequency of webmail interactions between the Plaintiff's Servers and other third party servers, and the number and frequency of chat messaging interactions between the Plaintiff's Servers and other third party servers, as well as information pertaining to the types of technology, hardware, software, programs, securities and processes being utilized by Plaintiff's Servers.

288.    This information and data revealed highly proprietary, sensitive, and confidential knowledge, including insight into Plaintiff's and The Trump Organization's business dealings, financial dealings, communications, future and current plans, techniques, patterns, methods, processes, and procedures, as well as identification of their corporate partners, political associates, clients, and vendors.

289.    This proprietary, sensitive and confidential information, data and/or knowledge constitutes trade secrets within the meaning of 18 U.S.C. § 1839(3) where they constitute business and/or political methods, techniques, processes, procedures and programs that are both protected from disclosure by the Plaintiff and derive significant economic value from not generally being known to or ascertainable by others, including the RICO Defendants, who can obtain economic value from disclosure or use of such information.

290.    The Plaintiff and The Trump Organization restricts access to their proprietary, sensitive and confidential information and data, including DNS data, even within their own personnel and prevents unauthorized access to such records by digital or electronic means.

291.    The Plaintiff and The Trump Organization further protects against theft and disclosure of such information by third parties by the requirement of executed non-disclosure agreements prior to providing any such access.

292.    The Plaintiff's confidential records were misappropriated by Defendants within the meaning of 18 U.S.C. § 1839(5), where the Plaintiff's records were acquired by the RICO Defendants, through their conspiracy with Neustar and Joffe, without the Plaintiff's authorization and through Defendants' acts of espionage or other improper means conducted by electronic or other means.

293.    The RICO Defendants conspired to violate the Defend Trade Secrets Act, 18 U.S.C.

§ 1832(a)(1), by assisting, aiding, and abetting Neustar and Joffe in obtaining Plaintiff's proprietary, sensitive and confidential information and data by fraud, artifice, and deception and, thereafter, stealing, appropriating, taking, carrying away, and concealing the theft of Plaintiff's confidential records with intent to convert Plaintiff's confidential records, which are related to products sold in interstate and foreign commerce, to Defendants' own benefit, while knowing and intending that such misappropriation would injure the Plaintiff.

294.    Each of the RICO Defendants were aware of, and active participants in, the conspiracy for Neustar and Joffe's to violate the Defend Trade Secrets Act, 18 U.S.C. § 1832, and each of the RICO Defendants committed at least one act in furtherance of this goal.

295.    The RICO Defendants' actions constitute a conspiracy to steal trade secrets in violation of 18 U.S.C. § 1832(a)(5).

### *Obstruction of Justice (18 U.S.C. §§ 1503, 1512)*

296.    The RICO Defendants, through and using the Enterprise, engaged in, and continues to engage in, a coordinated effort to destroy the Plaintiff's political career and impede his ability to effectively govern as President of the United States.  This coordinated effort amounts to a set of related predicate acts with similar purposes, results, and methods, which included acts in violation of 18 U.S.C. § 1503 and/or 1512 (obstruction of justice).

297.    On one or more occasions, the RICO Defendants, knowingly and deliberately provided falsified, altered and misleading records, including the White Papers and the Dossier, to law enforcement officials and made false statements to law enforcement officials, including the FBI and CIA, with the intention of obstructing, impeding, influencing and/or impairing their investigations into alleged Russian collusion, and/or conspired with others to carry out these acts.

298.    On September 19, 2016, Sussmann met with FBI officials in Washington D.C., at

which time he, among other things: (i) made false statements to FBI officers, including that he was acting on behalf of any client; (ii) provided falsified, altered and/or misleading records, including the White Papers, to FBI officials; (iii) withheld and/or concealed pertinent information, including without limitation the true nature of the White Papers, his work with Neustar and Joffe, the falsity of the purported link between Trump Tower and Alfa Bank, and the existence of the Enterprise and its overarching conspiracy to create a false narrative of Trump-Russia collusion.

299.    On September 19, 2016, Sussmann met with FBI officials in Washington D.C., at which time he, among other things: (i) made false statements to FBI officials, including that he was not acting on behalf of any client; (ii) provided falsified, altered and/or misleading records, including (1) *White Paper #1 AuditableV3,* (2) *White Paper Comments: Time Series Analysis of Recursive Queries,* (3) a white paper drafted by Fusion GPS regarding a purported Trump-Alfa Bank connection, and (4) eight files containing falsified, altered, and/or curated data and information relating to Alfa Bank, Trump Tower, and the mail.trump-email.com domain, to FBI officials; (iii) withheld and/or concealed pertinent information, including, without limitation, that he was acting on behalf of his clients, Clinton, the Clinton Campaign, the DNC, and in furtherance of the Enterprise, the falsified and/or misleading nature of the White Papers and the other documents that he was handing over, the true nature of his work with Neustar and Joffe, the falsity of the purported link between Trump Tower and Alfa Bank, and the existence of the Enterprise and its overarching conspiracy to create a false narrative of Trump-Russia collusion.

300.    Sussmann's conduct in connection with his September 19, 2016 meeting with the FBI corruptly obstructed, influenced, and impeded and/or endeavored to obstruct, influence or impede the due administration of justice and/or one or more official proceeding(s), namely Crossfire Hurricane and/or other ongoing investigations by the FBI, the DOJ, the CIA, and/or the

IG, and therefore constituted a violation of 18 U.S.C. §§ 1503 and/or 1512.

301.    On February 9, 2017, Sussmann met with CIA officials at a location outside of Washington D.C., at which time he, among other things: (i) made false statements to CIA officials, including that he was not representing a particular client; (ii) provided falsified, altered and/or misleading records, including the White Papers and multiple data files containing purported DNS data, ranging from 2016 through early 2017, to CIA officials; (iii) withheld and/or concealed pertinent information, including, without limitation, that he was acting on behalf of his clients, Clinton, the Clinton Campaign, the DNC, and in furtherance of the Enterprise, the falsified and/or misleading nature of the White Papers and the other documents that he was handing over, the true nature of his work with Neustar and Joffe, the falsity of the purported link between Trump Tower and Alfa Bank, and the existence of the Enterprise and its overarching conspiracy to create a false narrative of Trump-Russia collusion.

302.    Sussmann's actions on February 9, 2017 corruptly obstructed, influenced, and impeded and/or endeavored to obstruct, influence or impede the due administration of justice, and/or one or more official proceedings, namely, ongoing investigations by the CIA, the FBI, the IG, and/or the DOJ and therefore constituted a violation of 18 U.S.C. §§ 1503 and/or 1512.

303.    The other RICO Defendants, Clinton, Clinton Campaign, DNC, Perkins Coie, and Elias, had a meeting of the minds, common intent, were aware of, and conspired with Sussmann in the commission of the above-mentioned violations of 18 U.S.C. § 1512, including, without limitation, his conduct in connection with his meeting with the FBI on September 19, 2016 and his meeting with the CIA on February 9, 2017, and each of the other RICO Defendants committed an overt act in furtherance of said violation(s), and the RICO Defendants conspired to commit the above-named acts in furtherance of the overarching conspiracy to denigrate the Plaintiff and to

derail his political career.

304.     Therefore, the actions of the RICO Defendants, Clinton, Clinton Campaign, DNC, Perkins Coie, and Elias, constituted a conspiracy to obstruct justice in violation of 18 U.S.C. § 1512(k).

305.     By virtue of the foregoing, Sussmann, and the other RICO Defendants, willfully, knowingly, deliberately and corruptly obstructed, influenced, and impeded and/or endeavored to obstruct, influence or impede the due administration of justice, and/or one or more official proceedings, including, but not limited to, Crossfire Hurricane and/or other investigations by the FBI, the CIA, the IG, and the DOJ.

306.     In addition, the RICO Defendants conspired with Fusion GPS, Fritsch, Simpson, Orbis Ltd., Steele, and Danchenko to produce the Steele Dossier, which contained falsified, misleading and inaccurate representations about the alleged Trump-Russia connection, and which they knew would be provided to law enforcement, including without limitation the FBI, the DOJ and the CIA, for the purpose of corruptly obstructing, influenced, and impeding and/or endeavoring to obstruct, influence or impede one or more official proceedings, including, but not limited to, Crossfire Hurricane and/or other investigations by the FBI, the CIA, the IG, and the DOJ, in violation of 18 U.S.C. § 1512.

307.     In addition, the RICO Defendants conspired with Danchenko in connection with his conduct in making various false statements and misrepresentations to the FBI in violation of 18 U.S.C. § 1512, including, but not limited to:

a.     On June 15, 2017, Danchenko stated, at the direction of and in coordination with the RICO Defendants, that he had not spoken with Dolan about any material contained in the Dossier. This statement was patently false, as Danchenko used

the information provided by Dolan as a source for allegations made in the Dossier.

b.  On March 16, 2017, May 18, 2017, October 24, 2017, and November 16, 2017, Danchenko, at the direction of and in coordination with the RICO Defendants, directly lied about the sources relied upon in compiling the Dossier.

308.   The RICO Defendants had a meeting of the minds, common intent, were aware of, and conspired with Fusion GPS, Fritsch, Simpson, Orbis Ltd., Steele, and Danchenko in connection with the commission of the above-mentioned violations of 18 U.S.C. § 1512, including, without limitation, the scheme to produce and fraudulently disseminate the Steele Dossier and Danchenko's various false statements to law enforcement, and each of the other RICO Defendants committed an overt act in furtherance of said violations, and the RICO Defendants conspired to commit the above-named acts in furtherance of the overarching conspiracy to denigrate the Plaintiff and to derail his political career.

309.   Therefore, the actions of the RICO Defendants constituted a conspiracy to obstruct justice in violation of 18 U.S.C. § 1512(k).

310.   Based on the foregoing, the RICO Defendants' actions constituted at least two separate violations of 18 U.S.C. §§ 1503 and/or 1512.

311.   All of Defendants' actions in violation of 18 U.S.C. § 1832 occurred after May 11, 2016 and, therefore, qualify as predicate acts pursuant to the 2016 amendment federal RICO statute.

**Damages**

312.   The Plaintiff has been injured in his business and property as a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c).

313.   As a direct and proximate result of Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory,

special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.

314.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' actions and the various federal investigations and/or official proceedings which arose therefrom, in addition to the loss of existing and future business opportunities for himself, the Trump Campaign, and the Trump Organization LLC.

315.    All of these injuries were sustained within, and were the result of conduct occurring within the United States.

316.    The Plaintiff is entitled to recover, pursuant to Title 18 United States Code § 1964(c), treble damages in the amount to be determined by offer of proof at time of trial.  The Plaintiff is also entitled to recover attorneys' fees and costs of this litigation, as well as damages arising from lost profits and/or lost business opportunities attributable to the activities engaged in by defendants committed in furtherance of the Enterprise.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Hillary Clinton, HFACC, Inc., the Democratic National Committee, Perkins Coie, LLP, Michael Sussmann, and Marc Elias for damages, including Compensatory and Treble damages, costs, attorneys' fees, and such further and other relief as this honorable Court may deem just and proper.

## Count II
### RICO Conspiracy
### (18 U.S.C. § 1962(D))
*(Against Clinton, Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta, Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele, Danchenko, Neustar, and Joffe)*

317.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

318.    Defendants, Clinton, the Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta, Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele, Danchenko, Neustar, and Joffe (the "RICO Conspiracy Defendants")*,* are all "persons" within the meaning of 18 U.S.C. § 1961(3).

319.    The RICO Conspiracy Defendants conspired with each other to violate 18 U.S.C. § 1962(C) and knowingly agreed, conspired and acted in concert for the express purpose of injuring the Plaintiff's political career and/or impeding his ability to effectively govern through a pattern of racketeering activity.

320.    The RICO Conspiracy Defendants knew that they were engaged in a conspiracy to commit the predicate acts, including theft of trade secrets (18 U.S.C. § 1832) and obstruction of justice (18 U.S.C. §§ 1503 and/or 1512), and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern racketeering activity.  This conduct constitutes conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

321.    Each of the RICO Conspiracy Defendants knew about and agreed to facilitate the Enterprise's scheme to fraudulently concoct a scheme to damage the Plaintiff's political career and undermine his ability to effectively govern as the President of the United States through the wrongful acts identified herein.  It was part of the conspiracy that the RICO Conspiracy Defendants

72

would commit a pattern of racketeering activity in the conduct of the affairs of the enterprise, including the acts of racketeering as set forth herein.

322.   No RICO Conspiracy Defendant has withdrawn, or otherwise dissociated itself, from the conspiracy at issue or the other conspirators.

323.   As a direct and proximate result of RICO Conspiracy Defendants' actions, the Plaintiff has been injured in his business and property has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.

324.   Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' actions and the various federal investigations and/or official proceedings arose therefrom.

325.   The Plaintiff is entitled to recover, pursuant to Title 18 United States Code § 1964(c), treble damages in the amount to be determined by offer of proof at time of trial.  The Plaintiff is also entitled to recover attorneys' fees and costs of this litigation, as well as damages arising from lost profits and/or lost business opportunities attributable to the activities engaged in by defendants committed in furtherance of the Enterprise.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Michael Sussmann, Perkins Coie, LLP, Hillary R.  Clinton, HFACC, Inc., the Democratic National Committee, the DNC Services Corporation, Charles Halliday Dolan, Jr., Jake Sullivan, John Podesta, Perkins Coie, LLP, Marc Elias, Fusion GPS, Glenn Simpson, Peter Fritsch, Nellie Ohr, Bruce Ohr, Orbis Business

Intelligence, Ltd., Christopher Steele, Igor Danchenko, Neustar, Inc., Rodney Joffe, Robert Mook, Philippe Reines, James Comey, Peter Strzok, Lisa Page, Kevin Clinesmith, Andrew McCabe, John Does 1 through 10, said names being fictious and unknown persons, and ABC Corporations 1 through 10, said names being fictitious and unknown entities, for damages, including compensatory and treble damages, costs, attorneys' fees, and such further and other relief as this Court may deem just and proper.

**Count III**
**Injurious Falsehood**
**(18 U.S.C. § 2701-12)**
*(Against Clinton, Sullivan, Schultz, Danchenko, Sussmann, and Steele)*

326.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

327.    As detailed at length herein, on multiple occasions the Defendants, Clinton, Joffe, Sussmann, Steele, Sullivan, and Schultz, made, disseminated and/or published false and damaging statements concerning the Plaintiff, specifically that he was colluding with Russia and its President Vladimir Putin.

328.    At all relevant times, the Defendants acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia; despite said knowledge, the Defendants conspired to disseminate false information and spread a false narrative in an attempt to ruin the Plaintiff.

329.    These individual Defendants, Clinton, Sullivan, Schultz, Danchenko, Sussmann, and Steele, made, disseminated, and/or published the false and damaging statements to third parties, including, but not limited to, government authorities, media outlets, and the general public.

330.    Clinton, Sullivan, and Schultz, among other things, falsely and deliberately

published false and damaging statements about the Plaintiff and his purported ties with Russia and promoted their false allegations through the media.

331.    In turn, the media heavily reported their allegations story as true, making it appear as if the Plaintiff had colluded with the Russian government, despite the falsity of their claims.

332.    Sullivan, among other things, issued a press release on October 31, 2016, on behalf of Clinton and the Clinton Campaign, in made false and damaging claims about the Plaintiff:

> [T]his could be the most direct link yet between Donald Trump and Moscow.  Computer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank. This secret hotline may be the key to unlocking the mystery of Trump's ties to Russia.  It certainly seems the Trump Organization felt it had something to hide, given that it apparently took steps to conceal the link when it was discovered by journalists.  This line of communication may help explain Trump's bizarre adoration of Vladimir Putin and endorsement of so many pro-Kremlin positions throughout this campaign.  It raises even more troubling questions in light of Russia's masterminding of hacking efforts that are clearly intended to hurt Hillary Clinton's campaign.  We can only assume that federal authorities will now explore this direct connection between Trump and Russia as part of their existing probe into Russia's meddling in our elections.

333.    Clinton, personally, also published the same false and damaging statements to the public, through her Twitter account on October 31, 2016, and to media outlets.

334.    Clinton continues to publish the false and damaging allegations to media outlets.

335.    For example, on June 16, 2021, Hillary Clinton appeared on the Morning Joe show on MSNBC and stated to the general public of the State of Florida, and the rest of the United States: "We don't have Trump as spokesperson for Putin, anymore."  "After disastrous Trump presidency, in which he gave Putin a green light to do whatever he wanted to do, once Trump was elected, of course."

336.    Schultz has also published numerous false and damaging statements about the

Plaintiff and his alleged collusion with Russia.

337.   For example, she told CNN's Erin Burnett on "OutFront", that reported contacts between President Donald J. Trump's campaign aides and Russia amounted to collusion.   Schultz told the reporter, "[W]ith every passing day, it gets more and more disturbing, and more and more evidence that there was collusion."  "Donald Trump should be the first person asking for one, but since I think he likely was part of it, it's not surprising that hasn't happened."

338.   Danchenko, among other things, submitted falsified evidence to the FBI and published false and damaging statements orally to the FBI.

339.   Sussmann, among other things, submitted falsified evidence to the FBI, DOJ and CIA and published false and damaging statements orally to the FBI.

340.   Steele, among other things knowingly maintained and published to third parties, including, but not limited to the FBI, the false series of reports referred to as the "Steele Dossier."

341.   The individual Defendants knew that the statements were false at the time they made then and also knew or should have known that said statements would damage the Plaintiff's lawful property interests.

342.   As a direct and proximate result of the individual Defendants' unlawful conduct, the Plaintiff has suffered and will continue to suffer economic losses and irreparable injuries.

343.   As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.

344.   Among other things, the Plaintiff was forced to incur expenses Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be

in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom.

345.    The Plaintiff does not claim nor seek any compensation for damage to his reputation, but rather, he seeks damages for the cost of dealing with the legal issues and political issues, which he was required to spend to redress the injurious falsities which were propounded by the Defendants, and all other losses incurred due to the tortious conduct of the Defendants.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Hillary Clinton, Jake Sullivan, Debbie Wasserman Schultz, Michael Sussmann, Christopher Steele, and Igor Danchenko, and for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### <u>Count IV</u>
### Conspiracy to Commit Injurious Falsehood
*(Against Clinton, Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta, Schultz, Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele, Danchenko, Neustar, and Joffe)*

346.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

347.    The Defendants had a meeting of minds to harm the Plaintiff by making false and damaging statements regarding the Plaintiff's alleged collusion with the Russian government, and its President Vladimir Putin, and then disseminating the false and damaging statements by publishing them to third parties, including, but not limited to, government authorities, media outlets, and the general public, in an attempt to cause harm to the Plaintiff.

348.    As such, the Defendants conspired to commit unlawful acts by unlawful means. They had different roles, where some actors, such as Danchenko, Dolan, Steele, and Joffe, were involved in the fabrication of supposed facts to put into the Dossier, and later helped to foist it upon the FBI, while others were more involved with the publishing of the allegations to the media and general public, and still others were more involved in feeding false information federal authorities.

349.     Each of the Defendants executed one or more acts in furtherance of the conspiracy, as detailed in this Complaint, and committed overt acts to harm the Plaintiff in furtherance of the conspiracy.

350.    In this regard, the Defendants conspired to create a false narrative that that the Plaintiff was colluding with Russia through their dissemination of false and damaging statements.

351.    At all relevant times, the Defendants acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia; despite said knowledge, the Defendants conspired to disseminate false information and spread a false narrative in an attempt to ruin the Plaintiff.

352.     Despite this knowledge, that no evidence existed of the collusion, the Defendants further conspired to publish the false information to third parties, such as the FBI, other governmental agencies, the news-media outlets, and the U.S. population, in an attempt to smear the Plaintiff's to harm his chance of being elected and properly administrating his office of President of the United States.

353.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual,

compensatory, special, incidental, and consequential damage in addition to costs of defense and attorneys' fees.

354.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

355.    The Plaintiff does not claim nor seek any compensation for damage to his reputation, but rather, he seeks damages for the cost of dealing with the legal issues and political issues, which he was required to spend to redress the injurious falsities which were propounded by the Defendants, and all other losses incurred due to the tortious conduct of the Defendants.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Michael Sussmann, Perkins Coie, LLP, Hillary R.  Clinton, HFACC, Inc., the Democratic National Committee, the DNC Services Corporation, Debbie Wasserman Schultz, Charles Halliday Dolan, Jr., Jake Sullivan, John Podesta, Perkins Coie, LLP, Marc Elias, Fusion GPS, Glenn Simpson, Peter Fritsch, Bruce Ohr, Nellie Ohr, Orbis Business Intelligence, Ltd., Christopher Steele, Igor Danchenko, Neustar, Inc., Rodney Joffe, Robert Mook, Philippe Reines, John Does 1 through 10, said names being fictious and unknown persons, and ABC Corporations 1 through 10, said names being fictitious and unknown entities, for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

## Count V
## Malicious Prosecution
*(Against Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele, Joffe, Comey, McCabe, Strzok, Page, and Clinesmith)*

356.     The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

357.     The Defendants, Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele and Joffe, willfully and knowingly misled FBI and DOJ officials with the intention of inducing the FBI to commence an investigation of the Plaintiff and his alleged collusion with Russia.

358.     The Defendants, Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele and Joffe, concocted a scheme to denigrate the Plaintiff and by so doing, to cause harm to his campaign, and, in the course of carrying out this scheme, conspired to feed false and/or misleading information to the FBI and the DOJ, which prompted the FBI to commence an investigation.

359.     The Defendants, Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele and Joffe, were the legal cause of the commencement of the FBI's investigation into the Plaintiff in that they, among other things, engaged in efforts to falsify information, documents, and/or evidence, such as the Dossier and the white papers, provided said false information, documents and/or evidence to the FBI and the DOJ, made false and/or misleading statements to the FBI and the DOJ concerning, among other things, the facts and circumstances of the development of the Dossier and the white papers, the credibility of their evidence and sources, the individuals and entities behind the Dossier and white papers, and other facts relevant to the Defendants' plot to falsely implicate the Plaintiff.

360.     As a direct and proximate results of the Defendants' efforts, on July 31, 2016, the FBI launched a Foreign Agents Registration Act ("FARA") investigation, known as Crossfire Hurricane, to determine whether individual(s) associated with the Plaintiff and his campaign were

witting of and/or coordinating activities with the Russian government.

361.    In acting to bring forth the false information to commence the investigation by the FBI for the express purpose of harming the Plaintiff, the Defendants acted with malicious intent.

362.    The Defendants, Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele and Joffe, acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia; despite said knowledge, the Defendants conspired to disseminate false information and spread a false narrative in an attempt to ruin the Plaintiff.

363.    Subsequent to the commencement of Crossfire Hurricane, additional Defendants who were well-position within the FBI, Comey, McCabe, Strzok, Page, and Clinesmith, were the legal cause of the continuation of the FBI's investigation and the commencement of extrajudicial FISA surveillance of the Plaintiff and his administration in that they, among other things, engaged in efforts to falsify evidence, information and/or documents, such as an e-mail correspondence regarding Carter Page that was submitted in furtherance of FISA application(s); relied upon knowingly false information including, without limitation, the White Papers and the Steele Dossier, which the Defendants were aware was not credible and was funded by the Clinton Campaign and the DNC; withheld pertinent and material information from FISA applications and in submissions, communications, and correspondences with judges, law enforcement officials, supervisors, superiors, and other government officials; made false and/or misleading statements to the FISC, Congress, and/or the Plaintiff, who at the time was sitting President of the United States; and otherwise misled as to the credibility of the evidence supporting their investigation, the individuals and entities behind the Dossier and white papers, and other facts relevant to the evidentiary basis for Crossfire Hurricane, the FISA applications, the Mueller investigation, and

other related investigations regarding the alleged Trump-Russia connection.

364.    In acting to falsely maintain and continue the investigation(s) by the FBI and the DOJ for the express purpose of harming the Plaintiff, the Defendants, Comey, McCabe, Strzok, Page, and Clinesmith, acted with malicious intent.

365.    The Defendants, Comey, McCabe, Strzok, Page, and Clinesmith, acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia, and they knew that Crossfire Hurricane lacked a legitimate evidentiary basis and was based on a false and contrived premise; despite said knowledge, the Defendants conspired to continue the baseless investigations, to obtain FISA warrants in excess of their lawful authority, and to proliferate the spread of the Defendants' false narrative.

366.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.

367.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities for himself, the Trump Campaign, and the Trump Organization LLC.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter

a Judgment for Donald J. Trump and against the Defendants, Michael Sussmann, Peter Fritsch, Glenn Simpson, Christopher Steele, Nellie Ohr, Igor Danchenko, Rodney Joffe, James Comey, Andrew McCabe, Peter Strzok, Lisa Page, and Kevin Clinesmith for compensatory damages, Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

## Count VI
### Conspiracy to Commit Malicious Prosecution
*(Against Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, Joffe, Podesta, Mook, Reines, Comey, McCabe, Strzok, Page, and Clinesmith)*

368.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

369.    The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, and Joffe, had a meeting of minds and a common plan to induce the FBI and/or the Department of Justice through deceptive means into commencing an unfounded investigation into the Plaintiff's alleged collusion with the Russian government, Vladimir Putin, and other government officials.

370.    The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, and Joffe, conspired to cause the FBI's investigation to be commenced, and continue forward, by, among other things, falsifying information, documents, and evidence, such as the Dossier and the white papers, providing said falsified information, documents, and evidence to the FBI and the DOJ, and making false and/or misleading statements to the FBI and the DOJ concerning, among other things, the facts and circumstances of the development of the Dossier and the white papers, the credibility of their evidence and sources, the individuals and entities behind the Dossier and White Papers, and other facts relevant to the Defendants' plot to falsely implicate the Plaintiff.

371.    The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson,

Fritsch, Steele, Ohr, Danchenko, and Joffe, concocted a scheme to denigrate the Plaintiff and tarnish his harm his chance of becoming elected and then to properly and effectively administrate his office of President of the United States.  In the course of carrying out this scheme, they conspired to feed false and/or misleading information to the FBI and the DOJ which prompted the FBI to commence an investigation.

372.    The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, and Joffe, conspired to do an unlawful act by unlawful means.

373.    The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, and Joffe, acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia; despite said knowledge, the Defendants conspired to disseminate false information and spread a false narrative in an attempt to ruin the Plaintiff.

374.    Moreover, in conspiring to bring forth the false information to commence the investigation by the FBI for the express purpose of harming the Plaintiff, the Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, and Joffe, acted with malicious intent.

375.    Subsequent to the commencement of Crossfire Hurricane, additional Defendants who were well-positioned within the FBI, Comey, McCabe, Strzok, Page, and Clinesmith, conspired to continue the FBI's investigation and to commence an extrajudicial FISA surveillance of the Plaintiff and his administration in that they, among other things, conspired to falsify evidence, information and/or documents, such as an e-mail correspondence regarding Carter Page that was submitted in furtherance of FISA application(s); conspired to rely upon knowingly false information including, without limitation, the White Papers and the Steele Dossier, which the

Defendants were aware was not credible and was funded by the Clinton Campaign and the DNC; conspired to withhold pertinent and material information from FISA applications and in submissions, communications, and correspondences with judges, law enforcement officials, supervisors, superiors, and other government officials; conspired to make false and/or misleading statements to the FISC, Congress, and/or the Plaintiff, who at the time was sitting President of the United States; and otherwise conspired to mislead as to the credibility of the evidence supporting their investigation, the individuals and entities behind the Dossier and white papers, and other facts relevant to the evidentiary basis for Crossfire Hurricane, the FISA applications, the Mueller investigation, and other related investigations regarding the alleged Trump-Russia connection.

376.   In conspiring to falsely maintain and continue the investigation(s) by the FBI and the DOJ for the express purpose of harming the Plaintiff, the Defendants, Comey, McCabe, Strzok, Page, and Clinesmith, acted with malicious intent.

377.   The Defendants, Comey, McCabe, Strzok, Page, and Clinesmith, acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia, and they knew that Crossfire Hurricane lacked a legitimate evidentiary basis and was based on a false and contrived premise; despite said knowledge, the Defendants conspired to continue the baseless investigations, to obtain FISA warrants in excess of their lawful authority, and to proliferate the spread of the Defendants' false narrative.

378.   Each of the above-named Defendants executed several acts in furtherance of the conspiracy, as detailed at length in this Complaint, and committed overt acts to harm the Plaintiff in the furtherance of the conspiracy.

379.   As a direct and proximate result of the Defendants' actions, the Plaintiff has

suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.

380.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage in addition to costs of defense and attorneys' fees.

381.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Hillary Clinton, Michael Sussmann, Debbie Wasserman Schultz, Charles Halliday Dolan, Jr., Jake Sullivan, Marc Elias, Glenn Simpson, Peter Fritsch, Christopher Steele, Nellie Ohr, Igor Danchenko, and Rodney Joffe, John Podesta, Robert Mook, Philippe Reines, James Comey, Andrew McCabe, Peter Strzok, Lisa Page, and Kevin Clinesmith for compensatory damages, Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### Count VII
### Computer Fraud and Abuse Act
### (18 U.S.C. § 1030)
*(Against Neustar, Joffe, DNC, Clinton Campaign, Clinton, Perkins Coie, Sussmann)*

382.    The Plaintiff avers the allegations contained in the preceding paragraphs and

incorporates them in this count, as if set forth at length herein.

383.    The computers belonging to the Executive Office of the President of the United States are non-public, belonging to a department or agency of the United States, are exclusively for the use of the United States Government and are involved in interstate and foreign commerce and communications.

384.    The computers belonging to the Trump Organization LLC, located at Trump Tower, are involved in interstate and foreign commerce and communication and, therefore, are protected computers under 18 U.S.C. § 1030(e)(2).

385.    The Defendants' conduct as alleged herein violated 18 U.S.C. §§ 1030(a)(2), 1030(a)(3), 1030(a)(4), and/or 1030(a)(6).

386.    The Defendants, Neustar and Joffe, knowingly, intentionally and unlawfully accessed and/or exceeded their authority to access the computers at the Executive Office of the President of the United States and thereby obtained and used valuable, sensitive and/or proprietary information and data from those computers in violation of 18 U.S.C. § 1030(a)(2)(B), 1030(a)(2)(C), and 1030(a)(3).

387.    Such information and data include, but are not limited to, non-public, sensitive, confidential, classified and/or proprietary internet data, DNS records, techniques, processes, procedures and programs.

388.    Neustar and Joffe also knowingly, intentionally, and unlawfully accessed and/or exceeded their authority to access computers belonging to the Trump Organization LLC, located at the Trump Tower, and thereby obtained and used valuable, sensitive and/or proprietary information and data from those computers in violation of 18 U.S.C. § 1030(a)(2)(C).

389.    Such information and data include, but are not limited to, non-public, sensitive,

confidential and/or proprietary internet data, DNS records, business methods, techniques, processes, procedures and programs.

390.    As detailed at length herein, the Defendants, the DNC, the Clinton Campaign, Clinton, Perkins Coie, and Sussmann conspired with Neustar and Joffe in their commission of the above-stated acts, in violation of 18 § U.S.C. 1030(b).

391.    As a direct and proximate result of the DNC, the Clinton Campaign, Clinton, Perkins Coie, Sussmann, Neustar, and Joffe's violations of 18 U.S.C. § 1030, the Plaintiff has been injured and has sustained a loss in excess of $5,000.

392.    Among other things, the Defendants obtained valuable, sensitive, proprietary and confidential data and information pertaining to the Plaintiff, which they manipulated, falsified and altered for nefarious purposes, and, in addition, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' actions and the various federal investigations and/or official proceedings arose therefrom

393.    The acts of the above-mentioned Defendants which violated 18 U.S.C. § 1030 were not discoverable until September 16, 2021, upon the disclosure of said acts described in the indictment of Michael Sussmann in *United States v. Sussmann*, case no. 1:21-cr-00582-CRC, United States District Court, District for Columbia.

394.    As a direct and proximate result of the Defendant's actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage, including, among other things, the cost of investigating and responding to the unauthorized access, defending himself against federal

investigations, harm to his business, and loss of trade secrets and/or other proprietary, sensitive or valuable information and data, entitling the Plaintiff to compensatory relief under 18 U.S.C. § 1030(g).

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Neustar, Inc., Rodney Joffe, Perkins Coie, LLP, Michael Sussmann, HFACC, Inc., the Democratic National Committee, the DNC Services Corporation, and Hillary Clinton for compensatory damages, Punitive damages, costs, attorneys' fees, and such further and other relief as this honorable Court may deem just and proper.

## Count VIII
### Theft of Trade Secrets
### (18 U.S.C. § 1830-32)
*(Against Neustar, Joffe, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton)*

395.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

396.    The Plaintiff owns and possesses certain non-public, proprietary, sensitive and confidential information and data, including without limitation, DNS data.

397.    DNS internet traffic data houses highly proprietary, sensitive and confidential data. For example, among other things, an analysis of raw DNS data could reveal a comprehensive view into an individual or a company's website traffic, e-mail traffic, webmail traffic, chat messaging, in addition to the types of technology, hardware, software, programs, securities and processes being utilized by the servers.

398.    Neustar and Joffe, at the direction of Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, exploited access to non-public data sources and/or servers, and unlawfully acquired, stole and exploited sensitive, proprietary and confidential internet data, including without limitation, DNS information, traffic, and/or data originating from computers and/or

servers: (i)located at Plaintiff's private apartment in Central Park West in New York and belonging to the Plaintiff; and (ii) located at Trump Tower and belonging to The Trump Organization, in which Plaintiff has an ownership interest (collectively, with the computers and/or servers house in Plaintiff's private apartment, "Plaintiff's Servers").

399.    Joffe and Neustar exploited their access to non-public data to, among other things, mine DNS traffic and other data from Plaintiff's Servers for the purpose of gathering derogatory information about the Plaintiff.

400.    In doing so, Joffe and Neustar intentionally accessed, without authorization, Plaintiff's Servers.

401.    By illegally accessing the above-mentioned information and data, the Neustar and Joffe, were able to obtain proprietary, sensitive, and/or confidential information and data including, among other things, the number and frequency of e-mail communications between the Plaintiff's Servers and other third party servers, the number and frequency of website visits to third party websites by the Plaintiff's Servers, the number and frequency of webmail interactions between the Plaintiff's Servers and other third party servers, and the number and frequency of chat messaging interactions between the Plaintiff's Servers and other third party servers, as well as information pertaining to the types of software, programs, securities and processes being utilized by Plaintiff's Servers.

402.    This information and data revealed highly proprietary, sensitive, and confidential knowledge, including insight into Plaintiff's and The Trump Organization's business dealings, financial dealings, communications, future and current plans, techniques, patterns, methods, processes, and procedures, as well as identification of their corporate partners, political associates, clients, and vendors.

403.    This proprietary, sensitive and confidential information, data and/or knowledge constitutes trade secrets within the meaning of 18 U.S.C. § 1839(3) where they constitute business and/or political methods, techniques, processes, procedures and programs that are both protected from disclosure by the Plaintiff and derive significant economic value from not generally being known to or ascertainable by others, including the Defendants, who can obtain economic value from disclosure or use of such information.

404.    The Plaintiff and The Trump Organization restricts access to their proprietary, sensitive and confidential information and data, including DNS data, even within their own personnel and prevents unauthorized access to such records by digital or electronic means.

405.    The Plaintiff and The Trump Organization further protects against theft and disclosure of such information by third parties by the requirement of executed non-disclosure agreements prior to providing any such access.

406.    Defendants, Neustar and Joffe, violated the Defend Trade Secrets Act, 18 U.S.C. § 1832(a)(1), by knowingly obtaining the Plaintiff's confidential records by fraud, artifice, and deception and, thereafter, stealing, appropriating, taking, carrying away, and concealing the theft of the Plaintiff's confidential records with intent to convert the Plaintiff's confidential records, which are related to products sold in interstate and foreign commerce, to the Defendants' own benefit, while knowing and intending that such misappropriation would injure the Plaintiff.

407.    Defendants, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, conspired with Neustar and Joffe to commit the above-named acts in furtherance of the overarching conspiracy to denigrate and spread injurious falsehoods to harm the Plaintiff's political career and to impede his ability to effectively govern.

408.    Defendants, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton,

conspired with Neustar and Joffe to violate the Defend Trade Secrets Act, 18 U.S.C. § 1832(a)(1), by assisting, aiding, and abetting Neustar and Joffe in obtaining Plaintiff's proprietary, sensitive and confidential information and data by fraud, artifice, and deception and, thereafter, stealing, appropriating, taking, carrying away, and concealing the theft of Plaintiff's confidential records with intent to convert Plaintiff's confidential records, which are related to products sold in interstate and foreign commerce, to Defendants' own benefit, while knowing and intending that such misappropriation would injure the Plaintiff

409. Each of the Defendants, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, were aware of, and active participants in, the conspiracy for Neustar and Joffe's to violate the Defend Trade Secrets Act, 18 U.S.C. § 1832, and each of the RICO Defendants committed at least one act in furtherance of this goal.

410. The Plaintiff's confidential records were misappropriated by Defendants within the meaning of 18 U.S.C. § 1839(5), where the Plaintiff's records were acquired by the Defendants, through unlawful and deceptive acts, without the Plaintiff's authorization and through Defendants' acts of espionage or other improper means conducted by electronic or other means.

411. The theft of the protected trade secrets has damaged the Plaintiff.

412. The actions of Defendants, Neustar and Joffe, constitute theft of trade secrets in violation of 18 U.S.C. § 1832(a)(1).

413. The actions of Defendants, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, constitute a conspiracy to steal trade secrets in violation of 18 U.S.C. § 1832(a)(5).

414. As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage in addition to costs of defense and

attorneys' fees.

415.    Among other things, the Plaintiff was forced to incur, the Plaintiff was forced to

incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four

million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees,

and related expenses incurred in connection with his effort to defend against the Defendants'

actions and the various federal investigations and/or official proceedings arose therefrom, in

addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a

Judgment for Donald J. Trump and against the Defendants, Neustar, Inc., Rodney Joffe, Perkins

Coie, LLP, Michael Sussmann, HFACC, Inc., the Democratic National Committee, the DNC

Services Corporation, and Hillary Clinton, for compensatory damages, Punitive damages, costs,

attorneys' fees, and such further and other relief as this Court may deem just and proper.

**Count IX**
**Stored Communications Act**
**(18 U.S.C. 2701-12)**
*(Against Neustar and Joffe)*

416.    The Plaintiff avers the allegations contained in the preceding paragraphs and

incorporates them in this count, as if set forth at length herein.

417.    The Defendants, Neustar and Joffee, on one or more occasions willfully and

intentionally accessed, without authorization or in excess of any authorization, facilities through

which an electronic communication is provided.

418.    Neustar and Joffee obtained unauthorized access to or, at a minimum, exceeded

their authorization to access, numerous facilities through which an electronic communication is

provided, including, but not limited to: (i) the computers, networks and/or servers of the Plaintiff's

private New York residence; (ii) the computers, networks and/or servers of the Executive Office

of the President of the United States; and (iii) the computers, networks and/or servers of the Trump Organization LLC, specifically located at Trump Tower (collectively, the "Computers").

419.   Neustar and Joffee obtained wire or electronic communications from the Computers that were in electronic storage in such systems.

420.    The Plaintiff was aggrieved as a direct and proximate result of Neustar and Joffe's actions, and was caused to suffer significant damage, entitling him to an award for monetary relief under 18 U.S.C. § 2707(c).

421.   The violations of Neustar and Joffe were willful and intentional, thereby warranting an award of punitive damages under 18 U.S.C. § 2707(c).

422.   Moreover, in conspiring to bring forth the false information to commence the investigation by the FBI for the express purpose of harming the Plaintiff, the Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, and Joffe, acted with malicious intent.

423.   The Plaintiff also seeks an award for attorneys' fees and costs as permitted pursuant to 18 U.S.C. § 2707(c)

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Neustar, Inc.  and Rodney Joffe, for compensatory damages, punitive damages, costs, attorneys' fees, and such further and other relief as this Court may deem just and proper.

### Count X
**Agency**
*(Against Clinton)*

424.   The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

425.    Clinton, acting as a principal, used the law firm, Perkins Coie, and the Clinton Campaign as her agents to act on her behalf to carry out the plot against Trump to assure that he would be falsely implicated as colluding with a hostile foreign sovereignty.

426.    Specifically, the Clinton Campaign and the DNC under Clinton's direction put into place a scheme to hire dishonest operatives to put together a collection of lies and innuendo about the Plaintiff and shop it to the FBI.  The statements that were disseminated were knowingly false and damaging.

427.    Clinton directed the DNC and the Clinton Campaign to also retain Perkins Coie, LLP to find proof of a sinister link between Trump and Russia in the lead-up to the 2016 Presidential Election.

428.    The Clinton Campaign and the DNC, under the direction of Hillary Clinton, directed its law firm, Perkins Coie, to hire an outside intelligence firm, Fusion GPS to dig up dirt on the Plaintiff's alleged connections with Russia in 2016.  They paid Fusion GPS approximately $10 million to produce and propagate a false narrative that the Plaintiff had colluded with the Russians.

429.    Clinton attempted to shield her involvement through a barricade of agents working on her behalf.

430.    Once retained Perkins Coie, was tasked with spearheading the mission to find or fabricate proof of a sinister link between Trump and Russia in the lead-up to the 2016 Presidential Election.

431.    The Clinton Campaign also secured Joffe and his company Neustar, Inc.  to help Clinton achieve her goal.

432.    During the lead-up to the 2016 Presidential Election, the Clinton Campaign retained Perkins Coie to perform "opposition research" on the Trump Campaign.

433.    Perkins Coie did not provide legal services to the Defendants, but instead, was commissioned to dig up whatever dirt they could on the Plaintiff, and to the extent there was none, to manufacture it.

434.    Perkins Coie, acting with the knowledge and direction of the Clinton Campaign, then proceeded to proliferate a false narrative that the Trump Campaign was actively colluding with Russian operatives to subvert the 2016 Presidential Election.

435.    Sussmann and Elias, while working for Perkins Coie, and working on behalf of the Clinton Campaign, worked with Joffe and attempted to find any such wrongdoing by the Plaintiff.

436.    Sussmann advised the media and others, falsely and knowingly claiming to demonstrate the existence of a secret communications channel between the Trump Organization and Alfa Bank.  In this regard, Sussmann invoiced the Clinton Campaign for his communications with Joffe and Elias.

437.    Sussmann was also advising the Clinton Campaign in connection with cybersecurity issues, and Perkins Coie, acted as the Clinton Campaign's General Counsel.

438.    Joffe used his access at multiple organizations to gather and mine public and non-public Internet data regarding Trump and his associates, with the goal of creating a "narrative" regarding the candidate's ties to Russia."

439.    Joffe later shared certain results of those data searches and analysis with Sussmann so that Sussmann, in turn, could provide them to the media and the FBI.

440.    Clinton was fully aware of the plan and hired and instructed the necessary parties to make it happen.

441.    Moreover, employees of Perkins Coie, Elias and Sussmann had multiple conferences regarding their work and billed the Clinton Campaign for these meetings.

442.    All of the abovementioned acts were committed by Perkins Coie under the instruction and for the benefit of Hillary Clinton and the Clinton Campaign.

443.    The agents, the Clinton Campaign and Perkins, Coie, LLP, were not acting outside of the instructions of the principal when committing the above-mentioned acts because they were hired for the sole purpose of digging up or manufacturing information on the Plaintiff.

444.    Sussmann, and his firm, Perkins Coie were always acting on behalf of and in coordination with the Clinton Campaign, in assembling and conveying Sussmann's allegations.

445.    Additionally, all of Sussmann's recorded time and work relating to the Russian Bank were billed to the Clinton Campaign.

446.    Clinton is liable as a principal for all of the acts her agents committed against the Plaintiff at her request and for her benefit.

447.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage in addition to costs of defense and attorneys' fees.

448.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

449.    The Plaintiff does not claim nor seek any compensation for damage to his reputation, but rather, he seeks damages for the cost of dealing with the legal issues and political

issues, which he was required to spend to redress the injurious falsities which were propounded by the Defendants, and all other losses incurred due to the tortious conduct of the Defendants.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Hillary Clinton, for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### Count XI
### Respondeat Superior/Vicarious Liability
### *(Against Perkins Coie)*

450.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

451.    Under the doctrine of respondeat superior, the Defendant, Perkins Coie, is vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

452.    Specifically, under the doctrine of respondeat superior, Perkins Coie is responsible for the tortious actions that its employees, Sussmann and Elias, committed.

453.    Elias and Sussmann were two of Perkins Coie's senior partners responsible for representing the DNC.  The senior partners negotiated the Joint Fund-Raising Agreement between the DNC and the Clinton Campaign in which Hillary Clinton would be permitted to control the party's finances, strategy, and utilize the money that the DNC raised.

454.    Sussmann and Joffe engaged in efforts with Elias and individuals acting on behalf of the Clinton Campaign to manufacture evidence of wrongdoing by the Plaintiff and the existence of a secret communications channel between the Trump Organization and Alfa Bank.

455.    Sussmann reported the Alfa Bank connection as though it was real and lied to the

FBI General Counsel in that he falsely stated that he was not acting on behalf of any client, when he was specifically there at the behest of Clinton, the Clinton Campaign, and the DNC.  In fact, he invoiced the Clinton Campaign for his efforts.

456.    From in or about late July through in or about mid-August 2016, Sussmann, Joffe, and Elias coordinated and communicated about the Plaintiff's involvement with Alfa Bank.  Sussmann and Perkins Coie invoiced the Clinton Campaign for that conspiratorial meeting.

457.    Elias and Sussmann perpetrated lies about the Plaintiff and falsified evidence.  Elias and Sussmann committing these egregious acts while working for a client of their firm.  The DNC and the Clinton Campaign hired Perkins Coie and Sussmann and Elias to complete the work as a part of their job.

458.    At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

459.    As a direct and proximate result of the torturous actions by agents, servants, representatives, employees and/or contractors, as alleged above, Perkins Coie is vicariously liable to the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

460.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage in addition to costs of defense and attorneys' fees.

461.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and

continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities for himself, the Trump Campaign, and the Trump Organization LLC.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Perkins Coie, LLP, for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

## Count XII
### Respondeat Superior/Vicarious Liability
*(Against the DNC)*

462.   The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

463.   Under the doctrine of respondeat superior, the Defendant, the DNC, is vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

464.   Specifically, under the doctrine of respondeat superior, the DNC is responsible for the tortious actions committed by its chairperson, Schultz, and other members and employees.

465.   At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

466.   As a direct and proximate result of the torturous actions by agents, servants, representatives, employees and/or contractors, as alleged above, the DNC is vicariously liable to

the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

467.   Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, the Democratic National Committee, the DNC Services Corporation, for Compensatory damages, Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

<u>**Count XIII**</u>
**Respondeat Superior/Vicarious Liability**
*(Against the Clinton Campaign)*

468.   The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

469.   Under the doctrine of respondeat superior, the Defendant, the Clinton Campaign, vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

470.   Specifically, under the doctrine of respondeat superior, the Clinton Campaign is responsible for the tortious actions committed by its campaign manager, communications director, and foreign policy advisor.

471.   On or about September 15, 2016, Elias exchanged emails with the Clinton

Campaign's campaign manager, communications director, and foreign policy advisor concerning the plot to falsely connect Donald J. Trump to a Russian bank.

472.    At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

473.    As a direct and proximate result of the torturous actions by agents, servants, representatives, employees and/or contractors, as alleged above, the Clinton Campaign is vicariously liable to the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

474.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, HFACC Inc., for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

**Count XIV**
**Respondeat Superior/Vicarious Liability**
*(Against Fusion GPS)*

475.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

476.    Under the doctrine of respondeat superior, the Defendant, Fusion GPS is vicariously

responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

477.   Specifically, under the doctrine of respondeat superior, Fusion GPS is responsible for the tortious actions committed by its employees, Fritsch and Simpson.

478.   Elias, in his mission to obtain derogatory anti-Trump 'opposition research,' commissioned Fusion GPS, and its co-founders, Fritsch and Simpson, and directed them to dredge up evidence—legitimate or otherwise, true or otherwise, of collusion between the Plaintiff and Russia.

479.   Fritsch and Simpson, in turn, enlisted the assistance of Orbis Ltd and its owner, Steele, to produce a series of reports setting forth damning evidence of the supposed collusion between the Plaintiff and Russia.

480.   Moreover, the efforts of Ohr to pass the knowingly false Dossier through her husband to the Department of Justice, while she was in the full-time employment of Fusion GPS also leads to the liability of Fusion GPS.

481.   The now-debunked collection of reports, known as the "Steele Dossier" or simply the "Dossier," was riddled with misstatements, misrepresentations and flat out lies.  As it turns out, the Dossier was largely based upon information provided to Steele by his primary sub-source, Danchenko, who admittedly fabricated his claims.

482.   Danchenko had close ties to senior Clinton Campaign official Dolan, who knowingly provided false information to Danchenko, who relayed it to Steele, who reported it in his Dossier and fed it to the FBI and the media.

483.   Fritsch and Simpson were hired and working for their company Fusion GPS when they fabricated research and evidence.

484.     At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

485.     As a direct and proximate result of the torturous actions by agents, servants, representatives, employees and/or contractors, as alleged above, Fusion GPS is vicariously liable to the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

486.     Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Fusion GPS, for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

**<u>Count XV</u>**
**Respondeat Superior/Vicarious Liability**
(*Against Orbis Business Intelligence Ltd*)

487.     The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

488.     Under the doctrine of respondeat superior, the Defendant, Orbis, vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

489. Specifically, under the doctrine of respondeat superior, Orbis is responsible for the tortious actions committed by its employee, Steele.

490. Fritsch and Simpson enlisted the assistance of Orbis Ltd and its owner, Steele, to produce a series of reports setting forth damning evidence of the supposed collusion between the Plaintiff and Russia.

491. The now-debunked collection of reports, known as the "Steele Dossier" or simply the "Dossier," was riddled with misstatements, misrepresentations and flat out lies. As it turns out, the Dossier was largely based upon information provided to Steele by his primary sub-source, Danchenko, who admittedly fabricated his claims.

492. Danchenko had close ties to senior Clinton Campaign official, Dolan, who knowingly provided false information to Danchenko, who relayed it to Steele, who reported it in his Dossier and fed it all the way back up the chain.

493. Fusion GPS was hired to create the fabricated Dossier and Steele was working for the company when he created it.

494. At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

495. As a direct and proximate result of the tortious actions by agents, servants, representatives, employees and/or contractors, as alleged above, Orbis is vicariously liable to the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

496. As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual,

compensatory, special, incidental, and consequential damage in addition to costs of defense and attorneys' fees.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Orbis Business Intelligence Ltd., for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

## Count XVI
### Respondeat Superior/Vicarious Liability
*(Against Neustar)*

497.   The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

498.   Under the doctrine of respondeat superior, the Defendant, Neustar vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

499.   Specifically, under the doctrine of respondeat superior, Neustar is responsible for the tortious actions committed by its employee, Joffe.

500.   The Clinton Campaign secured Neustar, Inc. which is run by Joffe, to help Hillary Clinton achieve her goal.

501.    Sussmann and Elias, while working for Perkins Coie, LLP, and working on behalf of the Clinton Campaign, worked with Joffe and attempted to find wrongdoing by the Plaintiff or the Trump Organization.

502.   Sussmann advised the media and others, falsely and knowingly claiming to demonstrate the existence of a secret communications channel between the Trump Organization and Alfa Bank.  In this regard, Sussmann invoiced the Clinton Campaign for his Communications

with Joffe and Elias.

503.    Sussmann was also advising the Clinton Campaign in connection with cybersecurity issues, and Perkins Coie, acted as the Clinton Campaign's General Counsel.

504.    Joffe used his access at multiple organizations to gather and mine public and non-public Internet data regarding Trump and his associates, with the goal of creating a "narrative" regarding the candidate's ties to Russia."

505.    Joffe later shared certain results of those data searches and analysis with Sussmann so that Sussmann, in turn, could provide them to the media and the FBI.

506.    Joffe was working and acting on behalf of Neustar when he attempted to find wrongdoing and fabricated facts and evidence.

507.    At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

508.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage in addition to costs of defense and attorneys' fees.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Neustar, Inc., for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

## **Jury Demand**

The Plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  March 24, 2022

Respectfully submitted by:

**THE TICKTIN LAW GROUP**
270 SW Natura Avenue
Deerfield Beach, Florida 33441
Telephone: (561) 232-2222


 /s/ Pete*r Ticktin*
PETER TICKTIN, ESQUIRE
Florida Bar No. 887935
JAMIE ALAN SASSON, ESQUIRE
Florida Bar No. 10802
SHAINA VANMEHREN, ESQUIRE
Florida Bar No. 1025180
Our Matter No.: 22-0062


and

**HABBA MADAIO & ASSOCIATES LLP**
1430 US Highway 206
Suite 240
Bedminster, New Jersey 07921
ALINA HABBA, ESQUIRE **(Upon Anticipated Admission *Pro Hac Vice*)**
New Jersey Bar No. 018592010
MICHAEL T. MADAIO, ESQUIRE **(Upon Anticipated Admission *Pro Hac Vice*)**
New Jersey Bar No. 070752013

# 21

Plaintiff's Motion to Disqualify Judge Middlebrooks (Apr. 4, 2022)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: 2:22-cv-14102-DMM

DONALD J. TRUMP,

       Plaintiff,

v.

HILLARY R. CLINTON, et al.,

       Defendant.

_____/

## PLAINTIFF'S MOTION TO DISQUALIFY JUDGE MIDDLEBROOKS

The Plaintiff, DONALD J. TRUMP, by and through his undersigned counsel, hereby files his Motion to Disqualify The Honorable Donald M. Middlebrooks, United States District Judge for the Southern District of Florida, under 28 U.S.C. § 455, and as grounds for disqualification states as follows:

1.      The Plaintiff files this Motion for Disqualification of the Honorable Donald M. Middlebrooks under 28. U.S.C. § 455(a).

2.      The basis for the disqualification of the presiding Judge is that Donald M. Middlebrooks was nominated to his current position as a Federal Court Judge, on January 7, 1997, by the then 42nd President of the United States, William J. Clinton.

3.      William J. Clinton and the Defendant, HILLARY CLINTON, are presently husband and wife.  HILLARY CLINTON was married to William J. Clinton, during the time her husband nominated Judge M. Middlebrooks to his current position, as Federal Court Judge, and

HILLARY CLINTON acted as First Lady of the United States, during the time of the Judge's nomination.

4.      Due to the fact that the Defendant, HILLARY CLINTON is being sued by her former opponent for the United States Presidency, an election that she lost, regarding serious allegations on her part, as well as her allies, of engaging in fraudulent and unlawful activities against the Plaintiff, and because her husband nominated Judge Middlebrooks to the Federal Bench, there exists a reasonable basis that Judge Middlebrooks' impartiality will be questioned.

5.      28 USC 455 provides that "(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

6.      Due to the fact that Judge Middlebrooks has a relationship to the Defendant, HILLARY CLINTON's husband, by way of his nomination as Judge to this Court, this amounts to prejudice so virulent or pervasive as to constitute bias against a party.   See *Hamm v. Members of Bd. Of Regents*, 709 F.2d 647, 651 (11th Cir. 1983); *Davis*, 517 F. 2d at 1052.

7.      Moreover, the Plaintiff is unaware of the exact extent of the relationship between Judge Middlebrooks and the Defendant, HILLARY CLINTON, herself, who acted as First Lady of the United States, during the time of the Judge's nomination to Federal Court Judge.

8.      The Plaintiff is also unaware if the Judge has current relationship with either the Defendant, HILLARY CLINTON, or her husband, and how far back the relationship has existed.

9.      In this circuit, "the test for determining whether a judge's impartiality might reasonably be questioned is an objective one and requires asking whether a disinterested observer fully informed of the facts would entertain a significant doubt as to the judge's impartiality." *Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla*., 140 F.3d 898, 912 (11

THE TICKTIN LAW GROUP, PLLC,
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Cir. 1998) (citing *Diversified Numismatics, Inc. v. City of Orlando*, 949 F.2d 382, 385 (11 Cir. 1991).

10.     There is no question that Judge's Middlebrooks' impartiality would be questioned by a disinterested observer, fully informed of the facts, due to Judge's relationship with the Defendant, either, individually, or by the very nature of his appointment to the Federal Bench, by the Defendant's husband.

11.     The most important issue is not simply that justice must be done, but also that justice must appear to be done.  This could not be more important in a case like the above styled cause, where wrongs in regard to a presidential election are to be redressed.

12.     Due to the reasonable questioning of the Judge's impartiality, based on the Judge's nomination as a Federal Court Judge, the Honorable Judge Middlebrooks should be disqualified from this Case, and should recuse himself from acting in any capacity in this subject litigation.

WHEREFORE, the Plaintiff, DONALD J. TRUMP, respectfully requests that the Honorable Donald J. Middlebrooks be disqualified from the above styled litigation, and that he recuse himself from acting in any capacity, whatsoever, in this subject litigation, and any other relief this Court may deem just and proper.

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1(a)(3)

The undersigned counsel has not conferred with counsel(s) for the Defendant(s) in a good faith effort to resolve the issues raised in this Motion, as no appearances have been filed for any of the Defendants.

THE TICKTIN LAW GROUP, PLLC,
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Dated:  April 4, 2022

Respectfully submitted by:

**THE TICKTIN LAW GROUP**
270 SW Natura Avenue
Deerfield Beach, Florida 33441
Telephone: (561) 232-2222


 /s/ Pete*r Ticktin*
PETER TICKTIN, ESQUIRE
Florida Bar No. 887935
JAMIE ALAN SASSON, ESQUIRE
Florida Bar No. 10802

and

**HABBA MADAIO & ASSOCIATES LLP**
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
ALINA HABBA, ESQUIRE
New Jersey Bar No.  018592010
MICHAEL T. MADAIO, ESQUIRE
New Jersey Bar No. 070752013

**THE TICKTIN LAW GROUP, PLLC,**
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed this 4th day of April 2022, with the Clerk of Court using CM/ECF, which will send a notice of electronic filing to all Parties listed on the Service List.

/s/ Peter Ticktin_____
Peter Ticktin

## SERVICE LIST

Juan Antonio Gonzalez, Esquire
Anthony.Pogorzelski@usdoj.gov
**Assistant U.S. Attorney**
99 N.E. 4th Street, Suite 300
Miami, Florida 33132
Tel: (305) 961-9296 (counsel for USA regarding redaction)

Samuel L. Hendrix, Esquire
SLHendrix@fbi.gov
**Federal Bureau of Investigation**
Office of General Counsel
935 Pennsylvania Avenue, NW
Room 10140 (counsel for acceptance of service for FBI)

Jamie Alan Sasson, Esquire
Serv513@LegalBrains.com
Peter Ticktin, Esquire
Serv512@LegalBrains.com
**THE TICKTIN LAW GROUP, PLLC.**
270 SW Natura Avenue
Deerfield Beach, Florida 33441-1610
Telephone: (954) 570-6757
Facsimile: (954) 570-6760
*Attorneys for the Plaintiff*

Alina Habba, Esquire
ahabba@habbalaw.com
**Habba Madaio & Associates LLP**
1430 US Highway 206 Suite 240
Bedminster, NJ 07921
Telephone: (908) 869-1188
*Attorneys for the Plaintiff*

THE TICKTIN LAW GROUP, PLLC,
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Michael T. Madaio, Esquire
mmadaio@habbalaw.com
**Habba Madaio & Associates LLP**
1430 US Highway 206 Suite 240
Bedminster, NJ 07921
908-869-1188
*PRO HAC VICE*
*Attorneys for the Plaintiff*

**THE TICKTIN LAW GROUP, PLLC,**
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

# 30
Order Denying Motion for Disqualification (Apr. 6, 2022)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CV-14102-MIDDLEBROOKS

DONALD J. TRUMP,

     Plaintiff,

v.

HILLARY R. CLINTON, et al.,

     Defendants.

_____/

### ORDER DENYING MOTION FOR DISQUALIFICATION

THIS CAUSE comes before the Court on Plaintiff Donald J. Trump's Motion to Disqualify

Judge Middlebrooks, filed on April 4, 2022. (DE 21). For the reasons explained below, Plaintiff's

Motion is denied.

Plaintiff initiated this lawsuit on March 24, 2022, alleging that "the Defendants, blinded by

political ambition, orchestrated a malicious conspiracy to disseminate patently false and injurious

information about Donald J. Trump and his campaign, all in the hopes of destroying his life, his

political career and rigging the 2016 Presidential Election in favor of Hillary Clinton." (DE 1 at

¶ 9).[1] In this Motion, Plaintiff argues that I should disqualify myself from presiding over this case

because I was nominated to the federal bench by former President Bill Clinton, the spouse of

Defendant Hillary Clinton. (DE 21 at ¶ 3). According to Plaintiff, the very fact of my appointment

by Bill Clinton "amounts to prejudice so virulent or pervasive as to constitute bias against a party."

---

[1] On this general premise, the Complaint asserts claims for RICO violations, predicated on the
theft of trade secrets and obstruction of justice (Count I); injurious falsehood (Count III); malicious
prosecution (Count V); violations of the Computer Fraud and Abuse Act (Count VII); theft of trade
secrets (Count VIII); and violations of the Stored Communications Act (Count IX). The Complaint
also contains counts for various conspiracy charges and theories of agency and vicarious liability.
(Counts II, IV, VI, and X–XVI).

(*Id.* at ¶ 6). Plaintiff also urges that disqualification is necessary because he "is unaware of the exact extent of the relationship between" me and Defendant Hillary Clinton. (*Id.*).

The judicial disqualification statute, 28 U.S.C. § 455, provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The importance of this statute cannot be understated. It ensures that litigants in federal court receive impartial treatment and plays an important role in upholding the public's trust in the judiciary. But a district judge "is as much obliged not to recuse himself when it is not called for as he is obliged to when it is." *In re Drexel Burnham Lambert Inc.*, 861 F.3d 1307, 1312 (2d Cir. 1988); *see also In re Union Leader Corp.*, 292 F.3d 381, 391 (1st Cir. 1961).[2] This is because "[i]n the real world, recusal motions are sometimes driven more by litigation strategies than by ethical concerns."[3]  *In re Kansas Pub. Emps. Ret. Sys.*, 85 F.3d 1353, 1360 (8th Cir. 1996) (quoting *In re Cargill, Inc.*, 66 F.3d 1256, 1262–63 (1st Cir. 1995)). "We subscribe to the view that motions to recuse should not 'be viewed as an additional arrow in the quiver of advocates in the face of [anticipated] adverse rulings.'" *Id.* at 1360 (quoting *TV Commc'n Network, Inc. v. ESPN, Inc.*, 767 F. Supp. 1077, 1081 (D. Colo. 1991)).

---

[2] While there is no longer a "duty to sit" doctrine and § 455(a) requires that doubts be resolved in favor of recusal, judges are still obligated to recuse only when there are proper grounds to do so. *See United States v. Kelly*, 888 F.2d 732, 744 (11th Cir. 1989).

[3] I note that Plaintiff filed this lawsuit in the Fort Pierce division of this District, where only one federal judge sits: Judge Aileen Cannon, who Plaintiff appointed in 2020. Despite the odds, this case landed with me instead. And when Plaintiff is a litigant before a judge that he himself appointed, he does not tend to advance these same sorts of bias concerns. *See, e.g., Donald J. Trump v. Wisc. Elections Comm'n,* No. 20-cv-1785 (E.D. Wis. 2020) (Judge Brett Ludwig); *Donald J. Trump for President, Inc., et al., v. Sec. of Commonwealth of Pa.*, No. 20-cv-3371 (3d Cir. 2020) (Judge Stephanos Bibas); *Comm. on Ways and Means, U.S. House of Representatives v. U.S. Dep't of the Treasury*, No. 19-cv-01974 (D.D.C. 2019) (Judge Trevor McFadden).

It is true that I was appointed to the bench by former President Bill Clinton. Although former President Clinton is not a party to this lawsuit, I will give Plaintiff the benefit of the doubt and equate the interests of the Clintons for the sake of analysis here. The law is well settled that appointment to the bench by a litigant, without more, will not "create in reasonable minds, with knowledge of all the relevant circumstances that a reasonable inquiry would disclose, a perception that [the judge's] ability to carry out judicial responsibilities with integrity, impartiality, and competence [would be] impaired." *In re Executive Office of the President*, 215 F.3d 25, 25 (D.C. Cir. 2000) (quoting Code of Conduct for United States Judges Canon 24 cmt., reprinting in 2 Administrative Office of the United States Courts, Guide to Judiciary Policies and Procedures, ch. 1 at 1-2, 1-3); *see also Straw v. United States*, 4 F.4th 1358, 1362 (Fed. Cir. 2021) ("There is no support whatsoever for the contention that a judge can be disqualified based simply on the identity of the President who appointed him."); *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 138 F.3d 33, 38 (2d Cir. 1998) ("Nor should one charge that a judge is not impartial solely because an attorney is embroiled in a controversy with the administration that appointed the judge. Judges generally have political backgrounds to one degree or another but must be presumed, absent more, to be impartial.").

Given this precedent, I am not disqualified from presiding, nor should I recuse on the basis of any appearance of partiality. The three cases Plaintiff cites in his Motion compel no different conclusion, and indeed do not appear to support his arguments.[4] To warrant recusal, something

---

[4] In the first case he cites, *Hamm v. Members of Bd. of Regents of Fla.*, the Eleventh Circuit held that a district court judge did not exhibit bias sufficient to warrant recusal based on certain statements he made at trial. *See* 709 F.2d 647, 651 (11th Cir. 1983) ("This is not a case in which the judge openly exhibited 'a partisan zeal' for the defendants or 'stepped down from the bench to assume the role of advocate' on the defendants' behalf."); *see also Davis v. Bd. of Sch. Com'rs of Mobile Cnty*, 517 F.2d 1044, 1051 (11th Cir. 1975) (same). Neither case discussed whether judicial appointment by a party, without more, would cause a reasonable person to suspect bias on the part

3

more must be involved than solely my appointment to the bench twenty-five years ago by the spouse of a litigant now before me. And the conclusory assertions in Plaintiff's Motion do not supply any conceivable, additional grounds. I have never met or spoken with Bill or Hillary Clinton. Other than my appointment by Bill Clinton, I do not now have nor have I ever had any relationship with the Clintons.[5] "Recusal cannot be based on unsupported, irrational or highly tenuous speculation." *United States v. Cerceda*, 188 F.3d 1291, 1293 (11th Cir. 1999) (internal quotations omitted). Moreover, I have considered whether the nature of this lawsuit—acutely politically charged as it is—might provide some additional cause to question my qualification to preside, but I see no impediment there either. Every federal judge is appointed by a president who is affiliated with a major political party, and therefore every federal judge could *theoretically* be viewed as beholden, to some extent or another. As judges, we must all transcend politics.

When I became a federal judge, I took an oath to "faithfully and impartially discharge and perform all duties . . . under the Constitution and laws of the United States." 28 U.S.C. § 453. I have done so for the last twenty-five years, and this case will be no different.

---

of the presiding judge. And *Bivens Gardens* emphasized that, to establish bias justifying disqualification, a party must demonstrate "such pervasive bias and prejudice that it constitutes bias against a party"—a showing that certainly has not been made here. 140 F.3d 898, 914 (11th Cir. 1998).

[5] I was nominated by former President Clinton in September 1996 upon the recommendation of Florida's Senators. My name was one of three submitted to them by a nominating commission they had established. Both Senator Bob Graham, Democrat, and Senator Connie Mack, Republican, spoke on my behalf at the hearing of the Judiciary Committee chaired by Senator Orrin Hatch, Republican, which considered the nomination. My nomination was unanimously reported, and I was confirmed by the Senate by unanimous consent in a voice vote. 143 Cong. Rec. 70 (Fri. May 23, 1997) (S5066–5070).

As such, it is **ORDERED AND ADJUDGED** that Plaintiff's Motion (DE 21) is **DENIED.**

**SIGNED** in Chambers at West Palm Beach, Florida, this 6th day of April, 2022.

Donald M. Middlebrooks
United States District Judge

cc:      Counsel of Record

5

52

Defendant Hillary Rodham Clinton's Motion to Dismiss the Complaint
and Memorandum of Law in Support (Apr. 20, 2022)

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

DONALD J. TRUMP,

     Plaintiff,

  v.

HILLARY R. CLINTON, et al.,

     Defendants.

Case No. 2:22-cv-14102-DMM

## DEFENDANT HILLARY RODHAM CLINTON'S MOTION TO DISMISS THE COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT

David E. Kendall*
Katherine M. Turner*
Michael J. Mestitz*

WILLIAMS & CONNOLLY LLP
725 Twelfth Street N.W.
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029

  * Motion for admission *pro hac vice* pending

David Oscar Markus

MARKUS/MOSS PLLC
40 NW 3rd Street, PH 1
Miami, FL 33128
Tel: (305) 379-6667

*Counsel for Defendant Hillary Rodham Clinton*

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

ARGUMENT ...............................................................................................................1

I.      PLAINTIFF'S CLAIMS ARE TIME-BARRED ON THE FACE OF THE
        COMPLAINT .................................................................................................1

II.     EACH OF PLAINTIFF'S CLAIMS FAILS ON THE MERITS.......................5

        A.      Count I:  RICO..................................................................................6

        B.      Count II:  RICO Conspiracy .........................................................14

        C.      Count III:  Injurious Falsehood.....................................................15

        D.      Count IV:  Conspiracy to Commit Injurious Falsehood ...............19

        E.      Count VI:  Conspiracy to Commit Malicious Prosecution ...................19

        F.      Count VII:  Computer Fraud and Abuse Act .......................................20

        G.      Count VIII:  Theft of Trade Secrets .................................................20

        H.      Count X:  "Agency".........................................................................20

CONCLUSION...........................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*ADT LLC v. Vivint, Inc.*, No. 17-cv-80432, 2017 WL 5640725 (S.D. Fla. Aug. 3, 2017) .............4

*Agency Holding Corp. v Malley-Duff & Assocs.*, 483 U.S. 143 (1987) .........................................3

*Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302 (S.D. Fla. 2014)..........................................19

*Almanza v. United Airlines, Inc.*, 851 F.3d 1060 (11th Cir. 2017).................................................7

*Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283 (11th Cir. 2010) .....................................6, 7, 15

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)................................................................12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................. *passim*

*Barabe v. Apax Partners Eur. Managers, Ltd.*, 359 F. App'x 82 (11th Cir. 2009).....................20

*Beck v. Prupis*, 529 U.S. 494 (2000)....................................................................................10, 15

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)...........................................................6, 7, 19

*Boyle v. United States*, 556 U.S. 938 (2009) ...............................................................................7

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...........................................................................................15

*Chunhong Jia v. Boardwalk Fresh Burgers & Fries, Inc.*,
     No. 19-cv-2527, 2020 WL 5628734 (M.D. Fla. Sept. 21, 2020)...........................................20

*Davis v. Monahan*, 832 So. 2d 708 (Fla. 2002) ............................................................................4

*Ferrell v. Durbin*, 311 F. App'x 253 (11th Cir. 2009).................................................................12

*From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52 (Fla. Dist. Ct. App. 1981) .........................18

*Galen v. County of Los Angeles*, 477 F.3d 652 (9th Cir. 2007)....................................................14

*Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*, 341 F.3d 1292 (11th Cir. 2003) ............14

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989)................................................................11, 12

*Hawaii v. Trump*, 859 F.3d 741 (9th Cir.), *vacated on other grounds*, 138 S. Ct. 377
     (2017)......................................................................................................................................2

*Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182 (N.D. Cal. 2020).................................................8

*Hemi Grp. v. City of New York*, 559 U.S. 1 (2010) .....................................................................12

iii

*Henry v. ExamWorks Inc.*, No. 20-cv-12268, 2021 WL 3440698 (11th Cir. Aug. 6, 2021) ...........2

*Horsley v. Feldt*, 304 F.3d 1125 (11th Cir. 2002).............................................................................16

*Intermatic Inc. v. Toeppen*, 947 F. Supp. 1227 (N.D. Ill. 1996)........................................................8

*Jackson v. BellSouth Telecomms.*, 372 F.3d 1250 (11th Cir. 2004) .........................................11, 12

*Kanarick v. GE Credit Retail Bank Care Credit*,
   No. 13-cv-80039, 2013 WL 12092479 (S.D. Fla. Sept. 6, 2013) ......................................15, 18

*Klayman v. City Pages*, No. 13-cv-143, 2015 WL 1546173 (M.D. Fla. Apr. 3, 2015),
   *aff'd*, 650 F. App'x 744 (11th Cir. 2016)....................................................................................17

*La Grasta v. First Union Sec.*, 358 F.3d 840 (11th Cir. 2004) ........................................................1

*Lehman v. Lucom*, 727 F.3d 1326 (11th Cir. 2013)..........................................................................3

*Masson v. New Yorker Mag.*, 501 U.S. 496 (1991) ........................................................................17

*Melford v. Kahane & Assocs.*, 371 F. Supp. 3d 1116 (S.D. Fla. 2019) ..........................................19

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ..................................................................16

*Nunes v. Fusion GPS*, 531 F. Supp. 3d 993 (E.D. Va. 2021) .........................................................13

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*,
   418 U.S. 264 (1974)....................................................................................................................16

*Ray v. Spirit Airlines*, 836 F.3d 1340 (11th Cir. 2016) ..................................................................12

*Rock the Vote v. Trump*, No. 20-cv-06021, 2020 WL 6342927 (N.D. Cal. Oct. 29, 2020)............2

*Sentry Data Sys. v. CVS Health*, 361 F. Supp. 3d (S.D. Fla. 2018)................................................8

*Sewell v. Bernardin*, 795 F.3d 337 (2d Cir. 2015)..........................................................................4

*Simpson v. Sanderson Farms*, 744 F.3d 702 (11th Cir. 2014)......................................................6, 7

*Super Vision Int'l v. Mega Int'l Comm. Bank*, 534 F. Supp. 2d 1326 (S.D. Fla. 2008) ...............15

*TracFone Wireless, Inc. v. Hernandez*, 196 F. Supp. 3d 1289 (S.D. Fla. 2016) .........................20

*United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013) .............................................................10

*United States v. Flynn*, 507 F. Supp. 3d 116 (D.D.C. 2020) ..........................................................2

*United States v. Smith*, 22 F.4th 1236 (11th Cir. 2022) ..................................................................8

*United States v. Sutton*, No. 20-7028, 2022 WL 1014359 (10th Cir. Apr. 5, 2022).....................10

*United States v. Young*, 916 F.3d 368 (4th Cir. 2019) ................................................................10

*Willis v. Lipton*, 947 F.2d 998 (1st Cir. 1991) .........................................................................14

*Young v. Ball*, 835 So. 2d 385 (Fla. Dist. Ct. App. 2003)............................................................4

## STATUTES

18 U.S.C. § 1030(g) .............................................................................................................4

18 U.S.C. § 1503 ...............................................................................................................10

18 U.S.C. § 1512..........................................................................................................8, 9, 10

18 U.S.C. § 1512(f)(1) .........................................................................................................10

18 U.S.C. § 1515(a) ............................................................................................................10

18 U.S.C. § 1519 ...............................................................................................................10

18 U.S.C. § 1622 ...............................................................................................................10

18 U.S.C. § 1832.................................................................................................................7

18 U.S.C. § 1836.................................................................................................................5

18 U.S.C. § 1836(d) ............................................................................................................5

18 U.S.C. § 1962................................................................................................................12

18 U.S.C. § 1962(c) .........................................................................................................6, 15

18 U.S.C. § 1962(d) .......................................................................................................14, 15

Fla. Stat. § 95.11(4)(g)..........................................................................................................4

Fla. Stat. § 95.11(3)(p)..........................................................................................................4

## OTHER SOURCES

Donald J. Trump (@realDonaldTrump), archived at The Trump Twitter Archive,
  thetrumparchive.com ...............................................................................2, 3, 16

Robert S. Mueller, III, Report on the Investigation into Russian Interference in the 2016
  Presidential Election, 1 (Vol. 1, March 2019),
  https://www.justice.gov/storage/report.pdf..............................................................17

Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, S. Rep.
116-290, vol. 2 (2020), https://www.intelligence.senate.gov/sites/default/files/
documents/Report_Volume2.pdf ...........................................................................17

U.S. Dep't of Justice, Office of the Inspector General, Review of Four FISA Applications
and Other Aspects of the FBI's Crossfire Hurricane Investigation (2019), available at
https://www.justice.gov/storage/120919-examination.pdf ...............................13, 14

## INTRODUCTION

Whatever the utility of Plaintiff's Complaint as a fundraising tool, a press release, or a list of political grievances, it has no merit as a lawsuit, and should be dismissed with prejudice.

## ARGUMENT

## I. PLAINTIFF'S CLAIMS ARE TIME-BARRED ON THE FACE OF THE COMPLAINT

"[A] Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate . . . if it is apparent from the face of the complaint that the claim is time-barred." *La Grasta v. First Union Sec.*, 358 F.3d 840, 845–46 (11th Cir. 2004). This is plainly such a case. The gravamen of Plaintiff's claims concerns alleged events occurring in 2016 and 2017, so the statute of limitations on his claims expired long ago.

Plaintiff focuses on four supposed instances of Defendants' alleged wrongdoing, which he collectively characterizes as "an unthinkable plot . . . to weave a false narrative that their Republican opponent, Donald J. Trump, was colluding with a hostile foreign sovereignty." Compl. ¶ 1. First, he alleges that Defendants conspired in the creation of the Steele Dossier. *Id.* ¶ 4. Second, he alleges that Defendants conspired to obtain and reveal Domain Name System ("DNS") internet traffic information from various computers. *Id.* ¶¶ 5, 123. Third, he alleges that Defendants conspired to provide false statements to law enforcement, which he asserts were single-handedly responsible for a variety of investigations into Plaintiff, his campaign, and his associates. *Id.* ¶¶ 7, 8. Finally, he alleges that Defendants "orchestrated a malicious conspiracy to disseminate patently false and injurious information"—that is, public speech with which he disagrees. *Id.* ¶ 9.

By the Complaint's own telling, these alleged events occurred long ago, and Plaintiff has been aware of his purported injuries for years. For example, Plaintiff alleges that the DNS traffic

collected from the Trump Organization computers was public knowledge "in or about late October 2016." *Id.* ¶¶ 183–84.  The only concrete allegations concerning Clinton date back to October 31, 2016, when she issued two tweets referring to the reported connection between Plaintiff and Alfa Bank, based on the public reporting of the DNS traffic information.  *Id.* ¶¶ 188–89.

Plaintiff's claims about the "Steele Dossier" fare no better.  Buzzfeed News published the dossier on January 10, 2017.  That day, and in the days that followed, Plaintiff took to Twitter to express the same allegations at issue here, confirming that he was on notice of his supposed claims.[1]  On January 11, 2017, Plaintiff tweeted "Russia just said the unverified report paid for by political opponents is 'A COMPLETE AND TOTAL FABRICATION, UTTER NONSENSE.' Very unfair!"[2]  On January 13, 2017, in a series of tweets, he laid out his allegations in more detail:

> It now turns out that the phony allegations against me were put together by my political opponents and a failed spy afraid of being sued…. Totally made up facts by sleazebag political operatives, both Democrats and Republicans – FAKE NEWS!  Russia says nothing exists.  Probably… released by "Intelligence" even knowing there is no proof, and never will be.  My people will have a full report on hacking within 90 days![3]

Moreover, additional allegations confirm that information publicly available throughout 2017 put Plaintiff on notice of his claims.  For example, the Complaint alleges that in March 2017, Robert Mook allegedly "acknowledged" that "surveillance may have been conducted on Trump

---

[1] The Court may rely on judicially noticeable facts in ruling on the timeliness of Plaintiff's claims on a motion to dismiss.  *See, e.g.*, *Henry v. ExamWorks Inc.*, No. 20-cv-12268, 2021 WL 3440698, at *3 (11th Cir. Aug. 6, 2021) (affirming dismissal on statute-of-limitations grounds).

[2] Donald J. Trump (@realDonaldTrump), Twitter (Jan. 11, 2017), archived at The Trump Twitter Archive, thetrumparchive.com.  The Court may take judicial notice of Plaintiff's tweets.  *See, e.g.*, *Hawaii v. Trump*, 859 F.3d 741, 773 n.14 (9th Cir.) (per curiam) (taking judicial notice of Plaintiff's tweets), *vacated on other grounds*, 138 S. Ct. 377 (2017); *Rock the Vote v. Trump*, No. 20-cv-06021, 2020 WL 6342927, at *4 n.2 (N.D. Cal. Oct. 29, 2020) (same); *United States v. Flynn*, 507 F. Supp. 3d 116, 126 n.6 (D.D.C. 2020) (same).

[3] Donald J. Trump (@realDonaldTrump), Twitter (Jan. 13, 2017) (ellipses in original), archived at The Trump Twitter Archive, thetrumparchive.com.

computers as well."  Compl. ¶ 220.  It also alleges that the claim that "Sussmann was acting on behalf of, and in coordination with, the Clinton Campaign and DNC" was "confirmed in December 2017."  *Id.* ¶ 218.

Indeed, *all* of Plaintiff's claims accrued no later than October 29, 2017, when Plaintiff publicly asserted that Clinton was responsible for the Steele Dossier, "the Comey fix," and "phony" stories on his collusion with Russia, and claimed the facts of the alleged conspiracy were "pouring out":

> Never seen such Republican ANGER & UNITY as I have concerning the lack of investigation on Clinton made Fake Dossier (now $12,000,000?),… …the Uranium to Russia deal, the 33,000 plus deleted Emails, the Comey fix and so much more. Instead they look at phony Trump/Russia,…. …"collusion," which doesn't exist. The Dems are using this terrible (and bad for our country) Witch Hunt for evil politics, but the R's… …are now fighting back like never before.  There is so much GUILT by Democrats/Clinton, and now the facts are pouring out.  DO SOMETHING![4]

These allegations form the gravamen of all of Plaintiff's claims.  But notwithstanding his rousing, all-caps call to action, Plaintiff waited four years, four months, and twenty-four days before filing suit.  His delay renders each of his claims untimely.

The statute of limitations for civil RICO actions (Count I) and conspiracy to commit RICO violations (Count II) is four years, and begins running when the injury was or should have been discovered.  *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013); *Agency Holding Corp. v Malley-Duff & Assocs.*, 483 U.S. 143 (1987).  Because the claim accrued no later than October 29, 2017—the date by which Plaintiff's own statements and allegations make clear he was aware of not only his alleged injury, but also the supposed conspiracy and Clinton's alleged role in it—the statute of limitations expired by October 29, 2021.

---

[4] Donald J. Trump (@realDonaldTrump), Twitter (Oct. 29, 2017) (ellipses in original), archived at The Trump Twitter Archive, thetrumparchive.com.

The statute of limitations for injurious falsehood, a type of "trade slander" under Florida law, is two years from publication. *ADT LLC v. Vivint, Inc.*, No. 17-cv-80432, 2017 WL 5640725, at *6 & n.8 (S.D. Fla. Aug. 3, 2017) (Middlebrooks, J.); Fla. Stat. § 95.11(4)(g). The statute of limitations on Plaintiff's claims regarding Clinton's October 31, 2016 tweets therefore ran on October 31, 2018. Compl. ¶¶ 188–89.[5]

The statute of limitations for conspiracy to commit injurious falsehood (Count IV) and conspiracy to commit malicious prosecution (Count VI) is four years from the date of injury, in keeping with Florida's statute of limitations for general claims of civil conspiracy. *Davis v. Monahan*, 832 So. 2d 708, 709 (Fla. 2002); *Young v. Ball*, 835 So. 2d 385, 386 (Fla. Dist. Ct. App. 2003); *see* Fla. Stat. § 95.11(3)(p) (providing four-year statute of limitations for claims not otherwise listed). Because Plaintiff's claims again accrued no later than October 29, 2017, the statute of limitations on these claims expired by October 29, 2021.[6]

The statute of limitations under the Computer Fraud and Abuse Act (Count VII) is two years from the violation or discovery of the violation. 18 U.S.C. § 1030(g). Here, Plaintiff asserts that "[t]he acts of the above-mentioned Defendants" were not discoverable until September 2021. Compl. ¶ 393. But Plaintiff's other factual allegations—which state that the DNS lookup information was publicly known in October 2016—contradict this boilerplate legal conclusion. *Id.* at ¶¶ 183–89. As the Second Circuit has held, a claim under the Computer Fraud and Abuse Act accrues when the plaintiff is aware of the alleged violation, even if the plaintiff does not know the identity of the alleged perpetrators. *Sewell v. Bernardin*, 795 F.3d 337, 342 (2d Cir. 2015).

---

[5] The Complaint also cites two additional tweets by Clinton from June 16, 2021, and February 16, 2022. *See* Compl. ¶¶ 260–61. Although these tweets fall within two years of the Complaint's filing, any claims based on those statements fail on the merits. *See infra*, pp. 15–18.

[6] Moreover, tolling for delayed discovery does not apply to conspiracy claims under Florida law. *See Davis*, 832 So. 2d at 709; *Young v. Ball*, 835 So. 2d at 386.

Thus, even if Plaintiff was unaware of the identity of the supposed perpetrators until more recently, Plaintiff's knowledge of the DNS information's release in late October 2016 means the statute of limitations ran in late October 2018.

Finally, the statute of limitations for a civil action for theft of trade secrets under 18 U.S.C. § 1836(d) is three years from the date "on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836. Here, again, Plaintiff's claims accrued upon public knowledge of his DNS traffic in October 2016. The statute of limitations therefore ran in late October 2019.

## II.   EACH OF PLAINTIFF'S CLAIMS FAILS ON THE MERITS

Even were Plaintiff's claims timely, they are still meritless. To be clear, Clinton vigorously disputes the allegations in the Complaint. But even taking those allegations as true, Plaintiff fails to plead any cognizable legal causes of action.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" nor will "naked assertions devoid of further factual enhancement." *Id.* (alterations adopted) (citation omitted). In addition, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (citation omitted).

Moreover, because Plaintiff hinges his RICO claim on a pattern of allegedly fraudulent activity, *see, e.g.*, Compl. ¶ 281 (alleging a "fraudulent scheme"), he must comply with Rule 9(b)'s

heightened pleading standard, which requires that a party state with particularity the circumstances constituting fraud. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010).

Plaintiff's pleading flunks both the traditional and the heightened standards. The *only* factually supported allegations concerning Clinton in the lengthy Complaint are that she declared her candidacy for president on April 12, 2015, Compl. ¶ 42; she won the Democratic Party nomination for president on July 26, 2016, *id.* ¶ 128; she tweeted twice regarding reported computer connections between Trump and Alfa Bank on October 31, 2016, *id.* ¶¶ 188–89; and she made two subsequent statements regarding Plaintiff and Russia, *id.* ¶¶ 260, 261, 335.

The remainder of the allegations about Clinton are purely conclusory: that she "orchestrated" schemes, Compl. ¶ 1, "exerted control over" others, *id.* ¶ 54, "conceived and funded" Defendants' "plot," *id.* ¶ 57, "direct[ed]" activities, *id.* ¶¶ 81, 123, that others acted "at [her] behest," *id.* ¶ 172, and that she otherwise masterminded each element of Defendants' alleged wrongdoing through agents and intermediaries, *see generally id.* ¶¶ 424–46 (alleging a cause of action for "Agency" against Clinton). These "formulaic recitation[s] of the elements of a cause of action," and "legal conclusions" are the type of fact-free pleading this Court is bound to reject. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Iqbal*, 556 U.S. at 678. And a closer examination of Plaintiff's purported causes of action reveals ample additional reasons to dismiss.

## A.     Count I: RICO

Section 1962(c) prohibits persons "employed by or associated with any enterprise" from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). To allege a violation of Section 1962(c), a plaintiff must show that a RICO enterprise committed a pattern of RICO predicate acts. *Simpson v. Sanderson Farms*, 744 F.3d 702, 705 (11th Cir. 2014). In addition, a plaintiff must show they suffered an "injury to business or property" and "that the defendant's racketeering

activity proximately caused the injury." *Id.*  The Complaint does not satisfy these elementary requirements.

*First*, Plaintiff has not alleged that Clinton participated in any cognizable RICO enterprise. A claim that "several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates . . . [is] not . . . enough to show that the individuals were members of an enterprise." *Boyle v. United States*, 556 U.S. 938, 947 n.4 (2009).  Here, the Complaint alleges only an amalgamation of political grievances against twenty-eight named defendants and several unnamed entities.  Clinton's participation in the supposed enterprise is nothing more than a collection of "labels and conclusions," "formulaic recitation[s] of the elements of a cause of action," and "'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557); *see supra*, p. 5.  Absent any well-pleaded allegations connecting Clinton to the supposed enterprise, she is not a proper defendant.

At most, Plaintiff alleges that other entities sought to further Clinton's candidacy and, after the election, politically opposed Plaintiff's administration.  This is conduct plainly protected by the First Amendment, and there is nothing unlawful about engagement in political activity. Further, mere allegations of independent action—or even intentional parallel conduct between actors—do not suffice to state a RICO claim.  *See Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1069 (11th Cir. 2017) (finding no RICO enterprise and noting parallel conduct is insufficient); *Am. Dental Ass'n*, 605 F.3d at 1296.

*Second*, Plaintiff has not adequately alleged any RICO predicate acts.  Plaintiff alleges that the enterprise as a whole—but not Clinton herself—engaged in two RICO predicate acts:  theft of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1832, and witness tampering in violation of 18 U.S.C. § 1512.

7

"Theft of trade secrets consists of five elements: first, the defendant must intend to convert proprietary information to the economic benefit of anyone other than the owner; second, the proprietary information must be a trade secret; third, the defendant must knowingly steal, take without authorization, or obtain by fraud or deception trade secret information; fourth, the defendant must intend or know that the offense would injure the owner of the trade secret; and finally, the trade secret must be related to a product that is in interstate or foreign commerce." *United States v. Smith*, 22 F.4th 1236, 1243 (11th Cir. 2022).

Here, Plaintiff's trade secret claim is apparently based on the alleged misappropriation of "DNS internet traffic data." Compl. ¶ 285. But DNS data is not information "owned" by Plaintiff. On the contrary, DNS information is created automatically when computers connect to each other across the internet. *See Intermatic Inc. v. Toeppen*, 947 F. Supp. 1227, 1231 (N.D. Ill. 1996) (explaining DNS data). Like Internet Protocol ("IP") addresses, DNS information is part of the internet architecture allowing computers to communicate, and is automatically shared with Internet Service Providers and third-party devices. Courts have routinely held that, for this reason, plaintiffs have no legally protected privacy interest in their IP address information. *E.g.*, *Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1189 (N.D. Cal. 2020). This reasoning applies to Plaintiff's DNS information, which defeats his trade-secret claim.[7]

Nor does Plaintiff adequately allege that the DNS information is a "trade secret"—that is, that it "derives independent economic value" from "not being generally known to" others. *Sentry Data Sys. v. CVS Health*, 361 F. Supp. 3d, 1279, 1292 (S.D. Fla. 2018). Plaintiff alleges that DNS

---

[7] Plaintiff faces an additional hurdle, even if DNS information were "owned" by anyone: he also attempts to include the Trump Organization's servers in his trade-secret claim, because he claims "an ownership interest" in the Organization. *See* Compl. ¶ 286. And he mentions in passing DNS information for the Executive Office of the President. *E.g.*, *id.* ¶ 250. But the Trump Organization and the federal government are not plaintiffs, and Plaintiff cannot press a claim on their behalves.

information "could" reveal information about "website traffic, e-mail traffic," and information about hardware and software used on a computer. Compl. ¶ 286.[8] And the Complaint alleges, in conclusory terms, that DNS information reflects information that "derive[s] significant economic value from not being generally known to or ascertainable by others." *Id.* ¶ 289. But this is nothing more than a formulaic recitation of the elements, unsupported by any facts. *Iqbal*, 556 U.S. at 678. Plaintiff articulates no way in which this information is *independently* valuable: unlike a customer list, a confidential process, or other trade secrets, Plaintiff does not capitalize on DNS or server information, nor does DNS information *lose* value if it becomes widely known.

Plaintiff's allegations about witness tampering as a RICO predicate act fare no better. Plaintiff alleges that the RICO enterprise violated 18 U.S.C. § 1512, which forbids individuals from "alter[ing], destroy[ing], or conceal[ing] a record, document, or other object" in an "official proceeding," from "obstruct[ing] influenc[ing], or imped[ing] any official proceeding," and from "corruptly persuad[ing] another person" to "withhold testimony," or alter and destroy documents in an "official proceeding." Plaintiff claims that Defendants violated this provision by "deliberately providing falsified, altered and misleading records" and inducing Sussmann and Danchenko to make false statements in the "Crossfire Hurricane" investigation. Compl. ¶¶ 298–307.

Defendants' supposed wrongdoing does not satisfy the statutory elements of witness tampering. As an initial matter, Plaintiff does not identify any "official proceeding" Defendants supposedly obstructed. "Official proceeding" is defined by statute as a federal judicial case, a proceeding before Congress, a proceeding before a federal government agency, or a proceeding

---

[8] Tellingly, Plaintiff does not allege that DNS traffic actually reveals the *content* of emails or other communications—it does not.

involving insurance business.  18 U.S.C. § 1515(a).  Investigations that do not result in charges are not "official proceedings" under the statute.  *See United States v. Young*, 916 F.3d 368, 384 (4th Cir. 2019) (FBI investigation); *United States v. Ermoian*, 752 F.3d 1165, 1171–72 (9th Cir. 2013) (same).  But here, Plaintiff's allegations are limited to "investigations into Russian collusion," *e.g.*, Compl. ¶ 297, and the assertion that individual Defendants allegedly impeded "ongoing investigations by the CIA, the FBI, the IG, and/or the DOJ," *id.* ¶ 302.  He has identified no judicial, congressional, or agency proceeding that Defendants purportedly obstructed.[9]

Moreover, Plaintiff's "witness tampering" charges are really allegations that Defendants— including the witnesses themselves—conspired to offer false evidence.  These claims are a poor fit for the statute.  Plaintiff's claim is not that Defendants "destroyed" or "altered" documents, but that they contributed to the *creation* of documents that contained purported inaccuracies, like the Steele Dossier, or created "curated" information, like DNS data.  *See id.* ¶ 299.  Similarly, Plaintiff asserts that the enterprise induced Sussmann and Danchenko to provide supposedly false testimony that "withheld and/or concealed pertinent information."  *Id.*  But that is not the same as "withhold[ing] testimony" entirely.  18 U.S.C. § 1512.  Plaintiff's allegations are more akin to suggestions that Defendants supposedly suborned perjury or falsified documents.  *See* 18 U.S.C. §§ 1519, 1622.  But neither of those appear in RICO's list of predicate acts, which is "exhaustive." *See Beck v. Prupis*, 529 U.S. 494, 497 n.2 (2000).

---

[9] Although a proceeding need not be "pending or imminent" under Section 1512, *see* 18 U.S.C. § 1512(f)(1), one must nevertheless be "reasonably foreseeable to the defendant."  *United States v. Sutton*, No. 20-7028, 2022 WL 1014359, at *2 (10th Cir. Apr. 5, 2022).  Plaintiff also sporadically cites obstruction of justice under Section 1503, *see* Compl. ¶¶ 296, 302, 310, which is even further from a viable claim:  that section requires that an "official proceeding" be actually pending.

**Third**, Plaintiff has not adequately alleged a pattern of racketeering activity. Beyond adequately pleading predicate acts, *supra*, pp. 7–10, a plaintiff must also allege that the acts "amount to, or . . . otherwise constitute a threat of, *continuing* racketeering activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989). A plaintiff may do this two ways: by pleading "closed-ended continuity" or "open-ended continuity." Here, Plaintiff succeeds at neither.

A party can allege closed-ended continuity "by proving a series of related predicates extending over a substantial period of time." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1265 (11th Cir. 2004) (quoting *H.J. Inc.*, 492 U.S. at 241). But Plaintiff has failed entirely to allege any specific dates for the supposed theft of trade secrets, alleging only that they occurred "after May 11, 2016." Compl. ¶ 311. And the alleged instances of witness tampering occurred in a seven-month period between September 2016 and June 2017. *See* Compl. ¶ 298–307.

The Eleventh Circuit has categorically rejected allegations of closed-ended continuity when the supposed pattern of racketeering activity lasted less than nine months, and other circuits reject patterns lasting less than a year. *Jackson*, 372 F.3d at 1266 (11th Cir. 2004) (collecting cases, including those rejecting longer periods). This alone defeats Plaintiff's claim. And "the courts have [also] refused to find a closed-ended pattern of racketeering even when the scheme took place over longer periods of time" when "the RICO allegations concern only a single scheme with a discrete goal." *Jackson*, 372 F.3d at 1267. Here, Plaintiff alleges that the supposed RICO scheme worked "with a *single*, self-serving purpose: to vilify Donald J. Trump" in connection with his campaign and presidency. Compl. ¶ 2 (emphasis added). In light of this "single" goal, even a lengthier time period would not save Plaintiff's deficient pleading.

Plaintiff has also failed to allege open-ended continuity. To plead open-ended continuity, a plaintiff must "allege either that the alleged acts were part of the defendants' 'regular way of

doing business,' or that the illegal acts threatened repetition in the future." *Jackson*, 372 F.3d at 1267 (quoting *H.J. Inc.*, 492 U.S. at 242–43). Here, the Complaint lacks any allegations that the predicate acts—which Plaintiff alleges were engineered specifically to target him—were part of Defendants' "regular" way of doing business. Nor is there any nonconclusory allegation that the supposed racketeering is likely to recur in the future. Indeed, "single schemes with a specific objective and a natural ending point can almost never present a threat of continuing racketeering activity." *Ferrell v. Durbin*, 311 F. App'x 253, 257 (11th Cir. 2009). Here, Plaintiff claims the racketeering activity was intended to "mislead law enforcement, the media, and the public at large and to impede, obstruct, and falsely provoke federal investigations against the Plaintiff, the Trump Campaign, and the Trump Administration." Compl. ¶ 282. With Plaintiff out of office, there is no reason this would recur. The only continuing conduct Plaintiff alleges are instances of public speech—acts that are not RICO predicates, so cannot support an ongoing "pattern" of offenses. This lays bare Plaintiff's claim for what it is: a lawsuit aimed at political speech he does not like.

**Finally**, Plaintiff has failed to adequately allege RICO standing—that is, an injury directly caused by a predicate racketeering act prohibited under Section 1962. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 452 (2006). A viable RICO claim requires both an injury to the plaintiff's business or property and "some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp. v. City of New York*, 559 U.S. 1, 9 (2010) (citation omitted). "A link that is 'too remote,' 'purely contingent,' or 'indirect' is insufficient." *Id.* Similarly, that an injury was "foreseeable" is not enough; instead, "the injury must be direct." *Ray v. Spirit Airlines*, 836 F.3d 1340, 1349 (11th Cir. 2016).

Plaintiff has alleged injury in only the vaguest terms, asserting repeatedly that he incurred "defense costs, legal fees and related expenses . . . in connection with his efforts to defend himself"

against "Defendant's tortious actions, false accusation, and overall fraudulent scheme to discredit and delegitimize him." *E.g.*, Compl. ¶ 263; *id.* ¶ 264 (seeking "the cost of dealing with . . . legal and political issues"). Here, however, any costs and fees Plaintiff incurred were directly and proximately caused by his own political goals, not Defendants' alleged racketeering activities. Indeed, similar allegations have been found insufficient to state a RICO claim based on the Steele Dossier. *See Nunes v. Fusion GPS*, 531 F. Supp. 3d 993, 1012–13 (E.D. Va. 2021) (rejecting suit for damages incurred to "publicly address" a "smear campaign").

Here, Plaintiff has not articulated any direct connection between the release of DNS data or witness statements and the costs he incurred for "legal issues and political issues," even if such vague allegations were sufficient to state a RICO injury.[10] Plainly, Plaintiff's public-relations and political expenses are not recoverable. *See id.* And to the extent Plaintiff was allegedly harmed by investigations, other actors—federal investigators—needed to decide independently to pursue investigations, based on their own judgment and a variety of evidence, before he incurred any legal fees. Indeed, the U.S. Department of Justice Office of Inspector General's investigation into Crossfire Hurricane—which Plaintiff cites at Compl. ¶ 3 n.1—was critical of the FBI in several respects, but found that the agency opened the investigation "for an authorized purpose" and "with adequate factual predication."[11] In particular, the investigation was *not* predicated on DNS information or the Steele Dossier, but on a tip from a friendly foreign government that a Trump campaign advisor "suggested" that "the Trump campaign had received 'some kind of suggestion' from Russia that it could assist with the anonymous release of information that would be damaging

---

[10] Plaintiff limits his claim to these unidentified costs, and three times purports to disclaim any damages for injury to his reputation. *See* Compl. ¶¶ 345, 355, 449.

[11] U.S. Dep't of Justice, Office of the Inspector General, Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation at 347 (2019), available at https://www.justice.gov/storage/120919-examination.pdf.

to Hillary Clinton."[12]   The Inspector General "did not find information . . . indicating that any information other than the [friendly foreign government] information was relied upon to predicate the opening of the Crossfire Hurricane investigation."[13]

The independent basis for investigation, and the exercise of judgment by federal investigators, breaks any chain of causation with Plaintiff's supposed injury.  *See Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*, 341 F.3d 1292, 1308 (11th Cir. 2003) (affirming dismissal where plaintiffs could not establish "obstruction of justice and witness tampering" as "the proximate cause of their alleged injury"); *Willis v. Lipton*, 947 F.2d 998, 1001 (1st Cir. 1991) (defendant's conduct did not proximately cause the plaintiff's loss of employment where that conduct preceded an FTC enforcement action and a bankruptcy action); *see also Galen v. County of Los Angeles*, 477 F.3d 652, 663 (9th Cir. 2007) (a "judicial officer's exercise of independent judgment in the course of his official duties" is a quintessential "superseding cause").

Plaintiff also alleges that he was injured by "the loss of existing and future business opportunities."  Compl. ¶ 263.  But these, too, go wholly unidentified.  Plaintiff alleges they are "too numerous to list," and cites only his ban from Twitter as an example, which he asserts was "due to the misinformation claim waged by Hillary Clinton."  *Id.* at n.78.  This alleged harm also depends on a third-party actor—Twitter—and is unmoored from any of the alleged racketeering conduct.  Plaintiff has not alleged that his Twitter ban had any connection to his DNS information or the myriad investigations regarding his connections to Russia.  Plaintiff's core grievance against Hillary Clinton is the practice of politics, and cannot support this legal claim.

### B.      Count II:  RICO Conspiracy

Section 1962(d) prohibits the act of conspiring to violate subsections (a) through (c).

---

[12] *Id.* at 1.
[13] *Id.* at ii.

Plaintiff alleges that Defendants conspired to violate Section 1962(c).  To state a RICO conspiracy

claim, "a plaintiff must 'allege an illegal agreement to violate a substantive provision of the RICO

statute.'"  *Super Vision Int'l v. Mega Int'l Comm. Bank*, 534 F. Supp. 2d 1326, 1342 (S.D. Fla.

2008) (citation omitted).   Conclusory allegations of a conspiracy "unsupported by actual

allegations of fact"—like the conclusory allegations here, *see* Compl. ¶¶ 319–22—are not enough.

*Super Vision Int'l*, 534 F. Supp. 2d at 1343; *see also Am. Dental Ass'n*, 605 F.3d at 1293–94.

Furthermore, for a plaintiff to prevail under Section 1962(d), the overt act causing injury

must itself be an act of racketeering.  *Beck*, 529 U.S. at 495–96.  Plaintiff has not alleged a predicate

act of racketeering here, nor any injury from such an act.  He therefore fails to state a viable RICO

conspiracy claim.  *See Super Vision Int'l*, 534 F. Supp. 2d at 1342.

### C.      Count III:  Injurious Falsehood

Under Florida law, the term injurious falsehood refers variously to slander of title,

disparagement of property, or trade libel.  "The gist of the tort is the 'intentional interference with

another's economic relations.'"  *Kanarick v. GE Credit Retail Bank Care Credit*, No. 13-cv-80039,

2013 WL 12092479, at *4 (S.D. Fla. Sept. 6, 2013) (Middlebrooks, J.) (citation omitted).

As an initial matter, Plaintiff's lawsuit fails because political speech is "integral to the

operation of the system of government established by our Constitution," and "[t]he First

Amendment affords the broadest protection to such political expression."  *Buckley v. Valeo*, 424

U.S. 1, 14 (1976) (per curiam).  The only statements attributed to Clinton are her commentary that

"We don't have Trump as a spokesperson for Putin, anymore," and "[a]fter [a] disastrous Trump

presidency, in which he gave Putin a green light to do whatever he wanted to do, once Trump was

elected, of course."  Compl. ¶ 335.  Plaintiff also alleges earlier in the Complaint that, "in response

to media reports" Clinton tweeted that "Trump & Fox are desperately spinning up a fake scandal

to detract from his real ones.  So it's a day that ends in Y.  The more his misdeeds are exposed, the more they lie.  For those interested in reality, here's a good debunking of their latest nonsense."[14]

These statements are quintessential expressions of opinion under the First Amendment. Debate on matters of public import "may well include vehement, caustic, and sometimes unpleasantly sharp attacks," but are nonetheless constitutionally protected when they are "rhetorical hyperbole." *Horsley v. Feldt*, 304 F.3d 1125, 1131 (11th Cir. 2002) (citations omitted).

Plaintiff can hardly claim to be a stranger to the rough-and-tumble tone of political rhetoric. *See supra*, p. 2–3; *see generally* The Trump Twitter Archive, thetrumparchive.com (collecting Plaintiff's tweets).  Here, Clinton's statements use rhetorical imagery and figures of speech to discuss a matter of public importance.  Plaintiff concedes that each of these statements were made in connection with media reports, evidencing the widespread public interest in the issue.  Compl. ¶¶ 260–61.  "[T]o use loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies—like 'unfair' or 'fascist'—is not to falsify facts."  *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 284 (1974) (holding the epithet "traitor" not actionable).

Plaintiff faces another hurdle under the First Amendment:  the Constitution also "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964).  Although referred to as "malice," actual malice in this context "should not be confused with the concept of malice as an evil intent or a

---

[14] The Complaint also refers to Clinton's tweets from October 31, 2016, Compl. ¶¶ 188, 189, 333, but any claim on those statements is time-barred.  *See supra*, p. 4.

motive arising from spite or ill will." *Masson v. New Yorker Mag.*, 501 U.S. 496, 510–11 (1991). Instead, it refers to a speaker's subjective belief that her own statements were probably false, or at least that she entertained serious doubts as to their truth. *Id.* at 510.

Plaintiff's allegations here, too, are lacking. The Complaint focuses largely on Clinton's alleged ill will towards Plaintiff. *See* Compl. ¶ 1 (alleging that defendants "maliciously conspired"); *id.* ¶ 190 (alleging Clinton's "pathological need to stop Trump"); *id.* ¶ 259 (alleging a motivation to damage Plaintiff's political career). "However, no amount of repeating the word 'malice' will overcome the constitutional requirement." *Klayman v. City Pages*, No. 13-cv-143, 2015 WL 1546173, at *14 (M.D. Fla. Apr. 3, 2015) (rejecting similar pleading), *aff'd*, 650 F. App'x 744 (11th Cir. 2016) (per curiam). As to the *true* actual malice standard, Plaintiff offers only conclusory and unsupported allegations that Clinton was "aware" her statements or the Trump-Russia story was "false," Compl. ¶¶ 190, 260, and makes a single conclusory allegation that "the Defendants acted with actual malice," *id.* ¶ 328. This is nothing more than the type of "labels and conclusions" that do not suffice. *Iqbal*, 556 U.S. at 678 (citation omitted). And, in any event, investigations by the federal government corroborate Russian interference in the 2016 election designed to benefit Plaintiff and harm Clinton.[15]

Even setting aside the constitutional deficiencies with Plaintiff's pleading, he also fails to allege the elements of injurious falsehood under Florida law. "In order to sustain a claim for

---

[15] *See, e.g.*, Robert S. Mueller, III, Report on the Investigation into Russian Interference in the 2016 Presidential Election, 1 (Vol. 1, March 2019), https://www.justice.gov/storage/report.pdf ("[T]he Special Counsel's investigation established that Russia interfered in the 2016 presidential election" and "favored presidential candidate Donald J. Trump and disparaged presidential candidate Hillary Clinton."); Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, S. Rep. 116-290, vol. 2, at 32 (2020), https://www.intelligence.senate.gov/sites/default/files/documents/Report_Volume2.pdf ("At the direction of the Kremlin," the Russian Internet Agency "sought to influence the 2016 U.S presidential election by . . . supporting Donald Trump.").

injurious falsehood, Plaintiff must adequately allege: (1) a falsehood; (2) published or communicated to a third party; (3) the Defendant kn[e]w that the falsehood would likely induce others not to deal with the Plaintiff; (4) the falsehood did play a material and substantial part in inducing others not to deal with the Plaintiff; and (5) special damages." *Kanarick*, 2013 WL 12092479, at *4.

Here, Plaintiff has failed to allege any "falsehood" under Florida law. Clinton's statements were "critical judgments" of opinion, based on facts "set forth" in the press, or "otherwise known or available to the reader or listener as a member of the public." *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. Dist. Ct. App. 1981). Such statements are not actionable.

Nor has Plaintiff alleged that Clinton knew the statements "would likely induce others not to deal with the Plaintiff." *Kanarick*, 2013 WL 12092479, at *4. On the contrary, the only allegations about Clinton's state of mind assert that her motivation had nothing to do with Plaintiff's business, but that she was motivated by "a pathological need to stop Trump from ever entering the White House," and a "hope[] of damaging Trump's political career." Compl. ¶¶ 190, 259. Clinton's statements deal entirely with Trump's presidency and his fitness for public office. There is no allegation that Clinton knew or intended that the alleged statements would harm Plaintiff's *business interests*, or induce others not to deal with him commercially.

Finally, Plaintiff wholly fails to plead that Clinton's statements actually played "a material and substantial part in inducing others not to deal with the Plaintiff." *Kanarick*, 2013 WL 12092479, at *4. Because Plaintiff pleads nothing whatsoever about his supposed business injury, *see supra*, p. 12–13, 15, the Complaint is devoid of any well-pleaded factual allegations that Clinton's statements played any role in inducing others to deprive him of unspecified business opportunities.

### D.      Count IV:  Conspiracy to Commit Injurious Falsehood

"To plead civil conspiracy, a plaintiff must allege '(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy.'" *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1316 (S.D. Fla. 2014) (citation omitted).  Here, as before, the allegations of any agreement between Clinton and other defendants, or any specific actions on Clinton's part, are purely conclusory.  *See* Compl. ¶¶ 346–52.  These "formulaic recitation[s] of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  Nor has Plaintiff alleged any underlying injurious falsehood. *Supra,* pp. 15–18.

### E.      Count VI:  Conspiracy to Commit Malicious Prosecution

"Under Florida law, Plaintiff must establish six elements to support a claim for the tort of malicious prosecution: (1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damages as a result of the original proceeding." *Melford v. Kahane & Assocs.*, 371 F. Supp. 3d 1116, 1123–24 (S.D. Fla. 2019).  Plaintiff fails to plead any of these elements.  Most notably, Plaintiff identifies no judicial proceedings, much less ones that terminated in his favor.  Nor can he allege an absence of probable cause for the Crossfire Hurricane investigation. *See supra*, p. 13.

Clinton, however, is named only as a defendant as to the conspiracy count, not the substantive offense.  To allege a conspiracy to commit malicious prosecution, Plaintiff must satisfy the same elements of civil conspiracy set out above.  His conclusory pleading fails for the same reason as the previous conspiracy claims.  Nor does Plaintiff cogently allege the specific aim of

the conspiracy—for example, the judicial proceeding that Defendants allegedly conspired to commence or continue.  This claim, like the others, must fail.

### F.  Count VII:  Computer Fraud and Abuse Act

To allege a violation of the Computer Fraud and Abuse Act, a plaintiff must allege that (1) the defendant accessed a protected computer; (2) without authorization or by exceeding authorized access; (3) knowingly and with intent to defraud; and (4) the defendant's access furthered the intended fraud and obtained anything of value.  *See TracFone Wireless, Inc. v. Hernandez*, 196 F. Supp. 3d 1289, 1300 (S.D. Fla. 2016).  Plaintiff does not allege that Clinton personally took any of these steps, but merely allege in boilerplate that she "conspired" with others.  Compl. ¶ 390.  No well-pleaded factual allegations support this cursory allegation, and the claim must be dismissed.

### G.  Count VIII:  Theft of Trade Secrets

Plaintiff's allegations for theft of trade secrets fail for the same reasons that Plaintiff has failed to allege this count as a cognizable RICO predicate act.  *See supra*, pp. 8–9.

### H.  Count X:  "Agency"

This count recites a litany of threadbare allegations that Clinton masterminded all the foregoing events.  But those allegations are unsupported by any facts.  And, in any event, "agency" is not an independent cause of action.  *See, e.g.*, *Barabe v. Apax Partners Eur. Managers, Ltd.*, 359 F. App'x 82, 84 (11th Cir. 2009) (per curiam); *see also Chunhong Jia v. Boardwalk Fresh Burgers & Fries, Inc.*, No. 19-cv-2527, 2020 WL 5628734, at *2 (M.D. Fla. Sept. 21, 2020) (holding that respondeat superior is not an independent cause of action, but a theory of liability).

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiff's Complaint with prejudice.[16]

---

[16] Clinton also incorporates by reference and adopts the arguments made by other defendants in support of dismissal.

Dated: April 20, 2022

Respectfully submitted,

*/s/ David E. Kendall*
David E. Kendall*
Katherine M. Turner*
Michael J. Mestitz*

WILLIAMS & CONNOLLY LLP
725 Twelfth Street N.W.
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
dkendall@wc.com

* Motion for admission *pro hac vice* pending

David Oscar Markus

MARKUS/MOSS PLLC
40 NW 3rd Street, PH 1
Miami, FL 33128
Tel.  (305) 379-6667

*Attorneys for Defendant Hillary Rodham Clinton*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 20, 2022, I caused to be filed electronically the foregoing Defendant Hillary Rodham Clinton's Motion to Dismiss the Complaint and Memorandum of Law in Support with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this matter who are on the CM/ECF system.

*/s/ David E. Kendall*
David E. Kendall

66

Plaintiff's Expedited Motion for an Extension of Time to File an
Amended Complaint as a Matter of Course or to Response to Hillary
Clinton's Motion to Dismiss and Memorandum of Law (Apr. 21, 2022)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: 2:22-cv-14102-DMM

DONALD J. TRUMP,

      Plaintiff,

v.

HILLARY R. CLINTON, et al.,

      Defendant.

_____/

**PLAINTIFF'S EXPEDITED MOTION FOR AN EXTENSION OF TIME
TO FILE AN AMENDED COMPLAINT AS A MATTER OF COURSE OR TO
RESPONSE TO HILLARY CLINTON'S
MOTION TO DISMISS AND MEMORANDUM OF LAW**

The Plaintiff, DONALD J. TRUMP, by and through his undersigned counsel, hereby files his Expedited Motion for an Extension of Time pursuant to Rule 8 F.R.Civ.P. and Rule 7.1, including Rule 7.1(d)(2) of the Local Rules of the Southern District of Florida to File either an Amended Complaint "as a matter of course" pursuant to Rule 15(a) of the F.R.Civ.P. or to file a Response to HILLARY CLINTON's Motion to Dismiss, and in support states as follows:

1.      The Plaintiff filed his initial Complaint [ECF No. 1.] against 28 defendants in the above styled matter on March 24, 2022.

2.      Presently, a number of the Defendants have requested extensions of time to file responses to the Complaint.  In this regard, the undersigned have been appropriately accommodating.  HILLARY CLINTON, on the other hand, filed a timely Motion to Dismiss, seeking no additional time to respond. [ECF No. 52.]

3.      Rule 15 F.R.Civ.P. gives the Plaintiff an advantage of being able to cure defects or otherwise improve and enhance a complaint by filing an amended complaint within 21 days of the time a Motion to Dismiss or an Answer is served.

4.      However, the benefit of that rule would be frustrated to a great extent if the Plaintiff, *sub judice*, were to be given the one opportunity to cure as a matter of course before 27 out of the 28 Defendants of the case at bar, have answered or moved to dismiss, as it is with certainty due to extensions which have been given that further motions to dismiss will be filed in time for the Plaintiff to cure the issues which would have been otherwise curable by filing an Amended Complaint.

5.      There is no question that the time afforded to file an Amended Complaint as a matter of course, in the instant case, expires on May 11, 2022, 21 days after HILLARY CLINTON filed her Motion to Dismiss.  *Rubinstein v. Keshet Inter Vivos Tr*., No. 17-61019-CIV, 2017 U.S. Dist. LEXIS 222899, 2017 WL 7792570, at *3 (S.D. Fla. Oct. 18, 2017) (Torres, MJ).

6.      It is appropriate to move for an enlargement of time to file an Amended Counterclaim, provided that the Motion for an Extension of Time is filed within 21 days of the first Motion to Dismiss, which is served.  *Johnson v. Ga*., 2015 U.S. Dist. LEXIS 24606, 2015 WL 877779 (N.D. Ga 2015).  Such an amendment would not only provide the opportunity to cure which is provided in Rule 15(a) F.R.Civ.P., but it would promote the judicial economies of this Court.

7.      In the above styled suit, the other Defendants have been requesting extensions of time from the undersigned counsel, in order to file a responses to the Complaint.  The extensions of time that been requested range from 20-30 additional days.   The Plaintiff has been agreeable

2

to all of the requested extensions.  Moreover, there are Defendants who have not been served at this time.

8.      It is expected that several of the other Defendants will also move to dismiss the underlying complaint.

9.      As there is such a large number of Defendants who are expected to move to dismiss the Complaint, and it may prove practical to cure whatever issues arise by amending the Complaint, and whereas 30-day extensions have been given and are likely to be given to most of the Defendants, and whereas there remain some Defendants who remain unserved, an extension should be given, but any such extension should be limited, so that the case moves forward before a service holdout is finally served.

10.      Therefore, the Plaintiff is not seeking a flexible date but rather an extension of 39 days to either file an Amended Complaint, as a matter of course, pursuant to Rule 15(a) or to file a Response to Hillary Clinton's Motion to Dismiss.  In other words, the Plaintiff is seeking 60 days rather than the 21 days provided by Rule 15(a), being the 21 days in the rule plus the 39 day extension.

11.       The extension will not only keep the pleadings and Rule 12 motions more simple, but it will assist in terms of judicial economy for all the Motions to Dismiss to be filed, and then for the Plaintiff to do one major amendment, rather than to seek to file numerous responses to the numerous motions to dismiss.

12.      It is believed that many of the Defendants will be raising similar issues in their various Motions to Dismiss, and allowing the Complaint to be amended, once most of the motions to dismiss are filed, would allow the Plaintiff an opportunity to cure the deficiencies raised in those motions.

3

**Expedited Motion**

13.     As HILLARY CLINTON filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the F.R.Civ.P. which triggered a 21-day clock, the Plaintiff has only until May 11, 2022 to file an Amended Counterclaim as a matter of course pursuant to Rule 15(a) of the F.R.Civ.P. moreover, the Plaintiff has only until May 4, 2022, to file a Response to the Motion to Dismiss, which would be moot upon the filing of an Amended Complaint before or on that date.

14.     The date by which the Plaintiff needs a decision as to this Motion for an Extension of Time is therefore May 4, 2022.  As this date is now only 13 days away, there is good reason for this Court to expedite this motion.

WHEREFORE, the Plaintiff, DONALD J. TRUMP, respectfully requests that this Court grant him an extension of time, pursuant to Rule 6 of the Federal Rules of Civil Procedure, extending the 21-day period permitted by Rule 15(a) to amend the Complaint as a matter of course, by an additional 39 days to amend his Complaint, which would take the time to Monday, June 20, 2022, and such other relief as this Court may deem just and proper.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1(a)(3)

The undersigned counsel conferred with counsel for the Defendant in a good faith effort to resolve the issues raised in this Motion and has not yet received a response from Opposing Counsel.  An email was sent to all counsel on record and to Nancy Hart, of Gibson Dunn, at nhart@GibsonDunn.com, who is expected to file.  The undersigned called David Kendall and left a message, early in the morning, and no response was received to either the email or the phone call.  Counsel were advised that time would be short, as the undersigned is seeking an expedited hearing or decision.

/s/ Peter Ticktin_____
Peter Ticktin

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed this 21st day of April, 2022, with the Clerk of Court using CM/ECF, which will send a notice of electronic filing to all Parties listed on the Service List.

/s/ Peter Ticktin____

| THE TICKTIN LAW GROUP | HABBA MADAIO & ASSOCIATES LLP |
|---|---|
| Peter Ticktin, Esquire | Alina Habba, Esquire |
| Florida Bar No.: 887935 | ahabba@habbalaw.com |
| Serv512@LegalBrains.com | Michael T. Madaio, Esquire |
| Jamie Alan Sasson, Esquire | mmadaio@habbalaw.com |
| Florida Bar No.: 10802 | 1430 US Highway 206 Suite 240 |
| Serv513@LegalBrains.com | Bedminster, NJ 07921 |
| 270 SW Natura Avenue | Telephone: (908) 869-1188 |
| Deerfield Beach, Florida 33441-1610 | *Attorneys for the Plaintiff* |
| Telephone: (954) 570-6757 | |
| *Attorneys for the Plaintiff* | |

**SERVICE LIST**

Juan Antonio Gonzalez, Esquire
Fla. Bar No. 619884
Anthony.Pogorzelski@usdoj.gov
**Assistant U.S. Attorney**
99 N.E. 4th Street, Suite 300
Miami, Florida 33132
Tel: (305) 961-9296
*Attorneys for Defendant*
*United States of America*
*James Comey*

David E. Kendall, Esquire
dkendall@wc.com
**Williams & Connolly, LLP**
725 12th Street NW
Washington, DC 20005-3901
202-434-5000
*PRO HAC VICE*
*Attorney for the Defendant*
*Hillary R. Clinton*

David Oscar Markus, Esquire
dmarkus@markuslaw.com
**Markus/Moss, LLP**
40 N.W. Third Street
Penthouse 1
Miami, Florida 33128
Telephone: 305-379-6667
*Attorneys for the Defendant*
*Hillary R. Clinton*

Katherine M. Turner, Esquire
kturner@wc.com
**Williams & Connolly, LLP**
725 12th Street NW
Washington, DC 20005-3901
202-434-5000
*PRO HAC VICE*
*Attorney for the Defendant*
*Hillary R. Clinton*

Michael J. Mestitz, Esquire

6

mmestitz@wc.com
**Williams & Connolly, LLP**
725 12th Street NW
Washington, DC 20005-3901
202-434-5000
*PRO HAC VICE*
*Attorney for the Defendant*
*Hillary R. Clinton*

Jonathan Edward Levine, Esquire
Jonathan.levine@levinepllc.com
**Levine & Associates, PLLC**
5311 Lee Highway
Arlington, Virginia 22207
Telephone: 703-525-2668
*Attorney for Defendant*
*Charles Halliday Dolan, Jr.*

Franklin G. Monsour, Jr., Esquire
fmonsour@orrick.com,
**Orrick, Herrington & Stcliffe, LLP**
51 West 52nd Street
New York, New York 10019
Telephone: 202-339-8533
*PRO HAC VICE*
*Attorney for Defendant*
*Igor Danchenko*

Diana Marie Fassbender, Esquire
dszego@orrick.com
**Orrick, Herrington & Stcliffe, LLP**
1152 15th Street NW
Washington, D.C. 20005
Facsimile: 202-339-8400
*PRO HAC VICE*
*Attorney for Defendant*
*Igor Danchenko*

Alexandra N. Epps, Esquire
aeps@qslwm.com
**Quiling SElander Lownds Winslet and Moser**
6900 North Dallas Parkway, Suite 800
Plano, Texas 75024
Telephone: 214-560-5463
*Attorney for the Defendant*

7

*Nuestar, Inc.*

Adam Seth Fels, Esquire
afels@ffslawfirm.com
**Fridman Fels & Soto, PLLC**
2525 Ponce de Leon Blvd., Ste 750
Coral Gables, FL 33134
305-569-7701
*Attorney for the Defendant*
*Bruce Ohr and Nellie Ohr*

Eugene K. Pettis, Esquire
cmarr@hpslegal.com
**Haliczer Pettis & Schwamm P.A.**
100 SE 3rd Avenue, 7th Floor
Fort Lauderdale, FL 33394
954-523-9922
*Attorney for Defendant*
*Marc Elias*

8

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: 2:22-cv-14102-DMM

DONALD J. TRUMP,

   Plaintiff,

v.

HILLARY R. CLINTON, et al.,

   Defendant.

_____/

**ORDER ON PLAINTIFF'S MOTION FOR ENLARGEMENT OF TIME
TO FILE AMENDED COMPLAINT AS A MATTER OF COURSE**

THIS MATTER is before the Court on the Plaintiff, DONALD J. TRUMP's Motion for

Enlargement of Time to File Amended Complaint.

After having reviewed the Motion, it is hereby **ORDERED and ADJUDGED:**

1.  The Motion is hereby GRANTED.

2.  The Plaintiff shall be permitted to 1) file an Amended Complaint as a matter of

course pursuant to Rule 15(a) F.R.Civ.P. of an additional 39 days, until June 20, 2022, or in the

alternative 2) to file Responses to Motions to Dismiss or Strike until June 20, 2022, or within 14

days of the filing of any such Motions to Dismiss which are filed by the Defendants, which ever

are later.

_____
_____
_____

DONE AND ORDERED at Fort Lauderdale, Florida this ___ day of    April, 2022.

_____

THE HONORABLE DONALD MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

cc.:   Counsel of record

124

Defendant John Podesta's Motion to Dismiss the Complaint and
Memorandum of Law in Support (May 4, 2022)

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

DONALD J. TRUMP,

                          Plaintiff,

            v.

HILLARY R. CLINTON, et al.,                        Case No. 2:22-cv-14102-DMM

                          Defendants.

## DEFENDANT JOHN PODESTA'S MOTION TO DISMISS THE COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT

Defendant John Podesta, by and through undersigned counsel, moves to dismiss Plaintiff's claims against Defendant with prejudice. Defendant moves to dismiss on the grounds that Plaintiff's claims are time-barred on the face of the complaint, and each of Plaintiff's claims against Defendant fail on the merits.

## ARGUMENT

### I.   COUNTS II, IV AND VI OF THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE STATUTE OF LIMITATIONS ON THESE CLAIMS HAS EXPIRED.

Defendant John Podesta joins in and adopts the arguments in Section I of Defendant Hillary Rodham Clinton's Motion to Dismiss (Dkt. 52) that Plaintiff's claims are time-barred on the face of the Complaint and should therefore be dismissed.  Dismissal on statute of limitations grounds is appropriate where it is apparent on the face of the complaint that Plaintiff's claims are time-barred. *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845-46 (11th Cir. 2004).

As articulated in Section I of Defendant Hillary Rodham Clinton's Motion to Dismiss, Plaintiff's claims relate to events that occurred in 2016 and 2017, as such the statute of limitations

has long expired.  Indeed, the factual allegations as to Defendant John Podesta relate to a meeting that occurred in 2017, statements made in October 2016, and social media posts in October 2017. Compl. ⁋⁋ 82, 191-92, 221.  The allegations that Defendants conspired to (1) create the Steele Dossier, (2) obtain and reveal internet data of a connection between Trump Tower and Alfa Bank, (3) provide false statements to law enforcement, and (4) disseminate false and injurious information, are all alleged events that occurred over four years ago.  Moreover, Plaintiff's own Complaint and his tweets demonstrate that he has been aware of the purported injuries for years.

The statute of limitations for conspiracy to commit RICO violations (Count II) is four years and runs from the date the injury was or should have been discovered.  *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013).  On October 29, 2017, Plaintiff tweeted about the same conspiracy which he now alleges in the Complaint.[1]  Plaintiff's own statements reveal that he was aware of the alleged conspiracy and injury more than four years ago, therefore, his claim is time-barred and should be dismissed.

The statute of limitations for conspiracy to commit injurious falsehood (Count IV) and conspiracy to commit malicious prosecution (Count VI) is four years from the date of the injury. *King v. Bencie*, 806 Fed. Appx. 873, 875 (11th Cir. 2020) (noting the statute of limitations for civil conspiracy is four years); *Newberger v. U.S. Marshals Serv*., 751 F.2d 1162, 1166 (11th Cir. 1985) (holding that actions for conspiracy in Florida are governed by a four-year statute of limitations).

---

[1]    "Never seen such Republican ANGER & UNITY as I have concerning the lack of investigation on Clinton made Fake Dossier (now $12,000,000?), the Uranium to Russia deal, the 33,000 plus deleted Emails, the Comey fix and so much more. Instead they look at phony Trump/Russia, 'collusion,' which doesn't exist. The Dems are using this terrible (and bad for our country) Witch Hunt for evil politics, but the R's are now fighting back like never before. There is so much GUILT by Democrats/Clinton, and now the facts are pouring out. DO SOMETHING!" Donald J. Trump (@realDonaldTrump), Twitter (Oct. 29, 2017), archived at The Trump Twitter Archive, thetrumparchive.com.

Plaintiff was aware of the alleged conspiracy on October 29, 2017, and Defendant's tweets recited in the Complaint, mere public speech, occurred on October 31, 2017. Compl. ¶ 221.  It is clear from the face of the Complaint that Plaintiff's claims expired by October 2021 and should therefore be dismissed.

## II.    COUNTS II, IV AND VI OF THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFF'S CLAIMS FAIL ON THE MERITS.

Defendant John Podesta joins in and adopts the arguments in Sections II B through E of Defendant Hillary Rodham Clinton's Motion to Dismiss (Dkt. 52) that Plaintiff's claims fail on the merits and should therefore be dismissed.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. In making a fraud claim, "a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). To satisfy the heightened pleading standard of Rule 9(b), a complaint must set forth:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Garfield v. NDC Health Corp*., 466 F.3d 1255, 1262 (11th Cir.2006).

## A.  Count II: RICO Conspiracy

As articulated in Section II B of Defendant Hillary Rodham Clinton's Motion to Dismiss, Plaintiff has failed to state a RICO conspiracy claim for which he is entitled relief.  "In order to state a claim for civil RICO conspiracy, a plaintiff must allege an illegal agreement to violate a substantive provision of the RICO statute."  *Super Vision Intern., Inc. v. Mega Intern. Commercial Bank Co., Ltd*., 534 F. Supp. 2d 1326, 1342 (S.D. Fla. 2008) (internal quotation marks omitted).  "A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A*., 119 F.3d 935, 950 (11th Cir.1997).

Plaintiff has not plausibly alleged sufficient facts regarding any purported agreement between Defendant John Podesta and other entities or persons to engage in the ongoing criminal conduct of an enterprise.  In fact, the non-conclusory allegations as to Defendant are limited to discrete public statements and a single meeting.  Compl. ¶¶ 82, 191-92, 221.  The allegations concerning Defendant's public statements are wholly irrelevant to establishing an agreement to engage in a RICO conspiracy.  The allegation of a meeting between Defendant John Podesta and Glenn Simpson after the Steele Dossier was published to "compare notes on Russia meddling in the election" is not sufficient to establish any alleged illegal agreement to violate a substantive provision of the RICO statute.  Compl. ¶ 82.  The alleged meeting occurred after the alleged conspiracy, and Plaintiff does not specifically allege the meeting was in any way connected to the conspiracy.  Moreover, Defendant was himself a victim of Russian interference in the election.[2]

---

[2]     *See* Jeff Stein, *What 20,000 pages of hacked WikiLeaks emails teach us about Hillary Clinton*, Vox, October 20, 2016, available at https://www.vox.com/policy-and-politics/2016/10/20/13308108/wikileaks-podesta-hillary-clinton

Defendant allegedly discussing Russian interference in the election is thus not only entirely innocuous but also irrelevant to establishing a conspiracy in this context. Plaintiff's allegations of Defendant's insignificant conduct, absent a plausibly-alleged "meeting of the minds," fail to "nudge[ his] claims across the line from conceivable to plausible." *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

### B. Count IV: Conspiracy to Commit Injurious Falsehood

As articulated in Section II C and D of Defendant Hillary Rodham Clinton's Motion to Dismiss, Plaintiff has failed to state a claim for conspiracy to commit injurious falsehood because the statements identified in the Complaint are political speech protected by the First Amendment and the Complaint fails to allege sufficient facts to demonstrate any agreement between Defendant John Podesta and any other defendant to commit injurious falsehood. *See Horsley v. Feldt*, 304 F.3d 1125, 1131 (11th Cir. 2002) (acknowledging that statements "may well include vehement, caustic, and sometimes unpleasantly sharp attacks," but they are nevertheless "constitutionally protected and those who make them are exempt from liability for defamation if the attacks are simply 'rhetorical hyperbole.'"); *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1316 (S.D. Fla. 2014) ("To plead civil conspiracy, a plaintiff must allege (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." (internal quotation marks omitted)).

### C. Count VI: Conspiracy to Commit Malicious Prosecution

As articulated in Section II E of Defendant Hillary Rodham Clinton's Motion to Dismiss, Plaintiff has failed to state a claim for the tort of malicious prosecution. In order to state a claim for malicious prosecution, a plaintiff must allege "(1) a criminal prosecution instituted or continued

by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019).   Plaintiff failed to identify any criminal proceeding that terminated in his favor.   Plaintiff cannot plausibly allege a lack of probable cause for the Crossfire Hurricane investigation.[3]   Moreover, Plaintiff fails to allege sufficient facts to demonstrate any agreement between Defendant John Podesta and any other defendant to commit malicious prosecution. This claim, along with the others, should be dismissed.

## CONCLUSION

For the forgoing reasons, John Podesta respectfully requests that the Court dismiss Counts II, IV, and VI of Plaintiff's Complaint with prejudice.

Dated: May 4, 2022

Respectfully Submitted

/s/Robert P. Trout
Robert P. Trout *
Paola Pinto
SCHERTLER ONORATO MEAD & SEARS
555 13th Street, N.W.
Suite 500 West
Washington, D.C.  20004
Phone: (202) 628-4155

*Motion for admission *pro hac vice* pending

*Attorneys for Defendant John Podesta*

---

[3]     The U.S. Department of Justice Office of Inspector General found the Crossfire Hurricane investigation was opened "for an authorized purpose" and "with adequate factual predication." U.S. Dep't of Justice, Office of the Inspector General, Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation at 347 (2019), available at https://www.justice.gov/storage/120919-examination.pdf.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 4, 2022, I caused to be filed electronically the foregoing Defendant John Podesta's Motion to Dismiss the Complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record on this matter who are on the CM/ECF system.

/s/ Robert P. Trout
Robert P. Trout

# 139

Defendants Fusion GPS, Glenn Simpson, and Peter Fritsch's Motion to
Dismiss the Complaint and Memorandum of Law in Support
(May 11, 2022)

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

DONALD J. TRUMP

           Plaintiff,

    v.

HILLARY R. CLINTON et al.,

          Defendants.

Case No. 2:22-cv-14102-DMM

## DEFENDANTS FUSION GPS, GLENN SIMPSON, AND PETER FRITSCH'S MOTION TO DISMISS THE COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT

Adam S. Fels
**FRIDMAN FELS & SOTO PLLC**
2525 Ponce de Leon Blvd., Suite 750
Coral Gables, FL 33134
afels@ffslawfirm.com

Tel: 305-569-7701

Joshua A. Levy*
Rachel Clattenburg*
Kevin P. Crenny*
* admitted *pro hac vice*
**LEVY FIRESTONE MUSE LLP**
900 17th St. NW, Suite 1200
Washington, D.C. 20006
jal@levyfirestone.com
rmc@levyfirestone.com
kcrenny@levyfirestone.com

Tel: 202-845-3215
Fax: 202-595-8253

*Counsel for Defendants*
*Fusion GPS, Peter Fritsch, and Glenn*
*Simpson*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

LEGAL STANDARD .......................................................................................................... 4

ARGUMENT ...................................................................................................................... 5

    I.   THE COMPLAINT DOES NOT STATE A CLAIM FOR RICO CONSPIRACY
         AGAINST THE FUSION DEFENDANTS. ......................................................... 5

            A.   The Statute of Limitations for RICO and RICO Conspiracy Has Run. .............. 5

            B.   The Complaint Does Not Plausibly Allege RICO Standing. ............................ 6

            C.   The Elements of the RICO Predicate Acts Are Not Adequately Alleged. ......... 8

            D.   A Pattern of Racketeering Activity Is Not Adequately Alleged. ...................... 9

            E.   The Entirely Conclusory Conspiracy Allegations Fall Short of the Pleading
               Standards. ..................................................................................................... 10

   II.  THE STATE LAW CLAIMS BROUGHT AGAINST THE FUSION DEFENDANTS
         ALSO FAIL. ...................................................................................................... 11

            A.   The Conspiracy to Commit Injurious Falsehood Claim Is Untimely,
               Constitutionally Invalid, and Lacking Key Elements of the Tort. ................... 11

            B.   The Malicious Prosecution Claims Fails Because Trump Has Not Been
                Prosecuted. .................................................................................................. 16

            C.   "Respondeat Superior/Vicarious Liability" Is Not a Cause of Action. ............. 16

CONCLUSION ................................................................................................................. 17

## INTRODUCTION

Defendants Bean LLC, d/b/a Fusion GPS,[1] Glenn Simpson, and Peter Fritsch (the "Fusion Defendants") move to dismiss the Complaint with prejudice because the claims are time-barred and the Complaint fails to state a claim for relief.

The Complaint—a lengthy jumble of incorrect statements of fact—alleges a conspiracy over the course of 2016 and early 2017 designed to damage Plaintiff Donald Trump's political fortunes. Trump alleges that the Fusion Defendants conspired with other defendants to violate RICO, 18 U.S.C. § 1962(c), "for the express purpose of injuring the Plaintiff's political career and/or impeding his ability to effectively govern through a pattern of racketeering activity," which, according to Trump, consisted of alleged theft of trade secrets and conspiracy to steal trade secrets, Compl. ¶¶ 284–95, and alleged obstruction of justice and a conspiracy to obstruct justice, *id.* ¶¶ 296–311. Trump does not allege that the Fusion Defendants violated a substantive RICO provision and instead only alleges they violated the RICO conspiracy provision, 18 U.S.C. § 1962(d) (Count II). In addition, Trump alleges the following Counts against the Fusion Defendants: Conspiracy to Commit Injurious Falsehood (Count IV); Malicious Prosecution (Count V, against Fritsch and Simpson); Conspiracy to Commit Malicious Prosecution (Count VI, against Fritsch and Simpson); and "Respondeat Superior/Vicarious Liability" (Count XIV, against Fusion GPS only).

While the Fusion Defendants strongly dispute the Complaint's allegations and insinuations about them, their firm, and their work, this motion treats nonconclusory allegations made in the Complaint as though they are true—as a motion to dismiss must at this stage of litigation. Even

---

[1] Named in the complaint as Fusion GPS.

affording the Complaint this generous standard of review, it fails entirely to state any claims against the Fusion Defendants.

## BACKGROUND

Trump's Complaint alleges few facts concerning the Fusion Defendants.

Only a few meetings between the Fusion Defendants and their alleged co-conspirators are mentioned, and none are described with the required specificity. The Complaint alleges that in April 2016, Fritsch and Simpson met with Defendant Marc Elias and that this meeting was arranged by a "senior figure in the Democratic party." Compl. ¶ 66. Then, it says, Fusion GPS was retained by Elias and his then-firm Perkins Coie and was instructed to conduct "opposition research for the Clinton Campaign and the DNC." *Id.* ¶ 68. It is alleged that all parties understood that Fusion's "true task was to prepare a fraudulent 'dossier'" that could be used to harm Trump's campaign and, if elected, his ability to serve as president. *Id.* ¶ 70. Just two meetings between Fusion and Perkins are identified: Defendants Elias and Michael Sussmann are alleged to have met with "personnel from Fusion GPS" on July 29, 2016, and Sussmann is said to have met with a Fusion representative again on August 20, 2016. *Id.* ¶ 168.[2] The Fusion Defendants are said to have "[known] that they were engaged in a conspiracy to" steal trade secrets and obstruct justice, and to have "agreed to facilitate" this scheme. *Id.* ¶¶ 320–21.

As for Fusion's own operations, the Complaint alleges that "in or about June 2016" the firm "officially retained Orbis Ltd. and Steele to find 'links between Russia and the then Republican candidate . . . Donald J. Trump'" and directed Orbis, Steele, and others to "beg[in] preparing approximately seventeen anti-Trump memoranda known collectively as the 'Steele

---

[2] The Complaint describes these meetings as being held "[i]n the lead-up" to a meeting Sussmann had with the FBI general counsel on September 19, 2016. *Id.* ¶ 168, 170.

Dossier.'" *Id.* ¶¶ 80–81. The Complaint alleges that this dossier was "intended to . . . harm Trump's candidacy" and "to induce the FBI to commence an investigation into alleged ties between Russia and Donald J. Trump." *Id.* ¶ 84. Defendant Nellie Ohr is said to have worked for the firm around April 2016 and is said to have researched "Trump's family members and campaign aides." *Id.* ¶ 74. The Fusion Defendants are alleged to have thought that she "would be instrumental in lending credibility to the Steele Dossier." *Id.* ¶ 76.

The Complaint provides few details on the Fusion Defendants' alleged roles in spreading alleged misinformation. In July 2016, unspecified Defendants are said to have "beg[u]n feeding false information to federal law enforcement . . . [and] through the media. . . . in an effort to cast malicious aspersions on Donald J. Trump." *Id.* ¶ 131; *see also id.* ¶ 165 (alleging again that "Defendants were also spreading disinformation"). Along with other Defendants the Fusion Defendants are alleged to have "conspired to disseminate" claims of collusion with Russia that they knew were false or were reckless in failing to verify. *Id.* ¶ 351. Fritsch and Simpson, with Steele, are only said to have met with members of the media once, on September 21, 2016 "to discuss their investigative findings" concerning Trump's relationships with Russia, but does not identify what, if any, false information they conveyed at this meeting. *Id.* ¶ 166. In late September and early October 2016, Fusion is alleged to have "coordinate[d] with" Sussmann, Elias, and Rodney Joffe "to disseminate the . . . allegations" of communications between the Trump Organization and Alfa Bank to the media. *Id.* ¶ 181. Fusion's role in this dissemination is not described.[3] More broadly, Fritsch and Simpson allegedly acted with actual malice as they allegedly

---

[3] These coordinated efforts are said to have occurred "in the weeks following" September 19, 2016, *id.* ¶¶ 179, 181, which suggests that the Fusion Defendants' September 21, 2016 meetings with members of the media were not part of this coordinated effort. This means Trump has not alleged a single specific action concerning the Fusion Defendants' supposed coordination with Sussmann, Elias, and Joffe.

"engaged in efforts to falsify information, documents and/or evidence, such as the Dossier" and allegedly conspired to "spread a false narrative in an attempt to ruin" Trump and "feed false and/or misleading information to the FBI and DOJ." *Id.* ¶¶ 362, 371.

Following the election, Simpson is said to have met with Bruce Ohr "to discuss Fusion GPS's findings regarding Russia and the election." *Id.* ¶ 195. Simpson is alleged to have provided Ohr with "most of the reports comprising the Steele Dossier," and Ohr is alleged to have provided those reports to the FBI in December 2016. *Id.* ¶ 197. Simpson is also alleged to have met with John Podesta in January 2017 "to compare notes on Russia meddling in the election." *Id.* ¶ 82. Finally, the Fusion Defendants are alleged to have "continued their collective mission to fabricate evidence and disparage Donald J. Trump" in the years since 2016. *Id.* ¶ 252. The Complaint states that an organization known as The Democracy Integrity Project has been funding these efforts. *Id.* ¶¶ 253–54. Finally, the Complaint brings the aforementioned five claims against the Fusion Defendants.

## LEGAL STANDARD

A court faced with a motion to dismiss must determine whether a complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). The plaintiff must have "ple[d] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court should treat the complaint's factual allegations as true and construe all reasonable inferences from those facts in the nonmovant's favor, *see Hawthorne v. Mac Adjustment, Inc.,* 140 F.3d 1367, 1370 (11th Cir. 1998), but need not accept the complaint's legal conclusions, and may reject any "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678. A complaint that provides only "conclusory statements,"

"'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" fails to state a claim." *Id.*

## ARGUMENT

### I. THE COMPLAINT DOES NOT STATE A CLAIM FOR RICO CONSPIRACY AGAINST THE FUSION DEFENDANTS.

Count I alleges a substantive RICO violation under 18 U.S.C. § 1962(c) against a subset of the defendants, but not against the Fusion Defendants. Count II alleges that the Fusion Defendants conspired with other defendants to violate RICO § 1962(d). Both Counts fail to state a claim for relief. The Complaint's failure to state a claim under § 1962(c) dooms Count II's RICO conspiracy claim, because "a person may not bring suit under § 1964(c) predicated on a violation of § 1962(d) for injuries caused by an overt act that is not an act of racketeering or otherwise unlawful under the statute." *Beck v. Prupis*, 529 U.S. 494, 507 (2000). Because the Complaint fails to state a claim for relief under § 1962(c), Plaintiff cannot state a claim for a relief for RICO conspiracy. For this reason, Defendant Clinton's arguments as to why the Complaint's RICO claims must be dismissed are equally applicable to the Fusion Defendants, and the Fusion Defendants adopt and incorporate Defendant Clinton's arguments on Count I and Count II. *See* Def. Hillary Rodham Clinton's Mot. to Dismiss the Compl. and Mem. of L. in Supp. ("Clinton Br.") at 1–15.

### A. The Statute of Limitations for RICO and RICO Conspiracy Has Run.

The RICO allegations in the Complaint are barred by the applicable statute of limitations. The statute of limitations for RICO actions—including RICO conspiracy actions—is four years from the date when the injury was or should have been discovered. *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013); *Agency Holding Corp. v Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987). As demonstrated in Defendant Clinton's brief, Trump sent four tweets on October 29, 2017

5

describing the same conspiracy he now alleges in the Complaint.[4] Clinton Br. at 3, Dkt. No. 52. As early as January 2017 he had suggested that the "dossier" was "A COMPLETE FRAUD" consisting of "phony allegations . . . put together by my political opponents."[5] In May 2017 Trump asserted again that "the story that there was collusion between the Russians & Trump campaign was fabricated by Dems."[6] The statute of limitations therefore started running no later than October 29, 2017 and expired no later than October 29, 2021. Because the Complaint includes only conclusory allegations concerning the Fusion Defendants' conduct after that date, any alleged injuries—including legal fees—that Trump incurred later than October 2017 are irrelevant for statute of limitations purposes. *See Lehman v. Lucom*, 727 F.3d 1326, 1331 (11th Cir. 2013) ("[W]hen an injury is a continuation of an initial injury it is not *new and independent*" such that it would restart the statute of limitations (internal quotations and alteration omitted)).

### B.  The Complaint Does Not Plausibly Allege RICO Standing.

The Complaint fails to plausibly allege that the alleged predicate acts directly caused Trump's alleged injuries, and the Complaint should be dismissed on that basis. 18 U.S.C. § 1964(c). "[P]leading a civil RICO claim requires that plaintiffs plead facts sufficient to give rise to a reasonable inference that the claimed racketeering activity . . . was the but-for and proximate

---

[4] Donald J. Trump (@realDonaldTrump), Twitter (Oct. 29, 2017 at 9:53:43 AM, 10:02:37 AM, 10:09:51 AM, and 10:17:14 AM), archived at The Trump Twitter Archive, thetrumparchive.com. Federal courts have taken judicial notice of the former President's tweets in a number of cases. *See, e.g.*, *Hawaii v. Trump*, 859 F.3d 741, 773 n.14 (9th Cir.) (per curiam) (taking judicial notice of Plaintiff's tweets), *vacated on other grounds*, 138 S. Ct. 377 (2017); *Rock the Vote v. Trump*, No. 20-cv-06021, 2020 WL 6342927, at *4 n.2 (N.D. Cal. Oct. 29, 2020) (same); *United States v. Flynn*, 507 F. Supp. 3d 116, 126 n.6 (D.D.C. 2020) (same).

[5] Donald J. Trump (@realDonaldTrump), Twitter (Jan. 14, 2017 at 8:14:13 AM), archived at The Trump Twitter Archive, thetrumparchive.com; *Id.* (Jan. 13, 2017 at 6:05:55 AM).

[6] *Id.* (May 12, 2017 at 7:51:56 AM); *see also id.* (May 8, 2017 at 6:46:00 PM) ("The Trump-Russia collusion story is a total hoax . . . ."); *id.* (Jun. 22, 2017 at 10:01:10) (referring to collusion allegations as "all a big Dem HOAX!").

6

cause of the plaintiffs' injuries." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1349 (11th Cir. 2016) (emphasis in original).

Here, Trump cannot demonstrate a "'direct causal connection' between the predicate offense and the alleged harm." *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 10–11 (2010); *Klayman v. Clinton*, No. 15-cv-80388, 2015 WL 10857500, at *6 (S.D. Fla. Aug. 11, 2015) (Middlebrooks, J.) ("RICO standing requires a plaintiff's injury to be *directly* caused by a predicate racketeering act prohibited under § 1962.") (emphasis in original). This is because Trump does not claim that the alleged predicate acts directly and proximately caused him to incur the vaguely asserted legal fees and other expenses, or to lose alleged business opportunities. *See* Compl. ¶ 263. Rather, he alleges that the *Government's* investigations and proceedings caused him to incur legal fees and expenses. Any claimed connection between his alleged expenses and the alleged predicate acts is too attenuated. The *direct* cause of Trump's alleged expenditures on defense costs and legal fees, and his alleged lost business opportunities, were the independent decisions of U.S. government investigators to take actions to investigate Trump, as part of their alleged "federal investigations and official proceedings." *Id.* ¶ 263. Those decisions of federal investigators are many steps removed from the alleged predicate offenses of stealing "DNS internet traffic data" or making "false statements." *Id.* ¶¶ 284, 299–302. "RICO only reaches harm that necessarily is caused by the predicate acts." *GolTV, Inc. v. Fox Sports Latin Am., Ltd.*, No. 16-cv-24431, 2018 WL 1393790, at *9 (S.D. Fla. Jan. 26, 2018) (citing *Hemi Grp.*, 559 U.S. at 13). The analysis of RICO proximate cause should not "go beyond the first step." *In re Takata Airbag Prod. Liab. Litig.*, 524 F. Supp. 3d 1266, 1284 (S.D. Fla. 2021) (dismissing RICO allegations for failure to meet RICO's "strict causation requirement") (quoting *Hemi Grp.*, 559 U.S. at 10) (internal

quotation marks omitted). Here, Trump fails to plausibly allege that the alleged predicate acts are the "first step" in the chain of causation of his alleged injuries.

It is not sufficient for Trump to allege that the purported economic harm was a "foreseeable and natural consequence" of the alleged predicate acts, *see* Compl. ¶ 264. "[T]he fact that an injury is reasonably foreseeable is not sufficient to establish proximate cause in a RICO action—the injury must be direct." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1349 (11th Cir. 2016) (citing *Hemi Grp.*, 559 U.S. at 12). The Complaint should be dismissed for lack of RICO standing.[7]

**C.  The Elements of the RICO Predicate Acts Are Not Adequately Alleged.**

Two RICO predicate acts are identified in the Complaint—theft of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1832, and witness tampering in violation of 18 U.S.C. § 1512—but neither is properly alleged.

The trade secret allegations depend on the alleged misappropriation of "DNS internet traffic data," Compl. ¶ 285, but Trump did not own this data, as would be required if its theft were to constitute an actionable theft of trade secrets. *United States v. Smith*, 22 F.4th 1236, 1243 (11th Cir. 2022) (elements of theft of trade secrets include that "the offense would injure the *owner* of the trade secret" (emphasis added)). Nor did the allegedly stolen DNS data "derive independent economic value" from the fact that they are "not . . . generally known to" persons other than Trump. 18 U.S.C. § 1839(3)(B) (defining a "trade secret"). The information is not "independently

---

[7] Furthermore, it is not clear that Trump's alleged injuries are cognizable RICO injuries. "Some courts interpreting RICO's statutory language have found attorneys' fees and legal expenses not to constitute an injury sufficient to confer standing under RICO." *Natural-Immunogenics Corp. v. Newport Trial Grp.*, No. 8:15-cv-02034 (C.D. Cal. Nov. 23, 2020) (citing, *inter alia*, *Hotel, Motel, Restaurant & Hi-Rise Employees & Bartenders v. Pier 66 Co.*, 599 F. Supp. 761, 765 (S.D. Fla. 1984)).

valuable" at all, and the Complaint's assertion to the contrary is entirely unexplained and conclusory. *See* Compl. ¶ 289.

The witness tampering allegations are also not properly alleged. The "Crossfire Hurricane" FBI *investigation* is not an "official *proceeding*" within the meaning of the witness tampering statute. 18 U.S.C. § 1515(a) (definitions). Additionally, the Complaint focuses on conduct that does not fit the plain language of the statute. The statute concerns, among other things, "alter[ing], destroy[ing], or conceal[ing] . . . record[s], document[s], or other object[s]" or "corruptly persuad[ing]" others to do the same or to otherwise impede investigations. 18 U.S.C. § 1512. The Complaint, on the other hand, alleges that certain defendants "provided falsified, altered and misleading records" to law enforcement. Compl. ¶ 297. Section 1512 describes a number of possible violations, but none of them—and no other RICO predicate act—lines up with the conduct alleged.

### D. A Pattern of Racketeering Activity Is Not Adequately Alleged.

To prove that the conduct of RICO defendants "amount[s] to, or . . . otherwise constitute[s] a threat of, *continuing* racketeering activity" beyond just "multiple schemes," a plaintiff must allege that the racketeering activity had characteristics of either "closed- [or] open-ended continuity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240–41 (1989). Closed-ended continuity requires that the predicate acts "extend[] over a substantial period of time"—more than nine months in this Circuit. *Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1265–66 (11th Cir. 2004). Plaintiffs' timeline of alleged predicate acts, spanning seven months, is too brief. *See* Compl. ¶¶ 298–307, 311. Additionally, "a single scheme with a discrete goal" necessarily lacks closed-ended continuity, *Jackson,* 372 F.3d at 1267, and Trump has described a scheme with the "single" goal of harming his political career. Compl. ¶ 2. Open-ended continuity has also not been alleged because nothing in the Complaint amounts to anything beyond the most conclusory allegations

that any of the RICO defendants are likely to commit further predicate acts. *See Jackson*, 372 F.3d at 1268.

### E. The Entirely Conclusory Conspiracy Allegations Fall Short of the Pleading Standards.

Finally, even if true, the allegations in the Complaint concerning the Fusion Defendants are too vague to state a claim for RICO conspiracy. The Complaint contains only "formulaic recitation[s] of the elements of a cause of action," and "'naked assertion[s]' devoid of 'further factual enhancement,'" which do not suffice to state a claim upon which relief can be granted and are not enough to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555, 557 (2007)). A Complaint alleging a conspiracy must give the Court a basis for inferring that the defendants were conspiring and not just engaging in "unknowingly parallel conduct." *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1069 (11th Cir. 2017). The Fusion Defendants are alleged to have been hired to conduct research and to have met with the firm and lawyers who hired them, and to have attempted to share their research. *See supra* at 2–4 (summarizing allegations concerning Fusion Defendants). The Complaint then applies "labels and conclusions" asserting a conspiracy. *Iqbal*, 556 U.S. at 678. Many of the RICO conspiracy defendants were working, in one way or another, for or with a campaign opposed to the Plaintiff— as were countless other Americans. The Complaint singles out a subset of those opposed to Trump's campaign and labels their ordinary election-year campaigning and parallel conduct a conspiracy. But such conclusory labels and allegations can and should be ignored by the Court. *In re Northlake Foods, Inc.*, 715 F.3d 1251, 1257 (11th Cir. 2013); *see also Twombly*, 550 U.S. at 566–67 ("[T]he plaintiff 'may believe the defendants conspired . . . , [but] the defendants' allegedly conspiratorial actions could equally have been prompted by lawful, independent goals

which do not constitute a conspiracy.'" (quoting *Kramer v. Pollock–Krasner Foundation,* 890 F. Supp. 250, 256 (S.D.N.Y. 1995))).

Additionally, as explained *supra* at 8–9, the Complaint's failure to properly allege a violation of either RICO substantive provision means the RICO conspiracy claim also must be dismissed. *See Doria v. Class Action Servs., LLC*, No. 08-cv-80512, 2008 WL 11411205, at *4 n.9 (S.D. Fla. Oct. 30, 2008) (Middlebrooks, J.) ("[A] plaintiff alleging a violation of § 1962(d) must first show an overt act that is independently wrongful under a substantive provision of the RICO statute.").

## II.   THE STATE LAW CLAIMS BROUGHT AGAINST THE FUSION DEFENDANTS ALSO FAIL.

### A. The Conspiracy to Commit Injurious Falsehood Claim Is Untimely, Constitutionally Invalid, and Lacking Key Elements of the Tort.

The tort of "[i]njurious falsehood essentially concerns 'intentional interference with another's economic relations'" and it is appropriately brought by a plaintiff asserting "damage to property . . . [or] damage to business interests from disparagement reflecting upon the business'[s] existence or character, or the manner in which the business is conducted." *Leavitt v. Cole*, 291 F. Supp. 2d 1338, 1342 (M.D. Fla. 2003) (quoting *Salit v. Ruden, McClosky, et al., P.A.*, 742 So. 2d 381, 386 (Fla. 4th Dist. Ct. App. 1999)). Count IV fails to state a claim for conspiracy to commit injurious falsehood against the Fusion Defendants.

*First*, the claim has been brought outside the applicable statutes of limitations. A claim for conspiracy fails when the underlying tort alleged is outside its statute of limitations, *see Ovadia v. Bloom*, 756 So.2d 137, 140–41 (Fla. 3d Dist. Ct. App. 2000) (citing *Orlando Sports Stadium, Inc. v. Sentinel Star Co.*, 316 So.2d 607, 609 (Fla. 4th Dist. Ct. App. 1975)); *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1317 (S.D. Fla. 2014) (holding that where underlying tort claims "[do] not survive [a] Motion to Dismiss, they cannot substantiate [a] civil conspiracy claim"). Florida

allows just two years from publication for an injurious falsehood claim. *ADT LLC v. Vivint, Inc.*, No. 17-cv-80432, 2017 WL 5640725, at \*6 & n.8 (S.D. Fla. Aug. 3, 2017) (Middlebrooks, J.) (equating "injurious falsehood" with "trade slander" and applying two-year statute of limitations to such claims); *Ashraf v. Adventist Health Sys./Sunbelt, Inc.*, 200 So.3d 173, 174 (S.D. Fla. 2016) (two-year limit for slander actions runs from publication); Fla. Stat. Ann. § 95.11(4)(g). A claim alleging civil conspiracy also fails when it is not brought within four years from the date that the plaintiff "either knows or should know that the last element of the cause of action occurred." *Wilder v. J.P. Morgan Chase Bank, N.A.*, No. 18-cv-20820, 2018 WL 5629922, at \*2 (S.D. Fla. Oct. 30, 2018) (quoting *Lesti v. Wells Fargo Bank*, N.A. 980 F. Supp. 2d 1311, 1320 (M.D. Fla. 2013)). This is the same starting point and length of time as the RICO claims discussed above, and Trump's October 29, 2017 tweets alleging a conspiracy again show that he knew all the facts he purports to allege here over four years before filing this suit.

The facts alleged in the Complaint are all over four years old. The Complaint describes no publications, statements, or even activity by the Fusion Defendants later than early 2017 in anything more than conclusory fashion. The only post-January 2017 allegation concerning Fusion Defendants is that they have allegedly "continued their collective mission to fabricate evidence and disparage Donald J. Trump . . . well after Trump won the 2016 election." *Id.* ¶ 252. Beyond statements about alleged funding for this mission, *id.* ¶¶ 253–54, the Complaint does not say when, where, or how the Fusion Defendants continued this supposed mission. There is no allegation that they published anything within the two years prior to the filing of this lawsuit. These post-election allegations amount to nothing more than conclusory assertions of an ongoing injury, which may be ignored like any other conclusory allegations. *See Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010) ("[C]onclusory allegations . . . are not entitled to an assumption of truth . . . ."); *see also*

*In re Takata Airbag Prods. Liability Litig.*, No. 14-cv-24009, 2016 WL 11662171, at \*14 (S.D. Fla. Sept. 30, 2016) (noting that "conclusory allegations" do not impact the running of a statute of limitations). Because all the alleged conduct occurred and was known to Trump over four years ago, the Complaint fails to plausibly allege that the underlying tort alleged (injurious falsehood) has been brought within its two-year statute of limitations or that the conspiracy claim has been brought within its four-year conspiracy limitations period.

*Second*, any statements made by the Fusion Defendants concerning candidate or President Trump at any point are protected under the First Amendment. *See Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam); *see also* Clinton Br. at 15. A public official cannot recover damages for defamatory falsehoods relating to official conduct without proving—or, at this stage, plausibly alleging—that the falsehoods were made with "actual malice." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). Trump's suggestions that the Fusion Defendants acted with actual malice consist entirely of conclusory assertions that unspecified information was untrue, *see, e.g.*, Compl. ¶ 70 (stating that Fusion's "true task was to prepare a fraudulent 'dossier'"); *id.* ¶ 131 (referencing "false information"); *id.* ¶ 165 (referencing "disinformation"), and equally conclusory allegations of actual malice, *see, e.g., id.* ¶¶ 351, 362, 373. These are simply "formulaic recitation[s] of the elements of a cause of action," that fail to state a claim. *Iqbal*, 556 U.S. at 678.[8]

---

[8] Although a plaintiff's facts are accepted as true at this stage, it should be noted that many of the premises underlying Trump's alleged falsehoods concerning the relationship among Russia, Trump, and the Trump Campaign were later substantiated by the findings of multiple federal investigations. The Treasury Department identified a "known Russian Intelligence Services Agent," Konstantin Kilimnik, as having "provided the Russian Intelligence Services with sensitive information on polling and campaign strategy," that Special Counsel Robert Mueller's investigation had previously determined Kilimnik obtained from Trump Campaign official Paul Manafort. Press Release, U.S. Dep't of the Treasury, Treasury Escalates Sanctions Against the Russian Government's Attempts to Influence U.S. Elections (Apr. 15, 2021), https://home.treasury .gov/news/press-releases/jy0126; Robert S. Mueller, III, Report on the Investigation into Russian Interference in the 2016 Presidential Election ("Mueller Report"), 130–31 (Vol. 1, March 2019),

*Third*, Trump also fails to properly plead a number of the required elements for injurious falsehood under Florida law. These elements under Florida law are "(1) a falsehood; (2) published or communicated to a third party; (3) the Defendant kn[e]w that the falsehood would likely induce others not to deal with the Plaintiff; (4) the falsehood did play a material and substantial part in inducing others not to deal with the Plaintiff; and (5) special damages." *Kanarick v. GE Credit Retail Bank Care Credit*, No. 13-cv-80039, 2013 WL 12092479, at \*4 (S.D. Fla. Sept. 6, 2013). The Complaint entirely ignores the economic nature of the third and fourth elements' requirements concerning "others not [dealing] with the Plaintiff." *Id.* Injurious falsehood involves holding a person who "disparage[es] . . . the quality of another's land, chattels or intangible things" accountable for "pecuniary loss resulting . . . from the impairment of vendibility." *Lehman v. Goldin*, 36 So. 2d 259, 260 (Fla. 1948) (quoting the Restatement of Torts § 624 (1938)); *see also Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 387 (Fla. Dist. Ct. App. 1999) ("[A]ny kind of legally protected property interest which is capable of being sold or transferred may be the subject of disparagement."). The statements Trump alleges were false did not touch in the least on any of his property interests, nor does he allege anywhere that the Fusion Defendants—or any others—anticipated that anything they were doing or saying "would likely induce others not to *deal with* the Plaintiff" with regard to property or money. The Complaint itself alleges that Fusion aimed to "ruin[] [Trump]'s opportunity to be elected and . . . to properly serve as President,"[9] Compl. ¶ 70, not to ruin the Trump Organization or Trump's personal finances.

---

https://www.justice.gov/storage/report.pdf. The Special Counsel also established that "Russia interfered in the 2016 presidential election" and "favored presidential candidate Donald J. Trump." Mueller Report at 1. The Senate Intelligence Committee reached the same conclusion. Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, S. Rep. 116-290, vol. 2, at 32 (2020), https://www.intelligence.senate.gov/sites/default/files/documents/Report_Volume2.pdf.

[9] These unquantifiable "opportunit[ies]" are not "intangible things" under the definition given in the Restatement of Torts, which the Florida Supreme Court adopted in *Lehman*. The "intangible

Nor does the Complaint adequately allege any of Trump's damages were directly caused by the Defendants' supposed conduct. The Complaint's periodic references to lost "business opportunities," *e.g., id.* ¶¶ 263, 354, are again conclusory recitations of the elements of a claim, *Iqbal*, 556 U.S. at 678, and bear no connection to Trump's overall narrative of harm to his *political* fortunes. Furthermore, even if the Complaint had adequately identified Trump's lost business opportunities, they could not plausibly be directly attributed to Defendants' conduct to the exclusion of unrelated negative press coverage or controversial statements and decisions that Trump and his surrogates made during his campaign and presidency.[10] This, too, is fatal to the injurious falsehood claims because "[s]pecial damages require proof that the loss is directly attributed to defendants conduct and the loss is not to be explained by other considerations." *Wound Care Concepts, Inc. v. Vohra Health Servs., P.A.*, No. 19-cv-62078, 2022 WL 320952, at *14 (S.D. Fla. Jan. 28, 2022) (citing *Salit*, 742 So. 2d at 386); *see also id.* ("Defendants fail to show that Plaintiffs' actions were the sole cause of Defendants['] losses, which is a requirement to establish special damages.").

Finally, even if the underlying claim for injurious falsehood were adequately pled—which it is not—the conspiracy claim would still fail. As was the case for the RICO conspiracy claim, a conspiracy among parties is not alleged in any detail but is instead asserted in conclusory terms.

---

things" described there are "interests recognized by the law of property which are salable or otherwise capable of profitable disposal." Restatement of Torts § 624, special note c ("It may be a mortgage, lease, easement, reversion or remainder, . . . a trust or other equitable interest therein[,] . . . . a patent right, a copyright or the right to use a trademark or trade name[,] . . . . intangible property whether represented and embodied in a document, negotiable or otherwise, or consisting of a simple debt or other cause of action.").

[10] The Complaint's lone purported example of a lost business opportunity—Trump's 2021 loss of access to his Twitter account, Compl. at n.78—was quite famously prompted by *his own* conduct in the aftermath of the *2020* election, not Defendants' conduct in 2016. Kate Conger & Mike Isaac, *Inside Twitter's Decision to Cut off Trump*, N.Y. Times (Jan. 16, 2021), https://www.nytimes.com/2021/01/16/technology/twitter-donald-trump-jack-dorsey.html.

**B. The Malicious Prosecution Claims Fails Because Trump Has Not Been Prosecuted.**

Under Florida law, a plaintiff claiming malicious prosecution must establish:

(1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damages as a result of the original proceeding.

*Melford v. Kahane & Assocs.*, 371 F. Supp. 3d 1116, 1123–24 (S.D. Fla. 2019) (citing *Alamo Rent-A-Car, Inc. v. Mancusi*, 632 So.2d 1352, 1355 (Fla. 1994)). The Complaint identifies no such proceeding, nor has one been brought against Trump in connection with the allegations at issue. "An action for malicious prosecution . . . [can] never occur outside the context of litigation." *Fischer v. Debrincat*, 169 So. 3d 1204, 1209 (Fla. Dist. Ct. App. 2015), *approved*, 217 So. 3d 68 (Fla. 2017). The remaining elements accordingly fail as well.[11] Count VI's conspiracy claim likewise fails because, yet again, the conspiracy is asserted in only conclusory fashion, and a conspiracy claim cannot survive absent a viable claim for the underlying tort. *Ovadia*, 756 So.2d at 140–41; *Alhassid*, 60 F. Supp. 3d at 1317.[12]

**C. "Respondeat Superior/Vicarious Liability" Is Not a Cause of Action.**

Finally, Trump's claim against Fusion itself for "Respondeat Superior" or "Vicarious

---

[11] Even if the "Crossfire Hurricane" investigation qualified as a proceeding—which it does not under Florida law because it was not a judicial proceeding—Trump could not establish the fifth element (among others) because an Inspector General investigation into that investigation found that it was properly initiated. U.S. Dep't of Justice, Office of the Inspector General, Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation at 347 (2019), https://www.justice.gov/storage/120919-examination.pdf.

[12] Count VI is also untimely even under the four-year conspiracy statute of limitations applied in Florida. *See supra* at 11–12. All of the Complaint's non-conclusory allegations involving the Fusion Defendants concern actions taken in 2016 and early 2017.

Liability" (Count XIV) fails to state a claim because respondeat superior and vicarious liability are not valid causes of action, but rather theories of liability. *Chunhong Jia v. Boardwalk Fresh Burgers & Fries, Inc.*, 2020 WL 5628734, at *2 (M.D. Fla. Sept. 21, 2020) ("[U]nder Florida . . . law, respondeat superior does not constitute an independent cause of action.") (citing *Turner Murphy Co. v. Specialty Constructors, Inc.*, 659 So.2d 1242, 1245 (Fla. 1st Dist. Ct. App. 1995)). To the extent that Count XIV is intended to charge Fusion with vicarious liability for the malicious prosecution torts brought against Simpson, Fritsch, and Nellie Ohr, it fails for the same reasons as those underlying torts.

## CONCLUSION

For all of the foregoing reasons, the Complaint should be dismissed with prejudice as to the Fusion Defendants.

Dated:  May 11, 2022

By:   /s/ Adam S. Fels
Adam S. Fels
**FRIDMAN FELS & SOTO PLLC**
2525 Ponce de Leon Blvd., Suite 750
Coral Gables, FL 33134
afels@ffslawfirm.com

Tel: 305-569-7701

Joshua A. Levy (admitted *pro hac vice*)
Rachel Clattenburg (admitted *pro hac vice*)
Kevin P. Crenny (admitted *pro hac vice*)
**LEVY FIRESTONE MUSE LLP**
900 17th St. NW, Suite 1200
Washington, D.C. 20006
jal@levyfirestone.com
rmc@levyfirestone.com
kcrenny@levyfirestone.com

Tel: 202-845-3215
Fax: 202-595-8253

*Counsel for Defendants*
*Fusion GPS, Peter Fritsch, and Glenn Simpson*

17

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing was served through the Court's electronic filing system on May 11, 2022 to counsel of record.

  /s/ Adam S. Fels
Adam S. Fels

141

Democratic Nation Committee, DNC Services Corporation, and Debbie Wasserman Schultz's Motion to Dismiss the Complaint and Memorandum of Law in Support (May 11, 2022)

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

DONALD J. TRUMP,

               Plaintiff,

    v.

HILLARY R. CLINTON, et al.,

               Defendants.

Case No. 2:22-cv-14102-DMM

## DEMOCRATIC NATIONAL COMMITTEE, DNC SERVICES CORPORATION, AND DEBBIE WASSERMAN SCHULTZ'S MOTION TO DISMISS THE COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT

Gerald Edward Greenberg
GELBER SCHACHTER & GREENBERG PA
One Southeast Third Avenue
Suite 2600
Miami, FL 33131-1715
(305) 728-0950
ggreenberg@gsgpa.com

Roberta A. Kaplan
Shawn G. Crowley
Maximillian L. Feldman
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
212.763.0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
mfeldman@kaplanhecker.com
*Admitted Pro Hac Vice*

*Attorneys for Defendants Democratic National Committee, DNC Services Corporation, and Debbie Wasserman Schultz*

## PRELIMINARY STATEMENT

Defendants the Democratic National Committee and DNC Services Corporation ("DNC"), as well as Defendant Debbie Wasserman Schultz, respectfully request that the Court dismiss the Complaint with prejudice.

*First*, all of Plaintiff's claims against the DNC and Ms. Wasserman Schultz—which largely concern events surrounding the 2016 Presidential election—are clearly time-barred on the face of the Complaint. This result is hardly surprising: for well over five years, Plaintiff has known about (and publicly decried) the supposed vast conspiracy at the heart of this untimely Complaint.

*Second*, Plaintiff's allegations against the DNC and Ms. Wasserman Schultz fail to state a claim on which relief can be granted in any event. Despite the sheer bulk of the Complaint (108 pages and 508 paragraphs), the only facts pleaded with specificity against these parties concern routine political behavior: for example, the DNC hired the same general counsel as the Clinton Campaign; those parties negotiated a joint fundraising agreement; and the DNC's former chair (Ms. Wasserman Schultz) appeared twice on cable news to express her opinions about the President of the United States. To be sure, Plaintiff sprays the Complaint with additional, general allegations that *others* were acting at the DNC's direction. But those vague and conclusory allegations cannot push his claims past the plausibility threshold. Indeed, as discussed below, each of the claims alleged in the Complaint rests on fundamental errors of both law and logic.

## ARGUMENT

To state a claim upon which relief may be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (*per curiam*) (citation omitted). "A complaint that provides 'labels and conclusions' or 'a formulaic recitation of the elements of a

cause of action'" is insufficient. *Id.* (citation omitted). "Stating a plausible claim for relief requires pleading factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged; this obligation requires more than a sheer possibility that a defendant has acted unlawfully" or facts that are "merely consistent with" a defendant's liability. *Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011) (cleaned up). Additionally, "[l]egal conclusions without adequate factual support are entitled to no assumption of truth." *Id.*

When it comes to issues of timeliness, "[a]lthough a statute of limitations bar is an affirmative defense, and a plaintiff need not negate such a defense in his complaint, a Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate if it is apparent from the face of the complaint that the claim is time-barred." *Makozy v. Stewart Title*, No. 20 Civ. 14316, 2021 WL 686863, at *1 (S.D. Fla.) (cleaned up), *aff'd sub nom. Makozy v. Westcor Land Title*, 852 F. App'x 518 (11th Cir. 2021).

Moreover, because the thrust of Plaintiff's Complaint is a "wide-ranging and fraudulent scheme" to produce and disseminate "fraudulent evidence" that was supposedly "intended to mislead law enforcement, the media, and the public at large," ¶¶ 7, 281-82, *see also* ¶¶ 4, 9, 59, 70, 263, 270, 278, 293, 308, 321, Plaintiff must comply with Rule 9(b)'s heightened pleading standard, which requires him to state with precision and particularity the circumstances constituting fraud. *Miccosukee Tribe of Indians of Fla. v. Cypress*, 814 F.3d 1202, 1212 (11th Cir. 2015); *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1316 (S.D. Fla. 2014).

## I.     Plaintiff's Claims Are Time-Barred.

The relevant statutes of limitations provide a complete defense on the face of the Complaint as to all counts against the DNC and Ms. Wasserman Schultz (together, the "DNC Parties"). To that end, the DNC Parties adopt by reference the arguments made in Part I of Hillary Rodham Clinton's Motion to Dismiss the Complaint ("Clinton Brief") (ECF No. 52 at pp. 1-5). Plaintiff

brings only a subset of the claims he brings against Secretary Clinton (Counts I-IV, VI-VIII, X) against the DNC (Counts I, II, IV, VII, VIII) and Ms. Wasserman Schultz (Counts III, IV, VI).[1] And Plaintiff does not assert any material allegations against the DNC Parties independent of his vague and conclusory allegations that the DNC Parties conspired with Secretary Clinton to "weave a false narrative that their Republican opponent, Donald J. Trump, was colluding with a hostile foreign sovereignty." ¶ 1. Indeed, Plaintiff avers that "at all relevant times" the DNC was "controlled by Clinton." ¶ 276. Accordingly, Plaintiff's claims against the DNC and Ms. Wasserman Schultz are time-barred, for substantially the same reasons as those outlined in the Clinton Brief.[2]

In addition to his generalized allegations of a conspiracy, Plaintiff alleges that Ms. Wasserman Schultz made two specific statements constituting injurious falsehoods under Florida law. But the Florida statute of limitations for injurious falsehood claims is two years. *ADT LLC v. Vivint, Inc.*, No. 17 Civ. 80432, 2017 WL 5640725, at *6 & n.8 (S.D. Fla. Aug. 3, 2017) (Middlebrooks, J.). As a result, the statute of limitations has run on both statements attributed to Ms. Wasserman Schultz since the first statement allegedly occurred on May 10, 2019, *see* ¶ 258,

---

[1] Although Plaintiff purports to bring a claim for "Respondeat Superior/Vicarious Liability" (Count XII) against the DNC, that is not an independent claim under Florida law. *See* Part I.H, *infra*.

[2] While the Complaint cites two alleged statements by Secretary Clinton within the limitations period, from June 16, 2021 and February 16, 2022, ¶¶ 260-61, it is black letter law that the statute of limitations for civil RICO actions begins running "when the injury was or should have been discovered." *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013); *Serpentfoot v. Rome City Comm'n*, 426 F. App'x 884, 887 (11th Cir. 2011) (affirming dismissal of civil RICO claim on statute of limitation grounds); *see also Verdejo v. HP Inc.*, No. 21 Civ. 20431, 2021 WL 5933727, at *11 (S.D. Fla. Nov. 8, 2021) (plaintiffs' RICO conspiracy claims based on additional extortionary payments within the limitations period could not revive their time-barred action where the new injury was "merely a reaffirmation of the original threats"); *Armbrister v. Roland Int'l Corp.*, 667 F. Supp. 802, 809 (M.D. Fla. 1987) ("Statutes of limitations triggered by injury to the Plaintiffs begins to run when the injury commences or first appears, not when it recurs."). Nor can Plaintiff take advantage of the "separate accrual" rule because he does not allege a "new RICO predicate act," let alone one that "gives rise to a new and independent injury." *Lehman*, 727 F.3d at 1330-31.

and the second statement on its face occurred before Special Counsel Robert Mueller was appointed in May 2017, *see* ¶ 337 ("Donald Trump should be the first person asking for one"—*i.e.*, an investigation into allegations of Russian collusion).

For these reasons, all claims against the DNC Parties are clearly untimely on their face, and this Court need not even reach the other independent reasons to dismiss for failure to state a claim under Rule 12(b)(6).

**II.      Plaintiff Fails to State a Plausible Claim for Relief.**

    **A.      Count I: RICO (against the DNC)**

As many courts have recognized, because of their very nature, civil RICO claims "must be subjected to scrutiny due to their potential for abuse by civil litigants." *Al-Ghena Int'l Corp. v. Radwan*, No. 13 Civ. 61557, 2013 WL 12237726, at \*9 (S.D. Fla. Dec. 23, 2013) (citation omitted). As a result, plaintiffs "wielding RICO almost always miss the mark," *Flexborrow LLC v. TD Auto Fin. LLC*, 255 F. Supp. 3d 406, 414 (E.D.N.Y. 2017), and "courts have generally approached civil RICO claims with a skeptical eye," *Entretelas Americanas S.A. v. Soler*, No. 19 Civ. 03658, 2020 WL 9815186, at \*5 (S.D.N.Y.), *aff'd*, 840 F. App'x 601 (2d Cir. 2020), *as amended* (Jan. 7, 2021). Because of this potential for abuse, "courts have an obligation to scrutinize civil RICO claims early in the litigation—to separate the rare complaint that actually states a claim for civil RICO." *DeBoskey v. SunTrust Mortg., Inc.*, No. 14 Civ. 1778, 2017 WL 4083557, at \*7 (M.D. Fla. Sept. 14, 2017) (citation omitted). Plaintiff's pleading here is not even close to being the kind of "rare" RICO complaint that should survive a motion to dismiss.

With respect to the Complaint's civil RICO claims, the DNC Parties adopt by reference the arguments in Part II.A of the Clinton Brief, pp. 6-14. Plaintiff asserts that the DNC and Secretary Clinton participated in the same RICO enterprise, supported by the same predicate acts and the same pattern of racketeering activity, causing the same (vague) injury. Thus, Plaintiff's

failures to adequately plead (a) the existence of a cognizable RICO enterprise, (b) predicate acts supporting a RICO claim, (c) a pattern of racketeering activity, or (d) standing under the RICO statute are fatal to his RICO claim against the DNC for substantially the same reasons as those asserted by Secretary Clinton.

Furthermore, Plaintiff does not plausibly allege that the DNC participated in the purported enterprise, let alone participated through a pattern of racketeering activity, as required by the RICO statute. 18 U.S.C. § 1962(c); *see Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (holding that "one must have some part in directing" the enterprise to be liable under the statute). Plaintiff's allegations concerning the DNC's connection to the alleged racketeering activity are wholly conclusory. *See, e.g.*, ¶¶ 81, 106, 123, 173. Indeed, Plaintiff's vague allegations that the DNC "directed" *other* alleged participants to commit predicate acts are contradicted in key respects by Plaintiff's own, more specific allegations. For example, although Plaintiff alleges that Mr. Joffe acted to unlawfully exploit access to internet data at "at the behest of certain 'VIPs' of the Clinton Campaign and Perkins Coie" including "Clinton, Sullivan, Elias and/or Sussmann," ¶ 122, in the very next paragraph, the Complaint alleges that Joffe acted "at the direction of Clinton, the Clinton Campaign and the DNC," ¶ 123. Similarly, Plaintiff alleges that Mr. Sussmann met with the FBI's General Counsel "at the behest of Clinton, the Clinton Campaign, and the DNC," but in the very next sentence alleges that "he billed the Clinton Campaign for his efforts, as he had with all of his actions taken in furtherance of the Defendants' conspiracy." ¶ 172. Black letter principles prohibiting improper group pleading, *see, e.g.*, *Libov v. Readix, Inc.*, No. 10 Civ. 61755, 2011 WL 13216996, at *1 (S.D. Fla. Sept. 8, 2011), mean that Plaintiff cannot simply "lump[] together all of the defendants in their allegations of fraud," *Ambrosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007) (affirming dismissal of civil RICO claims). Plaintiff's failure

"to describe the who, what, when, where, and how" of **the DNC's** participation in the alleged racketeering activity, with specificity, is fatal to his RICO claim against the DNC. *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1217 (11th Cir. 2020) (affirming dismissal of federal RICO claims).

**B.     Count II: RICO Conspiracy (against the DNC)**

The DNC Parties adopt by reference the arguments made in Part II.B of the Clinton Brief, pp. 14-15. Plaintiff's conclusory allegations concerning a RICO conspiracy do not differentiate among the roles and actions of the 21 purported participants in the conspiracy. His claims against the DNC thus fail for substantially the same reasons as those outlined by Secretary Clinton.

**C.     Count III: Injurious Falsehood (against Ms. Wasserman Schultz)**

Plaintiff's claim for injurious falsehood fails as well. To state a claim for injurious falsehood, Plaintiff must allege:

> (1) A falsehood (2) has been published, or communicated to a third person (3) when the defendant-publisher knows or reasonably should know that it will likely result in inducing others not to deal with the plaintiff and (4) in fact, the falsehood does play a material and substantial part in inducing others not to deal with the plaintiff; and (5) special damages are proximately caused as a result of the published falsehood.

*Bothmann v. Harrington*, 458 So. 2d 1163, 1168 (Fla. Dist. Ct. App. 1984).[3]

Plaintiff points to two statements allegedly made by Ms. Wasserman Schultz to support his claim. First, he alleges that on May 10, 2019, Ms. Wasserman Schultz stated on MSNBC:

> You know, what's so disturbing is that Donald Trump is so lacking in confidence about his ability to actually get elected without the help of a foreign power, and particularly a foreign adversary, that they will go to any lengths and that he will instruct and allow his

---

[3] While *Bothmann* concerned a cause of action for "slander of title," 458 So. 2d at 1168, as this Court has recognized, "[i]njurious falsehood is a term interchangeably used to refer to a group of torts, which includes slander of title, disparagement of property, or trade libel." *Kanarick v. GE Credit Retail Bank Care Credit*, No. 13 Civ. 80039, 2013 WL 12092479, at *4 (S.D. Fla. Sept. 6, 2013) (Middlebrooks, J.) (internal quotation marks omitted) (applying elements set forth in *Bothmann* to injurious falsehood claim).

colleagues and allies to go to any lengths to be able to secure his
success in an election.

¶ 258.[4] Second, and alternatively, Plaintiff alleges that Ms. Wasserman Schultz stated on CNN:

"[W]ith every passing day, it gets more and more disturbing, and more and more evidence that

there was collusion. . . . Donald Trump should be the first person asking for one, but since I think

he likely was part of it, it's not surprising that hasn't happened." ¶ 337.[5]

Plaintiff's allegations, which focus on political speech, are a poor fit for an injurious

falsehood claim, the "gist" of which is a defendant's "intentional interference with another's

economic relations." *Kanarick v. GE Credit Retail Bank Care Credit*, No. 13 Civ. 80039, 2013

WL 12092479, at *4 (S.D. Fla. Sept. 6, 2013) (Middlebrooks, J.). Indeed, Plaintiff fails to allege

*any facts* suggesting that Ms. Wasserman Schultz knew that her statements would likely induce

others not to deal economically with Plaintiff, who at the time was serving as President of the

United States. Nor does Plaintiff allege that (and, if so, how) Ms. Wasserman Schultz's statements

played a material or substantial role in inducing others not to do business with Plaintiff. *See, e.g.*,

*Dragash v. Fed. Nat'l Mortg. Ass'n*, No. 15 Civ. 847, 2016 WL 9632958, at *4 (M.D. Fla. Mar.

14, 2016), *aff'd*, 700 F. App'x 939 (11th Cir. 2017) (dismissing claim for slander of title where

plaintiff failed to plead that falsehood "induced others to not deal with the plaintiff"). Plaintiff also

fails to plead the requisite "special damages . . . proximately caused as a result of the published

falsehood." *Bothmann*, 458 So. 2d at 1168. To the contrary, he asserts that he suffered the same

---

[4] In the same paragraph, Plaintiff also alleges "Schultz appeared on MSNBC and boldly announced
that there were 'clear indications' that Donald J. Trump colluded with Russia." In addition to the
other reasons for dismissal outlined in this section, any claim based on this allegation should be
dismissed because it "fail[s] to provide an adequate description of the statements," *Malhotra v.
Aggarwal*, No. 17 Civ. 24407, 2019 WL 3425161, at *2 (S.D. Fla. July 30, 2019).

[5] Any claim based on this statement fails because Plaintiff "fail[s] to provide an adequate
description of the . . . time frame" in which the statement was made, *Malhotra*, 2019 WL 3425161,
at *2, in addition to the other reasons set forth herein.

losses for injurious falsehood as he did with respect to *all* of the other claims alleged in the Complaint. *See* ¶ 344. This obviously does not suffice. And of course, each of these pleading failures provides an independent basis for dismissal.

But there is more: Plaintiff's claim is also clearly barred by the First Amendment to the U.S. Constitution. Political comments based on facts "known or available to the reader or listener as a member of the public" are, by definition, "pure opinion" protected by the First Amendment. *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. Dist. Ct. App. 1981); *see also Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 717 (11th Cir. 1985) ("Opinions are protected from defamation actions by the First Amendment."); *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1384 (S.D. Fla. 2006) (finding "textbook expression of pure opinion" where defendant "merely offered readers his judgment—albeit, a harsh one—based upon facts that were known or available to them").[6] Plaintiff cannot seriously dispute that facts concerning Plaintiff's interactions with Russia were widely known: it is the premise of his entire Complaint. And while Plaintiff may find Ms. Wasserman Schultz's alleged characterizations objectionable, that does not convert them into falsifiable statements of fact. Because Ms. Wasserman Schultz's "subjective assessment of [Mr. Trump's] conduct" is "not readily capable of being proven true or false," it is not actionable as a matter of law. *Turner v. Wells*, 879 F.3d 1254, 1264 (11th Cir. 2018).

Plaintiff also violates a separate First Amendment limitation: he fails to allege that Ms. Wasserman Schultz uttered either of the alleged statements with actual malice (in other words,

---

[6] Florida courts "have afforded" personal defamation claims and injurious falsehood-type claims "identical treatment, distinguishing them only to the extent that 'slander of title' is defined as defamation of property interest, while libel and slander are defined as defamation of character of the person." *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 209 (Fla. Dist. Ct. App. 2002); *see also Tobinick v. Novella,* 108 F. Supp. 3d 1299, 1309 (S.D. Fla. 2015) (holding, under California law, that "constitutional protection does not depend on the label given the stated cause of action" and where "allegedly false and/or defamatory statements . . . constitute the gravamen of" trade libel and unfair competition claims, "each of these claims is subject to the First Amendment defamation rules.").

with knowledge of their falsity or reckless disregard for their truth). *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *Jacoby v. Cable News Network, Inc.*, No. 21-12030, 2021 WL 5858569, at *3 (11th Cir. Dec. 10, 2021) (*per curiam*) ("We may not hold a defendant liable for defaming a public figure about a matter of public concern unless he is shown to have acted with actual malice."); *Smith v. Russell*, 456 So. 2d 462, 464 (Fla. 1984) (holding, in defamation action, that "the applicable *New York Times* standard allows public figures or public officials to recover for injury to reputation only upon clear and convincing proof of actual malice"). Plaintiff's only allegations on this score are general and conclusory. *See* ¶ 328 (stating that Defendants "knew that Plaintiff was not colluding with Russia, or, at a minimum, acted with reckless abandon as to the truth" of their statements). Such vague allegations are plainly inadequate to state a claim. *See Jacoby*, 2021 WL 5858569, at *4-5 (affirming dismissal of defamation claim where plaintiff offered only "conclusory allegations" that defendant "intend[ed] to fabricate or otherwise mispresent facts concerning [the plaintiff] and his business so that he would suffer resulting reputational harm"); *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1253 (11th Cir. 2021) ("bare-bone[s] allegations" that the defendant's "conduct, in and of itself, would have created a high degree of awareness of the probable falsity of" the statement insufficient to allow court to infer that the defendant "seriously doubted" the statement's accuracy).

### D.   Count IV: Conspiracy to Commit Injurious Falsehood (against the DNC and Ms. Wasserman Schultz)

Plaintiff's conspiracy claim fails because his claims concerning the underlying injurious falsehood tort fail. "An action for civil conspiracy requires that a claimant plead an underlying tort or civil wrong, serving as the conspiracy's object." *Abromats v. Abromats*, No. 16 Civ. 60653, 2016 WL 4917153, at *4 (S.D. Fla. Sept. 15, 2016). As set forth above, Plaintiff's underlying injurious falsehood claims are time-barred and inadequately pleaded. *See* Parts I & II.C *supra*;

9

Clinton Brief at pp. 4, 15-18. As a result, the conspiracy claim must necessarily fail as well. *See, e.g.*, *Abromats*, 2016 WL 4917153, at *4 (S.D. Fla. Sept. 15, 2016) (dismissing conspiracy claim where underlying tort claims were time-barred); *Ovadia v. Bloom*, 756 So. 2d 137, 140 (Fla. Dist. Ct. App. 2000) (holding that "conspiracy to defame claim cannot stand where" underlying defamation claim was time-barred); *Buckner v. Lower Fla. Keys Hosp. Dist.*, 403 So. 2d 1025, 1027 (Fla. Dist. Ct. App. 1981).

Moreover, even if that were not the case (which it is), Plaintiff has failed to adequately allege a conspiracy. Under Florida law, in order "to plead civil conspiracy, a plaintiff must allege (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Alhassid*, 60 F. Supp. 3d at 1316 (internal quotation marks omitted). Plaintiff must "set forth clear, positive, and specific allegations of civil conspiracy." *Corbett v. Transportation Sec. Admin.*, 968 F. Supp. 2d 1171, 1190 (S.D. Fla. 2012), *aff'd*, 568 F. App'x 690 (11th Cir. 2014). Here, however, Plaintiff has failed to allege the "who, what, when, where, and how" of any purported conspiratorial agreement. *Alhassid*, 60 F. Supp. 3d at 1320; *see also Corbett*, 968 F. Supp. 2d at 1190 (noting that "[g]eneral allegations of conspiracy are inadequate" (citation omitted)). For example, Plaintiff asserts generally that Defendants "had a meeting of the minds" to make and disseminate "false and damaging statements," ¶ 347, but does not allege any specific facts establishing a conspiratorial agreement to commit injurious falsehood. "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Alhassid*, 60 F. Supp. 3d at 1319 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007)); *see also Parisi v. Kingston*, 314 So. 3d 656, 662 (Fla. Dist. Ct. App. 2021)

(dismissing a complaint alleging civil conspiracy as "deficient because it fails to allege, with any specificity, any facts evidencing how [one defendant] conspired with [others]").

**E.   Count VI: Conspiracy to Commit Malicious Prosecution (against Ms. Wasserman Schultz)**

Similar to the claims discussed above, Plaintiff's claim of conspiracy to commit malicious prosecution against Ms. Wasserman Schultz requires that he plead *both* elements of civil conspiracy under Florida law, *and* the underlying tort of malicious prosecution. *See* Part I.E *supra*. Plaintiff fails on both fronts.

As with his other conspiracy claims, Plaintiff fails to "set forth clear, positive, and specific allegations of civil conspiracy." *Corbett*, 968 F. Supp. 2d at 1190. Once again, he fails to allege any basic facts of any conspiratorial agreement. *Alhassid*, 60 F. Supp. 3d at 1320. Other than the conclusory allegation that Ms. Wasserman Schultz and eleven other defendants supposedly "had a meeting of minds," ¶ 369, Plaintiff offers no factual allegations indicating Ms. Wasserman Schultz had interactions with any of the other alleged conspirators, let alone any factual allegations to support the conclusion that Ms. Wasserman Schultz agreed to join a conspiracy "to feed false and/or misleading information to the FBI and the DOJ." ¶ 371. His claim fails for that reason alone.

Plaintiff's claim, however, also fails for the independent reason that he has not sufficiently pleaded the underlying tort of malicious prosecution. To state a claim for malicious prosecution under Florida law, a plaintiff must allege:

> (1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damages as a result of the original proceeding.

*Melford v. Kahane & Assocs.*, 371 F. Supp. 3d 1116, 1123-24 (S.D. Fla. 2019). Here, Plaintiff cannot allege that an "original judicial proceeding" was commenced against him. More specifically, Plaintiff's claim is founded exclusively on investigations by the FBI and Special Counsel Mueller. Under well-settled Florida law, a non-adversarial, confidential investigation is not a judicial proceeding for purposes of a claim of malicious prosecution. *See Nw. Fla. Home Health Agency v. Merrill*, 469 So. 2d 893, 900 (Fla. Dist. Ct. App. 1985) (noting that such an investigation "does not become quasi-judicial unless the agency determination is subject to the right to notice and hearing on the part of the person being proceeded against").

### F.      Count VII: Computer Fraud and Abuse Act (against the DNC)

Not surprisingly, Plaintiff's claim under the federal Computer Fraud and Abuse Act (CFAA) should likewise be dismissed. A defendant can be held liable under the CFAA only if he "(1) intentionally 'accessed' a computer, (2) lacked authorization or exceeded his authorized access to the computer, (3) obtained information from the computer, and (4) caused a loss of at least $5,000.00 to [Plaintiff]." *Hamilton Grp. Funding, Inc. v. Basel*, 311 F. Supp. 3d 1307, 1313 (S.D. Fla. 2018) (alteration in original) (citation omitted).[7] Plaintiff's CFAA claim fails for multiple reasons.

*First*, Plaintiff does not allege the DNC "accessed" any computer. Instead, Plaintiff alleges the DNC "conspired with Neustar and Joffe in *their* commission" of the relevant acts. ¶ 390 (emphasis added). But this stretches civil liability beyond the bounds of the statute. As a general rule, courts do not read civil secondary liability into laws that do not provide for it. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994) ("[W]hen

---

[7] While a civil plaintiff may establish a CFAA claim based on other forms of damage—for example, "physical injury to any person," 18 U.S.C. § 1030(c)(4)(A)(i)(III)—the only cognizable injury Plaintiff pleads here is loss in excess of $5,000. ¶ 319.

Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors."). And here, there is no basis to expand liability under the CFAA, which expressly limits its private right of action to suits "against the violator." 18 U.S.C. § 1030(g); *see Agilysys, Inc. v. Hall*, 258 F. Supp. 3d 1331, 1344 (N.D. Ga. 2017) (holding that even if one defendant had "directed or induced" another defendant to violate the CFAA, the first defendant "did not access [Plaintiff's] computers, and therefore, [the first defendant] may not be held liable as the violator under the CFAA").

*Second*, Plaintiff does not allege sufficient facts to establish "an agreement to violate the law," as is required in order to state a claim for conspiracy in any event. *Coll Builders Supply, Inc. v. Velez*, No. 617 Civ. 933, 2017 WL 4158661, at *10 (M.D. Fla. Aug. 31, 2017) (dismissing CFAA conspiracy claim based on allegations that one defendant acted "at the behest of and on behalf of" another defendant), *report and recommendation adopted*, No. 617 Civ. 933, 2017 WL 4125641 (M.D. Fla. Sept. 18, 2017); *Agilysys*, 258 F. Supp. 3d at 1343 (dismissing CFAA conspiracy claim where, in addition to lack of statutory basis for theory, there "are no facts showing" that one defendant "induced or even directed" another defendant to take the relevant actions).[8]

*Third*, Plaintiff has not adequately alleged that he suffered the type of loss necessary to bring a civil claim under the CFAA. For purposes of the statute, the term "loss" is defined to include "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its

---

[8] In *Coll Builders*, the court noted that "it remains a somewhat unsettled question of law as to whether a civil defendant may be held liable for attempting or conspiring to violate the CFAA." 2017 WL 4158661, at *6. This Court should reject civil liability for conspiracy to violate the CFAA for the reasons explained herein.

condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). As the Eleventh Circuit has explained, this "includes the *direct* costs of responding to the violation in the first portion of the definition, and consequential damages *resulting from interruption of service* in the second." *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1174 (11th Cir. 2017) (emphasis added). But here, Plaintiff does not allege any direct costs expended in responding to the alleged violations, and the "defense costs, legal fees, and related expenses" he purports to have incurred are certainly not related to any interruption of service. ¶ 392.

### G.      Count VIII: Theft of Trade Secrets (against the DNC)

Plaintiff's claim for theft of trade secrets fails for the same reasons that Plaintiff has not sufficiently pleaded theft of trade secrets as a RICO predicate act. *See* Clinton Brief pp. 8-9.

In any event, because criminal statutes generally "do not provide for private civil causes of action," *Smith v. JP Morgan Chase*, 837 F. App'x 769, 770 (11th Cir. 2021), there is no private right of action for conspiracy claims based on theft of trade secrets, Plaintiff's sole relevant claim against the DNC. *See* ¶ 413 ("The actions of Defendants, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, constitute a conspiracy to steal trade secrets in violation of 18 U.S.C. § 1832(a)(5)."). Instead, "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). The statutory provision at issue does not expressly provide for a private right of action; nor can one be implied in light of the substantial criminal enforcement mechanism in the statute. *See, e.g.*, *Love v. Delta Air Lines*, 310 F.3d 1347, 1357 (11th Cir. 2002) ("The explicit provision of these elaborate enforcement mechanisms strongly undermines the suggestion that Congress also intended to create by implication a private right of action in a federal district court but declined to say so expressly."). While a *separate* provision of the Defend Trade Secrets Act does provide for a private right of action to obtain "an

order providing for the seizure of property necessary to prevent the propagation or dissemination of the trade secret that is the subject of the action," that cause of action is limited to civil actions under that subsection. 18 U.S.C. § 1836(b). Accordingly, "the weight of authority tips against the viability of conspiracy claims based on misappropriation of trade secrets under" 18 U.S.C. § 1832. *NW Monitoring LLC v. Hollander*, 534 F. Supp. 3d 1329, 1338 (W.D. Wash. 2021); *see also, e.g.*, *Genentech, Inc. v. JHL Biotech, Inc.*, No. 18 Civ. 06582, 2019 WL 1045911, at *12 (N.D. Cal. Mar. 5, 2019); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 271 F. Supp. 3d 835, 840–44 (E.D. Va. 2017).

### H.  Count XII: Respondeat Superior/Vicarious Liability (against the DNC)

Plaintiff's claim for respondeat superior should be dismissed because "no such cause of action exists." *Colite Int'l Inc. v. Robert L. Lipton, Inc.*, No. 05 Civ. 60046, 2006 WL 8431505, at *12 (S.D. Fla. Jan. 20, 2006). Moreover, the Complaint is bereft of any factual allegations establishing that Ms. Wasserman Schultz was acting within the scope of her employment when she undertook the actions described in the Complaint, especially since Plaintiff's *own* allegations make it clear that Ms. Wasserman Schultz had already resigned as Chair of the DNC on July 28, 2016, ¶ 18, well before she made the alleged statements concerning Plaintiff on MSNBC and CNN.

### CONCLUSION

For the foregoing reasons, the DNC and Ms. Wasserman Schultz respectfully request that the Court grant their motion to dismiss the Complaint with prejudice.

Dated: May 11, 2022   Respectfully submitted,

       By: /s/ *Gerald E. Greenberg*
          Gerald Edward Greenberg
          GELBER SCHACHTER & GREENBERG PA
          One Southeast Third Avenue
          Suite 2600
          Miami, FL 33131-1715
          (305) 728-0950
          ggreenberg@gsgpa.com

          Roberta A. Kaplan
          Shawn G. Crowley
          Maximillian L. Feldman
          KAPLAN HECKER & FINK LLP
          350 Fifth Avenue, 63rd Floor
          New York, NY 10118
          212.763.0883
          rkaplan@kaplanhecker.com
          scrowley@kaplanhecker.com
          mfeldman@kaplanhecker.com
          *Admitted Pro Hac Vice*

          *Attorneys for Defendants Democratic*
          *National Committee, DNC Services*
          *Corporation, and Debbie Wasserman*
          *Schultz*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 11, 2022, I caused to be filed electronically the foregoing Democratic National Committee, DNC Services Corporation, and Debbie Wasserman Schultz's Motion to Dismiss the Complaint and Memorandum of Law in Support with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this matter who are on the CM/ECF system.


By:     /s/ *Gerald E. Greenberg*
        Gerald Edward Greenberg
        GELBER SCHACHTER & GREENBERG PA
        One Southeast Third Avenue
        Suite 2600
        Miami, FL 33131-1715
        (305) 728-0950
        ggreenberg@gsgpa.com

143

Perkins Coie LLP's Motion to Dismiss Under Federal Rule 12(b)(6) and
Incorporated Memorandum of Law (May 11, 2022)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Donald J. Trump,

               Plaintiff,

    v.

Hillary R. Clinton et al.,

               Defendants.

Civil Action No. 22-14102

## PERKINS COIE LLP'S MOTION TO DISMISS UNDER FEDERAL RULE 12(B)(6) AND INCORPORATED MEMORANDUM OF LAW

Nancy E. Hart (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  (212) 351-4000

F. Joseph Warin (*pro hac vice*)
Geoffrey M. Sigler (*pro hac vice*)
Katherine Moran Meeks (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  (202) 955-8500

Eleni Kastrenakes Howard
Howard J. Harrington
AKERMAN LLP
777 South Flagler Drive
Suite 1100, West Tower
West Palm Beach, FL 33401
Telephone:  (561) 653-5000
Fax:  (561) 659-6313

*Attorneys for Perkins Coie LLP*

# TABLE OF CONTENTS

Page

INTRODUCTION .............................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.    Plaintiff's Claims Are Untimely. ........................................................................... 2

II.   Plaintiff Has Failed to State a Plausible RICO Claim Against Perkins Coie. .................. 2

III.  Plaintiff Cannot Maintain a Claim Against Perkins Coie for Conspiracy to Publish an Injurious Falsehood Because the Underlying Claim Fails on the Merits...................... 4

      A.    Plaintiff Fails to Plead Multiple Elements of the Injurious Falsehood Claim. ....................................................................................................... 4

      B.    The Injurious Falsehood Claim Is Untimely. ........................................... 8

      C.    The Conspiracy Claim Fails Because the Underlying Claim Does. ................ 9

IV.   Plaintiff Cannot Maintain a Claim for Conspiracy to Commit Malicious Prosecution Because the Underlying Claim Fails on the Merits. ..................................... 9

V.    Plaintiff Fails to Plead Multiple Elements of the Computer Fraud and Abuse Act Claim. .................................................................................................................. 13

      A.    The Supreme Court Has Foreclosed the "Unauthorized Access" Theory on Which the CFAA Claim Rests. ................................................................. 13

      B.    Plaintiff Fails to Plead Damage or Loss Compensable Under the CFAA. .......... 15

      C.    The CFAA Claim Should Be Dismissed to the Extent It Relates to EOP Computers or Systems. ............................................................................ 17

VI.   The Respondeat Superior Count Against Perkins Coie Should Be Dismissed Because the Underlying Claims Fail. ....................................................................... 17

CONCLUSION ................................................................................................................... 17

REQUEST FOR HEARING ............................................................................................... 18

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## CASES

*777 Partners LLC v. Pagnanelli*,
  No. 20-cv-20172, 2021 WL 2038175 (S.D. Fla. Mar. 8, 2021) .......................................13, 16

*ADT LLC v. Vivint, Inc.*,
  No. 17-cv-80432, 2017 WL 5640725 (S.D. Fla. Aug. 3, 2017) ............................................8, 9

*Am. Heritage Enters., Inc. v. Am. Paramount Fin., Inc.*,
  No. 10-cv-80921, 2011 WL 13225180 (S.D. Fla. July 5, 2011) ..............................................4

*Armor Corr. Health Servs., Inc. v. Teal*,
  No. 19-cv-24656, 2021 WL 5834245 (S.D. Fla. Dec. 8, 2021)...............................................15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................................................3, 4, 15

*Brown Jordan Int'l, Inc. v. Carmicle*,
  846 F.3d 1167 (11th Cir. 2017) ..............................................................................................16

*CareersUSA, Inc. v. Guerrero*,
  No. 14-cv-80096, 2014 WL 12862259 (S.D. Fla. Aug. 25, 2014) ..........................................14

*Christman v. Holmes*,
  448 F. App'x 869 (11th Cir. 2011) .........................................................................................10

*Cisneros v. Petland, Inc.*,
  972 F.3d 1204 (11th Cir. 2020) ................................................................................................3

*Colite Int'l Inc. v. Robert L. Lipton, Inc.*,
  No. 05-cv-60046, 2006 WL 8431505 (S.D. Fla. Jan. 20, 2006)..............................................17

*Cox v. Adm'r U.S. Steel & Carnegie*,
  17 F.3d 1386 (11th Cir.), *modified on reh'g*, 30 F.3d 1347 (1994)...........................................4

*Day v. Taylor*,
  400 F.3d 1272 (11th Cir. 2005) ................................................................................................8

*Debrincat v. Fischer*,
  217 So. 3d 68 (Fla. 2017).................................................................................................10, 11

*Falic v. Legg Mason Wood Walker, Inc.*,
  347 F. Supp. 2d 1260 (S.D. Fla. 2004) ...................................................................................4, 5

**TABLE OF AUTHORITIES**

(*continued*)

Page(s)

*FEC v. Craig for U.S. Senate*,
   816 F.3d 829 (D.C. Cir. 2016) ........................................................................8

*Funny Cide Ventures, LLC v. Miami Herald Publ'g Co.*,
   955 So. 2d 1241 (Fla. 4th DCA 2007) .............................................................6

*Honig v. Kornfeld*,
   339 F. Supp. 3d 1323 (S.D. Fla. 2018) ............................................................9

*IBI Grp. v. B&S Eng'g Consultants, LLC*,
   No. 17-cv-246, 2017 WL 7311866 (M.D. Fla. June 27, 2017) ......................15

*Kanarick v. GE Credit Retail Bank Care Credit*,
   No. 13-cv-80039, 2013 WL 12092479 (S.D. Fla. Sept. 6, 2013) ....................5

*Mortg. Now, Inc. v. Stone*,
   No. 09-cv-80, 2010 WL 11519201 (N.D. Fla. Sept. 29, 2010) ......................16

*Muskegan Hotels, LLC v. Patel*,
   986 F.3d 692 (7th Cir. 2021) ...........................................................................3

*My Energy Monster, Inc. v. Gawrych*,
   No. 20-cv-2548, 2021 WL 6125579 (M.D. Fla. Sept. 29, 2021).....................16

*Rodgers v. Addy*,
   No. 17-cv-23429, 2021 WL 4487903 (S.D. Fla. Sept. 27, 2021) .....................3

*Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*,
   742 So. 2d 381 (Fla. 4th DCA 1999) ............................................................6, 8

*Schwartz v. ADP, Inc.*,
   No. 21-cv-283, 2021 WL 5760434 (M.D. Fla. Dec. 3, 2021) ........................16

*Sierra v. City of Hallandale Beach*,
   996 F.3d 1110 (11th Cir. 2021) ......................................................................17

*Sream, Inc. v. PB Grocery, Inc.*, No. 16-cv-81584, 2017 WL 6409006
   (S.D. Fla. Mar. 1, 2017)...................................................................................6

*St. Johns Vein Ctr., Inc. v. StreamlineMD LLC*,
   347 F. Supp. 3d 1047 (M.D. Fla. 2018)..........................................................13

*Union Oil of Calif. v. Watson*,
   468 So. 2d 349 (Fla. 3d DCA 1985) ...............................................................12

*Valladares v. Bank of Am. Corp.*,
   197 So. 3d 1 (Fla. 2016).................................................................................10

TABLE OF AUTHORITIES
(*continued*)

Page(s)

*Van Buren v. United States*,
    141 S. Ct. 1648 (2021) ................................................................................13, 14, 15

*Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupfer, P.A. v. Flanagan*,
    629 So. 2d 113 (Fla. 1993) ....................................................................................9

*Wound Care Concepts, Inc. v. Vohra Health Servs., P.A.*,
    No. 19-cv-62078, 2022 WL 320952 (S.D. Fla. Jan. 28, 2022) ........................6, 7

*XTec, Inc. v. Hembree Consulting Servs., Inc.*,
    No. 14-cv-21029, 2014 WL 12729173 (S.D. Fla. Aug. 1, 2014) .........................5

**STATUTES**

18 U.S.C. § 1030 ............................................................................................13, 14, 15

18 U.S.C. § 1962 ..............................................................................................................3

**OTHER AUTHORITIES**

Devlin Barrett & Matt Zapotosky, *Mueller Complained that Barr's Letter Did Not Capture
    "Context" of Trump Probe*, Wash. Post (Apr. 30, 2019) .......................................12

Office of the Inspector Gen., U.S. Dep't of Justice, *Review of Four FISA Applications and Other
    Aspects of the FBI's Crossfire Hurricane Investigation* (2019)  ........................8, 11

Office of Special Counsel, U.S. Dep't of Justice, *Report on the Investigation into Russian
    Interference in the 2016 Presidential Election* (2019) ..........................................12

Restatement (Second) of Torts § 654 ...............................................................................10

**RULES**

Fed. R. Civ. P. 9 ...........................................................................................................6, 7

Fed. R. Civ. P. 12 .............................................................................................................1

Fed. R. Evid. 201 .............................................................................................................6

Defendant Perkins Coie LLP ("Perkins Coie") respectfully submits this motion to dismiss Counts I–VIII and XI of the complaint under Federal Rule of Civil Procedure 12(b)(6) and this accompanying memorandum of law.

## INTRODUCTION

As a result of "various federal investigations," plaintiff Donald J. Trump alleges he has incurred $24 million in "defense costs, legal fees, and related expenses." Compl. ¶ 314. He now seeks to shift the blame—and the bill—for his mounting legal debts to a host of political rivals and perceived adversaries, from the 2016 Democratic candidate for president and her lawyers to the former director of the FBI. But plaintiff has not come close to tracing his legal fees to any conduct by Perkins Coie LLP or stating a viable claim against this defendant (or any other). To the contrary, plaintiff's stale claims fall well outside the statute of limitations and fail on the merits in multiple independent respects. Whatever value plaintiff's hyperbolic allegations may hold as political rhetoric, the claims lack any legal merit.

Defendant Hillary Clinton has submitted a memorandum explaining why plaintiff's claims should be dismissed. Dkt. No. 52. In the interest of avoiding duplicative briefing, Perkins Coie adopts and incorporates by reference Secretary Clinton's arguments as to the statutes of limitations for all claims; the civil RICO and RICO conspiracy claims (Counts I and II); the injurious falsehood and conspiracy to commit injurious falsehood claims, to the extent the arguments are not specific to Secretary Clinton's individual statements (Counts III and IV); the conspiracy to commit malicious prosecution claim (Count VI); and theft of trade secrets claim (Count VIII). *See* Clinton Mem. 1–15, 17–20. Perkins Coie submits this memorandum to address the claims and allegations unique to the firm. For the reasons given below and in Secretary Clinton's briefing, this Court should dismiss the claims against Perkins Coie.

## ARGUMENT

### I.      Plaintiff's Claims Are Untimely.

Plaintiff's claims and allegations relate to conduct dating back two presidential election cycles to 2016 and 2017—ancient history from both a political and legal perspective.  For the reasons stated in Secretary Clinton's brief, the statute of limitations has run on the civil RICO and RICO conspiracy claims (Counts I and II), the conspiracy to commit injurious falsehood claim (Count IV), the conspiracy to commit malicious prosecution claim (Count VI), the Computer Fraud and Abuse Act claim (Count VII), and the theft of trade secrets claim (Count VIII).  *See* Clinton Mem. 1–5.  The injurious falsehood claim specific to Perkins Coie's former partner Michael Sussmann (Count III), and the related vicarious liability count against Perkins Coie (Count XI), are also untimely as explained in Section III.B, *infra*.  Plaintiff's failure to timely assert these claims provides a standalone basis for dismissal as against Perkins Coie.

### II.      Plaintiff Has Failed to State a Plausible RICO Claim Against Perkins Coie.

For the reasons given in Secretary Clinton's brief, the civil RICO claim (Count I) and RICO conspiracy claim (Count II) fail on multiple independent grounds.  Plaintiff has not plausibly alleged any cognizable RICO enterprise, has not sufficiently alleged any (much less the required two) predicate acts, has not shown any pattern of racketeering activity, and has entirely failed to allege the basic elements of RICO standing.  Clinton Mem. 6–14.  As to the conspiracy claim, plaintiff has not plausibly alleged an illegal agreement to violate a substantive provision of the RICO statute, an overt act of racketeering, or any injury arising from such an act.  *Id.* at 14–15.  Any one of these defects provides a sufficient basis for dismissing the RICO and RICO conspiracy claims against Perkins Coie.

Above and beyond the grounds for dismissal articulated by Secretary Clinton, the Court should dismiss the civil RICO claim against Perkins Coie because the complaint fails plausibly to

allege that the firm participated in the supposed RICO enterprise. To survive a motion to dismiss, "the plaintiff must plead that *each* defendant engaged in the conduct of the affairs of the RICO enterprise through a pattern of racketeering activity involving at least two predicate criminal acts." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1208 (11th Cir. 2020) (emphasis added). As to Perkins Coie, however, the allegations consist solely of the sort of "conclusory statements" and "naked assertions" that need not be taken as true even at the pleading stage. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (brackets omitted). Plaintiff asserts that Perkins Coie served as general counsel to the Clinton campaign and the Democratic National Committee, "spearhead[ed] the scheme" to find proof of "a sinister link" between plaintiff and Russia, and "launched parallel operations" through its former partners Marc Elias and Michael Sussmann. Compl. ¶¶ 3, 43, 49. These allegations do not come close to showing that Perkins Coie engaged in a single RICO predicate act, let alone "a pattern of racketeering activity." *See* 18 U.S.C. § 1962(c). "A complaint that does no more than allege that a law firm performed legal work for an enterprise fails to state a violation of § 1962(c)." *Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 698–99 (7th Cir. 2021). Because the complaint does not plausibly allege that Perkins Coie "engaged in the conduct of the affairs of the RICO enterprise," *Cisneros*, 972 F.3d at 1208, the RICO claim should be dismissed. *See also Rodgers v. Addy*, No. 17-cv-23429, 2021 WL 4487903, at *4 (S.D. Fla. Sept. 27, 2021) (dismissing RICO claim where plaintiffs "have not met their . . . pleading requirements to make out two predicate acts . . . for each defendant").

Nor has plaintiff plausibly alleged that Perkins Coie is vicariously liable for supposed RICO violations by its former partners (Count XI). In the RICO context, plaintiff must do more than allege an employment or agency relationship. To recover under a respondeat superior theory, plaintiff must plausibly allege that Perkins Coie "derive[d] some benefit from the RICO violation."

*Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1406 (11th Cir.), *modified on reh'g*, 30 F.3d 1347 (1994); *Am. Heritage Enters., Inc. v. Am. Paramount Fin., Inc.*, No. 10-cv-80921, 2011 WL 13225180, at *6 n.8 (S.D. Fla. July 5, 2011). But the complaint does not identify a single benefit that accrued to Perkins Coie from the supposed RICO violations of its former partners. As alleged in the complaint, the asserted aim of the enterprise was not to benefit Perkins Coie at all, but to injure plaintiff and cost him the presidency. Compl. ¶ 9.

Plaintiff likewise fails to allege that Perkins Coie "authorized or subsequently acquiesced in" the supposedly wrongful acts of its former partners. *See Cox*, 17 F.3d at 1407. The complaint does not plead a single fact to suggest that the firm knew about or authorized an alleged "plan . . . to provide false evidence and information" to law enforcement officials. Compl. ¶ 167. Plaintiff must offer more than "naked assertions devoid of further factual enhancement," *Iqbal*, 556 U.S. at 678 (brackets omitted), before it can hold "an international law firm," Compl. ¶ 16, vicariously liable for supposed falsehoods to law enforcement officials or other alleged acts of the firm's former partners.

**III.    Plaintiff Cannot Maintain a Claim Against Perkins Coie for Conspiracy to Publish an Injurious Falsehood Because the Underlying Claim Fails on the Merits.**

The complaint does not allege that Perkins Coie published a single injurious falsehood concerning plaintiff, and instead seeks to hold the firm liable on vicarious liability or conspiracy grounds. The respondeat superior (Count XI) and conspiracy (Count IV) counts against Perkins Coie should be dismissed because the underlying injurious falsehood claim fails on the merits.

**A.    Plaintiff Fails to Plead Multiple Elements of the Injurious Falsehood Claim.**

Injurious falsehood is a close cousin to defamation, except that it protects "economic interests" rather than "personal reputation." *Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp. 2d 1260, 1268 (S.D. Fla. 2004). "Injurious falsehood essentially concerns intentional interference

with another's economic relations." *XTec, Inc. v. Hembree Consulting Servs., Inc.*, No. 14-cv-21029, 2014 WL 12729173, at *6 (S.D. Fla. Aug. 1, 2014).  Because the tort vindicates commercial interests, a plaintiff must plausibly allege, among other elements, that (1) defendant knew his falsehood would "likely induce others not to deal with the Plaintiff," (2) "the falsehood did play a material and substantial part in inducing others not to deal with the Plaintiff," and (3) special damages.  *Kanarick v. GE Credit Retail Bank Care Credit*, No. 13-cv-80039, 2013 WL 12092479, at *4 (S.D. Fla. Sept. 6, 2013) (Middlebrooks, J.); *see also* Clinton Mem. 17–18.

The injurious falsehood claim fails at the threshold because the alleged injuries plaintiff claims are not "economic" in nature.  *See Falic*, 347 F. Supp. 2d at 1268.  Although the complaint recites boilerplate allegations that plaintiff lost "existing and future business opportunities," Compl. ¶ 354, the gravamen of the alleged injury concerns plaintiff's political prospects rather than his private business ventures.  By plaintiff's own account, the "false information" allegedly propagated by defendants had the purpose of "derail[ing] his campaign" and impairing his ability to govern as president.  *Id.* ¶¶ 70, 352.  Perkins Coie has found no authority suggesting that a damaged political candidacy amounts to an economic injury cognizable under the banner of injurious falsehood.  Plaintiff, in any event, does not come close to showing that any supposed falsehoods actually damaged his campaign.  *Plaintiff*—not Hillary Clinton—won the 2016 election.  *Id.* ¶ 193.

The complaint also fails to allege that Perkins Coie or its former partners "induce[d]" a single individual or entity "not to deal with the Plaintiff."  *See Kanarick*, 2013 WL 12092479, at *4.  The closest the complaint comes is a single footnote alleging that plaintiff was "banned from different social media platforms, including Twitter," as a result of "the misinformation campaign waged by Hillary Clinton."  Compl. ¶ 263 n.78.  But while plaintiff's exile from social media

might stifle his communications with the public, the complaint does not allege that plaintiff monetized his social media accounts or suffered specific economic losses as a result of the alleged bans. In any event, plaintiff rewrites history when he suggests that Twitter shut down his account as a result of defendants' alleged falsehoods. Twitter suspended plaintiff from its platform on January 8, 2021—two days after the insurrection at the U.S. Capitol, and nearly five years after the alleged conspiracy at issue in this case—because it determined that plaintiff's tweets posed "the risk of further incitement of violence." Twitter Blog, Permanent Suspension of @realDonaldTrump (Jan. 8, 2021).[1]

The injurious falsehood claim should also be dismissed because plaintiff has failed to plead special damages, a "crucial element" of the tort. *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 388 (Fla. 4th DCA 1999). "The special damage rule requires the plaintiff to establish pecuniary loss that has been realized or liquidated, as in the case of specific lost sales." *Id.* "Special damages require proof that the loss is directly attributed to defendants['] conduct and the loss is not to be explained by other considerations." *Wound Care Concepts, Inc. v. Vohra Health Servs., P.A.*, No. 19-cv-62078, 2022 WL 320952, at *14 (S.D. Fla. Jan. 28, 2022); *see also Funny Cide Ventures, LLC v. Miami Herald Publ'g Co.*, 955 So. 2d 1241, 1246 (Fla. 4th DCA 2007). Under the Federal Rules, special damages must be "specifically stated" in the complaint. Fed. R. Civ. P. 9(g).

---

[1] The Court may judicially notice the date and content of Twitter's suspension notice even at the pleading stage because these are facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," namely from Twitter's own web site. *See* Fed. R. Evid. 201(b); *Sream, Inc. v. PB Grocery, Inc.*, No. 16-cv-81584, 2017 WL 6409006 (S.D. Fla. Mar. 1, 2017) (Middlebrooks, J.). As the former president, plaintiff can hardly expect the Court to turn a blind eye to the circumstances of his suspension from Twitter, which was widely covered in the press at the time.

The allegations do not come close to establishing the required nexus between plaintiff's legal bills and the alleged false narrative supposedly spread by Perkins Coie's former partner, Michael Sussmann. By plaintiff's telling, he accumulated the vast legal fees in the course of defending himself from "*various* federal investigations" and "official proceedings." Compl. ¶¶ 344, 354 (emphasis added). But the complaint does not provide any accounting of how the $24 million in legal fees is apportioned among these various inquiries—and that failure is fatal to his claim. Plaintiff faced multiple investigations and proceedings that he does not even attempt to connect to Perkins Coie or Sussmann, from special counsel Robert Mueller's investigation, to the two impeachment proceedings, to the House inquest into the January 6, 2021 attack on the U.S. Capitol. Instead, the complaint identifies only a single investigation, Operation Crossfire Hurricane, supposedly related to the Steele dossier or the allegedly false evidence Sussmann allegedly tendered to the FBI. *Id.* ¶¶ 170, 179.[2] Because the complaint fails to connect the $24 million in legal fees to that lone investigation, plaintiff has not plausibly alleged that his "loss is directly attributed to defendants," *Wound Care Concepts*, 2022 WL 320952, at *14, or stated his damages with the specificity required by Federal Rule 9(g).

Even Crossfire Hurricane bears no logical relationship to plaintiff's asserted legal fees. As alleged in the complaint, the FBI "opened an investigation of the Trump–Alfa Bank allegations" just days after Sussmann met with the FBI's general counsel on September 19, 2016. Compl. ¶¶ 170, 179. But the FBI "concluded" no later than February 2017 that "there was insufficient

---

[2] The complaint alleges that Sussmann has been indicted "for proffering false statements to law enforcement officials." Compl. ¶ 8. But the indictment itself alleges that the false statement consisted of Sussmann's alleged representation that he was not presenting evidence "for any client." *See* Indictment ¶ 4, Dkt. No. 1, *United States v. Sussmann*, No. 21-cr-00582 (D.D.C. Sept. 16, 2021) (incorporated by reference at Compl. ¶ 5 n.2). Plaintiff at no point explains how he was possibly injured by this supposed misrepresentation.

evidence to support the allegations of a secret communications channel with the Russian bank."
*Id.* ¶¶ 170, 180.[3]  The complaint offers no plausible explanation for how plaintiff could possibly
have accrued $24 million in legal fees defending himself from an allegedly false report that the
FBI considered and dispatched within the space of five months.

Plaintiff has not even plausibly alleged that he is personally liable for the cost of his legal
defense.  Although plaintiff repeatedly asserts that he was "forced to *incur* . . . defense costs, legal
fees, and related expenses" amounting to $24 million, Compl. ¶¶ 344, 354 (emphasis added), he
does not specify what amount (if any) of that total he paid from his own pocket.  Federal election
law permits candidates or office holders to use campaign funds to pay "legal expenditures made
in response to charges of campaign or official misconduct."  *FEC v. Craig for U.S. Senate*, 816
F.3d 829, 842 (D.C. Cir. 2016).  Particularly because the complaint points to unspecified injuries
sustained by the Trump campaign, Compl. ¶ 314, the allegations do not support the inference that
plaintiff has "realized" an actual "pecuniary loss" recoverable as special damages.  *See Salit*, 742
So. 2d at 388.

**B.     The Injurious Falsehood Claim Is Untimely.**

The injurious falsehood claim must also be dismissed because the allegedly injurious
conduct took place well outside Florida's two-year limitations period.  *See ADT LLC v. Vivint,*

---

[3]  A report of the Department of Justice's inspector general that is incorporated by reference into
the complaint confirms that the FBI quickly dismissed a supposed connection between plaintiff
and the Russian bank.  *See* Compl. ¶ 3 n.1.  The report concluded:  "The FBI investigated
whether there were cyber links between the Trump Organization and Alfa Bank, but had
concluded by early February 2017 that there were no such links."  *See* Ex. 1, Office of the
Inspector Gen., U.S. Dep't of Justice, *Review of Four FISA Applications and Other Aspects of
the FBI's Crossfire Hurricane Investigation* 119 n.259 (2019) (hereinafter "IG Report").  The
full report is available online at https://www.justice.gov/storage/120919-examination.pdf.
Because the complaint incorporates the IG Report by reference, the Court may consider it at
the pleading stage without converting this motion into one for summary judgment.  *See Day v.
Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

*Inc.*, No. 17-cv-80432, 2017 WL 5640725, at *6 (S.D. Fla. Aug. 3, 2017) (collecting cases).  A

cause of action for injurious falsehood accrues at the time defendant publishes the falsehood to a

third party.  *Id.*; *see also Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupfer, P.A. v.

Flanagan*, 629 So. 2d 113, 114–15 (Fla. 1993).  Here, the statute of limitations began running

when Sussmann allegedly provided false statements and documentary evidence to the FBI and

CIA in late 2016 and early 2017 concerning a possible connection between plaintiff and a Russian

bank—and expired no later than 2019.  Compl. ¶¶ 121, 170, 215.

To the extent plaintiff bases his injurious falsehood claim on information Sussmann

provided to reporters, it fares no better.  The complaint alleges that Sussmann "communicated with

the media" on August 20, 2016, Compl. ¶ 168(f); "met with a reporter" on September 1, 2016 "to

discuss the false Trump–Alfa Bank connection," *id.* ¶ 166(a); and "emailed a reporter a link to an

opinion article" on October 10, 2016, *id.* ¶ 182.  Any claim based on these stale communications

falls far outside the two-year limitations period, and is meritless in any event.

### C.     The Conspiracy Claim Fails Because the Underlying Claim Does.

Plaintiff cannot salvage his meritless injurious falsehood claim by repackaging it as a claim

for conspiracy to commit an injurious falsehood (Count IV).  "An actionable conspiracy requires

an actionable underlying tort or wrong."  *See Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1345 (S.D.

Fla. 2018).  Because the underlying tort claim fails on the merits, the Court should dismiss the

conspiracy claim against Perkins Coie.

### IV.     Plaintiff Cannot Maintain a Claim for Conspiracy to Commit Malicious Prosecution Because the Underlying Claim Fails on the Merits.

To state a claim for malicious prosecution (Count V), plaintiff must plausibly allege,

among other elements, that (1) "an original criminal or civil judicial proceeding" was instituted

against the plaintiff, (2) defendant was "the legal cause of the original proceeding," (3) "there was

an absence of probable cause for the original proceeding," and (4) there was a "bona fide termination" of the original proceeding "in favor of" the plaintiff. *Debrincat v. Fischer*, 217 So. 3d 68, 70 (Fla. 2017). Plaintiff has not plausibly alleged any of these four elements.

Plaintiff fails to satisfy a fundamental precondition for a malicious prosecution claim: he does not allege he was ever charged, prosecuted, or named as a defendant in "an original criminal or civil judicial proceeding." *See Debrincat*, 217 So. 3d at 70. At most, plaintiff asserts that Perkins Coie's former partners "misled FBI and DOJ officials with the intention of inducing the FBI to commence an investigation" into plaintiff's possible collusion with Russia. Compl. ¶ 357. But "an action for malicious prosecution . . . could never occur outside the context of litigation." *Debrincat*, 217 So. 3d at 70 (brackets omitted). Absent an allegation that the investigation ripened into a civil or criminal case, plaintiff cannot state a claim for malicious prosecution as a matter of law. *See Valladares v. Bank of Am. Corp.*, 197 So. 3d 1, 10 (Fla. 2016) (rejecting malicious prosecution claim because plaintiff was "never arrested or prosecuted"); *see also Christman v. Holmes*, 448 F. App'x 869, 872 (11th Cir. 2011) (holding plaintiff could not state a claim based on a warrantless arrest where he was never arraigned or indicted); Restatement (Second) of Torts § 654 (recognizing that "[c]riminal proceedings" begin when an indictment is returned or process is issued "for the purpose of bringing the person accused . . . before an official or tribunal").

Even assuming a mere investigation could support a malicious prosecution claim, plaintiff was *not even the subject* of Crossfire Hurricane—the only investigation he even attempts to link to Perkins Coie's former partners. As alleged in the complaint, the FBI opened individual cases into Carter Page, George Papadopoulous, and Paul Manafort, all of whom were "associated with the Trump Campaign," and into Michael Flynn, who later served as plaintiff's national security advisor. Compl. ¶¶ 136–37. But the complaint nowhere indicates that the Crossfire Hurricane

investigation ever broadened to include plaintiff himself.  Because the complaint fails to allege a criminal investigation (much less criminal charges) "against the *present plaintiff*," *Debrincat*, 217 So. 3d at 70 (emphasis added), the malicious prosecution claim must be dismissed.

Even if the Crossfire Hurricane investigation could support a malicious prosecution claim, which it cannot, the allegations undermine rather than support the conclusion that defendants were the "legal cause" of that investigation or that the FBI lacked "probable cause."  *See Debrincat*, 217 So. 3d at 70.  The complaint extensively cites and relies upon the published findings of the Department of Justice's inspector general concerning the origins of the Crossfire Hurricane investigation.  *E.g.*, Compl. ¶¶ 3 n.1, 80 n.23, 132 n.41.  And the IG Report concludes, based on interviews with FBI officials and a review of classified documents, that Crossfire Hurricane had "a legitimate law enforcement purpose" entirely independent of the Steele dossier.  Ex. 1, at 350.  More specifically, the FBI launched the investigation on July 31, 2016, after it received a tip from a friendly foreign government that a foreign policy advisor to the Trump campaign had "suggested" that Russia could release damaging information about the Clinton campaign—a tip that came only days after WikiLeaks released hacked emails from the Democratic National Committee ("DNC").  *Id.* at 49–51, 346.  According to the inspector general, the information flowing from "a trusted intelligence partner," combined with the DNC hack, "created a counterintelligence concern that the FBI was 'obligated' to investigate."  *Id.* at 53–54, 346–48.  In short, the FBI launched Crossfire Hurricane for an "authorized purpose" based on an "adequate factual predication" that had nothing to do with Perkins Coie, its former partners, or any other defendant.  *Id.* at 347.

Finally, plaintiff has not plausibly alleged that any investigation supposedly instigated by Perkins Coie's former partners terminated in his favor.  "That element is satisfied by either a

favorable decision on the merits or a bona fide termination of the proceedings," that is, "a good faith nolle prosequi or declination to prosecute." *Union Oil of Cal. v. Watson*, 468 So. 2d 349, 353 & n.3 (Fla. 3d DCA 1985). Plaintiff attempts to meet his burden by asserting that Special Counsel Robert Mueller "found no evidence" that plaintiff or his campaign associates "ever colluded with the Russian government to undermine the 2016 election." Compl. ¶¶ 232–33. But plaintiff cannot rely on the Mueller investigation to satisfy the "favorable termination" element because the complaint does not allege that Perkins Coie's former partners in any way influenced the opening of that investigation. And even if it did, the Mueller investigation did *not* conclude with "a favorable decision on the merits" as to plaintiff's innocence. *See Union Oil*, 468 So. 2d at 353.

The Mueller Report states only that the special counsel declined to issue a judgment about whether plaintiff's conduct "constitutes a federal offense" in light of the Office of Legal Counsel's opinion that a sitting president should not be indicted. Office of Special Counsel, U.S. Dep't of Justice, 2 *Report on the Investigation into Russian Interference in the 2016 Presidential Election* 1–2 (2019) (cited at Compl. ¶ 232).[4] At the same time, the report made clear that Mueller would have cleared plaintiff of obstruction of justice had he been able to do so with "confidence." *Id.* at 2. Mueller was "unable to reach that judgment" based on the evidence. *Id.* While his report did not affirmatively conclude plaintiff had committed a crime, "it also *does not exonerate him*." *Id.* (emphasis added). This conclusion falls far short of a favorable termination on the merits. *See Union Oil*, 468 So. 2d at 353 ("Where dismissal is on technical grounds, for procedural reasons,

---

[4] The complaint quotes from Attorney General Barr's letter to Congress summarizing the conclusions of the Mueller Report. Compl. ¶ 234 & n.63. But the report itself, and not the Attorney General's summary, is the best evidence of its contents. That is all the more true here, where Mueller issued his own letter asserting that the Attorney General "did not fully capture the context, nature, and substance" of his conclusions. *See* Devlin Barrett & Matt Zapotosky, *Mueller Complained that Barr's Letter Did Not Capture "Context" of Trump Probe*, Wash. Post (Apr. 30, 2019) (linking to Mueller response letter).

or any other reason not inconsistent with the guilt of the accused, it does not constitute a favorable termination.").

Plaintiff's claim for malicious prosecution thus fails on four independent grounds—*i.e.*, the judicial proceeding, legal cause, absence of probable cause, and bona fide termination elements—any one of which provides a sufficient basis for dismissal.  As with the injurious falsehood claim, the failure of the underlying malicious prosecution claim dooms the related conspiracy claim against Perkins Coie's former partners (Count VI) and the vicarious liability count against Perkins Coie (Count XI).  *See* p. 9, *supra*; p. 17, *infra*.  These claims, too, should be dismissed.

**V.     Plaintiff Fails to Plead Multiple Elements of the Computer Fraud and Abuse Act Claim.**

Although it is "predominately designed as a criminal statute to punish computer hacking," the Computer Fraud and Abuse Act ("CFAA") permits civil actions "under a narrow set of circumstances."  *St. Johns Vein Ctr., Inc. v. StreamlineMD LLC*, 347 F. Supp. 3d 1047, 1057 (M.D. Fla. 2018).  To state a claim under the CFAA, a plaintiff must allege that (1) "defendant intentionally accessed a protected computer" (2) "without authorization or exceeding authorized access," (3) "defendant thereby obtained information," and (4) "plaintiff suffered damage or loss of at least $5,000.00."  *777 Partners LLC v. Pagnanelli*, No. 20-cv-20172, 2021 WL 2038175, at *4–5 (S.D. Fla. Mar. 8, 2021) (citing 18 U.S.C. § 1030(g)).  The claim (Count VII) should be dismissed because the allegations do not fit the narrow and specific definitions of "unauthorized access" and "damage or loss" under the CFAA.

**A.     The Supreme Court Has Foreclosed the "Unauthorized Access" Theory on Which the CFAA Claim Rests.**

The Supreme Court's most recent opinion construing the CFAA forecloses the theory of "unauthorized access" plaintiff sketches in the complaint.  In *Van Buren v. United States*, 141 S.

Ct. 1648 (2021), the Supreme Court interpreted the statutory term "exceeds authorized access" to reach only defendants who access "information located in particular areas of the computer—such as files, folders, or databases—that are off limits" to them. *Id.* at 1662 (citing 18 U.S.C. § 1030(a)(2)). Critically for present purposes, the Supreme Court held that exploiting existing access to a computer system "for an improper purpose" does *not* violate the statute. *Id.* "CFAA focuses on—and punishes—an individual's unauthorized *access* of information rather than how a defendant *uses* the accessed data." *CareersUSA, Inc. v. Guerrero*, No. 14-cv-80096, 2014 WL 12862259, at *3 (S.D. Fla. Aug. 25, 2014).

Yet plaintiff's theory of liability turns entirely on defendants' supposedly improper use of DNS data to which defendant Neustar already had access. As alleged in the complaint, Neustar is "an information technology company" that "offers various internet-related information, data and analytics services, including Domain Name System ("DNS") resolution services." Compl. ¶ 103. In the ordinary course of business, Neustar allegedly acquired "access to non-public and proprietary internet data," including DNS data from Trump Tower and plaintiff's private New York City apartment. *Id.* ¶ 123. Neustar also provided "DNS resolution services" to the Executive Office of the President ("EOP") and thereby "c[a]me to access and maintain dedicated servers for the EOP." *Id.* ¶ 124. According to plaintiff, Perkins Coie and its former partner Sussmann supposedly "tasked Neustar" and its chief executive, Rodney Joffe, "to exploit . . . their access to non-public data to dredge up" compromising information about plaintiff. *Id.* ¶ 109. Neustar and Joffe then proceeded to "min[e]" executive branch DNS data and "quer[y] their holdings of non-public internet data" against internet protocol and email addresses associated with plaintiff, the Trump Organization, and "numerous Trump associates." *Id.* ¶¶ 125–26.

Taken as true only for purposes of this motion, the allegations demonstrate that Neustar and Joffe did no more than the CFAA allows—they employed data already in their possession to run searches concerning the plaintiff.  Far from gaining unauthorized access to files or systems "off limits" to them, *Van Buren*, 141 S. Ct. at 1662, these defendants allegedly "exploited . . . access" they were otherwise given for supposedly "nefarious purposes," Compl. ¶¶ 102, 122.[5] While plaintiff might find this alleged improper use by Neustar and Joffe objectionable, it plainly does not violate the CFAA.  *See Armor Corr. Health Servs., Inc. v. Teal*, No. 19-cv-24656, 2021 WL 5834245, at *27 (S.D. Fla. Dec. 8, 2021) (holding that executive authorized to access employer's systems with "no meaningful limitations" did not violate CFAA by downloading documents "for the improper purpose of using [them]" to compete with employer).

The CFAA claim also fails to the extent plaintiff alleges (without basis) that defendants "manipulated, falsified, and altered" data to manufacture a connection between plaintiff's computer servers and those of a Russian bank.  Compl. ¶ 392.  The CFAA is "an anti-hacking statute" that penalizes unauthorized access to protected computers.  *IBI Grp. (Fla.) Inc. v. B&S Eng'g Consultants, LLC*, No. 17-cv-246, 2017 WL 7311866, at *3 (M.D. Fla. June 27, 2017). Allegations that defendants "fabricat[ed]" computer-related evidence, Compl. ¶ 110, fall outside the statute's scope.

**B.      Plaintiff Fails to Plead Damage or Loss Compensable Under the CFAA.**

The CFAA claim should be dismissed on the alternative basis that plaintiff fails to allege compensable damage or loss in excess of $5,000 in one year.  *See* 18 U.S.C. § 1030(g).  Damages

---

[5]  Although the complaint includes a single, throwaway allegation that Sussmann "commission[ed]" Neustar "to brazenly hack servers," Compl. ¶ 62, it provides no support for this "naked assertion[] devoid of further factual development." *Iqbal*, 556 U.S. at 678.  The allegation, which is also inconsistent with other well-pleaded facts, therefore need not be taken as true even at the motion to dismiss stage. *Id.*

under the CFAA are narrowly confined to two permissible categories:  (1) reasonable costs associated with responding to a breach, such as "assessing the damage done" and "restoring" systems to their prior condition, and (2) revenue lost or costs incurred because of an interruption of service.  *Brown Jordan Int'l , Inc. v. Carmicle*, 846 F.3d 1167, 1174 (11th Cir. 2017); *see also 777 Partners*, 2021 WL 2038175, at *5 (defining "damage" under the CFAA as "an impairment to the integrity or availability of data, a program, a system, or information").  Other types of foreseeable losses, such as "lost revenue from the possible misappropriation of 'stolen' information," do not count toward the $5,000 statutory minimum.  *Schwartz v. ADP, Inc.*, No. 21-cv-283, 2021 WL 5760434, at *2 (M.D. Fla. Dec. 3, 2021).

Courts within the Eleventh Circuit thus routinely dismiss CFAA claims for failure to plead the type of damages recoverable under the statute.  *See, e.g.*, *Schwartz*, 2021 WL 5760434, at *1 (dismissing claim where plaintiff made only "conclusory allegation" of loss in excess of $5,000); *My Energy Monster, Inc. v. Gawrych*, No. 20-cv-2548, 2021 WL 6125579, at *4 (M.D. Fla. Sept. 29, 2021) (dismissing complaint for failure to plead "at least $5,000" in spending "on remedial actions"); *777 Partners*, 2021 WL 2038175, at *5–6 (holding that plaintiff could not recover for defendant's unjust enrichment and failed to allege compensable "cost[s] of responding to the alleged offense"); *Mortg. Now, Inc. v. Stone*, No. 09-cv-80, 2010 WL 11519201, at *5 (N.D. Fla. Sept. 29, 2010) (dismissing claim on ground that "lost profits" untethered to an "interruption of service" "do not constitute loss under the CFAA").

The same result should obtain here.  Although plaintiff asserts damages well in excess of $5,000, those damages—legal fees stemming from federal criminal investigations—do not satisfy the narrow definition of recoverable loss under the CFAA.  Plaintiff's complete failure to detail remedial costs in excess of $5,000 provides an independent basis for dismissal.

### C.   The CFAA Claim Should Be Dismissed to the Extent It Relates to EOP Computers or Systems.

Finally, the CFAA claim should be dismissed to the extent it relies upon Neustar's alleged unauthorized access of computers belonging to the Executive Office of the President.  Compl. ¶ 383.  Plaintiff cannot recover civil damages as a private plaintiff for unauthorized access to computers owned by the federal government.  To the extent any party improperly extracted "valuable, sensitive, and/or proprietary information and data" from EOP computer systems, *id.* ¶ 386, that injury is the government's to vindicate, not plaintiff's.  *See Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1125 (11th Cir. 2021) (Newsom, J., concurring) (noting plaintiff can sue for injury to the government only where Congress has authorized a *qui tam* suit).

## VI.   The Respondeat Superior Count Against Perkins Coie Should Be Dismissed Because the Underlying Claims Fail.

Plaintiff cannot hold Perkins Coie vicariously liable for the alleged conduct of its former partners Elias and Sussmann (Count XI) because plaintiff has failed to state any viable claim against these defendants.  *See* Compl. ¶ 452.  "Respondeat superior is not an independent cause of action."  *Colite Int'l Inc. v. Robert L. Lipton, Inc.*, No. 05-cv-60046, 2006 WL 8431505, at *12 (S.D. Fla. Jan. 20, 2006).  "Rather, it is a legal theory that presupposes the existence of an underlying claim and assesses liability . . . because of a certain status."  *Id.*  Because the underlying claims against Elias and Sussmann fail on the merits, plaintiff cannot maintain a standalone claim for vicarious liability.

## CONCLUSION

For the reasons explained above and in the Clinton memorandum, the complaint against Perkins Coie should be dismissed in its entirety.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b), Perkins Coie respectfully requests a hearing on its motion to dismiss.  Perkins Coie submits that a hearing would benefit the parties and the Court in light of the sheer length of the complaint and the large number of claims and defendants.  Perkins Coie estimates that a hearing for all parties requesting oral argument would last one hour.

Dated:  May 11, 2022

Respectfully submitted,

Nancy E. Hart (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193

F. Joseph Warin (*pro hac vice*)
Geoffrey M. Sigler (*pro hac vice*)
Katherine Moran Meeks (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306

*/s/ Eleni Kastrenakes Howard*
Eleni Kastrenakes Howard (Fla. Bar No. 0073073)
Howard J. Harrington (Fla. Bar No. 0118719)
AKERMAN LLP
777 South Flagler Drive
Suite 1100, West Tower
West Palm Beach, FL 33401
Telephone:  (561) 653-5000
Fax:  (561) 659-6313
eleni.kastrenakeshoward@akerman.com
jay.harrington@akerman.com

*Attorneys for Perkins Coie LLP*

# Exhibit 1

**REDACTED FOR PUBLIC RELEASE**



# Office of the Inspector General
## U.S. Department of Justice

**OVERSIGHT ★ INTEGRITY ★ GUIDANCE**



# Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation

Oversight and Review Division 20-012                    December 2019 (Revised)

**REDACTED FOR PUBLIC RELEASE**

# NOTICE

This report was originally issued on December 9, 2019.  The report was updated on December 11 and December 20, 2019, with the following changes (page references are to the public version of the report):

- On pages iv, xvi, 400, and 407, we changed the phrase "before and after" to "both during and after the time."  In all instances, the phrase appears in connection to the time period during which we found that the Crossfire Hurricane team used Confidential Human Sources (CHSs) to interact and consensually record conversations with Page and Papadopoulos.  The corrected information appearing in this updated report reflects the accurate information concerning these time periods that previously appeared, and still appears, on pages 305 and 313 (*e.g.,* the statement on page 305 that "the Crossfire Hurricane team tasked CHSs to interact with Page and Papadopoulos both during the time Page and Papadopoulos were advisors to the Trump campaign, and after Page and Papadopoulos were no longer affiliated with the Trump campaign").

- On pages ix, 164, 165, 214, and 364 we removed redactions of certain information related to Person 1.  We also removed redactions throughout the report related to the dates the Carter Page FISA applications were filed and the dates FISA authority expired for each application.  These changes to previously-redacted text were made in response to subsequent decisions made by the Department of Justice and the FBI about the classification of the underlying information.  *See* page 14, footnote 24.

- On pages xi, 242, 368, and 370, we changed the phrase "had no discussion" to "did not recall any discussion or mention."  On page 242, we also changed the phrase "made no mention at all of" to "did not recall any discussion or mention of."  On page 370, we also changed the word "assertion" to "statement," and the words "and Person 1 had no discussion at all regarding WikiLeaks directly contradicted" to "did not recall any discussion or mention of WikiLeaks during the telephone call was inconsistent with."  In all instances, this phrase appears in connection with statements that Steele's Primary Sub-source made to the FBI during a January 2017 interview about information he provided to Steele that appeared in Steele's election reports.  The corrected information appearing in this updated report reflects the accurate characterization of the Primary Sub-source's account to the FBI that previously appeared, and still appears, on page 191, stating that "[the Primary Sub-Source] did not recall any discussion or mention of Wiki[L]eaks."

- On page 57, we added the specific provision of the United States Code where the Foreign Agents Registration Act (FARA) is codified, and revised a footnote in order to reference prior OIG work examining the Department's enforcement and administration of FARA.

- On page 413, we changed the word, "three" to "second and third."  The corrected information appearing in this updated report reflects the accurate description of the Carter Page FISA applications that did not contain the information the FBI obtained from Steele's Primary Sub-source in January 2017 that raised significant questions about the reliability of the Steele reporting.  This information previously appeared, and still appears, accurately on pages xi, xiii, 368, and 372.

# TABLE OF CONTENTS

CHAPTER ONE:  INTRODUCTION ........................................................................ 1

I.     Background and Overview ...................................................................... 1

II.    Prior OIG Reports on FISA and Related Issues ........................................ 9

III.   Methodology ....................................................................................... 11

IV.    Structure of the Report ........................................................................ 14

CHAPTER TWO:  APPLICABLE LAWS AND DEPARTMENT AND FBI POLICIES ......... 16

I.     FBI Counterintelligence Investigations .................................................. 16

       A.     Predicated Investigations ............................................................ 19

       B.     Sensitive Investigative Matters (SIM) .......................................... 21

II.    Department and FBI Policies Governing the Use of Confidential Human
       Sources (CHS) .................................................................................... 22

       A.     Risk Management Issues Related to CHSs ..................................... 22

       B.     Documenting CHS Activities ........................................................ 25

       C.     Validation Process for CHSs ........................................................ 26

       D.     Closure and Re-Opening of CHSs ................................................ 28

       E.     Use of CHSs in Sensitive Monitoring Circumstances ....................... 29

       F.     Use of CHS Reporting in FISA Applications ................................... 30

III.   The Foreign Intelligence Surveillance Act (FISA) .................................... 31

       A.     Statutory Requirements and the Foreign Intelligence Surveillance
              Court ....................................................................................... 31

       B.     FBI and Department FISA Procedures ........................................... 39

              1.     Preparation and Approval of FISA Applications ..................... 39
              2.     "Woods Procedures" ......................................................... 42

IV.    Ethics Regulations .............................................................................. 45

V.     Examples of Other Department and FBI Policies Regulating Investigative
       Activity that Could Potentially Impact Civil Liberties ............................... 46

       A.     Undisclosed Participation ........................................................... 46

       B.     Investigative Activities Concerning Members of the News Media,
              White House and Executive Branch Personnel, and Members of
              Congress .................................................................................. 47

      1.      Members of the News Media ................................................ 47
      2.      White House and Executive Branch Personnel ...................... 48
      3.      Members of Congress and Their Staff .................................. 48

CHAPTER THREE:  THE OPENING OF CROSSFIRE HURRICANE, STAFFING, AND
THE EARLY STAGES OF THE INVESTIGATION ......................................... 49

I.     Intelligence Community Awareness of Attempted Russian Interference in
the 2016 U.S. Elections ....................................................................... 49

II.    The Friendly Foreign Government Information and the FBI's Decision to
Open Crossfire Hurricane and Four Related Counterintelligence
Investigations ..................................................................................... 50

   A.    Receipt of Information from the Friendly Foreign Government and
the Opening of Crossfire Hurricane ............................................... 51

   B.    The FBI Opens Counterintelligence Investigations on Papadopoulos,
Carter Page, Manafort, and Flynn ................................................. 59

   C.    The Pre-Existing FBI New York Field Office Counterintelligence
Investigation of Carter Page ........................................................ 61

III.   Organization and Oversight of the Crossfire Hurricane Investigation ......... 63

   A.    FBI Staffing of the Crossfire Hurricane Investigation ...................... 64

      1.      The Management and Structure of the Crossfire Hurricane
Team .............................................................................. 64
      2.      The Role of Peter Strzok and Lisa Page in Crossfire Hurricane
and Relevant Text Messages ............................................. 66

   B.    The Role of Senior FBI and Department Leadership in the Crossfire
Hurricane Investigation ............................................................... 68

      1.      FBI Leadership .................................................................. 68
      2.      Department of Justice ....................................................... 69
      3.      White House Briefings ....................................................... 76

IV.   Investigative Steps in Crossfire Hurricane Prior to Receipt of Christopher
Steele Reporting on September 19 ....................................................... 77

CHAPTER FOUR:  THE FBI'S RECEIPT AND EVALUATION OF INFORMATION FROM
CHRISTOPHER STEELE PRIOR TO THE FIRST FISA APPLICATION ............. 84

I.     Steele and His Assistance to the FBI Prior to June 2016 ........................... 84

   A.    Introduction to Handling Agent 1 and Early Assistance ................... 84

   B.    The FBI Opens Steele as a CHS in October 2013 ............................ 86

   C.    Steele's Work for the FBI During 2014-2015 ................................. 90

II.    Steele Provides the FBI with Election Reporting in 2016 ........................... 93

A.   Steele's Engagement by Fusion GPS in June 2016 ........................... 93

B.   Steele Informs Handling Agent 1 in July 2016 about his Election Reporting Work ......................................................................... 95

C.   The Crossfire Hurricane Team Receives Steele's Reports on September 19 ........................................................................ 98

D.   The Crossfire Hurricane Team's Initial Handling of the Steele Reporting in September 2016 ..................................................... 101

E.   Steele Discusses His Reporting with Third Parties in Late September 2016 and the *Yahoo News* Article ............................................... 104

F.   The FBI's Early October Meeting with Steele ................................. 108

G.   FBI Disclosures to Steele during the Early October Meeting ........... 114

H.   Steele's Reporting to the FBI Following the Early October Meeting and Continuing Media Contacts .................................................. 116

CHAPTER FIVE:  THE FIRST APPLICATION FOR FISA AUTHORITY ON CARTER PAGE ........................................................................................ 121

I.   Decision to Seek FISA Authority ........................................................ 121

A.   Early Consideration of a Potential FISA ........................................ 121

B.   The FBI's Submission of a FISA Request Following Receipt of the Steele Reporting ...................................................................... 124

II.   Preparation and Approval of the First FISA Application ............................ 128

A.   Initial Drafts ............................................................................. 128

B.   Review and Approval Process ..................................................... 133

    1.   Initial Feedback and NSD Concerns over Steele's Potential Motivation and Bias ......................................................... 134

    2.   FBI Leadership Supports Moving Forward with the FISA Application and OI Drafts Additional Disclosures Concerning Steele ........................................................................... 139

    3.   Other Substantive Changes to the Application before ODAG Review ......................................................................... 144

    4.   October Meeting between Page and an FBI CHS ................... 146
    5.   Feedback from ODAG and Submission of the Read Copy ....... 147

III.  Feedback from the FISC on the Read Copy, Completion of the Woods Procedures, and Final Briefing and Signatures ....................................... 150

A.   Feedback from the FISC and Revisions to the Application .............. 150

B.   The FBI's Completion of the Factual Accuracy Review ("Woods Procedures") ........................................................................... 151

C.   FBI Director's Certification ......................................................... 153

D.    DAG Oral Briefing and Approval .................................................154

E.    Final Orders .............................................................................156

IV.    Inaccurate, Incomplete, or Undocumented Information in the First FISA Application ........................................................................................156

   A.    Information about Page's Prior Relationship with Another U.S. Government Agency and Information Page Provided to the Other Agency that Overlapped with Facts Asserted in the FISA Application ...............................................................................157

   B.    Source Characterization Statement .............................................160

   C.    Information about a Steele Sub-Source Relied Upon in the FISA Application (Person 1) ................................................................163

   D.    September 23 Media Disclosure ..................................................165

   E.    Papadopoulos's Denials to an FBI CHS in September 2016 .............166

   F.    Carter Page's Denials to an FBI CHS in August and October 2016 ...168

CHAPTER SIX:   FBI ACTIVITIES INVOLVING CHRISTOPHER STEELE AFTER THE FIRST FISA AND FBI EFFORTS TO ASSESS STEELE'S ELECTION REPORTING.......................................................................................172

I.    Steele's Briefing to *Mother Jones* and the FBI's Closure of Steele as a CHS in November 2016.........................................................................172

II.    The FBI Receives Additional Steele Reporting Post-Election .....................175

III.    The FBI Disseminates the Steele Reporting to the U.S. Intelligence Community and Seeks to Have It Included in the January 2017 Intelligence Community Assessment.....................................................177

IV.    FBI Validation Efforts Following Steele's Closure as a CHS.......................182

   A.    Information from Persons with Direct Knowledge of Steele's Work-Related Performance in a Prior Position........................................182

   B.    The FBI's Human Source Validation Review of Steele in March 2017 ......................................................................................183

   C.    The FBI Identifies and Interviews the Primary Sub-Source in Early 2017 ......................................................................................186

   D.    The FBI Obtains Additional Information about the Reliability of Steele's Reporting after FISA Renewal Application No. 3 ...............190

   E.    Crossfire Hurricane Team's Assessment of Potential Russian Influence on the Steele Election Reporting ....................................193

V.    The FBI's Efforts to Assess Steele's Election Reporting in 2016 and 2017 ...............................................................................................195

CHAPTER SEVEN:  THE THREE RENEWAL APPLICATIONS FOR CONTINUED FISA
       AUTHORITYON CARTER PAGE ................................................................197

I.     FISA Renewal Application No. 1 (January 12, 2017) ...............................197

       A.    Investigative Developments and Decision to Seek Renewal ............198

       B.    Preparation and Approval of Renewal Application No. 1..................199

             1.    Draft Renewal Application ................................................199
             2.    Review and Approval Process ...........................................204
             3.    Feedback from the FISC, Completion of the Final Renewal
                   Application and Woods Procedures, and Final Legal Review ...207
             4.    FBI Director's Certification ...............................................208
             5.    DAG Oral Briefing and Approval ........................................209
             6.    Final Orders ..................................................................209

II.    FISA Renewal Application No. 2 (April 7, 2017)......................................210

       A.    Case Reorganization, Investigative Developments, and Decision to
             Seek Renewal..................................................................................210

       B.    Preparation and Approval of Renewal Application No. 2..................212

             1.    Draft Renewal Application ................................................212
             2.    Review and Approval Process ...........................................215
             3.    Feedback from the FISC, Completion of the Final Renewal
                   Application and Woods Procedures, and Final Legal Review ...216
             4.    FBI Director's Certification ...............................................218
             5.    Oral Briefing and Approval ...............................................218
             6.    Final Orders ..................................................................219

III.   FISA Renewal Application No. 3 (June 29, 2017)....................................219

       A.    Investigative Developments and Decision to Seek FISA Renewal.....219

       B.    Preparation and Approval of Renewal Application No. 3..................220

             1.    Draft Renewal Application ................................................220
             2.    Review and Approval Process ...........................................224
             3.    Feedback from the FISC, Completion of the Final Renewal
                   Application and Woods Procedures, and FBI Director
                   Certification ..................................................................224
             4.    DAG Oral Briefing and Approval ........................................226
             5.    Final Orders ..................................................................227

CHAPTER EIGHT:  MISSTATEMENTS, OMISSIONS, AND ERRORS IN THE FISA
       RENEWAL APPLICATIONS...................................................................229

I.     Omissions in the FISA Applications, as NSD Reported to the FISC in July
       2018 ...............................................................................................230

       A.    Papadopoulos's Denials to FBI Confidential Human Sources............232

B.    Information the FBI Received From Bruce Ohr Concerning Steele and His Reporting .......................................................................233

C.    Inaccuracies Regarding Steele's Disclosures to Third Parties and Admissions Concerning Steele's *Yahoo News* Contact ....................238

II.   Other Inaccurate, Incomplete, or Undocumented Information in the Three FISA Renewal Applications .................................................................240

A.    Inconsistencies between Steele's Reporting and Information His Primary Sub-source Provided to the FBI.......................................241

B.    Information about Page's Prior Relationship with Another U.S. Government Agency and Information Page Provided the Other Agency that Overlapped with Facts Asserted in the FISA Applications ..............................................................................247

      1.    June 15, 2017—FBI OGC Attorney Requests Information about Page from Other U.S. Government Agency.............249
      2.    June 16, 2017—FBI OGC Attorney Provides the Liaison's Response to the OI Attorney ...........................................251
      3.    June 19, 2017—FBI OGC Attorney Provides SSA 2 with Inaccurate Information....................................................252

C.    Information Concerning Steele's Past Work-Related Performance....256

D.    Information Regarding Steele Reporting's Ties to the Democratic Party, the Democratic National Committee, and the Hillary Clinton Campaign ..................................................................................258

E.    FBI's Source Validation Report Concerning Steele .........................261

F.    Joseph Mifsud's Denials to the FBI .............................................262

G.    Carter Page's Alleged Role in Changing the Republican Platform on Russia's Annexation of Ukraine ..................................................263

CHAPTER NINE:  DEPARTMENT ATTORNEY BRUCE OHR'S ACTIVITIES DURING THE CROSSFIRE HURRICANE INVESTIGATION.......................................268

I.    Bruce Ohr's Background.......................................................................268

A.    Department Positions and Responsibilities....................................268

B.    Ohr's Relationship with Steele and Glenn Simpson ........................269

      1.    Ohr's Relationship with Steele from 2007 to March 2016 ......269
      2.    Ohr's Relationship with Simpson ........................................270

C.    Nellie Ohr's Relationship with Steele and Work for Fusion GPS........271

II.   Ohr's Communications with Steele, Simpson, and the FBI in 2016 and 2017 ...............................................................................................271

A.    Ohr's 2016 Contacts with Steele and Simpson Regarding Russian Issues ......................................................................................272

1.   Ohr's July 30, 2016 Meeting with Steele .............................272
2.   Ohr's August 22, 2016 Meeting with Simpson.....................274
3.   Ohr's September 23, 2016 Meeting with Steele ....................274
4.   Ohr's Early October 2016 Activities Regarding Steele's
     Information.....................................................................275
5.   Ohr's October 18-19, 2016 Communications with Steele and
     Meeting with McCabe and Lisa Page ..................................276
6.   Ohr's November 2016 Communications with the FBI and
     State Department Regarding Steele ...................................278
7.   Ohr's December 2016 Meetings with the FBI and Simpson ....281

B.   Ohr's Continued Contacts with Steele and Simpson from January to
     November 2017.......................................................................283

C.   Ohr's Lack of Notification to ODAG, NSD, and Others Regarding His
     Contacts with Steele, Simpson, and the FBI .................................284

III.   The FBI's Understanding of Its Relationship and Communications with
       Ohr ..................................................................................................286

A.   The Crossfire Hurricane Team's Understanding of Ohr's Activities
     Related to the Investigation ......................................................286

B.   FBI Management's Knowledge of Ohr's Activities............................288

IV.   Ohr's Activities Relating to the Criminal Division's Manafort Investigation..291

A.   November 2016 to December 2016............................................291

B.   January 31 and February 1, 2017 Meetings ..................................295

V.   Ohr's Removal from ODAG and OCDETF...............................................298

A.   ODAG's Communication Expectations and Lack of Knowledge of
     Ohr's Activities ........................................................................298

B.   Ohr Provides Rosenstein with Limited Information about His
     Connection with Steele and Fusion GPS ......................................301

C.   ODAG Learns of Ohr's Activities in Connection to the Russian
     Investigation and Transfers Ohr..................................................302

CHAPTER TEN:  THE USE OF OTHER CONFIDENTIAL HUMAN SOURCES AND
UNDERCOVER EMPLOYEES IN CROSSFIRE HURRICANE............................305

I.   Methodology ...................................................................................306

II.   Background.....................................................................................307

III.   Strategy and Planning for Use of CHSs and UCEs in the Crossfire
       Hurricane Investigation.......................................................................308

A.   Strategy for Use of CHSs and UCEs in Crossfire Hurricane..............308

B.   Planning for Operations Involving CHSs and UCEs.........................309

    C.     Absence of FBI CHSs Inside the Trump Campaign ..........................311

IV.  Use of CHSs and UCEs in the Crossfire Hurricane Investigation ................312

    A.     No CHSs and UCEs Used Prior to the Opening of the Crossfire Hurricane Investigation .............................................................312

    B.     CHS and UCE Involvement in Crossfire Hurricane...........................313

          1.    Source 2.........................................................................313
          2.    Source 3.........................................................................333

    B.     Other CHSs Who Were Not Tasked As Part of Crossfire Hurricane....336

V.   ODNI Strategic Intelligence Briefing Provided to Candidate Trump, Flynn, and Another Trump Campaign Advisor.................................................340

CHAPTER ELEVEN:  ANALYSIS .......................................................................345

I.    The Opening of Crossfire Hurricane and Four Related Counterintelligence Investigations..................................................................................346

    A.     Authorized Purpose ..................................................................347

    B.     Factual Predication...................................................................350

    C.     Sensitive Investigative Matters (SIMs).........................................352

    D.     Staffing of Investigation ............................................................354

    E.     Least Intrusive Investigative Techniques......................................355

II.   The FISA Applications .........................................................................357

    A.     The Role of the Steele Election Reporting in the Applications ..........359

    B.     Inaccurate, Incomplete, or Undocumented Information in the FISA Applications ...........................................................................361

          1.    The First FISA Application ................................................363
          2.    The Three Renewal Applications........................................368
          3.    Failures in the Woods Process ...........................................373

    C.     Conclusions Regarding the FISA Applications.................................375

          1.    The Failure to Share Relevant Factual Information with OI, the Department's Decision Makers, and the Court, and Other FISA Related Errors.........................................................375
          2.    Failure of Managers and Supervisors, including Senior Officials, in the Chain of Command .....................................378
          3.    Clarification Regarding OGC Legal Review During the Woods Process........................................................................380

III.  The FBI's Relationship with Christopher Steele and Its Receipt and Use of His Election Reporting..........................................................................380

    A.     The FBI's Receipt, Use, and Assessment of Steele's Reporting ........382

B.      The Lack of Agreement on Steele's Status as an FBI CHS and its
        Effect on the Crossfire Hurricane Team's Relationship with Steele ...386

IV.   Issues Relating to Department Attorney Bruce Ohr..................................390

      A.      Bruce Ohr's Interactions with Steele, Simpson, the State
              Department, and the FBI ............................................................392

      B.      FBI Interactions with Ohr Concerning Steele and Simpson .............394

      C.      Ethics Issues Raised by Nellie Ohr's Former Employment with
              Fusion GPS ...............................................................................396

      D.      Meetings Involving Ohr, CRM officials, and the FBI Regarding the
              MLARS Investigation ..................................................................397

V.    The Use of Other Confidential Human Sources and Undercover Employees
      and Compliance with Applicable Policies................................................399

      E.      Use of CHSs and UCEs...............................................................401

      F.      Compliance with FBI Policies ......................................................403

      G.      Participation in ODNI Strategic Intelligence Briefing ......................407

CHAPTER TWELVE:  CONCLUSIONS AND RECOMMENDATIONS ........................410

I.    Conclusions......................................................................................410

II.   Recommendations..............................................................................414

APPENDIX 1:  WOODS PROCEDURES............................................................418

APPENDIX 2:  FBI'S RESPONSE....................................................................424

# CHAPTER THREE
# THE OPENING OF CROSSFIRE HURRICANE, STAFFING, AND THE EARLY STAGES OF THE INVESTIGATION

On July 31, 2016, the FBI opened a counterintelligence investigation known as "Crossfire Hurricane." In this chapter, we provide an overview of the opening and initial steps of the Crossfire Hurricane investigation and its related cases. We first summarize the intelligence available to the FBI in the summer of 2016 regarding the Russian government's efforts to interfere with the 2016 U.S. elections. We then describe the events that led to the opening of the Crossfire Hurricane umbrella investigation and the related counterintelligence investigations of George Papadopoulos, Carter Page, Paul Manafort, and Michael Flynn. We also describe the structure and oversight of these investigations, including the FBI's staffing of the cases and the involvement of senior FBI and Department officials. Finally, we describe the early investigative steps taken in furtherance of the investigations.

## I.      Intelligence Community Awareness of Attempted Russian Interference in the 2016 U.S. Elections

At the time the Crossfire Hurricane investigation was opened in July 2016, the U.S. Intelligence Community (USIC), which includes the FBI, was aware of Russian efforts to interfere with the 2016 U.S. elections. The Russian efforts included cyber intrusions into various political organizations, including the Democratic National Committee (DNC) and Democratic Congressional Campaign Committee (DCCC). Throughout spring and early summer 2016, the FBI became aware of specific cyber intrusions for which the Russian government was responsible, through ongoing investigations into Russian hacking operations conducted by the FBI's Cyber Division and the FBI's Counterintelligence Division (CD).

In March and May 2016, FBI field offices identified a spear phishing campaign by the Russian military intelligence agency, known as the General Staff Intelligence Directorate (GRU), targeting email addresses associated with the DNC and the Hillary Clinton campaign, as well as efforts to place malware on DNC and DCCC computer networks. In June and July 2016, stolen materials were released online through the fictitious personas "Guccifer 2.0" and "DCLeaks." In addition, in late July 2016, WikiLeaks released emails obtained from DNC servers as part of its "Hillary Leak Series." By August 2016, the USIC assessed that in the weeks leading up to the 2016 U.S. elections, Russia was considering further intelligence operations to impact or disrupt the elections.

In addition to the Russian infiltration of DNC and DCCC computer systems, between March and August 2016, the FBI became aware of numerous attempts to hack into state election systems. These included confirmed access into elements of multiple state or local electoral boards using tactics, techniques, and procedures

associated with Russian state-sponsored actors.[163]  The FBI learned that Russian efforts also included cyber-enabled scanning and probing of election related infrastructure in several states.

It was in this context that the FBI received information on July 28, 2016, about a conversation between Papadopoulos and an official of a Friendly Foreign Government (FFG) in May 2016 during which Papadopoulos "suggested the Trump team had received some kind of suggestion" from Russia that it could assist this process with the anonymous release of information during the campaign that would be damaging to candidate Clinton and President Obama.  As described below, the FBI opened the Crossfire Hurricane investigation 3 days after receiving this information.

## II.    The Friendly Foreign Government Information and the FBI's Decision to Open Crossfire Hurricane and Four Related Counterintelligence Investigations

On July 31, 2016, the FBI opened the Crossfire Hurricane counterintelligence investigation to determine whether individuals associated with the Donald J. Trump for President Campaign were coordinating or cooperating, wittingly or unwittingly, with the Russian government to influence or interfere with the 2016 U.S. elections. According to the opening Electronic Communication (EC), the investigation was predicated on intelligence from an FFG.  In this section, we describe the receipt of the information from the FFG and the decisions to open the Crossfire Hurricane

---

[163]  Beginning in January 2017 and continuing into 2019, several U.S. government agencies, as well as senior intelligence officials, reported on Russia's efforts to interfere with the 2016 U.S. elections.  For example, the Intelligence Community Assessment (ICA) titled "Assessing Russian Activities and Intentions in Recent U.S. Elections," published on January 6, 2017, concluded that Russian President Vladimir Putin and the Russian government conducted an influence campaign followed by a Russian messaging strategy that blended covert intelligence operations, such as cyber activity, with overt efforts in order to undermine public faith in the U.S. democratic process, denigrate then candidate Clinton, and harm Clinton's electability and potential presidency.  Additionally, in June 2017, during a Senate Select Committee on Intelligence Hearing on Russian Interference in the 2016 U.S. Elections, USIC leadership concurred with the ICA and acknowledged that the Russian government was responsible for compromises of and leaks from political figures and institutions, among other activities, as part of its efforts to influence and interfere in U.S. elections.  Similarly, the Senate Select Committee on Intelligence in 2019 and the House Permanent Select Committee on Intelligence in 2018 found, in part, that the Russian government historically has attempted to interfere in U.S. elections and attempted to interfere in the 2016 U.S. elections through attacks on state voter registration databases, cyber operations targeting governments and businesses using tactics such as spear phishing, hacking operations to include the DNC network, and social media campaigns.  U.S. House Permanent Select Committee on Intelligence, *Report on Russian Active Measures*, 115th Cong., 2d sess., 2018, 114-130.  U.S. Senate Select Committee on Intelligence, *Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume 1: Russian Efforts Against Election Infrastructure with Additional Views,* 116th Cong., 1st sess., 2019, 1-10.  Further, Special Counsel Robert S. Mueller III concluded that the Russian government interfered with the 2016 U.S. elections through a social media campaign that favored then candidate Trump and disparaged then candidate Clinton, and through cyber intrusion operations against entities and individuals working on the Clinton Campaign. *See The Special Counsel's Report*, Vol. I at 1, 4-7.

counterintelligence investigation and the related investigations of Papadopoulos, Page, Manafort, and Flynn.

### A.   Receipt of Information from the Friendly Foreign Government and the Opening of Crossfire Hurricane

By March 2016, Papadopoulos, Page, and Flynn were among several individuals serving as foreign policy advisors for the Trump campaign. Manafort joined the Trump campaign in March 2016 as the campaign convention manager. In the weeks that followed, Papadopoulos met with officials of an FFG in a European city that had arranged several meetings in May 2016 to engage with members of the Trump campaign. During one of these meetings, Papadopoulos reportedly "suggested" to an FFG official that the Trump campaign "received some kind of a suggestion from Russia" that it could assist the campaign by anonymously releasing derogatory information about presidential candidate Hillary Clinton.[164] However, the FFG did not provide information about Papadopoulos's statements to the U.S. government at that time.

On July 26, 2016, 4 days after WikiLeaks publicly released hacked emails from the DNC, the FFG official spoke with a U.S. government (USG) official in the European city about an "urgent matter" that required an in-person meeting. At the meeting, the FFG official informed the USG official of the meeting with Papadopoulos. The FFG official also provided ████████████████████ information from ████████ FFG officials ████████ following the May 2016 meeting (hereinafter referred to as the FFG information). ████████ stated, in part, that Papadopoulos

---

[164] During October 25, 2018 testimony before the House Judiciary and House Committee on Government Reform and Oversight, Papadopoulos stated that the source of the information he shared with the FFG official was a professor from London, Joseph Mifsud. Papadopoulos testified that Mifsud provided him with information about the Russians possessing "dirt" on Hillary Clinton. Papadopoulos raised the possibility during his Congressional testimony that Mifsud might have been "working with the FBI and this was some sort of operation" to entrap Papadopoulos. As discussed in Chapter Ten of this report, the OIG searched the FBI's database of Confidential Human Sources (CHS), and did not find any records indicating that Mifsud was an FBI CHS, or that Mifsud's discussions with Papadopoulos were part of any FBI operation. In Chapter Ten, we also note that the FBI requested information ██
████████████████████████████████████████████████████████████████
████

We refer to Joseph Mifsud by name in this report because the Department publicly revealed Mifsud's identity in The Special Counsel's Report (public version). According to The Special Counsel's Report, Papadopoulos first met Mifsud in March 2016, after Papadopoulos had already learned that he would be serving as a foreign policy advisor for the Trump campaign. According to The Special Counsel's Report, Mifsud only showed interest in Papadopoulos after learning of Papadopoulos's role in the campaign, and told Papadopoulos about the Russians possessing "dirt" on then candidate Clinton in late April 2016. The Special Counsel found that Papadopoulos lied to the FBI about the timing of his discussions with Mifsud, as well as the nature and extent of his communications with Mifsud. The Special Counsel charged Papadopoulos under Title 18 U.S.C. § 1001 with making false statements. Papadopoulos pled guilty and was sentenced to 14 days in prison. *See The Special Counsel's Report*, Vol. 1, at 192-94.

suggested the Trump team had received some kind of suggestion from Russia that it could assist this process with the anonymous release of information during the campaign that would be damaging to Mrs. Clinton (and President Obama).  It was unclear whether he or the Russians were referring to material acquired publicly of [sic] through other means.  It was also unclear how Mr. Trump's team reacted to the offer.  We note the Trump team's reaction could, in the end, have little bearing of what Russia decides to do, with or without Mr. Trump's cooperation.

On July 27, 2016, the USG official called the FBI's Legal Attaché (Legat) and ███████████████████████ in the European city to her office and provided them with the FFG information.[165]  The Legat told us he was not provided any other information about the meetings between the FFG and Papadopoulos.[166]  The Legat also told us that he did not know under what FBI case number the FFG information should be documented and transmitted.  At the recommendation of the European city Assistant Legal Attaché (ALAT) for Counterintelligence, the Legat contacted a former ALAT who at the time was an Assistant Special Agent in Charge (ASAC) in the FBI's Philadelphia Field Office.  The ASAC told the Legat that he believed the FFG information was related to the hack of DNC emails and identified a case number for that investigation for the Legat to use to transmit the information.  The following day, on July 28, 2016, the Legat sent an EC documenting the FFG information to the Philadelphia Field Office ASAC.  The same day, the information in the EC was emailed to the Section Chief of the Cyber Counterintelligence Coordination Section at FBI Headquarters.

From July 28 to July 31, officials at FBI Headquarters discussed the FFG information and whether it warranted opening a counterintelligence investigation.  The Assistant Director (AD) for CD, E.W. "Bill" Priestap, was a central figure in these discussions.  According to Priestap, he discussed the matter with then Section Chief of CD's Counterespionage Section Peter Strzok, as well as the Section Chief of CD's Counterintelligence Analysis Section I (Intel Section Chief); and with representatives of the FBI's Office of the General Counsel (OGC), including Deputy General Counsel Trisha Anderson and a unit chief (OGC Unit Chief) in OGC's National Security and Cyber Law Branch (NSCLB).  Priestap told us that he also discussed the matter with either then Deputy Director (DD) Andrew McCabe or then Executive Assistant Director (EAD) Michael Steinbach, but did not recall discussing the matter with then Director James Comey told the OIG that he did not recall being briefed on the FFG information until after the Crossfire Hurricane investigation was opened, and that he was not involved in the decision to open the case.  McCabe said that although he did not specifically recall meeting with Comey immediately after the FFG information was received, it was "the kind of thing that would have been brought to Director Comey's attention immediately."  McCabe's

---

[165] A Legal Attaché (Legat) is the FBI Director's personal representative in a country in which the FBI has regional responsibility.

[166] According to the Legat, the ███████████████████ stated at the meeting with the USG official that the FFG information "sounds like an FBI matter."

contemporaneous notes reflect that the FFG information, Carter Page, and
Manafort, were discussed on July 29, after a regularly scheduled morning meeting
of senior FBI leadership with the Director.  Although McCabe told us he did not have
an independent recollection of this discussion, he told us that, based upon his
notes, this discussion likely included the Director.  McCabe's notes reflect only the
topic of the discussion and not the substance of what was discussed.

McCabe told us that he recalled discussing the FFG information with Priestap,
Strzok, then Special Counsel to the Deputy Director Lisa Page, and Comey,
sometime before Crossfire Hurricane was opened, and he agreed with opening a
counterintelligence investigation based on the FFG information.  He told us the
decision to open the case was unanimous.  McCabe said the FBI viewed the FFG
information in the context of Russian attempts to interfere with the 2016 U.S.
elections in the years and months prior, as well as the FBI's ongoing investigation
into the DNC hack by a Russian Intelligence Service (RIS).  He also said that when
the FBI received the FFG information it was a "tipping point" in terms of opening a
counterintelligence investigation regarding Russia's attempts to influence and
interfere with the 2016 U.S. elections because not only was there information that
Russia was targeting U.S. political institutions, but now the FBI had received an
allegation from a trusted partner that there had been some sort of contact between
the Russians and the Trump campaign.  McCabe said that he did not recall any
discussion about whether the FFG information constituted sufficient predication for
opening a Full Investigation, as opposed to a Preliminary Investigation, but said
that his belief at the time, based on his experience, was that the FFG information
was adequate predication.[167]

According to Priestap, he authorized opening the Crossfire Hurricane
counterintelligence investigation on July 31, 2016, based upon these discussions.
He told us that the FFG information was provided by a trusted source—the FFG—
and he therefore felt it "wise to open an investigation to look into" whether
someone associated with the Trump campaign may have accepted the reported
offer from the Russians.  Priestap also told us that the combination of the FFG
information and the FBI's ongoing cyber intrusion investigation of the DNC hacks
created a counterintelligence concern that the FBI was "obligated" to investigate.
Priestap said that he did not recall any disagreement about the decision to open
Crossfire Hurricane, and told us that he was not pressured to open the case.

We interviewed all of the senior FBI officials who participated in these
discussions about their reactions to the FFG information and assessments of it as

---

[167] As detailed in Chapter Two, the DIOG provides for two types of predicated investigations,
Preliminary Investigations and Full Investigations.  A Preliminary Investigation may be opened based
upon "any allegation or information" indicative of possible criminal activity or threats to the national
security; a Full Investigation may be opened based upon an "articulable factual basis" of possible
criminal activity or threats to the national security.  In cases opened as Preliminary Investigations, all
lawful investigative methods (including CHS and UCE operations) may be used except for mail
opening, physical searches requiring a search warrant, electronic surveillance requiring a judicial order
or warrant (Title III wiretap or a FISA order), or requests under Title VII of FISA.  A Preliminary
Investigation may be converted to a Full Investigation if the available information provides predication
for a Full Investigation.

predication for Crossfire Hurricane.  Each of these officials told us the information warranted opening a counterintelligence investigation.  For example, Anderson told us that when the information from the Legat arrived it was "really disturbing," and that she told Priestap the information needed to be reviewed by the Deputy Director immediately (Anderson and Priestap, in fact, briefed McCabe that day, July 28). She also told us that the decision to open the case was based upon the concern that the U.S. democratic process could be manipulated by a foreign power. Anderson also told us that "[the FBI] would have been derelict in our responsibilities had we not opened the case," and that a foreign power allegedly colluding with a presidential candidate or his team members was a threat to our nation that the FBI was obligated to investigate under its counterintelligence mission.

Similarly, then FBI General Counsel James Baker told us that everyone was in agreement about opening an investigation because the information came from a trusted intelligence partner, and it concerned a "Russian connection to the Trump campaign."  He told us the FBI had information about the Russian's hacking activities, which they considered "a threat."  Baker could not specifically recall whether Crossfire Hurricane was opened as a Preliminary Investigation or a Full Investigation, but told us that a Full Investigation "would have been justified under these facts."

The Intel Section Chief also told us that he recalled the discussions about the FFG information when it arrived and said no one disagreed with opening a counterintelligence investigation based on the information.  The Intel Section Chief also said that in the context of what was occurring with the DNC hacks and the release of the DNC emails, there was a possibility that the Russians reached out to a campaign to offer their assistance, and the FBI needed to investigate the allegation.  The OGC Unit Chief had the same recollection, telling us that there was no real question about whether to investigate and that her impression was everyone thought the FFG information was so serious that the FBI had to investigate the allegations:  "[T]his is not something we were looking to do, but given the allegations, we thought they were serious enough [that] we had to investigate."

Like Priestap, these officials told us that their evaluation of the FFG information was informed by the FBI's ongoing cyber investigation involving Russia and the DNC hack.  According to the Intel Section Chief and Strzok, when the FFG information arrived, the FBI already had strong corroborating information indicating that senior officials in the Russian government were responsible for directing attacks on the 2016 U.S. elections, including the hack of the DNC.  Anderson said the FBI's ongoing cyber investigation supported the decision to open a counterintelligence case based on the FFG information.  Anderson stated:

> …I don't remember exactly when we felt, you know, the moment in time when we felt that we had Russian attribution, not just to the hack, but also to the release of the emails.  So though that was suspected or we had some information to support that theory for quite some time, but whether you…can attribute that to the Russians with a

high degree of certainty or…not, it sort of puts the whole thing together.  On the one hand you've got the Russian efforts to obtain material that could be used as part of a foreign influence campaign and then on the other hand you've got [this] information about the possibility of collusion between the Russians and members of a presidential candidate's campaign.

Priestap told the OIG that before arriving at a final decision, he considered whether to provide a "defensive briefing" to any member of the Trump campaign in lieu of opening an investigation. According to Priestap, defensive briefings occur when U.S. government or corporate officials are being targeted by a foreign adversary and the FBI determines the officials should be alerted to the potential threat.  Priestap did not recall who first raised the issue of defensive briefings, but said he discussed the subject collaboratively with other FBI officials.  Priestap told us that he ultimately decided not to conduct defensive briefings and explained his reasoning:

While the Counterintelligence Division does regularly provide defensive briefings to U.S. government officials or possible soon to be officials, in my experience, we do this when there is no indication, whatsoever, that the person to whom we would brief could be working with the relevant foreign adversary.  In other words, we provide defensive briefings when we obtain information indicating a foreign adversary is trying or will try to influence a specific U.S. person, and when there is no indication that the specific U.S. person could be working with the adversary.  In regard to the information the [FFG] provided us, we had no indication as to which person in the Trump campaign allegedly received the offer from the Russians.  There was no specific U.S. person identified.  We also had no indication, whatsoever, that the person affiliated with the Trump campaign had rejected the alleged offer from the Russians.  In fact, the information we received indicated that Papadopoulos told the [FFG] he felt confident Mr. Trump would win the election, and Papadopoulos commented that the Clintons had a lot of baggage and that the Trump team had plenty of material to use in its campaign.  While Papadopoulos didn't say where the Trump team had received the "material," one could reasonably infer that some of the material might have come from the Russians.  Had we provided a defensive briefing to someone on the Trump campaign, we would have alerted the campaign to what we were looking into, and, if someone on the campaign was engaged with the Russians, he/she would very likely change his/her tactics and/or otherwise seek to cover-up his/her activities, thereby preventing us from finding the truth.  On the other hand, if no one on the Trump campaign was working with the Russians, an investigation could prove that.  Because the possibility existed that someone on the Trump campaign could have taken the Russians up on their offer, I thought it wise to open an investigation to look into the situation.

McCabe said that he did not consider a defensive briefing as an alternative to opening a counterintelligence case.  He said that based on the FFG information, the FBI did not know if any member of the campaign was coordinating with Russia and that the FBI did not brief people who "could potentially be the subjects that you are investigating or looking for."  McCabe told us that in a sensitive counterintelligence matter, it was essential to have a better understanding of what was occurring before taking an overt step such as providing a defensive briefing.[168]

We also asked those FBI officials involved in the decision to open Crossfire Hurricane whether the FBI received any other information, such as from members of the USIC, that the FBI relied upon to predicate Crossfire Hurricane.  All of them told us that there was no such information and that predication for the case was based solely on the FFG information.[169]  We also asked Comey and McCabe about then CIA Director John Brennan's statements reported in several news articles that he provided to the FBI intelligence on Russian contacts with U.S. persons that predicated or prompted the opening of Crossfire Hurricane.  Comey told us that while Brennan shared intelligence on the overarching efforts by the Russian government to interfere in the 2016 U.S. elections, Brennan did not provide any information that predicated or prompted the FBI to open Crossfire Hurricane.  McCabe said that he did not recall Brennan providing the FBI with information before the FBI's decision to open an investigation about any U.S person potentially cooperating with Russia in the efforts to interfere with the 2016 U.S. elections.  Priestap and the Intel Section Chief also told us that Brennan did not provide the FBI any intelligence that predicated the opening of Crossfire Hurricane.  We did not find information in FBI or Department electronic communications, emails, or other documents, or through witness testimony, indicating otherwise.

On July 31, 2016, the FBI opened a full counterintelligence investigation under the code name Crossfire Hurricane "to determine whether individual(s) associated with the Trump campaign were witting of and/or coordinating activities with the Government of Russia."  As the predicating information did not indicate a specific individual, the opening EC did not include a specific subject or subjects.  As described in Chapter Two, the factual predication required to open a Full Investigation under the Attorney General's Guidelines for Domestic Operations (AG

---

[168] McCabe told us that the decision to brief the DNC and Clinton campaign about the DNC hack was a different situation than the decision not to brief the Trump campaign about allegations of Russian efforts to assist the Trump campaign.  He said that the DNC was a victim of hacking and the FBI had known that the DNC was not responsible for the hacks for some time.

[169] As we describe in Chapter Four, although the FBI first received reporting from Christopher Steele regarding alleged Russian interference in the 2016 U.S. elections in early July 2016, the agents and analysts investigating the FFG information (the Crossfire Hurricane team) did not become aware of the Steele reporting until September 19, 2016.  We found no evidence the Steele election reporting was known to or used by FBI officials involved in the decision to open the Crossfire Hurricane investigation.

In the OIG's *Review of Various Actions in Advance of the 2016 Election*, we describe in Classified Appendix One certain information that the FBI was in possession of in 2016 but the vast majority of which the FBI had not reviewed by June 2018.  Given that timing, we did not see any evidence that any of that information was considered for or part of the predication for the opening of Crossfire Hurricane.

Guidelines) and the FBI's Domestic Investigations and Operations Guide (DIOG) is an "articulable factual basis" that reasonably indicates that one of several circumstances exist:

- An activity constituting a federal crime or a threat to the national security has or may have occurred, is or may be occurring, or will or may occur and the investigation may obtain information relating to the activity or the involvement or role of an individual, group, or organization in such activity;

- An individual, group, organization, entity, information, property, or activity is or may be a target of attack, victimization, acquisition, infiltration, or recruitment in connection with criminal activity in violation of federal law or a threat to the national security and the investigation may obtain information that would help to protect against such activity or threat; or

- The investigation may obtain foreign intelligence that is responsive to a requirement that the FBI collect positive foreign intelligence—*i.e.*, information relating to the capabilities, intentions, or activities of foreign governments or elements thereof, foreign organizations or foreign persons, or international terrorists.

The opening EC describing the predication for Crossfire Hurricane relied exclusively on Papadopoulos's statements to the FFG ▮▮▮▮▮▮▮ in the FFG information.

Crossfire Hurricane was opened by CD and was assigned a case number used by the FBI for possible violations of the Foreign Agents Registration Act (FARA), 22 U.S.C. § 611, *et seq.*, and 18 U.S.C. § 951 (Agents of Foreign Governments).[170]  As described in Chapter Two, the AG Guidelines recognize that activities subject to investigation as "threats to the national security" may also involve violations or potential violations of federal criminal laws, or may serve important purposes outside the ambit of normal criminal investigation and prosecution by informing national security decisions.  Given such potential overlap in subject matter, neither the AG Guidelines nor the DIOG require the FBI to differently label its activities as criminal investigations, national security investigations, or foreign intelligence collections.  Rather, the AG Guidelines state that, where an authorized purpose exists, all of the FBI's legal authorities are available for deployment in all cases to which they apply.[171]

The opening EC also designated Crossfire Hurricane as a "sensitive investigative matter," or SIM, which as described in Chapter Two, includes matters

---

[170]  We have previously found differing understandings between FBI agents and federal prosecutors and NSD officials about the intent of FARA as well as what constitutes a "FARA case."  *See* DOJ OIG, *Audit of the National Security Division's Enforcement and Administration of the Foreign Agents Registration Act*, Audit Division 16-24 (September 2016), https://oig.justice.gov/reports/2016/a1624.pdf (accessed December 19, 2019).

[171]  *See* AG Guidelines § A, II.

involving the activities of a domestic public official or political candidate (involving corruption or a threat to the national security), or a domestic political organization or an individual prominent in such an organization.[172]  The term "domestic political organization" includes, in relevant part, a committee or group formed to elect an individual to public office.  According to David Laufman, then Chief of the National Security Division's (NSD) Counterintelligence and Export Control Section (CES), the case was designated a SIM because it involved a campaign and "people associated with a campaign."  The DIOG requires that cases opened and designated as SIMs by FBI Headquarters be reviewed by OGC and approved by the appropriate FBI Headquarters operational section chief.  The DIOG also requires that the FBI provide an "appropriate NSD official" with written notification of the opening of a SIM.[173]  The DIOG does not impose any additional special requirements on SIMs, but does state particular care should be taken when considering whether a planned course of action is the least intrusive method and if reasonable based upon the circumstances of the investigation.[174]

After Priestap authorized the opening of Crossfire Hurricane, Strzok, with input from the OGC Unit Chief, drafted and approved the opening EC.[175]  Strzok told us that the case agent normally drafts the opening EC for an investigation, but that Strzok did so for Crossfire Hurricane because a case agent was not yet assigned and there was an immediate need to travel to the European city to interview the FFG officials who had met with Papadopoulos.  With respect to the DIOG's notification requirement to NSD, we located in the Crossfire Hurricane case file a Letterhead Memorandum (LHM) dated August 3, 2016, addressed to NSD. However, NSD officials told us that NSD has no record showing it received the LHM, and we were unable to determine whether the FBI in fact provided the LHM to NSD.[176]

In addition to being designated a SIM, witnesses told us that, because the information being investigated related to an ongoing presidential election campaign, the Crossfire Hurricane case file was designated as "prohibited" meaning that access to the file was restricted and viewable to only those individuals assigned to

---

[172] The DIOG requires that if a case is designated as a SIM at the time of opening, the title or case caption must contain the words "Sensitive Investigative Matter."  The opening EC for Crossfire Hurricane met this DIOG requirement.

[173] There is no requirement under the AG Guidelines or the DIOG that a senior Department official approve of or be consulted prior to the opening of an investigation designated a SIM.

[174] The DIOG requires that the least intrusive means or method be considered and—if reasonable based upon the circumstances of the investigation—used to obtain intelligence or evidence in lieu of a more intrusive method.  The concept of least intrusive method applies to the collection of all information.

[175] Strzok was promoted to a CD Section Chief in February 2016, and later to Deputy Assistant Director (DAD) of CD's Operations Branch I on September 4, 2016.

[176] According to FBI documents, although the FBI usually provides an LHM to NSD, "due to the extreme sensitivity of both predication and subject of [Crossfire Hurricane], NSD was orally briefed."  Notes and testimony reflect that in early August, NSD officials were briefed on at least two occasions at FBI Headquarters about the Crossfire Hurricane investigation.

work on the investigation. Agents and analysts referred to the investigation as "close-hold" and, as discussed later in this chapter, used covert investigative techniques to ensure information about the investigation remained known only to the team and FBI and Department officials.

### B.   The FBI Opens Counterintelligence Investigations on Papadopoulos, Carter Page, Manafort, and Flynn

On August 1, 2016, Strzok and a supervisory special agent (SSA 1) traveled to the European city to interview the FFG officials who met with Papadopoulos in May 2016.[177] According to Strzok and SSA 1, during the interview they learned that Papadopoulos did not say that he had direct contact with the Russians; that while his statement did not include him, it did not exclude him either; and that Papadopoulos stated the Russians told "us." Strzok and SSA 1 also said they learned that Papadopoulos did not specify any other individual who received the Russian suggestion. Strzok, the Intel Section Chief, the Supervisory Intelligence Analyst (Supervisory Intel Analyst), and Case Agent 2 told the OIG that, based on this information, the initial investigative objective of Crossfire Hurricane was to determine which individuals associated with the Trump campaign may have been in a position to have received the alleged offer of assistance from Russia.

After conducting preliminary open source and FBI database inquiries, intelligence analysts on the Crossfire Hurricane team identified three individuals—Carter Page, Paul Manafort, and Michael Flynn—associated with the Trump campaign with either ties to Russia or a history of travel to Russia. On August 10, 2016, the team opened separate counterintelligence FARA cases on Carter Page, Manafort, and Papadopoulos, under code names assigned by the FBI. On August 16, 2016, a counterintelligence FARA case was opened on Flynn under a code name assigned by the FBI. The opening ECs for all four investigations were drafted by either of the two Special Agents assigned to serve as the Case Agents for the investigation (Case Agent 1 or Case Agent 2) and were approved by Strzok, as required by the DIOG.[178] Each case was designated a SIM because the individual subjects were believed to be "prominent in a domestic political campaign."[179]

As summarized below, the opening ECs for the investigations provided similar descriptions of the predicating information relied upon to open the cases. The ECs

---

[177] Email exchanges reflect that the FBI planned to interview the FFG officials by telephone; however, the Legat told Strzok that a Senior Executive Service-level (SES) FBI official from CD should make the trip and meet with the FFG officials. Emails also reflect that a USG official advised the FBI that one of the FFG officials the FBI planned to interview would be unavailable on August 9 and suggested the interview take place prior to that date.

[178] Although the opening ECs identified Strzok, SSA 1, and the OGC Unit Chief as approvers, the OGC Unit Chief said that she provided legal review of the opening ECs only. As we described in Chapter Two, when a case is opened and designated a SIM by FBI Headquarters, the case opening requires review by OGC and approval by the FBI Headquarters operational Section Chief (SC).

[179] We did not locate any records that indicated the FBI provided written notification to NSD about the opening of these cases. However, as we described earlier in this chapter, the FBI orally briefed NSD officials on at least two occasions in August 2016 about the Crossfire Hurricane investigation to include Papadopoulos, Manafort, Flynn, and Carter Page.

differed in their descriptions of the particular activities of the subjects that gained the FBI's attention.

- The opening EC for the Carter Page investigation stated that there was an articulable factual basis that Carter Page "may wittingly or unwittingly be involved in activity on behalf of the Russian Federation which may constitute a federal crime or threat to the national security." The EC cross-referenced the predication for Crossfire Hurricane and stated that Page was a senior foreign policy advisor for the Trump campaign, had extensive ties to various Russia-owned entities, and had traveled to Russia as recently as July 2016. The EC also noted that Carter Page was the subject of an open, ongoing counterintelligence investigation assigned to the FBI's New York Field Office (NYFO), which we describe in the next section.

- The opening EC for the Manafort investigation stated that there was an articulable factual basis that Manafort "may wittingly or unwittingly be involved in activity on behalf of the Russian Federation which may constitute a federal crime or threat to the national security." The EC cross-referenced the predication for Crossfire Hurricane and stated that Manafort was designated the Delegate Process and Convention Manager for the Trump campaign, was promoted to Campaign Manager for the Trump campaign, and had extensive ties to pro-Russian entities of the Ukrainian government.

- The opening EC for the Papadopoulos investigation stated that there was an articulable factual basis that Papadopoulos "may wittingly or unwittingly be involved in activity on behalf of the Russian Federation which may constitute a federal crime or threat to the national security." The EC cross-referenced the predication for Crossfire Hurricane and stated that Papadopoulos was a senior foreign advisor for the Trump campaign and had "made statements indicating that he is knowledgeable that the Russians made a suggestion to the Trump team that they could assist the Trump campaign with an anonymous release of information during the campaign that would be damaging to the Clinton Campaign."

- The opening EC for the Flynn investigation stated that there was an articulable factual basis that Flynn "may wittingly or unwittingly be involved in activity on behalf of the Russian Federation which may constitute a federal crime or threat to the national security." The EC cross-referenced the predication for Crossfire Hurricane and stated that Flynn was an advisor to the Trump campaign, had various ties to state-affiliated entities of Russia, and traveled to Russia in December 2015.

### C.   The Pre-Existing FBI New York Field Office Counterintelligence Investigation of Carter Page

The OGC Unit Chief told us that of all the individuals associated with the Trump campaign best positioned to have received the alleged offer of assistance from Russia, Carter Page "quickly rose to the top" of the list because of his past connections to Russian officials and the FBI's previous contacts with Page.  As reflected in the FISA applications described in Chapters Five and Seven, as well as in other FBI documents, NYFO had an interest in Carter Page for several years before August 2016 and had interviewed him on multiple occasions because of his relationships with individuals the FBI knew to be Russian intelligence officers.

An FBI counterintelligence agent in NYFO (NYFO CI Agent) with extensive experience in Russian matters told the OIG that Carter Page had been on NYFO's radar since 2009, when he had contact with a known Russian intelligence officer (Intelligence Officer 1).  According to the EC documenting NYFO's June 2009 interview with Page, Page told NYFO agents that he knew and kept in regular contact with Intelligence Officer 1 and provided him with a copy of a non-public annual report from an American company.  The EC stated that Page "immediately advised [the agents] that due to his work and overseas experiences, he has been questioned by and provides information to representatives of [another U.S. government agency] on an ongoing basis."  The EC also noted that agents did not ask Page any questions about his dealings with the other U.S. government agency during the interviews.[180]

NYFO CI agents believed that Carter Page was "passed" from Intelligence Officer 1 to a successor Russian intelligence officer (Intelligence Officer 2) in 2013 and that Page would continue to be introduced to other Russian intelligence officers in the future.[181]  In June 2013, NYFO CI agents interviewed Carter Page about these contacts.  Page acknowledged meeting Intelligence Officer 2 following an introduction earlier in 2013.  When agents intimated to Carter Page during the interview that Intelligence Officer 2 may be a Russian intelligence officer, specifically, an "SVR" officer, Page told them he believed in "openness" and because

---

[180] On or about August 17, 2016, the Crossfire Hurricane team received a memorandum from the other U.S. government agency detailing its prior relationship with Carter Page, including that Page had been approved as an operational contact for the other agency from 2008 to 2013 and information that Page had provided to the other agency concerning Page's prior contacts with certain Russian intelligence officers.  We found no evidence that, after receiving the August 17 Memorandum, the Crossfire Hurricane team requested additional information from the other agency prior to submission of the first FISA application in order to deconflict on issues that we believe were relevant to the FISA application.  According to the U.S. government agency, "operational contact," as that term is used in the August 17 Memorandum, provides "Contact Approval," which allows the agency to contact and discuss sensitive information with a U.S. person and to collect information from that person via "passive debriefing," or debriefing a person of information that is within the knowledge of an individual and has been acquired through the normal course of that individual's activities.  According to the U.S. government agency, a "Contact Approval" does not allow for operational use of a U.S. person or tasking of that person.

[181] CI agents refer to this as "slot succession," whereby a departing intelligence officer "passes" his or her contacts to an incoming intelligence officer.

he did not have access to classified information, his acquaintance with Intelligence Officer 2 was a "positive" for him.  In August 2013, NYFO CI agents again interviewed Page regarding his contacts with Intelligence Officer 2.  Page acknowledged meeting with Intelligence Officer 2 since his June 2013 FBI interview.

In January 2015, three Russian intelligence officers, including Intelligence Officer 2, were charged in a sealed complaint, and subsequently indicted, in the Southern District of New York (SDNY) for conspiring to act in the United States as unregistered agents of the Russian Federation.[182]  The indictment referenced Intelligence Officer 2's attempts to recruit "Male-1" as an asset for gathering intelligence on behalf of Russia.

On March 2, 2016, the NYFO CI Agent and SDNY Assistant United States Attorneys interviewed Carter Page in preparation for the trial of one of the indicted Russian intelligence officers.  During the interview, Page stated that he knew he was the person referred to as Male-1 in the indictment and further said that he had identified himself as Male-1 to a Russian Minister and various Russian officials at a United Nations event in "the spirit of openness."  The NYFO CI Agent told us she returned to her office after the interview and discussed with her supervisor opening a counterintelligence case on Page based on his statement to Russian officials that he believed he was Male-1 in the indictment and his continued contact with Russian intelligence officers.

The FBI's NYFO CI squad supervisor (NYFO CI Supervisor) told us she believed she should have opened a counterintelligence case on Carter Page prior to March 2, 2016 based on his continued contacts with Russian intelligence officers; however, she said the squad was preparing for a big trial, and they did not focus on Page until he was interviewed again on March 2.  She told us that after the March 2 interview, she called CD's Counterespionage Section at FBI Headquarters to determine whether Page had any security clearances and to ask for guidance as to what type of investigation to open on Page.[183]  On April 1, 2016, the NYFO CI Supervisor received an email from the Counterespionage Section advising her to open a ▮▮▮▮▮▮▮▮ investigation on Page.  The NYFO CI Supervisor said that ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  In addition, according to FBI records, the relevant CD section at FBI Headquarters, in consultation with OGC, determined at that time that the Page investigation opened by NYFO was not a SIM, but also noted, "should his status change, the appropriate case modification would be made."  The NYFO CI Supervisor told us that based on what was documented in

---

[182] Intelligence Officer 3 pled guilty in March 2016.  The remaining two indicted Russian intelligence officers were no longer in the United States.

[183] CI agents in NYFO told us that the databases containing security clearance information were located at FBI Headquarters.  When a subject possesses a security clearance, the FBI opens an espionage investigation; if the subject does not possess a security clearance, the FBI typically opens a counterintelligence investigation.

the file and what was known at that time, the NYFO Carter Page investigation was not a SIM.

Although Carter Page was announced as a foreign policy advisor for the Trump campaign prior to NYFO receiving this guidance from FBI Headquarters, the NYFO CI Supervisor and CI Agent both told the OIG that this announcement did not influence their decision to open a case on Page and that their concerns about Page, particularly his disclosure to the Russians about his role in the indictment, pre-dated the announcement. However, the NYFO CI Supervisor said that the announcement required noting his new position in the case file should his new position require he obtain a security clearance.

On April 6, 2016, NYFO opened a counterintelligence ▮▮▮▮▮ investigation on Carter Page under a code name the FBI assigned to him (NYFO investigation) based on his contacts with Russian intelligence officers and his statement to Russian officials that he was "Male-1" in the SDNY indictment. Based on our review of documents in the NYFO case file, as well as our interview of the NYFO CI Agent, there was limited investigative activity in the NYFO investigation between April 6 and the Crossfire Hurricane team's opening of its investigation of Page on August 10. The NYFO CI Agent told the OIG that the steps she took in the first few months of the case were to observe whether any other intelligence officers contacted Page and to prepare national security letters seeking Carter Page's cell phone number(s) and residence information. The NYFO CI agent said that she did not use any CHSs to target Page during the NYFO investigation. The NYFO investigation was transferred to the Crossfire Hurricane team on August 10 and became part of the Crossfire Hurricane investigation.

## III.   Organization and Oversight of the Crossfire Hurricane Investigation

The FBI conducted and oversaw the Crossfire Hurricane investigation from July 31, 2016, to May 17, 2017, at which time it was transferred to the Special Counsel's Office. Over that 10-month period, three different teams of agents and analysts were assigned to the case: the first team worked out of FBI Headquarters from the opening of the case through December 2016; the second team worked out of three FBI field offices and FBI Headquarters from approximately January 2017 through April 2017; and the third team worked, like the second team, out of the three FBI field offices and FBI Headquarters from April 2017 to May 17, 2017. In this section, we describe the organization and staffing of the three investigative teams and the FBI's reasons for making changes as to how the investigation was organized. We also describe the role played by FBI and Department senior leadership in the investigation.

### H.   Steele's Reporting to the FBI Following the Early October Meeting and Continuing Media Contacts

Steele continued to furnish the FBI with written reports following the early October meeting.  Handling Agent 1 told us that he became a "middleman" between Steele and the Crossfire Hurricane team and forwarded Steele's reports to the team.  According to Handling Agent 1's records, during October 2016, Steele communicated with him four times and provided seven written reports, one of which concerned Carter Page and thus was responsive to the FBI's request for information concerning Page's activities.[253]

On October 19, 2016, Steele also forwarded to Handling Agent 1 a report that Steele said he had obtained from State Department official Jonathan Winer. Steele included a notation on the report explaining that Winer had been given the report by a friend of a well-known Clinton supporter, and that the friend had obtained the report from a Turkish businessman with strong links to Russia, including the Federal Security Service of the Russian Federation (FSB).[254]  The report included numerous allegations attributed to an FSB source, including that (1) a "'pervasive' and 'sophisticated' intelligence operation" was focused in part on

---

[253] These seven reports, with selected highlights, were:

- Report 130 (Putin and his colleagues were surprised and disappointed that leaks of Clinton's emails had not had a greater impact on the campaign; a stream of hacked Clinton material had been injected by the Kremlin into compliant western media outlets like WikiLeaks and the stream would continue until the election);

- Report ███████████████████████████████████████████████████████;

- Report 134 (a close associate of Rosneft President Sechin confirmed a secret meeting with Carter Page in July; Sechin was keen to have sanctions on the company lifted and offered up to a 19 percent stake in return);

- Report 135 (Trump attorney Michael Cohen was heavily engaged in a cover up and damage control in an attempt to prevent the full details of Trump's relationship with Russia being exposed; Cohen had met secretly with several Russian Presidential Administration Legal Department officials; immediate issues were efforts to contain further scandals involving Manafort's commercial and political role in Russia/Ukraine and to limit damage from the exposure of Carter Page's secret meetings with Russian leadership figures in Moscow the previous month);

- Report 136 (Kremlin insider reports that Cohen's secret meeting/s with Kremlin officials in August 2016 was/were held in Prague);

- Report ████████████████████████████████████████████████████████████;

  and

- Report ██████████████████████████████████████.

[254] According to open source reporting, the FSB serves as Russia's domestic intelligence and security service that retains a broad mission of counterintelligence, counterterrorism, cyber defense, border security, and economic security, in addition to overseeing Russia's vast technical monitoring system known as SORM.

Trump and was an "open secret" in Putin's government; (2) sex videos existed of
Trump; and (3) the FSB funneled payments to Trump through an Azerbaijani
family.  According to Steele's notation to the report, Steele did not have a way to
verify the source(s) or the information but noted that, even though the reporting
originated from a different source network, some of it was "remarkably similar" to
Steele's reporting, especially with regard to the alleged 2013 Ritz Carlton incident
involving Trump and prostitutes, Trump's compromise by the FSB, and the
Kremlin's funding of the Trump campaign by way of the Azerbaijani family.  The
Supervisory Intel Analyst characterized the report as "yet another report that would
need to be evaluated."

In addition to continuing to provide reporting to the FBI, Steele also was,
unbeknownst to the FBI at the time, continuing his outreach to the media
concerning alleged contacts between the Trump campaign and the Russian
government.  According to information from the foreign litigation noted above,
Steele returned to Washington, D.C., in mid-October and provided additional
briefings to *The New York Times*, *The Washington Post*, and *Yahoo News*.  We
asked Steele why he did not advise the FBI of his engagements with the media.  He
stated that he did not alert the FBI because the media briefings were part of his
contract with Fusion GPS and were set up and attended by Simpson.  As noted
above, Steele did not believe that the FBI had raised the issue of media contacts
with him at the early October meeting, and his contemporaneous notes from that
meeting do not mention the issue.

Further, Steele met on October 11 at the State Department with Winer and
Deputy Assistant Secretary Kathleen Kavalec, who was a deputy to then Assistant
Secretary Victoria Nuland.  Steele told us that Winer had originally contacted him to
request that he meet with Nuland, who ultimately did not attend.[255]  Notes of the
meeting taken by State Department staff reflect that Steele addressed a wide array
of topics during the meeting, including:

- Derogatory information on Trump;
- Manafort's role as a "go-between" with the campaign and Kremlin;
- The role of Alfa Bank, one of Russia's largest privately owned banks,
  as a conduit for secret communications between Manafort and the
  Kremlin;
- Manafort's debts to the Russians;
- Carter Page's meeting with Sechin;
- The Russian Embassy's management of a network of Russian émigrés
  in the United States who carry out hacking and recruiting operations;
  and

---

[255] Steele told us that he was delayed from the airport and arrived late for the meeting, by
which time Nuland had departed.

- The Russian cyber penetration of the DNC.[256]

The notes also indicate that Steele explained that the information his firm collected on the connection between Trump and Russia came from ███████████, █



According to the notes, Steele stated that ████████████████████████████ The notes also state that Steele's firm had ████████████████████

   We asked Kavalec about the meeting with Steele.  She stated that Nuland did not ask to meet with Steele and that Nuland requested she attend the meeting because Nuland did not want to devote time to it.  It was Kavalec's understanding that Steele sought the meeting with Nuland as part of a wider effort to disseminate his election report findings to persons in Washington, D.C.  She stated that during the meeting Steele expressed frustration that the FBI had not acted on his reporting and explained that when he first offered information to the FBI he found a lack of interest.

   Kavalec told us that shortly after the meeting with Steele, she encountered the FBI's liaison to the State Department and mentioned the meeting to him.  According to Kavalec, she explained to the liaison that she was willing to be interviewed by the FBI regarding her meeting with Steele, though Steele had informed her that he had already been in contact with the FBI to share his reporting.  The FBI liaison told us that Kavalec also informed him that a particular piece of information in Steele's reporting appeared to be incorrect.  She explained to the FBI liaison that Russia did not have a consulate in Miami as indicated by Steele's reporting, which claimed that a cyber-hacking operation was being run, in part, out of the Russian consulate in Miami.[257]  The FBI liaison informed SSA 1 and Case Agent 1 via email on November 18 that Kavalec had met with Steele, she had taken notes of their meeting, the liaison could obtain information from Kavalec about the meeting, and, according to Kavalec, the information from Steele's reporting about a Russian consulate being located in Miami was inaccurate.[258]  The

---

[256] Much of the information presented by Steele at the State Department briefing can be found in Reports 130 and 132, both of which Steele provided to the FBI in October.

[257] Kavalec's typed notes from Steele's October 11, 2016 briefing stated that Steele told her that a Russian cyber hacking operation targeting the 2016 U.S. elections was making payments to involved persons from "the Russian [c]onsulate in Miami."  Steele's election Report 95 contained similar, but not fully consistent, information.  Report 95 did not explicitly state that there was a Russian consulate in Miami.  Instead, Report 95 stated that Russian consular officials and diplomatic staff in Miami were making payments in order to facilitate a secret exchange of intelligence between persons affiliated with Trump and the Russian government.

[258] After reviewing a portion of our draft report and his November 18, 2016 email to SSA 1 and Case Agent 1, the FBI liaison told us that he believes that he first learned about Kavalec's meeting with Steele on or about November 18, 2016.

FBI liaison told us that he received no directives from the Crossfire Hurricane team to gather information from Kavalec regarding her contact with Steele.

In anticipation of an FBI interview, Kavalec said she prepared a typewritten summary of the meeting within 1 to 2 weeks after talking with the liaison. The typed summary began by noting that Steele said at the meeting that he had undertaken the investigation "at the behest of an institution he declined to identify that had been hacked." The summary also noted that Steele told the attendees that the "institution…is keen to see this information come to light prior to November 8." However, the FBI did not interview Kavalec nor did they seek her notes.

Two days after the meeting with Steele, Kavalec emailed an FBI CD Section Chief a document that Kavalec received from Winer discussing allegations about a linkage between Alfa Bank and the Trump campaign, a topic that was discussed at the October 11 meeting.[259] Kavalec advised the FBI Section Chief in the email that the information related to an investigation that Steele's firm had been conducting. The Section Chief forwarded the document to SSA 1 the same day.

We asked Steele why he did not inform the FBI of the meeting at the State Department and why he did not abide by the FBI's request for exclusivity. He said he did not think it was appropriate to turn down a meeting request from an Assistant Secretary of State, which he said he received on short notice. He also stated that, at the time he received the meeting request, the meeting agenda was unclear, and he was uncertain what topics he would be asked to discuss. He said it was his understanding that the FBI did not object to his discussing general themes with other agencies as opposed to "details" about his intelligence and source network.

Handling Agent 1 told us that he believed Steele should have alerted him to both his media contacts in September and October and his meeting with State Department staff in October. As noted above, the Crossfire Hurricane team first learned of Steele's October meeting with the State Department from the FBI liaison on November 18, by which date the FBI had already closed Steele as a CHS because of his *Mother Jones* disclosure, which we discuss in Chapter Six. Handling Agent 1 explained that Steele should have recognized the need to provide this notice to the FBI, especially given the discussions that took place with the Crossfire Hurricane team in early October.

---

[259] Steele separately wrote in Report 112, dated September 14, 2016, that Alfa Bank allegedly had close ties to Putin. The Crossfire Hurricane team received Report 112 on or about November 6, 2016, from a *Mother Jones* journalist through then FBI General Counsel James Baker. Additionally, Ohr advised the FBI on November 21, 2016, according to an FBI FD-302, that Steele had told Ohr that the Alfa Bank server was a link to the Trump campaign and that Person 1's Russia/American organization in the U.S. had used the Alfa Bank server two weeks prior. Steele told us that the information about Alfa Bank was not generated by Orbis. The FBI investigated whether there were cyber links between the Trump Organization and Alfa Bank, but had concluded by early February 2017 that there were no such links. The Supervisory Intel Analyst told us that he factored the Alfa Bank/Trump server allegations into his assessment of Steele's reporting.

# CHAPTER ELEVEN
## ANALYSIS

In this chapter, we provide the OIG's analysis of the events described in Chapter Three through Chapter Ten. We divide our analysis into five sections. In Section I, we discuss whether the opening of the Crossfire Hurricane investigation and four related investigations, and whether certain early investigative techniques used by the FBI, complied with the requirements of the Attorney General's Guidelines for Domestic FBI Operations (AG Guidelines) and the FBI's Domestic Investigations and Operations Guide (DIOG).

In Section II, we analyze the role of Christopher Steele's election reporting in the four Carter Page Foreign Intelligence Surveillance Act (FISA) applications and the numerous instances in which factual representations in those applications were inaccurate, incomplete, or unsupported by appropriate documentation, based upon information the FBI had in its possession at the time the applications were filed. In Section III, we analyze the FBI's handling of Christopher Steele and his election reporting, and whether the FBI's receipt and use of his reporting during the Crossfire Hurricane investigation complied with FBI Confidential Human Source (CHS) policies and procedures.

Section IV examines issues relating to Department attorney Bruce Ohr's interactions with Steele, Glenn Simpson, the FBI, and the State Department during the Crossfire Hurricane investigation, as well as whether the work Ohr's spouse performed for Simpson's firm implicated any ethical rules applicable to Ohr. We also analyze Ohr's interactions with Department attorneys and FBI officials concerning the Department's criminal investigation of Paul Manafort.

Lastly, in Section V, we focus on the FBI's use of CHSs, other than Steele, and Undercover Employees (UCEs) in the Crossfire Hurricane investigation and analyze whether the Crossfire Hurricane team's use of such individuals complied with Department and FBI policies. We also analyze the attendance of an FBI Supervisory Special Agent (SSA) assigned to the Crossfire Hurricane investigation at counterintelligence briefings given to the 2016 presidential candidates and certain campaign advisors.

As we explained in Chapter One, we did not analyze all of the decisions in the Crossfire Hurricane investigation. Rather, we reviewed the topics described above. Moreover, our role in this review was not to second-guess discretionary judgments by Department personnel about whether to open an investigation, or specific judgment calls made during the course of an investigation, where those decisions complied with or were authorized by Department rules, policies, or procedures. We do not criticize particular decisions merely because we might have recommended a different investigative strategy or tactic based on the facts learned during our investigation. The question we considered was not whether a particular investigative decision was ideal or could have been handled more effectively, but rather whether the Department and the FBI complied with applicable legal requirements, policies, and procedures in taking the actions we reviewed, or,

alternatively, whether the circumstances surrounding a decision indicated that it was based on inaccurate or incomplete information, or considerations other than the merits of the investigation. If the explanations we were given for a particular decision were consistent with legal requirements, policies, and procedures, and were not unreasonable, we did not conclude that the decision was based on improper considerations in the absence of documentary or testimonial evidence to the contrary.

## I.  The Opening of Crossfire Hurricane and Four Related Counterintelligence Investigations

In this section, we examine the opening of Crossfire Hurricane and four related counterintelligence investigations of individuals associated with the Donald J. Trump for President Campaign. Specifically, we analyze whether, in opening these investigations, the FBI complied with the requirements set forth in the AG Guidelines and the DIOG.

The applicable provisions of the AG Guidelines and the DIOG require that FBI investigations be undertaken for an "authorized purpose"—that is, "to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security or to collect foreign intelligence." The AG Guidelines also require that FBI investigations have adequate factual predication—that is, allegations, reports, facts, or circumstances indicative of possible criminal activity or a national security threat. In addition, for investigations designated as Sensitive Investigative Matters (SIMs), such as Crossfire Hurricane, the DIOG imposes special approval and notification requirements when opening such a matter. The DIOG also emphasizes that investigators take particular care to consider whether a planned investigative activity is the least intrusive method and is reasonably based upon the needs of the investigation.

As described in Chapter Three, on July 31, 2016, the FBI's Counterintelligence Division (CD) opened a Full Investigation titled "Crossfire Hurricane" to determine whether individual(s) associated with the Trump campaign were "witting of and/or coordinating activities with the Government of Russia." The opening of the investigation occurred days after WikiLeaks publicly released hacked emails from the Democratic National Committee (DNC). According to the FBI Electronic Communication (EC) documenting the decision, the investigation was opened in response to information CD officials received on July 28, 2016, from a Friendly Foreign Government (FFG) indicating that in a May 2016 meeting with the FFG, George Papadopoulos, an advisor to the Trump campaign, "suggested the Trump team had received some kind of a suggestion" from Russia that it could assist in the election process with the anonymous release of information during the campaign that would be damaging to candidate Clinton and President Obama. We did not find information in FBI or Department emails, or other documents, or through witness testimony, indicating that any information other than the FFG information was relied upon to predicate the opening of the Crossfire Hurricane investigation. However, as noted below, the FBI received the FFG information at a time when it had reason to believe that Russia may have been connected to the

WikiLeaks disclosures that occurred earlier in July 2016, and when the U.S. Intelligence Community (USIC), including the FBI, was aware of Russia's efforts to interfere with 2016 U.S. elections.

In the following weeks, the FBI also opened related counterintelligence investigations into four individuals associated with the Trump campaign—Papadopoulos, Carter Page, Michael Flynn, and Paul Manafort—because the FBI identified these individuals as having alleged ties to Russia or a history of travel to Russia.

We concluded that the FBI's decision to open Crossfire Hurricane and the four related individual investigations was, under Department and FBI policy, a discretionary judgment call and that the FBI's exercise of discretion was in compliance with those policies. For the reasons described below, we found that each investigation was opened for an authorized purpose and, in light of the low threshold established by Department and FBI predication policy, with adequate factual predication. We also found that the FBI satisfied the DIOG's notification and approval requirements for designating Crossfire Hurricane and the four related individual investigations as SIMs. Nevertheless, we were concerned about the limited notice requirements under Department and FBI policy before opening investigations such as these, relating to constitutionally protected activity occurring during a national presidential campaign. We were also concerned about the limited notice requirements before using more intrusive investigative techniques that could impact constitutionally protected activity. Accordingly, we make several recommendations below to address these concerns.

### A.    Authorized Purpose

The AG Guidelines and the DIOG both require that FBI investigations be undertaken for an "authorized purpose"—that is, "to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security or to collect foreign intelligence." Under both the AG Guidelines and the DIOG, the FBI may not undertake an investigation for the sole purpose of monitoring activities protected by the First Amendment or to interfere with the lawful exercise of other rights secured by the Constitution or laws of the United States. However, both the AG Guidelines and the DIOG permit the FBI to conduct an investigation, even if it might impact First Amendment or other constitutionally protected activity, so long as there is a legitimate law enforcement purpose associated with the investigation.

We concluded that, under the AG Guidelines and the DIOG, the FBI had an authorized purpose when it opened Crossfire Hurricane to obtain information about, or to protect against, a national security threat or federal crime, even though the investigation also had the potential to impact constitutionally protected activity. The FBI's opening EC referenced the Foreign Agents Registration Act (FARA) and stated, "[b]ased on the information provided by [the FBI Legal Attaché], this investigation is being opened to determine whether individual(s) associated with the Trump campaign are witting of and/or coordinating activities with the Government of Russia." We found that the FBI opened the Crossfire Hurricane

investigation shortly after officials in CD received the FFG information on July 28. The opening EC documented the pertinent FFG information verbatim and described relevant background information. All of the senior FBI officials who participated in the discussions about whether to open a case told us the information from the FFG warranted investigation. For example, the FBI's then Deputy General Counsel told us that the FBI "would have been derelict in our responsibilities had we not opened the case," because a foreign power allegedly colluding with a presidential candidate or his campaign was a threat to our nation that the FBI was obligated to investigate under its counterintelligence mission.

Then CD Assistant Director E.W. "Bill" Priestap, who approved opening the case, told us that the combination of the FFG information and the FBI's ongoing cyber intrusion investigation into the July 2016 hacks of the DNC's emails created a counterintelligence concern that the FBI was "obligated" to investigate. Priestap also told us that, prior to making the final decision to approve the opening of Crossfire Hurricane, he considered whether the FBI should conduct defensive briefings for the Trump campaign about the information from the FFG. However, Priestap ultimately decided that providing such briefings created the risk that "if someone on the campaign was engaged with the Russians, he/she would very likely change his/her tactics and/or otherwise seek to cover-up his/her activities, thereby preventing us from finding the truth." We did not identify any Department or FBI policy that applied to this decision and therefore determined that the decision whether to conduct defensive briefings in lieu of opening an investigation, or at any time during an investigation, was a judgment call that is left to the discretion of FBI officials.[482]

As part of our review, we sought to determine whether there was evidence that political bias or other improper considerations affected decision making in Crossfire Hurricane, including the decision to open the investigation. Such evidence would raise questions as to whether Crossfire Hurricane was opened for an authorized purpose, and serious concerns about whether the decision compromised the constitutional rights of any U.S. persons. We discussed the issue of political bias in a prior OIG report, *Review of Various Actions in Advance of the 2016 Election*, where we described text messages between then Special Counsel to the Deputy Director Lisa Page and then Section Chief Peter Strzok, among others. These text messages included statements of hostility toward then candidate Trump and statements of support for then candidate Hillary Clinton. These messages, most of which pertained to the Russia investigation, potentially indicated or created the appearance that investigative decisions were impacted by bias or improper considerations. Our prior review stated that the text messages were "not only

---

[482] Later in this chapter, we recommend that the Department and FBI evaluate which types of sensitive investigative matters should require advance notification to a senior Department official, such as the Deputy Attorney General, in addition to the notifications currently required for such matters, especially for opening investigations that implicate core First Amendment activity and raise policy considerations or heighten enterprise risk. Such a requirement would not only give senior Department leadership the opportunity to consider the constitutional and prudential issues associated with opening certain investigations but also the opportunity to consult with the FBI about whether to conduct a defensive briefing in a circumstance such as this one.

indicative of a biased state of mind but, even more seriously, impl[y] a willingness
to take official action to impact [Trump's] electoral prospects." For example, on
July 31, 2016, in connection with the formal opening of Crossfire Hurricane, Strzok
texted Page: "And damn this feels momentous. Because this matters. The
[Clinton email investigation] did, too, but that was to ensure we didn't F something
up. This matters because this MATTERS. So super glad to be on this voyage with
you." Additionally, on August 8, 2016, Page sent a text message to Strzok that
stated, "[Trump's] not ever going to become president, right? Right?!" Strzok
responded, "No. No he's not. We'll stop it." Although we did not find in our prior
report any documentary or testimonial evidence directly connecting the political
views stated in the text messages to the specific investigative actions in Midyear
that we reviewed, we concluded that Strzok's text messages with Page indicated or
created the appearance of bias against Trump. We further concluded that the
messages raised serious questions about the propriety of any investigative
decisions in which Strzok and Lisa Page played a role. Because several of these
inappropriate and troubling messages occurred at or near the time of the opening
of Crossfire Hurricane, we closely reviewed the roles of Strzok and Lisa Page in the
investigation's opening and whether there was any documentary or testimonial
evidence that their views impacted the decision to open the investigation.

We found that while she attended some of the discussions, Lisa Page did not
play a role in the decision to open Crossfire Hurricane or the four individual cases.
Strzok was directly involved in the decisions to open Crossfire Hurricane and the
four individual cases, but we found that he was not the sole, or even the highest
level decision maker as to any of those matters. Priestap, Strzok's supervisor, told
us that ultimately he was the official who made the decision to open the Crossfire
Hurricane investigation, and Strzok then prepared and approved the formal
documentation, as required by the DIOG. Evidence reflected that this decision by
Priestap was reached by consensus after multiple days of discussions and meetings
that included Strzok and other leadership in CD, the FBI Deputy Director, the FBI
General Counsel, and the FBI Deputy General Counsel. We similarly found that the
decisions to open the four individual cases were reached by consensus of Crossfire
Hurricane agents and analysts who identified individuals associated with the Trump
campaign who had recently travelled to Russia or had other alleged ties to Russia,
and that Priestap was involved in those decisions. The formal documentation
opening each of these four investigations was approved by Strzok, as required by
the DIOG.

We did not find documentary or testimonial evidence that political bias or
improper motivation influenced Priestap's decision to open Crossfire Hurricane. The
evidence also showed that FBI officials responsible for and involved in the case
opening decisions were unanimous in their belief that, together with the July 2016
release by WikiLeaks of hacked DNC emails, the Papadopoulos statement described
in the FFG information reflected the Russian government's potential next step to
interfere with the 2016 U.S. elections. These FBI officials were similarly unanimous
in their belief that the FFG information represented a threat to national security that
warranted further investigation by the FBI. Witnesses told us that they did not

recall observing during these discussions any instances or indications of improper motivations or political bias on the part of the participants, including Strzok.

We also reviewed the text messages and emails of each of the FBI officials, in addition to Strzok, who participated in the decision to open Crossfire Hurricane and the four individual cases, and did not identify any statements in those communications that indicated or suggested the decision could have been affected by political bias or other improper considerations. We also reviewed other contemporaneous documents, such as meeting notes, and asked witnesses who were not involved in the decision to open Crossfire Hurricane but who were familiar with the predication for the case for any evidence of political bias or improper motivation in the FBI's decision making. Again, we found no such evidence, including from Department officials briefed about Crossfire Hurricane subsequent to it being opened. These officials also did not express any concerns about the FBI's decision to open the investigation. By way of example, David Laufman, then Chief of the National Security Division's (NSD) Counterintelligence and Export Control Section (CES), told us that it would have been "a dereliction of duty and responsibility of the highest order not to commit the appropriate resources as urgently as possible to run these facts to the ground, and find out what was going on."

We therefore concluded the FBI met the requirement in the AG Guidelines and the DIOG that Crossfire Hurricane be opened for an "authorized purpose," namely "to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security or to collect foreign intelligence." We also determined that, although the investigation had the potential to impact constitutionally protected activity, the FBI's decision to open the investigation was permissible under both Department and FBI policies because there was a legitimate law enforcement purpose associated with the investigation. Nevertheless, we believe that investigations affecting core First Amendment activity and national political campaigns raise significant constitutional and prudential issues and therefore we recommend below that Department policy require advance notification to a senior Department official, such as the Deputy Attorney General (DAG), before a Department component opens such an investigation so that Department leadership can consider these issues from the outset.

## B.    Factual Predication

In addition to requiring an authorized purpose, Department and FBI policy also mandate that each case have adequate factual predication before being initiated. The predication requirement is not a legal requirement but rather a prudential one imposed by Department and FBI policy. For example, the Supreme Court has held that the Department and FBI can lawfully open a federal criminal grand jury investigation even in the absence of predication. *See United States* v. *Morton Salt*, 338 U.S. 632, 642-43 (1950) (a grand jury "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not"); *see also United States* v. *R. Enterprises*, 498 U.S. 292, 297 (1991).

The AG Guidelines generally describe predication as allegations, reports, facts, or circumstances indicative of possible criminal activity or a national security threat, or the potential for acquiring information responsive to foreign intelligence collection requirements.  For full counterintelligence investigations such as Crossfire Hurricane and the four related individual investigations, Section II.B.4 of the AG Guidelines and Section 7 of the DIOG state that the required level of predication is an "articulable factual basis" that "reasonably indicates" that any one of three defined circumstances exists, including:

> An activity constituting a federal crime or a threat to the national security has or may have occurred, is or may be occurring, or will or may occur and the investigation may obtain information relating to the activity or the involvement or role of an individual, group, or organization in such activity.[483]

The AG Guidelines and the DIOG do not provide heightened predication standards for sensitive matters, or for allegations potentially impacting constitutionally protected activity, such as First Amendment rights.  Rather, as we discuss below, the approval and notification requirements contained in the AG Guidelines and DIOG are, in part, intended to provide the means by which such concerns can be considered by senior officials.

In Crossfire Hurricane, the "articulable factual basis" set forth in the opening EC was the FFG information received from an FBI Legal Attaché stating that Papadopoulos had suggested during a meeting in May 2016 with officials from a "trusted foreign partner" that the Trump team had received some kind of suggestion from Russia that it could assist by releasing information damaging to candidate Clinton and President Obama.[484]  Additionally, by July 31, 2016, although not specifically mentioned in the EC, the FBI had reason to believe that Russia may have been connected to the WikiLeaks disclosures that occurred earlier in July 2016.  Further, as we note in Chapter Three, the FBI received the FFG information at a time when the USIC, including the FBI, was aware of Russia's efforts to interfere with the 2016 U.S. elections.  Given the low threshold for predication in

---

[483] As detailed in Chapter Two, the DIOG separately provides that a Preliminary Investigation may be opened based upon "any allegation or information" indicative of possible criminal activity or threats to the national security.  In cases opened as Preliminary Investigations, the DIOG provides that all lawful investigative methods (including CHS and UCE operations) may be used except for mail opening, physical searches requiring a search warrant, electronic surveillance requiring a judicial order or warrant (Title III wiretap or a FISA order), or requests under Title VII of FISA.  A Preliminary Investigation may be converted to a Full Investigation if the available information provides predication for a Full Investigation.

[484] Papadopoulos has stated that the source of the information he shared with the FFG was a professor from London, Joseph Mifsud, and has raised the possibility that Mifsud may have been working with the FBI.  As described in Chapter Ten of this report, the OIG searched the FBI's database of Confidential Human Sources (CHSs) and did not find any records indicating that Mifsud was an FBI CHS, or that Mifsud's discussions with Papadopoulos were part of any FBI operation.  The FBI also requested information on █████████████████████████████████████

the AG Guidelines and the DIOG, we concluded that the FFG information, provided by a government the USIC deems trustworthy, and describing a first-hand account from an FFG employee of the content of a conversation with Papadopoulos, was sufficient to predicate the full counterintelligence investigation because it provided the FBI an articulable factual basis that, if true, reasonably indicated activity constituting either a federal crime or a threat to national security may have occurred or may be occurring.[485]

We similarly concluded that the FBI had sufficient predication to open full counterintelligence investigations of Papadopoulos, Page, Flynn, and Manafort in August 2016.  The investigation of Papadopoulos was predicated upon his alleged statements in May 2016 to an employee of the FFG.  According to the opening EC, Papadopoulos was "identical to the individual who made statements indicating that he is knowledgeable that the Russians made a suggestion to the Trump team that they could assist the Trump campaign with an anonymous release of information during the campaign that would be damaging to the Clinton campaign."  The three other cases were predicated on information developed by the Crossfire Hurricane team through law enforcement database and open source searches, conducted to determine which individuals associated with the Trump campaign may have been in a position to have received the alleged offer of assistance from Russia.  As described in Chapter Three, through these efforts, the Crossfire Hurricane team identified three individuals—Page, Manafort, and Flynn—associated with the Trump campaign with either ties to Russia or a history of travel to Russia, two of whom (Page and Manafort) were already the subjects of open FBI investigations pertaining to, in part, their Russia-related activities.  The FBI determined that this information, taken together with the information from the FFG indicating Russia had made a suggestion to the Trump team that it could assist by releasing information damaging to candidate Clinton, stated an articulable factual basis reasonably indicating activity may be occurring that may constitute a federal crime or a threat to national security.  As with the opening of Crossfire Hurricane, we concluded that the quantum of information articulated by the FBI to open these individual investigations was sufficient to satisfy the low threshold established by Department and FBI predication policy, particularly in the context of the FBI's separate and ongoing investigative efforts to address Russian interference in 2016 U.S. elections.

### C.    Sensitive Investigative Matters (SIMs)

We concluded that the FBI appropriately designated Crossfire Hurricane and each of the four individual counterintelligence investigations as SIMs, or Sensitive

---

[485]  We determined that the election reporting from Christopher Steele played no role in the opening of Crossfire Hurricane.  As described in Chapter Four, while some individuals in the FBI, including Steele's handling agent, had received Steele's election reporting as early as July 2016, the CD officials at FBI Headquarters and the members of the Crossfire Hurricane team did not receive the first Steele reports until September 19—weeks after the Crossfire Hurricane investigation was opened—and were not aware of any of the information in the reports prior to that date.  We also found no evidence that the FBI undertook any investigative activities directed at the Trump campaign or members of the Trump campaign before opening Crossfire Hurricane on July 31, 2016.  As described in Chapters Three and Nine, the FBI had ongoing investigations of Paul Manafort and Carter Page at that time, which were unrelated to the information that predicated Crossfire Hurricane.

144

Defendant Nellie Ohr's Motion to Dismiss the Complaint and
Memorandum of Law in Support (May 11, 2022)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

DONALD J. TRUMP,

    Plaintiff,

        v.

HILLARY R. CLINTON, *et al*.,

    Defendants.

1:22-cv-14102 (DMM)

May 11, 2022

## DEFENDANT NELLIE OHR'S MOTION TO DISMISS THE COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT

Defendant Nellie Ohr, through counsel, moves to dismiss Plaintiff Donald Trump's claims with prejudice. As explained below, each of the claims against the defendant is time-barred on the face of the Complaint, and each fails on the merits.

## ARGUMENT

## I.     COUNTS II, IV, V AND VI OF THE COMPLAINT SHOULD BE DISMISSED AS TIME-BARRED

Mrs. Ohr joins and adopts the arguments set forth in Section I of Defendant Hillary Rodham Clinton's Motion to Dismiss (Dkt. 52, the "Clinton Motion to Dismiss") that the statute of limitations has expired with respect to each count in the Complaint. Dismissal is appropriate "if it is apparent from the face of the complaint that the claim is time-barred." *La Grasta* v. *First Union Sec.*, 358 F.3d 840, 845–46 (11th Cir. 2004).

As explained in the Clinton Motion to Dismiss, Plaintiff's claims all arise from events that allegedly took place in 2016 and 2017. Moreover, while only three allegations in the Complaint

relate to Mrs. Ohr, each of these relates to events in 2016.  First, Plaintiff alleges that Mrs. Ohr

provided "assistance" to several other defendants in preparing the so-called "Steele Dossier"

around June 2016.  (Complaint ¶¶ 80–81).  Second, Plaintiff alleges that on July 31, 2016, Mrs.

Ohr attended a meeting with Defendant Bruce Ohr (her husband), and Defendant Christopher

Steele, although there are no allegations about the substance or relevance of this meeting.

(Complaint ¶133.)   And finally, Plaintiff alleges that Mrs. Ohr prepared certain "anti-Trump

'opposition research' reports," which made their way to the Federal Bureau of Investigation on

December 20, 2016.   (Complaint ¶198.)   Thus, all of the allegations about Mrs. Ohr relate to

conduct that occurred more than five years ago.  And as detailed below, the statute of limitations

for each count naming Mrs. Ohr is four years.

For conspiracy to commit RICO violations, as alleged in Count II, the Supreme Court has

established a four-year limitations period, which begins to run when the plaintiff knew or should

have known of his or her injury.  *Rotella* v. *Wood*, 528 U.S. 549, 553–54 (2000).  As stated in the

Clinton Motion to Dismiss, Plaintiff tweeted about the same alleged conspiracy and injury that he

describes in Count II on October 29, 2017.[1]  Because Plaintiff's own words reveal knowledge of

the alleged conspiracy more than four years before he filed the Complaint, Count II of the

Complaint is time-barred and should be dismissed.

For conspiracy to commit malicious prosecution, as alleged in Count VI, the statute of

limitations is four years, beginning when the last element constituting the cause of action occurs.

---

[1]  Clinton Motion at 3, citing Donald J. Trump (@RealDonaldTrump), Twitter (Oct. 29, 2017),
archived at The Trump Twitter Archive, thetrumparchive.com ("Never seen such Republican
ANGER & UNITY as I have concerning the lack of investigation on Clinton made Fake
Dossier (now $12,000,000?), the Uranium to Russia Deal, the 33,000 plus deleted Emails, the
Comey fix and so much more.  Instead they look at phony Trump/Russia, 'collusion,' which
doesn't exist.  The Dems are using this terrible (and bad for our country) Witch Hunt for evil
politics, but the R's are now fighting back like never before.  There is so much GUILT by
Democrats/Clinton, and now the facts are pouring out.  DO SOMETHING!".)

*See* Fl. St. § 95.11(3)(p) (establishing four-year statute of limitations for all actions not specifically subject to a different limitations period); Fl. St. § 95.031(1) ("A cause of action accrues when the last element constituting the cause of action occurs."). Likewise, for the tort of malicious prosecution, as alleged in Count V, the statute of limitations is four years, which begins to run when the last element constituting the cause of action occurs. *See* Fla. Stat. § 95.11(3)(o) (establishing four-year statute of limitations for malicious prosecution); Fla. Stat. § 95.031(1). The statute of limitations for the tort of injurious falsehood is only two years. Fla. Stat. § 95.11(4)(g); see also *ADT LLC v. Vivint, Inc.*, No. 17-cv-80432, 2017 WL 5640725, at *6 & n.8 (S.D. Fla. Aug. 3, 2017) (Middlebrooks, J.) (trade slander claims in Florida subject to two-year statute of limitations). Because Plaintiff's allegations all relate to conduct in 2016 and 2017—well more than four years before Plaintiff filed his Complaint—Counts IV, V and VI are time-barred and must be dismissed.

## II.   COUNTS II, IV, V AND VI OF THE COMPLAINT SHOULD BE DISMISSED ON THE MERITS

Mrs. Ohr joins and adopts the arguments set forth in Sections II.B, II.D and II.E of the Clinton Motion to Dismiss. As discussed below, each of the claims against Mrs. Ohr fails on the merits because Plaintiff fails to allege sufficient facts to satisfy the elements of those offenses. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). The Complaint fails to meet this requirement, instead offering, at most, "[t]hreadbare recitals of the elements . . . supported by mere conclusory statements." *Id.* The claims against Mrs. Ohr should therefore be dismissed.

A.      **Count II:  RICO Conspiracy**

As argued in Section II.B of the Clinton Motion to Dismiss, Plaintiff has failed to state a RICO conspiracy claim, so Count II must be dismissed.  Moreover, Count II must be dismissed against Mrs. Ohr because Plaintiff fails to allege facts that would support an inference that Mrs. Ohr agreed to participate in *any* conspiracy, let alone a RICO conspiracy.  "To be guilty of a conspiracy, parties must have agreed to commit an act that is itself illegal." *Jackson* v. *BellSouth Telecommunications*, 372 F.3d 1250, 1269 (11th Cir. 2004).  In the RICO context, a claim for RICO conspiracy therefore must "allege an illegal agreement to violate a substantive provision of the RICO statute."  When a RICO conspiracy claim merely alleges "that the defendants conspired and confederated to commit conduct which in itself does not constitute a RICO violation," the claim must be dismissed.  *Id.*

Here, Plaintiff fails to allege that Mrs. Ohr agreed with anyone to do anything related to the supposed RICO predicate acts.  Plaintiff posits two supposed RICO predicates:  theft of trade secrets and obstruction of justice.  (Compliant ⁋ 319.)  But none of Plaintiff's allegations about Mrs. Ohr bear any relation to these predicates.  As stated above, Plaintiff alleges that Mrs. Ohr provided some "assistance" to others in creating the Steele Dossier (Complaint ⁋ 81) and that she drafted opposition research (Complaint ⁋ 198).  Plaintiff nowhere tries to link these alleged actions to either RICO predicate.  Plaintiff also alleges that Mrs. Ohr (together with her husband, Defendant Bruce Ohr) met with Defendant Christopher Steele in July 2016.  (Complaint ⁋133.)  However, Plaintiff makes no allegations about the substance of this meeting or its relation to the supposed RICO conspiracy.  In short, Plaintiff offers, at best, a conclusory allegation that Mrs. Ohr entered a RICO conspiracy with other defendants.  In the RICO context (as well as in other contexts), "[c]onclusory allegations that Defendants conspired with each other are insufficient to

survive a motion to dismiss." *Super Vision Intern., Inc.* v. *Mega Intern. Commercial Bank Co., Ltd.*, 534 F.Supp. 2d 1326, 1334 (S.D. Fla. 2008). Count II should therefore be dismissed.

### B.    Count IV:  Conspiracy to Commit Injurious Falsehood

As with Count II, Count IV should be dismissed because Plaintiff fails to allege any facts to support an inference that Mrs. Ohr joined any conspiracy. But the claims against Mrs. Ohr also require dismissal for a more fundamental reason—namely—that Plaintiff's allegations against Mrs. Ohr involve her participation in core political speech, which enjoys the broadest protection under the First Amendment of the United States Constitution. Plaintiff alleges merely that Mrs. Ohr provided "assistance" in preparing the Steele Dossier (Complaint ¶81) and that she authored opposition research about Plaintiff (Complaint ¶198).[2] In other words, Plaintiff alleges that Mrs. Ohr engaged in activities that the Supreme Court has recognized as "integral to the operation of the system of government established by our Constitution," to which the "First Amendment affords the broadest protection . . . ." *Buckley* v. *Valeo*, 424 U.S. 1, 14 (1976).

Recognizing the importance of speech about politicians and other public officials, the Supreme Court has found in the First Amendment a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 270 (1964). Thus, the Constitution "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–280. The "actual malice" standard applies equally to officials who have already been elected and to candidates for public

---

[2]    As stated above, Plaintiff also alleges that Mrs. Ohr attended a meeting with Christopher Steele in July 2016, but there are no allegations about the substance of this meeting or its supposed relevance to any of Plaintiff's claims. (Complaint ¶133.)

office.  *Monitor Patriot Co.* v. *Roy*, 401 U.S. 265, 271–72 (1971) ("if it be conceded that the First Amendment was fashioned to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people, then it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office") (internal quotation omitted).

Plaintiff utterly fails to satisfy this actual-malice requirement because he does not even allege that Mrs. Ohr made any false statement, let alone that she made any false statement knowingly or with reckless disregard for its truth.  Nor does Plaintiff allege any facts to support an inference that Mrs. Ohr conspired with others to make false statements.  Count IV should therefore be dismissed.

### C.   Count V:   Malicious Prosecution and Count VI:   Conspiracy to Commit Malicious Prosecution

In order to state a claim for malicious prosecution, a plaintiff must allege: "(1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence or probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damages as a result of the original proceeding."  Clinton Motion to Dismiss at 19, quoting *Melford* v. *Kahane & Assocs.*, 371 F. Supp. 3d 1116, 1123–24 (S.D. Fla. 2019).  As discussed in Section II.E of the Clinton Motion to Dismiss, Plaintiff has failed to plead any of these elements.

Moreover, even if those elements were somehow satisfied with respect to some Defendant, plaintiff's scant allegations about Mrs. Ohr could not support an inference that she had caused any judicial proceeding as required by Count V and Count VI.  Nothing in the Complaint connects

- 6 -

Mrs. Ohr's alleged assistance in creating the Steele Dossier (Complaint ¶ 81) or her alleged drafting of opposition research (Complaint ¶ 198) with the institution of any judicial proceeding.[3] Nor do those allegations support an inference that she had acted with malice, as required by Count V and Count VI.  Nor does the Complaint allege facts to support an inference that Mrs. Ohr had conspired with others to commence or continue a judicial proceeding, as required by Count VI. Count V and Count VI should therefore be dismissed.

---

[3]   Indeed, as explained in the Clinton Motion to Dismiss, Plaintiff fails to allege the existence of any judicial proceeding, let alone any judicial proceeding that terminated in his favor.  Clinton Motion to Dismiss at 19.

**CONCLUSION**

For the foregoing reasons, Nellie Ohr respectfully moves the Court to dismiss Counts II,

IV, V and VI of Plaintiff's Complaint with prejudice.


Dated: May 11, 2022

                               Respectfully submitted,

                               By: /s/Adam S. Fels

                               Joshua Berman
                               CLIFFORD CHANCE US LLP
                               2011 K Street, NW
                               Washington, D.C.  20006-1001
                               Tel. (202) 912-5000
                               Fax (202) 912-6000
                               Joshua.Berman@CliffordChance.com

                               Benjamin Peacock
                               CLIFFORD CHANCE US LLP
                               New York, New York 10019
                               Tel. (212) 878-8000
                               Fax (212) 878-8375
                               Benjamin.Peacock@CliffordChance.com

                               Adam S. Fels
                               Florida Bar No. 0114917
                               FRIDMAN FELS & SOTO, PLLC
                               2525 Ponce de Leon Blvd., Suite 750
                               Coral Gables, FL 33134
                               afels@ffslawfirm.com
                               Tel: 305-569-7701
                               Afels@ffslawfirm.com

# 145

Defendant Robert E. Mook's Motion to Dismiss the Complaint and
Memorandum of Law in Support (May 11, 2022)

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

DONALD J. TRUMP,

> Plaintiff,

v.

HILLARY R. CLINTON, et al.,

> Defendants.

Case No. 2:22–cv–14102–DMM

## DEFENDANT ROBERT E. MOOK'S MOTION TO DISMISS THE
## COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT

**DEBEVOISE & PLIMPTON LLP**

Andrew J. Ceresney*
Wendy B. Reilly*
Isabela M. Garcez*

919 Third Avenue
New York, NY 10022
Tel: (212) 909-6000
aceresney@debevoise.com
wbreilly@debevoise.com
imgarcez@debevoise.com

> \* Appearance *pro hac vice*

**BARZEE FLORES**

William R. Barzee (Florida Bar No. 158720)

Courthouse Center, Penthouse One
40 NW Third Street
Miami, FL 33128
Tel: (305) 374–3998
williambarzee@barzeeflores.com

*Counsel for Defendant Robert E. Mook*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ........................................................................................................................2

I.    JOINDER IN DEFENDANT CLINTON'S MOTION TO DISMISS ............................................2

II.   THE CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS ....................................2

III.  THE COMPLAINT FAILS TO STATE A CLAIM AGAINST MR. MOOK
      AND FAILS TO PLEAD FRAUD WITH PARTICULARITY ......................................................3

      A.    The RICO Conspiracy Claim Fails (Count II) ................................................3

      B.    The Claim for Conspiracy to Commit Injurious Falsehood Fails (Count IV) ........................6

      C.    The Claim for Conspiracy to Commit Malicious Prosecution Fails (Count VI) ...................7

CONCLUSION ......................................................................................................................8

# TABLE OF AUTHORITIES

**Cases**

*Adell v. Macon County Greyhound Park, Inc.*,
   785 F. Supp. 2d 1226 (M.D. Ala. 2011) ....................................................5

*Alhassid v. Bank of Am.*,
   60 F. Supp. 3d 1302 (S.D. Fla. 2014) ....................................................6, 7

*Anza v. Ideal Steel Supply Corp.*,
   547 U.S. 451 (2006)...............................................................................6

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................1, 8

*Cisneros v. Petland, Inc.*,
   972 F.3d 1204 (11th Cir. 2020) ...........................................................3, 4

*Hemi Group, LLC v. City of New York*,
   559 U.S. 1 (2010)..................................................................................6

*Jackson v. BellSouth Telecomms.*,
   372 F.3d 1250 (11th Cir. 2004) ...........................................................3, 4

*Keeton v. Gynecare Worldwide*,
   No. 15-20442-CIV-KING/MCALILEY, 2016 WL 2753866
   (S.D. Fla. Jan. 29, 2016) ........................................................................5

*Nunes v. Fusion GPS*,
   531 F. Supp. 3d 993 (E.D. Va. 2021) .......................................................5

*Strates Shows v. Amusements of Am.*,
   379 F. Supp. 2d 817 (E.D.N.C. 2005)........................................................5

*Super Vision Int'l v. Mega Int'l Comm. Bank Co., Ltd.*,
   534 F. Supp. 2d 1326 (S.D. Fla. 2008) .....................................................4

*The Knit With v. Knitting Fever, Inc.*,
   Nos. 08–4221, 08–4775, 2012 WL 2938992 (E.D. Pa. July 19, 2012),
   *aff'd* 625 F. App'x 27 (3d Cir. 2015)........................................................5

*Truthinadvertisingenforcers.com v. Dish Network*, LLC,
   No. 8:16–cv–2366–T–33JSS, 2016 WL 7230955 (M.D. Fla. Dec. 14, 2016) .........5

*United States v. Vaghela*,
   169 F.3d 729 (11th Cir. 1999) ................................................................3

*Watson v. Florida Judicial Qualifications Comm'n,*
   No. 14-60306–Civ–COOKE/TORRES, 2017 WL 3218163
   (S.D. Fla. July 28, 2017) .................................................................................................4

**Statutes**

18 U.S.C. § 1964 ...............................................................................................................5

**Other Authorities**

Fed. R. Civ. P. 9(b) ..........................................................................................................1

Fed. R. Civ. P. 12(b)(6) ....................................................................................................1

Defendant Robert E. Mook respectfully moves to dismiss the Complaint filed by Plaintiff Donald J. Trump ("Plaintiff") (ECF 1) for failure to state a claim, Fed. R. Civ. P. 12(b)(6), and failure to plead fraud with particularity, Fed. R. Civ. P. 9(b).

## PRELIMINARY STATEMENT

The allegations against Mr. Mook teeter on the thinnest of reeds.  Mr. Mook, who served as campaign manager for the 2016 Clinton Campaign, is named as a defendant in only three of the 13 counts asserted in the Complaint, each premised on his alleged participation in an ill-defined and farfetched conspiracy.[1]  The 508-paragraph Complaint makes only a handful of sparse and conclusory references to Mr. Mook.  The Complaint alleges vaguely that Mr. Mook (*i*) provided unspecified "assistance" in preparation of the Steele Dossier, Complaint ¶ 81; (*ii*) was sent bills from Defendant Fusion GPS by Defendant Marc Elias (counsel to the Campaign), *id*. ¶ 83; (*iii*) exchanged emails with Mr. Elias about a supposed "plot to falsely connect Donald J. Trump to the Russian bank, Alfa Bank, by disseminating the lies to the media," *id.* ¶¶ 169, 471; and (*iv*) "acknowledged" during a post-Campaign television appearance "that there was a wiretap of Russian officials in contact with associates of President Trump, and that surveillance may have been conducted on Trump computers as well," *id*. ¶ 220.

Mr. Mook vigorously disputes these allegations.  But even if they were accepted as true for the purposes of a motion to dismiss analysis, these scant allegations do not come close to pleading a claim for conspiracy under any of the legal theories asserted by Plaintiff.  To survive a motion to dismiss, Plaintiff must plead sufficient factual content to establish "more than a sheer possibility that a defendant acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Nowhere does the Complaint allege a knowing agreement to violate the law.  Indeed, at no point

---

[1]  The three counts are (*i*) RICO Conspiracy (Count II), (*ii*) Conspiracy to Commit Injurious Falsehood (Count IV), and (*iii*) Conspiracy to Commit Malicious Prosecution (Count VI).

does Plaintiff allege *any* agreement by Mr. Mook with *anyone* to commit *any* illegal act.  The Complaint fails the most basic of threshold pleading requirements—it fails to allege facts that would "allow[] the court to draw the reasonable inference that [Mr. Mook] is liable for the misconduct alleged." *Id*.

The threadbare claims against Mr. Mook should be dismissed in their entirety and with prejudice.

## ARGUMENT

## I.   JOINDER IN DEFENDANT CLINTON'S MOTION TO DISMISS

Defendant Hillary Rodham Clinton demonstrates in her Motion to Dismiss why Plaintiff's claims must be dismissed ("Clinton Motion").  (ECF 52.)  Defendant Clinton's arguments equally apply to the claims asserted against Mr. Mook.  Accordingly, Mr. Mook joins in and adopts those arguments, which are incorporated herein, and requests that the Court dismiss the claims against Mr. Mook for the reasons set forth in the Clinton Motion.  Similarly, Mr. Mook joins in and adopts the arguments, which are incorporated herein, made in Defendant John Podesta's Motion to Dismiss.  (ECF 124.)

## II.   THE CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

As an initial matter, the three counts asserted against Mr. Mook are incurably time-barred because the statute of limitations for each claim expired by October 29, 2021, at the latest.  As demonstrated in the Clinton Motion, there is no question that Plaintiff was on notice of his alleged injury by October 29, 2017, and that the statutes of limitation for the three counts alleged against Mr. Mook are each four years.  (ECF 52 at 1–5.)  Moreover, the only allegations regarding Mr. Mook that reference specific dates refer to a September 15, 2016 email exchange and a March 7, 2017 television appearance.  Complaint ¶¶ 220, 169.  Any claims against Mr. Mook expired long before Plaintiff filed the Complaint.

### III.   THE COMPLAINT FAILS TO STATE A CLAIM AGAINST MR. MOOK AND FAILS TO PLEAD FRAUD WITH PARTICULARITY

The Complaint's conclusory references to Mr. Mook fall far short of pleading the elements of a conspiracy claim under any theory. Indeed, the allegations are so vague that it is unclear whether Plaintiff is even attempting to allege a fraud. To the extent that he is, the Complaint utterly fails to meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Given the absence of any plausible claim for relief, the claims against Mr. Mook must be dismissed.

#### A.   The RICO Conspiracy Claim Fails (Count II)

To adequately plead a RICO conspiracy claim, Plaintiff must allege facts establishing an illegal agreement to violate a substantive provision of the RICO statute. *See Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1269 (11th Cir. 2004). Put another way, Plaintiff must allege that Mr. Mook "agreed to commit an act that is itself illegal." *United States v. Vaghela*, 169 F.3d 729, 732 (11th Cir. 1999). The Complaint is missing both requirements—an illegal act and an agreement.

As explained in the Clinton Motion, the Complaint fails to plead the elements of a substantive RICO claim, including a RICO enterprise, a pattern of racketeering activity, and RICO predicate acts. (ECF 52 at 6–15.) Where a RICO claim fails, a RICO conspiracy claim also fails. *See Jackson*, 372 F.3d at 1269 (noting a defendant "cannot be found guilty of conspiring to commit an act that is not itself against the law"). By failing to plead an underlying claim, the Complaint "'simply concludes that the defendants conspired and confederated to commit conduct which in itself does not constitute a RICO violation.'" *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1220 (11th Cir. 2020) (quoting *Jackson*, 372 F.3d at 1269). Such a complaint "must be dismissed." *Id*.

Even assuming the Complaint adequately pleaded a substantive RICO claim, it fails to allege that Mr. Mook agreed to participate in the objective of a RICO enterprise to engage in a pattern of racketeering activity.  Plaintiff alleges generally and vaguely that Mr. Mook and other Defendants conspired to injure Plaintiff's political career and/or impede his ability to effectively govern.  Complaint ¶ 319.  However, Plaintiff makes no factual allegations to substantiate such a conspiracy, let alone Mr. Mook's intentional participation in such a conspiracy.  Beyond boilerplate recitation of the elements of a RICO conspiracy claim, the Complaint merely alleges vaguely that Mr. Mook (*i*) provided unspecified "assistance" in preparation of the Steele Dossier, Complaint ¶ 81; (*ii*) was sent bills from Defendant Fusion GPS by Defendant Elias (counsel to the Campaign), *id.* ¶ 83; (*iii*) exchanged emails with Mr. Elias about a supposed "plot to falsely connect Donald J. Trump to the Russian bank, Alfa Bank, by disseminating the lies to the media," *id.* ¶¶ 169, 471; and (*iv*) "acknowledged" during a post-Campaign television appearance "that there was a wiretap of Russian officials in contact with associates of President Trump, and that surveillance may have been conducted on Trump computers as well," *id.* ¶ 220.

These allegations do not come close to alleging that Mr. Mook knowingly agreed to participate in a conspiracy, let alone one aimed at facilitating a racketeering scheme.  *See Super Vision Int'l v. Mega Int'l Comm. Bank Co. Ltd.*, 534 F. Supp. 2d 1326, 1342 (S.D. Fla. 2008) (dismissing RICO conspiracy claim where "conclusory allegation [ ] unsupported by actual allegations of fact" failed to create "reasonable inference that [the defendant] made such an agreement").  Nor is merely alleging a defendant's title or position within an organization a sufficient basis to allege a knowing agreement to participate in a conspiracy.  *See, e.g.*, *Watson v. Florida Judicial Qualifications Comm'n*, No. 14-60306–Civ–COOKE/TORRES, 2017 WL

3218163, *9 (S.D. Fla. July 28, 2017) (holding that "simply being the Executive Director" of an organization did not establish participation in a RICO conspiracy).

Count II fails for the additional reason that Plaintiff lacks RICO standing. RICO's standing requirement applies equally to substantive RICO claims and RICO conspiracy claims. 18 U.S.C. § 1964(c). To establish standing, Plaintiff must allege an injury to his business or property that was proximately caused by alleged racketeering activity. *Id*. The only injury alleged under Count II is a vague reference to legal costs "incurred in connection with [Plaintiff's] effort to defend against the Defendants' actions and the various federal investigations." Complaint ¶ 324.[2] As the Clinton Motion explains, voluntarily incurred legal fees are not a cognizable RICO injury. (ECF 52 at 12–13.) *See Nunes v. Fusion GPS*, 531 F. Supp. 3d 993, 1012–13 (E.D. Va. 2021); *see also The Knit With v. Knitting Fever, Inc.*, Nos. 08–4221, 08–4775, 2012 WL 2938992, at *25–27 (E.D. Pa. July 19, 2012) (holding plaintiff could not recover costs that "were not occasioned directly by the predicate acts in furtherance of that conspiracy, but rather by the costs that Plaintiff chose to incur to investigate and mitigate the effects of Defendants' conduct"), *aff'd* 625 F. App'x 27, 35 (3d Cir. 2015); *Strates Shows v. Amusements of Am.*, 379 F. Supp. 2d 817, 833 (E.D.N.C. 2005) ("[T]hese legal fees and costs are

---

[2]   Elsewhere in the Complaint, Plaintiff vaguely references "loss of existing and future business opportunities." Complaint ¶ 354. The Clinton Motion correctly notes that this allegation fails for lack of particularity and lack of a causal connection to any alleged racketeering activity. (ECF 52 at 14.) Indeed, the alleged injury to a plaintiff's business or property must consist of a definite and measurable loss, and cannot be hypothetical or speculative. As such, courts have held that unspecified opportunities are a mere expectancy interest, which is insufficient to establish a RICO injury. *See Keeton v. Gynecare Worldwide*, No. 15-20442-CIV-KING/MCALILEY, 2016 WL 2753866, at *3 (S.D. Fla. Jan. 29, 2016) ("Allegations of an injury to a mere expectancy interest or an intangible property interest are insufficient to state a RICO injury."); *see also Adell v. Macon County Greyhound Park, Inc*., 785 F. Supp. 2d 1226, 1237 (M.D. Ala. 2011) ("Courts have excluded from the phrase's meaning injury to mere expectancy interests or to an intangible property interest") (internal citations omitted); *Truthinadvertisingenforcers.com v. Dish Network, LLC*, No. 8:16–cv–2366–T–33JSS, 2016 WL 7230955, *5 (M.D. Fla. Dec. 14, 2016) (same) (quoting *Adell*).

not 'direct' injury flowing from defendants' illegal conduct, but rather, at best, 'indirect' injury which plaintiff did not automatically incur, but chose to incur, in mitigating the effect of defendants' conduct.").

Moreover, as the Clinton Motion explains, Plaintiff lacks standing because he fails to articulate a direct connection between his alleged injury and the alleged predicate acts. (ECF 52 at 13–14.) Courts rarely go "beyond the first step" in the causal chain when evaluating whether there is a sufficiently "direct relation between the injury asserted and the injurious conduct alleged." *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 10 (2010). Here, Plaintiff's asserted injury is "entirely distinct" from any alleged racketeering activity. *See Anza v. Ideal Steel Supply* Corp., 547 U.S. 451, 458 (2006) (finding no standing where the "cause of [plaintiff]'s asserted harms . . . is a set of actions . . . entirely distinct" from the RICO violation). RICO standing cannot be premised on a speculative chain of causation.

For all of these reasons, Count II should be dismissed as to Mr. Mook.

## B.     The Claim for Conspiracy to Commit Injurious Falsehood Fails (Count IV)

The Complaint is equally devoid of facts to support a claim that Mr. Mook conspired to commit injurious falsehood.

The Clinton Motion thoroughly explains that the Complaint fails to plead a substantive claim for injurious falsehood, including because the alleged statements underlying this claim are protected by the First Amendment. (ECF 52 at 15–18.) Given that the substantive claim cannot proceed, no conspiracy claim can proceed either. *See Alhassid v. Bank of Am*., 60 F. Supp. 3d 1302, 1316 (S.D. Fla. 2014) (noting plaintiff must allege "an underlying illegal act or tort on which conspiracy is based").

Furthermore, the Complaint fails to plead any facts whatsoever to suggest that Mr. Mook entered into an agreement with anyone to commit injurious falsehood. *See id.* (indicating that a

claim for civil conspiracy requires "an agreement between two or more parties . . . to do an unlawful act"). The Complaint alleges in conclusory fashion that "Defendants had a meeting of the minds to harm the Plaintiff by making false and damaging statements regarding the Plaintiff's alleged collusion with the Russian government," but makes no reference to any action or participation by Mr. Mook. Complaint ¶ 347. There are no allegations that Mr. Mook knowingly agreed to participate in such a conspiracy, let alone particularized factual allegations of any relevant acts committed by Mr. Mook. Indeed, the only reference to Mr. Mook is in the heading for Count IV; there is no specific reference to him in the allegations in that section of the Complaint, which refer only to the conduct of unspecified "Defendants." The Complaint also fails to allege that Plaintiff suffered any cognizable injury as a result of the supposed "conspiracy," merely referring vaguely to "significant damage" and "defense costs, legal fees and related expenses." *Id*. ¶¶ 353–54.

Plaintiff's bare bones allegations cannot sustain a claim. Count IV should be dismissed.

### C.    The Claim for Conspiracy to Commit Malicious Prosecution Fails (Count VI)

For similar reasons, Plaintiff fails to adequately allege that Mr. Mook conspired to commit malicious prosecution. The Clinton Motion explains why the Complaint fails to plead a claim for malicious prosecution, including that it lacks the fundamental element of a judicial proceeding against Plaintiff caused by Defendants. (ECF 15 19–20.) Even assuming such a claim had been properly pleaded, the Complaint fails to allege a single fact to establish that Mr. Mook participated in a conspiracy. Mr. Mook is merely listed in the heading for Count VI—he is never mentioned in the paragraphs describing the allegations underlying the count. Complaint ¶¶ 368–381. Nor do the scant mentions of Mr. Mook in the body of the Complaint support a claim that he joined in such a conspiracy against Plaintiff. The allegations make no reference to

an agreement, nor do they describe an illegal act, and thus fail to plead a claim for relief that is "plausible on its face." *Iqbal*, 556 U.S. at 678.

As with the other claims, Count VI's conclusory allegations require dismissal.

## CONCLUSION

For the foregoing reasons, and those articulated in the Clinton Motion, the Court should dismiss the claims against Mr. Mook, and do so with prejudice.

Dated:    May 11, 2022

Respectfully submitted,

*/s/ Andrew J. Ceresney*

**DEBEVOISE & PLIMPTON LLP**

Andrew J. Ceresney*
Wendy B. Reilly*
Isabela M. Garcez*

919 Third Avenue
New York, NY 10022
Tel: (212) 909-6000
aceresney@debevoise.com
wbreilly@debevoise.com
imgarcez@debevoise.com

* Appearance *pro hac vice*

**BARZEE FLORES**

William R. Barzee (Florida Bar No. 158720)

Courthouse Center, Penthouse One
40 NW Third Street
Miami, FL 33128
Tel: (305) 374–3998
williambarzee@barzeeflores.com

*Counsel for Defendant Robert E. Mook*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically filed using the CM/ECF system, which will provide notice to all counsel of record this 11th day of May, 2022.

*/s/ William R. Barzee*
William R. Barzee

146

Defendant Michael Sussmann's Motion to Dismiss Pursuant to Federal
Rule of Civil Procedure 12(b)(6) and Memorandum of Law in Support
(May 11, 2022)

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

DONALD J. TRUMP,

                    Plaintiff,

           v.                                          Case No. 2:22-cv-14102-DMM

HILLARY R. CLINTON, et al.,

                    Defendants.

**DEFENDANT MICHAEL SUSSMANN'S MOTION TO DISMISS PURSUANT TO**
**FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) AND**
**MEMORANDUM OF LAW IN SUPPORT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................1

I.      All Of Plaintiff's Claims Against Mr. Sussmann Are Untimely ........................................2

II.     Plaintiff's Claims Against Mr. Sussmann Are Defectively Pled .......................................4

        A.      Counts I, II & VIII: Plaintiff Fails To Allege Viable RICO Predicate Acts,
                Cognizable Damages, Or Proximate Causation......................................................4

        B.      Counts III & IV: Plaintiff Fails To Identify A Sufficient Harm Or Causal
                Link To Support The Injurious Falsehood Claims ..................................................8

        C.      Counts V & VI: There Was No Prosecution To Support The Malicious
                Prosecution Claims ..................................................................................................9

        D.      Count VII: The Computer Fraud and Abuse Act Claim Fails to State a
                Cognizable Claim and Fails For Lack of Qualifying Damages............................10

III.    All Of Plaintiff's Claims Against Mr. Sussmann Are Barred By The *Noerr-
        Pennington* Doctrine ........................................................................................................11

CONCLUSION.........................................................................................................13

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Alamo Rent-A-Car, Inc. v. Mancusi,*
 632 So. 2d 1352 (Fla. 1994)........................................................9

*Anza v. Ideal Steel Supply Corp.,*
 547 U.S. 451 (2006)................................................................7

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009)................................................................5

*Borough of Duryea, Pa. v. Guarnieri,*
 564 U.S. 379 (2011)...............................................................11

*Brown Jordan Int'l, Inc. v. Carmicle,*
 846 F.3d 1167 (11th Cir. 2017) ..................................................10

*Callaway Land & Cattle Co., Inc. v. Banyon Lakes C. Corp.,*
 831 So. 2d 204 (Fla. Dist. Ct. App. 2002) .....................................2, 9

*Citizens United v. FEC,*
 558 U.S. 310 (2010)...............................................................11

*Dreni v. PrinterOn Am. Corp.,*
 486 F. Supp. 3d 712 (S.D.N.Y. 2020)............................................10

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,*
 365 U.S. 127 (1961).........................................................2, 11, 12

*Green Leaf Nursery v. E.I. DuPont de Nemours & Co.,*
 341 F.3d 1292 (11th Cir. 2003) ....................................................8

*Grogan v. Platt,*
 835 F.2d 844 (11th Cir. 1988) .....................................................7

*Hecht v. Commerce Clearing House, Inc.,*
 897 F.2d 21 (2d Cir. 1990).........................................................7

*Int'l Brotherhood of Teamsters, Local 734 Health & Welfare Tr. Fund v.*
 *Phillip Morris Inc.,*
 196 F.3d 818 (7th Cir. 1999) ......................................................12

*Intermatic Inc. v. Toeppen,*
 947 F. Supp. 1227 (N.D. Ill. 1996) .................................................3

ii

*Ironworkers Local Union 68 v. AstraZeneca Pharmaceuticals, LP,*
    634 F.3d 1352 (11th Cir. 2011) .................................................................................6

*Jackson v. BellSouth Telecomms.,*
    372 F.3d 1250 (11th Cir. 2004) ( .........................................................................5, 8

*Kanarick v. GE Credit Retail Bank Care Credit,*
    2013 WL 12092479 (S.D. Fla. Sept. 6, 2013) ...................................................9

*Klayman v. Clinton,*
    2015 WL 10857500 (S.D. Fl. Aug. 11, 2015) ....................................................7

*La Grasta v. First Union Secs., Inc.,*
    358 F.3d 840 (11th Cir. 2004) .............................................................................4

*Lehman v. Lucom,*
    727 F.3d 1326 (11th Cir. 2013) ...........................................................................2

*McGuire Oil Co. v. Mapco, Inc.,*
    958 F.2d 1552 (11th Cir. 1992) .........................................................................12

*Melford v. Kahane & Assocs.,*
    371 F. Supp. 3d 1116 (S.D. Fla. 2019) ............................................................10

*Olson v. Johnson,*
    961 So. 2d 356 (Fla. Dist. Ct. App. 2007) .....................................................2, 9

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979) ............................................................................................6

*Rotella v. Wood,*
    528 U.S. 549 (2000) .........................................................................................2, 4

*Rylewicz v. Beaton Servs., Ltd.,*
    698 F. Supp. 1391 (N.D. Ill. 1988) .....................................................................7

*Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.,*
    742 So. 2d 381 (Fla. Dist. Ct. App. 1999) .........................................................8

*Sedima, S.P.R.L. v. Imrex Co., Inc.,*
    473 U.S. 479 (1985) ............................................................................................6

*SilverHorse Racing, LLC v. Ford Motor Co.,*
    2016 WL 7137273 (M.D. Fla. Apr. 27, 2016) .................................................12

*Simpson v. Sanderson Farms,*
    744 F.3d 702 (11th Cir. 2014) .............................................................................7

*Thaeter v. Palm Beach Cnty. Sheriff's Office,*
    449 F.3d 1342 (11th Cir. 2006 ........................................................................8

*United Mine Workers of Am. v. Pennington,*
    381 U.S. 657 (1965) ...................................................................................12

*United States v. Aguilar,*
    515 U.S. 593 (1995) .....................................................................................6

*United States v. Silverman,*
    745 F.2d 1386 (11th Cir. 1984) ....................................................................6

*United States v. Starrett,*
    55 F.3d 1525 (11th Cir. 1995) ......................................................................4

*Valladares v. Bank of Am. Corp.,*
    197 So. 3d 1 (Fla. 2016) .............................................................................10

*Wagner, Nugent, Johnson, Roth, Romano, Erickson & Kupfer, P.A. v. Flanagan,*
    629 So. 2d 113 (Fla. 1993) ...........................................................................2

*Wallace v. Kato,*
    549 U.S. 384 (2007) .....................................................................................3

*White v. Lee,*
    227 F.3d 1214 (9th Cir. 2000) ....................................................................12

*Wichansky v. Zowine,*
    150 F. Supp. 3d 1055 (D. Ariz. 2015) ........................................................11

## STATUTES

18 U.S.C. § 1030(e)(8) ......................................................................................10

18 U.S.C. § 1030(e)(11) ....................................................................................10

18 U.S.C. § 1030(g) .......................................................................................2, 10

18 U.S.C. § 1503 .................................................................................................6

18 U.S.C. § 1512 .................................................................................................6

18 U.S.C. § 1515(a)(1) ........................................................................................6

18 U.S.C. § 1832 .............................................................................................4, 5

18 U.S.C. § 1836 .................................................................................................2

18 U.S.C. § 1839(3) .............................................................................................5

iv

18 U.S.C. § 1839(3)(B) ................................................................................................5

18 U.S.C. § 1963(c) ....................................................................................................6

Fla. Stat. § 95.031 ......................................................................................................3

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ...................................................................................................1

## OTHER AUTHORITIES

U.S. Dep't of Justice, Office of the Inspector General, *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation* (2019) .....................................8

## INTRODUCTION

Defendant Michael Sussmann moves to dismiss Plaintiff's claims against him with prejudice.  Mr. Sussmann adopts in full the arguments advanced by defendants Hillary R. Clinton and Perkins Coie LLP for dismissal of the Complaint.  *See* Dkt. No. 52 (the "Clinton Brief"); Dkt. No. 143 (the "Perkins Coie Brief").  Mr. Sussmann submits this supplemental brief to highlight the application of those arguments to the allegations against him, and to raise an additional defense under the First Amendment to the United States Constitution.

The Complaint in this case spans 508 paragraphs and names 27 defendants, plus unidentified "John Does" and "ABC Corporations."  Plaintiff's sprawling pleading presents a winding narrative around the 2016 presidential election, alleging that former Secretary of State (and then-candidate) Clinton, together with her campaign (the "Clinton Campaign") and the Democratic National Committee ("DNC"), hatched a multi-pronged "plot" to "vilify" Plaintiff by "fabricat[ing] . . . proof of a sinister link between . . . Trump and Russia."  Compl. ¶¶ 1-3.  So far as Mr. Sussmann is concerned, the Complaint alleges that he conveyed to the government certain "bogus" evidence of a "back channel" between Trump servers and a Russian bank.  *See id.* ¶¶ 5, 101-126, 166-73.  The Complaint further alleges that Plaintiff was harmed when the government decided to investigate his relationship with Russia, suffering damages in the form of unspecified "defense costs, legal fees, and related expenses."  *Id.* ¶¶ 8, 179, 263.

The Complaint asserts eight counts against Mr. Sussmann, numbered I through VIII, each of which should be dismissed with prejudice for at least three independent reasons.  *First*, all of the claims against Mr. Sussmann are time-barred.  *Second*, Plaintiff's vague and conclusory allegations are insufficient to sustain his pleading burden as to any such claim.  *Third*, to the extent Plaintiff's alleged injuries derive from governmental action based on purported statements and

information provided by Mr. Sussmann, his claims target constitutionally protected petitioning activity and must be dismissed under *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and its progeny.  For these and the reasons detailed in the Clinton and Perkins Coie Briefs, Plaintiff's claims against Mr. Sussmann should be dismissed in their entirety.

## I.  ALL OF PLAINTIFF'S CLAIMS AGAINST MR. SUSSMANN ARE UNTIMELY

As a threshold matter, each of the claims asserted against Mr. Sussmann is untimely.  For purposes of applying the relevant statutes of limitations, the counts naming Mr. Sussmann are divisible into two categories: (i) claims that accrue upon the *occurrence* of the alleged injury; and (ii) claims that accrue when Plaintiff *discovered* (or reasonably should have discovered) the fact of the injury.  The first category includes Counts III (Injurious Falsehood) and IV (Conspiracy to Commit Injurious Falsehood).[1]  And Counts I (RICO), II (RICO Conspiracy), VII (Computer Fraud and Abuse Act), and VIII (Theft of Trade Secrets) fall into the second category.[2]

In Mr. Sussmann's case, the triggering events relevant to *either* standard occurred over five years ago.  And as the Clinton Brief explains, Plaintiff's claims carry, *at most*, a four-year

---

[1]    *See Wagner, Nugent, Johnson, Roth, Romano, Erickson & Kupfer, P.A. v. Flanagan*, 629 So. 2d 113, 114-15 (Fla. 1993) (discussing defamation actions); *see also Callaway Land & Cattle Co., Inc. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 209 (Fla. Dist. Ct. App. 2002) (noting that the same limitations period governs defamation and injurious falsehood claims); *Olson v. Johnson*, 961 So. 2d 356, 359-60 (Fla. Dist. Ct. App. 2007) ("A conspiracy cause of action accrues when the plaintiff suffers damages as a result of the acts performed pursuant to the conspiracy.").

[2]    *See Rotella v. Wood*, 528 U.S. 549, 555 (2000) (RICO); *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013) (RICO conspiracy); 18 U.S.C. § 1030(g) (stating the limitations period for a Computer Fraud and Abuse Act violation begins to run upon "the act complained of or the date of discovery of the damage"); 18 U.S.C. § 1836 (stating a claim for theft of trade secrets accrues when "the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered").  Regarding Counts V and VI, a malicious prosecution claim accrues, if at all, when the underlying action terminates in the plaintiff's favor.  *See Olson v. Johnson*, 961 So. 2d 356, 359 (Fla. Dist. Ct. App. 2007).  Here, because Plaintiff does not allege that he was ever the subject of criminal prosecution, his purported claim never accrued at all.  *See infra* Section II.C.

limitations period running from the time of accrual—with several of the claims against Mr. Sussmann subject to an even shorter limitations period. *See* Clinton Br. at 3-5. As a result, *all* of the claims against Mr. Sussmann are stale and should be dismissed on that basis alone.

*First*, for claims accruing upon the occurrence of the asserted injury, the sole question is when Mr. Sussmann took the alleged action that resulted in Plaintiff's purported harm—*i.e.*, the last alleged act needed to give Plaintiff "a 'complete and present cause of action.'" *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (citation omitted); *see also* Fla. Stat. § 95.031 ("A cause of action accrues when the last element constituting the cause of action occurs.").[3] The Complaint alleges that Plaintiff was injured "[a]s a result" of Mr. Sussmann conveying purportedly sensitive "internet data" to the FBI in September 2016.[4] Compl. ¶¶ 7, 109-26, 165-82, 215, 339.[5] Because that communication occurred nearly six years before Plaintiff filed suit in March 2022, Counts III and IV are time-barred. *See* Clinton Br. at 4 (discussing two- and four-year limitations periods for injurious falsehood and conspiracy claims, respectively); *see also* Perkins Coie Br. at 8-9 (discussing two-year limitations period for injurious falsehood claim).

*Second*, with respect to those claims accruing upon discovery of the injury, Plaintiff concedes that "multiple media outlets" reported on the alleged link between the Trump Organization and Alfa Bank servers "in or about late October 2016." Compl. ¶ 183. Plaintiff

---

[3]     For purposes of this motion, Mr. Sussmann assumes that Florida law governs Plaintiff's common law claims.

[4]     As detailed in the Clinton Brief, the data purportedly at issue—"DNS internet traffic data"—is "created automatically when computers connect to each other across the internet," and is part of the underlying "architecture" of the internet. Clinton Br. at 8 (citing *Intermatic Inc. v. Toeppen*, 947 F. Supp. 1227, 1231 (N.D. Ill. 1996)).

[5]     Plaintiff also alludes in passing to an alleged meeting between Mr. Sussmann and "two CIA employees," Compl. ¶ 215-17, but the Complaint does not link that meeting to any injury that Plaintiff purportedly suffered. Regardless, any claim arising from that meeting—which occurred in February 2017—also would be untimely.

specifically points to public reports "that U.S. government authorities had received and were investigating allegations concerning a purported secret channel of communications between the Trump Organization and a . . . Russian Bank," *id.*—the source of Plaintiff's alleged injury attributed, in part, to Mr. Sussmann. Plaintiff was thus aware of the injury underlying his claims against Mr. Sussmann by no later than October 2016. And that is sufficient to start the clock for Counts I, II, VII, and VIII—with the statutes of limitations on those claims having expired between 2018 and 2020. *See Rotella v. Wood*, 528 U.S. 549, 555 (2000) ("[D]iscovery of the injury, not discovery of the other elements of the claim, . . . starts the clock"); Clinton Br. at 3-5 (discussing applicable limitations periods).

The untimeliness of the claims against Mr. Sussmann is reason alone to dismiss them. *See La Grasta v. First Union Secs., Inc.*, 358 F.3d 840, 845-46 (11th Cir. 2004) (confirming that dismissal is appropriate where untimeliness is "apparent from the face of the complaint").

## II.     PLAINTIFF'S CLAIMS AGAINST MR. SUSSMANN ARE DEFECTIVELY PLED

### A.     Counts I, II & VIII: Plaintiff Fails To Allege Viable RICO Predicate Acts, Cognizable Damages, Or Proximate Causation

As further detailed in the Clinton Brief, *see* Clinton Br. at 7-10, Plaintiff fails to adequately allege any "predicate act" supporting his RICO and RICO conspiracy claims (let alone "two or more," as the law requires, *United States v. Starrett*, 55 F.3d 1525, 1543 (11th Cir. 1995))—and the same pleading failure equally forecloses his standalone theft of trade secrets claim.[6] On top of that, Plaintiff's complained-of harms do not constitute cognizable economic injuries; and the Complaint fails to establish that Mr. Sussmann's alleged actions proximately caused those purported injuries in any event.

---

[6]     Plaintiff asserts theft of trade secrets under 18 U.S.C. § 1832 as both a predicate to his RICO claim (Count I) and as a standalone claim (Count VIII). The standalone claim fails for the same reasons discussed *infra*.

*First*, both of the two RICO "predicate acts" cited in Counts I and II are deficiently pled as to Mr. Sussmann.[7]  The first—theft of trade secrets under 18 U.S.C. § 1832—alleges that Mr. Sussmann "conspired" with Neustar, Inc. to utilize the company's lawful access to DNS data which, Plaintiff contends, comprised "trade secrets."  In order to qualify as a "trade secret," however, Plaintiff would need to plausibly allege that the data "derives independent *economic* value . . . from not being generally known to . . . another person who can obtain *economic* value from the disclosure or use of the information."  18 U.S.C. § 1839(3)(B) (emphasis added).  Yet Plaintiff offers *no* account—plausible or otherwise—of the economic value of DNS information either to himself or to Mr. Sussmann or Neustar.  (Indeed, it is unclear how Plaintiff could plausibly claim even to have "owned" data generated automatically as a routine function of internet communications.  *See* Clinton Br. at 8.)  Instead, he spends 65 pages describing the data's supposed *political* utility before abruptly switching gears and making a conclusory assertion that it also conveys "significant economic value."  Compl. ¶¶ 288-89.[8]  That factually unsupported, talismanic invocation of the statutory language is insufficient to state a claim.  *See Ashcroft v. Iqbal*, 556 U.S.

---

[7]     Even if Plaintiff alleged that Mr. Sussmann participated in at least two predicate acts – which he did not – the RICO claims still fail for the additional reason that these acts did not constitute a pattern of racketeering activity.  *See* Clinton Br. at 11-12.  The Complaint's specific allegations as to Mr. Sussmann span approximately eight months from July 2016 to February 2017, *see* Compl. ¶¶ 109, 215-17, which Courts have categorically rejected as being too brief a period of time for a pattern of racketeering activity.  *See, e.g., Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1266 (11th Cir. 2004).  And the Complaint does not plead with any specificity how Mr. Sussmann's conduct remains ongoing or that the predicate acts were a "regular way of doing business."  *See* Compl. ¶¶ 270, 273-76.

[8]     Tellingly, Plaintiff in one instance adds the word "political" to his otherwise parroted definition of "trade secrets."  *Compare* Compl. ¶ 289 ("This . . . information . . . constitutes trade secrets within the meaning of 18 U.S.C. § 1839(3) where [it] constitute[s] business *and/or political methods* . . ." (emphasis added)), *with* 18 U.S.C. § 1839(3) ("[T]he term 'trade secret' means all forms and types of financial, business, scientific, technical, economic, or engineering information.").  This alteration to Plaintiff's otherwise rote recitation of the statutory language betrays his attempt to reframe political sensitivities as trade secrets.

662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *see also* Clinton Br. at 8-9.

The other purported predicate—for obstruction of justice under 18 U.S.C. §§ 1503 and 1512, *see* Compl. ¶ 302—is likewise deficiently pled.  Plaintiff alleges that Mr. Sussmann made misstatements about Plaintiff's ties with Russia and Mr. Sussmann's affiliation with the Clinton Campaign in meetings with the FBI and CIA, and thereby "obstructed . . . the due administration of justice and/or one or more official proceedings, namely" those agencies' investigations.  Compl. ¶¶ 300, 302.  In their statutory context, however, the terms "due administration of justice" and "official proceedings" refer to *adjudicative* proceedings—not investigations.  *See* 18 U.S.C. § 1515(a)(1) (defining "official proceeding"); *United States v. Aguilar*, 515 U.S. 593, 599-600 (1995) ("[U]ttering false statements to an investigating agent . . . who might or might not testify before a grand jury" does not constitute obstruction of the "due administration of justice."); *United States v. Silverman*, 745 F.2d 1386, 1393 (11th Cir. 1984) (defining "due administration of justice" as "judicial procedure").  As Plaintiff admits, the investigation supposedly stemming from Mr. Sussmann's government disclosures never materialized into a prosecution or other judicial proceeding, *see, e.g.*, Compl. ¶ 232—so his claim also necessarily fails, *see* Clinton Br. at 9-10.

*Second*, the Complaint fails to allege that either predicate act injured Plaintiff's "business or property."  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495 (1985); 18 U.S.C. § 1963(c) (restricting civil RICO relief to persons "injured in [their] business or property by reason of a violation of section 1962").  The requirement that civil RICO plaintiffs plead "an injury to business or property . . . has [] 'restrictive significance.'"  *Ironworkers Local Union 68 v. AstraZeneca Pharmaceuticals, LP*, 634 F.3d 1352, 1361 (11th Cir. 2011) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)).  But here, Plaintiff makes only broad-brushed assertions that the

predicate acts somehow harmed his "political career and . . . ability to effectively govern," Compl. ¶ 296, and that he later incurred "defense costs, legal fees, and related expenses" in connection with his own "effort to defend against" the "various" investigations and other unidentified "proceedings" that purportedly "arose" from "Defendants' actions," *id.* ¶ 314.[9]  Those alleged harms in no sense reflect injuries to Plaintiff's "business or property," and therefore cannot convey standing to bring civil RICO claims.  *See Rylewicz v. Beaton Servs., Ltd.*, 698 F. Supp. 1391, 1395-96 (N.D. Ill. 1988) ("The phrase 'business and property' excludes . . . political damages."); *Grogan v. Platt*, 835 F.2d 844, 847 (11th Cir. 1988) ("'[I]njured in his business or property' excludes personal injuries, including the pecuniary losses therefrom.").

*Finally*, even had Plaintiff pled a cognizable economic injury, he failed to allege or explain how Mr. Sussmann's alleged acts—statements made to the FBI, CIA, and unspecified "reporters"—proximately *caused* that purported harm.  *See generally* Clinton Br. at 12-14.  "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led *directly* to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006); *see also Simpson v. Sanderson Farms*, 744 F.3d 702, 705 (11th Cir. 2014).  Here, setting aside Plaintiff's bald assertion that he was injured "[a]s a direct and proximate result of Defendants' actions," Compl. ¶ 313, the Complaint makes clear that Plaintiff's public-image challenges and legal costs stemmed from reports, investigations, and proceedings by third

---

[9]   Plaintiff makes a cursory reference to "the loss of existing and future business opportunities for himself, the Trump Campaign, and the Trump Organization."  Compl. ¶ 314.  Leaving aside the troubling question of what "existing and future business opportunities" Plaintiff's political campaign might pursue, it is clear that such speculative allegations of unspecified business losses are insufficient to support a claim.  *Accord Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 24 (2d Cir. 1990); *Klayman v. Clinton*, 2015 WL 10857500, at *6 (S.D. Fl. Aug. 11, 2015) (Middlebrooks, J.) (holding allegation that conduct "may have compromised Plaintiff's ability to earn a living" was too speculative to support RICO standing).

parties—not Mr. Sussmann directly.  And that intervening factor—the independent decisions by *other* individuals acting on their own volition to publish articles, commence investigations, and file lawsuits—breaks any causal link between Mr. Sussmann's alleged actions and Plaintiff's asserted harm.  *See Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*, 341 F.3d 1292, 1308 (11th Cir. 2003) (affirming dismissal where plaintiffs could not establish "obstruction of justice and witness tampering" as "the proximate cause of their alleged injury").  Indeed, Plaintiff himself acknowledges that the "Crossfire Hurricane" investigation cited throughout the Complaint pre-dated Mr. Sussmann's alleged meetings with the government, *see* Compl. ¶ 134 (alleging the FBI "opened" its investigation on July 31, 2016); *id.* ¶ 170 (discussing Mr. Sussmann's alleged FBI meeting on September 19, 2016); and an official report referenced in the Complaint makes clear that intel from a friendly foreign government—*not* the DNS information Mr. Sussmann allegedly shared—"was relied upon to predicate the opening of the Crossfire Hurricane investigation."[10]

These pleading failures—among others, *see* Clinton Br. at 6-15—are fatal to both the substantive RICO count (Count I) as well as the conspiracy claim (Count II), *see Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1269 (11th Cir. 2004) (holding that dismissal of "a substantive RICO claim" also requires dismissal of related "RICO conspiracy claims").

**B.      Counts III & IV: Plaintiff Fails To Identify A Sufficient Harm Or Causal Link To Support The Injurious Falsehood Claims**

Plaintiff's injurious falsehood claims similarly fail as to Mr. Sussmann because the Complaint is devoid of facts showing that Mr. Sussmann interfered with any of Plaintiff's "*economic* relations," as Florida law requires.  *Salit v. Ruden, McClosky, Smith, Schuster &*

---

[10]      U.S. Dep't of Justice, Office of the Inspector General, *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation* at 346 (2019), *available at* https://www.justice.gov/storage/120919-examination.pdf; *see also Thaeter v. Palm Beach Cnty. Sheriff's Office*, 449 F.3d 1342, 1352 n.7 (11th Cir. 2006) (considering investigative report that was "incorporate[d] by reference" into complaint); Compl. ¶ 3 n.1.

*Russell, P.A.*, 742 So. 2d 381, 386 (Fla. Dist. Ct. App. 1999) (emphasis added); *see also* Perkins Coie Br. at 7-8. Plaintiff asserts only that Mr. Sussmann's alleged actions led to "legal issues and political issues." Compl. ¶¶ 339, 345. But those purported harms cannot support an injurious falsehood cause of action. *See Callaway Land & Cattle Co., Inc. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 209 (Fla. Dist. Ct. App. 2002) (limiting scope of injurious falsehood claims to "protect[ing] economic interests of the injured party against pecuniary loss," as distinct from losses to the "personal reputation of the plaintiff"); Clinton Br. at 18 (noting that the Complaint challenges statements which "deal entirely with Trump's presidency and fitness for office," not Plaintiff's "business interests"). Furthermore, even if Plaintiff did identify a sufficient harm, he fails to plead whether and how Mr. Sussmann's statements in particular played "a material and substantial part in inducing others not to deal with the Plaintiff," *Kanarick v. GE Credit Retail Bank Care Credit*, 2013 WL 12092479, at *4 (S.D. Fla. Sept. 6, 2013) (Middlebrooks, J.)—an essential element of the claim. For these (among other) reasons, *see generally* Perkins Coie Br. at 4-9; Clinton Br. at 17-19, Counts III and IV should be dismissed.

### C.    Counts V & VI: There Was No Prosecution To Support The Malicious Prosecution Claims

Plaintiff's malicious prosecution claims fail for the basic reason that Plaintiff was never *prosecuted*. A cause of action for malicious prosecution arises, if at all, upon termination of an underlying action in the plaintiff's favor. *See Olson v. Johnson*, 961 So. 2d 356, 359 (Fla. Dist. Ct. App. 2007). But there is no allegation that Mr. Sussmann's purported statements to the government resulted in *any* kind of "original criminal or civil judicial proceeding," *Alamo Rent-A-Car, Inc. v. Mancusi*, 632 So. 2d 1352, 1355 (Fla. 1994)—much less one resolved in Plaintiff's favor, *see* Perkins Coie Br. at 9-10. On the contrary, Plaintiff himself asserts that "[t]he FBI's

investigation of [Mr. Sussmann's] allegations [] concluded that there was insufficient evidence to" warrant taking legal action.  Compl. ¶ 180.

Additionally, the requisite causal link is once again missing.  Even if the FBI's investigation could be deemed an "original criminal or judicial proceeding" (and it cannot),[11] Plaintiff has not demonstrated how Mr. Sussmann could possibly have been the "legal cause" of a matter that preceded his alleged actions.  *Melford v. Kahane & Assocs.*, 371 F. Supp. 3d 1116, 1123-24 (S.D. Fla. 2019).  These and other pleading deficiencies require dismissal of Counts V and VI.  *See* Perkins Coie Br. at 9-13; Clinton Br. at 19.

### D.    Count VII: The Computer Fraud and Abuse Act Claim Fails to State a Cognizable Claim and Fails For Lack of Qualifying Damages

For reasons detailed in the Perkins Coie brief, *see* Perkins Br. at 13-17, Plaintiff has not plausibly alleged a violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(g) regarding Mr. Sussmann.  Notably, the Supreme Court has foreclosed the "unauthorized access" theory on which the CFAA claim rests, and a CFAA claim cannot be based on alleged unauthorized access by Neustar to computers belonging to the Executive Office of the President.

Plaintiff's CFAA claim against Mr. Sussmann also fails to allege a cognizable harm.  Under the CFAA, civil claimants can recover as "damage or loss" only those costs "necessary to assess and remedy damage" to a protected computer.  *Dreni v. PrinterOn Am. Corp.*, 486 F. Supp. 3d 712, 735 (S.D.N.Y. 2020); *see also Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1174 (11th Cir. 2017); 18 U.S.C. §§ 1030(e)(8), (11) (defining "damage" and "loss").  But here, the damages allegedly resulting from the use of Plaintiff's DNS information—"defense costs, legal

---

[11] As noted in the Perkins Coie Brief, the FBI's investigation was not a criminal proceeding, *see* Perkins Coie Br. at 10 (citing *Valladares v. Bank of Am. Corp.*, 197 So. 3d 1, 10 (Fla. 2016) (rejecting malicious prosecution claim because plaintiff was "never arrested or prosecuted")), and Plaintiff does not allege that Mr. Sussmann's statements contributed to any other qualifying prosecution.

fees, and related expenses," Compl. ¶ 392—bear no relation whatsoever to identifying or remedying a computer intrusion, *see Wichansky v. Zowine*, 150 F. Supp. 3d 1055, 1071-72 (D. Ariz. 2015) ("[L]itigation expenses . . . are not a cognizable loss under the CFAA."). Thus, even had Plaintiff plausibly alleged a CFAA violation (and he has not), dismissal of Count VII would be warranted.

## III. ALL OF PLAINTIFF'S CLAIMS AGAINST MR. SUSSMANN ARE BARRED BY THE *NOERR-PENNINGTON* DOCTRINE

Plaintiff's claims are predicated on the same core theory of liability: that Mr. Sussmann conveyed to representatives of the federal government allegations about Plaintiff's links to Russia, and that Plaintiff was injured by the FBI's purportedly related investigation. Taking Plaintiff's allegations as true, such governmental communications fall squarely within the protections afforded to this kind of "petitioning" activity; they are foreclosed by the *Noerr-Pennington* doctrine; and Mr. Sussmann accordingly cannot be held civilly liable for the harms stemming from any resulting governmental action.

The right to petition is "integral to the democratic process." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011). It "allows citizens to express their ideas, hopes, and concerns to their government." *Id.* And where, as here, that right is exercised in the form of "speech uttered during a campaign for political office," the First Amendment's protections are at their "fullest." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010).

The *Noerr-Pennington* doctrine preserves this constitutional right by protecting petitioners from civil liability for governmental action stemming from their petitions. *See Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961) ("[N]o violation . . . can be predicated upon [] attempts to influence the . . . enforcement of laws."). *Noerr-Pennington* thus allows a party to present grievances to the government—"regardless of intent or purpose"—

11

without fear that those affected by any resulting governmental action can obtain civil redress against them.  *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965); *see also White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000) ("*Noerr-Pennington* is a label for a form of First Amendment protection; to say that one does not have *Noerr-Pennington* immunity is to conclude that one's petitioning activity is unprotected by the First Amendment.").

Because of its constitutional rooting, courts have applied *Noerr-Pennington* to reject both federal and state-law claims based on the results of a party's governmental petitioning.  *See, e.g.*, *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1559, 1559-1562 (11th Cir. 1992) (citing the doctrine's "First Amendment underpinnings" and applying it to dismiss a state-law claim); *Int'l Brotherhood of Teamsters, Local 734 Health & Welfare Tr. Fund v. Phillip Morris Inc.*, 196 F.3d 818, 826 (7th Cir. 1999) (dismissing a RICO action); *SilverHorse Racing, LLC v. Ford Motor Co.*, 2016 WL 7137273, at *2-3 (M.D. Fla. Apr. 27, 2016) (collecting cases).

Here, Plaintiff's claims against Mr. Sussmann are all based on a singular theory that (1) Mr. Sussmann presented to the federal government evidence concerning potential ties between Plaintiff and a Russian bank; (2) the government investigated Plaintiff based (at least in part) on those allegations; and (3) Plaintiff suffered damages in defending against those investigations.  *See, e.g.*, Compl. ¶ 179 (alleging that, "as a result of" the meeting between Mr. Sussmann and the FBI, "the FBI opened an investigation of the Trump-Alfa Bank allegations"); *id.* ¶ 263 (describing Plaintiff's damages as the result of "the various federal investigations and official proceedings that arose" from Defendants' alleged actions).  Plaintiff thus seeks to hold Mr. Sussmann liable for classic petitioning activity; indeed, assuming the truth of Plaintiff's allegations, the actions he purports to target are not unlike the "publicity campaign to influence governmental action" addressed in *Noerr* itself.  365 U.S. at 140-41; *see also id.* at 129 (describing a campaign "to create

an atmosphere of distaste for [rivals] among the general public").  Accordingly, even beyond the Complaint's pleading deficiencies, the *Noerr-Pennington* doctrine forecloses Plaintiff's claims against Mr. Sussmann.

## CONCLUSION

For the foregoing reasons and the additional bases detailed in the Clinton and Perkins Coie Briefs, the Court should dismiss Counts I through VIII as to Mr. Sussmann, in their entirety.

Date: May 11, 2022

Respectfully submitted,

By: */s/ Roberto Martínez*

**COLSON, HICKS, EIDSON, P.A.**

Roberto Martínez (Florida Bar No. 305596)
bob@colson.com
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
(305) 476-7400

**LATHAM & WATKINS LLP**

Sean M. Berkowitz*
sean.berkowitz@lw.com
330 N. Wabash, Suite 2800
Chicago, IL 60611
(312) 876-7700

Michael S. Bosworth*
michael.bosworth@lw.com
1271 Avenue of the Americas
New York, NY 10020
(212) 916-1221

Stephen P. Barry*
stephen.barry@lw.com
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200

Michael F. Houlihan*
michael.houlihan@lw.com
200 Clarendon Street
Boston, MA 02116
(617) 880-4642

*Admitted pro hac vice*

*Attorneys for Defendant Michael Sussmann*

14

147

Marc Elias's Motion to Dismiss Under Federal Rule 12(b)(6) and
Incorporated Memorandum of Law (May 11, 2022)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

DONALD J. TRUMP,

                Plaintiff,

        v.

HILLARY R. CLINTON, et al.,

                Defendants.

Case No. 2:22-cv-14102-DMM

## MARC ELIAS'S MOTION TO DISMISS UNDER FEDERAL RULE 12(B)(6) AND INCORPORATED MEMORANDUM OF LAW

Reid J. Schar*
April A. Otterberg*
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
Tel: (312) 222-9350
Fax: (312) 527-0484
* Admitted *pro hac vice*

Eugene K. Pettis
Debbie P. Klauber
HALICZER, PETTIS & SCHWAMM
One Financial Plaza
100 S.E. 3rd Ave., Seventh Floor
Fort Lauderdale, FL 33394
Tel: (954) 523-9922
Fax: (954) 522-2512

*Counsel for Defendant Marc Elias*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 1

LEGAL STANDARD .......................................................................................................... 3

ARGUMENT ...................................................................................................................... 4

I.      Counts I, II, IV, and VI Are Time-Barred as a Matter of Law. ........................... 4

II.     Plaintiff Does Not State a RICO Claim Against Mr. Elias (Count I). ................. 5

        A.      Plaintiff Fails to State the Enterprise Element. ...................................... 5

        B.      Plaintiff Does Not Allege That Mr. Elias Participated in a Pattern of
                Racketeering Activity Involving At Least Two Predicate Acts. ............ 7

                1.      Plaintiff Fails to State At Least Two Predicate Acts. ................ 7

                2.      Plaintiff Does Not Allege Mr. Elias Engaged in a Pattern of
                        Racketeering Activity. ................................................................ 9

        C.      Plaintiff Does Not Satisfy RICO's Demanding Causation Standard. ... 10

III.    Plaintiff Fails to State a RICO Conspiracy Claim Against Mr. Elias (Count II). ............. 11

IV.     Plaintiff's Claim for Conspiracy to Commit Injurious Falsehood Fails (Count IV). ....... 12

V.      Plaintiff Does Not—And Cannot—State a Malicious Prosecution Claim (Count V). ..... 13

VI.     The Claim for Conspiracy to Commit Malicious Prosecution Also Fails (Count VI) ...... 15

CONCLUSION .................................................................................................................. 16

REQUEST FOR HEARING ............................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**

*Aldridge v. Lily-Tulip. Inc. Salary Ret. Plan Benefits Comm.*, 953 F.2d 587 (11th Cir. 1992).... 10

*Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302 (S.D. Fla. 2014) ............................ 12, 15, 16

*Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283 (11th Cir. 2010) ........................................ 4, 11

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) ..................................................... 10

*Artubel v. Colonial Bank Grp., Inc.*, No. 8:08-cv-179-T-23MAP, 2008 WL 3411785
(M.D. Fla. Aug. 8, 2008) ....................................................... 15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................ 3

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................... 3

*Boyle v. United States*, 556 U.S. 938 (2009) ................................................................. 6

*Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001)........................................... 6

*Cisneros v. Petland, Inc.*, 972 F.3d 1204 (11th Cir. 2020)......................................... 5, 6, 7

*Cole v. Lobello Painting, Inc.*, No. 8:06-CV-2171, 2007 WL 2330860
(M.D. Fla. Aug. 14, 2007) ....................................................... 16

*Colite Int'l Inc. v. Robert L. Lipton, Inc.*, No. 05-60046-CIV, 2006 WL 8431656
(S.D. Fla. June 6, 2006) ....................................................... 11

*Cont'l 332 Fund, LLC v. Kozlowski*, No. 2:17-cv-41-FtM-38MRM, 2020 WL 1234808
(M.D. Fla. Mar. 13, 2020)....................................................... 7

*Corcel Corp., Inc. v. Ferguson Enters., Inc.*, No. 12-80896, 2016 WL 880557
(S.D. Fla. Mar. 8, 2016)....................................................... 4

*Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 354 (8th Cir. 2011)...................................... 7

*Day v. Taylor*, 400 F.3d 1272 (11th Cir. 2005) ............................................................ 14

*Debrincat v. Fischer*, 217 So. 3d 68 (Fla. 2017) ................................................. 13, 14, 15

*Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp. 2d 1260 (S.D. Fla. 2004) ...................... 13

*Fla. Evergreen Foliage v. E.I. Dupont De Nemours & Co.*, 336 F. Supp. 2d 1239
(S.D. Fla. 2004)....................................................... 6

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989)....................................................... 9

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992) ...................................... 5, 10

*HSBC Bank USA, Nat'l Ass'n v. Ross*, No. 8:11-cv-02019, 2012 WL 13140776
    (M.D. Fla. Apr. 5, 2012) ............................................................................................... 16

*In re Takata Airbag Prods. Liability Litig.*, 524 F. Supp. 3d 1266 (S.D. Fla. 2021) .............. 10, 11

*Jackson v. BellSouth Telecomm.*, 372 F.3d 1250 (11th Cir. 2004) ......................................... 10, 11

*Joseph v. Bernstein*, No. 13–24355–CIV, 2014 WL 4101392 (S.D. Fla. Aug. 19, 2014) ........... 14

*Kelly v. Palmer, Reifler, & Assocs., P.A.*, 681 F. Supp. 2d 1356 (S.D. Fla. 2010) ...................... 6

*Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350 (M.D. Fla. 2005) ...................... 6, 7

*McMurray v. U-Haul Co., Inc.*, 425 So. 2d 1208 (Fla. 4th DCA 1983) ........................................ 4

*Muskegan Hotels, LLC v. Patel*, 986 F.3d 692 (7th Cir. 2021) .................................................... 7

*Nunes v. Fusion GPS*, 531 F. Supp. 3d 993 (E.D. Va. 2021) ............................................... 6, 8, 11

*Pac. Harbor Capital, Inc. v. Barnett Bank, N.A.*, 252 F.3d 1246 (11th Cir. 2001) ...................... 4

*Rinker v. Carnival Corp.*, 753 F. Supp. 2d 1237 (S.D. Fla. 2010) .............................................. 13

*Rodgers v. Addy*, No. 17-cv-23429, 2021 WL 4487903 (S.D. Fla. Sept. 27, 2021) ..................... 7

*Spain v. Brown & Williamson Tobacco Corp.*, 363 F.3d 1183 (11th Cir. 2004) ......................... 12

*Sterling Nat'l Mortg. Co., Inc. v. Infinite Title Solutions, LLC*, No. 10-22147-CIV,
    2011 WL 13220625 (S.D. Fla. Mar. 3, 2011), *report and recommendation adopted*,
    2011 WL 1222168 (S.D. Fla. Mar. 31, 2011) ............................................................... 9

*Super Vision Int'l, Inc. v. Mega Int'l Commercial Bank Co., Ltd.*, 534 F. Supp. 2d 1326
    (S.D. Fla. 2008) ......................................................................................................... 11

*United States v. Davis*, 854 F.3d 1276 (11th Cir. 2017) .............................................................. 8

*United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013) ............................................................ 8

*United States v. Goldin Indus., Inc.*, 219 F.3d 1271 (11th Cir. 2000) ........................................... 6

*United States v. McDaniel*, No. 2:13-CR-00015, 2013 WL 8476819 (N.D. Ga. Oct. 2, 2013),
    *report and recommendation adopted*, 2014 WL 2084891 (N.D. Ga. May 16, 2014) ........ 8

*United States v. Young*, 916 F.3d 368 (4th Cir. 2019) ................................................................ 8

*Valladares v. Bank of Am. Corp.*, 197 So. 3d 1 (Fla. 2016) ....................................................... 14

*Wilder v. JP Morgan Chase Bank, N.A.*, No. 18-20820, 2018 WL 5629922
    (S.D. Fla. Oct. 30, 2018)........................................................... 4

**Statutes**

18 U.S.C. § 1503........................................................................... 8

18 U.S.C. § 1512........................................................................... 8

18 U.S.C. § 1515(a)....................................................................... 8

**Rules**

Fed. R. Civ. P. 12(b)(6)................................................................ 3

Fed. R. Civ. P. 9(b)...................................................................... 4

**Other Authorities**

Office of the Inspector General, U.S. Dep't of Justice, *Review of Four FISA Applications
    and Other Aspects of the FBI's Crossfire Hurricane Investigation* (2019)..................... 14

U.S. Dep't of Justice, Office of Special Counsel, *Report on the Investigation into Russian
    Interference in the 2016 Presidential Election*, vol. II (2019)........................................ 15

## INTRODUCTION

Seeking to score political points, Plaintiff has brought a slew of meritless claims against a wide-ranging group of defendants.  One of those defendants is Marc Elias, a lawyer for the Democratic National Committee and Hillary Clinton's 2016 presidential campaign.  As shown below, Plaintiff's claims against Mr. Elias are time-barred as a matter of law and lack the factual and legal content necessary to state any plausible cause of action.  Each of Plaintiff's political grievances, masquerading as legal claims, should be dismissed with prejudice.

## FACTUAL BACKGROUND

On March 24, 2022, Plaintiff filed his 108-page, 508-paragraph Complaint against numerous individuals and entities who purportedly wronged Plaintiff in the lead-up to the 2016 presidential election through a supposed far-reaching conspiracy to connect him and his presidential campaign to Russia.  (*See generally* Dkt. 1, Compl.)  The length and breadth of the Complaint are nothing more than an effort to mask Plaintiff's failure to state any claim.

Plaintiff broadly contends that Mr. Elias, a former partner at the law firm of Perkins Coie, "led an effort to produce spurious 'opposition research' claiming to reveal illicit ties between the Trump Campaign and Russian operatives[.]"[1]  (*Id.* ¶ 3.)  The details specific to Mr. Elias, however, are few and conclusory.  Plaintiff alleges that Mr. Elias, together with his former law partner, Michael Sussmann, was responsible for Perkins Coie's representation of the Democratic National Committee (the "DNC") and Hillary Clinton's presidential campaign (the "Clinton Campaign"), with Mr. Elias serving as both entities' "General Counsel."  (*Id.* ¶ 50.)  Plaintiff alleges that in August 2015, Mr. Elias and Mr. Sussmann negotiated a joint fundraising agreement between the DNC and the Clinton Campaign.  (*Id.* ¶¶ 51–53.)  Plaintiff further alleges, in conclusory fashion,

---

[1] Consistent with the standards that govern this motion, Mr. Elias accepts any well-pled allegations in the Complaint as true, but for purposes of this motion only.

that Mr. Elias was part of a "plan to publicly and falsely denigrate" Plaintiff and to "wrongly implicate him as colluding with Russia." (*Id.* ¶ 60.)  Mr. Elias's role, according to Plaintiff, was to work with Fusion GPS, an investigative firm, to develop a dossier showing a link between Plaintiff and Russia. (*Id.* ¶ 61.)  Plaintiff alleges Mr. Elias retained the firm in April 2016 and that the firm reported to him thereafter in its work. (*Id.* ¶¶ 66–67, 71–73.)

According to the Complaint, while Mr. Elias was working with Fusion, Mr. Sussmann was working with Neustar, Inc., an information technology company, to search for a connection between Plaintiff and a Russian bank. (*Id.* ¶ 5.)  Plaintiff asserts that Neustar executive Rodney Joffe unlawfully "search[ed], gather[ed], and mine[d] internet data . . . to obtain derogatory information" about Plaintiff, and that this was done in "furtherance" of work he was doing with Mr. Elias and Mr. Sussmann. (*Id.* ¶ 122.)  Aside from this conclusory statement, Plaintiff fails to allege any facts explaining how Mr. Elias was involved in the claimed data violations, which Plaintiff contends constituted a theft of trade secrets.

Plaintiff's remaining allegations pertaining to Mr. Elias rely on vaguely described excerpts of client billing records to suggest that Mr. Elias was somehow involved in efforts to spread a false narrative about Plaintiff through the media.  Plaintiff alleges that Mr. Elias met with Mr. Sussmann and Fusion GPS on July 29, 2016; met and had calls with Mr. Sussmann and Mr. Joffe on several occasions in August 2016; and spoke to Mr. Sussmann on the phone on September 12, 2016. (*Id.* ¶¶ 166, 168.)  Plaintiff further asserts that shortly before Mr. Sussmann met with the FBI in September 2016 to provide the agency with allegedly false information about Plaintiff's ties to Russia, Mr. Elias exchanged emails with Jake Sullivan and other Clinton Campaign staff. (*Id.* ¶ 169.)  According to Plaintiff, after the meeting with the FBI, Mr. Sussmann "coordinate[d]" with Mr. Joffe, Mr. Elias, and Fusion GPS to "disseminate" allegations about Plaintiff's ties to a Russian bank to the media. (*Id.* ¶ 181.)  Plaintiff also contends, without elaboration, that Mr. Elias allegedly

2

"assisted" Mr. Sullivan with a written statement about Plaintiff's ties to Russia that was published on October 31, 2016.  (*Id.* ¶¶ 185–87.)  Plaintiff does not allege what this "assistance" entailed or even any specific actions by Mr. Elias in the days leading up to this date.  There are no assertions regarding Mr. Elias's conduct after October 31, 2016.

Although Plaintiff attempts to paint Mr. Elias as part of a wide-ranging conspiracy, he alleges that Mr. Elias interacted with only a limited group: Mr. Sussmann, Perkins Coie, Fusion GPS and its co-founders, Mr. Joffe, and Clinton Campaign staff.  The Complaint does not allege that Mr. Elias had any contact with the FBI or any other agency during the relevant timeframe, nor does the Complaint allege that Mr. Elias spoke to the press about Plaintiff's ties to Russia.

Based on these razor-thin allegations, Plaintiff asserts claims against Mr. Elias for: a violation of RICO, 18 U.S.C. § 1962(c) (Count I); RICO conspiracy, 18 U.S.C. § 1962(d) (Count II); conspiracy to commit injurious falsehood (Count IV); malicious prosecution (Count V); and conspiracy to commit malicious prosecution (Count VI).  Each of these claims fails for the reasons explained below, and for the reasons set forth in the motions to dismiss filed by Secretary Clinton, Perkins Coie, and other defendants, which Mr. Elias joins to the extent applicable to him.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Instead, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In addition, where, as here, a plaintiff's claims are based on an alleged pattern of fraudulent conduct, the complaint must also comply with Rule 9(b), which requires that "[i]n alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b); *see Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010) (applying Rule 9(b) to RICO claims).

## ARGUMENT

### I.   Counts I, II, IV, and VI Are Time-Barred as a Matter of Law.

Plaintiff's delay in filing suit makes four of his claims against Mr. Elias—the two RICO claims (Counts I and II) and the two state-law conspiracy claims (Counts IV and VI)—untimely as a matter of law.[2]  Each of these claims has a four-year limitations period.[3]  *See, e.g., Pac. Harbor Capital, Inc. v. Barnett Bank, N.A.*, 252 F.3d 1246, 1251 (11th Cir. 2001) (RICO claim); *Wilder v. JP Morgan Chase Bank, N.A.*, No. 18-20820, 2018 WL 5629922, at *3 (S.D. Fla. Oct. 30, 2018) (conspiracy claims under Florida law); *Corcel Corp., Inc. v. Ferguson Enters., Inc.*, No. 12-80896, 2016 WL 880557, at *4–5 (S.D. Fla. Mar. 8, 2016) (RICO conspiracy claim).  As Secretary Clinton showed in her motion, which Mr. Elias joins and incorporates (Dkt. 52 at Section I), Plaintiff's own Complaint shows that four-year period expired long before he filed this lawsuit.

Plaintiff's sparse allegations specific to Mr. Elias prove the point, as they all involve events from long ago.  The allegations date back to "mid-2015," when the DNC and the Clinton Campaign retained Perkins Coie, and August 2015, when Mr. Elias and Mr. Sussman purportedly negotiated a joint fundraising agreement between the two clients.  (Compl. ¶¶ 49–51.)  Otherwise, *all* of Plaintiff's allegations regarding conduct by Mr. Elias date back to 2016 (*id.* ¶¶ 166, 168–69, 181, 187)—more than five years before Plaintiff filed this lawsuit—with not a single allegation identifying any supposed activity by Mr. Elias after October 31, 2016.

---

[2] For Count V (malicious prosecution), Plaintiff was never prosecuted (*see* Part V, below), so no such claim ever accrued in the first place.  *See, e.g., McMurray v. U-Haul Co., Inc.*, 425 So. 2d 1208, 1211 (Fla. 4th DCA 1983).

[3] If any state-law claims survive this motion, Mr. Elias reserves the right to argue that a law other than Florida law governs the claims.

Plaintiff also does not and cannot allege he did not know of his claims within the limitations period.  Plaintiff was quite aware, no later than at least October 29, 2017, of what he characterized as a conspiracy by those associated with Secretary Clinton and the Democratic Party to connect him to Russia.  (Dkt. 52 at Section I.)  Even that (generous) date is more than four years before Plaintiff filed this suit.  Counts I, II, IV, and VI are untimely and should be dismissed.

## II.   Plaintiff Does Not State a RICO Claim Against Mr. Elias (Count I).

Plaintiff's untimely RICO allegations also do not state a viable claim against Mr. Elias.  Under § 1962(c), Plaintiff was required to "plausibly allege six elements: that the defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the plaintiff." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020).  Plaintiff cannot state a RICO claim by lumping individual defendants together.  Rather, he was required to plead "that *each defendant* engaged in the conduct of the affairs of the RICO enterprise through a pattern of racketeering activity involving at least two predicate criminal acts."  *Id.* at 1207 (emphasis added).  RICO claims also are subject to a heightened causation standard: a plaintiff must demonstrate both proximate and but-for causation, showing a "direct relation between the injury asserted and the injurious conduct alleged."  *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992).  Plaintiff does not state these elements against any of the RICO defendants, but the deficiencies are particularly pronounced in his effort to sue Mr. Elias.

### A.   Plaintiff Fails to State the Enterprise Element.

Plaintiff does not allege the existence of a cognizable RICO enterprise, and Mr. Elias joins and incorporates the arguments made by Secretary Clinton and Perkins Coie on this point.  (Dkt. 52 at 7; Dkt. 143 at 2–3.)  Plaintiff attempts to plead that Mr. Elias was part of an "association-in-fact" enterprise, which requires three structural components: "a purpose, relationships among those

associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Plaintiff does not allege the existence of an enterprise with these features; instead, the Complaint "merely recite[s] the elements of an association-in-fact enterprise and allege[s] only conclusory facts." *Nunes v. Fusion GPS*, 531 F. Supp. 3d 993, 1006 (E.D. Va. 2021). This is far from what is required to plausibly allege the existence of an enterprise for purposes of a RICO claim. *Id.*

Plaintiff also does not allege that Mr. Elias is "separate and distinct from" the alleged RICO enterprise. *Kelly v. Palmer, Reifler, & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1378 (S.D. Fla. 2010). RICO requires such distinctiveness "because liability 'depends on showing that the defendants conducted or participated in the conduct of the *enterprise's* affairs, not just their *own* affairs.'" *Id.* (quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) (original emphasis)). "The crucial factor" is whether each defendant "'is free to act independently and advance its own interests contrary to those' of the other entities" in the enterprise. *Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350, 1365 (M.D. Fla. 2005) (quoting *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1277 (11th Cir. 2000)); *see also Fla. Evergreen Foliage v. E.I. Dupont De Nemours & Co.*, 336 F. Supp. 2d 1239, 1261–62 (S.D. Fla. 2004) (dismissing Florida RICO claim where "each and every one of the listed [defendants] is or was a DuPont employee or agent"). Thus, "plaintiffs may not plead the existence of a RICO enterprise between a corporate defendant and its agents or employees acting within the scope of their roles for the corporation." *Cisneros*, 972 F.3d at 1215 (quotation and citation omitted). Accordingly, in both *Kelly* and *Florida Evergreen*, the plaintiffs failed to state claims where the alleged RICO enterprise consisted in part of an entity and the counsel who represented and served as agents of the entity. *Kelly*, 681 F. Supp. 2d at 1378; *Fla. Evergreen*, 336 F. Supp. 2d at 1261–62.

Mr. Elias's co-defendants to Count I are his former Perkins Coie colleague (Mr. Sussmann); his former law firm (Perkins Coie); two former clients of Perkins Coie (the Clinton Campaign and the DNC); and Secretary Clinton herself. This group of defendants lacks the separation and distinctiveness required for a RICO claim. As a partner at Perkins Coie who allegedly was providing legal services to these clients at the time of his alleged conduct in violation of RICO, Mr. Elias was *not* "free to act independently and advance [his] own interests contrary to those of the other [defendants]." *See Lockheed Martin Corp.*, 357 F. Supp. 2d at 1365. "A complaint that does no more than allege that a law firm performed legal work for an enterprise fails to state a violation of § 1962(c)." *Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 698–99 (7th Cir. 2021). Plaintiff's attempt to plead a RICO enterprise fails, and Count I should be dismissed.

### B.    Plaintiff Does Not Allege That Mr. Elias Participated in a Pattern of Racketeering Activity Involving At Least Two Predicate Acts.

Plaintiff's allegations concerning Mr. Elias's participation in a pattern of racketeering activity, involving at least two predicate acts, also fall short. *See Cisneros*, 972 F.3d at 1215 ("each defendant" must have "participated" in the pattern of racketeering activity).

### 1.    Plaintiff Fails to State At Least Two Predicate Acts.

Plaintiff does not allege that Mr. Elias, specifically, participated in at least two RICO predicate acts. *See, e.g.*, *Cisneros*, 972 F.3d at 1217 (affirming dismissal where defendant was not alleged to have participated in two predicate acts); *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 354, 358 (8th Cir. 2011) (affirming dismissal for failure to plead "at least two predicate acts committed by each defendant"); *Rodgers v. Addy*, No. 17-cv-23429, 2021 WL 4487903, at *3–4 (S.D. Fla. Sept. 27, 2021) (dismissing RICO claim where the plaintiffs failed to plead "two predicate acts for each defendant"); *Cont'l 332 Fund, LLC v. Kozlowski*, No. 2:17-cv-41-FtM-38MRM, 2020 WL 1234808, at *3–5 (M.D. Fla. Mar. 13, 2020) (same result).

Plaintiff's allegations concerning the purported theft of trade secrets, one of his claimed predicate acts, fail generally for the reasons set forth in Secretary Clinton's brief.  (Dkt. 52 at 8–9.)  As to Mr. Elias specifically, the allegations are strikingly sparse.  Plaintiff merely states, without further explanation, that Mr. Joffe "unlawfully search[ed], gather[ed] and mine[d] internet data" in "furtherance of" his purported efforts "with" Mr. Sussmann and Mr. Elias to disseminate false allegations about Plaintiff.  (Compl. ¶ 122.)  This single conclusory statement does not provide the detail necessary to show that Mr. Elias participated in the supposed theft of trade secrets.[4]

Nor does Plaintiff allege Mr. Elias participated in the Complaint's second asserted predicate act, involving witness tampering.[5]  At the outset, 18 U.S.C. § 1512 requires an "official proceeding," and there was no such proceeding here.  As Secretary Clinton explained (Dkt. 52 at 9–10), by statute, an "official proceeding" includes a federal court or grand jury proceeding, a proceeding before Congress, a proceeding "before a federal government agency which is authorized by law," or a proceeding involving insurance business.  18 U.S.C. § 1515(a).  The Complaint focuses on the FBI's investigation into ties between Plaintiff and Russia, but "an FBI investigation is *not* an official proceeding under the obstruction of justice statute."  *United States v. Ermoian*, 752 F.3d 1165, 1172 (9th Cir. 2013) (emphasis added); *accord United States v. Young*, 916 F.3d 368, 384 (4th Cir. 2019) (reaching the same conclusion); *United States v. McDaniel*, No. 2:13-CR-00015, 2013 WL 8476819, at *12 (N.D. Ga. Oct. 2, 2013) (same), *report and recommendation adopted*, 2014 WL 2084891 (N.D. Ga. May 16, 2014).  Nor does Plaintiff allege

---

[4] Indeed, Plaintiff does not even attempt to plead his independent claim for the theft of trade secrets (Count VIII) against Mr. Elias.

[5] To the extent Plaintiff intended to allege a predicate act of obstruction of justice under 18 U.S.C. § 1503, that claim, too, fails because that statute requires a pending *judicial* proceeding.  *See United States v. Davis*, 854 F.3d 1276, 1290 (11th Cir. 2017); *Nunes*, 531 F. Supp. 3d at 1009.  No such proceeding is alleged here.

any way in which Mr. Elias withheld or destroyed evidence, another requirement of § 1512. Instead, he asserts Mr. Elias contributed to the *creation* of allegedly false documents. (*See, e.g.*, Compl. ¶ 61 ("Elias would work with Fusion GPS and a host of others to *develop* a dossier"); *id.* ¶ 63 (the "first phase of the Defendants' conspiracy" involved "the *creation* of an incriminating dossier") (emphases added).) Section 1512 does not cover this alleged conduct. (Dkt. 52 at 10.)

In short, Plaintiff's failure to allege Mr. Elias's participation in at least two predicate acts dooms his RICO claim. *See Sterling Nat'l Mortg. Co., Inc. v. Infinite Title Solutions, LLC*, No. 10-22147-CIV, 2011 WL 13220625, at *5 (S.D. Fla. Mar. 3, 2011) (each RICO element must be established "as to each individual defendant without exception"), *report and recommendation adopted*, 2011 WL 1222168 (S.D. Fla. Mar. 31, 2011).

### 2. Plaintiff Does Not Allege Mr. Elias Engaged in a Pattern of Racketeering Activity.

Even if Plaintiff had alleged that Mr. Elias participated in at least two predicate acts, his RICO claim still fails because he does not allege these acts constituted a pattern of racketeering activity by Mr. Elias. A "pattern" means the alleged predicate acts demonstrate ongoing racketeering activity or a "threat" of "continuing" racketeering activity. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989) (emphasis omitted). Mr. Elias joins and incorporates Secretary Clinton's arguments showing that Plaintiff has not pled either "closed-ended" or "open-ended" continuity of the alleged racketeering. (Dkt. 52 at 11–12.) As to Mr. Elias in particular, the Complaint's few allegations specific to his alleged conduct span a very short period of just six months, from April 2016 (when Mr. Elias met with Fusion GPS's co-founders and retained the firm) to October 31, 2016 (when Mr. Sullivan published a statement with which Mr. Elias allegedly "assisted"). (Compl. ¶¶ 66–67, 185–87.) Courts have categorically rejected closed-ended continuity for periods of less than nine months. *See, e.g., Jackson v. BellSouth Telecomm.*, 372

F.3d 1250, 1266 (11th Cir. 2004); *see also Aldridge v. Lily-Tulip. Inc. Salary Ret. Plan Benefits Comm.*, 953 F.2d 587, 593 (11th Cir. 1992) (period of six months was insufficient). And there are no facts alleged in the Complaint, let alone facts specific to Mr. Elias, to show open-ended continuity—that the predicate acts were part of his "regular way of doing business" or that they may recur in the future. *Jackson*, 372 F.3d at 1267 (quotations and citations omitted). The lack of a pattern of racketeering activity is another reason Plaintiff's RICO claim should be dismissed.

### C.    Plaintiff Does Not Satisfy RICO's Demanding Causation Standard.

Plaintiff also does not allege standing (causation) under RICO. RICO involves a heightened "direct causation" standard; a plaintiff must demonstrate both proximate and "but-for" causation. In evaluating a RICO claim, the "'central question'" on causation is "'whether the alleged violation led directly to the plaintiff's injuries.'" *In re Takata Airbag Prods. Liability Litig.*, 524 F. Supp. 3d 1266, 1283 (S.D. Fla. 2021) (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)). Thus, Plaintiff must show a "*direct relation* between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268 (emphasis added).

Even assuming Plaintiff has adequately pled an injury recognized under RICO (he has not, *see* Dkt. 52 at 14), Plaintiff's allegations are too attenuated to satisfy this demanding causation standard. He does not allege facts demonstrating that his alleged $24 million in "defense costs" and lost business opportunities (Compl. ¶ 314) are the direct result of the alleged RICO violation. Plaintiff offers nothing more than a vague statement that proceedings "arose" from Defendants' conduct—again, failing to set forth any allegations specific to Mr. Elias, and grouping him together with other defendants. (*Id.*) As Secretary Clinton showed in her motion to dismiss (Dkt. 52 at 13–14), other agencies' and litigants' independent judgment about whether to pursue such proceedings cannot be attributed to any conduct by Mr. Elias (or any of the other RICO defendants) that is alleged in the Complaint. Plaintiff asks the Court to take multiple steps beyond Mr. Elias's and

other defendants' alleged conduct and award damages for costs allegedly incurred in connection with proceedings initiated by third parties who (a) are not part of the claimed RICO enterprise and (b) exercised their own judgment in determining whether to bring such proceedings.  Indeed, another court recently held that similar allegations regarding legal and political expenses purportedly arising from the Steele Dossier were insufficient to state a RICO claim.  *See Nunes*, 531 F. Supp. 3d at 1012–13.  Plaintiff's asserted causal link between the alleged misconduct and his supposed damages is too remote, contingent, and indirect to support a RICO claim.  *See, e.g.*, *Takata*, 524 F. Supp. 2d at 1283–85 (dismissing RICO claim for lack of causation).

### III.    Plaintiff Fails to State a RICO Conspiracy Claim Against Mr. Elias (Count II).

Plaintiff cannot salvage his RICO allegations by labeling them as a "RICO conspiracy." Not only is this claim untimely (*see* Part I, above), but Plaintiff also cannot proceed on a RICO conspiracy claim where his underlying RICO charge does not itself state a claim.  *E.g.*, *Jackson*, 372 F.3d at 1269; *Super Vision Int'l, Inc. v. Mega Int'l Commercial Bank Co., Ltd.*, 534 F. Supp. 2d 1326, 1342 (S.D. Fla. 2008).  Mr. Elias joins and incorporates Secretary Clinton's arguments showing the insufficiency of Plaintiff's RICO conspiracy claim.  (Dkt. 52 at Section II.B.)

Plaintiff also does not plead that Mr. Elias "agreed" either to "the overall objective of the conspiracy" or "to commit two predicate acts."  *See Am. Dental Ass'n*, 605 F.3d at 1291.  Plaintiff pleads only the insufficient conclusion that a conspiracy existed. (Compl. ¶¶ 319–21.) These allegations are not specific to Mr. Elias, nor do they demonstrate that he, in particular, entered "an illegal agreement to violate a substantive provision of the RICO statute."  *Jackson*, 372 F.3d at 1269; *see Colite Int'l Inc. v. Robert L. Lipton, Inc.*, No. 05-60046-CIV, 2006 WL 8431656, at *5 (S.D. Fla. June 6, 2006) (dismissing conclusory RICO conspiracy claim).  And just as Plaintiff fails to plead that Mr. Elias committed two predicate acts (*see* Part II.B, above), he does not allege Mr. Elias *agreed* to do so either.  The RICO conspiracy claim should be dismissed.

**IV.    Plaintiff's Claim for Conspiracy to Commit Injurious Falsehood Fails (Count IV).**

Plaintiff does not assert a claim for injurious falsehood against Mr. Elias, but he does lump

Mr. Elias together with other defendants in an amorphous (and untimely) claim for "conspiracy to

commit injurious falsehood" (Count IV).  Conspiracy is not an independent cause of action under

Florida law, *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1316 (S.D. Fla. 2014), so such a

claim fails where the underlying cause of action fails, *Spain v. Brown & Williamson Tobacco

Corp.*, 363 F.3d 1183, 1199 (11th Cir. 2004).  Secretary Clinton and Perkins Coie have provided

a multitude of reasons why Plaintiff does not state his injurious falsehood claim—including

Plaintiff's improper focus on political speech that is protected under the First Amendment and his

failure to plead malice, economic injuries, that any statement induced any person or entity not to

deal with Plaintiff, or that Plaintiff himself incurred special damages.  (Dkt. 52 at Section II.C;

Dkt. 143 at 4–8.)  Mr. Elias joins and incorporates all these arguments.

Plaintiff otherwise cannot rely on some ill-defined "conspiracy" to expand his defective

injurious falsehood claim to include Mr. Elias.  (*See* Dkt. 52 at Section II.D; Dkt. 143 at 9.)

Conspiracy requires "(a) an agreement between two or more parties, (b) to do an unlawful act or

to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the

conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Alhassid*,

60 F. Supp. 3d at 1316 (quotation and citation omitted).

Once again, the allegations against Mr. Elias are extraordinarily thin.  Plaintiff alleges *no*

facts showing Mr. Elias's agreement to participate in the publication or communication of any

falsehoods.  Indeed, he does not identify any connection between Mr. Elias and all but one of the

supposedly false statements quoted in the Complaint.  As to that single statement, all Plaintiff

alleges is the legal conclusion that Mr. Elias "assisted" Mr. Sullivan with his October 31, 2016

statement about a link between Plaintiff and Russia.  (Compl. ¶¶ 185–7.)  Plaintiff provides no

12

description of Mr. Elias's supposed "assistance," nor does he allege that Mr. Elias and Mr. Sullivan even communicated in the days just before the statement was published. (*See id.*) Plaintiff's threadbare allegations fall far short of pleading conspiracy. *See, e.g.*, *Rinker v. Carnival Corp.*, 753 F. Supp. 2d 1237, 1244 (S.D. Fla. 2010) (dismissing civil conspiracy claim where the plaintiff alleged merely that the defendant "knew, allowed, encouraged, and/or participated" in the unlawful act). In all events, the alleged falsehood attributed to Mr. Sullivan is protected, non-actionable political expression. (*See* Dkt. 52 at 15–16.) And there are no allegations that Mr. Sullivan's statement, and Mr. Elias's supposed participation in a conspiracy as to that statement, caused Plaintiff damages—let alone the required special damages that "directly and immediately" flowed from the statement itself. *See Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp. 2d 1260, 1268–69 (S.D. Fla. 2004); *see also* Dkt. 143 at 4–8.

## V. Plaintiff Does Not—And Cannot—State a Malicious Prosecution Claim (Count V).

Plaintiff's malicious prosecution claim fares no better. To state such a claim under Florida law, a plaintiff must allege that: (1) "an original criminal or civil judicial proceeding against the present plaintiff was commenced or continued"; (2) the defendant was "the legal cause of the original proceeding"; (3) there was "a bona fide termination of that proceeding" in the plaintiff's favor; (4) the original proceeding lacked probable cause; (5) the defendant acted with malice; and (6) "the plaintiff suffered damage as a result of the original proceeding." *Debrincat v. Fischer*, 217 So. 3d 68, 70 (Fla. 2017) (quotation marks and citation omitted). Secretary Clinton and Perkins Coie have demonstrated numerous defects in this claim, and Mr. Elias joins and incorporates these arguments. (Dkt. 52 at Section II.E; Dkt. 143 at 9–13.) As to Mr. Elias specifically, however, the flaws in Plaintiff's claim are glaring.

*First*, Plaintiff does not—and cannot—allege that *Mr. Elias* "commenced or continued" an "original criminal or civil judicial proceeding" against him. *See Debrincat*, 217 So. 3d at 70.

Plaintiff does not distinguish Mr. Elias from any other defendant, choosing instead to lump groups of defendants together and allege that they "misled" agency officials with the "intention of inducing the FBI to commence an investigation." (Compl. ¶¶ 357–62.) This group pleading is itself improper, *see, e.g.*, *Joseph v. Bernstein*, No. 13–24355–CIV, 2014 WL 4101392, at \*3, 6 (S.D. Fla. Aug. 19, 2014), but even more fundamentally, as a matter of law, an agency investigation is not a "judicial proceeding" that can support a malicious prosecution claim. An action for malicious prosecution can "never occur outside the context of litigation," *Debrincat*, 217 So. 3d at 70, and Plaintiff was "never arrested, nor was he prosecuted," *Valladares v. Bank of Am. Corp.*, 197 So. 3d 1, 8 (Fla. 2016). Additionally, as Perkins Coie has shown (Dkt. 143 at 10–11), Plaintiff has not even alleged that *he* was the target of the FBI's investigation. Instead, the Complaint asserts that the Crossfire Hurricane investigation focused on individuals "associated with" Plaintiff's presidential campaign. (Compl. ¶¶ 136–37.) Thus, Plaintiff's malicious prosecution claim fails right out of the gate: There was no "prosecution" of Plaintiff, and certainly not a "malicious" one initiated by Mr. Elias.

*Second*, Plaintiff does not allege *any* facts demonstrating that Mr. Elias was a "legal cause" of the Crossfire Hurricane investigation. *See Debrincat*, 217 So. 3d at 70. To the contrary, as the Department of Justice's Office of Inspector General concluded, the FBI launched Crossfire Hurricane on July 31, 2016, based on a tip from a friendly foreign government. (*See* Dkt. 143-1, Office of the Inspector General, U.S. Dep't of Justice, *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*, at 49–51, 53–54, 346–48, 350 (2019).)[6] Plaintiff does not allege that any defendant, much less Mr. Elias specifically, had any

---

[6] Plaintiff relies on this report to make various allegations in his Complaint (*see* Compl. ¶¶ 3 n.1, 80 n.23, 132 n.41, 166 n.51), and its authenticity cannot be disputed. As such, the Court may properly consider this report on this Motion. *See, e.g.*, *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

involvement with that tip.  Rather, as Plaintiff admits in his own Complaint, the FBI had *already* launched its investigation nearly *two months before* Mr. Sussmann met with the FBI and long before any of the Steele Dossier's contents were provided to the FBI.  (Compl. ¶¶ 141, 170, 197, 360.)  Moreover, there is no allegation whatsoever that Mr. Elias met with, spoke to, or interacted in any way with *any* individual who then decided to initiate the Crossfire Hurricane investigation.  Plaintiff's meager allegations do not show that Mr. Elias was a "legal cause" of any proceeding (let alone a judicial one) against Plaintiff.

*Third*, Plaintiff does not allege—because he cannot—that the Crossfire Hurricane investigation resulted in a "bona fide termination" in his "favor."  *See Debrincat*, 217 So. 3d at 70.  Whatever that standard might mean for an investigation (rather than the judicial proceeding that is required to state a claim), there was no termination favorable to Plaintiff here.  Special Counsel Robert Mueller's report—which Plaintiff himself cites (Compl. ¶¶ 232–34)—is far from the necessary "favorable decision on the merits" or "good faith *nolle prosequi* or declination to prosecute."  *See Artubel v. Colonial Bank Grp., Inc.*, No. 8:08-cv-179-T-23MAP, 2008 WL 3411785, at *14 (M.D. Fla. Aug. 8, 2008).  To the contrary, the Mueller report explicitly states that it "'does not exonerate'" Plaintiff.  *See* U.S. Dep't of Justice, Office of Special Counsel, *Report on the Investigation into Russian Interference in the 2016 Presidential Election*, vol. II at 1–2, 182 (2019) (excerpt provided at Exhibit A); *see also* Dkt. 143 at 11–13.[7]  Count V should be dismissed.

## VI.    The Claim for Conspiracy to Commit Malicious Prosecution Also Fails (Count VI).

Plaintiff's claim for conspiracy to commit malicious prosecution cannot stand without an underlying malicious prosecution claim, so this claim fails for the same reasons that Count V fails.  *See Alhassid*, 60 F. Supp. 3d at 1317 (dismissing conspiracy claim where underlying tort claims

---

[7] Plaintiff explicitly invokes and relies on the Mueller report to support the allegations of his Complaint (Compl. ¶¶ 232–34), so the Court may consider it here.  *See supra* n.5.

were also dismissed).  Mr. Elias joins and incorporates the arguments made in Section II.E of Secretary Clinton's motion to dismiss and in Section IV of Perkins Coie's motion.

In addition, the conspiracy claim fails of its own accord as to Mr. Elias.  Count VI contains no allegations showing that *Mr. Elias* agreed to participate in an alleged conspiracy to maliciously prosecute Plaintiff.  Instead, Plaintiff throws Mr. Elias in with a host of other defendants and alleges that they all "had a meeting of the minds" and "conspired."  (Compl. ¶¶ 369–72.)  These threadbare allegations fall short of establishing that Mr. Elias, individually, "agree[d]" with any other party to "do an unlawful act or to do a lawful act by unlawful means."  *Alhassid*, 60 F. Supp. 3d at 1316; *see also Cole v. Lobello Painting, Inc.*, No. 8:06-CV-2171, 2007 WL 2330860, at *5 (M.D. Fla. Aug. 14, 2007) (dismissing conspiracy claim that was "bereft of any factual allegations that the [defendants] were part of a conspiratorial agreement").  Nor does Plaintiff identify any "overt act" that Mr. Elias purportedly undertook "in furtherance of the conspiracy" to maliciously prosecute Plaintiff.  *See Alhassid*, 60 F. Supp. 3d at 1316.  Plaintiff's "formulaic recitation of the elements for civil conspiracy" is not enough, and his claim should be dismissed.  *See HSBC Bank USA, Nat'l Ass'n v. Ross*, No. 8:11-cv-02019, 2012 WL 13140776, at *2 (M.D. Fla. Apr. 5, 2012).

## CONCLUSION

For the foregoing reasons, Mr. Elias respectfully requests that the Court dismiss, with prejudice, all counts asserted against him in the Complaint (Counts I, II, IV, V, and VI).

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b), Mr. Elias respectfully requests a hearing on this Motion.  He believes a hearing would benefit the parties and the Court given the length of Plaintiff's Complaint, the large number of claims and defendants, and the numerous motions to dismiss being filed.  Mr. Elias estimates that a hearing for all parties requesting oral argument would last approximately one hour.

Dated: May 11, 2022                           Respectfully submitted,

                                               _/s/ Eugene K. Pettis_____
                                               Eugene K. Pettis (Fla. Bar #508454)
                                               Debbie P. Klauber (Fla. Bar #55646)
                                               HALICZER, PETTIS & SCHWAMM
                                               One Financial Plaza
                                               100 S.E. 3rd Ave., Seventh Floor
                                               Fort Lauderdale, FL 33394
                                               Tel: (954) 523-9922

                                               Reid J. Schar (admitted *pro hac vice*)
                                               April A. Otterberg (admitted *pro hac vice*)
                                               JENNER & BLOCK LLP
                                               353 N. Clark St.
                                               Chicago, IL 60654
                                               Tel: (312) 222-9350

                                               *Attorneys for Defendant Marc Elias*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 11, 2022, I caused to be filed electronically the foregoing

Defendant Marc Elias's Motion to Dismiss the Complaint and Memorandum of Law in Support

with the Clerk of Court using the CM/ECF system, which will send notification of such filing to

all counsel of record in this matter who are on the CM/ECF system.


        /s/ Eugene K. Pettis
        Eugene K. Pettis

# EXHIBIT A

U.S. Department of Justice

Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

# Report On The Investigation Into Russian Interference In The 2016 Presidential Election

Volume II of II

Special Counsel Robert S. Mueller, III

*Submitted Pursuant to 28 C.F.R. § 600.8(c)*

Washington, D.C.

March 2019

U.S. Department of Justice

Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

### INTRODUCTION TO VOLUME II

This report is submitted to the Attorney General pursuant to 28 C.F.R. § 600.8(c), which states that, "[a]t the conclusion of the Special Counsel's work, he . . . shall provide the Attorney General a confidential report explaining the prosecution or declination decisions [the Special Counsel] reached."

Beginning in 2017, the President of the United States took a variety of actions towards the ongoing FBI investigation into Russia's interference in the 2016 presidential election and related matters that raised questions about whether he had obstructed justice. The Order appointing the Special Counsel gave this Office jurisdiction to investigate matters that arose directly from the FBI's Russia investigation, including whether the President had obstructed justice in connection with Russia-related investigations. The Special Counsel's jurisdiction also covered potentially obstructive acts related to the Special Counsel's investigation itself. This Volume of our report summarizes our obstruction-of-justice investigation of the President.

We first describe the considerations that guided our obstruction-of-justice investigation, and then provide an overview of this Volume:

*First*, a traditional prosecution or declination decision entails a binary determination to initiate or decline a prosecution, but we determined not to make a traditional prosecutorial judgment. The Office of Legal Counsel (OLC) has issued an opinion finding that "the indictment or criminal prosecution of a sitting President would impermissibly undermine the capacity of the executive branch to perform its constitutionally assigned functions" in violation of "the constitutional separation of powers."[1] Given the role of the Special Counsel as an attorney in the Department of Justice and the framework of the Special Counsel regulations, *see* 28 U.S.C. § 515; 28 C.F.R. § 600.7(a), this Office accepted OLC's legal conclusion for the purpose of exercising prosecutorial jurisdiction. And apart from OLC's constitutional view, we recognized that a federal criminal accusation against a sitting President would place burdens on the President's capacity to govern and potentially preempt constitutional processes for addressing presidential misconduct.[2]

*Second*, while the OLC opinion concludes that a sitting President may not be prosecuted, it recognizes that a criminal investigation during the President's term is permissible.[3] The OLC opinion also recognizes that a President does not have immunity after he leaves office.[4] And if individuals other than the President committed an obstruction offense, they may be prosecuted at this time. Given those considerations, the facts known to us, and the strong public interest in

---

[1] *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 222, 260 (2000) (OLC Op.).

[2] *See* U.S. CONST. Art. I § 2, cl. 5; § 3, cl. 6; *cf.* OLC Op. at 257-258 (discussing relationship between impeachment and criminal prosecution of a sitting President).

[3] OLC Op. at 257 n.36 ("A grand jury could continue to gather evidence throughout the period of immunity").

[4] OLC Op. at 255 ("Recognizing an immunity from prosecution for a sitting President would not preclude such prosecution once the President's term is over or he is otherwise removed from office by resignation or impeachment").

U.S. Department of Justice

Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

safeguarding the integrity of the criminal justice system, we conducted a thorough factual investigation in order to preserve the evidence when memories were fresh and documentary materials were available.

*Third*, we considered whether to evaluate the conduct we investigated under the Justice Manual standards governing prosecution and declination decisions, but we determined not to apply an approach that could potentially result in a judgment that the President committed crimes. The threshold step under the Justice Manual standards is to assess whether a person's conduct "constitutes a federal offense." U.S. Dep't of Justice, Justice Manual § 9-27.220 (2018) (Justice Manual). Fairness concerns counseled against potentially reaching that judgment when no charges can be brought. The ordinary means for an individual to respond to an accusation is through a speedy and public trial, with all the procedural protections that surround a criminal case. An individual who believes he was wrongly accused can use that process to seek to clear his name. In contrast, a prosecutor's judgment that crimes were committed, but that no charges will be brought, affords no such adversarial opportunity for public name-clearing before an impartial adjudicator.[5]

The concerns about the fairness of such a determination would be heightened in the case of a sitting President, where a federal prosecutor's accusation of a crime, even in an internal report, could carry consequences that extend beyond the realm of criminal justice. OLC noted similar concerns about sealed indictments. Even if an indictment were sealed during the President's term, OLC reasoned, "it would be very difficult to preserve [an indictment's] secrecy," and if an indictment became public, "[t]he stigma and opprobrium" could imperil the President's ability to govern."[6] Although a prosecutor's internal report would not represent a formal public accusation akin to an indictment, the possibility of the report's public disclosure and the absence of a neutral adjudicatory forum to review its findings counseled against potentially determining "that the person's conduct constitutes a federal offense." Justice Manual § 9-27.220.

*Fourth*, if we had confidence after a thorough investigation of the facts that the President clearly did not commit obstruction of justice, we would so state. Based on the facts and the applicable legal standards, however, we are unable to reach that judgment. The evidence we obtained about the President's actions and intent presents difficult issues that prevent us from conclusively determining that no criminal conduct occurred. Accordingly, while this report does not conclude that the President committed a crime, it also does not exonerate him.

\*     \*     \*

This report on our investigation consists of four parts. Section I provides an overview of obstruction-of-justice principles and summarizes certain investigatory and evidentiary considerations. Section II sets forth the factual results of our obstruction investigation and analyzes the evidence. Section III addresses statutory and constitutional defenses. Section IV states our conclusion.

---

[5] For that reason, criticisms have been lodged against the practice of naming unindicted co-conspirators in an indictment. *See United States v. Briggs*, 514 F.2d 794, 802 (5th Cir. 1975) ("The courts have struck down with strong language efforts by grand juries to accuse persons of crime while affording them no forum in which to vindicate themselves."); *see also* Justice Manual § 9-11.130.

[6] OLC Op. at 259 & n.38 (citation omitted).

2

U.S. Department of Justice

Attorney Work Product // May Contain Material Protected Under Fed. R. Crim. P. 6(e)

## IV. CONCLUSION

Because we determined not to make a traditional prosecutorial judgment, we did not draw ultimate conclusions about the President's conduct.   The evidence we obtained about the President's actions and intent presents difficult issues that would need to be resolved if we were making a traditional prosecutorial judgment.   At the same time, if we had confidence after a thorough investigation of the facts that the President clearly did not commit obstruction of justice, we would so state.   Based on the facts and the applicable legal standards, we are unable to reach that judgment.   Accordingly, while this report does not conclude that the President committed a crime, it also does not exonerate him.

149

Defendant HFACC, Inc.'s Motion to Dismiss the Complaint and
Memorandum of Law in Support (May 16, 2022)

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

DONALD J. TRUMP,

                Plaintiff,

    v.

HILLARY R. CLINTON, et al.,

                Defendants.

Case No. 2:22-cv-14102-DMM

## DEFENDANT HFACC, INC.'S MOTION TO DISMISS THE COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT

Defendant HFACC, Inc. (the "Clinton Campaign" or "HFA"), by and through undersigned counsel, moves to dismiss Plaintiff's claims against Defendant with prejudice. Defendant moves to dismiss on the grounds that Plaintiff's claims are time-barred on the face of the complaint, and each of Plaintiff's claims against Defendant fail on the merits.

## ARGUMENT

### I.   COUNTS I, II, IV, VII, VIII AND XIII OF THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE STATUTE OF LIMITATIONS ON THESE CLAIMS HAS EXPIRED.

Defendant HFA joins in and adopts the arguments in Section I of Defendant Hillary Rodham Clinton's Motion to Dismiss (Dkt. 52) that Plaintiff's claims are time-barred on the face of the Complaint and should therefore be dismissed.  Dismissal on statute of limitations grounds is appropriate where it is apparent on the face of the complaint that Plaintiff's claims are time-barred. *La Grasta v. First Union Sec., Inc*., 358 F.3d 840, 845-46 (11th Cir. 2004).

As articulated in Section I of Defendant Hillary Rodham Clinton's Motion to Dismiss, Plaintiff's claims relate to events that occurred in 2016 and 2017, as such the statute of limitations

has long expired.  The allegations that Defendants conspired to (1) create the Steele Dossier, (2) obtain and reveal internet data of a connection between Trump Tower and Alfa Bank, (3) provide false statements to law enforcement, and (4) disseminate false and injurious information, are all alleged events that occurred over four years ago.  Moreover, Plaintiff's own Complaint and his tweets demonstrate that he has been aware of the purported injuries for years.

The statute of limitations for civil RICO actions (Count I) and conspiracy to commit RICO violations (Count II) is four years and runs from the date the injury was or should have been discovered.  *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013).  On October 29, 2017, Plaintiff tweeted about the same conspiracy which he now alleges in the Complaint.[1]  Plaintiff's own statements reveal that he was on notice of the alleged conspiracy and injury more than four years ago, therefore, his claim is time-barred and should be dismissed.

The statute of limitations for conspiracy to commit injurious falsehood (Count IV) is four years from the date of the injury. *King v. Bencie*, 806 Fed. Appx. 873, 875 (11th Cir. 2020) (noting the statute of limitations for civil conspiracy is four years); *Newberger v. U.S. Marshals Serv.*, 751 F.2d 1162, 1166 (11th Cir. 1985) (holding that actions for conspiracy in Florida are governed by a four-year statute of limitations).  Plaintiff's allegations that HFA "repeatedly fed disinformation to the media" and "shared false narratives" points to acts that occurred on or before March 24, 2017.  Compl. ¶ 6.  Plaintiff's claims expired by March 2021 and should therefore be dismissed.

---

[1]      "Never seen such Republican ANGER & UNITY as I have concerning the lack of investigation on Clinton made Fake Dossier (now $12,000,000?), the Uranium to Russia deal, the 33,000 plus deleted Emails, the Comey fix and so much more. Instead they look at phony Trump/Russia, 'collusion,' which doesn't exist. The Dems are using this terrible (and bad for our country) Witch Hunt for evil politics, but the R's are now fighting back like never before. There is so much GUILT by Democrats/Clinton, and now the facts are pouring out. DO SOMETHING!" Donald J. Trump (@realDonaldTrump), Twitter (Oct. 29, 2017), archived at The Trump Twitter Archive, thetrumparchive.com.

The statute of limitations under the Computer Fraud and Abuse Act (Count VII) is two years from the violation, or discovery of the violation. 18 U.S.C. § 1030(g). Plaintiff alleges the DNS lookup information was publicly known in October 2016. Compl. at ¶¶ 183–89. Even if Plaintiff only became aware of the identity of the alleged perpetrators until more recently, his knowledge of the DNS information's release in October 2016 indicates the statute of limitations expired in late October 2018. *Sewell v. Bernardin*, 795 F.3d 337, 342 (2d Cir. 2015) (holding that claims under the Computer Fraud and Abuse Act accrue when the plaintiff is aware of the alleged violation, even if the plaintiff does not know the identity of the alleged perpetrators).

The statute of limitations for a civil action for theft of trade secrets under 18 U.S.C. § 1836(d) is three years from the date "on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836. Here, again, Plaintiff's claims accrued upon public knowledge of his DNS traffic in October 2016. The statute of limitations therefore ran in late October 2019.

To the extent that Count XIII, "Respondeat Superior/Vicarious Liability" is intended to hold HFA vicariously responsible for torts brought against Defendants Jake Sullivan, John Podesta, and Robbie Mook, the claims expired four years from the date of the injury. *See King*, 806 Fed. Appx. at 875; *Newberger*, 751 F.2d at 1166.

## II.     COUNTS I, II, IV, VII, VIII AND XIII OF THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFF'S CLAIMS FAIL ON THE MERITS.

Defendant HFA joins in and adopts the arguments in Sections II A, B, D, and F of Defendant Hillary Rodham Clinton's Motion to Dismiss (Dkt. 52) that Plaintiff's claims fail on the merits and should therefore be dismissed.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id*.  In making a fraud claim, "a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b).  To satisfy the heightened pleading standard of Rule 9(b), a complaint must set forth:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Garfield v. NDC Health Corp*., 466 F.3d 1255, 1262 (11th Cir.2006).

### A.  Count I: RICO

As articulated in Section II A of Defendant Hillary Rodham Clinton's Motion to Dismiss, Plaintiff has failed to state a RICO claim for which he is entitled relief.  In order to sustain a RICO claim, a plaintiff must "plausibly allege six elements: that the defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the plaintiff." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020).  Plaintiff has not plausibly alleged any cognizable RICO enterprise, has not sufficiently alleged the required two predicate acts, has not shown any pattern of racketeering activity, and has failed to adequately allege RICO standing.  *See* Section II A of Defendant Hillary Rodham Clinton's Motion to Dismiss, pp. 6-14.

Furthermore, Plaintiff does not plausibly allege that HFA participated in the purported enterprise, let alone participated through a pattern of racketeering activity, as required by the RICO statute. 18 U.S.C. § 1962(c); *see Boyle v. United States*, 556 U.S. 938, 947 n.4 (2009)("[S]everal individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates . . . [is] not . . . enough to show that the individuals were members of an enterprise.") Plaintiff's allegations concerning HFA's direction of the alleged racketeering activity are entirely conclusory. Indeed, Plaintiff merely states that HFA "directed" other alleged participants or was an active participant of the conspiracy to commit theft of trade secret. *See, e.g.*, ¶¶ 102, 109, 122, 123, 286, 294. The allegations are merely "formulaic recitation[s] of the elements of a cause of action," and "'naked assertion[s]' devoid of 'further factual enhancement,'" which do not suffice to state a claim upon which relief can be granted and are not enough to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555, 557 (2007)).

Plaintiff's claim that HFA engaged in obstruction of justice under 18 U.S.C. §§ 1503 and 1512 is also deficient. Plaintiff fails to identify any "official proceeding" Defendants purportedly obstructed.[2] *See* 18 U.S.C. § 1515(a) (defining "official proceeding" as a federal judicial case, a proceeding before Congress, a proceeding before a federal government agency, or a proceeding involving insurance business.) The Complaint centers on the FBI's investigation into ties between Plaintiff and Russia, but "an FBI investigation is not an official proceeding under the obstruction of justice statute." *United States v. Ermoian*, 752 F.3d 1165, 1172 (9th Cir. 2013). Plaintiff makes vague references to other investigations, but investigations that do not result in charges are not "official proceedings" under the statute. *See United States v. Young*, 916 F.3d 368, 384 (4th Cir.

---

[2] Obstruction of justice under 18 U.S.C. § 1503 requires a pending judicial proceeding. *See United States v. Davis*, 854 F.3d 1276, 1290 (11th Cir. 2017). Plaintiff identifies no such proceeding in his Complaint.

2019).  Moreover, Plaintiff has failed to allege that HFA withheld, altered, or destroyed evidence in any way.  *See* 18 U.S.C. § 1515.  Plaintiff's sole allegation is that HFA contributed to the creation of documents that contained purported inaccuracies. Such conduct is not convered by 18 U.S.C. § 1515.

Plaintiff's allegations do not come close to showing that HFA engaged in a single RICO predicate act, let alone "a pattern of racketeering activity."  *See* 18 U.S.C. § 1962(c).  Plaintiff has not pled either "closed-ended" or "open-ended" continuity of the alleged racketeering. *See* Section II A of Defendant Hillary Rodham Clinton's Motion to Dismiss, pp. 11-12.  Nor has Plaintiff satisfied the heightened "direct causation" standard in RICO claims and shown a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Securities Investor Protection Corp*., 503 U.S. 258, 268 (1992); *In re Takata Airbag Prods. Liability Litig*., 524 F. Supp. 3d 1266, 1283 (S.D. Fla. 2021).  Plaintiff has alleged injury in only the vaguest terms and failed to demonstrate that his alleged $24 million in "defense costs" and lost business opportunities are the direct result of the alleged RICO violation. *See* Section II A of Defendant Hillary Rodham Clinton's Motion to Dismiss, pp. 13-14.

**B. Count II: RICO Conspiracy**

As articulated in Section II B of Defendant Hillary Rodham Clinton's Motion to Dismiss, Plaintiff has failed to state a RICO conspiracy claim for which he is entitled relief.  "In order to state a claim for civil RICO conspiracy, a plaintiff must allege an illegal agreement to violate a substantive provision of the RICO statute." *Super Vision Intern., Inc. v. Mega Intern. Commercial Bank Co., Ltd*., 534 F. Supp. 2d 1326, 1342 (S.D. Fla. 2008) (internal quotation marks omitted). "A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant

agreed to commit two predicate acts." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir.1997). Plaintiff has not plausibly alleged sufficient facts regarding any purported agreement between HFA and other entities or persons to engage in the ongoing criminal conduct of an enterprise. In fact, the non-conclusory allegations as to Defendant's participation in a RICO conspiracy are limited to its engagement of counsel for the campaign. Plaintiff's allegations of Defendant's ordinary conduct, absent a plausibly-alleged "meeting of the minds," fail to "nudge[ his] claims across the line from conceivable to plausible." *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Moreover, Plaintiff has failed to adequately plead a RICO claim and so his RICO conspiracy claim also fails. *See Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1269 (11th Cir. 2004) (noting that the complaint "simply concludes that the defendants conspired and confederated to commit conduct which in itself does not constitute a RICO violation").

### C. Count IV: Conspiracy to Commit Injurious Falsehood

As articulated in Sections II C and D of Defendant Hillary Rodham Clinton's Motion to Dismiss, Plaintiff has failed to state a claim for conspiracy to commit injurious falsehood because Plaintiff failed to adequately plead the claim of injurious falsehoods and the statements identified in the Complaint are political speech protected by the First Amendment. *See Horsley v. Feldt*, 304 F.3d 1125, 1131 (11th Cir. 2002) (acknowledging that statements "may well include vehement, caustic, and sometimes unpleasantly sharp attacks," but they are nevertheless "constitutionally protected and those who make them are exempt from liability for defamation if the attacks are simply 'rhetorical hyperbole'"). Plaintiff's claim also fails to allege sufficient facts to demonstrate any agreement between Defendant HFA and any other defendant to commit injurious falsehood. *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1316 (S.D. Fla. 2014) ("To plead civil

conspiracy, a plaintiff must allege (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy.") (Internal quotation marks omitted).

### D.  Count VII: Computer Fraud and Abuse Act

As articulated in Section II F of Defendant Hillary Rodham Clinton's Motion to Dismiss, Plaintiff has also failed to adequately plead a claim under the Computter Fraud and Abuse Act. A defendant can be held liable under the CFAA only if he "(1) intentionally 'accessed' a computer, (2) lacked authorization or exceeded his authorized access to the computer, (3) obtained information from the computer, and (4) caused a loss of at least $5,000.00 to [Plaintiff]." *Hamilton Grp. Funding, Inc. v. Basel*, 311 F. Supp. 3d 1307, 1313 (S.D. Fla. 2018) (alteration in original) (citation omitted). Plaintiff does not allege that HFA personally took any of these steps.  Compl. ¶¶ 382–93.  Instead, Plaintiff merely alleges that HFA "conspired" with others. *Id*. at ¶ 390.  First, there are simply no factual allegations supporting this conclusory allegation of conspiracy. Second, the Computer Fraud and Abuse Act limits its private right of action to suits "against the violator." 18 U.S.C. § 1030(g); *see Agilysys, Inc. v. Hall*, 258 F. Supp. 3d 1331, 1344 (N.D. Ga. 2017) (holding that even if one defendant had "directed or induced" another defendant to violate the Computer Fraud and Abuse Act, the first defendant "did not access [Plaintiff's] computers, and therefore, [the first defendant] may not be held liable as the violator under the [act]").  Finally, Plaintiff alleges Defendants Joffe and Neustar "exploited" their "access to non-public data" to gather information about Plaintiff, but the Supreme Court has made clear that using existing access to a computer system "for an improper purpose" does *not* violate the statute. *Van Buren v. United States*, 141 S. Ct. 1648, 1662 (2021).

### E.  Count VIII: Theft of Trade Secrets

Plaintiff's claim for theft of trade secrets fails for the same reasons that Plaintiff has not sufficiently plead theft of trade secrets as a RICO predicate act.  *See* Defendant Hillary Rodham Clinton's Motion to Dismiss at 7-9.  Plaintiff has failed to show that Plaintiff owned DNS data or that DNS data constitutes a "trade secret."  *See United States v. Smith*, 22 F.4th 1236, 1243 (11th Cir. 2022) (listing elements of theft of trade secrets); *see also Sentry Data Sys. v. CVS Health*, 361 F. Supp. 3d, 1279, 1292 (S.D. Fla. 2018) (noting that a trade secret "derives independent economic value" from "not being generally known to" others).  Further, the Defend Trade Secrets Act does not create an express or implied private right of action for redress for conspiracy to engage in theft of trade secrets.  *See Steves & Sons, Inc. v. JELD-WEN, Inc*., 271 F. Supp. 3d 835, 842 (E.D. Va. 2017) ("Where, as here, a criminal statute establishes what is a crime and specifies the punishment for committing the crime, it is not enforceable in a private civil action unless Congress specifically so provides.").

### F.  Count XIII: Respondeat Superior/Vicarious Liability

Plaintiff's claim for respondeat superior should be dismissed because it is not a valid cause of action, but rather a theory of liability.  *Colite Int'l Inc. v. Robert L. Lipton, Inc*., No. 05 Civ. 60046, 2006 WL 8431505, at *12 (S.D. Fla. Jan. 20, 2006); *Chunhong Jia v. Boardwalk Fresh Burgers & Fries, Inc.*, 2020 WL 5628734, at *2 (M.D. Fla. Sept. 21, 2020) ("[U]nder Florida . . . law, respondeat superior does not constitute an independent cause of action.") (citing *Turner Murphy Co. v. Specialty Constructors, Inc.*, 659 So.2d 1242, 1245 (Fla. 1st Dist. Ct. App. 1995)).  To the extent that Count XIII is intended to hold HFA vicariously responsible with the tort actions brought against Defendants Jake Sullivan, John Podesta, and Robbie Mook, the claim fails for the

same reasons as those underlying torts.  This claim, along with the others, should be dismissed with prejudice.

## CONCLUSION

For the forgoing reasons, HFA respectfully requests that the Court dismiss Counts I, II, IV, VII, VIII and XIII of Plaintiff's Complaint with prejudice.

Dated: May 16, 2022                          Respectfully Submitted

                                             /s/Robert P. Trout
                                             Robert P. Trout *
                                             Paola Pinto (Florida Bar Number 1013933)
                                             SCHERTLER ONORATO MEAD & SEARS
                                             555 13th Street, N.W.
                                             Suite 500 West
                                             Washington, D.C.  20004
                                             Phone: (202) 628-4155
                                             rtrout@schertlerlaw.com
                                             ppinto@schertlerlaw.com


                                             *Admitted *pro hac vice*


                                             *Attorneys for Defendant HFACC, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 16, 2022, I caused to be filed electronically the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record on this matter who are on the CM/ECF system.

/s/ Robert P. Trout
Robert P. Trout

157

Defendant Rodney Joffe's Motion to Dismiss the Complaint and
Memorandum of Law (May 20, 2022)

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No. 2:22-cv-14102-DMM**

DONALD J. TRUMP,

        Plaintiff,

v.

RODNEY JOFFE, et al.,

        Defendants.

**DEFENDANT RODNEY JOFFE'S MOTION TO DISMISS
THE COMPLAINT AND MEMORANDUM OF LAW**

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF PLEADED FACTS ........................................................................2

ARGUMENT ..............................................................................................................4

I.     ALL CLAIMS SHOULD BE DISMISSED BECAUSE THEY ARE TIME-BARRED ....4

II.    THE RICO CONSPIRACY CLAIM (COUNT II) FAILS................................................6

III.   THE REMAINING CLAIMS SHOULD BE DISMISSED AS TO JOFFE BECAUSE THIS COURT LACKS PENDENT PERSONAL JURISDICTION .................................8

      A.    Joffe Is Not Subject to General Jurisdiction in Florida.............................9

      B.    This Court Lacks Specific Personal Jurisdiction over Joffe ....................9

IV.   THE REMAINING CLAIMS FAIL ON THE MERITS AS WELL ...............................11

      A.    Count IV – Conspiracy to Commit Injurious Falsehood ........................12

      B.    Counts V and VI – Malicious Prosecution and Conspiracy ...................13

      C.    Count VII – Computer Fraud and Abuse Act .........................................13

      D.    Count VIII – Theft of Trade Secrets .......................................................17

      E.    Count IX – Stored Communications Act ("SCA")..................................18

CONCLUSION...........................................................................................................20

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Almanza v. United Airlines, Inc.*,
   851 F.3d 1060 (11th Cir. 2017) ...................................................................................8

*Am. Dental Ass'n v. Cigna Corp.*,
   605 F.3d 1283 (11th Cir. 2010) ...........................................................................6, 7, 8

*Armor Corr. Health Servs., Inc. v. Teal*,
   No. 19-cv-24656, 2021 WL 5834245 (S.D. Fla. Dec. 8, 2021)..............................16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................................................7

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 554 (2007)............................................................................................7, 12

*Bristol-Myers Squibb Co. v. Superior Court*,
   137 S. Ct. 1773 (2017).............................................................................................9

*Calder v. Jones*,
   465 U.S. 783, 104 S. Ct. 1482 (1984)...................................................................11

*CareersUSA, Inc. v. Guerrero*,
   No. 14-cv-80096, 2014 WL 12862259 (S.D. Fla. Aug. 25, 2014) .........................15

*Carter v. MGA, Inc.*,
   189 F. App'x 893 (11th Cir. 2006) .........................................................................7

*Cisneros v. Petland, Inc.*,
   972 F.3d 1204 (11th Cir. 2020) ..............................................................................6

*Coastal Wellness Ctrs., Inc. v. Progressive Am. Ins. Co.*,
   309 F. Supp. 3d 1216 (S.D. Fla. 2018) ...................................................................3

*In re DoubleClick Inc. Privacy Litig.*,
   154 F. Supp. 2d 497 (S.D.N.Y. 2001)....................................................................20

*Falic v. Legg Mason Wood Walker, Inc.*,
   347 F. Supp. 2d 1260 (S.D. Fla. 2004) .................................................................12

*Fischer v. Debrincat*,
   169 So. 3d 1204, 1209 (Fla. Dist. Ct. App. 2015), *approved*, 217 So. 3d 68
   (Fla. 2017)..............................................................................................................13

*Garcia v. City of Laredo*,
   702 F.3d 788 (5th Cir. 2012) ...........................................................................19, 20

*In re Google Inc.*,
   806 F.3d 125 (3d Cir. 2015)..............................................................................18, 20

*Heeger v. Facebook, Inc.*,
  509 F. Supp. 3d 1182 (N.D. Cal. 2020) ................................................................. 18

*Honig v. Kornfeld*,
  339 F. Supp. 3d 1323 (S.D. Fla. 2018) ........................................................... 12, 13

*IPC Sys., Inc. v. Garrigan*,
  No. 1:11-CV-3910-AT, 2012 WL 12872028 (N.D. Ga. May 21, 2012) ................ 19

*Koch v. Royal Wine Merchants, Ltd.*,
  847 F. Supp. 2d. 1370 (S.D. Fla. 2012) ................................................................. 9

*La Grasta v. First Union Sec., Inc.*,
  358 F.3d 840 (11th Cir. 2004) ............................................................................... 4

*Leatherback Sea Turtle v. Flagler Cnty. Bd. Of Cnty. Commr's*,
  359 F. Supp. 2d 1209 (M.D. Fla. 2004) ................................................................. 4

*Lehman v. Dow Jones & Co.*,
  783 F.2d 285 (2d Cir.1986) ................................................................................. 18

*Leon v. Continental AG*,
  301 F. Supp. 3d 1203 (S.D. Fla. 2017) .............................................................. 8, 9

*Medici v. Lifespan Corp.*,
  239 F. Supp. 3d 355 (D. Mass. 2017) .................................................................... 9

*Melgarejo v. Pysca Panama, S.A.*,
  537 F. App'x 852 (11th Cir. 2013) ...................................................................... 10

*Miller v. Gizmodo Media Grp., LLC*,
  383 F. Supp. 3d 1365 (S.D. Fla. 2019) ................................................................ 11

*Nexans Wires S.A. v. Sark–USA, Inc.*,
  319 F. Supp. 2d 468 (S.D.N.Y.2004) ................................................................... 16

*Prou v. Giarla*,
  62 F. Supp. 2d 1365 (S.D. Fla. 2014) .................................................................... 9

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004) ................................................................................ 18

*Rep. of Panama v. BCCI Holdings (Luxembourg) S.A.*,
  119 F.3d 935 (11th Cir. 1997 ................................................................................ 8

*Resdev, LLC v. Lot Builders Ass'n, Inc.*,
  No. 6:04–CV–1374, 2005 WL 1924743 (M.D. Fla. Aug. 10, 2005) .................... 16

*Riley v. Cardozo*,
  2017 WL 2799900 (M.D. Fla. June 28, 2017) ..................................................... 11

*Sears Authorized Hometown Stores, LLC v. Nationwide Mktg. Grp., LLC*,
  No. 19-CV-3403, 2019 WL 5064731 (N.D. Ill. Oct. 9, 2019) ............................... 9

*Sentry Data Sys. v. CVS Health*,
  361 F. Supp. 3d (S.D. Fla. 2018) ......................................................................... 17

*Super Vision Int'l, Inc. v. Mega Int'l Commercial Bank Co., Ltd.*,
   534 F. Supp. 2d 1326 (S.D. Fla. 2008) ................................................................6, 7

*Talwar v. Creative Labs, Inc.*,
   No. CV 05-3375 FMC AJWX, 2006 WL 4568797, at *1 (C.D. Cal. Aug. 11,
   2006) .................................................................................................................3

*Tarasewicz v. Royal Caribbean Cruises Ltd.*,
   2015 WL 3970546 (S.D. Fla. June 30, 2015) ..........................................................10

*TracFone Wireless, Inc. v. Hernandez*,
   196 F. Supp. 3d 1289 (S.D. Fla. 2016) ..................................................................14

*United States v. Steiger*,
   318 F.3d 1039 (11th Cir. 2003) ............................................................................19

*United Techs. Corp. v. Mazer*,
   556 F.3d 1260 (11th Cir. 2009) ............................................................................9

*Van Buren v. United States*,
   141 S. Ct. 1648 (2021) ................................................................................14, 15

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*,
   529 U.S. 765 (2000) ...........................................................................................17

*Walden v. Fiore*,
   571 U.S. 277 (2014) ....................................................................................10, 11

*Walker v. Coffey*,
   956 F.3d 163 (3d Cir. 2020) ................................................................................19

**Statutes**

18 U.S.C.A. § 2707(f) ..........................................................................................5

18 U.S.C. § 1030 ..........................................................................................*passim*

18 U.S.C. § 1832 ...............................................................................................17

18 U.S.C. § 1836 .................................................................................................5

18 U.S.C. § 1839(3)(B) .......................................................................................17

18 U.S.C. § 1962 ..........................................................................................*passim*

18 U.S.C. § 2510(15) .........................................................................................19

18 U.S.C. § 2510(17) .........................................................................................20

18 U.S.C. § 2701 ..........................................................................................*passim*

**Other Authorities**

Orin S. Kerr, *A User's Guide to the Stored Communications Act, and A
   Legislator's Guide to Amending It*, 72 GEO. WASH. L. REV. 1208, 1214 (2004) ..................18

U.S. Dept. of Commerce, Nat'l Inst. of Standards & Tech., *Secure Domain Name
   System (DNS) Deployment Guide* (September 2013), available at:
   https://nvlpubs.nist.gov/nistpubs/specialpublications/nist.sp.800-81-2.pdf ..................*passim*

Rodney Joffe respectfully submits this memorandum of law in support of his motion to dismiss Plaintiff Donald J. Trump's Complaint (Dkt. 1) (the "Complaint").

## PRELIMINARY STATEMENT

Plaintiff's Complaint advances a sprawling narrative, hurling accusations of wrongdoing at nearly 30 individuals and entities (plus an additional 20 fictitious entities) coming from disparate backgrounds, including a former Presidential candidate, a sitting Member of Congress, the former Director of the Federal Bureau of Investigation ("FBI") and other former FBI Agents, a former Department of Justice ("DOJ") attorney, a respected law firm, and an internet technology company. One of the Defendants, Rodney Joffe, is one of the most highly-respected cyber-security experts in the world and is regularly called upon by the U.S. government to assist, and to recruit other private sector experts to assist, the government in sensitive matters.[1] The alleged conspiracy is similarly nebulous, including allegations regarding the "creation of an incriminating dossier," the use of internet technology information to monitor connections between Plaintiff and a Russian bank, efforts to "mislead federal law enforcement," the spread of a "false narrative through the media," and even efforts by law enforcement during the Crossfire Hurricane FBI investigation. As ably detailed in the numerous Motions to Dismiss filed by other Defendants, which Joffe joins and adopts, as incorporated herein, Plaintiff's Complaint is riddled with legal flaws requiring its dismissal with prejudice.

The claims fail because each is time-barred, coming nearly six years after Plaintiff demanded someone "DO SOMETHING" about the alleged conspiracy. Further, the RICO

---

[1] Joffe received the FBI Director's Award in 2013 based on assistance he provided in the investigation of a network of nearly than 60 cyber-criminals in more than 30 countries. *See* BuisnessWire, *Neustar's Rodney Joffe Receives Prestigious FBI Director's Award*, (Oct. 29, 2013), available: https://www.businesswire.com/news/home/20131029005948/en/Neustar %E2 %80%99s-Rodney-Joffe-Receives-Prestigious-FBI Director%E2%80%99s-Award.

Conspiracy claim (Count II) must be dismissed because Plaintiff has failed to state any substantive RICO claim, and lacks any specific, non-conclusory allegations supporting Joffe's joining of or participation in any conspiracy.  Without RICO as a basis for personal jurisdiction, all the remaining claims should be dismissed because this Court lacks personal jurisdiction over Joffe, a Virginia resident whose actions relating to this case involved no targeted connection to Florida whatsoever.  And, if this Court reaches the merits, each additional claim is time-barred and without merit.  Plaintiff's Complaint consists of nothing more than a rambling airing of grievances, and fails to meet even the most basic elements of his claims.  For these reasons, the Complaint should be dismissed.

## STATEMENT OF PLEADED FACTS

In the wide-ranging conspiracy alleged by Plaintiff, very few facts actually concern Joffe. The only allegations actually relating to Joffe are that, in July 2016, he was "in communication" with unspecified "high-ranking officials of the Clinton Campaign" (Compl. ¶ 106), and was "tasked [] to exploit its information" (Compl. ¶ 109; *see also id*. ¶ 5), searched for a "secret 'back channel'" between Trump and Alfa Bank (Compl. ¶ 110), "manipulated a sales form" (Compl. ¶ 111), had certain correspondence with a "team of researchers" (Compl. ¶¶ 112-115), "drafted" and sent a paper summarizing the allegations, "continued to compile" information regarding the same (Compl. ¶¶ 116, 118, 213), and "exploited his access . . . to unlawfully search, gather and mine internet data" from certain sources (Compl. ¶¶ 122-126; *see also id*. ¶ 177).

All remaining mentions of Joffe relate to conclusory assertions that he "stole trade secrets" (Compl. ¶ 123), "coordinated" with others (Compl. ¶ 177; *see also id*. ¶ 181), "play[ed] his] part in the . . . grand conspiracy" (Compl. ¶ 212), "conspired" with the "RICO Defendants" (Compl. ¶¶ 284, 286-87), "made, disseminated, and/or published false and damaging statements"

(Compl. ¶ 327), was "involved in the fabrication of supposed facts to put into the Dossier" (Compl. ¶ 348), "willfully and knowingly" misled FBI and DOJ officials (Compl. ¶ 357), "concocted a scheme to denigrate" Trump (Compl. ¶ 358), "had a meeting of minds" and "conspired to cause the FBI's investigation to be commenced" (Compl. ¶¶ 369-70), "conspired to do an unlawful act by unlawful means" (Compl. ¶ 372) with "malicious intent" (Compl. ¶ 374), and "exceeded" and "exploited" authority to access certain DNS data (Compl. ¶¶ 386, 388, 398-401, 418-420).

Plaintiff's claims against Joffe rest on the facially false premise that accessing DNS data equates to "exploit[ing] access to non-public and proprietary internet data" (Compl. ¶ 123) and "mining" DNS traffic (Compl. ¶ 125). Plaintiff further alleges that "DNS internet traffic data houses highly proprietary, sensitive and confidential data" (Compl. ¶ 285). This factually and legally inaccurate, and conclusory, characterization of DNS data is the root of Count VII (Computer Fraud and Abuse Act), Count VIII (Theft of Trade Secrets), and Count IX (Stored Communications Act).

The reality is that the Domain Name System (DNS) is a "distributed computing system that enables access to Internet resources by user-friendly domain names rather than IP addresses, by translating domain names to IP addresses and back." U.S. Dept. of Commerce, Nat'l Inst. of Standards & Tech., Secure Domain Name System (DNS) Deployment Guide (September 2013) at (iii), available at: https://nvlpubs.nist.gov/nistpubs/specialpublications/nist.sp.800-81-2.pdf ("*DNS Deployment Guide*").[2] "The domain name data provided by DNS is intended to be

---

[2] Courts routinely take judicial notice of government publications, including from the U.S. Department of Commerce. *See Coastal Wellness Ctrs., Inc. v. Progressive Am. Ins. Co.*, 309 F. Supp. 3d 1216, 1220 n.4 (S.D. Fla. 2018) ("The Court may take judicial notice of government publications and website materials."); *Talwar v. Creative Labs, Inc.*, No. CV 05-3375 FMC AJWX, 2006 WL 4568797, at *1 n.2 (C.D. Cal. Aug. 11, 2006) (granting request to take judicial

available to any computer located anywhere in the Internet." *Id*. Notably, "DNS data is meant to be public," just like IP addresses. *Id*. Security efforts involving DNS data typically do not involve obscuring this data, but rather "[t]he primary security goals for DNS are data integrity and source authentication, which are needed to ensure the authenticity of domain name information and maintain the integrity of domain name information in transit." *Id*. And, when DNS components are "attacked" these attacks entail disruption of "access to the resources whose domain names are handled by the attacked DNS components." *Id*. Said differently, security concerns regarding DNS data do not relate to its access, but rather, relate to its disruption.

## **ARGUMENT**

## I.   **ALL CLAIMS SHOULD BE DISMISSED BECAUSE THEY ARE TIME-BARRED**

Joffe joins in and adopts the arguments in Section I of Hillary Clinton's Motion to Dismiss (Dkt. 52) (the "Clinton Motion"),[3] that Plaintiff's claims are time-barred and should be dismissed. *See La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845-46 (11th Cir. 2004).

Plaintiff's claims relate to events that occurred in 2016 and 2017, for which the statute of limitations has long since expired. *See* Dkt. 52 at 1-5. Indeed, the factual allegations as to Joffe relate to activity that allegedly occurred in July 2016, email communications dating back to August–September 2016, and "compil[ing] data" through early 2017. Compl. ¶¶ 109, 111-121, 213. As noted in the Clinton Motion, *all* of Plaintiff's claims accrued no later than October 29,

---

notice of (1) United States Department of Commerce, National Institute of Standards and Technology ("NIST"), "Guide for the Use of the International System of Units"; and (2) NIST, "The International System of Units."); *Leatherback Sea Turtle v. Flagler Cnty. Bd. of Cnty. Commr's*, 359 F. Supp. 2d 1209, 1214 & n.2 (M.D. Fla. 2004) (taking judicial notice of "current forecast" of hurricane path and intensity projected by the National Hurricane Center).

[3] Joffe also joins in and adopts the statute of limitations arguments raised by John Podesta (Dkt. 124 at Section I), Nellie Ohr (Dkt. 144 at Section I), Michael Sussmann (Dkt. 146 at Section I) Marc Elias (Dkt. 147 at Section I), and the forthcoming Motion by Neustar (at Section II).

2017. Here, even the longest applicable statute of limitations is the four-year period for the RICO conspiracy (Count II), conspiracy to commit injurious falsehood (Count IV), conspiracy to commit malicious prosecution (Count VI), and malicious prosecution claims (Count V). *See id.* at 3-5; Dkt. 144 at 2-3. As such, all claims have been time barred since, at the very latest, October 2021. In fact, others were time barred before then.[4]

Plaintiff's only claim against Joffe not already addressed by other Defendants is Count IX, asserted against Joffe and Neustar, for violating the Stored Communications Act (18 U.S.C. § 2701-12) ("SCA"). Like Plaintiff's other claims, the SCA claim is clearly time-barred, as the statute of limitations is two years "after the date upon which the claimant first discovered or had a reasonable opportunity to discover the violation." 18 U.S.C.A. § 2707(f). Again, although Plaintiff asserts that the acts were not discoverable until September 2021 (Compl. ¶ 393), Plaintiff's other allegations—which state that the DNS lookup information was publicly known in October 2016—contradict this conclusion. *See* Compl. ¶¶ 183-89. Moreover, as other Defendants have explained, Plaintiff's own Complaint and his tweets demonstrate he has been

---

[4] The statute of limitations under the Computer Fraud and Abuse Act ("CFAA") (Count VII) is two years from the violation or discovery of the violation, and although Plaintiff asserts that the acts were not discoverable until September 2021, Plaintiff's other allegations—which state that the DNS lookup information was publicly known in October 2016—contradict this conclusion. *See* Dkt. 52 at 4. *See also, e.g.,* Eric Lichtblau and Steven Lee Myers, *Investigating Donald Trump, F.B.I. Sees No Clear Link to Russia,* N.Y. Times, (October 31, 2016), available: https://www.nytimes.com/2016/11/01/us/politics/fbi-russia-election-donald-trump.html ("Computer logs obtained by The New York Times show that two servers at Alfa Bank sent more than 2,700 'look-up' messages—a first step for one system's computers to talk to another—to a Trump-connected server beginning in the spring."). The statute of limitations for a civil action for theft of trade secrets under the Defend Trade Secrets Act ("DTSA") (Count VIII) is three years from the date "on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." *See* Dkt. 52 at 5 (quoting 18 U.S.C. § 1836). Here, again, Plaintiff's claims accrued upon public knowledge of his DNS traffic in October 2016.

aware of his purported injuries for years. *See* Dkt. 52 at 2-5; Dkt. 124 at 2-3 ("the facts are pouring out. DO SOMETHING!"). As such, the statute of limitations ran in October 2018.

## II.     THE RICO CONSPIRACY CLAIM (COUNT II) FAILS

Beyond being time-barred, the RICO conspiracy claim fails on every level. Joffe joins in and adopts the arguments in Sections II.A and II.B of the Clinton Motion, as well as other motions filed by defendants in this case, that the Complaint does not satisfy the requirements to establish the underlying RICO claim (Count I) or the claim for RICO conspiracy (Count II). *See* Dkt. 52 at 6-14; Dkt 143 (Perkins Coie) at 2; Dkt. 141 (DNC) at 4; Dkt. 145 (Mook) at 3-6; Dkt. 146 at 4-8; Dkt. 147 (Elias) at 5-11, and the forthcoming Neustar Motion (Section III.A.1).

First, Count II, alleging a RICO conspiracy, fails because the substantive Section 1962(c) RICO claim in Count I fails. As the Motions to Dismiss filed by the defendants named in Count I ably explain, and Joffe adopts herein, Plaintiff's substantive RICO claim fails at every level: it does not allege any cognizable RICO enterprise, a viable RICO predicate act (let alone two), a pattern of continuing racketeering activity, cognizable damages, proximate cause, or RICO standing. *See* Dkt. 52 at 6-14; Dkt. 141 at 4; Dkt. 143 at 2-4; Dkt. 146 at 4-8; Dkt. 147 at 5-10. Because Plaintiff's claim for civil RICO fails, his "RICO conspiracy claim necessarily fails" and Count II also must be dismissed. *Super Vision Int'l, Inc. v. Mega Int'l Com. Bank Co.,* 534 F. Supp. 2d 1326, 1342 (S.D. Fla. 2008); *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1220 (11th Cir. 2020) ("[A] complaint that 'simply concludes that the defendants conspired and confederated to commit conduct which in itself does not constitute a RICO violation' must be dismissed.")

Even assuming the Complaint adequately pleaded a substantive RICO claim (it did not), Count II fails for additional reasons. To survive a motion to dismiss, Plaintiff must either "show[] that the defendant agreed to the overall objective of the conspiracy" or "show[] that the

defendant agreed to commit two predicate acts." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293 (11th Cir. 2010). As part of its review, the Court's "first task is to eliminate any allegations in Plaintiff['s] complaint that are merely legal conclusions." *Id.* As shown in the Statement of Pleaded Facts, the Complaint's support for a conspiracy is mere say-so. Simply repeating multiple times an accusation that "[e]ach of the RICO Conspiracy Defendants" "agreed to facilitate the Enterprise's scheme" (Compl. ¶ 321), or that Joffe "coordinated" or "conspired" with the "RICO Defendants" (*e.g.* Compl. ¶¶ 177, 181, 284, 286-87), fails to meet Plaintiff's burden. *See Carter v. MGA, Inc.,* 189 F. App'x 893, 895 (11th Cir. 2006) ("But plaintiffs alleged no facts to show or to create a reasonable inference that Defendants made an agreement. Plaintiffs' conclusory allegations that Defendants conspired with each other are insufficient to survive a motion to dismiss."). These allegations are mere "formulaic recitation[s] of the elements of a cause of action," and "'naked assertion[s]' devoid of 'further factual enhancement,'" which do not suffice to state a claim upon which relief can be granted and are not enough to survive a motion to dismiss (particularly under the demanding Rule 9(b) standard). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)); *see also Super Vision*, 534 F. Supp. 2d at 1342–43.

Nor do the Complaint's allegations plausibly plead that Joffe "agreed" to the overall objective of the conspiracy, or to commit two predicate acts. All the Complaint claims is that, at Sussmann's request, (Compl. ¶ 109), Joffe (who was employed by Neustar at that time) and an unidentified "team of researchers" engaged in allegedly inappropriate use of access to DNS data (*e.g.* Compl. ¶¶ 110-126), and then worked on a White Paper with Sussmann (Compl. ¶ 116) allegedly at the "behest" of Clinton, Sullivan, Elias and/or Sussmann (Compl. ¶ 122). This does not allege a viable predicate act, nor does it show any agreement by Joffe to participate in the

overall alleged conspiracy.  Indeed, it shows no actual connection between Joffe and any other Defendant, other than his employer and his counsel at Perkins Coie.  No factual allegation supports that Joffe had any awareness (much less agreed to be involved in a conspiracy) with other alleged actors, like Steele, the FBI employees, or even Clinton.  Moreover, there is no fact pled to support Joffe's knowledge of, or involvement, in any other alleged part of the conspiracy, including the Steele Dossier, or any conduct by officials in the Crossfire Hurricane investigation.

Further, to successfully allege a conspiracy, a complaint must give the court a basis for inferring that defendants were conspiring and not simply engaging in "unknowingly parallel conduct." *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1069 (11th Cir. 2017). And, the Supreme Court and Eleventh Circuit have cautioned courts not to infer an agreement where there is an "obvious alternative explanation." *Am. Dental Ass'n*, 605 F.3d at 1294-95.  Even assuming that the Complaint pleads parallel conduct by different groups of actors (it does not), it completely fails to plead a non-conclusory connection between them.  At most, it shows that Joffe and a group of researchers were concerned about the possibility that publicly-accessible DNS information would show a connection between a Presidential candidate and a Russian bank owned by oligarchs with close ties to Vladimir Putin.

Because the underlying substantive RICO claim fails, and because the Complaint fails to plead factual assertions sufficient to show Joffe's knowledge, agreement, and participation in any RICO conspiracy, Count II should be dismissed.

## III.   THE REMAINING CLAIMS SHOULD BE DISMISSED AS TO JOFFE BECAUSE THIS COURT LACKS PENDENT PERSONAL JURISDICTION

Plaintiff's only plausible basis for personal jurisdiction over Joffe is the statutory personal jurisdiction under Section 1962(d)'s nationwide service of process provision. *Rep. of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997).  But,

"Plaintiff['s] RICO claim must survive a 12(b)(6) analysis if it is to serve as the basis for the Court's personal jurisdiction." *Leon v. Continental AG*, 301 F. Supp. 3d 1203, 1231-32 (S.D. Fla. 2017).  As noted above, it does not.  Without any statutory basis, Plaintiff must establish that this Court has general or specific jurisdiction over Joffe in order to proceed on the remaining claims. *See Prou v. Giarla*, 62 F. Supp. 3d 1365, 1375-76 (S.D. Fla. 2014).[5]  He cannot; so the remaining claims may be dismissed under Rule 12(b)(2). *See Leon*, 301 F. Supp. 3d at 1236; *Koch v. Royal Wine Merchants, Ltd.*, 847 F. Supp. 2d 1370, 1378 (S.D. Fla. 2012).

### A.      Joffe Is Not Subject to General Jurisdiction in Florida

This Court does not have general jurisdiction over Joffe because he is not domiciled in this State, nor has Plaintiff asserted that general jurisdiction over Joffe is appropriate. *See Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780 (2017).

### B.      This Court Lacks Specific Personal Jurisdiction over Joffe

Plaintiff also does not adequately allege specific jurisdiction over Joffe.  He seeks to do so by asserting that "Joffe's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida." *See* Compl. ¶ 34.  But these generalized, conclusory jurisdictional allegations fail to satisfy Plaintiff's burden of alleging "sufficient facts to make out a *prima facie* case of jurisdiction."  *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009).  Moreover, the exercise of specific jurisdiction

---

[5] Importantly, like the state law claims (Counts IV-VI), the remaining federal claims under the CFAA, DTSA and SCA (Counts VII-IX) do not have nationwide service of process provisions. *See Sears Authorized Hometown Stores, LLC v. Nationwide Mktg. Grp., LLC*, No. 19-CV-3403, 2019 WL 5064731, at *1 (N.D. Ill. Oct. 9, 2019) ("[T]he CFAA and DTSA do not have nationwide service of process," and accordingly, plaintiff "must establish personal jurisdiction under state law."); *Medici v. Lifespan Corp.*, 239 F. Supp. 355, 367 (D. Mass. 2017) "The Stored Communications Act does not authorize nationwide jurisdiction.").

over Joffe would violate the Due Process Clause of the U.S. Constitution. *See Melgarejo v. Pysca Panama, S.A.*, 537 F. App'x 852, 860 (11th Cir. 2013).

A forum state's exercise of jurisdiction over an out-of-state defendant "must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Walden v. Fiore*, 571 U.S. 277, 286 (2014). It is "insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff." *Id.* Instead, for long-arm jurisdiction in Florida to comport with due process, the plaintiff must show that the defendant engaged in conduct tied to the asserted causes of action by which he "purposively avail[ed himself of] the privilege of conducting activities within Florida, thus invoking the benefits and protections of its laws" such that he "should reasonably anticipate being haled into court there." *Tarasewicz v. Royal Caribbean Cruises Ltd.*, No. 14-civ-60885, 2015 WL 3970546, at *19 (S.D. Fla. June 30, 2015).

This standard is not met here. The complaint alleges only one attenuated link between the events in question and Florida, and it does not involve conduct by Joffe: "Clinton appeared on MSNBC's Morning Joe . . . when she stated to MSNBC's audience, *which included the general public of the State of Florida* and the rest of the United States: 'We don't have Trump as spokesperson for Putin, anymore'" (Compl. ¶ 260 (emphasis added); *see also id.* ¶ 335). This is not an act by Joffe, let alone one allegedly causing injury specifically in Florida, and it therefore does not establish personal jurisdiction over Joffe. *See Walden*, 571 U.S. at 286.

Here, there is simply no intentional conduct by Joffe that occurred in Florida, or was targeted at Florida. As in *Walden*, "[i]t is undisputed that no part of [defendant's] course of conduct occurred in [Florida]." 571 U.S. at 288. Likewise, Joffe never "traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to [Florida]," *id.* at 289, in

10

connection with the events at issue.  Instead, Joffe's actions are all alleged to have occurred or

been targeted at locations *outside* of Florida. According to the Complaint, the servers in question

relate to the Trump Organization in New York, Trump Tower in New York, and the Executive

Office of the President in Washington, D.C., involving contacts with Alpha Bank in Russia (e.g.

Compl. ¶ 110, 123). Moreover, there is no basis to assert that Joffe intentionally harmed Plaintiff

in Florida because Plaintiff did not live there at the time of Joffe's alleged tortious conduct.  At

the time of the alleged conduct (2016-2017), Plaintiff resided in New York and did not become a

Florida resident until September 27, 2019.  *See* Declaration of Domicile, Recorded 10/04/2019

Palm Beach County, Florida. CFN 20190364271 (attached as Exhibit A). Plaintiff's later-

acquired residence (and purported injury) in Florida is merely a "random, fortuitous" contact that

is insufficient to satisfy due process.  *See Walden*, 571 U.S. at 286; *see also Riley v. Cardozo*,

No. 3:16-cv-961-J-34MCR, 2017 WL 2799900, at *6 (M.D. Fla. June 28, 2017).[6]

      Nor can Plaintiff rely on the *Calder* effects test to establish jurisdiction. *See Calder v.

Jones*, 465 U.S. 783 (1984).  It is not enough that the information was accessible in Florida.

There is no credible allegation that Joffe "targeted" Florida, and no evidence that Joffe had

"reason to believe the 'brunt' of Plaintiff's injury would be felt in Florida."  *Miller v. Gizmodo

Media Grp., LLC*, 383 F. Supp. 3d 1365, 1373 (S.D. Fla. 2019).  For these reasons, the remaining

claims against Joffe should be dismissed because this Court lacks personal jurisdiction over him.

## IV.    THE REMAINING CLAIMS FAIL ON THE MERITS AS WELL

      In addition to being unable to establish personal jurisdiction over Joffe—which should

dispose of this action—Plaintiff's remaining claims are also meritless.  Beyond being time-

---

[6] Even if Plaintiff did reside in Florida at the time, it would not permit the exercise of specific jurisdiction over Joffe because "the plaintiff cannot be the only link between the defendant and the forum."  *Walden*, 571 U.S. at 285.  "[M]ere injury to a forum resident is not a sufficient connection to the forum" to establish specific jurisdiction.  *Id*. at 290.

barred as discussed in Section I, *supra*, the claims fail to plead facts to support any cognizable cause of action and instead rest on "formulaic recitation[s] of the elements" of the claims and "legal conclusion[s]" this Court must reject.  *Twombly*, 550 U.S. at 555.

### A.    Count IV – Conspiracy to Commit Injurious Falsehood

In Count IV, Plaintiff claims that Joffe conspired to commit injurious falsehood by his creation of a "false narrative that the Plaintiff was colluding with Russia." Compl. ¶ 350.  As explained in Section II.C of the Clinton Motion, Section II.B of the Sussmann Motion, and Section III.A of the Perkins Coie motion, which Joffe joins and adopts, the substantive injurious falsehood claim fails on the merits for multiple reasons, chief among them that injurious falsehood protects "economic interests" and not "personal reputation." *Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp. 2d 1260, 1268 (S.D. Fla. 2004).  Ignoring this requirement, the Complaint fails to plead "economic" injuries.  *See* Dkt. 143 at 4-7.  As explained in Sections II.C-D of the Clinton Motion and Section III.A of the Perkins Coie Motion, the Complaint's references to lost "business opportunities" are conclusory recitations of the elements of a claim, and bear no connection to Trump's overall narrative of harm to his *political* fortunes (a puzzling narrative, as we all know that 2016 ended with Trump's election to the highest office in the United States of America).  Further, Plaintiff has failed to plead special damages, a "crucial element" of the tort.  *See* Dkt. 143 at 6-7. Finally, as explained by other Defendants, Plaintiff's injurious falsehood claim fails because, as a public official, he has failed to plead actual malice as required by the First Amendment. *See* Dkt. 52 at 16-17; Dkt. 141 at 6-9; Dkt. 144 at 5-6.

Because the underlying claim fails, Count IV alleging conspiracy to commit injurious falsehood must also fail.  *See Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1345 (S.D. Fla. 2018).

Further, as discussed in Section II, *supra*, each conspiracy claim fails because the Complaint fails to plausibly plead Joffe's agreement or participation in any conspiracy.

**B.      Counts V and VI – Malicious Prosecution and Conspiracy**

In Counts V and VI, Plaintiff claims that Joffe committed malicious prosecution by "willfully and knowingly misle[ading] FBI and DOJ officials with the intention of inducing the FBI to commence an investigation of the Plaintiff and his alleged collusion with Russia" (Compl. ¶ 357), and by conspiring to do the same. As explained in Section II.E of the Clinton Motion, Section IV of the Perkins Coie Motion, and Section V of the Elias Motion, which Joffe joins, Plaintiff fails to plead any of the required elements for his malicious prosecution claim. *See* Dkt. 52 at 19; Dkt. 143 at 9-13; Dkt. 147 at 13-16. Specifically, Count V fails on the merits because Plaintiff has not alleged (1) there was a judicial proceeding; (2) that it terminated in his favor; and (3) that there was an absence of probable cause.   Indeed, the Complaint actually pleads that there *was no* judicial proceeding as the FBI "concluded that there was insufficient evidence" to pursue a further investigation.  Compl. ¶ 180; *see also* Dkt. 146 at 9-10.  "An action for malicious prosecution . . . [can] never occur outside the context of litigation." *Fischer v. Debrincat*, 169 So. 3d 1204, 1209 (Fla. Dist. Ct. App. 2015), *approved*, 217 So. 3d 68 (Fla. 2017). For these reasons, and those advanced in the Clinton and Perkins Coie Motions, Count V should be dismissed.  And, the conspiracy claim alleged in Count VI must fail too because the underlying claim is meritless, (Dkt. 52 at 19-20; Dkt. 143 at 9-13; *Honig*, 339 F. Supp. 3d at 1345), and fails to plausibly plead Joffe's participation and agreement, *see* Section II*, supra*.

**C.      Count VII – Computer Fraud and Abuse Act**

In Count VII, Plaintiff alleges that Joffe violated the Computer Fraud and Abuse Act ("CFAA") insofar as he (and Neustar) "knowingly, intentionally and unlawfully accessed and/or

exceeded their authority to access the computers" (Compl. ¶¶ 386, 388).  As explained in Section II.F of the Clinton Motion, Section III.C of the forthcoming Neustar Motion, and Section V of the Perkins Coie Motion, which Joffe adopts, the substantive CFAA claim fails on the merits for multiple reasons, including that Joffe's alleged activity does not "exceed authorized access," nor does Plaintiff allege compensable loss.   To succeed on a claim for a violation of the CFAA, Plaintiff must allege that (1) the defendant "accessed a protected computer;" "(2) without authorization or by exceeding authorized access;" "(3) knowingly and with intent to defraud;" and (4) the defendant's "access furthered the intended fraud and obtained anything of value." *See TracFone Wireless, Inc. v. Hernandez*, 196 F. Supp. 3d 1289, 1300 (S.D. Fla. 2016).

In this matter, Joffe's alleged actions did not "exceed[] authorized access," and therefore are not prohibited by the CFAA. *See Van Buren v. United States*, 141 S. Ct. 1648, 1649 (2021). In *Van Buren*, a police sergeant was asked by a civilian to use his police credentials to access a license plate database used by law enforcement to obtain information about a woman in exchange for a payment of approximately $5,000.  *See id*. at 1653.  Van Buren did so, using his valid credentials, and offered to provide the information he obtained from the database in exchange for the cash payment.  *See id*. The Supreme Court, holding that the police sergeant did not "exceed authorized access" under the CFAA, narrowed the application of the statute and clarified that the CFAA only extends to an individual who obtains information "located in particular areas of the computer . . . that are off limits to him," and *does not extend* to those "who had improper motives for obtaining information that was otherwise available to them." *Id*. at 1652, 1662.  Critically for present purposes, the Supreme Court held that exploiting existing

access to a computer system "for an improper purpose" does *not* violate the statute.  *Id.* at 1662[7]

The "CFAA focuses on—and punishes—'an individual's unauthorized *access* of information rather than how a defendant' *uses* the accessed data." *CareersUSA, Inc. v. Guerrero*, No. 14-cv-80096, 2014 WL 12862259, at *3 (S.D. Fla. Aug. 25, 2014).

Plaintiff's claim for violation of the CFAA cannot be squared with *Van Buren*.  It turns entirely on Joffe's purportedly improper use of DNS data, to which, as Plaintiff alleges in the Complaint, Joffe (and others) already had authorized access.  Plaintiff alleges that (1) Neustar is "an information technology company" that "offers various internet-related information, data and analytics services, including Domain Name System ("DNS") resolution services," and (2) Neustar provided "DNS resolution services" (Compl. ¶ 103) to the Executive Office of the President and thereby "*c[a]me to access* and maintain dedicated servers for the EOP." Compl. ¶ 124 (emphasis added). According to Plaintiff, Joffe allegedly was tasked "to exploit . . . *[his] access* to non-public data to dredge up" compromising information about Trump. Compl. ¶ 109 (emphasis added).  Joffe then proceeded to "min[e]" executive branch DNS data. Compl. ¶ 125. Even if these allegations were true, which they are not, they do not establish that Joffe ran afoul of the CFAA.  Far from gaining unauthorized access to files or systems "off limits" to them, *Van Buren*, 141 S. Ct. at 1662, Plaintiff's own rendition of the facts state that Joffe was *given* access, albeit allegedly using this access for supposedly "nefarious purposes," Compl. ¶¶ 102, 122.  And,

---

[7] Further, there is nothing "improper" about Joffe's motives. Joffe joins in and adopts the arguments in Section III of the Sussmann Motion— that all of Plaintiff's claims against Joffe are barred by the *Noerr-Pennigton Doctrine*. *See* Dkt. 146 at 11-13. Plaintiff's claims are each based on the same theory of liability: that Joffe conveyed information about Trump's links to Russia to Sussmann, who then provided it to representatives of the federal government and, accordingly, that Plaintiff was injured by the FBI's allegedly related investigation. If true, such governmental communications fall squarely within the protections afforded to this kind of "petitioning" activity; they are foreclosed by the *Noerr-Pennington* doctrine; and Joffe accordingly cannot be held civilly liable for the alleged harms from any resulting governmental action.

importantly, DNS Data "is meant to be public." *DNS Deployment Guide*, at (iii).  As such, the CFAA does not extend to Joffe, as the information was "otherwise available" due to its public nature.  Although this alleged behavior may cause discomfort to Plaintiff, it plainly does not violate the CFAA. *See Armor Corr. Health Servs., Inc. v. Teal*, No. 19-cv-24656, 2021 WL 5834245, at *27 (S.D. Fla. Dec. 8, 2021) (holding that executive authorized to access employer's systems with "no meaningful limitations" did not violate CFAA by downloading documents "for the improper purpose of using [them]" to compete with employer).

Further, Plaintiff does not allege any compensable "loss" under the CFAA. Absent an allegation that Plaintiff sustained compensable damage or loss in excess of $5,000 in one year, the CFAA claim should be dismissed.  *See* 18 U.S.C. § 1030(g).  Under § 1030(e)(11) "loss" means "any reasonable cost … including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." Plaintiff does not claim an interruption of service; rather, he seeks legal expenses and compensation relating to "harm to his business." Compl. ¶ 394. Accordingly, the Complaint fails to plead the kind of "loss" required by the CFAA. *See Nexans Wires S.A. v. Sark–USA, Inc.*, 319 F. Supp. 2d 468, 477–78 (S.D.N.Y. 2004) (because § 1030(e)(11) limits "loss" to costs incurred because of interruption of service, loss of business due to defendant's use of proprietary information was not covered by the CFAA); *Resdev, LLC v. Lot Builders Ass'n, Inc.*, No. 6:04–CV–1374, 2005 WL 1924743 *2–5 (M.D. Fla. Aug. 10, 2005) (rejecting the argument that "loss" can cover a trade secret's exclusivity value).[8]

---

[8] Finally, Joffe joins in and adopts the arguments in Section V.C of the Perkins Coie motion that the CFAA claim should be dismissed to the extent it relies upon allegedly unauthorized access to servers belonging to the Executive Office of the President ("EOP").  Compl. ¶ 383.  Plaintiff is

### D.      Count VIII – Theft of Trade Secrets

In Count VIII, Plaintiff alleges that Joffe engaged in theft of trade secrets, violating the DTSA by "exploit[ing] access to non-public data sources and/or servers, and unlawfully acquir[ing], st[ealing] and exploit[ing] sensitive, proprietary and confidential internet data" (Compl. ¶ 398).  Joffe joins in and adopts the arguments in Section A (pages 8-9) of the Clinton Motion and Section III.D of the forthcoming Neustar Motion regarding theft of trade secrets, which demonstrate that this claim must also fail on the merits.[9]

As a primary matter, a trade secret "derives independent economic value" from "not being generally known to" others.  *Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d, 1279, 1292 (S.D. Fla. 2018) (citing 18 U.S.C. § 1839(3)(B)).   Yet Plaintiff offers no account— plausible or otherwise—of the independent economic value of DNS information either to himself or to Joffe.  Nor could he plausibly claim that DNS data "derives" its value "from not being generally known."  As explained at pages 8-9 of the Clinton Motion and Section III.A.1 & D of the Neustar Motion, DNS data is not a "trade secret."  For a user, each resource on this network is identified by a unique name: the domain name.  For network equipment (e.g., routers), the unique resource identifier is the IP address.  To access Internet resources in a user-friendly way, rather than by strings of numbers (IP addresses), users need a system that translates these domain names to IP addresses and then back again: this translation is the Domain Name System (DNS).  *See DNS Deployment Guide* at 2.1.  "The single most important factor in determining whether

---

not permitted to recover civil damages as a private plaintiff for unauthorized access to computers owned by the federal government.  Even if a party improperly extracted "valuable, sensitive and/or proprietary information and data" from EOP computer systems (*id*. ¶ 386), which no party did, that injury is the government's to vindicate, not Trump's.  *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765 (2000).

[9] Joffe also adopts the DNC's argument that 18 U.S.C. § 1832(a)(5) does not afford a private right of action.  *See* Dkt. 141 at 14-15.

particular information is a trade secret is whether the information is kept secret." *Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 418 (2d Cir. 2004) (citing *Lehman v. Dow Jones & Co.,* 783 F.2d 285, 298 (2d Cir.1986)).  DNS data is publicly available and therefore cannot, by any stretch of the imagination, be a "trade secret."

Further, as discussed above, DNS data, which is public, is not information "owned" by the Plaintiff.  Thus, as with IP information, individuals lack a protected privacy interest in DNS data.  Dkt. 52 at 8; *Heeger v. Facebook, Inc.,* 509 F. Supp. 3d 1182, 1189 (N.D. Cal. 2020); *see also Register.com*, 356 F.3d at 418 ("WHOIS information"—an internet record listing that identifies who owns a domain and how to get in contact with them—"cannot be copyrighted … patented, … or protected as a trade secret or confidential information under state law.").

E.    **Count IX – Stored Communications Act**

The Stored Communications Act ("SCA") has a "narrow scope" and is "not a catch-all statute designed to protect the privacy of stored Internet communications." Orin S. Kerr, *A User's Guide to the Stored Communications Act, and A Legislator's Guide to Amending It*, 72 GEO. WASH. L. REV. 1208, 1214 (2004).  To succeed on a claim alleging a violation of the SCA, Plaintiff must allege that the defendant "(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system." *In re Google Inc.*, 806 F.3d 125, 145-46 (3d Cir. 2015).

As with other claims, Plaintiff simply repeats the elements of the SCA, claiming that Joffe violated the statute by exceeding access to "numerous facilities through which an electronic communication is provided" including private computers, those at the EOP, and those of the

Trump Organization. *See* Compl. ¶ 418.  Plaintiff, however, fails to allege a cognizable SCA

violation for several reasons.  First, as described above, the Complaint fails to plausibly plead

that Joffe accessed or "intruded" into any non-public or private information because DNS data is

public, or that Joffe "exceeded" his authorized access.  *See* Sections IV.C and IV.D, *supra*; *see*

*also Walker v. Coffey*, 956 F.3d 163, 168 (3d Cir. 2020) ("[a]ccessing a facility as defined by

section 2701 requires an intrusion into an electronic communication system").[10]

Second, Plaintiff's SCA claim fails because the "facility through which an electronic

communication service is provided" includes internet or network service providers, not

Plaintiff's personal computers, or computers/servers belonging to the EOP or the Trump

Organization.  *See United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003) ("The SCA,

however, does not appear to apply to the source's hacking into Steiger's computer to download

images and identifying information stored on his hard-drive because there is no evidence to

suggest that Steiger's computer maintained any 'electronic communication service' as defined in

18 U.S.C. § 2510(15).").  As the Fifth Circuit explained in *Garcia v. City of Laredo*, 702 F.3d

788, 790 (5th Cir. 2012), the "home computer of an end user is not protected by the [Stored

Communications Act]."    Rather, "[t]he statute envisions a *provider* (the [Internet service

provider] or other network service provider) and a *user* (the individual with an account with the

provider), with the *user's communications in the possession of the provider*." *Id.* at 793.

Likewise, the Northern District of Georgia has held that the SCA did not apply to accessing the

computers of a business to obtain trade secrets because, despite the fact that the company

"provides telephone, internet, and email services to its employees," it was not a "provider of

'electronic communication service'" within the meaning of the SCA.  *IPC Sys., Inc. v. Garrigan*,

---

[10] With regard to this argument, Joffe also joins Section III.E of the forthcoming Neustar Motion.

No. 1:11-CV-3910-AT, 2012 WL 12872028, at *9 (N.D. Ga. May 21, 2012).  Other courts are in accord.  *See In re Google Inc.*, 806 F.3d at 146 (dismissing SCA claim regarding "illicit access [] to the plaintiffs' personal web browsers"); *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 512 (S.D.N.Y. 2001).  Indeed, it appears that *no court* has held that the SCA applies to anyone but service providers (such as internet service providers, phone companies, or social network service providers, such as Facebook or Myspace, which host private messaging).  Accordingly, because Plaintiff fails to plead that there was an intrusion into a "facility" (a network service provider), the SCA is inapplicable.

Relatedly, DNS data is not "in electronic storage".  The SCA defines "electronic storage" as "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication."  18 U.S.C. § 2510(17); *see also Garcia*, 702 F.3d at 792.  Despite the conclusory assertion that Joffe "obtained wire or electronic communications from the Computers that were in electronic storage in such systems," (Compl. at ¶ 419), the actual pleaded allegations relate only to obtaining public DNS data.  Moreover, "electronic storage" "encompasses only the information that has been stored by an electronic communication service provider," and does not include "[e]mails stored on the laptop computer" nor the Trump or EOP servers here. *See Garcia*, 702 F.3d at 793.  The Complaint simply fails to allege any facts showing the use of a facility, electronic communications, or electronic storage.  For these reasons, Count IX must fail.

## **CONCLUSION**

For all of the foregoing reasons, and those advanced by his co-Defendants, Joffe respectfully requests that the Court grant his Motion to Dismiss.

Dated:  May 20, 2022                                        Respectfully submitted,


                                                           */s/ Edward Soto*
                                                           Edward Soto (FBN 0265144)
                                                           **WEIL GOTSHAL & MANGES LLP**
                                                           1395 Brickell Avenue, Suite 1200
                                                           Miami, FL 33131
                                                           Telephone: (305) 577-3100
                                                           Facsimile: (305) 374-7159


                                                           Steven A. Tyrrell, *admitted pro hac vice*
                                                           **WEIL GOTSHAL & MANGES LLP**
                                                           2001 M Street, N.W., Suite 600
                                                           Washington, D.C. 20036
                                                           Telephone: (202) 682-7000
                                                           Facsimile: (202) 857-0940


                                                           *Attorneys for Rodney Joffe*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 20, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Edward Soto*
Edward Soto (FBN 0265144)
**WEIL GOTSHAL & MANGES LLP**
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
Telephone: (305) 577-3100
Facsimile: (305) 374-7159

Steven A. Tyrrell, *admitted pro hac vice*
**WEIL GOTSHAL & MANGES LLP**
2001 M Street, N.W., Suite 600
Washington, D.C. 20036
Telephone: (202) 682-7000
Facsimile: (202) 857-0940

*Attorneys for Rodney Joffe*

# EXHIBIT A

CFN 20190364271

OR BK 30932 PG 0239
RECORDED 10/04/2019 09:57:23
Palm Beach County, Florida
Sharon R. Bock,CLERK & COMPTROLLER
Pgs 0239 - 240; (2pgs)

## DECLARATION OF DOMICILE

**For Domiciliaries of the State Of Florida:**

To the Clerk of the Circuit Court (County Comptroller) of Palm Beach County, Florida.

This is my declaration of domicile in the State of Florida that I am filing this day in accordance and in conformity with Section 222.17, Florida Statutes.

I ____Donald J Trump_____ hereby declare that I reside in and maintain a place of abode at:

____1100 South Ocean Boulevard_____
(street and number)
____Palm Beach, Palm Beach County_____ , Florida
(city and county)

which place of abode I recognize and intend to maintain as my permanent home and, if I maintain another place or places of abode in some other state or states, I hereby declare that my above-described residence and abode in the State of Florida constitutes my predominant and principal home, and I intend to continue it permanently as such. I am, at the time of making this declaration, a bona fide resident of the State of Florida residing at:

____1100 South Ocean Boulevard_____
(street and number)
____Palm Beach, Palm Beach County_____ , Florida
(city and county)

I formerly resided at:
____721 Fifth Avenue_____
(street and number)
____New York, New York County, New York_____
(city, county and state)

and the place or places where I maintain another or other place or places of abode are as follows: (Here list street address, city, county, and state of any other place or places of abode.)

____See attached Schedule A.____

_____
(Signature)

Sworn to and subscribed before me this ____27th____ of ____September____ , 2019

_____
(Signature of Notary Public, State of Florida)

____David E. Kalbaugh____ ____District of Columbia____
(Print, type or stamp commissioned name of Notary Public)

Personally Known ____✓____ or Produced Identification
(Check One)

Type of Identification Produced: _____

**(See reverse side for Domiciliaries of States Other than the State of Florida)**

**Schedule A**

**Declaration of Domicile
of Donald J. Trump**

The places where I maintain other places of abode are as follows:



| | Street | City | County | State |
|---|---|---|---|---|
| (1) | 1600 Pennsylvania Ave, NW | Washington | N/A | D.C. |
| (2) | 900 Lamington Road | Bedminster | Somerset | NJ |

This is not a certified copy

159

Defendant Igor Danchenko's Motion to Dismiss the Complaint and
Incorporated Memorandum of Law (May 20, 2022)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 2:22-CV-14102-MIDDLEBROOKS

DONALD J. TRUMP,

     Plaintiff,

v.

HILLARY R. CLINTON, et al.,

     Defendants.

_____/

### DEFENDANT IGOR DANCHENKO'S MOTION TO DISMISS THE COMPLAINT AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT

Defendant Igor Danchenko, through undersigned counsel, moves to dismiss Plaintiff Donald Trump's claims with prejudice. The Complaint (DE 1) consists of over one hundred pages of Plaintiff's well-publicized grievances and preferred narrative, all the while failing to state a claim as a matter of law. As argued in Defendant Hillary R. Clinton's motion to dismiss ("Clinton Motion") (DE 52),[1] those claims are time-barred and defectively pled. Those failures are particularly apparent as to Mr. Danchenko, who, as discussed below, does not know any of the alleged "RICO Defendants."

### ARGUMENT

### I.   ALL COUNTS AS TO MR. DANCHENKO ARE TIME-BARRED ON THE FACE OF THE COMPLAINT AND SHOULD BE DISMISSED

    A.   RICO Conspiracy

Mr. Danchenko joins in and adopts the arguments in Section I of the Clinton Motion that Plaintiff's claims are time-barred. Dismissal under Federal Rule of Civil Procedure 12(b)(6) is

_____

[1] Mr. Danchenko joins in and adopts the other Defendants' arguments in support of dismissal.

appropriate where—like here—it "is apparent on the face of the complaint" that the claim is time-barred. *La Grasta v. First Union Sec., Inc*., 383 F.3d 840, 845-46 (11th Cir. 2004).

While Plaintiff does not name Mr. Danchenko in Count I, the substantive RICO count, he includes him along with other additional Defendants in Count II for RICO conspiracy. This distinction does not matter for statute of limitations purposes. As explained in the Clinton Motion, the statute of limitations for civil RICO is four years, accruing when the plaintiff knew or should have known of the alleged injury. *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013) (The four-year statute of limitations begins to run "when the injury was or should have been discovered, regardless of whether or when the injury is discovered to be part of a pattern of racketeering.") (citation omitted); *White v. Greenpoint Mortg. Funding Inc*., No. 14-80452-CIV, 2014 U.S. Dist. LEXIS 185973, at *11 (S.D. Fla. June 26, 2014) (dismissing RICO and RICO conspiracy claims because "[k]nowledge of the injury, rather than knowledge of the pattern of RICO activity, starts the clock running for statute of limitations purposes") (citation omitted).

Plaintiff made public his knowledge of the alleged RICO conspiracy and injury in a tweet on October 29, 2017.[2] Accordingly—at the latest—his claims accrued on that date, well over four years before he filed the Complaint. Regarding Mr. Danchenko specifically, Plaintiff's allegations concern the so-called "Steele Dossier." Compl. ¶¶ 81, 88. The Dossier and Plaintiff's allegations

---

[2] Donald J. Trump (@realDonaldTrump), Twitter (Oct. 29, 2017), archived at The Trump Twitter Archive, thetrumparchive.com ("Never seen such Republican ANGER & UNITY as I have concerning the lack of investigation on Clinton made fake Dossier (now $12,000,000?), the Uranium to Russia deal, the 33,000 plus deleted Emails, the Comey fix and so much more. Instead they look at phony Trump/Russia, 'collusion,' which doesn't exist. The Dems are using this terrible (and bad for our country) Witch Hunt for evil politics, but the R's are now fighting back like never before. There is so much GUILT by Democrats/Clinton, and now the facts are pouring out. DO SOMETHING!").

concerning it were public even earlier, as of January 2017.[3]  And Mr. Danchenko's own alleged acts began in 2016, Compl. ¶ 79, with the latest allegedly occurring in November 2017, *id*. ¶ 201— all outside of the four-year limitations period.  Moreover, Plaintiff has no recourse to make his allegations about these acts timely: He "cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." *Lehman*, 727 F.3d at 1331.  "By extension, when an injury is a continuation of an initial injury, it is not *new and independent*." *Id*. (alteration in original) (internal citation omitted).  The RICO conspiracy that Plaintiff complains of is thus irrevocably time-barred and should be dismissed with prejudice.

   B.  Injurious Falsehood and Malicious Prosecution

      The remaining claims against Mr. Danchenko—injurious falsehood (Count III), malicious prosecution (Count V), and conspiracy to commit same (Counts IV and VI, respectively)—are time-barred as well.  The statute of limitations for the Malicious Prosecution claims is four years, accruing when the last element constituting the cause of the action occurs.  *See* Fla. Stat. § 95.11(3)(o); Fla. Stat. § 95.031(1).  The Injurious Falsehood claims are subject to only a two-year statute of limitations. Fla. Stat. § 95.11(4)(g); *see ADT LLC v. Vivint, Inc*., No. 17-cv-80432,

---

[3]  *See* https://www.buzzfeednews.com/article/kenbensinger/these-reports-allege-trump-has-deep-ties-to-russia (January 10, 2017) (publishing the Steele Dossier); Donald J. Trump (@realDonaldTrump), Twitter (Jan. 11, 2017), archived at The Trump Twitter Archive, thetrumparchive.com ("Russia just said the unverified report paid for by political opponents is 'A COMPLETE AND TOTAL FABRICATION, UTTER NONSENSE.' Very unfair!"); Donald J. Trump (@realDonaldTrump), Twitter (Jan. 13, 2017), archived at The Trump Twitter Archive, thetrumparchive.com ("It now turns out that the phony allegations against me were put together by my political opponents and a failed spy afraid of being sued…. Totally made up facts by sleazebag political operatives, both Democrats and Republicans – FAKE NEWS!  Russia says nothing exists.  Probably… released by 'Intelligence' even knowing there is no proof, and never will be.  My people will have a full report on hacking within 90 days!").

U.S. Dist. LEXIS 123516, at *15 n.8 (S.D. Fla. Aug. 3, 2017) (Middlebrooks, J.) (two-year statute

of limitations for trade slander) (citing *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A*.,

742 So. 2d 381, 386 (Fla. 4th DCA 1999)) ("injurious falsehood" encompasses a group of torts

under Florida law).  A separate statute of limitations for civil conspiracy under Florida law is four

years.  *Young v. Ball*, 835 So. 2d 385, 386 (Fla. Dist. Ct. App. 2003) (citing Fla. Stat. § 95.11(3)).

Accordingly, as with the RICO counts, because all of Defendants' alleged acts, including

Mr. Danchenko's, occurred more than four years before Plaintiff filed his Complaint, Counts III–

VI are time-barred and should be dismissed with prejudice.

## II. ALL COUNTS AS TO MR. DANCHENKO SHOULD BE DISMISSED AS MERITLESS

### A. RICO Conspiracy

Mr. Danchenko joins in and adopts the arguments advanced in the Clinton Motion that the

RICO counts in the Complaint are defectively pled and meritless.  *See* Clinton Motion, Section II

B.  In sum, Plaintiff has failed to satisfy any of the pleading requirements for RICO, and thus his

RICO conspiracy claims are necessarily meritless as well.  *Jackson v. BellSouth Telecomm.*, 372

F.3d 1250, 1269 (11th Cir. 2004) ("If the underlying [RICO] cause of action is not viable, the

conspiracy claims must also fail.") (citation omitted).

As for Mr. Danchenko specifically, the argument for dismissal is even easier.  The

Complaint does not allege how Mr. Danchenko supposedly conspired with the RICO Defendants,

which the Complaint defines as "Clinton, the Clinton Campaign, the DNC, Perkins Coie, Elias,

and Sussmann."  Compl. ¶ 268.  That is because Mr. Danchenko never met, communicated, or

agreed with any of the RICO Defendants about anything, let alone about the alleged predicate acts.

This pleading deficiency (and reality) is dispositive of Plaintiff's RICO conspiracy claim against

Mr. Danchenko.  "A Plaintiff can establish a RICO conspiracy in one of two ways: (1) by showing the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." *ADA v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010).  Here, Plaintiff can show neither.

The only allegations in the Complaint that attempt to allege that Mr. Danchenko "agreed" with a RICO conspiracy is in relation to the alleged predicate act of obstruction of justice.  Each of those allegations is as conclusory as the next: "the RICO Defendants *conspired* with Danchenko in connection with his conduct . . . ," *id*. ¶ 307 (emphasis added); "Danchenko stated, *at the direction of and in coordination with* the RICO Defendants . . . ," *id*. ¶ 307.a (emphasis added); "the RICO Defendants *had a meeting of the minds, common intent, were aware of, and conspired with* . . . [lumping Defendants together, including] Danchenko," *id*. ¶ 308 (emphasis added).  Such conclusory allegations "unsupported by actual allegations of fact" are obviously insufficient. *Super Vision Int'l v. Mega Int'l Comm. Bank*, 534 F. Supp. 2d 1326, 1343 (S.D. Fla. 2018). Plaintiff can do no better, because, again, Mr. Danchenko does not know any of the RICO Defendants.

Finally, the predicate act of obstruction of justice requires the obstruction of an "official proceeding."  18 U.S.C. § 1512.  Plaintiff complains only of obstruction of FBI and CIA "investigations," Compl. ¶ 297, which do not qualify as an official proceeding.  *See United States v. Peterson*, 544 F. Supp. 2d 1363, 1376 (M.D. Ga. 2008) (explaining that obstruction under 18 U.S.C. § 1512 requires "an official proceeding [that] is pending or about to be instituted at the time of the obstructive act" and finding that a federal investigation is neither); 18 U.S.C. § 1515(a)(1)

(defining "official proceeding"); Clinton Motion at 9-10.  Here, no official proceeding ever even

occurred.  Count II for RICO conspiracy should be dismissed with prejudice as to Mr. Danchenko.[4]

B. <u>Injurious Falsehood and Malicious Prosecution Claims</u>

As set forth in the Clinton Motion, and joined and adopted herein, the Complaint fails to

state a claim for injurious falsehood, or a conspiracy thereto.  *See* Clinton Motion, Sections II C

and D.  A claim for injurious falsehood requires Plaintiff to show "(1) a falsehood; (2) published

or communicated to a third party; (3) the Defendant know that the falsehood would likely induce

others not to deal with the Plaintiff; (4) the falsehood did play a material and substantial part in

inducing others not to deal with the Plaintiff; and (5) special damages."  *Kanarick v. GE Credit*

*Retail Bank Care Credit*, No. 13-80039-CIV, 2013 U.S. Dist. LEXIS 201958, at *9-10 (S.D. Fla.

Sept. 6, 2013) (Middlebrooks, J.).  Focusing on the third and fourth elements, Plaintiff has not

alleged what false statements Mr. Danchenko made that he knew would "likely induce others not

to deal with the Plaintiff," and that "did play a material and substantial part in inducing others not

to deal with the Plaintiff."  *Id*.  Instead, Plaintiff alleges "discussions," with no specifics, Compl.

¶ 79, and "assistance," with no specifics, *id*. ¶ 81.

One statement Plaintiff *implies* Mr. Danchenko made concerned Paul Manafort's departure

from Plaintiff's presidential campaign, which Plaintiff alleges was provided to Mr. Danchenko by

Charles Dolan and then allegedly made its way to the Dossier.  Compl. ¶¶ 94-95.  As a threshold

matter, such attenuated and unspecified allegations cannot satisfy any pleading standard.  More

pertinently, Plaintiff does not allege this information about Manafort's resignation was false; and

he conveniently overlooks that it was widely reported prior to when he alleges Mr. Danchenko

---

[4] Plaintiff asserts no allegations against Mr. Danchenko regarding the other predicate act of theft of trade secrets.  Compl. ¶¶ 284-95, 395 (Count VIII).

received an email about it.[5]  As a matter of commonsense, communication of already public information cannot serve as a basis for materially and substantially inducing others to act on that same information.  Furthermore, just as the media's reporting on the goings-on of Plaintiff's political campaign was political speech protected by the First Amendment, so it would have been for Mr. Danchenko.  *See Monitor Patriot Co. v. Roy*, 401 U.S. 265, 271-72 (1971) (First Amendment protection applies especially to statements about political campaigns).

Plaintiff also has not satisfied the fifth element of injurious falsehood, which requires him to allege *special damages* "directly attributed" to Mr. Danchenko's alleged conduct, which "[can]not . . . be explained by other considerations."  *Wound Care Concepts, Inc. v. Vohra Health Servs., P.A.*, No. 19-62078-CIV, U.S. Dist. LEXIS 20919 (S.D. Fla. Jan. 28, 2022).  Such attributed special damages require Plaintiff "to establish pecuniary loss that has been realized or liquidated, as in the case of specific lost sales," *Salit*, 742 So. 2d at 388, that are "specifically stated" in the Complaint, Fed. R. Civ. P. 9(g).  Here, the Complaint alleges damages in the form of $24 million in "legal fees" and related expenses in relation to various "federal investigations and/or official proceedings," but does not apportion among or explain which investigations or proceedings.  The FBI's Crossfire Hurricane investigation, mentioned throughout the Complaint, cannot possibly serve as a vehicle for materiality, causation, or special damages with regard to the Steele Dossier or any alleged connection Mr. Danchenko had to it.  This is so for several reasons.

---

[5] *Compare* Compl. ¶ 96 (alleged email dated Aug. 20, 2016) *with* https://thehill.com/blogs/ballot-box/presidential-races/291414-lewandowskis-tweets-report-on-manaforts-ukraine-ties/ (Aug. 14, 2016); https://www.politico.com/story/2016/08/corey-lewandowski-paul-manafort-trump-winning-227198 (Aug. 19, 2016); https://www.nbcnews.com/politics/2016-election/trump-campaign-chair-paul-manafort-resigns-n634366 (Aug. 19, 2016).

First, Plaintiff specifically alleges that Mr. Danchenko did not draft the Dossier, but rather only "assembled and provided" information that was relied on to draft it.  Compl. ¶ 88.  In other words, by the Complaint's own telling, Mr. Danchenko did not make statements in the Dossier or decide which statements it would include.  Second, the Crossfire Hurricane investigation was not an investigation into Plaintiff but "into whether individuals associated with the Donald J. Trump for President campaign were coordinating, wittingly or unwittingly, with the Russian government's efforts to interfere in the 2016 U.S. presidential election."  Office of the Inspector General, U.S. Department of Justice ("IG"), Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation ("IG Report") (Dec. 2019 Rev.) (Exhibit 1), at i; *see also id.* at 1, 50, 56 (same).[6]  It is not clear how allegedly providing information that made it into an investigation aimed at individuals besides the Plaintiff "play[ed] a material and substantial part in inducing others not to deal with the Plaintiff," *Kanarick*, 2013 U.S. Dist. LEXIS 201958, at *9-10, or caused special damages to Plaintiff "directly attributable" to anyone, especially Mr. Danchenko.  Third, and rendering all else academic, the IG found "no evidence the Steele election reporting was known to or used by FBI officials involved in the decision to open the Crossfire Hurricane investigation."  Ex. 1, IG Report at 56 n.169.  As the IG found, the "articulable factual basis" for the investigation was information received from a Friendly Foreign Government ("FFG") and known Russian efforts to interfere in the 2016 elections.  *Id*. at 351.  Mr. Danchenko was unconnected to any of this, and is not alleged to have been.

The Complaint further references the Foreign Intelligence Surveillance Act ("FISA") applications regarding Carter Page as part of the Crossfire Hurricane investigation but does not

---

[6] Exhibit 1 includes only the cited pages of the report, which is voluminous.  However, the full IG Report can be found at: https://www.justice.gov/storage/120919-examination.pdf.

allege that Mr. Danchenko provided any information regarding Carter Page, or that he had any awareness of or anything to do with any FISA application. Compl. ¶¶ 98-99.[7]  Furthermore, as with Manafort, statements about Page would have been political speech protected by the First Amendment.  And again, Mr. Danchenko is not alleged to have made any statements in the Dossier. Apart from these defective allegations, Plaintiff fully surrenders to vagueness and absurdity:

> The different opportunities which evaporated are too many to list, but as an example, Donald J. Trump has been banned from different social media platforms, including Twitter.  Most of this was due to the misinformation campaign waged by Hillary Clinton, whereby truth was deemed false and lies were deemed to be truth.

Compl. ¶ 263 n.78.  As stated, there is no factual basis for Mr. Danchenko having conspired with Defendant Hillary R. Clinton or the Clinton Campaign (or any other RICO Defendant), and the fact that Plaintiff was banned from Twitter in relation to his own conduct on January 6, 2021, is beyond argument.  None of this can serve as a basis for special damages "directly attributed" to Mr. Danchenko.  Finally, as with Plaintiff's RICO claims, there is no non-conclusory allegation that Mr. Danchenko agreed with anyone to commit injurious falsehood.  Compl. ¶ 348.  *See Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1316 (S.D. Fla. 2014) (among other things, a civil conspiracy requires "an agreement"); *Super Vision Int'l*, 534 F. Supp. 2d at 1343 (requiring "allegations of fact").  Counts III and IV should be dismissed with prejudice.

As for Plaintiff's malicious prosecution claims, they end before they begin, as Plaintiff has failed to plead the first element of "an original judicial proceeding against the present plaintiff." *Melford v. Kahane & Assocs.*, 371 F. Supp. 3d 1116, 1123-24 (S.D. Fla. 2019) (citing *Alamo Rent-*

---

[7] Plaintiff alleges that the allegations regarding "salacious sexual activity" in the Steele Dossier were "derived from Dolan."  ¶¶ 90-91.  This insufficiently pled allegation is also no basis for materiality, causation, or special damages: "These allegations, which have come to be known publicly as the 'salacious and unverified' portion of the reporting, were not included in the original Carter Page FISA application or any of the renewal applications."  Ex. 1, IG Report at 4 n.7.

*A-Car v. Mancusi*, 632 So. 2d 1352, 1355 (Fla. 1994)).  The Complaint explicitly states that its malicious prosecution claims relate to "the commencement of the FBI's Investigation."  Compl. ¶ 359.  As with the obstruction of justice allegation, *supra*, pp. 5-6, an investigation does not qualify as a proceeding, let alone a "judicial" one.  This lacking substantive count cannot support a conspiracy claim, and, as before, there is no non-conclusory allegation that Mr. Danchenko *agreed* with anyone to commit malicious prosecution.  Counts V and VI should be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, Igor Danchenko respectfully moves the Court to dismiss Counts II, III, IV, V, and VI of Plaintiff's Complaint with prejudice.

Dated:  May 20, 2022                                      Respectfully submitted,


By: */s/ Diana Marie Fassbender*

Franklin Monsour Jr. (admitted *pro hac vice*)
fmonsour@orrick.com
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019-6142
Tel: (212) 506-3512
Fax: (212) 506-5151

Diana Marie Fassbender
Fla Bar ID #17095
dszego@orrick.com
Orrick, Herrington & Sutcliffe LLP
1152 15th Street N.W.
Washington, DC  20005-1706
Tel: (202) 339-8853
Fax: (202) 339-8500

*Attorneys for Defendant Igor Danchenko*

# EXHIBIT 1

**REDACTED FOR PUBLIC RELEASE**



# Office of the Inspector General
## U.S. Department of Justice

**OVERSIGHT ★ INTEGRITY ★ GUIDANCE**



# Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation

Oversight and Review Division 20-012        December 2019 (Revised)

**REDACTED FOR PUBLIC RELEASE**



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

## Background

The Department of Justice (Department) Office of the Inspector General (OIG) undertook this review to examine certain actions by the Federal Bureau of Investigation (FBI) and the Department during an FBI investigation opened on July 31, 2016, known as "Crossfire Hurricane," into whether individuals associated with the Donald J. Trump for President Campaign were coordinating, wittingly or unwittingly, with the Russian government's efforts to interfere in the 2016 U.S. presidential election. Our review included examining:

- The decision to open Crossfire Hurricane and four individual cases on current and former members of the Trump campaign, George Papadopoulos, Carter Page, Paul Manafort, and Michael Flynn; the early investigative steps taken; and whether the openings and early steps complied with Department and FBI policies;

- The FBI's relationship with Christopher Steele, whom the FBI considered to be a confidential human source (CHS); its receipt, use, and evaluation of election reports from Steele; and its decision to close Steele as an FBI CHS;

- Four FBI applications filed with the Foreign Intelligence Surveillance Court (FISC) in 2016 and 2017 to conduct Foreign Intelligence Surveillance Act (FISA) surveillance targeting Carter Page; and whether these applications complied with Department and FBI policies and satisfied the government's obligations to the FISC;

- The interactions of Department attorney Bruce Ohr with Steele, the FBI, Glenn Simpson of Fusion GPS, and the State Department; whether work Ohr's spouse performed for Fusion GPS implicated ethical rules applicable to Ohr; and Ohr's interactions with Department attorneys regarding the Manafort criminal case; and

- The FBI's use of Undercover Employees (UCEs) and CHSs other than Steele in the Crossfire Hurricane investigation; whether the FBI placed any CHSs within the Trump campaign or tasked any CHSs to report on the Trump campaign; whether the use of CHSs and UCEs complied with Department and FBI policies; and the attendance of a Crossfire Hurricane supervisory agent at counterintelligence briefings given to the 2016 presidential candidates and certain campaign advisors.

## OIG Methodology

The OIG examined more than one million documents that were in the Department's and FBI's possession and conducted over 170 interviews involving more than 100 witnesses. These witnesses included former FBI Director Comey, former Attorney General (AG) Loretta Lynch, former Deputy Attorney General (DAG) Sally Yates, former DAG Rod Rosenstein, former Acting AG and Acting DAG and current FBI General Counsel Dana Boente, former FBI Deputy Director Andrew McCabe, former FBI General Counsel James Baker, and Department attorney Bruce Ohr and his wife. The OIG also interviewed Christopher Steele and current and former employees of other U.S. government agencies. Two witnesses, Glenn Simpson and Jonathan Winer (a former Department of State official), declined our requests for voluntary interviews, and we were unable to compel their testimony.

We were given broad access to relevant materials by the Department and the FBI. In addition, we reviewed relevant information that other U.S. government agencies provided the FBI in the course of the Crossfire Hurricane investigation. However, because the activities of other agencies are outside our jurisdiction, we did not seek to obtain records from them that the FBI never received or reviewed, except for a limited amount of State Department records relating to Steele; we also did not seek to assess any actions other agencies may have taken. Additionally, our review did not independently seek to determine whether corroboration existed for the Steele election reporting; rather, our review was focused on information that was available to the FBI concerning Steele's reports prior to and during the pendency of the Carter Page FISA authority.

Our role in this review was not to second-guess discretionary judgments by Department personnel about whether to open an investigation, or specific judgment calls made during the course of an investigation, where those decisions complied with or were authorized by Department rules, policies, or procedures. We do not criticize particular decisions merely because we might have recommended a different investigative strategy or tactic based on the facts learned during our investigation. The question we considered was not whether a particular investigative decision was ideal or could have been handled more effectively, but rather whether the Department and the FBI complied with applicable legal requirements, policies, and procedures in taking the actions we reviewed or, alternatively, whether the circumstances surrounding the decision indicated that it was based on

# CHAPTER ONE
# INTRODUCTION

## I.   Background and Overview

The Department of Justice (Department) Office of the Inspector General (OIG) undertook this review to examine certain actions by the Federal Bureau of Investigation (FBI) and the Department during an FBI investigation into whether individuals associated with the Donald J. Trump for President Campaign were coordinating, wittingly or unwittingly, with the Russian government.  The FBI's counterintelligence investigation, known as "Crossfire Hurricane," was opened on July 31, 2016, weeks after the Republican National Convention (RNC) formally nominated Trump as its candidate for President, and several months before the November 8, 2016 elections, through which Trump was elected President of the United States.  On May 17, 2017, the Crossfire Hurricane investigation was transferred from the FBI to the Office of Special Counsel upon the appointment of Special Counsel Robert S. Mueller III to investigate Russian interference with the 2016 presidential election and related matters.

The FBI opened Crossfire Hurricane in July 2016 following the receipt of certain information from a Friendly Foreign Government (FFG).  According to the information provided by the FFG, in May 2016, a Trump campaign foreign policy advisor, George Papadopoulos, "suggested" to an FFG official that the Trump campaign had received "some kind of suggestion" from Russia that it could assist with the anonymous release of information that would be damaging to Hillary Clinton (Trump's opponent in the presidential election) and President Barack Obama.  At the time the FBI received the FFG information, the U.S. Intelligence Community (USIC), which includes the FBI, was aware of Russian efforts to interfere with the 2016 U.S. elections, including efforts to infiltrate servers and steal emails belonging to the Democratic National Committee (DNC) and the Democratic Congressional Campaign Committee.  The FFG shared this information with the State Department on July 26, 2016, after the internet site WikiLeaks began releasing emails hacked from computers belonging to the DNC and Clinton's campaign manager.  The State Department advised the FBI of the information the next day.

Crossfire Hurricane was opened several weeks after the FBI's July 5, 2016 conclusion of its "Midyear Exam" investigation into Clinton's handling of government emails during her tenure as Secretary of State.[1]  Some of the same FBI officials, supervisors, and attorneys responsible for the Midyear investigation were assigned to the newly opened Crossfire Hurricane investigation, but there was almost no

---

[1] *See* U.S. Department of Justice (DOJ) Office of the Inspector General (OIG), *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*, Oversight and Review Division Report 18-04 (June 2018), https://www.justice.gov/file/1071991/download (accessed November 12, 2019), 2 (hereinafter *Review of Various Actions in Advance of the 2016 Election*).

Russian government. Officials determined there was an insufficient basis to proceed with a FISA application concerning Papadopoulos, and the Crossfire Hurricane team never submitted a FISA application for Papadopoulos. With regard to Page, on August 15, 2016, the Crossfire Hurricane team requested assistance from the FBI's Office of the General Counsel (OGC) to prepare a FISA application for submission to the FISC. However, after consultation between FBI OGC and attorneys in the Office of Intelligence (OI) in the Department's National Security Division (NSD), which is responsible for preparing FISA applications and appearing before the FISC, the Crossfire Hurricane team was told in late August 2016 that more information was needed to establish probable cause for a FISA on Page.

A few weeks later, on September 19, 2016, the Crossfire Hurricane team received a set of six reports prepared by Christopher Steele concerning Russian interference in the 2016 U.S. election and alleged connections between this Russian effort and individuals associated with the Trump campaign.[6] Steele is a former intelligence officer ███████████████████████████████████████████ who, following his retirement, opened a consulting firm and furnished information to the FBI beginning in 2010, primarily on matters concerning organized crime and corruption in Russia and Eastern Europe. In 2013, the FBI prepared paperwork to enable it to open Steele as an FBI CHS. In providing the first two election reports to his FBI handling agent in July 2016, Steele told the handling agent that he had been hired by an investigative firm, Fusion GPS, to collect information on the relationship between candidate Trump's businesses and Russia. Steele further informed the FBI handling agent that Fusion GPS had been retained by a law firm to conduct this research. According to the handling agent, it was obvious to him that the request for the research was politically motivated.

Two of the six Steele reports received by the Crossfire Hurricane team on September 19 referenced Carter Page by name. One stated that Page had held secret meetings with two high level Russian officials during Page's July 2016 trip to Moscow. This report also indicated that one of the alleged meetings included a discussion about the Kremlin potentially releasing compromising information about Democratic candidate Hillary Clinton to Trump's campaign team. Another report from Steele described "a well-developed conspiracy of co-operation" between the Russian government and Trump's campaign to defeat Clinton, using Carter Page and others as intermediaries.[7] On September 21, 2016, 2 days after the team received these reports, FBI OGC advised OI that the FBI believed it was ready to

---

[6] As described in this report, information from Christopher Steele's reports—sometimes collectively referred to as the "Steele dossier"—that pertained to Carter Page was relied upon in the Carter Page FISA applications. In those applications, Steele was referred to as "Source #1." We refer to Steele by name in this report because the Department and the FBI have publicly revealed Steele's identity as Source #1 in connection with FOIA litigation.

[7] A third report from Steele, which did not reference Carter Page, stated that Russian intelligence services had used concealed cameras to film Trump's alleged sexual activities with prostitutes at a Moscow hotel, and claimed that the Russians could blackmail Trump by threatening to release this compromising material. These allegations, which have come to be known publicly as the "salacious and unverified" portion of the reporting, were not included in the original Carter Page FISA application or any of the renewal applications.

associated with Russian state-sponsored actors.[163]  The FBI learned that Russian efforts also included cyber-enabled scanning and probing of election related infrastructure in several states.

It was in this context that the FBI received information on July 28, 2016, about a conversation between Papadopoulos and an official of a Friendly Foreign Government (FFG) in May 2016 during which Papadopoulos "suggested the Trump team had received some kind of suggestion" from Russia that it could assist this process with the anonymous release of information during the campaign that would be damaging to candidate Clinton and President Obama.  As described below, the FBI opened the Crossfire Hurricane investigation 3 days after receiving this information.

## II.    The Friendly Foreign Government Information and the FBI's Decision to Open Crossfire Hurricane and Four Related Counterintelligence Investigations

On July 31, 2016, the FBI opened the Crossfire Hurricane counterintelligence investigation to determine whether individuals associated with the Donald J. Trump for President Campaign were coordinating or cooperating, wittingly or unwittingly, with the Russian government to influence or interfere with the 2016 U.S. elections. According to the opening Electronic Communication (EC), the investigation was predicated on intelligence from an FFG.  In this section, we describe the receipt of the information from the FFG and the decisions to open the Crossfire Hurricane

---

[163]  Beginning in January 2017 and continuing into 2019, several U.S. government agencies, as well as senior intelligence officials, reported on Russia's efforts to interfere with the 2016 U.S. elections.  For example, the Intelligence Community Assessment (ICA) titled "Assessing Russian Activities and Intentions in Recent U.S. Elections," published on January 6, 2017, concluded that Russian President Vladimir Putin and the Russian government conducted an influence campaign followed by a Russian messaging strategy that blended covert intelligence operations, such as cyber activity, with overt efforts in order to undermine public faith in the U.S. democratic process, denigrate then candidate Clinton, and harm Clinton's electability and potential presidency.  Additionally, in June 2017, during a Senate Select Committee on Intelligence Hearing on Russian Interference in the 2016 U.S. Elections, USIC leadership concurred with the ICA and acknowledged that the Russian government was responsible for compromises of and leaks from political figures and institutions, among other activities, as part of its efforts to influence and interfere in U.S. elections.  Similarly, the Senate Select Committee on Intelligence in 2019 and the House Permanent Select Committee on Intelligence in 2018 found, in part, that the Russian government historically has attempted to interfere in U.S. elections and attempted to interfere in the 2016 U.S. elections through attacks on state voter registration databases, cyber operations targeting governments and businesses using tactics such as spear phishing, hacking operations to include the DNC network, and social media campaigns.  U.S. House Permanent Select Committee on Intelligence, *Report on Russian Active Measures*, 115th Cong., 2d sess., 2018, 114-130.  U.S. Senate Select Committee on Intelligence, *Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume 1: Russian Efforts Against Election Infrastructure with Additional Views,* 116th Cong., 1st sess., 2019, 1-10.  Further, Special Counsel Robert S. Mueller III concluded that the Russian government interfered with the 2016 U.S. elections through a social media campaign that favored then candidate Trump and disparaged then candidate Clinton, and through cyber intrusion operations against entities and individuals working on the Clinton Campaign. *See The Special Counsel's Report*, Vol. I at 1, 4-7.

McCabe said that he did not consider a defensive briefing as an alternative to opening a counterintelligence case.  He said that based on the FFG information, the FBI did not know if any member of the campaign was coordinating with Russia and that the FBI did not brief people who "could potentially be the subjects that you are investigating or looking for."  McCabe told us that in a sensitive counterintelligence matter, it was essential to have a better understanding of what was occurring before taking an overt step such as providing a defensive briefing.[168]

We also asked those FBI officials involved in the decision to open Crossfire Hurricane whether the FBI received any other information, such as from members of the USIC, that the FBI relied upon to predicate Crossfire Hurricane.  All of them told us that there was no such information and that predication for the case was based solely on the FFG information.[169]  We also asked Comey and McCabe about then CIA Director John Brennan's statements reported in several news articles that he provided to the FBI intelligence on Russian contacts with U.S. persons that predicated or prompted the opening of Crossfire Hurricane.  Comey told us that while Brennan shared intelligence on the overarching efforts by the Russian government to interfere in the 2016 U.S. elections, Brennan did not provide any information that predicated or prompted the FBI to open Crossfire Hurricane. McCabe said that he did not recall Brennan providing the FBI with information before the FBI's decision to open an investigation about any U.S person potentially cooperating with Russia in the efforts to interfere with the 2016 U.S. elections. Priestap and the Intel Section Chief also told us that Brennan did not provide the FBI any intelligence that predicated the opening of Crossfire Hurricane.  We did not find information in FBI or Department electronic communications, emails, or other documents, or through witness testimony, indicating otherwise.

On July 31, 2016, the FBI opened a full counterintelligence investigation under the code name Crossfire Hurricane "to determine whether individual(s) associated with the Trump campaign were witting of and/or coordinating activities with the Government of Russia."  As the predicating information did not indicate a specific individual, the opening EC did not include a specific subject or subjects.  As described in Chapter Two, the factual predication required to open a Full Investigation under the Attorney General's Guidelines for Domestic Operations (AG

---

[168] McCabe told us that the decision to brief the DNC and Clinton campaign about the DNC hack was a different situation than the decision not to brief the Trump campaign about allegations of Russian efforts to assist the Trump campaign.  He said that the DNC was a victim of hacking and the FBI had known that the DNC was not responsible for the hacks for some time.

[169] As we describe in Chapter Four, although the FBI first received reporting from Christopher Steele regarding alleged Russian interference in the 2016 U.S. elections in early July 2016, the agents and analysts investigating the FFG information (the Crossfire Hurricane team) did not become aware of the Steele reporting until September 19, 2016.  We found no evidence the Steele election reporting was known to or used by FBI officials involved in the decision to open the Crossfire Hurricane investigation.

In the OIG's *Review of Various Actions in Advance of the 2016 Election*, we describe in Classified Appendix One certain information that the FBI was in possession of in 2016 but the vast majority of which the FBI had not reviewed by June 2018.  Given that timing, we did not see any evidence that any of that information was considered for or part of the predication for the opening of Crossfire Hurricane.

The AG Guidelines generally describe predication as allegations, reports, facts, or circumstances indicative of possible criminal activity or a national security threat, or the potential for acquiring information responsive to foreign intelligence collection requirements.  For full counterintelligence investigations such as Crossfire Hurricane and the four related individual investigations, Section II.B.4 of the AG Guidelines and Section 7 of the DIOG state that the required level of predication is an "articulable factual basis" that "reasonably indicates" that any one of three defined circumstances exists, including:

> An activity constituting a federal crime or a threat to the national security has or may have occurred, is or may be occurring, or will or may occur and the investigation may obtain information relating to the activity or the involvement or role of an individual, group, or organization in such activity.[483]

The AG Guidelines and the DIOG do not provide heightened predication standards for sensitive matters, or for allegations potentially impacting constitutionally protected activity, such as First Amendment rights.  Rather, as we discuss below, the approval and notification requirements contained in the AG Guidelines and DIOG are, in part, intended to provide the means by which such concerns can be considered by senior officials.

In Crossfire Hurricane, the "articulable factual basis" set forth in the opening EC was the FFG information received from an FBI Legal Attaché stating that Papadopoulos had suggested during a meeting in May 2016 with officials from a "trusted foreign partner" that the Trump team had received some kind of suggestion from Russia that it could assist by releasing information damaging to candidate Clinton and President Obama.[484]  Additionally, by July 31, 2016, although not specifically mentioned in the EC, the FBI had reason to believe that Russia may have been connected to the WikiLeaks disclosures that occurred earlier in July 2016.  Further, as we note in Chapter Three, the FBI received the FFG information at a time when the USIC, including the FBI, was aware of Russia's efforts to interfere with the 2016 U.S. elections.  Given the low threshold for predication in

---

[483] As detailed in Chapter Two, the DIOG separately provides that a Preliminary Investigation may be opened based upon "any allegation or information" indicative of possible criminal activity or threats to the national security.  In cases opened as Preliminary Investigations, the DIOG provides that all lawful investigative methods (including CHS and UCE operations) may be used except for mail opening, physical searches requiring a search warrant, electronic surveillance requiring a judicial order or warrant (Title III wiretap or a FISA order), or requests under Title VII of FISA.  A Preliminary Investigation may be converted to a Full Investigation if the available information provides predication for a Full Investigation.

[484] Papadopoulos has stated that the source of the information he shared with the FFG was a professor from London, Joseph Mifsud, and has raised the possibility that Mifsud may have been working with the FBI.  As described in Chapter Ten of this report, the OIG searched the FBI's database of Confidential Human Sources (CHSs) and did not find any records indicating that Mifsud was an FBI CHS, or that Mifsud's discussions with Papadopoulos were part of any FBI operation.  The FBI also requested information on ███████████████████████████

160

Defendant Neustar, Inc.'s Motion to Dismiss Plaintiff's Complaint
Pursuant to Fed. R. Civ. P. 12(b)(6) and Incorporated Memorandum of
Law (May 20, 2022)

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

DONALD J. TRUMP,

               Plaintiff,

    v.

HILLARY R. CLINTON, et al.,

               Defendants.

Case No. 2:22-cv-14102- DMM
Middlebrooks/Reinhart

## DEFENDANT NEUSTAR, INC.'S MOTION TO DISMISS
## PLAINTIFF'S COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(6)
## AND INCORPORATED MEMORANDUM OF LAW

Samantha L. Southall (*pro hac vice* pending*)*
Pennsylvania Bar No. 80709
BUCHANAN INGERSOLL & ROONEY PC
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102
Tel: (215) 665-8700
Fax (215) 667-8760
Email: samantha.southall@bipc.com

Jennifer Olmedo-Rodriguez
Florida Bar No. 605158
BUCHANAN INGERSOLL & ROONEY PC
2 South Biscayne Blvd., Suite 1500
Miami, Florida 33131
Tel: (305) 347-4080
Fax (305) 347-4089
Email: jennifer.olmedo-rodriguez@bipc.com

*Counsel for Defendant Neustar, Inc.*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ....................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.     NEUSTAR IS NOT A PROPER PARTY TO THIS LITIGATION .................................... 2

II.    PLAINTIFF'S CLAIMS ARE TIME-BARRED BY THE FACE OF THE COMPLAINT. 3

III.   PLAINTIFF'S CLAIMS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE
      GRANTED .................................................................................................... 6

    A.   Plaintiff Fails to State a Plausible Claim for Violation of 18 U.S.C. § 1962(d) ............. 8

        1.   Plaintiff Fails to Adequately Plead a Cognizable RICO Predicate Act ................... 9

        2.   Plaintiff Fails to Adequately Plead the Existence of an Agreement ....................... 11

        3.   Plaintiff Fails to Adequately Allege Any RICO Injury ........................................... 12

    B.   Plaintiff Fails to State a Conspiracy to Commit Injurious Falsehood ......................... 13

    C.   Plaintiff Fails to State a Claim for Violation of CFAA ............................................... 14

        1.   Plaintiff's "Unauthorized Access" Theory is Legally Deficient ............................. 14

        2.   Plaintiff Fails to Plead A Damage or Loss Compensable Under the CFAA ........... 16

    D.   Plaintiff Fails to State a Claim for Theft of Trade Secrets .......................................... 17

    E.   Plaintiff Fails to State a Claim for Violation of the SCA ............................................ 18

    F.   Plaintiff Fails to State a Claim for Respondeat Superior / Vicarious Liability Because it
        is Not an Independent Cause of Action ....................................................................... 20

CONCLUSION ................................................................................................................. 20

REQUEST FOR HEARING .............................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### Cases

*777 Partners LLC v. Pagnanelli*,
  No. 20-cv-20172, 2021 WL 2038175 (S.D. Fla. Mar. 8, 2021) ................................14, 16, 17

*Almanza v. United Airlines, Inc.*,
  851 F.3d 1060 (11th Cir. 2017) ..........................................................................................11

*Am. Dental Ass'n v. Cigna Corp.*,
  605 F.3d 1283 (11th Cir. 2010) ..........................................................................................11

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006)..............................................................................................................12

*Armor Corr. Health Servs., Inc. v. Teal*,
  No. 19-cv-24656, 2021 WL 5834245 (S.D. Fla. Dec. 8, 2021)............................................16

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................................................6, 7, 16

*Balsam v. U.S.*,
  No. 20-CV-80958, 2021 WL 4461850 (S.D. Fla. July 13, 2021), *report and
  recommendation adopted*, 20-80958-CV, 2021 WL 4459568 (S.D. Fla. Sept.
  29, 2021) .................................................................................................................................7

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................................11, 13, 18

*Brown Jordan Int'l, Inc. v. Carmicle*,
  846 F.3d 1167 (11th Cir. 2017) ..........................................................................................16

*CareersUSA, Inc. v. Guerrero*,
  No. 14-cv-80096, 2014 WL 12862259 (S.D. Fla. Aug. 25, 2014) ................................. 14-15

*Ceithaml v. Celebrity Cruises, Inc.*,
  207 F. Supp. 3d 1345 (S.D. Fla. 2016) ................................................................................20

*Chunhong Jia v. Boardwalk Fresh Burgers & Fries, Inc.*,
  No. 19-cv-2527, 2020 WL 5628734 (M.D. Fla. Sept. 21, 2020)............................................20

*Cisneros v. Petland, Inc.*,
  972 F.3d 1204 (11th Cir. 2020) ............................................................................................8

*Colite Int'l Inc. v. Robert L. Lipton, Inc.*,
  No. 05-cv-60046, 2006 WL 8431505 (S.D. Fla. Jan. 20, 2006)............................................20

ii

*Davis v. Monahan*,
   832 So. 708 (Fla. 2002)..................................................................................5

*Domain Prot., LLC v. Sea Wasp, LLC*,
   426 F. Supp. 3d 355 (E.D. Tex. 2019), *aff'd sub nom.*, *Domain Prot., L.L.C. v.
   Sea Wasp, L.L.C.*, 23 F.4th 529 (5th Cir. 2022)...............................................9-10

*In re Facebook, Inc. Internet Tracking Litig.*,
   956 F.3d 589 (9th Cir. 2020) ......................................................................19

*Hawaii v. Trump*,
   859 F.3d 741 (9th Cir.), *vacated on other grounds*, 138 S. Ct. 377 (2017)..............................4

*Henry v. ExamWorks Inc.*,
   No. 20-cv-12268, 2021 WL 33440698 (11th Cir. Aug. 6, 2021) ............................4

*Hemi Grp. v. City of New York*,
   559 U.S. 1 (2010)......................................................................................12

*Honig v. Kornfeld*,
   339 F. Supp. 3d 1323 (S.D. Fla. 2018) ..........................................................13

*IBI Grp. (Fla.) Inc. v. B&S Eng'g Consultants, LLC*,
   No. 17-cv-246, 2017 WL 7311866 (M.D. Fla. June 27, 2017) ............................16

*Integrated Waste Solutions, Inc. v. Goverdhanam*,
   2010 WL 4910176 (E.D. Pa. 2010) ..............................................................19

*Intermatic Inc. v. Toeppen*,
   947 F. Supp. 1227 (N.D. Ill. 1996) ..............................................................10

*Jackson v. BellSouth Telecomms.*,
   372 F.3d 1250 (11th Cir. 2004) ...................................................................11

*K.T. v. Royal Caribbean Cruise, Ltd.*,
   931 F.3d 1041 (11th Cir. 2019) ....................................................................2

*King v. Bencie*,
   806 F. App'x. 873 (11th Cir. 2020) ...............................................................5

*Lehman v. Lucom*,
   727 F.3d 1330 (11th Cir. 2013) ....................................................................4

*Liberty Media Holdings, LLC v. BitTorrent Swarm*,
   277 F.R.D. 669 (S.D. Fla. 2011)....................................................................3

*Mortg. Now, Inc. v. Stone*,
   No. 09-cv-80, 2010 WL 11519201 (N.D. Fla. Sept. 29, 2010) ............................17

*My Energy Monster, Inc. v. Gawrych*,
 No. 20-cv-2548, 2021 WL 6125579 (M.D. Fla. Sept. 29, 2021)............................................17

*Newberger v. U.S. Marshals Serv.*,
 751 F.2d 1162 (11th Cir. 1985) ...................................................................................5

*Nunes v. Fusion GPS*,
 531 F. Supp. 3d 993 (E.D. Va. 2021) .........................................................................12

*Oginsky v. Paragon Properties of Costa Rica, LLC*,
 282 F.R.D. 681 (S.D. Fla. 2012)..................................................................................3

*Omnipol, A.S. v. Multinat'l Def. Serv., LLC*,
 19-14597, 2022 WL 1311596 (11th Cir. May 3, 2022)................................................8

*Padilla v. Porsche Cars N. Am., Inc.*,
 391 F. Supp. 3d 1108 (S.D. Fla. 2019) ........................................................................3

*Piescik v. CVS Pharmacy, Inc.*,
 21-81298-CV, 2021 WL 5996977 (S.D. Fla. Dec. 15, 2021)......................................7

*Raimi v. Furlong*,
 702 So. 2d 1273 (Fla. 3d DCA 1997) ........................................................................13

*Ray v. Spirit Airlines*,
 836 F.3d 1340 (11th Cir. 2016) .................................................................................12

*Rock the Vote v. Trump*,
 No. 20-cv-06021, 2020 WL 6342927 (N.D. Cal. Oct. 29, 2020) ................................4

*Rogers v. Nacchio*,
 241 F. App'x. 602 (11th Cir. 2007) ............................................................................8

*Sanguinetti v. JPMorgan Chase Bank Nat'l Ass'n*,
 20-CV-81023, 2020 WL 7765792 (S.D. Fla. Nov. 13, 2020) ....................................7

*Sartori v. Schrodt*,
 No. 19-15114, 2021 WL 6060975 (11th Cir. Dec. 20, 2021)....................................18

*Schwartz v. ADP, Inc.*,
 No. 21- cv-283, 2021 WL 5760434 (M.D. Fla. Dec. 3, 2021) ..................................17

*Sentry Data Sys. v. CVS Health*,
 361 F. Supp. 3d (S.D. Fla. 2018) ..........................................................................10-11

*Sewell v. Bernardin*,
 795 F.2d 337 (2d Cir. 2015)........................................................................................5

iv

*Sierra v. City of Hallandale Beach*,
    996 F.3d 1110 (11th Cir. 2021) ................................................................14, 18

*Skypoint Advisors, LLC v. 3 Amigos Prods. LLC*,
    No. 18-cv-356, 2021 WL 6118097 (M.D. Fla. Dec. 27, 2021) ..............................18

*Snow v. DirecTV, Inc.*,
    450 F.3d 1314 (11th Cir. 2006) ..........................................................................19

*St. Johns Vein Ctr., Inc. v. StreamlineMD LLC*,
    347 F. Supp. 3d 1047 (M.D. Fla. 2018)...............................................................14

*Super Vision Int'l, Inc. v. Mega Int'l Comm. Bank Co., Ltd.*,
    534 F. Supp. 2d 1326 (S.D. Fla. 2008) ............................................................9, 12

*Tomelleri v. Orlando Lakes and Wetlands Inc.*,
    No. 19-CV-801080 (S.D. Fla. March 30, 2020), *report and recommendation
    adopted sub nom. Tomelleri v. Natale*, 9:19-CV-81080, 2020 WL 6343353
    (S.D. Fla. Apr. 10, 2020) ...................................................................................7

*U.S. v. Bynum*,
    604 F.3d 161 (4th Cir. 2010) ..............................................................................19

*U.S. v. Flynn*,
    507 F. Supp. 3d 116 (D.D.C. 2020) ......................................................................4

*U.S. v. Smith*,
    22 F.4th 1236 (11th Cir. 2022) .............................................................................9

*U.S. v. Steiger*,
    318 F.3d 1039, 1049 (11th Cir. 2003) ............................................................. 18-19

*U.S. v. Trader*,
    981 F.3d 961 (11th Cir. 2020) ............................................................................10

*Van Buren v. U.S.*,
    141 S. Ct. 1648 (2021)...............................................................................14, 15

*Vista Mktg. v. Burkett*,
    812 F.2d 954 (11th Cir. 2016) ............................................................................18

*Weiland v. Palm Beach Cty. Sheriff's Office*,
    792 F.3d 1313 (11th Cir. 2015) .........................................................................7-8

*In re Zynga Priv. Litig.*,
    750 F.3d 1098 (9th Cir. 2014) ............................................................................19

## Statutes

18 U.S.C. § 1030 ...........................................................................................1, 5, 16

18 U.S.C. § 1512 ......................................................................................................9

18 U.S.C. § 1830 ......................................................................................................1

18 U.S.C. § 1832 ......................................................................................................9

18 U.S.C. § 1836 ...................................................................................................5-6

18 U.S.C. § 1962 ...................................................................................1, 4, 8, 12, 13

18 U.S.C. § 2701 *et seq.*..........................................................................................1

18 U.S.C. § 2707 ......................................................................................................6

Fla. Stat. § 95.11 .....................................................................................................5

## Rules

Fed. R. Civ. P. 9 ......................................................................................................9

Fed. R. Civ. P. 12 ................................................................................................1, 3

Fed. R. Civ. P. 21 ................................................................................................1, 3

Local Rule 7.1 .......................................................................................................20

## Other Authorities

Institute of Standards and Technology Special Publication, *Secure Domain Name System (DNS) Deployment Guide* (Sept. 2013), https://nvlpubs.nist.gov/nistpubs/specialpublications/nist.sp.800-81-2.pdf ...........10

*Neustar Security Services Spins Out with Focused Investment to Foster Accelerated Growth* (Dec. 1, 2021), https://www.home.neustar/about-us/news-room/press-releases/2021/neustar-security-services-spins-out-with-focused-investment-to-foster-accelerated-growth ................................................. 2-3

TransUnion, LLC, Exhibit 2.1 September 11, 2021 Securities Purchase Agreement (Form 8-K) (Dec. 1, 2021) ...........................................................2

Trump Twitter Archive, www.thetrumparchive.com .................................................4

*U.S. v. Sussmann*, No. 1:21-cr-00582-CRC (D.D.C.), Doc. No. 1 .................................5

Defendant Neustar, Inc. ("Neustar"), by and through its undersigned counsel, respectfully submits this Motion pursuant to Fed. R. Civ. P. 12(b)(6) and 21 to dismiss Counts II, IV, VII, VIII, IX, and XVI of the Complaint as to it together with this accompanying memorandum of law.

## PRELIMINARY STATEMENT

Neustar is differently situated from the other Defendants in this action. Simply put, it is not a proper party. In December, 2021, several months before Plaintiff filed his Complaint, TransUnion, LLC ("TransUnion") acquired Neustar's marketing, fraud and communications solutions business. TransUnion did *not* acquire Neustar's security business, Neustar Security Services, LLC ("NSS"), which includes DNS resolution services, and was excluded from the transaction. NSS now operates as a standalone company. Plaintiff's allegations as to Neustar only relate to its former security business, now known as NSS, and, to the extent Plaintiff can state any timely claims for relief (which he cannot), those claims should be asserted against NSS, not Neustar.

Rule 12(b)(6) also mandates dismissal of the Complaint as to Neustar. Each of the six claims Plaintiff has asserted against Neustar is barred by the applicable statutes of limitations and fails to state a claim upon which relief can be granted. Plaintiff alleges that Defendants engaged in a conspiracy to disseminate false information about him over the course of 2016 and early 2017 in order to damage his political career. More specifically, Plaintiff alleges that Neustar conspired with other Defendants to violate the Racketeer Influenced and Corrupt Organizations ("RICO") Act in violation of 18 U.S.C. § 1962(d) and that it conspired with other Defendants to commit an injurious falsehood. Plaintiff also asserts claims against Neustar for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), theft of trade secrets, 18 U.S.C. § 1830, violation of the Stored Communications Act, 18 U.S.C. § 2701 *et seq.* ("SCA"), and respondeat superior/vicarious liability.

1

Plaintiff's claims against Neustar are time-barred.  Plaintiff alleges that the purported conspiracy was made public in October 2016 and his public statements beginning in January 2017 evidence his knowledge of the allegations giving rise to his claims against Neustar in this litigation. Plaintiff's claims against Neustar also fail because, despite the sheer length of the Complaint, his claims against Neustar are unsupported by factual allegations, and contain formulaic recitations of the elements of each cause of action.

Defendant Hillary Clinton submitted a memorandum explaining why Plaintiff's claims should be dismissed.  Doc. No. 52.  To avoid duplicative briefing, Neustar adopts and incorporates Secretary Clinton's arguments as to why all of Plaintiff's claims are time-barred on the face of the Complaint.  *Id.* at 1-5.  Neustar also adopts and incorporates Secretary Clinton's arguments as to why the Complaint fails to state a claim for RICO conspiracy (Count II); conspiracy to commit injurious falsehood (Count IV), to the extent those arguments are not specific to Secretary Clinton's individual statements; and theft of trade secrets (Count VIII).

Neustar submits this memorandum to address the claims and averments unique to it.  For the reasons set forth below, this Court should dismiss the Complaint as to Neustar with prejudice.

## **ARGUMENT**

## I.   **NEUSTAR IS NOT A PROPER PARTY TO THIS LITIGATION**

TransUnion acquired Neustar's marketing, fraud and communications solutions business in December, 2021.[1]  *See, e.g.*, September 11, 2021 Securities Purchase Agreement at Section 2.1, a copy of which is attached to Exhibit 2.1 to TransUnion's Form 8-K filed on September 11, 2021; TransUnion's Form 8-K filed on December 1, 2021; *Neustar Security Services Spins Out with Focused Investment to Foster Accelerated Growth* (Dec. 1, 2021),

---

[1]   This Court may take judicial notice of publicly available agency records.  *See, e.g.*, *K.T. v. Royal Caribbean Cruises, Ltd.*, 931 F.3d 1041, 1047 (11th Cir. 2019).

2

https://www.home.neustar/about-us/news-room/press-releases/2021/neustar-security-services-spins-out-with-focused-investment-to-foster-accelerated-growth.   TransUnion did *not* acquire Neustar's security business, NSS, which includes DNS resolution services, and was excluded from the transaction.  NSS now operates as a standalone company.

Plaintiff's allegations as to Neustar relate to its former security business.  *See, e.g.*, Compl. at ¶¶ 103, 110, 123-26.  They do not relate to Neustar's marketing, fraud and communications solutions business.  Thus, to the extent Plaintiff can state any timely claims for relief (which, for the reasons explained herein, he cannot), those claims should be asserted against NSS and not Neustar.

This Court should exercise its inherent authority to drop Neustar from this action pursuant to Federal Rule Civil Procedure 21.  *See, e.g.*, *Oginsky v. Paragon Properties of Costa Rica, LLC*, 282 F.R.D. 681, 682–83 (S.D. Fla. 2012) (dropping misjoined parties and severing misjoined claims pursuant to Rule 21); *Liberty Media Holdings, LLC v. BitTorrent Swarm*, 277 F.R.D. 669, 672 (S.D. Fla. 2011)  (ordering multiple defendants be dismissed pursuant to Rule 21).

## II.   PLAINTIFF'S CLAIMS ARE TIME-BARRED BY THE FACE OF THE COMPLAINT

"Dismissal under Rule 12(b)(6) on statute of limitations grounds 'is appropriate only if it is apparent from the face of the complaint that the claim is time-barred.'"  *Padilla v. Porsche Cars N. Am., Inc.*, 391 F. Supp. 3d 1108, 1112 (S.D. Fla. 2019) *quoting La Grasta v. First Union. Sec., Inc.*, 358 F.2d 840, 845 (11th Cir. 2004).  Because Plaintiff's own allegations, which arise from events that allegedly occurred in 2016 and 2017, demonstrate that each claim he asserts against Neustar is barred by the applicable statute of limitations, this Court should dismiss the Complaint as to Neustar with prejudice.

3

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: 2 South Biscayne Boulevard, Suite 1500 ::  Miami, FL 33131 :: T 305 347 4080 :: F 305 347 4089

First, Plaintiff's claim against Neustar for violation of 18 U.S.C. § 1962(d) is subject to a four year statute of limitations which accrues from the date the injury was, or should have been, discovered. *Lehman v. Lucom*, 727 F.3d 1330 (11th Cir. 2013). Plaintiff avers in his Complaint that the basis of his RICO conspiracy claim against Neustar became public knowledge no later than October 2016. *See* Compl. at ¶¶ 183-85. Plaintiff also made multiple public statements about his allegations in early 2017. Plaintiff tweeted on January 13, 2017 that "…the phony allegations against me were put together by my political opponents and a failed spy afraid of being sued…"[2] On March 4, 2017, Plaintiff tweeted about the conspiracy to access information within Trump Tower that he also alleges in the Complaint.[3] Plaintiff continued to make public statements about the same alleged conspiracy throughout April 2017.[4] Nevertheless, Plaintiff waited until 2022 to bring this action. Plaintiff's own statements reveal that he was aware of the alleged conspiracy and injury more than four years ago. His claim for violation of 18 U.S.C. § 1962(d) is time-barred and this Court should dismiss it with prejudice.

Second, Plaintiff's claim against Neustar for conspiracy to commit injurious falsehood is subject to a statute of limitations four years from the date of the injury, consistent with Florida's

---

[2]     Donald J. Trump (@realDonaldTrump), Twitter (Jan. 13, 2017), archived at The Trump Twitter Archive, www.thetrumparchive.com. This Court may rely on judicially noticeable facts in determining the timeliness of Plaintiff's claims on a motion to dismiss. *See, e.g., Henry v. ExamWorks Inc.*, No. 20-cv-12268, 2021 WL 33440698, at *3 (11th Cir. Aug. 6, 2021). To that end,this Court may take judicial notice of Plaintiff's tweets. *See, e.g., Hawaii v. Trump*, 859 F.3d 741, 773 n.14 (9th Cir.) (per curiam) (taking judicial notice of Plaintiff's tweets), *vacated on other grounds*, 138 S. Ct. 377 (2017); *Rock the Vote v. Trump*, No. 20-cv-06021, 2020 WL 6342927, at *4 n.2 (N.D. Cal. Oct. 29, 2020) (same); *U.S. v. Flynn*, 507 F. Supp. 3d 116, 126 n.6 (D.D.C. 2020) (same).

[3]     Donald J. Trump (@realDonaldTrump), Twitter (Mar. 4, 2017), archived at The Trump Twitter Archive, www.thetrumparchive.com.

[4]     *See, e.g.*, Donald J. Trump (@realDonaldTrump), Twitter (Apr. 3, 2017), archived at The Trump Twitter Archive, www.thetrumparchive.com.

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: 2 South Biscayne Boulevard, Suite 1500 ::  Miami, FL 33131 :: T 305 347 4080 :: F 305 347 4089

statute of limitations for civil conspiracy. *King v. Bencie*, 806 F. App'x. 873, 875 (11th Cir. 2020) (affirming dismissal of action and noting that statute of limitations for civil conspiracy is four years); *see* Fla. Stat. § 95.11(3)(p) (four year statute of limitations for claims not otherwise listed); *see also Newberger v. U.S. Marshals Serv.*, 751 F.2d 1162, 1166 (11th Cir. 1985) (actions for civil conspiracy in Florida are governed by a four year statute of limitations). Plaintiff's allegations in the Complaint demonstrate that he was aware of this alleged conspiracy no later than January 13, 2017. *See supra* at n.2. Thus, the statute of limitations on this claim expired no later than January 13, 2021, more than a year before Plaintiff filed his Complaint.[5]

Third, the statute of limitations for a claim under the CFAA is two years from the violation or discovery of the violation. 18 U.S.C. § 1030(g). Plaintiff's conclusory and boilerplate allegation that the alleged violations were not discoverable until September 16, 2021, Compl. at ¶ 393, is contradicted by his other factual allegations that the information was publicly known as early as October, 2016. Compl. at ¶¶ 183-89. A claim under the CFAA must be initiated within two years, even if the plaintiff does not know the identity of the alleged perpetrators. *Sewell v. Bernardin*, 795 F.3d 337, 342 (2d Cir. 2015). Thus, even if Plaintiff only recently became aware of the identity of the supposed perpetrators,[6] Plaintiff's knowledge of the DNS information's release in late October, 2016 means the statute of limitations expired in October, 2018.

Fourth, claims for theft of trade secrets under 18 U.S.C. § 1836(d) must be brought within three years from the date "on which the misappropriation with respect to the action would relate

---

[5] The delayed discovery doctrine, which delays the commencement of the statute of limitations, does not apply to conspiracy claims under Florida law. *Davis v. Monahan*, 832 So. 708, 709 (Fla. 2002) (noting delayed discovery doctrine does not apply to civil conspiracy claims).

[6] The September 16, 2021 indictment of Michael Sussmann could not have assisted Plaintiff in identifying any of the alleged perpetrators because the document contains only pseudonyms. *See U.S. v. Sussmann*, No. 1:21-cr-00582-CRC (D.D.C.), Doc. No. 1.

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: 2 South Biscayne Boulevard, Suite 1500 :: Miami, FL 33131 :: T 305 347 4080 :: F 305 347 4089

is discovered or by the exercise of reasonable diligence should have been discovered."  Again, Plaintiff's claims accrued no later than October, 2016, when Plaintiff alleges that knowledge of his DNS traffic became public.  *See, e.g.*, Compl. at ¶¶ 183-84.  Thus, the statute of limitations for his theft of trade secrets expired in October, 2019, over two years before Plaintiff filed this Complaint.

Last, the statute of limitations for a civil cause of action for violation of the SCA is two years from discovery of or from when one "had a reasonable opportunity to discover the violation." 18 U.S.C. § 2707(f).  Because, according to the Complaint, Plaintiff's claims accrued upon public knowledge of his DNS traffic in October, 2016, *see* Compl. at ¶¶ 183-84, this claim also is barred by the statute of limitations.[7]

Because Plaintiff's own allegations in the Complaint demonstrate that he failed to timely assert his claims, this Court should dismiss the Complaint as against Neustar with prejudice.

## III.   PLAINTIFF'S CLAIMS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

Plaintiff's claims against Neustar not only are untimely, they also are wholly without merit. Neustar vigorously disputes the Complaint's allegations but, for purposes of this Motion acknowledges that this Court is constrained to treat them as though they are true.  Plaintiff nevertheless fails to state any cognizable claims against Neustar.

To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) *quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This pleading standard "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation."

---

[7]     Count XVI of the Complaint purports to be a claim for respondeat superior and vicarious liability, which are theories of liability and not causes of action.  For that reason, Neustar need not address whether this claim is barred by the statute of limitations.

6

*Id.* (citation omitted). Mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do." *Id.* quoting *Bell Atl. Corp. v. Twombly*, 550 U.S at 555; *Piescik v. CVS Pharmacy, Inc.*, 21-81298-CV, 2021 WL 5996977, at *6 (S.D. Fla. Dec. 15, 2021) (Middlebrooks, J.) ("bare assertion that the label was misleading, without any facts offered in support, is a conclusory allegation that does not satisfy the standard set forth in *Twombly* and *Iqbal*.").

As explained below, each of the six claims Plaintiff has asserted against Neustar fails this generous standard.[8] This Court should dismiss the Complaint as to Neustar with prejudice.

---

[8]     Plaintiff's 108 page Complaint, which is comprised of 508 paragraphs and asserts 16 counts against 28 separate defendants is an improper "shotgun" pleading. *See Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1321 (11th Cir. 2015); *Sanguinetti v. JPMorgan Chase Bank Nat'l Ass'n*, 20-CV-81023, 2020 WL 7765792 (S.D. Fla. Nov. 13, 2020) (Middlebrooks, J.); *Tomelleri v. Orlando Lakes and Wetlands Inc.*, No. 19-CV-801080 (S.D. Fla. March 30, 2020), *report and recommendation adopted sub nom. Tomelleri v. Natale*, 9:19-CV-81080, 2020 WL 6343353 (S.D. Fla. Apr. 10, 2020). This Court can *sua sponte* dismiss a "shotgun" pleading. *Balsam v. U.S.*, No. 20-CV-80958, 2021 WL 4461850 (S.D. Fla. July 13, 2021) (Reinhart, M.J.), *report and recommendation adopted*, 20-80958-CV, 2021 WL 4459568 (S.D. Fla. Sept. 29, 2021) (Middlebrooks, J.) *citing Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018). Because Plaintiff's Complaint falls into at least three of the categories identified by the Eleventh Circuit, this Court should dismiss it:

> [W]e have identified four rough types or categories of shotgun pleadings. The most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The next most common type, at least as far as our published opinions on the subject reflect, is a complaint that does not commit the mortal sin of re-alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief. Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against. The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants

7

### A.      Plaintiff Fails to State a Plausible Claim for Violation of 18 U.S.C. § 1962(d)

Although Count I of the Complaint asserts a substantive claim for violation of RICO under 18 U.S.C. § 1962(c) against certain defendants, it does *not* assert this claim against Neustar. Nevertheless, for the reasons set forth in sections II., A. and B. of Secretary Clinton's brief (Doc. No. 52), which Neustar joins and incorporates by reference, Plaintiff has failed to plead a claim for a violation of 18 U.S.C. § 1962(c).  Because Plaintiff's claim for violation of 18 U.S.C. § 1962(c) fails, his claim against Neustar for violation of 18 U.S.C. § 1962(d) necessarily fails as well. *Rogers v. Nacchio*, 241 F. App'x. 602, 609 (11th Cir. 2007).

Separately, the Complaint's allegations do not plausibly state a claim that Neustar conspired with the other defendants in violation of RICO.  To that end, Plaintiff has not adequately alleged an illegal agreement to violate a substantive provision of the RICO statute, a predicate act of racketeering, or any injury arising from such an act.  *See* Doc. No. 52 at 6-14.  Any one of these failures provides a sufficient basis for dismissing the RICO conspiracy claim against Neustar.

Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [section 1962]."  It is axiomatic that "a complaint that 'simply concludes that the defendants conspired and confederated to commit conduct which in itself does not constitute a RICO violation' must be dismissed."  *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1220 (11th Cir. 2020) *quoting Jackson v. BellSouth Telecomms.*, 372 F.3d 250, 1269 (11th Cir. 2004).  And, although direct evidence of a RICO conspiracy is not required, a "complaint must, however, offer more than 'mere [] legal conclusions.'"  *Omnipol, A.S. v. Multinat'l Def. Serv., LLC*, 19-14597, 2022 WL 1311596, at *6 (11th Cir. May 3, 2022) *quoting Am. Dental Ass'n*

---

adequate notice of the claims against them and the grounds upon which each claim rests.
*Weiland*, 792 F.3d at 1321-23.

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: 2 South Biscayne Boulevard, Suite 1500 :: Miami, FL 33131 :: T 305 347 4080 :: F 305 347 4089

*v. Cigna Corp.*, 605 A.3d 1283, 1293 (11th Cir. 2010).  Because Plaintiff bases his RICO claim on a pattern of allegedly fraudulent activity, *see, e.g.*, Compl. at ¶ 281, the Eleventh Circuit requires that his claim satisfy Rule 9(b).  *Super Vision Int'l, Inc. v. Mega Int'l Comm. Bank Co., Ltd.*, 534 F. Supp. 2d 1326, 1330 (S.D. Fla. 2008) *citing Ambriosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007).  Plaintiff's claim cannot withstand this standard.

### 1. Plaintiff Fails to Adequately Plead a Cognizable RICO Predicate Act

Plaintiff alleges that the enterprise engaged in two RICO predicate acts: theft of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1832, and witness tampering in violation of 18 U.S.C. § 1512.  Compl. at ¶¶ 278-316.  Plaintiff does not allege that Neustar engaged or conspired to engage in witness tampering.  Compl. at ¶¶ 296-311.  Thus, the only purported predicate act Plaintiff links to Neustar is the alleged theft of trade secrets.  *Id.* at ¶¶ 284-95.

"Theft of trade secrets consists of five elements: first, the defendant must intend to convert proprietary information to the economic benefit of anyone other than the owner; second, the proprietary information must be a trade secret; third, the defendant must knowingly steal, take without authorization, or obtain by fraud or deception trade secret information; fourth, the defendant must intend or know that the offense would injure the owner of the trade secret; and finally, the trade secret must be related to a product that is in interstate or foreign commerce." *U.S. v. Smith*, 22 F.4th 1236, 1243 (11th Cir. 2022).  For at least two reasons, Plaintiff has not stated a claim for theft of trade secrets.

First, Plaintiff's claim is based on the alleged misappropriation of domain name system ("DNS") internet traffic data.  Compl. at ¶ 285.  DNS internet traffic data is not information "owned" by Plaintiff.  It is, instead, akin to a phone book, and allows users to connect to websites using domain names instead of internet protocol ("IP") addresses.  The United States District Court for the Eastern District of Texas recently explained:

9

> To access a website . . . a user must connect his or her home computer to the one hosting the site. To achieve this, the user may enter in the website's IP address - which is a string of numbers which identify the computer where the website is housed - into Internet Explorer or another web browser. *See* IP Address, TECH TERMS COMPUTER DICTIONARY, https://techterms.com/definition/ip_address (last visited November 24, 2019). An IP Address, however, is often difficult to remember. Thus, rather than requiring a user to memorize a string of numbers, website owners often obtain an alpha-numeric "domain name" which users can enter into their browser to access their sought after website… [A]n "IP address," is comparable to a nine-digit phone number and a "domain name" is comparable to the name saved on a cell phone for that number. This domain name is stored in an electronic nameserver record.

*Domain Prot., LLC v. Sea Wasp, LLC*, 426 F. Supp. 3d 355, 395–96 (E.D. Tex. 2019), *aff'd sub nom.*, *Domain Prot., L.L.C. v. Sea Wasp, L.L.C.*, 23 F.4th 529 (5th Cir. 2022); *see Intermatic Inc. v. Toeppen*, 947 F. Supp. 1227, 1231 (N.D. Ill. 1996) (discussing how DNS fits within the internet architecture).

DNS information is part of the internet architecture and is automatically shared by all internet users with their Internet Service Providers ("ISPs") and third-party devices.[9] For this reason, it is well established that plaintiffs have no legally protected privacy interests in their IP address information. *See, e.g.*, *U.S. v. Trader*, 981 F.3d 961, 967–68 (11th Cir. 2020) (finding no reasonable expectation of privacy in email address or IP address where individual did not use software to avoid disclosing same). This reasoning applies equally to Plaintiff's DNS information.

Second, Plaintiff fails to adequately allege that the DNS information "derives independent economic value" from "not being generally known to" others. *See Sentry Data Sys. v. CVS Health*,

---

[9]      The Domain Name System is a "distributed computing system that enables access to Internet resources by user-friendly domain names rather than IP addresses, by translating domain names to IP addresses and back." *Secure Domain Name System (DNS) Deployment Guide*. National Institute of Standards and Technology Special Publication (Sept. 2013) at (iii), available at: https://nvlpubs.nist.gov/nistpubs/specialpublications/nist.sp.800-81-2.pdf. Despite Plaintiff's assertions to the contrary, "DNS data is meant to be public." *See id.*

10

361 F. Supp. 3d, 1279, 1292 (S.D. Fla. 2018) (finding sufficient allegations of efforts taken and costs incurred to compile customer list, and thus, adequately pled as trade secret). Plaintiff instead merely alleges that the DNS information "could" reveal information about "website traffic, email traffic…in addition to the types of technology, hardware, software, programs, securities and processes being utilized by the servers." Compl. at ¶ 285. Plaintiff also makes the conclusory averment that DNS information is information that "derive[s] significant economic value from not being generally known to or ascertainable by others." *Id.* at ¶ 289. Plaintiff's boilerplate pleading identifying the elements of a theft of trade secrets claim is insufficient. *Twombly*, 550 U.S. at 555.

Plaintiff fails to allege how DNS information is independently valuable. He also does not plead any facts explain how DNS information, which he does not own and is readily available to ISPs and other third-parties, loses its (unarticulated) value if it becomes widely known. Because Plaintiff's theft of trade secrets claims is insufficient as a matter of law, it is not a cognizable predicate act.

## 2. Plaintiff Fails to Adequately Plead the Existence of an Agreement

Even if Plaintiff had plausibly pled the predicate act of trade secret theft (which he has not), Plaintiff's RICO conspiracy claim against Neustar also fails because there are not any factual averments that Neustar entered into any agreement. To allege a RICO conspiracy, a plaintiff must allege "an illegal agreement to violate a substantive provision of the RICO statute." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1269 (11th Cir. 2004). A plaintiff must also plausibly allege a "meeting of the minds." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293-95 (11th Cir. 2010) *quoting Twombly*, 550 U.S. at 557. Further, a complaint must "assert allegations explaining how exactly the defendants went about entering into an agreement with each other." *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1068 (11th Cir. 2017). A conspiracy allegation

11

must give the court a reasonable basis to infer that the defendants were conspiring, and not simply engaging in "unknowingly parallel conduct." *Id.* at 1069.

Here, the Complaint is devoid of any factual allegations that Neustar entered into a conspiracy to violate a substantive provision of RICO. The Complaint alleges Neustar was "tasked" to gather information that "could show any wrongdoing" by Plaintiff, his campaign, or the Trump Organization. Compl. at ¶ 109. From this "task," the Complaint makes the inexplicable and unsupportable jump, premised on conclusory and boilerplate statements, that Neustar "conspired with" the other defendants to steal trade secrets. *See, e.g.*, Compl. at ¶¶ 284, 286, 292, 294, 318-21. These conclusory allegations of a conspiracy "unsupported by actual allegations of fact" are unmistakably insufficient. *See Super Vision Int'l*, 534 F. Supp. 2d at 1343.

### 3.      Plaintiff Fails to Adequately Allege Any RICO Injury

The Complaint also fails to sufficiently allege an injury directly caused by a predicate act proscribed by § 1962. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 452 (2006). A RICO claim requires an injury to the plaintiff's business or property as well as a direct relationship between the injury asserted and the alleged injurious conduct. *Hemi Grp. v. City of New York*, 559 U.S. 1, 9 (2010) (citation omitted). An injury that is foreseeable is not sufficient; the injury must be direct. *Ray v. Spirit Airlines*, 836 F.3d 1340, 1349 (11th Cir. 2016) (citation omitted).

Plaintiff has alleged his injury in vague and conclusory terms, asserting only that he incurred "defense costs, legal fees and related expenses . . . in connection with his efforts to defend himself" as a result of Defendants' alleged actions. *See, e.g.*, Compl. at ¶¶ 263-64. At least one other court found that similar allegations were insufficient to state a RICO claim. *See Nunes v. Fusion GPS*, 531 F. Supp. 3d 993, 1012-13 (E.D. Va. 2021). Plaintiff has not pled any direct connection between the release of DNS data and the "defense costs, legal fees and related

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: 2 South Biscayne Boulevard, Suite 1500 :: Miami, FL 33131 :: T 305 347 4080 :: F 305 347 4089

expenses" he has allegedly incurred.  This Court should dismiss Plaintiff's claim against Neustar for violation of 18 U.S.C. § 1962(d) with prejudice.

### B.    Plaintiff Fails to State a Conspiracy to Commit Injurious Falsehood

Plaintiff also asserts a claim against Neustar for conspiracy to commit injurious falsehood. Compl. at ¶¶ 346-55.  Plaintiff does *not* allege that Neustar published any allegedly injurious falsehoods against him but instead seeks to hold it liable for these purported injurious falsehoods based upon a conspiracy or vicarious liability theory.[10]  As a preliminary matter, this Court should dismiss the conspiracy claim because, as explained in Secretary Clinton's briefing, Plaintiff's underlying injurious falsehood claim fails.[11]  *See Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1345 (S.D. Fla. 2018) ("An actionable conspiracy requires an actionable underlying tort or wrong.").

In addition, Plaintiff has failed to plead factual allegations sufficient to state a claim for conspiracy.  It is well-settled Florida law that "a civil conspiracy requires: (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy."  *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997).

The Complaint is devoid of factual allegations supporting an "agreement" between Neustar and any other defendant.  *See* Compl. at ¶¶ 346-52.  Indeed, Count IV does not even specifically refer to Neustar.  *See id.*  Because "[f]ormulaic recitation[s] of the elements of a cause of action will not do," *Twombly*, 550 U.S. at 555, this Court should dismiss Plaintiff's claim against Neustar for conspiracy to commit an injurious falsehood with prejudice.

---

[10]    As explained *infra* at section III.F., Plaintiff's theory of vicarious liability fails.

[11]    Neustar joins in and incorporates by reference the arguments in sections II., C. and D. of Doc. No. 52.

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: 2 South Biscayne Boulevard, Suite 1500 ::  Miami, FL 33131 :: T 305 347 4080 :: F 305 347 4089

## C.      Plaintiff Fails to State a Claim for Violation of CFAA

The CFAA is "predominately designed as a criminal statute to punish computer hacking," but permits civil actions "under a narrow set of circumstances." *St. Johns Vein Ctr., Inc. v. StreamlineMD LLC*, 347 F. Supp. 3d 1047, 1057 (M.D. Fla. 2018). To state a claim under the CFAA, a plaintiff must allege that (1) "defendant intentionally accessed a protected computer" (2) "without authorization or exceeding authorized access," (3) "defendant thereby obtained information," and (4) "plaintiff suffered damage or loss of at least $5,000.00." *777 Partners LLC v. Pagnanelli*, No. 20-cv-20172, 2021 WL 2038175, at *4–5 (S.D. Fla. Mar. 8, 2021) (citation omitted). Because the Complaint's allegations do not fall within the narrow and specific definitions of "unauthorized access" and "damage or loss" under the CFAA, this Court should dismiss Plaintiff's CFAA claim as to Neustar with prejudice.[12]

### 1.      Plaintiff's "Unauthorized Access" Theory is Legally Deficient

Plaintiff bases his "unauthorized access" claim against Neustar for its alleged improper use of DNS information to which it already had access. A recent Supreme Court decision, *Van Buren v. U.S.*, 141 S. Ct. 1648 (2021) expressly rejects this theory. In *Van Buren*, the Court interpreted the statutory term "exceeds authorized access" to apply only to those defendants who access "information located in particular areas of the computer—such as files, folders, or databases—that are off limits" to them. *Id.* at 1662 *citing* 18 U.S.C. § 1030(a)(2). Notably, the Court held that exploiting existing access to a computer system "for an improper purpose" does *not* violate the statute. *Id.* "CFAA focuses on – and punishes – an individual's unauthorized *access* of

---

[12]      Plaintiff's attempts to include claims related to the Trump Organization's servers or the Executive Office of the President are unavailing. *See, e.g.*, Compl. at ¶¶ 383-84, 386, 388. Neither the Trump Organization nor the federal government is a plaintiff to this litigation and Plaintiff cannot assert a claim on their behalf. *See, e.g.*, *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1124-25 (11th Cir. 2021) (Newsom, J., concurring) (noting plaintiff can sue for injury to the government only where Congress has authorized a *qui tam* suit).

14

information rather than how a defendant *uses* the accessed data." *CareersUSA, Inc. v. Guerrero*, No. 14-cv-80096, 2014 WL 12862259, at *3 (S.D. Fla. Aug. 25, 2014) (emphasis in original) (quotation omitted).

The Complaint alleges Neustar is "an information technology company" that "offers various internet-related information, data and analytics services, including [DNS] resolution services."[13]  Compl. at ¶ 103.  In the ordinary course of its business, Neustar allegedly acquired "access to non-public and proprietary internet data," including DNS data from Trump Tower and plaintiff's private New York City apartment.  *Id. at* ¶ 123.  Neustar also allegedly provided "DNS resolution services" to the Executive Office of the President ("EOP") and thereby "c[a]me to access and maintain dedicated servers for the EOP."  *Id.* at ¶ 124.

The Complaint also alleges that Neustar and its then-chief executive, Mr. Joffe, were "tasked" "[] to exploit . . . their access to non-public data to dredge up" compromising information about plaintiff.  Compl. at ¶ 109.  Neustar and Mr. Joffe then allegedly proceeded to "min[e]" executive branch DNS data and "quer[y] their holdings of nonpublic internet data" against internet protocol and email addresses associated with plaintiff, the Trump Organization, and "numerous Trump associates."  *Id.* at ¶¶ 125–26.

Taken as true only for purposes of this Motion, the allegations demonstrate that Neustar and Mr. Joffe did no more than the CFAA allows – allegedly employed data already in their possession to run searches concerning Plaintiff.  Far from gaining unauthorized access to files or systems "off limits" to them, *Van Buren*, 141 S. Ct. at 1662, Neustar and Mr. Joffe allegedly

---

[13]    In December, 2021, several months before Plaintiff filed his Complaint, TransUnion acquired Neustar's marketing, fraud and communications solutions business.  It did not acquire Neustar's security business, which includes DNS resolution services, now operates as a standalone company.  Rodney Joffe is not an employee of Neustar, retiring before TransUnion's acquisition.

15

"exploited . . . access" they were otherwise given for supposedly "nefarious purposes," Compl. at ¶¶ 102, 122.[14]  This does *not* violate the CFAA.  *See Armor Corr. Health Servs., Inc. v. Teal*, No. 19-cv-24656, 2021 WL 5834245, at *27 (S.D. Fla. Dec. 8, 2021) (finding executive authorized to access employer's systems with "no meaningful limitations" did not violate CFAA by downloading documents "for the improper purpose of using [them]" to compete with employer).

Plaintiff's CFAA claim also fails to the extent he alleges (without any basis) that Defendants "manipulated, falsified, and altered" data to manufacture a connection between Plaintiff's computer servers and those of a Russian bank.  Compl. at ¶ 392.  The CFAA is "an anti-hacking statute" that penalizes unauthorized access to protected computers.  *IBI Grp. (Fla.) Inc. v. B&S Eng'g Consultants, LLC*, No. 17-cv-246, 2017 WL 7311866, at *3 (M.D. Fla. June 27, 2017).  Thus, allegations that Defendants "fabricat[ed]" computer-related evidence, Compl. at ¶ 110, are outside the scope of the statute.

## 2.    Plaintiff Fails to Plead A Damage or Loss Compensable Under the CFAA

This Court also should dismiss Plaintiff's CFAA claim for the independent reason that he fails to allege compensable damage or loss in excess of $5,000 in one year.  *See* 18 U.S.C. § 1030(g).  Damages under the CFAA are confined to two permissible categories: (1) reasonable costs associated with responding to a breach, such as "assessing the damage done" and "restoring" systems to their prior condition, and (2) revenue lost or costs incurred because of an interruption of service.  *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1174 (11th Cir. 2017); *see also 777 Partners*, 2021 WL 2038175, at *5 (defining "damage" under the CFAA as "an impairment

---

[14]    Although the Complaint includes a single, throwaway allegation that Neustar was commission[ed]" "to brazenly hack servers," Compl. at ¶ 62, it provides no support for this "naked assertion[] devoid of further factual development." *Iqbal*, 556 U.S. at 678.  The allegation, which is also inconsistent with other well-pleaded facts, therefore need not be taken as true even at this stage. *Id.*

16

to the integrity or availability of data, a program, a system, or information"). Other types of foreseeable losses, such as "lost revenue from the possible misappropriation of 'stolen' information," do not count toward the $5,000 statutory minimum. *Schwartz v. ADP, Inc.*, No. 21-cv-283, 2021 WL 5760434, at *2 (M.D. Fla. Dec. 3, 2021) (citation omitted).

To that end, courts within the Eleventh Circuit routinely dismiss CFAA claims for failure to plead the type of damages recoverable under the statute. *See, e.g.*, *Schwartz*, 2021 WL 5760434, at *2 (dismissing claim where plaintiff made only "conclusory allegation" of loss in excess of $5,000); *My Energy Monster, Inc. v. Gawrych*, No. 20-cv-2548, 2021 WL 6125579, at *4 (M.D. Fla. Sept. 29, 2021) (dismissing complaint for failure to plead "at least $5,000" in spending "on remedial actions"); *777 Partners*, 2021 WL 2038175, at *5-6 (holding that plaintiff could not recover for defendant's unjust enrichment and failed to allege compensable "cost[s] of responding to the alleged offense"); *Mortg. Now, Inc. v. Stone*, No. 09-cv-80, 2010 WL 11519201, at *5 (N.D. Fla. Sept. 29, 2010) (dismissing claim on ground that "lost profits" untethered to an "interruption of service" "do not constitute loss under the CFAA"). Although Plaintiff asserts damages well in excess of $5,000, those damages, which he describes as legal fees and expenses, do not satisfy the narrow definition of recoverable loss under the CFAA. This Court should therefore dismiss Plaintiff's CFAA claim as to Neustar with prejudice.

### D.    Plaintiff Fails to State a Claim for Theft of Trade Secrets

Plaintiff's allegations for theft of trade secrets fail for the same reason that Plaintiff failed to allege this claim as a cognizable RICO predicate act – Plaintiff does not own DNS information, which allows users to connect to websites using domain names instead of IP addresses and is readily available to internet service providers. *See supra* at section III.A.1.

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: 2 South Biscayne Boulevard, Suite 1500 :: Miami, FL 33131 :: T 305 347 4080 :: F 305 347 4089

### E.      Plaintiff Fails to State a Claim for Violation of the SCA

Plaintiff's claim for violation of the SCA fails not only because he fails to plead all of the elements of a private right of action, but also because he has failed to allege facts sufficient to support his claim.[15]  Plaintiff appears to aver that Neustar improperly "exploited access" to DNS information.[16]  Compl. at ¶¶ 123-24, 418.  Yet this allegation is insufficient to support his claim.

To state a claim under the SCA, "an aggrieved party must establish that the defendant (1) intentionally accessed without authorization a facility through which an electronic communication is provided, or intentionally exceeded an authorization to access that facility; and (2) obtained, altered, or prevented authorized access to a wire or electronic communication while it was in electronic storage in such system." *Skypoint Advisors, LLC v. 3 Amigos Prods. LLC*, No. 18-cv-356, 2021 WL 6118097, at *3 (M.D. Fla. Dec. 27, 2021) (citations omitted).

Plaintiff does not allege, aside from "formulaic recitation[s] of the elements of a cause of action" what electronic communications were obtained.  *See Twombly*, 550 U.S. at 555; Compl. at ¶ 419.  SCA claims often arise from claims of unauthorized access of an email or laptop.  *See, e.g.*, *Sartori v. Schrodt*, No. 19-15114, 2021 WL 6060975 (11th Cir. Dec. 20, 2021); *Vista Mktg. v. Burkett*, 812 F.2d 954, 964 (11th Cir. 2016) (finding unauthorized accessing of emails stored by an online host violates the SCA).  Tellingly, Plaintiff has not made this allegation.  Further, courts have not held that personal computers are "facilities" under the SCA because the computers do not provide electronic communication services.  *See, e.g.*, *U.S. v. Steiger*, 318 F.3d 1039, 1049 (11th

---

[15]      Neustar joins in and incorporates by reference the arguments in section IV.E. of Rodney Joffe's Motion to Dismiss.

[16]      Plaintiff's attempts to include claims related to the Trump Organization's servers or the Executive Office of the President are unavailing.  *See, e.g.*, Compl. at ¶¶ 123-24, 418.  Neither the Trump Organization nor the federal government is a plaintiff to this litigation and Plaintiff cannot assert a claim on their behalf.  *See, e.g.*, *Sierra*, 996 F.3d at 1125 (Newsom, J., concurring) (noting plaintiff can sue for injury to the government only where Congress has authorized a *qui tam* suit).

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: 2 South Biscayne Boulevard, Suite 1500 :: Miami, FL 33131 :: T 305 347 4080 :: F 305 347 4089

Cir. 2003) (finding the SCA does not "apply to the source's hacking into Steiger's computer to download images and identifying information stored on his hard-drive because there is no evidence to suggest that Steiger's computer maintained any 'electronic communication service' as defined in 18 U.S.C. § 2510(15).")  To the extent that Plaintiff's claim arises from DNS information, *see* Compl. at ¶¶ 124-26, such information is not an "electronic communication" under the SCA.  *See, e.g.*, *In re Facebook, Inc. Internet Tracking Litig.,* 956 F.3d 589, 609 (9th Cir. 2020) (URLs are not protected under the SCA); *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) (IP addresses are not "contents" of a communications under the SCA because they "do not [] reveal any more about the underlying contents of communication than do phone numbers."); *U.S. v. Bynum*, 604 F.3d 161, 164 n.2 (4th Cir. 2010) (defendant's IP address amounts to numbers that he "never possessed").

Plaintiff also fails to adequately allege that the unnamed electronic communications at issue were in electronic storage.  Only communications in "electronic storage" are actionable.  *See Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1316 (11th Cir. 2006) (affirming dismissal where communication was not in "electronic storage," and "thus, are not protected by the SCA.").  Plaintiff does not allege any facts about the "electronic storage" system which allegedly stored the electronic communications at issue.  Instead, the Complaint makes the conclusory allegation that Neustar obtained (unidentified) communications from "the Computers that were in electronic storage in such systems."  Compl. at ¶ 419.  This is insufficient.  *See, e.g.*, *Integrated Waste Solutions, Inc. v. Goverdhanam,* 2010 WL 4910176 (E.D. Pa. 2010) (finding proprietary information stored on business' computer was not in "electronic storage" within the SCA).  This Court should dismiss Plaintiff's claim against Neustar for violation of the SCA with prejudice.

**F.**    **Plaintiff Fails to State a Claim for Respondeat Superior / Vicarious Liability Because it is Not an Independent Cause of Action**

Last, Plaintiff purports to assert a claim against Neustar for "Respondeat Superior/Vicarious Liability." *See, e.g.*, Compl. at ¶¶ 498-499, 506-07.  Respondeat superior and vicarious liability are theories of liability, not independent causes of action. *Chunhong Jia v. Boardwalk Fresh Burgers & Fries, Inc.*, No. 19-cv-2527, 2020 WL 5628734, at *2 (M.D. Fla. Sept. 21, 2020) (respondeat superior is not an independent cause of action, but a theory of liability); *Ceithaml v. Celebrity Cruises, Inc.*, 207 F. Supp. 3d 1345, 1349 (S.D. Fla. 2016) ("Theories of vicarious liability, however, are not independent causes of action; instead, they are theories of liability for other claims."); *Colite Int'l Inc. v. Robert L. Lipton, Inc.*, No. 05-cv-60046, 2006 WL 8431505, at *12 (S.D. Fla. Jan. 20, 2006) (dismissing with prejudice plaintiff's counts for respondeat superior liability "since no such cause of action exists for respondeat superior.").[17] This Court should therefore dismiss Count XVI as to Neustar with prejudice.

## CONCLUSION

For all of the foregoing reasons, Neustar respectfully requests that this Court dismiss Plaintiff's Complaint as against Neustar with prejudice.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b), Neustar respectfully requests a hearing on its motion to dismiss because a hearing would benefit the parties and this Court in light of the length of the Complaint and the number of claims and defendants.  Neustar estimates that a hearing on issues relating to it would last one hour.

---

[17]    Plaintiff's attempts to hold Neustar liable for the conduct of Mr. Joffe fail for at least two additional reasons.  First, the claims asserted against Mr. Joffe fail to state a claim upon which relief can be granted for the reasons set forth in his Motion to Dismiss.  Second, Neustar is improperly named as a defendant in this litigation. *See supra* at 1.

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: 2 South Biscayne Boulevard, Suite 1500 :: Miami, FL 33131 :: T 305 347 4080 :: F 305 347 4089

Dated: May 20, 2022

Respectfully submitted,

By: */s/ Jennifer Olmedo-Rodriguez*
    Jennifer Olmedo-Rodriguez
    Florida Bar No. 605158
    BUCHANAN INGERSOLL & ROONEY PC
    2 South Biscayne Blvd., Suite 1500
    Miami, Florida 33131
    Tel: (305) 347-4080
    Fax: (305) 347-4089
    Email: jennifer.olmedo-rodriguez@bipc.com

    -   and –

    Samantha L. Southall (*pro hac vice* pending*)*
    Pennsylvania Bar No. 80709
    BUCHANAN INGERSOLL & ROONEY PC
    50 S. 16th Street, Suite 3200
    Philadelphia, PA 19102
    Tel: (215) 665-8700
    Fax (215) 667-8760
    Email: samantha.southall@bipc.com

    *Counsel for Defendant Neustar, Inc.*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 20, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

    */s/ Jennifer Olmedo-Rodriguez*
    BUCHANAN INGERSOLL & ROONEY PC

4865-4577-2063, v. 10

BUCHANAN INGERSOLL & ROONEY PC :: One Biscayne Tower :: 2 South Biscayne Boulevard, Suite 1500 ::  Miami, FL 33131 :: T 305 347 4080 :: F 305 347 4089

# 162

Charles Dolan's Motion to Dismiss (May 23, 2022)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| DONALD J. TRUMP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )   Case No. 2:22-cv-14102-DMM |
| | ) |
| HILLARY R. CLINTON, ET AL., | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

## **CHARLES DOLAN'S MOTION TO DISMISS**

Defendant Charles Dolan, by and through counsel, respectfully moves this Court to dismiss the Complaint against him in this matter pursuant to Rules 12(b)(2), 12(b)(3), and 12(b)(6) of the Federal Rules of Civil Procedure. An accompanying Memorandum is filed in support of this Motion.

Counts II, IV, and VI, three conspiracy counts, which relate to RICO, injurious falsehood and malicious prosecution, are the Counts pled against Mr. Dolan.

Respectfully submitted,

/s/ George R. A. Doumar
George R.A. Doumar
*Admitted Pro Hac Vice*
Jonathan E. Levine, Esquire
Florida Bar No. 937711
Mahdavi Bacon Halfhill & Young, PLLC
11350 Random Hills Road, Suite 700
Fairfax, Virginia, 22030
Tel: (703) 352-1300
Fax: (703) 352-1301
Email: gdoumar@doumarmartin.com

Attorneys for Charles H. Dolan

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 23, 2022, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing on all

counsel of record.

<u>/s/ George R. A. Doumar</u>
George R.A. Doumar
*Admitted Pro Hac Vice*
Jonathan E. Levine, Esquire
Florida Bar No. 937711
Mahdavi Bacon Halfhill & Young, PLLC
11350 Random Hills Road, Suite 700
Fairfax, Virginia, 22030
Tel: (703) 352-1300
Fax: (703) 352-1301
Email: gdoumar@doumarmartin.com

Attorneys for Charles H. Dolan

163

Charles Dolan's Memorandum in Support of Motion to Dismiss
(May 23, 2022)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| DONALD J. TRUMP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 2:22-cv-14102-DMM |
| | ) |
| HILLARY R. CLINTON, ET AL., | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

**CHARLES DOLAN'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

Respectfully submitted,

/s/ George R. A. Doumar
George R.A. Doumar
*Admitted Pro Hac Vice*
Jonathan E. Levine, Esquire
Florida Bar No. 937711
Mahdavi Bacon Halfhill & Young, PLLC
11350 Random Hills Road, Suite 700
Fairfax, Virginia, 22030
Tel: (703) 352-1300
Fax: (703) 352-1301
Email: gdoumar@doumarmartin.com

Attorneys for Charles H. Dolan

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

BRIEF SUMMARY ............................................................................................... 1

RELEVANT FACTS ALLEGED IN THE COMPLAINT ..................................... 1

ARGUMENT ........................................................................................................ 3

I.   THIS COURT LACKS PERSONAL JURISDICTION OVER MR. DOLAN ................. 3

   A.   Facts, Including Those Pled, Confirm the Lack of Sufficient Contacts.......................... 3

      1.   Mr. Dolan Has Never Had Business, Property, or Offices in Florida. ...................... 3

      2.   Plaintiff Has the Burden To Make Out a Prima Facie Case of Personal Jurisdiction, But Has Not Done So and Cannot Do So As to Mr. Dolan........................................ 3

   B.   Neither the Long-Arm Statute nor Due Process Is Satisfied............................................ 4

      1.   No Allegations Concerning Mr. Dolan's Conduct Meet the Requirements for Personal Jurisdiction Pursuant to the Florida Long-Arm Statute ................................ 4

      2.   There Is No Allegation That Mr. Dolan Provided Services in Florida or Provided Services Used in Florida During the Relevant Time Frame........................................ 5

      3.   The Claim Does Not Relate to Any Contacts Mr. Dolan Had in Florida, and Mr. Dolan Never Availed Himself of the Privilege of Conducting Activities In Florida, Confirming that the Due Process Prong Is Not Satisfied ........................................... 6

II.   THE STATUTES OF LIMITATIONS FOR ALL COUNTS RAISED AGAINST MR. DOLAN (AND OTHER DEFENDANTS) HAVE EXPIRED.......................................... 7

III.   COUNTS II, IV, AND VI OF THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLANTIFF'S CLAIMS FAIL ON THE MERITS......................................... 9

IV.   THERE IS NO FACTUAL ALLEGATION TO SUPPORT THAT CHARLES DOLAN HAD AN AGREEMENT WITH ANYONE TO DO ANYTHING UNLAWFUL; MR DANCHENKO IS THE ONLY OTHER DEFENDANT WITH WHOM MR. DOLAN IS ALLEGED TO HAVE ANY CONTACT ...................................................................... 10

V.   VENUE IS IMPROPER. ................................................................................. 13

CONCLUSION..................................................................................................................... 13

## **TABLE OF AUTHORITIES**

**Cases**

Agency Holding Corp. v Malley-Duff & Assocs., 483 U.S. 143 (1987)....................................... 8

Arora v. Paige, 855 F. App'x 667, 669 (11th Cir. 2021) ................................................... 7

Berry v. Coleman, 172 F. App'x 929, 932 (11th Cir. 2006) ............................................. 12

Davis v. Monahan, 832 So. 2d 708, 709 (Fla. 2002) ................................................... 8

Diamond Chrystal Brands, Inc. v. Food Movers Int'l, Inc., 593 F.3d 1249, (11th Cir. 2010) ....... 6

EMI Sun Village, Inc. v. Catledge, 779 Fed. Appx. 627, 637 (11th Cir. 2019) .......................... 10

Frida Kahlo Corp. v. Pinedo, Civil Action No. 18-21826-Civ, 2021 U.S. Dist. LEXIS 172909 ... 7

Future Tech. Today, Inc. v. OSF Healthcare Sys., 218 F.3d 1247, 1249 (11th Cir. 2000) ........... 3

Griffin Indus., Inc. v. Irvin, 496 F.2d 1189, 1206 (11th Cir. 2007).................................. 11

Internet Solutions Corp. v. Marshall, 557 F.3d 1293, 1295 (11th Cir. 2009)................................ 4

Lehman v. Lucom, 727 F.3d 1326, 1330 (11th Cir. 2013) ............................................. 8

Licciardello v. Lovelady, 544 F.3d 1280, 1283 (11th Cir. 2008) .................................... 4

Lobel v. Genesis Group Intern., Inc., 2013 WL 1818424 (S.D. Fla. April 29, 2013) ................... 4

Posner v. Essex Ins. Co., Ltd., 178 F.3d 1209, 1214 (11th Cir. 1999) ........................... 4

Rexam Airspray Inc. v. Arminak, 471 F. Supp. 2d 1292, 1298 (S.D. Fla. 2007)......................... 4

Sculptchair, Inc. v. Century Arts, Ltd., 94 F.3d 623, 626 (11th Cir. 1996).................................. 4

Snow v. DirecTV, Inc., 450 F.3D 1314, 1318 (11th Cir. 2006) .................................... 6

Wilchombe v TeeVee Toons, Inc., 555 F. 3rd 949, 959 (11th Cir. 2009)................................. 11

Young v. Ball, 835 So. 2d 385, 386 (Fla. Dist. Ct. App. 2003).................................... 8

**Statutes**

28 U.S.C. §1391 ................................................................................................................. 13

Fla. Stat. § 95.11(3)(p) ...................................................................................................... 8

Fla. Stat. § 48.193 .......................................................................................................... 4, 6

**Rules**

Rule 12(b)(2) Fed. R. Civ. P. ............................................................................................. 3

Rule 12(b)(6) ............................................................................................................. 3, 7, 10

**INTRODUCTION**

Defendant Charles Dolan, by and through counsel, files this memorandum in support of his motion to dismiss pursuant to Rules 12(b)(2), 12(b)(3), and 12(b)(6) of the Federal Rules of Civil Procedure, in relation to Counts II, IV, and VI of Plaintiff Donald J. Trump's Complaint, which are the counts pled against Mr. Dolan.

**BRIEF SUMMARY**

Initially, the courts in Florida have no personal jurisdiction over Mr. Dolan. The case against him should be dismissed on that basis alone.

Also, Mr. Dolan agrees with the arguments made by other Defendants that the statute of limitations for Counts II, IV and VI have expired based on the allegations of the Complaint itself. Mr. Dolan also agrees that the three conspiracy counts do not state a claim for the reasons set forth in numerous other motions.  The Complaint's allegations do not satisfy the elements for the underlying counts for RICO, injurious falsehood and malicious prosecution.  Finally, Mr. Dolan's attenuated connection to the other defendants (he is only alleged to have any contact with Defendant Danchenko) precludes any agreement in any alleged wrongful scheme alleged to use false information to take to the FBI.

**RELEVANT FACTS ALLEGED IN THE COMPLAINT**

The facts in the Complaint alleging Mr. Dolan's connection with any unlawful conspiracy to smear Plaintiff when he was running for President -- even assuming that states a cause of action – are tenuous, ambiguous and insufficient to make him a co-conspirator.  Although the Complaint alleges a specific agreement by the Clinton Campaign and others to develop information and go to the FBI, Complaint, ¶76-77, Mr. Dolan is not alleged to be part of that agreement.

1

The only specific factual allegations relating to Mr. Dolan involve conversations he had with Defendant Danchenko. (Complaint at ¶79,89-97, 205-209, 246)   Both Mr. Danchenko and Mr. Dolan were interested in Russian-related business.   See the Danchenko Indictment, cited in the Complaint at pages 19-21 as a source for allegations relating to Mr. Dolan, at ¶¶20, 21, 26. Mr. Dolan and Danchenko were introduced in Washington, D.C. through Russia-related networks and worked on a business conference in Russia in October 2016.   (Danchenko Indictment, ¶20, 21, 26.) Danchenko and Dolan had conversations and Danchenko agreed to help work on the business conference.  Id. at ¶26.

One possible conversation Mr. Dolan had cited in the Complaint relates to a stay that Mr. Dolan had in a Moscow hotel (this conversation is a source of speculation in the Complaint based on Mr. Dolan having stayed in the hotel), and one conversation cited in the Complaint relates to a reaction to the resignation of Paul Manafort. (Complaint at ¶91, 94).   There is no allegation supporting any alleged agreement or conspiracy to undertake any unlawful act by Mr. Dolan, and no allegation that he spoke to any other Defendant other than Mr. Danchenko.   Based on the Complaint, and in particular the underlying Danchenko Indictment, Mr. Dolan was not part of any conspiracy or agreement to do anything unlawful. Mr. Dolan never spoke to anyone except Mr. Danchenko. For that reason, the conspiracy counts against Mr. Dolan must be dismissed.

Mr. Dolan was a public relations consultant but did not have any relevant contact with the DNC, FusionGPS, Perkins Coie, or any of the other defendants in this matter.

Having phone conversations with Mr. Danchenko in the Washington D.C. area and working with him on a business conference in Russia does not subject Mr. Dolan to personal jurisdiction in Florida. There is no allegation, nor can there be, that Mr. Dolan had any

communications with any other Defendant during the relevant time frame.   Gossiping with one acquaintance does not constitute a conspiracy.

## ARGUMENT

The Complaint must be dismissed under Rule 12(b)(2) Fed. R. Civ. P. for lack of personal jurisdiction over Defendant Dolan, and pursuant to Rule 12(b)(6), for failure to state a claim upon which relief can be granted against Charles Dolan.

### I.  THIS COURT LACKS PERSONAL JURISDICTION OVER MR. DOLAN

### A.  Facts, Including Those Pled, Confirm the Lack of Sufficient Contacts

### 1.  Mr. Dolan Has Never Had Business, Property, or Offices in Florida.

This Court does not have personal jurisdiction over Mr. Dolan.   The Complaint does not allege any facts to establish the Court's jurisdiction over Mr. Dolan. Mr. Dolan is a resident of Arlington, Virginia. He has no business, property, or offices in Florida. He has no continuous and systematic contacts in Florida, and had no contacts in Florida relating to the transactions at issue. Mr. Dolan is not subject to jurisdiction under Florida's long-arm statute and the exercise of jurisdiction over him by this Court would violate due process under the *International Shoe* analysis. Mr. Dolan provides a Declaration in support of this motion to dismiss for lack of personal jurisdiction (the "Declaration"), attached as Exhibit 1, confirming his lack of contacts.

### 2.  Plaintiff Has the Burden To Make Out a Prima Facie Case of Personal Jurisdiction, But Has Not Done So and Cannot Do So As to Mr. Dolan

The plaintiff carries the burden of establishing a prima facie case of personal jurisdiction over a nonresident defendant and must plead sufficient material facts to satisfy that burden. *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000). "A prima facie case is established if the plaintiff presents enough evidence to withstand a motion for a directed verdict." *Lobel v. Genesis Group Intern., Inc.*, 12-81408-CIV, 2013 WL 1818424 (S.D. Fla. April

3

29, 2013). A plaintiff's failure to allege any grounds supporting the exercise of personal jurisdiction is sufficient reason to grant a motion to dismiss for lack of jurisdiction. *Id*. Plaintiff here alleges no contacts by Mr. Dolan with Florida.

### B. <u>Neither the Long-Arm Statute nor Due Process Is Satisfied</u>

Florida's long-arm statute, section 48.193, Florida Statutes, does not provide a basis for personal jurisdiction over Mr. Dolan. *See Internet Solutions Corp. v. Marshall*, 557 F.3d 1293, 1295 (11th Cir. 2009). Even if the long-arm statute reached Mr. Dolan, the Court would then need to determine whether "sufficient minimum contacts exist between the defendants and the forum state so as to satisfy 'traditional notions of fair play and substantial justice." *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626 (11th Cir. 1996). A defendant's contacts with the forum statute must be of such a nature that the defendant should reasonably expect to be hauled into court in the forum state. *Id*. at 631. "Personal jurisdiction principles safeguard defendants from being unwillingly placed under the jurisdiction of a foreign court in a manner that is unjust and inequitable." *Rexam Airspray Inc. v. Arminak*, 471 F. Supp. 2d 1292, 1298 (S.D. Fla. 2007).

### 1. <u>No Allegations Concerning Mr. Dolan's Conduct Meet the Requirements for Personal Jurisdiction Pursuant to the Florida Long-Arm Statute</u>

The extensive 108-page Complaint sets forth no specific factual allegations that could serve as a basis for personal jurisdiction over Mr. Dolan. *See Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008); *Posner v. Essex Ins. Co., Ltd*., 178 F.3d 1209, 1214 (11th Cir. 1999). The Eleventh Circuit has made clear that "Florida's long-arm statute is to be strictly construed." *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996). Florida's long arm statute enumerates the circumstances that allow a Florida court to exercise personal jurisdiction over an out of state defendant. *See* Fla. Stat. § 48.193.

4

The only geographical references concerning Mr. Dolan in the 108-page Complaint are allegations about activities in Washington, D.C. and Moscow, Russia. *See* Complaint at ¶91(g) and 92.   The only statement Plaintiff asserts concerning personal jurisdiction over Mr. Dolan is conclusory. *See* Complaint at ¶ 19 ("Dolan's acts and omission as identified in this lawsuit arise out or relate to his conduct in and/or affecting among other jurisdictions, Florida"). Based on these allegations, the Complaint should be dismissed as to Mr. Dolan.

Any attempt by Plaintiff to amend his Complaint to add allegations against Mr. Dolan would be futile.   Mr. Dolan meets none of the prongs of the long-arm statute.   He operates no business in the state; he did not commit a tortious act in the state; he owns no real property in Florida or provided insurance therein; he has not breached a contract in the state; he is not engaged in solicitation or service activities in the state; he has not injected goods in the stream of commerce; he has not engaged in intercourse leading to a paternity dispute.   Plaintiff has the burden to allege facts that make a prima facie case for personal jurisdiction but has alleged none of these activities.

## 2. There Is No Allegation That Mr. Dolan Provided Services in Florida or Provided Services Used in Florida During the Relevant Time Frame

Although not alleged nor specified, the only remotely plausible subsection of Florida's long arm statute that Plaintiff can assert for personal jurisdiction over Mr. Dolan is subsection 6, where personal jurisdiction can be asserted when a defendant's actions:

> Caus[ed] injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either: a) The defendant was engaged in solicitation or service activities within this state; or b) Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

If the basis for personal jurisdiction is resulting injury in Florida (assuming that such injury has been factually alleged), then either Mr. Dolan would have had to have been engaged in

solicitation or services activities at the same time in Florida, or had products or services made or provided by him that were used or consumed in Florida in the ordinary course in business in the same time period. Mr. Dolan is a Washington, D.C. based consultant, and was at the time.

Plaintiff Trump has not met his initial burden to plead facts sufficient for a *prima facie* case of personal jurisdiction, and cannot, consistent with Rule 11 of the Federal Rules of Civil Procedure, plead sufficient facts to support the exercise of personal jurisdiction over Mr. Dolan under Fla. Stat. § 48.193. See *Diamond Chrystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010) ("A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction."); *Snow v. DirecTV, Inc., 450 F.3D 1314, 1318* (11th Cir. 2006) (vague and conclusory allegations are insufficient to establish a prima facie case of personal jurisdiction).

Plaintiff simply cannot plead sufficient facts to make out a *prima facie* case of personal jurisdiction against Mr. Dolan, so the case should be dismissed with prejudice as to Mr. Dolan.

### 3. The Claim Does Not Relate to Any Contacts Mr. Dolan Had in Florida, and Mr. Dolan Never Availed Himself of the Privilege of Conducting Activities In Florida, <u>Confirming that the Due Process Prong Is Not Satisfied</u>

The Complaint does not allege any conduct that satisfies the Eleventh Circuit's three-part test to determine compliance with constitutional due process:

> (1) whether the plaintiff's claims arise out of or relate to at least one of the defendant's contacts with the forum;
> (2) whether the nonresident defendant purposefully availed himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws;
> (3) and whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice.

*Frida Kahlo Corp. v. Pinedo*, Civil Action No. 18-21826-Civ, 2021 U.S. Dist. LEXIS 172909, at *1 (S.D. Fla. Sep. 10, 2021)

Mr. Dolan does not own property in Florida. Ex. 1 at ¶2. He is and was a resident of Virginia. *Id* at ¶1. He does not conduct business in Florida, nor did he during the relevant time period. *Id* at ¶3. Further, his travel to Florida over the past several years has been only intermittent and for the purpose of visiting his aunt and friends. *Id* at ¶4-6.

Mr. Dolan never purposefully availed himself of the benefits of Florida law sufficient to be hauled into Court.   Nothing alleged throughout the Complaint indicates that any of the causes of action arose from any contact Mr. Dolan had with Florida. Given the dearth of allegations concerning Mr. Dolan's contacts, and his actual lack of contact, this Court cannot exercise personal jurisdiction over Mr. Dolan.

Especially given controlling authority from the Eleventh Circuit, Mr. Dolan respectfully requests that this Court dismiss Mr. Dolan from this lawsuit with prejudice.

## II.   THE STATUTES OF LIMITATIONS FOR ALL COUNTS RAISED AGAINST MR. DOLAN (AND OTHER DEFENDANTS) HAVE EXPIRED

Mr. Dolan adopts the arguments in Defendant Hillary Clinton's Motion to Dismiss (Dkt. 52)(the "Clinton Motion"), John Podesta's Motion To Dismiss, Igor Danchenko's Motion to Dismiss, and others, as to Counts, II, IV, and VI, namely that Plaintiff's claims are time-barred on their face, as well as the similar arguments of other Defendants. Multiple defendants have raised the statute of limitations as a basis for dismissal, and the grounds are even stronger in Mr. Dolan's case given the paucity of factual allegations relating to him.   A Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate if it is apparent from the face of the complaint that the claim is time barred. *Arora v. Paige*, 855 F. App'x 667, 669 (11th Cir. 2021).

The Complaint's latest chronological allegation in relation to any relevant conversation by Mr. Dolan occurred on January 13, 2017. *See* Complaint, ¶ 209. All of the causes of action raised against Mr. Dolan have a four-year statute of limitations. The Plaintiff alleges injury or knowledge at various points during 2017. As discussed in the Clinton Motion, RICO causes of action have a four-year statute of limitations. The statute of limitations for conspiracy to commit RICO violations (Count II) is four years and begins running when the injury was or should have been discovered. *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013); *Agency Holding Corp. v Malley-Duff & Assocs.*, 483 U.S. 143 (1987). Count II, at ¶¶ 323 and 324, states the alleged injury as harm to Plaintiff's business and property, including legal expenses he incurred defending himself against the accusations in the Steele Dossier.

The absolute latest date when the Plaintiff can possibly claim that the injury was discovered would be January of 2017 when the Dossier became public. Accordingly, the statute of limitations for Count II expired, at the latest, in January 2021. The statute of limitations for conspiracy to commit injurious falsehood (Count IV) is also conspiracy to commit malicious prosecution (Count VI) is four years from the date of injury, in keeping with Florida's statute of limitations for general claims of civil conspiracy. *Davis v. Monahan*, 832 So. 2d 708, 709 (Fla. 2002); *Young v. Ball*, 835 So. 2d 385, 386 (Fla. Dist. Ct. App. 2003); see Fla. Stat. § 95.11(3)(p) (providing four-year statute of limitations for claims not otherwise listed). Counts IV (at ¶355) and VI (at ¶¶380 and 381) allege that the "injury" was "the cost of dealing with the legal issues and political issues" arising out of the Dossier. Even putting aside the pre-publication investigations, the latest Plaintiff can possibly claim the injury occurred would be January 2017, when the Dossier was made public. Plaintiff filed his Complaint over a year too late — March 24, 2022. Accordingly, Counts II, IV, and VI against Mr. Dolan must be dismissed with prejudice.

### III.    COUNTS II, IV, AND VI OF THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLANTIFF'S CLAIMS FAIL ON THE MERITS

Mr. Dolan joins in and adopts the arguments in Section II B through E of the Defendant Hillary Clinton's Motion to Dismiss (Dkt. 52) that Plaintiff's claims as to Counts, II, IV and VI fail on the merits and should therefore be dismissed, as well as similar arguments in Section II of Defendant John Podesta's motion to dismiss (Dkt. 124), and similar arguments in other motions. The pleading requirements for these counts are simply not met.

There is no allegation that Mr. Dolan agreed even to communicate with any other Defendant, other than Mr. Danchenko.   The allegations against Mr. Dolan at most show that he visited Moscow on business, and that he gossiped with Mr. Danchenko (which will be discussed further below) about his visit and about the reason for Mr. Manafort leaving the Trump campaign. Mr. Dolan primarily discussed with Mr. Danchenko potential consulting business relating to work in Russia.

In addition, as to Count II, the "RICO Defendants" are defined earlier in the Complaint, Complaint, ¶268, and then Mr. Dolan is apparently just included as a "RICO Conspiracy Defendant" in Count II without further elaboration or any statements that he even had any contact with the RICO Defendants.

As another example, and again assuming a valid cause of action is pled, Mr. Dolan's name appears to be added to Count VI, even though there is no allegation that Mr. Dolan had any knowledge of any potential investigations or warrants, or anything that would remotely approach the elements of malicious prosecution.

For the reason set forth in other motions, including the motions cited above, the elements of a RICO conspiracy, injurious falsehood and malicious prosecution, relating to Counts II, IV and VI, are not pled.

## IV. THERE IS NO FACTUAL ALLEGATION TO SUPPORT THAT CHARLES DOLAN HAD AN AGREEMENT WITH ANYONE TO DO ANYTHING UNLAWFUL; MR DANCHENKO IS THE ONLY OTHER DEFENDANT WITH WHOM MR. DOLAN IS ALLEGED TO HAVE ANY CONTACT

For a civil conspiracy to exist, there must be some specific, concrete allegation of an agreement between two or more parties to act unlawfully. *EMI Sun Village, Inc. v. Catledge*, 779 Fed. Appx. 627, 637 (11th Cir. 2019) ("A civil conspiracy requires: (1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts done under the conspiracy.") Here, there are no allegations tying Mr. Dolan to any other Defendant besides Mr. Danchenko, and no allegation that Mr. Dolan and Mr. Danchenko entered into an agreement to do anything unlawful.

As an initial matter, there are no specific allegations that Mr. Dolan had any contact with any party besides Mr. Danchenko. Mr. Dolan was introduced to Mr. Danchenko for purposes of potential unrelated business.

Plaintiff relies on the Danchenko Indictment as to its allegations against Mr. Dolan, but speculates to make tenuous allegations linking Mr. Dolan in his lawsuit. The allegations of the Complaint are not supported by the Indictment, which confirms that there was no unlawful agreement between Danchenko and Dolan.

This Court may and should consider the Danchenko Indictment, as a court considering a Rule 12(b)(6) motion can rely on documents referred to in the complaint. *See Wilchombe v TeeVee*

10

*Toons, Inc.,* 555 F. 3rd 949, 959 (11th Cir. 2009).   When the documents relied on contradict of the general and conclusory allegations of the pleading, the documents relied on govern. *See Griffin Indus., Inc. v. Irvin, 496 F.2d 1189, 1206* (11th Cir. 2007).

The Complaint, relying on the Danchenko Indictment, alleges that Mr. Dolan and Mr. Danchenko had discussions about someone creating a "dossier." Complaint at ¶79. But the underlying statement in the Indictment upon which the Complaint relies merely states that Mr. Dolan and Mr. Danchenko "…engaged in discussions regarding potential business collaboration…on issues relating to Russia." Indictment at ¶23. (Emphasis added).  *See* Danchenko Indictment attached as Exhibit 2.   There is no reference to a dossier or other document, or an effort to smear Plaintiff in that paragraph of the indictment.   The Complaint does not allege anything about Dolan related to the FBI or any proceeding, investigation or prosecution, which seems to be the gravamen of the alleged conspiracy.

The subparts of Complaint ¶79 contain vague allegations and overly generous speculative inferences to presume that there was an agreement between Mr. Dolan and Mr. Danchenko to engage in an unlawful smear campaign to cause Plaintiff actionable injury.

For example, subpart c of ¶79 states that Mr. Danchenko told Mr. Dolan that Mr. Danchenko passed a note to Mr. Steele to attempt to introduce Mr. Dolan to Mr. Steele, but there is no allegation that Mr. Dolan and Mr. Steele ever communicated; Subpart d states that Mr. Danchenko sent Mr. Dolan an email regarding the Russian Banking Sector; and subpart e states that Mr. Dolan represented to an acquaintance that he (Mr. Dolan) and Mr. Danchenko are colleagues and were exchanging information.   The only relation to Plaintiff is the allegation that Mr. Danchenko solicited Mr. Dolan to cooperate in creating the dossier, but that conclusory allegation relies on the Danchenko Indictment, which does not state anything of the sort.

The Danchenko Indictment that Plaintiff relies upon confirms that Dolan stayed at a Moscow hotel, and received a tour, in June 2016, and that Danchenko visited the same hotel at around the same time, but that no one told Dolan about any salacious sexual activity.   Danchenko Indictment, ¶30, 31, 33.   Further, the Indictment alleged that Mr. Danchenko and Mr. Dolan collaborated on setting up a conference in October in Moscow, and that Mr. Danchenko was to assist Mr. Dolan with "logistics, provide translation services, and present on various relevant topics at the October Conference." Indictment at ¶26. These hotel visits appear to be the source for Plaintiff's allegation that information as to salacious sexual activity in a Moscow hotel that appeared in the Dossier was relayed by Dolan to Danchenko. Complaint, ¶91.  There is just no basis for this rumor that has ricocheted around the internet about Mr. Dolan being the source of an allegation about salacious sexual activity.

Plaintiff claims the Dossier is full of lies, but then cites allegations in the Dossier to implicate Mr. Dolan despite the Indictment providing no basis for him to do so.   Nor does the Dossier even mention Mr. Dolan. The allegation about Mr. Dolan being the source of this allegation is conclusory and inconsistent with ¶¶23, 26, 30, 31, 32, and 35 of the Indictment.   Also, there were multiple rumors and reports regarding the Plaintiff's sexual activity, including from the Plaintiff himself.

The Indictment confirms only that Mr. Dolan coordinated with Mr. Danchenko and hotel staff to organize a conference in Moscow and that Russian officials may have attended that conference. "On a motion to dismiss, conclusory allegations and unwarranted deductions of fact are not admitted as true. This is particularly true when the conclusory allegations contradict the other facts alleged in the complaint." *Berry v. Coleman*, 172 F. App'x 929, 932 (11th Cir. 2006).

The Complaint also discusses an allegation regarding Mr. Manafort's departure from Plaintiff's presidential campaign as being something that originated with Mr. Dolan. Complaint at ¶94-96. Mr. Manafort's leaving the Trump campaign and the possible reasons, therefore, do not appear to have any relevance to the claims of Plaintiff. This was public information. Indictment at ¶49 and ¶52.

As stated in the Indictment Plaintiff references throughout his Complaint, Mr. Dolan was not aware at the time of the specifics of Danchenko's project against Trump, or that Danchenko's reporting would be provided to the FBI. Indictment at ¶52.

There are no specific allegations that Mr. Dolan was involved in any unlawful conspiracy. Based on the lack of allegations as to Mr. Dolan, Counts II, IV and VI against him should be dismissed with prejudice.

### V.   VENUE IS IMPROPER

Defendant Dolan also, pursuant to Fed. R. Civ. P. 12(b)(3), raises an objection to venue, under 28 U.S.C. §1391. The allegations do not reflect that any actions relating to this Complaint took place in Florida.   The statute requires that a claim be brought where "a substantial part of the events or omissions giving rise to the claim occurred." That a newspaper may publish information in Florida does not merit dragging Defendants to Florida from all over the country or even the world.

### CONCLUSION

There is no allegation that Mr. Dolan had contact with any other defendant besides Mr. Danchenko. Mr. Dolan was working in his consulting and public relations business during the relevant time period, and met Mr. Danchenko through that work.   There is no allegation that he had any paid or formal or even informal role in the Clinton Presidential campaign, or worked with

any of the other Defendants, other than doing volunteer work for a Presidential campaign.   Mr. Dolan is at most tied tenuously to two bits of information that he allegedly relayed to Mr. Danchenko. That is insufficient for conspiracy.

If gossiping with a business associate about politics in Washington, D.C. during a Presidential election year could subject a person to liability, even if the gossip involves adverse information regarding a candidate, courts would be flooded with lawsuits.

There is no allegation supporting that Mr. Dolan agreed to a plan or conspiracy to undertake anything unlawful with anyone.

The claims against Mr. Dolan should be dismissed with prejudice.

Respectfully submitted,

/s/ George R. A. Doumar
George R.A. Doumar
*Admitted Pro Hac Vice*
Jonathan E. Levine, Esquire
Florida Bar No. 937711
Mahdavi Bacon Halfhill & Young, PLLC
11350 Random Hills Road, Suite 700
Fairfax, Virginia, 22030
Tel: (703) 352-1300
Fax: (703) 352-1301
Email: gdoumar@doumarmartin.com

Attorneys for Charles H. Dolan

**CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2022, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing on all

counsel of record.

Respectfully submitted,

/s/ George R. A. Doumar
George R.A. Doumar
*Admitted Pro Hac Vice*
Jonathan E. Levine, Esquire
Florida Bar No. 937711
Mahdavi Bacon Halfhill & Young, PLLC
11350 Random Hills Road, Suite 700
Fairfax, Virginia, 22030
Tel: (703) 352-1300
Fax: (703) 352-1301
Email: gdoumar@doumarmartin.com

Attorneys for Charles H. Dolan

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

DONALD J. TRUMP      )
      )
Plaintiff      )
      )
v.      )
      )   Case No. 2:22-cv-14102-DMM
      )
HILLARY R. CLINTON, ET AL      )
      )
      )
Defendants      )
      )

### DECLARATION OF CHARLES HALLIDAY DOLAN

I, Charles, H. Dolan, declare and affirm as follows pursuant to 28 U.S.C. §1746:

1.      My name is Charles H. Dolan.  I reside in the Commonwealth of Virginia, in Arlington.  I have lived in Virginia since 1986. I have been involved in consulting and public relations activities in the Washington., D.C. area since 1989.

2.      I do not own any property in Florida, and never have.  I have never resided in Florida.

3.      I do not have any business or offices in Florida, nor have I provided any services in Florida.   Nor have I solicited business in Florida, at least not in the last ten years.

4.      I do not vacation regularly in Florida.

5.      I have not traveled to Florida for any reason since at least November 2019, when I visited an aunt who lives just north of Tampa, for a couple of days.  Before that, I had visited Florida intermittently over the years for personal reasons, to see my aunt, or to see friends.

6.      I have no recollection or record of visiting Florida at any time during 2016.

7.      I have reviewed the Complaint in this matter. I did have communications with Igor Danchenko during 2016, as we both discussed potentially doing business together. None of those conversations took place in Florida. Mr. Danchenko lived in the Washington, D.C. area. I had no communications during 2016 with any of the other individual defendants. My communications with Mr. Danchenko primarily related to doing some potential business together, related to Russia and possibly Cyprus, and mostly took place in the Washington, D.C. area. Mr. Danchenko and I did see each other in Russia on two occasions, when we were both there on business.

8.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 23, 2022.

Arlington, Virginia.

Charles Halliday Dolan, Jr

# EXHIBIT 2

*Danchenko Indictment*
*Unsealed version*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILED
IN OPEN COURT

NOV - 3 2021

CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **UNDER SEAL** |
| | : | |
| v. | : | CR No. 1:21-CR-245 (AJT) |
| | : | |
| IGOR Y. DANCHENKO, | : | COUNTS ONE – FIVE |
| | : | 18 U.S.C. § 1001(a)(2) |
| Defendant. | : | False Statements |
| | : | |

INDICTMENT

The Grand Jury Charges that:

I. Introduction and Overview

1.      On or about July 31, 2016, the Federal Bureau of Investigation ("FBI") opened an investigation known as "Crossfire Hurricane" into whether individuals associated with the Donald J. Trump presidential campaign (the "Trump Campaign") were coordinating activities with the Russian government.

2.      Beginning in or about July 2016 and continuing through December 2016, the FBI began receiving a series of reports from a former British government employee ("U.K. Person-1") that contained derogatory information on then-candidate Donald J. Trump ("Trump") concerning Trump's purported ties to Russia (the "Company Reports").

3.      Earlier that year, a U.S.-based international law firm ("Law Firm-1"), acting as counsel to the Hillary Clinton Presidential campaign (the "Clinton Campaign"), had retained a U.S.-based investigative firm ("U.S. Investigative Firm-1") to conduct research on Trump and his associates.   In or about June 2016, U.S. Investigative Firm-1, in turn, retained U.K. Person-1, a

former officer in a friendly foreign intelligence service ("Foreign Intelligence Service-1"), and his

U.K.-based firm ("U.K Investigative Firm-1"), to investigate Trump's purported ties to Russia.

4.      During the U.S. presidential election season and afterwards, U.K. Person-1 and

employees of U.S. Investigative Firm-1 provided the Company Reports to multiple media outlets

and to U.S. government personnel.

5.      The Company Reports played an important role in applications that FBI personnel

prepared and submitted to obtain warrants pursuant to the Foreign Intelligence Surveillance Act

("FISA") targeting a United States citizen who had been an advisor to then-candidate Trump

("Advisor-1").   In connection with the FBI's Crossfire Hurricane investigation and the later

investigation by Special Counsel Robert S. Mueller III, the FBI relied substantially on the

Company Reports in these FISA applications to assert probable cause that Advisor-1 was a witting

agent of the Russian Federation.

6.      The FBI obtained a total of four court-approved FISA applications targeting

Advisor-1, which authorized intrusive electronic surveillance of Advisor-1 from in or about

October 2016 through in or about September 2017.   Each of the FISA applications set forth the

FBI's assessment that Advisor-1 was a knowing agent of Russia and further alleged – based on the

Company Reports – that Advisor-1 was part of a "well-coordinated conspiracy of co-operation"

between Trump's campaign and the Russian government.

7.      Over time, the FBI attempted to investigate, vet, and analyze the Company Reports

but ultimately was not able to confirm or corroborate most of their substantive allegations.

8.      In the context of these efforts, the FBI learned that U.K. Person-1 relied primarily

on a U.S.-based Russian national, **IGOR DANCHENKO ("DANCHENKO")**, the defendant

herein, to collect the information that ultimately formed the core of the allegations found in the

Company Reports.   From in or about January 2017 through in or about November 2017, and as part of its efforts to determine the truth or falsity of specific information in the Company Reports, the FBI conducted several interviews of **DANCHENKO** regarding, among other things, the information that **DANCHENKO** had provided to U.K. Person-1 (collectively, the "Interviews").

9.      As alleged in further detail below, **DANCHENKO** lied to FBI agents during these Interviews.

10.      First, **DANCHENKO** stated falsely that he had never communicated with a particular U.S.-based individual – who was a long-time participant in Democratic Party politics and was then an executive at a U.S. public relations firm ("PR Executive-1") – about any allegations contained in the Company Reports.  In truth and in fact, and as **DANCHENKO** well knew, **DANCHENKO** sourced one or more specific allegations in the Company Reports anonymously to PR Executive-1.

11.      PR Executive-1's role as a contributor of information to the Company Reports was highly relevant and material to the FBI's evaluation of those reports because (a) PR Executive-1 maintained pre-existing and ongoing relationships with numerous persons named or described in the Company Reports, including one of **DANCHENKO's** Russian sub-sources (detailed below), (b) PR Executive-1 maintained historical and ongoing involvement in Democratic politics, which bore upon PR Executive-1's reliability, motivations, and potential bias as a source of information for the Company Reports, and (c) **DANCHENKO** gathered some of the information contained in the Company Reports at events in Moscow organized by PR Executive-1 and others that **DANCHENKO** attended at PR Executive-1's invitation.  Indeed, and as alleged below, certain allegations that **DANCHENKO** provided to U.K. Person-1, and which appeared in the Company

3

Reports, mirrored and/or reflected information that PR Executive-1 himself also had received through his own interactions with Russian nationals.

12.     Second, **DANCHENKO** stated falsely during the Interviews, that, in or about late July 2016, he received an anonymous phone call from an individual who **DANCHENKO** believed to be a particular U.S. citizen and who was then president of the Russian-American Chamber of Commerce ("Chamber President-1"). **DANCHENKO** also falsely stated that, during this phone call, (i) the person he believed to be Chamber President-1 informed him, in part, about information that the Company Reports later described as demonstrating a well-developed "conspiracy of cooperation" between the Trump Campaign and Russian officials, and (ii) **DANCHENKO** and the aforementioned person agreed to meet in New York. In truth and fact, and as **DANCHENKO** well knew, **DANCHENKO** never received such a phone call or such information from any person he believed to be Chamber President-1, and **DANCEHNKO** never made any arrangements to meet Chamber President-1 in New York. Rather, **DANCHENKO** fabricated these facts regarding Chamber President-1.

13.     As alleged in further detail below, all of **DANCHENKO's** lies were material to the FBI because, among other reasons, (1) the FBI's investigation of the Trump Campaign relied in large part on the Company Reports to obtain FISA warrants on Advisor-1, (2) the FBI ultimately devoted substantial resources attempting to investigate and corroborate the allegations contained in the Company Reports, including the reliability of **DANCHENKO's** sub-sources; and (3) the Company Reports, as well as information collected for the Reports by **DANCHENKO**, played a role in the FBI's investigative decisions and in sworn representations that the FBI made to the Foreign Intelligence Surveillance Court throughout the relevant time period.

A. <u>The Defendant</u>

14.     At all times relevant to this Indictment, **DANCHENKO** was a citizen of the Russian Federation and was lawfully in the United States. **DANCHENKO** resided in Washington, D.C. and Virginia.

15.     From in or about 2005 through in or about 2010, **DANCHENKO** worked as an analyst at a Washington, D.C.-based think tank ("Think Tank-1") where he focused primarily on Russian and Eurasian geo-political matters.

16.     In or about 2010, an employee of Think Tank-1 ("Think Tank Employee-1") introduced **DANCHENKO** to U.K. Person-1.   In or about 2011, U.K. Person-1 retained **DANCHENKO** as a contractor at U.K. Investigative Firm-1.   In his work for U.K. Investigative Firm-1, **DANCHENKO** focused primarily on Russian and Eurasian business risk assessment and geopolitical analysis.

B. <u>U.K. Investigative Firm-1 and Its Role in the 2016 Presidential Election Campaign</u>

17.     U.K. Investigative Firm-1 was at all times relevant to this Indictment a U.K.-based business intelligence firm.  Beginning in or around June 2016, U.K. Person-1 – using information provided primarily by **DANCHENKO** – began to compile and draft the Company Reports containing purported evidence of illicit ties between Trump and the Russian government.   On or about July 5, 2016, U.K. Person-1 provided the first of the Company Reports to an FBI agent overseas.

C. <u>PR Executive-1</u>

18.     At all times relevant to this indictment, PR Executive-1 was a Virginia-based public relations professional employed by a Washington, D.C.-based public relations firm ("PR Firm-1").  In or about February 2016, Think Tank Employee-1 – the aforementioned individual who

introduced **DANCHENKO** to U.K. Person-1 in 2010 – introduced **DANCHENKO** to PR Executive-1 in connection with potential business opportunities.

19.     In addition to his work as a public relations professional, PR Executive-1 had served as (1) chairman of a national Democratic political organization, (2) state chairman of former President Clinton's 1992 and 1996 presidential campaigns, and (3) an advisor to Hillary Clinton's 2008 Presidential campaign. Moreover, beginning in or about 1997, President Clinton appointed PR Executive-1 to two four-year terms on an advisory commission at the U.S. State Department. With respect to the 2016 Clinton Campaign, PR Executive-1 actively campaigned and participated in calls and events as a volunteer on behalf of Hillary Clinton.

20.     In his role as a public relations professional, PR Executive-1 spent much of his career interacting with Eurasian clients with a particular focus on Russia. For example, from in or about 2006 through in or about 2014, the Russian Federation retained PR Executive-1 and his then-employer to handle global public relations for the Russian government and a state-owned energy company. PR Executive-1 served as a lead consultant during that project and frequently interacted with senior Russian Federation leadership whose names would later appear in the Company Reports, including the Press Secretary of the Russian Presidential Administration ("Russian Press Secretary-1"), the Deputy Press Secretary ("Russian Deputy Press Secretary-1"), and others in the Russian Presidential Press Department. Additionally, PR Executive-1 maintained relationships with the then-Russian Ambassador to the United States ("Russian Ambassador-1") and the head of the Russian Embassy's Economic Section in Washington, D.C. ("Russian Diplomat-1"), both of whom also would later appear by name in the Company Reports.

21.     Beginning in or about early 2015, an acquaintance of PR Executive-1 ("Organizer-1") was planning a business conference that Organizer-1 and others would host in October 2016

6

(the "October Conference") at a Moscow hotel that would later appear in the Company Reports (the "Moscow Hotel"). Organizer-1 planned the October Conference on behalf of a group of senior international business people who were seeking to explore potential business investments in Russia. To that end, the October Conference included individuals who could provide insight into the economic, political, diplomatic and cultural aspects of the Russian Federation. Organizer-1 enlisted PR Executive-1 to participate in the October Conference because of PR Executive-1's ability to set up meetings with senior Russian government officials and provide analysis of the 2016 U.S. Democratic presidential primary at the October Conference.

22.     In preparation for the October Conference, Organizer-1 and PR Executive-1 planned and carried out a trip to Moscow in or about June 2016 (the "June 2016 Planning Trip").

### D. DANCHENKO's Relationship with PR Executive-1

23.     In or about late April 2016, **DANCHENKO** and PR Executive-1 engaged in discussions regarding potential business collaboration between PR Firm-1 and U.K. Investigative Firm-1 on issues relating to Russia. These discussions reflected that **DANCHENKO** and PR Executive-1 had exchanged information regarding each other's backgrounds and professional activities, including **DANCHENKO's** work for U.K. Investigative Firm-1 and U.K. Person-1.

24.     For example, on or about April 29, 2016, **DANCHENKO** sent an email to PR Executive-1 indicating that **DANCHENKO** had passed a letter to U.K. Person-1 on behalf of PR Executive-1. Specifically, the email stated that **DANCHENKO** had "forwarded your letter" to [U.K. Person-1] and his business partner. "I'll make sure you gentlemen meet when they are in Washington or when you are in London."

25.     That same day, **DANCHENKO** sent an email to PR Executive-1 outlining certain work that **DANCHENKO** was conducting with U.K. Investigative Firm-1. The email attached a

U.K Investigative Firm-1 report titled "Intelligence Briefing Note, 'Kompromat' and 'Nadzor' in the Russian Banking Sector."

26.     Shortly thereafter, PR Executive-1 asked **DANCHENKO** to assist PR Executive-1 and Organizer-1 with the October Conference, which **DANCHENKO** agreed to do. PR Executive-1 subsequently asked and received permission from Organizer-1 to enlist **DANCHENKO** to assist with logistics, provide translation services, and present on various relevant topics at the October Conference.

27.     On or about June 10, 2016, and prior to the June 2016 Planning Trip, PR Executive-1 sent an email to a U.S.-based acquaintance which reflected that PR Executive-1 and **DANCHENKO** had become colleagues and were exchanging information. In describing **DANCHENKO,** PR Executive-1 stated: "He is too young for KGB. But I think he worked for FSB. Since he told me he spent two years in Iran. And when I first met him he knew more about me than I did. [winking emoticon]." (The Federal Security Service of the Russian Federation, or "FSB," is the principal security agency of Russia and the principal successor agency to the KGB.)

28.     In or about May, August, and September 2016, in preparation for the October Conference, PR Executive-1 and Organizer-1 attended at least three meetings at the Russian Embassy in Washington, D.C., and communicated with Russian Embassy staff, including Russian Ambassador-1 and Russian Diplomat-1 (both of whom, as described above and in further detail below, appeared in the Company Reports). PR Executive-1 and Organizer-1 also attended a meeting at the Russian Embassy on or about September 14, 2016. **DANCHENKO** did not attend any of these meetings.

29.     In anticipation of the June 2016 Planning Trip to Moscow, PR Executive-1 also communicated with Russian Press Secretary-1 and Russian Deputy Press Secretary-1, both of whom worked in the Kremlin and, as noted above, also appeared in the Company Reports.

30.     On or about June 13, 2016, PR Executive-1 and Organizer-1 traveled to Moscow for the June 2016 Planning Trip.   PR Executive-1 and Organizer-1 stayed at the Moscow Hotel. On or about June 14, 2016, **DANCHENKO**, who, at the time was already present in Russia working on behalf of U.K. Investigative Firm-1, met with PR Executive-1 and Organizer-1 in Moscow. **DANCHENKO** did not stay at the Moscow Hotel during the June 2016 Planning Trip.

31.     During the June 2016 Planning Trip at the Moscow Hotel, PR Executive-1 and Organizer-1 participated in, among other things, (1) a meeting with the general manager of the Moscow Hotel ("General Manager-1") and a female hotel staff member ("Staff Member-1") to discuss the October Conference, (2) a lunch on or about June 15, 2016 with Staff Member-1 and other members of the Moscow Hotel staff who assisted in the preparations for the October Conference, and (3) a tour of the Moscow Hotel, including the Presidential Suite.

32.     In addition, and as described in further detail below, references to the Moscow Hotel, the Presidential Suite, and a Moscow Hotel manager and other staff would all later appear in the Company Reports.

33.     On or about June 14, 2016, **DANCHENKO** visited PR Executive-1 and others at the Moscow Hotel, and posted a picture on social media of himself and PR Executive-1 with Red Square appearing in the background.

34.     On or about June 17, 2016, **DANCHENKO** flew from Moscow to London.  While in London, **DANCHENKO** met with U.K. Person-1 to provide him with information that would later appear in the Company Reports.

35.     On or about October 4, 2016, PR Executive-1, Organizer-1, and **DANCHENKO** traveled to Moscow for the October Conference.  The October Conference featured several Russian government officials including (i) a prominent member of the Duma (Russian Parliament) ("Duma Member-1") and (ii) members of the Russian Ministry of Foreign Affairs, including, as discussed above, Russian Diplomat-1 and another Russian diplomat ("Russian Diplomat-2").  As part of the October Conference, participants also attended meetings in the Kremlin with the Russian Ministry of Foreign Affairs and the Russian Presidential Press Department.

36.     According to PR Executive-1, individuals affiliated with the Clinton Campaign did not direct, and were not aware of, the aforementioned meetings and activities with **DANCHENKO** and other Russian nationals.

E.  (U) Russian Sub-Source-1

37.     At all times relevant to this Indictment, **DANCHENKO** maintained communications with a Russian national ("Russian Sub-Source-1") based in a foreign country ("Country-1") who, according to **DANCHENKO**, acted as one of **DANCHENKO's** primary sources of information for allegations contained in the Company Reports.  **DANCHENKO** and Russian Sub-Source-1 had initially met as children in Russia, and remained friends thereafter.

38.     In or about early 2016, Russian Sub-Source-1 began working at a business based in Country-1 ("Business-1") that was owned by a Russian national and would later appear in the Company Reports.  Russian Sub-Source-1 conducted public relations and communications work for Business-1.

F.  DANCHENKO Introduces Russian Sub-Source-1 to PR Executive-1

39.     In or about March 2016, and prior to the June 2016 Planning Trip, **DANCHENKO** learned from Russian Sub-Source-1 that Business-1 was interested in retaining a U.S.-based public

relations firm to assist with Business-1's entry into the U.S. market. **DANCHENKO** brokered a meeting between PR Executive-1 and Russian Sub-Source-1 to discuss a potential business relationship. Thereafter, PR Firm-1 and Business-1 entered a contractual relationship.

40.    In or around the same time period, **DANCHENKO**, PR Executive-1, and Russian Sub-Source-1 communicated about, among other things, the business relationship between Business-1 and PR Firm-1.

41.    During the same time period, Russian Sub-Source-1 and PR Executive-1 communicated regularly via social media, telephone, and other means. In these communications and others, Russian Subsource-1 and PR Executive-1 discussed their political views and their support for Hillary Clinton.

   a.    For example, during July 2016 meetings in Country-1, PR Executive-1 gifted to Russian Sub-Source-1 an autobiography of Hillary Clinton, which he signed and inscribed with the handwritten message, "To my good friend [first name of Russian Sub-Source-1], A Great Democrat."

   b.    Additionally, on or about July 13, 2016, Russian Sub-Source-1 sent a message to a Russia-based associate and stated that PR Executive-1 had written a letter to Russian Press Secretary-1 in support of Russian-Sub-Source-1's candidacy for a position in the Russian Presidential Administration.

   c.    On or about July 22, 2016, PR Executive-1 sent an email to Russian Sub-Source-1 and informed Russian Sub-Source-1 that he would be attending a reception for Hillary Clinton. Shortly thereafter, Russian Sub-Source-1 responded: "[T]ell her please she [Clinton] has a big fan in [Country-1]. Can I please ask you to sign for me her (anything)."

11

d.    In or about August 2016, Russian Sub-Source-1 sent a message to a Russia-based associate describing PR Executive-1 as an "advisor" to Hillary Clinton.  Russian Sub-Source-1 further commented regarding what might happen if Clinton were to win the election, stating in Russian, "[W]hen [PR Executive-1 and others] take me off to the State Department [to handle] issues of the former USSR, then we'll see who is looking good and who is not."

e.    In or about September 2016, Russian Sub-Source-1 made a similar comment in a message to the same associate, stating in Russian that PR Executive-1 would "take me to the State Department if Hillary wins."

f.    On or about November 7, 2016 (the day before the 2016 U.S. Presidential election), Russian Sub-Source-1 emailed PR Executive-1 in English and stated, in part:

> [] I am preparing you some information on former USSR/UIC countries, Igor [**DANCHENKO**] possibly told you about that. . . . . Tomorrow your country is having a great day, so, as a big Hillary fan, I wish her and all her supporters to have a Victory day.  Hope, that someday her book will have one more autograph on it)
>
> Thank you for your help and support,
>
> Best regards,
> [First Name of Russian Sub-Source-1]

G.  Chamber President-1

42.    At all times relevant to this Indictment, Chamber President-1 was a New York-based real estate broker.  Chamber President-1 previously served as president of the Russian-American Chamber of Commerce from 2006 to 2016.  In the course of his employment, Chamber President-1 had occasion to work on real estate projects with Trump and staff at the Trump Organization, which at all times relevant to this Indictment was owned by Trump.

43.     As discussed more fully below, **DANCHENKO** claimed to have sourced several allegations contained in the Company Reports to Chamber President-1, including allegations of purported ongoing communications between the Trump campaign and Russian officials.

H. DANCHENKO's U.S. Election Reporting

44.     As alleged above and in further detail below, from in or about May 2016 through in or about December 2016, during the same time period as the events set forth above involving PR Executive-1 and Organizer-1 (including the June 2016 Planning Trip and the October Conference), **DANCHENKO** assembled and provided to U.K. Person-1 purported information that U.K. Person-1 would, in turn, use to draft the Company Reports. **DANCHENKO** gathered some of this purported information during the June 2016 Planning Trip and the October Conference. Indeed, and as alleged below, certain allegations that **DANCHENKO** provided to U.K. Person-1, and which appeared in the Company Reports, mirrored and/or reflected information that PR Executive-1 himself also had received through his own interactions with Russian nationals.

II. DANCHENKO's False Statements Involving PR Executive-1

A. PR Executive-1 Provides Information Regarding Campaign Manager-1

45.     At least one allegation contained in a Company Report dated August 22, 2016, reflected information that **DANCHENKO** collected directly from PR Executive-1. In particular, that Company Report detailed the August 2016 resignation of Trump's Campaign Manager ("Campaign Manager-1") and his allegedly strained relationship with another campaign staff member ("Campaign Staff Member-1"). The allegation in the Company Report stated:

> Close associate of TRUMP explains **reasoning behind [Campaign Manager-1's] recent resignation.** Ukraine revelations played part but others wanted [Campaign Manager-1] out for various reasons, especially [Campaign Staff Member-1] who remains influential . . .

13

> Speaking separately, also in late August 2016, **an American political figure associated with Donald TRUMP** and his campaign outlined the reasons behind [Campaign Manager-1's] recent demise. S/he said it was true that the Ukraine corruption revelations had played a part in this, but also, **several senior players close to TRUMP had wanted [Campaign Manager-1] out**, primarily to loosen his control on strategy and policy formulation. Of particular importance in this regard was [Campaign Manager-1's] **predecessor as campaign manager, [Campaign Staff Member-1], who hated [Campaign Manager-1] personally and remained close to TRUMP** with whom he discussed the presidential campaign on a regular basis.

(emphasis added) (capitalization in original).

46.    This Company Report contained information that **DANCHENKO** had gathered directly from PR Executive-1 in response to a specific request. In particular, on or about August 19, 2016, **DANCHENKO** emailed PR Executive-1 to solicit any "thought, rumor, or allegation" about Campaign Manager-1. In the email, **DANCHENKO** also informed PR Executive-1 that he (**DANCHENKO**) was working on a "project against Trump":

> Could you please ask someone to comment on [Campaign Manager-1's] resignation and anything on Trump campaign? Off the record of course! **Any thought, rumor, allegation. I am working on a related project against Trump.** I asked [PR Executive-1's acquaintance] three months ago but he didn't say much although shared a couple of valuable insights.
>
> Thanks a lot!
>
> Best,
> Igor

(emphasis added)

47.    Later that day, PR Executive-1 replied to **DANCHENKO**, stating in part:

> Let me dig around on [Campaign Manager-1]. Pretty sure the new team wanted him gone asap and used today's NYT story to drive a stake in his heart.

48.     On or about August 20, 2016, PR Executive-1 emailed **DANCHENKO** the following:

> Hi Igor:
>
> I had a drink with **a GOP friend of mine** who knows some of the players and got some of what is in this article, which provides even more detail.  **She also told me that [Campaign Staff Member-1], who hates [Campaign Manager-1] and still speaks to Trump regularly played a role.  He is said to be doing a happy dance over it.**
>
> **I think the bottom line is that in addition to the Ukraine revelations, a number of people wanted Campaign Manager-1 gone.  It is a very sharp elbows crowd.**

(emphasis added).   PR Executive-1 attached to the email a link to an internet news article that discussed Campaign Manager-1's resignation as Trump Campaign manager.

49.     Later that day, **DANCHENKO** replied to PR Executive-1, expressing his appreciation for the information, and stating that their "goals clearly coincide[d]" with regard to **DANCHENKO's** efforts to gather derogatory information about Trump:

> Dear [PR Executive-1],
>
> Thank you for this.   Any additional insights will be much appreciated.
>
> **It is an important project for me, and our goals clearly coincide.** I've been following the Russia trail in Trump's campaign.  It is there so what you read in the news is hardly an exaggeration.  Some things are less dramatic while others are more than they seem.

(emphasis added).

50.     PR Executive-1 replied to **DANCHENKO** with the following: "Thanks!  I'll let you know if I hear anything else."

51.     PR Executive-1 provided this information regarding Campaign Manager-1 to **DANCHENKO** two days before it appeared in the August 22, 2016 Company Report.   As

reflected above, the information provided by PR Executive-1 was substantially the same as the information contained in the Company Report.  In particular:

a.  PR Executive-1 claimed to have received the information from a "GOP friend," whom the above-referenced Company Report describes as a "close associate of Trump."

b.  In his email, PR Executive-1 referred to "Ukraine revelations" about Campaign Manager-1, which the Company Report also refers to as the "Ukraine corruption revelations."

c.  PR Executive-1's email stated a **"number of people wanted [Campaign Manager-1] gone."**  The Company Report similarly stated that **"several senior players close to TRUMP had wanted [Campaign Manager-1] out."** (emphasis added).

d.  PR Executive-1's email stated that "[Campaign Staff Member-1], who **hates [Campaign Manager-1]** and **still speaks to Trump** regularly played a role" in Campaign Manager-1's departure.  (emphasis added).  The Company Report similarly states that Campaign Manager-1's departure was due to "[Campaign Staff Member-1], who **hated [Campaign Manager-1]** personally and **remained close to TRUMP."** (emphasis added).

52.     PR Executive-1 later acknowledged to the FBI that he never met with a "GOP friend" in relation to this information that he passed to **DANCHENKO**, but, rather, fabricated the fact of the meeting in his communications with **DANCHENKO**.  PR Executive-1 instead obtained the information about Campaign Manager-1 from public news sources.  According to PR Executive-1, he (PR Executive-1) was not aware at the time of the specifics of **DANCHENKO's** "project against Trump," or that **DANCHENKO's** reporting would be provided to the FBI.

B.  DANCHENKO's Statements to the FBI Regarding PR Executive-1

53.    On or about June 15, 2017, the FBI interviewed **DANCHENKO** in the Eastern District of Virginia regarding the Company Reports.  FBI agents recorded the June Interview without **DANCHENKO's** knowledge.

54.    During the interview, the FBI asked **DANCHENKO**, among other things, if he had talked to PR Executive-1 regarding any allegations contained in the Company Reports. **DANCHENKO** denied that PR Executive-1 provided any specific information related to the Company Reports.  In particular, when an FBI agent ("Agent-1") mentioned PR Executive-1's name during a conversation about individuals who may have contributed to the Company Reports, the following exchange, in part, occurred:

| | |
|---|---|
| FBI AGENT-1: | Um, because obviously I don't think you're the only . . . |
| **DANCHENKO:** | Mm-hmm. |
| FBI AGENT-1: | Person that has been contributing.  You may have said one – and this is the other thing we are trying to figure out. |
| | [. . .] |
| FBI AGENT-1: | Do you know a [PR Executive-1]? |
| **DANCHENKO:** | Do I know [PR Executive-1]? Yeah. |
| FBI AGENT-1: | How long have you known him? [laughing] |
| | [pause] |
| **DANCHENKO:** | I've known [PR-Executive-1] for [pause] I don't know, a couple years maybe. |
| FBI AGENT-1: | Couple years? |
| **DANCHENKO:** | But but but but but but but I've known of him for like 12 years. |

17

[. . .]

| | |
|---|---|
| **DANCHENKO:** | Yeah. Yeah he likes Russia. **I don't think he is, uh, – would be any way be involved.** But—but—uh—b—but he's uh [UI] what I would think would be easily played. Maybe. Uh, he's a bit naïve in his, um liking of Russia. |
| FBI AGENT-1: | Okay, so you've had . . . was there any . . . but you had **never talked to [PR Executive-1] about anything that showed up in the dossier [Company Reports] right?** |
| **DANCHENKO:** | **No.** |
| FBI AGENT-1: | You don't think so? |
| **DANCHENKO:** | **No. We talked about, you know, related issues perhaps but no, no, no, nothing specific.** |

(emphasis added).

55.    In a later part of the conversation, **DANCHENKO** stated, in substance and in part, that PR Executive-1 had traveled on the October "delegation" to Moscow; that PR Executive-1 conducted business with Business-1 and Russian Sub-source-1; and that PR Executive-1 had a professional relationship with Russian Press Secretary-1.

56.    **DANCHENKO's** June 15, 2017 statements that (i) he never talked to [PR Executive-1] about "anything [specific] that showed up" in the Company Reports, and that (ii) he did not think PR Executive-1 was "involved in any way" in those reports, were knowingly and intentionally false. In truth and in fact, and as **DANCHENKO** well knew, **DANCHENKO** had gathered specific information from PR Executive-1 that appeared in the August 22, 2016 Company Report concerning Campaign Manager-1's resignation.

## III. The Materiality of DANCHENKO's Lies Regarding PR Executive-1

57.    **DANCHENKO's** lies denying PR Executive-1's role in specific information referenced in the Company Reports were material to the FBI because, among other reasons, they deprived FBI agents and analysts of probative information concerning PR Executive-1 that would have, among other things, assisted them in evaluating the credibility, reliability, and veracity of the Company Reports, including **DANCHENKO's** sub-sources.  In particular, PR Executive-1 maintained connections to numerous people and events described in several other reports, and **DANCHENKO** gathered information that appeared in the Company Reports during the June Planning Trip and the October Conference.  In addition, and as alleged below, certain allegations that **DANCHENKO** provided to U.K. Person-1, and which appeared in other Company Reports, mirrored and/or reflected information that PR Executive-1 himself also had received through his own interactions with Russian nationals.   As alleged below, all of these facts rendered **DANCHENKO's** lies regarding PR Executive-1's role as a source of information for the Company Reports highly material to the FBI's ongoing investigation.

### A.   DANCHENKO's Allegations Regarding Trump's Salacious Sexual Activity

58.    For example, an allegation in a Company Report dated June 20, 2016 indicated that Trump had previously engaged in salacious sexual activity while a guest at the Moscow Hotel. The allegation stated, in part:

> According to Source D, where s/he had been present, TRUMP's (perverted) conduct in Moscow included hiring the presidential suite of the [Moscow Hotel], where he knew President and Mrs OBAMA (whom he hated) had stayed on one of their official trips to Russia, and [engaged in sexual activity]. The hotel was known to be under FSB control with microphones and concealed cameras in all the main rooms to record anything they wanted to.

> The [Moscow Hotel] episode involving TRUMP reported above was **confirmed by Source E, a senior (western) member of staff at**

**the hotel,** who said that s/he and several of the staff were aware of it at the time and subsequently. S/he believed it had happened in 2013. Source E provided an introduction for a company ethnic Russian operative to **Source F, a female staffer** at the hotel when TRUMP had stayed there, who also confirmed the story.

(emphasis added) (capitalization in original).

*PR Executive-1 and Organizer-1 Receive a Tour of the Moscow Hotel's Presidential Suite*

59.     Certain of the information in the June 20, 2016 Company Report reflected facts that PR Executive-1 and Organizer-1 also learned during the June 2016 Planning Trip to Moscow.

60.     For example, and as alleged above, during the June 2016 Planning Trip, both PR Executive-1 and Organizer-1 stayed at the Moscow Hotel.   While at the Moscow Hotel, PR Executive-1 and Organizer-1 (i) received a tour of the Moscow Hotel's Presidential Suite (ii) met with the general manager ("General Manager-1") and other staff of the Moscow Hotel, and (iii) attended meetings – to include with **DANCHENKO** – at various Russian government ministries. Further, PR Executive-1 had lunch with **DANCHENKO** during the June 2016 Planning Trip.

61.     According to Organizer-1, during the aforementioned tour of the Presidential Suite, a Moscow Hotel staff member told the participants, including PR Executive-1, that Trump had stayed in the Presidential Suite.  According to both Organizer-1 and PR Executive-1, the staff member did not mention any sexual or salacious activity.

*DANCHENKO's Statements to the FBI Regarding the Moscow Hotel*

62.     During the Interviews in or about 2017 in which he was asked about this Company Report, **DANCHENKO** initially claimed to have stayed at the Moscow Hotel in June 2016. **DANCHENKO** later acknowledged in a subsequent interview, however, that he did not stay at the Moscow Hotel until the October Conference.

63.    During the Interviews, **DANCHENKO** claimed to have collected information concerning Trump's purported activities at the Moscow Hotel from various sources, including but not limited to General Manager-1 and other Moscow Hotel staff.

64.    **DANCHENKO** further claimed that he characterized Trump's alleged activity to U.K. Person-1 as "rumor and speculation," and that **DANCHENKO** had been unable to confirm the veracity of the story.

65.    Based on the foregoing, **DANCHENKO's** lies to the FBI denying that he had communicated with PR Executive-1 regarding information in the Company Reports were highly material.  Had **DANCHENKO** accurately disclosed to FBI agents that PR Executive-1 was a source for specific information in the aforementioned Company Reports regarding Campaign Manager-1's departure from the Trump campaign, *see* Paragraphs 45-57, *supra*, the FBI might have taken further investigative steps to, among other things, interview PR Executive-1 about (i) the June 2016 Planning Trip, (ii) whether PR Executive-1 spoke with **DANCHENKO** about Trump's stay and alleged activity in the Presidential Suite of the Moscow Hotel, and (iii) PR Executive-1's interactions with General Manager-1 and other Moscow Hotel staff.  In sum, given that PR Executive-1 was present at places and events where **DANCHENKO** collected information for the Company Reports, **DANCHENKO's** subsequent lie about PR Executive-1's connection to the Company Reports was highly material to the FBI's investigation of these matters.

B.  DANCHENKO's Allegations Regarding Russian Diplomat-1

66.    Another allegation in the Company Reports that demonstrated the materiality of **DANCHENKO's** lies regarding PR Executive-1 was dated September 14, 2016 and claimed that the Russian government withdrew Russian Diplomat-1 from his job at the Russian Embassy in

21

Washington, D.C. due to fears relating to the diplomat's purported role in meddling in the U.S.

presidential election.   Specifically, the allegation in the Company Report stated:

> [S]peaking [] to [a] compatriot, a senior Russian [Ministry of Foreign Affairs] official reported that as a prophylactic measure, a leading Russia diplomat, **[Russian Diplomat-1], had been withdrawn from Washington on short notice because Moscow feared his heavy involvement in the US presidential election operation,** including the so-called veterans' pensions ruse (reported previously), would be exposed in the media there. **His replacement, [Russian Diplomat-2] however was clean in this regard.**

*PR Executive-1 Receives Information Regarding Russian Diplomat-1*

67.    This allegation – like the allegation concerning the Presidential Suite of the

Moscow Hotel – bore substantial similarities to information that PR Executive-1 received during

the 2016 time period.

68.    For example, and as discussed above, in or about May, August, and September

2016, and in preparation for the October Conference, PR Executive-1 and Organizer-1 had

attended meetings with staff of the Russian Embassy in Washington, D.C., including Russian

Diplomat-1. **DANCHENKO** was not present at these meetings.

69.    After one of these meetings on or about May 31, 2016, a member of the Russian

Embassy staff informed PR Executive-1 and Organizer-1 in an email that Russian Diplomat-1

would be recalled back to Russia in September 2016 and replaced by Russian Diplomat-2.

**DANCHENKO** was not a recipient of this email.

70.    On or about August 2, 2016, PR Executive-1 and Organizer-1 attended another

meeting with Russian Diplomat-1 at the Russian Embassy in Washington, D.C. **DANCHENKO**

was not present at this meeting.

71.    On or about August 19, 2016, Russian Diplomat-1 sent an email to PR Executive-

1 and others.  The email stated, in substance and part, that Russian Diplomat-1 was returning to

Russia and was being replaced by Russian Diplomat-2. Russian Diplomat-1 further stated: "[Russian Diplomat-2] **is a talented diplomat and economist with impressive experience in American studies**." (emphasis added).

72. On or about September 13, 2016 – the day prior to the date of the Company Report containing the allegation regarding Russian Diplomat-1 – PR Executive-1 called **DANCHENKO**. At the time of the call, **DANCHENKO** was in Russia.

*DANCHENKO's Statements to the FBI Regarding Russian Diplomat-1*

73. When interviewed separately by the FBI in or about 2017, **DANCHENKO** and U.K. Person-1 provided differing information about the purported source(s) of these allegations regarding Russian Diplomat-1:

a. In particular, on or about January 25, 2017, **DANCHENKO** stated to FBI agents that he learned of the information about Russian Diplomat-1's departure from Russian Diplomat-1 himself while Russian Diplomat-1 was helping **DANCHENKO** obtain a new Russian passport. **DANCHENKO** further stated that Russian Diplomat-1 described his replacement, Russian Diplomat-2, as a **"bright young guy"** – similar to the statement contained in the aforementioned August 2016 email from Russian Diplomat-1 to PR Executive-1. **DANCHENKO** also stated to the FBI that his conversation with Russian Diplomat-1 occurred in late spring 2016 – in or around the same time that PR Executive-1 and Organizer-1 first learned of Russian Diplomat-1's impending return to Russia. **DANCHENKO** denied speaking with Russian Diplomat-1 at the October Conference in Moscow.

74. However, when interviewed by the FBI on or about September 18 and 19, 2017, U.K. Person-1 stated that **DANCHENKO** learned of the aforementioned allegation in Moscow

after bumping into Russian Diplomat-1 on the street in August 2016. In fact, **DANCHENKO** was located in the United States in August 2016.

75.    Based on the foregoing, **DANCHENKO's** lies to the FBI denying that he had communicated with PR Executive-1 regarding information in the Company Reports were highly material. Had **DANCHENKO** accurately disclosed to FBI agents that PR Executive-1 was a source for specific information in the Company Reports regarding Campaign Manager-1's departure from the Trump campaign, *see* Paragraphs 45-57, *supra*, the FBI might also have taken further investigative steps to, among other things, interview PR Executive-1 regarding his potential knowledge of Russian Diplomat-1's departure from the United States. Such investigative steps might have assisted the FBI in resolving the above-described discrepancy between **DANCHENKO** and U.K. Person-1 regarding the sourcing of the allegation concerning Russian Diplomat-1.

C.    DANCHENKO's Allegation Regarding Russian Chief of Staff-1

76.    A final allegation in a Company Report that demonstrated the materiality of **DANCHENKO's** false statements denying PR Executive-1's role as a source for information in the Company Reports was dated September 14, 2016, and contained information related to the firing of the chief of staff of the Russian Presidential Administration ("Russian Chief of Staff-1"). The allegation stated:

> PUTIN had been receiving conflicting advice on interfering from three separate and expert groups. On one side had been the Russian ambassador to the US, [Russian Ambassador-1], and the Ministry of Foreign Affairs, together with an independent and informal network run by presidential foreign policy advisor, [Former Russian Ambassador to the U.S.] who had urged caution and the potential negative impact on Russia from the operation/s. On the other side was former [Russian Chief of Staff-1], backed by Russian Foreign Intelligence (SVR), who had advised PUTIN that the pro-TRUMP, anti-CLINTON operation/s would be both effective and plausibly

deniable with little blowback. **The first group/s had been proven right and this had been the catalyst in PUTIN's decision to sack [Russian Chief of Staff-1] (unexpectedly) as PA Head in August. His successor, [name of Russian Official], had been selected for the job partly because he had not been involved in the US presidential election operation/s.**

(emphasis added) (capitalization in original).

*PR Executive-1 Receives Information Regarding Chief of Staff-1*

77.    This allegation coincided with information that PR Executive-1 had received regarding changes in the Russian Presidential Administration in the weeks prior to the issuance of the Company Report.

78.    In particular, on or about August 12, 2016, the same day that Russian Chief of Staff-1 was reportedly fired, Russian Sub-Source-1 sent a message to PR Executive-1 on social media and stated, "Russian presidential administration is making significant changes right now." **DANCHENKO** was not copied on this message.

79.    Minutes later, PR Executive-1 and Russian Sub-Source-1 spoke for approximately 10 minutes.

80.    On or about September 13, 2016 – the day prior to the date of the Company Report containing the allegation regarding Russian Chief of Staff-1 – PR Executive-1 called **DANCHENKO**.   At the time of the call, **DANCHENKO** was in Russia.

*DANCHENKO's Statements to the FBI Regarding Chief of Staff-1*

81.    In the aforementioned January 25, 2017 interview, the FBI asked **DANCHENKO** about the sourcing of this allegation.  **DANCHENKO** stated to the FBI that he learned about the allegation involving Russian Chief of Staff-1 from Russian Sub-Source-1 and "two other friends." **DANCHENKO** did not identify the two other "friends," nor did he mention PR Executive-1 in connection with the allegation.

25

82. Based on the foregoing, **DANCHENKO's** lie to the FBI about PR Executive-1 not providing information contained in the Company Reports was highly material. Had **DANCHENKO** accurately disclosed to FBI agents that PR Executive-1 was a source for specific information in the aforementioned Company Reports regarding Campaign Manager-1's departure from the Trump campaign, *see* Paragraphs 45-57, *supra*, the FBI might have taken further investigative steps to, among other things, interview PR Executive-1 regarding his potential knowledge of additional allegations in the Company Reports regarding Russian Chief of Staff-1. Such investigative steps might have, among other things, assisted the FBI in determining whether PR Executive-1 was one of **DANCHENKO's** "other friends" who provided the aforementioned information regarding Putin's firing of Russian Chief of Staff-1.

IV.  DANCHENKO's False Statement Regarding Disclosure of
his Relationship with U.K. Person-1 and U.K. Investigative Firm-1

83. In another interview conducted by the FBI on or about January 24, 2017 in the District of Columbia, **DANCHENKO** made another intentionally false statement that involved his activities with PR Executive-1, among others. In particular, the FBI questioned **DANCHENKO** during this interview about, among other things, his relationship with U.K. Person-1 and U.K. Investigative Firm-1. FBI agents asked **DANCHENKO** whether his friends, associates, and/or sub-sources were aware that he (**DANCHENKO**) worked for U.K. Person-1 and U.K. Investigative Firm-1.

84. In response, **DANCHENKO** falsely stated, in sum and substance, that while certain friends were aware that **DANCHENKO** worked generally in due diligence and business intelligence, **DANCHENKO** never mentioned that he worked for U.K. Person-1 or U.K. Investigative Firm-1 to his friends or associates. **DANCHENKO** further stated, "you [the FBI] are the first people" he had told. **DANCHENKO** added that the reason he never told associates

26

about his relationship with U.K. Person-1 and U.K. Investigative Firm-1 was the existence of a

non-disclosure agreement he signed with U.K. Person-1 and U.K. Investigative Firm-1.

85.    **DANCHENKO's** statements asserting that he had not informed friends and

associates of his relationship with U.K. Person-1 and the U.K. Investigative Firm were knowingly

and intentionally false.  On numerous occasions, and as **DANCHENKO** well knew, he had

informed PR Executive-1, Russian Sub-Source-1, and others about his relationship with U.K.

Person-1 and U.K. Investigative Firm-1.  For example, and as alleged above, **DANCHENKO**

attempted to broker business between PR Executive-1 and U.K. Person-1 as early as in or about

April 2016. *See* Paragraphs 23-25, *supra.*  Moreover, in the context of these efforts and afterwards,

PR Executive-1 exhibited specific awareness of **DANCHENKO's** relationships with U.K. Person-

1 and U.K. Investigative Firm-1.  For example, on or about June 10, 2016, PR Executive-1, while

in Country-1 with Russian Sub-Source-1, emailed a U.S.-based acquaintance regarding efforts to

assist **DANCHENKO** in obtaining a U.S. visa:

> Monday night I fly to Moscow and will meet with a Russian guy
> who is working with me on a couple of projects.  He also **works for
> a group of former [allied foreign intelligence service] guys in
> London who do intelligence for business** . . . . [H]e owes me as his
> Visa is being held up and I am having a word with the Ambassador.

(emphasis added).

86.    Approximately seven months later, on or about January 13, 2017, PR Executive-1

replied to an email sent by a U.S.-based person discussing a recent news article regarding the

Company Reports, including the allegations concerning Business-1.  In the email, PR Executive-

1 again demonstrated his knowledge of **DANCHENKO's** relationship with U.K. Investigative

Firm-1 and the Company Reports:

> [] I've been interviewed by the Washington Post and the London
> Times – three times over the last two days over the **[Foreign**

> **Intelligence Service-1] Dossier on Trump and I know the
> Russian agent who made the report (He used to work for me).**
> My client in [Country-1] [Business-1] has been accused of being the
> party that organized the hacking. Presently speaking with the
> barrister in London who is filing a brief against **Former British
> [Government Employee] [U.K. Person-1] has been unmasked** as
> <u>the man behind an explosive</u> dossier about <u>US president-elect
> Donald Trump.</u> Also in conversation with former British
> Ambassador who knows [U.K. Person-1]. Quite right – Oh what a
> boring life.

(bold emphasis added) (underline in original).

87. At this time, **DANCHENKO** was not publicly known to be a source for U.K.

Person-1.

88. Further demonstrating the falsity of **DANCHENKO's** statements to the FBI,

**DANCHENKO's** email and social media communications reflect that he also previously had

disclosed his relationship with U.K. Investigative Firm-1 to at least five other individuals,

including Russian Sub-Source-1 and acquaintances based in the United States, the United

Kingdom, and Russia. For example, on or about July 28, 2016, **DANCHENKO** sent a message

to an acquaintance and stated "Thanks to my reporting in the past 36 hours, [U.K. Person-1] and

[U.K. Investigative Firm-1 Employee] are flying in tomorrow for a few days so I might be busy .

. . ." In addition, on or about September 18, 2016, **DANCHENKO** sent a message to the same

acquaintance stating that **DANCHENKO** had "[w]ork to do for [U.K. Person-1] who's probably

coming to DC on Wednesday." U.K. Person-1 did, in fact, travel to Washington. D.C. on or about

September 21, 2016.

89. Accordingly, **DANCHENKO's** January 24, 2017 statements (i) that he never

mentioned U.K. Person-1 or U.K. Investigative Firm-1 to his friends or associates and (ii) that

"you [the FBI] are the first people he's told," were knowingly and intentionally false. In truth and

in fact, and as **DANCHENKO** well knew, **DANCHENKO** had informed a number of individuals

about his relationship with U.K. Person-1 and U.K. Investigative Firm-1. Such lies were material

to the FBI's ongoing investigation because, among other reasons, it was important for the FBI to

understand how discreet or open **DANCHENKO** had been with his friends and associates about

his status as an employee of U.K. Investigative Firm-1, since his practices in this regard could, in

turn, affect the likelihood that other individuals – including hostile foreign intelligence services –

would learn of and attempt to influence **DANCHENKO's** reporting for U.K. Investigative Firm-

1.

V.  DANCHENKO's False Statements Regarding
    Allegations Sourced to Chamber President-1

90.    In addition to making the aforementioned intentionally false statements to the FBI

during the Interviews, **DANCHENKO** also lied to the FBI regarding a call that he purportedly

received from someone he claimed to believe was Chamber President-1 (referenced in Paragraphs

42-43, *supra*) in or about July of 2016.  Information that **DANCHENKO** attributed to that

purported call served as a basis for allegations that appeared in the Company Reports.

91.    In particular, an allegation contained in an undated Company Report described a

"well-developed conspiracy of cooperation" between Donald Trump, the Trump Campaign, and

senior Russian officials.  This allegation would ultimately underpin the four FISA applications

targeting Advisor-1.  Specifically, the allegation stated:

> Speaking in confidence to a compatriot **in late July 2016, Source
> E, an ethnic Russian close associate of Republican US
> presidential candidate Donald TRUMP,** admitted that there was a
> well-developed conspiracy of co-operation between them and the
> Russian leadership. This was managed on the TRUMP side by the
> Republican candidate's campaign manager, [Campaign Manager-
> 1], who was using foreign policy advisor, [Advisor-1], and others as
> intermediaries. The two sides had a mutual interest in defeating
> Democratic presidential candidate Hillary CLINTON, whom
> President PUTIN apparently both hated and feared. (capitalization
> in original).

(emphasis added). An additional allegation contained in this same Company Report indicated that Russian diplomatic staff in Washington, D.C., New York, and Miami were paying U.S.-based cyber actors to conduct operations against the Democratic Party and Hillary Clinton.

A. <u>DANCHENKO's Alleged Phone Call with Chamber President-1</u>

92.     During several interviews, including on or about March 16, 2017, May 18, 2017, October 24, 2017, and November 2, 2017, **DANCHENKO** informed the FBI that he believed "Source E" in the above-referenced allegations referred, at least in part, to Chamber President-1.

93.     As described in further detail below, **DANCHENKO** falsely stated to the FBI during the Interviews that in or around the summer of 2016, he received a phone call from an anonymous Russian male who did not identify himself to **DANCHENKO** but who **DANCHENKO** claimed to believe was Chamber President-1.

B. DANCHENKO's False Statement Regarding
   <u>his Alleged Phone Call with Chamber President-1</u>

94.     On or about January 24, 2017 and January 25, 2017, the FBI interviewed **DANCHENKO** at an FBI office in Washington, D.C. about, among other things, his relationship with Chamber President-1. During this interview, **DANCHENKO** falsely stated that, in or around July 2016, he received a phone call from an unidentified individual who he believed to be Chamber President-1.

95.     In particular, **DANCHENKO** stated, in part:

a.     In or about June or July 2016, **DANCHENKO** communicated with a U.S.-based Russian journalist ("Russian Journalist-1") who worked for a Russian state-run media outlet ("Russian Media Company-1") about reaching out to Chamber President-1. Russian Journalist-1 indicated that his colleague ("Russian Journalist-2") had a relationship with Chamber President-1.

30

b. Thereafter, **DANCHENKO** reached out to Chamber President-1 via email twice.

c. In or about July 2016, **DANCHENKO** received a call from an unidentified Russian male who **DANCHENKO** believed – and claimed to still believe at the time of the Interviews – to be Chamber President-1.

d. **DANCHENKO** and the anonymous caller he believed to be Chamber President-1 spoke for approximately 10 to 15 minutes, during which **DANCHENKO** mentioned Advisor-1 and Campaign Manager-1. On the same call, the anonymous caller stated, among other things, that there was communication between the Trump campaign and Russian officials, but that there was "nothing bad about it." **DANCHENKO** claimed that the anonymous caller also indicated on the call that the Kremlin might be of help to get Trump elected.

e. **DANCHENKO** claimed that, on the call, he and the anonymous caller he believed to be Chamber President-1 made arrangements to meet in New York.

96. When interviewed by the FBI on or about September 18 and 19, 2017, U.K. Person-1 contradicted **DANCHENKO's** account. In particular, U.K. Person-1 stated that **DANCHENKO** had met in-person with Chamber President-1 on two or three separate occasions – at least once in New York City and perhaps once in Charleston, South Carolina.

97. U.K. Person-1 further stated that **DANCHENKO** sourced the aforementioned allegation regarding Trump's purported salacious sexual activity, in part, to Chamber President-1. Specifically, U.K. Person-1 stated that "Source D" in the Company Report dated June 20, 2016 was Chamber President-1.

98. **DANCHENKO's** January 24, 2017 and January 25, 2017 statements claiming that he spoke with an individual that he believed to be Chamber President-1 and arranged to meet him in New York, were knowingly and intentionally false. In truth and in fact, and as reflected in

31

contemporaneous communications, **DANCHENKO** did not receive such a call from Chamber President-1, and did not agree to meet Chamber President-1 in New York. In particular, the above-referenced statements were knowingly and intentionally false for the following reasons, among others:

a. On or about July 21, 2016 – the same time period as the purported "late July" information referenced in the aforementioned, undated Company Report – **DANCHENKO** emailed Chamber President-1, stating, in part:

> Colleagues from [Russian Media Company-1] gave me your contact information. You spoke to [Russian Journalist-2] about Donald Trump and his trips to Russia. I wanted to ask you: what projects was he looking into or were these just image-building trips for beauty contests? There has been a lot of speculation for months now on this topic. It would be interesting to chat about this topic. The question is from a construction company from Switzerland. I think a political component exists, but it can be counterbalanced. Russian-Chinese cooperation is also of great interest, the sanctions aspect included. There are projects in Russia which are looking for investors and equipment suppliers. Like many others in Russia, they are looking at Asia – China and Hong Kong – but they don't know how to approach. It's confidential of course – I don't have any relationship to the media, though of course I do have acquaintances here. In any case, it would be interesting if and when possible to chat with you by phone or meet for coffee/beer in Washington or in New York where I will be next week. I myself am in Washington. It is also possible by e-mail in Russian or in English. I sent you a request to LinkedIn – there my work is clearer.

b. From on about July 26, 2016 through July 28, 2016, **DANCHENKO** traveled to New York with a family member. On or about July 28, 2016, **DANCHENKO** visited, among other places, the Bronx Zoo with the family member. During this trip, **DANCHENKO** did not meet or communicate with Chamber President-1.

32

    c. Also on or about July 28, 2016, **DANCHENKO** messaged an acquaintance the following: "Another meeting tonight. Thanks to my reporting in the past 36 hours, [U.K. Person-1] and [U.K. Investigative Firm Employee] are flying in tomorrow [i.e., July 29, 2016] for a few days so I might be busy – don't know when but in Downtown D.C."

    d. On or about August 18, 2016 – more than two weeks *after* **DANCHENKO** purportedly received the aforementioned anonymous call and allegedly agreed to meet with Chamber President-1 in New York – **DANCHENKO** emailed Chamber President-1 and stated, in part: "Hello [Chamber President-1], I wrote to you a few weeks ago. We are contacts on Linkedin." **DANCHENKO** then described to Chamber President-1 a potential real estate investment in Russia. **DANCHENKO** continued: "If there is opportunity and interest, let's meet and chat about this and other projects . . . . Write, call. My contact information is below."

    e. **DANCHENKO's** August 18, 2016 email to Chamber President-1 – which post-dated the purported "late July" information from the aforementioned Company Report – reflected that **DANCHENKO** had not, in fact, spoken with Chamber President-1 in "late July." Specifically, **DANCHENKO's** email did not mention a possible call from Chamber President-1 in or about late July, did not discuss plans to meet in New York, did not ask why Chamber President-1 did not show up to the alleged meeting in New York, and did not refer to any other exchanges or interactions between **DANCHENKO** and Chamber President-1. Rather, and as **DANCHENKO's** email made clear, **DANCHENKO** had not received any response from Chamber President-1 ("I wrote you several weeks ago"), and was still hoping to arrange an in-person meeting ("If there is opportunity and interest, let's meet and chat[.]").

f. Moreover, in a message dated on or about August 24, 2016 – which **DANCHENKO** provided to the FBI – **DANCHENKO** emailed Russian Journalist-2 and stated, in part:

> Good Afternoon, [first name of Russian Journalist-2],
>
> [Russian Journalist-1] recommended that I get in touch with [Chamber President-1]. I've read your interviews with him. **But for some reason [Chamber President-1] doesn't respond.** I already both asked him about TRUMP (capitalization in original) and also proposed a project in Russia. What is your relationship with him like? **Would you be able to ask him to reply to me? I could call or write on LinkedIn, but until he responds I would not like to pester him.**

(emphasis added). This August 24, 2016 email to Russian Journalist-2 again reflected that **DANCHENKO** had not, in fact, spoken with Chamber President-1 in "late July." Specifically, **DANCHENKO's** email did not mention a possible call from Chamber President-1, did not discuss plans to meet in New York with Chamber President-1, and did not inform Russian Journalist-2 that Chamber President-1 did not show up to the alleged meeting in New York.

g. Chamber President-1 has claimed in public statements and on social media that he never responded to **DANCHEKNO's** emails, and that he and **DANCHENKO** never met or communicated.

99. On or about March 16, May 18, October 24, and November 16, 2017, the FBI conducted additional interviews of **DANCHENKO** in the Eastern District of Virginia. In these Interviews, **DANCHENKO** repeated, in substance, his prior false statements regarding a purported anonymous call and a planned meeting in New York. In particular:

a. In the March 16, 2017 interview, which the FBI recorded without **DANCHENKO's** knowledge, **DANCHENKO** confirmed, in substance, his claim that he had received an anonymous call from someone he believed was "probably" Chamber President-1,

34

stating, in part, "I have to talk to guys with [Russian Media Company-1] . . . [a]nd see what what's he really about . . . [w]hether he was the person who contacted me[,] [w]here he is now and **and I probably spoke** with him, but I don't know.  Anyway.  Strange character." (emphasis added)

    b.  In the interview conducted on or about May 18, 2017, which the FBI also recorded without **DANCHENKO's** knowledge, **DANCHENKO** repeated, in substance, the same claim. Specifically, an FBI agent reminded **DANCHENKO** that he had previously told the FBI that he "got the call from the guy up in uh, New York [] [t]hat you thought was [Chamber President-1]," to which **DANCHENKO** responded, "yes."  Thereafter, **DANCHENKO** stated, in part, "I'm not sure if I, he called, but . . . I just don't remember.  But I, I was at the time **I was under the impression it was him,** because I talked to [] [Russian Media Company-1] [t]o [Russian Journalist-2]. . . and **I assumed it would have been him** . . . He never showed up.  He never showed up in New York." (emphasis added).

    c.  In a subsequent interview with the FBI on or about October 24, 2017, **DANCHENKO** denied meeting in-person with Chamber President-1 in New York and Charleston, South Carolina (which, as noted above, is what U.K. Person-1 told the FBI had occurred).

    d.  In that same interview, **DANCHENKO** stated, "**I believe I spoke to [Chamber President-1] on the phone a couple of times,** at least someone who I thought was him," thus confirming his earlier false assertions regarding an anonymous call and contradicting his earlier statements that he had only spoken to the person he believed to be Chamber President-1 on one occasion. (emphasis added).

    e.  During the same interview, **DANCHENKO** also told FBI agents that "I scheduled a meet time and place in New York [and] [Chamber President-1] never showed."

100.    In a subsequent November 16, 2017 interview, **DANCHENKO** repeated his false claims to the FBI regarding Chamber President-1. Specifically, **DANCHENKO** stated, in substance and in part, the following:

a.    U.K. Person-1 believed that **DANCHENKO** had direct contact (*i.e.*, meetings) with Chamber President-1, and **DANCHENKO** never corrected U.K. Person-1 about that erroneous belief.

b.    **DANCHENKO** received a phone call from an individual who **DANCHENKO** believed to be Chamber President-1. **DANCHENKO** based this belief on the fact that he (**DANCHENKO**) had listened to online videos of Chamber President-1 speaking, and the individual on the call "sounded like" the same person. The call lasted approximately 15 minutes.

c.    **DANCHENKO** and the person he purportedly believed to be Chamber President-1 attempted to meet face-to-face in a midtown bar in New York City. Chamber President-1 never showed up for the meeting.

VI.    The Materiality of DANCHENKO's Lies Regarding Chamber President-1

101.    Based on the foregoing, **DANCHENKO's** lies to the FBI claiming to have received a late July 2016 anonymous phone call from an individual that **DANCHENKO** believed to be Chamber President-1 were highly material to the FBI because, among other reasons, the allegations sourced to Chamber President-1 by **DANCHENKO** formed the basis of a Company Report that, in turn, underpinned the aforementioned four FISA applications targeting a U.S. citizen (Advisor-1). Indeed, the allegations sourced to Chamber President-1 played a key role in the FBI's investigative decisions and in sworn representations that the FBI made to the Foreign Intelligence Surveillance Court throughout the relevant time period. Further, at all times relevant to this

Indictment, the FBI continued its attempts to analyze, vet, and corroborate the information in the Company Reports.

## COUNT ONE

102.    Paragraphs 1 to 101 are incorporated by reference.

103.    On or about June 15, 2017, within the Eastern District of Virginia, **IGOR DANCHENKO**, the defendant, did willfully and knowingly make a materially false, fictitious, and fraudulent statement or representation in a matter before the jurisdiction of the executive branch of the Government of the United States, to wit, on or about June 15, 2017, the defendant denied to agents of the FBI that he had spoken with PR Executive-1 about any material contained in the Company Reports, when in truth and in fact, and as the defendant well knew, PR Executive-1 was the source for an allegation contained in a Company Report dated August 22, 2016 and was otherwise involved in the events and information described in the reports.

(In violation of Title 18, United States Code, Sections 1001(a)(2))

## COUNT TWO

104.    Paragraphs 1 to 101 are incorporated by reference.

105.    On or about March 16, 2017, within the Eastern District of Virginia, **IGOR DANCHENKO**, the defendant, did willfully and knowingly make a materially false, fictitious, and fraudulent statement or representation in a matter before the jurisdiction of the executive branch of the Government of the United States, to wit, on or about March 16, 2017, the defendant stated to agents of the FBI that he received a late July 2016 telephone call from an individual who **DANCHENKO** believed was "probably" Chamber President-1, when in truth and in fact, and as the defendant well knew, Chamber President-1 never called **DANCHENKO**.

(In violation of Title 18, United States Code, Sections 1001(a)(2))

37

## COUNT THREE

106.    Paragraphs 1 to 101 are incorporated by reference.

107.    On or about May 18, 2017, within the Eastern District of Virginia, **IGOR DANCHENKO**, the defendant, did willfully and knowingly make a materially false, fictitious, and fraudulent statement or representation in a matter before the jurisdiction of the executive branch of the Government of the United States, to wit, on or about May 18, 2017, the defendant stated to agents of the FBI that he "was under the impression" that a late July 2016 telephone call that he received was from Chamber President-1, when in truth and in fact, and as the defendant well knew, Chamber President-1 never called **DANCHENKO**.

(In violation of Title 18, United States Code, Sections 1001(a)(2))

## COUNT FOUR

108.    Paragraphs 1 to 101 are incorporated by reference.

109.    On or about October 24, 2017, within the Eastern District of Virginia, **IGOR DANCHENKO**, the defendant, did willfully and knowingly make a materially false, fictitious, and fraudulent statement or representation in a matter before the jurisdiction of the executive branch of the Government of the United States, to wit, on or about October 24, 2017, the defendant stated to agents of the FBI that he believed that he spoke to Chamber President-1 on the telephone on more than one occasion, when in truth and in fact, and as the defendant well knew, **DANCHENKO** never spoke to Chamber President-1.

(In violation of Title 18, United States Code, Sections 1001(a)(2))

38

## COUNT FIVE

110.    Paragraphs 1 to 101 are incorporated by reference.

111.    On or about November 16, 2017, within the Eastern District of Virginia, **IGOR DANCHENKO**, the defendant, did willfully and knowingly make a materially false, fictitious, and fraudulent statement or representation in a matter before the jurisdiction of the executive branch of the Government of the United States, to wit, on or about November 16, 2017, the defendant stated to agents of the FBI that he believed that he had spoken to Chamber President-1 on the telephone, when in truth and in fact, and as the defendant well knew, **DANCHENKO** never spoke to Chamber President-1.

(In violation of Title 18, United States Code, Sections 1001(a)(2))

JOHN H. DURHAM
Special Counsel
U.S. Department of Justice

A TRUE BILL:
Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

_____
Foreperson
Date: November 3, 2021

# 165

[Jake Sullivan] Motion to Dismiss under Rule 12(b)(6) and
Memorandum of Law in Support (May 25, 2022)

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

DONALD J. TRUMP,

                    Plaintiff,

      v.

HILLARY R. CLINTON, et al.,

                    Defendants.

Case No. 2:22-cv-14102-DMM

## MOTION TO DISMISS UNDER RULE 12(B)(6) AND
## MEMORANDUM OF LAW IN SUPPORT

**WILKINSON STEKLOFF LLP**

Brian L. Stekloff*
Sarah E. Neuman*

2001 M Street, NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000
bstekloff@wilkinsonstekloff.com
sneuman@wilkinsonstekloff.com

    *Appearance *pro hac vice*

**BARZEE FLORES**

William R. Barzee (Florida Bar No. 158720)

Courthouse Center, Penthouse One
40 NW Third Street
Miami, FL 33128
Tel: (305) 374–3998
williambarzee@barzeeflores.com

*Counsel for Defendant Jake Sullivan*

## TABLE OF CONTENTS

ARGUMENT ..................................................................................................... 1

    I.    Count II, Count III, Count IV, and Count VI Are Incurably Time-Barred
        And Must Be Dismissed ................................................................................ 1

    II.    Count II Must Be Dismissed. ........................................................................ 2

        A.    Count II Is Incurably Time-Barred. ..................................................... 2

        B.    Plaintiff Fails To Plead Numerous Elements Of Count II. ...................... 3

    III.    Count III Must Be Dismissed. ...................................................................... 4

        A.    The Statute Of Limitations On Count III Ran Years Ago. ...................... 4

        B.    Plaintiff Fails To Plead Numerous Elements Of Count III. ..................... 4

        C.    Count III Is Barred By The First Amendment. ...................................... 5

    IV.    Count IV Must Be Dismissed. ...................................................................... 8

    V.    Count VI Must Be Dismissed. ...................................................................... 9

CONCLUSION ................................................................................................. 10

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*ADT LLC v. Vivint, Inc.*, No. 17-cv-80432,
  2017 WL 5640725 (S.D. Fla. Aug. 3, 2017)................................................. 4

*Alhassid v. Bank of Am., N.A.*,
  60 F. Supp. 3d 1302 (S.D. Fla. 2014) ..................................................... 8, 9

*Am. Dental Ass'n v. Cigna Corp.*,
  605 F.3d 1283 (11th Cir. 2010) ............................................................ 3

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................... 1, 8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................... 8

*Chaparro v. Carnival Corp.*,
  693 F.3d 1333 (11th Cir. 2012) .......................................................... 1, 5

*Donald J. Trump For President, Inc. v. N.Y. Times Co.*, No. 152099/2020,
  2021 WL 938979 (N.Y. Sup. Ct. Mar. 9, 2021) ........................................... 7

*Fortson, v. Colangelo*,
  434 F. Supp. 2d 1369 (S.D. Fla. 2006) ..................................................... 7

*From v. Tallahassee Democrat, Inc.*,
  400 So. 2d 52 (Fla. Dist. Ct. App. 1981) .................................................. 6

*Ganske v. Mensch*,
  480 F. Supp. 3d 542 (S.D.N.Y. 2020)...................................................... 6

*Honig v. Kornfeld*,
  339 F. Supp. 3d 1323 (S.D. Fla. 2018) .................................................. 8, 9

*Jackson v. BellSouth Telecomms.*,
  372 F.3d 1250 (11th Cir. 2004) ........................................................... 3

*Jacoby v. Cable News Network, Inc.*, No. 21-12030,
  2021 WL 5858569 (11th Cir. Dec. 10, 2021) .............................................. 8

*Kanarick v. GE Credit Retail Bank Care Credit*, No. 13-cv-80039,
  2013 WL 12092479 (S.D. Fla. Sept. 6, 2013) ............................................. 4

*La Grasta v. First Union Sec., Inc.*,
  358 F.3d 840 (11th Cir. 2004) ........................................................... 2

*Lehman v. Lucom*,
  727 F.3d 1326 (11th Cir. 2013) .......................................................... 2

*Masson v. New Yorker Mag., Inc.*,
  501 U.S. 496 (1991)..................................................................... 8

Page(s)

<u>Cases cont'd</u>

*Miccosukee Tribe of Indians of Fla. v. Cypress,*
   814 F.3d 1202 (11th Cir. 2015) ............................................................... 1

*N.Y. Times Co. v. Sullivan,*
   376 U.S. 254 (1964) .................................................................................. 5

*Rinker v. Carnival Corp.,*
   753 F. Supp. 2d 1237 (S.D. Fla. 2010) .................................................... 9

*Scanz Techs., Inc. v. JewMon Enters., LLC,* No. 20-22957-CIV,
   2021 WL 65466 (S.D. Fla. Jan. 7, 2021) ................................................. 6

*Sream, Inc. v. PB Grocery, Inc.,*
   No. 16-cv-81584, 2017 WL 6409006 (S.D. Fla. Mar. 1, 2017) .............. 6

*U.S. ex rel. Osheroff v. Humana Inc.,*
   776 F.3d 805 (11th Cir. 2015) ................................................................. 6

*Viridis Corp. v. TCA Glob. Credit Master Fund, LP,*
   155 F. Supp. 3d 1344 (S.D. Fla. 2015) .................................................... 3

*Wardak v. Goolden,* No. 1:19-CV-21121-RAR,
   2020 WL 9718811 (S.D. Fla. May 22, 2020) .......................................... 7

<u>Rules</u>

Fed. R. Civ. P. 9(b) ........................................................................................ 1

Fed. R. Civ. P. 12(b)(6) .............................................................................. 1, 2

Fed. R. Evid. 201(b)(2) .................................................................................. 6

Defendant Jake Sullivan respectfully moves to dismiss the Complaint filed by Plaintiff Donald J. Trump ("Plaintiff"), ECF No. 1, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Even if Plaintiff's baseless allegations were accepted as true for purposes of this Motion (and they are not), they are insufficient to make out any of the four Counts in which Mr. Sullivan is named.[1]  Because Plaintiff has not come close to establishing "more than a sheer possibility" of unlawful conduct, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), the claims against Mr. Sullivan should be dismissed in their entirety with prejudice.

## ARGUMENT

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (*per curiam*) (internal quotation marks and citation omitted).  "A complaint that provides labels and conclusions or a formulaic recitation of the elements of a cause of action is not adequate." *Id.* (internal quotation marks and citation omitted). Further, Rule 9(b)'s heightened pleading standard applies given the Complaint's allegations about a fraudulent scheme, and Plaintiff "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see also Miccosukee Tribe of Indians of Fla. v. Cypress*, 814 F.3d 1202, 1212 (11th Cir. 2015).

### I. Count II, Count III, Count IV, and Count VI Are Incurably Time-Barred And Must Be Dismissed.

All claims in which Mr. Sullivan is named—Count II (RICO Conspiracy); Count III (Injurious Falsehood); Count IV (Conspiracy to Commit Injurious Falsehood); and Count VI

---

[1] Mr. Sullivan is named in Count II (RICO Conspiracy); Count III (Injurious Falsehood); Count IV (Conspiracy to Commit Injurious Falsehood); and Count VI (Conspiracy to Commit Malicious Prosecution).

(Conspiracy to Commit Malicious Prosecution)—must be dismissed because they are incurably time-barred on the face of the Complaint.

"[A] Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate . . . if it is apparent from the face of the complaint that the claim is time-barred." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845–46 (11th Cir. 2004). Mr. Sullivan joins in, adopts, and incorporates arguments by other Defendants as to why the Counts in which Mr. Sullivan is named are incurably time-barred. *See* Clinton Mot., ECF No. 52 at 1–4; Podesta Mot., ECF No. 124 at 1–3; DNC Mot., ECF No. 141 at 2–4; Perkins Coie Mot., ECF No. 143 at 2; Mook Mot., ECF No. 145 at 2; Elias Mot., ECF No. 147 at 4–5. Mr. Sullivan also demonstrates below why the injurious falsehood claim predicated on a particular statement attributed to Mr. Sullivan is barred by the applicable statute of limitations.

## II. Count II Must Be Dismissed.

Count II should be dismissed because it is time-barred and because Plaintiff fails to allege various elements of the alleged RICO conspiracy.

### A. Count II Is Incurably Time-Barred.

Count II—Plaintiff's RICO conspiracy claim—must be dismissed because it is incurably time-barred on the face of the Complaint. The statute of limitations for a RICO conspiracy is four years and runs from the date the injury was or should have been discovered. *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013). As explained in Secretary Clinton's Motion, Plaintiff's own public statements make clear that he was aware of Defendants' alleged conspiracy to "weave a false narrative" that Plaintiff was colluding with Russia, Compl. ¶ 1, as of no later than October 29, 2017. Clinton Mot., ECF No. 52 at 1–3. The statute of limitations for Count II thus ran no later than October 29, 2021.

**B.  Plaintiff Fails To Plead Numerous Elements Of Count II.**

In addition to being time-barred, Plaintiff's RICO conspiracy claim against Mr. Sullivan should be dismissed because Plaintiff fails to adequately plead numerous elements of the underlying RICO claim, and the Complaint lacks sufficient allegations that Mr. Sullivan entered an agreement with other Defendants to commit a RICO conspiracy.

As set out in more detail in Secretary Clinton's Motion, Plaintiff's substantive RICO claim fails because the Complaint does not properly plead a cognizable RICO enterprise, predicate acts, a pattern of racketeering activity, or the basic elements of RICO standing.  *Id.* at 6–14.  Because the substantive RICO offense is inadequately pleaded, the RICO conspiracy claim also necessarily fails.  *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1269 (11th Cir. 2004); *see also* Mook Mot., ECF No. 145 at 3.  Mr. Sullivan joins in and incorporates Secretary Clinton's arguments demonstrating additional fatal flaws in Plaintiff's RICO conspiracy claim.  Clinton Mot., ECF No. 52 at 14–15.

Count II is further defective as to Mr. Sullivan because Plaintiff fails to allege that Mr. Sullivan agreed to "the overall objective of the conspiracy" or "to commit two predicate acts." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293 (11th Cir. 2010).  The Complaint alleges generally and vaguely that Mr. Sullivan and other Defendants conspired to injure Plaintiff's political career and to impede his ability to govern.  *See* Compl. ¶ 319.  But Plaintiff offers no factual allegations to substantiate the alleged conspiracy or Mr. Sullivan's agreement to participate in it.  This "glaring deficiency" dooms Plaintiff's RICO conspiracy claim as to Mr. Sullivan. *Viridis Corp. v. TCA Glob. Credit Master Fund, LP*, 155 F. Supp. 3d 1344, 1366 (S.D. Fla. 2015).

For each of these reasons, the RICO conspiracy claim must be dismissed.

### III. Count III Must Be Dismissed.

Count III—Plaintiff's injurious falsehood claim—fails at the threshold because it is time-barred on the face of the Complaint.  In addition, Count III must be dismissed due to a slew of pleading deficiencies and because it is barred by the First Amendment.

#### A. The Statute Of Limitations On Count III Ran Years Ago.

Under Florida law, the statute of limitations for Plaintiff's injurious falsehood claim is two years from publication.  *ADT LLC v. Vivint, Inc.*, No. 17-cv-80432, 2017 WL 5640725, at *6 & n.8 (S.D. Fla. Aug. 3, 2017) (Middlebrooks, J.).[2]  The alleged falsehood Mr. Sullivan is accused of propagating is an October 31, 2016 campaign statement commenting on an article in *Slate* discussing Plaintiff's ties to Russia.  Compl. ¶¶ 185–86, 332.  Accordingly, the injurious falsehood claim based on this statement ran on October 31, 2018.

#### B. Plaintiff Fails To Plead Numerous Elements Of Count III.

In addition to being time-barred, Count III must be dismissed on account of various pleading deficiencies.  To state a claim for injurious falsehood, Plaintiff must allege "(1) a falsehood; (2) published or communicated to a third party; (3) the Defendant kn[e]w that the falsehood would likely induce others not to deal with the Plaintiff; (4) the falsehood did play a material and substantial part in inducing others not to deal with the Plaintiff; and (5) special damages."  *Kanarick v. GE Credit Retail Bank Care Credit*, No. 13-cv-80039, 2013 WL 12092479, at *4 (S.D. Fla. Sept. 6, 2013) (Middlebrooks, J.).  The "gist" of an injurious falsehood claim is a defendant's "intentional interference with another's *economic* relations."  *Id.* (emphasis added).  Plaintiff's claim for injurious falsehood stumbles at every turn.

---

[2] For purposes of this motion, Mr. Sullivan assumes that Florida law governs Plaintiff's common law claims.

As noted, Plaintiff's injurious falsehood claim against Mr. Sullivan is predicated on a campaign statement issued in October 2016 about reported ties between Plaintiff and a Russian bank. Compl. ¶¶ 185–86, 332. Plaintiff repeatedly asserts in summary fashion that the multi-paragraph statement is "false," *e.g.*, Compl. ¶¶ 186, 332–33, but never offers any factual allegations to support this "formulaic recitation of [an] element[]" of his claim. *Chaparro*, 693 F.3d at 1337. The Complaint does not even do the minimum work of identifying which portion of the statement is supposedly false.[3] Plaintiff's vague and conclusory allegations about falsity are "not adequate." *Id.* Further, the Complaint is devoid of *any* non-conclusory factual allegation that Mr. Sullivan knew that the campaign statement likely would induce others not to engage in business dealings with Plaintiff, that the statement played a material part in inducing others not to deal with Plaintiff, or that Plaintiff suffered special damages as a result of the statement. *See* DNC Mot., ECF No. 141 at 7–8; Perkins Coie Mot., ECF No. 143 at 6–8. Each of these defects provides an independent basis for dismissal of the injurious falsehood claim as to Mr. Sullivan.

### C. Count III Is Barred By The First Amendment.

Plaintiff's injurious falsehood claim runs headlong into the First Amendment to the U.S. Constitution. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269–70 (1964) (noting "profound national commitment" to "uninhibited, robust, and wide-open" debate on public issues, and long-settled principle that "freedom of expression upon public questions is secured by the First Amendment"). "[W]hen [a] defendant makes a comment or opinion based on facts which are set

---

[3] To the extent Plaintiff challenges the concluding sentence about a federal investigation, he has misconstrued the statement. Specifically, whereas the statement says "**[w]e can only assume** that federal authorities will now explore this direct connection between Trump and Russia as part of their existing probe into Russia's meddling in our elections," Plaintiff alleges that the statement says that "federal authorities **were investigating**" the connection. Compl. ¶ 185 (emphases added). Plaintiff cannot make out a claim by transforming an "assum[ption]" into a definitive statement.

forth in the article or which are otherwise known or available to the reader or listener as a member

of the public," the statement in question is constitutionally protected "pure opinion." *From v.*

*Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. Dist. Ct. App. 1981). Whether something is

pure opinion requires "examin[ation of] the statement in its totality and the context in which it was

uttered or published," and "the court must give weight to cautionary terms used by the person

publishing the statement." *Id.*

Here, Mr. Sullivan's statement is expressly "[i]n response to" facts set out in a "report from

*Slate*," which was and remains available to the public.[4] Mr. Sullivan's "cautionary" language

confirms that his statement qualifies as pure opinion:

> This **could be** the most direct link yet between Donald Trump and Moscow.
> Computer scientists have **apparently** uncovered a covert server linking the
> Trump Organization to a Russian-based bank. This secret hotline **may be**
> the key to unlocking the mystery of Trump's ties to Russia. It certainly
> **seems** the Trump Organization felt it had something to hide, given that it

---

[4] The campaign statement excerpt included in the Complaint does not reflect the statement's introductory language that the statement was "[i]n response to a news report from *Slate*." https://twitter.com/HillaryClinton/status/793250312119263233/photo/1. A more complete statement is reflected in a tweet by Secretary Clinton, which Plaintiff relies on in his Complaint, ¶ 188 & n. 56, and incorporates by reference. The Court may judicially notice the campaign statement posted to Twitter. *See, e.g.*, *Ganske v. Mensch*, 480 F. Supp. 3d 542, 546 (S.D.N.Y. 2020) ("Because Defendant's two other July 27, 2018 tweets are integral to the allegations in the complaint and necessary to place her comments in context, the Court will take judicial notice of [those tweets]."); *Scanz Techs., Inc. v. JewMon Enters., LLC*, No. 20-22957-CIV, 2021 WL 65466, at *5 (S.D. Fla. Jan. 7, 2021) (explaining that courts often take judicial notice of social media posts where such posts are incorporated by reference in the complaint). Judicial notice may be taken without converting the motion to dismiss into a motion for summary judgment. *See* Fed. R. Evid. 201(b)(2); *Stream, Inc. v. PB Grocery, Inc.*, No. 16-cv-81584, 2017 WL 6409006, at *3 (S.D. Fla. Mar. 1, 2017) (Middlebrooks, J.). The Court also may judicially notice the October 31, 2016 *Slate* article on which Mr. Sullivan's statement was predicated for purposes of assessing whether Mr. Sullivan's statement relies upon facts in that article, without converting the motion to dismiss into a motion for summary judgment. *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 812 (11th Cir. 2015) ("[C]ourts may take judicial notice of documents such as the newspaper articles . . . for the limited purpose of determining which statements the documents contain (but not for determining the truth of those statements)."). The article is available at http://www.slate.com/articles/news_and_politics/cover_story/2016/10/was_a_server_registered_to_the_trump_organization_communicating_with_russia.html.

> **apparently** took steps to conceal the link when it was discovered by
> journalists. This line of communication **may help explain** Trump's bizarre
> adoration of Vladimir Putin and endorsement of so many pro-Kremlin
> positions throughout this campaign. It raises even more troubling questions
> in light of Russia's masterminding of hacking efforts that are clearly
> intended to hurt Hillary Clinton's campaign. **We can only assume** that
> federal authorities will now explore this direct connection between Trump
> and Russia as part of their existing probe into Russia's meddling in our
> elections.

Compl. ¶ 185 (emphases added).  These hedgy words convey that Mr. Sullivan is formulating an

opinion in real time and reacting to the facts reported by *Slate*.

The overall context also supports the pure-opinion conclusion.  A "Hillary for America"

campaign logo appears at the top of the statement, and Mr. Sullivan's commentary plainly was

issued on behalf of the campaign.  "Reasonable reader[s]" understand that statements on behalf of

a candidate seeking office are advocacy pieces with a political bent.  *Fortson*, *v. Colangelo*, 434

F. Supp. 2d 1369, 1381 (S.D. Fla. 2006) ("Because the challenged statements were made through

a medium that fosters debate on basketball issues and that routinely uses figurative or hyperbolic

language, a reasonable reader is more likely to regard its content as opinion . . . ."); *see also Wardak*

*v. Goolden*, No. 1:19-CV-21121-RAR, 2020 WL 9718811, at *9 (S.D. Fla. May 22, 2020)

(addressing defamation claim and noting "statements by a disgruntled ex-lover are often the kinds

of statements that are taken with a grain, or more, of salt").  In sum, the totality of the circumstances

surrounding the campaign statement makes clear that it is protected under the First Amendment as

opinion.  *See Donald J. Trump For President, Inc. v. N.Y. Times Co.*, No. 152099/2020, 2021 WL

938979, at *1 (N.Y. Sup. Ct. Mar. 9, 2021) (dismissing defamation claim brought by Plaintiff

against *The New York Times* based on column describing ties between Plaintiff and Russia as

"nonactionable opinion").

As a separate First Amendment basis for dismissal, Plaintiff fails to adequately plead that Mr. Sullivan issued the statement with "actual malice"—that is, "deliberate or reckless falsification." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 499 (1991). Plaintiff's only allegations on this front are, once again, formulaic. *See* Compl. ¶ 328 ("Defendants acted with actual malice, as they knew that the Plaintiff was not colluding with Russia . . . ."); *id.* ¶ 341 ("Defendants knew that the statements were false at the time they made then [*sic*] . . . ."). These threadbare "labels and conclusions" do not suffice to state a claim. *Iqbal*, 556 U.S. at 678; *see also Jacoby v. Cable News Network, Inc.*, No. 21-12030, 2021 WL 5858569, at *5–6 (11th Cir. Dec. 10, 2021) (affirming dismissal of defamation claim due to plaintiff's conclusory allegations about actual malice).

**IV. Count IV Must Be Dismissed.**

In addition to being time-barred, the conspiracy to commit injurious falsehood claim fails because Plaintiff fails to plead a substantive claim for injurious falsehood, as set out above. *See Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1345 (S.D. Fla. 2018) (Middlebrooks, J.) (actionable conspiracy requires actionable underlying cause of action).

Further, the Complaint is devoid of any factual allegations suggesting that Mr. Sullivan entered into an agreement to commit injurious falsehood. *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1316 (S.D. Fla. 2014) (stating that civil conspiracy requires "an agreement between two or more parties . . . to do an unlawful act"). Plaintiff asserts in summary fashion that "Defendants had a meeting of minds to harm the Plaintiff by making false and damaging statements regarding the Plaintiff's alleged collusion with the Russian government." Compl. ¶ 347. This barebones allegation, simply a recitation of the legal standard, is insufficient to plead that Mr. Sullivan agreed to enter into a conspiracy to commit injurious falsehood. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Elsewhere in the Complaint, Plaintiff alleges that Mr. Elias "assisted" Mr. Sullivan with the October 31, 2016 campaign statement, and that Secretary Clinton tweeted a screenshot of the statement after it was issued.  Compl. ¶¶ 187–88.  These allegations do not establish a meeting of the minds between Mr. Sullivan and Mr. Elias or Secretary Clinton (or anyone else) to commit an injurious falsehood.  The allegation about Mr. Elias offers no detail about what the assistance purportedly entailed, or how, when, or where the assistance was provided, and therefore is insufficient.  *See Rinker v. Carnival Corp.*, 753 F. Supp. 2d 1237, 1244 (S.D. Fla. 2010) (allegation that a defendant "participated" in the allegedly unlawful act did not establish an agreement).  Nor does Plaintiff allege that Mr. Sullivan and Secretary Clinton conferred about drafting or tweeting out the statement.  "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."  *Alhassid*, 60 F. Supp. 3d at 1319.

The Court should dismiss Count IV.

## V. Count VI Must Be Dismissed.

In addition to being time-barred, Plaintiff's failure to make out a claim for malicious prosecution—as thoroughly demonstrated by other Defendants, *see* Clinton Mot., ECF No. 52 at 19–20; Podesta Mot., ECF No. 124 at 5–6; Perkins Coie Mot., ECF No. 143 at 9–13; Sussman Mot., ECF No. 146 at 9–10; Elias Mot., ECF No. 147 at 13–15—dooms his related conspiracy claim.  *Honig*, 339 F. Supp. 3d at 1345.

What is more, Plaintiff again fails to allege any basic facts of conspiratorial agreement with respect to Mr. Sullivan.  Aside from the conclusory allegation that Mr. Sullivan and 11 other Defendants "had a meeting of minds" and "conspired," Compl. ¶¶ 369–72, the Complaint provides no detail to support the conclusion that Mr. Sullivan individually agreed to join a conspiracy "to feed false and/or misleading information to the FBI and the DOJ," *id.* ¶ 371.

Count VI should be dismissed.

## CONCLUSION

For the foregoing reasons and those articulated by other Defendants incorporated herein, the Court should dismiss the claims against Mr. Sullivan with prejudice.

Dated:          May 25, 2022                            Respectfully submitted,


*/s/ Brian L. Stekloff*

**WILKINSON STEKLOFF LLP**

Brian L. Stekloff*
Sarah E. Neuman*

2001 M Street, NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000
bstekloff@wilkinsonstekloff.com
sneuman@wilkinsonstekloff.com

      *Appearance *pro hac vice*

**BARZEE FLORES**

William R. Barzee (Florida Bar No. 158720)

Courthouse Center, Penthouse One
40 NW Third Street
Miami, FL 33128
Tel: (305) 374–3998
williambarzee@barzeeflores.com

*Counsel for Defendant Jake Sullivan*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically filed using the CM/ECF system, which will provide notice to all counsel of record this 25th day of May, 2022.

*/s/ William R. Barzee*
William R. Barzee

177

Amended Complaint for Damages and Demand for Trial by Jury
(June 21, 2022)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 2:22-cv-14102-DMM


DONALD J. TRUMP,

               Plaintiff,

v.

HILLARY R. CLINTON, HFACC, INC.,
DEMOCRATIC NATIONAL COMMITTEE,
DNC SERVICES CORPORATION, PERKINS
COIE, LLC, MICHAEL SUSSMANN, MARC
ELIAS, DEBBIE WASSERMAN SCHULTZ,
CHARLES HALLIDAY DOLAN, JR., JAKE
SULLIVAN, ADAM SCHIFF, JOHN PODESTA,
ROBERT E. MOOK, PHILLIPE REINES,
FUSION GPS, GLENN SIMPSON, PETER
FRITSCH, NELLIE OHR, BRUCE OHR,
ORBIS BUSINESS INTELLIGENCE, LTD.,
CHRISTOPHER STEELE, IGOR DANCHENKO,
NEUSTAR, INC., NEUSTAR SECURITY
SERVICES, RODNEY JOFFE, JAMES COMEY,
PETER STRZOK, LISA PAGE, KEVIN
CLINESMITH, ANDREW MCCABE, ROD
ROSENSTEIN, JOHN DOES 1 THROUGH 10
(said names being fictitious and unknown persons),
and ABC CORPORATIONS 1 THROUGH 10 (said
names being fictitious and unknown entities),

               Defendants.

_____/


**<u>AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR TRIAL BY JURY</u>**

      The Plaintiff, Donald J. Trump, by and through his undersigned counsel, hereby serves his

Amended Complaint for Damages and Demand For Trial by Jury on the Defendants, Hillary R.

Clinton, HFACC, Inc., the Democratic National Committee, DNC Services Corporation, Perkins

Coie, LLC, Michael Sussmann, Marc Elias, Debbie Wasserman Schultz, Charles Halliday Dolan,

Jr., Jake Sullivan, Adam Schiff, John Podesta, Robert E. Mook, Phillipe Reines, Fusion GPS, Glenn Simpson, Peter Fritsch, Nellie Ohr, Bruce Ohr, Orbis Business Intelligence, Ltd., Christopher Steele, Igor Danchenko, Neustar, Inc., Neustar Security Services, Rodney Joffe, James Comey, Peter Strzok, Lisa Page, Kevin Clinesmith, Andrew McCabe, Rod Rosenstein, John Does 1 through 10 (said names being fictious and unknown persons), and ABC Corporations 1 through 10 (said names being fictitious and unknown entities) and alleges as follows:

**Introduction**

1.      In the run-up to the 2016 Presidential Election, Hillary Clinton and her cohorts orchestrated an unthinkable plot – one that shocks the conscience and is an affront to this nation's democracy.  Acting in concert, the Defendants maliciously conspired to weave a false narrative that their Republican opponent, Donald J. Trump, was colluding with a hostile foreign sovereignty.  The actions taken in furtherance of their scheme—falsifying evidence, deceiving law enforcement, spreading disinformation through the media, and exploiting access to highly-sensitive data sources—are so outrageous, subversive and incendiary that even the events of Watergate pale in comparison.

2.      Under the guise of 'opposition research,' 'data analytics,' and other political stratagems, the Defendants nefariously sought to sway the public's trust.  They worked together with a common, self-serving purpose: to vilify Donald J. Trump.  Indeed, their far-reaching conspiracy was designed to cripple Trump's initial bid for presidency and tarnish his electability for future elections by fabricating a scandal that would be used to trigger an unfounded federal investigation and ignite a media frenzy.

3.      The scheme was conceived, coordinated and carried out by top-level officials at the Clinton Campaign and the DNC—including 'the candidate' herself—who attempted to shield her

involvement behind a wall of third parties.[1]  To start, the Clinton Campaign and the DNC enlisted the assistance of their shared counsel, Perkins Coie, a law firm with deep Democrat ties, in the hopes of obscuring their actions under the veil of attorney-client privilege.  Perkins Coie was tasked with spearheading the scheme to find—or fabricate—proof of a sinister link between Donald J. Trump and Russia.  To do so, Perkins Coie launched parallel operations: on one front, Perkins Coie partner Marc Elias led an effort to produce spurious 'opposition research' claiming to reveal illicit ties between the Trump Campaign and Russian operatives; on a separate front, Perkins Coie partner Michael Sussmann headed a campaign to develop misleading evidence of a bogus 'back channel' connection between e-mail servers at Trump Tower and a Russian-owned bank.

4.       Marc Elias, in his mission to obtain derogatory anti-Trump 'opposition research,' commissioned Fusion GPS, an investigative firm, and its co-founders, Peter Fritsch and Glenn Simpson, and directed them to dredge up evidence—actual or otherwise—of collusion between Trump and Russia.  Fritsch and Simpson, in turn, enlisted the assistance of Orbis Ltd. and its owner, Christopher Steele, to produce a series of reports purporting to contain proof of the collusion.  Of course, the now fully debunked collection of reports, known as the "Steele Dossier," was riddled with misstatements, misrepresentations and, most of all, flat out lies.  In truth, the Steele Dossier was largely based upon information provided to Steele by his primary sub-source, Igor Danchenko, who was subsequently indicted for falsifying his claims.  Even more damning, Danchenko had close ties to senior Clinton Campaign official, Charles Halliday Dolan, Jr., who

---

[1] U.S. Dep't of Justice, Office of the Inspector General, Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation at 96 (2019) (hereinafter "IG Report").

knowingly provided false information to Danchenko, who relayed it to Steele, who reported it in the Steele Dossier and eagerly fed the deceptions to both the media and the FBI. This duplicitous arrangement existed for a singular self-serving purpose – to discredit Donald J. Trump and his campaign.

5.      At the same time, Michael Sussmann, in his hunt for damaging intel against the Trump Campaign, turned to Rodney Joffe—a fervent anti-Trumper who had recently been promised a high-ranking position with the Clinton Administration—to exploit his access to sensitive, proprietary and non-public data in search of a secret "back channel" connection between Trump Tower and Alfa Bank. When it was discovered that no such channel existed, the Defendants resorted to truly subversive measures – hacking servers at Trump Tower, Trump's private apartment, and, most alarmingly, the *White House*. This ill-gotten data was then manipulated to create a misleading "inference" and submitted to law enforcement in an effort to falsely implicate Donald J. Trump and his campaign.[2] All of these acts were carried out in coordination with the Clinton Campaign, the DNC, and Perkins Coie, at the behest of certain Democratic "VIPs."[3]

6.      While their multi-pronged attack was underway, the Defendants seized on the opportunity to publicly malign Donald J. Trump by instigating a full-blown media frenzy. Indeed, the Clinton Campaign and DNC—admittedly on a "mission" to "raise the alarm" about their contrived Trump-Russia link[4]—repeatedly fed disinformation to the media and shamelessly

---

[2] Indictment at ¶ 23 (ECF Doc. No. 1), *U.S. v. Sussmann*, case no. 1:21-cr-00582-CRC, District of Columbia (Sept. 16, 2021) (hereinafter the "Sussmann Indictment").
[3] *Id.* ¶ 10.
[4] Jennifer Palmieri (former Clinton Campaign Communications Director), *The Clinton campaign warned you about Russia. But nobody listened to us.*, The Washington Post, March 24, 2017.

promoted their false narratives.  All the while, Fusion GPS, Perkins Coie, Hillary Clinton, Jake Sullivan, Rodney Joffe, Adam Schiff, Debbie Wasserman Schultz, and others did their best to proliferate the spread of those dubious and false claims through press releases, televised interviews, social media, and other public statements.

7.     The fallout from the Defendants' actions was not limited to the public denigration of Trump and his campaign.   The Federal Bureau of Investigation (FBI)—relying on the Defendants' fraudulent evidence—commenced several large-scale investigations and expended precious time, resources and taxpayer dollars looking into the spurious allegation that the Trump Campaign had colluded with the Russian Government to interfere in the 2016 presidential election. The effects of this unfounded investigation were prolonged and exacerbated by the presence of a small faction of Clinton loyalists who were well-positioned within the Department of Justice and the FBI – James Comey, Andrew McCabe, Peter Strzok, Lisa Page, Kevin Clinesmith, and Bruce Ohr. These government officials were willing to abuse their positions of public trust to advance the baseless probe to new levels, including obtaining an extrajudicial FISA warrant and instigating the commencement of an oversight investigation headed by Special Counsel Robert Mueller. As a result, Donald J. Trump and his campaign were forced to expend tens of millions of dollars in legal fees to defend against these contrived and unwarranted proceedings. Justice would ultimately prevail – following a two-year investigation, Special Counsel Mueller went on to exonerate Donald J. Trump and his campaign with his finding that there was no evidence of collusion with Russia.

8.     The Defendants' actions were carried out in secrecy and were intentionally concealed from Donald J. Trump, the Federal Election Commission, the American people, among many others. It is only recently, in 2022, that the full extent of the Defendants' conspiracy has been unmasked and continues to be exposed by Special Counsel John Durham, who has been

heading a DOJ investigation into the origins of the Trump-Russia conspiracy. To date, Durham has already issued indictments to Sussmann, Danchenko, and former FBI employee Kevin Clinesmith, among others, for proffering false statements to law enforcement officials. As outlined below, these 'speaking' indictments not only implicate many of the Defendants named herein but also provide a great deal of insight into the inner workings of the Defendants' conspiratorial enterprise. Based on the facts that have already been uncovered throughout the course of Durham's investigation, it seems all but certain that additional indictments are forthcoming.

9.      In short, the Defendants, blinded by political ambition, orchestrated a malicious conspiracy to disseminate patently false and injurious information about Donald J. Trump and his campaign, all in the hopes of destroying his political career and rigging the 2016 Presidential Election in favor of Hillary Clinton. When their gambit failed, and Donald J. Trump was elected, the Defendants' efforts continued unabated, merely shifting their focus to undermining his presidential administration and tarnishing his electability for future presidential elections. Worse still, the Defendants continue to spread their vicious lies to this day as they unabashedly publicize their thoroughly debunked falsehoods in an effort to ensure that he will never be elected again.

10.      The deception, malice, and treachery perpetrated by the Defendants has caused significant harm to the American people, and to the Plaintiff, Donald J. Trump, and they must be held accountable for their heinous acts.

<u>**Jurisdiction and Venue**</u>

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that claims which arise under the laws of the United States, and this court has supplemental jurisdiction of the additional claims pursuant to 28 U.S.C. § 1367(a) as they all are so related to the federal questions that they form part of the same case or controversy.

6

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because at least one Defendant and the Plaintiff reside in this District and a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this District. In this regard, the publications of injurious falsehoods were intended to occur in the Southern District of Florida, and they did occur in the Southern District of Florida.

### The Parties

13. The Plaintiff, Donald J. Trump, the 45th President of the United States of America, is a private citizen who is *sui juris* and a resident of the State of Florida in the County of Palm Beach.

14. The Defendant, Hillary R. Clinton (hereinafter "Clinton"), is a resident of the State of New York and is *sui juris.* She was the Democratic nominee for the 2016 Presidential Election. Clinton's acts and omissions as identified in this lawsuit arise out of or relate to her conduct in and/or affecting, among other jurisdictions, Florida.

15. The Defendant, HFACC, Inc. (hereinafter the "Clinton Campaign"), is a corporation with its principal place of business in New York and doing business all over the United States, including in Palm Beach County, Florida. The Clinton Campaign's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

16. The Defendant, the Democratic National Committee is a national committee, as defined by 52 U.S.C. § 30101, with its principal place of business in Washington, D.C. The Democratic National Committee is registered with the FEC as the DNC Services Corp./Dem. Services Corp, and it operates through the Defendant, the DNC Services Corporation. In turn, the DNC Services Corporation is a District of Columbia not-for-profit corporation, with its principal

7

place of business in Washington, D.C.  The Democratic National Committee undertakes most of its business and financial activities through the DNC Services Corporation (hereinafter, the Democratic National Committee and the DNC Services Corporation are collectively referred to as the "DNC").  The DNC operates and conducts substantial and continuous business in the State of Florida.  The DNC's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

17.      The Defendant, Perkins Coie, LLP (hereinafter "Perkins Coie"), is an international law firm with its headquarters in Seattle, Washington.  Perkins Coie has a registered agent in Tallahassee, Florida, and does substantial, continuous business in Florida generally and in Palm Beach County specifically.  Perkins Coie's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

18.      The Defendant, Michael Sussmann (hereinafter "Sussmann"), is a resident of the District of Columbia, and is *sui juris*.  He is an attorney and a former agent and/or employee of Perkins Coie and, at all relevant times herein, was acting within the scope of his employment with Perkins Coie.  Sussmann's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

19.      The Defendant, Debbie Wasserman Schultz (hereinafter "Schultz") is a resident of the State of Florida and is *sui juris*.  She served as Chairperson of the DNC from May 2011 until the date of her resignation on July 28, 2016.  Schultz's acts and omissions as identified in this lawsuit arise out of or relate to her conduct in and/or affecting, among other jurisdictions, Florida.

20.      The Defendant, Charles Halliday Dolan, Jr.  (hereinafter "Dolan"), is a resident of the State of New York, and is *sui juris*.  With respect to the 2016 Clinton Campaign, Dolan actively campaigned and participated in calls and events as a volunteer on behalf of Hillary Clinton.

8

Dolan's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

21.     The Defendant, Jake Sullivan (hereinafter "Sullivan"), is a resident of the District of Columbia, and is *sui juris*.  He was Chief Foreign Policy Advisory for the 2016 Clinton Campaign and, at all relevant times herein, was acting within the scope of his employment with the Clinton Campaign. Currently, Sullivan is serving as National Security Advisor for the Biden Administration.  Sullivan's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

22.     The Defendant, Adam Schiff (hereinafter "Schiff"), is a resident of the State of California, and is *sui juris*.   He has been a U.S Representative for the State of California since 2001.  Schiff's acts and omissions as identified in this lawsuit arise out of or relate to her conduct in and/or affecting, among other jurisdictions, Florida.

23.     The Defendant, John Podesta (hereinafter "Podesta"), is a resident of the District of Columbia, and is *sui juris*.  He was Chairman for the 2016 Clinton Campaign and, at all relevant times herein, was acting within the scope of his employment with the Clinton Campaign.  Podesta's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

24.     The Defendant, Robert E. Mook (hereinafter "Mook"), is a resident of the Commonwealth of Virginia and served as the campaign manager for the 2016 Clinton Campaign. At all relevant times herein, was acting within the scope of his employment with the Clinton Campaign.  Mook's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting among other jurisdictions, Florida.

25.     The Defendant, Phillipe Reines (hereinafter "Reines"), is a resident of the District

9

of Columbia, and is *sui juris*.  He served as a long-time former communications advisor to Hillary

Clinton and, at all relevant times herein, was acting within the scope of his employment with the

Clinton Campaign.  Reines' acts and omissions as identified in this lawsuit arise out of or relate to

his conduct in and/or affecting among other jurisdictions, Florida.

26.     The Defendant, Marc Elias (hereinafter "Elias"), is a resident of Washington D.C.

and is *sui juris*.  He is an attorney and a former employee and/or agent of Perkins Coie, the DNC

and the Clinton Campaign and, at all relevant times herein, was acting within the scope of his

employment and/or agency of Perkins Coie.  Elias's acts and omissions as identified in this lawsuit

arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

27.     The Defendant, Fusion GPS, is a Delaware limited liability company which

represents that it provides research, strategic intelligence, and due diligence services to

corporations, law firms, and investors worldwide, and is headquartered in Washington D.C.

Fusion GPS's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct

in and/or affecting, among other jurisdictions, Florida.

28.     The Defendant, Glenn Simpson (hereinafter "Simpson"), is a principal and co-

founder of Fusion GPS, is a resident of the District of Columbia, and is *sui juris*.  Simpson's acts

and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting,

among other jurisdictions, Florida.

29.     The Defendant, Peter Fritsch (hereinafter "Fritsch"), is a principal and co-founder

of Fusion GPS, is a resident of the State of Florida, and is *sui juris*.  Fritsch's acts and omissions

as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other

jurisdictions, Florida.

30.     The Defendant, Nellie Ohr (hereinafter "Mrs. Ohr"), is a resident of the

Commonwealth of Virginia, and is *sui juris*. At all relevant times, she was an employee of Fusion GPS and was acting within the scope of her employment with Fusion GPS. Mrs. Ohr's acts and omissions as identified in this lawsuit arise out of or relate to her conduct in and/or affecting, among other jurisdictions, Florida.

31.    The Defendant, Bruce Ohr (hereinafter "Mr. Ohr"), is a resident of the Commonwealth of Virginia, and is *sui juris*. At all relevant times, Bruce Ohr was a United States Department of Justice official. Mr. Ohr's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

32.    The Defendant, Orbis Business Intelligence Ltd. (hereinafter "Orbis Ltd."), is a London, England-based intelligence consultancy firm. Orbis Ltd.'s acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

33.    The Defendant, Christopher Steele (hereinafter "Steele"), is a principal and founder of Orbis Ltd., a resident of the United Kingdom, and he is *sui juris*. Steele's acts and omissions as identified in this lawsuit were all done in the scope of his employment with Orbis, Ltd., and arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

34.    The Defendant, Igor Danchenko (hereinafter "Danchenko"), at all times relevant to this Complaint, was a citizen of the Russian Federation and was lawfully in the United States. Danchenko resides in the District of Columbia and the Commonwealth of Virginia and is *sui juris*. At all relevant times, Danchenko was a contractor for Orbis Ltd. and was acting within the scope of his agency with Orbis Ltd. Danchenko's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

35.    The Defendant, Neustar, Inc., is an information technology company with its

headquarters in Sterling, Virginia. Neustar's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

36.     The Defendant, Neustar Security Services ("NSS") (collectively, with Neustar, Inc., referred to as "Neustar") is an information technology company with its headquarters in Sterling, Virginia. Neustar's acts and omissions, as identified in this lawsuit, arise out of or relate to its conduct in and/or affecting, among other jurisdictions, Florida.

37.     The Defendant, Rodney Joffe (hereinafter "Joffe"), is a resident of the Commonwealth of Virginia, and is *sui juris.* Joffe is a former executive of Neustar and, at all relevant times herein, was acting within the scope of his employment with Neustar. Joffe's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

38.     The Defendant, James Comey (hereinafter "Comey"), is a resident of the Commonwealth of Virginia, and is *sui juris.* Comey was the 7th Director of the Federal Bureau of Investigation from 2013 to May 2017. Comey's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

39.     The Defendant, Peter Strzok (hereinafter "Strzok"), is a resident of the Commonwealth of Virginia, and is *sui juris.* At all relevant times, Strzok was an agent of the Federal Bureau of Investigation. Strzok's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

40.     The Defendant, Lisa Page (hereinafter "Mrs. Page"), is a resident of the District of Columbia, and is *sui juris.* At all relevant times Mrs. Page was an attorney for the Federal Bureau of Investigation. Mrs. Page's acts and omissions as identified in this lawsuit arise out of or relate to her conduct in and/or affecting, among other jurisdictions, Florida.

41.     The Defendant, Kevin Clinesmith (hereinafter "Clinesmith"), is a resident of the District of Columbia, and is *sui juris.* At all relevant times, Clinesmith was an attorney for the Federal Bureau of Investigation. Clinesmith's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

42.     The Defendant, Andrew McCabe (hereinafter, "McCabe"), is a resident of the Commonwealth of Virginia, and is *sui juris.* McCabe was the Deputy Director of the Federal Bureau of Investigation from 2016 to March of 2018. McCabe's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

43.     The Defendant, Rod Rosenstein (hereinafter, "Rosenstein"), is a resident of the State of Maryland and is sui juris. Rosenstein was the United States Deputy Attorney General from April 2017, until May 2019. Rosenstein's acts and omissions as identified in this lawsuit arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida.

44.     The Defendants, John Does 1 through 10, are individuals whose identities are presently unknown to the Plaintiff, including, but not limited to, journalists, publishers, editors, investigators, state or federal officials, co-conspirators, officers, employees, agents, managers, owners, principals and/or other duly authorized individuals who caused or contributed to the incident or incidents for which the Plaintiff seeks damages, and/or are vicariously and/or otherwise liable for the acts, commissions, or other culpable conduct of those who did cause or contribute to the incidents alleged.

45.     The Defendants, ABC Corporations 1 through 10, are corporate entities presently unidentifiable to the Plaintiff, including, but not limited to, media companies, publication companies, editorial companies, municipalities, state or federal agencies, law enforcement

authorities, investigative agencies, political organizations, political affiliates, private firms and/or other duly authorized corporate or governmental entities who caused or contributed to the incident or incidents for which the Plaintiff seeks damages, and/or are vicariously and/or otherwise liable for the acts, commissions, or other culpable conduct of those who did cause or contribute to the incidents alleged.

### Statement of Facts

#### *The DNC and the Clinton Campaign Become One*

46.     On April 6, 2015, the Clinton Campaign retained Perkins Coie, a law firm with longstanding ties to the Democratic Party, as its general counsel.[5]

47.     Shortly thereafter, on April 12, 2015, Clinton formally declared her candidacy for President of the United States.  Clinton sought the nomination of the Democratic Party.

48.     It was clear from the early days of the Democratic primaries that the DNC—which according to its own rules, is required to "maintain impartiality and evenhandedness" during the Democratic Primary nominating process—was backing Clinton and favored her as the preferred Democratic nominee.[6]

49.     For example, in a confidential, inter-office DNC memorandum dated May 26, 2015 (the "DNC Memo"), which only came to light after the DNC servers were hacked by an individual using the name "Guccifer 2.0," it was noted that the DNC sought to "provide a contrast between the GOP field and HRC" and that it would "[u]se specific hits to muddy the waters around ethics, transparency and campaign finance attacks on HRC."[7]

---

[5] Gov't Ex. 0301, *U.S. v. Sussmann*.
[6] DNC Charter and Bylaws, Art.  5 § 4.
[7] Complaint, Ex.  A (ECF Doc.  No.  8), *Wilding v.  DNC Services Corp., et al.*, case no.  0:16-cv-61511-WJZ, Southern District of Florida (July 13, 2016).

50.     Notably, the DNC Memo also stated that, in order to "muddy the waters" around Clinton's perceived vulnerabilities as a candidate, the DNC had outlined a plan to "damage Republican presidential candidates' credibility with voters by looking for targeted opportunities to undermine their specific messaging."  The DNC Memo also discussed "opposition research" and a strategy to "utilize the research to place highly targeted hits" against Republican candidates.[8]

51.     Around that same time, as later disclosed through a WikiLeaks release of confidential DNC documents, Schultz, the head of the DNC, stated in an e-mail that Clinton's Democratic competitor, Bernie Sanders, "isn't going to be president."

52.     Furthermore, Donna Brazile, then vice-chair of the DNC, said in criticism of Schultz: "She hadn't been very interested in controlling the party – she let Clinton's headquarters in Brooklyn do as it desired so she didn't have to inform the party officers how bad the situation was."

53.     In or around mid-2015, in an effort to foster greater coordination and cohesion with Clinton and the Clinton Campaign, the DNC retained the same law firm, Perkins Coie, to serve as its general counsel.

54.     Two of Perkins Coie's senior partners, Elias and Sussmann, were largely responsible for handling the firm's representation of the DNC and the Clinton Campaign in their legal, political, and other affairs.  Elias, in particular, was designated as "General Counsel" for both the DNC and the Clinton Campaign.

55.     In or around August 2015, Elias and Sussmann negotiated a Joint Fund-Raising Agreement between their two clients, the DNC and the Clinton Campaign.

---

[8] *Id.*

56.     The Joint Fund-Raising Agreement was nothing more than a thinly veiled effort to align the interests and operations of the DNC and the Clinton Campaign by giving the Clinton Campaign control over the DNC, an organization that was supposed to remain impartial.

57.     Specifically, the Joint Fund-Raising Agreement—which was entered into months before Clinton won the Democratic nomination—specified that, in exchange for raising money and investing in the DNC, the Clinton Campaign would control the DNC's finances, strategy, and all the money raised.   Her campaign had the right of refusal on who would be the party communications director, and it would make final decisions on all the other staff.   The DNC also was required to consult with the campaign about all other staffing, budgeting, data, analytics, and mailings.[9]

58.     In reference to the effect of the Joint Fund-Raising Agreement, then-DNC chairman Donna Brazile stated that she "couldn't write a press release without passing it by" the Clinton Campaign.[10]

59.     Gary Gensler, the Chief Financial Officer of the Clinton Campaign, stated that the DNC was "fully under the control" of the Clinton Campaign.[11]

60.     The Federal Election Commission noted that the arrangement between the Clinton Campaign and the DNC was "troubling" and found that that there was an "unusual degree of closeness between [the Clinton Campaign] and the DNC."[12]

---

[9] Donna Brazile, *Hacks: The Inside Story of the Break-ins and Breakdowns that Put Donald Trump in the White House*, November 7, 2017.
[10] Donna Brazile, *Inside Hillary Clinton's Secret Takeover of the DNC*, Politico Magazine, November 2, 2017.
[11] *Id.*
[12] Statement of Reasons at 7, August, 30, 2019, MURs 7304 & 7331, *In Re Hillary Victory Fund, et al.*

61.     Given the intimate ties between the DNC and the Clinton Campaign, and the amount of control that Clinton exerted over both, it was clear that the organizations' interests were aligned and they shared a common purpose: get Clinton elected President by any means necessary.

### The Clinton Campaign and DNC Conspire With Their Attorneys, Perkins Coie, to Frame Republican Candidate Donald J. Trump

62.     On June 16, 2015, Donald J. Trump announced his candidacy for President and sought the Republican nomination.[13]

63.     Seeking to thwart Trump's campaign, harm his political career, and diminish the likelihood of him winning the election, the Clinton Campaign and the DNC devised a nefarious scheme to discredit, delegitimize and defame him by proliferating a false narrative that Donald J. Trump and his campaign were actively colluding with Russia to interfere in the 2016 Presidential Election.

64.     This plot was conceived and funded by Clinton, the Clinton Campaign, and DNC and would require the participation, cooperation and assistance of many individuals and entities acting in concert with one another to willfully carry out numerous tortious and criminal acts.  The Defendants had a meeting of minds and a common objective: to irreparably harm Trump's electability and to destroy his political career.

65.     To start, the Clinton Campaign and the DNC enlisted the assistance of their joint attorneys, Perkins Coie.

66.     The Clinton Campaign and the DNC chose Perkins Coie to oversee and coordinate their plan for a specific purpose – they formulated that conspiring with their legal counsel would

---

[13] Reem Nasr, *Donald Trump announces candidacy for president*, June 16, 2015, https://www.cnbc.com/2015/06/16/donald-trump-announces-candidacy-for-president.html.

fraudulently conceal their dealings under the shroud of attorney-client privilege. However, despite the Defendant' ill-intentions, attorney-client privilege is wholly inapplicable to the pertinent discussions between these parties – not only were the communications between the DNC/Clinton Campaign and Perkins Coie non-legal in nature, but they were also in furtherance of criminal and tortious wrongdoing.

67. Specifically, the Clinton Campaign and the DNC directed Perkins Coie to coordinate a two-pronged plan to publicly and falsely denigrate Donald J. Trump, with Elias and Sussmann each leading parallel operations to wrongly implicate him as colluding with Russia.

68. On one front, Elias would work with Fusion GPS and a host of others to develop a dossier, based on lies and misinformation purporting to show an incriminating link between Trump and Russia, which would be used to mislead law enforcement officials and ignite a media frenzy.

69. On a separate front, Sussmann would commission the information technology company, Neustar, to brazenly hack servers from highly-sensitive locations—including Donald J. Trump's private residence, Trump Tower, and, most shockingly, the White House—to uncover proprietary data that could then be manipulated to give the impression that Trump was engaged in illegitimate business with a Russian bank, Alfa Bank.

### *Perkins Coie Recruits Fusion GPS to Effectuate a Multi-Faceted Smear Campaign*

70. To effectuate the first phase of the Defendants' conspiracy—involving the creation of a fraudulent and incriminating dossier—the DNC and the Clinton Campaign would require the services of an investigative firm to dredge up derogatory 'opposition research' on Donald J. Trump and, to the extent there was none, to manufacture it.

71. At all relevant times, Fusion GPS was a private investigative firm specializing in media and politics. It was founded in 2011 by former *Wall Street Journal* employees Glenn

Simpson and Peter Fritsch.[14]

72.     On March 1, 2016, Fritsch sent an e-mail to a "senior figure in the Democratic Party" and conveyed his belief that Trump "had to be stopped." The Democratic contact responded by stating "Yes. Let's talk."[15]

73.     The "senior figure in the Democratic Party" arranged for Fritsch and Simpson to meet with Elias. The meeting took place on April 20, 2016, in Washington D.C.[16]

74.     Effective as of April 1, 2016, on behalf of and at the direction of the Clinton Campaign and the DNC, Elias and Perkins Coie retained Fusion GPS.[17]

75.     In particular, Fusion GPS was hired, through Perkins Coie, to perform 'opposition research' for the Clinton Campaign and the DNC.[18]

76.     At that time, Simpson and Fritsch were aware that Perkins Coie represented the DNC and the Clinton Campaign.[19]

77.     The Clinton Campaign and the DNC were well aware that Fusion GPS had a well-

---

[14] See generally Glenn Simpson and Peter Fritsch, *Crime in Progress: Inside the Steele Dossier and the Fusion GPS Investigation of Donald Trump* (hereinafter "*Crime in Progress*").

[15] Glenn Simpson and Peter Fritsch, *Crime in Progress: Inside the Steele Dossier and the Fusion GPS Investigation of Donald Trump* ("*Crime in Progress*"), p. 55.

[16] *Id.* at 56.

[17] Gov't Ex. 0302, *U.S. v. Sussmann*; *see also* Interview of Marc Elias at tr. 15, Permanent Select Committee on Intelligence, U.S. House of Representatives, December 13, 2017 (hereinafter, the "Elias Testimony") ("Q: You, Marc Elias and Perkins Coie, on behalf of the DNC and the Hillary Clinton Campaign, retained Fusion GPS? A: True.")

[18] Elias Testimony at 633:13-17 ("Q: Other than the Clinton Campaign at this time, was there any other client who Fusion GPS did work for? A: The Democratic National Committee. Q: Okay. So those were the two clients? A: Yes.").

[19] Letter from Matthew J. Gehringer, General Counsel, Perkins Coie, to William W. Taylor, III, Zuckerman Spaedar LLP, dated October 24, 2017, MUR 7291 HFA Resp. at 2, Ex. 1; *see also* Interview of Glenn Simpson at tr. 19, Permanent Select Committee on Intelligence, U.S. House of Representatives, November 14, 2017 (hereinafter, the "Simpson Testimony") ("Q: With respect to this fact pattern, with respect to your firm being retained, were you aware that Perkins Coie was working on behalf of the DNC? A: Yes.").

documented history of employing a 'scorched earth' strategy wherein the company would produce false and/or misleading dossiers to be spread through the media to damage his opportunity to win an election.

78.     The Clinton Campaign, the DNC, Perkins Coie and Fusion GPS each understood that Fusion GPS's true task was to launch a public smear campaign based on fraudulent evidence that could be used to falsely implicate Donald J. Trump to derail his campaign, ruining his opportunity to be elected and if elected to then interfere with his ability to properly serve as President of the United States.

79.     The Defendants agreed that Fusion GPS would report the results of its "investigation" to Elias.[20]

80.     In fact, Simpson and Fritsch reported *only* to Elias and did "not have any contact with the campaign brass."[21]

81.     In this way, Elias acted as a liaison between Fusion GPS and the Clinton Campaign/the DNC – he was the "gatekeeper" of communications between these parties and would report the progress of Fusion GPS's work to the Clinton Campaign and the DNC.[22]

82.     As Fritsch and Simpson recounted in their book, the relationship was set up that way for a specific reason; per Elias, Fusion GPS was walled-off from the Clinton Campaign and the DNC for "legal reasons: If Fusion's communications were with a lawyer, they could be

---

[20] *Id.* at 57.

[21] *Id.*

[22] Elias Testimony at 48 ("I was the sole. I was the – I was the gatekeeper. But there were – but there were instances in which there were some interactions otherwise. But that – but I was the gatekeeper."); *see also* Sullivan Testimony at 56 ("Q: Were you in meeting in which Mr. Elias briefed you on information that was of an opposition research nature? A: I was.").

considered privileged and kept confidential."[23]

83.    To further conceal their involvement with Fusion GPS, the Clinton Campaign and the DNC funneled the funds to finance Fusion GPS's work through Perkins Coie:

a.  Elias has testified that "[t]he money with which to retain [Fusion GPS] came from the Clinton campaign, Hillary for America, called the Clinton campaign, and the Democratic National Committee."[24]

b.  For example, on August 16, 2016, the DNC made a $66,500 payment to Perkins Coie; the DNC has acknowledged that this was the first of many such payments that were paid by the DNC and the Clinton Campaign, through Perkins Coie, to Fusion GPS.[25]

c.  Despite being earmarked as payments for Fusion GPS, the Clinton Campaign and the DNC reported the payments as being for "legal and compliance consulting."[26]

d.  In total, a sum in the amount of $777,907.97 was paid by the DNC to Perkins Coie and subsequently disbursed by Perkins Coie to Fusion GPS, as payment for Fusion GPS's services.[27]

e.  Likewise, a sum in the amount of $180,000 was paid by the Clinton Campaign to Perkins Coie and subsequently disbursed by Perkins Coie to Fusion GPS, as payment for Fusion GPS's services.[28]

---

[23] *Id.*
[24] Elias Testimony at 15.
[25] MUR 7291 DNC Resp. at 2 n.2; 8.
[26] Second General Counsel's Report at 2-3, MUR 7291 & 7449, *In the Matter of DNC Services Corp./DNC, et al.* (hereinafter, "FEC Second Gen. Counsel's Rpt.").
[27] *Id.*
[28] *See* MUR 7291 & 7449, Response to Discovery Requests at 6 (Apr. 13, 2021).

f.   As described in greater detail below, the Federal Election Commission pursued charges against the Clinton Campaign and the DNC for misreporting these payments in violation of campaign finance laws, finding that "[the Clinton Campaign] and the DNC did not properly disclose the purpose of [their] disbursements to Perkins Coie, for what appears to have been opposition research done by Fusion [GPS]."[29]

84.   The Clinton Campaign, the DNC and Perkins Coie intentionally sought to conceal their hiring of Fusion GPS from the public.[30]

85.   The coordination and interactions between the Clinton Campaign, the DNC, Perkins Coie and Fusion GPS were frequent and significant – *daily* conference calls were scheduled to be held every single weekday (Monday through Friday) at 8:30am from June 6, 2016 through the beginning of November 2016; required attendees included Elias, Simpson, Fritsch, and Clinton Campaign lawyer, Deborah Fine.[31]

86.   In addition, Elias would have weekly in-person meetings with Simpson and Fritsch.[32]

87.   In or around the time Fusion GPS was retained by the Defendants, Nellie Ohr was an employee of Fusion GPS, where her role was to conduct extensive opposition research on Donald J. Trump's family members and campaign aides.

---

[29] First General Counsel's Report at 27, MUR 7291, 7331 & 7449, *In the Matter of DNC Services Corp./DNC, et al.* (hereinafter, "FEC First Gen. Counsel's Rpt.").

[30] Elias Testimony at 643:21-24 ("Q: [Y]ou didn't want the public to know that Fusion GPS was working with the campaign. Is that fair? A: Sure.").

[31] Gov't Ex. 304, *U.S. v. Sussmann*.

[32] Elias Testimony at 635:10-12 ("Q: And the weekly check-ins – was that an in-person meeting? A: Yes. Q: And would you do that at Perkins Coie or at Fusion GPS. A: Always at my office.").

88.     Mrs. Ohr's husband, Bruce Ohr, was an Associate Deputy Attorney General with the DOJ. Mrs. Ohr had also been previously employed with the DOJ.

89.     The Clinton Campaign, the DNC, Perkins Coie, and Fusion GPS knew that this close relationship with a high-ranking DOJ official would be of great value in effectuating their plot – they understood that Mr. Ohr would be instrumental in lending credibility to the Steele Dossier by having Mr. Ohr serve as a seemingly trustworthy intermediary to disseminate it through government channels such as the FBI and the DOJ.

### As the Presidential Race Takes Form, the Defendants Put Their Plan Into Action

90.     On May 26, 2016, Donald J. Trump secured enough GOP votes to become the presumptive Republican Nominee for President of the United States in the 2016 election.[33]

91.     Shortly thereafter, on June 6, 2016, Hillary Clinton clinched enough GOP votes to become the presumptive Democratic Nominee for President of the United States in the 2016 election.[34]

92.     With the stage set and the election cycle underway, the Clinton Campaign, the DNC, Perkins Coie and Fusion GPS put their collective plan into action.

93.     Specifically, the Defendants undertook to develop two separate false narratives that would be fed to law enforcement and simultaneously spread through the media, all in an effort to cause malicious aspersions on Donald J. Trump, the Trump Campaign, and the Trump Organization, including: (i) a fraudulent 'dossier' purportedly substantiated findings of a nefarious

---

[33] Amita Kelly, *Donald Trump Clinches GOP Nomination*, NPR, May 26, 2016, https://www.npr.org/2016/05/26/479588197/donald-trump-clinches-gop-nomination.
[34] Domenico Montanaro, *Clinton Has Enough Delegates to Claim Democratic Nomination*, NPR, June 6, 2016, https://www.npr.org/2016/06/06/481020591/why-hillary-clinton-will-be-called-the-presumptive-nominee.

link between Trump and Russia; and (ii) falsified and/or misleading data which allegedly showed a 'back channel' connection between the Trump Organization and a Russian bank, Alfa Bank, which has deep connections to the Russian Government.

### *Fusion GPS Enlists the Assistance of Steele and Orbis Ltd.*

94.    To develop the dossier, the Clinton Campaign, the DNC, Perkins Coie and Fusion GPS turned to Orbis Ltd., a private intelligence firm, and its owner, Christopher Steele, a former British intelligence officer.

95.    Orbis Ltd. was chosen to partake in the scheme because Steele's interests were aligned with the Defendants' overarching conspiracy – he "was desperate that Donald Trump not get elected" and he "was passionate about [Donald J. Trump] not being president."[35]

96.    Orbis Ltd. was also chosen because of the ties between one of its analysts/sub-sources, Danchenko, and an individual with intimate ties to the Clinton Campaign and one its close associates, Dolan.

   a.  Danchenko, a Russian citizen, had been working as a contractor/analyst with Orbis Ltd. Since 2011, focusing primarily on Russian and Eurasian geo-political matters.[36]

   b.  Dolan, then an employee of public relations firm, Kglobal, was a longtime participant in Democratic politics, having previously served as chairman of national Democratic political organization, state chairman of former President Bill Clinton's 1992 and 1996 presidential campaigns, adviser to Clinton's 2008 presidential campaign, and having been appointed by Clinton to two four-year

---

[35] Bruce Ohr Transcribed Interview 124, Aug.  28, 2918.
[36] Danchenko Indictment ¶ 16.

terms on an advisory commission at the U.S. State Department.  With respect to the 2016 Clinton campaign, Dolan actively campaigned and participated in calls and events as a volunteer on behalf of the Clinton Campaign.[37]

c.   In late April 2016, Danchenko began having discussions with Dolan about a potential business collaboration between Orbis Ltd. and Kglobal to create a "dossier" to smear Donald J. Trump and to disseminate the false accusations to the media.  Those discussions reflected that Danchenko and Dolan had exchanged information regarding each other's backgrounds and professional activities, including Danchenko's work for Orbis Ltd, and Steele:[38]

d.   On or about April 29, 2016, Danchenko sent an e-mail to Dolan indicating that Danchenko had passed a letter to Steele and his business partner at Orbis Ltd. on behalf of Dolan and intended to set up a meeting between the two.[39]

e.   That same day, Danchenko sent an e-mail to Dolan outlining certain work that Danchenko was conducting with Orbis Ltd. The e-mail attached an Orbis Ltd. Report titled "Intelligence Briefing Note, 'Kompromat' and 'Nadzor' in the Russian Banking Sector."[40]

f.   On or about June 10, 2016, Dolan sent an e-mail to a U.S.-based acquaintance which reflected that Dolan and Danchenko had become colleagues and were exchanging information.  In describing Danchenko, Dolan stated: "He is too young

---

[37] *Id.* ¶ 19.
[38] *Id.* ¶ 23.
[39] *Id.* ¶ 24.
[40] *Id.* ¶ 25.

for KGB.  But I think he worked for FSB.[41]  Since he told me he spent two years in Iran.  And when I first met him he knew more about me than I did.  [winking emoticon]."

97.    In or about May 2016, Fusion GPS officially retained Orbis Ltd.[42]

98.    Elias expressly authorized Fusion GPS's decision to retain Orbis Ltd.[43]

99.    Steele has testified that his task was to "collect intelligence from our sources on Trump-Russia issues and interference in the US presidential campaign which would be fed to a client of Fusion, which was a law firm, Washington-based."[44]

100.    In taking on this assignment, Steele was aware that "Democratic Party associates" were paying for his and Fusion GPS's "research," and that "the ultimate client" was "the leadership of the Clinton presidential campaign."[45]

101.    Steele also viewed Perkins Coie as a client, as well as the "legal arm of the Democratic Party."[46]

102.    Critically, Steele has testified that "the candidate"—Hillary Clinton—was "aware of [his] reporting."[47]

---

[41] The Federal Security Service of the Russian Federation, commonly referred to as the "FSB," is the principal security agency of Russia and the principal successor agency to the KGB.

[42] Tr.  of Christopher Steele Deposition at 155-156 (Mar.  17-18, 2020), *Aven v.  Orbis* (2020) EWHC 1812 (QB) (hereinafter, "Steele Dep.").

[43] Elias Testimony at 33 ("Q: […] Would you have to sign off on that decision [to retain Fusion GPS]? Do you have to sign off on decisions to hire subcontractors and vendors? A: I had the authority under the contract. I didn't in all instances. I did in this instance.").

[44] Steele Dep. at tr. 156:15-19.

[45] IG Report at 96; *see also* Steele Dep. at 162-163 ("Q: . . .  in early July . . .  who did you think the ultimate client was? A: I thought it was the campaign . . .  Q: You knew it was the leadership of the Clinton presidential campaign, didn't you? A: I believed it was the campaign, yes.  Q: The leadership of the Clinton campaign? A: Fine, the leadership of the campaign.")

[46] Steele Dep. at tr. 158:2-4; 67:21-22.

[47] FBI Notes at 96; *see also* Steele Dep. at tr. 163 (emphasis added).

103.     Shortly after being retained—at the direction of Clinton, the Clinton Campaign, the DNC, Perkins Coie, and Fusion GPS—Orbis Ltd. and Steele, with the assistance of Nellie Ohr, Danchenko Dolan, and others, began preparing approximately seventeen anti-Trump memoranda known collectively as the "Steele Dossier" or simply the "Dossier."

104.     All of these parties had a collective understanding regarding the true nature of the Dossier – it would contain unverified, falsified, and fraudulent information which would be fed to law enforcement to perpetuate a false narrative that Donald J. Trump was colluding with Russia.

105.     Indeed, Steele has explicitly acknowledged that "the purpose of [his] work was to prevent Donald Trump from becoming president[.]"[48]; he has acknowledged that the "FBI" was an "intended audience" of his reporting.[49]

106.     Thus, the Dossier was intended to not only harm Trump's political career and candidacy, but more importantly, it was fabricated to induce the FBI to commence an investigation into alleged ties between Russia and Donald J. Trump, the Trump Campaign, and the Trump Organization.

107.     In drafting the Dossier, Steele purported to rely upon numerous sources who contributed information and prevarications to him.

108.     Several of the alleged sources named in the Dossier have refuted, under oath, that they provided any of the purported information contained in the Dossier to Steele:

      a.   Olga Galkina, a Russian citizen who was referenced as "sub-source 3" in the Dossier, stated that she was never a source or sub-source to Steele, and, in fact,

---

[48] Steel Dep. at tr. 97:5-8 ("Q: That was the purpose of your work, to prevent Donald Trump from becoming president? A: By definition, an opposing candidate in their campaign was seeking to win an election.")
[49] *Id.* at tr. 67:21-22.

never even met him.[50]

    b.  Alexey Dundich, a Russian citizen who was referenced as "sub-source 4" in the Dossier, stated that he never was a source of information, and never even met Steele.[51]

109.    The primary source for the information provided in the Dossier was Steele's analyst, Danchenko.

110.    From May 2016 through December 2016, Danchenko assembled and provided to Steele purported information that Steele would, in turn, rely upon to draft the Dossier.

111.    During that same time, Danchenko had numerous meetings, communications and interactions with Dolan.[52]

112.    Danchenko also brokered numerous meetings between himself, Dolan and Galinka.[53]

    a.  In addition, Dolan and Galinka communicated regularly during that time and regularly discussed, among other things, their political views and their support for Clinton.[54]

    b.  Galinka viewed Dolan as an "advisor" to Clinton and believed that he would "take [her] to the State Department if Hillary wins."[55]

---

[50] Declaration of Olga Aleksandrovna Galkina dated June 8, 2021 (ECF Doc. No. 153-8), *Fridman, et al. v. Bean LLC a/k/a Fusion GPS, et al.*, case no. 17-2041-RJL, District of Columbia (June 21, 2021).

[51] Declaration of Alexey Sergeyevich Dundich dated May 13, 2021 (ECF Doc. No. 153-4), *Fridman, et al. v. Bean LLC a/k/a Fusion GPS, et al.*, case no. 17-2041-RJL, District of Columbia (June 21, 2021).

[52] *See generally* Danchenko Indictment.

[53] *Id.* ¶¶ 39-41.

[54] *Id.* ¶ 41.

[55] *Id.* ¶¶ 41.

113.   Certain information contained in the Dossier, which Danchenko provided to Steele, mirrors and/or reflects information that Dolan had conveyed to Danchenko.

114.   For example, an allegation contained in Report 80 of the Dossier, claiming that Donald J. Trump had previously engaged in "salacious sexual activity" in the Presidential Suite at a Moscow hotel, was derived from Dolan:

a.   Dolan had stayed at the Moscow hotel in June 2016, and, during that trip, he participated in, among other things: 1) a meeting with the general manager of the Moscow hotel and a female hotel staff member, (2) a lunch with a Staff Member and other members of the Moscow hotel staff and (3) a tour of the Moscow hotel, including the Presidential Suite.

b.   Thereafter, Dolan told Danchenko that he learned from a hotel staffer that Trump had stayed in the Presidential Suite and engaged in "salacious sexual activity."

c.   References to the Moscow hotel, the Presidential Suite, and a hotel manager and other staff would all later appear in the Dossier, which included absurd allegations that Trump participated in "sexual or salacious activity."

d.   Dolan ultimately admitted that no one at the hotel mentioned anything to him about Trump's supposed "sexual or salacious" activity.

115.   Another allegation, contained in Report 111 of the Dossier, claiming that the Russian government withdrew a Russian from his job at the Russian Embassy in Washington, D.C. due to fears relating to the diplomat's purported role in meddling in the U.S. Presidential Election, had clearly originated from Dolan:

> [S]peaking separately to [a] compatriot, a senior Russian [Ministry of Foreign Affairs] official reported that as a prophylactic measure, a leading Russia diplomat, [Russian Diplomat-1], had been

> withdrawn from Washington on short notice because Moscow
> feared his heavy involvement in the US presidential election
> operation, including the so-called veterans' pensions ruse (reported
> previously), would be exposed in the media there. His replacement,
> [Russian Diplomat-2] however was clean in this regard.

116.    This allegation bore substantial similarities to information that Dolan received during the 2016 time period.

117.    Moreover, Dolan was undoubtedly a source for an allegation in the Dossier regarding Paul Manafort's departure from the Trump Campaign:

> S/he said it was true that the Ukraine corruption revelations had
> played a part in this, but also, several senior players close to
> [Trump] had wanted [Paul Manafort] out, primarily to loosen his
> control on strategy and policy formulation. Of particular
> importance in this regard was Paul Manafort's] predecessor as
> campaign manager, [Campaign Staff Member-1-], who hated [Paul
> Manafort] personally and remained close to [Trump] with whom
> he discussed the presidential campaign on a regular basis.

118.    The above allegation contained information that Dolan provided to Danchenko is in response to a specific request. In particular, on August 19, 2016, Danchenko e-mailed Dolan to inquire as to any "thought, rumor, or allegation" about Paul Manafort.

119.    Thereinafter, on August 20, 2016, Dolan e-mailed Danchenko the following:

> I had a drink with a GOP friend of mine who knows some of the
> players and got some of what is in this article, which provides even
> more detail. She also told me that [Campaign Staff Member-1],
> who hates [Paul Manafort] and still speaks to Trump regularly
> played a role. He is said to be doing a happy dance over it.

120.    Later that same day, Danchenko replied to Dolan, expressing his appreciation for the information, adding that their "goals clearly coincide[d]" with respect to gathering derogatory information about Trump.[56] Dolan responded, stating "Thanks! I'll let you know if I hear anything

---

[56] Id. ¶ 49.

else."[57]

121.    Moreover, an allegation contained in an undated Dossier report described a "well-developed conspiracy of cooperation" between Donald J. Trump, the Trump Campaign, and senior Russian officials, claiming:

> Speaking in confidence to a compatriot in late July 2016, [Source E], an ethnic Russian close associate of Republican US presidential candidate Donald Trump, admitted that there was a well-developed conspiracy of co-operation between them and the Russian leadership.  This was managed on the Trump side by the Republican candidate's Campaign manager, [Paul Manafort], who was using foreign policy advisor, [Carter Page], and others as intermediaries. The two sides had a mutual interest in defeating Democratic presidential candidate Hillary Clinton, whom President Putin apparently both hated and feared.

122.    This allegation would ultimately be offered in support of four FISA applications targeting former Trump Campaign associate Carter Page.

123.    An additional allegation contained in the Dossier indicated that Russian diplomatic staff in Washington, D.C., New York, and Miami were paying U.S.-based cyber actors to conduct operations against the Democratic Party and Clinton.

### *Sussmann Recruits Joffe and Neustar to Lead a Cyberattack Against Trump*

124.    While Elias was overseeing Fusion GPS, Orbis, Steele and others in the creation of the Dossier, Sussmann—at the direction of the Clinton Campaign and the DNC—was heading another aspect of the Defendants' conspiracy: a plot to exploit sensitive data sources and falsify evidence to manufacture ties between Donald J. Trump and a Russian bank.

125.    To put this plan in motion, the Clinton Campaign, DNC, Perkins Coie and Fusion GPS would require the assistance of a cybersecurity expert with the expertise and access to

---

[57] *Id.* ¶ 50.

sensitive, non-public data that could be exploited for their nefarious purposes.

126.    At all relevant times, Neustar was an information technology company founded in 1998 which offers various internet-related information, data and analytics services, including Domain Name System ("DNS") resolution services, to its customers.[58]

127.    At all relevant times, Neustar processed approximately 150 billion DNS responses per day with regard to its customers' data; this data is stored, for a period of time, by Neustar.[59]

128.    Far from apolitical, Neustar and its employees have long been aligned with the Democratic Party.  In 2016 alone, 100% of congressional campaign donations from Neustar employees went to Democrats.

129.    At all relevant times, Joffe was an executive of Neustar and had an ownership interest in at least six additional technology and/or data-related companies, Dissect Cyber Inc. ("Dissect Cyber"), Zetalytics LLC ("Zetalytics"), BitVoyant, LLC ("BitVoyant"), BlueVoyant, LLC ("Bluevoyant"), Packet Forensics, LLC (Packet Forensics"), and Littoral Ventures, LLC ("Littoral") (collectively, the "Data Companies").

130.    At all relevant times, Joffe had access to numerous data sources through his various positions with Neustar and the Data Companies, including access to non-public, proprietary data.

131.    In or around 2016, Joffe was in communication with high-ranking officials of the Clinton Campaign and/or the DNC in the lead-up to the 2016 Presidential Election.

132.    During that time, Joffe was "tentatively offered the top [cybersecurity] job by the Democrats" in the event Clinton won the presidency.  He stated that he "definitely would not take

---

[58] Sussmann Indictment at ¶ 12.
[59] Testimony of Steve DeJong at tr. 504:18-25, *U.S. v. Sussmann*, May 17, 2022 (trial transcript; afternoon session) (hereinafter, "DeJong Testimony").

the job under Trump."[60]

133.    Since at least August 2009, Perkins Coie, and Sussmann in particular, frequently served as outside counsel for Joffe and Neustar; as such, Neustar was a significant source of revenue for Perkins Coie.[61]

      a.    For instance, from 2014 through 2017, Perkins Coie billed the following amounts to Neustar: $693,323.49 in legal fees in 2014; $1,197,254.04 in legal fees in 2015; $1,476,851.84 in legal fees in 2016; and $2,155,216.65 in legal fees in 2017.[62]

134.    In or around July 2016, Perkins Coie, Elias and Sussmann, acting on behalf of and at the direction of the Clinton Campaign and the DNC, tasked Joffe to exploit his access to the information gathering services and non-public data of Neustar and the Tech Companies to dredge up confidential, proprietary, non-public information, data and/or records relating to Donald J. Trump, the Trump Campaign, and the Trump Organization, in the hopes that the data would reveal wrongdoing that could be used to create an injurious falsehood to harm the political reputation of Donald J. Trump.

135.    The Clinton Campaign, the DNC, Fusion GPS, and Joffe further agreed that, if no such damaging information could be found, that the ill-obtained data would be falsified and/or presented in a fraudulent manner to create an "inference" of wrongdoing.[63]

136.    The above-named Defendants referred to this project as "Crimson Rhino."[64]

---

[60] Sussmann Indictment ¶ 15.
[61] Gov't Ex. 2202, *U.S. v. Sussmann*.
[62] *Id.*
[63] Sussman Indictment at ¶23(h); *see also* Paul Sperry, *Clinton Tech" Rodney Joffe Had a Shady Past Before He Targeted Trump,* New York Post, February 21, 2022.
[64] Testimony of Jay Novick, *U.S. v. Sussmann*, May 17, 2022 (trial transcript, morning session) (hereinafter, the "Novick Testimony").

137.    The name was used to avoid having the name "Trump" bandied about, and its purpose was to link certain individuals listed in a tasking document—all "of whom were associated with the Trump Campaign—with Russia.[65]

138.    The purpose of obtaining this information was to modify it to appear incriminating and then to disseminate it to law enforcement and the media, thereby damaging the candidacy and overall electability of Donald J. Trump.[66]

139.    As described in greater detail below, with regard to their interactions with law enforcement, the Defendants' agreed to utilize a method known as 'circular reporting' whereby two individuals—Sussmann and Joffe—would simultaneously and surreptitiously present evidence to law enforcement in an attempt to self-corroborate their respective efforts.

140.    In furtherance of these efforts, beginning in or around July 2016, Joffe began exploiting his access to non-public data sources, including through Neustar and the Data Companies, in search of proof of a secret "back channel" between Donald J. Trump or the Trump Organization and Alfa Bank.[67]

141.    In doing so, Joffe unlawfully searched, gathered and mined internet data, including non-public and proprietary data, to obtain derogatory information on Donald J. Trump.[68]

     a.    The purpose of obtaining such data was to create an "inference" and "narrative" regarding Trump's purported ties to Russia.[69]

---

[65] Novick Testimony at tr. 1999:19-2015:25.

[66] Sussman Indictment at ¶21.

[67] Sussmann Indictment ¶¶ 21-23; *see also* Motion to Inquire into Potential Conflicts of Interest ¶ 4 (ECF Doc.  No.  35), *United States v.  Sussmann*, case no.  1:21-cr-00582-CRC, District of Columbia (Feb.  11, 2022) (hereinafter "Sussmann Conflict Motion").

[68] *Id.*

[69] Sussmann Indictment ¶ 23.

    b.   Those actions were directed by and/or done at the behest of certain "VIPs" of the Clinton Campaign and Perkins Coie.[70]

    c.   Those "VIPs" include Clinton, Sullivan, Elias and/or Sussmann.

142.    Among other things, Joffe—at the direction of Clinton, the Clinton Campaign, the DNC, Perkins Coie, and Sussmann—exploited his access to non-public and proprietary internet data through Neustar and the Data Companies, including without limitation, domain name system (DNS) internet traffic, of: (i) a healthcare provider; (ii) Trump Tower; (iii) Donald Trump's private apartment in Central Park West, and (iv) the Executive Office of the President of the United States (EOP).[71]

    a.   In doing so, Joffe, by and through his position with Neustar, intentionally accessed, without authorization or in excess of any authorization, the computers, servers, and/or other sensitive data sources at the above-stated facilities.

    b.   Joffe, by and through his position with Neustar, stole trade secrets, in the form of proprietary, sensitive and confidential data, information, and knowledge, from the above-stated facilities.

    c.   After obtaining the data, Joffe, by and through his position with Neustar, "spoofed" the information, by disguising the origin of the computer communications, and making them appear falsely to originate from a particular IP address.

143.    With regard to the EOP, Joffe and Neustar had come to access and maintain dedicated servers for the EOP as part of a highly sensitive arrangement whereby Neustar provided

---

[70] *Id.* ¶ 22-23; *see also* Sussmann Conflict Motion ¶¶ 4-5.
[71] *Id.*

DNS resolution services to the EOP.[72]

144.    Joffe and Neustar exploited this arrangement by, among other things, mining the EOP's DNS traffic and other data for the purpose of gathering derogatory information about Donald J. Trump.[73]

145.    In addition, Joffe, Neustar, and their associates queried their holdings of non-public internet data against a lengthy list of more than 9,000 IP addresses, 3,000 internet domains, and 60 e-mail addresses and domains that related to Donald J. Trump, the Trump Organization, and numerous Trump associates, in their search for derogatory information.[74]

146.    Donald J. Trump only recently learned of this information no earlier than September 16, 2021, as these revelations were exposed for the first time in the Sussmann indictment and/or subsequent motions filed by Special Counsel John Durham.

### The Defendants Commence Their Disinformation Campaign

147.    Steele finished his first report of the Dossier on June 20, 2016.

148.    Almost immediately thereafter, Fusion GPS, with the approval of the Clinton Campaign, the DNC and Perkins Coie, began shopping their fictitious stories to various news outlets, hoping that it would become national and international news, and ultimately cause harm to Donald J. Trump.

149.    Importantly, all of the communications between Fusion GPS and the media, as described *infra*, were expressly authorized by Perkins Coie, the DNC and the Clinton Campaign, as Simpson has testified that Fusion GPS does not share information with the media without

---

[72] *Id.*
[73] *Id*.
[74] Sussman Indictment at ¶22(h).

express consent from its clients.[75]

150.    Beginning as early as May 2016, Fusion GPS began contacting reporters to persuade them to publish negative stories about Trump, the Trump Campaign, and the Trump Organization – stories that Fusion GPS was well aware were false and misleading.

151.    Around that same time, Fusion GPS also directed Steele to spread information to the media, including briefing journalists on his 'findings' and disseminating information to the media.[76]

152.    On May 14, 2016, Fritsch and Fusion GPS employee, Jake Berkowitz, engaged in various communications with Franklin Foer, a journalist for *Slate*, concerning the purported Russian connections of several of Trump's campaign associates, including Carter Page and Rick Burt.[77]

153.    On June 27, 2016, Fritsch sent an e-mail to Foer attempting to insinuate that the Trump Campaign was colluding with Russia.[78]

154.    The next day, June 28, 2016, Foer responded and provided a draft article to Fritsch and Berkowitz to review, stating: "I'm out of town this week.  I handed in a draft of the piece - - here's a copy.  It's not at all edited, so forgive all the rawness.  I have no idea what my editor will

---

[75] Simpson Testimony at 32-33 ("Q:[I]f you're doing work on behalf of a client, it could be I guess one of two situations: The client could either authorize you to talk to reporters on their behalf; or if a reporter called you and asked you for information, you could check with your client as to whether you have their permission to share the information? A: That is correct. […] Q: You wouldn't be sharing information without your client's approval one way or the other? A: That's right.").

[76] *Id.* at 59 ("Q: Did you direct Steele to brief the media outlets, and why? A: Yeah. We did it together.")

[77] *U.S. v. Sussmann*, ECF Doc. No. 98-1 (hereinafter the "Fusion GPS e-mails"), e-mails from Franklin Foer to Jake Berkowitz dated May 14, 2016 through May 15, 2016.

[78] Fusion GPS e-mails, e-mail from Peter Fritsch to Franklin Foer dated June 27, 2016 9:23am .

say.  But can you guys scan it for omissions and errors?  And obviously, keep it to yourself.  (Also promise me that you won't use it as a prod to the competition, whoever they are now.)."[79]

155.    Fritsch replied on the same day, stating that he and Berkowitz would "read it closely and make some suggestions."[80]

156.    In addition to spreading their lies through the media, the Clinton Campaign, the DNC, Perkins Coie and Fusion GPS also planned to simultaneously report their false stories to federal law enforcement and counterintelligence authorities.

157.    The purpose of feeding their false narratives to federal authorities was twofold: first, the Defendants sought to trigger various federal investigations into Donald J. Trump and his associates, hoping that it would injure his candidacy and political reputation; second, the Defendants sought to bolster the credibility of the stories they were peddling to the media by the fact that they were being actively investigated by federal authorities.

158.    The opening salvo occurred on July 5, 2016, when Steele—a paid FBI informant—began sending his dossier memoranda to the FBI, knowing that they contained false information on Donald J. Trump purporting to show compromising ties to Russia.[81]

159.    Simpson has admitted that Fusion GPS was aware that Steele was going to brief the FBI about his 'findings' relating to Trump and Russia and that Simpson "assented to" him doing so.[82]

### *The Intelligence Community Uncovers the Defendants' Plot*

160.    The Republican National Committee ("RNC") held its presidential nominating

---

[79] Fusion GPS e-mails, e-mails between Fristch, Berkowitz and Foer dated June 28, 2016.
[80] *Id.*
[81] *Id.*  at ¶ 2; *see also* IG Report.
[82] Simpson Testimony at 61.

convention from July 18 through July 21, 2016, wherein Donald J. Trump was nominated as the Republican Nominee for President of the United States in the 2016 election.

161.    On July 26, 2016, Clinton formally won the nomination of the Democratic Party at the Democratic National Convention.

162.    In late July of 2016, U.S. intelligence agencies obtained insight into Russian intelligence analysis alleging that Clinton had "approved a campaign plan to stir up a scandal against U.S. Presidential candidate Donald Trump by tying him to Putin and the Russians' hacking of the Democratic National Committee."[83]

163.    Sometime thereafter, CIA Director John Brennan briefed then-President Barack Obama and other senior national security officials on the intelligence, including the "alleged approval by Hillary Clinton . . .  of a proposal from one of her foreign policy advisors to vilify Donald Trump by stirring up a scandal claiming interference by Russian security services."[84]

164.    Meanwhile, throughout the course of the Democratic National Convention, which was held between July 25, 2016 through July 28, 2016, Sullivan—Clinton's foreign policy advisor—"really started sounding the alarm" about Russian interference in the 2016 Presidential Election.[85]

165.    Sullivan and Jennifer Palmieri, then-Communications Director for the Clinton Campaign, were "on a mission to get the press to focus on . . . the prospect that Russia had not

---

[83] Letter from John Ratcliffe, Dir.  of Nat'l Intelligence, to Sen.  Lindsey Graham, Chairman, S. Comm.  on the Judiciary (Sept.  29, 2020), https://www.judiciary.senate.gov/imo/media/doc/09-29-20_Letter%20to%20Sen.%20 Graham_Declassification%20of%20FBI's%20Crossfire%20Hurricane%20Investigations_20-00912_U_SIGNEDFINAL.pdf.  .
[84] *Id.*
[85] Sullivan Testimony at 14.

only hacked and stolen e-mails from the Democratic National Committee, but that it had done so to help Donald Trump and hurt Hillary Clinton."[86]

166.    Sullivan began meeting with the "reporting and producer teams of each of the major networks" including "CNN, ABC, FOX, CBS [and] NBC."[87]

167.    Among other things, Sullivan briefed the major networks on "the nature of the connections between several members of Trump's foreign policy and political team and elements of the Russian Government or Russian-backed proxies" and how these connections allegedly created a "pretty disturbing picture."[88]

168.    In or around that time, Frisch e-mailed journalist Jay Solomon with the *Wall Street Journal*, discussing a senior Trump advisors' supposed meeting with former KGB official with close ties to Putin, among other false allegations of Russia collusion.  In one e-mail, Peter Frisch, on July 26, 2016, wrote to the Wall Street Journal reporter, when he told him that Carter Page "is neither confirming or denying". that he should "call adam Schiff. Or difi for that matter.  I bet they are concerned about what page was doing other than giving a speech over 3 days in Moscow."

169.    On the morning of July 31, 2016, Steele met with Nellie Ohr and Bruce Ohr, at which time Steele discussed his work on the Steele Dossier. Bruce Ohr was already aware at that time that Steele was "sharing his information with the Clinton campaign."[89]

    a.    Thereafter, in August 2016, Bruce Ohr met with Andrew McCabe and Lisa Page and briefed them on the false accusation contained in the Steele Dossier,

---

[86] Jennifer Palmieri, *The Clinton campaign warned you about Russia. But nobody listened to us*., The Washington Post, March 24, 2017.

[87] Interview of Jake Sullivan at tr. 15, Permanent Select Committee on Intelligence, U.S House of Representatives, December 21, 2017 (hereafter, the "Sullivan Testimony").

[88] *Id.* at 16.

[89] S. REP. NO. 116-290, vol. 5, at 909–10.

particularly those concerning Carter Page.

170.    On that same day, as described in greater detail below, the FBI opened a Foreign Agents Registration Act ("FARA") investigation, known as Operation Crossfire Hurricane ("Crossfire Hurricane"), into whether individuals associated with the Trump Campaign were witting of and/or coordinating activities with the Russian government.

### *Defendants Escalate Their Efforts as the FBI Launches Crossfire Hurricane*

171.    As the unfounded Crossfire Hurricane investigation was unfolding, Clinton, the Clinton Campaign, the DNC, Perkins Coie undertook further efforts to prop up the unfounded investigation, spark additional investigations within the FBI, and spread disinformation through the media.

172.    In particular, Clinton, the Clinton Campaign, the DNC, Perkins Coie and Fusion GPS devised a plot whereby Sussmann and Joffe would each independently and surreptitiously present their 'white papers' and modified data to the FBI in the hopes that the dual presentation would corroborate their respective findings. This tactic is known as 'circular reporting.'

173.    At the same time, Steele would continue—and accelerate—his interactions with the FBI, as part of a collective effort to make their allegations of Trump-Russia collusion appear legitimate.

174.    Meanwhile, Fusion GPS, Steele, Sussmann would simultaneously engage with journalists and attempt to leverage the ongoing investigations—which they knew to be falsely prompted—as a means of adding credibility to their claims and perpetuating their lies through the media.

175.    On July 29, 2016, Elias, Sussmann, Joffe, Fritsch, and Fusion GPS employee Laura

Seago had an in-person meeting at the Washington D.C. office of Perkins Coie.[90]

    a.   The purpose of the meeting was "to discuss allegations of communications between the Trump organization and Alfa Bank."[91]

    b.   An inter-office calendar entry for Perkins Coie designated the meeting as pertaining to the "Clinton" matter.[92]

176.    On the same day, Steele was also present at Perkins Coie's Washington D.C. office for a meeting with Sussmann.[93]

    a.   At that meeting, Sussmann told Steele about a purported connection between a server at Alfa Bank and a server at the Trump Organization.[94]

    b.   Shortly after the meeting concluded, Simpson directed Steele to draft Memorandum 112 of the Steele Dossier, which concerns the purported corrupt ties between Alfa Bank and the Russian Government.[95]

    c.   According to Steele, the "instruction to produce [Memorandum 112] was absolutely definitely linked to the server issue."[96]

177.    All of Sussmann's time for the July 29 meetings was billed to the Clinton Campaign under the category "General Political Advice"[97] with the billing description "meeting with Elias,

---

[90] *See* Gov't Ex. 1705, *U.S. v. Sussmann*; *see also* Steele Dep. at tr. 159:10 (March 17, 2020).

[91] Saego Testimony at tr. 575:20-22.

[92] *See* Gov't Ex. 1705, *U.S. v. Sussmann*.

[93] Steele Dep. at tr. 159:10 ("I visited Perkins Coie on 29 July.").

[94] Steele Dep. at tr. 1:19-25 through 2:1-3 (March 18, 2020).

[95] *Id.* at tr. 2:4-6 (March 18, 2020)

[96] *Id.* at tr. 5:1-2.

[97] For all of Sussmann's other billing entries cited herein that he billed to the Clinton Campaign, he similarly billed his time to the Clinton Campaign under the category "General Political Advice."

others regarding [] confidential project."[98]

178.    On July 31, 2016, Sussmann billed the Clinton Campaign for "communications with M. Elias regarding server issue".[99]

179.    Shortly thereafter, in early August 2016, Sussmann met with Steele again to discuss the Trump-Alfa Bank allegations; his time for the meeting was billed to the Clinton Campaign.[100]

180.    On about August 12, 2016, Sussmann met with Elias and Joffe in Elias' office; the meeting was billed to the Clinton Campaign with the billing description "confidential meetings with Elias, others."[101]

      a.    Fritsch also met with Sussmann at the Perkins Coie office on the same date.[102]

181.    On or about August 17, 2016, Sussmann had a conference call with Elias and Joffe; his time was billed to the Clinton Campaign with the billing description "telephone conference with Joffe."[103]

182.    On the same day, there was also a conference call between Elias, Simpson, Fritsch, and Clinton Campaign attorney Deborah Fine.[104]

183.    On or about August 19, 2016, Sussmann had another meeting with Elias and Joffe; Sussmann billed his time to the Clinton Campaign with the billing description stating, in part, "confidential meeting with Elias, others[.]"

---

[98] Gov't Ex. 1704, *U.S. v. Sussmann*.

[99] Gov't Ex. 553.2, *U.S. v. Sussmann*.

[100] Tr.  of Interview at 74–75, H.  Permanent Select Comm.  on Intelligence Interview of Michael Sussmann (Dec.  18, 2017), https://www.dni.gov/files/HPSCI_Transcripts/2020-05-04-Michael_Sussmann-MTR_Redacted.pdf; Tr.  of Steele Dep.  at 1–2.

[101] Sussmann Indictment at ¶20; *see also* Gov't Ex. 1704, *U.S. v. Sussmann*.

[102] Gov't Ex. 0318, *U.S. v. Sussmann*.

[103] Gov't Ex. 1704, *U.S. v. Sussmann*.

[104] Gov't Ex. 0326, *U.S. v. Sussmann*.

184.    On or about August 20, 2016, Sussmann met with a representative of Fusion GPS and communicated with the media; he billed his time to the Clinton Campaign with the billing description, "Meeting with consultant and Elias; revisions to White Paper; meeting with expert; meeting with expert and reporter; follow up meeting with reporter; conversations with Elias."

185.    On the same day, Georgia Tech researcher Manos Antonakakis e-mailed Steve DeJong, a Neustar employee, stating, in pertinent part: "You know that if you are getting an encrypted e-mail with Rodney [Joffe] CCed, in the middle of the night, something is up. I will need you to pull all data you have (UltraDNS, TLDs, ccTLDs, and especially the data from the 'Secondary' dataset we talked about in May), for the following zones and IP addresses:" and then listed numerous domains relating to Trump and/or Alfa Bank.[105]

186.    Although the e-mail was sent from Mr. Antonakakis, it was understood that the 'research request' that required the data was, in fact, from Joffe.[106]

187.    On the same day, August 20, 2016, Joffe and his researchers manipulated a sales form on two different websites, faking the other's e-mail address to make them "appear to communicate with each other. . ."[107]

      a.   Joffe believed that this fake "inference" was believable enough that "Hillary's opposition research and whatever professional gov[ernments] and investigative

---

[105] Gov't Ex. 0111; *see also* DeJong Testimony at tr. 513:5-14.

[106] *Id.* at 514:7-13 ("It's not uncommon for us to get research requests and data requests. Rodney was well-known for working at all hours, 24/7, depending on what time zone he happened to be in. It was not uncommon for us to get these requests. It was a little uncommon that it would come from Manos, but it wasn't unexpected that it would come from Rodney in the middle of the night.").

[107] Sussmann Indictment at ¶23.

journalists are also digging [would] come up with the same things[.]"[108]

188.     On or about the same date, Joffe clarified in an e-mail that the "task" he had been "given" by Perkins Coie, the Clinton Campaign, and the DNC was "indeed broad" and further stated, in part:

> Being able to provide evidence of *anything* that shows an attempt to behave badly in relation to this, the VIPs would be happy.  They're looking for a true story that could be used as the basis for closer examination.[109]

189.     On or about August 21, 2016, Joffe e-mailed his team of researchers, urging them to push forward with their anti-Trump research, which he claimed would "give the base of a very useful narrative."[110]

190.     In that same e-mail, Joffe admitted that the 'narrative' that they were trying to prove—a connection between Trump and Alfa Bank—was merely a "red herring" with no factual basis that should be "ignored."[111]

191.     On September 1, 2016, Sussmann met with Eric Lichtblau of the *New York Times* to discuss the false Trump-Alfa Bank connection; Lichtblau would later write an article about the topic.[112]

192.     On September 8, 2016, Fritsch providing a summary of findings on the Trump Russia connection to Steven Mulfson of the *Washington Post*.

193.     Beginning on or about September 5, 2016, despite knowing that the data relating to the Trump and Alfa Bank servers was merely a 'red herring', Sussmann, Joffe and Fusion GPS

---

[108] *Id.*
[109] *Id.*
[110] *Id.*
[111] *Id.*
[112] Gov't Ex. 0349, *U.S. v. Sussmann*.

began to draft, review, and revise multiple "White Papers" summarizing the allegations—which they knew to be false—of a supposed tie between Donald J. Trump and Alfa Bank.[113]

194.    All the time Sussmann spent drafting his 'white papers,' as with all his time spent working with Neustar, Fusion GPS, and all of his acts in furtherance of the Defendants' conspiracy, were billed to the Clinton Campaign.[114]

195.    The next day, on September 6, 2016, Sussmann and Elias met with representatives of Fusion GPS; he billed his time to the Clinton Campaign and the meeting was categorized as relating to the "Clinton" matter.115

196.    On September 7, 2016, U.S. intelligence officials forwarded an investigative referral to Comey and Strzok regarding "U.S. Presidential candidate Hillary Clinton's approval of a plan concerning U.S. Presidential candidate Donald Trump and Russian hackers hampering U.S. elections as a means of distracting the public from her use of a private mail server."[116]

197.    On September 12, 2016, Sussmann spoke with Elias via phone regarding Sussmann's efforts to communicate with one newspaper on the allegations about Alfa Bank; Sussmann and Elias both billed the call to the Clinton Campaign.

198.    On September 13, 2016, Sussmann purchased two thumb drives (the "Thumb Drives") from a Staples located nearby Perkins Coie's Washington D.C. Office.[117]

---

[113] *Id.* at ¶24; *see also* American News, *Fusion GPS Revealed To Have Pushed Russia Collusion Story to Numerous Outlets*, April 27, 2020.

[114] *See generally* Sussmann Indictment.

[115] Gov't Ex. 1705, *U.S. v. Sussmann*.

[116] Letter from John Ratcliffe, Dir.  of Nat'l Intelligence, to Sen.  Lindsey Graham, Chairman, S. Comm.  on the Judiciary (Sept.  29, 2020), https://www.judiciary.senate.gov/imo/media/doc/09-29-20_Letter%20to%20Sen.%20 Graham_Declassification%20of%20FBI's%20Crossfire%20Hurricane%20Investigations_20-00912_U_SIGNEDFINAL.

[117] Gov't Ex. 0380, *U.S. v. Sussmann*.

199.    The expense for the Thumb Drives was charged to, and ultimately reimbursed by, the Clinton Campaign.[118]

200.    On or about September 14, 2016, Joffe sent the white paper, on which Sussmann had been working, to his team with the following comment:

> Please read as if you had no prior knowledge or involvement, and you were handed this document as a security expert (NOT a DNS expert) and were asked: Is this plausible as an explanation?' NOT to be able to say that this is, without doubt, fact, but to merely be plausible.  Do NOT spend more than a short while on this (If you spend more than an hour you have failed the assignment).  Hopefully less.  :)[119]

201.    On or about the same date, one of Joffe's researchers replied, stating that the white paper achieved Joffe's objective, but noting that the paper "smartly" avoided discussing weaknesses or "holes" in the paper's hypothesis.[120]

a.  In a September 15, 2016 e-mail correspondence, one of the recipients of the question responded to Joffe, stating, in part, that the "paper's conclusion was plausible" in the "narrow scope" defined by Joffe.

b.  In a September 16, 2016 e-mail correspondence, one of Joffe's team confirmed that Sussmann would convey the false information to the FBI regarding the supposed connection between Donald J. Trump and Alfa Bank, with the plan to deceive.[121]

202.    In or around that time, in early-to-mid September 2016, a meeting occurred at the offices of Perkins Coie in Washington D.C. Attendees included Elias, Sussman, Joffe, Fritsch and

---

[118] *Id.*
[119] *Id.* at ¶24.
[120] Sussman Indictment at ¶24(f).
[121] Sussman Indictment at ¶24(i).

Fusion GPS employee Lauren Seago; the purpose of the meeting was to review and discuss the status of the "allegations of communications between the Trump Organization and Alfa Bank." [122]

203.    On or about September 15, 2016, just four days before Sussmann's meeting with the FBI, Elias exchanged e-mails with Sullivan, Mook, Podesta, and Palmieri with the subject line "Alfa Bank article" – i.e., the plot to falsely connect Donald J. Trump to the Russian bank, Alfa Bank, by disseminating the lies to the media.[123]

***Sussmann Meets with FBI General Counsel to Submit Falsified Data and Evidence***

204.    On September 18, 2016, Sussmann texted the FBI General Counsel, Jim Baker, stating the following: "Jim — it's Michael Sussmann. I have something time-sensitive (and sensitive) I need to discuss. Do you have availability for a short meeting tomorrow? I'm coming on my own — not on behalf of a client or company — want to help the Bureau. Thanks," he wrote in the message displayed in court."

205.    On September 19, 2016, Sussmann met with Baker at FBI Headquarters in Washington D.C. to convey his allegations of the connection between Donald J. Trump and the Russian bank.[124]

206.    During this meeting, the following, in substance and in part, took place:

a.    Sussmann stated falsely that he was not acting on behalf of any client, which led Baker to understand that Sussmann was conveying the allegations as a good citizen and not as an advocate for any client.[125]

---

[122] Testimony of Laura Seago at tr. 575:20-22, *U.S. v. Sussmann,* May 18 (trial transcript; morning session) (hereinafter, the "Seago Testimony").
[123] Gov't Ex. 0390, *U.S. v. Sussmann*.
[124] Sussman Indictment at ¶27.
[125] Sussman Indictment at ¶27(a).

b. Sussmann stated that he had been approached by multiple cyber experts concerning the Russian bank connections allegations; Sussmann provided the names of three cyber experts but did not name or mention Neustar, Joffe, the Clinton Campaign, or any other person or company referenced above.[126]

c. Sussmann described the allegations of a secret Trump Organization server that was in communication with the Russian bank, including that the Russian bank had used a TOR exit node located at a healthcare company to communicate with the Trump Organization.[127]

d. Sussmann stated that media outlets were in possession of information about the Trump Organization's secret server, and that a story would be published on Friday of that week.[128]

e. Sussmann provided to Baker two Thumb Drives and hard copy papers, which contained and comprised the following: (i) the aforementioned white paper that Sussmann had assisted in drafting, entitled *White Paper #1 AuditableV3*, which contained no date or author's name; (ii) a white paper drafted by a researcher, which was entitled, *White Paper Comments: Time Series Analysis of Recursive Queries*, dated September 19, 2016, and contained no author's name; (iii) white paper drafted by Fusion GPS regarding the Russian Bank and its parent company, which contained no date or author's name; and (iv) eight files containing the Russian Bank data and other purported data and information relating to the

---

[126] Sussman Indictment at ¶27(b).
[127] Sussman Indictment at ¶27(d).
[128] Sussman Indictment at ¶27(e).

mail.trump-e-mail.com domain.[129]

    f.   Sussmann told Baker that the issue was "time sensitive" and said that a "major media outlet" would soon be reporting it; in fact, Sussmann was personally pushing the story to the *New York Times* through his communications with *Times* reporter, Eric Lichtblau.

207.    Sussmann reported the Trump-Alfa Bank connection, as though it was real, and lied to Baker, by falsely stating that he was not acting on behalf of any client, when he was specifically there at the behest of Clinton, the Clinton Campaign, and the DNC.  In fact, he billed the Clinton Campaign for his efforts, as he had with all of his actions taken in furtherance of the Defendants' conspiracy.[130]

208.    Sussmann's statement to Baker that he was not acting on behalf of any client was knowingly and intentionally false.  In truth, and as Sussmann well knew, he and his firm, Perkins Coie, had been acting on behalf of and in coordination with five specific clients, *i.e.,* Clinton, the Clinton Campaign, the DNC, Fusion GPS, Joffe, and Neustar in assembling and conveying his allegations.[131]

209.    Sussmann billed his meeting with Baker to the Clinton Campaign with the billing description, "work and communications regarding confidential project."[132]

210.    Sussmann concealed and failed to disclose, among other things, that, (i) he had spent time drafting one of the white papers he provided to Baker and billed that time to the Clinton Campaign, (ii) Fusion GPS, which at the time was also acting as a paid agent of the Clinton

---

[129] Sussman Indictment at ¶27(f).
[130] Sussman Indictment at ¶30.
[131] Id.
[132] Sussman Indictment at ¶29.

Campaign and the DNC, drafted another of those white papers; and (iii) the "major media outlet" was the *New York Times* and Sussmann himself had provided the Alfa Bank allegations to *Times* reporter Eric Lichtblau.[133]

211.    Sussmann's lies and omissions were material because, among other reasons, they misled Baker and other FBI personnel concerning the political nature of his work and deprived the FBI of information that might have permitted it more fully to assess and uncover the origins of the relevant data and technical analysis, including the identities and motivations of Sussmann's clients.[134]

212.    Had the FBI uncovered the origins of the relevant data and analysis, it would have learned, among other things, that (i) in compiling and analyzing the Alfa Bank allegations, Joffe had exploited his access to non-public data at multiple internet companies to conduct opposition research concerning Donald J. Trump; (ii) in furtherance of these efforts, Joffe had enlisted, and was continuing to enlist, the assistance of researchers at a U.S.-based university who were receiving and analyzing internet data in connection with a pending federal government cybersecurity research contract; and (iii) Sussmann, Elias, Perkins Coie, Joffe, and Neustar had coordinated, and were continuing to coordinate, with representatives and agents of the Clinton Campaign and the DNC with regard to the data and written materials that Sussmann gave to the FBI and the media.

213.    Immediately after the aforementioned September 19, 2016, meeting, Baker spoke with the Assistant Director of the FBI's Counterintelligence Division, Bill Priestap.   During their conversation, Baker conveyed the substance of his meeting with Sussmann.   Priestap took

---

[133] Sussman Indictment at ¶30.
[134] Sussman Indictment at ¶32.

contemporaneous handwritten notes which reflect, in substance, the above-referenced statements by Sussmann and stated, among other things: "Michael Sussmann – Atty: Perkins Coie, LLP not doing this for any client."[135]

214.    On September 23, 2016, as a direct result of Sussmann's meeting with Baker, the FBI opened a full field investigation into the "network communications between a US-based server [the Trump Organization] and the Russian ALFA BANK organization."[136]

   a.   A full field investigation is the highest level of investigation that can be authorized by the FBI – it is an investigation in which the FBI "employs all of [its] resources."[137]

215.    The FBI's investigation of these allegations nevertheless concluded that there was insufficient evidence to support the allegations of a secret communications channel with the Russian bank.  In particular, and among other things, the FBI's investigation revealed that the e-mail server at issue was not owned or operated by the Trump Organization but rather, had been administered by a mass marketing e-mail company that sent advertisements for Trump hotels and hundreds of other clients.

216.    In the weeks following his meeting with the FBI, Sussmann continued to coordinate with Joffe, Elias, Fusion GPS, and Steele to disseminate the Russian bank allegations to the media and to law enforcement. [138]

217.    For example, on or about October 10, 2016, Sussmann e-mailed a reporter a link to

---

[135] Sussman Indictment at ¶28.
[136] *See* Def. Ex. DX-525, *U.S. v. Sussmann*.
[137] Testimony of Curtis Heide at tr. 1817:25-1818:2, *U.S. v. Sussmann*, May 24, 2022 (trial transcript; afternoon session) (hereinafter, the "Heide Testimony").
[138] Sussman Indictment at ¶33.

an opinion article which asserted, in substance and in part, that investigative reporters had not published as many stories regarding Donald J. Trump as other media outlets.[139]

### *Joffe Also Contacts the FBI To Report False Information*

218.    On or about October 2, 2016, Joffe reached out to FBI Special Agent (SA) Tom Grasso via telephone and provided "information relating to communications between the Trump Campaign and some entity in Russia."[140]

219.    In particular, Joffe provided at least one IP address, pertaining to an individual connected to Alfa Bank, to SA Grasso.[141]

220.    At the time he contacted SA Grasso, Joffe was a confidential human source (CHS) for the FBI.[142]

221.    Joffe contacted SA Grasso despite the fact that SA Grasso was not Joffe's handling agent.[143]

      a.    Standard practice within the FBI is for a CHS to deal exclusively with his handling agent.[144]

222.    During the course of the call, Joffe specifically asked SA Grasso "not to disclose his identity to other people in the Bureau."[145]

223.    Further, Joffe did not disclose to SA Grasso the source of the data he was passing along, nor did he disclose his connections to Fusion GPS, Perkins Coie, the DNC or the Clinton

---

[139] Sussman Indictment at ¶34.

[140] Testimony of Tom Grasso at tr. 2159:3-9, *U.S. v. Sussmann*, May 25, 2022 (trial transcript; morning session) (hereinafter the "Grasso Testimony").

[141] *Id.* at tr. 2158:13-14.

[142] *Id.* at tr. 2166:24-2167:1.

[143] *Id.* at tr. 2167:2-3.

[144] *Id.* at tr. 2174:16-20.

[145] *Id.* at tr. 2167:19-23.

Campaign.[146]

224.    The same day Joffe e-mail Grasso, he sent an e-mail to Sussmann to arrange an in-person meeting the following day.[147]

225.    The Clinton Campaign, the DNC, Perkins Coie, and Fusion GPS were well aware JJoffe's intention to feed false information to the FBI.

### Steele Continues Meeting with Law Enforcement While the Media Blitz Goes On

226.    Meanwhile, on the same date Sussmann met with the FBI—September 19, 2016—Steele provided reports from the Steele Dossier to the FBI which contained false information regarding Carter Page and his purported ties to Russia.

    a.    Thereafter, the FBI applied for four (4) separate FISA warrants as to Carter Page.

    b.    In doing so, the FBI relied substantially on the Dossier as a means of establishing probable cause that Carter Page was a witting agent of the Russian Federation.

    c.    Indeed, McCabe would later testify before Congress behind closed doors in December 2017 that, if not for the Steele Dossier, no FISA warrant would have been issued.[148]

    d.    Inspector General Michael Horowitz found that the Steele Dossier played a "central and essential role in the decision by the FBI [Office of General Counsel] to support the request for FISA surveillance targeting Carter Page, as well as the [Department of Justice]'s ultimate decision to seek the FISA order."[149]

    e.    Each of the FISA applications set forth the FBI' s assessment that Carter Page was

---

[146] *Id.* at tr. 2171:9-15.
[147] Gov't Ex. 0432, *U.S. v. Sussmann*.
[148] 120919-examination.pdf (justice.gov) at fn. 264.
[149] IG Report at 359.

a knowing agent of Russia and further alleged—in reliance on the Dossier—that Carter Page was part of a "well-coordinated conspiracy of co-operation between the Trump Campaign and the Russian government."

227.    Two days later, on September 21, 2016, Steele, Fritsch, and Simpson met with numerous members of the media in Washington D.C., including reporters from *The New York Times*, *The Washington Post*, *New Yorker*, *Yahoo News*, and *CNN*, to discuss their investigative findings of an alleged "sinister relationship" between Donald J. Trump and Russia, including the "possible coordination of members of Donald J. Trump's campaign team and Russian government officials."[150]

    a.   Fusion GPS specifically directed Steele to appear for the briefings to the press.[151]

    b.   The purpose of Steele being present for these meetings was to add credibility to the Defendant's false claims – he was "presented as a serious and experienced former intelligence officer whose research could be trusted."[152]

228.    Around that time, Steele and Simpson met with Michael Isikoff of *Yahoo! News* and discussed his 'findings' in the Dossier regarding the purported Trump-Russia collusion.[153]

229.    On September 23, 2016, *Yahoo! News* published an article titled "*U.S. Intel Officials Probe Ties Between Trump Advisor and Kremlin*."[154]

230.    The article was littered with false and defamatory information about Trump and his campaign, including "numerous references to information contained in the Dossier, including U.S.

---

[150] *Crime in Progress* at 110; *see also* IG report at 105.
[151] *See* IG Report at 105.
[152] Steele Dep. at tr. 166:19-24.
[153] *See* IG Report at 104-108.
[154] *See* https://www.yahoo.com/news/u-s-intel-officials-probe-ties-between-trump-adviser-and-kremlin-175046002.html.

officials had received intelligence reporting that Carter Page had met with Igor Sechin, Chairman of Rosneft, and Igor Divyekin, Deputy Chief in the Russian Presidential Administration."[155]

231.    The article cited a "well placed Western intelligence source" for the information obtained; Isikoff has since confirmed that the information was contributed by Steele.[156]

232.    On September 27, 2016, Sussmann sent an e-mail to Lichtblau disclosing an IP address and DNS data, purportedly connected to the Trump-Alfa Bank 'back channel.'[157]

233.    On October 3, 2016, Steele met with FBI's Crossfire Hurricane team in Rome, Italy.[158]

234.    At that meeting, Steele failed to disclose the identities of his client, Fusion GPS, or his ultimate clients, Perkins Coie, the Clinton Campaign, and the DNC.[159]

235.    Steele also refused to agree to cease his communications with the media and other third parties.[160]

236.    Thereafter, on October 11, 2016, Steele met with an official of the United States Department of State (the "State Dept."), Kathleen Kavalec—who "had been closely coordinating with the FBI"—in an attempt to reinforce Sussman's false claims concerning the purported Alfa Bank-Trump connection.[161]

237.    At that meeting, Steele told Kavalec, among other things, that: "Peter Aven of Alfa Bank has been the conduit for secret communications between the Kremlin and [Paul] Manafort;

---

[155] *Id.*; *see also* IG Report at 106.
[156] *Id.*; *see also* IG Report at 106.
[157] Gov't Ex. 0427, *U.S. v. Sussmann*.
[158] *See* IG Report at 108-114.
[159] *Id.* at 111.
[160] *Id.* at 113.
[161] Steele Dep. at tr. 45:4-6 (March 18, 2020).

messages are encrypted via Tor software and run between a hidden server manages by Alfa Bank."[162]

238.    Steele later acknowledged that he received this information did not come from one of his sources but rather from Simpson and Fusion GPS.[163]

239.    In her notes of the meeting, Kavalec recounted the following: "Orbis undertook this investigation into Russia/Trump connection at the behest of an institution he declined to identify that had been hacked. The institution approached them based on the recommendation of Glenn Simpson and Peter Fritsch (specialists in economic crime, formerly of the WSJ) and is *keen to see this information come to light prior to November 8*. Orbis undertook the investigation in June of 2016."[164]

      a.    Steele later testified that the "institution" referred to in Kavalec's notes is the DNC.[165]

      b.    Steele also confirmed that he, along with Fusion GPS, shared the DNC and Clinton Campaign's goal of having the information "come to light" prior to Election Day.[166]

240.    The DNC's deadline for having the Trump-Russia information "come to light" is of utmost significance – November 8, 2016, was Election Day; indeed, Steele expressed to Kavalec

---

[162] *Id.* at 45:7-20; 90:5.

[163] *Id.* at 45:19-20 and 46:8-10.

[164] U.S. Dept. of State, Case No. F-2018-04736, Doc No. C06679743, unclassified April 30, 2019 (emphasis added).

[165] Steele Dep. at tr. 92:7.

[166] Steele Dep. at tr. 5:20-25 ("Q: Now that was, indeed, was it not, the position of Fusion, that they did want your information to come to light prior to November 8? A: I think that's right, yes. Q: And that was a view I suggest you shared? A: Yes. […]").

that the goal of his "ultimate clients" was to "prevent Donald Trump from becoming president."[167]

### Defendants Fabricate an 'October Surprise' in a Last-Ditch Attempt to Sway the Election

241.     With the election fast approaching, the Defendants hastened their efforts to publicly malign Donald J. Trump and his campaign.

242.     On October 12, 2016, one day after his meeting with the State Dept., Steele met with Elias and Sussmann in Perkins Coie's Washington D.C. office.

243.     On that same day, Steele and Simpson met with reporters from *The New York Times*, *The Washington Post*, and *Yahoo News* and provided additional briefings of his supposed findings concerning a Trump-Russia connection.[168]

244.     In or around that time, Fusion GPS sent out a flurry of e-mails to media contacts for the purpose of spreading false and defamatory information regarding Donald J. Trump through the media:

   a.   For example, on September 19, 2016, Jake Berkowitz of Fusion GPS wrote to Matthew Mosk at CBS News sending him the same, spreading the Russian Collusion story.[169]

   b.   Furthermore, on October 5, 2016 Peter Frisch e-mailed Eric Lichtblau—a reporter with *The New York Times* who had also been in frequent communication with Sussmann, with the subject regarding Alfa and Trump—discussing Donald J. Trump and the Alfa Bank.[170]

---

[167] *Id.* at 94:15-18 ("Q: When you met the FBI in October, you told them that the ultimate clients were people seeking to prevent Donald Trump from becoming president? A: Yes.").
[168] *Id.* at 117.
[169] Fusion GPS e-mails, e-mails from Berkowitz to Mosk dated September 19, 2016.
[170] Fusion GPS e-mails, e-mails from Fritsh to Lichtenblau dated October 5, 2016.

c. On October 18, 2016, Frisch exchanged several e-mails with Mark Hosenball of *Reuters*, an international news agency. In one of the e-mails, dated October 18, 2016 at 11:01am, Frisch pressured the reporter, writing, "meantime, do the f-cking alfa bank secret comms story.  It is hugely important.  Forget the WikiLeaks sideshow".  In response to the e-mail, Hosenball wrote back, "the problem with the Alfa bank story at this point is that my cyber expert colleagues cannot satisfy themselves about the authenticity of some of the key date, which they say from what they can tell is NOT public data."[171]

245.    In or around September or October of 2016, Elias briefed Mook about the information and data in his possession pertaining to the Trump-Alfa Bank connection.[172]

246.    At that time, Elias was aware that the information and data in his possession had been unlawfully obtained by Sussmann, Joffe, and others and had been fraudulently modified to create a false inference that there existed a secret back-channel for communications between the Trump Organization and Alfa Bank; Elias conveyed this information to Mook.

247.    After his discussion with Elias, Mook had several conversations with Podesta, Sullivan and Palmieri as to "whether the campaign should affirmatively push [the Alfa Bank allegations] to the media[.]"[173]

248.    By Mook's own admission, he "didn't totally understand" the Trump-Alfa Bank allegations and he wasn't "totally confident in" the veracity of the information; indeed, he thought

---

[171] Gov't Ex. 0652, *U.S. v. Sussmann*.
[172] Testimony of Robert Mook at tr. 1263:9-12, Transcript of Jury Trial (May 20, morning session), *U.S. v. Sussmann* (hereinafter, the "Mook Testimony
[173] *Id.* at 1265:1-16.

it was "highly suspect."[174]

249.    In fact, Mook and other senior members of the Clinton Campaign lacked "any subject matter expertise with which to judge what [they] were briefed on."[175]

250.    Mook, Podesta, Sullivan and Palmieri "decided to give it to a reporter."[176]

251.    The Clinton Campaign "want[ed] that information out to the public," and the most effective way to do so was "through the media."[177]

252.    Thereafter, Mook spoke to Clinton about the decision to push the false Alfa Bank allegations to the media – Clinton "agreed to that."[178]

253.    Ultimately, the "leadership team [of the Clinton Campaign] decided to direct members of [its] press team to share [the Alfa Bank] information with the media[.]"[179]

254.    In particular, the Clinton Campaign disseminated the Trump-Alfa Bank information to "someone at *Slate*."

255.    In or around that time, in October 2016, Fritsch and two of his Fusion GPS employees, Berkowitz and Seago, attended a meeting with Franklin Foer, a *Slate* journalist, at Foer's home.[180]

256.    In that meeting, the Fusion GPS team briefed Foer on the "allegations between the Trump Organization and Alfa Bank" and talked about the "highly credible computer scientists who seemed to thin that these allegations were credible."[181]

---

[174] Mook Testimony at tr. 1253:22-1254:2, 1282:10.
[175] *Id.* at tr. 1264:20-24.
[176] *Id.* at tr. 1266:3-4.
[177] *Id.* at tr. 1256:9-15.
[178] *Id.* at tr. 1267:12-16; *see also id.* at tr. 1274:10-11.
[179] *Id.* at tr. 12923-5.
[180] Seago Testimony at tr. 581.
[181] *Id.* at 581:17-21.

257.    Fusion GPS's purpose for holding this meeting was to convince Foer to publish an article concerning the Trump-Alfa Bank allegations.[182]

258.    On October 30, 2016, Fritsch forwarded to Foer a tweet from an MSNBC contributor which stated, "Reid says he's talked w/ top NatSec officials who say that Comey 'possesses explosive information' about Trump's ties to Russia'"; accompanying the tweet, Fritsch told Foer it was "time to hurry."[183]

259.    The next day, on October 31, 2016, Foer provided a draft of his *Slate* article to Fritsch for his review.

260.    Shortly thereafter,  Fritsch e-mailed Michael Isikoff, a journalist with *Yahoo News*, stating: "Big story on the trump Alfa server moving early pm. OTR. [United States Government] absolutely investigating. Campaign will light it up I imagine."[184]

261.    On the same day, October 31, 2016, eight days before the 2016 Presidential Election, *Slate* published an article—written by Franklin Foer—reporting on the supposed Trump-Alfa Bank connection.[185]

262.    In the article, Foer claims that he "communicated extensively with [a person going by the pseudonym] Tea Leaves and two of [her] closest collaborators, who also spoke with me on the condition of anonymity."[186]

    a.  Tea Leaves has since been identified as April Lorenzen, a data analyst with

---

[182] *Id.* at 582:10-12 ("Q: And to what extent was the purpose of this meeting to try and encourage Mr. Foer to publish an article? A: We certainly hopes that he would publish an article.").
[183] Fusion GPS e-mails, e-mails from Fritsch to Foer dated October 30, 2016.
[184] Gov't Ex. 0668, *U.S. v. Sussmann*.
[185] Franklin Foer, *Was a Trump Server Communicating with Russia?*, Slate, October 31, 2016.
[186] *Id.*

ZETAlytics, one of the data analytics companies owned by Joffe.[187]

263.    Foer also wrote that Tea Leaves and her collaborators "persuasively demonstrated some of their analytical methods to me–and showed me two white papers[.]"[188]

264.    Foer's article discussed the purported 'findings' of the cyber researchers at length and attempt to frame their findings as damning evidence of Trump's collusion with Russia, including quotes from sources stating things such as: the data is "not simulated; "[n]o reasonable person would come to the conclusion other than the one I've come to" (that the data shows communications between Trump servers and Alfa Bank); and that "[i]t would be really, really hard to fake these."[189]

265.    On about the same day, October 31, 2016, shortly after the release of Foer's *Slate* article, Sullivan put out a written campaign statement that claimed that Trump and the Russians had set up a "secret hotline" through Alfa Bank and that "federal authorities" were investigating "this direct connection between Trump and Russia." He portrayed the shocking discovery as the work of independent experts—"computer scientists"—without disclosing their connection to Hillary Clinton and/or the Clinton Campaign.  The full statement was as follows:

> [T]his could be the most direct link yet between Donald Trump and Moscow.  Computer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank. This secret hotline may be the key to unlocking the mystery of Trump's ties to Russia.  It certainly seems the Trump Organization felt it had something to hide, given that it apparently took steps to conceal the link when it was discovered by journalists.  This line of communication may help explain Trump's bizarre adoration of Vladimir Putin and endorsement of so many pro-Kremlin positions throughout this campaign.  It raises even more troubling questions

---

[187] Testimony of Ryan Gaynor at tr. 1632:4-7, U.S. v. Sussmann, May 23, 2022 (trial transcript; afternoon session) (hereinafter, the "Gaynor Testimony").
[188] *Id.*
[189] *Id.*

in light of Russia's masterminding of hacking efforts that are clearly intended to hurt Hillary Clinton's campaign. We can only assume that federal authorities will now explore this direct connection between Trump and Russia as part of their existing probe into Russia's meddling in our elections.

266.     Sullivan was acting in the scope and authority of his employment with the Clinton Campaign when he made this false statement, which was made with the intention of harming Trump and his campaign.

267.     Elias, acting in the scope and authority of the Clinton Campaign, assisted Sullivan with the statement, as evidenced by his billing entries submitted to the Clinton Campaign.

268.     On the same day, Clinton published the same false and damaging statements to the public through her Twitter account, wherein she included a photograph of Sullivan's statement along with her own commentary: "Computer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank."[190]

269.     A second tweet from Clinton on that same day said that it was "time for Trump to answer serious questions about his ties to Russia." It also included a graphic stating the following:

> 1. Donald Trump has a secret server. (Yes, Donald Trump.) 2. It was set up to communicate privately with a Putin-tied Russian bank called Alfa Bank. 3. When a reporter asked about it, they shut it down. 4. One week later, they created a new server with a different name for the same purpose.[191]

270.     Sullivan and Clinton made the above statements despite her awareness that they

---

[190] Hillary Clinton (@HillaryClinton), Twitter (Oct. 31, 2016, 8:36 PM), https://twitter.com/hillaryclinton/status/79325031211926233?lang=en.
[191] Hillary Clinton (@HillaryClinton), Twitter (Oct. 31, 2016, 7:32 PM), https://twitter.com/HillaryClinton/status/793234169576947712?ref_src=twsrc%5Etfw%7Ctwca mp%5Etweetembed%7Ctwterm%5E793234169576947712%7Ctwgr%5E%7Ctwcon%5Es1_&re f_url=https%3A%2F%2Fthenationaldesk.com%2Fnews%2Famericas-news-now%2Ftweets-by-hillary-clinton-allegedly-support-accusations-her-campaign-paid-to-spy-on-trump-donald-president-e-mails-russia-john-durham-michael-susmann

were patently false, that the supposed 'findings' concerning the DNS data had been fabricated, and that neither Donald J. Trump nor the Trump Organization had any ties to Alfa Bank. She was driven by a pathological need to stop Trump from ever entering the White House irrespective of the damage and national discord it would cause.

271.    According to Podesta, the Clinton Campaign had also prepared a video promoting the Trump-Alfa Bank false narrative that it had planned to release in conjunction with Sullivan's statements and Clinton's tweets as part of an "all-out push through social media."[192]

272.    Meanwhile, on that same day, October 31, 2016, Steele and Simpson had a Skype call with David Corn, a journalist with *Mother Jones*.[193]

273.    According to Steele's testimony, the purpose of having this meeting was that he "wanted [Corn] to publish that the US Government was investigating Trump";[194] he was also "aware that Mr. Corn was likely to be publishing an article after [the] interview."[195]

274.    Later that day, *Mother Jones* released an article titled "*A Veteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump*" published by David Corn which contained numerous disparaging statements about Trump and his campaign, and, in particular, referenced many of the false allegations contained in the Dossier.

275.    For example, the *Mother Jones* article stated: "The first memo, based on the former intelligence officer's conversations with Russian sources, noted, 'Russian regime has been cultivating, supporting and assisting Trump for at least 5 years. Aim, endorsed by Putin, has been

---

[192] Michael Isikoff, David Corn, *Russian Roulette: The Inside Story of Putin's War on America and the Election of Donald Trump*, 2018, at page 224.
[193] Steele Dep. at 85:16-17 (March 18, 2020).
[194] Steele Dep. at tr. 24:4-5 (July 23, 2020).
[195] *Id.* at tr. 22:11-15.

to encourage splits and divisions in western alliance.' It maintained that Trump 'and his inner circle have accepted a regular flow of intelligence from the Kremlin, including on his Democratic and other political rivals.' It claimed Russian intelligence had 'compromised' Trump during his visits to Moscow and could 'blackmail him.' It also reported that Russian intelligence had compiled a dossier on Hillary Clinton based on 'bugged conversations she had on various visits to Russia and intercepted phone calls.'"[196]

276.    John D. Podesta, Hillary Clinton's campaign chairman, also pushed the false Trump-Russia allegations.  After Wikileaks released internal Clinton campaign e-mails, Podesta told reporters on October 11, 2016, that "I've been involved in politics for nearly five decades. This definitely is the first campaign that I've been involved in which I've had to tangle with Russian intelligence agencies who seem to be doing everything they can on behalf of our opponent."

277.    He then stated, without even a shred of evidence that "I think it is a reasonable assumption to, or at least a reasonable conclusion, that Mr. Stone had advance warning, and the Trump campaign had advance warning about what Assange was going to do."[197]

### *The Defendants' Scheme Continues Forward Even After Trump's Victory*

278.     On November 9, 2016, in spite the Defendants' collective efforts, Trump won the 2016 Presidential Election.

279.    Nonetheless, the Defendants forged ahead with their efforts to tarnish his presidency, impede his ability to effectively govern, and otherwise destroy his political career.

---

[196] David Corn, *A Veteran Spy Has Given the FBI Information Alleging a Russian Operation to Cultivate Donald Trump*," *Mother* Jones, October 31, 2016.
[197] https://time.com/4528049/hillary-clinton-john-podesta-e-mails-hackers-russia/

280.    In mid-November 2016, Glenn Simpson met personally with Bruce Ohr, at his request, to discuss Fusion GPS's findings regarding Russia and the election.

281.    On December 10, 2016, Glenn Simpson provided a thumb drive to Bruce Ohr containing most of the reports comprising the Steele Dossier.

282.    Bruce Ohr was  as a long-time friend of Steele with a relationship going back to at least 2006.  Bruce Ohr texted and e-mailed extensively with Steele beginning in January 2016 [198]

283.    Bruce Ohr held the fourth highest position at the Department of Justice, and was married to Nellie Orh, who was working for Fusion GPS.   Nellie Ohr, was hired as an independent contractor by Glenn Simpson, the founder of political opposition research firm Fusion GPS

284.    Bruce Ohr testified before Congress in August, 2018, that his wife, Nellie Ohr provided him memory stick, which included research she had done for Fusion GPS on various Russian figures.  Bruce Ohr stated before Congress, "and the reason she provided that information to me is, my understanding was, it related to some of the same —it related to the FBI's Russia investigation. And she gave me that stick to give to the FBI."[199]

285.    On December 12, 2016, Ohr provided the same thumb drive to the FBI.

286.    Mr. Ohr concealed this meeting from the Department of Justice; he was later reprimanded and demoted for doing so.  Moreover, Orh received two demotions because "DOJ ethics regulations forbid department officials from working on cases where a spouse has a financial interest." Ohr admitted he had been aware of this rule at the time.    The only person whom Ohr admitted at the Department of Justice that he told that he passed along his wife's dossier

---

[198] The Markets Work Article by Jeff Carlson dated August 12, 2018 "The Bruce Ohr & Christopher Steele Conversation
[199] John Solomon, *The family secret Bruce Ohr told Rod Rosenstein about Russia Case*, The Hill, February 20, 2019.

to the FBI was the Deputy Attorney General, Rod Rosenstein.  Bruce Ohr testified before Congress and stated the following: "what I had said, I think, to Mr. Rosenstein in October of 2017 was that my wife was working for Fusion GPS…The dossier, as I understand it, is the collection of reports that Chris Steele has prepared for Fusion GPS."[200]

287.    On December 15, 2016, Simpson and Fritsch met with Eric Litchtblau of *The New York Times* and provided him a copy of the Dossier.

288.    On December 20, 2016, Bruce Ohr provided a second thumb drive to the FBI, which contains anti-Trump "opposition research" reports prepared by his wife, Nellie Ohr, in her capacity as a Fusion GPS employee.

289.    Around the same time, in mid-November 2016, Steele arranged a meeting with David Kramer, a director of a private foundation affiliated with Senator John McCain.

290.    David Kramer previously worked in state department and was a longtime aide to McCain.   Kramer became aware of the dossier through his relationship with Steele, whom he had previously met.   Steele, McCain and Kramer met at the Halifax Forum, which is an international forum, to discuss the dossier.

291.    Later, on November 29, 2016, Kramer flew to London, and met with Steele, who showed him the actual Dossier.  The next day, Glenn Simpson of Fusion GPS handed the dossier over to Kramer, who then handed it over to McCain, sometime in early December 2016.  McCain then went to James Comey, director of the FBI, with a copy of the Dossier on December 9, 2016.  In response to being handed a copy of the Dossier, Comey informed the senator that the FBI already had an investigation underway,

---

[200] *Id.*

a. Steele's purpose in doing so was that he hoped McCain would share his findings with his "colleagues on the various committees in the Senate," including "his committees in Congress, the Homeland Security Committee and the Intelligence Committee," as well as "other agencies."[201]

b. David Kramer, in a Court deposition held on December 17, 2017, suggested that Steele and Fusion GPS founder Glenn Simpson sought to use him and McCain as conduits to pass the dossier to the FBI.   Kramer said he "believed McCain was sought out in order provide more "oomph" in terms of attaching the FBI's attention."   "I think they felt a senior Republican was better to be a recipient of this rather than a Democrat  because if it were a Democrat, I think the view was this it would have been dismissed as a political attack", said Kramer.[202]

292.    Furthermore, on December 29, 2016, Kramer leaked copies of the dossier to *Buzzfeed News* and multiple other media outlets, such as The Washington Post, *The Wall Street Journal* and *CNN*.[203]

293.    On January 5, 2017, Steele instructed the external IT provider to delete "all e-mail traffic relating to Orbis' assignment by Fusion GPS to gather intelligence regarding Russia's eddorts to influence the US Presidential election process and the links between Russia and

---

[201] Steele Dep. at tr. 56:12-16; 59:22-25; 60:21 (July 23, 2020).

[202] The Daily Caller by Chuck Ross dated March 14, 2019 "John McCain associate had Contact with a Dozen Reporters regarding Steele Dossier".

[203] The Daily Caller by Shelby Talcott, dated April 27, 2022 "Resurfaced Interview Reveals McCain Associate's Leak to BuzzFeed was Alleged "Hail Mary" to Prevent Trump Inauguration."   The Daily Caller by Chuck Ross dated March 14, 2019 "John McCain associate had Contact with a Dozen Reporters regarding Steele Dossier".

Trump."[204]

294.    With the Dossier in hand, on January 10, 2017, Buzzfeed published the Dossier in its entirety, posting it on its website and describing it as "explosive."[205]

295.    The article also stated that Buzzfeed was "publishing the full document so that Americans can make up their minds about allegations about the president-elect that have circulated at the highest levels of the U.S. government."

296.    On January 20, 2017, Donald J. Trump was inaugurated as the 45th President of the United States.

***Sussmann Attempts to Deceive the CIA into Launching an Unfounded Investigation***

297.    Meanwhile, Sussmann and Joffe continued to play their part in the Defendants' grand conspiracy.

298.    Through late 2016 and early 2017, Joffe and a researcher continued to compile additional information and data regarding the Alfa Bank allegations and gathered other purported data allegedly involving Donald J. Trump's related computer networks which they claimed tied him to Russia.

299.    Around that time, Sussmann began arranging a meeting with the Central Intelligence Agency (CIA) to continue spreading his lies.

300.    In late December 2016, Sussmann contacted the General Counsel of the CIA to set up a meeting regarding the Trump-Alfa Bank allegations.[206]

301.    In late January 2017, Sussmann contacted a former employee of the CIA in a further

---

[204] Ken Bensinger, Miriam Elder, Mark Schoofs, *These Reports Allege Trump Has Deep Ties To Russia*, *Buzzfeed News*, January 10, 2017.
[205] *Id.*
[206] Sussmann Indictment at ¶40.

attempt to obtain a meeting with the CIA.

302.    On January 31, 2017, Sussmann and the former employee of the CIA had several

communications seeking to arrange a meeting with the CIA.[207]

303.    Pursuant to these communications, Sussmann summarized the Trump-Alfa Bank

allegations, requested that the former employee assist him in obtaining a meeting with the CIA,

and stated that if the CIA was not interested then Sussmann's client would likely go to the media

with the allegations. A meeting was eventually arranged.[208]

304.    On or about February 9, 2017, Sussmann met with two CIA employees at a location

outside the District of Columbia.[209]

305.    At the meeting, the following, in substance and in part, occurred:

    a.    Sussmann stated falsely – as he previously had stated to the FBI General Counsel

        that he was "not representing a particular client." In truth and in fact, and as

        Sussmann had acknowledged to the Former Employee just days earlier, Sussmann

        was representing a client.[210]

    b.    Sussmann disclosed that Perkins Coie, was active in representing several

        Democratic Party causes and officer-holders, including both the DNC and Clinton.

        Sussmann stated, however, that such work was unrelated to his reasons for

        contacting the CIA.[211]

    c.    Sussmann discussed and described the updated allegations, including new details

---

[207] *Id.* at ¶41.
[208] *Id.*
[209] *Id.*
[210] Sussman Indictment at ¶42(a).
[211] Sussman Indictment at ¶42(b).

concerning the Russian Bank allegations that he had not provided to the FBI General Counsel.[212]

d. Sussmann provided to the CIA employees (i) several white papers, and (ii) multiple data files containing purported DNS data, ranging from 2016 through early 2017.[213]

306.    As he had done in his prior meeting with the FBI, Sussmann—acting on behalf of the Clinton Campaign and the DNC—again lied to and intentionally mislead federal law enforcement officials in furtherance of the Defendants' scheme.

307.    That Sussmann was acting on behalf of, and in coordination with, the Clinton Campaign and the DNC when he made his false statements to the FBI and the CIA was confirmed in December 2017, when Sussmann testified under the penalty of perjury before the House Permanent Select Committee on Intelligence:

> Q: [] When you decided to engage the two principals, one, [the FBI General Counsel] in September, and the general counsel of [Agency-2] in December, you were doing that **on your own volition,** based on information another client provided you. Is that correct?
>
> [Sussman]: No.
>
> Q: So what was – so did your client direct you to have those conversations?
>
> [Sussman]: Yes.
>
> Q: Okay. And your client also was witting of you going to [the CIA] in February to disclose the information that individual had provided you?
>
> [Sussman]: **Yes**

---

[212] Sussman Indictment at ¶42(c).
[213] Sussman Indictment at ¶42(d).

[ ... ]

Q: Okay. I want to ask you, so you mentioned that **your client directed you** to have these engagements with the FBI and [redacted] and to disseminate the information that client provided you. Is that correct?

[Sussmann]: [] [W]e had a conversation, as lawyers do with their clients, about client needs and objectives and the best course to take for a client. And so it may have been a decision that we came to together. I mean, I don't want to imply that I was sort of directed to do something against my better judgment, or that we were in any sort of conflict, but this was -- I think it's most accurate to say it was done on behalf of my client.[214]

308.     In addition, the materials Sussmann provided to the CIA—including several white papers and multiple data files containing purported DNS data, ranging from 2016 through early 2017—were falsified or "spoofed" to appear incriminating in nature.

309.     Indeed, after the meeting with Sussmann, CIA ultimately concluded that the data provided by Sussman had been altered, spoofed and/or falsified to create a misleading connection between Trump and Alfa Bank. Specifically, the CIA found that the data was not "technically plausible," that it did not "withstand technical scrutiny," that it "contained gaps" and was "user created and not machine/tool generated."[215]

310.     This conclusion aligns with the conclusion reached by Ankura, an industry-leading private technological consulting firm hired by Alfa Bank to investigate the server claims. In particular, Ankura concluded that it was "likely that threat actors may have conducted some inauthentic DNS activity to force a 'connection' between Alfa-Bank and the Trump Organization,

---

[214] Sussman Indictment at ¶44.
[215] Mem. in Opp. at 20 (ECF Doc. No, 70), *U.S. v. Sussman*, 1:21-cr-00582 (D.C., April 15, 2022)

only to then later 'discover' the connection."[216]

311.    In other words, like the CIA, Ankura believed the data was assembled and manipulated by "malicious actors."[217]

### *Fusion GPS and Joffe Continue Their Conspiratorial Efforts*

312.    In February 2017, Fusion GPS and Steele were hired by the Penn Quarter Group (PQG) to continue their Trump research.

313.    In March 2017, Daniel Jones, through The Democracy Integrity Project ("TDIP") and/or the Penn Quarter Group ("PQG"), had "secured the services of Steele [and] Fusion GPS to continue exposing Russian interference in the 2016 Presidential Election."[218]

    a.    John Podesta testified before the House Intelligence Committee in December 2017, that he met on February 10, 2017, with Daniel Jones, along with Glenn Simpson and Peter Fritch of Fusion GPS.   In separate testimony, Jake Sullivan, also revealed he participated in the meeting.

    b.    Podesta told the House Intelligence Committee in December 2017, that "they were interested in trying to raise money to continue their efforts to investigate the Russian interference in the campaign."   Podesta stated that he agreed to help the trio open doors to big Democratic fund-raisers and sit down for press interviews and documentaries regarding any "new developments" uncovered by dossier author and former British intelligence officer Christopher Steele. Jake Sullivan

---

[216] *See Covert Channel Allegation: New Data Analysis Results* at 4, Ankura, April 2020, available at https://justthenews.com/sites/default/files/2020-04/Ankura_AlfaBank_ResearchAnalysis_Apr2020dh.pdf
[217] *Id.* at 18.
[218] H. Permanent Select Comm. On Intelligence Report, Report on Russian Active Measures at 113 (March 22, 2018).

accompanied Podesta to the meeting, which he said lasted about an hour and was held in an office building in Washington. [219]

314.    In connection with this engagement, Jones planned to "push the information he obtained from Fusion [GPS] and Steele to policymakers on Capitol Hill, the press, and the FBI."[220]

315.    Since 2017, The Democracy Integrity Project ("TDIP") has paid Fusion GPS, Steele and their associates more than $3.8 million to continue their 'opposition research' against Donald J. Trump and to continue pushing the false Trump-Russia narrative.

316.    In particular, TDIP has paid $3.3 million to Fusion GPS; $250,000 to "Walsingham Partners Ltd.," a London-based firm owned by Steele and his partner, Christopher Burrows; nearly $130,000 to "Edward Austin Ltd." a London-based intelligence consultancy operated by Edward Baumgartner, a Fusion GPS contractor; and $148,000 to the law firm Zuckerman Spaeder, which has represented Fusion GPS in a variety of Dossier-related legal matters.

317.    Daniel Jones operated what he called a "shadow media organization helping the government" to investigate Russian meddling in the 2016 election. He told the FBI in March 2017 that "he received funding from a group of between seven and 10 wealthy donors and that he planned to provide information to federal investigators, the press, and lawmakers". [221]

318.    In 2018 Alfa Bank, which was falsely implicated in the collusion conspiracy against Donald J. Trump, filed a Jon Doe lawsuit, seeking to determine "who spread the false allegations

---

[219] Clinton Foundation Timeline E-mail/Dossier Investigations by Katie Weddington dated February 10, 2017 "  John Podesta and Jake Sullivan re-engage with Fusion GPS and Dan Jones after 2016 election to push Clinton/Steele dossier."

[220] Letter from Chairman Grassley to Senator Coons dated May 29, 2018; *see also id.*
[221] The Daily Caller Article by Chuck Ross, Dated April 1, 2019 Firms Tied To Fusion GPS, Christopher Steele Were Paid $3.8 Million By Soros-Backed Group | The Daily Caller

about the Russian bank to the news media and U.S. authorities". [222]

319.    Daniel Jones' provided videotaped testimony in the Jon Doe civil case, in which he recounted "how he formed TDIP, in early 2017, raised money for it and continued a private investigation into alleged Russian and other interference in the 2016 election."    In his testimony Jones acknowledged that "he worked post-election with some of the key figures tied to Hillary Clinton's campaign on the  Russia collusion allegations, including Michael Sussmann and Glenn Simpson."    Daniel Jones also testified that "Simpson helped him raise money for his non-profit TDIP and Daniel Jones hired Simpson's Fusion GPS firm to investigate election issues starting in early 2017. Records introduced during the testimony confirmed the donor-funded TDIP paid Simpson's firm about $3.3 million for its work".[223]

320.    Daniel Jones also described in his testimony how he "worked with Sussmann and the DNC to obtain evidence from Rodney Joffe, about alleged computer communications between a Trump server and the Alfa Bank in Russia".[224]

321.    Moreover, Daniel Jones testified he was "asked by a Democratic investigator on the Senate Armed Services Committee to investigate the Alfa Bank allegations in early 2017 and to meet with Sussmann."    After the meeting with Sussman, Daniel Jones testified he "received computer data from Sussmann containing 37 million DNS lookups to review for any connections of Trump-Russia collusion, and later learned the data came from a computer executive that Sussmann identified only by the pseudonym "Max." Jones said he quickly determined that

---

[222] American Faith.com by Just The News, dated October 17, 2021, Soros-tied group met with FBI during Russia collusion probe, hired Christopher Steele - American Faith; Daniel Jones Transcript from Deposition taken on August 18, 2021 in Palm Beach County Circuit Court Case, AO Alfa-Bank v. Jon Doe, Case Number 50-2020-CA-006304-XXX-MB
[223] *Id.*
[224] *Id.*

executive to be Joffe.[225]

322.     Daniel Jones was also tasked by a Democrat on the Armed Services Committee in 2017 to prepare a 600-plus-page report on the Alfa Bank-Trump allegations.   In his testimony, Jones revealed the "Democratic staffer who tasked him with the work indicated Democrats in Congress did not believe the FBI and others in U.S. intelligence had aggressively enough investigated the Alfa Bank allegations before dismissing them."   "That was my perception, that the Senate Armed Services committee, other senators on the Senate Intelligence Committee and the House Intelligence Committee believed that the government wasn't doing enough to look into these allegations and refute them or confirm them or make any assessment of them," Jones testified. [226]

323.     Daniel Jones testified that "he built a firewall between Simpson's and Steele's research work for TDIP and the Senate Armed Services project because of their past ties to the Clinton campaign." [227]

324.     On October 8, 2018, a publication called the New Yorker wrote an article titled, "*was there a connection between a Russian Bank and the Trump Campaign"* which pushed the false narrative Trump Russia Collusion.   In furtherance of the conspiracy, Rodney Joffe sat down for the New Yorker article, anonymously calling himself "Max" and "admitting in the piece that he'd continued to help that effort long after the election, providing Daniel Jones's team with 37 million Internet records to examine."  Joffe, explained to the New Yorker "how vitally important it was in 2016 to make sure the threat his team discovered was "known before the election." "Which was why he and his lawyer

---

[225] *Id.*
[226] *Id.*
[227] *Id.*

first went with their information to the press."[228]

325.    The New Yorker article, with the false information brought to them by Fusion GPS, TDIP and Joffe (aka Max), concluded that the Alfa Bank Trump collusion allegations were legit.[229] As a result, the general public was led to the believe, falsely, that there was a connection between Trump and the Alfa Bank, despite the fact that none existed.

326.    For example, the article stated, "examining records for the Trump domain, Max's group discovered D.N.S. lookups from a pair of servers owned by Alfa Bank, one of the largest banks in Russia. Alfa Bank's computers were looking up the address of the Trump server nearly every day. There were dozens of lookups on some days and far fewer on others, but the total number was notable: between May and September, Alfa Bank looked up the Trump Organization's domain more than two thousand times. "We were watching this happen in real time—it was like watching an airplane fly by," Max said. "And we thought, Why the hell is a Russian bank communicating with a server that belongs to the Trump Organization, and at such a rate? [230]

327.    Meanwhile, Joffe and Neustar's exploitation of access to non-public data sources continued throughout 2017.

328.    For example, on July 18, 2017, Joffe e-mailed Steve De Jong, an employee of Neustar, Inc., stating: "I have 4 jobs that look specifically for [T]rump data" and included a list four Trump and Alfa Bank related queries.[231]

### *Danchenko Impedes the FBI's Ongoing Investigations with Numerous False Statements*

---

[228] New York Post by Kimbery Strassel, Dated February 18, 2022  Truth about techies who targeted Trump (nypost.com); The New Yorker by Dexter Fixins, Dated October 8, 2018 Was There a Connection Between a Russian Bank and the Trump Campaign? | The New Yorker
[229] *Id.*
[230] *Id.*
[231] Gov't Ex. 0719, *U.S. v. Sussmann.*

329.     Over time, the FBI attempted to investigate, vet, and analyze the Dossier but ultimately was not able to confirm or corroborate most of their substantive allegations.

330.     In the context of those efforts, the FBI learned that Danchenko, a Russian analyst, had served as a central source of information contained in the Dossier.

331.     From January 2017 through November 2017, the FBI conducted numerous interviews with Danchenko (collectively the "Interviews") concerning, among other things, the information that Danchenko had provided to Steele for the Dossier.

332.     During the course of these Interviews, Danchenko plainly admitted that he had "zero" corroboration for the key allegations that he had contributed to the Dossier.

333.     In addition, as alleged in further detail below, Danchenko repeatedly lied to FBI agents during his Interviews.

334.     First, Danchenko falsely stated that he never communicated with Charles Halliday Dolan, Jr, a claim which was patently false.

335.     In fact, Danchenko and Dolan had been in frequent communication since at least April 2016, had gone on a trip together, and had attended numerous meetings and conferences together.

336.     The disclosure of Danchenko's relationship with Dolan would have been incredibly relevant to the FBI's understanding of the contents of the Dossier:

a.     At all relevant times, Dolan has long held deep ties to the Democratic Party operative and has been a close associate of and adviser to Hillary Clinton.

b.     As a result, Dolan frequently interacted with senior Russian Federation leadership whose names would later appear in the Dossier, such as Putin spokesman Dmitry Peskov and then-Russian ambassador to the US Sergey Kislyak.

78

    c.   Also, in 2006, the Kremlin signed a deal with Ketchum, the PR firm where Dolan served as vice president for public affairs.  As part of that agreement, Ketchum was to handle global public relations for the Russian government as well as the state-owned energy company Gazprom.

337.   In fact, as detailed above, many of the allegations contained in the Dossier came *directly from* Dolan, who had conveyed them to Danchenko who, in turn, reported them to Steele.

338.   Dolan's role as a contributor of information to the Dossier was highly relevant and material to the FBI's evaluation of those reports because:

    a.   Dolan maintained pre-existing and ongoing relationships with numerous persons named or described in the Dossier, including one of Danchenko's Russian sub-sources,

    b.   Dolan maintained historical and ongoing involvement in Democratic politics, which bore upon Dolan's reliability, motivations, and potential bias as a source of information for the Dossier, and

    c.   Danchenko gathered some of the information contained in the Dossier at events in Moscow organized by Dolan and others that Danchenko attended at Dolan's invitation.  Certain allegations that Danchenko provided to Steele, and which appeared in the Dossier, mirrored and/or reflected information that Dolan himself also had received through his own interactions with Russian nationals.

339.   On or about January 13, 2017, Dolan replied to an e-mail sent by a U.S.-based person discussing a recent news article regarding the Dossier, wherein Dolan stated:

> [] I've been interviewed by the Washington Post and the London Times -three times over the last two days over the Steele Dossier on Trump and I know the Russian agent who made the report (He used

to work for me). My client in [Foreign Country] [Business] has been accused of being the party that organized the hacking. Presently speaking with the barrister in London who is filing a brief against Steele has been unmasked as the man behind an explosive dossier about US president-elect Donald Trump. Also in conversation with former British Ambassador who knows Steele. Quite right -Oh what a boring life.

340.     At that time, Danchenko was not publicly known to be a source for Steele.

341.     On March 16, 2017, Danchenko informed the FBI that he believed the source in the above-referenced allegations referred, at least in part, to the Chamber President. He repeated these claims in subsequent interviews on or about March 16, 2017, May 18, 2017, October 24, 2017, and November 2, 2017.

### *The FBI's Role in Perpetuating the Defendants' False Claims*.

342.     Meanwhile, all along, several high-level officers within the FBI seized upon the false reporting that had been presented as an opportunity to hatch their own wrongful scheme against Donald J. Trump.

343.     On September 23, 2016, a mere four (4) days after Sussman's meeting with Baker, the FBI opened a full field investigation into the "network communications between a US-based server [the Trump Organization] and the Russian ALFA BANK organization."

344.     By October 5, 2016, and internal FBI memo confirmed that the Alfa Bank allegations had "already been debunked" and that there was no "covert channel" between the Trump Organization and Alfa Bank.

345.     By August 16, 2016, as part of the larger Crossfire Hurricane umbrella investigation into the presidential campaign of Donald J. Trump, the FBI had opened individual cases of four United States individuals, Carter Page, George Papadopoulos, Paul Manafort, and General Michael Flynn. All four of these individuals, Page, Papadopoulos, Manafort, and Flynn were associated

with the Trump Campaign.

346.   Flynn is a retired United States Army lieutenant general, who was formerly director of the Defense Intelligence Agency.  In the run-up to the 2016 Presidential Election, Flynn was a vocal critic of the policies of then President Barak Obama.  Moreover, Flynn openly criticized presidential candidate, Clinton, opposing her nomination for Presidency, calling for her to withdraw from the race and stating that "if I did a tenth-a tenth-of what she did, I would be in jail today." During the 2016 Presidential race, Flynn worked for Donald. J. Trump's campaign as its foreign policy advisor.   On November 18, 2016, Flynn accepted Trump's offer for the position of National Security Advisor.

347.   In the position as National Security Advisor, Flynn would preside over seventeen (17) intelligence agencies and would be in the key position to stop the plot of the Defendants to hijack Trump's presidency, and to create the false Russian narrative.

348.   For the Defendants' plot to succeed, it was imperative that Flynn not be allowed to serve as the National Security advisor. Due to his position, he would have naturally learned of the inner machinations of the Russia Collusion conspiracy and could potentially inform Donald J. Trump of same.

349.   Therefore, senior FBI officials, Comey, McCabe, Page, Strzok, the DNC and Clinton orchestrated a plan to falsely accuse Flynn of colluding with Russia to protect the potential dissemination of the intimate details of their plot

350.   In fact, the plan to remove Flynn from his position overseeing national intelligence, started under former President Barack Obama.   President Obama advised President-Elect Trump against hiring Flynn and expressed "profound concerns" about placing Flynn in a sensitive, high-level national security post.

351.     Realizing the danger of making Flynn privy to their investigations into Donald J. Trump and his campaign, the senior FBI officials openly discussed their concern about briefing the veteran intelligence official, General Flynn, on the ongoing investigation of the Trump campaign.

352.     As such, in August of 2016, the senior FBI officials commenced an FBI investigation of Flynn.   The investigation was code named "Crossfire Razor", and the investigation's stated "goal" was to determine whether Flynn "was directed and controlled by and/or coordinated activities with the Russian Federation in a manner which is a threat to the national security and/or possibly a violation of the Foreign Agents Registration Act, 18 U.S.C. § 951 et seq.

353.     The FBI predicated the counterintelligence investigation on Flynn on three alleged facts: Flynn's service as foreign policy advisor to Donald J. Trump campaign, his publicly documented connection to state-affiliated Russian entities, and the fact that he had traveled to Russia in December 2015.

354.     After four months of investigations, the FBI "determined that Flynn was no longer a viable candidate as part of the larger Crossfire Hurricane umbrella case" and prepared to close the investigation.

355.     The FBI drafted a "Closing Communication to put into motion the termination of the case.  This document stated that after numerous searches of holdings and investigative steps, each step yielded "no derogatory information" on Flynn.  The document noted "the absence of any derogatory information or lead information" and that the investigation had failed to produce any information on which to predicate further investigated efforts".

356.     However, following the closure of the investigation, the senior leadership of the FBI, including, Comey, McCabe, Strzok and Page scrambled to reopen a case against Flynn in an effort

to prevent him from serving as National Security Adviser.

357.    The FBI's top counterintelligence official would later memorialize discussions about the FBI's attempts to "get [Flynn] fired."

358.    For example, on January 4, 2017, FBI Deputy Director Strzok learned that "Razor's" closure had not been timely executed, and the counterintelligence investigation into Flynn was unexpectedly, still formally open.  Mr. Strzok relayed the "serendipitously good news to Lisa Page, an attorney for the FBI, and special counsel to FBI Deputy Director Andrew McCabe, remarking that "our utter incompetence actually helps us."  Mr. Strzok instructed agents to "keep it open for now" at the behest of the '7th floor', a reference to James Comey and his Deputy Director, McCabe.  They determined that no reopening was needed when they discovered they had failed to officially close the previous investigation.

359.    At the behest of Comey and McCabe, the senior FBI agents met to decide how to handle Flynn.  Their ultimate goal" was to get Flynn to lie, so he could be prosecuted or fired.  FBI notes released in April 2020, confirm this plan.  Specifically, a handwritten note by FBI agent, Bill Preistap, head of FBI counterintelligence, was later unearthed that said: "I believe we should rethink this. What is our goal? Truth/admission or to get him to lie, so we can prosecute him or get him fired?" This was, in essence, a sting operation, as Flynn had not committed a crime.  Moreover, handwritten notes from the FBI's lawyers warned that the FBI could be "seen as playing games" as a result of their conduct[232]

360.    Around this time, FBI Director, Comey took the position that the FBI would not notify the incoming Trump administration of the ongoing investigation of Flynn, despite other

---

[232] LifeZette, by Polizette Staff, Dated April 30, 2020 Obama tried to sink Flynn, then the FBI tried to get him (lifezette.com)

senior officials believing that the incoming administration should be notified.

361.    Comey was able to justify his withholding of this information from the Trump administration, by claiming to the FBI that the information was not a "counterintelligence investigation, but instead, protected as a purported "criminal investigation."

362.    The Deputy Attorney General, Director of National Intelligence, and Director of the Central Intelligence Agency all agreed that the FBI should notify the Trump administration, but Comey, as Director of the FBI, refused to brief the White House.

363.    Instead of notifying the White House and Donald J. Trump, Comey, as well as McCabe, proceeded with the plan, and authorized FBI agents to interview Flynn.   This was done, despite the fact that the interview should have been coordinated with the Department of Justice and been approved by the proper channels, considering that Flynn was the impending national security advisor, and he was not represented by counsel.

364.    Prior to the interview, Strzok coordinated with FBI' officials regarding strategy for interviewing Flynn, stating that it should be given a "defensive briefing" about an investigation under the Crossfire Hurricane umbrella or alternatively an interview under light defensive briefing pretext. The interview was masked under the guise of a briefing, and not a criminal interview, as the FBI, was once again concerned about the information being discovered by the Trump administration.   In fact, Mr. Strozk stated in internal memos his justification for the secrecy, stating that the Department of Justice might "direct us" to inform the Vice President of the United States or "anyone else", speculating that this could lead to the White House directing  Flynn not to speak to the FBI.

365.    On January 22, 2017, an FBI attorney e-mailed Strzok and Page and stated that "if we usually tell the White House, then I think I should do what we what we normally do."  The

senior FBI officials disregarded the advice of counsel directed that the investigation be concealed from Donald J. Trump and the White House.

366.    Ultimately, Deputy Director, McCabe called Flynn and set up the interview.  In later media statements McCabe stated that he explained to Flynn that it was a "sit down" and expressed to Flynn the FBI's desire to accomplish the interview "quickly, quietly and discretely as possible."   McCabe was the primary interviewer.  It was later reported that Flynn was unguarded and viewed the agents as allies, despite the fact that Flynn was the subject of an FBI investigation.

367.    Both of the agents at the interview stated that Flynn exhibited a "very sure demeanor and did not give any indicators of deception."  Moreover, they did not perceive that he was lying during the interview.

368.    Further evidence of the plot was discovered on October 7, 2020, when Director of National Intelligence, John Ratcliffe wrote a letter to Senate Intelligence Committee Chairman, Lindsay Graham.

369.    Ratcliffe's letter stated that Clinton and her campaign conceived the false Trump Russia collision story to protect Clinton's presidential bid, which, was at the time, in trouble because of revelations about her illegally using a private e-mail server to handle classified information. Ratcliffe confirmed in the letter that Obama, Comey, and Strzok knew about it.

370.    Included with the letter were handwritten notes by then-CIA Director John Brennan, describing briefing Obama on "alleged approval by Hillary Clinton, on July 26, 2016, of a proposal from one of her foreign policy advisors to vilify Donald Trump by stirring up a scandal claiming interference by Russian security services."

371.    On October 6, 2020, this same letter prompted Donald J. Trump to order the

declassification of the Russia Collusion documents, which led to the discovery of more information regarding the plot to takedown Donald J. Trump.

372.    On January 5, 2017, an Oval Office meeting occurred between President Obama, Vice President Joe Biden, James Comey, and Sally Yates (then-national security adviser to Suisan Rice).

373.    At this meeting, it was confirmed by testimony later given by Comey and Yates in 2020, that President Obama gave guidance to key officials who would be tasked with protecting his administration's utilization of secretly funded Clinton campaign research.

374.    Newly released notes confirm President Barack Obama's key role in the surveillance and leak operation against Michael Flynn. The handwritten notes demonstrate that President Obama personally directed former FBI Director James Comey and former Deputy Attorney General Sally Yates to investigate Flynn for having routine phone calls with a Russian counterpart. The notes also suggest they withhold information from President Trump and his key national security figures.

375.    Sally Yates confirmed to the Special Counsel investigating the matter that on January 5, 2017, President Obama revealed the existence of the Flynn investigation to her.   In an e-mail, Susan Rice further detailed the President Obama's involvement stating that "President Obama said he wants to be sure that, as we engage with the incoming team, we are mindful to ascertain if there is any reason that we cannot share information fully as it relates to Russia."

376.    The focus of the January 5, 2017 was to both develop a strategy of how to target Flynn and the matter of withholding vital national security information from Flynn.

377.    This was accomplished, as both Donald J. Trump and Flynn were entirely unaware that the investigation of Flynn was given the go-ahead.

378.    On January 24, 2017, Flynn was interviewed by the FBI, which was conducted by McCabe.

379.    Following said interview, acting Attorney General Sally Yates,  made an "urgent" request to meet with White House counsel Don McGahn, and subsequently met with him on January 26 and January 27.  At the meeting Yates told McGahn that Flynn had misled Vice President Pence and other administration officials about the nature of his conversations with a Russian ambassador and told him that Flynn was possibly susceptible to blackmail by the Russians.

380.    Moreover, the false story was also leaked to the national press, in an effort to put pressure on Donald J. Trump to fire Flynn.   On February 9, 2017, The Washington Post broke the story regarding Flynn and his possible collusion with Russia.   The New York Times also confirmed the story by The Washington Post,

381.    Public pressure on Flynn increased as a result of said news reports.    On February 13, 2018, Flynn resigned as National Security Advisor.

382.    On February 14, 2018 White House Press Secretary Sean Spicer said Trump had asked for Flynn to resign, "not based on a legal issue, but based on a trust issue", due to "misleading the Vice President and others.

383.    Later, in December 2017, President Trump said he had to fire General Flynn "because he lied" to the Vice President and the FBI.

384.    Ultimately, the Defendants, including Comey, McCabe Strzok, and Page, were successful in causing Flynn to be ousted as National Security Advisor.

385.    Among others at the FBI, Crossfire Hurricane was led by FBI Deputy Assistant Director Peter Strzok, FBI Director James Comey, and FBI Deputy Director, Andrew McCabe,

with involvement and assistance from, among others, FBI Special Counsel Lisa Page and FBI attorney Kevin Clinesmith.

    a.   Text messages between Strzok and FBI Special Counsel Lisa Page, who were engaged in an illicit affair during that time, reveal that both of them had an utter disdain for the subject of their investigation, Donald J. Trump, and were determined to ensure that Hillary Clinton won the 2016 presidential election.

    b.   For example, on August 8, 2016, Page texted Strzok, "[Trump's] not ever going to become president right? Right?!." Strzok replied, "No. No he's not. We'll stop it."

    c.   The text messages also contained reference to an "insurance policy" that was being cultivated by Strzok, Page, McCabe, Comey and others at the FBI, in the event that Trump were to win the election:

    d.   On August 15, 2016, Strzok texted Page: I want to believe the path you threw out for consideration in Andy's (Andrew McCabe, Deputy Director of the FBI) office that there's no way Trump gets elected—but I'm afraid we can't take that risk. It's like an insurance policy in the unlikely event you die before you're 40 …"

    e.   This reference to an "insurance policy" reveals that Strzok and Page intended to ensure that, if Donald. J. Trump did indeed win the presidential election, that he would be quickly removed from office or, at a minimum, unable to effectively govern.

386.   As discussed above, the FBI had opened individual cases under the Crossfire Hurricane Umbrella as to four United States individuals, Carter Page, George Papadopoulos, Paul Manafort, and Michael Flynn.

387.     Three of these individuals, Page, Papadopoulous, and Manafort, were associated with the Trump Campaign.

388.     The focus of Crossfire Hurricane quickly became to obtain a FISA warrant authorizing spying and electronic surveillance of Carter Page, a foreign policy advisor with the Trump Campaign.

389.     To surveil an American citizen, FISA requires that there be probable cause that the target is an "agent of a foreign power" who is "knowingly engag[ing]…in clandestine intelligence activities." In short, to legitimately obtain a FISA warrant against Carter Page, the FBI had to demonstrate that he was a Russian agent who was knowingly engaging in intelligence activities on behalf of Russia.

390.     The FBI ultimately obtained a total of four court approved FISA applications targeting Carter Page, which authorized intrusive electronic surveillance of him from in or about October 2016 through in or about September 2017; the first application was approved on October 21, 2016 ("FISA #1"), and three renewal applications were approved on January 12, 2017 ("FISA # 2"), April 7, 2017 ("FISA # 3"), and June 29, 2017 ("FISA # 4").

391.     The FISA applications were reviewed by numerous FBI agents, FBI attorneys, and National Security Division (NSD) attorneys and, as required by law, was ultimately certified by then FBI Director James Comey and approved by then Deputy Attorney General Sally Yates.[233]

392.     In fact, no probable cause existed and there was no truth to any of the allegations against Carter Page, Donald J. Trump, or the Trump Campaign.

393.     Strzok was directly involved in the decision to open Crossfire Hurricane and the

---

[233] *Id*. at 6.

four FISA applications.  Additionally, "the documentation opening each of the four individual investigations was approved by Strzok."[234]

394.    Further, Comey and Sally Yates approved the first renewal application Comey and then Acting Attorney General Dana Boente approved the second renewal, and then Acting FBI Director Andrew McCabe and then Deputy Attorney General (DAG), signed the third renewal, and the Defendant, Rod Rosenstein approved the fourth renewal.[235]

395.    McCabe received regular briefings on the progress of Crossfire Hurricane and discussed the investigation with Comey at regular briefings.[236]

396.    Clinesmith was assigned to provide legal support to FBI personnel working on Crossfire Hurricane. Clinesmith worked with the National Security Division of the United States Department of Justice to prepare the FISA applications to obtain authority from the United States Foreign Intelligence Surveillance Court.[237]

397.    While 'assisting' the FBI, Clinesmith doctored an e-mail with the Central Intelligence Agency. Clinesmith communicated with the CIA regarding whether Carter Page was a source. [238]

398.    Clinesmith took the e-mail he received and added the words "not a source" and provided the doctored e-mail to the FBI.[239]

399.    Ohr had regular contact with the Crossfire Hurricane team and provided them with

---

[234] *Id* at 349
[235]  *Id.* at 7
[236] 120919-examination.pdf (justice.gov) (Page 69)
[237] *See generally* Indictment, *United States v.  Clinesmith*, case no.  1:20-cr-00165-JEB, District of Columbia (Aug.  14, 2020) (hereinafter, "Clinesmith Indictment").
[238] *Id.*
[239] *Id.*

information that appeared in the FBI interview Report Form (FD-302).

400.    James Comey was the Director of the FBI and his actions in this capacity allowed the false Trump-Russia collusion narrative to continue to thrive.

401.    Comey personally signed three FISA applications to spy on Carter Page, with the Dossier serving as part of the basis for the warrant requests.

402.    Comey was aware, or should have been aware, that there was no evidentiary basis for the FISA applications and that the Steele Dossier was not a credible source:

    a.  *The Washington Times* reported that it had obtained a three page highly classified memo from September 2016, in which the CIA informed then FBI Director James Comey, that the Clinton Campaign was planning to blame "collusion" between Trump and the Russian government.  The memo shows that Comey was advised by the CIA of what the Clinton campaign had been doing.  Comey was advised of the fact that the Clinton campaign was setting up Donald J. Trump, weeks after the FBI had opened the Crossfire Hurricane investigation into alleged collusion.  That information was a red flag to the FBI and it was ignored, as Comey was aligned with the Clinton Campaign.

    b.  Comey admitted in December, 2018, during his testimony before the House Judiciary Committee, that prior to signing the FISA application to obtain the warrant to conduct surveillance on Carter Page, that he was aware that the fake Dossier, authored by Steele, was financed by the Clinton Campaign and the DNC, or as he referred to them, "political actors, who opposed Donald J. Trump."  Yet, none of that information was disclosed in the FISA applications in October, 2016, or any of the renewals.

c.  Moreover, Comey during his testimony before the House Judiciary Committee that when he met with Donald J, Trump in January 2017, in Trump Tower, to brief him on the Dossier, that he failed to inform the incoming President, about who financed the document, despite, the fact that Comey was well aware that it was financed by Hillary Clinton via the DNC and the Clinton Campaign through Perkins Coie.

d.  Comey intentionally withheld that information from Donald J. Trump, as well as in the FISA applications, themselves.  Comey not only withheld that information from Donald J. Trump and the FISA Court, so that the scheme could be hidden, but he also pushed back, on behalf of the FBI, requests from Donald J, Trump to investigate the origins of the "salacious material" i.e.: the Dossier.  As such, Comey confirmed that he did not tell Donald J. Trump, during his briefing that the Dossier had been paid for by his political opponents, mainly Hillary Clinton, the Clinton Campaign, and the DNC, via the Perkins Coie law firm.

e.  On the same day that he approved the approved a FISA surveillance warrant application verifying reporting by Christopher Steele, former FBI Director James Comey admitted in an e-mail to former Director of National Intelligence James Clapper that he was "not able to sufficiently corroborate the reporting" provided in Christopher Steele's now-disproved dossier. "We are not able to sufficiently corroborate the reporting," Comey wrote.

f.  Comey leaked information, which was classified, regarding his private conversations with President Donald J. Trump, to a college professor friend, knowing that it would be shared to a reporter, causing an investigation.

403.  Despite knowing that the information could not be sufficiently corroborated,

Comey utilized the Steele Dossier as purported evidence to sign FISA documents to conduct surveillance on Carter Page, when he knew that the Dossier was discredited, and failed to advise the FISA court.

404.     Comey failed to tell the FISA court that the Dossier was reportedly funded by the Clinton Campaign and the DNC and compiled by Fusion GPS.

405.     Comey failed to tell the FISA court that the Dossier he relied upon to request a warrant to monitor Carter Page was a product of the Fusion GPS

406.     Comey relied on the Dossier to monitor Carter Page, even though months later he called the information in the Dossier salacious and unverified.

407.     Comey relied on the Dossier, even though the FBI determined the document was only minimally corroborated, and in fact, he was not able to "sufficiently corroborate the reporting."

408.     Andrew McCabe was Deputy Director of the Federal Bureau of Investigation (FBI) from February 2016 to March 2018.

409.     On May 9, 2017, McCabe became acting director of the FBI, and served in this role until August 1, 2017, when he reverted back to his role as Deputy Director.

410.     McCabe's actions in this capacity spearheaded the investigation, and allowed the false Trump-Russia collusion narrative to continue to thrive.

411.     In June, 2017, McCabe, acting as Deputy Director of the FBI, personally signed the Fourth FISA application to spy on Carter Page, with the Dossier serving as part of the basis for the warrant requests.

412.     As Deputy Director of the FBI, McCabe played a critical role in the FBI's investigation into Donald J. Trump, titled "Hurricane Cross-Fire". McCabe was instrumental in

pushing the FISA warrants, despite his knowledge that they were uncorroborated and false.

413.     McCabe was also part of the discussion about the insurance policy, in the event of a Trump win in 2016 between Strzok and Page.  Specifically, in February, 2018, Senator Nunes released a memorandum into abuses by the FBI, and asserted that a text message from  Strzok discusses "a meeting with Deputy Director McCabe to discuss an 'insurance' policy against President Trump's election".

414.     During the time he headed the investigation into Donald. J. Trump, McCabe was aware that Clinton's campaign lawyer, Sussmann, was working on her behalf, when he was provided the Dossier to the FBI.    Yet, he failed to disclose this in his investigation, or when executing the FISA Warrant.

415.     Recently, on May 13, 2022, in the criminal case brought by John Durham against Sussman, several Department of Justice notes were produced in the case, showing that Sussman did in fact inform the FBI, which would have included McCabe, that he was working on "behalf of his client", although he did not specify who his client was.    Sussman's own lawyers have admitted in the Durham case that more than 300 FBI e-mail chains they have reviewed show the FBI knew that Sussman worked for Democratic campaigns. per the Washington Post.

416.     McCabe knowing that the dossier was funded by the Clinton campaign, and that Sussman was working on behalf of Clinton, intentionally kept the FBI in the dark, and downplayed any notion that the Dossier was not legitimate, warranting the spying on Donald J. Trump.  As a result, the FBI employees, not including its senior FBI officials, which were calling the shots, were left in the dark regarding the Clinton connection to the dossier.

417.     In his actions, McCabe was responsible for refusing to close the Mike Flynn investigation, despite there being no evidence of a criminal act, continuing to push forward the

investigation to find evidence of wrongdoing on the part of Donald J. Trump.

418.   Moreover, McCabe had a conflict of interest in heading the investigation into Donald J. Trump, as prior to his appointment as Director of the FBI, months earlier, his wife a Democratic politician had been the recipient of $675,000 in campaign cash donated by Clinton and Democratic Party-affiliated political action committees

419.   Despite all of this, McCabe signed the final FISA. Application, and continued to head the investigation of Clinton's political opponent.

420.   In 2017, while heading the investigation, McCabe also attempted to have Donald J. Trump removed from office. In a 60 minutes interview in February 2019, McCabe confirmed that he and a handful of other Justice Department officials, including Rosenstein, openly discussed recruiting Cabinet members to invoke the 25th Amendment to remove Donald J. Trump.

421.   In 2017 and 2018, the House Intelligence Committee probed the Russia collusion claim.   In May 2020, transcripts were released of those hearings.   During those hearings McCabe admitted that the FBI was unable to "prove the accuracy" of the dossier, which was used to obtain surveillance warrants for former Trump campaign aide Carter Page.   Moreover, McCabe testified that he did not know if Steele's reporting on Page, was true or not.

422.   In 2018, the Inspector General, Michael Horowitz conducted an into investigation into FBI Deputy Director Andrew McCabe, regarding media leaks to the press by McCabe  These unauthorized leaks were done in October 2016, by McCabe to the *Wall Street Journal*, in which he  leaked information regarding an investigation of the Clinton Foundation.

423.   In the  report from Inspector General Michael Horowitz, it was disclosed that McCabe made unauthorized disclosures to the media that were designed to combat the perception

that he had a conflict of interest in overseeing dual FBI investigations related to former Secretary of State Hillary Clinton.  The press disclosures in question were made to Wall Street Journal reporter Devlin Barrett, shortly after he wrote a story detailing political donations from Clinton ally and former Virginia Gov. Terry McAuliffe to the failed state Senate campaign of McCabe's wife, Jill McCabe.

424.   The Office of Inspector General found that then-Deputy Director Andrew McCabe lacked candor, including under oath, on multiple occasions in connection with describing his role in connection with a disclosure to the Wall Street Journal. The Office of Inspector General also concluded that McCabe's disclosure of the existence of an ongoing investigation to the press, violated the FBI's and the Department's media policy and constituted misconduct."  The report concluded that McCabe was "responsible for approving an improper media disclosure",

425.   On March 16, 2018, Attorney General Jeff Sessions fired McCabe.  The decision was based on the report from the DOJ Inspector General and the FBI's disciplinary office.

426.   On December 19, 2019, the Department of Justice Inspector General Michael Horowitz submitted his report of his review of Four FISA applications and other Aspects of the FBI's Crossfire Hurricane Investigation.

427.   In his report, Horowitz reported that he found 17 "significant inaccuracies and omissions" in the FBI investigation of Page and that the FBI failed "to include exculpatory evidence in its four successful applications for surveillance warrants."

428.   In a 2020, McCabe was probed by the Senate Judiciary Committee.  At the hearing, McCabe admitted that the warrant would not have been obtained without the dossier.  Moreover, he admitted unacceptable" errors were made throughout the investigation.

429.   At all material times, McCabe knew that the FBI was unable to prove the

information put into the dossier, despite this knowledge, McCabe moved forward with the dossier to obtain the FISA warrant, even though it did not meet the necessary legal threshold and should never have been issued.

430.   Since his firing from the FBI, McCabe continues to spread the falsity regarding the Trump Russia-collusion story. In February, 2019, while promoting his book on television, McCabe was interviewed by Anderson Cooper. On the show, McCabe made clear he still questions where Trump's loyalties lie. When Cooper asked if he believes Trump could be a Russian asset, McCabe replied, "I think it's possible. I think that's why we started the investigation." The headline, posted across the media, based on the interview was McCabe - " I think it's' possible Trump is a Russian asset.

431.   The Deputy Attorney General, Rod Rosenstein also conspired to cause damage to Donald J. Trump.  Rosenstein was a key figure in overseeing that probe, which was charged with investigating whether anyone on President Trump's team was conspiring with Russian operatives.

432.   In his role as Deputy Attorney General, Rosenstein overzealously targeted Donald J. Trump by concealing and allowing the FBI to act unlawfully, and personally accelerating the investigation, despite his knowledge that it was baseless.

433.   Moreover, Rosenstein, in his role, failed to disclose the political funding behind the salacious Steele dossier on the FBI's FISC warrant application.

434.   In April 2017, Rosenstein was placed in charge of the Trump- Russia collision investigation by the Department of Justice.

435.   Three months later, on July 18, 2017, Rosenstein was the official responsible for renewing the FISA warrant, signing his name on the fourth FISA (Foreign Intelligence Surveillance Act) warrant application. Rosenstein was the official responsible for making a finding

of probable cause.  Rosenstein later admitted to not reading the entire FISA warrant, prior to signing the document.

436.    As the head of the investigation for the Department of Justice, Rosenstein had a major conflict of interest, as he wanted to see harm caused upon Donald J. Trump but remained in charge of the investigation.

437.    During his tenure as head of the investigation for the Department of Justice, Rosenstein was at the center of the Russia hoax. Rosenstein exploited his authority and intentionally concealed and manipulated the false collusion conspiracy.

438.    In fact, it was well-known to Rosenstein, prior to signing the FISA warrant, that the FBI document that initially launched the Trump-Russia probe, dated July 31, 2016, failed to identify a single piece of plausible evidence justifying the Bureau's investigation of the Trump campaign.

439.    Despite this, Rosenstein, in his position as head of the investigation, intentionally failed to expose the truth, specifically that the FBI investigation was devoid of any evidence, and therefore illegitimate.

440.    In his investigation, Rosenstein failed to question Comey, Strzok and others at the FBI about the lack of evidence, or demand that they produce some tangible evidence that would justify his continued investigation.

441.    Furthermore, Rosenstein, as head of the investigation, could have terminated the obviously illicit probe of Donald J. Trump, having every opportunity to do so, but did not. Instead, Rosenstein accelerated and elevated the investigation.

442.    The acceleration of the investigation occurred, when on May 17, 2017, Rosenstein appointed Robert Mueller as Special Counsel to investigate the Trump-Russia collusion hoax.

443.     At the time of the Special Counsel's appointment, Rosenstein was aware that there

was still no evidence of a collusion conspiracy involving the Trump campaign and Russia.

444.     Months before the appointment of the Special Counsel, in January of 2017, the FBI

had debunked the Steele "dossier" upon which the FBI had so heavily relied.   Other FBI efforts

to locate collusion evidence produced nothing.

445.     To appoint a Special Counsel, the regulations required Rosenstein to demonstrate

that there was some evidence of a potential crime, and to articulate a criminal act. Despite the fact,

that there was no evidence of any crime committed, Rosenstein abused his authority by appointing

a Special Counsel.

446.     Moreover, to appoint a Special Counsel, the Department of Justice must show that

an investigation or prosecution "would present a conflict of interest for the Department of Justice."

Despite the fact that no such conflict existed, Rosenstein proceeded with appointing a Special

Counsel to oversee the matter.

447.     As the head of the investigation into Donald J. Trump, the Russia Collusion probe,

and the signer of the renewed FISA warrant, Rosenstein bore utter disdain for Donald J. Trump.

The magnitude of this hatred and unlawful conduct was exposed by *The New York Times,* on

September 21, 2018, when it reported that Rosenstein suggested, in May 2017, that he could

secretly tape and record conversations between himself and Trump. Specifically, that he discussed

wearing a wire during his meeting with President Donald J. Trump and suggested invoking

the 25th amendment to attempt to remove Trump from office.[240]

448.     Rosenstein admitted in May 2019 to Fox 5 News, according to the Washington

_____

[240] New York Times, by Nicholas Fandos and Adam Goldman, dated October 10, 2018, *Former Top F.B.I. Lawyer Says Rosenstein Was Serious About Taping Trump* - The New York Times

Examiner, to discussing with McCabe, his plans to secretly record the president, but denied he

ever intended to wear a "wire." "I had a conversation with Andrew McCabe about an investigation

that he was conducting involving the president. And there was a discussion about whether or not

the president would be recorded in the course of that investigation. I never intended to wear a wire,

and I think that if Mr. McCabe asked me to wear a wire, we would've had to reconsider the whole

thing. Because you can't run an investigation and serve as a witness," Rosenstein said in an episode

of the Siege on Democracy podcast.

### *A String of Federal Investigations Clear Donald J. Trump and Uncover the Defendants' Illicit Conspiracy*

449.    On May 9, 2017, Comey was fired from his position of Director of the FBI.

450.    Shortly thereafter, in the wake of his firing, Comey took retaliatory action against

Donald J. Trump.

451.    During his time with the FBI, Comey had documented several of his interactions

with Donald J. Trump in a series of memos. After he was no longer an employee of the FBI, Comey

intentionally shared these memos with one of his lawyer friends, who he directed to leak to a *New

York Times* reporter who had been reporting on the Russia conspiracy theory.

452.    The leak was investigated by the Office of the Inspector General (IG) which, in an

August 2019 report, faulted Comey for the "unauthorized disclosure of sensitive investigative

information, obtained during the course of FBI employment, in order to achieve a personally

desired outcome."[241]

---

[241] Report of Investigation of Former Federal Bureau of Investigation Director James Comey's Disclosure of Sensitive information and Handling of Certain Memoranda, Office of the Inspector General, Oversight and Review Division 19-02, August 2019, https://oig.justice.gov/reports/2019/o1902.pdf (hereinafter, the "IG Report (Aug. 2019).

453.    The outcome that Comey desired—per his own admission to Congress—was to "prompt" the appointment of a special counsel to investigate Donald J, Trump' alleged conspiracy with the Russian movement.

454.    The IG's report noted that Comey had "set a dangerous example" by "release[ing] sensitive information" to "create public pressure for official action."

455.    Comey was successful in getting the special master appointed, due to his unlawful leaking of information, even though Comey didn't have enough evidence to pursue it in his own official capacity.

456.    In May 2017, Robert Mueller was appointed as Special Counsel to "oversee the previously-confirmed FBI investigation of Russian government efforts to influence to 2016 Presidential Election and related matters."[242]

457.    Strzok, the leader of the Russia probe, texted Lisa Page in May 2017 that he was reluctant to join Mueller's probe and leave his senior FBI post because he feared "there's no big there, there."[243]

458.    In addition, in May 2017, Page told Representative John Ratcliffe "it still existed in the scope of possibility that there would be literally nothing" to connect Trump and Russia, no matter what Mueller or the FBI did."

459.    On March 22, 2019, Special Counsel Robert Mueller concluded his 22-month investigation and submitted his confidential report entitled "Report on the Investigation into Russian Interference in the 2016 Presidential Election" (the "Mueller Report") to Attorney General

---

[242] Appoint of Special Counsel (press release), US Department of Justice, May 17, 2017, https://www.justice.gov/opa/pr/appointment-special-counsel.
[243] Lisa Page bombshell: FBI couldn't prove Trump-Russia collusion before Mueller appointment | The Hill

William Barr.

460. The Mueller Report demonstrated that, after a two-year long investigation coming on the heels of a year-long FBI investigation, the Special Counsel found no evidence that Donald J. Trump or his campaign ever colluded with the Russian government to undermine the 2016 election.

461. Specifically, Special Counsel Mueller "did not find that the Trump campaign, or anyone associated with it, conspired or coordinated with the Russian government in these efforts, despite multiple efforts from Russian-affiliated individuals to assist the Trump campaign."[244]

462. In March of 2019, shortly after the Muller Report determined there was no collusion, Reines went on Fox News and continued to accuse Donald J. Trump.

463. Reines debated with Mollie Hemingway who told Reines that the conspiracy was over and Reines responded: "You saying it on FOX doesn't make it so.  He's under investigation by 17 other entities including the Southern District of New York."[245]

464. In or around 2019, several probes were commenced or carried out concerning the origins of the FBI's Crossfire Hurricane and relevant wrongdoing of the Defendants.

### *Office of the Inspector General*

465. First, the Office of the Inspector General performed a review to determine whether the Crossfire Hurricane investigation was adequately predicated and whether the FBI had acted on false and misleading information.

466. Through this investigation, the IG uncovered numerous deficiencies with the FBI's

---

[244] Letter from AG William Barr, March 24, 2019.
[245] https://www.realclearpolitics.com/video/2019/03/24/mollie_hemingway_vs_philippe_reines_on_mueller_its_important_to_understand_philippe_its_over.html#!

conduct.

467.    In a report dated December 9, 2019, the IG identified "at least 17 significant errors or omissions in the Carter Page FISA applications, and many additional errors in the Woods Procedure."[246]

468.    Thereafter, on January 23, 2020, the DOJ formally admitted to the FISC that, with respect to at least the last two warrant applications, "if not earlier, there was insufficient predication to establish probable cause to believe that [Dr.] Page was acting as an agent of a foreign power."

469.    The FISC has also issued several rulings finding that FISA warrants contained material omissions and misstatements, lacked candor, and/or that the warrants were not lawfully obtained:

    a.  In an Order dated December 17, 2019, the FISC stated: "The frequency with which representations made by FBI personnel turned out to be unsupported or contradicted by information in their possession, and with which they withheld information detrimental to their case, calls into question whether information contained in other FBI applications is reliable."

    b.  In an Order dated January 7, 2020, the FISC stated: "The Court understands the government to have concluded, in view of the material misstatements and omissions, that the Court's authorizations were not valid.

    c.  In an Order dated March 5, 2020, the FISC stated: "There is thus little doubt that the government breached its duty of candor to the Court with respect to those applications [involving Carter Page]."

---

[246] IG Report (12/19).

d.  In an Order dated June 25, 2020, the FISC stated: "The government acknowledges

that there were material omissions, and the Court has found violations of the

government's duty of candor, in all four applications [regarding Carter Page]."

### Federal Election Commission

470.    The FEC has issued numerous reports and findings concerning the various

violations of campaign finance laws by the Clinton Campaign and/or the DNC in connection with

their financial dealings with the other Defendants and otherwise relating to facts surrounding this

action.

471.    On July 23, 2019, the FEC found reason to believe that the DNC and HFA violated

52 U.S.C. § 30104(b)(5)(A) and (b)(6)(B)(v) and 11 C.F.R § 104.3(b)(3)(i) and (b)(4)(i) by

misreporting the purpose of funds paid to Fusion GPS through Perkins Coie.[247]

472.    The FEC's investigation revealed that the total amount of money that the DNC

spent on Fusion GPS' opposition research—which it passed through Perkins Coie and illegally

reported as "legal and compliance consulting"—was in the amount of $777,907.97.[248]

473.    Similarly, the FEC found that a sum in the amount of $180,000 was paid by the

Clinton Campaign to Perkins Coie and subsequently disbursed by Perkins Coie to Fusion GPS, as

payment for Fusion GPS's services.[249]

474.    The FEC Office of General Counsel concluded that "[the Clinton Campaign] and

the DNC did not properly disclose the purpose of [their] disbursements to Perkins Coie, for what

---

[247] Certification ¶ 2.a, MURs 7291 &7449 (DNC & HFA) (July 26, 2019).
[248] Second General Counsel's Report at 2-3, MUR 7291 & 7449, *In the Matter of DNC Services Corp./DNC, et al.* (hereinafter, "FEC Second Gen. Counsel's Rpt.").
[249] *Id.*

appears to have been opposition research done by Fusion [GPS]."[250]

475.    After conclusion of its investigation, the FEC found "probable cause to believe that the Clinton Campaign "violated 52 U.S.C. § 30104(b)(5)(A) and 11 C.F.R. § 104.3(b)(4)(i) by misreporting the purpose" of the disbursements to Fusion GPS.[251]

476.    Likewise, the FEC found probable cause to believe that the DNC "violated 52 U.S.C. § 30104(b)(5)(A) and 11 C.F.R. § 104.3(b)(4)(i) by misreporting the purpose" of the disbursements to Fusion GPS.[252]

477.    On February 22, 2022, the Clinton Campaign and the DNC respectively entered into Conciliation Agreements with the FEC to resolve these violations.[253]

478.    As set forth in its Conciliation Agreement, the Clinton Campaign agreed to pay a civil penalty to the FEC in the amount of $8,000 pursuant to 52 U.S.C. 30109(a)(5)(A) and to not violate U.S.C. § 30104(b)(5)(A) or 11 C.F.R. § 104.3(b)(4)(i) in the future.[254]

479.    As set forth in its Conciliation Agreement, the DNC agreed to pay a civil penalty to the FEC in the amount of $105,000 pursuant to 52 U.S.C. 30109(a)(5)(A) and to not violate U.S.C. § 30104(b)(5)(A) or 11 C.F.R. § 104.3(b)(4)(i) in the future.[255]

***Department of Justice/Special Counsel John Durham***

480.    In light of these admissions, as well as the obvious questions about the legitimacy

---

[250] FEC First Gen. Counsel's Rpt. at 27.

[251] Conciliation Agreement between HFACC and FEC at 1, February 22, 2022, MUR 7291 & 7449, *In the Matter of DNC Services Corp./DNC, et al.* (hereinafter, "Clinton Campaign Conciliation Agreement").

[252] Conciliation Agreement between DNC and FEC at 1, February 22, 2022, MUR 7291 & 7449, *In the Matter of DNC Services Corp./DNC, et al.* (hereinafter, "DNC Conciliation Agreement").

[253] *See generally* Clinton Campaign Conciliation Agreement and DNC Conciliation Agreement.

[254] Clinton Campaign Conciliation Agreement at 3.

[255] DNC Conciliation Agreement at 3.

of Crossfire Hurricane, Attorney General William Barr assigned John Durham, the United States Attorney for the District of Connecticut, to lead an investigation on behalf of the Department of Justice into Crossfire Hurricane.

481.    Thereafter, on October 19, 2020, Barr officially appointed Durham to serve as Special Counsel and to continue his investigation into the origins of Crossfire Hurricane.

482.    On August 8, 2020, in his first actions as Special Counsel, Durham criminally indicted former FBI attorney Kevin Clinesmith, for making a false statement, stemming from his altering of an e-mail in connection with the submission of a Foreign Intelligence Surveillance Act ("FISA") application related to spying on Donald J. Trump.   Clinesmith was referred for potential prosecution by the Justice Department's inspector general's office, which conducted its own review of the Russia investigation.

483.    Between July 2015 and September 2019, Clinesmith was employed with the FBI as an Assistant General Counsel in the National Security Department.   Clinesmith was assigned to provide legal support to FBI personnel working on Crossfire Hurricane, and he assisted FBI personnel with applications prepared by the FBI and the Justice Department's National Security Division to conduct surveillance under the FISA. [256]

484.    Clinesmith intentionally altered an e-mail he received from a "government agency", by adding the words "not a source," and then forwarded the e-mail to the FBI Supervisory Special Agent.   On June 29, 2017, the FBI Supervisory Special Agent, relying on the altered e-mail, signed and submitted the fourth FISA application to the U.S. Foreign Intelligence

---

[256] Press Release Department of Justice U.S Attorneys Office District of Connecticut, dated August 19, 2020 FBI Attorney Admits Altering E-mail Used for FISA Application During "Crossfire Hurricane" Investigation | USAO-CT | Department of Justice

Surveillance Court, which allowed them to eavesdrop on Carter Page, who was a former Trump campaign advisor.  The application did not include the individual's history or status as a source, with the other government agency.[257]

485.    Ultimately, on August 19, 2021, Clinesmith pleaded guilty to one count of making a false statement within both the jurisdiction of the executive branch and judicial branch of the U.S. government.[258]

486.    On September 16, 2021, less than a year into his investigation, Durham indicted Sussmann for one count of making a false statement to a federal law enforcement in violation of 18 U.S.C. § 1001(a)(2) for, on September 19, 2016, "stat[ing] to the General Counsel of the FBI that he was not acting on behalf of any client in conveying the particular allegations concerning [Donald J. Trump], when in truth, and in fact, and as [Sussmann] well knew, he was acting on behalf of specific clients, namely, [Joffe] and the Clinton Campaign."[259]

487.    On November 3, 2021, Durham indicted Danchenko for five separate counts of violating 18 U.S.C. § 1001(a)(2) for making false statements to a law enforcement officials:[260]

> e.   Count One alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on June 15, 2017 when he "denied to agents of the FBI that he had spoken with [Dolan] about any material contained in the [Steele Dossier], when in truth and in fact, and as the defendant well knew, [Dolan] was the source for an allegation contained in the [Steele Dossier] dated August 22, 2016 and was otherwise involved in the events

---

[257] *Id.*

[258] *Id.*

[259] Indictment at 27, *United States v.  Sussmann*, case no.  1:21-cr-00582-CRC, District of Columbia (Sept.  16, 2021) (hereinafter, "Sussmann Indictment").

[260] *See generally* Indictment, *United States v. Danchenko*, case no. 1:21-cr-00245-AJT, Eastern District of Virginia (Nov.  3, 2021) (hereinafter, Danchenko Indictment")

and information described in the reports."[261]

f.  Count Two alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on March 16, 2017 when he "stated to agents of the FBI that he received a late July 2016 telephone call from an individual who Danchenko believed was 'probably' Chamber President-1, when in truth and in fact, and as [Danchenko] well knew, Chamber President-1 never called Danchenko."[262]

g.  Count Three alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on May 18, 2017 when he "stated to agents of the FBI that he 'was under the impression' that a late July 2016 telephone call that he received was from Chamber President-I, when in truth and in fact, and as the defendant well knew, Chamber President-I never called Danchenko."[263]

h.  Count Four alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on October 24, 2017 when he "stated to agents of the FBI that he believed that he spoke to Chamber President-I on the telephone on more than one occasion, when in truth and in fact, and as the defendant well knew, Danchenko never spoke to Chamber President-I."[264]

i.  Count Five alleges that Danchenko violated 18 U.S.C. § 1001(a)(2) on November 16, 2017 when he "stated to agents of the FBI that he believed that he had spoken to Chamber President-I on the telephone, when in truth and in fact, and as the

---

[261] *Id.* at 37.
[262] *Id.*
[263] *Id.* at 38.
[264] *Id.*

defendant well knew, Danchenko never spoke to Chamber President-I."[265]

488.    On December 17, 2021, Durham filed a motion to inquire into potential conflicts of interests in Danchenko's criminal case, notifying the court to a potential conflict of interest since Danchenko's defense counsel also represents the Clinton Campaign, noting that "the interests of the Clinton Campaign and [Danchenko] could potentially diverge in connection with any plea discussions, pre-trial proceedings, hearings, trial, and sentencing proceedings."

489.    In the motion, Durham also confirms that his office is actively investigating the Clinton Campaign for its role in the subject matter of this action, stating that "[a]reas of inquiry that may become relevant . . .  include topics such as (1) the Clinton Campaign's knowledge or lack of knowledge concerning the veracity of information in the Company Reports sourced by the defendant, (2) the Clinton Campaign's awareness or lack of awareness of the defendant's collection methods and sub-sources, (3) meetings or communications between and among the Clinton Campaign, U.S. Investigative Firm-1, and/or U.K.  Person-1 regarding or involving the defendant, (4) the defendant's knowledge or lack of knowledge regarding the Clinton Campaign's role in and activities surrounding the Company Reports, and (5) the extent to which the Clinton Campaign and/or its representatives directed, solicited, or controlled the defendant's activities." He further noted that "the Clinton Campaign and [Danchenko] each might have an incentive to shift blame and/or responsibility to the other party for any allegedly false information that was contained within the Company Reports and/or provided to the FBI."[266]

490.    On January 25, 2022, in a discovery-related motion in the Sussmann criminal case,

---

[265] *Id.*

[266] *See generally* Motion to Inquire into Potential Conflicts of Interest (ECF Doc.  No.35), *United States v.  Danchenko*, case no.  1:21-cr-00245-AJT, Eastern District of Virginia (Dec.  17, 2021).

it was revealed that Durham has already questioned a "former employee of the Clinton Campaign"
and has served document requests and/or subpoenas on the Clinton Campaign and a "political
organization" – likely the DNC.[267]

491.    On February 11, 2022, Durham filed a motion to inquire into potential conflicts of
interest in the Sussmann case.  Notably, in reference to Neustar and Joffe's exploitation of non-
public data in connection with the Defendants' conspiracy, Durham states that "among the Internet
data [Joffe] and his associates exploited was domain name system ("DNS")  Internet traffic
pertaining to (i) a particular healthcare provider, (ii) Trump Tower, (iii) Donald Trump's Central
Park West apartment building, and (iv) the Executive Office of the President of the United States
("EOP")," and specifically notes that "[Joffe] and his associates exploited [a sensitive]
arrangement [with the EOP] by mining the EOP's DNS traffic and other data for the purpose of
gathering derogatory information about Donald Trump."[268]

### The Defendants' Malicious Conspiracy Remains Active to This Day

492.    The Defendants' collective effort to falsely implicate and publicly denigrate Donald
J. Trump has not ceased and, in fact, the Defendants continue to proliferate the injurious falsehood
that Donald J. Trump colluded with Russia to this very day.

493.    Fusion GPS, Simpson, Fritsch, and Steele continued their collective mission to
fabricate evidence and disparage Donald J. Trump with it, well after Trump won the 2016 election.

494.    Perkins Coie still serves as general counsel to the DNC.[269]

---

[267] *See* Government's Discovery Update and Request for Additional Time to Produce Residual
Discovery Materials, *United States v.  Sussmann*, case no.  1:21-cr-00582-CRC, District of
Columbia (Jan.  25, 2022).
[268] *See generally* Motion to Inquire into Potential Conflicts of Interest (ECF Doc.  No.35), *United
States v. Sussmann*, case no.  1:21-cr-00582-CRC, District of Columbia (Feb.  11, 2022).
[269] *See* https://www.perkinscoie.com/en/experience/democratic-national-committee-2.html.

495.     John Podesta and Philippe Reines have continued to insist that Donald J. Trump colluded with Russia.

496.     In October of 2017, Podesta went on Twitter and accused Donald J. Trump of "running a "big lie campaign" centered on the investigation into Russian meddling in the U.S. election."[270]

497.     On, April 16, 2018, Reines tweeted "yes collusion, yes collusion, yes collusion" in response to an article titled: 'Breaking: Trump puts the brake on new Russian sanctions, reversing Haley's announcement.'

498.     John Podesta is the founder and Chair for the Board of Directors for the Center for American Progress.  Podesta previously served as counselor to President Barak Obama, serving as co-chair of Obama's transition tram.  Podesta also previously served as White House chief of Staff for Bill Clinton, and chaired Hillary Clinton's 2016 Presidential Campaign.     The Center for American Progress is intended to be a is a public policy research and advocacy organization which presents a liberal viewpoint on economic and social issues. It has its headquarters in Washington, D.C., but is really an anti-Trump organization.

499.     The organization has been involved, by and through its founder and chair, Podesta, of pushing the false Trump Russia collusion narrative.  In furtherance of the plan to push the false Russia narrative to the general public, Podesta and the American Progress Action Fund set up the "Moscow Project".

500.     The Moscow Project was set up as a basis to continue to spread the false Russian narrative.  Its stated purpose is to analyze the facts behind Trump's collusion with Russia and

---

[270] https://www.yahoo.com/news/trump-behind-apos-big-lie-164719959.html

communicate it to the public.  The Moscow Project still exists, to this day, pushing the false Trump

Russia collusion narrative.  For example, as of the date of the filing of this amended Complaint,

on its website, the "Moscow Project" editors, under the direction of Podesta, write in red bold

letters, "The Trump Russia Collusion."  Moreover, on its homepage, it showcases several articles,

which falsely claim that there was collusion, such as "Yes Collusion. Yes Obstruction", dated June

22, 2020.  "Creating a New Scandal is the Latest Episode of Trump's Endless Coverup", dated

May 20, 2020. [271]

     501.    Reflecting its goal of spreading lies regarding Donald J. Trump, the Center for

America Progress Web-Site, under the direction of Podesta wrote on March 23, 2017 on its web-

site,  the following, "on Wednesday the *Associated Press* reported that Paul Manafort, Trump's

former campaign manager, secretly worked with a Russian billionaire on a plan to "greatly

benefit the Putin Government." Sound familiar? This isn't the first time we've heard about shady

ties between Manafort and Russian officials. And it's not just Manafort. It seems like every day

brings new reports of ties between the Trump team and Russia. And today is no exception, it is

now being reported that FBI has information that Trump associates communicated with Russian

operatives—possibly to coordinate the release of information during the campaign. Confused by

all the news? The Moscow Project is here to help. Consider it your one-stop-shop for the who,

what when, and where of all things Trump and Russia. See all the key players, a timeline of

events, and a fact-checked version of the Steele Dossier (of Buzzfeed fame). You can also

contribute to the investigation using the Genius tool or by sending confidential tips

---

[271] The Moscow Project themoscowproject.org, dated June 17, 2022.

to tips@themoscowproject.org.[272]

502.    Debbie Wasserman Schultz has also continued to maintain that Donald J. Trump

colluded with Russia.

503.    For instance, on May 10, 2019, Schultz appeared on MSNBC and boldly announced

that there were "clear indications" that Donald J. Trump colluded with Russia.  She went on to

state:

> You know, what's so disturbing is that Donald Trump is so lacking
> in confidence about his ability to actually get elected without the
> help of a foreign power, and particularly a foreign adversary, that
> they will go to any lengths and that he will instruct and allow his
> colleagues and allies to go to any lengths to be able to secure his
> success in an election.[273]

504.    Adam Schiff, a member of the Democratic Party, who represents California's 28th

Congressional District since 2013, has been a vocal advocate of the Trump Russia-collusion

conspiracy story.

505.    Schiff has routinely falsely claimed that he has seen "ample evidence "that Trump

colluded with the Russian government.  Schiff has stated on multiple occasions that there is an

abundance of evidence that the Trump campaign colluded with the Russians to win the 2016

presidential election.  Moreover, Schiff has routinely claimed to the press, and the American

public, for years, that he has "smoking gun" evidence proving Trump colluded with Russia in order

to win the 2016 election.

506.    In January 2017, a committee probe of the Trump Russia Collusion was started by

---

[272] The Moscow Project - Center for American Progress Action,
www.americaprogressaction.org, dated March 23, 2017
[273]https://www.realclearpolitics.com/video/2019/05/11/wasserman_schultz_trump_clearly_collu
ded_with_russia_and_engaged_in_obstructed_justice_to_cover_it_up.html

the House Intelligence committee, in which Schiff is a member, and now chairs.   In 2017, Schiff as a member of the House Intelligence committee, was involved in the congressional probe, acting as one of the staunchest advocates in the committee that the collusion had actually occurred.   The committee probe concluded in March 2018, with a report finding no evidence that the Trump campaign conspired with the Kremlin and finding that The House Intelligence Committee found the "Trump campaign did not collude with Russia".

507.   Transcripts released from those proceedings, which Schiff vehemently objected to their release, but were released after a vote of the members, prove that Schiff knew there was no proof of collusion. Yet, he still repeatedly touted the claim of collusion on national media outlets for several more years, and continues to this day to maintain that Trump colluded with Russia.

508.   In February 2019, Senate intelligence committee Chairman Richard Burr told CBS News his panel had discovered nothing to indicate collusion had occurred, which Schiff denied. Schiff stated to the press, "All of this is evidence of collusion, and you either have to look the other way to say it isn't or you have to have a different word for it, because it is a corrupt dealing with a foreign adversary during a campaign.

509.   On March 2, 2019, Schiff stated to the press, "I think there is direct evidence in the e-mails from the Russians through their intermediary offering dirt on Hillary Clinton as part of what is described in writing as the Russian government effort to help elect Donald Trump".

510.   On March 28, 2019, the nine Republican members of the House Intelligence Committee officially called for Schiff to resign due to his allegations that Trump's campaign colluded with Russians in the 2016 election. Schiff responded by accusing the Republican members of tolerating "immoral" and "corrupt" conduct by Trump campaign members and administration appointees.

511.    Recently, an e-mail was uncovered by John Durham indicating Schiff's affiliation with Fusion GPS.  Peter Frisch, on behalf of Fusion GPS e-mailed Jay Solomon at the Wall Street Journal in July 2016.  In the e-mail, dated July 26, 2016, which was recently unearthed by John Durham, Peter Frisch wrote to the Wall Street Journal reporter, when the reporter told him that Carter Page "is neither confirming or denying". that he should "call Adam Schiff. Or difi for that matter.  I bet they are concerned about what page was doing other than giving a speech over 3 days in Moscow."

512.    Schiff continues to spread the false Trump Russia-collusion narrative.  From 2017 to 2021, Schiff has been a regular guest on national news outlets, such as MSNC, CBS's "Face the Nation, NBC' Meet the Press and CNN, in which he has routinely claimed that Trump colluded with Russia, that there is plenty of evidence, and it is damming. For Example, on March 24, 2019, on ABC's This Week" with George Stephanopoulos, Schiff called it congresses duty to expose e Trump's relationship with Russia. Moreover, continuing to state there was significant evidence of Trump collusion.   When asked by the host if he would apologize for his claims that Trump colluded with Russia, after new information had been revealed disproving the collision, he double-downed on his prior statements, that there was significant and incriminating evidence of the collusion.

513.    On May 9th, 2020, Schiff claimed on CNN's State of the Union, there was "more than circumstantial evidence" that Donald Trump's 2016 presidential campaign colluded with Russia.  "You can see evidence in plain sight on the issue of collusion, pretty compelling evidence,"

514.    On April 16, 2021, Schiff on MSNBC "the last word" with Lawrence O'Donnell, continued to maintain the false narrative that Donald J. Trump and his administration colluded

with Russian, and went even further stating that it continued to do so in the 2020 election.  Stating that the "Trump campaign was passing strategic polling and strategic information to a Russian intelligence agent."    "Not just Russian intelligence, but the same ones that tried to help Trump win the 2016 election, what most people would call collusion, I don't know how the no collusion crowd explains that."

515.    At all relevant times, Adam Schiff knew that the Steele Dossier was an opposition research document paid for by the Clinton campaign and the DNC.  Schiff suppressed that information from the congressional probe, as well as from the American public, such information which would have undercut the collusion accusations.

516.    After years of delay, when Schiff was forced to release transcripts of interviews conducted by him, and his fellow House Intelligence Committee members into Russia meddling, it was learned that the director of National Intelligence, former Obama Attorney General, former Deputy Attorney General, and the FBI Deputy Director, among others, all told his committee that there was no direct evidence of criminal conspiracy.

517.    Despite this knowledge, Schiff knew, continued to profess that the central assertion of the dossier, that the Trump campaign had colluded with the Russian government during the 2016 campaign, was not only possible but indeed a fact. He did so on numerous occasions and with great certitude. Every time he did, it was a lie. To this day, Schiff has never produced any evidence to back up his claims.

518.    Likewise, Clinton has continued to drum up the false Trump-Russia narrative in the hopes of damaging Trump's political career.

519.    In an October 2019 interview for the "Campaign HQ" podcast, Clinton stated about Trump: "I don't know what Putin has on him, whether it's both personal and financial. I assume it

is."[274]

520.    For example, on June 16, 2021, Clinton appeared on MSNBC's *Morning Joe* show and again attempted to reinforce the debunked Trump-Russia story—of which she led the effort to manufacture and is no doubt aware is false—when she stated to MSNBC's audience, which included the general public of the State of Florida and the rest of the United States: "We don't have Trump as spokesperson for Putin, anymore."  "After disastrous Trump presidency, in which he gave Putin a green light to do whatever he wanted to do, once Trump was elected, of course..."

521.    On February 16, 2022, in response to media reports concerning the filing of Durham's February 11, 2022 motion, Clinton tweeted that "Trump & Fox are desperately spinning up a fake scandal to distract from his real ones.  So it's a day that ends in Y.  The more his misdeeds are exposed, the more they lie.  For those interested in reality, here's a good debunking of their latest nonsense."[275]

522.    Recently, in a June 18, 2022 article published by the *Financial Times*, Clinton referred to her loss Trump in the 2016 Presidential Election as "unfinished business" and further stated: "Look, the most important thing is to win the next election. The alternative is so frightening that whatever does not help you win should not be a priority."[276]

523.    These are but a few of the recent examples of the Defendants' ongoing efforts to maintain their conspiracy to spread injurious falsehoods against Donald J. Trump.

---

[274] Blake, Aaron. "Hillary Clinton suggests Putin has kompromat on Trump, Russia will back Tulsi Gabbard third-party bid." Washington Post. October 18, 2019. Accessed August 11, 2020. https://www.washingtonpost.com/politics/2019/10/18/hillary-clinton-suggests-putin-has-kompromat-trump-russians-will-back-tulsi-gabbard-third-party-bid/
[275] https://twitter.com/HillaryClinton/status/1494036101572575232.
[276] Edward Luce, *Hillary Clinton: 'We are standing on the precipice of losing our democracy'*, June 17, 2022, https://www.ft.com/content/2e667c3f-954d-49fa-8024-2c869789e32f.

524.     As a direct and proximate cause of the Defendants' actions, Trump has sustained significant injuries and damages including, but not limited to, expenses in the form of defense costs, legal fees and related expenses incurred in connection with his efforts to defend against the Defendants' tortious actions, false accusation, and overall scheme to discredit and delegitimize him, the Trump Campaign and Administration, and the Trump Organization and the various federal investigations and official proceedings that arose therefrom, which to date is in an amount no less than twenty-four million dollars ($24,000,000) and continuing to accrue, as well as the loss of existing and future business opportunities.[277]

525.     It was a goal of the Defendants' conspiracy, and indeed a direct and proximate consequence of the same, that this substantial economic harm would befall Trump.  The Plaintiff does not claim nor seek any compensation for damage to his reputation, but rather, he seeks damages for the cost of dealing with the legal issues and political issues, which he was required to spend to redress the injurious falsities which were propounded by the Defendants, and all other losses incurred due to the tortious conduct of the Defendants.

526.     All precedent acts and requirements have been done or have been waived by the Defendants.

527.     The Plaintiff was required to retain the attorneys named below to bring this action and to pay them reasonable attorneys' fees.

---

[277] The different opportunities which evaporated are too many to list, but as an example, Donald J. Trump has been banned from different social media platforms, including Twitter.  Most of this was due to the misinformation campaign waged by Hillary Clinton, whereby truth was deemed false and lies were deemed to be truth.

**Count I**
**RICO**
**(18 U.S.C. § 1962(C))**
*(Against Clinton, Clinton Campaign, DNC, Perkins Coie, Elias, Sussmannn, Fusion GPS, Joffe)*

528.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

529.    The Defendants, Clinton, the Clinton Campaign, the DNC, Perkins Coie, Elias, Sussmann, Fusion GPS, and Joffe (collectively, the "RICO Defendants") are all "persons" within the meaning of 18 U.S.C. § 1961(3).

**The RICO Enterprise**

530.    At all relevant times, the RICO Defendants, Clinton, the Clinton Campaign, the DNC, Perkins Coie, Elias, Sussmann, Fusion GPS, and Joffe, conducted the affairs of an association in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4).

531.    The members of the Enterprise are a group of persons associated together for the common purpose of carrying on an ongoing enterprise; specifically—as confirmed by U.S. intelligence officials—the Enterprise had a common, unlawful goal of corruptly and wrongfully harming the Plaintiff's political reputation, damaging his electability for the 2016 Presidential Election and subsequent elections, impeding his ability to effectively govern, and otherwise sabotaging his political career through deceptive, criminal and fraudulent means, including, but not limited to, falsely implicating the Plaintiff, the Trump Campaign, and the Trump Administration as colluding with Russia. The actions undertaken by the RICO Defendants in furtherance of this goal were intended to inflict the type of injury and harm suffered by Plaintiff.

532.    The Enterprise was formed as early as April 2015, when Clinton announced her candidacy, formed her campaign and began conspiring with the DNC and Perkins Coie to target

Plaintiff, and remains ongoing and continuing to the present day. In the alternative, the Enterprise

continued through at least January 20, 2021 when Plaintiff formally departed the office of the

presidency.

533. At all relevant times, the Enterprise has had a longevity sufficient to permit the

RICO Defendants to pursue the Enterprise's purpose. Indeed, the Enterprise's conduct remains

ongoing to this day as the RICO Defendants continue to perpetuate their fraudulent scheme by

spreading disinformation, harmful lies, and false narratives to the media concerning Plaintiff's

purported illicit ties to Russia. In addition, given the potential that Plaintiff will run for President

again in 2024, coupled with the RICO Defendants' longstanding political and professional

relationships, there is a significant likelihood that conduct of the Enterprise's racketeering conduct

will repeat in the future, including but not limited to, theft of trade secrets, obstruction of justice,

and other unlawful tactics, in furtherance of their attempts to further damage Plaintiff's electability

and to ensure that he is unable to secure a victory in the 2024 Presidential Election.

534. The Enterprise is, and at all relevant times was, a continuing unit that functioned

with a common purpose and had an ascertainable structure for carrying out its objectives. While

the precise organizational framework of the Enterprise may have varied over time, and some of

the RICO Defendants may have held different roles at different times, the Enterprise has been

structured to operate as a continuing unit to accomplish the common goals and purposes of its

scheme. In general, the leadership of the Enterprise was the Clinton Campaign and the DNC, as

well as Clinton, who exerted significant control over both the Clinton Campaign and the DNC.

Clinton, the Clinton Campaign and the DNC worked in tandem with their joint counsel, Perkins

Coie, whose partners, Sussmann, and Elias, simultaneously served as general counsel for the

Clinton Campaign and the DNC, in devising, coordinating, and overseeing the Enterprise's

activities. Perkins Coie was the central hub that coordinated and oversaw the day-to-day operations of the Enterprise. Perkins Coie, at the behest of and on behalf of the Clinton Campaign and the DNC, contracted with Fusion GPS to spearhead the media-based smear campaign against Plaintiff; this arrangement was misreported to the FEC for the purposes of concealing the Clinton Campaign and the DNC's connection to Fusion GPS. Perkins Coie also represented Joffe and his company, Neustar. Joffe's role was to lead a cyber-based, data-driven attack against Plaintiff. All of the RICO Defendants played a part in misleading law enforcement and counterintelligence officials, including, without limitation the preparation and presentation of various falsified materials and various false statements made in connection with same.

535. At all relevant times, each of the RICO Defendants were aware of each other's conduct in furtherance of the scheme and were knowing and willing participants in that conduct. The RICO Defendants had frequent meetings, calls and communications amongst themselves for the purpose of orchestrating, coordinating, and carrying out their unlawful actions. To the extent any of the RICO Defendants did not communicate or interact directly with any other RICO Defendants, such as the Clinton Campaign, they communicated and/or interacted indirectly through Perkins Coie as a liaison and were continually apprised of the activities of the other RICO Defendants; this was done purposefully with the intention that attorney-client privilege communications could be used to conceal their communications.

536. Since the Enterprise's activities had a significant impact on the 2016 presidential election, provoked numerous unwarranted federal investigations and congressional inquiries, severely impacted the reputation of a presidential candidate, affected fundraising and electoral spending in the 2016 presidential election and 2020 presidential election, and, ultimately, impeded the ability of a sitting President of the United States to effectively govern, the Enterprise affected

interstate and foreign commerce.

537.   Many of the members of the Enterprise have longstanding interpersonal and/or professional relationships rooted in their political and professional connections, ongoing business dealings, and mutual interest and participation in common activities and dealings.

## Predicate Acts

538.   Section 1961(1) of RICO also provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1832 (relating to theft of trade secrets); 18 U.S.C. § 1512 (obstruction of justice); and 18 U.S.C. § 1343 (fraud by wire, radio or television).   As set forth herein, in furtherance of their scheme to harm the Plaintiff, his reputation and his business, the RICO Defendants engaged in numerous acts in violation of 18 U.S.C. § 1832, 18 U.S.C. § 1512, and 18 U.S.C. § 1343.

539.   Each RICO Defendant has conducted and participated in, directly or indirectly, the management, conduct and/or operation of the Enterprise and its affairs through a pattern of racketeering activity including acts indictable under 18 U.S.C. § 1832 (theft of trade secrets), 18 U.S.C. § 1512 (obstruction of justice), and 18 U.S.C. § 1343 (wire fraud).

540.   The RICO Defendants have consistently and regularly committed acts of racketeering activity spanning from, at least, April 2015 through, at a minimum, November 17, 2017.   These multiple acts shared a common or related purpose, goal, result, participants, victims, and methods of commission.

541.   Beginning in or around April 2015, the RICO Defendants engaged in wide-ranging scheme to concoct a false narrative that the Plaintiff, his businesses, his campaign, and eventually, his administration, were colluding with Russia to undermine the 2016 Presidential Election and engage in other corrupt dealings.

542.     The RICO Defendants, through their deceptive and illegal conduct intended to mislead law enforcement, the media, and the public at large through the spread of disinformation and fraudulent claims; to unlawfully obtain confidential, sensitive and proprietary data that could be falsified and weaponized against Plaintiff; and to obstruct and falsely provoke federal investigations against the Plaintiff, the Trump Campaign, and the Trump Administration.

543.     In furtherance of this scheme, the Defendants committed multiple related acts, each of which constitutes an act of racketeering activity, and which, collectively, constitute a pattern of racketeering activity.

### Theft of Trade Secrets (18 U.S.C. § 1832)

544.     In violation of 18 U.S.C. § 1832(a)(5), Joffe, in coordination with and at the direction of the other RICO Defendants, abused and exploited access to non-public and highly-sensitive data sources and/or servers and acquired, obtained in excess of authorization and/or stole proprietary, sensitive and confidential internet data, records and/or information, including without limitation, DNS internet traffic data pertaining to Plaintiff, including data originating from his servers located at his private New York residence and those located at Trump Tower and used in connection with his business, The Trump Organization LLC, a company involved in interstate commerce, and stole trade secrets in violation of 18 U.S.C. § 1832 (theft of trade secrets).

545.     DNS internet traffic data houses highly proprietary, sensitive and confidential data. For example, among other things, an analysis of raw DNS data reveals a comprehensive view into an individual or a company's website traffic, e-mail traffic, webmail traffic, chat messaging, in addition to the types of technology, hardware, software, programs, securities and processes being utilized by the servers.

546.     Joffe, with assistance from the other RICO Defendants, exploited his access to non-

public data sources and/or servers, through Neustar and the Data Companies, to unlawfully

acquire, steal and exploit sensitive, proprietary and confidential internet data, including without

limitation, DNS information, traffic, and/or data originating from computers and/or servers: (i)

located at Plaintiff's private apartment in Central Park West in New York and belonging to the

Plaintiff; and (ii) located at Trump Tower and belonging to The Trump Organization, in which

Plaintiff has an ownership interest (collectively, with the computers and/or servers house in

Plaintiff's private apartment, "Plaintiff's Servers").

547.    By illegally accessing the above-mentioned information and data, the RICO

Defendants were able to obtain proprietary, sensitive, and/or confidential information and data

including, among other things, the number and frequency of e-mail communications between the

Plaintiff's Servers and other third party servers, the number and frequency of website visits to third

party websites by the Plaintiff's Servers, the number and frequency of webmail interactions

between the Plaintiff's Servers and other third party servers, and the number and frequency of chat

messaging interactions between the Plaintiff's Servers and other third party servers, as well as

information pertaining to the types of technology, hardware, software, programs, securities and

processes being utilized by Plaintiff's Servers.

548.    This information and data revealed highly proprietary, sensitive, and confidential

knowledge, including insight into Plaintiff's and The Trump Organization's contacts, client lists,

business dealings, financial dealings, communications, future and current plans, techniques,

patterns, methods, processes, and procedures, as well as identification of their corporate partners,

political associates, clients, and vendors.

549.    This proprietary, sensitive and confidential information, data and/or knowledge

constitutes trade secrets within the meaning of 18 U.S.C. § 1839(3) where they constitute business

and/or political methods, techniques, processes, procedures and programs that are both protected from disclosure by the Plaintiff and derive significant economic value from not generally being known to or ascertainable by others, including the RICO Defendants, who were able to obtain insight and economic value from the unauthorized use, disclosure and misappropriation of such information.

550.    The Plaintiff and The Trump Organization restricts access to their proprietary, sensitive and confidential information and data, including DNS data, even within their own personnel and prevents unauthorized access to such records by digital or electronic means.

551.    The Plaintiff and The Trump Organization further protects against theft and disclosure of such information by third parties by the requirement of executed non-disclosure agreements prior to providing any such access.

552.    The Plaintiff's confidential records were misappropriated by Defendants within the meaning of 18 U.S.C. § 1839(5), when the Plaintiff's confidential and proprietary records were acquired by the RICO Defendants, without the Plaintiff's authorization and through Defendants' acts of espionage or other improper means conducted by electronic or other means.

553.    Joffe, with assistance from, in coordination with, and at the direction of the other RICO Defendants, violated the Defend Trade Secrets Act, 18 U.S.C. § 1832(a)(1), by obtaining Plaintiff's proprietary, sensitive and confidential information and data by fraud, artifice, and deception and, thereafter, stealing, appropriating, taking, carrying away, and concealing the theft of Plaintiff's confidential records with intent to convert Plaintiff's confidential records, which are related to products sold in interstate and foreign commerce, to Defendants' own benefit, while knowing and intending that such misappropriation would injure the Plaintiff.

554.    Clinton, the Clinton Campaign, the DNC, Perkins Coie, Sussman, Elias, and Fusion

GPS violated the Defend Trade Secrets Act, 18 U.S.C. § 1832(a)(5) by conspiring, assisting, aiding, and abetting Joffe in obtaining Plaintiff's proprietary, sensitive and confidential information and data by fraud, artifice, and deception and, thereafter, stealing, appropriating, taking, carrying away, and concealing the theft of Plaintiff's confidential records with intent to convert Plaintiff's confidential records, which are related to products sold in interstate and foreign commerce, to Defendants' own benefit, while knowing and intending that such misappropriation would injure the Plaintiff

555.   Each of the RICO Defendants were aware of, and active participants and/or conspirators in, Joffe's violation the Defend Trade Secrets Act, 18 U.S.C. § 1832, and each of the RICO Defendants committed at least one act in furtherance of this goal.

556.   The RICO Defendants' actions constitute theft of trade secrets and/or a conspiracy to steal trade secrets in violation of 18 U.S.C. § 1832(a)(5).

557.   All of Defendants' actions in violation of 18 U.S.C. § 1832 occurred after May 11, 2016 and, therefore, qualify as predicate acts pursuant to the 2016 amendment federal RICO statute.

### *Obstruction of Justice (18 U.S.C. § 1512)*

558.   The RICO Defendants, through and using the Enterprise, engaged in, and continues to engage in, a coordinated effort to destroy the Plaintiff's political career and impede his ability to effectively govern as President of the United States.  This coordinated effort amounts to a set of related predicate acts with similar purposes, results, and methods, which included acts in violation of 18 U.S.C. § 1512 (obstruction of justice).

559.   On one or more occasions, the RICO Defendants, knowingly and deliberately provided falsified, altered and misleading records, including the White Papers and the Dossier, to

law enforcement officials and made false statements to law enforcement officials, including the FBI and CIA, with the intention of obstructing, impeding, influencing and/or impairing their investigations into alleged Russian collusion, and/or conspired with others to carry out these acts.

560.    On September 19, 2016, Sussmann met with FBI officials in Washington D.C., at which time he, among other things: (i) made false statements to FBI officers, including that he was acting on behalf of any client; (ii) provided falsified, altered and/or misleading records, including the White Papers, to FBI officials; (iii) withheld and/or concealed pertinent information, including without limitation the true nature of the White Papers, his work with Neustar and Joffe, the falsity of the purported link between Trump Tower and Alfa Bank, and the existence of the Enterprise and its overarching conspiracy to create a false narrative of Trump-Russia collusion.

561.    On September 19, 2016, Sussmann met with FBI officials in Washington D.C., at which time he, among other things: (i) made false statements to FBI officials, including that he was not acting on behalf of any client; (ii) knowingly provided falsified, altered and/or misleading records, materials and evidence, including (1) *White Paper #1 AuditableV3,* (2) *White Paper Comments: Time Series Analysis of Recursive Queries,* (3) a white paper drafted by Fusion GPS regarding a purported Trump-Alfa Bank connection, and (4) eight files containing falsified, altered, and/or curated data and information relating to Alfa Bank, Trump Tower, and the mail.trump-e-mail.com domain, to FBI officials; (iii) withheld and/or concealed pertinent information, including, without limitation, that he was acting on behalf of his clients, Clinton, the Clinton Campaign, the DNC; that he was perpetrating a fraudulent scheme, along with his cohorts, in furtherance of the Enterprise; the falsified, spoofed and/or misleading nature of the White Papers and the other documents that he was handing over; the true nature of his work with the RICO Defendants; the falsity of the purported link between Trump Tower and Alfa Bank,; and the

existence of the Enterprise and its overarching conspiracy to mislead law enforcement for the purpose of creating a false narrative concerning the purported Trump-Russia collusion.

562.    Sussmann's conduct in connection with his September 19, 2016 meeting with the FBI corruptly obstructed, influenced, and impeded and/or constituted an attempt to corruptly obstruct, influence or impede one or more official proceeding(s), namely the FBI's Crossfire Hurricane investigation, the FBI's full field investigation into the Trump-Alfa Bank connection, and/or other investigations by the FBI, the DOJ, the CIA, Congress, and/or the IG and therefore constituted a violation of 18 U.S.C. § 1512.

563.    On October 2, 2016, Joffe contacted FBI Special Agent Tom Grasso via telephone, at which time he, among other things: (i) made false and misleading statements to SA Grasso, including statements regarding "information relating to communications between the Trump Campaign and some entity in Russia"; (ii) provided unlawfully obtained records, including an IP address of an individual affiliated with Alfa Bank; (iii) despite being a confidential human source, Joffe intentionally circumvented his handler and spoke with Grasso on the condition of anonymity, all for the purpose of adding credibility to the 'circular reporting' Joffe was carrying out with Sussman; (iv) withheld and/or concealed pertinent information, including, without limitation, that he was working with Clinton, the Clinton Campaign, the DNC, Perkins Coie, Sussmann, and Fusion GPS; that he was perpetrating a fraudulent scheme, along with his cohorts, in furtherance of the Enterprise; the true nature of his work with the RICO Defendants; the falsity of the purported link between Trump Tower and Alfa Bank,; and the existence of the Enterprise and its overarching conspiracy to mislead law enforcement for the purpose of creating a false narrative concerning the purported Trump-Russia collusion.

564.    Joffe's conduct in connection with his October 2, 2016 call with SA Grasso

corruptly obstructed, influenced, and impeded and/or constituted an attempt to obstruct, influence

or impede the due administration of justice, and/or one or more official proceedings, namely

investigations by the CIA, the FBI, Congress, the IG, and/or the DOJ and therefore constituted a

violation of 18 U.S.C. § 1512.

565.    On February 9, 2017, Sussmann met with CIA officials at a location outside of

Washington D.C., at which time he, among other things: (i) made false statements to CIA officials,

including that he was not representing a particular client; (ii) provided falsified, altered and/or

misleading records, including updated White Papers and multiple data files containing purported

DNS data, ranging from 2016 through early 2017, to CIA officials; (iii) withheld and/or concealed

pertinent information, including, without limitation, that he was acting on behalf of his clients,

Clinton, the Clinton Campaign, the DNC; that he was perpetrating fraudulent scheme, along with

his cohorts, in furtherance of the Enterprise; the falsified, spoofed and/or misleading nature of the

White Papers and the other documents that he was handing over; the true nature of his work with

the RICO Defendants; the falsity of the purported link between Trump Tower and Alfa Bank,; and

the existence of the Enterprise and its overarching conspiracy to mislead law enforcement for the

purpose of creating a false narrative concerning the purported Trump-Russia collusion.

566.    Sussmann's conduct in connection with his February 9, 2017 meeting corruptly

obstructed, influenced, and impeded and/or constituted an attempt to obstruct, influence or impede

the due administration of justice, and/or one or more official proceedings, namely, investigations

by the CIA, the FBI, Congress, the IG, and/or the DOJ and therefore constituted a violation of 18

U.S.C. § 1512.

567.    Sussmann's actions on February 9, 2017 corruptly obstructed, influenced, and

impeded and/or endeavored to obstruct, influence or impede the due administration of justice,

and/or one or more official proceedings, namely, ongoing investigations by the CIA, the FBI, the

IG, and/or the DOJ and therefore constituted a violation of 18 U.S.C. § 1512.

568.    The other RICO Defendants, Clinton, Clinton Campaign, DNC, Perkins Coie, and

Elias*,* had a meeting of the minds, common intent, were aware of, and conspired with Sussmann

in the commission of the above-mentioned violations of 18 U.S.C. § 1512, including, without

limitation, his conduct in connection with his meeting with the FBI on September 19, 2016 and

his meeting with the CIA on February 9, 2017, and each of the other RICO Defendants committed

an overt act in furtherance of said violation(s), and the RICO Defendants conspired to commit the

above-named acts in furtherance of the overarching conspiracy to denigrate the Plaintiff and to

derail his political career.

569.    Therefore, the actions of the RICO Defendants, Clinton, Clinton Campaign, DNC,

Perkins Coie, and Elias, constituted a conspiracy to obstruct justice in violation of 18 U.S.C. §

1512(k).

570.    By virtue of the foregoing, Sussmann, and the other RICO Defendants, willfully,

knowingly, deliberately and corruptly obstructed, influenced, and impeded and/or endeavored to

obstruct, influence or impede the due administration of justice, and/or one or more official

proceedings, including, but not limited to, Crossfire Hurricane and/or other investigations by the

FBI, the CIA, the IG, and the DOJ.

571.    In addition, the RICO Defendants, led by Fusion GPS, produced the fraudulent

Steele Dossier, which contained falsified, misleading and inaccurate reporting about the alleged

Trump-Russia connection, and which the RICO Defendants orchestrated to be fed to law

enforcement, including without limitation the FBI and the DOJ, for the purpose of corruptly

obstructing, influenced, and impeding and/or attempting to obstruct, influence or impede one or

more official proceedings, including, but not limited to, Crossfire Hurricane, the full field investigation of the Trump-Alfa Bank allegations and/or other investigations by the FBI, the CIA, Congress, the IG, and the DOJ, in violation of 18 U.S.C. § 1512.

572.     In addition, the RICO Defendants conspired with Danchenko in connection with his conduct in making various false statements and misrepresentations to the FBI in violation of 18 U.S.C. § 1512, including, but not limited to:

    a.  On June 15, 2017, Danchenko stated, at the direction of and in coordination with the RICO Defendants, that he had not spoken with Dolan about any material contained in the Dossier. This statement was patently false, as Danchenko used the information provided by Dolan as a source for allegations made in the Dossier.

    b.  On March 16, 2017, May 18, 2017, October 24, 2017, and November 16, 2017, Danchenko, at the direction of and in coordination with the RICO Defendants, directly lied about the sources relied upon in compiling the Dossier.

573.     The RICO Defendants had a meeting of the minds, common intent, were aware of, and conspired with Orbis Ltd., Steele, and Danchenko in connection with the commission of the above-mentioned violations of 18 U.S.C. § 1512, including, without limitation, the scheme to manufacture and disseminate the Steele Dossier and Danchenko's various false statements to law enforcement, and each of the other RICO Defendants committed an overt act in furtherance of said violations, and the RICO Defendants conspired to commit the above-named acts in furtherance of the overarching conspiracy to denigrate the Plaintiff and to derail his political career.

574.     Therefore, the actions of the RICO Defendants constituted a conspiracy to obstruct justice in violation of 18 U.S.C. § 1512(k).

575.     Based on the foregoing, the RICO Defendants' actions constituted at least two

separate violations of 18 U.S.C. § 1512.

### Wire Fraud (18 U.S.C. § 1343)

576.    A scheme to defraud includes any plan to deprive a person of something of value by trick, deceit, chicanery or overreaching, including through affirmative misrepresentations, material omissions of fact, or any deceptive or dishonest behavior.

577.    As described herein, the Enterprise engaged in a calculated scheme to defraud the news media, law enforcement and counterintelligence officials for the purpose of proliferating a false narrative of collusion between Trump and Russia.

578.    Plaintiff was the intended target of the fraudulent scheme; in committing the acts of wire fraud described *infra*, the RICO Defendants sought to mislead others (journalists, reporters, law enforcement officials, etc.) as a means of depriving Plaintiff of tangible and/or intangible property, including, without limitation, causing loss of political and/or business reputation, loss of business opportunities, loss of competitive position, and/or loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations.

579.    As a direct and proximate result of the RICO Defendants' actions, Plaintiff did in fact suffer said injuries and/or deprivation of said property.

580.    As part of and in furtherance of the scheme, the RICO Defendants made repeated use of, or caused their agents, representatives, and/or subordinates to repeatedly make use of, the interstate wires to transmit various documents, communications, or payments, including with knowledge that the use of wires would follow in the ordinary course of business or where such use could be reasonably foreseen.

581.    Each separate use of the interstate wire facilities employed by the RICO Defendants was related, had similar intended purposes, involved similar participants and/or targets, utilized

similar techniques and methods of execution, and negatively affected the same victim – the Plaintiff.

582.    Many of the precise dates of the RICO Defendants' uses of the interstate wire facilities have been, and continue to be, concealed by the RICO Defendants and therefore are not knowable at the present time. Indeed, the Enterprise was intentionally devised in such a manner that would fraudulently conceal relevant communications made in furtherance of these types of predicate acts, including, but not limited to, the RICO Defendants' abuse of attorney-client privilege, the entering into of numerous confidentiality agreements amongst all parties, and the misreporting of the true nature of the parties' arrangement to federal authorities and agencies including the FEC. As such, knowledge of the Enterprise fraudulent acts is peculiarly within RICO Defendants' control.[278]

583.    In spite of his diligent efforts, Plaintiff does not, and cannot, know the full extent of the Enterprise's fraudulent scheme. At a minimum, however, the RICO Defendants' use of interstate wire facilities to perpetuate their unlawful scheme included the following:

   a.  May 14, 2016 e-mails between Fusion GPS (Fritsch and Berkowitz) and Franklin Foer, journalist for *Slate*, concerning the purported Russian connections of several of Trump's campaign associates, including Carter Page and Rick Burt.

   b.  June 27-28, 2016 e-mails from Fritsch to Foer attempting to insinuate that the Trump Campaign was colluding with Russia.

   c.  July 26, 2016 e-mails from Fritsch to Jay Solomon, journalist with the *Wall Street Journal*, discussing a senior Trump advisors' supposed meeting with former KGB official with close ties to Putin, among other false allegations of Russia collusion;

---

[278] *Cf. Hill v. Morehouse Med. Assocs., Inc.*, 2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003) ("Rule 9(b)'s heightened pleading standard may be applied less stringently. . . when specific factual information about . . . fraud is peculiarly within [a] defendant's knowledge or control" as long the pleading party accompanies its legal theory with factual allegations that make the "theoretically viable claim plausible."); *Omnipol, A.S. v. Worrell*, 421 F. Supp. 3d 1321, 1344 (M.D. Fla. 2019) ("Rule 9(b)'s pleading standard may be relaxed when evidence of the fraud is exclusively within the defendant's possession.").

including one e-mail when Fritsch wrote to Solomon that Carter Page "is neither confirming or denying". that he should "call adam Schiff. Or difi for that matter. I bet they are concerned about what page was doing other than giving a speech over 3 days in Moscow."

d. August 16, 2016 wire payment from the DNC to Perkins Coie in the amount of $66,500, which was funneled through Perkins Coie to Fusion GPS in order to conceal the relationship between the DNC and Perkins Coie.

e. From August 2016 through November 2016, wire payments totaling $777,907.97 paid by the DNC to Perkins Coie and subsequently disbursed by Perkins Coie to Fusion GPS.

f. From August 2016 through November 2016, wire payments totaling $180,000 paid by the Clinton Campaign to Perkins Coie and subsequently disbursed by Perkins Coie to Fusion GPS.

g. August 20, 2016 e-mails from Joffe to his researchers asking that the researchers spoof communications between e-mail address to make them "appear to communicate with each other"; to ensure that the fake "inference" was believable enough that "Hillary's opposition research and whatever professional gov[ernments] and investigative journalists are also digging [would] come up with the same things[.]"; and stating that "[b]eing able to provide evidence of *anything* that shows an attempt to behave badly in relation to this, the VIPs would be happy.  They're looking for a true story that could be used as the basis for closer examination."

h. August 21, 2016 e-mail from Joffe to researchers urging them to push forward with their anti-Trump research, which he claimed would "give the base of a very useful narrative"; and admitting that the 'narrative' that they were trying to prove—a connection between Trump and Alfa Bank—was merely a "red herring" with no factual basis that should be "ignored."

i. September 13, 2016 e-mail from Joffe to researchers, attaching falsified 'white papers' that he, Sussmann and Fusion GPS had been working, and stating: "Please read as if you had no prior knowledge or involvement, and you were handed this document as a security expert (NOT a DNS expert) and were asked: Is this plausible as an explanation?' NOT to be able to say that this is, without doubt, fact, but to merely be plausible.  Do NOT spend more than a short while on this (If you spend more than an hour you have failed the assignment).  Hopefully less.  :)."

j. September 15, 2016 e-mail from Elias to Sullivan, Mook, Podesta and Palmieri with the subject line "Alfa Bank article."

k. September 18, 2016 text message from Sussmann to Jim Baker to schedule meeting with FBI and falsely stating that Sussmann is "coming on my own – no on behalf of a client or company – want to help the Bureau."

l. October 2, 2016 phone call from Joffe to FBI Special Agent Grasso wherein Joffe circumvented his FBI handler to provide "information relating to communications

between the Trump Campaign and some entity in Russia," including an IP address, as an anonymous source.

m.  September 27, 2016 e-mail from Sussmann to Eric Litchtblau, reporter with *The New York Times*, disclosing an IP address and DNS data, purportedly connected to the Trump-Alfa Bank 'back channel.'

n.  September 19, 2016, e-mail from Fusion GPS (Jake Berkowitz) to Matthew Mosk, *CBS News*, sending him details and information concerning the Russian Collusion story.

o.  October 18, 2016 e-mail from Fritsch to Eric Lichtblau, *The New York Times*— who had also been in frequent communication with Sussmann, with the subject regarding Alfa and Trump—discussing Donald J. Trump and the Alfa Bank.

p.  October 18, 2016 e-mails from Fritsch to Mark Hosenball of *Reuters*, stating, among other things, "meantime, do the f-cking alfa bank secret comms story.  It is hugely important.  Forget the WikiLeaks sideshow".

q.  October 2016 phone call between Mook and Clinton, when Clinton authorizes Mook to release the Trump-Alfa Bank allegations—which she knew to be false and defamatory—to push it to the media, including to *Slate*.

r.  October 2016 e-mail communication from Clinton Campaign staffer to Franklin Foer with Alfa Bank information and directing the release of a *Slate* article, as expressly authorized by top ranking officials of the Clinton Campaign, including Clinton, Mook, Sullivan and Podesta, as well as Perkins Coie, and Elias, Sussmann.

s.  October 30, 2016 forwarded tweet from Fritsch to Franklin Foer, *Slate*, about Comey possessing explosive information about Trump's ties to Russia and stating "time to hurry."

t.  October 30, 2016 e-mail from Fritsch to Michael Isikoff, *Yahoo News* stating *"*Big story on the trump Alfa server moving early pm. OTR. [United States Government] absolutely investigating. Campaign will light it up I imagine."

u.  October 31, 2016 electronic campaign statement from Jake Sullivan stating: "[T]his could be the most direct link yet between Donald Trump and Moscow. Computer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank.  This secret hotline may be the key to unlocking the mystery of Trump's ties to Russia.  It certainly seems the Trump Organization felt it had something to hide, given that it apparently took steps to conceal the link when it was discovered by journalists.  This line of communication may help explain Trump's bizarre adoration of Vladimir Putin and endorsement of so many pro-Kremlin positions throughout this campaign.  It raises even more troubling questions in light of Russia's masterminding of hacking efforts that are clearly intended to hurt Hillary Clinton's campaign.  We can only assume that federal authorities will now explore this direct connection between Trump and Russia as part of their existing probe into Russia's meddling in our elections."

v.   October 31, 2016 tweet from Hillary Clinton re-publishing Sullivan's above statement and adding: "Computer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank."

w.   October 31, 2016 tweet from Hillary Clinton stating "time for Trump to answer serious questions about his ties to Russia" and including a graphic stating; "1. Donald Trump has a secret server.  (Yes, Donald Trump.) 2.  It was set up to communicate privately with a Putin-tied Russian bank called Alfa Bank. 3.  When a reporter asked about it, they shut it down. 4.  One week later, they created a new server with a different name for the same purpose."

x.   October 31, 2016 Skype call between Steele, Simpson and David Corn, *Mother Jones*, providing Trump-Alfa Bank info to Corn; per Steele, the purpose of the meeting was that "he "wanted [Corn] to publish that the US Government was investigating Trump."

y.   October 11, 2016 television statements from Podesta stating: "I've been involved in politics for nearly five decades.  This definitely is the first campaign that I've been involved in which I've had to tangle with Russian intelligence agencies who seem to be doing everything they can on behalf of our opponent."; and "I think it is a reasonable assumption to, or at least a reasonable conclusion, that Mr. Stone had advance warning, and the Trump campaign had advance warning about what Assange was going to do."

z.   July 18, 2017 e-mail from Joffe to Neustar employee, Steve DeJong, stating "I have 4 jobs that look specifically for [T]rump data" and included a list four Trump and Alfa Bank related queries."

aa.   October 2017 tweet from Podesta accusing Donald J. Trump of "running a "big lie campaign" centered on the investigation into Russian meddling in the U.S. election."

bb.   April 16, 2018 tweet from Reines stating "yes collusion, yes collusion, yes collusion" in response to an article titled: 'Breaking: Trump puts the brake on new Russian sanctions, reversing Haley's announcement."

cc.   October 2018 e-mails and/or other form of electronic submissions from Joffe to Daniel Jones with data for 37 million DNS lookups.

dd.   May 10, 2019 television appearance on MSNBC by (former DNC chairperson) Wasserman-Schultz stating there are "clear indications" that Donald J. Trump colluded with Russia and further stating: "You know, what's so disturbing is that Donald Trump is so lacking in confidence about his ability to actually get elected without the help of a foreign power, and particularly a foreign adversary, that they will go to any lengths and that he will instruct and allow his colleagues and allies to go to any lengths to be able to secure his success in an election."

ee.   October 2019 podcast interview on "CampaignHQ" by Clinton, stating: ""I don't know what Putin has on him, whether it's both personal and financial. I assume it is."

ff. June 16, 2021 television appearance on MSNBC's *Morning Joe* show stating: "We
don't have Trump as spokesperson for Putin, anymore."; and "[a]fter disastrous
Trump presidency, in which he gave Putin a green light to do whatever he wanted
to do, once Trump was elected, of course..."

gg. February 16, 2022 tweet from Clinton stating: "Trump & Fox are desperately
spinning up a fake scandal to distract from his real ones.  So it's a day that ends in
Y.  The more his misdeeds are exposed, the more they lie.  For those interested in
reality, here's a good debunking of their latest nonsense."

584.     Each of the foregoing transmissions listed above constituted the transmittal by
means of wire communication in interstate commerce of signals, sounds or writings for the purpose
of executing or attempting to execute the predicate acts or the scheme to defraud described herein.

585.     In sending the foregoing transmissions, the RICO Defendants sought to deceive
and defraud the respective recipients, including journalists, reporters, media contacts, law
enforcement officials, and counterintelligence officials, as applicable, and intended for the
respective recipients to rely on their false, misleading and/or fraudulent misrepresentations.

586.     With regard to the false and fraudulent transmissions sent to journalists, reporters
and/or media contacts, the RICO Defendants intended to deceive the journalists, reporters and/or
media contacts so that they would publish false, defamatory, and inaccurate articles, stories, and/or
news pieces about Plaintiff and his alleged collusion with Russia; the above-mentioned journalists,
reporters, and media contacts did in fact rely upon the RICO Defendants' fraudulent
misrepresentations in publishing false, defamatory, and inaccurate articles, stories, and/or news
pieces about Plaintiff and his alleged collusion with Russia.

587.     With regard to the false and fraudulent transmissions sent to law enforcement
officials and/or counterintelligence officials, the RICO Defendants intended to deceive the law
enforcement officials and/or counterintelligence officials to provoke them into launching one or
more public investigation(s) into Plaintiff and his alleged collusion with Russia; the above-

137

mentioned law enforcement officials and/or counterintelligence officials did in fact rely upon the

RICO Defendants' fraudulent misrepresentations in launching one or more public investigation(s)

into Plaintiff and his alleged collusion with Russia, including the FBI's Crossfire Hurricane

investigation, the FBI's full field investigation into the allegations contained in the Steele Dossier,

the FBI's full field investigation into the allegations regarding the Trump-Alfa Bank connection,

the CIA's investigation relating to Trump-Russia allegations, congressional investigations, and the

Special Counsel investigations.

588.    Plaintiff was injured as a direct and proximate result of the Enterprise's scheme to

defraud and by the reliance of the journalists, reporters, media contacts, law enforcement officials

and/or counterintelligence officials on the RICO Defendants' fraudulent misrepresentation.

**Timeliness of Claims**

589.    Despite his exercise of reasonable diligence, Plaintiff was unable to discover his

injury and/or the fact that it was caused by a RICO violation(s) until December 9, 2019, at the

earliest, upon the release of the Office of the Inspector General's report entitled *Review of Four

FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigations* on

December 9, 2019, which exposed, in part, the RICO Defendants' role in defrauding the media

and intentionally misleading the FBI into commencing the Crossfire Hurricane investigation.

590.    In addition, to the extent necessary, suspension, tolling and/or extension of the

applicable statute of limitations is warranted for the reasons set forth below, without limitation.

### *Fraudulent Concealment*

591.    The RICO Defendants actively and fraudulently concealed the existence of the

Enterprise and the nature of their illicit actions by organizing the Enterprise in a such a manner

that would conceal its existence and the nature of the RICO Defendants' illicit conduct.

592. The RICO Defendants intentionally exploited attorney-client privilege as a means of obscuring their activities and rendering all of their communications confidential and privileged.

593. According to Elias, Fusion GPS was intentionally walled-off from the Clinton Campaign and the DNC for "legal reasons: If Fusion's communications were with a lawyer, they could be considered privileged and kept confidential."[279]

594. Given Perkins Coie's role as the "gatekeeper" amongst the Clinton Campaign, the DNC, Fusion GPS, and Joffe, the RICO Defendants have attempted to construct an organizational framework for the Enterprise that protects all of their communications under the pretense of attorney-client privilege.[280]

595. Indeed, the RICO Defendants have consistently argued that any and all of their communications are privileged, even those between parties that are seemingly unrelated and not in privity.[281]

596. To further conceal the existence of the Enterprise, the Clinton Campaign and the DNC funneled payments to Fusion GPS, through Perkins Coie, for the purpose of intentionally disguising the relationship between the RICO Defendants.

    a. For example, on August 16, 2016, the DNC made a $66,500 payment to Perkins Coie; the DNC has acknowledged that this was the first of many such payments that were paid by the DNC and the Clinton Campaign, through Perkins Coie, to

---

[279] *Id.*

[280] Elias Testimony at 48 ("I was the sole. I was the – I was the gatekeeper. But there were – but there were instances in which there were some interactions otherwise. But that – but I was the gatekeeper."); Sullivan Testimony at 56 ("Q: Were you in meeting in which Mr. Elias briefed you on information that was of an opposition research nature? A: I was.").

[281] *See generally*, *U.S. v. Sussmann*.

Fusion GPS.[282]

    b.   Despite being earmarked as payments for Fusion GPS, the Clinton Campaign and the DNC reported the payments as being for "legal and compliance consulting."[283]

        i.   The FEC found "probable cause to believe that the Clinton Campaign and the DNC "violated 52 U.S.C. § 30104(b)(5)(A) and 11 C.F.R. § 104.3(b)(4)(i) by misreporting the purpose" of the disbursements to Fusion GPS.[284]

        ii.   On February 22, 2022, the Clinton Campaign and the DNC respectively entered into Conciliation Agreements with the FEC to resolve these violations.[285]

        iii.   As set forth in its Conciliation Agreement, the Clinton Campaign agreed to pay a civil penalty to the FEC in the amount of $8,000 pursuant to 52 U.S.C. 30109(a)(5)(A) and to not violate U.S.C. § 30104(b)(5)(A) or 11 C.F.R. § 104.3(b)(4)(i) in the future; similarly, the DNC agreed to pay a civil penalty to the FEC in the amount of $105,000 pursuant to 52 U.S.C. 30109(a)(5)(A) and to not violate U.S.C. § 30104(b)(5)(A) or 11 C.F.R. § 104.3(b)(4)(i) in the future.[286]

597.    Elias has even admitted that the Clinton Campaign, the DNC and Perkins Coie

---

[282] MUR 7291 DNC Resp. at 2 n.2; 8.
[283] Second General Counsel's Report at 2-3, MUR 7291 & 7449, *In the Matter of DNC Services Corp./DNC, et al.* (hereinafter, "FEC Second Gen. Counsel's Rpt.").
[284] *See generally* Clinton Campaign Conciliation Agreement and DNC Conciliation Agreement.
[285] *See generally* Clinton Campaign Conciliation Agreement and DNC Conciliation Agreement.
[286] *Id.*

intentionally sought to conceal their relationship with Fusion GPS hidden from the public.[287]

598.    In addition, the RICO Defendants, on numerous occasions, made false statements to law enforcement officials for the purpose of covering-up their illicit actions.

599.    For example, on September 18, 2016 (via text) and September 19, 2016 (in-person), Sussmann told FBI General Counsel, Jim Baker, that his meeting with Baker was not on behalf of any client. As a result of that lie, there was a "close hold" placed on Sussmann as a source, and his identity was kept confidential from all except a chosen few within the FBI. Had Sussmann been honest about appearing on behalf of any client, his identity would not have been protected and his actions would have been discoverable at a much earlier time.[288]

600.    Due to his fraudulent misrepresentation, it was not publicly known that Sussmann went to the FBI until the filing of the Sussmann Indictment on September 16, 2021. Even several of the FBI agents who testified at his trial stated that they did not know Sussmann's identity until after the indictment was filed.

601.    Similarly, when Joffe fed false information to Special Agent Grasso ("SA Grasso") with the FBI, he directed SA Grasso "not to disclose his identity to other people in the Bureau."[289]

602.    Joffe also intentionally neglected to disclose to SA Grasso that he was working in coordination with the Clinton Campaign, the DNC, and Perkins Coie.[290]

603.    Due to Joffe's misrepresentation and omission, SA Grasso agreed to keep Joffe's identity secret.

---

[287] Elias Testimony at 643:21-24 ("Q: [Y]ou didn't want the public to know that Fusion GPS was working with the campaign. Is that fair? A: Sure.").
[288] *See generally*, Gaynor Testimony.
[289] *Id.* at tr. 2167:19-23.
[290] *Id.* at tr. 2171:9-15.

604.    In addition, many of the RICO Defendants have made false or misleading statements, often times under oath, in the course of congressional investigations, law enforcement and/or counter-intelligence investigations, and civil or criminal proceedings, all for the purpose of concealing their wrongdoing.

605.    Finally, given the subversive and fraudulent nature of the RICO Defendants' actions—including widespread fraud, obstruction of justice, and cyber-hacking—the Enterprise's conduct is self-concealing by nature and not susceptible to discovery by Plaintiff or other third parties.

606.    In spite of the same, Plaintiff made significant efforts to investigate the Enterprise's conduct and exercised due diligence to the extent permissible by law.

607.    For instance, among other things, Plaintiff has frequently raised public awareness of the Defendants' illicit scheme and has publicly called for their misconduct to be investigated by the proper authorities.

### *Statutory Tolling*

608.    In *Agency Holding Corp. v. Malley-Duff & Assoc.*, 483 U.S. 143 (1987), the Supreme Court noted that "even a cursory comparison of the two statutes reveals that the civil action provision of RICO was patterned after the Clayton Act" and affirmed that the "4-year statute of limitations for Clayton Act actions … [is] the most appropriate limitations period for RICO actions."[291]

609.    When a statute of limitations is adopted in such a manner, the tolling and suspension provisions which are part of that statute must likewise be applied. Indeed, the Supreme Court has

---

[291] *Agency Holding Corp. v. Malley-Duff & Assoc.*, 483 U.S. 143, 156 (1987); *see also* 15 U.S.C. § 15.

expressly held that "[a]ny period of limitation . . . is understood fully only in the context of the various circumstances that suspend it from running against a particular cause of action."[292]

610.    Accordingly, given the Supreme Court's adoption of the Clayton Act's four-year statute of limitations for civil RICO claims, the tolling and suspension provision of the Clayton Act, set forth in 15 U.S.C. § 16(i), likewise applies to civil RICO claims.[293]

611.    The following proceedings, without limitation, qualify as "civil or criminal proceedings [] instituted by the United States," as defined in 15 U.S.C. § 16(i), applicable to the instant action:

> a.   *In the Matter of DNC Services Corp./Democratic National Committee and William Q. Derrough in his official capacity as treasurer; Hillary for America and Elizabeth Jones in her official capacity as treasurer; Perkins Coie LLP; Marc Elias; Fusion GPS; Christopher Steele*, Federal Election Commission, MURs 7291 and 7449 (July 23, 2019);
>
> b.   Investigation of Special Counsel John Durham, pursuant to 28 U.S.C. §§ 509,5 10, and 515, Office of the Attorney General Order No. 4878-2020 (December 19, 2020);
>
> c.   *United States v. Kevin Clinesmith*, case no. 1:20-cr-00165-JEB, United States District Court, District of Columbia (August 14, 2020);
>
> d.   *United States v. Michael Sussmann*, case no. 1:21-cr-00582-CRC, United States District Court, District of Columbia (September 16, 2021);
>
> e.   *United States v. Igor Danchenko*, case no. 1:21-cr-00245-AJT, United States District Court, Eastern District of Virginia (Nov. 3, 2021);

612.    As to each of the above "civil or criminal proceedings," the running of the

---

[292] *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 463 (1975)*; see also West v. Conrail,* 481 U.S. 35 (1987); *Bd. of Regents v. Tomanio,* 446 U.S. 478 (1980).

[293] *See, e.g., Pension Fund Mid Jersey Trucking Industry v. Omni Funding*, 687 F.Supp. 962, 965 (D.N.J., June 28, 1988) ("I conclude that the tolling provisions of the Clayton Act are applicable under RICO."); *Gianelli v. Schoenfeld*, 2021 WL 4690724, at *6 (E.D. Cal. Oct. 7, 2021) ("The court is willing to assume . . . that the Clayton Act's tolling provision applies to RICO claims."); *Pres. Petrified Forrest v. Renzi*, 2014 WL 530574, at *3-4 (D. Ariz. Feb. 12, 2013) ("

applicable statute of limitations was suspended as of the commencement of said proceeding and remained suspended "during the pendency thereof and for one year after." *Id.*

## Damages

613.    The Plaintiff has been injured in his business and property as a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c).

614.    As a direct and proximate result of the RICO Defendants' racketeering activity described herein, numerous unfounded investigations, including the FBI's Crossfire Hurricane investigation and its full field Alfa Bank investigation, numerous congressional investigations, and Special Counsel investigations were commenced; countless false, damaging, and defamatory articles and media stories of all types (televisions, radio, internet, etc.) were published, resulting in the widespread dissemination of false, damaging and defamatory accusations of Plaintiff's purported collusion with Russia which became years-long headline story that irreparable, unjustly and permanently tarnished Plaintiff's political reputation.

615.    As a result of the foregoing, Plaintiff has been injured in his business and property and has incurred and will continue to incur, significant damages, losses, and deprivation of tangible and intangible property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations, and has suffered actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.

616.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in

connection with his effort to defend against the RICO Defendants' actions and the various federal investigations and/or official proceedings which arose therefrom, in addition to the loss of existing and future business opportunities for himself, the Trump Campaign, and the Trump Organization LLC.

617.    All of these injuries were sustained within, and were the result of conduct occurring within, the United States.

618.    The Plaintiff is entitled to recover, pursuant to Title 18 United States Code §1964(c), treble damages in the amount to be determined by offer of proof at time of trial.  The Plaintiff is also entitled to recover attorneys' fees and costs of this litigation, as well as damages arising from lost profits and/or lost business opportunities attributable to the activities engaged in by defendants committed in furtherance of the Enterprise.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Hillary Clinton, HFACC, Inc., the Democratic National Committee, Perkins Coie, LLP, Michael Sussmann, Marc Elias, Fusion GPS, and Rodney Joffe for damages, including compensatory and treble damages, costs, attorneys' fees, and such further and other relief as this honorable Court may deem just and proper.

**Count II**
**RICO Conspiracy**
**(18 U.S.C. § 1962(D))**
*(Against Clinton, Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta, Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele, Danchenko, Neustar, Inc., Neustar Security Services, and Joffe)*

619.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

145

620.    Defendants, Clinton, the Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta, Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele, Danchenko, Neustar, Inc., Neustar Security Services, and Joffe (the "RICO Conspiracy Defendants")*,* are all "persons" within the meaning of 18 U.S.C. § 1961(3).

621.    Each of the RICO Conspiracy Defendants agreed to accomplish the unlawful plan of the Enterprise through a course of racketeering activity, including, but not limited to, theft of trade secrets (18 U.S.C. § 1832), obstruction of justice (18 U.S.C. § 1512), and wire fraud (18 U.S.C. § 1343).

622.    Each of the RICO Conspiracy Defendants agreed to overall objective of the Enterprise, namely to corruptly and wrongfully harm the Plaintiff's political reputation, damage his electability for the 2016 Presidential Election and subsequent elections, impede his ability to effectively govern, and otherwise sabotaging his political career through deceptive, criminal and fraudulent means, including, but not limited to, falsely implicating the Plaintiff, the Trump Campaign, and the Trump Administration as colluding with Russia. In the alternative, each of the RICO Conspiracy Defendants agreed with at least one of the other RICO Conspiracy Defendants to commit two predicate acts in furtherance of the Enterprise's conspiracy.

623.    Each of the RICO Conspiracy Defendants engaged in all, or significant portions of, the racketeering acts alleged in this Complaint, possessed knowledge of at least the general contours of the conspiracy, and acted with the intent to further and/or facilitate the conduct of the Enterprise.

624.    Each Defendant knew about and agreed to facilitate the Enterprise by way of the acts in which he or she engaged as alleged herein and/or through explicit agreement amongst some or all of the RICO Conspiracy Defendants.

625. Further evidence of an agreement among the Defendants is particularly within the knowledge and control of each of the RICO Conspiracy Defendants.

626. Each of the RICO Conspiracy Defendants was aware of the existence of the Enterprise; agreed to the overall objective of the conspiracy; and knowingly furthered the conduct of the Enterprise, including the predicate acts of theft of trade secrets (18 U.S.C. § 1832), obstruction of justice (18 U.S.C. § 1512), and wire fraud (18 U.S.C. § 1343), and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern racketeering activity.

627. Each of the RICO Conspiracy Defendants knew about and agreed to facilitate the Enterprise's scheme to harm the Plaintiff's political career, tarnish his electability, and undermine his ability to effectively govern as the President of the United States through the wrongful acts identified herein. It was part of the conspiracy that the RICO Conspiracy Defendants would commit a pattern of racketeering activity in the conduct of the affairs of the enterprise, including the acts of racketeering as set forth herein.

628. The RICO Conspiracy Defendants' conduct constitutes conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

629. No RICO Conspiracy Defendant has withdrawn, or otherwise dissociated itself, from the conspiracy at issue or the other conspirators.

630. As a direct and proximate result of the RICO Conspiracy Defendants' racketeering activity described herein, numerous unfounded investigations, including the FBI's Crossfire Hurricane investigation and its full field Alfa Bank investigation, numerous congressional investigations, and Special Counsel investigations were commenced; countless false, damaging, and defamatory articles and media stories of all types (televisions, radio, internet, etc.) were

published, resulting in the widespread dissemination of false, damaging and defamatory accusations of Plaintiff's purported collusion with Russia which became years-long headline story that irreparable, unjustly and permanently tarnished Plaintiff's political reputation.

631.     As a result of the foregoing, Plaintiff has been injured in his business and property and has incurred and will continue to incur, significant damages, losses, and deprivation of tangible and intangible property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations, and has suffered actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.

632.     Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the RICO Conspiracy Defendants' actions and the various federal investigations and/or official proceedings which arose therefrom, in addition to the loss of existing and future business opportunities for himself, the Trump Campaign, and the Trump Organization LLC.

633.     All of these injuries were sustained within, and were the result of conduct occurring within, the United States.  The Plaintiff is entitled to recover, pursuant to Title 18 United States Code §1964(c), treble damages in the amount to be determined by offer of proof at time of trial. The Plaintiff is also entitled to recover attorneys' fees and costs of this litigation, as well as damages arising from lost profits and/or lost business opportunities attributable to the activities engaged in by defendants committed in furtherance of the Enterprise.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Michael Sussmann, Perkins Coie, LLP, Hillary R. Clinton, HFACC, Inc., the Democratic National Committee, the DNC Services Corporation, Charles Halliday Dolan, Jr., Jake Sullivan, John Podesta, Perkins Coie, LLP, Marc Elias, Fusion GPS, Glenn Simpson, Peter Fritsch, Nellie Ohr, Bruce Ohr, Orbis Business Intelligence, Ltd., Christopher Steele, Igor Danchenko, Neustar, Inc., Rodney Joffe, Robert Mook, Philippe Reines, James Comey, Peter Strzok, Lisa Page, Kevin Clinesmith, Andrew McCabe, John Does 1 through 10, said names being fictios and unknown persons, and ABC Corporations 1 through 10, said names being fictitious and unknown entities, for damages, including compensatory and treble damages, costs, attorneys' fees, and such further and other relief as this Court may deem just and proper.

### Count III
### Injurious Falsehood
*(Against Clinton, Sullivan, Schultz, Schiff, Danchenko, Sussmann, and Steele)*

634.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

635.    As detailed at length herein, on multiple occasions the Defendants, Clinton, Joffe, Sussmann, Steele, Sullivan, Schultz, and Schiff made, disseminated and/or published false and damaging statements concerning the Plaintiff, specifically that he was colluding with Russia and its President Vladimir Putin.

636.    At all relevant times, the Defendants acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia; despite said knowledge, the Defendants conspired to disseminate false information and spread a false narrative in an attempt to ruin the

Plaintiff.

637.    These individual Defendants, Clinton, Sullivan, Schultz, Schiff, Danchenko, Sussmann, and Steele, made, disseminated, and/or published the false and damaging statements to third parties, including, but not limited to, government authorities, media outlets, and the general public.

638.    Clinton, Sullivan, Schultz, and Schiff among other things, falsely and deliberately published false and damaging statements about the Plaintiff and his purported ties with Russia and promoted their false allegations through the media.

639.    In turn, the media heavily reported their allegations story as true, making it appear as if the Plaintiff had colluded with the Russian government, despite the falsity of their claims.

640.    Sullivan, among other things, issued a press release on October 31, 2016, on behalf of Clinton and the Clinton Campaign, in made false and damaging claims about the Plaintiff:

> [T]his could be the most direct link yet between Donald Trump and Moscow.  Computer scientists have apparently uncovered a covert server linking the Trump Organization to a Russian-based bank. This secret hotline may be the key to unlocking the mystery of Trump's ties to Russia.  It certainly seems the Trump Organization felt it had something to hide, given that it apparently took steps to conceal the link when it was discovered by journalists.  This line of communication may help explain Trump's bizarre adoration of Vladimir Putin and endorsement of so many pro-Kremlin positions throughout this campaign.  It raises even more troubling questions in light of Russia's masterminding of hacking efforts that are clearly intended to hurt Hillary Clinton's campaign.  We can only assume that federal authorities will now explore this direct connection between Trump and Russia as part of their existing probe into Russia's meddling in our elections.

641.    Clinton, personally, also published the same false and damaging statements to the public, through her Twitter account on October 31, 2016, and to media outlets.

642.    Clinton continues to publish the false and damaging allegations to media outlets.

643.    For example, on June 16, 2021, Hillary Clinton appeared on the Morning Joe show on MSNBC and stated to the general public of the State of Florida, and the rest of the United States: "We don't have Trump as spokesperson for Putin, anymore."  "After disastrous Trump presidency, in which he gave Putin a green light to do whatever he wanted to do, once Trump was elected, of course."

644.    Schiff, as a senior congressman, has been the main presenter of the false information to the American public, through his numerous guest interviews with national television news stations.   As such, Schiff has published the same false and damaging statements to the public, through various interviews on national television, and other news outlets, from 2016 till 2021.  For Example, on March 24, 2019, on ABC's This Week" with George Stephanopoulos, Schiff called it congresses duty to expose Trumps "duty to expose Trump's relationship with Russia.  Stating, "there was significant evidence of Trump collusion."

645.    On May 9, 2020, Schiff claimed on CNN's State of the Union, there was "more than circumstantial evidence" that Donald Trump's 2016 presidential campaign colluded with Russia.  "You can see evidence in plain sight on the issue of collusion, pretty compelling evidence,"

646.    On April 16, 2021, Schiff on MSNBC "the last word" with Lawrence O'Donnell, continued to publish the false statements, and maintaining the false narrative that Donald J. Trump and his administration had colluded with Russian, and went even further stating that it continued to do so in the 2020 election.  Stating that the "Trump campaign was passing strategic polling and strategic information to a Russian intelligence agent."     "Not just Russian intelligence, but the same ones that tried to help Trump win the 2016 election, what most people would call collusion, I don't know how the no collusion crowd explains that."

647.    Schultz has also published numerous false and damaging statements about the Plaintiff and his alleged collusion with Russia.

648.    For example, she told CNN's Erin Burnett on "OutFront", that reported contacts between President Donald J. Trump's campaign aides and Russia amounted to collusion.   Schultz told the reporter, "[W]ith every passing day, it gets more and more disturbing, and more and more evidence that there was collusion."  "Donald Trump should be the first person asking for one, but since I think he likely was part of it, it's not surprising that hasn't happened."

649.    Danchenko, among other things, submitted falsified evidence to the FBI and published false and damaging statements orally to the FBI.

650.    Sussmann, among other things, submitted falsified evidence to the FBI, DOJ and CIA and published false and damaging statements orally to the FBI.

651.    Steele, among other things knowingly maintained and published to third parties, including, but not limited to the FBI, the false series of reports referred to as the "Steele Dossier."

652.    The individual Defendants knew that the statements were false at the time they made then and also knew or should have known that said statements would damage the Plaintiff's lawful property interests.

653.    As a direct and proximate result of the individual Defendants' unlawful conduct, the Plaintiff has suffered and will continue to suffer economic losses and irreparable injuries.

654.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.  In addition, Plaintiff has been injured in his business and property and has incurred and will continue to incur, significant damages, losses, and deprivation of tangible and intangible

property, including but not limited to loss of political and/or business reputation, loss of business

opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade

secrets, and/or loss of contractual relations.

655.    Among other things, the Plaintiff was forced to incur expenses in an amount to be

determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and

continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in

connection with his effort to defend against the Defendants' false accusations and the various

federal investigations and/or official proceedings arose therefrom.

656.    The Plaintiff does not claim nor seek any compensation for damage to his

reputation, but rather, he seeks damages for the cost of dealing with the legal issues and political

issues, which he was required to spend to redress the injurious falsities which were propounded by

the Defendants, and all other losses incurred due to the tortious conduct of the Defendants.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter

a Judgment for Donald J. Trump and against the Defendants, Hillary Clinton, Jake Sullivan,

Debbie Wasserman Schultz, Adam Schiff, Michael Sussmann, Christopher Steele, and Igor

Danchenko, for damages, including Punitive damages, costs, and such further and other relief as

this Court may deem just and proper.

## <u>Count IV</u>
## Conspiracy to Commit Injurious Falsehood
(*Against Clinton, Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta,
Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele,
Danchenko, Neustar, Inc., Neustar Security Services, and Joffe*)

657.    The Plaintiff avers the allegations contained in the preceding paragraphs and

incorporates them in this count, as if set forth at length herein.

658.    The Defendants had a meeting of minds to harm the Plaintiff by making false and

damaging statements regarding the Plaintiff's alleged collusion with the Russian government, and

its President Vladimir Putin, and then disseminating the false and damaging statements by

publishing them to third parties, including, but not limited to, government authorities, media

outlets, and the general public, in an attempt to cause harm to the Plaintiff.

659.    As such, the Defendants conspired to commit unlawful acts by unlawful means.

They had different roles, where some actors, such as Danchenko, Dolan, Steele, and Joffe, were

involved in the fabrication of supposed facts to put into the Dossier, and later helped to foist it

upon the FBI, while others were more involved with the publishing of the allegations to the media

and general public, and still others were more involved in feeding false information federal

authorities.

660.    Each of the Defendants executed one or more acts in furtherance of the conspiracy,

as detailed in this Complaint, and committed overt acts to harm the Plaintiff in furtherance of the

conspiracy.

661.    In this regard, the Defendants conspired to create a false narrative that that the

Plaintiff was colluding with Russia through their dissemination of false and damaging statements.

662.    At all relevant times, the Defendants acted with actual malice, as they knew that

the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to

the truth of whether the Plaintiff had colluded with Russia; despite said knowledge, the Defendants

conspired to disseminate false information and spread a false narrative in an attempt to ruin the

Plaintiff.

663.    Despite this knowledge, that no evidence existed of the collusion, the Defendants

further conspired to publish the false information to third parties, such as the FBI, other

governmental agencies, the news-media outlets, and the U.S. population, in an attempt to smear

the Plaintiff's to harm his chance of being elected and properly administrating his office of President of the United States.

664.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.  In addition, Plaintiff has been injured in his business and property and has incurred and will continue to incur, significant damages, losses, and deprivation of tangible and intangible property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations.

665.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

666.    The Plaintiff does not claim nor seek any compensation for damage to his reputation, but rather, he seeks damages for the cost of dealing with the legal issues and political issues, which he was required to spend to redress the injurious falsities which were propounded by the Defendants, and all other losses incurred due to the tortious conduct of the Defendants.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Michael Sussmann, Perkins Coie, LLP, Hillary R.  Clinton, HFACC, Inc., the Democratic National Committee, the DNC Services

Corporation, Debbie Wasserman Schultz, Charles Halliday Dolan, Jr., Jake Sullivan, John Podesta, Perkins Coie, LLP, Marc Elias, Fusion GPS, Glenn Simpson, Peter Fritsch, Bruce Ohr, Nellie Ohr, Orbis Business Intelligence, Ltd., Christopher Steele, Igor Danchenko, Neustar, Inc., and/or Neustar Security Services, Rodney Joffe, Robert Mook, Philippe Reines, John Does 1 through 10, said names being fictious and unknown persons, and ABC Corporations 1 through 10, said names being fictitious and unknown entities, for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### Count V
### Malicious Prosecution
*(Against Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele, Joffe, Comey, Rosenstein, McCabe, Strzok, Page, and Clinesmith)*

667.   The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

668.   The Defendants, Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele and Joffe, willfully and knowingly misled FBI and DOJ officials with the intention of inducing the FBI to commence an investigation of the Plaintiff and his alleged collusion with Russia.

669.   The Defendants, Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele and Joffe, concocted a scheme to denigrate the Plaintiff and by so doing, to cause harm to his campaign, and, in the course of carrying out this scheme, conspired to feed false and/or misleading information to the FBI and the DOJ, which prompted the FBI to commence an investigation.

670.   The Defendants, Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele and Joffe, were the legal cause of the commencement of the FBI's investigation into the Plaintiff in that they, among other things, engaged in efforts to falsify information, documents, and/or evidence, such as the Dossier and the white papers, provided said false information, documents

and/or evidence to the FBI and the DOJ, made false and/or misleading statements to the FBI and

the DOJ concerning, among other things, the facts and circumstances of the development of the

Dossier and the white papers, the credibility of their evidence and sources, the individuals and

entities behind the Dossier and white papers, and other facts relevant to the Defendants' plot to

falsely implicate the Plaintiff.

671.    As a direct and proximate results of the Defendants' efforts, on July 31, 2016, the

FBI launched a Foreign Agents Registration Act ("FARA") investigation, known as Crossfire

Hurricane, to determine whether individual(s) associated with the Plaintiff and his campaign were

witting of and/or coordinating activities with the Russian government.

672.    In acting to bring forth the false information to commence the investigation by the

FBI for the express purpose of harming the Plaintiff, the Defendants acted with malicious intent.

673.    The Defendants, Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele

and Joffe, acted with actual malice, as they knew that the Plaintiff was not colluding with Russia

or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded

with Russia; despite said knowledge, the Defendants conspired to disseminate false information

and spread a false narrative in an attempt to ruin the Plaintiff.

674.    Subsequent to the commencement of Crossfire Hurricane, additional Defendants

who were well-position within the FBI, Comey, McCabe, Strzok, Page, and Clinesmith, were the

legal cause of the continuation of the FBI's investigation and the commencement of extrajudicial

FISA surveillance of the Plaintiff and his administration in that they, among other things, engaged

in efforts to falsify evidence, information and/or documents, such as an e-mail correspondence

regarding Carter Page that was submitted in furtherance of FISA application(s); relied upon

knowingly false information including, without limitation, the White Papers and the Steele

Dossier, which the Defendants were aware was not credible and was funded by the Clinton Campaign and the DNC; withheld pertinent and material information from FISA applications and in submissions, communications, and correspondences with judges, law enforcement officials, supervisors, superiors, and other government officials; made false and/or misleading statements to the FISC, Congress, and/or the Plaintiff, who at the time was sitting President of the United States; and otherwise misled as to the credibility of the evidence supporting their investigation, the individuals and entities behind the Dossier and white papers, and other facts relevant to the evidentiary basis for Crossfire Hurricane, the FISA applications, the Mueller investigation, and other related investigations regarding the alleged Trump-Russia connection.

675.   In acting to falsely maintain and continue the investigation(s) by the FBI and the DOJ for the express purpose of harming the Plaintiff, the Defendants, Comey, McCabe, Strzok, Page, and Clinesmith, acted with malicious intent.

676.   The Defendants, Comey, McCabe, Rosenstein, Strzok, Page, and Clinesmith, acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia, and they knew that Crossfire Hurricane lacked a legitimate evidentiary basis and was based on a false and contrived premise; despite said knowledge, the Defendants conspired to continue the baseless investigations, to obtain FISA warrants in excess of their lawful authority, and to proliferate the spread of the Defendants' false narrative.

677.   As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.  In addition, Plaintiff has been injured in his business and property and has incurred

and will continue to incur, significant damages, losses, and deprivation of tangible and intangible property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations.

678.     Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities for himself, the Trump Campaign, and the Trump Organization LLC.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Michael Sussmann, Peter Fritsch, Glenn Simpson, Christopher Steele, Nellie Ohr, Igor Danchenko, Rodney Joffe, James Comey, Andrew McCabe, Rod Rosenstein, Peter Strzok, Lisa Page, and Kevin Clinesmith for compensatory damages, Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

## <u>Count VI</u>
### Conspiracy to Commit Malicious Prosecution
*(Against Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, Joffe, Podesta, Mook, Reines, Comey, McCabe, Rosenstein, Strzok, Page, and Clinesmith)*

679.     The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

680.     The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson,

Fritsch, Steele, Ohr, Danchenko, and Joffe, had a meeting of minds and a common plan to induce

the FBI and/or the Department of Justice through deceptive means into commencing an unfounded

investigation into the Plaintiff's alleged collusion with the Russian government, Vladimir Putin,

and other government officials.

681.   The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson,

Fritsch, Steele, Ohr, Danchenko, and Joffe, conspired to cause the FBI's investigation to be

commenced, and continue forward, by, among other things, falsifying information, documents,

and evidence, such as the Dossier and the white papers, providing said falsified information,

documents, and evidence to the FBI and the DOJ, and making false and/or misleading statements

to the FBI and the DOJ concerning, among other things, the facts and circumstances of the

development of the Dossier and the white papers, the credibility of their evidence and sources, the

individuals and entities behind the Dossier and White Papers, and other facts relevant to the

Defendants' plot to falsely implicate the Plaintiff.

682.   The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson,

Fritsch, Steele, Ohr, Danchenko, and Joffe, concocted a scheme to denigrate the Plaintiff and

tarnish his harm his chance of becoming elected and then to properly and effectively administrate

his office of President of the United States.  In the course of carrying out this scheme, they

conspired to feed false and/or misleading information to the FBI and the DOJ which prompted the

FBI to commence an investigation.

683.   The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson,

Fritsch, Steele, Ohr, Danchenko, and Joffe, conspired to do an unlawful act by unlawful means.

684.   The Defendants, Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson,

Fritsch, Steele, Ohr, Danchenko, and Joffe, acted with actual malice, as they knew that the Plaintiff

was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of

whether the Plaintiff had colluded with Russia; despite said knowledge, the Defendants conspired

to disseminate false information and spread a false narrative in an attempt to ruin the Plaintiff.

686.    Moreover, in conspiring to bring forth the false information to commence the

investigation by the FBI for the express purpose of harming the Plaintiff, the Defendants, Clinton,

Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, and Joffe,

acted with malicious intent.

686.    Subsequent to the commencement of Crossfire Hurricane, additional Defendants

who were well-position within the FBI, Comey, McCabe,  Rosenstein, Strzok, Page, and

Clinesmith, conspired to continue the FBI's investigation and to commence an extrajudicial FISA

surveillance of the Plaintiff and his administration in that they, among other things, conspired to

falsify evidence, information and/or documents, such as an e-mail correspondence regarding

Carter Page that was submitted in furtherance of FISA application(s); conspired to rely upon

knowingly false information including, without limitation, the White Papers and the Steele

Dossier, which the Defendants were aware was not credible and was funded by the Clinton

Campaign and the DNC; conspired to withhold pertinent and material information from FISA

applications and in submissions, communications, and correspondences with judges, law

enforcement officials, supervisors, superiors, and other government officials; conspired to make

false and/or misleading statements to the FISC, Congress, and/or the Plaintiff, who at the time was

sitting President of the United States; and otherwise conspired to mislead as to the credibility of

the evidence supporting their investigation, the individuals and entities behind the Dossier and

white papers, and other facts relevant to the evidentiary basis for Crossfire Hurricane, the FISA

applications, the Mueller investigation, and other related investigations regarding the alleged

Trump-Russia connection.

687.    In conspiring to falsely maintain and continue the investigation(s) by the FBI and the DOJ for the express purpose of harming the Plaintiff, the Defendants, Comey, McCabe, Rosenstein, Strzok, Page, and Clinesmith, acted with malicious intent.

688.    The Defendants, Comey, McCabe, Strzok, Page, and Clinesmith, acted with actual malice, as they knew that the Plaintiff was not colluding with Russia or, at a minimum, acted with reckless abandon as to the truth of whether the Plaintiff had colluded with Russia, and they knew that Crossfire Hurricane lacked a legitimate evidentiary basis and was based on a false and contrived premise; despite said knowledge, the Defendants conspired to continue the baseless investigations, to obtain FISA warrants in excess of their lawful authority, and to proliferate the spread of the Defendants' false narrative.

689.    Each of the above-named Defendants executed several acts in furtherance of the conspiracy, as detailed at length in this Complaint, and committed overt acts to harm the Plaintiff in the furtherance of the conspiracy.

690.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.

691.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.  In addition, Plaintiff has been injured in his business and property and has incurred and will continue to incur, significant damages, losses, and deprivation of tangible and intangible

property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations.

692.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Hillary Clinton, Michael Sussmann, Debbie Wasserman Schultz, Charles Halliday Dolan, Jr., Jake Sullivan, Marc Elias, Glenn Simpson, Peter Fritsch, Christopher Steele, Nellie Ohr, Igor Danchenko, and Rodney Joffe, John Podesta, Robert Mook, Philippe Reines, James Comey, Andrew McCabe, Rod Rosenstein, Peter Strzok, Lisa Page, and Kevin Clinesmith for compensatory damages, Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### Count VII
### Computer Fraud and Abuse Act
### (18 U.S.C. § 1030)
*(Against Neustar, Inc., Neustar Security Services, Joffe, DNC, Clinton Campaign, Clinton, Perkins Coie, Sussmann)*

693.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

694.    The computers belonging to the Executive Office of the President of the United States are non-public, belonging to a department or agency of the United States, are exclusively

for the use of the United States Government and are involved in interstate and foreign commerce and communications.

695.    The computers belonging to the Trump Organization LLC, located at Trump Tower, are involved in interstate and foreign commerce and communication and, therefore, are protected computers under 18 U.S.C. § 1030(e)(2).

696.    The Defendants' conduct as alleged herein violated 18 U.S.C. §§ 1030(a)(2), 1030(a)(3), 1030(a)(4), and/or 1030(a)(6).

697.    The Defendants, Neustar, Inc. and/or Neustar Security Services, and Joffe, knowingly, intentionally and unlawfully accessed and/or exceeded their authority to access the computers at the Executive Office of the President of the United States and thereby obtained and used valuable, sensitive and/or proprietary information and data from those computers in violation of 18 U.S.C. § 1030(a)(2)(B), 1030(a)(2)(C), and 1030(a)(3).

698.    Such information and data include, but are not limited to, non-public, sensitive, confidential, classified and/or proprietary internet data, DNS records, techniques, processes, procedures and programs.

699.    Neustar and/or Neustar Security Services, and Joffe also knowingly, intentionally and unlawfully accessed and/or exceeded their authority to access computers belonging to the Trump Organization LLC, located at the Trump Tower, and thereby obtained and used valuable, sensitive and/or proprietary information and data from those computers in violation of 18 U.S.C. § 1030(a)(2)(C).

700.    Such information and data include, but are not limited to, non-public, sensitive, confidential and/or proprietary internet data, DNS records, business methods, techniques, processes, procedures and programs.

701.     As detailed at length herein, the Defendants, the DNC, the Clinton Campaign, Clinton, Perkins Coie, and Sussmann conspired with Neustar, Inc., and/or Neustar Security Services, and Joffe in their commission of the above-stated acts, in violation of 18 § U.S.C. 1030(b).

702.     As a direct and proximate result of the DNC, the Clinton Campaign, Clinton, Perkins Coie, Sussmann, Neustar, Inc. and/or Neustar Security Services, and Joffe's violations of 18 U.S.C. § 1030, the Plaintiff has been injured and has sustained a loss in excess of $5,000.

703.     Among other things, the Defendants obtained valuable, sensitive, proprietary and confidential data and information pertaining to the Plaintiff, which they manipulated, falsified and altered for nefarious purposes, and, in addition, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' actions and the various federal investigations and/or official proceedings arose therefrom

704.     The acts of the above-mentioned Defendants which violated 18 U.S.C. § 1030 were not discoverable until September 16, 2021, upon the disclosure of said acts described in the indictment of Michael Sussmann in *United States v. Sussmann*, case no. 1:21-cr-00582-CRC, United States District Court, District for Columbia.

705.     As a direct and proximate result of the Defendant's actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage, including, among other things, the cost of investigating and responding to the unauthorized access, defending himself against federal investigations, harm to his business, and loss of trade secrets and/or other proprietary, sensitive or

valuable information and data, entitling the Plaintiff to compensatory relief under 18 U.S.C. §

1030(g).

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter

a Judgment for Donald J. Trump and against the Defendants, Neustar, Inc. and/or Neustar Security

Services, Rodney Joffe, Perkins Coie, LLP, Michael Sussmann, HFACC, Inc., the Democratic

National Committee, the DNC Services Corporation, and Hillary Clinton for compensatory

damages, punitive damages, costs, attorneys' fees, and such further and other relief as this

honorable Court may deem just and proper.

### Count VIII
### Theft of Trade Secrets
### (18 U.S.C. § 1830-32)
*(Against Neustar, Inc., Neustar Security Services, Joffe, Perkins Coie, Sussmann, Clinton
Campaign, DNC, and Clinton)*

706.    The Plaintiff avers the allegations contained in the preceding paragraphs and

incorporates them in this count, as if set forth at length herein.

707.    The Plaintiff owns and possesses certain non-public, proprietary, sensitive and

confidential information and data, including without limitation, DNS data.

708.    DNS internet traffic data houses highly proprietary, sensitive and confidential data.

For example, among other things, an analysis of raw DNS data reveals a comprehensive view into

an individual or a company's website traffic, e-mail traffic, webmail traffic, chat messaging, in

addition to the types of technology, hardware, software, programs, securities and processes being

utilized by the servers.

709.    Neustar, Inc. and/or Neustar Security Services, and Joffe, at the direction of Perkins

Coie, Sussmann, Clinton Campaign, DNC, and Clinton, exploited access to non-public data

sources and/or servers and unlawfully acquired, stole and exploited sensitive, proprietary and

confidential internet data, including without limitation, DNS information, traffic, and/or data originating from computers and/or servers: (i) located at Plaintiff's private apartment in Central Park West in New York and belonging to the Plaintiff; and (ii) located at Trump Tower and belonging to The Trump Organization, in which Plaintiff has an ownership interest (collectively, with the computers and/or servers house in Plaintiff's private apartment, "Plaintiff's Servers").

710.    Joffe and Neustar, Inc. and/or Neustar Security Services, exploited their access to non-public data to, among other things, mine DNS traffic and other data from Plaintiff's Servers for the purpose of gathering derogatory information about the Plaintiff.

711.    In doing so, Joffe and Neustar, Inc. and/or Neustar Security Services intentionally accessed, without authorization, Plaintiff's Servers.

712.    By illegally accessing the above-mentioned information and data, Neustar, Inc. and/or Neustar Security Services, and Joffe, were able to obtain proprietary, sensitive, and/or confidential information and data including, among other things, the number and frequency of e-mail communications between the Plaintiff's Servers and other third party servers, the number and frequency of website visits to third party websites by the Plaintiff's Servers, the number and frequency of webmail interactions between the Plaintiff's Servers and other third party servers, and the number and frequency of chat messaging interactions between the Plaintiff's Servers and other third party servers, as well as information pertaining to the types of software, programs, securities and processes being utilized by Plaintiff's Servers.

713.    This information and data revealed highly proprietary, sensitive, and confidential knowledge, including insight into Plaintiff's and The Trump Organization's business dealings, financial dealings, communications, future and current plans, techniques, patterns, methods, processes, and procedures, as well as identification of their corporate partners, political associates,

clients, and vendors.

714.    This proprietary, sensitive and confidential information, data and/or knowledge constitutes trade secrets within the meaning of 18 U.S.C. § 1839(3) where they constitute business and/or political methods, techniques, processes, procedures and programs that are both protected from disclosure by the Plaintiff and derive significant economic value from not generally being known to or ascertainable by others, including the Defendants, who can obtain economic value from disclosure or use of such information.

715.    The Plaintiff and The Trump Organization restricts access to their proprietary, sensitive and confidential information and data, including DNS data, even within their own personnel and prevents unauthorized access to such records by digital or electronic means.

716.    The Plaintiff and The Trump Organization further protects against theft and disclosure of such information by third parties by the requirement of executed non-disclosure agreements prior to providing any such access.

717.    Defendants, Neustar. Inc. and/or Neustar Security Services, and Joffe, violated the Defend Trade Secrets Act, 18 U.S.C. § 1832(a)(1), by knowingly obtaining the Plaintiff's confidential records by fraud, artifice, and deception and, thereafter, stealing, appropriating, taking, carrying away, and concealing the theft of the Plaintiff's confidential records with intent to convert the Plaintiff's confidential records, which are related to products sold in interstate and foreign commerce, to the Defendants' own benefit, while knowing and intending that such misappropriation would injure the Plaintiff.

718.    Defendants, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, conspired with Neustar, Inc. and/or Neustar Security Services and Joffe to commit the above-named acts in furtherance of the overarching conspiracy to denigrate and spread injurious

falsehoods to harm the Plaintiff's political career and to impede his ability to effectively govern.

719.    Defendants, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, conspired with Neustar, Inc. and/or Neustar Security Services, and Joffe to violate the Defend Trade Secrets Act, 18 U.S.C. § 1832(a)(1), by assisting, aiding, and abetting Neustar and Joffe in obtaining Plaintiff's proprietary, sensitive and confidential information and data by fraud, artifice, and deception and, thereafter, stealing, appropriating, taking, carrying away, and concealing the theft of Plaintiff's confidential records with intent to convert Plaintiff's confidential records, which are related to products sold in interstate and foreign commerce, to Defendants' own benefit, while knowing and intending that such misappropriation would injure the Plaintiff

720.    Each of the Defendants, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, were aware of, and active participants in, the conspiracy for Neustar, Inc. and/or Neustar Security Services, and Joffe to violate the Defend Trade Secrets Act, 18 U.S.C. § 1832, and each of the RICO Defendants committed at least one act in furtherance of this goal.

721.    The Plaintiff's confidential records were misappropriated by Defendants within the meaning of 18 U.S.C. § 1839(5), where the Plaintiff's records were acquired by the Defendants, through unlawful and deceptive acts, without the Plaintiff's authorization and through Defendants' acts of espionage or other improper means conducted by electronic or other means.

722.    The theft of the protected trade secrets has damaged the Plaintiff.

723.    The actions of Defendants, Neustar, Inc., and/or Neustar Security Services, and Joffe, constitute theft of trade secrets in violation of 18 U.S.C. § 1832(a)(1).

724.    The actions of Defendants, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton, constitute a conspiracy to steal trade secrets in violation of 18 U.S.C. § 1832(a)(5).

725.    As a direct and proximate result of the Defendants' actions, the Plaintiff has

suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.  In addition, Plaintiff has been injured in his business and property and has incurred and will continue to incur, significant damages, losses, and deprivation of tangible and intangible property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations.

726.    Among other things, the Plaintiff was forced to incur Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' actions and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Neustar, Inc. and/or Neustar Security Services, Rodney Joffe, Perkins Coie, LLP, Michael Sussmann, HFACC, Inc., the Democratic National Committee, the DNC Services Corporation, and Hillary Clinton, for compensatory damages, punitive damages, costs, attorneys' fees, and such further and other relief as this Court may deem just and proper.

## Count IX
## Stored Communications Act
### (18 U.S.C. 2701-12)
*(Against Neustar, Inc. and/or Neustar Security Services, and Joffe)*

727.    The Plaintiff avers the allegations contained in the preceding paragraphs and

incorporates them in this count, as if set forth at length herein.

728.    The Defendants, Neustar, Inc. and/or Neustar Security Services, and Joffe, on one
or more occasions willfully and intentionally accessed, without authorization or in excess of any
authorization, facilities through which an electronic communication service is provided.

729.    Neustar, Inc. and/or Neustar Security Services, and Joffe obtained unauthorized
access to or, at a minimum, exceeded their authorization to access, numerous facilities through
which an electronic communication service is provided, including, but not limited to: (i) the
computers, networks and/or servers of the Plaintiff's private New York residence; (ii) the
computers, networks and/or servers of the Executive Office of the President of the United States;
and (iii) the computers, networks and/or servers of the Trump Organization LLC, specifically those
located at Trump Tower (collectively, the "Computers").

730.    Neustar, Inc. and/or Neustar Security Services, and Joffe obtained wire or
electronic communications from the Computers that were in electronic storage in such systems.

731.    The Plaintiff was aggrieved as a direct and proximate result of Neustar, Inc. and/or
Neustar Security Services, and Joffe's actions, and was caused to suffer significant damage,
entitling him to an award for monetary relief under 18 U.S.C. § 2707(c).

732.    The violations of Neustar and Joffe were willful and intentional, thereby warranting
an award of punitive damages under 18 U.S.C. § 2707(c).

733.    Moreover, in conspiring to bring forth the false information to commence the
investigation by the FBI for the express purpose of harming the Plaintiff, the Defendants, Clinton,
Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, and Joffe,
acted with malicious intent.

734.    The Plaintiff also seeks an award for attorneys' fees and costs as permitted pursuant

to 18 U.S.C. § 2707(c).

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendants, Neustar, Inc. and/or Neustar Security Services,  and Rodney Joffe, for compensatory damages, punitive damages, costs, attorneys' fees, and such further and other relief as this Court may deem just and proper.

### Count X
**Agency**
*(Against Clinton)*

735.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

736.    Clinton, acting as a principal, used the law firm, Perkins Coie, and the Clinton Campaign as her agents to act on her behalf to carry out the plot against Trump to assure that he would be falsely implicated as colluding with a hostile foreign sovereignty.

737.    Specifically, the Clinton Campaign and the DNC under Clinton's direction put into place a scheme to hire dishonest operatives to put together a collection of lies and innuendo about the Plaintiff and shop it to the FBI.  The statements that were disseminated were knowingly false and damaging.

738.    Clinton directed the DNC and the Clinton Campaign to also retain Perkins Coie, LLP to find proof of a sinister link between Trump and Russia in the lead-up to the 2016 Presidential Election.

739.    The Clinton Campaign and the DNC, under the direction of Hillary Clinton, directed its law firm, Perkins Coie, to hire an outside intelligence firm, Fusion GPS to dig up dirt on the Plaintiff's alleged connections with Russia in 2016.  They paid Fusion GPS approximately $10 million to produce and propagate a false narrative that the Plaintiff had colluded with the Russians.

740.    Clinton attempted to shield her involvement through a barricade of agents working on her behalf.

741.    Once retained Perkins Coie, was tasked with spearheading the mission to find or fabricate proof of a sinister link between Trump and Russia in the lead-up to the 2016 Presidential Election.

742.    The Clinton Campaign also secured Joffe and his company Neustar, Inc.  to help Clinton achieve her goal.

743.    During the lead-up to the 2016 Presidential Election, the Clinton Campaign retained Perkins Coie to perform "opposition research" on the Trump Campaign.

744.    Perkins Coie did not provide legal services to the Defendants, but instead, was commissioned to dig up whatever dirt they could on the Plaintiff, and to the extent there was none, to manufacture it.

745.    Perkins Coie, acting with the knowledge and direction of the Clinton Campaign, then proceeded to proliferate a false narrative that the Trump Campaign was actively colluding with Russian operatives to subvert the 2016 Presidential Election.

746.    Sussmann and Elias, while working for Perkins Coie, and working on behalf of the Clinton Campaign, worked with Joffe and attempted to find any such wrongdoing by the Plaintiff.

747.    Sussmann advised the media and others, falsely and knowingly claiming to demonstrate the existence of a secret communications channel between the Trump Organization and Alfa Bank.  In this regard, Sussmann invoiced the Clinton Campaign for his communications with Joffe and Elias.

748.    Sussmann was also advising the Clinton Campaign in connection with cybersecurity issues, and Perkins Coie, acted as the Clinton Campaign's General Counsel.

749.    Joffe used his access at multiple organizations to gather and mine public and non-public Internet data regarding Trump and his associates, with the goal of creating a "narrative" regarding the candidate's ties to Russia."

750.    Joffe later shared certain results of those data searches and analysis with Sussmann so that Sussmann, in turn, could provide them to the media and the FBI.

751.    Clinton was fully aware of the plan and hired and instructed the necessary parties to make it happen.

752.    Moreover, employees of Perkins Coie, Elias and Sussmann had multiple conferences regarding their work and billed the Clinton Campaign for these meetings.

753.    All of the abovementioned acts were committed by Perkins Coie under the instruction and for the benefit of Hillary Clinton and the Clinton Campaign.

754.    The agents, the Clinton Campaign and Perkins, Coie, LLP, were not acting outside of the instructions of the principal when committing the above-mentioned acts because they were hired for the sole purpose of digging up or manufacturing information on the Plaintiff.

755.    Sussmann, and his firm, Perkins Coie were always acting on behalf of and in coordination with the Clinton Campaign, in assembling and conveying Sussmann's allegations.

756.    Additionally, all of Sussmann's recorded time and work relating to the Russian Bank were billed to the Clinton Campaign.

757.    Clinton is liable as a principal for all of the acts her agents committed against the Plaintiff at her request and for her benefit.

758.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and

attorneys' fees.  In addition, Plaintiff has been injured in his business and property and has incurred

and will continue to incur, significant damages, losses, and deprivation of tangible and intangible

property, including but not limited to loss of political and/or business reputation, loss of business

opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade

secrets, and/or loss of contractual relations.

759.    Among other things, the Plaintiff was forced to incur expenses in an amount to be

determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and

continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in

connection with his effort to defend against the Defendants' false accusations and the various

federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing

and future business opportunities.

760.    The Plaintiff does not claim nor seek any compensation for damage to his

reputation, but rather, he seeks damages for the cost of dealing with the legal issues and political

issues, which he was required to spend to redress the injurious falsities which were propounded by

the Defendants, and all other losses incurred due to the tortious conduct of the Defendants.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter

a Judgment for Donald J. Trump and against the Defendant, Hillary Clinton, for damages,

including Punitive damages, costs, and such further and other relief as this Court may deem just

and proper.

### Count XI
### Respondeat Superior/Vicarious Liability
*(Against Perkins Coie)*

761.    The Plaintiff avers the allegations contained in the preceding paragraphs and

incorporates them in this count, as if set forth at length herein.

762.   Under the doctrine of respondeat superior, the Defendant, Perkins Coie, is vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

763.   Specifically, under the doctrine of respondeat superior, Perkins Coie is responsible for the tortious actions that its employees, Sussmann and Elias, committed.

764.   Elias and Sussmann were two of Perkins Coie's senior partners responsible for representing the DNC.  The senior partners negotiated the Joint Fund-Raising Agreement between the DNC and the Clinton Campaign in which Hillary Clinton would be permitted to control the party's finances, strategy, and utilize the money that the DNC raised.

765.    Sussmann and Joffe engaged in efforts with Elias and individuals acting on behalf of the Clinton Campaign to manufacture evidence of wrongdoing by the Plaintiff and the existence of a secret communications channel between the Trump Organization and Alfa Bank.

766.   Sussmann reported the Alfa Bank connection as though it was real and lied to the FBI General Counsel in that he falsely stated that he was not acting on behalf of any client, when he was specifically there at the behest of Clinton, the Clinton Campaign, and the DNC.  In fact, he invoiced the Clinton Campaign for his efforts.

767.   From in or about late July through in or about mid-August 2016, Sussmann, Joffe, and Elias coordinated and communicated about the Plaintiff's involvement with Alfa Bank. Sussmann and Perkins Coie invoiced the Clinton Campaign for that conspiratorial meeting.

768.   Elias and Sussmann perpetrated lies about the Plaintiff and falsified evidence.  Elias and Sussmann committing these egregious acts while working for a client of their firm.  The DNC and the Clinton Campaign hired Perkins Coie and Sussmann and Elias to complete the work as a part of their job.

769.    At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

770.    As a direct and proximate result of the torturous actions by agents, servants, representatives, employees and/or contractors, as alleged above, Perkins Coie is vicariously liable to the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

771.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.  In addition, Plaintiff has been injured in his business and property and has incurred and will continue to incur, significant damages, losses, and deprivation of tangible and intangible property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations.

772.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities for himself, the Trump Campaign, and the Trump Organization LLC.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter

a Judgment for Donald J. Trump and against the Defendant, Perkins Coie, LLP, for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

## Count XII
### Respondeat Superior/Vicarious Liability
*(Against the DNC)*

773.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

774.    Under the doctrine of respondeat superior, the Defendant, the DNC, is vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

775.    Specifically, under the doctrine of respondeat superior, the DNC is responsible for the tortious actions committed by its chairperson, Schultz, and other members and employees.

776.    At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

777.    As a direct and proximate result of the torturous actions by agents, servants, representatives, employees and/or contractors, as alleged above, the DNC is vicariously liable to the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

778.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various

federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, the Democratic National Committee, the DNC Services Corporation, for Compensatory damages, Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

## Count XIII
### Respondeat Superior/Vicarious Liability
*(Against the Clinton Campaign)*

779.     The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

780.     Under the doctrine of respondeat superior, the Defendant, the Clinton Campaign, vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

781.     Specifically, under the doctrine of respondeat superior, the Clinton Campaign is responsible for the tortious actions committed by its campaign manager, communications director, and foreign policy advisor.

782.     On or about September 15, 2016, Elias exchanged e-mails with the Clinton Campaign's campaign manager, communications director, and foreign policy advisor concerning the plot to falsely connect Donald J. Trump to a Russian bank.

783.     At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

784.     As a direct and proximate result of the torturous actions by agents, servants,

representatives, employees and/or contractors, as alleged above, the Clinton Campaign is vicariously liable to the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

785.    Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, HFACC Inc., for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

**Count XIV**
**Respondeat Superior/Vicarious Liability**
*(Against Fusion GPS)*

786.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

787.    Under the doctrine of respondeat superior, the Defendant, Fusion GPS is vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

788.    Specifically, under the doctrine of respondeat superior, Fusion GPS is responsible for the tortious actions committed by its employees, Fritsch and Simpson.

789.    Elias, in his mission to obtain derogatory anti-Trump 'opposition research,' commissioned Fusion GPS, and its co-founders, Fritsch and Simpson, and directed them to dredge

up evidence—legitimate or otherwise, true or otherwise, of collusion between the Plaintiff and Russia.

790. Fritsch and Simpson, in turn, enlisted the assistance of Orbis Ltd and its owner, Steele, to produce a series of reports setting forth damning evidence of the supposed collusion between the Plaintiff and Russia.

791. Moreover, the efforts of Ohr to pass the knowingly false Dossier through her husband to the Department of Justice, while she was in the full-time employment of Fusion GPS also leads to the liability of Fusion GPS.

792. The now-debunked collection of reports, known as the "Steele Dossier" or simply the "Dossier," was riddled with misstatements, misrepresentations and flat out lies. As it turns out, the Dossier was largely based upon information provided to Steele by his primary sub-source, Danchenko, who admittedly fabricated his claims.

793. Danchenko had close ties to senior Clinton Campaign official Dolan, who knowingly provided false information to Danchenko, who relayed it to Steele, who reported it in his Dossier and fed it to the FBI and the media.

794. Fritsch and Simpson were hired and working for their company Fusion GPS when they fabricated research and evidence.

795. At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

796. As a direct and proximate result of the torturous actions by agents, servants, representatives, employees and/or contractors, as alleged above, Fusion GPS is vicariously liable to the Plaintiff, as he suffered losses due to the actions of the employees who were working within

the scope of their employment.

797.   Among other things, the Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the Defendants' false accusations and the various federal investigations and/or official proceedings which arose therefrom, in addition to the loss of existing and future business opportunities.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Fusion GPS, for damages, including punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### Count XV
### Respondeat Superior/Vicarious Liability
### (*Against Orbis Business Intelligence Ltd*)

798.   The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

799.   Under the doctrine of respondeat superior, the Defendant, Orbis, vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

800.   Specifically, under the doctrine of respondeat superior, Orbis is responsible for the tortious actions committed by its employee, Steele.

801.   Fritsch and Simpson enlisted the assistance of Orbis Ltd and its owner, Steele, to produce a series of reports setting forth damning evidence of the supposed collusion between the Plaintiff and Russia.

802.   The now-debunked collection of reports, known as the "Steele Dossier" or simply

the "Dossier," was riddled with misstatements, misrepresentations and flat out lies.  As it turns out, the Dossier was largely based upon the fabricated information provided to Steele by his primary sub-source, Danchenko.

803.    Danchenko had close ties to senior Clinton Campaign official, Dolan, who knowingly provided false information to Danchenko, who relayed it to Steele, who reported it in his Dossier and fed it all the way back up the chain.

804.    Fusion GPS was hired to create the fabricated Dossier and Steele was working for the company when he created it.

805.    At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

806.    As a direct and proximate result of the tortious actions by agents, servants, representatives, employees and/or contractors, as alleged above, Orbis is vicariously liable to the Plaintiff, as he suffered losses due to the actions of the employees who were working within the scope of their employment.

807.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damages, including but not limited to, actual, compensatory, special, incidental, and consequential damages in addition to costs of defense and attorneys' fees.  In addition, Plaintiff has been injured in his business and property and has incurred and will continue to incur, significant damages, losses, and deprivation of tangible and intangible property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Orbis Business Intelligence Ltd., for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

### Count XVI
### Respondeat Superior/Vicarious Liability
*(Against Neustar, Inc and/or Neustar Security Services)*

808.    The Plaintiff avers the allegations contained in the preceding paragraphs and incorporates them in this count, as if set forth at length herein.

809.    Under the doctrine of respondeat superior, the Defendants, Neustar, Inc. and/or Neustar Security Services, vicariously responsible for the torturous conduct of its agents, servants, representatives, employees and/or contractors.

810.    Specifically, under the doctrine of respondeat superior, Neustar, Inc. and/or Neustar Security Services is responsible for the tortious actions committed by its employee, Joffe.

811.    The Clinton Campaign secured Neustar, Inc. and/or Neustar Security Services, which is run by Joffe, to help Hillary Clinton achieve her goal.

812.    Sussmann and Elias, while working for Perkins Coie, LLP, and working on behalf of the Clinton Campaign, worked with Joffe and attempted to find wrongdoing by the Plaintiff or the Trump Organization.

813.    Sussmann advised the media and others, falsely and knowingly claiming to demonstrate the existence of a secret communications channel between the Trump Organization and Alfa Bank.  In this regard, Sussmann invoiced the Clinton Campaign for his Communications with Joffe and Elias.

814.    Sussmann was also advising the Clinton Campaign in connection with cybersecurity

issues, and Perkins Coie, acted as the Clinton Campaign's General Counsel.

815.    Joffe used his access at multiple organizations to gather and mine public and non-public Internet data regarding Trump and his associates, with the goal of creating a "narrative" regarding the candidate's ties to Russia."

816.    Joffe later shared certain results of those data searches and analysis with Sussmann so that Sussmann, in turn, could provide them to the media and the FBI.

817.    Joffe was working and acting on behalf of Neustar, Inc. and/or Neustar, Inc. and/or Neustar Security Services when he attempted to find wrongdoing and fabricated facts and evidence.

818.    At all material times, the above-named employees were all acting within the scope of their employment, performing work for their employer at the time of the tortious conduct, and therefore are responsible for the actions of their employees.

819.    As a direct and proximate result of the Defendants' actions, the Plaintiff has suffered, and continues to suffer, significant damage, including but not limited to, actual, compensatory, special, incidental, and consequential damage in addition to costs of defense and attorneys' fees.

WHEREFORE, the Plaintiff, Donald J. Trump, respectfully requests that this Court enter a Judgment for Donald J. Trump and against the Defendant, Neustar, Inc. and/or Neustar Security Services, for damages, including Punitive damages, costs, and such further and other relief as this Court may deem just and proper.

## **Jury Demand**

The Plaintiff hereby demands a trial by jury of all issues so triable.

**THE TICKTIN LAW GROUP**
270 SW Natura Avenue
Deerfield Beach, Florida 33441
Telephone: (561) 232-2222


 /s/ Pete*r Ticktin*
PETER TICKTIN, ESQUIRE
Florida Bar No. 887935
JAMIE ALAN SASSON, ESQUIRE
Florida Bar No. 10802
Our Matter No.: 22-0062


and

**HABBA MADAIO & ASSOCIATES LLP**
1430 US Highway 206
Suite 240
Bedminster, New Jersey 07921
ALINA HABBA, ESQUIRE (*Pro Hac Vice*)
New Jersey Bar No. 018592010
MICHAEL T. MADAIO, ESQUIRE (*Pro Hac Vice*)
New Jersey Bar No. 070752013
Our Matter No.: 4500-7

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed this 21st day of June, 2022, with the Clerk of Court using CM/ECF, which will send a notice of electronic filing to all Parties listed on the Service List.


     /s/ *Peter Ticktin*

**THE TICKTIN LAW GROUP**
Peter Ticktin, Esquire
Florida Bar No.: 887935
Serv512@LegalBrains.com
Jamie Alan Sasson, Esquire
Florida Bar No.: 10802
Serv513@LegalBrains.com
270 SW Natura Avenue
Deerfield Beach, Florida 33441-1610
Telephone: (954) 570-6757
*Attorneys for the Plaintiff*

**HABBA MADAIO & ASSOCIATES**
Alina Habba, Esquire
ahabba@habbalaw.com
Michael T. Madaio, Esquire
mmadaio@habbalaw.com
1430 US Highway 206 Suite 240
Bedminster, New Jersey 07921
Telephone: (908) 869-1188
*Attorneys for the Plaintiff*

## SERVICE LIST

Anthony Erickson-Pogorzelski, Esquire
Fla. Bar No. 619884
Anthony.Pogorzelski@usdoj.gov
**Assistant U.S. Attorney**
99 N.E. 4th Street, Suite 300
Miami, Florida 33132
Telephone: 305- 961-9296
*Attorneys for Defendant*
*United States of America*

David E. Kendall, Esquire
dkendall@wc.com
**Williams & Connolly, LLP**
725 12th Street NW
Washington, DC 20005-3901
Telephone: 202-434-5000
*PRO HAC VICE*
*Attorney for the Defendant*
*Hillary R. Clinton*

David Oscar Markus, Esquire
dmarkus@markuslaw.com
**Markus/Moss, LLP**
40 N.W. Third Street
Penthouse 1
Miami, Florida 33128
Telephone: 305-379-6667
*Attorneys for the Defendant*
*Hillary R. Clinton*

Katherine M. Turner, Esquire
kturner@wc.com
**Williams & Connolly, LLP**
725 12th Street NW
Washington, DC 20005-3901
Telephone: 202-434-5000
*PRO HAC VICE*
*Attorney for the Defendant*
*Hillary R. Clinton*

Michael J. Mestitz, Esquire
mmestitz@wc.com
**Williams & Connolly, LLP**
725 12th Street NW
Washington, DC 20005-3901
Telephone: 202-434-5000
*PRO HAC VICE*
*Attorney for the Defendant*
*Hillary R. Clinton*

Jonathan Edward Levine, Esquire
Jonathan.levine@levinepllc.com
**Levine & Associates, PLLC**
5311 Lee Highway
Arlington, Virginia 22207
Telephone: 703-525-2668
*Attorney for Defendant*
*Charles Halliday Dolan, Jr.*

George R.A. Doumar, Esquire
gdoumar@doumarmartin.com
**Mahdavi, Bacon, Halfhill & Young,
PLLC**
11350 Random Hills Road, Suite 700
Fairfax, Virginia 22030
Telephone: 703-352-1300
*PRO HAC VICE*
*Attorney for Defendant*
*Charles Halliday Dolan, Jr*

Franklin G. Monsour, Jr., Esquire
fmonsour@orrick.com
**Orrick, Herrington & Sutcliffe, LLP**
51 West 52nd Street
New York, New York 10019
Telephone: 202-339-8533
*PRO HAC VICE*
*Attorney for Defendant*
*Igor Danchenko*

Diana Marie Fassbender, Esquire
dszego@orrick.com
**Orrick, Herrington & Sutcliffe, LLP**
1152 15th Street NW

Washington, D.C. 20005
*PRO HAC VICE*
*Attorney for Defendant*
*Igor Danchenko*

Alexandra N. Epps, Esquire
aepps@qslwm.com
**Quiling Selander Lownds Winslett and Moser, PC**
6900 North Dallas Parkway, Suite 800
Plano, Texas 75024
Telephone: 214-560-5463
*Attorney for the Defendant*
*Neustar, Inc.*

Adam Seth Fels, Esquire
afels@ffslawfirm.com
Florida Bar No.: 0114917
**Fridman Fels & Soto, PLLC**
2525 Ponce de Leon Blvd., Ste 750
Coral Gables, FL 33134
Telephone: 305-569-7701
*Attorney for the Defendant*
*Bruce Ohr and Nellie Ohr*
*Fusion GPS*
*Glenn Simpson*
*Peter Fritsch*

Kevin P. Crenny, Esquire
kcrenny@levyfirestone.com
**Levy Firestone Muse, LLP**
900 17th Street NW, Suite 1200
Washington, D.C., 20006
Telephone: 202-845-3215
*PRO HAC VICE*
*Attorney for the Defendant*
*Fusion GPS*
*Glenn Simpson*
*Peter Fritsch*

Joshua Levy, Esquire
jal@levyfirestone.com
**Levy Firestone Muse, LLP**
900 17th Street NW, Suite 1200
Washington, D.C., 20006
Telephone: 202-845-3215

*PRO HAC VICE*
*Attorney for the Defendant*
*Fusion GPS*
*Glenn Simpson*
*Peter Fritsch*

Rachel Clattenburg, Esquire
rmc@levyfirestone.com
**Levy Firestone Muse, LLP**
900 17th Street NW, Suite 1200
Washington, D.C., 20006
Telephone: 202-845-3215
*PRO HAC VICE*
*Attorney for the Defendant*
*Fusion GPS*
*Glenn Simpson*
*Peter Fritsch*

Joshua Berman, Esquire
Joshua.Berman@cliffordChance.com
**Clifford Chance US, LLP**
2011 K. Street, NW
Washington, D.C., 20006-1001
Telephone: 202-912-5000
*PRO HAC VICE*
*Attorney for Defendants*
*Nellie Ohr and Bruce Ohr*

Benjamin Peacock, Esquire
Benjamin.Peacock@cliffordChance.com
**Clifford Chance US, LLP**
2011 K. Street, NW
Washington, D.C., 20006-1001
Telephone: 202-912-5000
*PRO HAC VICE*
*Attorney for Defendants*
*Nellie Ohr and Bruce Ohr*

Eugene K. Pettis, Esquire
cmarr@hpslegal.com
Service@hpslegal.com
**Haliczer Pettis & Schwamm P.A.**
100 SE 3rd Avenue, 7th Floor
Fort Lauderdale, FL 33394
Telephone: 954-523-9922

*Attorneys for Defendant*
*Marc Elias*


Debra P. Klauber, Esquire
dklauber@hpslegal.com
Service@hpslegal.com
**Haliczer Pettis & Schwamm P.A.**
100 SE 3rd Avenue, 7th Floor
Fort Lauderdale, FL 33394
Telephone: 954-523-9922
*Attorneys for Defendant*
*Marc Elias*


April A. Otterberg, Esquire
aotterberg@jenner.com
**Jenner & Block, LLP**
353 N. Clark Street
Chicago, Il 60654-3454
Telephone: 312-222-9350
*PRO HAC VICE*
*Attorney for the Defendant*
*Marc Elias*


Reid J. Schar, Esquire
rschar@jenner.com
**Jenner & Block, LLP**
353 N. Clark Street
Chicago, Il 60654-3454
Telephone: 312-222-9350
*PRO HAC VICE*
*Attorney for the Defendant*
*Marc Elias*


Roberto Martinez, Esquire
Bob@colson.com
becky@colson.com
Florida Bar No.: 305596
**Colson Hicks Eidson, P.A.,**
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134
Telephone: 305-476-7400
*Attorney for the Defendant*
*Michael Sussmann*


Michael S. Bosworth, Esquire

Michael.Bosworth@lw.com
**Latham & Watkins, LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212-916-1221
*PRO HAC VICE*
*Attorney for the Defendant*
*Michael Sussmann*


Michael F. Houlihan, Esquire
Michael.Houlihan@lw.com
**Latham & Watkins, LLP**
200 Clarendon Street
Boston, MA 02116
Telephone: 617-880-4642
*PRO HAC VICE*
*Attorney for the Defendant*
*Michael Sussmann*


Sean M. Berkowitz, Esquire
Sean.Berkowitz@lw.com
**Latham & Watkins, LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: 312-876-7700
*PRO HAC VICE*
*Attorney for the Defendant*
*Michael Sussmann*


Stephen P. Barry, Esquire
Stephen.Barry@lw.com
**Latham & Watkins, LLP**
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Telephone: 202-637-2200
*PRO HAC VICE*
*Attorney for the Defendant*
*Michael Sussmann*


Eleni Kastrenakes Howard, Esquire
Eleni.kastrenakeshoward@akerman.com
Florida Bar No.: 73073
**Akerman, LLP**
777 S. Flagler Drive, Suite 1100, West Tower
West Palm Beach, Florida 33401

Telephone: 561-653-5000
*Attorney for the Defendant*
*Perkins Coie, LLP*

Howard Jay Harrington, Esquire
Jay.harrington@akerman.com
Florida Bar No.: 0118719
**Akerman, LLP**
777 S. Flagler Drive, Suite 1100, West Tower
West Palm Beach, Florida 33401
Telephone: 561-653-5000
*Attorney for the Defendant*
*Perkins Coie, LLP*

F. Joseph Warin, Esquire
fwarin@gibsondunn.com
**Gibson Dunn & Crutcher, LLP**
1050 Connecticut Avenue NW
Washington, D.C., 20036-5306
Telephone: 202-887-3609
*PRO HAC VICE*
*Attorney for the Defendant*
*Perkins Coie, LLP*

Geoffrey M. Sigler, Esquire
gsigler@gibsondunn.com
**Gibson Dunn & Crutcher, LLP**
1050 Connecticut Avenue NW
Washington, D.C., 20036-5306
Telephone: 202-887-3609
*PRO HAC VICE*
*Attorney for the Defendant*
*Perkins Coie, LLP*

Katherine M. Meeks, Esquire
kmeeks@gibsondunn.com
**Gibson Dunn & Crutcher, LLP**
1050 Connecticut Avenue NW
Washington, D.C., 20036-5306
Telephone: 202-887-3609
*PRO HAC VICE*
*Attorney for the Defendant*
*Perkins Coie, LLP*

Nancy E. Hart, Esquire

nhart@gibsondunn.com
**Gibson Dunn & Crutcher, LLP**
1050 Connecticut Avenue NW
Washington, D.C., 20036-5306
Telephone: 202-887-3609
*PRO HAC VICE*
*Attorney for the Defendant*
*Perkins Coie, LLP*

Gerald E. Greenberg, Esquire
ggreenberg@gsgpa.com
Florida Bar No.: 440094
**Gelber Schachter & Greenberg, P.A.**
One South East Third Avenue, Suite 2600
SunTrust International Center
Miami, Florida 33131
Telephone: 305-728-0950
*Attorney for the Defendant*
*Democratic National Committee*
*DNC Services Corporation*
*Debbie Wasserman Schultz*

Shawn G. Crowley, Esquire
scrowley@kaplanhecker.com
**Kaplan Hecker & Fink, LLP**
350 5th Avenue, 63rd Floor
New York, New York 10118
Telephone: 212-763-0883
*PRO HAC VICE*
*Attorney for the Defendants*
*Democratic National Committee*
*DNC Services Corporation*

Maximillian Feldman, Esquire
mfeldman@kaplanhecker.com
**Kaplan Hecker & Fink, LLP**
350 5th Avenue, 63rd Floor
New York, New York 10118
Telephone: 212-763-0883
*PRO HAC VICE*
*Attorney for the Defendants*
*Democratic National Committee*
*DNC Services Corporation*

Roberta A. Kaplan, Esquire

rkaplan@kaplanhecker.com
**Kaplan Hecker & Fink, LLP**
350 5th Avenue, 63rd Floor
New York, New York 10118
Telephone: 212-763-0883
*PRO HAC VICE*
*Attorney for the Defendants*
*Democratic National Committee*
*DNC Services Corporation*

Edward Soto, Esquire
Edward.soto@weil.com
Florida Bar No.: 0265144
**Weil Gotshal & Manges, LLP**
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone: 305-577-3100
*PRO HAC VICE*
*Attorney for the Defendant*
*Rodney Joffe*

Steven Tyrrell, Esquire
Steven.tyrrell@weil.com
**Weil, Gotshal & Manges, LLP**
2001 M St. NW, Suite 600
Washington, D.C. 20063
Telephone:
*PRO HAC VICE*
*Attorney for the Defendant*
*Rodney Joffe*

Noah Brozinsky, Esquire
nbrozinsky@kaiserDillon.com
Florida Bar No.: 010470
**KaiserDillon, PLLC**
1099 14th Street NW, 8th Floor West
Washington, D.C. 20005
*Attorney for the Defendant*
*Kevin E. Clinesmith*

Christopher Muha, Esquire
CMuha@kaiserdillon.com
**KaiserDillon, PLLC**
1099 14th Street NW, 8th Floor West
Washington, D.C. 20005
Telephone: 202-640-2850

*PRO HAC VICE*
*Attorney for the Defendant*
*Kevin E. Clinesmith*

William Pittard, Esquire
Wpittard@kaiserdillon.com
**KaiserDillon, PLLC**
1099 14th Street NW, 8th Floor West
Washington, D.C. 20005
Telephone: 202-640-2850
*PRO HAC VICE*
*Attorney for the Defendant*
*Kevin E. Clinesmith*

Paola Pinto, Esquire
ppinto@schertlerlaw.com
Florida Bar No.: 1013933
**Schertler Onorato Mead & Sears**
555 13th Street, N.W.
Suite 500 West
Washington, D.C. 20004
Telephone: 202-628-4155
*Attorney for the Defendants*
*John Podesta*
*HFACC, Inc.*

Robert P. Trout, Esquire
Rtrout@schertlerlaw.com
**Schertler Onorato Mead & Sears**
555 13th Street, N.W.
Suite 500 West
Washington, D.C. 20004
Telephone: 202-628-4155
*PRO HAC VICE*
*Attorney for the Defendants*
*John Podesta*
*HFACC, Inc.*

William R. Barzee, Esquire
williambarzee@barzeeflores.com
**Barzee Flores**
Courthouse Center, Penthouse One
40 NW Third Street
Miami, Florida 33128
Telephone: 3025-374-3998
*Counsel for the Defendants*

*Robert E. Mook*
*Jack Sullivan*

Andrew J. Ceresney, Esquire
aceresney@debevoise.com
**Debevoise & Plimpton, LLP**
919 Third Avenue
New York, NY 10022
Telephone: 212-909-6000
*PRO HAC VICE*
*Attorney for the Defendant*
*Robert E. Mook*

Isabela M. Garcez, Esquire
imgarcez@debevoise.com
**Debevoise & Plimpton, LLP**
919 Third Avenue
New York, NY 10022
Telephone: 212-909-6000
*PRO HAC VICE*
*Attorney for the Defendant*
*Robert E. Mook*

Wendy B. Reilly, Esquire
wbreilly@debevoise.com
**Debevoise & Plimpton, LLP**
919 Third Avenue
New York, NY 10022
Telephone: 212-909-6000
*PRO HAC VICE*
*Attorney for the Defendant*
*Robert E. Mook*

Brian L. Stekloff, Esquire
bstekloff@wilkinsonstekloff.com
**Wilkinson Stekloff, LLP**
2001 M. Street NW, 10th Floor
Washington, D.C. 20036
Telephone: 202-847-4030
*PRO HAC VICE*
*Attorney for the Defendant*
*Jake Sullivan*

Sarah E. Neuman, Esquire
sneuman@wilkinsonstekloff.com
**Wilkinson Stekloff, LLP**

2001 M. Street NW, 10th Floor
Washington, D.C. 20036
Telephone: 202-847-4030
*PRO HAC VICE*
*Attorney for the Defendant*
*Jake Sulliv*

# 188
Order (June 23, 2022)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO: 22-14102-CV-MIDDLEBROOKS

DONALD J. TRUMP,

      Plaintiff,

v.

HILLARY R. CLINTON, et al.,

      Defendants.

_____/

## **ORDER**

The Court has reviewed Plaintiff's Amended Complaint. To the extent that the allegations against certain Defendants, and therefore the arguments relied on by those Defendants in support of dismissal, remain unchanged, and in the interest of reducing costs in this action, Defendants are advised that they may readopt their prior Motions to Dismiss if they so choose.

Moreover, to the extent that the various Defendants seek to raise the same arguments, they are encouraged to consolidate their responses where appropriate.

**SIGNED** in Chambers in West Palm Beach, Florida on this 23rd day of June, 2022.

Donald M. Middlebrooks
United States District Judge

cc:    Counsel of Record

1

225

Charles Dolan's Motion to Dismiss Plaintiff's Amended Complaint and
Memorandum in Support (July 14, 2022)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| DONALD J. TRUMP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )   Case No. 2:22-cv-14102-DMM |
| | ) |
| HILLARY R. CLINTON, ET AL., | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

**CHARLES DOLAN'S MOTION TO DISMISS PLAINTIFF'S AMENDED**
**COMPLAINT AND MEMORNDUM IN SUPPORT**

Defendant Charles Dolan, by and through counsel, files this Motion to Dismiss Plaintiff's

Amended Complaint, pursuant to Rules 12(b)(2), 12(b)(3), and 12(b)(6) of the Federal Rules of

Civil Procedure, in relation to Counts II, IV, and VI of Plaintiff Donald J. Trump's Complaint,

which are the counts pled against Mr. Dolan.

**MEMORANDUM IN SUPPORT**

**SUMMARY**

Regarding Mr. Dolan, Plaintiff's Amended Complaint presents no new material

allegations. Given the similarity of Plaintiff's Complaint and Amended Complaint, Mr. Dolan

adopts the argument raised in his initial motion to dismiss. Docket entries 162 and 163.  As to

arguments for statutes of limitations and failure to state a claim, Mr. Dolan has joined Defendants'

consolidated motion to dismiss.   This short memorandum addresses issues unique to Mr. Dolan.

1

**NEW ERRONEOUS FACTS ALLEGED**
**<u>CONCERNING MR. DOLAN CONFIRM THIS MATTER SHOULD BE DISMISSED</u>**

As an initial matter, Plaintiff now alleges for the first time that Mr. Dolan is a resident of New York. Amended Complaint at ¶20. That is a new allegation, but is absolutely not true and could have been easily checked.

Plaintiff also attempts to redress a false allegation made in the initial Complaint (which undersigned counsel brought to Plaintiff counsel's attention) that Mr. Dolan was the former Chairman of the DNC, by now claiming that Mr. Dolan served as "chairman of national Democratic political organization[.]" *Compare* Amended Complaint at ¶96 with Complaint at ¶78. Mr. Dolan was never Chairman of the DNC or of any national Democratic political organization. The factual statement is still untrue.  Mr. Dolan is also again described as a senior Hillary Clinton campaign official from 2016, when in fact his role in 2016 was as a volunteer who knocked on doors the last week of the campaign.   A declaration from Mr. Dolan addressing these issues is attached.

Plaintiff alleges that Mr. Danchenko arranged for Mr. Dolan to meet with an individual identified as "Galinka," that Mr. Dolan and Galinka exchanged political views, and that Galinka speculated that Mr. Dolan would help make her an advisor at the U.S. State Department. *Id* at ¶112.  These facts do not seem relevant to the allegations but seem gleaned from news articles.

Besides these allegations above, there are no new assertions that are material for the causes of action Plaintiff raises against Mr. Dolan.

## ARGUMENT

### A.  Mr. Dolan Has Signed On to the Consolidated Motion to Dismiss

Given that Plaintiff Trump raises no new material facts and does not assert new theories that support his cause of action, Mr. Dolan adopts the same argument he raised in his prior motion to dismiss, as permitted by the Court's June 23 Order. *See* Dckt no. 162 and 163. Mr. Dolan also adopts the arguments made in the consolidated Defendants' memorandum as to Rule 12(b)(6), and has signed on to that motion.

### B. There Are No Minimum Contacts and No Prima Facie Case of Personal Jurisdiction Alleged

In addition to the arguments in the consolidated Motion To Dismiss, Mr. Dolan has neither minimum contacts related to the claim nor regular contacts sufficient for a Florida court to exercise jurisdiction over him.  Mr. Dolan incorporates the facts and authorities in is initial motion and supporting memorandum.  Nor is venue in South Florida proper as to any claim against Mr. Dolan.

### C. Plaintiff' and Plaintiff's Counsel Did Not Confirm the Most Basic Facts as to Mr. Dolan, Confirming That There Was No Reasonable Inquiry

Mr. Dolan also notes Plaintiff's lack of diligence in ascertaining Mr. Dolan's state of residence and past activities. Mr. Dolan is a resident of the Commonwealth of Virginia, and not the State of New York, as alleged anew by Plaintiff. Amended Complaint at ¶20. Mr. Dolan's residence is readily ascertainable with a simple internet search and was also affirmed by Mr. Dolan in his prior motion to dismiss. *See* Dckt no. 162 and 163.  Undersigned counsel previously brough to Plaintiff counsel's attention that Mr. Dolan was never Chairman of the DNC.   So Plaintiff's counsel now calls him a past Chairman of a national political organization.  Mr. Dolan's biography is available on the internet and would have confirmed this assertions was false.

### D.  Even Accepting the Facts Pled, Mr. Dolan's Negligible Role Confirms There Are No Cognizable Causes of Action Against Him

As stated in Mr. Dolan's prior motion, there is no allegation that Mr. Dolan had contact with any other defendant besides Mr. Danchenko. Mr. Dolan was working in his consulting and public relations business during the relevant time period, and met Mr. Danchenko through that work.   There is simply no allegation that Mr. Dolan agreed to help with any scheme to involve the FBI or concoct false information, and there is nothing to suggest he was aware of any such plan (even assuming such a plan is actionable).  There is no allegation that he had any paid or formal or even informal role in the Clinton Presidential campaign, or worked with any of the other Defendants, other than doing volunteer work.   Mr. Dolan is at most tied tenuously to two bits of information that he allegedly relayed to Mr. Danchenko. That is insufficient for conspiracy.

If gossiping with a business associate about political intelligence in Washington, D.C. during a Presidential election year could subject a person to liability, especially if the gossip involves information regarding a presidential candidate, and originates form sources like Politico and Fox News, courts would be flooded with lawsuits.

There is no factual allegation supporting that Mr. Dolan agreed to a plan or conspiracy to undertake anything unlawful with anyone.

Mr. Dolan incorporates the arguments in his prior motion, and adopts the arguments made in the Defendants' consolidated motion, in response to the allegations in the Amended Complaint.

The claims against Mr. Dolan should be dismissed with prejudice.

Respectfully submitted,

/s/ George R. A. Doumar
George R.A. Doumar

4

*Admitted Pro Hac Vice*
Jonathan E. Levine, Esquire
Florida Bar No. 937711
Mahdavi Bacon Halfhill & Young, PLLC
11350 Random Hills Road, Suite 700
Fairfax, Virginia, 22030
Tel: (703) 352-1300
Fax: (703) 352-1301
Email: gdoumar@doumarmartin.com

Attorneys for Charles H. Dolan

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 14, 2022, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing on all

counsel of record.

Respectfully submitted,

/s/ George R. A. Doumar
George R.A. Doumar
*Admitted Pro Hac Vice*
Jonathan E. Levine, Esquire
Florida Bar No. 937711
Mahdavi Bacon Halfhill & Young, PLLC
11350 Random Hills Road, Suite 700
Fairfax, Virginia, 22030
Tel: (703) 352-1300
Fax: (703) 352-1301
Email: gdoumar@doumarmartin.com

Attorneys for Charles H. Dolan

225-1

Second Declaration of Charles Dolan (July 14, 2022)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| DONALD J. TRUMP,  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | |
| v.  ) | |
| )  Case No. 2:22-cv-14102-DMM | |
| ) | |
| HILLARY R. CLINTON, ET AL.,  ) | |
| ) | |
| ) | |
| Defendants.  ) | |

**SECOND DECLARATION OF CHARLES DOLAN**

I, Charles H. Dolan, declare and affirm as follows pursuant to 28 U.S.C §1746:

1. My name is Charles H. Dolan. I reside in the Commonwealth of Virginia, in Arlington. I have lived in Virginia since 1986.

2. I do not own any property in New York, and never have. I have never resided in New York.

3. I do not have any business or offices in New York, nor have I provided any services in New York. Nor have I solicited business in New York, as least not in the last ten years.

4. I do not vacation regularly in New York.

5. I was previously identified in the initial complaint as a former Chairman of the DNC. That was utterly false and just plain uninformed. The Amended Complaint now identifies me as the former Chairman of a national Democratic political organization. That is also not true. I am also identified in the Amended Complaint as a senior Hillary Clinton for President campaign official. That is utterly false and just plain uninformed by the plaintiff and his attorneys. The fact of the matter is that my involvement in the 2016 campaign was as a volunteer knocking on doors in New Hampshire for the last week of the campaign.

6. I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on July 14, 2022.

Arlington, Virginia.

Charles Halliday Dolan, Jr.

## 226

Hillary Clinton's, HFACC, Inc.'s, John Podesta's, Robert Mook's, Jake Sullivan's, DNC's, DNC Services Corporation's, Debbie Wasserman Schultz's, Perkins Coie LLP's, Marc Elias's, Michael Sussmann's, Charles Halliday Dolan, Jr.'s, Fusion GPS's, Glenn Simpson's, Peter Fritsch's, Nellie Ohr's, Bruce Ohr's, Igor Danchenko's, Rodney Joffe's, Neustar Security Services's, and Neustar, Inc.'s Joint Motion to Dismiss Under Federal Rule 12(b)(6) and Incorporated Memorandum of Law (July 14, 2022)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Donald J. Trump,

                    Plaintiff,

        v.

Hillary R. Clinton *et al.*,

                    Defendants.

Civil Action No. 2:22-14102-DMM

**HILLARY CLINTON'S, HFACC, INC.'S, JOHN PODESTA'S, ROBERT MOOK'S, JAKE SULLIVAN'S, DNC'S, DNC SERVICES CORPORATION'S, DEBBIE WASSERMAN SCHULTZ'S, PERKINS COIE LLP'S, MARC ELIAS'S, MICHAEL SUSSMANN'S, CHARLES HALLIDAY DOLAN, JR.'S, FUSION GPS'S, GLENN SIMPSON'S, PETER FRITSCH'S, NELLIE OHR'S, BRUCE OHR'S, IGOR DANCHENKO'S, RODNEY JOFFE'S, NEUSTAR SECURITY SERVICES'S, AND NEUSTAR, INC.'S JOINT MOTION TO DISMISS UNDER FEDERAL RULE 12(B)(6) AND INCORPORATED MEMORANDUM OF LAW**

**TABLE OF CONTENTS**

Page

INTRODUCTION. ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I.   PLAINTIFF'S CLAIMS ARE TIME-BARRED ............................................................. 2

    A.   RICO Violations and Conspiracy to Commit RICO Violations
        (Counts I–II) ................................................................................................ 4

    B.   Injurious Falsehood (Count III) .................................................................. 5

    C.   Malicious Prosecution (Count V) ............................................................... 6

    D.   Conspiracy-Related Claims (Counts IV and VI) ........................................ 6

    E.   Computer Fraud and Abuse Act (Count VII) ............................................. 6

    F.   Theft of Trade Secrets Under the Defend Trade Secrets Act (Count VIII) ............ 7

    G.   Stored Communications Act (Count IX) ..................................................... 7

II.   EACH OF PLAINTIFF'S CLAIMS FAILS ON THE MERITS ......................................... 7

    A.   Plaintiff's Civil RICO Claim (Count I) Fails on Multiple Independent
        Grounds. ...................................................................................................... 8

        1.   Plaintiff Has Not Alleged a Cognizable RICO Enterprise ...................... 8

        2.   Plaintiff Has Not Alleged That Each RICO Defendant Engaged In
            At Least Two Predicate Acts. ................................................................. 9

        3.   Plaintiff Has Not Plausibly Alleged a Pattern of Racketeering
            Activity ................................................................................................ 14

        4.   Plaintiff Fails to Allege RICO Standing or Causation. ...................... 15

    B.   Plaintiff Has Not Plausibly Alleged a RICO Conspiracy (Count II). ................ 19

    C.   Plaintiff Fails To Plead Claims For Injurious Falsehood (Count III) and
        Conspiracy To Commit Injurious Falsehood (Count IV). ....................... 19

        1.   Plaintiff Fails To Plead Multiple Elements of the Injurious
            Falsehood Claim. ................................................................................ 19

        2.   The Injurious Falsehood Claims Are Barred By the First
            Amendment. ........................................................................................ 21

        3.   The Conspiracy Claim (Count IV) Fails Because the Underlying
            Claim Fails and Because the Conspiracy is Inadequately Pleaded. ........ 22

**TABLE OF CONTENTS**
(continued)

Page

D.   Plaintiff Fails To Plead a Claim for Malicious Prosecution (Count V) or for the Related Conspiracy Claims (Count VI)...................................................... 23

E.   Plaintiff Fails To State a Claim Based on Defendants' Alleged Use of DNS Data. ......................................................................................................... 25

    1.   Plaintiff Has No Claim Under the Computer Fraud and Abuse Act (Count VII)...................................................................................... 26

    2.   Plaintiff Has No Claim Under the Defend Trade Secrets Act (Count VIII) ...................................................................................... 27

    3.   Plaintiff Has No Claim Under the Stored Communications Act (Count IX)......................................................................................... 27

F.   The Agency and Respondeat Superior Counts Should Be Dismissed Because the Underlying Claims Fail on the Merits (Counts X–XVI) ................. 30

III.   PLAINTIFF'S FACTUAL ALLEGATIONS AS TO INDIVIDUAL DEFENDANTS ARE INSUFFICIENT. ............................................................ 30

A.   Clinton and Clinton Campaign Defendants (Podesta, Mook, Sullivan, and HFAA) ............................................................................................................ 31

B.   DNC and Debbie Wasserman Schultz .................................................................... 35

C.   Perkins Coie and Former Partners Marc Elias and Michael Sussmann................ 38

D.   Fusion GPS Defendants ......................................................................................... 42

E.   Nellie Ohr and Bruce Ohr ..................................................................................... 43

F.   Igor Danchenko...................................................................................................... 43

G.   Rodney Joffe, Neustar Security Services, and Neustar, Inc.................................. 45

CONCLUSION........................................................................................................................ 47

## TABLE OF AUTHORITIES

Page(s)

### CASES

*777 Partners LLC v. Pagnanelli*,
   No. 20-cv-20172, 2021 WL 2038175 (S.D. Fla. Mar. 8, 2021) ............................................. 26

*ADT LLC v. Vivint, Inc.*,
   No. 17-cv-80432, 2017 WL 5640725 (S.D. Fla. Aug. 3, 2017) ............................................. 5

*Agency Holding Corp. v Malley-Duff & Assocs., Inc.*,
   483 U.S. 143 (1987) ............................................................................................................... 4

*Agilysys, Inc. v. Hall*,
   258 F. Supp. 3d 1331 (N.D. Ga. 2017) ................................................................................ 37

*Al-Rayes v. Willingham*,
   914 F.3d 1302 (11th Cir. 2019) ............................................................................................. 8

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) ............................................................................................................. 35

*Alhassid v. Bank of Am., N.A.*,
   60 F. Supp. 3d 1316 (S.D. Fla. 2014) ....................................................................... 23, 35, 41

*Almanza v. United Airlines, Inc.*,
   851 F.3d 1060 (11th Cir. 2017) ........................................................................................... 46

*Am. Dental Ass'n v. Cigna Corp.*,
   605 F.3d 1283 (11th Cir. 2010) ............................................................................. 8, 42, 45, 46

*Am. Heritage Enters., Inc. v. Am. Paramount Fin., Inc.*,
   No. 10-cv-80921, 2011 WL 13225180 (S.D. Fla. July 5, 2011) ........................................... 39

*Ambrosia Coal & Const. Co. v. Pages Morales*,
   482 F.3d 1309 (11th Cir. 2007) ........................................................................................... 36

*Anderson v. Ahluwalia*,
   No. 21-cv-60793, 2022 WL 850000 (S.D. Fla. Feb. 28, 2022) ............................................. 30

*Anza v. Ideal Steel Supply Co.*,
   547 U.S. 451 (2006) ........................................................................................................ 15, 18

*Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ............................................................................................................. 11

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Armor Corr. Health Servs., Inc. v. Teal*,
   No. 19-cv-24656, 2021 WL 5834245 (S.D. Fla. Dec. 8, 2021) .............................................. 26

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................................. 7, 30, 39

*Ayres v. Gen. Motors Corp.*,
   234 F.3d 514 (11th Cir. 2000) ............................................................................................. 14

*Barabe v. Apax Partners Eur. Managers, Ltd.*,
   359 F. App'x 82 (11th Cir. 2009) ......................................................................................... 30

*Barmapov v. Amuial*,
   986 F.3d 1321 (11th Cir. 2021) ........................................................................................... 46

*Beck v. Prupis*,
   529 U.S. 494 (2000) ............................................................................................................. 19

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................................................... 30, 43

*Bently v. Bank of America, N.A.*,
   773 F. Supp. 2d 1367 (S.D. Fla. 2011) ............................................................................... 47

*Boyle v. United States*,
   556 U.S. 938 (2009) ............................................................................................................... 8

*Brown Jordan Int'l, Inc. v. Carmicle*,
   2016 WL 815827 (S.D. Fl. Mar. 2, 2016) ........................................................................... 29

*Brown Jordan Int'l, Inc. v. Carmicle*,
   846 F.3d 1167 (11th Cir. 2017) ........................................................................................... 27

*Cass v. U.S. Dist. Ct.*,
   No. 20-cv-6071, 2021 WL 1124540 (E.D.N.Y. Mar. 24, 2021) ........................................... 12

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1994) ............................................................................................................. 37

*Cisneros v. Petland, Inc.*,
   972 F.3d 1204 (11th Cir. 2020) ...................................................................................... 9, 36

*Citizens United v. FEC*,
   558 U.S. 310 (2010) ............................................................................................................. 42

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Coastal Wellness Ctrs., Inc. v. Progressive Am. Ins. Co.*,
   309 F. Supp. 3d 1216 (S.D. Fla. 2018) .................................................................................. 10

*Colite Int'l Inc. v. Robert L. Lipton, Inc.*,
   No. 05-cv-60046, 2006 WL 8431505 (S.D. Fla. Jan. 20, 2006) ............................................. 30

*Coll Builders Supply, Inc. v. Velez*,
   No. 17-cv-933, 2017 WL 4158661 (M.D. Fla. Aug. 31, 2017), *report and recommendation
   adopted*, No. 17-cv-933, 2017 WL 4125641 (M.D. Fla. Sept. 18, 2017) ............................... 37

*In re Connetics Corp. Sec. Litig.*,
   542 F. Supp. 2d 996 (N.D. Cal. 2008) .................................................................................. 41

*Corsello v. Lincare, Inc.*,
   428 F.3d 1008 (11th Cir. 2005) .............................................................................................. 2

*Cox v. Adm'r U.S. Steel & Carnegie*,
   17 F.3d 1386 (11th Cir.), *modified on reh'g*, 30 F.3d 1347 (1994) ........................................ 39

*Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   945 F.3d 1150 (11th Cir. 2019) ............................................................................................ 13

*Ctr. for Immigr. Studies v. Cohen*,
   410 F. Supp. 3d 183 (D.D.C. 2019) ..................................................................................... 13

*Davis v. Monahan*,
   832 So. 2d 708 (Fla. 2002) .................................................................................................... 6

*Day v. Taylor*,
   400 F.3d 1272 (11th Cir. 2005) ............................................................................................ 17

*DNC v. Russian Fed'n*,
   392 F. Supp. 3d 410 (S.D.N.Y. 2019) .................................................................................... 9

*Donald J. Trump For President, Inc. v. N.Y. Times Co.*,
   No. 152099/2020, 2021 WL 938979 (N.Y. Sup. Ct. Mar. 9, 2021) ....................................... 22

*E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961) .............................................................................................................. 41

*In re Facebook, Inc. Internet Tracking Litig.*,
   956 F.3d 589 (9th Cir. 2020) ........................................................................................... 28, 29

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Falic v. Legg Mason Wood Walker, Inc.*,
  347 F. Supp. 2d 1260 (S.D. Fla. 2004) .............................................................. 19, 20

*FEC v. Craig for U.S. Senate*,
  816 F.3d 829 (D.C. Cir. 2016) ............................................................................. 16

*Ferrell v. Durbin*,
  311 F. App'x 253 (11th Cir. 2009) ....................................................................... 15

*First Nat'l Bank of Boston v. Bellotti*,
  435 U.S. 765 (1978).............................................................................................. 9

*Fischer v. Debrincat*,
  169 So. 3d 1204 (Fla. 4th DCA 2015) ............................................................. 23, 24

*Fortson v. Colangelo*,
  434 F. Supp. 2d 1369 (S.D. Fla. 2006) ................................................................. 22

*Fox v. Loews Corp.*,
  309 F. Supp. 3d 1241 (S.D. Fla. 2018) ................................................................. 47

*From v. Tallahassee Democrat, Inc.*,
  400 So. 2d 52 (Fla. 1st DCA 1981) ...................................................................... 22

*Funny Cide Ventures, LLC v. Miami Herald Publ'g Co.*,
  955 So. 2d 1241 (Fla. 4th DCA 2007) .................................................................. 20

*Garcia v. City of Laredo*,
  702 F.3d 788 (5th Cir. 2012) ........................................................................... 29, 30

*Genentech, Inc. v. JHL Biotech, Inc.*,
  No. 18-cv-06582, 2019 WL 1045911 (N.D. Cal. Mar. 5, 2019) ............................ 38

*In re Google Inc.*,
  806 F.3d 125 (3d Cir. 2015)................................................................................. 28

*Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*,
  341 F.3d 1292 (11th Cir. 2003) ........................................................................... 16

*H.J. Inc. v. Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989)............................................................................................ 14

*Halvorssen v. Simpson*,
  807 F. App'x 26 (2d Cir. 2020) ........................................................................... 14

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Hawaii v. Trump*,
   859 F.3d 741 (9th Cir.), *vacated on other grounds*, 138 S. Ct. 377 (2017)............................ 3

*Hemi Grp. v. City of N.Y.*,
   559 U.S. 1 (2010)......................................................................................................... 15, 18

*Henry v. Examworks Inc.*,
   No. 20-cv-12268, 2021 WL 3440698 (11th Cir. Aug. 6, 2021) ............................................. 3

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   31 F.4th 1180 (9th Cir. 2022) ................................................................................................ 28

*Honig v. Kornfeld*,
   339 F. Supp. 3d 1323 (S.D. Fla. 2018) .................................................................................. 23

*Horsley v. Feldt*,
   304 F.3d 1125 (11th Cir. 2002) ............................................................................................ 21

*Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Phillip Morris Inc.*,
   196 F.3d 818 (7th Cir. 1999) ................................................................................................ 42

*Integrated Waste Sols., Inc. v. Goverdhanam*,
   No. 10-cv-2155, 2010 WL 4910176 (E.D. Pa. 2010) ........................................................... 29

*Jackson v. Bank of Am., N.A.*,
   898 F.3d 1348 (11th Cir. 2018) ............................................................................................ 47

*Jackson v. BellSouth Telecommc'ns*,
   372 F.3d 1250 (11th Cir. 2004) ...................................................................................... *passim*

*Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*,
   162 F.3d 1290 (11th Cir. 1998) ............................................................................................ 27

*Kanarick v. GE Credit Retail Bank Care Credit*,
   No. 13-cv-80039, 2013 WL 12092479 (S.D. Fla. Sept. 6, 2013) .......................................... 20

*Kelly v. Palmer, Reifler, & Assocs., P.A.*,
   681 F. Supp. 2d 1356 (S.D. Fla. 2010) .................................................................................. 39

*Kelly v. United States*,
   140 S. Ct. 1565 (2020)........................................................................................................... 13

*Kimberlin v. Nat'l Bloggers Club*,
   No. 13-cv-3059, 2015 WL 1242763 (D. Md. Mar. 17, 2015) ............................................... 13

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997)...................................................................................................... 4, 5

*La Grasta v. First Union Sec., Inc.*,
358 F.3d 840 (11th Cir. 2004) ......................................................................................... 2

*Lehman v. Lucom*,
727 F.3d 1326 (11th Cir. 2013) ....................................................................................... 4

*Libov v. Readix, Inc.*,
No. 10-cv-61755, 2011 WL 13216996 (S.D. Fla. Sept. 8, 2011) ................................. 36

*Local 355 Hotel, Motel, Rest. & Hi-Rise Emps. & Bartenders Union v. Pier 66 Co.*,
599 F. Supp. 761 (S.D. Fla. 1984) ................................................................................ 16

*Love v. Delta Air Lines*,
310 F.3d 1347 (11th Cir. 2002) ..................................................................................... 37

*Magluta v. Samples*,
256 F.3d 1282 (11th Cir. 2001) ..................................................................................... 47

*Malhotra v. Aggarwal*,
No. 17-cv-24407, 2019 WL 3425161 (S.D. Fla. July 30, 2019)................................... 36

*Masson v. New Yorker Mag., Inc.*,
501 U.S. 496 (1991)....................................................................................................... 22

*McGuire Oil Co. v. Mapco, Inc.*,
958 F.2d 1552 (11th Cir. 1992) ..................................................................................... 42

*McMurray v. U-Haul Co.*,
425 So. 2d 1208 (Fla. 4th DCA 1983) ............................................................................ 6

*Melford v. Kahane & Assocs.*,
371 F. Supp. 3d 1116 (S.D. Fla. 2019) ......................................................................... 23

*Miccosukee Tribe of Indians of Fla. v. Cypress*,
814 F.3d 1202 (11th Cir. 2015) ....................................................................................... 8

*Micro v. Shabanets*,
No. 15-cv-80999, 2015 WL 11438937 (S.D. Fla. Dec. 4, 2015)................................... 19

*Mortg. Now, Inc. v. Stone*,
No. 09-cv-80, 2010 WL 11519201 (N.D. Fla. Sept. 29, 2010) ..................................... 27

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Muskegan Hotels, LLC v. Patel,*
    986 F.3d 692 (7th Cir. 2021) ............................................................................... 37

*Nexans Wires S.A. v. Sark–USA, Inc.,*
    319 F. Supp. 2d 468 (S.D.N.Y. 2004) ..................................................................... 27

*Nunes v. Fusion GPS,*
    531 F. Supp. 3d 993 (E.D. Va. 2021) ..................................................................... 16

*NW Monitoring LLC v. Hollander,*
    534 F. Supp. 3d 1329 (W.D. Wash. 2021) .............................................................. 38

*O'Rourke v. Dominion Voting Sys. Inc.,*
    552 F. Supp. 3d 1168 (D. Colo. 2021) .................................................................... 41

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin,*
    418 U.S. 264 (1974) ................................................................................................ 21

*United States ex rel. Osheroff v. Humana Inc.,*
    776 F.3d 805 (11th Cir. 2015) ................................................................................ 22

*Pavelic & LeFlore v. Marvel Entm't Group,*
    493 U.S. 120 (1989) ................................................................................................ 41

*Ray v. Spirit Airlines,*
    836 F.3d 1340 (11th Cir. 2016) .......................................................................... 8, 16

*Resdev, LLC v. Lot Builders Ass'n, Inc.,*
    No. 04-cv-1374, 2005 WL 1924743 (M.D. Fla. Aug. 10, 2005) ............................ 27

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993) ................................................................................................ 35

*Rock the Vote v. Trump,*
    No. 20-cv-06021, 2020 WL 6342927 (N.D. Cal. Oct. 29, 2020) ............................. 3

*Rodgers v. Addy,*
    No. 17-cv-23429, 2021 WL 4487903 (S.D. Fla. Sept. 27, 2021) ........................... 40

*Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.,*
    742 So. 2d 381 (Fla. 4th DCA 1999) ...................................................................... 20

*Se. Laborers Health & Welfare Fund v. Bayer Corp.,*
    655 F. Supp. 2d 1270 (S.D. Fla. 2009) ..................................................................... 8

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Sentry Data Sys. v. CVS Health,*
   361 F. Supp. 3d (S.D. Fla. 2018) ............................................................................................. 10

*Sewell v. Bernardin,*
   795 F.3d 337 (2d Cir. 2015)........................................................................................................ 7

*Sierra v. City of Hallandale Beach,*
   996 F.3d 1110 (11th Cir. 2021) ............................................................................................... 11

*SilverHorse Racing, LLC v. Ford Motor Co.,*
   No. 16-cv-53, 2016 WL 7137273 (M.D. Fla. Apr. 27, 2016)................................................. 42

*Spence-Jones v. Rundle,*
   991 F. Supp. 2d. 1221 (S.D. Fla. 2013) ............................................................................. 1, 13

*Sream, Inc. v. PB Grocery, Inc.,*
   No. 16-cv-81584, 2017 WL 6409006 (S.D. Fla. Mar. 1, 2017)............................................. 19

*St. Johns Vein Ctr., Inc. v. Streamline MD LLC,*
   347 F. Supp. 3d 1047 (M.D. Fla. 2018)................................................................................. 26

*Steves & Sons, Inc. v. JELD-WEN, Inc.,*
   271 F. Supp. 3d 835 (E.D. Va. 2017) .................................................................................... 38

*Super Vision Int'l v. Mega Int'l Comm. Bank,*
   534 F. Supp. 2d 1326 (S.D. Fla. 2008) ............................................................................ 19, 43

*Turner v. Wells,*
   879 F.3d 1254 (11th Cir. 2018) .............................................................................................. 22

*Union Oil of Cal. v. Watson,*
   468 So. 2d 349 (Fla. 3d DCA 1985) ...................................................................................... 25

*United Mine Workers of Am. v. Pennington,*
   381 U.S. 657 (1965)................................................................................................................ 42

*United States v. Cioni,*
   649 F.3d 276 (4th Cir. 2011) ................................................................................................. 28

*United States v. Ermoian,*
   752 F.3d 1165 (9th Cir. 2013) ............................................................................................... 12

*United States v. Flynn,*
   507 F. Supp. 3d 116 (D.D.C. 2020) ........................................................................................ 3

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*United States v. Peterson*,
    627 F. Supp. 2d 1359 (M.D. Ga. 2008) ................................................................................ 23

*United States v. Smith*,
    22 F.4th 1236 (11th Cir. 2022) ............................................................................................ 10

*United States v. Steiger*,
    318 F.3d 1039 (11th Cir. 2003) ...................................................................................... 28, 29

*United States v. Turkette*,
    452 U.S. 576 (1981) ............................................................................................................... 9

*United States v. Wheeler*,
    16 F.4th 805 (11th Cir. 2021) .............................................................................................. 13

*United States v. Young*,
    916 F.3d 368 (4th Cir. 2019) ............................................................................................... 12

*United Techs. Corp. v. Mazer*,
    556 F.3d 1260 (11th Cir. 2009) ........................................................................................... 38

*Valladares v. Bank of Am. Corp.*,
    197 So. 3d 1 (Fla. 2016) ...................................................................................................... 23

*Van Buren v. United States*,
    141 S. Ct. 1648 (2021) .................................................................................................... 26, 27

*Vibe Micro, Inc. v. Shabanets*,
    878 F.3d 1291 (11th Cir. 2018) ...................................................................................... 46, 47

*Vista Mktg., LLC v. Burkett*,
    812 F.3d 954 (11th Cir. 2016) ............................................................................................. 29

*Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupfer, P.A. v. Flanagan*,
    629 So. 2d 113 (Fla. 1993) .................................................................................................... 5

*Weiland v. Palm Beach Cty. Sheriff's Office*,
    792 F.3d 1313 (11th Cir. 2015) ...................................................................................... 46, 47

*Wilder v. J.P. Morgan Chase Bank, N.A.*,
    No. 18-cv-20820, 2018 WL 5629922 (S.D. Fla. Oct. 30, 2018) ...................................... 6, 30

*Willis v. Lipton*,
    947 F.2d 998 (1st Cir. 1991) ............................................................................................... 16

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Wound Care Concepts, Inc. v. Vohra Health Servs., P.A.*,
  No. 19-cv-62078, 2022 WL 320952 (S.D. Fla. Jan. 28, 2022) ................................................ 21

*XTec, Inc. v. Hembree Consulting Servs., Inc.*,
  No. 14-cv-21029, 2014 WL 12729173 (S.D. Fla. Aug. 1, 2014) ........................................... 20

*Young v. Ball*,
  835 So. 2d 385 (Fla. 2d DCA 2003) ..................................................................................... 6

*In re Zynga Priv. Litig.*,
  750 F.3d 1098 (9th Cir. 2014) ............................................................................................. 29

### STATUTES

15 U.S.C § 16(i) ..................................................................................................................... 5

18 U.S.C. § 1030(a) ................................................................................................................ 26

18 U.S.C. § 1030(g) .................................................................................................. 6, 26, 37

18 U.S.C. § 1343 ........................................................................................................... 13, 42

18 U.S.C. § 1515(a) ................................................................................................................ 12

18 U.S.C. § 1832 ........................................................................................................... 26, 38

18 U.S.C. § 1836(b) ................................................................................................................ 38

18 U.S.C. § 1836(d) ................................................................................................................. 7

18 U.S.C. § 1839(3)(B) ........................................................................................................... 10

18 U.S.C. § 1961(1) ................................................................................................................ 12

18 U.S.C. § 1962(c) ...................................................................................................... 35, 39, 42

18 U.S.C. § 1962(d) ................................................................................................................ 19

18 U.S.C. § 2511(2)(g)(i) .................................................................................................. 28, 29

18 U.S.C. § 2701(a) ................................................................................................................ 29

18 U.S.C. § 2707(f) ................................................................................................................. 7

Fla. Stat. § 95.11(4)(g) ............................................................................................................ 5

## TABLE OF AUTHORITIES
(continued)

Page(s)

Fla. Stat. § 95.11(p) ......................................................................................................... 6

### OTHER SOURCES

ACLU, *A Little-Known Privacy Battle Is Being Waged Over Encrypting the Nuts and Bolts of the Internet* (Dec. 18, 2019), https://tinyurl.com/3dj6eerr ............................................ 11

Devlin Barrett & Matt Zapotosky, *Mueller Complained that Barr's Letter Did Not Capture "Context" of Trump Probe*, Wash. Post (Apr. 30, 2019) ...................................................... 25

Samantha Bradshaw & Laura DeNardis, *Privacy by Infrastructure: The Unresolved Case of the Domain Name System* Pol'y & Internet 16 (2019) ................................................. 11

Nick Gass, *Lewandowski on Manafort firing: 'People think I won,'* Politico (Aug. 19, 2016), https://tinyurl.com/a6vdpx3h .................................................................................... 44

Office of the Inspector General ,U.S. Dep't of Justice, *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation* (2019) ...................... 17, 24, 44

Office of Special Counsel, U.S. Dep't of Justice, *Report on the Investigation into Russian Interference in the 2016 Presidential Election* (2019) ............................................................ 25

Orin S. Kerr, *A User's Guide to the Stored Communications Act, and A Legislator's Guide to Amending It*, 72 Geo. Wash. L. Rev. 1208, 1214 (2004) ...................................................... 28

Paul Schmitt et al., *Oblivious DNS: Practical Privacy for DNS Queries*, Proceedings of the Applied Networking Research Workshop (2019) .................................................................... 11

*Social media erupts as Lewandowski tweets report on Manafort's ties to Ukraine*, The Hill (Aug. 14, 2016) .................................................................................................................. 44

U.S. Dep't of Commerce, Nat'l Inst. of Standards & Tech., *Secure Domain Name System (DNS) Deployment Guide* (Sept. 2013) ................................................................................... 10

### RULES

Fed. R. Civ. P. 8 ......................................................................................................... 1, 7

Fed. R. Civ. P. 9(b) .................................................................................................. 8, 13

Fed. R. Civ. P. 9(g) ......................................................................................................... 21

Fed. R. Evid. 201(b) ......................................................................................................... 19

## INTRODUCTION

Defendants filed fifteen separate motions to dismiss that provided Plaintiff Donald Trump with a comprehensive guide to the many fatal defects in his original complaint. Rather than attempt "to cure any deficiencies," DE 111 at 1, Plaintiff returned an amended complaint ("AC"), DE 177, swollen with eighty new pages of irrelevant allegations that mirror grievances he has repeatedly voiced over the years in speeches, tweets, interviews, and debates, but which do nothing to lend merit to his suit. The AC "reads more like a political manifesto than the short, plain statement of jurisdiction and . . . claims contemplated by Rule 8 of the Federal Rules of Civil Procedure." *Spence-Jones v. Rundle,* 991 F. Supp. 2d 1221, 1224 (S.D. Fla. 2013) (Middlebrooks, J.).

The AC alleges a series of disconnected political disputes that Plaintiff has alchemized into a sweeping conspiracy among the many individuals Plaintiff believes to have aggrieved him. This supposed conspiracy improbably includes Hillary Clinton and James Comey as coconspirators. It even paints one of the former President's own appointees, former Deputy Attorney General Rod Rosenstein, as someone who "wanted to see harm caused upon Donald J. Trump." AC ¶ 436. All that links these disparate people and events is Plaintiff's antipathy toward them. This is a President who doesn't just list enemies: he sues them. Although the AC meanders through numerous irrelevant episodes, the factual allegations underlying Plaintiff's nine substantive claims are straightforward.[1]  Plaintiff asserts that Hillary Clinton and her campaign, the Democratic National Committee, and lawyers for the Campaign and the Committee commissioned Fusion GPS to create the so-called "Steele Dossier" and separately directed technology executive Rodney Joffe to use his access to so-called Domain Name System ("DNS") data to investigate a suspicious pattern of activity between Trump Organization servers and those of Alfa Bank, a notorious Russian bank

---

[1]  Plaintiff asserts sixteen counts in total:  RICO and conspiracy to commit RICO; injurious falsehood and conspiracy to commit injurious falsehood; malicious prosecution and conspiracy to commit malicious prosecution; computer fraud; theft of trade secrets; violation of the Stored Communications Act; and various agency or respondeat superior counts. The Defendants named in each count are listed in the Appendix to this motion.

with close ties to Vladimir Putin. Various Defendants then supposedly gave interviews to the press and provided this research to federal law enforcement officers, allegedly sparking investigations that caused Plaintiff to amass $24 million in legal fees—including the fees his counsel charged for preparing the complaint in this very suit. AC ¶ 527.

The Court should dismiss these baseless claims with prejudice. Each of the claims is hopelessly stale and fails on the merits in multiple independent respects. Any further amendment would be futile and serve only to give Plaintiff a platform for rehashing tired rivalries from the 2016 election. *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005). Whatever the utility of Plaintiff's amended complaint as a fundraising tool, a press release, or a list of political grievances, it has no merit as a lawsuit.

**ARGUMENT**

## I.   PLAINTIFF'S CLAIMS ARE TIME-BARRED.

"[A] Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate . . . if it is apparent from the face of the complaint that the claim is time-barred." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845–46 (11th Cir. 2004) (quotation marks omitted). This is plainly such a case. The gravamen of Plaintiff's claims concerns alleged events occurring in 2015, 2016, and 2017, so the statute of limitations on his claims expired long ago.[2]

Plaintiff focuses on three supposed instances of Defendants' alleged wrongdoing, which he collectively characterizes as "an unthinkable plot . . . to weave a false narrative that their Republican opponent, Donald J. Trump, was colluding with a hostile foreign sovereignty." AC ¶ 1. First, he alleges that Defendants conspired in the creation of the Steele Dossier. *Id.* ¶ 4. Second, he alleges that Defendants conspired to provide false statements to law enforcement, including about a connection between the Trump Organization and Alfa Bank, and he asserts these Defendants were single-handedly responsible for a variety of investigations into Plaintiff, his

---

[2]   Indeed, the 193-page AC cites dates in the years 2015, 2016, and 2017 a total of 355 times, dwarfing totals for later years:  2018 (24 times), 2019 (43 times), 2020 (43 times), 2021 (30 times).

campaign, and his associates. *Id.* ¶¶ 7, 8. Finally, he alleges that Defendants "orchestrated a malicious conspiracy to disseminate patently false and injurious information"—that is, public speech with which he disagrees. *Id.* ¶ 9.

By the AC's own telling, these alleged events occurred long ago, and Plaintiff has been aware of his purported injuries for years. For example, Plaintiff alleges that the DNS data concerning interactions between Trump Organization servers and those of Alfa Bank, and the federal investigation of the same, was public knowledge when Slate published on "October 31, 2016 . . . an article reporting on the supposed Trump-Alfa Bank connection." AC ¶ 261 & n.185; *see also id.* ¶ 265 (noting federal investigation).

Plaintiff's claims about the "Steele Dossier" fare no better. The AC notes that Buzzfeed News published the Dossier on January 10, 2017. AC ¶ 294. Plaintiff immediately took to Twitter to level the same allegations that now appear in the AC, confirming that he was on notice of his supposed claims at that time.[3] On January 11, 2017, Plaintiff tweeted "Russia just said the unverified report paid for by political opponents is 'A COMPLETE AND TOTAL FABRICATION, UTTER NONSENSE.' Very unfair!"[4] On January 13, 2017, in a series of tweets, he laid out his allegations in more detail:

> It now turns out that the phony allegations against me were put together by my political opponents and a failed spy afraid of being sued.... Totally made up facts by sleazebag political operatives, both Democrats and Republicans – FAKE NEWS! Russia says nothing exists. Probably... released by "Intelligence" even knowing there is no proof, and never will be. My people will have a full report on hacking within 90 days![5]

---

[3] The Court may take judicial notice of Plaintiff's tweets. *See Hawaii v. Trump*, 859 F.3d 741, 773 n.14 (9th Cir.) (taking judicial notice of Plaintiff's tweets), *vacated on other grounds*, 138 S. Ct. 377 (2017); *Rock the Vote v. Trump*, No. 20-cv-06021, 2020 WL 6342927, at *4 n.2 (N.D. Cal. Oct. 29, 2020) (same); *United States v. Flynn*, 507 F. Supp. 3d 116, 126 n.6 (D.D.C. 2020) (same). Furthermore, the Court may rely on judicially noticeable facts in ruling on the timeliness of Plaintiff's claims on a motion to dismiss. *See, e.g.*, *Henry v. Examworks Inc.*, No. 20-cv-12268, 2021 WL 3440698, at *3 (11th Cir. Aug. 6, 2021) (affirming statute-of-limitations dismissal).

[4] Donald J. Trump (@realDonaldTrump), Twitter (Jan. 11, 2017). All tweets cited herein are archived at the Trump Twitter Archive, thetrumparchive.com.

[5] Donald J. Trump (@realDonaldTrump), Twitter (Jan. 13, 2017).

Indeed, *all* of Plaintiff's claims accrued no later than October 29, 2017, when Plaintiff publicly asserted that certain Defendants were responsible for the Steele Dossier, "the Comey fix," and "phony" stories on his collusion with Russia, and claimed the facts of the alleged conspiracy were "pouring out":

> Never seen such Republican ANGER & UNITY as I have concerning the lack of investigation on Clinton made Fake Dossier (now $12,000,000?),… …the Uranium to Russia deal, the 33,000 plus deleted Emails, the Comey fix and so much more. Instead they look at phony Trump/Russia,…. …"collusion," which doesn't exist. The Dems are using this terrible (and bad for our country) Witch Hunt for evil politics, but the R's… …are now fighting back like never before. There is so much GUILT by Democrats/Clinton, and now the facts are pouring out. DO SOMETHING![6]

These allegations form the foundation of all of Plaintiff's claims. But notwithstanding Plaintiff's rousing, all-caps call to action, he waited four years, four months, and twenty-four days before filing suit. His delay renders each of his claims untimely.

### A.    RICO Violations and Conspiracy to Commit RICO Violations (Counts I–II)

The statute of limitations for civil RICO actions and conspiracy to commit RICO violations is four years, and begins running when the injury was or should have been discovered. *See Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013); *Agency Holding Corp. v Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987). While Plaintiff makes a perfunctory attempt to plead that Defendants' "fraudulent concealment" tolled the statute of limitations, AC ¶¶ 589–607, this defense "in the context of civil RICO embodies a 'due diligence' requirement." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 196 (1997). Thus, "the concealment requirement is satisfied only if the plaintiff shows that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense." *Id.* (brackets omitted). Plaintiff's own statements and allegations make clear he was aware of not only his alleged injury, but also the supposed conspiracy and the Defendants' alleged role in it no later than October 29, 2017.

Plaintiff also argues in passing that he is entitled to tolling of his RICO claims under the Clayton Act, which tolls the statute of limitations for a private action "[w]henever any civil or

---

[6] Donald J. Trump (@realDonaldTrump), Twitter (Oct. 29, 2017).

criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws." 15 U.S.C. § 16(i); AC ¶¶ 608–12. Even assuming RICO borrows the Clayton Act's tolling provision in some cases—a doubtful proposition[7]—this is not a case in which such tolling would apply. The government has not brought any "any civil or criminal proceeding . . . to prevent, restrain, or punish violations of [RICO]," that would toll the statute of limitations for Plaintiff's civil RICO claim, nor has Plaintiff even pointed to any government actions founded on the specific RICO predicate acts he alleges. Plaintiff's position appears to be that a civil RICO claim should be tolled based on *any government proceeding that might conceivably relate to the alleged conspiracy, regardless of the government's cause of action*. Plaintiff's broad proposed tolling rule—wholly unsupported by either the text of the statute or the Supreme Court's rationale for extending the Clayton Act's general four-year statute of limitations to RICO—would effectively toll the limitations period for any RICO claim so long as a RICO plaintiff was sufficiently creative in pleading the scope of the supposed RICO conspiracy. Such a result would be absurd.

### B.    Injurious Falsehood (Count III)

The statute of limitations for injurious falsehood, a type of "trade slander" under Florida law, is two years from publication.[8] *ADT LLC v. Vivint, Inc.*, No. 17-cv-80432, 2017 WL 5640725, at *6 & n.8 (S.D. Fla. Aug. 3, 2017) (Middlebrooks, J.); *see also Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupfer, P.A. v. Flanagan*, 629 So. 2d 113, 114–15 (Fla. 1993); Fla. Stat. § 95.11(4)(g). The two-year statute of limitations on the statements Plaintiff identifies ran long ago. *See, e.g.*, AC ¶¶ 268–69 (Clinton's tweets dated October 31, 2016); *id.* ¶ 265 (Sullivan's

---

[7]  Plaintiff cites only a small handful of out-of-circuit district court cases for this proposition. But the text of RICO lacks any indication of an intent to include a specialized tolling provision analogous to the Clayton Act's, and the Supreme Court itself noted that the "Clayton Act's express statute of limitations does not necessarily provide all the answers" as to RICO. *Klehr*, 521 U.S. at 193.

[8]  Defendants assume only for purposes of this motion that Florida law governs the state law claims, but explicitly reserve the right to argue that a law other than Florida law governs the claims if any survive this motion.

campaign statement dated October 31, 2016); *id.* ¶ 503 (Wasserman Schultz's MSNBC interview on May 10, 2019).

### C.    Malicious Prosecution (Count V)

The statute of limitations for malicious prosecution expires after four years. *Olson v. Johnson*, 961 So. 2d 356, 359 (Fla. Dist. Ct. App. 2007). Although such a claim never accrued in the first place because Plaintiff was not prosecuted, *see McMurray v. U-Haul Co.*, 425 So. 2d 1208, 1211 (Fla. 4th DCA 1983); pp. 23–24, *infra*, Plaintiff has long been on notice of the investigations that underlie this claim. AC ¶ 265.

### D.    Conspiracy-Related Claims (Counts IV and VI)

The statute of limitations for conspiracy to commit injurious falsehood (Count IV) and conspiracy to commit malicious prosecution (Count VI) is four years from the date of injury, in keeping with Florida's statute of limitations for general claims of civil conspiracy. *Davis v. Monahan*, 832 So. 2d 708, 709 (Fla. 2002); *Wilder v. J.P. Morgan Chase Bank, N.A.*, No. 18-cv-20820, 2018 WL 5629922, at *2 (S.D. Fla. Oct. 30, 2018); *see also* Fla. Stat. § 95.11(p). Because Plaintiff's claims accrued no later than October 29, 2017, the statute of limitations on these claims expired by October 29, 2021.[9] These conspiracy claims are therefore untimely. The AC also contains only nonactionable allegations of conspiratorial conduct later than 2017: it complains only of First Amendment-protected speech, AC ¶¶ 315–16, 462, 497, 519–22, and makes purely conclusory allegations of continuing conduct, *id.* ¶¶ 9, 492–93, 533–34, 681.

### E.    Computer Fraud and Abuse Act (Count VII)

The statute of limitations under the Computer Fraud and Abuse Act ("CFAA") is two years from the violation or discovery of the violation. 18 U.S.C. § 1030(g). Plaintiff asserts that "[t]he acts of the above-mentioned Defendants" were not discoverable until September 2021. AC ¶ 704. But Plaintiff's other factual allegations—which state that the DNS lookup information was publicly known in October 2016—contradict this boilerplate legal conclusion. *Id.* ¶¶ 124–30, 253–

---

[9] Tolling for delayed discovery does not apply to conspiracy claims under Florida law. *See Davis*, 832 So. 2d at 709; *Young v. Ball*, 835 So. 2d 385, 386 (Fla. 2d DCA 2003).

77. As the Second Circuit has held, a claim under the CFAA accrues when the plaintiff is aware of the alleged violation, even if he does not know the identity of the alleged perpetrators. *Sewell v. Bernardin*, 795 F.3d 337, 342 (2d Cir. 2015). Thus, even if Plaintiff was unaware of the identity of the supposed perpetrators until more recently, his knowledge of the DNS information's release in October 2016 means the statute of limitations ran in October 2018.

### F.      Theft of Trade Secrets Under the Defend Trade Secrets Act (Count VIII)

The limitations period for a civil theft of trade secrets action under the federal Defend Trade Secrets Act ("DTSA") is three years from the date "on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). Here, again, Plaintiff's claims accrued upon public knowledge of his DNS traffic in October 2016, and the statute of limitations therefore ran in late October 2019. AC ¶ 261 & n.185.

### G.      Stored Communications Act (Count IX)

Similarly, Plaintiff's claim under the Stored Communications Act ("SCA") is time-barred because it, too, relies on the DNS data. The limitations period for the SCA is two years "after the date upon which the claimant first discovered or had reasonable opportunity to discover the violation." 18 U.S.C. § 2707(f). As noted above, Plaintiff's SCA claim accrued upon public knowledge of his DNS traffic in October 2016, so the limitations period expired in late October 2018. *See* AC ¶ 268.

## II.      EACH OF PLAINTIFF'S CLAIMS FAILS ON THE MERITS.

Even were Plaintiff's claims timely, they are still meritless. To be clear, Defendants vigorously dispute the allegations in the AC. But even taking those allegations as true, Plaintiff fails to plead any cognizable causes of action.

The Rule 8 pleading standard is a familiar one. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of

action will not do," nor will "naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Because Plaintiff hinges his RICO claim on a pattern of allegedly fraudulent activity, *see, e.g.*, AC ¶¶ 533, 576–88, he must also comply with Rule 9(b)'s heightened pleading standard, which requires a party to state with particularity the circumstances constituting fraud. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010); *see also Miccosukee Tribe of Indians of Fla. v. Cypress*, 814 F.3d 1202, 1212 (11th Cir. 2015). Plaintiff satisfies neither standard.

### A.    Plaintiff's Civil RICO Claim (Count I) Fails on Multiple Independent Grounds.

To state a viable civil RICO claim, a plaintiff must plausibly allege that each defendant (1) operated or managed (2) an enterprise (3) through a pattern of racketeering activity (4) consisting of at least two racketeering acts, and that plaintiff (5) suffered injury to "business or property" (6) directly caused by the substantive RICO violation. *Ray v. Spirit Airlines,* 836 F.3d 1340, 1348 (11th Cir. 2016). Plaintiff fails to satisfy any of these essential elements.

### 1.    Plaintiff Has Not Alleged a Cognizable RICO Enterprise.

A RICO enterprise is "a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009). To state the obvious, groups affiliated for legitimate purposes—like political campaigns and their agents—do not constitute RICO enterprises. "[T]he relevant 'purpose' in an association-in-fact enterprise is the members' shared purpose of engaging in *illegal activity*." *Al-Rayes v. Willingham*, 914 F.3d 1302, 1308 (11th Cir. 2019) (emphasis added); *Se. Laborers Health & Welfare Fund v. Bayer Corp.*, 655 F. Supp. 2d 1270, 1278 (S.D. Fla. 2009) (Middlebrooks, J.) (dismissing RICO claim where complaint "fails to adequately allege any facts which would indicate the existence of a common purpose to commit racketeering acts").

Far from pursuing unlawful ends, the RICO Defendants shared a purpose that was not only legitimate, but constitutionally protected: opposing Plaintiff, the Republican candidate, in the 2016 presidential election. AC ¶¶ 2, 9. The lead RICO Defendant was the Democratic candidate in that election, and many of the others were alleged participants in her campaign. Although

Plaintiff attempts to cast their legitimate political activity in pejorative terms, his allegations that Defendants sought to "harm[ his] political reputation" and "damag[e] his electability," *id.* ¶ 531, reveal that at root this case is an attempt to relitigate grievances from the 2016 election (which *Plaintiff won*). But the courts are not a forum for rehashing yesterday's politics, and Plaintiff cannot spin a RICO enterprise out of campaign activity "at the heart of the First Amendment's protection." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 776 (1978); *see also DNC v. Russian Fed'n*, 392 F. Supp. 3d 410, 440 (S.D.N.Y. 2019) (rejecting RICO enterprise where "alleged common goal" of electing Trump was neither "unlawful or fraudulent").

Plaintiff's assertion that Defendants somehow used "deceptive, criminal and fraudulent *means*" to oppose his candidacy does not satisfy the enterprise requirement. AC ¶ 531 (emphasis added). Not only are these assertions conclusory, but they address a "separate element" of the claim—the pattern of racketeering activity. *United States v. Turkette*, 452 U.S. 576, 583 (1981). "The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." *Id.* What defines the enterprise is the common "purpose of conducting illegal activity." *Jackson v. BellSouth Telecommc'ns*, 372 F.3d 1250, 1264 (11th Cir. 2004). Absent any allegation of an illicit purpose binding the enterprise together, Plaintiff flunks this basic RICO requirement.

### 2.  Plaintiff Has Not Alleged That Each RICO Defendant Engaged In At Least Two Predicate Acts.

Plaintiff also fails to allege any RICO predicate acts, let alone a pattern of racketeering that involves at least *two* predicate acts by each RICO Defendant. *See Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1208 (11th Cir. 2020).

***No Theft of Trade Secrets Under the DTSA***. Plaintiff seems to think any information that potentially implicates privacy interests can be called a trade secret. He is wrong. "Theft of trade secrets consists of five elements: [1] the defendant must intend to convert proprietary information to the economic benefit of anyone other than the owner; [2] the proprietary information must be a trade secret; [3] the defendant must knowingly steal, take without authorization, or obtain by fraud

or deception trade secret information; [4] the defendant must intend or know that the offense would injure the owner of the trade secret; and [5] the trade secret must be related to a product that is in interstate or foreign commerce." *United States v. Smith*, 22 F.4th 1236, 1243 (11th Cir. 2022).

Plaintiff has not established that DNS information is a "trade secret," let alone that it is a trade secret "related to a product . . . in interstate or foreign commerce." *See Smith*, 22 F.4th at 1243. A trade secret "derives independent economic value" from "not being generally known to" others who "can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(B); *Sentry Data Sys. v. CVS Health*, 361 F. Supp. 3d, 1279, 1292 (S.D. Fla. 2018). Plaintiff attempts to get by with mere assertions that DNS data "reveals a comprehensive view" into a person's "website traffic [and] e-mail traffic." AC ¶ 545. But the fact that Plaintiff claims a personal privacy interest in the computers' internet activity—and more specifically, in the multiple "look ups" between Alfa Bank and Trump-related servers—does not render it a trade secret. DNS internet traffic data is not information "owned" by Plaintiff; rather, it is automatically shared by all internet users with third-party technology providers. *See* U.S. Dep't of Commerce, Nat'l Inst. of Standards & Tech. ("NIST"), *Secure Domain Name System (DNS) Deployment Guide* iii, 2-1 to 2-2 (Sept. 2013), https://tinyurl.com/2p9f2r24.[10]  Plaintiff articulates no way in which DNS data is *independently* valuable to him: unlike a customer list, a confidential process, or other recognized trade secret, Plaintiff does not capitalize on DNS data, nor does he allege that Defendants sought to convert this information for their own "economic benefit." *Smith*, 22 F.4th at 1243.  Instead, nonparty data scientists supposedly combed through the DNS data so that Defendants could use such analysis for the alleged political purpose of "damaging the candidacy and overall electability of Donald J. Trump." AC ¶ 138.

DNS data is not even secret; on the contrary, it is meant to be public. *See* NIST, *supra*, at iii. Plaintiff alleges that defendant Joffe "had access" to "DNS internet traffic" in his capacity as

---

[10] Courts routinely take judicial notice of government publications, including from the U.S. Department of Commerce. *See, e.g., Coastal Wellness Ctrs., Inc. v. Progressive Am. Ins. Co.*, 309 F. Supp. 3d 1216, 1220, n.4 (S.D. Fla. 2018).

an executive at Neustar, "an information technology company" that provides "Domain Name System ('DNS') resolution services." AC ¶¶ 126, 130, 142 (alteration omitted). DNS resolution is a necessary link in the digital chain that enables individuals to call up websites on their computers. Every website has a location in cyberspace known as an Internet Protocol ("IP") address. *See* ACLU, *A Little-Known Privacy Battle Is Being Waged Over Encrypting the Nuts and Bolts of the Internet* (Dec. 18, 2019), https://tinyurl.com/3dj6eerr. When a user types the name of a website into his browser, his computer then "reaches out to a server known as a 'DNS resolver,' which tells [the] computer the IP address that it needs to download [the] web page." *Id.* DNS resolvers thus serve as the Internet's address book, matching "human-readable domain names (www.american.edu) into the binary addresses (147.9.4.186) that routers use to locate online services and information." Samantha Bradshaw & Laura DeNardis, *Privacy by Infrastructure: The Unresolved Case of the Domain Name System*, 11 Pol'y & Internet 16, 18 (2019). As a result, "whoever operates the DNS resolver gets to see the names of all the web sites" a user visits. ACLU, *supra*; *see also* Paul Schmitt et al., *Oblivious DNS: Practical Privacy for DNS Queries*, Proceedings of the Applied Networking Research Workshop 17 (2019) ("DNS operators . . . can see all of the DNS queries that a user issues.").

Plaintiff's own allegations thus show that he does not "own" the DNS data,[11] nor did any Defendant "steal" such data from Plaintiff, "take [it] without authorization, or obtain [it] by fraud or deception." *Smith,* 22 F.4th at 1243. The allegation that Defendants enlisted Joffe to "mine[] internet data" to which he had "access" in the ordinary course of business does not amount to criminal theft of trade secrets. AC ¶¶ 130, 134, 140–42.

---

[11] Plaintiff attempts to include the Trump Organization in his trade secret and other claims. AC ¶¶ 546, 699. And he further asserts that DNS information was gathered from the Executive Office of the President ("EOP") during a period of time when Plaintiff was not even in office. *Id.* ¶¶ 491, 697. But Plaintiff cannot press a claim on behalf of these nonparties. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977) ("The plaintiff must show that he himself is injured by the challenged action of the defendant."); *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1124–25 (11th Cir. 2021) (Newsom, J., concurring) (plaintiff can sue for injury to government only in *qui tam* suits).

***No Obstruction of Justice***.  Plaintiff's allegations that the RICO Defendants violated 18 U.S.C. § 1512, the federal witness tampering statute, fare no better.  AC ¶¶ 558–575.  Plaintiff appears to rely on § 1512(c), which creates criminal penalties for "[w]hoever corruptly . . . alters, destroys, mutilates, or conceals a record, document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding," or who "otherwise obstructs, influences, or impedes any official proceeding."

But Plaintiff fails to identify any "official proceeding" that these Defendants supposedly obstructed.  By statute, "official proceedings" are strictly limited to federal judicial cases or proceedings before Congress or a federal agency.  18 U.S.C. § 1515(a).  Investigations that do not result in charges do not constitute "official proceedings" under the statute.  *See United States v. Young,* 916 F.3d 368, 384 (4th Cir. 2019) (FBI investigation insufficient); *United States v. Ermoian,* 752 F.3d 1165, 1171–72 (9th Cir. 2013) (same).  Here, Plaintiff asserts only that individual Defendants impeded the FBI's Crossfire Hurricane investigation, its short-lived "Trump-Alfa Bank" investigation, and unspecified "other investigations" by "the FBI, the DOJ, the CIA, Congress and/or the IG."  AC ¶¶ 562, 564, 566–67.  But he does not allege (nor can he) that any of these investigations matured into official proceedings (or had become official proceedings at the time of the alleged tampering/obstruction).

Plaintiff also fails to allege any "witness tampering."  He alleges that the RICO Defendants *created* documents that contained purported inaccuracies, like the Steele Dossier, or "curated" information, like DNS data.  AC ¶ 561.  He also asserts that, as part of the enterprise, Defendants Sussmann and Danchenko provided supposedly false testimony.[12]  But perjury and falsifying documents (even if adequately alleged, which they are not) are not RICO predicate acts.  *See* 18 U.S.C. § 1961(1).  Nor does conspiracy under 18 U.S.C. § 1512(k) circumvent Plaintiff's pleading failures.  *See Cass v. U.S. Dist. Ct.*, No. 20-cv-6071, 2021 WL 1124540, at *3 (E.D.N.Y. Mar. 24,

---

[12]  Conspicuously absent from the AC is the fact that, on May 31, 2022, Sussmann was acquitted by the jury of the single charge (making a false statement) brought against him by Special Counsel Durham.  *United States v. Sussmann*, No. 21-cr-582 (D.D.C.), DE 156.

2021) (rejecting conspiracy to obstruct justice as RICO predicate act where complaint lacked "any plausible, credible factual allegations of . . . agreements to act").

***No Wire Fraud***. In recognition of the foregoing flaws, Plaintiff's AC adds a catalog of allegedly false email communications, tweets, and televised public statements supposedly constituting wire fraud. AC ¶¶ 583(a)–(gg). But Rule 9(b) requires Plaintiff to specify "precisely" why any allegedly fraudulent statements were false and how they misled him—and this specificity is nowhere to be found. *See Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.*, 945 F.3d 1150, 1159 (11th Cir. 2019); p. 8, *supra*. In many instances, Plaintiff does not describe the content of these communications at all, nor does he allege he was the one defrauded. AC ¶ 583(a)–(c), (j), (m)–(p). And, of course, many of the public statements constitute protected political speech under the First Amendment. *Id.* ¶ 583(u)–(w), (y), (bb), (dd)–(gg); pp. 21–22, *infra*.

But even assuming Plaintiff had alleged falsity with particularity, his wire fraud allegations would still fall short. The federal wire fraud statute, 18 U.S.C. § 1343, is not a catchall prohibition on "all acts of dishonesty." *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020). Instead, it prohibits "only deceptive schemes to deprive the victim of money or property." *Id.* (alteration omitted); *see also Spence-Jones*, 991 F. Supp. 2d at 1254 ("The federal mail fraud statute is limited in scope to the protection of property rights."). Plaintiff, however, does not allege that the RICO Defendants intended to deprive him or anyone else of "something of value." *See United States v. Wheeler*, 16 F.4th 805, 820 (11th Cir. 2021). His theory is that these Defendants damaged his "political and/or business reputation" and cost him unspecified business opportunities with their supposed scheme to "defraud the news media, law enforcement and counterintelligence officials" with a "false narrative" about his ties to Russia. AC ¶¶ 577–78.[13] But absent any allegation that "an object of the[] dishonesty was to *obtain* . . . money or property," *Kelly*, 140 S. Ct. at 1568 (emphasis added), Plaintiff necessarily fails to plead wire fraud as a predicate act.

---

[13] Plaintiff presumably did not style this alleged scheme to harm his reputation as a defamation claim because state torts do not qualify as RICO predicate acts. *See Ctr. for Immigr. Studies v. Cohen*, 410 F. Supp. 3d 183, 191–92 (D.D.C. 2019); *Kimberlin v. Nat'l Bloggers Club*, No. 13-cv-3059, 2015 WL 1242763, at *9 (D. Md. Mar. 17, 2015).

Plaintiff also asserts that the RICO Defendants committed wire fraud by "misreporting" payments to Fusion GPS in campaign finance reports, citing to a voluntary conciliation agreement between the Clinton campaign, the DNC, and the Federal Election Commission ("FEC").[14]  AC ¶¶ 470–79, 583(d)–(f).  But violations of federal campaign finance laws—much less unproven violations—do not constitute RICO predicate offenses.  *See Ayres v. Gen. Motors Corp.*, 234 F.3d 514, 522 (11th Cir. 2000) (holding that violations of the federal Safety Act's disclosure requirements could not be prosecuted as wire fraud under the civil RICO statute).  Nor does Plaintiff allege that these campaign finance reports defrauded him of anything of value, as needed to plead wire fraud.

### 3.   Plaintiff Has Not Plausibly Alleged a Pattern of Racketeering Activity.

Beyond pleading two specific predicate acts by each defendant, a RICO plaintiff must also allege that defendants engaged in a *pattern* of racketeering activity—that is, that the acts "amount to, or . . . otherwise constitute a threat of, continuing racketeering activity."  *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 240 (1989).  A plaintiff must do this either by pleading "closed-ended" or "open-ended" continuity.  Here, Plaintiff succeeds at neither.

A party can allege closed-ended continuity "by proving a series of related predicates extending over a substantial period of time."  *Jackson*, 372 F.3d at 1265 (quotation marks omitted).  The Eleventh Circuit has categorically rejected allegations of closed-ended continuity when the supposed pattern of racketeering activity lasted less than nine months, and other circuits reject patterns lasting less than two years.  *Id.* at 1266 (collecting cases); *Halvorssen v. Simpson*, 807 F. App'x 26, 31 (2d Cir. 2020) (noting two-year "minimum" for closed-ended continuity).

Here, the alleged scheme had only a limited shelf life.  The purported predicate offenses took place over an approximately half-year period around the 2016 election—the alleged theft of trade secrets between July 2016 and "early 2017," AC ¶¶ 134, 140, 298, 321; the alleged witness

---

[14] While the FEC made a preliminary finding of probable cause that the payments were not appropriately classified, the ultimate conciliation agreements between the FEC, the Clinton campaign, and the DNC expressly stated that the Campaign and the DNC did not concede such a finding.  AC ¶ 477 & n.251, *available at* https://tinyurl.com/cxr4nue6.

tampering between September 2016 and February 2017, *id.* ¶¶ 205, 218, 304, 561–65; and the alleged wire fraud between May and October 2016, *id.* ¶ 583(a)–(y).  But even assuming the alleged racketeering "took place over longer periods of time," courts have refused to find closed-end continuity where "the RICO allegations concern only a single scheme with a discrete goal." *Jackson,* 372 F.3d at 1267.  These Defendants allegedly shared a single, time-limited objective: "to vilify Donald J. Trump" in connection with his 2016 campaign and presidency.  AC ¶ 2.

Plaintiff has also failed to plead open-ended continuity, which requires a showing that "the alleged acts were part of the defendants' regular way of doing business, or that the illegal acts threatened repetition in the future." *Jackson,* 372 F.3d at 1267 (quotation marks omitted).  The AC lacks any allegation that the predicate acts—which were supposedly engineered to target Plaintiff's candidacy—were part of the RICO Defendants' "regular" way of doing business.  Nor does the AC provide any basis to infer such activity will recur in the future.  "[S]ingle schemes with a specific objective and a natural ending point can almost never present a threat of continuing racketeering activity." *Ferrell v. Durbin,* 311 F. App'x 253, 257 (11th Cir. 2009); *see* AC ¶ 240 (alleging scheme's "deadline" was "Election Day").  Plaintiff's assertion that he may seek the presidency in 2024 does not change the analysis.  AC ¶ 533.  The speculative possibility that Plaintiff may run against a *different* Democratic nominee does not suggest that *these* Defendants will engage in any future racketeering activity.

### 4.   Plaintiff Fails to Allege RICO Standing or Causation.

Even if Plaintiff had alleged a pattern of racketeering activity (which he has not), he fails to allege an injury to business or property directly caused by that racketeering. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 452 (2006).  "A link that is too remote, purely contingent, or indirect is insufficient." *Hemi Grp. v. City of N.Y.,* 559 U.S. 1, 9 (2010) (quotation marks omitted). Similarly, that an injury was "foreseeable" is not enough; "the injury must be direct." *Ray*, 836 F.3d at 1349.

Plaintiff alleges injury in only the vaguest terms, asserting that he "incurred" $24 million in "defense costs, legal fees and related expenses . . . in connection with his efforts to defend

15

against . . . various federal investigations" supposedly instigated by Defendants. AC ¶ 616. But "legal fees" resulting from a supposed "smear campaign" against a political figure (even if Plaintiff himself paid these fees) do not constitute compensable injuries to business or property for purposes of the RICO statute. *Nunes v. Fusion GPS*, 531 F. Supp. 3d 993, 1013 (E.D. Va. 2021); *see also Local 355 Hotel, Motel, Rest. & Hi-Rise Emps. & Bartenders Union v. Pier 66 Co.*, 599 F. Supp. 761, 765 (S.D. Fla. 1984). Moreover, Plaintiff has not even alleged that he paid these fees himself. *See* AC ¶¶ 524, 616. Federal election law permits candidates or office holders to use *campaign funds* to pay "legal expenditures made in response to charges of campaign or official misconduct." *FEC v. Craig for U.S. Senate*, 816 F.3d 829, 842 (D.C. Cir. 2016).[15] Tellingly, Plaintiff repeatedly alleges that Defendants inflicted damages on "the Trump Campaign." AC ¶¶ 524, 616. Finally, Plaintiff added no new allegations showing injury to *his own* business or property in the AC, in response to these arguments made previously by Defendants. *See* DE 143 at 8.

Even if legal fees could be considered injuries to business or property, Plaintiff fails to make the requisite causal link between his legal fees and the alleged racketeering activity. Nor can he, because independent actors not part of the alleged RICO enterprise—*i.e.*, federal officials and agents—made the decisions to pursue investigations based on their own judgment and a variety of evidence. *See Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*, 341 F.3d 1292, 1308 (11th Cir. 2003) (affirming dismissal where plaintiffs could not establish "obstruction of justice and witness tampering" as "the proximate cause of their alleged injury"); *Willis v. Lipton*, 947 F.2d 998, 1001 (1st Cir. 1991) (defendant's conduct did not proximately cause the plaintiff's loss of employment where that conduct preceded an FTC enforcement action).

Time and again, the AC and its incorporated documents show that causation does not exist—even though it is Plaintiff's obligation to plead facts showing that it does. For example,

---

[15] Plaintiff alleges that the fees he paid his counsel to file this complaint form part of his alleged damages. AC ¶ 527. Recent campaign finance disclosures, however, indicate that Plaintiff's Save America PAC paid Habba, Maddaio & Associates nearly $250,000 in April 2022 and his Make America Great Again PAC paid the firm $10,000 in February 2022. These PACs are not parties to this suit.

Plaintiff speculates that the FBI might not have pursued the Crossfire Hurricane or Alfa Bank investigations had Sussmann disclosed "the political nature of his work" when he provided the Steele Dossier and DNS information while allegedly representing "he was not acting on behalf of any client." AC ¶¶ 208, 211. But this theory suffers from multiple fatal defects—most conspicuously that Sussmann was *acquitted* on May 31, 2022 of misleading the FBI about this very statement. *See* n.12, *supra*; AC ¶ 486. And far from showing that Sussmann or other Defendants misled federal agents about their political ties, Plaintiff's own allegations establish that the "FBI knew that Sussmann worked for Democratic campaigns," AC ¶¶ 414–15; *see also id.* ¶ 402(c), and could judge the credibility of the information he provided accordingly.

Moreover, the Department of Justice's Inspector General ("IG") concluded, in a report incorporated by reference into the AC, that the FBI opened Crossfire Hurricane after a friendly foreign government reported that a Trump campaign advisor had "suggested" that "Russia could assist . . . with the anonymous release of information . . . damaging to candidate Clinton." *See* Ex. 1 (excerpts from Report) at 346 (cited at AC ¶¶ 3 n.1, 226(d), 426, 467); *see also Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (noting court may consider incorporated documents on motion to dismiss). While the AC notes that the IG "performed a review to determine whether the Crossfire Hurricane investigation was adequately predicated," AC ¶ 465, it notably fails to include the *result* of this investigation. The IG found that the FBI pursued Crossfire Hurricane "for an authorized purpose" and "with adequate factual predication," Ex. 1 at 347, that existed entirely independent of any Defendants. Plaintiff's speculative assertions of causation are thus unfounded.

Indeed, even assuming that Defendants somehow influenced the opening of the FBI's Crossfire Hurricane or Alfa Bank investigations, the AC does not trace the alleged $24 million in legal fees and other unspecified expenses to those inquiries. In Plaintiff's telling, "the FBI . . . debunked the Steele dossier" no later than January 2017, only six months after Steele (a non-RICO Defendant) allegedly began providing the Dossier to the agency. AC ¶¶ 158, 444. Similarly, Plaintiff asserts that the FBI "debunked" the "Alfa Bank allegations" by October 5, 2016, mere weeks after Sussmann presented the DNS information to the FBI on September 19. *Id.* ¶ 205. The

AC offers no plausible explanation for how Plaintiff could possibly have accrued $24 million in legal fees as a result of two short-lived FBI investigations that resulted in no charges against him.

The chain of causation grows even more remote—and, indeed, never connects at all—when one attempts to track Plaintiff's legal fees back to the alleged acts of racketeering. And Plaintiff makes no attempt whatsoever to tie any injury to the alleged campaign finance violations that supposedly constitute wire fraud. Plaintiff has no standing to pursue this wire fraud theory at all because the reporting violation had a more "direct victim," *Anza*, 547 U.S. at 458—the FEC, which "vindicate[d] the laws by pursuing [its] own claims," *id.* at 460; *see* AC ¶¶ 470–79.

In a last-ditch effort to satisfy RICO's standing requirements, Plaintiff vaguely asserts that he was injured by the "loss of business opportunities" that are "too many to list." AC ¶¶ 524 & n.277, 615. But these losses go wholly unidentified and remain implausible in any event. As the winner of the 2016 presidential election, *id.* ¶ 278, Plaintiff was engaged in the conduct of state rather than private business ventures from January 2017 to January 2021. Any alleged business losses he suffered since returning to the private sector are far too remote in time from the alleged racketeering activity in 2016 and 2017 and are easily traceable to Plaintiff's own conduct while in office or other intervening causes. *See Hemi Grp.*, 559 U.S. at 9.

The closest Plaintiff comes to identifying an "evaporated" opportunity is a single footnote alleging that he was "banned from different social media platforms, including Twitter," as a result of "the misinformation campaign waged by Hillary Clinton." AC ¶ 524 n.277. But Plaintiff rewrites history when he suggests that Twitter shut down his account as a result of any conduct by Defendants. Twitter suspended Plaintiff from its platform on January 8, 2021—two days after the insurrection at the U.S. Capitol, and nearly five years after the alleged racketeering at issue in this case—because it determined that Plaintiff's tweets posed "the risk of further incitement of violence." Twitter Blog, Permanent Suspension of @realDonaldTrump (Jan. 8, 2021).[16]

---

[16] The Court may judicially notice the date and content of Twitter's suspension notice even at the pleading stage because these are facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," namely from Twitter's own

**B.     Plaintiff Has Not Plausibly Alleged a RICO Conspiracy (Count II).**

To state a RICO conspiracy claim under 18 U.S.C. § 1962(d), a "plaintiff must allege an illegal agreement to violate a substantive provision of the RICO statute." *Super Vision Int'l v. Mega Int'l Com. Bank*, 534 F. Supp. 2d 1326, 1342 (S.D. Fla. 2008); *see also Micro v. Shabanets*, No. 15-cv-80999, 2015 WL 11438937, at *8 (S.D. Fla. Dec. 4, 2015) (Middlebrooks, J.) (holding that conspiracy claim should be dismissed where "the underlying claims are not supported by factual allegations to state a RICO violation"). Plaintiff's conclusory allegations of conspiracy "unsupported by actual allegations of fact" do not suffice. *Super Vision*, 534 F. Supp. 2d at 1343; AC ¶¶ 619–33. Furthermore, for a plaintiff to prevail under § 1962(d), the overt act causing injury must itself be an act of racketeering. *Beck v. Prupis,* 529 U.S. 494, 495–96 (2000). Plaintiff, however, has not alleged a predicate act of racketeering here, nor any injury from such an act, and therefore fails to state a viable RICO conspiracy claim.

**C.     Plaintiff Fails To Plead Claims For Injurious Falsehood (Count III) and Conspiracy To Commit Injurious Falsehood (Count IV).**

The injurious falsehood claim should be dismissed because Plaintiff fails to plead multiple elements of the claim, and because the First Amendment bars the claim. Because the substantive claim fails, the related conspiracy to commit injurious falsehood claim must also be dismissed.

**1.     Plaintiff Fails To Plead Multiple Elements of the Injurious Falsehood Claim.**

Injurious falsehood is a close cousin to defamation, except that it protects "economic interests" rather than "personal reputation." *Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp. 2d 1260, 1268 (S.D. Fla. 2004). "Injurious falsehood essentially concerns intentional interference with another's economic relations." *XTec, Inc. v. Hembree Consulting Servs., Inc.*, No. 14-cv-21029, 2014 WL 12729173, at *6 (S.D. Fla. Aug. 1, 2014) (quotation marks omitted). Because the tort vindicates commercial interests, a plaintiff must plausibly allege, among other elements, that (1) the defendant published "a falsehood," (2) the defendant knew his falsehood would "likely induce others not to deal with the Plaintiff," (3) "the falsehood did play a material and substantial

---

website. *See* Fed. R. Evid. 201(b); *Sream, Inc. v. PB Grocery, Inc.*, No. 16-cv-81584, 2017 WL 6409006 (S.D. Fla. Mar. 1, 2017) (Middlebrooks, J.).

part in inducing others not to deal with the Plaintiff," and (4) special damages. *Kanarick v. GE Credit Retail Bank Care Credit*, No. 13-cv-80039, 2013 WL 12092479, at *4 (S.D. Fla. Sept. 6, 2013) (Middlebrooks, J.).

The injurious falsehood claim fails at the outset because the alleged injuries Plaintiff claims are not "economic" in nature. *See Falic*, 347 F. Supp. 2d at 1268. Although the AC recites boilerplate allegations that Plaintiff "suffer[ed] economic losses" and "has been injured in his business and property," AC ¶¶ 653–54, the gravamen of the alleged injury concerns Plaintiff's political prospects. *Id.* ¶ 2 (alleging conspiracy "to cripple Trump's initial bid for presidency and tarnish his electability for future elections"). Indeed, Plaintiff does not allege that Defendants propagated falsehoods that interfered with his *economic* relations. And even if harm in the political arena could amount to an economic injury cognizable under the banner of injurious falsehood (it does not), Plaintiff does not plausibly allege that any supposed falsehoods actually damaged his political career. *Plaintiff*—not Hillary Clinton—won the 2016 election. *Id.* ¶ 278.

On top of this fatal defect, Plaintiff makes only unadorned and conclusory assertions that Defendants' statements were false, *see, e.g.*, AC ¶ 635 ("Defendants . . . made, disseminated and/or published false and damaging statements concerning Plaintiff, specifically that he was colluding with Russia and its President Vladimir Putin."), and the AC is devoid of any allegations that Defendants knew that their statements would likely induce any individual or entity not to engage in business dealings with Plaintiff, or that the statements in fact played a material role in inducing others not to deal with Plaintiff.

Plaintiff also fails to plead the "crucial element" of special damages. *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 388 (Fla. 4th DCA 1999). "The special damage rule requires the plaintiff to establish pecuniary loss that has been realized or liquidated, as in the case of specific lost sales." *Id.* "Special damages require proof that the loss is directly attributed to defendants['] conduct and the loss is not to be explained by other considerations." *Wound Care Concepts, Inc. v. Vohra Health Servs., P.A.*, No. 19-cv-62078, 2022 WL 320952, at *14 (S.D. Fla. Jan. 28, 2022); *see also Funny Cide Ventures, LLC v. Miami Herald Publ'g Co.*,

955 So. 2d 1241, 1246 (Fla. 4th DCA 2007). Under the Federal Rules, special damages must be "specifically stated" in the complaint. Fed. R. Civ. P. 9(g).

The allegations do not come close to establishing the required nexus between Plaintiff's legal bills and the various statements referenced in Count III. By Plaintiff's telling, he accumulated the vast legal fees and other expenses in the course of defending himself from "various federal investigations" and "official proceedings." AC ¶ 655. But the AC does not identify these various investigations and proceedings, does not explain how Defendants' statements relate to these unspecified inquiries, and provides no accounting of how the $24 million in legal fees and other costs occurred. *See* pp. 16, 18, *supra*. Consequently, Plaintiff has not plausibly alleged that his "loss is directly attributed to defendants," *Wound Care Concepts*, 2022 WL 320952, at *14, or stated his damages with the specificity required by Rule 9(g).

## 2.    The Injurious Falsehood Claims Are Barred By the First Amendment.

Plaintiff's injurious falsehood claims also run headlong into the First Amendment. Many of the statements on which Plaintiff bases his claims are quintessential statements of "rhetorical hyperbole" that are not actionable. *Horsley v. Feldt*, 304 F.3d 1125, 1131 (11th Cir. 2002). For instance, the AC asserts that Hillary Clinton referred to Plaintiff as Putin's "spokesperson." AC ¶ 643. This "loose language" falls squarely within the First Amendment's ambit as "part of the conventional give-and-take in our economic and political controversies." *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 284 (1974) (holding the epithet "traitor" not actionable).

Other challenged statements amount to political commentary based on facts "known or available to the reader or listener as a member of the public," which are, by definition, unactionable "[p]ure opinion." *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981); *accord Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1384 (S.D. Fla. 2006) (finding "textbook expression of pure opinion" where defendant "merely offered readers his judgment—albeit, a harsh one—based upon facts that were known or available to them"). For instance, Plaintiff cites a campaign statement allegedly issued by Jake Sullivan (subsequently tweeted out by Hillary

Clinton), which offered opinion commentary on facts reported in an article published in *Slate*. AC ¶¶ 640–41.[17] While Plaintiff may find the statement objectionable, that does not convert it into a false statement of fact. *See Donald J. Trump For President, Inc. v. N.Y. Times Co.*, No. 152099/2020, 2021 WL 938979, at *1 (N.Y. Sup. Ct. Mar. 9, 2021) (dismissing defamation claim brought by Plaintiff based on newspaper column describing ties between Plaintiff and Russia, concluding those statements were "nonactionable opinion").

As a separate First Amendment basis for dismissal, Plaintiff—a quintessential example of both a public official and a public figure—fails to adequately plead that Defendants' statements were made with "actual malice"—that is, "deliberate or reckless falsification." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 499 (1991). Plaintiff's only allegations on this front are, once again, formulaic and insufficient. *See* AC ¶ 636 ("Defendants acted with actual malice, as they knew that the Plaintiff was not colluding with Russia."); *id.* ¶ 652 ("Defendants knew that the statements were false at the time they made then [*sic*]."). Such allegations plainly do not pass the plausibility threshold. *See Turner v. Wells*, 879 F.3d 1254, 1273–74 (11th Cir. 2018) (affirming dismissal of defamation claim due to plaintiff's conclusory allegations about actual malice).

### 3.    The Conspiracy Claim (Count IV) Fails Because the Underlying Claim Fails and Because the Conspiracy is Inadequately Pleaded.

Plaintiff cannot salvage his meritless injurious falsehood claim by repackaging it as a claim for conspiracy to commit an injurious falsehood. "An actionable conspiracy requires an actionable underlying tort or wrong." *Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1345 (S.D. Fla. 2018). Because the underlying tort claim fails, the Court should dismiss the conspiracy claim as well. Independently, Plaintiff asserts the existence of a conspiracy in only the most conclusory terms,

---

[17] Plaintiff relies on the tweet and incorporates it by reference, AC ¶ 268 & n.190, and the Court may therefore take judicial notice of it, *see* n.3, *supra*. The tweet is available at https://tinyurl.com/4632k4db. The Court also may judicial notice the October 31, 2016 *Slate* article on which the campaign statement was explicitly predicated, *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 812 (11th Cir. 2015), and which is also incorporated into the AC, *see* AC ¶¶ 261–65. The article is available at https://tinyurl.com/mtp4sxh3.

without the supporting facts necessary to state a claim. *See Alhassid v. Bank of Am.*, 60 F. Supp. 3d 1302, 1316 (S.D. Fla. 2014). This independently requires dismissal of the conspiracy claim.

### D. Plaintiff Fails To Plead a Claim for Malicious Prosecution (Count V) or for the Related Conspiracy Claim (Count VI).

Under Florida law, a plaintiff claiming malicious prosecution must establish: (1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination in favor of the plaintiff; (4) an absence of probable cause for the original proceeding; (5) malice on the part of the defendant; and (6) damages resulting from the original proceeding. *Melford v. Kahane & Assocs.*, 371 F. Supp. 3d 1116, 1123–24 (S.D. Fla. 2019). Plaintiff pleads none of these elements.

The AC fails to satisfy the first element because it identifies no "judicial proceeding" against Plaintiff, let alone one that terminated in his favor. Counts V and VI allege that some of the undersigned Defendants induced or conspired to induce the Crossfire Hurricane investigation. *See* AC ¶¶ 669–71, 680–82. And he blames the *federal* defendants for allegedly causing certain "*extrajudicial* FISA surveillance," as well as "the Mueller investigation," and "other related investigations regarding the alleged Trump-Russia connection." AC ¶ 674 (emphasis added). But none of these investigations amounts to a "judicial proceeding" because none is a civil or criminal lawsuit, and "[a]n action for malicious prosecution . . . [can] never occur outside the context of litigation." *Fischer v. Debrincat*, 169 So. 3d 1204, 1209 (Fla. 4th DCA 2015); *see also United States v. Peterson*, 627 F. Supp. 2d 1359, 1370 (M.D. Ga. 2008) (wiretap investigation not a judicial proceeding). The AC fails to allege that any of these investigations became a civil or criminal case, and therefore the malicious prosecution claim fails as a matter of law. *See Valladares v. Bank of Am. Corp.*, 197 So. 3d 1, 10 (Fla. 2016).

Even if Crossfire Hurricane were a judicial proceeding, Plaintiff was not the subject of that investigation—the only investigation he even attempts to link to Defendants Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele, and Joffe. AC ¶¶ 670–71. The AC sometimes

calls Crossfire Hurricane an "investigation into Donald J. Trump," *id.* ¶¶ 414, 418, 447; *see also id.* ¶¶ 351, 416, 441 (similar terminology), but these conclusory allegations are inconsistent with the AC's own description of the investigation.  As alleged in the AC, the FBI opened individual cases into Carter Page, George Papadopoulous, and Paul Manafort, all of whom were "associated with the Trump Campaign," and into Michael Flynn, who later served as Plaintiff's National Security Advisor.  *Id.* ¶¶ 345, 386.  But the AC nowhere explains when, how, or even if the Crossfire Hurricane investigation broadened to include Plaintiff personally—instead conflating an investigation into Plaintiff's campaign and associates with an investigation into Plaintiff himself. The AC thus fails to plausibly allege any judicial proceeding "against the present plaintiff," *Debrincat*, 217 So. 3d at 70, and the malicious prosecution claim must be dismissed.

The AC also fails to allege the second and fourth elements of a malicious prosecution claim—that the Defendants were the legal cause of the judicial proceeding and that the alleged proceeding suffered from an absence of probable cause.  If anything, the AC's allegations undermine the conclusions that Defendants were the "legal cause" of the Crossfire Hurricane investigation and that the FBI lacked "probable cause" in initiating it.  *See Debrincat*, 217 So. 3d at 70.  As discussed at page 17, *supra*, the Department of Justice's Inspector General concluded that the FBI opened Crossfire Hurricane "for an authorized purpose" and "with adequate factual predication" that had nothing to do with any Defendant.  Ex. 1 at 347.  In particular, the IG Report explains that the investigation was *not* predicated on DNS information or the Steele Dossier, but on a tip from a friendly foreign government.  *Id.* at 346.

Finally, the AC fails to satisfy the third element of a malicious prosecution claim because there is no plausible allegation that any investigation supposedly instigated by Defendants terminated in Plaintiff's favor.  "That element is satisfied by either a favorable decision on the merits or a bona fide termination of the proceedings," that is, "a good faith nolle prosequi or declination to prosecute." *Union Oil of Cal. v. Watson*, 468 So. 2d 349, 353 & n.3 (Fla. 3d DCA 1985).  Plaintiff does not adequately allege that Crossfire Hurricane terminated in his favor.  And his cursory attempt to rely on the supposed conclusions of the Mueller investigation to show

favorable termination, *see* AC ¶ 460, fails because that is a different investigation from the one at issue in his malicious prosecution claim. *Cf. id.* ¶¶ 674, 686 (alleging that other Defendants caused the Mueller investigation). Moreover, the Mueller investigation also did not conclude with "a favorable decision on the merits" as to Plaintiff's innocence. *See Union Oil*, 468 So. 2d at 353. The Mueller Report explicitly states that while it does not affirmatively conclude Plaintiff committed a crime, "it also *does not exonerate him*." Office of Special Counsel, U.S. Dep't of Justice, 2 *Report on the Investigation into Russian Interference in the 2016 Presidential Election* 1–2 (2019) (cited at AC ¶ 460) (emphasis added).[18]  This conclusion was neither "on the merits" nor "favorable" toward Plaintiff. *See Union Oil*, 468 So. 2d at 353.

As with the injurious falsehood claim, the claim for conspiracy to commit malicious prosecution (Count VI) fails both because the underlying claim fails, and because the conspiracy is asserted only in a purely conclusory fashion. *See* p. 23, *supra*.

### E.  Plaintiff Fails To State a Claim Based on Defendants' Alleged Use of DNS Data.

Three of Plaintiff's claims arise from the allegation that certain Defendants wrongfully "exploited" their access to DNS data to uncover "derogatory" information about Plaintiff. *See* AC ¶¶ 697, 706–20, 727–34. On this basis, Plaintiff attempts to plead claims under three different federal statutes:  the CFAA, 18 U.S.C. § 1030(a); the DTSA, 18 U.S.C. § 1832; and the SCA, 18 U.S.C. §§ 2701–12. Each of these claims is rooted in the false premise that DNS data is "non-public" or "proprietary." AC ¶ 142. It is neither. As explained at pages 10–11, *supra*, companies that provide DNS resolution services have a view into "all the web sites" a user visits. ACLU, *supra*. Simply stated, "DNS data is meant to be public." NIST, *supra*, at iii.

---

[18]  The Mueller Report itself, not Attorney General Barr's letter to Congress summarizing its conclusions, *see* AC ¶ 461 & n.244, is the best evidence of the Report's contents. Indeed, Mueller issued his own letter asserting that Barr's summary letter "did not fully capture the context, nature, and substance" of the Special Counsel's investigatory conclusions. *See* Devlin Barrett & Matt Zapotosky, *Mueller Complained that Barr's Letter Did Not Capture "Context" of Trump Probe*, Wash. Post (Apr. 30, 2019).

##### 1.   Plaintiff Has No Claim Under the Computer Fraud and Abuse Act (Count VII).

Congress enacted the CFAA primarily as a criminal statute to punish computer hacking, and allowed private civil actions only under a "narrow set of circumstances." *St. Johns Vein Ctr., Inc. v. StreamlineMD LLC*, 347 F. Supp. 3d 1047, 1057 (M.D. Fla. 2018). To state a civil claim under the CFAA, a plaintiff must allege: (1) the "defendant intentionally accessed a protected computer," (2) "without authorization or exceeding authorized access," (3) thereby obtaining information, and (4) causing certain types of "damage or loss of at least $5,000.00." *777 Partners LLC v. Pagnanelli*, No. 20-cv-20172, 2021 WL 2038175, at *4–5 (S.D. Fla. Mar. 8, 2021) (citing 18 U.S.C. § 1030(g)). Here, Plaintiff fails to plead facts to establish the second and fourth elements. Accordingly, Count VII should be dismissed.

The "without authorization" element requires a CFAA plaintiff to show that a defendant accessed "information located in particular areas of the computer—such as files, folders, or databases—that are off limits" to him. *Van Buren v. United States*, 141 S. Ct. 1648, 1652, 1662 (2021). Thus, the Act does not extend liability to individuals who "have improper motives for obtaining information that is otherwise available to them." *Id.* at 1652; *see also Armor Corr. Health Servs., Inc. v. Teal*, No. 19-cv-24656, 2021 WL 5834245, at *27 (S.D. Fla. Dec. 8, 2021) (executive did not violate CFAA by accessing his employer's systems despite executive's intent to use the information to compete against employer). Notwithstanding the conclusory (and inflammatory) allegation that certain Defendants were hired to "hack servers," AC ¶ 69, Plaintiff's claim ultimately boils down to the assertion that certain Defendants used DNS data that was already available to them. *See, e.g., id.* ¶ 212 ("Joffe had exploited his access to non-public data."). Even accepting as true Plaintiff's claim that the relevant Defendants acted with "nefarious" purposes, *id.* ¶ 703,[19] such actions do not equate to accessing files that are "off limits," which the CFAA requires. *Van Buren*, 141 S. Ct. at 1662.

---

[19] Defendants deny that there was anything "improper" about their motives, given that communications to the U.S. government about potential links between a presidential candidate

Plaintiff's claim also fails because the harm for which he seeks recovery—lost profits to his business interests, loss of trade secrets, and the cost of "defending himself against federal investigations," AC ¶ 705—is not recoverable under the CFAA. Congress deliberately limited the definition of a compensable "loss" to (1) the reasonable cost of responding to a hack and restoring the affected data and (2) lost revenues or costs incurred because of an interruption in service. *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1174 (11th Cir. 2017). Although Plaintiff parrots this statutory language, the allegation that he incurred costs in excess of $5,000 for "investigating and responding to the unauthorized access," AC ¶¶ 702, 705, is devoid of any factual support. And his claimed pecuniary losses to his business interests (due to the publication of unflattering information) are entirely unsupported by the AC, and well outside the statute's bounds. *See Mortg. Now, Inc. v. Stone*, No. 09-cv-80, 2010 WL 11519201, at *5 (N.D. Fla. Sept. 29, 2010) ("lost profits" untethered to an "interruption of service" "do not constitute loss under the CFAA"); *Resdev, LLC v. Lot Builders Ass'n, Inc.*, No. 04-cv-1374, 2005 WL 1924743, at *2–5 (M.D. Fla. Aug. 10, 2005) (rejecting argument that "loss" covers lost value of a trade secret); *Nexans Wires S.A. v. Sark–USA, Inc.*, 319 F. Supp. 2d 468, 477–78 (S.D.N.Y. 2004) (concluding that loss of business from defendant's use of proprietary information was not covered by CFAA).

Because Plaintiff's allegations do not fall within the CFAA's definitions of "unauthorized access" or "damage or loss"—each of which is an independent statutory requirement—this Court should dismiss Count VII with prejudice. *See Van Buren*, 141 S. Ct. at 1662.

### 2. Plaintiff Has No Claim Under the Defend Trade Secrets Act (Count VIII).

Plaintiff has failed to state a claim under the DTSA for all the reasons stated above at pages 9–11, *supra*, especially because DNS data does not constitute a trade secret.

### 3. Plaintiff Has No Claim Under the Stored Communications Act (Count IX).

---

and a foreign power fall squarely within the protections afforded to "petitioning" activity under the *Noerr-Pennington* doctrine. *See Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1316, n.65 (11th Cir. 1998); pp. 41–42, *infra*.

Congress enacted the SCA to ensure that historical Fourth Amendment privacy protections over personal communications extended to internet users' personal information stored in "large data banks," such as internet service providers. *See In re Google Inc.*, 806 F.3d 125, 147 (3d Cir. 2015); *In re Facebook, Inc. Internet Tracking Litig.,* 956 F.3d 589, 598 (9th Cir. 2020).[20]  In this regard, the SCA closely resembles the CFAA as an anti-hacking measure, but differs principally because it applies exclusively to communications kept by internet service providers or similar storage facilities. *See United States v. Cioni*, 649 F.3d 276, 282 (4th Cir. 2011); *United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003) (SCA does not apply to information stored on a personal hard drive). To state a claim under the SCA, a plaintiff must allege, among other things, that the defendant intentionally accessed such a facility—either without authorization or in excess of authorization—and thereby obtained unauthorized access to private communications. *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1200 (9th Cir. 2022). Consistent with Congress' focus on privacy protections, the statute expressly exempts from civil liability any access—even if unauthorized—to electronic communications that are "readily accessible to the general public." 18 U.S.C. § 2511(2)(g)(i). Again, Plaintiff does not and cannot plead the required elements of a claim.

As an initial matter, Plaintiff does not allege that there was any intrusion into a "facility." As noted above, the SCA imposes liability only to unauthorized intrusions of facilities "through which an electronic communication service is provided,"—*i.e.*, internet or network service providers—*not* personal devices or organizational servers. *See Steiger*, 318 F.3d at 1049 (SCA does not apply to information on personal hard drive); *Garcia v. City of Laredo*, 702 F.3d 788, 793 (5th Cir. 2012) (SCA does not apply to texts and pictures on cell phone). Although Plaintiff alleges intrusion into multiple different locations—*i.e.*, private, EOP, and Trump Organization computers

---

[20]  The SCA has a "narrow scope" and is "not a catch-all statute designed to protect the privacy of stored Internet communications." Orin S. Kerr, *A User's Guide to the Stored Communications Act, and A Legislator's Guide to Amending It*, 72 Geo. Wash. L. Rev. 1208, 1214 (2004).

and servers, *see, e.g.*, AC ¶¶ 695–97, 729—none of these is a "facility" within the scope of the SCA.

Plaintiff's claim also fails because—as was the case for Plaintiff's DTSA claim—the information at issue is DNS data, which is indisputably public. Like the DTSA, the SCA does not impose liability for accessing data in the public domain. 18 U.S.C. § 2511(2)(g)(i). In addition, DNS data are not "electronic communications" under the SCA, as they do not reveal the underlying contents of any communications.[21] *See In re Facebook, Inc. Internet Tracking Litig.,* 956 F.3d at 609 (holding URLs are not protected under the SCA); *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) (IP addresses are not "contents" of communications under the SCA because they "do not [] reveal any more about the underlying contents of communication than do phone numbers").

Further, Plaintiff's claim fails because he pleads no factual or legal explanation as to how DNS data is "in electronic storage" within the meaning of the SCA. 18 U.S.C. § 2701(a). The allegation that Defendants obtained (unidentified) communications from "the Computers that were in electronic storage in such systems," AC ¶ 730, is plainly insufficient. *See Integrated Waste Sols., Inc. v. Goverdhanam*, No. 10-cv-2155, 2010 WL 4910176, at *6–7 (E.D. Pa. Nov. 30, 2010) (finding proprietary information stored on business's computer was not in "electronic storage"). Moreover, "electronic storage" "encompasses only the information that has been stored by an electronic communication service provider," and does not include emails stored on a computer, nor on Trump or EOP servers. *See Garcia*, 702 F.3d at 793.

### F. The Agency and Respondeat Superior Counts Should Be Dismissed Because the Underlying Claims Fail on the Merits (Counts X–XVI)

Plaintiff's claims against Clinton on an agency theory of liability and his claims against Perkins Coie, the DNC, HFACC, Fusion GPS, Neustar, Inc., and Neustar Security Services on a

---

[21] The "communications" that most often serve as the basis of SCA claims are personal emails. *See, e.g.*, *Vista Mktg., LLC v. Burkett*, 812 F.3d 954, 963–64 (11th Cir. 2016); *Brown Jordan Int'l, Inc. v. Carmicle*, No. 14-cv-60629, 2016 WL 815827, at *2 (S.D. Fla. Mar. 2, 2016). Of course, Plaintiff brings no claim based on unauthorized access to emails. His only factually supported allegations relate exclusively to DNS data.

respondeat superior theory should be dismissed.  "Respondeat superior is not an independent cause

of action."  *Colite Int'l Inc. v. Robert L. Lipton, Inc.*, No. 05-cv-60046, 2006 WL 8431505, at *12

(S.D. Fla. Jan. 20, 2006); *see also Barabe v. Apax Partners Eur. Managers, Ltd.*, 359 F. App'x 82,

84 (11th Cir. 2009) (*per curiam*) (holding that plaintiff's agency claim was not an "independent

cause[] of action").  "Rather, it is a legal theory that presupposes the existence of an underlying

claim and assesses liability . . . because of a certain status." *Colite*, 2006 WL 8431505, at *12.

Because the underlying substantive claims each fail on the merits, Plaintiff cannot maintain

standalone claims for agency or vicarious liability. *See, e.g.*, *Anderson v. Ahluwalia*, No. 21-cv-

60793, 2022 WL 850000, at *8 (S.D. Fla. Feb. 28, 2022); *Wilder*, 2018 WL 5629922, at *5.

## III.   PLAINTIFF'S FACTUAL ALLEGATIONS AS TO INDIVIDUAL DEFENDANTS ARE INSUFFICIENT.

The arguments set forth above fully dispose of Plaintiff's claims against all undersigned

Defendants.  Beyond the substantive flaws with each cause of action, the AC lacks specific factual

allegations linking particular Defendants to the elements of the alleged torts.  The allegations

regarding specific Defendants are for the most part conclusory and vague.  These "formulaic

recitation[s] of the elements of a cause of action," and "legal conclusions" are the type of fact-free

pleading this Court is required to reject. *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007);

*Iqbal*, 556 U.S. at 678.

### A.   Clinton and Clinton Campaign Defendants (Podesta, Mook, Sullivan, and HFAA)

After Donald Trump won the 2016 Presidential election, the Clinton campaign apparatus

was quickly disbanded, and HFAA ceased to operate as a legal entity.[22]  The candidate, her

campaign chair John Podesta, her campaign manager Robert Mook, and her national security

advisor Jake Sullivan went their separate ways.  Despite the prolixity of the AC, Plaintiff has not

---

[22] Lawyers for HFAA signed a Conciliation Agreement with the Federal Election Commission earlier this year, paying an $8000 fine for record keeping violations but not conceding the FEC's allegations.

really alleged otherwise, as the claims made in the AC against these Defendants relate almost[23] entirely to the events of 2015, 2016, and 2017.  For all the reasons already explained above, they fail.

***Hillary Clinton.***  Plaintiff's pleading as to the candidate flunks both the traditional and the heightened fraud standards.  The *only* factually supported allegations concerning Clinton in the lengthy AC are that she declared her candidacy for president on April 12, 2015, AC ¶ 47; she won the Democratic Party nomination for president on July 26, 2016, *id.* ¶ 161; she tweeted twice regarding reported computer connections between Trump and Alfa Bank on October 31, 2016, *id.* ¶¶ 265, 269; and she made four subsequent brief statements regarding Plaintiff and Putin, *id.* ¶¶ 519–22, in 2019, 2021, and 2022.

The remainder of the allegations about Clinton are purely conclusory:  that she "orchestrated" schemes, AC ¶ 1, "exerted" "control over" others, *id.* ¶ 61, "conceived and funded" Defendants' "numerous tortious and criminal acts," *id.* ¶ 64, "was 'aware of . . .'" Christopher Steele's reporting, ¶ 102, "direct[ed]" activities, *id.* ¶ 103, that others acted "at [her] behest," *id.* ¶ 207, and that she otherwise masterminded each element of Defendants' alleged wrongdoing through agents and intermediaries, *see generally id.* ¶¶ 735–60 (alleging a cause of action for "Agency" against Clinton).

***John Podesta.***  The limited facts pertaining to John Podesta allegedly occurred no later than 2017, and according to the AC, "at all relevant times herein, [he] was acting within the scope of his employment with the Clinton Campaign." AC ¶ 23.  Podesta is alleged to have received an email from the Campaign's lawyer about Alfa Bank in September 2016, but there are no other specifics regarding the content of that email.  *Id.* ¶ 203.  He is alleged to have participated in a conversation regarding Alfa Bank, but there is no allegation concerning who said what.  *Id.* ¶ 247.  He is alleged, without more, to have participated in the decision to "give [the Alfa Bank

---

[23] The AC cites four brief statements by Clinton made in 2019, 2021, and 2022, allegedly about Trump and Putin, although the last does not even refer to Trump.  *See* AC ¶¶ 519–22.  These statements fall within two years of the AC's filing, but any claims based on them plainly fail on the merits.  *See supra*, pp. 19–22.

allegations] to a reporter." *Id.* ¶ 250. And the AC alleges that, when Podesta was himself a victim of Russian hacking, he publicly complained about it. *Id.* ¶ 276. Finally, the AC alleges that Podesta and Jake Sullivan met in February 2017 with Dan Jones (not a defendant) and with Glenn Simpson and Peter Fritsch, who asked Podesta to "help the trio open doors to big Democratic fundraisers and sit down for press interviews and documentaries regarding any 'new developments' uncovered by" Christopher Steele. *Id.* ¶ 313. Even ignoring the statute of limitations bar, nothing in these allegations can remotely support liability on any of the claims made in the AC.[24]

*Robert Mook.* Mook is named as a defendant in only three of the sixteen counts asserted in the AC: RICO Conspiracy (Count II), Conspiracy to Commit Injurious Falsehood (Count IV), and Conspiracy to Commit Malicious Prosecution (Count VI). At the outset, the most recent allegation concerning Mook dates to October 2016. AC ¶¶ 245–53. The four-year statute of limitations for conspiracy, *see* p. 6, *supra*, therefore expired by October 2020, long before Plaintiff filed this action.

On the substance, none of the allegations shows Mook participated in an actionable conspiracy. The sole facts alleged as to Mook are that he (*i*) exchanged emails with Elias that Plaintiff speculates—based solely on the email's subject line, "Alfa article"—were about a supposed "plot to falsely connect Donald J. Trump to the Russian bank, Alfa Bank, by disseminating the lies to the media," AC ¶¶ 203, 583(j); (*ii*) discussed the "Trump-Alfa Bank connection" with Elias and members of the Clinton Campaign and decided to give the information to a reporter, *id.* ¶¶ 245–53, 583(r); and *(iii)* discussed sharing the information with the media with

---

[24] In an apparent effort to sidestep the obvious statute of limitations barriers to his lawsuit, Plaintiff has vaguely referred to First Amendment protected public criticism of the Plaintiff that was first published in March 2017 and is still accessible on a website entitled the Moscow Project, which was established by the nonprofit, Center for American Progress (CAP). AC ¶¶ 499, 500. Lacking specifics regarding actions by any individual, the AC makes conclusory allegations seeking to link Podesta's alleged corporate role as Chair at CAP, and CAP's quintessential political expressive conduct, to the far-flung conspiracy alleged to include Podesta and his 30 codefendants who are not alleged to have anything to do with CAP. None of CAP's First Amendment protected activity can be actionable as part of an illegal conspiracy. Certainly none of CAP's activity, protected or not, can give rise to individual liability for Podesta.

Clinton, *id.* ¶¶ 252, 583(q). Even assuming Mook agreed to share information with the press, such conduct is not illegal, and a defendant "cannot be found guilty of conspiring to commit an act that is not itself against the law." *Jackson*, 372 F.3d at 1269. The AC also fails to allege that Mook believed the information about the connection between Alfa Bank and the Trump Organization was false or that he entered into an agreement to disseminate information he believed to be false. AC ¶¶ 248–49 (quoting Mook Tr. 1253:22–1254:10, 1264:20–24). The only allegation that comes close is facially inadequate to support this count and is based on a mischaracterization of Mook's testimony.[25]

The conspiracy to commit malicious prosecution claim (Count VI) also fails because the AC only lists Mook in the heading for Count VI and does not include any facts alleging that he had knowledge of or involvement in any effort to persuade the FBI or the Department of Justice to investigate (much less prosecute) Plaintiff.

***Jake Sullivan.*** The AC's sole allegations with respect to Sullivan fare no better. The allegations are that he spoke with reporters and news outlets about reported ties between Plaintiff and a Russian bank, *id.* ¶¶ 164–67, 250; "exchanged emails," *id.* ¶ 203, "had several conversations" about, *id.* ¶ 247, and published a campaign statement on the same subject, *id.* ¶¶ 265, 267; and that he attended a meeting, *id.* ¶ 313. The AC also suggests that Sullivan "directed" Joffe to undertake certain tasks, *id.* ¶ 141(c), but provides no factual support for this conclusory allegation. These flimsy allegations, even if accepted as true (and they are not), are insufficient to make out any of the claims asserted against Sullivan.

---

[25] The AC implies that Mook thought that the "veracity of the information" about "the Trump-Alfa Bank allegations" was "highly suspect." AC ¶ 248 (quoting Mook Tr. 1253–54, 1282). The "highly suspect" quotation came from a different line of questioning 30 pages later in the transcript, in which Mook testified that he believed the possible connection between Trump Tower and Alfa Bank was "highly suspect"—not the veracity of the information—and that "if it was something troubling, yes, we wanted the American people to know about it." Mook Tr. 1282:7–12; *see also id.* 1254 ("if it was true that there was some sort of passage of information between Trump Tower and a bank in Russia owned by an oligarch which is a main supporter of Vladimir Putin, that's obviously incredibly alarming and concerning, and that's probably something the American people should know when they're thinking about how they're going to vote"). Similarly, the AC's characterization of the Alfa Bank allegations as "false" has no support in the cited testimony. AC ¶ 252 (citing Mook Tr. 1267, 1274).

With respect to the injurious falsehood claim (Count III), which is predicated on a campaign statement discussing reporting in *Slate* about Plaintiff's ties to a Russian bank, *id.* ¶ 265, Plaintiff asserts in summary fashion that the multi-paragraph statement is "false," *id.* ¶¶ 635, 637, but offers no factual allegations to support this "formulaic recitation of [an] element[]" of his claim. *Chaparro*, 693 F.3d at 1337. The AC does not even do the minimum work of identifying which portion of the statement is supposedly false.[26] For this reason and those discussed at pages 19–22, *supra*, the injurious falsehood claim should be dismissed as to Sullivan.

As for the conspiracy claims in which Sullivan is named (Counts II, IV, and VI), the AC is devoid of any factual allegations that Sullivan entered into an agreement to commit any of the alleged underlying offenses. The AC summarily asserts in each Count that there was a meeting of the minds or a criminal conspiracy, and the AC's references to purported interactions between Sullivan and other Defendants are both sparse and conclusory. *See id.* ¶ 147 (Sullivan is a "VIP" who "directed" Joffe), ¶ 203 (exchanged emails with other Defendants), ¶ 247 ("had several conversations with" other Defendants), ¶ 250 (along with other Defendants, engaged with the media), ¶ 267 (received "assistance" from Elias); ¶ 268 (Clinton tweeted Sullivan's statement); ¶ 313 ("accompanied Podesta to [a] meeting"). Nowhere does the AC spell out how these interactions (the *sole* interactions between Sullivan and other Defendants cited in the AC) could possibly amount to an agreement to commit an unlawful act—and they do not. "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Alhassid*, 60 F. Supp. 3d at 1319. For these reasons and those discussed at pages 19, 23, and 25, *supra*, the conspiracy claims should be dismissed as to Sullivan.

---

[26] To the extent Plaintiff challenges the sentence about a federal investigation, he has misconstrued the statement. Specifically, whereas the statement says "*we can only assume* that federal authorities will now explore this direct connection between Trump and Russia as part of their existing probe into Russia's meddling in our elections," Plaintiff alleges the statement says that "federal authorities *were investigating*" the connection. AC ¶ 265 (emphases added). Plaintiff cannot make out a claim by transforming an "assum[ption]" into a definitive statement.

*HFAA.*  Because the plaintiff's case against HFAA is only as good as the case against the individuals who acted for the campaign—the candidate, her campaign chair John Podesta, her campaign manager, Robert Mook, and her national security advisor, Jake Sullivan—the claims against HFAA must also be dismissed.

## B.    DNC and Debbie Wasserman Schultz

The arguments set forth in Parts I and II fully dispose of all of Plaintiff's claims against the Democratic National Committee, DNC Services Corp. (together, "DNC") and Debbie Wasserman Schultz.  These claims, however, also fail for several additional reasons.

*RICO (Count I).*  Plaintiff does not plausibly allege that the DNC participated in the purported enterprise, let alone participated through a pattern of racketeering activity, as required by the RICO statute.  18 U.S.C. § 1962(c); *see Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (holding that "one must have some part in directing" the enterprise to be liable under the statute).  Plaintiff's allegations concerning the DNC's connection to the alleged racketeering activity are wholly conclusory.  *See, e.g.*, AC ¶¶ 103, 131, 208.  Indeed, Plaintiff's vague allegations that the DNC "directed" other alleged participants to commit predicate acts are contradicted in key respects by Plaintiff's own, more specific allegations.  For example, although Plaintiff alleges that Joffe acted to unlawfully exploit access to internet data at "at the behest of certain 'VIPs' of the Clinton Campaign and Perkins Coie," including "Clinton, Sullivan, Elias and/or Sussmann," *id.* ¶ 141, in the very next paragraph, the AC alleges that Joffe acted "at the direction of Clinton, the Clinton Campaign, the DNC, Perkins Coie, and Sussmann" *id.* ¶ 142.  Similarly, Plaintiff alleges that Sussmann met with the FBI's General Counsel "at the behest of Clinton, the Clinton Campaign, and the DNC," but in the very next sentence alleges that "he billed the Clinton Campaign for his efforts, as he had with all of his actions taken in furtherance of the Defendants' conspiracy."  *Id.* ¶ 207.  Black-letter principles prohibiting improper group pleading, *see, e.g., Libov v. Readix, Inc.*, No. 10-cv-61755, 2011 WL 13216996, at *1 (S.D. Fla. Sept. 8, 2011), mean that Plaintiff cannot simply "lump[] together all of the defendants in their allegations of fraud," *Ambrosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007) (affirming dismissal of civil

RICO claims). Plaintiff's failure "to describe the who, what, when, where, and how" of the DNC's participation in the alleged racketeering activity, with specificity, is fatal to his RICO claim against the DNC. *Cisneros*, 972 F.3d at 1217 (affirming dismissal of federal RICO claims).

***Injurious Falsehood (Count III).*** Plaintiff alleges "Schultz appeared on MSNBC and boldly announced that there were 'clear indications' that Donald J. Trump colluded with Russia." AC ¶ 503. Any claim based on this allegation should be dismissed because it "fail[s] to provide an adequate description of the statements." *Malhotra v. Aggarwal*, No. 17-cv-24407, 2019 WL 3425161, at *2 (S.D. Fla. July 30, 2019). Plaintiff also alleges that Wasserman Schultz stated on CNN, "[W]ith every passing day, it gets more and more disturbing, and more and more evidence that there was collusion. . . . Donald Trump should be the first person asking for one, but since I think he likely was part of it, it's not surprising that hasn't happened." AC ¶ 648. Any claim based on this claim is time-barred because, on its face, it occurred before Special Counsel Robert Mueller was appointed in May 2017. *See id.* ("Donald Trump should be the first person asking for one"— *i.e.*, an investigation into allegations of Russian collusion). In the alternative, it fails because Plaintiff "fail[s] to provide an adequate description of the . . . time frame" in which the statement was made. *Malhotra*, 2019 WL 3425161, at *2.

***Conspiracy to Commit Malicious Prosecution (Count VI).*** Plaintiff offers no factual allegations indicating Wasserman Schultz had interactions with any of the other alleged conspirators, let alone any factual allegations to support the conclusion that Wasserman Schultz agreed to join a conspiracy "to feed false and/or misleading information to the FBI and the DOJ," AC ¶ 682, other than the conclusory allegation that Wasserman Schultz and eleven other defendants supposedly "had a meeting of minds," *id.* ¶ 680. This conclusory allegation is insufficient to support a claim for conspiracy.

***Computer Fraud and Abuse Act (Count VII).*** Plaintiff alleges the DNC "conspired with Neustar, Inc., and/or Neustar Security Services, and Joffe in *their* commission" of acts allegedly violating the CFAA. AC ¶ 701 (emphasis added). But this stretches civil liability beyond the bounds of the statute. As a general rule, courts do not read civil secondary liability into laws that

do not provide for it. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994). And here, there is no basis to expand liability under the CFAA, which expressly limits its private right of action to suits "against the violator." 18 U.S.C. § 1030(g); *see Agilysys, Inc. v. Hall*, 258 F. Supp. 3d 1331, 1344 (N.D. Ga. 2017).

Moreover, Plaintiff does not allege sufficient facts to establish "an agreement to violate the law," as is required in order to state a claim for conspiracy in any event. *Coll Builders Supply, Inc. v. Velez*, No. 17-cv-933, 2017 WL 4158661, at *10 (M.D. Fla. Aug. 31, 2017) (dismissing CFAA conspiracy claim based on allegations that one defendant acted "at the behest of and on the behalf of" another defendant), *report and recommendation adopted*, No. 17-cv-933, 2017 WL 4125641 (M.D. Fla. Sept. 18, 2017).[27]

***Theft of Trade Secrets (Count VIII).*** There is no private right of action for conspiracy claims based on theft of trade secrets, Plaintiff's sole relevant claim against the DNC. *See* AC ¶ 724. Instead, "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). The statutory provision at issue does not expressly provide for a private right of action; nor can one be implied in light of the substantial criminal enforcement mechanism in the statute. *See, e.g., Love v. Delta Air Lines*, 310 F.3d 1347, 1357 (11th Cir. 2002). While a *separate* provision of the DTSA does provide for a private right of action to obtain "an order providing for the seizure of property necessary to prevent the propagation or dissemination of the trade secret that is the subject of the action," that cause of action is limited to civil actions under that subsection. *Id.* § 1836(b). Accordingly, "the weight of authority tips against the viability of conspiracy claims based on misappropriation of trade secrets under" 18 U.S.C. § 1832. *NW Monitoring LLC v. Hollander*, 534 F. Supp. 3d 1329, 1338 (W.D. Wash. 2021); *see also, e.g., Genentech, Inc. v. JHL Biotech, Inc.*, No. 18-cv-06582, 2019 WL

---

[27] In *Coll Builders*, the court noted that "it remains a somewhat unsettled question of law as to whether a civil defendant may be held liable for attempting or conspiring to violate the CFAA." 2017 WL 4158661, at *6. This Court should reject civil liability for conspiracy to violate the CFAA for the reasons explained herein.

1045911, at *12 (N.D. Cal. Mar. 5, 2019); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 271 F. Supp. 3d 835, 840–44 (E.D. Va. 2017).

*Respondeat Superior (Count XII).* The AC is bereft of any factual allegations establishing that Wasserman Schultz was acting within the scope of her employment when she undertook the actions described in the AC. Under Florida law, an employee's conduct is within the scope of his employment—as required for a theory of respondeat superior—only where, among other things, the conduct "occurred within the time and space limits of the employee's employment." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009). However, Plaintiff's own allegations make it clear that Wasserman Schultz had already resigned as Chair of the DNC on July 28, 2016, AC ¶ 18, well before she made the alleged statements concerning Plaintiff on MSNBC and CNN.

### C.   Perkins Coie and Former Partners Marc Elias and Michael Sussmann

Plaintiff's assertion that Perkins Coie LLP, Marc Elias, and Michael Sussmann form part of an ongoing RICO enterprise or conspiracy lacks any factual support—neither Elias or Sussmann even remains a partner at the firm.[28] For both the reasons given above and the more specific pleading failures detailed below, all claims against these Defendants should be dismissed.

*Perkins Coie.* The new RICO allegations concerning Perkins Coie (Counts I and II) lack substance. Plaintiff has inexplicably elevated Perkins Coie, a bit player in the original AC, to "the central hub that coordinated and oversaw the day-to-day operations" of the RICO enterprise, with the role of "devising, coordinating, and overseeing" the enterprise's affairs. AC ¶ 534. But these are mere "labels and conclusions," devoid of any supporting facts. *Iqbal*, 556 U.S. at 678. Stripped of this self-serving rhetoric, the AC alleges only that Perkins Coie served as general counsel to the Clinton campaign and the DNC and as counsel to Neustar and Joffe, AC ¶¶ 46, 53, 133; hired Fusion GPS for services related to the campaign, *id.* ¶ 75; paid Fusion with funds reimbursed by the campaign or the DNC, *id.* ¶ 83; and had regular conference calls with its clients and with Fusion

---

[28] *Contra* Plaintiff's unsupported allegation, AC ¶ 494, Perkins Coie no longer serves as general counsel to the DNC.

with the expectation that these discussions would remain private, *id.* ¶¶ 84–85. In short, Perkins Coie conducted the ordinary business of a law firm.

The allegations that Perkins Coie performed legal services for the alleged enterprise do not suffice to state a RICO claim. "To establish a valid enterprise to sustain RICO liability, Plaintiff[] must prove that each party to the enterprise is separate and distinct from the other." *Kelly v. Palmer, Reifler, & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1378 (S.D. Fla. 2010). A law firm that provides "traditional legal services" or otherwise acts "as an agent" for the enterprise does not qualify as "a separate and independent entity" for RICO purposes. *Id.* at 1379. "A complaint that does no more than allege that a law firm performed legal work for an enterprise fails to state a violation of § 1962(c)." *Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 698–99 (7th Cir. 2021).

Plaintiff also has not plausibly alleged that Perkins Coie is vicariously liable for any supposed RICO violations by its former partners (Count XI). To recover under a respondeat superior theory in the RICO context, Plaintiff must plausibly allege that Perkins Coie "derive[d] some benefit from the RICO violation." *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1406 (11th Cir.), *modified on reh'g*, 30 F.3d 1347 (1994); *Am. Heritage Enters., Inc. v. Am. Paramount Fin., Inc.*, No. 10-cv-80921, 2011 WL 13225180, at *6 n.8 (S.D. Fla. July 5, 2011). Plaintiff nowhere even attempts to satisfy this requirement (nor could he).

The remaining vague and conclusory allegations that Perkins Coie "spearhead[ed] the scheme to find . . . proof of a sinister link" between Plaintiff and Russia, AC ¶ 3, "coordinate[d] a two-pronged plan to publicly and falsely denigrate" Plaintiff, *id.* ¶ 67, "did [its] best to proliferate the spread of those dubious and false claims," *id.* ¶ 6, and was "well aware [of] []Joffe's intention to feed false information to the FBI," *id.* ¶ 225, lack factual support and do not state a claim for conspiracy to commit injurious falsehood (Count IV). Similarly, Plaintiff's bare assertion that Perkins Coie and others "tasked Joffe to exploit his access to . . . non-public data of Neustar," *id.* ¶ 134, does not add up to a CFAA or DTSA claim (Counts VII and VIII).

**Marc Elias.** Plaintiff's claims against Elias are defective for all the reasons set forth above, but a few points specific to Elias merit focus. Plaintiff does not allege any conduct whatsoever by

Elias after October 31, 2016, *see* AC ¶¶ 265–67, rendering all claims against him untimely.  In addition, the allegations against Elias boil down to his alleged participation in calls and meetings with clients, their agents, and his former law partner, *see* AC ¶¶ 175, 178, 180–84, 195, 197—with few to no details about what those events entailed, if they even occurred.  These assertions and the conclusory allegation that Elias served as a "gatekeeper" between his clients and Fusion GPS, *id.* ¶ 81, reflect ordinary legal work, not a tort, conspiracy, or RICO enterprise.

Otherwise, as to Count I, Plaintiff has not alleged that Elias personally committed at least two RICO predicate acts.  *See Rodgers v. Addy*, No. 17-cv-23429, 2021 WL 4487903, at *4 (S.D. Fla. Sept. 27, 2021).  Plaintiff improperly lumps Elias in with other Defendants in alleging theft of trade secrets as a RICO predicate act, *e.g.*, AC ¶¶ 553–54; *see also* p. 36, *supra* (citing cases prohibiting improper group pleading), and tellingly does not assert a stand-alone trade secret claim against Elias.  For wire fraud, Plaintiff cites a single email from Elias, *id.* ¶ 583(j), but fails to identify anything about the email other than its subject line or explain (let alone with the required particularity) why this single email deceived him, or anyone, out of money or property.  For RICO conspiracy (Count II), Plaintiff pleads no facts showing that Elias entered "an illegal agreement to violate a substantive provision of the RICO statute." *Jackson*, 372 F.3d at 1269.  On malicious prosecution (Count V), there is no allegation whatsoever that Elias met with, spoke to, or interacted with any federal agents involved in the Crossfire Hurricane investigation.  Elias was therefore not a "legal cause" of any proceeding (let alone a judicial one) against Plaintiff. *See* p. 24, *supra*.  On the two conspiracy counts (Counts IV and VI), Plaintiff does not allege facts showing that Elias personally agreed to the alleged misconduct. *See Alhassid*, 60 F. Supp. 3d at 1316.

***Michael Sussmann.***  Plaintiff's allegations concerning Sussmann are disingenuous, at best.  The AC draws liberally from the one-count speaking indictment filed against Sussmann in an entirely separate case by Special Counsel John Durham, including its charge that Sussmann lied when he allegedly told the FBI that he was not acting "on behalf of any client" when he presented information concerning Plaintiff's possible ties to Alfa Bank.  AC ¶¶ 206, 486 & n.259.  But the AC omits that a *unanimous* jury *acquitted* Sussmann of that precise conduct. *See* n.12, *infra*.

Plaintiff also fails to mention the fact that many allegations he lifted from the indictment were never subject to any offer of proof at trial. *See, e.g.*, AC ¶ 135 (alleging various defendants intended to "falsify" DNS data); *id.* ¶ 142 (alleging defendants "exploited . . . access" to DNS data). And there is nothing to suggest that Plaintiff himself made any effort to independently investigate—let alone substantiate—these parroted (and unsuccessful) allegations. *See Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120, 126 (1989) (confirming an attorney has a "nondelegable responsibility" to "personally . . . validate the truth and legal reasonableness of the papers filed").[29] These allegations therefore provide no support for the numerous claims Plaintiff asserts against Sussmann (Counts I–VIII).

Plaintiff's claims against Sussmann all rest on the premise that Sussmann presented to the government evidence of potential ties between Plaintiff and Alfa Bank and that Plaintiff was harmed by the resulting federal investigation. *See, e.g.*, AC ¶¶ 524, 670.[30] Leaving aside their other defects, these allegations fall squarely within the protection afforded to First Amendment petitioning activity by the *Noerr-Pennington* doctrine. *See E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961). Specifically, *Noerr-Pennington* immunity allows a party to present grievances to the government—"regardless of intent or purpose"—without fear that those adversely affected by resulting government action can obtain civil redress. *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965). Because of its constitutional rooting, courts have applied *Noerr-Pennington* to reject both federal and state-law claims based on the results of a party's governmental petitioning. *See, e.g.*, *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1559, 1559–62 (11th Cir. 1992) (citing the doctrine's "First Amendment underpinnings"

---

[29] *See also In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005–06 (N.D. Cal. 2008) (holding that, in light of an attorney's obligation under Rule 11 "to conduct a reasonable factual investigation" before filing suit, "it would make little sense that an attorney somehow can rely on the analysis of attorneys in different actions" without "personally investigat[ing] their claims" (emphasis omitted)); *O'Rourke v. Dominion Voting Sys. Inc.*, 552 F. Supp. 3d 1168 (D. Colo. 2021) (sanctioning plaintiffs' counsel for not making adequate inquiry into factual allegations borrowed from complaints in failed cases).

[30] Plaintiff ties his injuries and resulting damages directly to harms flowing from the various investigations he identifies, to the express exclusion of reputational harms. AC ¶¶ 524–25.

and applying it to dismiss a state-law claim); *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Phillip Morris Inc.*, 196 F.3d 818, 826 (7th Cir. 1999) (dismissing a RICO action); *SilverHorse Racing, LLC v. Ford Motor Co.*, No. 16-cv-53, 2016 WL 7137273, at \*2–3 (M.D. Fla. Apr. 27, 2016) (collecting cases). And where, as here, a petition implicates "speech uttered during a campaign for political office," the First Amendment's protections are at their "fullest." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010). Accordingly, the *Noerr-Pennington* doctrine provides an independent basis for dismissing Plaintiff's claims against Sussmann.

### D.   Fusion GPS Defendants

The AC identifies no specific conduct by Fusion GPS, Glenn Simpson, or Peter Fritsch ("Fusion Defendants") in connection with the RICO claim (Count I) or the RICO conspiracy claim (Count II) except for the use of interstate wires for communications. AC ¶ 583. But the AC fails to plausibly allege that any of the Fusion Defendants' communications amount to wire *fraud*. Even accepting as true the allegation that they spread false information to the media, an allegation they vigorously dispute, allegedly "defrauding the media," *id.* ¶ 589, is not a violation of 18 U.S.C. § 1343; *see also* pp. 13–14, *supra*. As for the RICO conspiracy claim, the AC's allegations concerning the Fusion Defendants' meetings and coordination set forth—at most—only "parallel conduct" that can be "explained by lawful, independent . . . behavior" that "[does] not plausibly suggest an illegal conspiracy." *Am. Dental Ass'n*, 605 F.3d at 1289. "[A]n allegation of possible parallel conduct without any allegation of an agreement" does not amount to a RICO or RICO conspiracy violation. *Id.* at 1292–93 ("Simply specifying particular dates and contents of communications cannot automatically constitute a valid claim that a defendant violated 18 U.S.C. § 1962(c)."). The Fusion Defendants are alleged to have been hired to conduct research and to have met with the firm and lawyers who hired them, and to have attempted to share their research. This is not actionable, or even unusual conduct in the context of a presidential election. Thousands of other Americans were working in opposition to the Plaintiff's campaign in 2016. The AC singles out a subset of those opposed to Trump's campaign and labels their ordinary election-year campaigning and parallel conduct a conspiracy. The Fusion Defendants' alleged conduct amounts

to nothing more than "[l]egitimate conduct" in the context of political research operations, *id.* at 1295, to which the Plaintiff has applied "labels and conclusions," *Twombly*, 550 U.S. at 555.

### E.   Nellie Ohr and Bruce Ohr

The AC fails to identify specific conduct by Bruce or Nellie Ohr in connection with the RICO conspiracy claim (Count II).   The AC alleges that Nellie Ohr provided some "assistance" to certain other Defendants in creating the Steele Dossier, AC ¶ 103, and that Bruce Ohr provided a thumb drive of "opposition research" prepared by Nellie Ohr to the FBI, AC ¶ 288.   However, the AC makes no attempt to link these alleged actions to any RICO predicate.   The AC also alleges that Bruce Ohr and Nellie Ohr met with Defendant Christopher Steele in July 2016, at which time Steele discussed his work on the Steele Dossier. AC ¶ 169.   Again, however, the AC makes no attempt to tie this meeting to any RICO predicate.   In short, the AC offers, at best, conclusory allegations that Bruce Ohr and Nellie Ohr entered a RICO conspiracy with other Defendants.   In the RICO context (as well as in other contexts), "[c]onclusory allegations that Defendants conspired with each other are insufficient to survive a motion to dismiss." *Super Vision Int'l, Inc. v. Mega Int'l Com. Bank Co.*, 534 F. Supp. 2d 1326, 1343 (S.D. Fla. 2008).

### F.   Igor Danchenko

Danchenko is named in the AC for his alleged connection to the Steele Dossier.   AC ¶¶ 103–04.   That fact alone renders the claims against him meritless. *See* p. 24, *supra* (no causal link).   But in any event, Plaintiff alleges only that Danchenko "assembled and provided" information that was relied on to draft the Steele Dossier. *Id.* ¶ 110.   Danchenko is not alleged to have made any statements in the Steele Dossier or to have decided which statements it would include.   Plaintiff *implies* Danchenko provided information about Paul Manafort's departure from Plaintiff's presidential campaign, which Plaintiff alleges was provided to Danchenko by Dolan and then allegedly made its way to the Dossier. *Id.* ¶¶ 117–18.   Of course, Plaintiff does not allege this information about Manafort's resignation was false, and he conveniently overlooks that it was

widely reported prior to when he alleges Danchenko received an email about it.[31]  Furthermore,

just as the media's reporting on the goings-on of Plaintiff's political campaign was political speech

protected by the First Amendment, so it would have been for any Defendant.

The AC further asserts that the Steele Dossier provided support for Foreign Intelligence

Surveillance Act ("FISA") applications regarding Carter Page.  But Page is not a plaintiff here,

and Plaintiff cannot recover for any alleged injuries on his behalf.  In any event, Plaintiff does not

allege that Danchenko provided any information regarding Page, or that he had any awareness of

or anything to do with any FISA application.  AC ¶¶ 121–22.[32]  Furthermore, as with Manafort,

statements about Page would have been political speech protected by the First Amendment.

Finally, Danchenko could not have conspired with the alleged RICO Defendants.  AC

¶ 529.  He does not know them.  He has never met, communicated, or *agreed* with any of them

about anything.  This is why all of Plaintiff's allegations that Danchenko conspired with anyone

are conclusory and factually baseless:  "the RICO Defendants *conspired* with Danchenko in

connection with his conduct . . . ," *id.* ¶ 572 (emphasis added); "Danchenko stated, *at the direction

of and in coordination with* the RICO Defendants . . . ," *id.* ¶ 572(a) (emphasis added); "[t]he

RICO Defendants had a *meeting of the minds, common intent, were aware of, and conspired with*

. . . [lumping Defendants together, including] Danchenko," *id.* ¶ 573 (emphasis added).  Plaintiff

can allege no specifics.  There are none.

---

[31]  *Compare* AC ¶ 118 (alleged email dated Aug. 19, 2016) *with Social media erupts as
Lewandowski tweets report on Manafort's ties to Ukraine*, The Hill (Aug. 14, 2016),
https://tinyurl.com/yc5dupz2; Nick Gass, *Lewandowski on Manafort firing: 'People think I
won,'* Politico (Aug. 19, 2016), https://tinyurl.com/a6vdpx3h.

[32]  Plaintiff alleges that information regarding "salacious sexual activity" in the Steele Dossier
was "derived from Dolan" and apparently passed through Danchenko to the Dossier.  AC
¶ 114.  This insufficiently pleaded allegation is also no basis for any of Plaintiff's claims:
"These allegations, which have come to be known publicly as the 'salacious and unverified'
portion of the reporting, were not included in the original Carter Page FISA application or any
of the renewal applications."  Ex. 1 at 4 n.7.

### G.   Rodney Joffe, Neustar Security Services, and Neustar, Inc.

*Rodney Joffe.*  Plaintiff has failed to plausibly plead that *Joffe* (or Neustar, Inc. or Neustar Security Services by association)[33] "agreed to the overall objective of the conspiracy" or "agreed to commit two predicate acts."  *Am. Dental Ass'n*, 605 F.3d at 1293.  Stripping away Plaintiff's unsupported legal conclusions, *e.g.*, AC ¶¶ 141–42, 534, 621–624, and conclusory assertions of "coordination" of "[a]ll" acts by the "Clinton Campaign, the DNC, and Perkins Coie," *id.* ¶¶ 5, 134, 172, *none* of the allegations meets Plaintiff's burden to plausibly plead facts showing an *agreement* by Joffe.  Instead, the allegations amount to nothing more than a description of perfectly legitimate connections between Joffe and others, including Joffe's engagement of Perkins Coie and Sussmann as his counsel, *e.g.*, *id.* ¶¶ 113, 134, and Joffe's status as an employee of Neustar during the relevant time period, *id.* ¶ 129.[34]  The remaining assertions, while adorned with inflammatory assertions of "spoofing" of information, *id.* ¶ 142, and the inaccurate assertion that DNS data is "confidential, proprietary, [and] non-public," *id.* ¶ 134, simply show that Joffe, as part of his employment, observed suspicious public DNS data and reported information he obtained to the FBI, *id.* ¶¶ 218–25, and that Joffe operated under a pseudonym, "Max," when dealing with Daniel Jones, *id.* ¶¶ 312–320.  This does not allege a viable predicate act, nor does it show any agreement by Joffe to participate in the alleged conspiracy.  No factual allegation supports that Joffe was aware of or agreed to be involved in a conspiracy with others, like Steele, the FBI employees, or even Clinton.  Moreover, there is no fact pleaded to support Joffe's knowledge of, or involvement, in any other alleged part of the conspiracy, including the Steele Dossier, or any conduct by officials in the Crossfire Hurricane investigation.

---

[33] This argument is likewise applicable to Neustar, Inc. and NSS, as both entities are included in this lawsuit by virtue of Joffe's affiliation with them.  The AC states that "[a]t all relevant times, Joffe was an executive of Neustar" and had access to data through his position at "Neustar."  AC ¶¶ 129–30.

[34] Plaintiff makes the vague assertion that "Joffe was in communication" with unspecified "officials of the Clinton Campaign and/or the DNC."  AC ¶ 131.  This too, fails to plead agreement.

Further, to successfully allege a conspiracy, a complaint must give the court a basis for inferring that defendants were conspiring and not simply engaging in "unknowingly parallel conduct." *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1069 (11th Cir. 2017). In that regard, the Supreme Court and Eleventh Circuit have cautioned courts not to infer an agreement where there is an "obvious alternative explanation." *Am. Dental Ass'n*, 605 F.3d at 1294–95. Even assuming that the AC pleads parallel conduct by different groups of actors (it does not), it completely fails to plead a non-conclusory connection between them. At most, it shows that Joffe and a group of researchers were concerned about the possibility that publicly accessible DNS information suggested a suspicious connection between a presidential candidate and a large Russian bank owned by oligarchs with close ties to Vladimir Putin.

***Neustar and NSS***. The AC is an improper "shotgun pleading" that warrants dismissal with prejudice. *See Barmapov v. Amuial*, 986 F.3d 1321, 1325–26 (11th Cir. 2021). "A district court has the inherent authority to control its docket and ensure the prompt resolution of lawsuits, which includes the ability to dismiss a complaint on shotgun pleading grounds." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018) (quotation marks omitted).

"Shotgun pleadings are flatly forbidden by the spirit, if not the letter of [the Federal Rules] because they are calculated to confuse the [opponent], and the court, so that theories of relief not provided by law . . . can be masked." 986 F.3d at 1324. Improper "shotgun pleadings" come in at least four varieties, including where the complaint "assert[ed] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions." *See Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1321–23 (11th Cir. 2015). Indeed, Plaintiff repeatedly refers to Neustar and NSS as a single entity ("Neustar") or in some combination thereof ("and/or"), while at the same time alleging that they are separate entities. AC ¶¶ 35–36. By asserting claims against multiple Defendants without specifying which Defendant is responsible for which act, neither NSS nor Neustar can respond to Plaintiff's allegations because they cannot "discern what [Plaintiff] is claiming and frame a responsive

pleading." *Weiland*, 792 F.3d at 1320–23. Plaintiff already had one chance to replead.[35] *See Vibe Micro*, 878 F.3d at 1294 (affirming dismissal with prejudice of the shotgun second amended complaint because it did not improve the allegations that were "oftentimes not connected to a particular Defendant or set of Defendants, making it impossible to understand who did what"); *accord Magluta v. Samples*, 256 F.3d 1282 (11th Cir. 2001); *Fox v. Loews Corp.*, 309 F. Supp. 3d 1241, 1249 (S.D. Fla. 2018); *Bently v. Bank of Am., N.A.*, 773 F. Supp. 2d 1367, 1373 (S.D. Fla. 2011). This Court should not provide him with another opportunity to do so.

## CONCLUSION

For the reasons given above, the AC should be dismissed with prejudice.[36]

---

[35] Neustar identified this as one of its grounds for dismissal of the initial complaint. *See* DE 160 at 7–8, n.8. Plaintiff did not oppose Neustar's motion; his "failure to oppose operated as an acknowledgment of these defects." *See Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1358 (11th Cir. 2018).

[36] Pursuant to the Court's June 23, 2022 Order, DE 188, undersigned Defendants also incorporate by reference their previously filed motions to dismiss the initial complaint.

Dated:  July 14, 2022                                    Respectfully submitted,


/s/ David Oscar Markus                          /s/ David E. Kendall
David Oscar Markus                              David E. Kendall (pro hac vice)
MARKUS/MOSS PLLC                                Katherine M. Turner (pro hac vice)
40 NW 3rd Street, PH 1                           Michael J. Mestitz (pro hac vice)
Miami, FL 33128                                 WILLIAMS & CONNOLLY LLP
Tel:  (305) 379-6667                            680 Maine Avenue, S.W.
                                                Washington, DC 20024
                                                Tel:  (202) 434-5000
                                                Fax:  (202) 434-5029
                                                dkendall@wc.com

                            *Attorneys for Defendant Hillary Rodham Clinton*


/s/ Robert P. Trout
Robert P. Trout (pro hac vice)
Paola Pinto (Florida Bar Number 1013933)
SCHERTLER ONORATO MEAD & SEARS
555 13th Street, N.W.
Suite 500 West
Washington, D.C. 20004
Phone:  (202) 628-4155
rtrout@schertlerlaw.com
ppinto@schertlerlaw.com

                        *Attorneys for Defendants HFACC, Inc. and John Podesta*


/s/ Gerald Edward Greenberg                     /s/ Roberta A. Kaplan
Gerald Edward Greenberg                         Roberta A. Kaplan (pro hac vice)
GELBER SCHACHTER & GREENBERG PA                 Shawn G. Crowley (pro hac vice)
One Southeast Third Avenue                       Maximillian L. Feldman (pro hac vice)
Suite 2600                                      KAPLAN HECKER & FINK LLP
Miami, FL 33131-1715                            350 Fifth Avenue, 63rd Floor
(305) 728-0950                                  New York, NY 10118
ggreenberg@gsgpa.com                            212.763.0883
                                                rkaplan@kaplanhecker.com
                                                scrowley@kaplanhecker.com
                                                mfeldman@kaplanhecker.com


     *Attorneys for Defendants Democratic National Committee, DNC Services Corporation, and*
                                *Debbie Wasserman Schultz*

/s/ Eleni Kastrenakes Howard
Eleni Kastrenakes Howard (Fla. Bar No.
0073073)
Howard J. Harrington (Fla. Bar No. 0118719)
AKERMAN LLP
777 South Flagler Drive
Suite 1100, West Tower
West Palm Beach, FL 33401
Telephone:  (561) 653-5000
Fax:  (561) 659-6313
eleni.kastrenakeshoward@akerman.com
jay.harrington@akerman.com

/s/ Nancy E. Hart
Nancy E. Hart (pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
nhart@gibsondunn.com

/s/ F. Joseph Warin
F. Joseph Warin (pro hac vice)
Geoffrey M. Sigler (pro hac vice)
Katherine Moran Meeks (pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
fwarin@gibsondunn.com
gsigler@gibsondunn.com
kmeeks@gibsondunn.com

*Attorneys for Perkins Coie LLP*

/s/ Eugene K. Pettis
Eugene K. Pettis (Fla. Bar #508454)
Debbie P. Klauber (Fla. Bar #55646)
HALICZER, PETTIS & SCHWAMM
One Financial Plaza
100 S.E. 3rd Ave., Seventh Floor
Fort Lauderdale, FL 33394
Tel:  (954) 523-9922

/s/ Reid J. Schar
Reid J. Schar (pro hac vice)
April A. Otterberg (pro hac vice)
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
Tel:  (312) 222-9350

*Attorneys for Defendant Marc Elias*

/s/ Roberto Martinez
Roberto Martínez (Florida Bar No. 305596)
Zachary Lipschultz (Florida Bar No. 123594)
COLSON, HICKS, EIDSON, P.A.
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
(305) 476-7400
bob@colson.com
zach@colson.com

/s/ Sean M. Berkowitz
Sean M. Berkowitz (pro hac vice)
LATHAM & WATKINS LLP
330 N. Wabash, Suite 2800
Chicago, IL 60611
(312) 876-7700
sean.berkowitz@lw.com

/s/ Stephen P. Barry
Stephen P. Barry (pro hac vice)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
stephen.barry@lw.com

/s/ Michael F. Houlihan
Michael F. Houlihan (pro hac vice)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
(617) 880-4642
michael.houlihan@lw.com

*Attorneys for Defendant Michael Sussmann*

/s/ Jonathan Edward Levine
Jonathan Edward Levine (FBN 937711)
Levine & Associates, PLLC
5311 Lee Highway
Arlington, VA 22207
Tel. (703) 525-2669

/s/ George R.A. Doumar
George R.A. Doumar (pro hac vice)
Mahdavi, Bacon, Halfhill & Young PLLC
11350 Random Hills Road, Suite 700
Fairfax, VA 22030
Tel. (703) 352-1300

*Attorneys for Charles Halliday Dolan, Jr.*

/s/ Brian L. Stekloff
Brian L. Stekloff (pro hac vice)
Sarah E. Neuman (pro hac vice)
WILKINSON STEKLOFF LLP
2001 M Street, NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000
bstekloff@wilkinsonstekloff.com
sneuman@wilkinsonstekloff.com

/s/ William R. Barzee
William R. Barzee (Florida Bar No. 158720)
BARZEE FLORES
Courthouse Center, Penthouse One
40 NW Third Street
Miami, FL 33128
Tel: (305) 374–3998
williambarzee@barzeeflores.com

*Attorneys for Defendant Jake Sullivan*

/s/ Andrew J. Ceresney
DEBEVOISE & PLIMPTON LLP
Andrew J. Ceresney (pro hac vice)
Wendy B. Reilly (pro hac vice)
Isabela M. Garcez (pro hac vice)
919 Third Avenue
New York, NY 10022
Tel: (212) 909-6000
aceresney@debevoise.com
wbreilly@debevoise.com
imgarcez@debevoise.com

/s/ William R. Barzee
William R. Barzee (Florida Bar No. 158720)
BARZEE FLORES
Courthouse Center, Penthouse One
40 NW Third Street
Miami, FL 33128
Tel: (305) 374–3998
williambarzee@barzeeflores.com

*Attorneys for Defendant Robert E. Mook*

/s/ Adam S. Fels
Adam S. Fels
FRIDMAN FELS & SOTO PLLC
2525 Ponce de Leon Blvd., Suite 750
Coral Gables, FL 33134
Tel: 305-569-7701
afels@ffslawfirm.com

/s/ Joshua A. Levy
Joshua A. Levy (pro hac vice)
Rachel Clattenburg (pro hac vice)
Kevin P. Crenny (pro hac vice)
LEVY FIRESTONE MUSE LLP
900 17th St. NW, Suite 1200
Washington, D.C. 20006
Tel: 202-845-3215
Fax: 202-595-8253
jal@levyfirestone.com
rmc@levyfirestone.com
kcrenny@levyfirestone.com

*Attorneys for Defendants Fusion GPS, Peter Fritsch, and Glenn Simpson*

/s/ Joshua Berman
Joshua Berman
CLIFFORD CHANCE US LLP
2011 K Street, NW
Washington, D.C. 20006
Tel. (202) 912-5000
Fax (202) 912-6000
Joshua.Berman@CliffordChance.com

/s/ Adam Fels
Adam Fels (Florida Bar No. 0114917)
FRIDMAN FELS & SOTO, PLLC
2525 Ponce de Leon Blvd., Suite 750
Coral Gables, FL 33134
Tel. (305) 569-7701
Afels@ffslawfirm.com

/s/ Benjamin Peacock
Benjamin Peacock
CLIFFORD CHANCE US LLP
New York, New York 10019
Tel. (212) 878-8000
Fax (212) 878-8375
Benjamin.Peacock@CliffordChance.com

*Attorneys for Bruce Ohr and Nellie Ohr*

/s/ Franklin Monsour Jr.
Franklin Monsour Jr. (pro hac vice)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Tel: (212) 506-3512
Fax: (212) 506-5151
fmonsour@orrick.com

/s/ Diana Marie Fassbender
Diana Marie Fassbender (Fla Bar ID #17095)
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street N.W.
Washington, DC 20005-1706
Tel: (202) 339-88533
Fax: (202) 339-8500
dszego@orrick.com

*Attorneys for Igor Danchenko*

/s/ Samantha L. Southall
Samantha L. Southall (pro hac vice)
Pennsylvania Bar No. 80709
BUCHANAN INGERSOLL & ROONEY PC
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102
Tel: (215) 665 8700
Fax (215) 667 8760
samantha.southall@bipc.com

/s/ Jennifer Olmedo Rodriguez
Jennifer Olmedo Rodriguez (Florida Bar No.
605158)
BUCHANAN INGERSOLL & ROONEY PC
2 South Biscayne Blvd., Suite 1500
Miami, Florida 33131
Tel: (305) 347 4080
Fax: (305) 347 4089
jennifer.olmedo-rodriguez@bipc.com

*Attorneys for Defendant Neustar, Inc.*

/s/ John M. McNichols
John M. McNichols (pro hac vice)
Allison S. Eisen (pro hac vice)
Kathryn E. Garza (pro hac vice)
WILLIAMS & CONNOLLY LLP
680 Maine Ave, S.W.
Washington, D.C. 20024
Telephone: (202) 434-5000
Fax: (202) 434-5029
jmcnichols@wc.com

/s/ James E. Gillenwater
James E. Gillenwater (Bar No. 1013518)
GREENBERG TRAURIG P.A.
333 SE 2nd Ave., Suite 4400
Miami, FL 33131
Telephone: (305) 579-0500
Fax: (305) 579-0717
gillenwaterj@gtlaw.com

*Attorneys for Neustar Security Services*

/s/ Edward Soto
Edward Soto (FBN 0265144)
WEIL GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
Telephone: (305) 577-3100
Facsimile: (305) 374-7159

/s/ Steven A. Tyrrell
Steven A. Tyrrell (pro hac vice)
WEIL GOTSHAL & MANGES LLP
2001 M Street, N.W., Suite 600
Washington, D.C. 20036
Telephone: (202) 682-7000
Facsimile: (202) 857-0940

*Attorneys for Rodney Joffe*

## APPENDIX

### Claims Asserted Against Each Defendant

| Claim | Defendants |
|---|---|
| RICO (Count I) | Clinton, Clinton Campaign, DNC, Perkins Coie, Elias, Sussmann, Fusion GPS, and Joffe |
| RICO Conspiracy (Count II) | Clinton, Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta, Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele, Danchenko, Neustar, Inc., Neustar Security Services, and Joffe |
| Injurious Falsehood (Count III) | Clinton, Sullivan, Schultz, Schiff, Danchenko, Sussmann, and Steele |
| Conspiracy to Commit Injurious Falsehood (Count IV) | Clinton, Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta, Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele, Danchenko, Neustar, Inc., Neustar Security Services, and Joffe |
| Malicious Prosecution (Count V) | Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele, Joffe, Comey, Rosenstein, McCabe, Strzok, Page, and Clinesmith |
| Conspiracy to Commit Malicious Prosecution (Count VI) | Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, Joffe, Podesta, Mook, Reines, Comey, McCabe, Rosenstein, Strzok, Page, and Clinesmith |
| Computer Fraud and Abuse Act (Count VII) | Neustar, Inc., Neustar Security Services, Joffe, DNC, Clinton Campaign, Clinton, Perkins Coie, and Sussmann |
| Theft of Trade Secrets (Count VIII) | Neustar, Inc., Neustar Security Services, Joffe, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton |
| Stored Communications Act (Count IX) | Neustar, Inc. and/or Neustar Security Services, and Joffe |
| Agency (Count X) | Clinton |
| Respondeat Superior/Vicarious Liability (Count XI) | Perkins Coie LLP |
| Respondeat Superior/Vicarious Liability (Count XII) | DNC |

| Claim | Defendants |
|---|---|
| Respondeat Superior/Vicarious Liability (Count XIII) | Clinton Campaign |
| Respondeat Superior/Vicarious Liability (Count XIV) | Fusion GPS |
| Respondeat Superior/Vicarious Liability (Count XV) | Orbis Business Intelligence Ltd. |
| Respondeat Superior/Vicarious Liability (Count XVI) | Neustar, Inc and/or Neustar Security Services |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of July, 2022, I caused a copy of the foregoing

Memorandum of Law in Support of Defendants' Motion to Dismiss to be served on all counsel of

record via CM/ECF.  All parties required to be served have been served.

_/s/ David Oscar Markus_
David Oscar Markus

## 227

Defendant Rodney Joffe's Motion to Dismiss for Lack of Personal
Jurisdiction (July 14, 2022)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 2:22-cv-14102-DMM**

DONALD J. TRUMP,

          Plaintiff,

v.

RODNEY JOFFE, et al.,

          Defendants.

**DEFENDANT RODNEY JOFFE'S**
**MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, Rodney Joffe respectfully submits this Motion to Dismiss for lack of personal jurisdiction.[1]

### A.      Plaintiff's Basis for Personal Jurisdiction Hinges on His Flawed RICO Claims

Plaintiff's Amended Complaint expands upon his rambling list of political grievances, but still fails to allege facts sufficient to sustain his claims.  With respect to Rodney Joffe, the Amended Complaint adds inconsequential factual allegations which, even if true, are insufficient to establish a connection to Florida, let alone one that would support the exercise of personal jurisdiction over Joffe.[2]

Yet again, Plaintiff's only plausible basis for personal jurisdiction over Joffe is the statutory personal jurisdiction under Section 1962(d)'s nationwide service of process provision. *Rep. of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997).  But, "Plaintiff['s] RICO claim must survive a 12(b)(6) analysis if it is to serve as the basis for the Court's personal jurisdiction." *Leon v. Continental AG*, 301 F. Supp. 3d 1203, 1231-32 (S.D. Fla. 2017).  For the reasons explained in the Joint Motion, the new factual allegations do little to support any of Plaintiff's claims, and Counts I and II must still fail. *See* Joint Motion.  Without RICO as a basis for personal jurisdiction, all the remaining claims should be dismissed because this Court lacks personal jurisdiction over Joffe, a Virginia resident whose actions relating to this case involved no targeted connection to Florida (and the Amended Complaint does not add any allegation of a connection to Florida).

---

[1] Joffe also joins in the Defendants' forthcoming Joint Motion to Dismiss ("Joint Motion"), which addresses the bases for dismissal under Rule 12(b)(6).

[2] The Amended Complaint also adds Joffe to the substantive RICO count in Count I which, for the reasons set forth in the Defendants' Joint Motion to Dismiss, is deficient, and should be dismissed.

**B.      There is No Remaining Basis for Personal Jurisdiction Over Joffe**

Absent a statutory basis, Plaintiff must establish that this Court has general or specific jurisdiction over Joffe in order to proceed on his remaining claims. *See Prou v. Giarla*, 62 F. Supp. 3d 1365, 1375-76 (S.D. Fla. 2014).[3]  He cannot; so the remaining claims should be dismissed under Rule 12(b)(2).

As an initial matter, Plaintiff has not asserted that general jurisdiction over Joffe is appropriate.  This concession is well-taken, as Joffe is not domiciled in Florida. *See Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780 (2017).

Further, Plaintiff does not adequately allege specific jurisdiction over Joffe.  Although he tries to do so by asserting that "Joffe's acts and omissions . . . arise out of or relate to his conduct in and/or affecting, among other jurisdictions, Florida," *see* Amended Compl. ¶ 37, these generalized, conclusory jurisdictional allegations fail to satisfy Plaintiff's burden of alleging "sufficient facts to make out a *prima facie* case of jurisdiction."  *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009).  Thus, the exercise of specific jurisdiction over Joffe would violate the Due Process Clause of the U.S. Constitution.  *See Melgarejo v. Pysca Panama, S.A.*, 537 F. App'x 852, 860 (11th Cir. 2013).

It is axiomatic that a forum state's exercise of jurisdiction over an out-of-state defendant "must be based on intentional conduct by the defendant that creates the necessary contacts with

---

[3] Like Plaintiff's state law claims (Counts IV-VI), his federal claims under the Computer Fraud and Abuse Act, Defend Trade Secrets Act and the Stored Communications Act (Counts VII-IX) do not have nationwide service of process provisions.  *See Sears Authorized Hometown Stores, LLC v. Nationwide Mktg. Grp., LLC*, 2019 WL 5064731, at *1 (N.D. Ill. Oct. 9, 2019) ("[T]he CFAA and DTSA do not have nationwide service of process," and plaintiff "must establish personal jurisdiction under state law."); *Medici v. Lifespan Corp.*, 239 F. Supp. 3d 355, 367 (D. Mass. 2017) ("Stored Communications Act does not authorize nationwide jurisdiction.").

the forum." *Walden v. Fiore*, 571 U.S. 277, 286 (2014).  It is "insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff." *Id*.  For long-arm jurisdiction in Florida to comport with due process, the plaintiff must show that the defendant engaged in conduct tied to the asserted causes of action by which he "purposely avail[ed himself of] the privilege of conducting activities within Florida" such that he "should reasonably anticipate being haled into court there." *Tarasewicz v. Royal Caribbean Cruises Ltd.*, 2015 WL 3970546, at *19 (S.D. Fla. June 30, 2015).

This standard is not met here.  The Amended Complaint alleges only one attenuated link between the events in question and Florida, and it does not involve conduct by Joffe.  In that regard, Plaintiff alleges that "Clinton appeared on MSNBC's *Morning Joe* . . . when she stated to MSNBC's audience, ***which included the general public of the State of Florida*** and the rest of the United States: 'We don't have Trump as spokesperson for Putin, anymore'" (Amended Compl. ¶ 520) (emphasis added).  This is not an act by Joffe, let alone one allegedly causing injury specifically in Florida, and it therefore does not support the exercise of personal jurisdiction over Joffe.  *See Walden*, 571 U.S. at 286.

The Amended Complaint does not allege—nor could it—that Joffe engaged in intentional conduct in Florida, or conduct that was targeted at Florida.  As in *Walden*, "[i]t is undisputed that no part of [defendant's] course of conduct occurred in [Florida]."  571 U.S. at 288.  Here, Joffe never "traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to [Florida]," *id*. at 289, in connection with the events at issue.  Instead, Joffe's actions are all alleged to have occurred or been targeted at locations *outside* of Florida. Indeed, according to the Amended Complaint, the servers in question relate to the Trump Organization in New York, Trump Tower in New York, and the Executive Office of the President in Washington, D.C., and concern alleged

3

contacts with Alfa Bank in Russia (*e.g.* Amended Compl. ¶ 142). Moreover, there is no basis to assert that Joffe intentionally harmed Plaintiff in Florida because Plaintiff did not live there at the time of Joffe's alleged tortious conduct. At the time of the alleged conduct (2016-2017), Plaintiff resided in New York and did not become a Florida resident until September 27, 2019. *See* Declaration of Domicile, Recorded 10/04/2019 Palm Beach County, Florida. CFN 20190364271 (ECF No. 157-1). Plaintiff's later-acquired residence (and purported injury) in Florida is merely a "random, fortuitous" contact that is insufficient to satisfy due process. *See Walden*, 571 U.S. at 286; *see also Riley v. Cardozo*, No. 3:16-cv-961-J-34MCR, 2017 WL 2799900, at *6 (M.D. Fla. June 28, 2017). And, even if Plaintiff did reside in Florida at the time, it would not permit the exercise of specific jurisdiction over Joffe because "the plaintiff cannot be the only link between the defendant and the forum." *Walden*, 571 U.S. at 285. "[M]ere injury to a forum resident is not a sufficient connection to the forum" to establish specific jurisdiction. *Id*. at 290.

Nor can Plaintiff rely on the *Calder* effects test to establish jurisdiction. *See Calder v. Jones*, 465 U.S. 783 (1984). It is not enough that the information was accessible in Florida. There is no credible allegation that Joffe "targeted" Florida, and no evidence that Joffe had "reason to believe the 'brunt' of Plaintiff's injury would be felt in Florida." *Miller v. Gizmodo Media Grp. LLC*, 383 F. Supp. 3d 1365, 1373 (S.D. Fla. 2019). For these reasons, the remaining claims against Joffe should be dismissed because this Court lacks personal jurisdiction over him.

4

## CONCLUSION

Based on the foregoing, this Court should dismiss Plaintiff's claims against Joffe for lack

of personal jurisdiction.

Dated:  July 14, 2022                                    Respectfully submitted,


                                                         */s/ Edward Soto*
                                                         Edward Soto (FBN 0265144)
                                                         **WEIL GOTSHAL & MANGES LLP**
                                                         1395 Brickell Avenue, Suite 1200
                                                         Miami, FL 33131
                                                         Telephone: (305) 577-3100


                                                         Steven A. Tyrrell, *admitted pro hac vice*
                                                         **WEIL GOTSHAL & MANGES LLP**
                                                         2001 M Street, N.W., Suite 600
                                                         Washington, D.C. 20036
                                                         Telephone: (202) 682-7000


                                                         *Counsel for Rodney Joffe*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 14, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Edward Soto*     
Edward Soto (FBN 0265144)
**WEIL GOTSHAL & MANGES LLP**
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
Telephone: (305) 577-3100
Facsimile: (305) 374-7159

*Counsel for Rodney Joffe*

## CERTIFICATE OF SERVICE

I, David Oscar Markus, counsel for appellees and a member of the Bar of this Court, certify that on June 10, 2024, a copy of the attached Supplemental Appendix was filed with the Clerk through the Court's electronic filing system.  I further certify that all parties required to be served have been served.

/s/ *David Oscar Markus*
DAVID OSCAR MARKUS
*Counsel for Appellees*

JUNE 10, 2024